Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
P.O. Box 300488
Austin, Texas 78705
Telephone: (737) 351-5855
julie.liddell@edtech.law
andrew.liddell@edtech.law

Leonard W. Aragon (*pro hac vice*)
E. Tory Beardsley (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
leonard@hbsslaw.com
toryb@hbsslaw.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EMILY CHERKIN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>Defendant. | Case No.: 3:24-cv-02706-JD<br><br>**DECLARATION OF LEONARD W. ARAGON IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Judge: The Honorable James Donato<br><br><u>Hearing</u><br>Date: April 23, 2026<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |

I, Leonard W. Aragon, declare as follows:

1. I am a partner at the law firm Hagens Berman Sobol Shapiro LLP, and I represent Plaintiffs in the above-captioned litigation. I am an attorney duly licensed to practice in Arizona, and I have been admitted *pro hac vice* in this Court. I submit this declaration in support of Plaintiffs' Motion for Class Certification. I have personal knowledge of the facts stated within this Declaration. If called upon, I could and would testify competently to the facts contained in this Declaration.

2. Attached hereto as **Exhibit 1** is a true and correct copy of PowerSchool's Form 8-K dated October 21, 2024 [PWRSCHL_00006701].

3. Attached hereto as **Exhibit 2** is a true and correct copy of a DPIA Report – PowerSchool SIS [PWRSCHL_00644395].

4. Attached hereto as **Exhibit 3** is a true and correct copy of a DPIA Report – Connected Intelligence [PWRSCHL_00644386].

5. Attached hereto as **Exhibit 4** are true and correct excerpts of the September 18, 2025 Deposition of Christopher Cirillo.

6. Attached hereto as **Exhibit 5** is a true and correct copy of a DPIA Report – Naviance [PWRSCHL_00644472].

7. Attached hereto as **Exhibit 6** is a true and correct copy of a DPIA Report – Schoology Learning [PWRSCHL_00644375].

8. Attached hereto as **Exhibit 7** is a true and correct copy of a DPIA Report – MTSS [PWRSCHL_00646371].

9. Attached hereto as **Exhibit 8** is a true and correct copy of PowerSchool Holdings, Inc.'s Responses and Objections to Plaintiffs' Non-Uniform Interrogatories.

10. Attached hereto as **Exhibit 9** are true and correct excerpts of the December 1, 2025 30(b)(6) Deposition of Darron Flagg.

11. Attached hereto as **Exhibit 10** are true and correct copy of excerpts of a Technology and Architecture presentation [PWRSCHL_00003280].

12. Attached hereto as **Exhibit 11** are true and correct copy of excerpts of a Technology Diligence presentation [PWRSCHL_00004347].

13. Attached hereto as **Exhibit 12** is a true and correct copy of PowerSchool's 2021 Form 10-K [PWRSCHL_00005197].

14. Attached hereto as **Exhibit 13** is a true and correct copy of PowerSchool Holdings, Inc.'s Supplemental Responses and Objections to Plaintiffs' Non-Uniform Interrogatories 1, 4, and 5.

15. Attached hereto as **Exhibit 14** are true and correct excerpts of the June 19, 2025 Deposition of Nicole Shinton.

16. Attached hereto as **Exhibit 15** are true and correct excerpts of the September 26, 2025 Deposition of Paul Brook.

17. Attached hereto as **Exhibit 16** are true and correct excerpts of the September 15, 2025 Deposition of Joseph Swingle.

18. Attached hereto as **Exhibit 17** are true and correct excerpts of the July 2, 2025 Deposition of Mishka McCowan.

19. Attached hereto as **Exhibit 18** are true and correct excerpts of the September 7, 2025 Deposition of Shahzad Ahmad.

20. Attached hereto as **Exhibit 19** is a true and correct copy of a DPIA Report – Analytics and Insight Platform [PWRSCHL_00644311].

21. Attached hereto as **Exhibit 20** is a true and correct copy of a DPIA Report – Behavior Support [PWRSCHL_00644501].

22. Attached hereto as **Exhibit 21** is a true and correct copy of a DPIA Report – Performance Matters Assessment [PWRSCHL_00644447].

23. Attached hereto as **Exhibit 22** is a true and correct copy of an Annual X-Sell/Upsell by Product report [PWRSCHL_00002785].

24. Attached hereto as **Exhibit 23** is a true and correct copy of excerpts an Analyst Day Presentation [PWRSCHL_00425124].

25. Attached hereto as **Exhibit 24** is a true and correct copy of a Hosted PS SIS Customer Info chart [PWRSCHL_00300715].

26. Attached hereto as **Exhibit 25** is a true and correct copy of a Supplemental Contract Incorporating Sourcewell Contract for Procurement of Educational Software and Services from

PowerSchool [PWRSCHL_00007269].

27. Attached hereto as **Exhibit 26** is a true and correct copy of excerpts of the 2022 Booking Raw Data report [PWRSCHL_00231378].

28. Attached hereto as **Exhibit 27** is a true and correct copy of the ByFinanceProduct report [PWRSCHL_00117279].

29. Attached hereto as **Exhibit 28** is a true and correct copy of excerpts of the Booking report [PWRSCHL_00702684].

30. Attached hereto as **Exhibit 29** is a true and correct copy of excerpts of the Clean – from mgmt report [PWRSCHL_00343564].

31. Attached hereto as **Exhibit 30** is a true and correct copy of the SIS Customer Base report [PWRSCHL_00374163].

32. Attached hereto as **Exhibit 31** is a true and correct copy of excerpts of a Request for Proposal Student Information Systems [PWRSCHL_00141839].

33. Attached hereto as **Exhibit 32** is a true and correct copy of a Student Data Privacy Agreement for Seattle School District No. 1 and PowerSchool [PWRSCHL_00007183].

34. Attached hereto as **Exhibit 33** are true and correct excerpts of the August 19, 2025 Deposition of David Concepción.

35. Attached hereto as **Exhibit 34** are true and correct excerpts of the November 24, 2025 Deposition of M.M.C.

36. Attached hereto as **Exhibit 35** are true and correct excerpts of the November 24, 2025 Deposition of L.M.C.

37. Attached hereto as **Exhibit 36** are true and correct excerpts of the August 26, 2025 Deposition of S.G.

38. Attached hereto as **Exhibit 37** is a true and correct copy of excerpts of report1579025626462 [PWRSCHL_00170053].

39. Attached hereto as **Exhibit 38** is a true and correct copy of a September 1, 2021 email [PWRSCHL_00072231].

40. Attached hereto as **Exhibit 39** is a true and correct copy of excerpts of UPDATE – Master

SFDC Report [PWRSCHL_00282149].

41. Attached hereto as **Exhibit 40** is a true and correct copy of excerpts of a data report [PWRSCHL_00001060].

42. Attached hereto as **Exhibit 41** is a true and correct copy of excerpts of a raw data report [PWRSCHL_0000077702].

43. Attached hereto as **Exhibit 42** are true and correct excerpts of the December 5, 2025 Deposition of Judith Jaeger.

44. Attached hereto as **Exhibit 43** is a true and correct copy of excerpts of PS SIS Customers with hosting report [PWRSCHL_00627056].

45. Attached hereto as **Exhibit 44** are true and correct excerpts of the September 12, 2025 Deposition of Emily Cherkin.

46. Attached hereto as **Exhibit 46** is a true and correct copy of PowerSchool's 2024 Terms of Use.

47. Attached hereto as **Exhibit 47** is a true and correct copy of PowerSchool's 2024 Main Services Agreement.

48. Attached hereto as **Exhibit 48** is a true and correct copy of PowerSchool Holdings, Inc.'s Supplemental Responses and Objections to Plaintiffs' Non-Uniform Interrogatories 2, 3, 7, 8.

49. Plaintiff and proposed Class Representatives S.G., by and through her mother, Emily Cherkin, and M.M.C. and L.M.C., by and through their father, David Concepcion, are jointly represented by Hagens Berman Sobol Shapiro LLP ("Hagens Berman") and the EdTech Law Center PLLC ("EdTech Law Center"). The firms have been working cooperatively in litigating this case and have divided this work so that tasks are accomplished efficiently and without duplications and will continue to do so in this case.

50. Each Class Representative, with the assistance of their respective parent, has diligently represented the class by, among other things, (1) answering interrogatories and requests for admissions from Defendant, (2) responding to all requests for production, (3) sitting for in-person depositions, (4) reviewing and approving the class action complaint, (5) responding to all inquiries from their attorneys, and (6) have generally promoted the claims of unnamed Class members at all times.

51. There is ample evidence to identify class members. For example, PowerSchool produced

numerous documents identifying its customers and which products they subscribe to. *See, e.g.*, PWRSCHL_00566064. (containing approximately 108,000 rows of accounts reporting PowerSchool's customers and product subscriptions); PWRSCHL_00702684 (sales spreadsheet with over 300,000 entries identifying customers, products, start/end dates, and booking amounts); PWRSCHL_00077701 (enrollment data for customers broken down by state).

52. To my knowledge, Hagens Berman has no conflicts of interest that would prevent the firm from providing zealous representation to the class representatives and the classes.

53. To my knowledge, Hagens Berman has not represented the Defendant. I was appointed as a Plaintiffs' Steering Committee Member in *PowerSchool Customer Data Security Breach MDL*, a case arising from the large-scale data breach affecting millions of students and educators.

54. I am aware of no practical and economic alternative procedure that is available to the parties that might be used to adjudicate the claims for relief asserted against the Defendant in this action in a fairer or more efficient manner than a class action.

55. My firm is ready, willing, and able to commit the resources required to vigorously litigate this case on behalf of the classes. My firm and I have already expended significant time and effort in researching, investigating and litigating the legal and factual issues in this case. To date Plaintiffs' counsel has: (1) identified and researched the claims giving rise to this case, (2) defeated a motion to dismiss and were able to proceed on the original complaint, (3) defeated a motion to intervene, (4) conducted substantial fact discovery, including all depositions permitted by the Court and the identification, collection, and review of over 110,000 documents from defendants, voluminous ESI productions from plaintiffs, and boxes of hard-copy documents, (5) defended depositions of all putative class representatives, including the in-person deposition of three minors, (6) resolved multiple discovery disputes with Defendant, (7) retained and supervised experts to address issues related to privacy and damages, (8) and have diligently represented the Class's interests.

56. I, and my firm, have extensive experience litigating consumer class actions. Hagens Berman has recovered more than $325 billion in large-scale complex litigation on behalf of consumers. Notable cases include: State Tobacco Litigation, $206 billion; Visa Check/Mastermoney Antitrust Litigation, $25 billion; Volkswagen Emissions Litigation, $14.7 billion; and E-Books Antitrust Litigation, $616 million. Our

track record in taking on the country's most powerful corporations demonstrates a commitment to successfully litigating tough claims and an ability to fund mass litigation. Hagens Berman's record speaks for itself. The firm's experience, resources, and skills, as manifested by its attorneys and staff, are the best representatives for the putative classes.

57. I am the attorney at Hagens Berman responsible for day-to-day management of the case. I have been assisted in this case by Robert B. Carey, the managing partner of the Phoenix office of Hagens Berman, and Whitney K. Siehl, a partner in Hagens Berman's Chicago office. These primary attorneys on the case have substantial experience handling class actions and complex litigation, are well versed in the underlying law, and are prepared to devote whatever additional resources are necessary to see this matter through to fruition. Other attorneys at the firm have assisted with discrete issues, including Tory Beardsley, of counsel in the Phoenix office. Amy Nolan is the primary paralegal assigned to the case. Additional information regarding the qualifications of the attorneys and staff assigned to the case is contained in our firm resume attached as **Exhibit 45.**

58. I am a highly skilled class action attorney, having litigated complex class actions since completing my miliary service and graduating from Stanford Law School almost 25 years ago. I routinely litigate against the largest corporations in the world, including Amazon, Williams-Sonoma, and PowerSchool, and I have helped obtain significant recoveries in marquee cases for the class action bar. Early in my career, for example, I initiated and handled the day-to-day litigation in *In re: NCAA Student-Athlete Name and Likeness Licensing Litigation*, the seminal case that started the revolution against the NCAA's mistreatment of student-athletes that eventually led to the historic $2.6 billion-dollar settlement against the NCAA and its member conferences. *See, e.g.,* https://www.hbsslaw.com/cases/ncaa-student-athlete-name-image-and-likeness. I have also worked closely with the Arizona Attorney General resulting in millions for the State of Arizona in litigation against General Motors, Mercedes-Benz, Robert Bosch LLC, and Volkswagen, and maintain a catastrophic personal injury practice.

59. I also have significant experience in data breach and privacy cases, having helped resolve three nationwide data breach class actions and an MDL alleging an identity theft protection company misled consumers regarding its ability to protect them. *See In re: Valley Anesthesiology Consultants, Inc. Data Breach Litig.* (CV2016-052906); *Liebich v. Maricopa County Community Colleges District* (CV2014-006870); *In re: Banner Health*

*Data Breach Litig.* (CV2016-02696); *In re LifeLock, Inc., Marketing and Sales Practices Litig.* (08-md-1977-PHX-MHM).

60. I have served on the Board of Visitors for Stanford Law School since 2016, taught a class action and complex litigation course at Arizona State University's Sandra Day O'Connor College of Law since 2013, and am routinely asked to speak on issues involving class actions at various law schools and professional legal organizations. For example, I spoke on and hosted a panel at the American Bar Association's 26th Annual National Institute on Class Actions. I am also a contributing author for "A Practitioner's Guide to Class Actions," published by the American Bar Association.

61. Additionally, Whitney K. Siehl, co-leads the firm's data breach, privacy, and cybersecurity practice, and has specialized experience in class actions including data breach, data privacy, and representing students. She is currently collaborating with the court-appointed liaison and coordinating counsel in *In Re: MOVEit Customer Data Breach Security Litigation*, MDL No. 1:23-md-03083-ADB (D. Mass.), which is believed to be the largest data breach MDL in history. Since the onset of the COVID-19 pandemic, Ms. Siehl has represented hundreds of thousands of university students, resulting in more than $28 million in settlements to date, pending court approval. Her other case successes include securing a $215 million fund for USC student survivors of sexual abuse by gynecologist Dr. George Tyndall, *In Re: USC Student Health Center Litigation* (C.D. Cal.), and a $17 million fund for survivors of Harvey Weinstein's sexual abuse. In addition, Ms. Siehl is a leader in the Illinois legal community serving as the President of the Women's Bar Association of Illinois ("WBAI") in 2023-2024, as an Advisory Council Member for the Illinois Supreme Court Commission on Professionalism's Initiative to Eliminate Bullying in the Legal Profession, and was named one of Chicago Law Bulletin Media's 2024 Top Women in Law.

62. Based on the foregoing, I respectfully request that the Court appoint Hagens Berman Sobol Shapiro LLP as one of the Class Counsel for the certified Class(es) under Rule 23(g).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED: February 9, 2026

/s/ Leonard W. Aragon
Leonard W. Aragon

# EXHIBIT 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (date of earliest event reported): October 1, 2024**

# PowerSchool Holdings, Inc.
**(Exact name of Registrant, as specified in its charter)**

| Delaware | 001-40684 | 85-4166024 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification Number) |

| | |
|---|---|
| **150 Parkshore Drive**<br>**Folsom, California** | **95630** |
| (Address of principal executive offices) | (Zip Code) |

**(877) 873-1550**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $0.0001 per share | PWSC | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Introduction**

On October 1, 2024 (the "Closing Date"), PowerSchool Holdings, Inc., a Delaware corporation (the "Company") completed its previously announced merger with BCPE Polymath Merger Sub, Inc., a Delaware corporation ("Merger Sub") and a wholly owned subsidiary of BCPE Polymath Buyer, Inc., a Delaware corporation ("Parent"). Pursuant to the terms and subject to the conditions set forth in the Agreement and Plan of Merger (the "Merger Agreement"), dated as of June 6, 2024, by and among the Company, Parent and Merger Sub, Merger Sub merged with and into the Company (the "Merger"), with the Company surviving such merger as a wholly owned subsidiary of Parent (the "Surviving Corporation"). Parent and Merger Sub are affiliates of investment funds advised by Bain Capital Private Equity, LP ("Bain").

The description of the Merger Agreement and the transactions contemplated by the Merger Agreement (including, without limitation, the Merger) in this Current Report on Form 8-K (this "Current Report") does not purport to be complete and is subject to and qualified in its entirety by reference to the full text of the Merger Agreement, a copy of which is filed as Exhibit 2.1 to the Company's Current Report on Form 8-K filed with the U.S. Securities and Exchange Commission (the "SEC") on June 10, 2024, and incorporated herein by reference.

**Item 1.01. Entry into a Material Definitive Agreement.**

The information set forth in the Introduction to this Current Report (the "Introduction") is incorporated by reference into this Item 1.01.

Concurrently with the closing of the Merger, Parent, as the borrower, and the Company, as a guarantor, entered into that certain Credit Agreement with Ares Capital Corporation as administrative agent and collateral agent, the lenders from time to time party thereto and the guarantors from time to time party thereto (the "Credit Agreement"), which provides for (i) a senior secured term loan facility in an aggregate principal amount of $2,375,000,000 (the "Term Loan"), (ii) a senior secured delayed draw term loan facility in an aggregate principal amount of $500,000,000, and (iii) a senior secured revolving credit facility in an aggregate principal commitment amount of $300,000,000. The obligations under the Credit Agreement are secured on a first priority basis by substantially all assets of the borrower and the guarantors (subject to certain exclusions and exceptions). The Credit Agreement includes representations and warranties, covenants, events of default and other provisions that are customary for facilities of their respective types.

**Item 1.02. Termination of a Material Definitive Agreement.**

The information set forth under Item 2.01 of this Current Report is incorporated by reference into this Item 1.02.

Concurrently with the closing of the Merger, the Company paid all outstanding fees and expenses and terminated all credit commitments outstanding under that certain First Lien Credit Agreement, dated as of August 1, 2018, as amended, amended and restated, supplemented or otherwise modified from time to time, among Severin Acquisition, LLC, the other borrowers and guarantors from time to time party thereto, the lenders from time to time party thereto and Barclays Bank PLC, as administrative agent, and all pledge, security and other agreements and documents related thereto.

**Item 2.01. Completion of Acquisition or Disposition of Assets.**

The information set forth in the Introduction and under Item 3.03, Item 5.01, Item 5.02 and Item 5.03 of this Current Report is incorporated by reference into this Item 2.01.

On October 1, 2024, pursuant to the terms and subject to the conditions set forth in the Merger Agreement, the Merger was completed, with Merger Sub being merged with and into the Company, and the Company surviving the Merger as a wholly owned subsidiary of Parent. At the effective time of the Merger (the "Effective Time"), each issued and outstanding share of Class A common stock, par value $0.0001 per share, of the Company (the "Class A Common Stock") (including each share of Class A Common Stock resulting from the exchange of limited liability company units of PowerSchool Holdings LLC ("LLC Units")), other than (i) any shares of Class A Common Stock held by the Company as treasury stock or owned by Parent or any of its affiliates or subsidiaries (including Merger Sub), in each case as of immediately prior to the Effective Time (the "Owned Company Shares"), (ii) certain shares

of Class A Common Stock (the "Rollover Shares"), which were transferred together with certain LLC Units ("Rollover Units") to BCPE Polymath Topco, LP, a Delaware limited partnership and affiliate of investment funds advised by Bain ("BCPE Topco") and/or its subsidiaries, immediately prior to the Effective Time pursuant to support and rollover agreements entered into in connection with the Merger Agreement and (iii) shares of Class A Common Stock held by holders who have not consented to the adoption of the Merger Agreement in writing and who have properly exercised appraisal rights with respect to their shares in accordance with, and who have complied with, Section 262 of, the General Corporation Law of the State of Delaware (the "Appraisal Shares"), was automatically cancelled, extinguished and converted into the right to receive $22.80 in cash without interest thereon (the "Per Share Price"), after giving effect to any required withholding taxes.

At the Effective Time, pursuant to the terms of the Merger Agreement, each share of Class B common stock, par value $0.0001 per share, of the Company issued and outstanding as of immediately prior to the Effective Time, was automatically cancelled and no payment was made with respect thereto.

Immediately prior to the Effective Time, all Rollover Shares and Rollover Units were transferred to BCPE Topco and/or its subsidiaries and, at the Effective Time, were automatically cancelled without any conversion thereof or consideration paid therefor. In exchange for the delivery of such Rollover Shares and Rollover Units to BCPE Topco and/or its subsidiaries, such holders of the Rollover Shares and the Rollover Units were issued certain equity interests of BCPE Topco and/or its subsidiaries. The aggregate value of the Rollover Shares and the Rollover Units cancelled and exchanged for equity interests of BCPE Topco and/or its subsidiaries at the Effective Time was approximately $1.68 billion.

At the Effective Time, each award of restricted stock units of the Company (the "Company RSUs") that was outstanding and vested immediately prior to the Effective Time or that vested in accordance with its terms as a result of the completion of the Merger (a "Vested Company RSU") was automatically cancelled and converted into the right to receive an amount in cash (without interest and subject to applicable withholding taxes) equal to the product of (i) the Per Share Price and (ii) the total number of shares of Class A Common Stock subject to such Vested Company RSU as of immediately prior to the Effective Time.

At the Effective Time, each award of Company RSUs outstanding immediately prior to the Effective Time that was not a Vested Company RSU (an "Unvested Company RSU") was automatically cancelled and converted into the right to receive an amount in cash (without interest and subject to applicable withholding taxes) equal to the product of (i) the Per Share Price and (ii) the total number of shares of Class A Common Stock subject to such Unvested Company RSU as of immediately prior to the Effective Time (the "Cash Replacement Company RSU Amount"), which Cash Replacement Company RSU Amount will, subject to the holder's continued service through the applicable vesting dates, vest and become payable at the same time as the Unvested Company RSU for which the Cash Replacement Company RSU Amount was exchanged would have vested and been payable pursuant to its terms, and otherwise generally has the same terms and conditions as applied to the Unvested Company RSU for which it was exchanged.

At the Effective Time, each award of market share units of the Company ("Company MSUs") outstanding as of immediately prior to the Effective Time was automatically cancelled and converted into a restricted stock unit award with respect to the common equity in Parent, the Surviving Corporation or one of its subsidiaries or a direct or indirect parent entity of Parent (the "Replacement Company MSU Award"), with the number of shares or units covered by such Replacement Company MSU Award equal to the quotient of (i) the product of (A) the Per Share Price and (B) the total number of shares of Class A Common Stock subject to such Company MSU as of immediately prior to the Effective Time (with the performance factor based on the Per Share Price) and (ii) the fair market value of such share or unit as of the Effective Time. The Replacement Company MSU Award will, subject to the holder's continued service through the applicable vesting dates, vest and settle at the same time as the Company MSUs for which such Replacement Company MSU Award was exchanged would have vested and settled pursuant to its terms, and otherwise generally has the same terms and conditions (including with respect to service-based vesting conditions but excluding any performance-based vesting conditions) as applied to the Company MSU for which it was exchanged.

At the Effective Time, each award of performance share units of the Company ("Company PSUs") outstanding as of immediately prior to the Effective Time was automatically cancelled and converted into a performance stock unit award with respect to the common equity in Parent, the Surviving Corporation or one of its subsidiaries or a direct or indirect parent entity of Parent (the "Replacement Company PSU Award"), with the number of shares or units covered by such Replacement Company PSU Award equal to the quotient of (i) the product of (A) the Per Share

Price and (B) the total number of shares of Class A Common Stock subject to such Company PSU as of immediately prior to the Effective Time (assuming target level of performance) and (ii) the fair market value of such share or unit as of the Effective Time. The Replacement Company PSU Award will, subject to the holder's continued service through the applicable vesting dates and satisfaction of the applicable performance condition applicable to such Company PSUs, vest and settle at the same time as the Company PSUs for which such Replacement Company PSU Award was exchanged would have vested and settled pursuant to its terms, and otherwise generally has the same terms and conditions (including with respect to service-based and performance-based vesting conditions) as applied to the Company PSU for which it was exchanged.

The foregoing description does not purport to be complete and is subject to and qualified in its entirety by reference to the full text of the Merger Agreement, which is included as Exhibit 2.1 to the Company's Current Report on Form 8-K filed with the SEC on June 10, 2024 and is incorporated herein by reference.

A copy of the press release issued by the Company on the Closing Date announcing the completion of the Merger is filed as Exhibit 99.1 to this Current Report and is incorporated by reference into this Item 2.01.

**Item 2.03. Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

The information set forth under Item 1.01 of this Current Report is incorporated by reference into this Item 2.03.

**Item 3.01. Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

The information set forth in the Introduction and under Item 2.01 and Item 3.03 of this Current Report is incorporated by reference into this Item 3.01.

In connection with the completion of the Merger, the Company notified representatives of the New York Stock Exchange ("NYSE") that the Merger had been completed and requested that NYSE suspend trading of the Class A Common Stock on NYSE prior to the opening of trading on October 1, 2024. In addition, the Company requested that NYSE file with the SEC a Notification of Removal from Listing and/or Registration under Section 12(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") on Form 25 to delist and deregister the Class A Common Stock from NYSE. The Company also intends to file with the SEC a Form 15 under the Exchange Act requesting the deregistration of the Class A Common Stock under Section 12(g) of the Exchange Act and suspension of the Company's reporting obligations under Sections 13 and 15(d) of the Exchange Act.

**Item 3.03. Material Modifications to Rights of Security Holders.**

The information set forth in the Introduction and under Item 2.01, Item 3.01, Item 5.01 and Item 5.03 of this Current Report is incorporated by reference into this Item 3.03.

Pursuant to the Merger Agreement and in connection with the completion of the Merger, each share of Class A Common Stock (other than the Owned Company Shares, the Rollover Shares and the Appraisal Shares) was automatically cancelled, extinguished and converted into the right to receive the Per Share Price.

**Item 5.01. Changes in Control of Registrant.**

The information set forth in the Introduction and under Item 2.01, Item 3.03 and Item 5.03 of this Current Report is incorporated by reference into this Item 5.01.

As a result of the completion of the Merger on October 1, 2024, a change in control of the Company occurred, and the Company became a wholly owned subsidiary of Parent.

In connection with the Merger, the aggregate purchase price paid for all outstanding shares of the Company (excluding the Owned Company Shares and the Rollover Shares) was approximately $3.01 billion. The funds used by Parent to consummate the Merger and complete the related transactions came from approximately $1.75 billion of equity contributions from Bain or its affiliates, and approximately $2.38 billion of proceeds received in connection with the Term Loan.

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

The information set forth in the Introduction and under Item 2.01 of this Current Report is incorporated by reference into this Item 5.02.

As a result of the Merger, at the Effective Time, (a) each of Hardeep Gulati, Laurence Goldberg, Maneet S. Saroya, Betty Hung, Gwen Reinke, Zach Levitt, Judy Cotte, Amy McIntosh, Barbara Byrne and Ronald D. McCray resigned from the Board of Directors of the Company (the "Board") and any committees of the Board on which they served and ceased to be directors of the Company, and the directors of Merger Sub immediately prior to the completion of the Merger continued as the directors of the Surviving Corporation; and (b) the officers of the Company immediately prior to the completion of the Merger became the officers of the Surviving Corporation.

**Item 5.03. Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

Pursuant to the terms of the Merger Agreement, at the Effective Time and by virtue of the Merger, the amended and restated certificate of incorporation of the Company, as in effect immediately prior to the Effective Time, was amended and restated in its entirety (the "Second Amended and Restated Certificate of Incorporation"). Immediately after the Effective Time, the bylaws of the Surviving Corporation were amended and restated in their entirety (the "Second Amended and Restated Bylaws").

Copies of the Second Amended and Restated Certificate of Incorporation and Second Amended and Restated Bylaws are filed as Exhibit 3.1 and Exhibit 3.2 to this Current Report, respectively, each of which is incorporated herein by reference.

**Item 8.01. Other Events.**

On October 1, 2024, the Company issued a press release announcing the completion of the Merger. A copy of the press release is furnished as Exhibit 99.1 and is incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description of Exhibit |
|---|---|
| 2.1 | Agreement and Plan of Merger, by and among PowerSchool Holdings, Inc., BCPE Polymath Buyer, Inc., and BCPE Polymath Merger Sub, Inc., dated June 6, 2024 (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed with the SEC on June 10, 2024).* |
| 3.1 | Second Amended and Restated Certificate of Incorporation of PowerSchool Holdings, Inc., dated as of October 1, 2024. |
| 3.2 | Second Amended and Restated Bylaws of PowerSchool Holdings, Inc., dated as of October 1, 2024. |
| 99.1 | Press Release dated as of October 1, 2024. |
| 104 | Cover Page Interactive Data file (embedded within the Inline XBRL document). |

* All schedules to the Merger Agreement have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The Company hereby agrees to furnish supplementally a copy of any omitted schedule to the SEC upon request.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**POWERSCHOOL HOLDINGS, INC.**

Date: October 1, 2024

By: /s/ Eric Shander
Name: Eric Shander
Title: President and Chief Executive Officer

**Exhibit 3.1**

SECOND AMENDED AND RESTATED

CERTIFICATE OF INCORPORATION

OF

POWERSCHOOL HOLDINGS, INC.

1. The name of this corporation is PowerSchool Holdings, Inc. (the "Corporation").

2. The registered office of the Corporation in the State of Delaware is located at 1209 Orange Street, Corporation Trust Center, New Castle County, Wilmington, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company.

3. The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "DGCL").

4. The total number of shares of stock that the Corporation shall have authority to issue is one thousand (1,000) shares of Common Stock, $0.001 par value per share. Each share of Common Stock shall be entitled to one vote.

5. Except as otherwise provided in the provisions establishing a class of stock, the number of authorized shares of any class or series of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the voting power of the corporation entitled to vote irrespective of the provisions of Section 242(b)(2) of the DGCL.

6. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. The size of the Board of Directors shall be determined as set forth in the bylaws of the Corporation, as in effect from time to time (the "Bylaws"). The election of directors need not be by written ballot unless the Bylaws shall so require.

7. In furtherance and not in limitation of the power conferred upon the Board of Directors by law, the Board of Directors shall have power to make, adopt, alter, amend and repeal from time to time the Bylaws of the Corporation, subject to the right of the stockholders entitled to vote with respect thereto to alter and repeal Bylaws made by the Board of Directors.

8. To the fullest extent permitted by law, no director or officer of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages arising from a breach of fiduciary duty as a director or officer, as applicable. If the DGCL or any other law of the State of Delaware is amended after approval by the stockholders of this paragraph to authorize corporate action further eliminating or limiting the personal liability of directors or officers, then the liability

of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL as so amended. Any amendment, repeal or modification of the foregoing provisions of this paragraph by the stockholders of the Corporation shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time of, or increase the liability of any director or officer of the Corporation with respect to, any acts, omissions or other matters of such director or officer occurring prior to, such amendment, repeal or modification.

9. The Corporation shall, to the maximum extent permitted from time to time under the law of the State of Delaware, indemnify and upon request shall advance expenses to any person who is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit, proceeding or claim, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was a director or officer of the Corporation or while a director or officer is or was serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent of any corporation, partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, against expenses (including attorney's fees and expenses), judgments, fines, penalties and amounts paid in settlement incurred in connection with the investigation, preparation to defend or defense of such action, suit, proceeding or claim; provided, however, that the foregoing shall not require the Corporation to indemnify or advance expenses to any person in connection with any action, suit, proceeding or claim initiated by or on behalf of such person or any counterclaim against the Corporation initiated by or on behalf of such person. Such indemnification shall not be exclusive of other indemnification rights arising under any by-law, agreement, vote of directors or stockholders or otherwise and shall inure to the benefit of the heirs and legal representatives of such person. Any person seeking indemnification under this paragraph shall be deemed to have met the standard of conduct required for such indemnification unless the contrary shall be established. The Corporation shall be the indemnitor of first resort for any director or officer who is entitled to indemnification and advancement pursuant to this paragraph (i.e., the Corporation's obligations to indemnify a director or officer shall be primary and any obligation of a current or former third party employer, partnership of which such director or officer is a partner, limited liability company of which such director or officer is a member or affiliate of such director or officer (any such person, an "Indemnitor"), to advance expenses or provide indemnification for the same expenses or liabilities incurred by such director or officer are secondary) and it shall be required to advance the full amount of expenses incurred by such director or officer and shall be liable for the full amount of expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by this certificate of incorporation (or any other agreement between the Corporation and such director or officer), without regard to any rights such director or officer may have against any Indemnitor. The Corporation shall have no right to seek contribution or other reimbursement from any Indemnitor for any payments by the Corporation.

Any amendment, repeal or modification of the foregoing provisions of this paragraph shall not adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification.

10. To the maximum extent permitted from time to time under the law of the State of Delaware, the Corporation renounces any interest or expectancy of the Corporation in, or in being offered an

opportunity to participate in, business opportunities that are from time to time presented to its directors or stockholders. No amendment or repeal of this paragraph shall apply to or have any effect on the liability or alleged liability of any officer, director or stockholder of the Corporation for or with respect to any opportunities of which such director or stockholder becomes aware prior to such amendment or repeal. To the fullest extent permitted by law, any Person purchasing or otherwise acquiring any interest in any shares of capital stock of the corporation shall be deemed to have notice of and to have consented to the provisions of this paragraph. As used herein, "Person" shall mean any individual, corporation, general or limited partnership, limited liability company, joint venture, trust association or any other entity.

11. The books of the Corporation may (subject to any statutory requirements) be kept outside the State of Delaware as may be designated by the Board of Directors or in the Bylaws of the Corporation.

12. If at any time the Corporation shall have a class of stock registered pursuant to the provisions of the Securities Exchange Act of 1934, for so long as such class is so registered, any action by the stockholders of such class must be taken at an annual or special meeting of stockholders and may not be taken by written consent.

13. The Corporation hereby elects not be governed by Section 203 of the DGCL.

[Remainder of Page Intentionally Left Blank]

**Exhibit 3.2**

SECOND AMENDED AND RESTATED BY-LAWS

OF

POWERSCHOOL HOLDINGS, INC.

October 1, 2024

ARTICLE 1.
LAW, CERTIFICATE OF INCORPORATION AND BY-LAWS

These Second Amended and Restated By-laws are subject to the Certificate of Incorporation. In these By-laws, references to law, to the Certificate of Incorporation and to the By-laws mean the law, the provisions of the Certificate of Incorporation and the provisions of the By-laws as in effect from time to time.

ARTICLE 2.
STOCKHOLDERS

2.1 Annual Meetings of Stockholders. The annual meeting of Stockholders for the election of Directors and the transaction of any other business that may properly come before the meeting will be held each year at such date and time, within or without the State of Delaware, as the Board shall determine.

2.2 Special Meetings of Stockholders. Special meetings of Stockholders for the transaction of such business as may properly come before the meeting may be called at any time by order of the Board or by signed, written demand delivered to the Corporation's Secretary by the Stockholders holding together at least a majority of all the shares of the Corporation entitled to vote at the meeting, and will be held at such time and date, within or without the State of Delaware, as may be specified by such order or written demand.

2.3 Place of Stockholders' Meetings. All meetings of Stockholders will be held at the Corporation's principal executive offices, or at any other place specified in the relevant notice of meeting.

2.4 Notice of Stockholders' Meetings. Except as otherwise required or permitted by applicable law, a written notice of the time, date and place of, and the means of remote communications, if any, for, each annual meeting of Stockholders, and a written notice of the time, date, place and purpose or purposes of, and the means of remote communications, if any, for, each special meeting of Stockholders, must be delivered not less than ten (10) nor more than sixty (60) calendar days before the date of the relevant meeting to each Stockholder entitled to vote thereat or entitled to notice thereof by applicable law, by the Certificate of Incorporation or by these By-laws.

Notice of meetings may be given personally, by mail, by any form of electronic transmission to which the Stockholder has consented or by any other manner approved by applicable law, by or at the direction of the Corporation's principal executive officer or secretary. Mailed notices will be deemed to be delivered when deposited in the United States mail, postage

prepaid, directed to the Stockholder at the Stockholder's address as it appears in the records of the Corporation. Notices given in any other manner will be deemed effective when dispatched to the Stockholder's address, email address, telephone number or other number appearing in the records of the Corporation.

Notice of any adjourned session of any meeting of Stockholders need not be given if the time, date and place of, and the means of remote communications, if any, for, the adjourned session was announced at the meeting at which the adjournment was taken; provided, however, that if the adjournment is for more than thirty (30) calendar days, or if, after the adjournment, a new record date is set for the adjourned session, then notice of the adjourned session must be given in the same manner as described above for delivering notices of annual or special meetings of Stockholders.

It will be the duty of each Stockholder to notify the Corporation of his, her or its post office address.

2.5 Waiver of Notice of Stockholders' Meetings. Except where expressly prohibited by applicable law or by the Certificate of Incorporation, no notice of the place, date, time and purpose or purposes of any Stockholders' meeting or any adjourned session of a Stockholders' meeting need be given to a Stockholder if either:

(a) the Stockholder has delivered to the Corporation a written or electronically transmitted waiver of notice, executed at any time either before or after the relevant meeting or adjourned session; or

(b) the Stockholder attends the relevant meeting or adjourned session in person or by proxy without at the beginning of the relevant meeting or adjourned session objecting to the transaction of business at that meeting or adjourned session because it is not lawfully called or convened.

Neither the business to be transacted at nor the purpose of any Stockholders' meeting or adjourned session of any Stockholders' meeting need be specified in any written or electronically transmitted waiver of notice.

2.6 Telephonic Stockholders Meetings. Stockholders may participate in any Stockholders' meeting by means of a conference telephone or any similar communications equipment that enables all persons participating in the meeting to hear each other during the meeting. Participation by these means will constitute presence in person at a meeting.

2.7 Quorum of Stockholders. At any Stockholders' meeting, the presence either in person or by proxy of the holders of record of a majority of the issued and outstanding shares of the capital stock of the Corporation entitled to vote at the meeting will constitute a quorum for that matter. If a quorum is present at an original meeting, then a quorum need not be present at an adjourned session of that meeting. Any meeting may be adjourned from time to time by a majority of the votes properly cast upon the question, whether or not a quorum is present.

Shares of the Corporation's capital stock belonging to the Corporation, or to another corporation if a majority of the shares of the other corporation entitled to vote in the election of Directors is directly or indirectly held by the Corporation, are neither entitled to vote nor may be

counted for quorum purposes; provided, however, that the foregoing will not limit the right of any corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

2.8. Action by Vote or Proxy of Stockholders. At each Stockholders' meeting, every Stockholder will be entitled to vote in person or by proxy appointed by instrument in writing, subscribed by such Stockholder or by such Stockholder's duly authorized attorney-in-fact (but no such proxy may be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period), and, unless the Certificate of Incorporation provides otherwise, will have one vote for each share of stock entitled to vote registered in the name of such Stockholder on the books of the Corporation on the applicable record date fixed pursuant to these By-Laws. At all elections of Directors the voting may, but need not be, by ballot. If a quorum is present at any Stockholders' meeting as regards a matter, then a plurality of votes properly cast for election of any Director will elect that Director, and a majority of the votes properly cast on any matter other than an election of a Director will decide that matter, except when a greater number of affirmative votes is otherwise required by applicable law, by the Certificate of Incorporation or by these By-Laws.

2.9. Action without Stockholders' Meetings. Unless otherwise provided in the Certificate of Incorporation or by applicable law, any action required or permitted to be taken by stockholders for or in connection with any corporate action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, are signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and are filed with the permanent records of the Corporation. Prompt notice of the taking of corporate action without a meeting by less than unanimous written consent must be given to those Stockholders who have not consented in writing.

In the event that the action consented to is such as requires filing a certificate under any provision of the DGCL, the certificate filed will state, in lieu of any statement required concerning a vote of stockholders, that written consent has been given under Section 228 of the DGCL, and that written notice has been given as provided in Section 228 of the DGCL.

2.10 Business at Annual Meetings of Stockholders. The only business that may be conducted at any annual meeting of Stockholders, is any business that has been (x) properly brought before the meeting by or at the direction of the Board, whether by specification in the notice of meeting or otherwise, or (y) properly brought before the meeting by a Stockholder. In order for business to be properly brought before an annual meeting of Stockholders by a Stockholder, in addition to any other applicable requirements, the Stockholder must have provided Advance Written Notice of the business to the Corporation's secretary, which Advance Written Notice must include:

(a) the name and record address of the Stockholder proposing the business;

(b) the number of shares of the Corporation that are beneficially owned by the Stockholder proposing the business, and the date on which those shares were acquired;

(c) a representation that the Stockholder proposing the business is entitled to vote at the meeting;

(d) a representation that the Stockholder proposing the business intends to appear in person or by proxy at the meeting to propose the business; and

(e) a brief description of the business desired to be brought before the meeting, the reasons for conducting the business at the meeting and any material interest that the Stockholder has in the business and the language of the proposal (if appropriate).

If the facts warrant, the Board or the chairperson of the relevant annual meeting of Stockholders may determine and declare that (i) the proposed business does not constitute proper business to be transacted at the meeting or (ii) the proposed business was not properly brought before the meeting in accordance with the provisions of this Section 2.10, in either of which cases the proposed business may not be transacted at the meeting.

2.11 Business at Special Meetings of Stockholders. The only business that may be conducted at any special meeting of Stockholders, is any business within the purpose or purposes described in the notice of meeting (or any supplements thereto) for that special meeting.

2.12 Inspection. At least ten (10) calendar days before every Stockholders' meeting, the person who has charge of the Corporation's stock ledger must make or have made a complete list of the Stockholders, arranged in alphabetical order, and showing the address of each Stockholder and number of shares of the Corporation's capital stock registered in the name of each Stockholder. This list will be open to the examination of any Stockholder, for any purpose germane to the given Stockholders' meeting, during ordinary business hours of the Corporation at the Corporation's principal executive offices for a period of at least ten (10) calendar days before the given Stockholders' meeting. This list will also be produced at the time and place of the given Stockholders' meeting during the whole time thereof, and may be inspected by any Stockholder present.

The stock ledger will be the only evidence as to who are the Stockholders entitled to examine the stock ledger, the list required by this Section 2.12 or the books of the Corporation, or to vote in person or by proxy at any Stockholders' meeting.

## ARTICLE 3.
## BOARD OF DIRECTORS

3.1 General Powers. The Corporation's business and affairs will be managed by, or under the direction of, the Board, which will have and may exercise all powers of the Corporation that are not otherwise reserved for exercise by the Stockholders by applicable law, by the Certificate of Incorporation or by these By-laws.

3.2 Number. The number of Directors constituting the entire Board will be three (3) or such other number as may be fixed from time to time by action of the Stockholders or the Board, unless otherwise specified in the Certificate of Incorporation, one of whom may be selected by the Board to be its Chairperson. The use of the phrase "entire Board" in these By-laws refers to the total number of Directors that the Corporation would have if there were no vacancies.

3.3 Qualification. Each Director must be at least eighteen (18) years of age. A Director need not be a Stockholder, a citizen of the United States or a resident of the State of Delaware.

3.4 Election and Tenure. Directors will be elected at each annual meeting of Stockholders, or, in the interim, by the Board to fill vacancies and newly created directorships, in each case, unless otherwise provided in the Certificate of Incorporation, and will hold office until the next annual meeting of Stockholders, until their successors are elected and qualified or until their earlier death, resignation, removal or disqualification.

3.5 Resignation and Removal. A Director may resign at any time by written or electronically transmitted notice of resignation to the Corporation, and such resignation will take effect upon the receipt thereof by the Chief Executive Officer, President or Secretary of the Corporation, unless otherwise specified in the resignation. Except as may be otherwise provided by applicable law, by the Certificate of Incorporation or by these By-laws, a Director (including persons elected by the Stockholders or the Directors to fill vacancies in the Board) may be removed from office, with or without cause, by the vote of the holders of a majority of the issued and outstanding shares of the particular class or series of the Corporation's capital stock entitled to vote in the election of such Director. The Board may at any time remove any officer either with or without cause. The Board may at any time terminate or modify the authority of any agent.

3.6 Committees. The Board may, by vote of a majority of the Board, create one or more Committees, for any one or more purposes, to the extent lawful, which will have such powers as are determined and specified by the Board in the resolution of appointment.

Each Committee will fix its own rules of procedure, and will meet where and as provided by such rules or by resolution of the Board. Except as otherwise provided by applicable law, the presence of a majority of the then appointed members of a Committee will constitute a quorum for the transaction of business by that Committee, and, in every case in which a quorum is present, the affirmative vote of a majority of the members of the Committee present will be the act of the Committee. Each Committee will keep minutes of its proceedings, and actions taken by a committee will be reported to the Board.

Any action required or permitted to be taken at any meeting of any Committee may be taken without a meeting if all the members of the Committee consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Committee.

In the event any person ceases to be a Director, such person simultaneously therewith will cease to be a member of any Committee.

3.7 Annual Meetings of the Board. Following the annual meeting of Stockholders, the newly elected Board will meet for the purpose of the election of Officers and the transaction of such other business as may properly come before the meeting. Such meeting may be held without notice immediately after the annual meeting of Stockholders at the same place in which such Stockholders' meeting is held.

3.8 Regular Meetings of the Board. Regular meetings of the Board may be held without call or notice at such places within or without the State of Delaware and at such times as the Board may from time to time determine, provided that notice of the first regular meeting following any such determination shall be given to absent directors.

3.9 Special Meetings of the Board. Special meetings of the Board may be held whenever called by the Chairperson of the Board, by the President or the Secretary of the Corporation or by a majority of the Directors then in office. Notice of a special meeting must be given to each Director, unless notice is waived by written or electronically transmitted waiver or by attendance at the relevant meeting without protesting prior thereto or at its commencement the lack of notice. Notice may be given by, or by a person designated by, the Chairperson of the Board, by the President or the Secretary of the Corporation or by any one of the Directors calling the meeting. No notice of any adjourned session of a special meeting will be required. Neither notice of a special meeting nor waiver of notice of a special meeting need specify the meeting's purpose or purposes.

3.10 Place of Board Meetings. Meetings of the Board may be held at any place within or without the State of Delaware, as may be, from time to time, fixed by resolution of the Board, or as may be specified in the notice of meeting.

3.11 Notice of Board Meetings. Whenever notice to Directors is required to be given, notice of the place, date and time and the purpose or purposes of any meeting of the Board will be given to each Director by mailing the same at least five (5) calendar days prior to the date of the meeting, or by electronically mailing or telephoning the same, or by delivering the same personally, not later than one (1) calendar day prior to the date of the meeting.

3.12 Telephonic Board Meetings. Directors may participate in any Board meeting by means of conference telephone or any similar communications equipment that enables all persons participating in the meeting to hear each other during the meeting. Participation by these means will constitute presence in person at a meeting.

3.13 Quorum of Directors. A majority of the total number of Directors then in office will constitute a quorum of Directors for the transaction of any business, except as otherwise provided by applicable law. A majority of the Directors present at any Board meeting, whether or not a quorum is present, may adjourn the meeting from time to time.

3.14 Action by Vote of Directors. The vote of the majority of the Directors present at a meeting at which a quorum is present will be the act of the Board. A Director present at a Board meeting when an action is taken is deemed to have assented to the action unless: (i) the Director objects at the beginning of the meeting, or promptly upon his or her arrival to the meeting, to holding or transacting business at the meeting, (ii) the Director's dissent or abstention from the action taken is entered in the meeting's minutes as reviewed and approved by the Directors or (iii) the Director delivers written notice of his or her dissent or abstention from the action to the presiding officer of the meeting before the meeting's adjournment, or to the Corporation within a reasonable time after the meeting's adjournment. The right of dissent or abstention with respect to any action is not available to a Director who votes in favor of the action.

3.15 Action Without a Board Meeting. Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting if all Directors consent to the action in one

or more writings or electronic transmissions filed with the minutes of proceedings of the Board. Actions taken without a meeting in accordance with this Section 3.15 will be treated for all purposes as actions of the Board.

3.16 Interested Directors and Officers. No contract or transaction between the Corporation and one or more of the Directors or Officers, or between the Corporation and any other corporation, partnership, association or other organization in which one or more of the Directors or Officers are directors or officers or have a financial interest will be void or voidable solely for that reason, or solely because the relevant Director or Officer is present at or participates in the Board or Committee meeting that authorizes the contract or transaction, or solely because the vote of the relevant Director is counted for that purposes, if:

(a) the material facts as to the Director's or Officer's relationship or interest, and as to the contract or transaction, are disclosed or known to the Board or Committee, and the Board or Committee authorizes the contract or transaction by affirmative votes of a majority of the disinterested Directors, even though the disinterested Directors be less than a quorum; or

(b) the material facts as to the Director's or Officer's relationship or interest, and as to the contract or transaction, are disclosed or known to the Stockholders entitled to vote thereon, and the contract or transaction is specifically approved by requisite vote of the Stockholders; or

(c) the contract or transaction is fair to the Corporation as of the time that it is authorized, approved or ratified by the Board, the applicable Committee or the Stockholders.

Interested Directors may be counted in determining the presence of a quorum at a meeting of the Board or of a Committee that authorizes a contract or transaction with an interested Director or Officer.

## ARTICLE 4.
## OFFICERS AND AGENTS

4.1 Election. The Board will elect the Officers, which will include a President and a Secretary, and may include, by election or appointment, a Chief Executive Officer, one or more Vice-Presidents (any one or more of whom may be given an additional designation of rank or function), a Treasurer and such Assistant Secretaries, such Assistant Treasurers and such other Officers as the Board may from time to time deem proper. Each Officer will have such powers and duties as may be prescribed by these By-laws and as may be assigned by the Board, the President or the Chief Executive Officer. The Corporation may also have any agents that the Board from time to time in its discretion chooses.

4.2 Qualification. Any two or more offices of the Corporation may be held by the same person. Any Officer may be a Director or a Stockholder. No Officer need be a Director or a Stockholder, except that the Board's chairperson and vice chairperson, if any, must be Directors.

4.3 Tenure. Each Officer will hold office until his or her successor is elected and qualified, unless a shorter period has been specified by the terms of his or her election, or until his or her earlier death, resignation or removal. The remuneration of all Officers may be fixed by the Board or in such other manner as the Board provides.

4.4 Removal. Any Officer may be removed at any time, with or without cause, by Board resolution. Any agent's authority may be modified or terminated at any time by the Board.

4.5 Resignation. Any Officer may resign at any time upon written notice to the Corporation, and such resignation will take effect upon receipt thereof by the Chief Executive Officer, President or Secretary of the Corporation, unless otherwise specified in the resignation.

4.6 Vacancies. The Board may at any time elect a successor to fill a vacancy occurring in any office. The Board also may leave unfilled for any period a vacancy in any office.

4.7 Compensation. The compensation of all Officers may be fixed by the Board or in such other manner as the Board provides.

4.8 Chairperson of the Board. The Chairperson of the Board of the Corporation, if any, will preside at all meetings of the Board and will have such other powers and duties as may from time to time be assigned by the Board.

4.9 Chief Executive Officer. The Board may designate a Chief Executive Officer. The Chief Executive Officer of the Corporation will have such duties as customarily pertain to that office, including the implementation of the policies of the Corporation as determined by the Board, and will have such other authority as from time to time may be assigned by the Board.

4.10 President. The President of the Corporation will have such duties as customarily pertain to that office, including the general management and supervision of the property, business and affairs of the Corporation, and will have such other authority as from time to time may be assigned by the Board.

4.11 Vice-Presidents. A Vice-President of the Corporation may execute and deliver in the name of the Corporation contracts and other obligations and instruments pertaining to the regular course of the duties of said office, and will have such other authority as from time to time may be assigned by the Board, the Chief Executive Officer of the Corporation or the President of the Corporation.

4.12 Treasurer. A Treasurer of the Corporation will have such duties as customarily pertain to that office, and will have such other authority as from time to time may be assigned by the Board, the Chief Executive Officer of the Corporation or the President of the Corporation.

4.13 Secretary. The Secretary of the Corporation will have such duties as customarily pertain to that office, and will have such other authority as from time to time may be assigned by the Board, the Chief Executive Officer of the Corporation or the President of the Corporation.

4.14 Assistant Officers. Any Assistant Officer of the Corporation will have such powers and duties of the Officer that such Assistant Officer of the Corporation assists, and will have such other authority as from time to time may be assigned by the Board, the Chief Executive Officer of the Corporation or the President of the Corporation.

ARTICLE 5.
STOCK

5.1 Certificates; Signatures. The shares of capital stock of the Corporation will be represented by certificates; provided, however, that the Board may provide by one or more resolutions that some or all of any or all classes or series of the Corporation's stock will be uncertificated shares. Any such resolutions will not apply to shares represented by a certificate until that certificate is surrendered to the Corporation. Notwithstanding the adoption of such a resolution by the Board, each holder of stock represented by certificates, and, upon request, each holder of uncertificated shares, will be entitled to have a certificate, signed by, or in the name of the Corporation, by any two authorized officers of the Corporation, representing the number of shares registered in certificate form. Any and all signatures on any such certificate may be facsimiles. If any Officer, or any transfer agent or registrar of the Corporation, who has signed or whose facsimile signature has been placed upon a certificate has ceased to be an Officer, or a transfer agent or registrar of the Corporation, before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if the signatory were still an Officer, or a transfer agent or registrar of the Corporation, at the issuance date. The name of the holder of record of the shares represented by a certificate, along with the number of such shares and the date of issue, will be entered on the books of the Corporation.

5.2 Transfer of Stock. Upon compliance with provisions restricting the transfer or registration of transfer of shares of stock, if any, the shares of capital stock of the Corporation will be transferable on the books of the Corporation only by the holder of record thereof in person, or by duly authorized attorney, upon surrender and cancellation of certificates for a like number of shares, properly endorsed, and the payment of all taxes due thereon.

5.3 Fractional Shares. The Corporation may, but will not be required to, issue fractions of shares when necessary to effect authorized transactions, or the Corporation may pay in cash the fair value of fractions of shares as of the time when those entitled to receive such fractions are determined, or the Corporation may issue scrip in registered or bearer form over the manual or facsimile signature of an Officer or of an agent of the Corporation, exchangeable as therein provided for full shares, but such scrip will not entitle the holder to any rights of a Stockholder except as therein provided.

Subject to any restrictions set forth in the Certificate of Incorporation, the Board will have power and authority to make all such rules and regulations as it may deem expedient concerning the issue, transfer and registration of certificates representing shares of the Corporation.

5.4 Lost, Stolen or Destroyed Certificates. The Corporation may issue a new certificate in place of any certificate theretofore issued by the Corporation that is alleged to have been lost,

stolen or destroyed, and the Board may require the owner of any lost, stolen or destroyed certificate, or his, her or its legal representative, to provide the Corporation with a bond sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of any certificate, or the issuance of any new certificate.

5.5 Record Date.

(a) In order that the Corporation may determine the Stockholders entitled to notice of or to vote at any Stockholders' meeting or any adjournment thereof, the Board may fix a record date, which record date may not be less than ten (10) nor more than sixty (60) calendar days before the date of such meeting. If no record date is fixed by the Board, the record date for determining Stockholders entitled to notice of or to vote at a Stockholders' meeting will be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of Stockholders of record entitled to notice of or to vote at a Stockholders' meeting will apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting.

(b) In order that the Corporation may determine the Stockholders entitled to consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which date may not be more than ten (10) calendar days after the date upon which the resolution fixing the record date is adopted by the Board. If no such record date has been fixed by the Board, the record date for determining Stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is required by the DGCL, will be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in Delaware by hand or certified or registered mail, return receipt requested, to its principal place of business or to an Officer or an agent of the Corporation having custody of the book in which proceedings of Stockholders' meeting are recorded. If no record date has been fixed by the Board and prior action by the Board is required by the DGCL, the record date for determining Stockholders entitled to consent to corporate action in writing without a meeting will be at the close of business on the day on which the Board adopts the resolution taking such prior action.

(c) In order that the Corporation may determine the Stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the Stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date may not be more than sixty (60) calendar days prior to such action. If no record date is fixed, the record date for determining Stockholders for any such purpose will be at the close of business on the day on which the Board adopts the resolution relating thereto.

5.6 Dividends. Subject to the provisions of applicable law and to the Certificate of Incorporation, the Board may declare dividends upon the Corporation's capital stock at any regular or special Board meeting out of any funds legally available for that purpose, as and when the Board deems expedient.

ARTICLE 6.
RATIFICATION

Any transaction, questioned in any lawsuit on the ground of lack of authority, defective or irregular execution, adverse interest of Director, Officer or Stockholder, non-disclosure, miscomputation or the application of improper principles or practices of accounting, may be ratified before or after judgment, by the Board or by the Stockholders, and, if so ratified, will have the same force and effect as if the questioned transaction had been originally duly authorized. Such ratification will be binding upon the Corporation and the Stockholders, and will constitute a bar to any claim or execution of any judgment in respect of such questioned transaction.

ARTICLE 7.
WAIVER OF NOTICE

Whenever notice is required to be given by applicable law, by the Certificate of Incorporation or by these By-laws, a written waiver thereof, signed by the person or persons entitled to said notice, whether before or after the time stated therein, will be deemed equivalent to notice.

ARTICLE 8.
GENERAL PROVISIONS

8.1 Fiscal Year. The fiscal year of the Corporation will be fixed, and will be subject to change, by the Board. Except as otherwise designated by the Board from time to time, the Corporation's fiscal year will begin on the first day of January and end on the last day of December.

8.2 Corporate Seal. Subject to alteration by the Board, the seal of the Corporation will consist of a flat-faced circular die with the word "Delaware" and the name of the Corporation cut or engraved thereon, together with such other words, dates or images as may be approved from time to time by the Board.

8.3 Bank Accounts. In addition to such bank accounts as may be authorized by the Board, either the primary financial officer or any person designated by the primary financial officer of the Corporation, whether or not an employee of the Corporation, may authorize such bank accounts to be opened or maintained in the name and on behalf of the Corporation as he or she may deem necessary or appropriate.

8.4 Execution of Instruments. The President of the Corporation and the Secretary of the Corporation each will have the power to enter into, execute and deliver, in the name and on the behalf of the Corporation, any deeds, leases, transfers, contracts, bonds, debentures, notes, checks, drafts and other obligations and instruments. In addition, any of the Board, the President of the Corporation and the Secretary of the Corporation may authorize any other person or persons, in

the name and on behalf of the Corporation, to enter into, execute and/or deliver any deeds, leases, transfers, contracts, bonds, debentures, notes, checks, drafts and other obligations and instruments, and such authority may be general or confined to specific instances.

8.5 Voting of Securities. The President of the Corporation, the Secretary of the Corporation and any other person so authorized by the Board, each acting singly, may waive notice of, and may act or appoint one or more other persons to act as the Corporation's proxy or attorney-in-fact at, any meeting of stockholders or owners of other interests of any other corporation or organization whose securities the Corporation holds. The Board, the President of the Corporation and the Secretary of the Corporation also may expressly delegate any of the foregoing powers to any of the other Officers or any of the Corporation's agents.

8.6 Financial Reports. The Board may appoint the primary financial officer, the Secretary of the Corporation or any other Officer to cause to be prepared and furnished to the Stockholders entitled thereto any special financial notice and/or financial statement, as the case may be, that may be required by any provision of applicable law.

8.7 Procedural Provisions. The Board may adopt rules of procedure to govern any Directors' or Stockholders' meetings to the extent not inconsistent with applicable law, the Certificate of Incorporation and these By-laws, as they are in effect from time to time. In the absence of any rules of procedure adopted by the Board, the chairperson of the relevant Board or Stockholders' meeting will make all decisions regarding the procedures for that meeting.

8.8 Forum for Adjudication of Disputes.

(a) Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any Director, Officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation arising pursuant to any provision of the DGCL or the Corporation's Certificate of Incorporation or By-laws or (iv) any action asserting a claim against the Corporation governed by the internal affairs doctrine will be a state or federal court located within the State of Delaware, in all cases subject to the court's having personal jurisdiction over the indispensable parties named as defendants. Any person or entity purchasing or otherwise acquiring any interest in the shares of capital stock of the Corporation will be deemed to have notice of and consented to the provisions of this Section 8.8.

(b) If any Foreign Action is filed in the name of any Stockholder, such Stockholder will be deemed to have consented to (i) the personal jurisdiction of the state and federal courts located within the State of Delaware in connection with any action brought in any such court to enforce Section 8.8(a) above (an "FSC Enforcement Action") and (ii) having service of process made upon such stockholder in any such FSC Enforcement Action by service upon such Stockholder's counsel in the Foreign Action as agent for such Stockholder.

8.9 Maintenance of Books and Records. The Corporation must keep, as permanent records, the minutes of all Board and Stockholders' meetings, the documentation of all actions taken without a Board or Stockholders' meeting and the documentation of all actions taken by a Committee. The Corporation also must maintain appropriate accounting records, and maintain and keep copies of any other documents required by applicable law.

8.10 Copies of Corporate Records. Any person dealing with the Corporation may rely upon a copy of the records of the proceedings, resolutions, votes or written consents of the Board, a Committee or the Stockholders, when certified by any Chairperson of the Board or any of the Officers.

8.11 Headings Not Determinative. The headings contained in these By-laws are for convenience of reference only, and may not affect the meaning or interpretation of these By-laws.

8.12 Inconsistent Provisions. If any provision of these By-laws is or becomes inconsistent with any provision of the Certificate of Incorporation, the DGCL or any other applicable law, then the provision of these By-laws will not be given any effect to the extent of the inconsistency, but will otherwise remain in full force and effect.

8.13 Amendments. These By-laws may be amended as provided in the Certificate of Incorporation, but no amendment will have the effect of diminishing the rights of any person who is or was a Director or Officer as to any acts or omissions taken or omitted prior to the amendment's date of execution.

## ARTICLE 9.
## DEFINITIONS

As used in these By-laws, capitalized terms not otherwise defined herein have the meanings provided to them below:

"Advance Written Notice" means written notice directed to the attention of the Corporation's secretary and delivered to, or mailed and received at, the Corporation's principal executive offices by no later than the deadline set forth in Rule 14a-8(e)(2) or (3), as applicable, under the Securities and Exchange Act of 1934, as amended, or as set forth in any successor rule.

"Board" means the board of directors of the Corporation.

"By-laws" means these By-laws of the Corporation, as amended and in effect from time to time.

"Certificate of Incorporation" means the certificate of incorporation of the Corporation, as amended and in effect from time to time.

"Committee" means a committee of the Board consisting of one or more Directors.

"Corporation" means PowerSchool Holdings, Inc.

"DGCL" means the General Corporation Law of the State of Delaware, as in effect from time to time.

"Director(s)" means one or more directors of the Board.

"Foreign Action" means any action the subject matter of which is within the scope of Section 8.8(a) that is filed in a court other than a court located within the State of Delaware.

"FSC Enforcement Action" has the meaning as set forth in Section 8.8(b).

"Officer(s)" means one or more officers of the Corporation.

"Stockholder(s)" means one or more holders of the Corporation's then issued and outstanding capital stock.

**Exhibit 99.1**

**Bain Capital Completes Acquisition of PowerSchool**

*Transaction supports PowerSchool's next chapter as a private standalone company*

**FOLSOM, Calif. – October 1, 2024** — PowerSchool Holdings, Inc. ("PowerSchool" or the "Company"), a leading provider of cloud-based software for K-12 education, today announced the close of its acquisition by Bain Capital for $22.80 per share in cash, representing a total enterprise value of approximately $5.6 billion.

PowerSchool's software solutions support over 60 million students and over 18,000 customers in more than 90 countries. The Company brings together the best of K-12 educational and operational technology to enhance every step of a student's learning journey.

"We could not be more excited to enter this next phase of PowerSchool's development, which will further its mission of delivering differentiated education software to drive better student outcomes, empower educators, and help districts operate more efficiently," said Hardeep Gulati, Chief Executive Officer of PowerSchool. "Together with Bain Capital, PowerSchool will continue to drive industry-leading innovation, particularly with PowerBuddy, our generative AI platform, and scale our global reach, helping more schools personalize education for every student journey."

"PowerSchool is aligned, throughout its entire organization, to its mission to personalize education and improve learning outcomes. We've had the privilege of seeing the leadership team's dedication to this mission through a world-class product innovation engine," said David Humphrey, a Partner at Bain Capital. "We are thrilled to support PowerSchool's mission and growth as it becomes a private company. This is a significant milestone that builds on PowerSchool's strong foundation and vast potential to deliver the power of its exceptional software solutions to a growing number of administrators, educators, parents, and students worldwide," added Max de Groen, a Partner at Bain Capital.

PowerSchool's common stock will no longer be publicly listed on the New York Stock Exchange, and PowerSchool will continue operations as a privately held company.

As part of the transaction, Vista Equity Partners and Onex Partners have each retained a minority investment in PowerSchool.

"Since our initial investment, PowerSchool has experienced a significant transformation, driven by strong leadership and our partnership with Hardeep," said Monti Saroya, Co-Head of Vista's Flagship Fund and Senior Managing Director. "We are confident that PowerSchool's relentless focus on product innovation—especially through embracing generative AI—and tactical expansion of its capabilities can further enhance education globally in this next phase."

"Supporting Hardeep and PowerSchool in the mission to transform K-12 education through technology has been rewarding and a privilege for Onex," said Laurence Goldberg, Managing Director at Onex Partners. "We are confident in the Company's ability to continue innovating to enhance the learning experience and improve outcomes for students, educators, administrators and parents."

**Advisors**

Goldman Sachs & Co. LLC acted as the exclusive financial advisor, and Kirkland & Ellis LLP served as legal advisor to PowerSchool. Centerview Partners LLC acted as the exclusive financial advisor, and Freshfields Bruckhaus Deringer LLP served as legal advisor to the Special Committee of the PowerSchool Board of Directors. Ropes & Gray LLP acted as legal advisor to Bain Capital.

Debt financing for the transaction was provided by Ares Capital Management, HPS Investment Partners, Blackstone Alternative Credit Advisors, Blue Owl Credit Advisors, Sixth Street Partners, and Golub Capital.

**About PowerSchool**

PowerSchool is a leading provider of cloud-based software for K-12 education in North America. Its mission is to empower educators, administrators, and families to ensure personalized education for every student journey. PowerSchool offers end-to-end product clouds that connect the central office to the classroom to the home with award-winning products including Schoology Learning and Naviance CCLR, so school districts can securely manage student data, enrollment, attendance, grades, instruction, assessments, human resources, talent, professional development, special education, data analytics and insights, communications, and college and career readiness. PowerSchool supports over 60 million students and over 18,000 customers in more than 90 countries, including more than 90 of the top 100 districts by student enrollment in the United States. Learn more at www.powerschool.com.

© PowerSchool. PowerSchool and other PowerSchool marks are trademarks of PowerSchool Holdings, Inc. or its subsidiaries. Other names and brands may be claimed as the property of others.

**About Bain Capital**

Bain Capital, LP is one of the world's leading private multi-asset alternative investment firms that creates lasting impact for our investors, teams, businesses, and the communities in which we live. Since our founding in 1984, we've applied our insight and experience to organically expand into numerous asset classes including private equity, credit, public equity, venture capital, real estate, life sciences, insurance and other strategic areas of focus. The firm has offices on four continents, more than 1,800 employees and approximately $185 billion in assets under management. To learn more, visit www.baincapital.com.

**About Vista Equity Partners**

Vista is a leading global investment firm with more than $100 billion in assets under management as of March 31, 2024. The firm exclusively invests in enterprise software, data and technology-enabled organizations across private equity, permanent capital, credit and public equity strategies, bringing an approach that prioritizes creating enduring market value for the benefit of its global ecosystem of investors, companies, customers and employees. Vista's investments are anchored by a sizable long-term capital base, experience in structuring technology-oriented transactions and proven, flexible management techniques that drive sustainable growth. Vista believes the transformative power of technology is the key to an even better future – a healthier planet, a smarter economy, a diverse and inclusive community and a broader path to prosperity. Further information is available at vistaequitypartners.com. Follow Vista on LinkedIn, @Vista Equity Partners, and on X, @Vista_Equity.

**About Onex Corporation**

Onex invests and manages capital on behalf of its shareholders and clients across the globe. Formed in 1984, we have a long track record of creating value for our clients and shareholders. Our investors include a broad range of global clients, including public and private pension plans, sovereign wealth funds, insurance companies, family offices and high-net-worth individuals. In total, Onex has $49 billion in assets under management, of which $8.5 billion is Onex' own investing capital. With offices in Toronto, New York, New Jersey and London, Onex and its experienced management teams are collectively the largest investors across Onex' platforms.

Onex is listed on the Toronto Stock Exchange under the symbol ONEX. For more information on Onex, visit www.onex.com. Onex' security filings can also be accessed at www.sedarplus.ca.

**Contacts**

For PowerSchool:

Investor Relations
Shane Harrison
investor.relations@PowerSchool.com
855-707-5100

Media Relations
Beth Keebler
public.relations@powerschool.com
503-702-4230

For Bain Capital:

Charlyn Lusk/Scott Lessne
646-502-3549/646-502-3569
clusk@stantonprm.com/slessne@stantonprm.com

For Vista Equity Partners:

Brian W. Steel
media@vistaequitypartners.com
212-804-9170

---

For Onex Corporation:

Jill Homenuk
shareholderrelations@onex.com
416-362-7711

Source: PowerSchool Holdings, Inc.

# EXHIBIT 2

# SUBMITTED UNDER SEAL

# EXHIBIT 3

# SUBMITTED UNDER SEAL

# EXHIBIT 4

# SUBMITTED UNDER SEAL

# EXHIBIT 5

# SUBMITTED UNDER SEAL

# EXHIBIT 6

# SUBMITTED UNDER SEAL

# EXHIBIT 7

# SUBMITTED UNDER SEAL

# EXHIBIT 8

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, California 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Rachael A. Rezabek
Ethan Joel Levinton (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
oliva.adendorff@kirkland.com
rachael.rezabek@kirkland.com
ethan.levinton@kirkland.com

*Attorneys for Defendant*
*PowerSchool Holdings, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EMILY CHERKIN, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>Defendant | CASE NO. 3:24-CV-02706-JD<br><br>**POWERSCHOOL HOLDINGS, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' NON-UNIFORM INTERROGATORIES** |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendant PowerSchool Holdings, Inc. ("PowerSchool") hereby responds and objects to Plaintiffs' First Set of Non-Uniform

Interrogatories, as well as the Definitions and Instructions incorporated therein (collectively the "Interrogatories" and individually the "Interrogatory"), which were served on PowerSchool on September 13, 2024.

## GENERAL OBJECTIONS AND CONDITIONS

The following General Objections and Conditions apply to each Interrogatory set forth below. Each Objection and Condition is hereby incorporated into the Response to each individually numbered Request as if fully set forth therein:

1. PowerSchool objects to the definitions of the following terms:

(a) PowerSchool objects to the definitions of "And" and "or" insofar as they request PowerSchool to interpret words contrary to their plain meaning.

(b) PowerSchool objects to the definitions of "Documents" and "All documents" to the extent the definitions purport to supersede the parties' agreed-upon forthcoming ESI Protocol or Stipulated Protective Order, including insofar as the definitions require production of exact duplicates. PowerSchool will interpret "Documents" and "All documents" consistent with the parties' forthcoming ESI Protocol and Stipulated Protective Order.

(c) PowerSchool objects to the definition of "Category of data" to the extent it attempts to impose an obligation to produce documents derivative of other documents until "the smallest discrete data element" is identified for any data referenced by such documents. PowerSchool further objects to the definition as overly broad to the extent that it includes data that is not Personally Identifiable Information ("PII"). PowerSchool agrees to confer with Plaintiffs as to a reasonable definition of this term.

(d) PowerSchool objects to the definition of "Communication(s)" as vague, ambiguous, overly broad, unduly burdensome, and disproportionate to the needs of discovery to the extent it purports to require PowerSchool to reference all forms of communications, regardless of burden and relevance. PowerSchool will interpret "Communication(s)" consistent with the parties' forthcoming ESI Protocol and Stipulated Protective Order and will only review such records as identified through a reasonable search.

(e) PowerSchool objects to the definitions of "Defendant" and "You" to the extent they refer to third parties, including any entity not controlled by PowerSchool and "person[s] … purporting to act on [PowerSchool's] behalf." PowerSchool further objects to the definitions of "You" and "Defendant" as vague, ambiguous, overly broad, unduly burdensome, and disproportionate to the needs of discovery to the extent that they purport to include entities other than PowerSchool. PowerSchool will interpret "Defendant" and "You" to include PowerSchool, its wholly owned subsidiaries, branches, divisions, officers, directors, employees, representatives, and persons acting on its behalf. PowerSchool further objects to the extent the definition seeks documents or information not within the direct possession or custody of PowerSchool and its employees, and objects to the extent documents are sought beyond that scope.

(f) PowerSchool objects to the definition of "Data" to the extent the definition covers types or categories of data not alleged to have been wrongfully collected, processed, or shared in the Plaintiffs' complaint, ECF No. 1 (the "Complaint"). PowerSchool further objects to the extent the definition concerns data not within PowerSchool's possession, custody, or control. PowerSchool further objects to the definition as overly broad to the extent that it includes data that is not PII. PowerSchool will interpret "Data" to mean, collectively, Customer Data, Collected Data, and Transaction Data, as those terms are defined in PowerSchool's Global Privacy Statement, available at https://www.powerschool.com/privacy/, and will respond as to the products and solutions offered to schools or school districts as alleged in the Complaint.

(g) PowerSchool objects to the definition of "Parent" or "parents" as overly broad to the extent it includes the parents who may not have legal custody over their child(ren) and parents or legal guardians of students who have not used the PowerSchool products or services purchased by schools or school districts at issue in the Complaint. PowerSchool will interpret "Parent" or "parents" to include only individuals who have legal custody over an individual attending grades K-12 in a public institution and who used PowerSchool products or services identified in the Complaint.

(h) PowerSchool objects to the definition of "Student" or "students" as overly broad in that it includes students who have not used the PowerSchool products or services at issue in the Complaint. PowerSchool will interpret "Student" or "students" to include only an individual attending grades K-12 in a public institution and who used PowerSchool products or services purchased by schools or school districts as alleged in the Complaint.

(i) PowerSchool objects to the definition of "Third-party" as vague and ambiguous insofar as it includes persons or entities with whom PowerSchool has no contractual relationship, as the definition as written encompasses prospective partners. PowerSchool will interpret the term "Third-party partners" to include only the entities identified in the Complaint: EAB, Capture, Finalsite, K12 Bloom, August Schools, Harvest Technology Group, and Career Key.

2. PowerSchool objects to the Interrogatories to the extent they require PowerSchool to respond with information within the "custody, control or possession of [PowerSchool's] investigators, accountants, consultants, employees, attorneys or other agents" because such requests would require PowerSchool to (i) divulge information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, immunity, or protection ("privileged information") and (ii) muster all its evidence and conduct third-party discovery at the outset of this litigation. PowerSchool will not divulge any privileged information, and it will respond only with information presently available to it based on the limited investigation and discovery conducted to date.

3. PowerSchool objects to the Interrogatories to the extent they seek to impose on PowerSchool any duty or obligation that is inconsistent with or in excess of those that are imposed by the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, or any other applicable rule, court order, or case law. PowerSchool will respond to the Interrogatories in the manner required by the Federal Rules of Civil Procedure and any other applicable rule or case law. PowerSchool objects to Plaintiffs' attempt to impose an obligation to identify documents with any greater specificity than is necessary for Plaintiffs to locate said documents.

4. PowerSchool objects to Instruction No. 4 because it attempts to impose an obligation to identify documents with any greater specificity than is necessary for Plaintiffs to locate said person.

Where PowerSchool identifies a document or person in response to an Interrogatory, it will provide only the reasonable information necessary and sufficient to locate such document or person.

5. PowerSchool objects to Instruction No. 5 because it attempts to impose an obligation to identify people with knowledge to support an objection based on privilege. PowerSchool will not engage in discovery on discovery at this juncture.

**SPECIFIC RESPONSES AND OBJECTIONS**

Consistent with the foregoing General Objections and Conditions, and further subject to any specific objections made in connection with each of the below-numbered Interrogatories, PowerSchool responds to the Interrogatories as follows:

**INTERROGATORY NO. 1:**

Identify each of YOUR "Products & Solutions," as those terms are used or have been used on YOUR website www.powerschool.com, that collects DATA, uses DATA, or discloses DATA to SCHOOLS or any THIRD PARTY.

**RESPONSE TO INTERROGATORY NO. 1:**

PowerSchool objects to this Request to the extent that it incorrectly contends that PowerSchool "collects" student data as opposed to processing such data on behalf of schools and/or school districts. PowerSchool will respond by identifying its "Products & Solutions," as those terms are used or have been used on PowerSchool's website www.powerschool.com.

PowerSchool further objects to this Request to the extent it seeks information relating to issues beyond the scope of this litigation and that is, thus, irrelevant. In particular, PowerSchool objects to the term "Data" as vague and ambiguous and overbroad, including insofar as it encompasses "Data" unrelated to Students or Parents who use PowerSchool products. PowerSchool will interpret "Data" to mean, collectively, Customer Data, Collected Data, and Transaction Data, as those terms are defined in PowerSchool's Global Privacy Statement, available at https://www.powerschool.com/privacy/, and to the extent such Data is applicable to Students and Parents.

As limited by the foregoing General Objections and Conditions, PowerSchool identifies the following "Products & Solutions," other than those that do not relate to Student or Parent Data:

- PowerSchool SIS
- Document Management
- Ecollect Forms
- Enrollment
- Enrollment Express
- Special Programs
- Schoology
- Performance Metrics
- Curriculum & Instruction
- ContentNav
- MTSS
- Attendance Intervention
- Behavior Support
- Naviance
- Headed2
- Connected Intelligence P20W
- Perform
- Student Analytics
- Risk Analysis
- Student Readiness Analytics
- Predictive Enrollment Analytics
- MyPowerHub
- SchoolMessenger Communicate
- SafeArrival
- PermissionClick
- PowerBuddy.

**INTERROGATORY NO. 2:**

For each product or solution identified in response to Interrogatory Request No.1 identify each CONTRACT you contend governs the relationship between YOU and a user of that product or solution, the effective date of each CONTRACT, and the termination date, if any, of each CONTRACT.

**RESPONSE TO INTERROGATORY NO. 2:**

PowerSchool incorporates by reference its Responses and Objections to Interrogatory No. 1. PowerSchool further objects to this Interrogatory because it is requesting discrete pieces of information on each of 26 products and solutions, and thus constitutes 26 separate interrogatories. *See Am. Bankers Ins. Co. of Fla. v. Nat'l Fire Ins. Co. of Hartford*, No. 4:19-cv-02237-HSG (KAW), 2020 WL 8996760, at *1-2 (N.D. Cal. July 9, 2020) (interrogatories requiring party to state, from four insurance policies, a quote of certain contract language and page number of certain provision, counted as eight separate interrogatories); *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 474-75 (N.D. Cal. 2004) (holding that a single interrogatory asking information about 26 allegedly infringing products constituted as 26 interrogatories). Thus, Interrogatory No. 2 requires PowerSchool to respond to a number of interrogatories that is far above the default limit of 25 interrogatories, which has not been extended by agreement or court order. *See* ECF No. 51; Fed. R. Civ. P. 33. Nevertheless, PowerSchool will meet and confer with Plaintiffs about this Interrogatory and is preparing a workable definition of "CATEGORY OF DATA" which is consistent with the scope of this litigation, pursuant to the parties' October 31, 2024 meet and confer.

**INTERROGATORY NO. 3:**

For each product or solution identified in response to Interrogatory Request No. 1 identify each CATEGORY OF DATA collected by each product or service, and for each such CATEGORY OF DATA identify:

a) your educational interest in that CATEGORY OF DATA,

b) each THIRD PARTY to whom that CATEGORY OF DATA is disclosed, shared, sold, or otherwise used by, and

c) why you collect that CATEGORY OF DATA.

**RESPONSE TO INTERROGATORY NO. 3:**

PowerSchool incorporates by reference its Responses and Objections to Interrogatory No. 1. PowerSchool objects to this Interrogatory because between the body of the Interrogatory and its three enumerated subparts, it seeks 4 discrete pieces of information on each of 26 products and solutions unrelated to the primary question and thus constitute 104 separate interrogatories. *See Am. Bankers*, 2020 WL 8996760, at *1-2 (interrogatories requiring party to state, from four insurance policies, a quote of certain contract language and page number of certain provision, counted as eight separate interrogatories); *Collaboration Properties*, 224 F.R.D. at 474-75 (holding that a single interrogatory asking information about 26 allegedly infringing products constituted as 26 interrogatories). Even if Plaintiffs had not served any other Interrogatories in this case, responding to Interrogatories Nos. 1-3 would require PowerSchool to respond to interrogatories far above the permitted limit. *See* ECF No. 51; Fed. R. Civ. P. 33(a)(1). This is overly burdensome and wholly disproportionate to the needs of the case.

The foregoing objections are compounded by Plaintiffs' overly broad and unreasonable definitions, including as to "CATEGORY OF DATA," which purports to require PowerSchool to identify not only the type of data ingested into PowerSchool products (e.g., "demographic information") but also the particular types of information that schools have actually inputted into such fields (e.g., "name, date of birth, gender, home address…"). *See* Pls.' Interrog. at 2 ¶ 9. By way of illustration, Plaintiffs allege that PowerSchool's "products have been deployed in more than 90 of the largest 100 districts … in the U.S." ECF No. 1, Compl. ¶ 36. Responding to the Interrogatory as to these 90 district alone could require PowerSchool to access and review how each data field in 26 products was utilized by over 90 schools and then, for each such piece of data, review contracts, agreements, directives, or otherwise to assess, *inter alia*, compliance with federal and state law of the relevant jurisdiction (including FERPA) as required by subpart (a); identify every vendor, substitute teacher, or independent contractor the school chose to disclose the information to as required by subpart (b); and detail PowerSchool's precise reason enabling such data to be ingested as required by subpart (c).

PowerSchool additionally objects to this Request to the extent that it incorrectly contends that PowerSchool "collects" student data as opposed to processing such data on behalf of schools.

Accordingly, Interrogatory No. 3 is unduly broad and unreasonable, and Plaintiffs cannot avoid the limitations on the number of interrogatories by asking PowerSchool to list products in one interrogatory and then cross reference PowerSchool's responses to ask for a summation of all its documents and communications about each such product in every circumstance. Nevertheless, PowerSchool will meet and confer with Plaintiffs about this Interrogatory.

**INTERROGATORY NO. 4:**

Identify each tracking technology (including but not limited to cookies, pixels, and browser fingerprints) that YOU use or have ever used in order to allow YOU or a THIRD PARTY to identify or partially identify a user of YOUR website, products, or solutions (including identifying a user's browser or device), which websites, products, and solutions include YOUR tracking technology or tracking technologies belonging to a THIRD PARTY, and for each tracking technology so identified, provide:

a) the products and solutions into which the tracking technology was implemented, and

b) for each product or solution so identified, provide:

1. the provider of the tracking technology,
2. the date the tracking technology was first implemented into that product or solution,
3. the reason or reasons for implementing the tracking technology into that product or solution,
4. the categories of information collected by each tracking technology implemented into that product or solution,
5. whether the implementation of the tracking technology has been discontinued, and
6. if so, the date the tracking technology was discontinued and
7. the reason or reasons for discontinuing the tracking technology.

**RESPONSE TO INTERROGATORY NO. 4:**

PowerSchool objects to Interrogatory No. 4 because the term "tracking technology" is undefined. PowerSchool will interpret the term to refer to "cookies, pixels, and browser fingerprints." PowerSchool further objects to Interrogatory No. 4 to the extent Plaintiffs conditioned the definition on information outside of PowerSchool's possession, custody, or control, such as by requiring PowerSchool to determine whether Third Parties used any cookie, pixels, or browser fingerprints to identify users.

PowerSchool will respond by identifying all cookies, pixels, and browser fingerprints that PowerSchool implemented or allowed to be implemented.

PowerSchool further objects to the term "website" insofar as it refers to www.powerschool.com as unduly burdensome, disproportionate to the needs of the case, and seeking information relating to issues beyond the scope of this litigation and that is, thus, irrelevant. The website, www.powerschool.com, is hosted for customer marketing purposes and is not intended for use by students or parents. PowerSchool will interpret the term "website" as referring to its products and solutions websites intended for use by students or parents.

PowerSchool further objects to subparts (b)(2)-(7) because these subparts seek detail on discrete subjects with respect to each of the cookies, pixels, or browser fingerprints that are not factually subsumed within and necessarily related to the primary question, and thus count as separate interrogatories per discrete subpart. *See Am. Bankers*, 2020 WL 8996760, at *1-2 (interrogatories requiring party to state, from four insurance policies, a quote of certain contract language and page number of certain provision, counted as eight separate interrogatories); *Collaboration Properties*, 224 F.R.D. at 474-75 (holding that a single interrogatory asking information about 26 allegedly infringing products constituted as 26 interrogatories).

As limited by the foregoing, PowerSchool responds that it is not aware of any tracking technology implemented in PowerSchool's products and solutions, including products and solution websites intended for use by students or parents, that PowerSchool implemented in order to allow it or a Third Party to identify or partially identify a user of PowerSchool's products and solutions, including products and solution websites intended for use by students or parents.

**INTERROGATORY NO. 5:**

Identify each THIRD PARTY with whom YOU share, disclose, or otherwise allow to use DATA, and for each third party so identified, identify:

a) all CONTRACTS governing your relationship with that THIRD PARTY,

b) the categories of DATA that YOU share with that THIRD PARTY, and

c) the purposes for which you share each CATEGORY OF DATA with that THIRD PARTY.

**RESPONSE TO INTERROGATORY NO. 5:**

PowerSchool objects to this Interrogatory as seeking information outside of PowerSchool's possession, custody, or control. Certain contracts between PowerSchool and its customers entitle the customer determine when and how to make any data available to any other third party, and such contracts speak for themselves. PowerSchool will answer the Interrogatory based on its knowledge only.

PowerSchool additionally objects to this Interrogatory to the extent that it incorrectly contends that PowerSchool "collects" student data as opposed to processing such data on behalf of schools. PowerSchool further objects to the phrase "share, disclose, or otherwise allow to use DATA," because it implies that PowerSchool can unilaterally transfer student data to Third Parties. PowerSchool's uptake, storage, disclosure, and use of Data is governed by the individual contracts with and direction of each of its educational customers.

As limited by the foregoing general and specific objections, PowerSchool identifies EAB, Capture, Finalsite, the following members of PowerSchool's Partner Program, which include partners whose applications can be integrated with PowerSchool applications, and its data vendors and data subprocessors:

1. 911 Inform
2. Abnormal Security
3. Access411
4. Ann Education
5. AttendanceK12
6. August Schools
7. AWS
8. BatOnRoute
9. BenchPrep
10. Blocksi
11. Bloomz

12. Book Systems
13. Britannica
14. BusBoss
15. Canva
16. Career Key
17. Carnegie Learning
18. CENTEGIX
19. CenterPoint Education Solutions
20. Class Solver
21. ClassHook
22. ClickView
23. Code.org
24. Common App
25. CypherWorks
26. DiscoveryEd
27. e~Funds for Schools
28. EBSCOed, powered by Stacks
29. Edgenuity
30. Edlio
31. Edsby
32. Education Advanced
33. Educational Impact
34. Educational Vistas
35. EduHealth
36. EduTrak
37. Experian
38. EZSchoolPay
39. Faria Education Group

40. FIS Global
41. Goodheart-Wilcox
42. Great Minds
43. Harvest Technology Group
44. Heartland MySchoolBucks
45. Horizon Education
46. Hubbe Inc.
47. Human eSources
48. i3 Education
49. identiMetrics
50. Impero Software
51. interviewstream
52. InTouch Receipting
53. ISTE
54. JASON Learning
55. K12 BLOOM
56. Kami
57. KEV Group
58. KIDaccount
59. KnowBe4
60. Level Data
61. Lincoln Learning
62. Linq
63. LunchTime
64. Magic Wrighter
65. Magnus Health
66. Marcia Brenner Associates
67. MasteryPrep

68. McGraw-Hill Education
69. Meals Plus
70. Meet the Teacher
71. Microsoft Education
72. MobileServe
73. Monsido Powered by Acquia
74. NoRedInk
75. Ocean Youth Academy
76. Orah
77. Park Bench evScheduler
78. Park Bench Visual PST
79. Partnership to End Addiction
80. PCS Revenue Control
81. Pear Deck
82. PickUp Patrol
83. Pickup Pro
84. PrimeroEdge K-12 Child Nutrition Software
85. QuestSim
86. Raptor Technologies
87. Rave Mobile Safety
88. Reach Student Life Management
89. RevTrak
90. Roadtrip Nation (RTN)
91. RYCOR
92. Savvas
93. ScholarChip
94. School Dismissal Manager
95. SchoolCheckIn

96. SchoolDay.AI
97. SchoolPass
98. SchoolSoft
99. SchoolSoft Conference Manager
100. SchoolSoft Permission Form Manager
101. Scribbles
102. Seity Health
103. Shmoop
104. Sight On Scene
105. Skooli
106. Slooh
107. SNAP Health Center
108. Spark Hire
109. STEMscopes
110. Stepwell
111. Stronge and Associates Educational Consulting, LLC
112. Student Provisioning Services
113. Studyo
114. Stukent
115. SwipeK12
116. TES Software
117. The Danielson Group
118. Thrive Compass
119. TimeClock Plus
120. Tools4ever
121. TurnItIn
122. Vanco
123. Visitu

124. Vizor

125. Welfie

126. Writable

127. x2VOL Powered by intelliVOL

128. Amazon

129. Twilio

130. Fivetran

131. Oracle

132. Snowflake

133. Qlik

134. Microsoft Azure

135. SmaRTY

136. Mailgun

137. AuthO

138. Common Application

139. Parchment

140. Scribbles

141. Render

142. Make.com

143. Mandrill

144. HireRight

145. Accurate

146. Cognos

147. Gainsight

148. PostMark

149. Vanco

150. PostMark

151. Bandwidth

PowerSchool objects to subparts (a), (b), and (c) of this Interrogatory because each seek different information on each of the 151 third parties unrelated to the primary question and thus constitute as many as 453 separate interrogatories. *See Am. Bankers*, 2020 WL 8996760, at *1-2 (interrogatories requiring party to state, from four insurance policies, a quote of certain contract language and page number of certain provision, counted as eight separate interrogatories); *Collaboration Properties*, 224 F.R.D. at 474-75 (holding that a single interrogatory asking information about 26 allegedly infringing products constituted as 26 interrogatories). When coupled with other Interrogatories responded to herein, Interrogatory No. 5 requires PowerSchool to respond to a number of interrogatories that is far above the default limit or even the limit that Plaintiffs seek to impose in this case. *See* ECF No. 40, Joint Case Management Statement 5. This is overly burdensome and wholly disproportionate to the needs of the case.

The foregoing objection is compounded by Plaintiffs' overly broad and unreasonable definitions, including as to "CATEGORY OF DATA," which purports to require PowerSchool to identify not only the type of data ingested into PowerSchool product (e.g., "demographic information") but also the particular types of information actually the schools inputted into such field (e.g., "name, date of birth, gender, home address…"). *See* Pls.' Interrog. at 2 ¶ 9. By way of illustration, Plaintiffs allege that PowerSchool's "products have been deployed in more than 90 of the largest 100 districts … in the U.S." ECF No. 1, Compl. ¶ 36. Responding to the Interrogatory as to these 90 districts alone would require PowerSchool to determine which schools asked PowerSchool to integrate which of the foregoing 151 partners, what line of information each such school enabled each such partner to access, and what purpose such data access services.

Accordingly, Interrogatory No. 5(a)-(c) is unduly broad and unreasonable, and Plaintiffs cannot avoid the limitations on the number of interrogatories by asking PowerSchool to list its partners in one subpart of an interrogatory and then cross reference PowerSchool's responses to ask for a summation of all its documents and communications about each such partner in every circumstance. Nevertheless, PowerSchool will meet and confer with Plaintiffs about this Interrogatory.

**INTERROGATORY NO. 6:**

To the extent you contend that consent is a defense to Plaintiffs' claims, state your contentions about how YOU obtain consent to collect DATA, to use DATA, to store DATA, and to disclose DATA to third parties; from whom such consent is obtained, and to which products or services such consent pertains.

**RESPONSE TO INTERROGATORY NO. 6:**

PowerSchool objects to Interrogatory No.6 on the grounds that it is a premature contention interrogatory and because discovery and its investigation in this action is ongoing. PowerSchool has not yet completed its evaluation of all of its potential defenses to Plaintiffs' claims. PowerSchool reserves the right to supplement its response after discovery is complete. PowerSchool additionally objects to this Request to the extent that it incorrectly contends that PowerSchool "collects" student data as opposed to processing such data on behalf of schools.

PowerSchool objects to this Interrogatory because it presumes that consent is required, which is a disputed and incorrect statement of law. PowerSchool further objects to this Interrogatory because it is a compound Interrogatory, seeking first detail on how PowerSchool obtains consent and then asking for specific detail about such consent. PowerSchool will respond generally, explaining its contentions, based on facts presently identified, concerning consent as it relates to products and solutions offered to schools or school districts.

As limited by the foregoing general and specific objections, PowerSchool responds as follows:

**(a) Family Education Rights and Privacy Act.**

When offering products and services, PowerSchool is a "school official" under the Family and Education Rights and Privacy Act (FERPA) allowing schools or districts to share student data with PowerSchool without obtaining consent. *See* 34 C.F.R. § 99.31(a). Under FERPA, "[t]he parent or eligible student [(defined as 18 years or older)] [must] provide a signed and dated written consent before an educational agency or institution discloses personally identifiable information from the student's education records." 34 C.F.R. § 99.30. *However*, 34 C.F.R. § 99.31(a) authorizes certain types of sharing for which consent is not required, including sharing with "[a] contractor, consultant, volunteer, or other party to whom an agency or institution has outsourced institutional services or functions."

These service providers are considered "school officials" with whom schools can share information without consent if the service provider:

> (1) Performs an institutional service or function for which the agency or institution would otherwise use employees;
>
> (2) is under the direct control of the agency or institution with respect to the use and maintenance of education records; and
>
> (3) is subject to the requirements of § 99.33(a) governing the use and redisclosure of personally identifiable information from education records.

34 C.F.R. § 99.31(a). 34 C.F.R. 99.33(a) further allows for the "officers, employees, and agents of a party that receives information" under FERPA to use it "for the purposes for which the disclosure was made."

PowerSchool is a "school official" because it is a "contractor . . . to whom an agency or institution has outsourced institutional services or functions." 34 C.F.R. § 99.31(a). In providing its products and solutions, PowerSchool performs functions that would otherwise be performed by the schools or districts themselves. For example, Schoology assists teachers in distributing and collecting assignments, distributing grades, and other core educational functions. Naviance assists schools in providing guidance counseling on career and educational opportunities that are critical functions of schools. And Headed2 allows educators to access pre-built career prep lesson plans and at-a-glance reporting on student and class progress, as well as review and comment on student assignments. All of these functions are traditional educational functions.

PowerSchool is uniquely situated to provide secure, flexible solutions for schools and school districts' technological needs in the modern era and especially under the new norms created by COVID-19. Rather than developing these products themselves or relying on the old fashioned "paper way" of distributing assignments or posting flyers with information about colleges, etc., schools and districts contract with PowerSchool to use technology to complete the same tasks. Like businesses in other industries, schools require service providers like PowerSchool to provide online and software solutions where the school or district lacks the knowhow, scale, or resources to develop and maintain these products independently.

Further, PowerSchool remains firmly "under the direct control" of the schools "with respect to the use and maintenance of education records" when offering its enterprise services. As will be discussed below, the schools are always in direct control of student data under the contractual arrangement between PowerSchool and the schools. Moreover, PowerSchool only uses student data for the educational purpose for which the disclosure was made.

**(b) California Education Code and Other State Law**

Governing laws expressly allow schools to share their student data with contractors like PowerSchool without having to collect consent from individual students or their parents. Consistent with the federal authorization, the California Education Code, for example, allows school districts to provide "access to pupil records" to a person authorized by federal regulation to have them "without written parental consent." Cal. Educ. Code § 49076(a). The Code also independently permits school districts to release student records to contractors providing "outsourced institutional services or functions" to the districts "without written parental consent." *Id.* § 49076(a)(2)(G)(i). The term "pupil records," as used in the relevant section of the California Education Code means both of the following:

> (i) Any information directly related to a pupil that is maintained by the local educational agency.
>
> (ii) Any information acquired directly from the pupil through the use of instructional software or applications assigned to the pupil by a teacher or other local educational agency employee.

*Id.* § 49073.1(a)(5)(A).

**(c) Contracts with the Schools.**

The foregoing notwithstanding, PowerSchool does obtain consent from schools—on behalf of parents and students—for the processing of Personal Information from children.

PowerSchool implicitly gets the schools' consent on behalf of the parents through the direct sale of the products to the schools and school districts, and in addition, while not every contract contains such language, PowerSchool's practice is to explicitly get consent from schools via its specific contractual agreements with schools and districts.

These contracts, which may vary from school to school and are discussed below, specify that the schools either explicitly understand certain types of Personal Information will be processed by

PowerSchool or they direct PowerSchool to process additional data. And the schools direct how such Personal Information is used. PowerSchool's practice is to include in its agreements provisions that explicitly provide the ability for schools to direct that information be deleted and that contractually prohibit further use of a child's personal information beyond the scope of the services purchased by the school or district. PowerSchool then uses data processed exclusively to service the school in providing the educational service for which the data is processed.

For example, much of the data that schools share with PowerSchool's products and solutions is data from school administrative records previously maintained by the school about the student and then transferred to PowerSchool products. This data is not "collected" from individual students by PowerSchool at all.

PowerSchool's contractual agreements[1] with schools and school districts reinforce that it nevertheless receives consent from schools to process Personal Information from students where required by applicable law.

*First*, schools or districts always remain firmly in control of their student data. Schools are aware of or choose what data is transferred or uploaded to PowerSchool systems or collected from students. Moreover, upon clients' request, PowerSchool's data protection addendums (DPAs) contain data schedules allowing customers to select which specific data fields the school will choose to populate.[2]

Further, it is PowerSchool's practice to include language concerning the school's ability to direct PowerSchool to delete student data as well as a provision ensuring data is deleted at the conclusion of the relationship with the school or school district.

> Upon written request from Customer and in accordance with the applicable terms in the following provisions of the Section 13 (Return and Disposition of Customer Data), PowerSchool will dispose or delete all Customer Data within a commercially reasonable time period when it is no longer needed for the purpose for which it was obtained. . . .

---

1 This Response describes PowerSchool's general contractual practices. Individual contractual agreements vary.

2 *See* PowerSchool Privacy Policy available at https://www.powerschool.com/privacy/ ("Because PowerSchool does not own or control Customer Data, any request for access, review, correction, or deletion of Customer Data must come directly from our Customers.").

> Nothing in this DPA or the MSA authorizes PowerSchool to maintain Customer Data beyond the time period reasonably needed to complete the disposition. . . .
>
> Throughout the Term of the MSA, Customer may request partial disposal of Customer Data that is no longer needed. . . .
>
> Partial disposal of Customer Data will be subject to Customer's request to transfer such data to a separate account.

*Second*, PowerSchool's practice is to include contractual language addressing its role as a school official under FERPA, such as:

> If PowerSchool will have access to Education Records, Processor acknowledges that, for the purposes of this DPA and the MSA, pursuant to the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g and its implementing regulations, 34 C.F.R. Part 99 ("FERPA"), it will be designated as a "school official" with "legitimate educational interests" in the Customer Education Records, Student Data, and Personal Data disclosed pursuant to the MSA, and PowerSchool agrees to abide by the FERPA limitations and requirements imposed on school officials. Processor will use the Education Records only for the purpose of fulfilling its duties under the MSA for Customer's and its Users' benefit, and shall not share Customer Data with or disclose it to any third party except as provided for in the MSA or this DPA, as required by Applicable Law, or if authorized in writing by the Customer.

*Third*, PowerSchool's practice of obtaining consent from schools as agents of parents for the processing of Personal Information from students is recorded in its contracts. Moreover, it is PowerSchool's practice for its contracts to require schools and school districts to accept the obligation to obtain any parent consent. For example, it is PowerSchool's practice to include explicit language in its agreements with schools acknowledging that PowerSchool has provided the school with notice of the data it will process, and that it will only use the data to benefit the school. PowerSchool's practice is also to include language requiring schools to attest that they are gaining any potentially necessary consent on behalf of students. For example, PowerSchool includes language such as:

> Customer represents and warrants that it has obtained all necessary consents and government authorizations required under Applicable Law to permit the Processing of Customer Data. . . .
>
> Where required by Applicable Law, Customer acknowledges it has obtained all valid consents from the parents or pupils related to the Customer Data sufficient to grant PowerSchool the permission to conduct Processing on such Customer Data on behalf of the Customer.
>
> Where applicable, Customer acknowledges that it will act as agent for the parents of students under the age of 13 for purposes of COPPA. Customer

> represents to PowerSchool that through the duration of this Agreement, the Customer is duly authorized to provide the data to PowerSchool for processing based on having obtained parental consent where necessary.

And even though not every contract contains this specific language, across all PowerSchool contracts, the substance of the agreement itself between PowerSchool and the school or district represents implied consent to PowerSchool's processing of student data on the customers' behalf in that the schools are selecting and purchasing the services PowerSchool provides *so that* PowerSchool, acting as a service provider, can process or maintain data on the schools' behalf.

**(d) Individual School Practices.**

Although discovery is still ongoing, PowerSchool further responds that there is evidence of schools and school districts obtaining express consent from parents and students. For example, the West Contra Costa Unified School District maintains an annual handbook that must be acknowledged by every parent (the "Handbook") and establishes that Plaintiffs David Concepción, L.M.C., and M.M.C., each granted their express consent.[3]

*First*, the Handbook contains a "Student Technology Acceptable Use & Internet Safety Policy," which must be signed by both students and parents. *See* Handbook § 8.10A. As part of the policy, students and parents acknowledge and agree:

- ***"The law permits school districts such as ours to consent to the collection of personal information on behalf of all of its students, thereby eliminating the need for individual parental consent given directly to the website operator."***
- That ***"anything [students] do online is public and can be monitored."***
- "Information stored on the district's network and school-based or district issued devices are not private. Electronic information, messages and files stored on the computer network may be treated like school lockers. Administrators may review any and all information to maintain system integrity and ensure that students are acting responsibly."
- "Electronic messages and files sent on the district's wireless network may be treated like any other school property. Administrators, staff, or network personnel may review files and messages to maintain system integrity and, if necessary, to ensure that users are acting responsibly."
- "If you are a parent or guardian of a student in the district, and you have concerns about your student's use of online electronic systems that store PII, we encourage you to speak with your school's principal or teachers to find out why we use the system and to inspect your student's stored work and information."

---

[3] https://docs.google.com/document/u/0/d/1EpZGAE4fKHRL80lAbvph16p29ymVHlIZRu68NzQCggI/pub?pli=1

- "Students shall not share confidential information or personally identifiable information with an open AI system of themselves, another student, staff member, or other person. Personally identifiable information includes, but is not limited to, a person's name, address, email address, telephone number, Social Security number, or other similar personally identifiable information."

- To "not give out any private information - such as full name, date of birth, address, phone number, or audio recordings or photos of ourselves or others - without family permission."

Handbook § 8.10A (emphases added).

Both students and parents agree that all of these "rules and guidelines" apply "while at [West Contra Costa Unified School District] as well as when off campus." Parents are also given an option to opt out.

*Second*, the following disclosure:

> School officers or employees having a legitimate educational interest may access student records without first obtaining parental consent. "School officers and employees" are persons employed by the District as an administrator, supervisor, instructor, or support staff member (including health or medical staff and District-employed law enforcement personnel) a Board member, a person or *company with whom the District has contracted to perform a special service* (auditor, medical consultant, special education service provider or therapist) or a parent or student serving as an official in performing his or her tasks. A "legitimate educational interest" is one held by a school officer or employee whose duties and responsibilities create a reasonable need for access.

Handbook § 7.24(e) (emphasis added).

*Third*, the following disclosure:

> One exception [(to a parent's right to consent to disclosures of personally identifiable information contained in the student's education records)], which permits disclosure without consent, is disclosure to school officials with legitimate educational interests. A school official is a person employed by the School as an administrator, supervisor, instructor, or support staff member (including health or medical staff and law enforcement unit personnel); a person serving on the School Board; a person *or company with whom the School has contracted to perform a special task* (such as an attorney, auditor, medical consultant, or therapist); or a parent or student serving on an official committee, such as a disciplinary or grievance committee, or assisting another school official in performing his or her tasks.

Handbook § 7.28(3) (emphasis added).

*Fourth*, the Handbook discloses the use of PowerSchool product, instructing parents to "review[] daily classwork, check[] homework, and review[] progress on Powerschool," including for "your child's most recent report cards"; teachers to "maintain[]" "[a]ssignments and marks . . . in the PowerSchool system or a gradebook"; and administrators to "[m]onitor teacher records including Powerschool, grades, progress reports, seating charts, and lesson plans." Handbook §§ 2.2, 2.9.

*Fifth*, the Handbook contains a "Parent-Student Acknowledgement Form" offering parents the opportunity to opt out from release of "directory information." This information subject to disclosure includes:

> Name, address, telephone, date of birth, email address, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, diplomas and awards received, and most recent previous educational institution attended.

Handbook § 7.31.

Individuals like Plaintiffs David Concepción, L.M.C., and M.M.C., who continued to use PowerSchool products and solutions despite these and other agreement and disclosure, either expressly consented or consent by virtue of electing not to seek to opt-out from the use of PowerSchool products and solutions.

**INTERROGATORY NO. 7:**

Identify each entity YOU have acquired, whether by purchase, merger, or any other means, and for each entity so identified, identify the date of the acquisition, state the reason for the acquisition, describe the assets that were acquired, and describe how YOU integrated or otherwise made available any acquired product or service.

**RESPONSE TO INTERROGATORY NO. 7:**

PowerSchool objects to this Interrogatory because it is a compound interrogatory consisting of three separate requests: (1) for an identification of certain acquisitions; (2) for detail about the business justifications and considerations that led to each such acquisitions; and (3) for an explanation as to certain of PowerSchool's post-acquisition activities. *E.g.*, *Am. Bankers*, 2020 WL 8996760, at *1-2;

*Collaboration Properties*, 224 F.R.D. at 474-75. PowerSchool will count this Interrogatory as three separate Interrogatories.

PowerSchool further objects to this Interrogatory insofar as it requests, as to each acquisition, PowerSchool detail its "reason for the acquisition" and manner of acquisition (including the precise asset acquired). Such information is irrelevant to this case, is a trade secret, is commercially sensitive, and is disproportionate and thus outside the scope of discovery pursuant to Federal Rule of Civil Procedure 26(b)(1). PowerSchool will not respond as to these portions of the Interrogatory but agrees to confer with Plaintiffs about the relevance of the request.

As limited by the foregoing, PowerSchool responds as follows: Hoonuit (October 2020); Naviance (March 2021); Kickboard (December 2021); Kinvolved (February 2022); Headed2 (June 2022); Chalk.com (May 2022); Neverskip (August 2023); SchoolMessenger (October 2023); Allovue (January 2024). As to each acquisition that resulted in PowerSchool obtaining a new product, PowerSchool made such product available by: (a) promoting the new product to existing customers; (b) assuming contracts with customers of any pre-acquisition entity; or (c) renegotiating contracts with customers of any pre-acquisition entity when appropriate.

**INTERROGATORY NO. 8:**

Identify all ways in which YOU monetize DATA collected from STUDENTS and PARENTS who use YOUR products or services.

**RESPONSE TO INTERROGATORY NO. 8:**

PowerSchool objects to the term "Data" as vague and ambiguous and overbroad, including insofar as it encompasses "Data" unrelated to Students or Parents who use PowerSchool products. PowerSchool will interpret "Data" to mean, collectively, Customer Data, Collected Data, and Transaction Data, as those terms are defined in PowerSchool's Global Privacy Statement, available at https://www.powerschool.com/privacy/, and to the extent such Data is applicable to Students and Parents

PowerSchool further objects to the term "monetize" as vague, ambiguous, and undefined, and because it presumes the validity of Plaintiffs' allegations, which are in dispute. PowerSchool will interpret the term "monetize" to mean "to sell" and not to include, for example, instances when a

PowerSchool customer "directs [PowerSchool] to intentionally disclose personal information to another." *E.g.*, Cal. Civ. Code § 1798.140, subd. (t)(2)(A). PowerSchool additionally objects to this Request to the extent that it incorrectly contends that PowerSchool "collects" student data as opposed to processing such data on behalf of schools. As limited by the foregoing general and specific objections, PowerSchool responds that it does not sell data for money.

Dated: November 13, 2024

/s/ *Ethan Joel Levinton*
Ethan Joel Levinton

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, California 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Rachael A. Rezabek
Ethan Joel Levinton (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
oliva.adendorff@kirkland.com
rachael.rezabek@kirkland.com
ethan.levinton@kirkland.com

*Attorneys for Defendant*
*PowerSchool Holdings, Inc.*

**VERIFICATION**

I declare under penalty of perjury that the Responses to Plaintiffs' Non-Uniform Interrogatories Nos. 1, 2, 4, 5, 6, 7, 8 are true and correct.

Dated: November 13, 2024

/s/ DocuSigned by: Darron Flagg
A3AC3679AD71444...

Name: Darron Flagg

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2024, I served the foregoing document to the following counsel of record via e-mail:

Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

Robert B. Carey
Leonard W. Aragon
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
rob@hbsslaw.com
leonard@hbsslaw.com

Julie Liddell
EDTECH LAW CENTER PLLC
P.O. Box 300488
Austin, Texas 78705
Telephone: (737) 351-5855
julie.liddell@edtech.law

*/s/ Ethan Joel Levinton*
Ethan Joel Levinton

# EXHIBIT 9

# SUBMITTED UNDER SEAL

# EXHIBIT 10

# SUBMITTED UNDER SEAL

# EXHIBIT 11

# SUBMITTED UNDER SEAL

# EXHIBIT 12

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021**

**OR**

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number 001-40684**

# PowerSchool Holdings, Inc.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **85-4166024** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **150 Parkshore Drive Folsom, CA** | |
| **(Address of Principal Executive Offices)** | **95630 (Zip Code)** |

**(877) 873-1550**
**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class of Securities to be Registered | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $0.0001 per share | PWSC | The New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes No☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.

Yes No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files) Yes No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large accelerated filer | Accelerated filer |
| Non-accelerated filer | Smaller reporting company |
| | Emerging growth company |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).

actionable insights improves the efficiency of school operations, the quality of instruction delivered by teachers, and the pace of student growth, generating a profound effect on K-12 educational outcomes.

We have created a strong competitive moat by investing over the past 20 years to build, maintain and continuously update our K-12 regulatory compliance reporting capabilities that solve state-specific, funding-related regulatory pain points for our customers. This investment is currently supported by a team of approximately 140 individuals in our broader research and development organization of approximately 994 individuals as of December 31, 2021.

***Building the PowerSchool Platform***

Our focus and strategy on delivering a comprehensive, integrated platform led to years of coordinated efforts to build an expansive suite of core capabilities required by our customers. Starting as the first web-based SIS, we combined our deep domain expertise in K-12 education with over twenty years of innovation and disciplined acquisition activity to become the core K-12 software platform, with a full suite of cloud-based offerings across student information, enrollment, learning management, assessment, special education, finance, HR and talent management.

From 2015 through February 2022, we completed 14 strategic acquisitions to thoughtfully build out our Unified Platform of K-12 software solutions, building upon years of leadership:

•Acquisition of Infosnap in 2015, adding a leading K-12 enrollment solution;

•Acquisition of Interactive Achievement in 2016, establishing our presence in K-12 student assessment and analytics;

•Acquisition of SRB in 2016, enhancing scale in K-12 SIS and ERP solutions in Canada;

•Acquisition of Sungard K-12 in 2017, adding a scaled K-12 ERP solution in the U.S.;

•Acquisition of PeopleAdmin in 2018, adding leading talent management and student assessment and analytics solutions;

•Acquisition of Schoology in 2019, adding the leading K-12 LMS;

•Acquisition of Hoonuit in 2020, adding an advanced data management and analytics solution for K-12;

•Acquisition of Naviance and Intersect in 2021, adding the leading college and career readiness solution for K-12;

•Six other smaller acquisitions, including our most recent acquisition in February 2022 of Kinvolved, Inc..

**Our Business Model**

We offer our software platform through a cloud-based, SaaS business model under contracts with annual price escalators, and we recognize subscription revenues ratably over annual subscription terms of the contracts. Our SaaS solutions include access to hosted software, software maintenance, product updates and upgrades, and technical and developer support. We sell our SaaS solutions through recurring fee arrangements where revenue is recognized on an annual basis following contract start date, which we refer to as recurring revenue. Our business model provides flexibility and optionality for our customers to purchase and deploy our software platform either through individual add-on solutions, or as a Unified Platform. The majority of new bookings come from our SaaS offerings and are thus recurring in nature, with recurring revenue accounting for more than 85.4% of our total revenue for the year ended December 31, 2021.

We generally price our SaaS and license agreements at individually negotiated rates with occasional discounts, typically for multi-solution sales or to help districts meet their budget and funding timing constraints. Contracts are typically sold on a three-year basis with one-year rolling renewals and annual price escalators. We typically invoice our customers annually, in advance, for subscription fees and maintenance, while a portion of customers are billed semiannually, quarterly, or monthly. SaaS revenues are recognized over time to appropriately reflect progress towards full completion of our performance obligations.

To help customers go live with our software and achieve success, we offer professional services such as professional consultation, implementation, customization and training services as requested by our customers.

Revenue from these services is primarily classified as non-recurring revenue, with a portion of the revenue consisting of recurring managed services classified as recurring revenue. For our SaaS business, these services generally take less than one year to complete.

## Key Factors Affecting Our Performance

Our historical financial performance has been, and we expect our financial performance in the future to be, driven by our ability to:

***Cross-Sell New Solutions to Existing Customers***

Many of our customers begin their journey with us by using only a small portion of our overall platform. As customers begin to appreciate the benefits of an integrated software platform across student data, classroom learning, back-office functions and talent management, they increase the number of solutions they buy from us over time. Our future revenue growth is dependent upon our ability to expand our customers' use of our platform, and our go-to-market efforts are designed to drive cross-sell growth. Our ability to increase sales to existing customers will depend on a number of factors, including the level of satisfaction with our solutions, competition, pricing, economic conditions and spending by customers on our solutions. We have adopted a customer success strategy and implemented processes across our customer base to drive revenue retention and expansion, which combined with our cross-selling success has resulted in a Net Revenue Retention Rate (as described below) of 106.4% as of December 31, 2021, compared to 108.1% as of December 31, 2020.

***Attract New Customers in North America***

We believe there is significant opportunity to increase market adoption of our Unified Platform by new customers. Our ability to attract new customers is dependent upon a number of factors including the features and pricing of our competitors' offerings, the effectiveness of our marketing efforts, the effectiveness of our channel partners in selling, the marketing and deploying of our software solutions, and the growth in demand of cloud-based technology solutions in K-12 education. We intend to expand our customer base by continuing to make significant and targeted investments in direct sales and marketing to attract new customers and to drive broader awareness of our software solutions.

***Continue to Expand Into Complementary Adjacencies***

From 2015 to February 2022, we have acquired and successfully integrated 14 complementary businesses to enhance our software and technology capabilities. We have a demonstrated track record of driving growth from our acquired assets and delivering positive return on investment. M&A is core to our strategy, and we intend to continue pursuing targeted acquisitions that further complement our portfolio of technology offerings or provide us access to new markets. This adjacency expansion strategy is complementary to our cross-selling strategy, as it both introduces acquired solutions to our existing customers and introduces a base of net new customers to whom we may sell our other solutions. Additionally, we intend to continue providing adjacent solutions by other means, which may include organic development and strategic partnerships. Our position as the leading system of record, engagement and intelligence provides us with a unique vantage point to identify the most critical needs of our customers and most innovative companies within the K-12 education ecosystem. We will continue to carefully evaluate acquisition, partnership, and development opportunities to assess whether they meet our strategic objectives and enhance our platform.

***Sustain Innovation and Technology Leadership***

Our success is dependent on our ability to sustain innovation and technology leadership to maintain our competitive advantage. We believe that we have built a highly differentiated Unified Platform that will position us to further extend the adoption of our platform and solutions. We intend to continue to invest in building additional solutions, features and functionality that expand our capabilities and facilitate the extension of our Unified Platform to new adjacencies. We also intend to continue to evaluate strategic acquisitions and investments in businesses and technologies to drive solutions and market expansion. Our future success is dependent on our ability to successfully develop, market and sell existing and new solutions to both new and existing customers.

***Expand Internationally***

We believe there is a significant opportunity to expand usage of our platform outside of North America. As of December 31, 2021, PowerSchool served customers in over 90 countries, primarily American international schools.

# EXHIBIT 13

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, California 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Zharna Shah (*pro hac vice*)
Taylor Rothman (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
zharna.shah@kirkland.com
taylor.rothman@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Ethan Joel Levinton (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
oliva.adendorff@kirkland.com
ethan.levinton@kirkland.com

*Attorneys for Defendant*
*PowerSchool Holdings, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EMILY CHERKIN, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>Defendant | CASE NO. 3:24-CV-02706-JD<br><br>**POWERSCHOOL HOLDINGS, INC.'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' NON-UNIFORM INTERROGATORIES 1, 4, AND 5** |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendant PowerSchool Holdings, Inc. ("PowerSchool") hereby provides supplemental responses and objections to Plaintiffs'

First Set of Non-Uniform Interrogatories 1, 4, and 5, as well as the Definitions and Instructions incorporated therein (collectively the "Interrogatories" and individually the "Interrogatory"), which were served on PowerSchool on September 13, 2024.

## GENERAL OBJECTIONS AND CONDITIONS

The following General Objections and Conditions apply to each Interrogatory set forth below. Each Objection and Condition is hereby incorporated into the Response to each individually numbered Request as if fully set forth therein:

1. PowerSchool objects to the definitions of the following terms:

(a) PowerSchool objects to the definitions of "And" and "or" insofar as they request PowerSchool to interpret words contrary to their plain meaning.

(b) PowerSchool objects to the definitions of "Documents" and "All documents" to the extent the definitions purport to supersede the parties' agreed-upon forthcoming ESI Protocol or Stipulated Protective Order, including insofar as the definitions require production of exact duplicates. PowerSchool will interpret "Documents" and "All documents" consistent with the parties' forthcoming ESI Protocol and Stipulated Protective Order.

(c) PowerSchool objects to the definition of "Category of data" to the extent it attempts to impose an obligation to produce documents derivative of other documents until "the smallest discrete data element" is identified for any data referenced by such documents. PowerSchool further objects to the definition as overly broad to the extent that it includes data that is not Personally Identifiable Information ("PII"). PowerSchool agrees to confer with Plaintiffs as to a reasonable definition of this term.

(d) PowerSchool objects to the definition of "Communication(s)" as vague, ambiguous, overly broad, unduly burdensome, and disproportionate to the needs of discovery to the extent it purports to require PowerSchool to reference all forms of communications, regardless of burden and relevance. PowerSchool will interpret "Communication(s)" consistent with the parties' forthcoming ESI Protocol and Stipulated Protective Order and will only review such records as identified through a reasonable search.

(e) PowerSchool objects to the definitions of "Defendant" and "You" to the extent they refer to third parties, including any entity not controlled by PowerSchool and "person[s] … purporting to act on [PowerSchool's] behalf." PowerSchool further objects to the definitions of "You" and "Defendant" as vague, ambiguous, overly broad, unduly burdensome, and disproportionate to the needs of discovery to the extent that they purport to include entities other than PowerSchool. PowerSchool will interpret "Defendant" and "You" to include PowerSchool, its wholly owned subsidiaries, branches, divisions, officers, directors, employees, representatives, and persons acting on its behalf. PowerSchool further objects to the extent the definition seeks documents or information not within the direct possession or custody of PowerSchool and its employees, and objects to the extent documents are sought beyond that scope.

(f) PowerSchool objects to the definition of "Data" to the extent the definition covers types or categories of data not alleged to have been wrongfully collected, processed, or shared in the Plaintiffs' complaint, ECF No. 1 (the "Complaint"). PowerSchool further objects to the extent the definition concerns data not within PowerSchool's possession, custody, or control. PowerSchool further objects to the definition as overly broad to the extent that it includes data that is not PII. PowerSchool will interpret "Data" to mean, collectively, Customer Data, Collected Data, and Transaction Data, as those terms are defined in PowerSchool's Global Privacy Statement, available at https://www.powerschool.com/privacy/, and will respond as to the products and solutions offered to schools or school districts as alleged in the Complaint.

(g) PowerSchool objects to the definition of "Parent" or "parents" as overly broad to the extent it includes the parents who may not have legal custody over their child(ren) and parents or legal guardians of students who have not used the PowerSchool products or services purchased by schools or school districts at issue in the Complaint. PowerSchool will interpret "Parent" or "parents" to include only individuals who have legal custody over an individual attending grades K-12 in a public institution and who used PowerSchool products or services identified in the Complaint.

(h) PowerSchool objects to the definition of "Student" or "students" as overly broad in that it includes students who have not used the PowerSchool products or services at issue in the Complaint. PowerSchool will interpret "Student" or "students" to include only an individual attending grades K-12 in a public institution and who used PowerSchool products or services purchased by schools or school districts as alleged in the Complaint.

(i) PowerSchool objects to the definition of "Third party" as vague and ambiguous insofar as it includes persons or entities with whom PowerSchool has no contractual relationship, as the definition as written encompasses prospective partners. PowerSchool will interpret "Third-Party Partners" to refer to members of its Partner Program and any other entity with whom it has a direct contractual relationship for sharing, exchanging, disclosing, or using student or parent data.

2. PowerSchool objects to the Interrogatories to the extent they require PowerSchool to respond with information within the "custody, control or possession of [PowerSchool's] investigators, accountants, consultants, employees, attorneys or other agents" because such requests would require PowerSchool to (i) divulge information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, immunity, or protection ("privileged information") and (ii) muster all its evidence and conduct third-party discovery at the outset of this litigation. PowerSchool will not divulge any privileged information, and it will respond only with information presently available to it based on the limited investigation and discovery conducted to date.

3. PowerSchool objects to the Interrogatories to the extent they seek to impose on PowerSchool any duty or obligation that is inconsistent with or in excess of those that are imposed by the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, or any other applicable rule, court order, or case law. PowerSchool will respond to the Interrogatories in the manner required by the Federal Rules of Civil Procedure and any other applicable rule or case law. PowerSchool objects to Plaintiffs' attempt to impose an obligation to identify documents with any greater specificity than is necessary for Plaintiffs to locate said documents.

4. PowerSchool objects to Instruction No. 4 because it attempts to impose an obligation to identify documents with any greater specificity than is necessary for Plaintiffs to locate said person.

Where PowerSchool identifies a document or person in response to an Interrogatory, it will provide only the reasonable information necessary and sufficient to locate such document or person.

5. PowerSchool objects to Instruction No. 5 because it attempts to impose an obligation to identify people with knowledge to support an objection based on privilege. PowerSchool will not engage in discovery on discovery at this juncture.

## SPECIFIC RESPONSES AND OBJECTIONS

Consistent with the foregoing General Objections and Conditions, and further subject to any specific objections made in connection with each of the below-numbered Interrogatories, PowerSchool responds to the Interrogatories as follows:

**INTERROGATORY NO. 1:**

Identify each of YOUR "Products & Solutions," as those terms are used or have been used on YOUR website www.powerschool.com, that collects DATA, uses DATA, or discloses DATA to SCHOOLS or any THIRD PARTY.

**RESPONSE TO INTERROGATORY NO. 1:**

PowerSchool objects to this Request to the extent that it incorrectly contends that PowerSchool "collects" student data as opposed to processing such data on behalf of schools and/or school districts. PowerSchool will respond by identifying its "Products & Solutions," as those terms are used or have been used on PowerSchool's website www.powerschool.com.

PowerSchool further objects to this Request to the extent it seeks information relating to issues beyond the scope of this litigation and that is, thus, irrelevant. In particular, PowerSchool objects to the term "Data" as vague and ambiguous and overbroad, including insofar as it encompasses "Data" unrelated to Students or Parents who use PowerSchool products. PowerSchool will interpret "Data" to mean, collectively, Customer Data, Collected Data, and Transaction Data, as those terms are defined in PowerSchool's Global Privacy Statement, available at https://www.powerschool.com/privacy/, and to the extent such Data is applicable to Students and Parents.

As limited by the foregoing General Objections and Conditions, PowerSchool identifies the following "Products & Solutions," other than those that do not relate to Student or Parent Data:

- PowerSchool SIS
- Document Management
- Ecollect Forms
- Enrollment
- Enrollment Express
- Special Programs
- Schoology
- Performance Matters
- ContentNav
- MTSS
- Attendance Intervention
- Behavior Support
- Naviance
- Headed2
- Connected Intelligence P20W
- Perform
- Student Analytics
- Risk Analysis
- Student Readiness Analytics
- Predictive Enrollment Analytics
- School Messenger
- MyPowerHub
- PermissionClick
- PowerBuddy

PowerSchool further clarifies that it has removed from this list Curriculum & Instruction and Safe Arrival, having confirmed that these products do not relate to Student or Parent Data. PowerSchool also notes that it has previously sold a Student Information System product under the name eSchoolPLUS.

**INTERROGATORY NO. 4:**

Identify each tracking technology (including but not limited to cookies, pixels, and browser fingerprints) that YOU use or have ever used in order to allow YOU or a THIRD PARTY to identify or partially identify a user of YOUR website, products, or solutions (including identifying a user's browser or device), which websites, products, and solutions include YOUR tracking technology or tracking technologies belonging to a THIRD PARTY, and for each tracking technology so identified, provide:

a) the products and solutions into which the tracking technology was implemented, and

b) for each product or solution so identified, provide:

1. the provider of the tracking technology,
2. the date the tracking technology was first implemented into that product or solution,
3. the reason or reasons for implementing the tracking technology into that product or solution,
4. the categories of information collected by each tracking technology implemented into that product or solution,
5. whether the implementation of the tracking technology has been discontinued, and
6. if so, the date the tracking technology was discontinued and
7. the reason or reasons for discontinuing the tracking technology.

**RESPONSE TO INTERROGATORY NO. 4:**

PowerSchool objects to Interrogatory No. 4 because the term "tracking technology" is undefined. PowerSchool will interpret the term according to its colloquial definition and to include "cookies, pixels, and browser fingerprints."

PowerSchool further objects to the term "website" insofar as it refers to www.powerschool.com as unduly burdensome, disproportionate to the needs of the case, and seeking information relating to issues beyond the scope of this litigation and that is, thus, irrelevant. The website www.powerschool.com is intended for marketing to schools and school district customers, and is not intended for use by students or parents. PowerSchool's products and solutions that are used by students are accessible through separate, school-specific webpages that are separate from www.powerschool.com. School records about students and parents, which is the crux of this case, are

thus not processed or available via www.powerschool.com. For this reason, PowerSchool maintains that the term "website" should refer only to its products and solutions websites intended for use by students or parents, and an inquiry into www.powerschool.com would yield only minimally relevant information (if any) and would be unduly burdensome and disproportionate to the needs of the case.

As limited by the foregoing, PowerSchool does not implement tracking technology in its products and solutions, including products and solution websites intended for use by students or parents, in order to enable PowerSchool or a Third Party to identify or partially identify a user of PowerSchool's products and solutions, including products and solution websites intended for use by students or parents. PowerSchool notes that students and parents directly sign in to PowerSchool products, and thus PowerSchool does not need any third-party solutions to identify users. In the interest of transparency, PowerSchool also directs Plaintiffs to its response to Interrogatory 5, which identifies all third parties that receive or process data under the circumstances explained therein.

Without waiving the foregoing objection and in the spirit of compromise, PowerSchool also provides the following response as to its website, www.powerschool.com:

An individual who visits www.powerschool.com for the first time to view PowerSchool's global privacy statement (located at sub-page www.powerschool.com/privacy) is immediately greeted with a consent banner enabling the individual to communicate their preferences regarding cookies. The individual is presented with the option to consent to cookie collection, which discloses and allows the individual to select whether to permit "Functional" and "Advertising Cookies." Such an individual would thus be consenting to Functional and Advertising cookies should they continue to use the website. Although the individual cannot choose whether to consent to "Required Cookies," these cookies enable the basic features of the website to function, such as providing secure log-in.




As explained in its cookie policy, PowerSchool implemented "Required" cookies "to enable the basic features of this site to function, such as providing secure log-in." PowerSchool implemented "Functional" cookies "to analyze [a visitor's] use of the site to evaluate and improve [PowerSchool's] performance" and "to provide a better customer experience on this site," such as allowing PowerSchool to "remember[] [a visitor's] log-in details, saving what is in [the visitor's] shopping cart, or providing [PowerSchool] information about how [its] site is used." As for "Advertisement" cookies, PowerSchool implements these "to show [a visitor] ads that are more relevant to [the visitor]," to enable the visitor "to share certain pages with social networks," and to "allow [the visitor] to post comments on [www.powerschool.com]."

Although PowerSchool has not implemented cookies or related technologies to allow it or a Third Party to identify or partially identify a visitor, in the interest of transparency, PowerSchool responds by identifying all cookies or related technologies implemented on www.powerschool.com:

| Company | Domain | Reason |
|---|---|---|
| 6Sense Insights, Inc. | 6sc.co, b.6sc.co, j.6sc.co | Advertisement |
| ACTV8, Inc. | app.box.com, cdn01.boxcdn.net, khoros.app.box.com | Functional: Customer Engagement |
| Ada Support | powerschool.ada.support, static.ada.support | Functional: Customer Engagement |

| Company | Domain | Reason |
|---|---|---|
| Adobe Audience Manager, Adobe Experience Platform | demdex.net, dpm.demdex.net | Advertisement |
| Akamai | embedwistia-a.akamaihd.net | Functional: Cloud Computing |
| Amazon (Cloudfront) | d1azc1qln24ryf.cloudfront.net, d2yeu2mwujl2s5.cloudfront.net | Functional: Content Delivery Network |
| Amazon (Web Services) | gtrk.s3.amazonaws.com, s3.amazonaws.com, trello-attachments.s3.amazonaws.com | Functional: Cloud Computing |
| Amazon Advertising | amazon-adsystem.com, s.amazon-adsystem.com | Advertisement |
| Amobee Inc./Nexxen Inc. | tidaltv.com, turn.com | Advertisement |
| Basis Global Technologies, Inc. | sitescout.com | Advertisement |
| Bootstrap CDN | maxcdn.bootstrapcdn.com | Functional: Content Delivery Network |
| BugHerd | www.bugherd.com | Functional: Website Management |
| Ceros | sdk.ceros.com | Functional: Cloud Computing |
| Cloudflare | cdnjs.cloudflare.com | Functional: Content Delivery Network |
| Cognito Forms | services.cognitoforms.com | Functional: Customer Engagement |
| Cookie Law Regulations | cdn.cookielaw.org | Functional |
| Crazy Egg | sample.crazyegg.com, script.crazyegg.com | Functional: Website Management |
| Datadog | www.datadoghq-browser-agent.com | Functional: Infrastructure Monitoring and Website Performance |
| Disqus | c.disquscdn.com, disqus.com, referrer.disqus.com, schoologyexchange.disqus.com | Functional: Customer Engagement |
| Drift | embeds.driftcdn.com, js.driftt.com | Functional: Customer Engagement |
| Embedly | cdn.embedly.com, embedly.com | Functional: Website Management |
| Engine Group | tag.clrstm.com | Functional |
| EX.CO Technologies Ltd | pixel.ex.co, static.ex.co, voting.ex.co | Advertisement |
| Exponential Interactive, Inc d/b/a VDX.tv | tribalfusion.com | Advertisement |
| Font Awesome | use.fontawesome.com | Functional: Website Management |
| G2 Crowd | g2crowd.com, images.g2crowd.com, tracking.g2crowd.com | Functional: Customer Engagement & Analytics |

| Company | Domain | Reason |
|---|---|---|
| Google Advertising Products | adservice.google.com, doubleclick.net, googleads.g.doubleclick.net, static.doubleclick.net, stats.g.doubleclick.net, www.googleadservices.com, www.youtube.com, youtube.com | Advertisement |
| Google Inc. | ajax.googleapis.com, analytics.google.com, apis.google.com, content.googleapis.com, csi.gstatic.com, drive.google.com, google.com, maps.googleapis.com, maps.gstatic.com, ssl.google-analytics.com, ssl.gstatic.com, www.google-analytics.com, www.googleapis.com, www.google.com, www.google.ie, www.googleoptimize.com, www.googletagmanager.com, www.gstatic.com | Functional: Application and Website Management |
| Google Inc. | s.ytimg.com | Advertisement |
| gskinner | code.createjs.com | Functional |
| hCaptcha | hcaptcha.com, newassets.hcaptcha.com | Functional: Website Management |
| Highcharts | code.highcharts.com | Functional: Website Management |
| Hirebridge | hirebridge.com, www.hirebridge.com | Functional: Customer Engagement & Analytics |
| Imgur | i.imgur.com | Advertisement |
| Index Exchange Inc. | casalemedia.com | Advertisement |
| IPONWEB GmbH | bidswitch.net | Advertisement |
| iSpot.tv | ispot.tv | Functional: Website Management |
| jQuery | code.jquery.com | Functional: Website Infrastructure |
| Khoros | xvwqy85873.i.lithium.com | Customer Engagement |
| LinkedIn | ads.linkedin.com, dc.ads.linkedin.com, linkedin.com, platform.linkedin.com, px.ads.linkedin.com, snap.licdn.com, www.linkedin.com | Advertisement |
| LinkedIn Marketing Solutions | adsymptotic.com | Advertisement |
| Litmos | static1.litmos.com | Functional: Learning Management System |
| LiveChat, Inc. | accounts.livechatinc.com, cdn.livechatinc.com, livechatinc.com, secure.livechatinc.com | Functional: Customer Engagement |

| Company | Domain | Reason |
|---|---|---|
| Magnite, Inc. | pixel.rubiconproject.com, rubiconproject.com | Advertisement |
| Marketo | bizible.com, bizibly.com, cdn.bizible.com, cdn.bizibly.com, munchkin.marketo.net, templates.marketo.net | Functional: Marketing Automation |
| Marketo | app-ab09.marketo.com, app-ab11.marketo.com, app-ab15.marketo.com, app-sj01.marketo.com, b2c-msm.marketo.com | Advertisement |
| MediaMath, Inc. | mathtag.com, sync.mathtag.com | Advertisement |
| Meta (formerly Facebook) | connect.facebook.net, facebook.com, www.facebook.com | Advertisement |
| Microsoft | c1-officeapps-15.cdn.office.net, c1-powerpoint-15.cdn.office.net, js.live.net, pus4-powerpoint.officeapps.live.com, view.officeapps.live.com | Functional: Website Management |
| Microsoft Advertising | bat.bing.com, bing.com | Advertisement |
| MNTN | dx.steelhousemedia.com, px.steelhousemedia.com, steelhousemedia.com, ww.steelhousemedia.com | Advertisement |
| Nativo, Inc. | jadserve.postrelease.com, postrelease.com, s.ntv.io | Advertisement |
| Neustar, Inc., a TransUnion company | agkn.com | Functional: Digital Performance |
| New Relic Inc. | bam-cell.nr-data.net, bam.nr-data.net, js-agent.newrelic.com, nr-data.net | Functional: Analytics |
| Nielsen Media Research Ltd. | exelator.com, loadm.exelator.com | Advertisement |
| OneTrust | geolocation.onetrust.com | Functional: Website Management & Risk Management/Compliance |
| OptinMonster | a.omappapi.com, a.optmstr.com, api.omappapi.com | Functional: Customer Engagement |
| Oracle AddThis | addthis.com, m.addthis.com, m.addthisedge.com, s7.addthis.com, su.addthis.com, v1.addthisedge.com, x.dlx.addthis.com | Advertisement |
| Oracle Advertising | bluekai.com, tags.bluekai.com | Advertisement |
| Oracle Data Cloud - Moat | z.moatads.com | Advertisement |
| PeopleAdmin | info.peopleadmin.com, peopleadmin.com | Required |
| Pinterest | ct.pinterest.com, pinterest.com, | Advertisement |

| Company | Domain | Reason |
|---|---|---|
| | s.pinimg.com | |
| Playbuzz Ltd (aka EX.CO) | cdn.playbuzz.com | Functional |
| Playbuzz Ltd (aka EX.CO) | ads.playbuzz.com, embed.playbuzz.com, img.playbuzz.com | Advertisement |
| Polyfill Service | polyfill.io | Functional |
| PowerSchool | aahelp.powerschool.com, docs.powerschool.com, go.powerschool.com, help.powerschool.com, investors.powerschool.com, learning-support.powerschool.com, powerschool.com, powersource.powerschool.com, regfamassist.powerschool.com, searchunify.powerschool.com, support.powerschool.com, training.powerschool.com, www.powerschool.com | Required |
| PowerSchool | assets.powerschool.com | Functional |
| Privo | privo.com | Functional: Privacy, Security & Risk Management/Compliance |
| PubMatic, Inc | pubmatic.com | Advertisement |
| Q4 Inc. (formerly Q4 Web Systems) | s27.q4cdn.com, widgets.q4app.com | Functional: Investor Engagement |
| Roku Advertising Services | w55c.net | Advertisement |
| Rollbar | cdn.rollbar.com | Functional: Website Management |
| Salesforce DMP (formerly Krux Digital, Inc.) | krxd.net | Advertisement |
| SalesLoft | scout-cdn.salesloft.com, scout.salesloft.com | Functional: Customer/Sales Engagement |
| Schoology | app.schoology.com, asset-cdn.schoology.com, developers.schoology.com, info.schoology.com, schoology.com, support.schoology.com, ui.schoology.com, www.schoology.com | Required |
| Scorecard Research | scorecardresearch.com | Functional: Market Research |
| Semasio GmbH | semasio.net | Advertisement |
| Sharethrough, Inc | sharethrough.com | Advertisement |
| SoundCloud | widget.sndcdn.com | Functional |

| Company | Domain | Reason |
|---|---|---|
| Swiftype | cc.swiftype.com, s.swiftypecdn.com | Functional: Website Management & Search |
| Tapad, Inc. | tapad.com | Advertisement |
| The UK Trade Desk Ltd | adsrvr.org, insight.adsrvr.org, match.adsrvr.org | Advertisement |
| Trackingplan, Inc. | config.trackingplan.com | Functional: Analytics |
| TrustArc | consent.trustarc.com, trustarc.com, truste.com | Functional: Privacy, Security & Risk Management/Compliance |
| Twitter/X | cdn.syndication.twimg.com | Functional |
| Twitter/X | analytics.twitter.com, platform.twitter.com, static.ads-twitter.com, syndication.twitter.com, t.co, twitter.com | Advertisement |
| Typeform | embed.typeform.com, font.typeform.com, typeform.com, www.typeform.com | Functional: Website Management |
| | limuirs-cloudfront-live.usw2.prod.hosted.lithcloud.com | Advertisement |
| Upwave Inc. | px.surveywall-api.survata.com, surveywall-api.survata.com | Functional: Marketing/Customer Engagement |
| Vimeo | f.vimeocdn.com, i.vimeocdn.com, player.vimeo.com, vimeo.com, www.vimeo.com | Functional: Website Management |
| Visual Website Optimizer | dev.visualwebsiteoptimizer.com, r1.visualwebsiteoptimizer.com | Functional: Analytics |
| Volentio JSD Limited | Cdn.jsdeliver.net | Functional: Content Delivery Network |
| Wistia | distillery.wistia.com, embed-ssl.wistia.com, fast.wistia.com, fast.wistia.net, wistia.net | Functional: Marketing/Customer Engagement |
| Xandr, Inc. | adnxs.com, ib.adnxs.com, secure.adnxs.com | Advertisement |
| Yahoo Inc. | analytics.yahoo.com, yahoo.com | Advertisement |
| Zendesk | p14.zdusercontent.com, p23.zdassets.com, p6.zdassets.com, schoology.zendesk.com, static.zdassets.com, theme.zdassets.com | Functional: Customer Engagement |

Finally, PowerSchool objects to subpart (b)(2), (4)-(7), which seeks identification of the "category of information" each cookie "collects," the dates each was implemented, and the reasons for why each was discontinued as impermissibly compound. *See Am. Bankers*, 2020 WL 8996760, at *1-2 (interrogatories requiring party to state, from four insurance policies, a quote of certain contract

language and page number of certain provision, counted as eight separate interrogatories); *Collaboration Properties*, 224 F.R.D. at 474-75 (holding that a single interrogatory asking information about 26 allegedly infringing products constituted as 26 interrogatories); *Safeco*, 181 F.R.D. at 443 (same, as to subparts incorporating by reference responses to requests for admission). Identifying the precise category of information each cookie can access, the specific dates of implementation, and the reasons for discontinuing a cookie presents a separate and distinct inquiry as to each cookie, and thus counts as nearly 100 separate interrogatories. This is overly burdensome and disproportionate to the needs of the case, particularly given that the requested information will be irrelevant for the reason discussed above.

PowerSchool remains willing to meet and confer if Plaintiffs seek additional information related to this Interrogatory.

**INTERROGATORY NO. 5:**

Identify each THIRD PARTY with whom YOU share, disclose, or otherwise allow to use DATA, and for each third party so identified, identify:

a) all CONTRACTS governing your relationship with that THIRD PARTY,

b) the categories of DATA that YOU share with that THIRD PARTY, and

c) the purposes for which you share each CATEGORY OF DATA with that THIRD PARTY.

**RESPONSE TO INTERROGATORY NO. 5:**

PowerSchool objects to this Interrogatory as seeking information outside of PowerSchool's possession, custody, or control. Certain contracts between PowerSchool and its customers entitle the customer to determine when and how to make any data available to any other third party, and such contracts speak for themselves. PowerSchool will answer the Interrogatory based on its knowledge only.

PowerSchool additionally objects to this Interrogatory to the extent that it incorrectly contends that PowerSchool "collects" student data as opposed to processing such data on behalf of schools. PowerSchool further objects to the phrase "share, disclose, or otherwise allow to use DATA," because it implies that PowerSchool can unilaterally transfer student data to Third Parties. PowerSchool's processing, storage, disclosure, and use of Data is governed by the individual contracts with and direction of each of its educational customers.

As limited by the foregoing general and specific objections, PowerSchool responds that there are three types of Third Parties that may receive access to or copies of data processed by PowerSchool: (1) schools; (2) PowerSchool's subprocessors, who are paid by PowerSchool (not the other way around); and (3) other school officials serving the same customer as PowerSchool, such as other school software providers, as directed by the customer schools.

*First*, the schools – as the owner of the records – may receive access to any and all data PowerSchool processes for the schools. Each customer decides what kind of information to process through PowerSchool's products and services, and the categories of data processed are thus theoretically limitless. These relationships are typically governed through a Main Services Agreement (formerly, Master Services Agreement), but specific customers can and often do negotiate an individualized contract. As for subparts (a)-(c) for this type of Third Parties, PowerSchool notes that it has produced documents responsive to the requests under Fed. R. Civ. P. 33(d) as PWSCHL_00161570 to PWRSCHL_00163120.

*Second*, PowerSchool's products (like virtually all software products) are made possible and secure because of services provided by a series of third-party subprocessors. These vendors vary from product to product, and currently include:

- **Amazon Web Services**: Cloud storage.
- **Authorize.net**: Payment processing.
- **AuthO (Okta)**: Secure access and user authentication.
- **Azure**: Data backup, storage and processing.
- **Cleaver**: Rostering and sanitization of data.
- **Cognos**: Data retrieval for customized reporting.
- **Fivetran -HVR**: Data replication tooling.
- **Gainsight**: Processing of anonymized web usage analytics data.
- **Google**: Mapping services.
- **Mailgun**: Email notifications.
- **Mandrill**: Email service.

- **Monte Carlo**: Data quality verification.
- **NMI**: Payment processing.
- **Oracle**: Data storage.
- **Payrix**: Payment processing
- **PostMark**: Email service.
- **Qlik**: Data replication tooling.
- **SendGrid**: Email service.
- **Snowflake**: Data storage.
- **Smarty**: Street address verification and auto-fill features.
- **Sumologic**: Aggregation of log entries.
- **SQL Server**: Cloud hosting.
- **Twilio**: Communications services.
- **Vanco**: Payment processing.

These subprocessors receive only the data necessary to fulfill their function. For example, a communication service would receive contact information necessary to complete the communication. Data hosting partners and vendors may process and store the same information PowerSchool processes and stores. These relationships are authorized by the contracts between PowerSchool and the customer school districts/schools, and the data sharing (if any) is strictly controlled by contracts between PowerSchool and the subprocessor. PowerSchool will produce, pursuant to Fed. R. Civ. P. 33(d), contracts with each subprocessor noted above.

*Third*, schools partner with other software providers serving as school officials to provide additional educational services. Schools control when and how their partners may receive their data processed by PowerSchool and can do so without PowerSchool's involvement. At any time, a school has the right to export the data processed by PowerSchool (such as through a CSV file) and provide it to the other school partners, and the school is solely responsible for such sharing. At times, schools have requested that PowerSchool develop or enable development of code that would automate such data sharing with a school partners for the convenience of the school. To that end, PowerSchool has executed license agreements with certain school partners to allow them access to PowerSchool's

proprietary technology subject to confidentiality obligations and fees for the integration work and service. Schools – not PowerSchool – control what data such parties receive through these integrations. PowerSchool's relationship with such partners is governed by a license agreement that prescribes the extent that such partners receive access to PowerSchool's proprietary technology. For clarity, these third parties do not pay PowerSchool for student data; instead, the schools—the owners of the data—require PowerSchool to share the schools' own student data with these other providers to the school. PowerSchool has worked with the following third-party partners during the relevant time period:

- 911 Inform
- Abnormal Security
- Access411
- Alert Solutions
- AllHere
- Allovue
- Amazon Web Service (AWS)
- Ann Education
- Apex Learning
- AttendanceK12
- August Schools
- BatonRoute
- BenchPrep
- Blackboard
- Blocksi
- Bloomz
- Boardingware
- Book Systems
- Boom Learning
- Britannica

- Bull Valley Software
- BusBoss
- C2C Schools
- Canva
- Capti Voice
- Capture
- CareDox
- Career Key
- Carnegie Learning
- CENTEGIX
- CenterPoint Education Solutions
- ChewBox
- Class Creator
- Class Solver
- ClassHook
- ClickView
- Code.org
- College Aid Pro
- Cometa
- Common App
- CompuClaim
- CyberSchool
- CypherWorks
- DiscoveryEd
- e~Funds for Schools
- EAB
- EBSCOed, powered by Stacks
- eCollect

- edcite schools
- Edge Document Solutions
- Edgenuity
- Edlio
- Edmentum
- Edsby
- Education Advanced
- Education Modified
- Educational Impact
- Educational Vistas
- EduHealth
- EduTrak
- EntrySign (ES)
- eSchoolView
- Experian
- Eyemetric Identity Systems
- EZSchoolPay
- Faria Education Group
- FIS Global
- GeniusApp Manager
- Goodheart-Wilcox
- Great Minds
- Harvest Technology Group
- Heartland
- Heartland MySchoolBucks
- Horizon Education
- Hubbe Inc.
- Human eSources

- i3 Education
- i3Verticals
- Ident-a-kid Visitor Management
- identiMetrics
- Impero Software
- interviewstream
- InTouch Receipting
- Intrado School Messenger
- IRIS
- ISTE
- iTrack
- JASON Learning
- JoeZoo App
- K12 BLOOM
- Kami
- Kaplan
- KEV Group
- Kickboard
- KIDaccount
- Kinvolved
- KnowBe4
- Kudor
- LeanStream
- Lessonbee
- Level Data
- Lincoln Learning
- Linq
- LobbyGuard

- LunchTime
- Macro Connect
- Magic Wrighter
- Magnus Health
- ManageBac
- Marcia Brenner Associates
- MasteryPrep
- McGraw-Hill Education
- McREL International
- Meals Plus
- Meet the Teacher
- Microsoft Education
- MindFlics
- MobileServe
- Monsido Powered by Acquia
- National Geograghic Learning/ Cengage
- NoRedInk
- Ocean Youth Academy
- OneLogin
- Orah
- Orison
- Parchment
- ParentSquare
- Park Bench evScheduler
- Park Bench Visual PST
- Partner4Results
- Partnership to End Addiction
- PaySchools

- PCS Revenue Control
- Pear Deck
- Performance Scoring
- PickUp Patrol
- Pickup Pro
- Prepmedians
- PrimeroEdge K-12 Child Nutrition Software
- PS Financials by Iris
- QuestSim
- Raptor Technologies
- Rave Mobile Safety
- Reach Boarding School System
- Reach Student Life Management
- ReadSpeaker
- Renzulli Learning
- Respondus
- RevTrak
- Roadtrip Nation (RTN)
- Ruvna
- RYCOR
- Savvas
- ScholarChip
- School Cloud
- School Dismissal Manager
- School Dispatch
- School Office Apps, Inc.
- School Safety Manager
- SchoolBzz

- SchoolCare
- SchoolCheckIn
- SchoolDay.AI
- SchoolLinks
- SchoolPass
- SchoolsBuddy
- SchoolSoft
- SchoolSoft Conference Manager
- SchoolSoft Permission Form Manager
- Scribbles
- Seity Health
- Shmoop
- Sight On Scene
- Skooli
- Slooh
- SNAP Health Center
- Sora by OverDrive
- Spark Hire
- STEMscopes
- Stemuli
- Stepwell
- Stronge and Associates Educational Consulting, LLC
- Student Provisioning Services
- Studyo
- Stukent
- SwiftREACH
- SwipeK12
- TCP (Time Clock Plus)

- TeacherLists
- TES Software
- The Danielson Group
- Thrive Compass
- Time for Kids
- TimeClock Plus
- Tools4ever
- TransACT
- TrueCare
- TurnItIn
- TutorFly
- Typesy
- UPAGO
- UR Turn, SBC
- Vanco
- Version3
- Visitu
- Vizor
- We Schools
- Welfie
- Whale Shark Software
- Wordware
- Writable
- x2VOL powered by intelliVOL
- Xello

Given that schools – rather than PowerSchool – share data with the foregoing entities, PowerSchool objects to subparts (a), (b), and (c) because further discovery into these entities is irrelevant, unduly burdensome, and disproportionate to the needs of the case. Further, subparts (a)-(c)

pose separate and distinct questions and must be counted as separate interrogatories. *See Am. Bankers*, 2020 WL 8996760, at *1-2; *Collaboration Properties*, 224 F.R.D. at 474-75; *Safeco*, 181 F.R.D. at 443. For instance, one of the third-party partners is TurnItIn—a software provider schools use to check student assignments for plagiarism. Not every school partners with TurnItIn and the types of data shared may vary school-to-school, such that PowerSchool will first need to identify the particular districts that have partnered with TurnItIn and then review the individual data-sharing policies those schools have chosen, before it can respond as to TurnItIn. This is a wholly different inquiry than as to PrimeroEdge K-12 Child Nutrition Software, which is a software provider for tracking nutrition related data. Again, not every school will partner with PrimeroEdge, the use will vary school to school, and the data sharing will vary as well. This makes each inquiry independent and not logically subsumed within each other. *Safeco*, 181 F.R.D. at 446. The burden of responding to what amounts to an extra 136 (or more) interrogatories is disproportionate to the needs of the case, particularly given that PowerSchool is sharing school data (if at all) at the express direction of the school and does not receive payment for such transfer.

PowerSchool remains willing to meet and confer if Plaintiffs seek additional information related to this Interrogatory.

Dated: June 30, 2025

/s/ *Taylor Rothman*
Taylor Rothman

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, California 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Zharna Shah (*pro hac vice*)
Taylor Rothman (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
zharna.shah@kirkland.com
taylor.rothman@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Ethan Joel Levinton (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
oliva.adendorff@kirkland.com
ethan.levinton@kirkland.com

*Attorneys for Defendant*
*PowerSchool Holdings, Inc.*

**VERIFICATION**

I declare under penalty of perjury that the Responses to Plaintiffs' Non-Uniform Interrogatories Nos. 1, 4, 5 are true and correct.

Dated: June 30, 2025

/s/ DocuSigned by: Darron Flagg
A3AC8679AD71444...
Darron Flagg

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2025, I served the foregoing document to the following counsel of record via e-mail:

Leonard W. Aragon
Robert B. Carey
Tory Bearsley
Whitney Siehl
Hagens Berman Sobol Shapiro LLP
11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
leonard@hbsslaw.com
rob@hbsslaw.com
toryb@hbsslaw.com
whitneys@hbsslaw.com

Julie Liddell
Andrew Liddell
EdTech Law Center PLLC
P.O. Box 300488
Austin, TX 78705
julie.liddell@edtech.law
andrew.liddell@edtech.law

Lori Feldman
George Feldman McDonald, PLLC
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
lfeldman@4-justice.com

*/s/ Taylor Rothman*
Taylor Rothman

# EXHIBIT 14

# SUBMITTED WITH REDACTIONS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

EMILY CHERKIN, et al., )
Plaintiff, )
v ) Case No. 3:24-CV-02706-JD
POWERSCHOOL HOLDINGS, INC., )
Defendant. )
)

VIDEOTAPED DEPOSITION OF NICOLE SHINTON

APPEARING REMOTELY

June 19, 2025

10:06 a.m.

Reported by: Eileen Mulvenna, CSR/RMR/CRR/RDR

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

A. Can you say that again?
Q. Sure.
Do you agree that a company that collects personal data from an individual has an obligation to obtain informed voluntary consent from that person before collecting personal data?
MR. LEVINTON: Objection, calls for a legal conclusion.
THE WITNESS: At PowerSchool, the data that we collect under my purview of products is owned by the school district. So the collection of that data is to serve a purpose for that school district.
BY MR. LIDDELL:
Q. Do you agree that a company that collects personal data from an individual has an obligation to obtain informed voluntary consent from that person before collecting personal data?
MR. LEVINTON: Objection, asked and answered. Objection, calls for a legal conclusion.
THE WITNESS: Sorry, sir, can you --

guardian?
MR. LEVINTON: Objection, calls for a legal conclusion. Ms. Shinton isn't an attorney.
THE WITNESS: Yes.
BY MR. LIDDELL:
Q. Do you agree that a company that collects personal data from a child, which is a person under the age of 18, must obtain informed voluntary consent from that child's parent or legal guardian?
MR. LEVINTON: Objection, calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. LIDDELL:
Q. Do you agree that PowerSchool should obtain informed voluntary consent from parents and legal guardians when collecting personal data from those parents and legal guardians?
MR. LEVINTON: Same objection.
THE WITNESS: No. Our customer is school districts. We do not explicitly

collect data. Our contract is with school districts, and it is up to those districts to decide what, if any, personal data they choose to collect.

BY MR. LIDDELL:

Q. Do you agree that PowerSchool should obtain informed voluntary consent from parents and legal guardians when collecting personal data about those parents and legal guardians?

MR. LEVINTON: Objection, calls for a legal conclusion. Objection, asked and answered.

THE WITNESS: Again, no. PowerSchool, our consumer is the school district. If the school district elects to collect data on parents or students, that is their choice.

BY MR. LIDDELL:

Q. Do you agree that PowerSchool should obtain informed voluntary consent from parents and legal guardians when collecting personal data from those parents and legal guardians?

MR. LEVINTON: Objection, assumes

facts not in evidence. Objection, calls for a legal conclusion. Objection, asked and answered.

THE WITNESS: No.

BY MR. LIDDELL:

Q. Do you agree that PowerSchool must obtain informed voluntary consent from parents and legal guardians when collecting personal data from those parents and legal guardians?

MR. LEVINTON: Objection, assumes facts not in evidence. Objection, calls for a legal conclusion.

THE WITNESS: No.

BY MR. LIDDELL:

Q. Do you agree that PowerSchool should obtain informed voluntary consent from a parent or legal guardian when collecting personal data from that person's child?

MR. LEVINTON: Objection, asked and answered. Objections, calls for a legal conclusion. Objection, assumes facts not in evidence.

THE WITNESS: No.
BY MR. LIDDELL:
Q. Do you agree that PowerSchool must obtain informed voluntary consent from a parent or legal guardian when collecting personal data from that person's child?
MR. LEVINTON: Same objections.
THE WITNESS: No.
BY MR. LIDDELL:
Q. Do you agree that disclosures regarding a company's data practices must be understandable to a reasonable person?
MR. LEVINTON: Objection, calls for a legal conclusion. Objection, vague.
THE WITNESS: Can you reask that, please?
BY MR. LIDDELL:
Q. Do you agree that disclosures regarding a company's data practices must be understandable to a reasonable person?
MR. LEVINTON: Same objections.
THE WITNESS: The school district, who

information it collects from students?

MR. LEVINTON: Same objections.

MR. LIDDELL: Excuse me. Allow me to start that over.

MR. LEVINTON: Sorry.

BY MR. LIDDELL:

Q. Do you agree that PowerSchool must explain to parents and legal guardians what information it collects from students and parents?

MR. LEVINTON: Same objections.

THE WITNESS: No.

BY MR. LIDDELL:

Q. Do you agree that PowerSchool should explain to parents and legal guardians how the company uses the data it collects?

MR. LEVINTON: Same objections.

THE WITNESS: No. I will say that the school district is in charge of electing which data to collect that is not mandated by PowerSchool.

BY MR. LIDDELL:

Q. Do you agree that PowerSchool should

explain to parents and legal guardians how the
company uses the data it collects?

MR. LEVINTON: Same objections.

THE WITNESS: No.

BY MR. LIDDELL:

Q. Do you agree that PowerSchool must
explain to parents and legal guardians how the
company uses the data it collects?

MR. LEVINTON: Objection, assumes facts not in evidence. Objection, vague. Objection, calls for a legal conclusion.

THE WITNESS: No.

BY MR. LIDDELL:

[redacted]

MR. LEVINTON: Objection, calls for a legal conclusion. Objection, vague.

[redacted]

Q. What is the responsibility of the services team?
A. Services team is primarily responsible for implementation and configuration of the product for our school districts.
Q. What are the responsibilities of the cloud operations team?
A. Cloud operations manages our hosted environments.
Q. And what do you mean by "hosted environments"?
A. School districts can choose to have PowerSchool SIS, at least, on-premise versus hosted in the cloud.
Q. What does "on-premises" mean?
A. On-premise means that the district has their own servers or hardware that they elect to maintain, and they own that. So they own that hardware and that -- we call them also self-hosted, meaning that they elect to choose to basically house their own data.
Q. And approximately how many of

STATE OF NEW YORK )
ss:
COUNTY OF WESTCHESTER )

I, EILEEN MULVENNA, CSR/RMR/CRR/RDR, a Certified Court Reporter, Registered Merit Reporter, Certified Realtime Reporter, Registered Diplomate Reporter, and Notary Public in and for the State of New York, do hereby certify:

That I reported the taking of the deposition of the witness, NICOLE SHINTON, commencing on the 19th day of June, 2025, at the hour of 10:06 a.m.

That prior to being examined, the witness was duly sworn by me to testify to the truth, the whole truth, and nothing but the truth.

That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true and accurate transcription of my said shorthand notes taken down at said time, and that a request has been made to review the transcript.

I further certify that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel involved in said action, nor a person financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my signature this 2nd day of July, 2025.

______________________________________

EILEEN MULVENNA, CSR/RMR/CRR

# EXHIBIT 15

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

EMILY CHERKIN, et al., )
Plaintiff, )
v ) Case No. 3:24-CV-02706-JD
POWERSCHOOL HOLDINGS, INC., )
Defendant. )
)

VIDEOTAPED DEPOSITION OF PAUL BROOK
APPEARING REMOTELY
September 26, 2025
9:00 a.m. (Pacific Daylight Time)

Reported by: Eileen Mulvenna, CSR/RMR/CRR/RDR
Job No. 00170377

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

speculation, legal conclusion, and
foundation.
THE WITNESS: We have data processing agreements with our customers who are the schools and the district.
BY MS. BEARDSLEY:
Q. Sure. But that wasn't my question. So I'll ask it again.
Do you agree that a company gathers -- that gathers personal data from individuals must obtained informed consent to gather that data?
MS. ROTHMAN: Same objections, calls for speculation, legal conclusion, foundation.
THE WITNESS: Again, PowerSchool's duty is to our customers who are the schools and the district to preserve and protect their data.
BY MS. BEARDSLEY:
Q. So PowerSchool does not have a duty to obtain informed consent from these students and parents?

MS. ROTHMAN: Objection, foundation, calls for speculation.

THE WITNESS: PowerSchool's duty is to our customers, who are the states, the districts, the schools. The schools are responsible for getting that permission from their constituents, whether that be parents, guardians, or teachers.

BY MS. BEARDSLEY:

Q. So in the case of PowerSchools [sic], it's the school or the school districts' duty to obtain informed consent from the parents for PowerSchools to gather student data?

MS. ROTHMAN: Objection, form, foundation, and speculation.

THE WITNESS: That responsibility is for the schools, the districts, and the state.

BY MS. BEARDSLEY:

Q. Please describe your responsibilities as chief customer officer.

A. So I am responsible for the majority

STATE OF NEW YORK )

ss:

COUNTY OF WESTCHESTER )

I, EILEEN MULVENNA, CSR/RMR/CRR/RDR, a Certified Court Reporter, Registered Merit Reporter, Certified Realtime Reporter, Registered Diplomate Reporter, and Notary Public in and for the State of New York, do hereby certify:

That I reported the taking of the deposition of the witness, PAUL BROOK, commencing on the 26th day of September, 2025, at the hour of 9:00 a.m.

That prior to being examined, the witness was duly sworn by me to testify to the truth, the whole truth, and nothing but the truth.

That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true and accurate transcription of my said shorthand notes taken down at said time, and that a request has been made to review the transcript.

I further certify that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel involved in said action, nor a person financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my signature this 8th day of October, 2025.



______________________________________

EILEEN MULVENNA, CSR/RMR/CRR

# EXHIBIT 16

# SUBMITTED UNDER SEAL

# EXHIBIT 17

# SUBMITTED UNDER SEAL

# EXHIBIT 18

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

-------------------------------x
EMILY CHERKIN, et al., :
:
Plaintiffs, : Case No.
:
vs. : 3:24-cv-02706-JD
:
POWERSCHOOL HOLDINGS, INC., :
:
Defendant. :
-------------------------------x

VIRTUAL VIDEOTAPED DEPOSITION OF
SHAHZAD AHMAD
Wednesday, September 17, 2025
8:05 a.m. Pacific Daylight Time

REPORTER: Dawn A. Jaques, CSR, CLR

---

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

A Our customers.
Q And in your experience, has PowerSchool ever accessed its customers' data without the school's permission?
A Never.
Q And in your experience, has PowerSchool ever accessed student data without the school's permission?
A Never.
Q Now, Plaintiffs allege that PowerSchool monetizes student data.
Does PowerSchool sell student data at all?
A No.
Q Does PowerSchool sell access to student data?
A No.
Q Does PowerSchool use data from one school to build a product used for another school?
A No.
Q Does PowerSchool use data from one

CERTIFICATE OF NOTARY PUBLIC

I, DAWN A. JAQUES, a Notary Public in and for the Commonwealth of Virginia, before whom the foregoing deposition was taken, do hereby certify that witness whose testimony appears in the foregoing pages was duly sworn by me; that the testimony of said witness was taken by me in shorthand at the time and place mentioned in the caption hereof and thereafter reduced to typewriting under my supervision; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition is taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the actions.

Dawn A. Jaques, CSR, CLR
Notary Public in and for
Commonwealth of Virginia

My commission expires:
August 31, 2027
Registration No. 132328

# EXHIBIT 19

# SUBMITTED UNDER SEAL

# EXHIBIT 20

# SUBMITTED UNDER SEAL

# EXHIBIT 21

# SUBMITTED UNDER SEAL

# EXHIBIT 22

# SUBMITTED UNDER SEAL

# EXHIBIT 23

# SUBMITTED UNDER SEAL

# EXHIBIT 24

# SUBMITTED UNDER SEAL

# EXHIBIT 25

# SUBMITTED UNDER SEAL

# EXHIBIT 26

# SUBMITTED UNDER SEAL

# EXHIBIT 27

# SUBMITTED UNDER SEAL

# EXHIBIT 28

# SUBMITTED UNDER SEAL

# EXHIBIT 29

# SUBMITTED UNDER SEAL

# EXHIBIT 30

# SUBMITTED UNDER SEAL

# EXHIBIT 31

# SUBMITTED UNDER SEAL

# EXHIBIT 32

## SUBMITTED UNDER SEAL

# EXHIBIT 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

EMILY CHERKIN, et al.,

Plaintiffs,

vs. No. 3:24-CV-02706-JD

POWERSCHOOL HOLDINGS, INC.,

Defendants.
/

VIDEOTAPED DEPOSITION OF DAVID CONCEPCION

Stenographically Reported by

ANGELA SINCLAIR, CSR No. 13902

RDR, RMR, RPR, CRR, CCRR

August 19, 2025

Q. Without telling me any of the substance of the discussions with your counsel, can you tell me, were you generally involved at all in preparing the complaint?

A. Yes.

Q. Can you describe for me at a high level the involvement without revealing any conversations that you've had with counsel?

A. Communications by phone and by email about questions about the case.

Q. Can you explain for me generally the basis of why you're suing PowerSchool in your own words?

A. The misuse of information without the authorization of us as parents, without the authorization of the kids of their personal information. Later we found out that there was a data breach. The school informed us about it. So our information, the kids' information is probably out somewhere and has been used.

The selling of our information potentially by PowerSchool or ParentSquare or all the parties involved and also just the fact that privacy is so important to our family for the reasons I previously stated, that we feel that this has been detrimental to our family.

Q. Okay. So let me just walk through those.

You said the misuse of information without the authorization of parents and students. What do you mean by "misuse of information"?

A. So the personal information of our kids and our family has been used for sale to sell it to other companies or for PowerSchool to build other products using our information or to sell it to other districts or other companies. I'm not sure what it is that they've used it for. And just generally using information without our authorization.

Q. And so you said "generally using information without authorization." What do you mean by that and is that separate from what you just talked about of selling to a third -- to other companies, building other products, selling to other districts or companies?

A. Also using it to build or use it for AI that has been used by PowerSchool or other related companies.

Q. And so if I'm understanding correctly, there is it sounds like two principal problems in your mind. One is selling information to somebody else, and the second is any sort of new product development.

Do I have that summary correct or is there something else?

MS. SIEHL: Object to the form. Misstates testimony.

You can answer.

THE WITNESS: Doing those things without any request by the company to the users, using information to possibly sell it to other companies, the information being leaked to who knows who who knows where for who knows what.

Storing information without our consent, keeping it and using it for other purposes other than the school's recordkeeping.

BY MR. TEMCHENKO:

Q. So I think I've got a number of categories now. So I've got developing products -- as I understand it, developing new products, selling it to others, allowing the data to be exposed to a data breach, and then you also said generally storing information without your express permission.

Does that fully sum up all of the reasons for why you're suing PowerSchool?

MS. SIEHL: Object to the form. Calls for a legal conclusion.

You can answer.

THE WITNESS: Not fully but for the most part, yes.

BY MR. TEMCHENKO:

Q. Okay. Is there -- what else did I miss from that recitation?

A. I'll have to think about it, but I think those are generally most of the items that are of concern to me.

Q. Okay. Let me take those one at a time starting with storing information without your permission.

What do you understand is the problem there?

A. I believe that PowerSchool has taken information and not held it only for the use or solely for the use of West Contra Costa Unified School District and the school that my children attend but has used it and stored it for other products that they may be producing or using it for.

Q. Okay. And so then if I'm understanding correctly, the problem with storing information without your consent is -- again goes to the misuse of the information for selling, product development, or those other issues you've discussed; is that right?

MS. SIEHL: Object to the form.

You can answer.

THE WITNESS: Yes.

BY MR. TEMCHENKO:

Q. You don't have a problem with PowerSchool generally storing information on behalf of West Contra Costa Unified School District for use by the West Contra Costa Unified School District?

A. I don't have a problem with them storing it for the purposes of recordkeeping and maintenance of records for my children's attendance and grade -- grading.

Q. You also mentioned exposing -- you mentioned a data breach. In this case are you trying to claim as your losses anything related to that data breach?

MS. SIEHL: Objection. Calls for a legal conclusion.

You can answer.

THE WITNESS: I don't know what was leaked or how much was leaked or to who it was leaked. I'm just stating that as one of the things. You asked me what were the factors that are of concern to me. That was one of the things that was of concern to me.

And the district sent us an email sometime late last year or very early this year saying that our district was one of the districts that was

breached by the data breach.

BY MR. TEMCHENKO:

Q. And so if -- are you asking for a monetary compensation or any other kind of remedy based on that data breach in this case?

MS. SIEHL: Object to the form. Calls for a legal conclusion.

You can answer.

THE WITNESS: I am not talking about any kind of monetary compensation for that.

BY MR. TEMCHENKO:

Q. And so to be clear, you're not seeking any kind of remedy, damages, money, or other based on the data breach that happened I believe it was last year?

MS. SIEHL: Object to the form. Calls for a legal conclusion.

You can answer.

THE WITNESS: I did not say anything about any kind of monetary compensation when I talked about the data breach.

BY MR. TEMCHENKO:

Q. And so just help me understand this because there is one other case related to the data breach specifically.

As part of this case, is it your intention

to stand up and tell the jury, the courts that one of the ways you were harmed is by that data breach?

MS. SIEHL: Object to the form. Calls for legal conclusion.

You can answer.

THE WITNESS: I don't know the extent of the data breach, but I assume that my information and my kids' information was leaked.

BY MR. TEMCHENKO:

Q. And so -- and I'm sorry, this is a narrower question.

Do you intend in this case to stand up and say you believe that your data was leaked in that data breach and therefore part of this case, what you're seeking in this case, is based on that data breach?

MS. SIEHL: Same objection. Calls for legal conclusion.

You can answer.

THE WITNESS: I'll discuss that with my attorneys. I don't -- I don't have a response for that right now.

BY MR. TEMCHENKO:

Q. So to understand -- if I'm understanding correctly, your attorneys will ultimately decide

whether that's something you're seeking in this case?
A. No. That's your assumption, not mine. That was not my statement.
Q. Okay. Then please help me understand.
Like is that -- are -- have you decided whether or not you're going to be seeking any recourse, damages, or otherwise based on the data breach or is somebody else going to make that decision for you?
A. I have not discussed that with anybody or even contemplated that at this time.
Q. And do you have any present intention to seek that, to seek recourse, damages, or otherwise based on that data breach?
MS. SIEHL: Object to the form.
You can answer.
THE WITNESS: I currently have not discussed that or thought about that.
BY MR. TEMCHENKO:
Q. Now, going to the product development, I think that leaves -- so we discussed the storing of data, discussed the data breach. The last two categories that we mentioned were selling the data and using it for product development for AI and the like.

During the course of this conversation have you thought of any fifth category or anything else that --

A. I've been focusing on your questions.

Q. Well, if not, that's perfectly fine.

A. Yeah.

Q. So now focusing on product development, explain that for me. What's your issue there? What -- explain that for me in your own words.

A. The use of any of my or my children's personal information for creation of anybody's products without our authorization I believe is inappropriate and unauthorized.

I think that anybody making any profit from our personal information is not something that is appropriate and it's not something that I ever authorized.

So using my children or my data to create/improve other products that are not the product that we are currently authorizing to use, which is PowerSchool or ParentSquare, is something that I don't believe is appropriate.

Q. Okay. And so if I'm understanding that correctly, then, if you're -- if PowerSchool is only -- is only referencing the data just to fix

REPORTER'S CERTIFICATE

I, ANGELA SINCLAIR, a Stenographic Certified Shorthand Reporter, holding a valid and current license issued by the State of California, duly authorized to administer oaths, do hereby certify:

That DAVID CONCEPCION, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified.

That said deposition was taken before me at said time and place, and was taken down in shorthand by me and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place.

The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certificate null and void.

Should the signature of the witness not be affixed to the deposition, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.

I further certify that I am neither counsel for nor related to any party in the foregoing deposition and caption named nor in any way interested in the outcome thereof.

That before completion of the proceedings, review of the transcript was NOT requested pursuant to Federal Rule 30(e).

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 3rd day of September 2025.



ANGELA SINCLAIR, CSR No. 13902
RDR, RMR, RPR, CRR, CCRR
State of California

# EXHIBIT 34

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

------------------------------------------

EMILY CHERKIN, et al.,

Plaintiffs,

vs.

Case No.
3:24-CV-02706-JD

POWERSCHOOL HOLDINGS, INC.,

Defendant.

------------------------------------------

REMOTE VIDEO DEPOSITION OF M.M.C.

Monday, November 24, 2025

10:15 a.m. (PST)

Reported by:
Jaclyn Urzia, RPR, CRR
Job No. 2025-1004245

Q And I'm guessing then you've never -- you don't recall ever going on this web page before?

A Uh-uh.

MS. SIEHL: So no?

THE WITNESS: Yeah.

BY MR. TEMCHENKO:

Q So no. Okay.

What does the word "privacy" mean to you?

A The word "privacy" means to be like keeping it secret and not like sharing it with other people.

Q And what about data privacy, do you know what data privacy is?

A Not really.

Q Okay. Well, without telling me the information that is like secret or private, like what kind of information would you say -- like kinds, categories of information would you say is private information about you?

A My history, my like -- my stuff I do, and I guess -- I don't really know what it means, but I guess data, my data.

Q Okay. And you said you don't know what "data" means?
A No, not really.
Q Okay. Do your teachers ever ask you to share stuff that's private about yourself in school?
A No.
Q Have you ever shared anything that's private about yourself in school?
A No.
Q Do you have any opinions about how much your private information is worth?
MS. SIEHL: Object to the form.
You can answer.
A Could you repeat that again?
Q Yeah.
Do you have any opinions about how much your private information is worth --
MS. SIEHL: Same objection.
BY MR. TEMCHENKO:
Q -- like how much money it's worth?
A There's no value. My privacy is too important.

Q Okay. And so you -- and just to make sure that I understood, it's not that your data has no value, it's just it's invaluable to you, it's priceless.

A Yeah.

Q Okay. Would you say that your name is your private information?

A No.

Q How about the name of your parents, is that private information?

A No, I don't think so.

Q How about your age, is that private information?

A No.

Q How about your hair color, is that private information?

A No.

Q And, I'm sorry, I couldn't quite hear that.

Is your hair color private information?

A No.

Q How about the fact that we're speaking English, is that private information?

REPORTER CERTIFICATE

I, JACLYN URZIA, do hereby certify:

That said deposition was taken at the time and place herein named; and that the transcript is a true record of the testimony as reported by me, a disinterested person, and was thereafter transcribed.

I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of December, 2025.



JACLYN URZIA, RPR, CRR

# EXHIBIT 35

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

------------------------------------------

EMILY CHERKIN, et al.,

Plaintiffs,

vs.

Case No.
3:24-CV-02706-JD

POWERSCHOOL HOLDINGS, INC.,

Defendant.

------------------------------------------

REMOTE VIDEO DEPOSITION OF L.M.C.

Monday, November 24, 2025

9:11 a.m. (PST)

Reported by:

Jaclyn Urzia, RPR, CRR

Job No. 2025-1004245

You can answer.
A I've never thought, basically.
Q Okay. Do you have any ideas or opinions about the value -- how much your personal information is worth?
MS. SIEHL: Object to the form.
You can answer.
A I mean, I wouldn't sell it because it's like my personal stuff. So no, not really.
Q Okay. Do you have any opinions on whether your personal information or how much it's worth is affected by your use of Google Classroom, Clever or apps like that?
MS. SIEHL: Object to the form.
You can answer.
A No.
Q Okay. So I know we've been talking about personal -- the things that are your personal information.
Do you think that your name is your personal information?
A No, because lots of people have a name.
Q Okay. How about your parents'

REPORTER CERTIFICATE

I, JACLYN URZIA, do hereby certify:

That said deposition was taken at the time and place herein named; and that the transcript is a true record of the testimony as reported by me, a disinterested person, and was thereafter transcribed.

I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of December, 2025.

JACLYN URZIA, RPR, CRR

# EXHIBIT 36

## SUBMITTED WITH REDACTIONS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---

| | |
|---|---|
| EMILY CHERKIN, et al., | ) |
| Plaintiffs, | ) |
| vs. | )No. 3:24-CV-02706-JD |
| POWERSCHOOL HOLDINGS, INC., | ) |
| Defendant. | ) |

---

Deposition Upon Oral Examination Of

S.G. MINOR CHILD

---

9:01 a.m.

August 26, 2025

1301 Second Avenue

Seattle, Washington

REPORTED BY: Yvonne A. Gillette, RPR, CCR No. 2129.

A [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

bit.
A Okay.
Q You can put that aside. What do you understand the term, data privacy, to mean?
A That whatever work or information that is mine is mine and not anyone else's.
Q How about privacy in general? What does that mean to you?
A Kind of like having the respect of being able to keep what you want to yourself.
Q Is it fair to say in the school context that, when you talk about privacy, you are assuming that the information you share with your teachers and with your school is not shared with anyone outside of your teachers and your school?
A Yes.
Q And if the information that you share with your teachers and your school stays within your teachers and your school, do you feel like your privacy would be respected?
MR. ARAGON: Objection. Form.
A Yeah.
Q What kind of information would you say is private?
MR. ARAGON: Objection. Form.

materials to you regarding what products they may create using your data?
A No.
Q If PowerSchool created a product using your data, would you consider that a harm to you?
A Yes.
Q If PowerSchool shared that data with a third party that's not your school or school district, would you consider that a harm to you?
A Yes.
Q If PowerSchool sold your data to a third party that's not your school or school district, would you consider that a harm?
A Yes.
Q Would you consider it a harm that PowerSchool created an artificial intelligence product using your data?
A Yes.
Q What if -- if PowerSchool created an artificial intelligence product and sold it back to your school, would you consider that a harm?
A Yes.
Q If PowerSchool used your data to create an artificial intelligence product, and that product was used to make predictions about you, would you consider

that a harm?
A Can you repeat that?
Q Yeah. If PowerSchool has made an artificial intelligence product, okay, and that product was used to make predictions about you, would you consider that a harm?
A Yes.
Q You understand this lawsuit a class action, right?
A Um-hum.
Q Do you understand your role as a class representative?
A Yes.
Q Can you just generally what you describe that you're going to do?
A Show up, tell the truth, and represent the class.
Q Did your mom force you to join this litigation?
A No.
Q Are you here voluntarily on your own free will?
A Yes.
Q Did you ever give PowerSchool permission to collect and use your data to make money?

A No.

MR. ARAGON: I pass the witness.

EXAMINATION

BY MS. SHAH:

Q Sylvie, have you actually read PowerSchool's privacy policy?

A Maybe. I don't think so, but possibly.

Q So you don't know actually one way or the other whether PowerSchool's policy does in fact disclose what they do with your data, right?

A No. Wait. Can you repeat that?

Q Let me repeat it. Too many double negatives. I'll represent to you, PowerSchool's privacy policy does in fact tell you what PowerSchool does with your data.

MR. ARAGON: Objection. Form.

Q Am I correct that you've just not read it?

MR. ARAGON: Objection. Form. Foundation.

A I think so.

Q And if PowerSchool's privacy policy says it does not sell your data, do you have any reason to disagree with that?

MR. ARAGON: Objection. Form.

A Can you say that again?

Q Yeah. If PowerSchool's privacy policy

C E R T I F I C A T E

State of Washington )
) ss.
County of King )

I, the undersigned Registered Professional Reporter and Washington Certified Court Reporter, hereby certify that the foregoing deposition upon Oral examination of S.G. MINOR CHILD was taken before me on August 26, 2025 and transcribed under my direction;

That the witness was duly sworn by me pursuant to RCW 5.28.010 to testify truthfully; that the transcript of the deposition is a full, true, and correct transcript to the best of my ability; that I am neither attorney for, nor a relative or employee of, any of the parties to the action or any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

I further certify that in accordance with CR 30(e), the witness was given the opportunity to examine, read, and sign the deposition, within 30 days, upon its completion and submission, unless waiver of signature was indicated in the record.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this date, September 2, 2025:

/S/Yvonne A. Gillette
____________________________
Yvonne A. Gillette
Washington Certified Court Reporter
License No. 2129

# EXHIBIT 37

# SUBMITTED UNDER SEAL

# EXHIBIT 38

# SUBMITTED UNDER SEAL

# EXHIBIT 39

# SUBMITTED UNDER SEAL

# EXHIBIT 40

# SUBMITTED UNDER SEAL

# EXHIBIT 41

# SUBMITTED UNDER SEAL

# EXHIBIT 42

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
---------------------------------------
EMILY CHERKIN, et al.,
Plaintiffs, Case No.
vs. 3:24-CV-02706-JD
POWERSCHOOL HOLDINGS, INC.,
Defendant.
---------------------------------------

REMOTE VIDEO DEPOSITION OF JUDITH JAEGER

Friday, December 5, 2025
9:36 a.m. (PST)

Reported by:
Jaclyn Urzia, RPR, CRR
Job No. 2025-1004246

Do you know where that is located or where that data is located?

A. I don't know.

Q. Is the data that's stored on the cloud in connection with PowerSchool products and services?

A. Yes.

Q. Do you know which PowerSchool products SPS stores -- strike that.

Do you know what PowerSchool products store data on the cloud?

A. Do I know which PowerSchool products?

Q. Yes.

A. Or just products in general?

Q. Do you know what PowerSchool products -- so you mentioned that PowerSchool products -- strike that.

You mentioned that there are PowerSchool products that SPS uses where that data is stored on the cloud, is that right?

A. Yes.

Q. Okay. Do you know which PowerSchool products store student data

from SPS on the cloud?
A. My understanding is that analytics and insights module, which holds student intervention data, and then also Naviance, which is college and career readiness platform.
And to my knowledge, those are the only two cloud-based PowerSchool products, and the rest are on premise.
Q. Okay. Thank you.
So based on all of this, is it fair to say that you are able to answer my questions about data collection and data sharing based on your personal experience and work experience at SPS?
MR. ARAGON: Objection. Form. Foundation.
A. Yes.
MS. AIRUT MURPHY: I'm also going to object. Vague.
Q. According to board policy, who creates the procedures governing the content management and control of student records?
MR. ARAGON: Objection.

REPORTER CERTIFICATE

I, JACLYN URZIA, do hereby certify:

That said proceedings were taken at the time and place herein named; and that the transcript is a true record of the testimony as reported by me, a disinterested person, and was thereafter transcribed.

I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of December, 2025.

Jaclyn Urzia

JACLYN URZIA, RPR, CRR

# EXHIBIT 43

# SUBMITTED UNDER SEAL

# EXHIBIT 44

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---

| | |
|---|---|
| EMILY CHERKIN, et al., | ) |
| Plaintiffs, | ) |
| vs. | )No. 3:24-CV-02706-JD |
| POWERSCHOOL HOLDINGS, INC., | ) |
| Defendant. | ) |

---

Deposition Upon Oral Examination Of

EMILY CHERKIN

*** CONFIDENTIAL ***

---

9:01 a.m.

September 12, 2025

1301 Second Avenue

Seattle, Washington

REPORTED BY: Yvonne A. Gillette, RPR, CCR No. 2129.

give informed consent about how their children's data is used, then at a bare minimum, no, I don't.
Q And you understand that there are obvious administrative benefits to storing information on a digital platform as compared to, you know, trying to store student records on paper, right?
A I can see there definitely could be advantages.
Q Okay. And, in fact, your school district has even quantified some of those types of benefits on page 2 of Exhibit 11, for instance, in the third paragraph, referring to a savings of a hundred thousand dollars per year in enrollment services staff overtime and additional hourly substitute time that was previously required when entering enrollment forms manually. Do you see that?
A I do.
Q When you talk about you have no issue with a student -- a school using a student information system so long as it's done safely, what do you mean by safely?
A I think I said effectively, safely, and legally. So, I mean, safely certainly would be a bare minimum protecting privacy of student information. So that's a -- it stays within the school itself. When I

future harm, can you identify any harm that you have already suffered as a result of PowerSchool collecting your data allegedly without consent?

MS. SIEHL: Object to the form. Calls for a legal conclusion. You can answer.

A My daughter is not able to fully participate in the educational experience like her peers are because the assumption and expectation and requirement is that she uses PowerSchool products among others.

Q And to be clear, that's a harm that you're alleging that's unique to your daughter or potentially others who opt out of certain participation, but wouldn't be harm experienced by other students who are not opting out, right?

A I see what you're saying. Yes. What I mean is that there isn't an alternative, that education is reliant on a tool that I allege collects and sells and profits from data about children without informed consent.

Q Other than your daughter not having an alternative, are there any other harms that you or your daughter have already suffered in relation to your allegation that PowerSchool has collected information without consent?

MS. SIEHL: Object to the form. Calls for a

A At this point, I'm unaware.
Q You are bringing this lawsuit based on your belief that your and your daughter's private information has been improperly collected and used without your consent, right?
A Yes.
Q So I want to make sure I'm clear on what you believe is private information. Okay?
A Okay.
Q Let's look at -- I'm going to mark the next document as Exhibit 21. But before I do that, what changes do you want PowerSchool to make?
A Stop collecting children's data without parental consent and compensate for any harm they've caused.
Q And when you say stop collecting data without consent, are you looking for PowerSchool to stop being used by schools at all?
A Not necessarily.
Q Are you looking -- what do you mean when you say not necessarily?
A I think we talked about this earlier. I believe that there are technology tools that can support a school system. If those tools are used in alignment with the law, consent, safety, data privacy,

C E R T I F I C A T E

State of Washington )

) ss.

County of King )

I, the undersigned Registered Professional Reporter and Washington Certified Court Reporter, hereby certify that the foregoing deposition upon Oral examination of EMILY CHERKIN was taken before me on September 12, 2025 and transcribed under my direction;

That the witness was duly sworn by me pursuant to RCW 5.28.010 to testify truthfully; that the transcript of the deposition is a full, true, and correct transcript to the best of my ability; that I am neither attorney for, nor a relative or employee of, any of the parties to the action or any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

I further certify that in accordance with CR 30(e), the witness was given the opportunity to examine, read, and sign the deposition, within 30 days, upon its completion and submission, unless waiver of signature was indicated in the record.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this date, September 29, 2025:

/S/Yvonne A. Gillette

Yvonne A. Gillette

Washington Certified Court Reporter

License No. 2129

# EXHIBIT 45





HAGENS BERMAN










Hagens Berman is a national leader in class-action litigation driven by an international team of legal powerhouses. With a tenacious spirit, we are motivated to make a positive difference in people's lives.

# Table of Contents

**INTRODUCTION**
The Firm....4
Locations....5
Quotes....6
Victories & Settlements....10

**PRACTICE AREAS**
Anti-Terrorism....17
Antitrust....18
Automotive Defect, Fraud & Products Liability Litigation....23
Automotive – Emissions Cheating....28
Civil and Human Rights....31
Consumer Protection – General Class Litigation....32
Consumer Protection – Drug and Supplement Litigation....35
Data Breach, Privacy & Cybersecurity....39
Employment Litigation....41
Environmental Litigation....43
Governmental Representation....47
High Tech Litigation....50
Intellectual Property....53
Investor Fraud – Individual and Class Action Litigation....55
Personal Injury and Abuse....59
Sexual Abuse and Harassment....61
Sports Litigation....64
Whistleblower Litigation....68

**APPELLATE VICTORIES**
Strengthening Consumer Law....73

**LEGAL TEAM**
Robert B. Carey....77
Leonard W. Aragon....81
Whitney K. Siehl....83

INTRODUCTION

# The Firm

Hagens Berman Sobol Shapiro LLP was founded in 1993 with one purpose: to help victims with claims of fraud and negligence that adversely impact a broad group. Through the firm's focus on class-action litigation and other complex, multi-party cases, it fights for those seeking representation against wrongdoing and fraud. As the firm grew, it expanded its scope while staying true to its mission of taking on important cases that implicate the public interest and the greater good. We represent plaintiffs including consumers, inventors, investors, workers, the environment, governments, whistleblowers and others.

---

We are one of the nation's leading class-action law firms and have earned an international reputation for excellence and innovation in ground-breaking litigation against large corporations.

---

## OUR FOCUS

Our focus is to represent plaintiffs in antitrust, consumer fraud, employment, environmental, intellectual property, product liability, securities and investment fraud, sexual harassment, tort and whistleblower law cases. Our firm is particularly skilled at managing multistate and nationwide class actions through an organized, coordinated approach. Our skilled team implements an efficient and aggressive prosecutorial strategy to place maximum pressure on defendants.

## WE WIN

We believe excellence stems from a commitment to try each case, vigorously represent the best interests of our clients and obtain maximum recovery. Our opponents know we are determined and tenacious. They respect our skills and recognize our track record of achieving top results for those who need it most.

## WHAT MAKES US DIFFERENT

We are driven to return to the class every possible portion of its damages — our track record proves it. While many class action or individual plaintiff cases result in large legal fees and no meaningful outcome for the client or class, Hagens Berman finds ways to return real value to the victims of corporate fraud and malfeasance through damages and real change.

## AN INTERNATIONAL REACH

Our firm offers clients an international scope of practice. We have flourished through our core network of U.S. offices, and with a global expansion, Hagens Berman has grown geographically to where our eyes have always been: trends of fraud, negligence and wrongdoing taking form anywhere in the world. The firm now does business through endeavors in Paris, London and Amsterdam and has a vested interest in fighting global instances of oppression and injustice.

INTRODUCTION

# Locations

### SEATTLE

1301 Second Avenue, Suite 2000
Seattle, WA 98101
T 206-623-7292
F 206-623-0594

### CHICAGO

455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
T 708-628-4949
F 708-628-4950

### PHOENIX

11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
T 602-840-5900
F 602-840-3012

### BERKELEY

715 Hearst Avenue, Suite 300
Berkeley, CA 94710
T 510-725-3000
F 510-725-3001

### LOS ANGELES

301 North Lake Avenue, Suite 920
Pasadena, CA 91101
T 213-330-7150
F 213-330-7152

### SAN DIEGO

533 F Street
Suite 207
San Diego, CA 92101
T 619-929-3340

### BOSTON

1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
T 617-482-3700
F 617-482-3003

### NEW YORK

594 Dean Street, Suite 24
Brooklyn, NY 11238
T 212-752-5455
F 917-210-3980

### LONDON

Hagens Berman UK LLP
80 Strand
London, WC2R 0DT
T 0203 150 1445

### PARIS

HBSS France
106 rue de l'Université
75007 Paris
T +1 83 64 15 08

INTRODUCTION

# Quotes

## "[A] clear choice emerges. That choice is the Hagens Berman firm."

*— U.S. District Court for the Northern District of California, In re Optical Disk Drive Products Antitrust Litigation (Appointing the firm lead counsel in the case which would later usher in $205 million in settlements.)*

## "Landmark consumer cases are business as usual for Steve Berman."

*— The National Law Journal, naming Steve Berman one of the 100 most influential attorneys in the nation for the third time in a row*

## "Berman is considered one of the nation's top class action lawyers."

*— Associated Press*

## "unprecedented success in the antitrust field"

*— California Magistrate Judge Nathanael M. Cousins
A July 2015 order awarding attorneys' fees in student-athlete name and likeness litigation*

## "All right, I think I can conclude on the basis with my five years with you all, watching this litigation progress and seeing it wind to a conclusion, that the results are exceptional…You did an exceptionally good job at organizing and managing the case…"

*— U.S. District Court for the Northern District of California, In re Dynamic Random Access Memory Antitrust Litigation (Hagens Berman was co-lead counsel and helped achieve the $406 million class settlement.)*

## "I think you have conducted yourselves with great professionalism in this case that has been very difficult, very challenging, and I'm grateful for your professionalism and your advocacy"

*— Honorable Terrence G. Berg
Fairness Hearing in Mark D. Chapman, et al. v. General Motors LLC, April 25, 2025*

## "aggressive and independent advocacy"

*— Hon. Thomas M. Durkin in an order appointing Hagens Berman as interim class counsel in In re Broiler Chicken Antitrust Litigation*

## "Class counsel has consistently demonstrated extraordinary skill and effort."

*— Hon. James Selna, Central District of California, In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices and Products Liability Litigation, (The firm was appointed co-lead counsel without submitting to lead the case, and later achieved what was then the largest settlement in history brought against an automaker – $1.6 billion.)*

## "…I have never worked with such professional, decent counsel."

*— Hon. Dennis M. Cavanaugh, United States District Judge (Retired), Transcript Of Proceedings Fairness Hearing for In re Mercedes-Benz Emissions Litigation, (Hagens Berman helped secure a $700 million settlement for class members and served as interim class counsel.)*

"…the track record of Hagens Berman[‘s] Steve Berman is…impressive, having racked… a $1.6 billion settlement in the Toyota Unintended Acceleration Litigation and a substantial number of really outstanding big-ticket results."

*— Hon. Milton I. Shadur, Senior U.S. District Judge, naming Hagens Berman interim class counsel in Stericycle Pricing MDL (Hagens Berman served as lead counsel and secured a $295 million settlement.)*

"…when you get good lawyers this is what happens; you get these cases resolved."

*— Hon. Dennis M. Cavanaugh, United States District Judge (Retired), Proceedings Fairness Hearing for In re Mercedes-Benz Emissions Litigation*

"…Class counsel have devoted considerable time and resources to this litigation…"

*— Hon. Dennis M. Cavanaugh, United States District Judge (Retired), Proceedings Fairness Hearing for In re Mercedes-Benz Emissions Litigation*

"…This result…puts significant money into the pockets of all of the class members, is an excellent result. …I've also looked at the skill and quality of counsel and the quality of the work… and find that to have been at a high level."

*— Hon. Beth Labson Freeman, United States District Judge, Final Approval of Settlement Hearing for Dean Sheikh et al v. Tesla, Inc.*

"…respective clients certainly got their money's worth with these attorneys and the work that they did on their behalf. …Plaintiffs did an excellent job on behalf of their clients in this case."

*— Hon. Dennis M. Cavanaugh, United States District Judge (Retired)
Proceedings Fairness Hearing for In re Mercedes-Benz Emissions Litigation*

"Class Member reaction to the Mercedes Settlement is overwhelmingly positive."

*— Hon. Dennis M. Cavanaugh (Ret.) Special Master, In re Mercedes-Benz Emissions Litigation*

"I will reiterate that class counsel has demonstrated over many years, superior experience and capability in handling class actions of this sort."

*— Hon. Beth Labson Freeman, United States District Judge, Final Approval of Settlement Hearing for Dean Sheikh et al v. Tesla, Inc.*

"Not only did they work hard and do what was appropriate under the circumstances; their behavior was exemplary throughout. They were fair and firm. There were no pushovers involved here."

*— Hon. Dennis M. Cavanaugh, United States District Judge (Retired), Proceedings Fairness Hearing for In re Mercedes-Benz Emissions Litigation*

"Class Counsel are extremely qualified and competent counsel who have experience and expertise prosecuting complex class actions…successfully tried class actions to jury verdicts and…also obtained billions of dollars in settlements…"

*— Judge Magnuson, Final CBL Approval Order*

"Plaintiffs have zealously litigated this case on behalf of the class over the course of eight years…the reaction of the class members has been overwhelmingly positive."

*— Hon. Jeffrey S. White*
*Order finalizing $28 million settlement in class-action against Schneider National Carriers Inc.*

"Unlike many antitrust class actions, Plaintiffs' Counsel identified and investigated the allegations in this case without the benefit of a prior government investigation."

*— Hon. Stephanie A. Gallagher, U.S. District Judge*
*Order Granting Plaintiffs' Motion for Attorneys' Fees, Jien et al. v. Perdue Farms Inc. et al.*

"Plaintiffs' Counsel consistently demonstrated strong and vigorous advocacy … Their skill and efficiency are further demonstrated by the strength and resources of defense counsel, which include some of the most respected law firms in the country."

*— Hon. Stephanie A. Gallagher, U.S. District Judge*
*Order Granting Plaintiffs' Motion for Attorneys' Fees, Jien et al. v. Perdue Farms Inc. et al.*

"…I have never worked with such professional, decent counsel."

*— Hon. Dennis M. Cavanaugh, United States District Judge (Retired), Transcript of Proceedings Fairness Hearing for In re Mercedes-Benz Emissions Litigation, (Hagens Berman helped secure a $700 million settlement for class members and served as interim class counsel.)*

"The level of representation of all parties in terms of the sophistication of counsel, was, in my view, of the highest levels. I can't imagine a case in which there was really a higher quality of representation across the board than this one."

*— Hon. William E. Smith, District Judge, U.S. District Court for the District of Rhode Island*
*In re Loestrin 24 Antitrust Litigation, Master File No. 1:13-md-2472 (D.R.I.)*
*Final Approval Hearing on the direct purchaser settlement ($120M)*

"…counsel provided strong representation for the class. Class counsel discovered and developed this case without the benefit of a government investigation's coattails. In total, class counsel reviewed 578,790 documents, deposed 19 fact and opposing-expert witnesses, and consulted with and retained 10 expert witnesses of their own."

*— Hon. William Alsup, District Judge*
*U.S. District Court for the Northern District of California, In re Glumetza Antitrust Litigation*

"Class counsel also successfully defeated defendants' motions to dismiss, certified a Rule 23 class, and defeated defendants' summary judgment motions prior to reaching an agreement with all three defendants to settle this action mere weeks before the trial date. Class counsel accomplished all of this despite vigorous opposition from large multi-national companies with high-quality representation from six national law firms."

*— Hon. William Alsup, District Judge*
*U.S. District Court for the Northern District of California, In re Glumetza Antitrust Litigation*

"The settlement was achieved at arm's length only after DPPs' highly skilled and experienced counsel had received and reviewed the voluminous discovery and exchanged over 30 expert reports with defendant…"

*— Hon. Nina Gerson, District Judge*
*U.S. District Court for the Eastern District of New York, In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation*

"I can't imagine attorneys litigating a case more rigorously than you all did in this case. It seems like every conceivable, legitimate, substantive dispute that could have been fought over was fought over to the max."

*— Hon. William E. Smith, District Judge, U.S. District Court for the District of Rhode Island*
*Final Approval Hearing on the direct purchaser settlement ($120M), In re Loestrin 24 Antitrust Litigation*

INTRODUCTION

# Victories & Settlements

Since its founding, the firm has secured settlements valued at more than $340 billion on behalf of class members in large-scale complex litigation.

## $260 BILLION

### STATE TOBACCO LITIGATION

Hagens Berman represented 13 states prosecuting major actions against Big Tobacco. The settlement led to a multistate settlement requiring the tobacco companies to pay the states and submit to advertising and marketing restrictions. It was the largest civil settlement in history.

## $25 BILLION

### VISA CHECK/MASTERMONEY ANTITRUST LITIGATION

The firm served as co-lead counsel in what was then the largest antitrust settlement in history. The class-action lawsuit alleged that Visa and MasterCard engaged in an anticompetitive scheme to monopolize the debit card services market and charge merchants artificially inflated interchange fees by tying merchant acceptance of their debit card services, Visa Check and MasterMoney, to merchant acceptance of their credit card services. Settlements secured categories of relief that court decisions valued at as much as $25-87 billion.

## $22.78 BILLION

### NCAA NAME, IMAGE & LIKENESS

The firm filed this class-action lawsuit on behalf of current and former NCAA college athletes accusing the NCAA, Pacific-12 Conference, the Big Ten Conference, the Big Twelve Conference, Southeastern Conference and Atlantic Coast Conference of allegedly illegally limiting the compensation that Division I college athletes may receive for the use of their names, images, likenesses and athletic reputations. Final approval of a $22.78 billion settlement was granted by the court, including $2.78 billion in back damages and revenue-sharing benefits expected to exceed $20 billion over the next 10 years — believed to be the largest antitrust settlement in history.

## $14.7 BILLION

### VOLKSWAGEN EMISSIONS LITIGATION

Hagens Berman was named a member of the plaintiffs' steering committee and part of the settlement negotiating team in this monumental case that culminated in the largest automotive settlement in history. The firm was the first law firm to file against Volkswagen regarding its Dieselgate emissions-cheating scandal.

## $1.67 BILLION

### VOLKSWAGEN FRANCHISE DEALERS LITIGATION

The firm served as lead counsel representing VW franchise dealers in this lawsuit related to VW's Dieselgate scandal. The settlement recovered nearly full damages for the class.

## $1.6 BILLION

### TOYOTA UNINTENDED ACCELERATION LITIGATION

Hagens Berman served as co-lead counsel and secured what was then the largest automotive settlement in history in this class action that recovered $1.6 billion for vehicle owners.

## $1.45 BILLION

### NOTEWORLD / MERACORD

The firm secured a default judgment on behalf of consumers for a useless debt-settlement conspiracy, following years of plaintiff victories in the case. Hagens Berman filed its lawsuit in 2011, on behalf of consumers nationwide, claiming the company violated Washington law and the federal Racketeer Influenced and Corrupt Organizations Act.

## $1.3 BILLION

### HYUNDAI KIA THETA II GDI FIRE HAZARD LITIGATION I

Hagens Berman is co-lead counsel in this case accusing automakers of selling vehicles with failure-prone engines that could sometimes catch fire. The case is still pending litigation pertaining to other affected models.

## $700 MILLION

### MERCEDES BLUETEC EMISSIONS LITIGATION

A monumental settlement was reached on behalf of owners of Mercedes vehicles affected by Daimler's emissions cheating. The case was initially filed and researched by Hagens Berman, based on the firm's independent vehicle testing, and the firm served as co-lead counsel. The consumer settlement followed a $1.5 billion settlement between Mercedes and the U.S. Justice Department and California Air Resources Board. The settlement includes an $875 million civil penalty for violating the Clean Air Act.

## $700 MILLION

### WASHINGTON PUBLIC POWER SUPPLY SYSTEM (WPPSS) SECURITIES LITIGATION

Hagens Berman represented bondholders and the trustee in a class action stemming from the failure of two nuclear projects. Plaintiffs were awarded a $700 million settlement.

## $568 MILLION

### APPLE E-BOOKS ANTITRUST LITIGATION

Hagens Berman served as co-lead counsel against Apple and five of the nation's largest publishing companies and secured a combined $568 million settlement, returning class members nearly twice their losses in recovery, following the firm's victory over Apple after it appealed the case to the U.S. Supreme Court.

## $535 MILLION

### CHINA MEDIAEXPRESS HOLDINGS, INC. SECURITIES LITIGATION

Hagens Berman, which served as lead counsel in the case, alleged on behalf of a class of investors that China MediaExpress Holdings made false and misleading statements, including misrepresentations about its revenues, the number of buses in its network and the nature of its business relationships. The lawsuit resulted in relief for investors valued at $535 million.

## $470 MILLION

### LCD ANTITRUST LITIGATION

Hagens Berman served as a member of the Executive Committee representing consumers in multi-district litigation. Total settlements exceeded $470 million.

## $453 MILLION

### GLUMETZA ANTITRUST LITIGATION

The court denied summary judgment and paved the way for trial in this litigation against brand and generic manufacturers of the diabetes drug Glumetza. Hagens Berman served as co-lead counsel for the direct purchaser class. U.S. District Judge William Alsup approved $453.85 million in settlements resolving direct purchasers' allegations. The result was the largest antitrust recovery to receive final approval in 2022.

## $406 MILLION

### DRAM ANTITRUST LITIGATION

The firm was co-lead counsel in this antitrust case which settled for $406 million in favor of purchasers of dynamic random access memory chips.

## $385 MILLION

### SUBOXONE ANTITRUST LITIGATION

Hagens Berman was co-lead counsel in this pharmaceutical antitrust class action alleging defendants violated federal antitrust laws by delaying generic competition for its blockbuster opioid addiction medicine, Suboxone.

## $383.5 MILLION

### DAVITA HEALTHCARE PERSONAL INJURY LITIGATION

A Denver jury awarded a monumental $383.5 million verdict to families of three patients who died after receiving dialysis treatments at DaVita clinics.

## $350 MILLION

### T-MOBILE DATA BREACH

Hagens Berman represented consumers in this class-action lawsuit against T-Mobile related to its 2021 data security breach. On Aug. 15, 2021, a hacker exposed the sensitive information of tens of millions of individuals that were either T-Mobile customers or those that had applied for credit with the company and put them at risk of identity theft and its subsequent consequences.

## $340 MILLION

### RANBAXY INC.

Hagens Berman served as co-lead counsel representing Meijer Inc. and Meijer Distribution Inc. in a class-action lawsuit against drugmaker Ranbaxy. The lawsuit alleged it recklessly stuffed the generic drug approval queues with grossly inadequate applications and deceiving the FDA into granting tentative approvals to lock in statutory exclusivities to which Ranbaxy was not entitled. Ranbaxy then excluded competition at the expense of U.S. drug purchasers. The settlement was part of a $485 million settlement for all plaintiffs. The result was the second largest antitrust recovery to receive final approval in 2022.

## $338 MILLION

### PHARMACEUTICAL AVERAGE WHOLESALE PRICE LITIGATION

Hagens Berman was lead counsel in this ground-breaking drug pricing case against the world's largest pharmaceutical companies, resulting in a victory at trial. The court approved a total of $338 million in settlements.

## $325 MILLION

### NEURONTIN PFIZER LITIGATION

The firm brought suit against Pfizer and its subsidiary, Parke-Davis, accusing the companies of a fraudulent scheme to market and sell the drug Neurontin for a variety of "off-label" uses for which it is not approved or medically efficacious.

## $307 MILLION

### FCA ECODIESEL EMISSIONS CHEATING LITIGATION

The firm achieved a settlement on behalf of owners of EcoDiesel Dodge 1500 and Jeep Grand Cherokee vehicles in response to Fiat Chrysler's emissions-cheating. Under the settlement, class members who repair their vehicles and submit a claim will receive $3,075. The total value of the deal is estimated at $307 million, granted all owners submit a valid claim.

## $300 MILLION

### HYUNDAI/KIA HYDRAULIC ELECTRONIC CONTROL UNIT (HECU) FIRE HAZARD

Approximately three million Hyundai and Kia vehicles nationwide were affected by a dangerous defect in the hydraulic and electronic control units (HECU), also known as anti-lock brake (ABS) modules which posed a risk of non-collision engine fires. Conservatively, plaintiffs' experts valued the settlement achieved by Hagens Berman as co-class counsel in the range of $326 million to $652 million.

## $295 MILLION

### STERICYCLE, STERI-SAFE LITIGATION

Hagens Berman served as lead counsel representing small businesses including veterinary clinics, medical clinics and labs in a class-action lawsuit alleging Stericycle's billing practices and accounting software violated consumer laws and constituted breach of contract.

## $255 MILLION

### HYUNDAI & KIA FUEL ECONOMY LITIGATION

Hagens Berman filed a class-action lawsuit on behalf of consumers alleging Hyundai and Kia overstated fuel economy for many vehicles they sold in the United States.

## $250 MILLION

### ENRON ERISA LITIGATION

Hagens Berman was co-lead counsel in this ERISA litigation, which recovered in excess of $250 million, the largest ERISA settlement in history.

## $250 MILLION

### BOFA COUNTRYWIDE APPRAISAL RICO

Hagens Berman served as co-lead counsel in a nationwide class-action lawsuit against Bank of America, Countrywide Financial and appraisal firm LandSafe Inc. on behalf of a class of home buyers accusing the suit's defendants of carrying out a series of phony appraisals in an attempt to secure more loans.

## $235 MILLION

### CHARLES SCHWAB SECURITIES LITIGATION

The firm was lead counsel in this action alleging fraud in the management of the Schwab YieldPlus mutual fund. A $235 million class settlement was approved by the court.

## $234.6 MILLION

### AEQUITAS CAPITAL MANAGEMENT

The firm settled this case on behalf of 1,600 investors of the now-defunct Aequitas companies. It is believed to be the largest securities settlement in Oregon history.

## $218 MILLION

### JP MORGAN MADOFF

Hagens Berman settled this case on behalf of Bernard L. Madoff investors in a suit filed against JPMorgan Chase Bank, its parents, subsidiaries and affiliates. The settlement against JPMorgan involved three simultaneous, separately negotiated settlements totaling more than $2.2 billion.

## $215 MILLION

### USC, DR. GEORGE TYNDALL SEXUAL ABUSE AND HARASSMENT

The firm served as co-lead counsel and secured a $215 million settlement on behalf of a class of thousands of survivors of sexual assault against the University of Southern California and its Dr. George Tyndall, the full-time gynecologist at USC's student health clinic.

## $212 MILLION

### TOYOTA, LEXUS DENSO FUEL PUMP DEFECT

Hagens Berman represented consumers in a lawsuit alleging that Toyota Motor Corp. sold vehicles with faulty engines made by Denso International America Inc. The defect left vehicle owners at risk of spontaneous vehicle shutdown, engine stall and other safety risks that increased the likelihood of a crash or injury. The settlement brought relief to more than 3.3 million vehicle owners and is valued between $212 million and $288 million.

## $208 MILLION

### NCAA GRANT-IN-AID CAP ANTITRUST LITIGATION

Hagens Berman was co-lead counsel in the damages portion of this historic antitrust class action claiming the NCAA unlawfully capped the value of athletic scholarships. In a historic ruling, the U.S. Supreme Court unanimously upheld a trial victory regarding the injunctive portion of the case securing monumental improvements for college athletes, and forever changing college sports. Steve Berman served as trial counsel.

## $205 MILLION

### OPTICAL DISC DRIVES (ODD) ANTITRUST LITIGATION

Hagens Berman served as lead counsel on behalf of consumers in a lawsuit filed against Philips, Pioneer and others for artificially inflating the price of ODDs.

## $200 MILLION

### NEW ENGLAND COMPOUNDING PHARMACY MENINGITIS OUTBREAK LITIGATION

Hagens Berman attorneys served as lead counsel for the plaintiffs' steering committee on behalf of plaintiff-victims of the 2012 fungal meningitis outbreak that led to more than 64 deaths and hundreds of joint infection cases.

## $169 MILLION

### ANIMATION WORKERS

Hagens Berman was co-lead counsel for a class of approximately 10,000 animators and other artistic workers in an antitrust class action against Pixar, DreamWorks, The Walt Disney Company, Sony and others for allegedly conspiring to restrain competition and suppress industry wages. A $169 million settlement resulted in a payment of more than $13,000 per class member.

## $150 MILLION

### FLONASE ANTITRUST LITIGATION

Hagens Berman was co-lead counsel representing purchasers in this case alleging GlaxoSmithKline filed petitions to prevent the emergence of generic competitors to its drug Flonase to overcharge consumers and purchasers of the drug, which would have been priced lower had a generic competitor been allowed to come to market.

## $150 MILLION

### LUPRON CONSUMER LITIGATION

Hagens Berman served as co-lead counsel on behalf of consumers and third-party payors who purchased the drug Lupron. Under the terms of the settlement, TAP Pharmaceuticals paid $150 million on behalf of all defendants.

## $123.4 MILLION

### EXPEDIA LITIGATION

Hagens Berman led this class action arising from bundled "taxes and service fees" that Expedia collects when its consumers book hotel reservations. Plaintiffs alleged that by collecting exorbitant fees as a flat percentage of the room rates, Expedia violated both the Washington Consumer Protection Act and its contractual commitment to charge as service fees only "costs incurred in servicing" a given reservation.

## $120 MILLION

### GENERAL MOTORS IGNITION SWITCH

Hagens Berman represented owners of GM-branded vehicles as co-lead counsel in a national class-action lawsuit seeking compensation, statutory penalties and punitive damages against GM on behalf of owners of millions of vehicles affected by alleged safety defects and recalls. The court granted final approval to a $120 million settlement on behalf of affected GM vehicle owners on Dec. 18, 2020. Under the settlement, a trust controlled by creditors in GM's 2009 bankruptcy contributed up to $50 million.

## $120 MILLION

### LOESTRIN ANTITRUST LITIGATION

Hagens Berman served as interim co-lead counsel for the certified class of direct purchasers. The parties reached a proposed settlement shortly before trial.

## $113 MILLION

### BATTERIES ANTITRUST LITIGATION

Hagens Berman served as co-lead counsel and secured a settlement in this class-action lawsuit against some of the largest electronics manufacturers for allegedly illegally fixing the price of lithium-ion batteries, pushing costs higher for consumers.

## $108 MILLION

### FIAT CHRYSLER LOW OIL PRESSURE SHUT-OFF

As co-lead counsel, Hagens Berman represented a class of owners of Fiat Chrysler vehicles allegedly prone to spontaneous shut off when oil pressure is low. A federal judge approved a settlement valued at $108 million comprised of comprehensive relief including extended warranties, software upgrades, free testing and repairs and repair reimbursements.

## $100 MILLION

### APPLE IOS APP STORE LITIGATION

In this lawsuit against Apple, the firm served as interim lead counsel in this matter and represented U.S. iOS developers against the tech giant. The suit accused Apple of monopolizing distribution services for iOS apps and in-app digital products, allegedly resulting in commission overcharges. Apple agreed to pay $100 million and make developer-friendly changes to its App Store policy.

## $100 MILLION

### OPPENHEIMER CORE BOND AND CHAMPION INCOME FUNDS LITIGATION

Hagens Berman obtained settlements in two cases alleging that various Oppenheimer entities and certain individual defendants made materially false or misleading statements and omissions to the investing public regarding the investment profile and objectives of the two funds.

## $100 MILLION

### TENET HEALTHCARE

Hagens Berman achieved a settlement on behalf of uninsured patients who received care at Tenet facilities nationwide, alleging that the patients were charged excessive prices at 114 hospitals owned and operated by Tenet Healthcare. The suit claimed that Tenet took advantage of the uninsured and working poor who did not have the economic leverage to negotiate lower rates, while giving discounts to HMO's and other large payers.

## $100 MILLION

### TREMONT LITIGATION

The firm filed a class action on behalf of investors alleging the company and others grossly neglected fiduciary duties by turning capital over to Bernard Madoff Investment Securities.

## $98 MILLION

### PROGRAF ANTITRUST LITIGATION

Hagens Berman served as court-appointed co-lead class counsel representing a class of direct purchasers of Prograf. The antitrust lawsuit alleges that Astellas violated antitrust laws by filing a petition with the FDA as a means of delaying entry of a generic version of Prograf, a drug used to prevent organ rejection by kidney, liver, heart and lung transplant patients.

## $95 MILLION

### APPLECARE

This class action secured compensation for iPhone and iPad owners who bought AppleCare or AppleCare+ coverage. The suit accused Apple of using inferior, refurbished or used parts in device replacements, despite promising to provide consumers with a device "equivalent to new in performance and reliability," and Hagens Berman reached a settlement with the tech giant in April 2022, resolving these claims.

## $94 MILLION

### CELEBREX ANTITRUST LITIGATION

Hagens Berman litigated claims on behalf of a certified class of direct purchasers alleging Pfizer obtained reissuance of a follow-on patent by defrauding the Patent and Trademark Office. The case settled just weeks before trial.

## $93 MILLION

### LIPITOR ANTITRUST LITIGATION

Hagens Berman served as co-lead counsel in this action alleging that drug manufacturer Pfizer delayed market entry of generic versions of the cholesterol drug Lipitor by fraudulently procuring a follow-on patent for Lipitor, knowingly listing that patent in the FDA Orange Book without any lawful basis to do so, suing generic pharmaceutical companies that challenged that patent's blocking ability, and then leveraging those meritless lawsuits into reverse payment settlements with the generic manufacturers.

## $92.5 MILLION

### BOEING SECURITIES LITIGATION

Boeing and Hagens Berman agreed to a settlement to this shareholder suit filed in November 1997 by Hagens Berman. The settlement, the then second largest awarded in the Northwest, affected tens of thousands of Boeing common stock shareholders.

## $90 MILLION

### GOOGLE PLAY STORE APP DEVELOPERS

The firm filed a class action on behalf of Android app developers for violating antitrust laws by allegedly illegally monopolizing markets for Android app distribution and in-app payment processing. A $90 million settlement has been preliminarily approved.

# PRACTICE AREAS

PRACTICE AREAS

# Anti-Terrorism

With a long track record of upholding the rights of those who often go unheard, Hagens Berman fights for justice on behalf of victims of international terrorism. Our anti-terrorism legal team builds on our robust history to forge innovative cases, bringing action against those that support terrorism.

Hagens Berman has always believed in fighting for the rights of those who often go unheard – those who are victims to tragic circumstances beyond their control. With our guiding principles driving our efforts, the firm has expanded its practice areas to include anti-terrorism litigation.

It's no secret that some businesses and individuals have pled guilty to violating United States laws that prohibit financial transactions with terrorist organizations and foreign states that support terrorism. We believe that the law is one of the most powerful tools to combat terrorism, and our renowned team of litigators brings a fresh perspective to the fight for victims' rights in this complex arena.

Through a deep understanding of both U.S. and international anti-terrorism laws, Hagens Berman builds on its foundation to investigate acts of terrorism and forge ironclad cases against those responsible. Our goal is to help ensure that those at the mercy of the world's most egregious perpetrators of violence are represented with the integrity and determination they deserve.

The firm's practice area conducts our mission of building a safer world through novel applications of the law and steadfast dedication.

### CHIQUITA BANANAS

Hagens Berman represented American citizens who were victims of terrorism in Colombia. The victims were harmed by Colombian terrorists that Chiquita Brands International Inc. paid so that it could grow bananas in Colombia in regions the terrorists controlled. Chiquita is one of the world's largest producers and marketers of fruits and vegetables and admitted it paid Colombian terrorist organizations as part of a guilty plea to settle criminal charges brought by the U.S. Department of Justice. Because of its conduct in Colombia, Chiquita was placed on corporate probation and paid a $25 million fine.

Plaintiffs sued Chiquita under the U.S. Anti-Terrorism Act, which allows American victims of international terrorism to sue anyone responsible and to recover treble damages and attorney's fees. Claims were resolved in the U.S. District Court for the Southern District of Florida as part of the consolidated multi-district litigation to resolve claims related to Chiquita's payments to Colombian terrorist organizations.

### FARC ANTI-TERRORISM

Hagens Berman assisted the family of an American geologist who was kidnapped and murdered in Colombia by the FARC narco-terrorist organization. Hagens Berman sued the FARC and obtained a multimillion-dollar judgment on behalf of the family. Subsequently, it has successfully enforced the family's judgment against the assets of South American narco-traffickers that have been linked to the FARC's extensive drug trade.

PRACTICE AREAS

# Antitrust

Hagens Berman works to preserve fair trade and healthy marketplace competition by protecting consumers and businesses from price-fixing, market allocation agreements, monopolistic schemes and other trade restraints. The firm's lawyers have earned an enviable reputation as experts in this often confusing and combative area of commercial litigation in which we have recovered nearly $30 billion in settlements for our clients. Our attorneys have a deep understanding of legal and economic issues within the marketplace, allowing us to employ groundbreaking market theories that shed light on restrictive anti-competitive practices. Our cases have returned more than $340 billion across all practice areas.

Hagens Berman represents millions of class members in high-profile class-action lawsuits and takes on major antitrust litigation to improve market conditions for consumers, businesses and investors. We have represented plaintiffs in markets as diverse as college sports, app development, debit and credit card services, personal computer components, electric and gas power, airlines and internet services, and we have prevailed against some of the world's largest corporations. The firm has also taken on wage-fixing antitrust agreements in various industries including animation, food production and aerospace engineering.

The firm's antitrust cases span the reaches of anticompetitive behavior, impacting even the realm of college sports. In the Keller and O'Bannon cases, the firm represented college athletes against the NCAA and Electronic Arts Inc. claiming the companies illegally use college football and basketball players' names and likenesses in video games without permission or consent from the player. In those matters, the firm secured a total $60 million in settlements, and checks went out to about 15,000 players, some up to $7,600, with a median around $1,100.

Hagens Berman has also brought about significant changes already to the NCAA's policies and procedures regulating payments. In NCAA Grants-in-Aid Scholarships Litigation, the firm brought an antitrust class action against the NCAA on behalf of college athletes, claiming that the NCAA had violated the law when it kept the class from being able to receive compensation provided by schools or conferences for athletic services other than cash. Following a $208 million settlement in the damages portion of the case — an almost 100% recovery of single damages — the Supreme Court upheld the favorable opinion of the Ninth Circuit in a 9-0 ruling regarding injunctive relief. Justice Kavanaugh's opinion further underscored the massive win for plaintiffs and the ruling's ongoing effects: "The NCAA couches its arguments for not paying student athletes in innocuous labels. But the labels cannot disguise the reality: The NCAA's business model would be flatly illegal in almost any other industry in America," pushing for further scrutiny of the NCAA's regulations. After the ruling, the NCAA relaxed some of the name, image and likeness (NIL) restrictions and the market for NIL revenues exploded reaching almost $5 billion this year. Few antitrust decisions have been so transformative.

The firm continued its work litigating against the NCAA regarding name, image and likeness (NIL) rights. Currently Hagens Berman is co-lead counsel in *House v. NCAA*, which challenges current restrictions on athletes NIL rights and seeks damages for lost NIL opportunities. In House, a federal judge approved a historic $22.78 billion settlement with the NCAA,

including $2.78 billion in back damages and over $20 billion in future payments, making it the largest antitrust settlement in history. The antitrust class-action lawsuit on behalf of hundreds of thousands of current and former college athletes at Division I schools will bring historic changes to college sports and will allow college athletes to be fairly compensated for the use of their name, image and likeness in what has become a multibillion-dollar industry. The settlement stands as the largest class-action antitrust settlement in history. Read more about the NIL case in Sports Litigation.

The firm has also generated substantial recoveries on behalf of health plans and consumers in antitrust cases involving pharmaceutical companies abusing patent rights to block generic drugs from coming to market. Hagens Berman's settlements accounted for 35% of total U.S. antitrust settlements that reached final approval in 2022, including the two largest antitrust recoveries to receive final approval, *In re Glumetza Antitrust Litigation* ($453.85 million settlement) and *In re Ranbaxy Generic Drug Application Antitrust Litigation* ($340 million settlement). Hagens Berman has served as lead or co-lead counsel in landmark antitrust litigation in many matters, including Paxil Direct Purchaser Litigation ($100 million), Relafen Antitrust Litigation ($75 million), Tricor Indirect Purchaser Antitrust Litigation ($65.7 million), and Augmentin Antitrust Litigation ($29 million).

## REPRESENTATIVE ANTITRUST SUCCESSES

### VISA CHECK/MASTERMONEY ANTITRUST LITIGATION

Hagens Berman was co-lead counsel in this landmark antitrust case involving Visa and Mastercard. The case alleged the credit card giants engaged in anticompetitive practices to monopolize the debit card services market and impose artificially inflated interchange fees on merchants. The court valued the settlement between $25 billion and $87 billion, making it the largest antitrust settlement in U.S. history at the time.

**RESULT:** $3.05 billion settlement and injunctive relief valued at more than $23 billion

### REAL ESTATE COMMISSIONS ANTITRUST LITIGATION

The firm represents home sellers as co-lead counsel accusing the National Association of Realtors (NAR) and the largest real estate brokerage firms in the United States of conspiring to artificially inflate commissions associated with home sales — in part by implementing rules that require home sellers to pay commission to the agent representing the buyer. In *Moehrl* and *Burnett*, the courts certified damages and injunctive relief classes of sellers who sold their home through a Multiple Listing Service (MLS) during the relevant time periods, as well as current and future owners of residential real estate in affected jurisdictions who are currently listing or will list homes on an MLS. Class settlements encompass sellers who listed their homes on an MLS anywhere in the United States. In an order related to expert discovery, the court said that the buyer-broker policies challenged in the lawsuit facilitate "keeping buyers in the dark and severely restricting negotiations over buyer-broker commissions."

**RESULT:** The firm has reached settlements totaling over $1 billion. The court has granted final approval of the settlements with the National Associate of Realtors ($418 million), HomeServices of America ($250 million), The Real Brokerage Inc. and other real estate companies ($110 million), Anywhere Real Estate ($83.5 million), Keller Williams Realty Inc. ($70 million) and RE/MAX ($55 million). The Court has further granted preliminary approval of settlements with Douglas Elliman ($7.75 million), @properties ($6.5 million) and Realty ONE ($5 million). The case is pending against remaining defendants. The New York Times reported that Steve Brobeck, Ph.D., who served as the executive director of Consumer Federation of America for nearly four decades, estimates that the $100 billion spent per year on residential real estate commissions will probably decline by between $20 billion and $50 billion, if the settlement with NAR is approved by the court.

### APPLE E-BOOKS LITIGATION

With state attorneys general, the firm served as lead counsel to secure a settlement with publishing companies that conspired with Apple to fix e-book prices. The firm then took on Apple for its part in the price-fixing conspiracy. In the final stage, the U.S. Supreme Court denied appeal from Apple, bringing the consumer payback amount to more than

twice the amount of losses suffered by the class of e-book purchasers. This represents one of the most successful recoveries in any antitrust lawsuit in the country.

**RESULT:** $568 million in total settlements

### LG PHILIPS AND TOSHIBA LCD ANTITRUST LITIGATION

Hagens Berman filed a class action against more than 20 manufacturers of TFT LCD products, including LG Philips and Toshiba, claiming the companies engaged in a conspiracy to fix, raise, maintain and stabilize the price of electronic products and devices. After years of representing consumers in multi-district litigation, the case against Toshiba went to trial. In 2012, Toshiba was found guilty of price-fixing and settled.

**RESULT:** $470 million in total settlements

### DYNAMIC RANDOM ACCESS MEMORY (DRAM) ANTITRUST LITIGATION

The firm served as class counsel in this lawsuit claiming DRAM manufacturers secretly agreed to reduce the supply of DRAM, a necessary component in a wide variety of electronics, which artificially raised prices. The class included equipment manufacturers, franchise distributors and purchasers.

**RESULT:** $406 million settlement

### OPTICAL DISK DRIVES ANTITRUST LITIGATION

Hagens Berman served as lead counsel in this lawsuit on behalf of consumers against Philips, Pioneer and others for allegedly artificially inflating the price of ODDs for consumers.

**RESULT:** $205 million in total settlements

### BROILER CHICKEN ANTITRUST LITIGATION

Hagens Berman serves as co-lead counsel in this massive antitrust class action asserting that the nation’s largest broiler chicken producers — Tyson, Pilgrim’s Pride, Perdue and a host of others — conspired to fix the price of chicken for consumers by up to 50 percent since 2009. Settlements will offer compensation to millions of American consumers who have unknowingly overpaid for chicken products for years.

**RESULT:** The firm has secured $203.35 million in total settlements and achieved class certification. Litigation against the remaining defendants is ongoing.

### ANIMATION WORKERS ANTITRUST LITIGATION

Hagens Berman served as co-lead counsel for a nationwide class of approximately 10,000 animators and other artistic workers in an antitrust class-action case filed against Pixar, DreamWorks, The Walt Disney Company, Sony, Blue Sky Studios and others for allegedly conspiring to restrain competition to suppress compensation. The settlement resulted in a payment of more than $13,000 per class member.

**RESULT:** $169 million settlement

### LITHIUM-ION BATTERIES ANTITRUST LITIGATION

The firm served as co-lead counsel in this class-action lawsuit alleging some of the largest electronics manufacturers illegally fixed the price of lithium-ion batteries, pushing costs higher for consumers.

**RESULT:** $113 million in total settlements

### APPLE IOS APP DEVELOPERS

As court-appointed class counsel, the firm achieved a $100 million settlement with Apple on behalf of US iOS app developers and developers of in-app products sold on Apple’s App Store following the filing of an antitrust class-action lawsuit. The suit accused Apple monopolized U.S. distribution for iOS apps and in-app digital products, resulting in commission overcharges to developers. The settlement brings important changes to App Store policies and practices,

and U.S. iOS developers with less than $1 million in annual proceeds from App Store sales can receive hundreds to tens of thousands of dollars in compensation.

**RESULT:** $100 million settlement

### PORK ANTITRUST LITIGATION

The firm serves as co-lead counsel in this antitrust litigation alleging that pork producers such as Tyson, Hormel and others colluded to knowingly reduce pork production to artificially inflate prices. The pork producers allegedly engaged in a conspiracy that has cost American consumers millions of dollars over the years.

**RESULT:** The firm has secured $109.4 million in settlements, of which $95 million has been granted final approval. Litigation against the remaining defendants is ongoing.

### GOOGLE PLAY STORE APP DEVELOPERS

The firm, serving as co-lead, achieved a $90 million settlement with Google on behalf of roughly 43,000 US Android app developers and developers of in-app products sold on Google's Play Store following the filing of an antitrust class-action lawsuit. The firm filed the class action against Google for violations of antitrust laws by illegally monopolizing markets for Android app distribution and in-app payment processing.

**RESULT:** $90 million settlement

### GENERIC PHARMACEUTICAL PRICING ANTITRUST LITIGATION

Hagens Berman filed multiple lawsuits against numerous generic pharmaceutical companies for conspiring to increase and set prices on inexpensive, commonly used generic drugs. In October 2024, direct purchaser plaintiffs settled with defendants Sun, Taro, Heritage, Apotex, and Breckenridge for a total of $120 million. In addition, in June 2024, the court granted preliminary approval of a settlement with Sandoz for $265 million. This settlement is still pending before the court.

**RESULT:** $120 million settlement

### RELAFEN ANTITRUST LITIGATION

In 2006, Judge William Young issued preliminary approval of a proposed settlement between GlaxoSmithKline and a class of consumers and third-party payors who purchased the drug Relafen or its generic alternatives. Under the terms of the settlement, the defendants paid damages of $75 million to class members. Of the total settlement amount, $25 million was allocated to consumers and $50 million was used to pay the claims of insurers and other third-party payors.

**RESULT:** $75 million settlement

### DAIRY PRICE-FIXING LITIGATION

The firm filed a class-action suit against several large players in the dairy industry, including the National Milk Producers Federation, Dairy Farmers of America, Land O'Lakes, Inc., Agri-Mark, Inc. and Cooperatives Working Together that together produce nearly 70 percent of milk consumed in the U.S. The suit alleged the groups conspired to fix U.S. milk prices through an organized scheme to limit production, involving the needless, premature slaughtering of 500,000 cows.

**RESULT:** $52 million settlement

### PANASONIC RESISTORS ANTITRUST LITIGATION

Hagens Berman was co-lead counsel, representing direct purchasers of linear resistors, a device in electronics used to limit electric current, against an alleged cartel of manufacturers who conspired to limit linear resistor price competition for nearly a decade.

**RESULT:** $50.25 million settlement

### HOTEL ROOM OVERPRICING

The nation's largest hotel chains settled a class-action lawsuit brought by consumers of hotel room reservations booked online. Consumers represented by Hagens Berman alleged hotel chains agreed to restrain competition for paid search advertising for hotel rooms associated with defendants' brand names, depriving consumers free, competitive information, and raising the price of hotel rooms booked online.

**RESULT:** The parties reached a confidential settlement.

## OTHER NEW AND PENDING ANTITRUST LITIGATION

### COLLEGE BOARD PRICE-FIXING ANTITRUST

Hagens Berman filed a class-action lawsuit against 40 of the nation's top private universities and College Board, an entity involved in college prep testing and financial aid, accusing them of colluding to artificially lower the college financial aid for students with noncustodial parents. The law firm's investigation found evidence that College Board implements and enforces unfair guidelines for students of noncustodial parents (any parent whose child does not live with them the majority of the time). This alleged anticompetitive conduct has decreased students' chances of qualifying for additional need-based financial aid from colleges and universities.

### FROZEN POTATO PRODUCTS ANTITRUST LITIGATION

Hagens Berman filed a class-action lawsuit on behalf of consumers against four frozen potato food processors — McCain Foods, Lamb Weston, J.R. Simplot and Cavendish Farms — for allegedly engaging in an illegal agreement for years potentially causing millions of U.S. consumers to overpay for frozen potato products, including french fries, tater tots, hashbrowns and more.

### LAS VEGAS HOTELS PRICE-FIXING ANTITRUST

The firm filed a lawsuit defending the rights of Las Vegas consumers harmed by an alleged scheme perpetrated by some of the largest gaming and hospitality companies, including Wynn and MGM Hotels. We believe these casinos colluded to artificially increase the price of Las Vegas hotel rooms, putting rates above competitive levels. In this alleged scheme, rates are adjusted beyond what a free market would bear. In 2024, the Department of Justice filed an amicus brief in the U.S. Court of Appeals for the Ninth Circuit, placing its support behind Hagens Berman's lawsuit in which consumers alleged Las Vegas hotels algorithmically fixed prices, violating the Sherman Act.

### YARDI ANTITRUST LITIGATION

The firm filed a nationwide class-action lawsuit accusing 18 property management companies, as well as Yardi Systems Inc., of a rent price-fixing scheme, violating antitrust laws. The lawsuit alleges Yardi's RENTmaximizer software allowed the codefendants to increase lease prices for millions of renters for years. In March 2024, U.S. District Judge Robert S. Lasnik appointed Hagens Berman interim class counsel.

PRACTICE AREAS

# Automotive Defect, Fraud & Products Liability Litigation

In litigating cases, we strive to make an impact for large classes of consumers, especially those who fall victim to the gross negligence and lack of oversight of one of the nation's largest industries: auto manufacturing. Hagens Berman's automotive litigation team has repeatedly been named a Practice Group of the Year by Law360, highlighting its "eye toward landmark matters and general excellence" in this area of law.

The federal court overseeing the massive multi-district litigation against Toyota appointed the firm to co-lead one of the largest consolidations of class-action cases in U.S. history. The litigation combined more than 300 state and federal suits concerning acceleration defects tainting Toyota vehicles. Hagens Berman was selected from more than 70 law firms applying for the role. Since then, the firm's automotive practice area has grown at an unrivaled pace, pioneering new investigations into emissions-cheating, defects, false marketing and safety hazards affecting the wellbeing of millions of drivers.

Hagens Berman's work fighting corporate wrongdoing in the automotive industry has repeatedly earned it a spot in the National Law Journal's list of Elite Trial Lawyers, and the firm's auto team who worked on *Toyota* were also named finalists for Public Justice's Trial Lawyer of the Year award.

Our firm has been a leader in this area of law for nearly a decade, and our settled cases include the following matters related to public safety, defect mitigation and more.

## REPRESENTATIVE SUCCESS IN AUTOMOTIVE DEFECT LITIGATION

### TOYOTA SUDDEN, UNINTENDED ACCELERATION LITIGATION

Steve Berman served as co-lead counsel for the economic loss class in this lawsuit filed on behalf of Toyota owners alleging a defect caused vehicles to undergo sudden, unintended acceleration. In addition to safety risks, consumers suffered economic loss from decreased value of Toyota vehicles following media coverage of the alleged defect.

**RESULT:** $1.6 billion settlement, which was the largest automotive settlement in history at the time, surpassed only by the firm's future settlements

### HYUNDAI/KIA THETA II GDI ENGINE FIRE HAZARD LITIGATION I

As co-lead counsel against Hyundai and Kia, Hagens Berman helped secure a $1.3 billion settlement on behalf of owners of cars affected by an engine defect causing spontaneous fires. The compensation includes lifetime warranty protection, software installation aimed to detect and prevent the engine defect, reimbursements for repair-related costs and lost value due to engine failures or fires, and payment for repair delays.

**RESULT:** $1.3 billion settlement

### HYUNDAI/KIA ENGINE FIRE HAZARD LITIGATION II

Following the firm's $1.3 billion settlement on behalf of owners of cars affected by an engine defect causing spontaneous fires in millions of Hyundai and Kia cars, Hagens Berman, which served as co-lead counsel in this case, also secured an additional settlement concerning engines not included in the first settlement. The newest settlement brings relief to owners of about 2.1 million vehicles with Gamma GDI and Nu GDI engines as well as Theta II MPI engines. "The settlement is comprehensive in compensating class members for the harms suffered and providing protection against future harms," Judge Staton said, noting that the deal is substantially similar to the one finalized in May 2021 in *In re Hyundai and Kia Engine Litigation*, which was valued at up to $1.3 billion.

**RESULT:** Settlement comparable to prior $1.3 billion in *In re Hyundai and Kia Engine Litigation*

### HYUNDAI/KIA HYDRAULIC ELECTRONIC CONTROL UNIT (HECU) FIRE HAZARD LITIGATION

Hagens Berman served as class counsel in this class-action lawsuit against automakers Hyundai and Kia on behalf of owners and lessees of approximately three million U.S. vehicles regarding a defect affecting the vehicles' hydraulic and electronic control units. The defect, which the lawsuit alleges Hyundai and Kia were aware of upon selling the affected vehicles, can cause electrical short-circuits and engine fires. Conservatively, plaintiffs' expert values the settlement in the range of $326 million to $652 million, depending on relief claimed by affected owners and lessors.

**RESULT:** Settlement valued at more than $300 million

### HYUNDAI KIA FUEL ECONOMY LITIGATION

Serving as class counsel, Hagens Berman represented Hyundai and Kia owners after the car manufacturers overstated the MPG fuel economy ratings on 900,000 of their cars. The suit seeks to give owners the ability to recover a lump-sum award for the lifetime extra fuel costs, rather than applying every year for that year's losses.

**RESULT:** $255 million settlement. Lump-sum payment plan worth $400 million on a cash basis, and worth even more if owners opt for store credit (150 percent of cash award) or new car discount (200 percent of cash award) options.

### TOYOTA, LEXUS DENSO FUEL PUMP LITIGATION

The firm filed this class action regarding a defect in the DENSO fuel pump installed in the affected Toyota and Lexus vehicles which can leave vehicle owners at risk of spontaneous vehicle shutdown, engine stall and other safety risks that increase the likelihood of a crash or injury.

**RESULT:** Settlement valued between $212 million and $288 million

### HYUNDAI KIA CAR THEFT DEFECT LITIGATION

Serving as co-lead counsel, the firm achieved relief in this class action stemming from Hyundai and Kia's failure to equip nearly nine million 2011-2022 models with an immobilizer, a common antitheft device in modern cars which prevents most vehicles from being started unless a code is transmitted from the vehicle's smart key. The lack of immobilizer in affected vehicles spawned viral "Kia Challenge" TikTok videos demonstrating simple measures "Kia Boys" take to steal affected Hyundai and Kia vehicles using only a common USB charging cord or similar metal object to start the engine, allowing thieves to steal them in less than 90 seconds.

**RESULT:** $200 million settlement

### GENERAL MOTORS IGNITION SWITCH LITIGATION

The firm served as co-lead counsel in a high-profile case on behalf of millions of owners of recalled GM vehicles affected by a safety defect linked to more than 120 fatalities. The lawsuit alleged GM did not take appropriate remedial measures, despite having prior knowledge of the defect.

**RESULT:** $120 million settlement

### FIAT CHRYSLER (FCA) LOW OIL PRESSURE SHUT OFF LITIGATION

Serving as co-lead counsel, Hagens Berman represented owners of Chrysler, Dodge, Fiat, Jeep and Ram vehicles affected by a defect causing overconsumption of oil and spontaneous vehicle shut off during low oil pressure. In 2022 a federal judge approved a settlement for owners of vehicles with 2.4L TigerShark MultiAir II engines.

**RESULT:** $108 million settlement

### HONDA INFOTAINMENT SYSTEM LITIGATION

Hagens Berman served as class counsel on behalf of owners of Honda vehicles in a class-action lawsuit against the automaker for a defect affecting the vehicles' infotainment system which was prone to failing to boot, freezing during use and suffering general malfunctions and glitches. Owners reported the issues on vehicles with as few as 580 miles. The U.S. district judge called the settlement for vehicle owners a "significant effort" in light of the difficulties and complexities of the case.

**RESULT:** $33 million settlement

### FORD MYFORD TOUCH LITIGATION

Hagens Berman served as co-lead counsel on behalf of owners of Ford vehicles equipped with MyFord Touch, an in-car communication and entertainment package, who claim that the flawed system put drivers at risk of an accident while causing economic hardship for owners. The complaint cites internal Ford documents that show that 500 of every 1,000 vehicles have issues involving MyFord Touch due to software bugs, and failures of the software process and architecture. Owners report that Ford has been unable to fix the problem, even after repeated visits.

**RESULT:** $17 million settlement

### ACURA RDX INFOTAINMENT SYSTEM LITIGATION

Hagens Berman served as class counsel in this class-action lawsuit against American Honda Motor Co. Inc., owners of 2019 and 2020 Acura RDX vehicles accused the automaker of knowingly selling the vehicles with defective infotainment systems, posing a serious safety risk to drivers. The alleged defect causes many of the vehicles' features associated with the infotainment system to malfunction, including the navigation system, audio system, as well as safety features like the backup camera.

**RESULT:** $10.5 million settlement

### NISSAN QUEST ACCELERATOR LITIGATION

Hagens Berman represented Nissan Quest minivan owners alleging their vehicles developed deposits in a part of the engine, causing drivers to apply increased pressure to push the accelerator down.

**RESULT:** Settlement providing reimbursement for cleanings or replacements and applicable warranty coverage

### VW ATLAS WIRING HARNESS DEFECT LITIGATION

Hagens Berman serves as co-class counsel in a class-action lawsuit representing owners and lessors of more than 222,000 defective Volkswagen Atlas vehicles affected by an alleged manufacturing defect in the door wiring harness. A settlement was granted preliminarily approval in July 2024. On Jan. 15, 2025, the Hon. Jessica S. Allen, U.S. Magistrate Judge of the U.S. District Court for the District of New Jersey, granted final approval to the settlement.

## PENDING LITIGATION AGAINST AUTOMAKERS:

The firm has filed several pending cases against major automakers, including the following class actions promoting consumers' rights:

### FCA CHRYSLER PACIFICA HYBRID MINIVAN ENGINE SHUTDOWN LITIGATION

Over 67,000 Chrysler plug-in hybrid electric vehicles are at risk for spontaneous power loss while the vehicle is in motion due to a serious wiring defect in the transmission of the gasoline-driven portion of the powertrain. The automaker's response to this potentially life-threatening issue falls short, leaving Chrysler customers with little recourse. According to a recall report filed with the National Highway Traffic Safety Administration in January 2023, 100% of 2017-2023 Chrysler Pacifica PHEVs are at risk for sudden engine shutoff due to this defect. Loss of motive power is total and comes without warning, giving drivers little or no opportunity to maneuver vehicles to safety, and can occur while moving at highway speeds.

### FCA CHRYSLER PACIFICA HYBRID MINIVAN FIRE HAZARD LITIGATION

In this automotive class-action lawsuit, the firm serves as co-lead counsel representing owners of 2017 and 2018 Chrysler Pacifica plug-in hybrid electric minivans. Twelve fires have been reported in Chrysler Pacifica hybrid minivans. All of the vehicles that caught fire were parked and turned off; eight of the 12 vehicles were plugged in and charging. In the recall report filed with the National Highway Traffic Safety Administration, Chrysler said the "root cause is unknown." Hagens Berman filed a consolidated master complaint Nov. 4, 2022. The complaint highlights Fiat Chrysler's proposed "fix" as a "Hobson's choice foisted on consumers" that fails to solve the issue. Even after having the recall performed, at least two Hybrid Pacifica vehicles have exploded into flames in owners' garages and driveways. In December 2023, the federal judge overseeing the consolidated lawsuit denied Fiat Chrysler's motion to dismiss plaintiffs' claims.

### FCA DODGE RAM 1500 & 1500 CLASSIC ECODIESEL TRUCKS EGR COOLER FIRE HAZARD LITIGATION

Hagens Berman serves as co-lead counsel representing owners of certain Dodge Ram 1500 trucks at risk for vehicle fire. Affected trucks have been built with defective EGR coolers that can crack due to thermal fatigue. This can allow coolant to leak into the running engine, which can result in combustion and a vehicle fire. In March 2024, a federal judge granted in part and denied in part FCA's motion to dismiss claims from owners whose vehicles had not yet caught fire due to the defect. The court sustained the majority of the owners' claims, including allegations that FCA violated express and implied warranties on the vehicles.

### FORD, GM, NISSAN CP4 HIGH-INJECTION FUEL PUMP DEFECT LITIGATION

Hagens Berman has filed multiple class-action lawsuits against Ford, GM and Nissan on behalf of diesel truck owners due to a defective high-pressure fuel injection pump in affected vehicles. The defective part generates metallic shavings and can lead to catastrophic failure of the engine. The complaints allege defendants routinely denied repair under warranty, even though the repair costs at least $7,000, and in some cases exceeds $10,000. In March 2023, Hon. Bernard A. Friedman allowed the majority of claims against Ford to continue, and in that same month, Hon. Terrence Berg certified seven state-specific classes on behalf of GM truck owners. In June 2025, a $50 million settlement with GM was granted final approval. Litigation against Ford and Nissan is ongoing.

### FORD ESCAPE, MAVERICK AND LINCOLN CORSAIR HYBRID FIRES LITIGATION

Ford has recalled more than 100,000 of its Escape, Maverick and Lincoln Corsair hybrid models manufactured since 2020 for a risk of spontaneously catching fire due to a safety defect. The issue has been traced to leaking fluid from the vehicles' engine block or oil pan. In response, rather than fix the faulty engine blocks and oil pans, Ford has issued "fix" instructions to its dealers that ask them to remove blinds from the grill shutter and drill holes in the floor of the engine compartment, potentially causing flammable fluids to drip into the roadway and owners' garages and driveways. The firm's class-action lawsuit against Ford was filed in August of 2022.

## HONDA CIVIC ELECTRONIC POWER STEERING DEFECT LITIGATION

The firm filed a class-action lawsuit accusing American Honda Motor Company of selling 2022-2023 Civics which it knew were equipped with faulty electronic power steering (EPS) systems. The EPS system failure allegedly occurs without warning and under various driving conditions, causing the vehicles to lose steering control at high speeds. The National Highway Traffic Safety Administration opened a preliminary investigation after receiving 145 reports of "momentary increase in steering effort," described as "sticky steering," which could result in the inability to avoid a road hazard.

## JEEP WRANGLER AND GLADIATOR ENGINE FIRE DEFECT

Hagens Berman filed a class-action lawsuit against Fiat Chrysler following reports of engine fires from owners of 2021-2023 Jeep Wrangler and Gladiator vehicles. According to the lawsuit, the fires originate from the power steering pump electrical connector on the passenger side of the engine compartment.

PRACTICE AREAS

# Automotive – Emissions Cheating

Having filed the first Dieselgate case in the country, Hagens Berman played a lead role in the record-breaking Volkswagen diesel emissions litigation. But Hagens Berman knew the story didn't end there. Since the Dieselgate scandal, the firm has uniquely dedicated resources to uncovering cheating devices used by other automakers. We have become a trailblazer in this highly specialized realm, outpacing federal agencies in unmasking fraud in emissions reporting.

When news broke in 2015 of Volkswagen's massive diesel emissions-cheating scandal, Hagens Berman was the first law firm in the nation to file suit against the automaker for its egregious fraud, going on to represent thousands of owners in litigation and take a leading role on the Plaintiffs' Steering Committee that would finalize a $14.7 billion, record-breaking settlement for affected owners. Since this case emerged, Hagens Berman has remained on the forefront of emissions litigation, relying on our legal team's steadfast and intensive investigative skills to unearth many other emissions-cheating schemes perpetrated by BMW, General Motors, Fiat Chrysler, Mercedes and other automakers, staying one step ahead of government regulators in our pursuit of car manufacturers that have violated emissions standards and regulations, as well as consumer confidence.

Hagens Berman's managing partner, Steve Berman, has dedicated the firm's resources to upholding the rights of consumers and the environment. The firm is uniquely dedicated to this cause and is the only firm that has purchased an emissions testing machine to determine if other diesel car manufacturers install cheating devices. The firm brings new cases based on its own research, time and testing.

## REPRESENTATIVE SUCCESS IN AUTOMOTIVE EMISSIONS LITIGATION

### VOLKSWAGEN DIESEL EMISSIONS LITIGATION

Hagens Berman was the first law firm in the nation to file a lawsuit against Volkswagen for its emissions fraud, seeking swift remedies for consumers affected by its fraud and violation of state regulations. The firm was named to the Plaintiffs' Steering Committee leading the national fight against VW, Porsche and Audi on behalf of owners and lessors of affected vehicles and also served as part of the Settlement Negotiating team in this record-breaking achievement.

**RESULT:** $14.7 billion settlement, the largest automotive settlement in history

### VOLKSWAGEN FRANCHISE DEALERS EMISSIONS LITIGATION

Hagens Berman served as lead counsel in a first-of-its-kind lawsuit brought by a franchise dealer. Three family-owned Volkswagen dealers filed a class action against VW for intentionally defrauding dealers by installing so-called "defeat devices" in its diesel cars that cause them direct harm. The suit states VW separately carried out a systematic, illegal pricing and allocation scheme that favored some dealers over others and illegally channeled financing business to VW affiliate, Volkswagen Credit Inc. The settlement received nearly unanimous approval, with 99 percent participation in the settlement.

**RESULT:** $1.67 billion settlement

## DAIMLER MERCEDES BLUETEC EMISSIONS LITIGATION

Hagens Berman was appointed co-lead counsel in this class action representing thousands of vehicle owners against Mercedes concerning emissions-cheating in its BlueTEC diesel vehicles. The lawsuit states Mercedes told vehicle owners and lessees their diesel cars were “the world’s cleanest and most advanced diesel,” when in fact testing indicated a systemic failure to meet emissions standards. Low temperature testing at highway speeds for example, produced emissions that were 8.1 to 19.7 times the highway emissions standard; at variable speeds, testing produced emissions as high as 30.8 times the standard, according to the firm’s independent testing.

Since the case settled, Hagens Berman has taken an advisory role in the emissions-cheating litigation against Mercedes’ parent company, Daimler, filed in Australia. The firm looks to build upon its existing win against Mercedes for emissions cheating in its vehicles sold in the U.S. and support Australians who were similarly deceived.

**RESULT:** $700 million settlement

## FIAT CHRYSLER ECODIESEL EMISSIONS LITIGATION

The firm led charges against Fiat Chrysler that it sold hundreds of thousands of EcoDiesel-branded vehicles that release illegally high levels of NOx emissions, despite explicitly selling these “Eco” diesels to consumers who wanted a more environmentally friendly vehicle. Hagens Berman was the first firm in the nation to uncover this scheme and file against Fiat Chrysler on behalf of owners of affected Dodge RAM 1500 and Jeep Grand Cherokee EcoDiesel vehicles. Following the firm’s groundbreaking suit, the EPA took notice, filing formal accusations against Fiat Chrysler.

**RESULT:** Settlement valued at $307 million, dependent upon claims rate

## PORSCHE PANAMERA & 911 EMISSIONS LITIGATION

This lawsuit claimed fuel economy inaccuracies in half a million 2005 to 2020 Volkswagen and Porsche gasoline models, and in 2022, a federal judge granted preliminary approval of an $80 million settlement agreement regarding emissions-cheating claims. Under the settlement, consumers in the most basic bracket of the class can receive payments from $250 to $1,109 per vehicle, and those who purchased higher-performance vehicles can receive an additional $250 in compensation, with other payments of $200 per vehicle available to other eligible class members.

**RESULT:** $80 million settlement

## AUDI EMISSIONS LITIGATION

In 2016, Hagens Berman unearthed additional emissions-cheating by Audi, affecting its gasoline 3.0-liter vehicles. The firm’s investigation revealed a newly discovered defeat device installed in gasoline engines which changed how the transmission operated when testing was detected to lower CO2 emissions, but otherwise allowed excessive CO2 emissions in normal, on-road driving. The firm was appointed lead counsel.

**RESULT:** The lawsuit was folded into the Volkswagen Dieselgate multidistrict litigation. The settlement benefited more than 88,000 vehicle owners and resulted in vehicle buybacks valued at more than $30,000 for some class members.

## BMW X5 & 335D EMISSIONS LITIGATION

Based on BMW’s marketing, consumers who purchased its X5 Diesel and 335d vehicles assumed they were making a choice that was better for the environment than other options. BMW told the public that the vehicles “met emissions standards in all 50 states,” that “BMW Efficient Dynamics” meant “Less emissions,” that its engines “protect the environment every day,” were “environmentally friendly,” and turned nitric oxides (harmful pollutants in diesel exhaust) “into environmentally compatible nitrogen and water vapor.” In reality, the 2009-2013 BMW X5 diesel and 2009-2011 335d vehicles emit harmful pollutants and emissions many times above legal emissions standards.

**RESULT:** A federal judge granted final approval to a settlement valued at $6 million.

**PENDING LITIGATION AGAINST AUTOMAKERS:**

The firm is currently litigating many pending cases against major automakers regarding emissions, including the following:

### CHEVY CRUZE DIESEL EMISSIONS LITIGATION

Hagens Berman filed a class-action lawsuit against Chevrolet (a division of General Motors) and Robert Bosch, LLC for installing emissions-cheating software in Cruze Clean Turbo Diesel cars, forcing consumers to pay high premiums for vehicles that pollute at illegal levels. While Chevy marketed these cars as a clean option, testing by an expert retained by Hagens Berman revealed the cars' emissions are often up to 36 times the federal standard.

### DODGE RAM 2500/3500 DIESEL EMISSIONS LITIGATION

According to the firm's investigation, Dodge has sold hundreds of thousands of Dodge RAM 2500 and 3500 trucks equipped with Cummins diesel engines that release illegally high levels of NOx emissions because fuel is diverted and burned to clear out the soot in the emission system. The firm is leading a national class action against Fiat Chrysler and Cummins (the engine manufacturer) for knowingly inducing consumers to pay premium prices for vehicles that exceed emissions standards, and lead to decreased fuel economy and higher costs because of the wasted fuel. Hagens Berman has also determined that there is a defeat device in these vehicles.

### GENERAL MOTORS DURAMAX EMISSIONS LITIGATION

Hagens Berman pioneered another instance of diesel emissions fraud. The firm's independent testing revealed that GM had installed an emissions-masking defeat device in its Duramax trucks, including Chevy Silverado and GMC Sierra models, in a cover-up akin to Volkswagen's Dieselgate concealment. In real world conditions, the trucks frequently emit 1.6 – 2.5 times the legal limit of deadly NOx pollutants and have been observed emitting almost 50 times the federal standard. Emissions cheating devices are installed in an estimated 705,000 affected vehicles. The U.S. Court of Appeals for the Sixth Circuit has reversed the Eastern District of Michigan trial court's dismissal of the Duramax diesel emissions case, overturning the ruling that such claims were preempted by the Clean Air Act. Pending further possible action by the defendants, once the appellate decision is final, attorneys expect the case to be remanded to the District Court for further proceedings.

PRACTICE AREAS

# Civil and Human Rights

Hagens Berman has represented individuals and organizations in difficult civil rights challenges that have arisen in the past two decades. In doing so, we have managed cases presenting complex legal and factual issues that are often related to highly charged political and historical events. Our clients have included such diverse communities as World War II prisoners of war, conscripted civilians and entire villages.

In this cutting-edge practice area, the firm vigilantly keeps abreast of new state and national legislation and case-law developments. We achieve positive precedents by zealously prosecuting in our clients' interests. Some examples of our work in this area include:

### WORLD TRADE ORGANIZATION PROTESTS

During the 1999 World Trade Organization protests in Seattle, tens of thousands of Seattle citizens became targets after Seattle officials banned all forms of peaceful protest. Seattle police attacked anyone found in the designated "no protest" zones with rubber bullets and tear gas. Hundreds of peaceful protesters were arrested and incarcerated without probable cause for up to four days. The firm won a jury trial on liability and ultimately secured a settlement from Seattle officials after filing a class action alleging violations of the First and Fourth Amendments.

### HUNGARIAN GOLD TRAIN

Following the firm's representation of former forced and enslaved laborers for German companies in the Nazi Slave Labor Litigation, Hagens Berman led a team of lawyers against the U.S. on behalf of Hungarian Holocaust survivors in the Hungarian Gold Train case. The suit claimed that, during the waning days of World War II, the Hungarian Nazi government loaded plaintiffs' valuable personal property onto a train, which the U.S. Army later seized, never returning the property to its owners and heirs.

### DOLE BANANAS LITIGATION

Hagens Berman filed suit against The Dole Food Company, alleging that it misled consumers about its environmental record. The complaint alleged that Dole purchased bananas from a grower in Guatemala that caused severe environmental damage and health risks to local residents. Dole ultimately agreed to take action to improve environmental conditions, collaborating with a non-profit group on a water filtration project for local communities.

PRACTICE AREAS

# Consumer Protection – General Class Litigation

Hagens Berman is a leader in protecting consumers, representing millions in large-scale cases that challenge unfair, deceptive and fraudulent practices.

We realize that consumers suffer the brunt of corporate wrongdoing and have little power to hold companies responsible or to change those tactics. We believe that when backed by a tenacious spirit and determination, class action cases have the ability to serve as a powerful line of defense in consumer protection.

Hagens Berman pursues class litigation on behalf of clients to confront fraudulent practices that consumers alone cannot effectively dispute. We make consumers' concerns a priority, collecting consumer complaints against suspected companies and exploring all avenues for prosecution.

Hagens Berman's legacy of protecting consumer rights reflects the wide spectrum of scams that occur in the marketplace. The cases that we have led have challenged a variety of practices such as:

- False, deceptive advertising of consumer products and services
- False billing and over-charging by credit card companies, banks, telecommunications providers, power companies, hospitals, insurance plans, shipping companies, airlines and Internet companies
- Deceptive practices in selling insurance and financial products and services such as life insurance and annuities
- Predatory and other unfair lending practices, and fraudulent activities related to home purchases

## REPRESENTATIVE SUCCESS IN CONSUMER PROTECTION LITIGATION

### T-MOBILE DATA BREACH LITIGATION (2021)

Hagens Berman served a court-appointed position on the Executive Committee in this consumer class action against T-Mobile for a data breach affecting 7.8 million subscribers, as well as 40 million people who had applied for credit with T-Mobile. T-Mobile also reported that approximately 850,000 active T-Mobile prepaid customers names, phone numbers and PIN numbers were exposed, as well as up to 52,000 names of customers related to current Metro by T-Mobile accounts.

**RESULT:** $350 million settlement pending preliminary approval

### STERICYCLE CONTRACT LITIGATION

The firm served as court-appointed lead counsel in a class-action lawsuit against Stericycle alleging that the company violated contracts and defrauded them by hundreds of millions of dollars through an automatic price-increasing scheme. In February of 2017, a federal judge certified a nationwide consumer class. The class had more than 246,000 class members, with damages estimated preliminarily at $608 million.

**RESULT:** $295 million settlement

### BANK OF AMERICA COUNTRYWIDE APPRAISAL RICO LITIGATION

Hagens Berman filed a nationwide class-action lawsuit against Bank of America, Countrywide Financial and appraisal firm, LandSafe Inc. on behalf of a class of home buyers alleging defendants carried out a series of phony appraisals in an attempt to secure more loans.

**RESULT:** $250 million settlement

### APPLECARE WARRANTY LITIGATION

The firm represented a class of Apple device owners claiming that Apple violated consumer laws, illegally charging customers premium prices for what they believed to be new replacement devices under its AppleCare/AppleCare+ programs. Attorneys for the class estimate the settlement will cover between 3.5 and 4 million refurbished Apple devices.

**RESULT:** $95 million settlement has been preliminarily approved

### BANK OF AMERICA MILITARY CUSTOMER FRAUD LITIGATION

Hagens Berman filed a class-action lawsuit alleging that Bank of America violated the Servicemembers Civil Relief Act, the Truth in Lending Act and North Carolina's Unfair and Deceptive Trade Practices Act. The suit also accused Bank of America of violating common law, including breach of contract, negligence and negligent misrepresentation.

**RESULT:** $42 million settlement

## PENDING CONSUMER PROTECTION LITIGATION

### COLLEGE TUITION & FEES AMID COVID-19 PANDEMIC REIMBURSEMENT

In 2020, as the COVID-19 pandemic unfolded, Hagens Berman sought to represent tuition and fee payers in class-action lawsuits seeking reimbursement for parents and guardians of college students or college students for tuition, fees and other expenses at colleges and universities across the nation. Hagens Berman believes that institutions of higher learning had no right to keep these charges given the coronavirus outbreak and lack of options to students, as college campuses closed.

**RESULT:** $14.4 million has been granted final approval by the courts in settlements reached with Brown University ($1.5 million), George Washington University ($5.4 million), Quinnipiac University ($2.5 million) and Rutgers University ($5 million), and a $4 million settlement with the University of Washington has been granted preliminary approval. Litigation continues against other universities.

### AMAZON BASICS PAPER PRODUCTS ECO-FRIENDLY ADVERTISING

The firm filed a class-action lawsuit against Amazon alleging it made false claims about the damaging environmental impact of its Amazon Basics toilet paper and paper towel products. The company has led consumers to believe it is a leader in environmental stewardship committed to "protecting natural resources." However, the lawsuit alleges that Amazon fails to disclose that its Amazon Basics paper products contribute to the devastating destruction in Canada's boreal forest — one of the last remaining primary forests on Earth.

### AMAZON COVID-19 PRICE GOUGING

This lawsuit was filed against Amazon accusing the company of price gouging consumers during the COVID-19 pandemic, causing massive price spikes for essential goods including food, personal hygiene products and other emergency or medical supplies, allegedly violating California state consumer-protection laws.

### AMAZON PRIME CANCELLATION "DARK PATTERNS"

Hagens Berman represents consumers seeking to hold Amazon accountable for its alleged use of "dark patterns" to deceive users into subscribing to Amazon Prime, or complicate the process of unsubscribing. Since the lawsuit's filing, the firm has been retained by Arizona Attorney General Kris Mayes to file a similar lawsuit on behalf of the state of Arizona, and the Federal Trade Commission filed a complaint against Amazon for the same actions, bolstering the firm's existing claims.

### CHARMIN BATH TISSUE ECO-FRIENDLY ADVERTISING

Hagens Berman filed a class-action lawsuit against Procter & Gamble accusing the company of making false claims about the harmful environmental impact of its Charmin toilet paper products. The company touts sustainability, proclaiming it "helps protect forests" and promises consumers "We are committed to helping keep forests as forests." Behind Charmin's promise that it "maintains healthy forests for generations to come." Procter & Gamble — a multibillion-dollar corporation — is allegedly cutting down boreal forest, in spite of its alleged greenwashing.

### ONEWHEEL SHUT OFF DEFECT

Consumers have reported sudden shutoffs and nosedives while operating Future Motion Inc.'s OneWheel electronic skateboards that launch riders from the board at potentially high speeds and steep angles. The boards have since been recalled yet Future Motion has yet to remedy the defect causing sudden loss of power. Hagens Berman filed its class action in 2022, seeking damages on behalf of consumers.

### CONSUMER INSURANCE LITIGATION

Hagens Berman has pioneered theories to ensure that, in first- and third-party contexts, consumers and health plans always receive the treatment and benefits to which they are entitled. Many of our cases have succeeded in expanding coverage owed and providing more benefits; recovering underpayments of benefits; and returning uninsured/underinsured premiums from the misleading tactics of the insurer. The firm's existing cases include pending litigation against Allstate and CNA Casualty Company.

PRACTICE AREAS

# Consumer Protection – Drug and Supplement Litigation

Hagens Berman aggressively pursues pharmaceutical industry litigation, fighting against waste, fraud and abuse in healthcare. For decades, pharmaceutical manufacturers have been among the most profitable companies in America. But while pharmaceutical companies become richer, consumers, health plans and insurers pay higher costs for prescription and over-the-counter drugs and supplements. We shine the light of public scrutiny on this industry's practices and represent individuals, direct and indirect purchasers, and the nation's most forward-thinking public-interest groups.

The firm's pharmaceutical and dietary supplement litigation practice is second to none in the nation in terms of expertise, commitment and landmark results. Hagens Berman's attorneys have argued suits against dozens of major drug companies, and the firm's aggressive litigation against the pharmaceutical industry has recovered settlements valued at more than $3.8 billion.

## RECENT ANTITRUST RESOLUTIONS

In the last few years, Hagens Berman — as lead or co-lead class counsel — has garnered significant settlements in several antitrust cases involving prescription drugs. In each case, the plaintiffs alleged that a manufacturer of a brand-name drug violated federal or state antitrust laws by delaying generic competitors from coming to market, forcing purchasers to buy the more expensive brand name version instead of the generic equivalent. Examples of our recent successes include:

### ZETIA ANTITRUST LITIGATION

Hagens Berman served as court-appointed lead counsel in this class-action lawsuit representing a class of direct purchasers of Merck's blockbuster cholesterol drug, Zetia. The lawsuit against pharma giant Merck and generic drugmaker Glenmark alleges the two colluded to illegally delay the market entry of generic versions and settled in 2024.

**RESULT:** Confidential settlement valued at hundreds of millions of dollars

### GLUMETZA ANTITRUST LITIGATION

The court denied summary judgment and paved the way for trial in this litigation against brand and generic manufacturers of the diabetes drug Glumetza. Hagens Berman served as co-lead counsel for the direct purchaser class. U.S. District Judge William Alsup approved $453.85 million in settlements resolving direct purchasers' allegations. The result was the largest antitrust recovery to receive final approval in 2022.

**RESULT:** $453.85 million settlement

## SUBOXONE ANTITRUST LITIGATION

Hagens Berman was co-lead counsel for a class of direct purchasers in this pharmaceutical antitrust class action MDL alleging defendants violated federal antitrust laws by delaying generic competition for its blockbuster opioid addiction medicine, Suboxone. The complaint alleges this scheme succeeded, and purchasers incurred substantial damages as a result.

**RESULT:** $385 million settlement

## RANBAXY ANTITRUST LITIGATION

Hagens Berman served as co-lead counsel representing Meijer Inc. and Meijer Distribution Inc. in a class-action lawsuit against drug maker, Ranbaxy. The lawsuit alleged it recklessly stuffed the generic drug approval queues with grossly inadequate applications, deceiving the FDA into granting tentative approvals to lock in statutory exclusivities to which Ranbaxy was not entitled and that it brandished these undeserved exclusivities to exclude others while its own applications floundered, all at the direct expense of U.S. drug purchasers. The settlement was part of a $485 million total settlement for all plaintiffs in the case. The result was the second largest antitrust recovery to receive final approval in 2022.

**RESULT:** $340 million settlement

## FLONASE ANTITRUST LITIGATION

Hagens Berman represented purchasers in this case alleging pharmaceutical giant GlaxoSmithKline filed petitions to prevent the emergence of generic competitors to its drug Flonase, all to overcharge consumers and purchasers of the drug, which would have been priced lower had a generic competitor been allowed to come to market.

**RESULT:** $150 million settlement

## PROGRAF ANTITRUST LITIGATION

Hagens Berman represented purchasers who alleged Astellas Pharma US, Inc. unlawfully maintained its monopoly and prevented generic competition for Prograf, an immunosuppressant used to help prevent organ rejection in transplant patients, harming purchasers by forcing them to pay inflated brand name prices for longer than they should have absent the anticompetitive conduct.

**RESULT:** $98 million settlement

## RELAFEN ANTITRUST LITIGATION

Hagens Berman filed a class-action lawsuit against GlaxoSmithKline, SmithKline Beecham Corporation, Beecham Group PLC and SmithKline Beecham PLC, on behalf of consumers and third-party payors who purchased the drug Relafen or its generic alternatives. The suit alleged that the companies who manufacture and sell Relafen unlawfully obtained a patent which allowed them to enforce a monopoly over Relafen and prevented competition by generic prescription drugs, causing consumers to pay inflated prices for the drug.

**RESULT:** $75 million settlement, $25 million of which was allocated to consumers and $50 million paid the claims of insurers and other third-party payors

## SKELAXIN ANTITRUST LITIGATION

The firm represented purchasers in this case alleging King Pharmaceuticals LLC and Mutual Pharmaceutical Company alleging conspired to suppress generic competition and preserve King's monopoly in the market for the brand name muscle relaxant Skelaxin.

**RESULT:** $73 million class settlement

### TRICOR ANTITRUST LITIGATION

In June 2005, Hagens Berman filed an antitrust lawsuit on behalf of a class of consumers and third-party payors against pharmaceutical manufacturers Abbott Laboratories and Fournier Industries concerning the brand name cholesterol drug Tricor. HBSS was appointed co-lead class counsel by the Court.

**RESULT:** $65.7 million settlement

### ALLERGAN RESTASIS LITIGATION

Hagens Berman served as court-appointed interim lead counsel for a proposed class of direct purchasers of the Allergan Inc. dry-eye emulsion, Restasis. The lawsuit accused the drugmaker fraudulently obtained a series of patents for Restasis by misrepresenting that clinical trials newly showed that a lower strength Restasis formulation worked better than a stronger version.

**RESULT:** $51.25 million settlement

## FRAUDULENT DRUG PRICING RESOLUTIONS

Hagens Berman has led many complex cases that take on fraud and inflated drug prices throughout the U.S. This includes sweeping manipulation of the average wholesale price benchmark used to set prices for prescription drugs nationwide, fraudulent marketing of prescription drugs and the rampant use of co-pay subsidy cards that drive up healthcare costs. These efforts have led to several significant settlements:

### MCKESSON AND FIRST DATABANK DRUG LITIGATION

The firm discovered a far-reaching fraud by McKesson and became lead counsel in this RICO case against McKesson and First DataBank, alleging the companies fraudulently inflated prices of more than 400 prescription drugs. Following the culmination of this case, states and federal government then used Hagens Berman's work to bring additional suits. Hagens Berman represented several states and obtained settlements three to seven times more than that of the Attorneys General. Almost $1 billion was recovered from the McKesson fraud.

**RESULT:** $350 million settlement and a four percent rollback on the prices of 95 percent of the nation's retail branded drugs, the net impact of which could be in the billions of dollars

### AVERAGE WHOLESALE PRICE DRUG LITIGATION

Hagens Berman served as co-lead counsel and lead trial counsel in this sprawling litigation against most of the nation's largest pharma companies, which alleges defendants artificially inflated Average Wholesale Price. Hagens Berman's work in this area led to many state governments filing suit and hundreds of millions in additional recovery.

**RESULT:** Approximately $338 million in settlements

## FRAUDULENT MARKETING RESOLUTIONS

Hagens Berman also litigates against drug companies that fraudulently promote drugs for uses not approved by the Food and Drug Administration (FDA), commonly known as "off-label" uses. We also litigate cases against dietary supplement manufacturers for making false claims about their products. Recent successes include:

### NEURONTIN THIRD-PARTY PAYOR LITIGATION

Hagens Berman served as co-lead trial counsel in this case alleging that Pfizer fraudulently and unlawfully promoted the drug Neurontin for uses unapproved by the FDA.

**RESULT:** $47 million jury verdict in favor of a single third-party payor plaintiff, automatically trebled to $142 million, and a $325 million class settlement

## NEW ENGLAND COMPOUNDING CENTER MENINGITIS OUTBREAK

In 2012, the Center for Disease Control confirmed that New England Compounding Center sold at least 17,000 potentially tainted steroid shots to 75 clinics in 23 states across the country, resulting in more than 64 deaths and 751 cases of fungal meningitis, stroke or paraspinal/peripheral joint infection. HBSS attorneys Thomas M. Sobol and Kristen A. Johnson serve as Court-appointed Lead Counsel for the Plaintiffs' Steering Committee on behalf of plaintiff-victims in MDL 2419 consolidated before The Honorable Ray W. Zobel in the United States District Court for the District of Massachusetts.

**RESULT:** $200 million settlement

## LUPRON LITIGATION

Hagens Berman prosecuted a lawsuit against TAP Pharmaceuticals Products, Inc. on behalf of a class of consumers and third-party payors who purchased the drug Lupron. The suit charged that TAP Pharmaceutical Products, Inc., Abbott Laboratories and Takeda Pharmaceutical Company Limited conspired to fraudulently market, sell and distribute Lupron, causing consumers to pay inflated prices for the drug.

**RESULT:** $150 million settlement

## CELEBREX/BEXTRA LITIGATION

Hagens Berman filed a class-action lawsuit against Pfizer on behalf of individual consumers and third-party payors who paid for the drug Bextra. The firm was praised by Judge Breyer for its "unstinting" efforts on behalf of the class, adding, "The attorneys on both sides were sophisticated, skilled, professional counsel whose object was to zealously pursue their clients' interest, but not at the cost of abandoning the appropriate litigation goals, which were to see, whether or not, based upon the merits of the cases, a settlement could be achieved."

**RESULT:** $89 million settlement

## VIOXX THIRD PARTY PAYOR MARKETING AND SALES PRACTICES LITIGATION

The firm served as lead counsel for third party payors in the Vioxx MDL, alleging that Merck & Co. misled physicians, consumers and health benefit providers when it touted Vioxx as a superior product to other non-steroidal anti-inflammatory drugs. According to the lawsuit. The drug had no benefits over less expensive medications but carried increased risk of causing cardiovascular events.

**RESULT:** $80 million settlement

## SERONO DRUG LITIGATION

Hagens Berman served as lead counsel for a class of consumers and third-party payors in a suit alleging that global biotechnology company Serono, Inc. schemed to substantially increase sales of the AIDS drug Serostim by duping patients diagnosed with HIV into believing they suffered from AIDS-wasting and needed the drug to treat that condition.

**RESULT:** $24 million settlement

## BAYER COMBINATION ASPIRIN/SUPPLEMENT LITIGATION

Hagens Berman served as lead counsel on behalf of consumers in a suit alleging that Bayer Healthcare LLC deceptively marketed Bayer® Women's Low-Dose Aspirin + Calcium, an 81 mg aspirin pill combined with calcium, and Bayer® Aspirin With Heart Advantage, an 81 mg aspirin pill combined with phytosterols. Plaintiffs alleged that Bayer overcharged consumers for these products or that these products should not have been sold, because these products were not FDA-approved, could not provide all advertised health benefits, and were inappropriate for long-term use.

**RESULT:** $15 million settlement

PRACTICE AREAS

# Data Breach, Privacy & Cybersecurity

Hagens Berman defends privacy rights and protects consumers' sensitive personal information in an era of ever-increasing threats to cybersecurity.

In 2022 alone, over 422 million people became vulnerable to cybercriminals via data breaches, often due to the negligence or wrongdoing of corporations and other institutions that collect people's private information. Hagens Berman's data breach legal team pursues litigation on behalf of the hundreds of millions of individuals impacted by data breaches every year, and our dedicated team includes attorneys highly skilled in this area of law and the high tech industry. Our firm is committed to holding corporations and institutions accountable for mishandling consumers' information, and to recovering compensation for those who have been harmed. While some firms pursue litigation only to protract the incident and expense their hours, our firm persistently pursues meaningful litigation to bring about swift relief and strengthen the laws and protocols protecting consumers.

## REPRESENTATIVE SUCCESS IN DATA BREACH, PRIVACY & CYBERSECURITY

### T-MOBILE DATA BREACH LITIGATION – 2021

T-Mobile's 2021 data breach was the cellular company's fifth since 2018, and exposed more than 40 million customers' sensitive personal information to cybercriminals. According to an interview, the hacker carried out the data breach using "a simple tool available to the public," and Hagens Berman attorneys pursued claims of negligence and breach of contract against T-Mobile for allegedly failing to adhere to "industry-standard security measures," according to the complaint.

**RESULT:** $350 million settlement

### CAPITAL ONE DATA BREACH LITIGATION

The 2019 Capital One data breach was the largest instance of data theft from a bank to date, and compromised the social security numbers and bank account numbers of 140,000 and 80,000 people, respectively. Hagens Berman pursued claims of negligence, unjust enrichment and violation of state data breach disclosure laws on behalf of Capital One's customers.

**RESULT:** $190 million settlement

### VALLEY ANESTHESIOLOGY DATA BREACH LITIGATION

In 2019, the firm reached a settlement with Valley Anesthesiology & Pain Consultants after a 2016 security incident in which hackers illegally accessed Valley's computer system, allegedly due to the company's failure to take appropriate security measures to protect its customers' data.

**RESULT:** The settlement provided identity theft protection to class members whose information was compromised in the breach

## PENDING LITIGATION IN DATA BREACH, PRIVACY & CYBERSECURITY

### CAPCUT USER RIGHTS

Hagens Berman filed a class-action lawsuit against ByteDance, the company that owns popular video editing app CapCut. The lawsuit alleges that CapCut profits from illegal use and dissemination of highly sensitive user data, including unique identifying information, email addresses, passcodes, biometric data and geolocation. The lawsuit also alleges that the company makes sensitive user data available to the Chinese government for surveillance and other purposes.

### POWERSCHOOL DATA BREACH

Hagens Berman filed a lawsuit against PowerSchool Holdings Inc. alleging it failed to secure and safeguard the sensitive personal data of an estimated 60 million students and families in a December 2024 cyberattack. The lawsuit claims the data breach occurred through the defendant's PowerSchool SIS (P-SIS) application, a software system schools and school districts use to manage student records. Through P-SIS, PowerSchool collected and maintained the sensitive data of students, their families and school personnel.

### POWERSCHOOL DATA PRIVACY

The firm filed a class-action lawsuit against PowerSchool Holdings Inc., which owns Schoology, Naviance, Performance Matters and SchoolMessenger, for allegedly violating student users' data privacy. The lawsuit alleges that these software platforms, which are used by over 45 million students globally, collect highly sensitive personal data from children including their educational records and all of their activities and communications while using the software.

### PROGRESS SOFTWARE MOVEIT DATA BREACH LITIGATION

Hagens Berman filed suit against Progress Software and a host of other defendants, including Bank of America, Fidelity Investments and Pension Benefit Information, following a 2023 hack that exploited a security vulnerability in MOVEit, a managed file transfer software owned by Progress and utilized by other defendants. More than 600 organizations worldwide were impacted by this security breach, which exposed the personal information, including social security numbers, medical records and banking information of over 40 million people. Hagens Berman's Partner Kristen Johnson was appointed by the court to serve as Liaison and Coordinating Counsel on the Leadership Team. On Sept. 20, 2024, Hagens Berman filed a motion on behalf of Plaintiffs' Lead Counsel for preliminary approval of a $9.95 million settlement with National Student Clearinghouse. Litigation continues against Progress Software and dozens of other defendants involved in the data breach allegations.

### TEMU SHOPPING APP PRIVACY VIOLATIONS LITIGATION

Hagens Berman represents consumers — including four children — against the creators of the popular shopping app Temu, accusing defendants of luring users with the promise of low-cost goods only to capture and disseminate their private information to unauthorized parties. Experts state Temu is purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware, capturing biometric data, WiFi information, camera access and more.

PRACTICE AREAS

# Employment Litigation

Hagens Berman takes special interest in protecting workers from exploitation or abuse. We take on race and gender discrimination, immigrant worker issues, wage and hour issues, on-the-job injury settlements and other crucial workplace issues.

Often, employees accept labor abuses or a curbing of their rights because they don't know the law, respect their superiors or fear for their jobs. We act on behalf of employees who may lack the individual power to bring about meaningful change in the workplace. We take a comprehensive approach to rooting out systemic employee abuses through in-depth investigation, knowledgeable experts and fervent exploration of prosecution strategies. Hagens Berman is a firm well-versed in taking on complicated employee policies and bringing about significant results.

## REPRESENTATIVE SUCCESS IN EMPLOYMENT LITIGATION

### CB RICHARD ELLIS SEXUAL HARASSMENT LITIGATION

Filed a class action against CB Richard Ellis, Inc., on behalf of 16,000 current and former female employees who alleged that the company fostered a climate of severe sexual harassment and discriminated against female employees by subjecting them to a hostile, intimidating and offensive work environment, also resulting in emotional distress and other physical and economic injuries to the class.

**RESULT:** An innovative and unprecedented settlement requiring changes to human resources policies and procedures, as well as the potential for individual awards of up to $150,000 per class member. The company agreed to increase supervisor accountability, address sexually inappropriate conduct in the workplace, enhance record-keeping practices and conduct annual reviews of settlement compliance by a court appointed monitor.

### POULTRY PROCESSING WAGE-FIXING ANTITRUST

Hagens Berman filed a nationwide class-action lawsuit against Perdue, Tyson, Hillshire Farms and many other of the nation's largest poultry processing companies for an alleged years-long wage-fixing agreement, causing employees to receive far less for their work than they are legally owed.

**RESULT:** $398.05 preliminarily approved, believed to be the second largest recovery in a labor antitrust class action

### RED MEAT PROCESSING WAGE-FIXING ANTITRUST

Hagens Berman filed a nationwide class-action lawsuit against JBS, Tyson, Hormel, Smithfield, Perdue and many other of the nation's largest meat processing companies for an alleged years-long wage-fixing agreement, causing employees to receive far less for their work than legally owed. The motion also seeks to certify the National Beef, Cargill and Hormel settlement classes and appoint Hagens Berman and other interim co-lead firms as settlement class counsel.

**RESULT**: The firm has reached $200.2 million in settlements which are pending court approval and continues to litigate against seven remaining defendants

### SCHNEIDER NATIONAL CARRIERS – REGIONAL DRIVERS

The firm represents a certified class of regional drivers in a suit filed against Schneider National Carriers, claiming that the company failed to pay its workers for all of their on-duty time devoted to a variety of work tasks, including vehicle inspections, fueling, and waiting on customers and assignments. The suit also claims that the company does not provide proper meal and rest breaks, and the company is liable for substantial penalties under the California Labor Code.

**RESULT:** $28 million settlement

### SCHNEIDER NATIONAL CARRIERS – MECHANICS

Hagens Berman filed a class-action lawsuit alleging that Schneider National Carriers failed to provide mechanics with proper overtime compensation, meal and rest break premiums, and accurate wage statements as required by California law.

**RESULT:** Settlement on terms mutually acceptable to the parties

### COSTCO WHOLESALE CORPORATION WAGE & HOUR LITIGATION

Filed a class action against Costco Wholesale Corporation on behalf of 2,000 current and former ancillary department employees, alleging that the company misclassified them as “exempt” executives, denying these employees overtime compensation, meal breaks and other employment benefits.

**RESULT:** $15 million cash settlement

### SUNDANCE REHABILITATION CORPORATION

Filed a class action against SunDance challenging illegal wage manipulation, inconsistent contracts and other compensation tricks used to force caregivers to work unpaid overtime.

**RESULT:** $3 million settlement of stock to be distributed out of the company’s bankruptcy estate

### WASHINGTON STATE FERRY WORKERS WAGE LITIGATION

Represented “on-call” seamen who alleged that they were not paid for being “on call” in violation of federal and state law.

**RESULT:** Improved working conditions for employees and rearrangement in work assignments and the **“**on-call**”** system

## PENDING EMPLOYMENT LITIGATION

### AEROSPACE EMPLOYEE WAGE-FIXING ANTITRUST

Hagens Berman filed a class-action lawsuit alleging wage-fixing and no-hire practices in the aerospace industry potentially affecting aerospace engineers and their wages. The firm is specifically making allegations regarding the hiring and compensation practices of six of the nation's largest aerospace engine design, manufacture and service companies for an alleged years-long wage-fixing, no-hire agreement, causing employees to receive far less for their work than they are legally owed.

### NAVAL ARCHITECTS AND MARINE ENGINEERS WAGE-FIXING ANTITRUST

Hagens Berman filed a class-action lawsuit against a group of shipbuilders, specialized engineering consultancies and a recruitment agency, alleging the companies colluded in a years-long wage-fixing, no-hire agreement causing naval architects and marine engineers to receive far less for their work than legally owed. The lawsuit brings antitrust claims for the alleged use of industry dominance to unlawfully deprive thousands of workers of hundreds of millions of dollars in compensation via naked “no-poach” agreements.

PRACTICE AREAS

# Environmental Litigation

Since Hagens Berman's founding, the firm has sought to work toward one simple goal: work for the greater good. Hagens Berman has established a nationally recognized environmental litigation practice, having handled several landmark cases in the Northwest, the nation and internationally.

Hagens Berman believes that protecting and restoring our environment from damage caused by irresponsible and illegal corporate action is some of the most rewarding work a law firm can do. As our firm has grown, we have established an internationally recognized environmental litigation practice.

**SCIENCE AND THE LAW**

Hagens Berman's success in environmental litigation stems from a deep understanding of the medical and environmental science that measures potential hazards. That expertise is translated into the courtroom as our attorneys explain those hazards to a judge or jury in easily understood terms.

**ENVIRONMENTAL EXPERTS**

Our firm's fostered deep relationships with top-notch environmental experts result in resonating arguments and court victories, as well as thoroughly researched and vetted investigations.

**REAL IMPACTS**

Environmental law is a priority at our firm, and we have taken an active role in expanding this practice area. In 2003, Steve Berman and his wife Kathy worked with the University of Washington to create the Kathy and Steve Berman Environmental Law Clinic, giving law students the training and opportunities needed to become hands-on advocates for the environment.

Hagens Berman's significant environmental cases include:

### EXXON VALDEZ OIL SPILL LITIGATION

Hagens Berman represented various classes of claimants, including fisherman and businesses located in Prince William Sound and other impacted areas who were damaged by one of the worst oil spills in United States history.

**RESULT:** $5 billion judgment awarded by a federal jury, and a $98 million settlement was achieved with Alyeska, the oil company consortium that owned the output of the pipeline

### RIO TINTO MINING LITIGATION

Hagens Berman represented then-current and former residents of Bougainville, Papua New Guinea in a decade-long class action accusing one of the world's largest mining companies, Rio Tinto, of egregious abuse of human rights and the environment. The complaint sites exposure to toxins, loss of property, environmental destruction and chemical defoliation among other acts of flagrant disregard to the Bougainvilleans' natural surroundings that had sustained their community.

**RESULT**: For more than a decade, the firm's attorneys prevailed. After reaching the U.S. Supreme Court, the firm's steadfast fight ended in a dismissal.

### SKAGIT VALLEY FLOOD LITIGATION

Hagens Berman represented farmers, homeowners and businesses who claimed damages as a result of the 1990 flooding of this community. The case was in litigation for ten years and involved a jury trial of more than five months. Ultimately, the State Supreme Court reversed this judgment. Despite this reversal, the firm is proud of this representation and believes that the Supreme Court erred.

**RESULT:** Judgments exceeding $6.3 million entered by the trial court following the entry of 53 verdicts against Skagit County

### KERR-MCGEE RADIATION LITIGATION

The firm brought a class action on behalf of residents of West Chicago, Illinois who were exposed to radioactive uranium tailings from a rare earth facility operated by Kerr-McGee.

**RESULT:** Medical monitoring settlement valued in excess of $5 million

### CHINOOK FERRY LITIGATION

The firm represented a class of property owners who challenged Washington State Ferries' high-speed operation of a new generation of fast ferries in an environmentally sensitive area of Puget Sound. Two of the ferries at issue caused environmental havoc and property damage, compelling property owners to act. A SEPA study conducted in response to the suit confirmed the adverse environmental impacts of the fast ferry service

**RESULT:** $4.4 million settlement, among the most favorable in the annals of class litigation in Washington state

### SYCAMORE, ILLINOIS WATER CONTAMINATION LITIGATION

Hagens Berman represented a proposed class of residents of Sycamore, Illinois in this class-action lawsuit against the city for allegedly creating a public health crisis through decades of negligence to its water system. Residents reported high lead levels from lab tests, experienced discolored and foul-smelling water coming from their taps, and complained of health issues stemming from exposure to the city's water. Testing conducted during the litigation revealed chlorine levels well below state and federal regulations.

**RESULT:** In 2023, the firm reached a settlement that required the city to: (1) spend an average of $1.2 million per year on water infrastructure improvement projects through 2027; and (2) engage an independent laboratory to conduct widespread lead, copper, and chlorine testing at sites selected by both the city and residents through 2025.

### GRAND CANYON LITIGATION

The firm represented the Sierra Club in a challenge to a Forest Service decision to allow commercial development on the southern edge of the Grand Canyon National Park.

**RESULT:** Project enjoined by the trial court

### IDAHO GRASS BURNING LITIGATION

In 2002, Hagens Berman brought a class-action lawsuit on behalf of Idaho residents who claimed grass-burning farmers released more than 785 tons of pollutants into the air, including concentrations of polycyclic aromatic hydrocarbons (PAHs), proven carcinogens. Burning the fields annually caused serious health problems, especially to those with respiratory ailments such as cystic fibrosis and asthma. The suit also asserted that Idaho's grass burning policies are far below the standards of other states such as neighboring Washington, where farmers use other techniques to remove grass residue from the fields.

**RESULT:** Settlement under confidential terms

### DOLE BANANAS LITIGATION

The firm took on Dole Food Company Inc. in a class-action lawsuit claiming the world's largest fruit and vegetable company lied to consumers about its environmental record and banana-growing practices. The suit alleged that Dole misrepresented its commitment to the environment in selling bananas from a Guatemalan banana plantation that did not comply with proper environmental practices.

**RESULT:** Culminated in 2013 when Dole and non-profit organization Water and Sanitation Health Inc. collaborated on a water filter project to assist local communities in Guatemala

### DIESEL EMISSIONS LITIGATION

Second to none in uncovering emissions cheating, the firm has dedicated its time and resources to breaking up the dirty diesel ring. After filing the first lawsuit in the country against Volkswagen, Audi and Porsche for its massive Dieselgate scandal in 2015, the firm went on to unmask emissions-cheating devices installed in vehicles made by Fiat Chrysler, Mercedes and General Motors and continues to investigate diesel cars for excessive, illegal and environmentally harmful levels of emissions.

**RESULT:** The firm's independently researched active cases have led to investigations by the EPA, DOJ and European authorities

### SAN FRANCISCO AND OAKLAND CLIMATE CHANGE LITIGATION

Hagens Berman represents the cities of San Francisco and Oakland, Calif. in two lawsuits filed against BP, Chevron Corp., Exxon Mobil Corp., Royal Dutch Shell PLC and ConocoPhillips alleging that the Big Oil giants are responsible for the cities' costs of protecting themselves from global warming-induced sea level rise, including expenses to construct seawalls to protect the two cities' more than 5 million residents. The newly filed case seek an order requiring defendants to abate the global warming-induced sea level rise by funding an abatement program to build sea walls and other infrastructure. Attorneys for the cities say this abatement fund will be in the billions.

### KIVALINA GLOBAL WARMING LITIGATION

A tiny impoverished Alaskan village of Inupiat Eskimos took action against some of the world's largest greenhouse gas offenders, claiming that contributions to global warming are leading to the destruction of their village and causing erosion to the land that will eventually put the entire community under water. Hagens Berman, along with five law firms and two non-profit legal organizations, filed a suit against nine oil companies and 14 electric power companies that emit large quantities of greenhouse gases into the atmosphere. The lawsuit alleged their actions resulted in the destruction of protective ice, exposing the village to severe storms that destroy the ground the village stands on. Relocating the village of Kivalina could cost between $95 and $400 million, an expense the community cannot afford.

### CANE RUN POWER PLANT COAL ASH LITIGATION

In 2013, Hagens Berman filed a class-action lawsuit against Louisville Gas and Electric Company alleging it illegally dumped waste from a coal-fired power plant onto neighboring property and homes where thousands of Kentucky residents live. According to the complaint, Louisville Gas and Electric Company's Cane Run Power Plant is fueled by the burning of coal, which also produces coal combustion byproducts — primarily fly ash and bottom ash — that contain significant quantities of toxic materials, including arsenic, chromium and lead. The dust spewed by Cane Run contains known carcinogens, posing significant potential health hazards.

### OREGON GROUNDWATER CONTAMINATION

Hagens Berman filed a class-action lawsuit representing those living in Morrow or Umatilla County, Oregon accusing the Port of Morrow, commercial farms and confined animal feeding operations of contaminating groundwater in Oregon's Lower Umatilla Basin by dumping nitrogen throughout Morrow and Umatilla Counties. Attorneys estimate the issue affects upwards of 46,000 residents, many of whom are children. Nitrogen in excess converts to nitrates in the soil,

potentially leading to serious health problems. On Feb. 24, 2025, U.S. Magistrate Judge Andrew Hallman issued an 80-page order recommending that claims under the federal Resource Conservation and Recovery Act and Oregon law — including claims for negligence, trespass, nuisance and inverse condemnation — be allowed to proceed.

### SEA-TAC INTERNATIONAL AIRPORT POLLUTION

The firm filed a class-action lawsuit representing those living within a five-mile radius of Seattle-Tacoma International Airport (Sea-Tac). According to the lawsuit, more than 300,000 people in this area, at least 60,000 of whom are children, have likely been exposed to unhealthy levels of toxic substances including lead and carbon monoxide from nearby airport operations. Attorneys call this the Contamination Zone, where levels of cancer, heart disease and chronic lower respiratory disease are significantly higher. On Nov. 25, 2024, U.S. District Judge Jamal N. Whitehead denied two motions, filed by the Port of Seattle, Alaska Air Group, and Delta Air Lines Inc., seeking to dismiss the lawsuit.

PRACTICE AREAS

# Governmental Representation

Hagens Berman has been selected by public officials to represent government agencies and bring civil law enforcement and damage recoupment actions designed to protect citizens and the treasury. We understand the needs of elected officials and their obligation to impartially and zealously represent the interests of the public without taking excessive risks in litigation. We are often chosen after competitive bidding, and have been hired by officials from across the political spectrum.

Hagens Berman has assisted governments in recovering billions of dollars in damages and penalties from corporate wrongdoers and, in the process, helped reform how some industries do business. In serving government, we are often able to leverage the firm's expertise and success in related private class-action litigation. Successes on behalf of government clients include:

### TOBACCO LITIGATION

We represented 13 states in landmark Medicaid-recoupment litigation against the country's major tobacco companies. Only two states took cases to trial – Washington and Minnesota. The firm served as trial counsel for the state of Washington, becoming only one of two private firms in the entire country to take a state case to trial.

Hagens Berman was instrumental in developing what came to be accepted as the predominant legal tactic to use against the tobacco industry: emphasizing traditional law enforcement claims such as state consumer protection, antitrust and racketeering laws. This approach proved to be nearly universally successful at the pleading stage, leaving the industry vulnerable to a profits-disgorgement remedy, penalties and double damages. The firm also focused state legal claims on the industry's deplorable practice of luring children to tobacco use.

**RESULT:** $260 billion for state programs, the largest settlement in the history of civil litigation in the U.S.

### MCKESSON AVERAGE WHOLESALE PRICE LITIGATION

This litigation is yet another example of fraudulent drug price inflation impacting not just consumers and private health plans, but public health programs such as Medicaid and local government-sponsored plans as well.

**RESULT:** Hagens Berman started the AWP class action, which resulted in many states filing cases. The firm represented several of those states in successful litigation.

### MCKESSON GOVERNMENT LITIGATION

On the heels of Hagens Berman's class action against McKesson, the firm led lawsuits by states (Connecticut, Utah, Virginia, Montana, Arizona).

**RESULT:** These states obtained recoveries three to seven times larger than states settling in the multi-state Attorneys General settlement. In addition, the firm obtained $12.5 million for the City of San Francisco and $82 million for a nationwide class of public payors.

## ZYPREXA MARKETING & SALES PRACTICES LITIGATION – CONNECTICUT

Hagens Berman served as outside counsel to then-Attorney General Richard Blumenthal in litigation alleging that Lilly engaged in unlawful off-label promotion of the atypical antipsychotic Zyprexa. The litigation also alleged that Lilly made significant misrepresentations about Zyprexa's safety and efficacy, resulting in millions of dollars in excess pharmaceutical costs borne by the State and its taxpayers.

**RESULT:** $25 million settlement

## GENERAL MOTORS IGNITION SWITCH LITIGATION

Hagens Berman is pleased to have assisted the Arizona Attorney General in its action against GM, as well as the district attorney of Orange County, California who filed a consumer protection lawsuit against GM, claiming the automaker deliberately endangered motorists and the public by intentionally concealing widespread, serious safety defects.

## AMAZON BUY BOX ALGORITHM & PRICE PARITY POLICIES – STATE OF ARIZONA

Hagens Berman has been retained by Arizona Attorney General and has filed a consumer-protection and antitrust lawsuit on behalf of the state of Arizona. The lawsuit accuses Amazon of violating Arizona's consumer-protection and antitrust laws by allegedly enforcing anticompetitive price parity policies and "using a biased algorithm to determine which offers shoppers will see, and therefore which sellers they will buy from, when they search for items on Amazon."

## STATE OPIOID LITIGATION

Hagens Berman was hired to assist multiple state and local governments in lawsuits brought against large pharmaceutical manufacturers including Purdue Pharma, Cephalon, Janssen Pharmaceuticals, Endo Health Solutions and Actavis charging that these companies and others deceived physicians and consumers about the dangers of prescription painkillers. Hagens Berman was also hired to represent several municipalities in lawsuits challenging the reckless distribution of prescription opioids by wholesale distributors and pharmacy chains.

The firm was first hired by California governmental entities for the counties of Orange and Santa Clara. The state of Mississippi also retained the firm's counsel in its state suit brought against the manufacturer of opioids. The suit alleges that the pharma companies engaged in tactics to prolong use of opioids despite knowing that opioids were too addictive and debilitating for long-term use for chronic non-cancer pain.

In a third filing, Hagens Berman was retained as trial counsel for the state of Ohio. Filed on May 31, 2017, the firm is assisting the Ohio Attorney General's office in its case against five opioid makers. Ohio Attorney General Mike DeWine stated that "drug companies engaged in fraudulent marketing regarding the risks and benefits of prescription opioids which fueled Ohio's opioid epidemic," and that "these pharmaceutical companies purposely misled doctors about the dangers connected with pain meds that they produced, and that they did so for the purpose of increasing sales."

In a fourth filing, Hagens Berman was retained by the state of Arkansas to challenge opioid manufacturers' deceptive marketing of prescription opioids. Announcing the lawsuit on April 2, 2018, Arkansas Attorney General Leslie Rutledge stated that "the reckless actions of these opioid manufacturers have wreaked havoc upon Arkansas and her citizens for far too long."

Hagens Berman has also represented the city of Seattle and Salt Lake County in separate lawsuits against the opioid manufacturers. These lawsuits also name the nation's largest wholesale distributors and pharmacy chains as defendants, alleging that they failed to implement adequate controls to prevent the diversion of opioids into the black market and other unlawful distribution channels.

## MUNICIPAL LENDING LITIGATION

Hagens Berman represents the cities of Los Angeles and Miami in a series of lawsuits filed against the nation's largest banks, including CitiGroup, JP Morgan, Wells Fargo and Bank of America alleging that they engage in systematic discrimination against minority borrowers, resulting in reduced property tax receipts and other damages to the cities. The suits seek damages for the City, claiming that the banks' alleged discriminatory behavior resulted in foreclosures, causing a reduction of property tax revenues and increased municipal service costs.

PRACTICE AREAS

# High Tech Litigation

Hagens Berman routinely investigates and confronts the world's largest tech companies and has pending litigation against Meta, Apple, Amazon, Alphabet and other Big Tech players for issues related to data protection, intellectual property, antitrust infringement, consumer rights violations and product defects affecting the daily lives of millions.

## HIGH TECH LITIGATION ATTORNEYS

Hagens Berman brings cutting edge cases against major tech companies. We leverage our resources, breadth of knowledge and expert litigation strategies against harmful anticompetitive practices, defective products and other instances of malfeasance perpetrated by Big Tech. Some of these kingpins believe they are too big to fail. Our firm is well-practiced in uncovering wrongdoing and holding responsible parties accountable for widespread fraud, even when governing bodies are constrained by red tape and bureaucracy, and other firms lack the necessary resources to continue long periods of complex litigation. Hagens Berman also litigates claims against tech companies in the areas of trade secrets, IP and patent law and represents individual business owners as well as large groups of consumers.

## HIGH TECH CLASS-ACTION CASES

Throughout Hagens Berman's decades-long track record, some of our largest cases have been brought against Big Tech companies, resulting in monumental recoveries for our clients:

### APPLE E-BOOKS LITIGATION

Hagens Berman served as co-lead counsel representing a class of Apple e-book purchasers claiming that Apple and five of the nation's top publishers, including HarperCollins Publishers, Hachette Book Group, Macmillan Publishers, Penguin Group Inc. and Simon & Schuster Inc. illegally fixed prices of electronic books. Working with the State Attorneys General in 33 jurisdictions. Hagens Berman reached settlements with the publishers, and after the Second Circuit confirmed its liability, Apple paid $450 million to the consumer class, a combined settlement that provided more than twice the estimated losses suffered by consumers.

**RESULT:** $568 million settlement

### APPLE IOS APP STORE FEES LITIGATION

In this lawsuit against Apple, the firm served as interim lead counsel and represented U.S. iOS developers. The lawsuit accused Apple of monopolizing distribution services for iOS apps and in-app digital products, resulting in commission overcharges.

**RESULT:** $100 million and developer-friendly changes to the App Store's policies

### APPLECARE WARRANTY LITIGATION

The firm represented a class of Apple device owners claiming that Apple violated consumer laws, illegally charging customers premium prices for what they believed to be new replacement devices under its AppleCare/AppleCare+ programs. Attorneys for the class estimate the settlement will cover between 3.5 and 4 million refurbished Apple devices.

**RESULT:** $95 million settlement has been preliminarily approved

### GOOGLE PLAY STORE FEES LITIGATION

The firm filed a class action on behalf of Android app developers against Google accusing it of violating antitrust laws by illegally monopolizing markets for Android app distribution and in-app payment processing. Hagens Berman was the first to file a class case, led settlement negotiations and patterned the settlement with Google after its 2021 legal win against Apple regarding damages to iOS developers through Apple's App Store policies.

**RESULT:** $90 million settlement

### GOOGLE ADSENSE LITIGATION

Hagens Berman represented a class of Google AdSense users who suffered unjust account suspensions.

**RESULT:** $11 million settlement

## PENDING LITIGATION AGAINST BIG TECH COMPANIES

The firm also has several pending litigations against Big Tech giants including Amazon, Apple and Meta. Some of our most notable pending claims include:

### AMAZON MARKETPLACE ANTITRUST VIOLATIONS

Independent investigations by Hagens Berman's legal team and expert antitrust attorneys have revealed that Amazon.com has violated federal antitrust price-fixing and monopoly laws, causing Amazon customers to pay artificially increased prices for products purchased online. In each of the pending cases, Hagens Berman was the first to file, and it serves as interim lead counsel, where leadership was contested.

In two cases representing consumers who purchased on and off Amazon Marketplace, *De Coster et al. v. Amazon.com* and *Frame-Wilson et al. v. Amazon.com Inc.*, Hagens Berman alleges a broad-reaching agreement between Amazon and the 2 million merchants that sell on its platform as third-party sellers. This agreement prevents third-party sellers from selling at lower prices anywhere else online, even if it costs them less to sell on other platforms and it would be more profitable to do so. This agreement substantially increases the price of virtually every product sold online and consolidates Amazon's iron hold on the online retail market.

In two cases, representing consumers who purchased on and off Amazon Marketplace, Hagens Berman alleges a broad-reaching agreement between Amazon and the 2 million merchants that sell on its platform as third-party sellers. This agreement prevents third-party sellers from selling at lower prices anywhere else online, even if it costs them less to sell on other platforms and it would be more profitable to do so. This agreement substantially increases the price of virtually every product sold online and consolidates Amazon's iron hold on the online retail market.

In a third suit, *Brown et al. v. Amazon.com Inc.*, Hagens Berman alleges that Amazon's agreements with its suppliers likewise increase online consumer prices by restraining price competition from other online retailers. These agreements impose financial penalties on the suppliers, whenever Amazon reduces its own retail price to match a lower online price of the supplier's products. These penalties pressure suppliers to impose minimum retail prices and enforce them against Amazon's retail competitors that would otherwise sell at a lower price than Amazon.

In 2025, a Washington federal judge compelled Amazon to produce documents previously marketed as privileged, including over 132,000 claims, benefitting all three pending cases.

### APPLE & AMAZON IPHONE & IPAD OVERPRICING ANTITRUST

In 2022, Hagens Berman filed an antitrust class-action lawsuit against Apple and Amazon alleging an illegal agreement between the two. The lawsuit accuses them of restrict the number of sellers offering iPhones and iPads on Amazon's platform, effectively lowering competition for sales and inflating prices. In 2023, a federal judge denied defendants' motion to dismiss, stating "…the facts as alleged would constitute an offense—regardless of how Defendants would prefer to frame them—and…they are sufficient to survive a motion to dismiss."

### APPLE ICLOUD ANTITRUST

In this 2024 antitrust class action, Hagens Berman represents consumers accusing Apple Inc. of establishing a monopoly through its iOS cloud-based storage policies. The lawsuit alleges Apple may have arbitrarily required device holders to use only Apple iCloud products to back up certain file types. This alleged control secures Apple a monopoly that allows it to charge artificially inflated prices for cloud storage, the lawsuit states. The case is pending on appeal.

### APPLE IPHONE OVERPRICING ANTITRUST

Hagens Berman's antitrust legal team filed a class action against Apple Inc. accusing it of violating federal antitrust laws for allegedly locking consumers into using its products, establishing an illegal monopoly over the smartphone market. The lawsuit accuses Apple of suppressing technologies and innovations that would make it easier for consumers to switch device ecosystems. In 2024, the firm's managing partner, Steve Berman, was appointed co-lead interim class counsel following the consolidation of the lawsuit into the MDL, In Re: Apple Inc. Smartphone Antitrust Litigation.

### APPLE PAY PAYMENT CARD ISSUER ANTITRUST

The firm filed a class-action lawsuit accusing Apple of intentionally monopolizing the billion-dollar mobile wallet market on iOS platforms, forcing payment card issuers to pay supracompetitive fees and stifling mobile wallet innovation. The lawsuit claims that Apple's antitrust behavior has led to upwards of $1 billion in illicit annual revenue through Apple Pay fees paid by payment card issuers including credit unions and other small businesses. In 2023, a federal judge allowed the case to continue following defendant's motion to dismiss. Judge White deemed plaintiffs plausibly allege that Apple has used its monopoly over the tap-and-pay mobile wallet market to charge issuers artificially inflated fees through Apple Pay policies and agreements.

### FACEBOOK ANTITRUST

Hagens Berman filed a class-action lawsuit in 2020 alleging Facebook gained an illegal monopoly by exploiting and selling user data. We believe Facebook utilized its own user data to identify emerging threats to its social-media monopoly without properly compensating consumers and without notifying them as to the extent to which their personal information was being used. In 2021, a key attorney on the case at Hagens Berman was named co-lead counsel for the class of consumers.

## NONPUBLIC INVESTIGATIONS

Hagens Berman is also involved in several nonpublic investigations of tech companies for various forms of deception and harm to consumers and employees.

PRACTICE AREAS

# Intellectual Property

The Hagens Berman intellectual property team has deep experience in all aspects of intellectual property litigation. We specialize in complex and significant damages cases against some of the world's largest corporations.

The firm is primarily engaged in patent and copyright infringement litigation at this time. We represent intellectual property owners, including inventors, universities, non-practicing entities, authors and other groups whose patent and copyright portfolios represents a significant creative and capital investment.

Our current and recent engagements include the following:

### DISNEY, FOX, MARVEL, PARAMOUNT COPYRIGHT LITIGATION

Hagens Berman currently represents Rearden LLC in three cases against Hollywood film studios. The complaint alleges that the studios are liable for thousands of unauthorized copies of Rearden's groundbreaking MOVA facial performance capture software, used by the studios for CG characters that appeared in seven major motion pictures. The complaint also alleges infringement of the MOVA trademark.

### ANGRY BIRDS TRADEMARK LITIGATION

Hagens Berman represented a Seattle artist who filed a lawsuit against Hartz Mountain Corporation — one of the nation's largest producers of pet-related products — claiming the company illegally sold the artist's trademarked Angry Birds pet toy line to video game giant Rovio Entertainment Ltd, robbing her of millions of dollars of royalty fees.

**RESULT:** Settled under confidential terms

### BOMBARDIER INC. PATENT LITIGATION

The firm represented Arctic Cat Inc. in patent infringement litigation against Bombardier Recreational Products and BRP U.S. Inc. The complaint alleges that Bombardier's Sea-Doo personal watercraft infringe Arctic Cat's patents covering temporary steerable thrust technology used when the rider turns in off-throttle situations.

**RESULT:** $46.7 million final judgment against defendants, trebling initial damages of $15.5 million awarded in a unanimous jury verdict

### NINTENDO PATENT LITIGATION

The firm represented Japan-based Shinsedai Company in patent infringement litigation against Nintendo. The suit alleged that our client's patents were infringed by various sports games for the Nintendo Wii.

**RESULT:** Settled under confidential terms

### SAMSUNG, LG, APPLE PATENT LITIGATION

The firm represented FlatWorld Interactives LLC in patent litigation against Apple, LG and Samsung. The complaints allege that the defendants' mobile handsets, tablets, media players and other devices infringe a FlatWorld patent covering the use of certain gestures to control touchscreen displays.

**RESULT:** Settled under confidential terms

Hagens Berman is also skilled in other aspects of intellectual property law, including trademark, trade dress, unfair competition, and trade secret litigation.

Unlike other intellectual property firms, Hagens Berman only represents plaintiffs. This reduces the risk of potential conflicts of interest which often create delays in deciding whether or not to take a case at larger firms.

PRACTICE AREAS

# Investor Fraud – Individual and Class Action Litigation

Investing is a speculative business involving assessment of a variety of risks that can only be properly weighed with full disclosure of accurate information. No investor should suffer undue risk or incur losses due to misrepresentations related to their investment decisions.

Our attorneys work for institutional and individual investors defrauded by unscrupulous corporate insiders and mutual funds. The firm vigorously pursues fraud recovery litigation, forcing corporations and mutual funds to answer to deceived investors.

Hagens Berman is one of the country's leading securities litigation firms advising clients in both individual and class-action cases. The firm has experience, dedication and a team with the horsepower required to drive complex cases to exemplary outcomes. Our attorneys are authorities in an array of issues unique to federal and state securities statutes and related laws. We use a variety of highly experienced experts as an integral part of our prosecution team. A few notable successes on behalf of our investor clients include:

### CHINA MEDIAEXPRESS HOLDINGS, INC. SECURITIES LITIGATION

Hagens Berman served as lead counsel in the case alleging on behalf of a class of investors that China MediaExpress Holdings made false and misleading statements, including misrepresentations about its revenues, the number of buses in its network and the nature of its business relationships. The lawsuit resulted in relief for investors valued at $535 million.

**RESULT:** $535 million settlement

### CHARLES SCHWAB YIELD PLUS SECURITIES LITIGATION

Lead counsel, alleging fraud in the management of the Schwab YieldPlus mutual fund.

**RESULT:** $235 million settlement

### AEQUITAS CAPITAL MANAGEMENT SECURITIES LITIGATION

Prosecuted class action against the bankers, lawyers and accountants who assisted Aequitas in carrying out a massive Ponzi scheme that defrauded investors of millions of dollars before the firm was shut down in 2016.

**RESULT:** $234 million in total settlements, representing the largest settlement of a securities lawsuit in Oregon history.

### JPMORGAN – MADOFF PONZI SCHEME LITIGATION

Case alleged that banking and investment giant JPMorgan was complicit in aiding Bernard Madoff's Ponzi scheme. Investors claim that JPMorgan operated as Bernard L. Madoff Investment Securities LLC's primary banker for more than 20 years.

**RESULT:** $218 million settlement amount for the class and a total of $2.2 billion paid from JPMorgan that will benefit victims of Madoff's Ponzi scheme

### MCKESSON

Hagens Berman filed this class action investor-rights derivative action based on the McKesson board's failure to monitor and oversee the company's opioid distribution operations resulting in hundreds of millions of dollars of potential damages from scores of lawsuits filed against McKesson.

**RESULT:** $175 million record-breaking derivative settlement and strong corporate governance changes

### OPPENHEIMER SECURITIES LITIGATION

Additional counsel for lead plaintiffs in class action alleging Oppenheimer misled investors regarding its Champion and Core Bond Funds.

**RESULT:** $100 million settlement

### TREMONT

Co-lead counsel in a case alleging Tremont Group Holdings (and its five Madoff feeder funds: Rye Select Broad Market Fund, L.P., Rye Select Broad Market Prime Fund, L.P., Rye Select Broad Market XL Fund, L.P., Rye Select Broad Market XL Portfolio Limited, and Rye Select Broad Market Portfolio Limited) breached its fiduciary duties by turning over $3.1 billion to Bernard Madoff. On Sept. 14, 2015, after nearly two years of negotiations and mediation, the court granted final approval of the plan of allocation and distribution of the funds which markets estimate could yield investors as much as $1.45 billion.

**RESULT:** $100 million plus negotiated bankruptcy proceed resulting in distributions of over $1 billion to investors

### BOEING

Uncovered critical production problems with the 777 airliner documented internally by Boeing, but swept under the rug until a pending merger with McDonnell Douglas was completed.

**RESULT:** $92.5 million record-breaking settlement

### ZUORA, INC. SECURITIES LITIGATION

The firm filed a securities fraud class action alleging misrepresentations and concealment of delays in implementing and integrating RevPro, the company's revenue recognition management software application. A $75.5 million settlement provided significant relief to investors.

**RESULT:** $75.5 million settlement

### MORRISON KNUDSEN

Filed a shareholder class action alleging that MK's senior officers concealed hundreds of millions in losses.

**RESULT:** $63 million settlement

### RAYTHEON/WASHINGTON GROUP

Charged Raytheon with deliberately misrepresenting the true financial condition of Raytheon Engineers & Constructors division in order to sell this division to the Washington Group at an artificially inflated price.

**RESULT:** $39 million settlement

### THERANOS INVESTOR LITIGATION

Hagens Berman represented Theranos investors in a lawsuit that states that Theranos and its officers set in motion a publicity campaign to raise billions of dollars for Theranos and themselves, and to induce investors to invest in Theranos, all the while knowing that its "revolutionary" blood test technology was essentially a hoax. In a case of first impression, the court upheld the investor claims where plaintiffs did not directly purchase their securities from Theranos, Elizabeth Holmes and Sunny Balwani, but through funds whose purpose included investing in Theranos.

**RESULT:** The firm secured a confidential settlement with Theranos, Holmes and Balwani ending the suit. The settlement also allowed for continued public access to depositions, video and exhibits which were featured prominently in various podcasts and streaming services, including "Bad Blood the Final Chapter," Netflix's "The Inventor: Out for Blood in Silicon Valley" and Hulu's "The Dropout."

### U.S. WEST

Represented shareholders of U.S. West New Vector in a challenge to the proposed buyout of minority shareholders by U.S. West.

**RESULT:** Settlement achieved, resulting in a $63 million increase in the price of the buyout, and the proposed buyout was stayed

## CURRENT CASEWORK

### SPAC LITIGATION

Hagens Berman represents investors in a number of private securities class action lawsuits arising out of fraud and other misconduct in connection with private companies that went public through special purpose acquisition vehicle ("SPAC") business combinations.

SPACs are shell entities that raise money and list on an exchange, usually with the goal of merging with a private firm and taking it public. SPACS burst onto the scene in 2020, as a hot alternative to traditional initial public offerings, raising more than $80 billion raised in 2020 and more than $160 billion raised in 2021, alone.

The SEC has recently raised serious concerns regarding the information asymmetries, the potential for misleading information and fraud, and conflicts of interest inherent SPAC business combinations. Several high-profile SPAC debacles have resulted in serious allegations of green washing, false projections and other securities fraud, collectively costing investors billions of dollars in investment losses.

The Firm's attorneys, together with its investigators, accountants and economic consultants, are prosecuting a number of securities class actions brought on behalf of damaged SPAC investors. For example, Hagens Berman serves as the court-appointed counsel in Berkeley Lights, Danimer, Desktop Metal, Hyzon, and Redwire.

### COVID-19-RELATED CLASS ACTIONS

As COVID-19 has continued to spread across the United States, Hagens Berman has remained keenly focused on protecting investors from frauds, illicit schemes and other misconduct relating to COVID-19. For example, Hagens Berman investigated, filed a proprietary action and serves as court-appointed lead counsel in one of the first securities class actions arising from a fraudulent scheme for corporate insiders to profit from disseminating false and misleading information concerning a company's COVID-19 vaccine candidate, *In re Vaxart*, Inc. Sec. Litig., No. 3:20-cv-05949-VA (N.D. Cal.). The Firm and its co-counsel recently defeated in large part defendants' motions to dismiss in Vaxart.

### CANNABIS SECURITIES FRAUD

The expanding legalization and sale of cannabis in not only the U.S. but globally, spurred a wave of cannabis-related initial public offerings and mergers and acquisitions. But as investors would later learn, the nascent industry was rife with accounting fraud, false projections and egregious insider trading. Hagens Berman currently serves as co-lead counsel in *In re Aurora Cannabis Inc. Securities Litigation*, 2:19-cv-20588-JMV-JBC (D. N.J.). The Firm and its-counsel also recently obtained a $13 million settlement on behalf of investors in *Ortiz v. Canopy Growth Corp. et al.*, 2:19-cv-20543 (D. N.J.).

## U.S.-LISTED FOREIGN COMPANIES

Investing in U.S.-listed foreign companies is a convenient way for U.S. investors to gain exposure to vast and fast-growing foreign economies. But the inability to inspect the audits of certain foreign firms, together with the spectacular collapses of several large issuers, have shined the light on rampant financial fraud at foreign issuers trading on American exchanges. The firm is currently leading the prosecution in a number of private securities class actions against U.S.-listed foreign companies, including against JOYY, Sasol, SOS and Wirecard.

## TECHNOLOGY SECTOR

Claims of lucrative contracts, investments and acquisitions, or of new product lines are common ways in which issuers in the technology space are about to get investors excited about the company so that they will purchase shares. But in recent history, several high-profile technology firms have been accused of attempting to pump their share price through fictitious statements about their products, prospects and economic activity. The firm was appointed lead counsel in an action against a recent IPO cloud application company, *Roberts v. Zuora Inc. et al*, 3:19-cv-03422 (N.D. Cal.), where the firm and its client have defeated defendants' motion to dismiss, certified a class of investors, and are preparing for trial. The firm was also appointed lead counsel against tech real-estate marketplace company Zillow over its failed house-flipping business, *Barua v. Zillow Group, Inc., et al.*, 2:21-cv-01551-TSZ (W. Wash.).

## WHISTLEBLOWERS

In an effort to curb Wall Street excesses, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, which built vigorous whistleblower protections into the legislation known as the "Wall Street Tip-Off Law." The law empowers the U.S. Securities and Exchange Commission to award between 10 and 30 percent of any monetary sanctions recovered in excess of $1 million to whistleblowers who provide information leading to a successful SEC enforcement. It also provides similar rewards for whistleblowers reporting fraud in the commodities markets.

Hagens Berman represents whistleblowers with claims involving violations of the Securities Exchange Act and the Commodities Exchange Act. Unlike traditional whistleblower firms who have pivoted into this area, Hagens Berman has a strong background and history of success in securities, antitrust and other areas of fraud enforcement, making us an ideal partner for these cases. Our matters before the SEC/CFTC include a range of claims, including market manipulation and fraudulent financial statements.

PRACTICE AREAS

# Personal Injury and Abuse

For nearly two decades, Hagens Berman's blend of professional expertise and commitment to our clients has made our firm one of the most well-respected and successful mass tort and personal injury law firms in the nation. We deliver exceptional results for our clients by obtaining impressive verdicts and settlements in personal injury litigation.

Our attorneys have experience in wrongful death, brain injury and other catastrophic injury cases, as well as deep experience in social work negligence, medical malpractice, nursing home negligence and sexual abuse cases.

Hagens Berman also has unparalleled experience in very specific areas of abuse law, recovering damages on behalf of some of the most vulnerable people in our society.

## VEHICLE COLLISION/TRAUMATIC INJURIES

Hagens Berman is an established leader in traumatic injury litigation. Our attorneys fight for the rights of injured athletes, slip-and-fall victims, victims of life-changing collisions and car crashes, those injured in the workplace and other victims of negligence who have suffered severe injuries. Our firm has successfully litigated personal injury claims involving traumatic brain injuries, spinal cord damage and other catastrophic injuries that require immediate care and leave victims physically, emotionally and financially vulnerable.

The firm represents multiple victims who suffered catastrophic injuries in rollover accidents involving Ford Super Duty trucks. Models manufactured between 1999 and 2016 are alleged to have dangerously weak roofs, prone to collapsing during rollovers allegedly due to design choices that compromised structural integrity and safety. Attorneys believe Ford was aware of these risks even before the first affected trucks hit the market in 1999.

## MEDICAL MALPRACTICE

Litigating a medical malpractice case takes acute specialization and knowledge of medical treatments and medicine. Notwithstanding these facts, Hagens Berman pursues meritorious medical malpractice claims in instances where clients have suffered life-altering personal injuries. Our firm's personal injury attorneys handle medical malpractice cases with the dedication and detail necessary to make victims whole. Hagens Berman is very selective in accepting medical malpractice cases and has been successful in recovering significant compensation for victims of medical error and negligence.

## NURSING HOME NEGLIGENCE

Nursing home negligence is a growing problem throughout the nation. As our population ages, reports of elder abuse and nursing home negligence continue to rise. Today, elder abuse is one of the most rapidly escalating social problems in our society. Hagens Berman is uniquely qualified to represent victims of elder abuse and nursing home negligence. Our attorneys have secured outstanding settlements in this area of law and have committed to holding nursing homes accountable for wrongdoing.

## SEXUAL ABUSE LITIGATION

Hagens Berman has represented a wide spectrum of individuals who have been victims of sexual abuse, including children and developmentally disabled adults. We treat each case individually, with compassion and attention to detail and have the expertise, resources and track record to stand up to the toughest opponents. In the area of sexual abuse, our attorneys have obtained record-breaking verdicts, including the largest personal injury verdict ever upheld by an appellate court in the state of Washington. More about Hagens Berman's sexual abuse practice can be found on the Sexual Abuse and Harassment practice area page.

## SOCIAL WORK NEGLIGENCE

Social workers play a critical role in the daily lives of our nation's most vulnerable citizens. Social workers, assigned to protect children, the developmentally disabled and elderly adults, are responsible for critical aspects of the lives of tens of thousands of citizens who are unable to protect themselves. Many social workers do a fine job. Tragically, many do not. The results are often catastrophic when a social worker fails to monitor and protect his or her vulnerable client. All too often, the failure to protect a child or disabled citizen leads to injury or sexual victimization by predators. With more than $40 million in recoveries on behalf of vulnerable citizens who were neglected by social workers, Hagens Berman is the most experienced, successful and knowledgeable group of attorneys in this dynamic area of law.

## WORKPLACE INJURY

While many workplace injury claims are precluded by workers' compensation laws, many instances of workplace injury are caused by the negligence and dangerous oversight of third parties. In these instances, victims may have valid claims. Hagens Berman's personal injury legal team has successfully brought many workplace injury claims, holding third parties liable for our clients' serious bodily injuries. This includes successfully litigating claims under the Washington Law Against Discrimination, which protects all people in the state from unfair and discriminatory practices in employment and public accommodations access.

PRACTICE AREAS

# Sexual Abuse and Harassment

Hagens Berman's attorneys recently achieved a nationwide sexual harassment settlement on behalf of 16,000 women and has represented survivors of abuse by Harvey Weinstein, as well as USC alumnae abused by the university's former gynecologist, Dr. George Tyndall. Our firm is committed to protecting and empowering individuals.

At Hagens Berman, we believe no one is above the law, and that no position of power should shield someone from being held accountable.

Right now, we are witnessing the silencing, disparaging and abuse that people everywhere in this nation are subjected to. Many are subjected to a system that does not respect them. The backlash against the brave survivors who have come forward to report sexual assault and harassment is unacceptable.

We believe survivors. Our firm's sexual harassment attorneys have protected their rights for decades, and we are dedicated to upholding the rights of the most vulnerable. Survivors should be heard, respected and protected from systemic abuse.

Sexual harassment is present and pervasive in many workplaces, industries and professional environments, and has damaged the lives and careers of countless individuals. It affects hundreds of thousands of people in the U.S., 51 percent of which are harassed by an authority figure, making it harder to come forward for fear of retaliation.

All too often, acts of sexual harassment and sexual misconduct are protected by systemic cover-ups by companies and organized agreements between those in power. Particular industries are more susceptible to these cover-ups including: entertainment and sports media, STEM, law enforcement, food service, politics, military, tech, finance, hospitality and transportation. But sexual harassment is pervasive in many other environments and is often obscured from view for years.

In these industries, survivors are routinely subjected to widespread policies and practices that create an environment promoting quid pro quo arrangements in which survivors feel pressured to take part in sexual acts and feel powerless against unwanted advancements. Survivors are also often punished for not taking part.

The firm achieved a nationwide sexual harassment settlement on behalf of 16,000 women and has represented survivors of sexual harassment and abuse by Harvey Weinstein, as well as USC alumnae abused by the university's former gynecologist, Dr. George Tyndall.

Representative sexual harassment successes and cases on behalf of our clients include:

### USC, DR. TYNDALL SEXUAL HARASSMENT LITIGATION

In May of 2018, Hagens Berman filed a class-action lawsuit against the University of Southern California (USC) and Dr. George Tyndall, the full-time gynecologist at USC's student health clinic. Tyndall sexually harassed, violated and engaged in wildly inappropriate behavior with female students who sought his medical care, according to news outlets, which stated he saw tens of thousands of female patients during his time at USC.

Official complaints of Dr. Tyndall's behavior began to surface at USC in the 1990s, but despite the university's knowledge of Dr. Tyndall's behavior, it did not report him to the agency responsible for protecting the public from problem doctors. USC did nothing, for decades, as more and more female students were sent into Dr. Tyndall's office.

The settlement's three-tier structure allowed class members to choose how much they wanted to engage with the claims process. Those who did not want to revisit a private, traumatic event could simply keep the guaranteed Tier 1 payment of $2,500. Those who chose to provide additional information in a claim form about their experience with Tyndall and how it affected them were eligible for up to $20,000 and those who chose to provide an interview were eligible for up to $250,000. The special master and her team of experts evaluated claims and allocated awards to Tier 2 and Tier 3 claimants. This focus on choice ensured that all class members received compensation while giving each class member the autonomy to decide for herself how involved she wanted to be in the settlement process.

The class-action settlement also went beyond monetary compensation and forced USC to implement real changes to their policies and procedures to help ensure that what happened at USC does not happen again.

**RESULT:** $215 million settlement

### HARVEY WEINSTEIN SEXUAL HARASSMENT

In a first-of-its-kind class-action lawsuit, Hagens Berman represented women on behalf of a class of all victims who were harassed or otherwise assaulted by Harvey Weinstein, seeking to hold him and his co-conspirators accountable for a years-long pattern of sexual harassment and cover-ups.

The lawsuit, filed Nov. 15, 2017, in the U.S. District Court for the Central District of California alleged that Miramax and The Weinstein Company (which Weinstein co-founded) facilitated Weinstein's organized pattern of predatory behavior, equating to an enterprise that violates the Racketeer Influenced and Corrupt Organizations Act, commonly referred to as the RICO Act, the same law brought against members of the Mafia for organized criminal behavior.

The lawsuit brought various charges against Weinstein and his companies for violating the RICO Act, mail and wire fraud, assault, civil battery, negligent supervision and retention, and intentional infliction of emotional distress.

**RESULT:** $17.1 million Sexual Misconduct Claims Fund

### FAIRFAX BEHAVIORAL HEALTH

Attorneys from Hagens Berman filed a class-action complaint on behalf of a proposed class of hundreds of patients that were arbitrarily strip-searched and video recorded while receiving treatment for mental illness at Fairfax Behavioral Health in Washington state.

One of the suit's named plaintiffs recalls being ordered to undress for an invasive strip-search when she presented for inpatient admission, even after disclosing her history of sexual abuse to Fairfax staff. She was not given a gown or towel to cover up during the search, and the staff member watched her undress and left the door open where other Fairfax staff members could see her.

Video cameras were located in the hallway, the holding area outside bathroom, and the room where the strip search was conducted. The cameras recorded her undressing and the strip-search.

The complaint states that Fairfax's practices — and its failure to limit the discretion of its staff — means that a substantial number of its mental health patients do not have reasonable access to inpatient care for mental health disorders.

**RESULT:** Settlement under confidential terms

### CB RICHARD ELLIS SEXUAL HARASSMENT LITIGATION

Filed a class action against CB Richard Ellis, Inc., on behalf of 16,000 current and former female employees who alleged that the company fostered a climate of severe sexual harassment and discriminated against female employees by subjecting them to a hostile, intimidating and offensive work environment, also resulting in emotional distress and other physical and economic injuries to the class. Under the terms of the settlement, the company agreed to increase

supervisor accountability, address sexually inappropriate conduct in the workplace, enhance record-keeping practices and conduct annual reviews of settlement compliance by a court appointed monitor.

**RESULT**: Innovative and unprecedented settlement requiring changes to human resources policies and procedures, as well as the potential for individual awards of up to $150,000 per class member

## KING COUNTY CHILD SEX ABUSE

Hagens Berman represented the victim of eight years of sexual abuse as a minor, at the hands of her brother-in-law. The lawsuit states that from 2005 to 2012, the case's defendant repeatedly sexually abused Hagens Berman's client. She was only eleven years old when the abuse began and was a minor during the entire duration of the abuse. In 2013, the state of Washington charged Willis with three counts of child molestation, to which he pled guilty. Court documents state, "Joshua Blaine Willis used his position of trust, confidence, or fiduciary responsibility to facilitate the commission of the … offense[s]…"

Court documents in the civil case filed in June of 2017 detail Willis' highly disgusting and horrifying actions including groping and molestation, exposing himself and other highly sexual and inappropriate behavior.

Following the years of sexual abuse, Hagens Berman's client suffers from Post-Traumatic Stress Disorder and the court awarded damages for treatment of her condition and other emotional distress, as well as loss of earning capacity and other economic damages in her "struggle with consistency and stability."

**RESULT:** $4,031,000 judgment

## STATE OF WASHINGTON SEXUAL ASSAULT, DSHS

Our client, a disabled Spokane, Wash. woman, was a patient at Eastern State Hospital. The hospital assigned a male nurse to provide one-on-one care and supervision for our client. The nurse trapped our client in a laundry room and raped her. Hagens Berman determined that the nurse, a state employee, had been reprimanded and accused on previous occasions of sexual assault of vulnerable patients. Hagens Berman initiated a negligence and civil rights lawsuit against the hospital and its administrators for failing to protect our client from a known sexual predator and for allowing that predator to remain on staff with the responsibility to care for vulnerable patients.

**RESULT:** $2.5 million settlement

## WORKPLACE SEXUAL HARASSMENT & OTHER INVESTIGATIONS

Sexual harassment is present and pervasive in many workplaces. It affects hundreds of thousands of women and men in the U.S., 51 percent of which are harassed by a supervisor, making it harder to come forward for fear of retaliation.

All too often, sexual harassment in the workplace is protected by systemic cover-ups by companies and those in power. Particular industries are more susceptible to these cover-ups including: commercial real estate, law enforcement, politics, military, tech, entertainment, sports media, finance, restaurants and hospitality, advertising and trucking.

In these industries, employees are routinely subjected to widespread policies that create an environment promoting quid pro quo arrangements in which they feel pressured to take part in sexual acts and feel powerless against unwanted advancements. Employees are also often punished for not taking part.

Hagens Berman is also investigating sexual harassment and abuse in various specific areas of study, including STEM programs. The firm also serves as a watchdog for industries where misconduct is particularly prevalent. These include hospitality, college campuses and research labs, boarding schools and the entertainment industry, especially within the area of professional music.

The firm remains committed to uncovering instances of sexual harassment in the workplace, and within fields of study and areas prone to harboring misconduct and abusive behavior.

PRACTICE AREAS

# Sports Litigation

Hagens Berman has one of the nation's most highly regarded sports litigation law practices. Our attorneys are the vanguard of new and innovative legal approaches to protect the rights of professional and college athletes in large scale cases against formidable, well-financed interests, including the National Collegiate Athletic Association (NCAA), the National Football League (NFL), the Fédération Internationale de Football Association (FIFA) and other sports governing institutions, creating lasting change.

## NCAA SCHOLARSHIPS/GRANT-IN-AID LITIGATION

In a first-of-its-kind antitrust action and far-reaching case affecting approximately 40,000 Division I college athletes, Hagens Berman filed a class-action against the NCAA and its most powerful member conferences, including the Pac-12, Big Ten, Big-12, SEC and ACC, claiming these entities violated federal antitrust laws by drastically reducing the number of scholarships and financial aid student-athletes receive to an amount below the actual cost of attendance and far below what the free market would bear.

The damages portion of the case resulted in an estimated average amount of $6,500 to each eligible class member who played his or her sport for four years.

In March of 2019, the firm as co-lead trial counsel on the injunctive aspect of the case obtained a court order that resulted in a change of NCAA rules limiting the financial treatment of athletes. That injunction was affirmed in a unanimous 9-0 Supreme Court victory, with the injunctive relief culminating in a monumental victory for plaintiffs in the case and for college athletes in years to come. The Court ruled that NCAA college athletes should be able to receive compensation from schools or conferences for athletic services other than cash compensation untethered to education-related expenses, prohibiting the NCAA from enforcing rules limiting those payments. The media called the firm's victory in the scholarships case against the NCAA a "major ruling" (ABC World News Tonight), that "will change the game" (ABC Good Morning America), "…the highest court left the NCAA unhoused and naked, with nothing left but its pretensions," (The Washington Post), it "delivered a heavy blow," (AP), and leaves the NCAA "more vulnerable than ever."

**RESULT:** $208 million settlement regarding the damages portion of the case, 100% of estimated single damages, followed by a unanimous 9-0 decision in favor of plaintiffs from the U.S. Supreme Court regarding the injunctive portion. The media called the firm's victory in the scholarships case against the NCAA a "major ruling" (ABC World News Tonight), that "will change the game" (ABC Good Morning America), "…the highest court left the NCAA unhoused and naked, with nothing left but its pretensions," (The Washington Post), it "delivered a heavy blow," (AP), and leaves the NCAA "more vulnerable than ever."

## NCAA CONCUSSIONS LITIGATION

Recently, the firm took on the NCAA for its failure to prevent concussions and protect student-athletes who suffered concussions. Steve Berman served as lead counsel in multi-district litigation and led the firm to finalize a settlement bringing sweeping changes to the NCAA's approach to concussion treatment and prevention.

The settlement's medical monitoring program is overseen by a medical science committee appointed by the court that screens and tracks concussions. Examinations include neurological and neurocognitive assessments to evaluate potential injuries. Each player now receives a seasonal baseline test to better assess concussions sustained during the season. All athletes who have sustained a concussion will now need to be cleared before returning to play. A medical professional trained in the diagnosis of concussions will be present at all games involving contact sports. The settlement also creates reporting mandates for concussions and their treatment.

**RESULT**: 50-year medical monitoring settlement funded by a $70 million medical monitoring fund, paid by the NCAA and its insurers, as well as significant changes to and enforcement of the NCAA's concussion management policies and return-to-play guidelines

### NCAA & ELECTRONIC ARTS NAME, IMAGE & LIKENESS RIGHTS IN VIDEOGAMES

Hagens Berman attorneys represented student-athletes claiming the NCAA illegally used their names, images and likenesses in Electronic Arts' popular NCAA Football, Basketball and March Madness videogame series. The firm began this case with the knowledge that the NCAA and its member schools were resolute in keeping as much control over student-athletes as possible and fought hard to ensure that plaintiffs would not be exploited for profit, especially by the organization that vowed to prevent the college athletes from exploitation. Settlement checks were sent to about 15,000 players, with average amounts of $1,100 and some up to $7,600.

The firm also represented NFL legend Jim Brown in litigation against EA for improperly using his likeness in its NFL video games, culminating in a $600,000 voluntary judgment offered by the video game manufacturer.

**RESULT**: Combined $60 million settlement, marking the first time the NCAA agreed to a settlement that pays student-athletes for acts related to their participation in athletics

### CONTINUED NAME, IMAGE & LIKENESS RIGHTS LITIGATION

Hagens Berman continued its efforts against the NCAA in an additional pending antitrust case regarding name, image and likeness (NIL) rights. In 2020, the firm filed a new lawsuit against the NCAA and its five most powerful conferences — the Pac-12, Big Ten, Big 12, SEC and ACC — claiming defendants knowingly violated federal antitrust laws in abiding by a particular subset of NCAA amateurism rules that prohibit college athletes from receiving anything of value in exchange for the commercial use of their NIL. The firm holds that the NCAA's regulations illegally limit the compensation that Division I college athletes may receive for the use of their NIL and athletic reputations.

In 2021, following the firm's victory in the *Alston* case and denial of defendants' motion to dismiss the NIL litigation, the NCAA chose to temporarily lift rules restricting certain NIL deals in what the firm believes will be the first step in another massive change in college sports to support college athletes.

After two decades of fighting on behalf of athletes regarding this issue, the firm secured a monumental $22.78 billion settlement for a class of more than 400,000 NCAA players. In addition to $2.78 billion in past damages, the total value of new payments and benefits to college athletes under the new revenue-sharing model is expected to exceed $20 billion over the next 10 years, making it the largest antitrust class-action settlement in history.

In unanimously upholding the rights of NCAA athletes in *Alston*, Justice Gorsuch wrote the NCAA had sought "immunity from the normal operation of the antitrust laws," and Justice Kavanaugh stated, "The NCAA is not above the law." The firm looks forward to continuing to uphold that same sentiment regarding NCAA athlete NIL rights and awaits the court's final decision.

### FIFA & U.S. SOCCER CONCUSSIONS

Several soccer players filed a class action against U.S. Soccer's governing bodies, which led to life-changing safety measures brought to millions of U.S. youth soccer players. Players represented by Hagens Berman alleged these groups failed to adopt effective policies to evaluate and manage concussions, leaving millions of players vulnerable to long-lasting brain injury.

The settlement against six of the largest youth soccer organizations greatly diminished risks of concussions and traumatic head injuries. Prior to the settlement, no rule limited headers in children's soccer. The settlement also highlights the importance of on-staff medical personnel at youth tournaments. Under the settlement, youth players who have sustained a concussion during practice or a game will need to follow certain return-to-play protocols before they are allowed to play again. Steve Berman, a youth soccer coach, has seen first-hand the settlement's impacts and life-changing effects every time young athletes take to the field.

**RESULT**: New return-to-play guidelines, benchmarks for concussion measurement and safety protocols, as well as new safety guidelines throughout U.S. Soccer, including completely eliminating heading for youth soccer's youngest players

### POP WARNER

Hagens Berman represented youth athletes who have suffered traumatic brain injuries due to gross negligence and filed a lawsuit on behalf of former Pop Warner football player Donnovan Hill and his mother Crystal Dixon. The suit claims that the league insisted Hill use improper and dangerous tackling techniques which left the then 13-year-old paralyzed from the neck down.

Hagens Berman sought to hold Pop Warner, its affiliates, Hill's coaches and members of the Lakewood Pop Warner board of directors accountable for the coaches' repeated and incorrect instruction that Hill and his teammates tackle opposing players by leading with the head. Sadly, months after the firm's settlement was reached in January 2016, 17-year-old Donnovan passed away. The firm believes that his case will continue to have a lasting impact on young athletes for generations and will help ensure safety in youth sports.

**RESULT:** Confidential settlement on behalf of Donnovan and his mother

### MLB FOUL BALL INJURIES

Hagens Berman filed a class-action lawsuit on behalf of baseball fans, seeking to extend safety netting to all major and minor league ballparks from foul pole to foul pole. The suit alleges that tens of millions attend an MLB game annually, and every year fans of all ages, but often children, suffer horrific and preventable injuries, such as blindness, skull fractures, severe concussions and brain hemorrhages when struck by a fast-moving ball or flying shrapnel from a shattered bat. The lawsuit was dismissed with the court ruling that the plaintiffs lacked standing because the chance of getting hit by a ball is remote.

While the firm commends the league for finally addressing the serious safety issue at stake in December 2015, the firm continues to urge MLB and its commissioner to make these more than recommendations to help end senseless and avoidable injuries to baseball's biggest fans. We believe our case sparked the eventual move to netting. After one of the owners of the Mariners belittled Steve for having filed the case, the firm happily saw the addition of netting extended to the foul poles at T-Mobile Park in the firm's headquarters of Seattle.

**RESULT:** MLB's commissioner Rob Manfred issued a recommendation to all 30 MLB teams to implement extended safety measures, including additional safety netting at ballparks

### NCAA TRANSFER ANTITRUST

Hagens Berman took on the NCAA for several highly recruited college athletes whose scholarships were revoked after a coaching change, or after the student-athletes sought to transfer to another NCAA-member school. The suit claimed the organization's limits and transfer regulations violate antitrust law.

The firm's case hinges on a destructive double standard. While non-athlete students are free to transfer and are eligible for a new scholarship without waiting a year, and coaches often transfer to the tune of a hefty pay raise, student-athletes are penalized and forced to sit out a year before they can play elsewhere, making them much less sought after by other college athletic programs. Hagens Berman continues to fight for student-athletes' rights to be treated fairly and terminate the NCAA's anticompetitive practices and overbearing regulations that limit players' options and freedoms.

## ADDITIONAL SPORTS CASES

In addition to its class actions, Hagens Berman has filed several individual cases to uphold the rights of athletes and ensure a fair and safe environment. The firm has filed multiple individual cases to address concussions and other traumatic head injuries among student-athletes at NCAA schools and in youth sports. Hagens Berman continues to represent the interests of athletes and find innovative and effective applications of the law to uphold players' rights.

The firm has also brought many concussions cases on behalf of individual athletes, challenging large universities and institutions for the rights those who have suffered irreversible damage due to gross negligence and lack of even the most basic concussion-management guidelines.

PRACTICE AREAS

# Whistleblower Litigation

Hagens Berman successfully represents whistleblowers under several whistleblower programs which financially reward private citizens who blow the whistle on fraud.

In cases brought under federal and state False Claims Act statutes, whistleblowers report fraud committed against the government and may sue those individuals or companies responsible, helping the government recover losses in return for a share of the damages.

In cases brought under the Dodd-Frank Whistleblower Programs of the Securities and Exchange Commission and the Commodity Futures Trading Commission, whistleblowers are awarded for original information that supports successful enforcement actions by those agencies. This is also true of the whistleblower programs of the Internal Revenue Service and the Department of Treasury.

Our depth and reach as a leading international plaintiffs' firm with significant success in cases against industry leaders in finance, health care, pharmaceuticals, the defense industry, consumer products, and many others leads whistleblowers to seek us to represent them in claims alleging fraud against the many of the largest and most successful corporations in the world.

Our firm has challenged these industries with great, unparalleled success, and has achieved several milestone victories for our whistleblower clients. With several former prosecutors and other government attorneys in its ranks and nearly 30-years of history of working with governments across the country, including close working relationships with senior attorneys at the U.S. Department of Justice, SEC, CFTC and state Attorneys General offices, the firm is second-to-none in its ability to advocate for whistleblowers.

The whistleblower programs under which Hagens Berman pursues cases include:

## FALSE CLAIMS ACT

Under the federal False Claims Act, and more than 30 similar state laws, a whistleblower reports fraud committed against the government, and under the law's *qui tam* provision, may file suit on behalf of the government to recover falsely and fraudulently obtained funds. These False Claims Acts statutes are the more effective tools in fighting Medicare and Medicaid fraud, defense contractor fraud, financial fraud, procurement and other contracting fraud, education fraud, and other types of fraud perpetrated against governments.

Under the False Claims Act, the whistleblower, known as a "relator," initially files a complaint under seal of the court, giving it only to the government and not to the defendant, which permits the government to investigate confidentially. After the investigation, the government may take over the whistleblower's suit, or it may decline. If the government declines, the whistleblower can proceed alone on his or her behalf. In successful suits, the whistleblower normally receives between 15 and 30 percent of the government's recovery as a reward.

Since 1986, federal and state false claims act recoveries have totaled more than $72 billion. Some examples of our cases brought under the False Claims Act include:

### U.S. EX REL. LAGOW V. BANK OF AMERICA

Represented former District Manager at Landsafe, Countrywide Financial's mortgage appraisal arm, who alleged systematic abuse of appraisal requirements as a means of inflating mortgage values.

**RESULT**: $1 billion settlement and substantial client reward

### U.S. EX REL. MACKLER V. BANK OF AMERICA

Represented a whistleblower who alleged that Bank of America failed to satisfy material conditions of its government contract to provide homeowners mortgage relief under the HAMP program.

**RESULT:** Settled as part of the 2012 global mortgage settlement, resulting in a substantial award to our client

### U.S. EX REL. HORWITZ V. AMGEN

Represented Dr. Marshall S. Horwitz, who played a key role in uncovering an illegal scheme to manipulate the scientific record regarding two of Amgen's blockbuster drugs.

**RESULT:** $762 million in criminal and civil penalties levied by the U.S. Department of Justice and a substantial award to our client

### U.S. EX REL. DOE V. US WORLD MEDS LLC

Represented a Senior Medical Director challenging off-label promotion and unlawful kickbacks to medical providers for use of its injectable products.

**RESULT:** Settled with a substantial award to our client

### U.S. EX REL. KITE V. BROOKHAVEN MEMORIAL, ET AL.

Represented a health care finance expert in this complex, declined False Claims Act case against several large hospitals who committed Medicare fraud through false claims for "outlier" payments.

**RESULT:** Settlements with every hospital defendant and a substantial award for our client

### U.S. EX REL. THOMAS V. SOUND INPATIENT PHYSICIANS INC.

Represented a former regional vice president of operations for Sound Physicians, who blew the whistle on Sound's alleged misconduct.

**RESULT:** $14.5 million in payments to the U.S. government by Tacoma-based Sound Physicians and a substantial award to our client

### U.S. EX REL. PLAINTIFFS V. CENTER FOR DIAGNOSTIC IMAGING INC.

Hagens Berman joined as lead trial counsel a qui tam lawsuit on behalf of two whistleblowers against Center for Diagnostic Imaging, Inc. (CDI), alleging that CDI violated anti-kickback laws and defrauded federally funded health programs.

**RESULT:** Through litigation we increased the settlement and secured a substantial award for our client.

### MEDTRONIC

Represented a top sales representative in this action challenging fraudulent medical device applications to the FDA and off-label promotion of its biliary devices.

**RESULT:** Secured a confidential settlement for our client.

## SECURITIES AND EXCHANGE COMMISSION / COMMODITY FUTURES TRADING COMMISSION

Since implementation of the SEC/CFTC Dodd Frank whistleblower programs in 2011, Hagens Berman has become a leading firm representing whistleblowers with claims involving violations of the Securities Exchange Act and the Commodities Exchange Act.

Unlike the False Claims Act, whistleblowers under the SEC and CFTC programs do not file a sealed lawsuit. Instead, they provide information directly to the SEC or the CFTC regarding violations of the federal securities or commodities laws. If the whistleblower's information leads to an enforcement action, they may be entitled to between 10 and 30 percent of the recovery.

Our firm has represented high-profile financial fraud whistleblowers, including in cases with front-page coverage in the Wall Street Journal and other respected publications. We were the first firm to represent a whistleblower whose complaint led to the criminal extradition of a market manipulator and the firm who represented a client whose complaint resulted in the largest fines ever levied against financial exchanges, including BATS and NYSE.

The firm represents several high-level Wall Street veterans in several areas of finance and trading as well as several directors and management level personnel at large corporations around the world.

Hagens Berman has worked closely in support of top government officials and enforcement personnel at both the SEC and CFTC across their several regional offices, establishing the credibility necessary to bring a case that is closely examined and acted upon.

Though many cases remain confidential in perpetuity at client request, a few of the firm's most recent whistleblower cases in this area include:

### EDGA EXCHANGE INC. AND EDGX EXCHANGE INC.

Represented HFT whistleblower and market expert, Haim Bodek, in an SEC fraud whistleblower case against two exchanges formerly owned by Direct Edge Holdings and since acquired by Bats Global Markets challenging undisclosed and improper practices undermining fair and orderly markets.

**RESULT:** Record-breaking $14 million fine secured by the U.S. Securities and Exchange Commission against defendants, the largest ever brought against a financial exchange at the time This resulted in a substantial award to our client.

### NAV SARAO FUTURES LIMITED PLC

Represented an anonymous market expert whistleblower who brought his concerns and original analysis to the CFTC after hundreds of hours spent analyzing data and other information regarding manipulation of the S&P 500 eMini.

**RESULT:** The market manipulator Mr. Sarao was criminally extradited and pled guilty to market manipulation and was forced to disgorge his ill-gotten gains. Our client received a substantial award.

### NEW YORK STOCK EXCHANGE (NYSE)

Represented Mr. Bodek in another successful SEC whistleblower complaint against a financial exchange for violations of SEC rules.

**RESULT:** The SEC secured a record fine against NYSE and our client received a substantial award.

### CARGILL

Represented the whistleblower responsible for the CFTC's action against the largest privately held company in the U.S., challenging Cargill's misconduct in providing inaccurate information on swaps and failures to supervise.

**RESULT:** Our client received a substantial award from the CFTC's successful enforcement action.

### GRANT THORNTON

Represented a whistleblower who brought allegations that a leading accounting and audit firm ignored red flags and conducted materially deficient audits of a public traded company about which our client reported.

**RESULT:** Grant Thornton was ordered to pay a fine to the SEC and our client received a substantial award.

### MODDHA INTERACTIVE INC. ET AL.

Represented the whistleblower who sparked the successful investigation and prosecution of a “hi-tech scam” investment fraud that resulted in freezing of assets.

**RESULT:** Defendants were ordered to pay a fine and penalties and our client shall receive an award from monies collected.

## INTERNAL REVENUE SERVICE

Hagens Berman also confidentially represents whistleblowers under the IRS whistleblower program enacted with the Tax Relief and Health Care Act of 2006. These cases enforced by the IRS are generally not made public.

The IRS program offers rewards to those who come forward with information about persons, corporations or any other entity that cheats on its taxes. In the event of a successful recovery of government funds, a whistleblower can be rewarded with up to 30 percent of the overall amount collected in taxes, penalties and legal fees.

Hagens Berman helps IRS whistleblowers present specific, credible tax fraud information to the IRS. Unlike some traditional False Claims Act firms, Hagens Berman has forensic accounting and tax fraud experience representing governments facing lost tax revenue due to fraud, making us well-positioned to represent IRS whistleblowers, as we currently do in cases with clients from around the world challenging evasion of U.S. tax laws.

## ANTI-MONEY LAUNDERING

The most recent whistleblower bounty program is the Anti-Money-Laundering (AML) program operated by the Department of Treasury’s Financial Crimes Enforcement Unit (FinCEN), strengthened in 2023 and offering whistleblower retaliation and confidentiality protections in reporting potential violations of AML laws by companies subject to the Bank Secrecy Act. The program also patterns itself on the Dodd-Frank whistleblower programs of the SEC and CFTC and offers similar awards to potential whistleblowers.

Hagens Berman has expanded its efforts to represent these AML whistleblowers.

# APPELLATE VICTORIES

APPELLATE VICTORIES

# Strengthening Consumer Law

At Hagens Berman, we distinguish ourselves not merely by the results we obtain, but by how we obtain them. Few class-action firms have our firm's combination of resources and acumen to see a case through as long as needed to obtain a favorable outcome. Our attorneys were instrumental in obtaining these federal appellate decisions that have shaped consumer law and bolstered the rights of millions nationwide:

- *Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299 (11th Cir. 2023) (affirming class certification under laws of several states and remanding for trial)
- *Hernandez v. Illinois Inst. of Tech.*, 63 F.4th 661 (7th Cir. 2023) (claims for breach of contract and unjust enrichment upheld for failure to provide in-person education during COVID-19 pandemic)
- *In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prod. Liab. Litig*., 54 F.4th 28, 32 (1st Cir. 2022) (consumers had standing to challenge overpayment for defective car booster seats)
- *In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.,* 27 F.4th 291 (4th Cir. 2022) (affirming fee award as authorized by Class Action Fairness Act)
- *NCAA v. Alston*, 141 S. Ct. 2141 (2021) (landmark decision invalidating NCAA antitrust restrictions on compensating student athletes)
- *Shaffer v. George Washington Univ.*, 27 F.4th 754 (D.C. Cir. 2022) (students adequately alleged universities breached contract to provide in-person education during COVID-19 pandemic)
- *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co. Ltd.*, 11 F.4th 118 (2d Cir. 2021) (monopolization sufficiently alleged and brand drug manufacturer's combination patents did not claim brand drug under Hatch-Waxman Act)
- *Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021) (administrative feasibility identifying absent class members not required for class certification)
- *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.,* 967 F.3d 264 (3d Cir. 2020) (upholding certified class of direct purchasers alleging anticompetitive conduct impeding market entry of generic versions of Suboxone)
- *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239 (9th Cir. 2020) (affirming injunction in favor of student athletes against NCAA, later sustained by Supreme Court in *NCAA v. Alston*, 141 S. Ct. 1231 (2020))
- *In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471 (4th Cir. 2020) (approving class action settlement concerning defective laminate flooring)
- *In re Lantus Direct Purchaser Antitrust Litig.*, 950 F.3d 1 (1st Cir. 2020) (drug manufacturer improperly listed insulin patent in FDA's Orange Book to extend monopoly)

- *In re Avandia Mktg., Sales & Prod. Liab. Litig.,* 945 F.3d 749 (3d Cir. 2019) (state law claims against manufacturer of type-2 diabetes drug not preempted by federal law)
- *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539 (9th Cir. 2019) (*en banc*) (upholding nationwide settlement class and providing guidance for district courts on choice-of-law inquiry in settlement context)
- *City of Miami v. Wells Fargo & Co*., 923 F.3d 1260 (11th Cir. 2019) (municipality adequately alleged causation for discrimination violating Fair Housing Act)
- *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 924 F.3d 662 (3d Cir. 2019) (vacating protective order for impeding common law right of public access to court filings)
- *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 895 F.3d 597 (9th Cir. 2018) (affirming $10 billion nationwide settlement providing relief to one-half million consumers for Volkswagen's emissions cheating and misleading "clean diesel" advertising)
- *In re Lipitor Antitrust Litig.*, 868 F.3d 231 (3d Cir. 2017) (direct purchasers of Lipitor and Effexor plausibly alleged unlawful reverse payment settlement agreements in violation of antitrust laws)
- *In Matter of Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016) (General Motors bankruptcy reorganization did not bar claims stemming from defective ignition switches)
- *George v. Urban Settlement Servs.*, 833 F.3d 1242 (10th Cir. 2016) (complaint adequately alleged Bank of America's mortgage modification program violated RICO)
- *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538 (1st Cir. 2016) ("reverse payments" for antitrust purposes under Actavis are not limited to cash payments)
- *Osborn v. Visa Inc.*, 797 F.3d 1057 (D.C. Cir. 2015) (complaint adequately alleged Visa and MasterCard unlawfully agreed to restrain trade in setting ATM access fees)
- *Little v. Louisville Gas & Elec. Co.*, 805 F.3d 695 (6th Cir. 2015) (Clean Air Act did not preempt state nuisance claims against coal plant for polluting surrounding community)
- *City of Miami v. Citigroup Inc.*, 801 F.3d 1268 (11th Cir. 2015) (reversing dismissal of complaint alleging Citigroup violated Fair Housing Act by pattern of discriminatory lending)
- *Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844 (9th Cir. 2013) (non-party could not invoke arbitration clause against plaintiff suing debt services provider)
- *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013) (affirming $142 million verdict for injury suffered from RICO scheme by Neurontin manufacturer Pfizer)
- *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268 (9th Cir. 2013) (First Amendment did not shield video game developer's use of college athletes' likenesses)
- *Garcia v. Wachovia Corp.*, 699 F.3d 1273 (11th Cir. 2012) (Wells Fargo could not rely on Concepcion to evade waiver of any right to compel arbitration)
- *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328 (7th Cir. 2012) (NCAA bylaws limiting scholarships per team and prohibiting multi-year scholarships are subject to antitrust scrutiny and do not receive pro-competitive justification at pleading stage)
- *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 24 (1st Cir. 2012) (approving cy pres provision in $150 million settlement)

- *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156 (1st Cir. 2009) (AstraZeneca illegally published inflated average wholesale drug prices, thereby giving windfall to physicians and injuring patients who paid inflated prices)

We set ourselves apart not only by getting results but by litigating every case through to finish – to trial and appeal, if necessary. This tenacious drive has led our firm to generate groundbreaking precedents in consumer law.

Hagens Berman has also been active in state courts nationwide. Notable examples of our victories include:

- *Franklin v. CSAA Gen. Ins. Co.*, 532 P.3d 1145, 1146 (Ariz. 2023) (injured drivers may "stack" or combine UIM coverages where multiple vehicles are insured under a single insurance policy)
- *In re Funko, Inc. Sec. Litig.*, 19 Wash. App. 2d 1045 (2021) (complaint adequately alleged violations of the Securities Act of 1933)
- *Hernandez v. Restoration Hardware, Inc.*, 409 P.3d 281 (Cal. 2018) (successfully arguing on behalf of amicus curiae that class action objectors must intervene to appeal)
- *Purdue Pharma L.P. v. State*, 256 So. 3d 1 (Miss. 2018) (refusing to transfer venue in litigation against leading opioid manufacturers)
- *Garza v. Gama*, 379 P.3d 1004 (Ariz. Ct. App. 2016) (reinstating certified class in wage-and-hour action prosecuted by Hagens Berman since 2005)
- *In re Farm Raised Salmon Cases*, 42 Cal. 4th 1077 (Cal. 2008) (Federal Food, Drug and Cosmetic Act did not preempt state claims for deceptive marketing of food products)
- *Pickett v. Holland Am. Line-Westours, Inc.*, 35 P.3d 351 (Wash. 2001) (reversing state court of appeals and upholding class action settlement with cruise line)

# LEGAL TEAM



rob@hbsslaw.com

T 602-840-5900
F 602-840-3012

11 West Jefferson Street
Suite 1000
Phoenix, AZ 85003

**YEARS OF EXPERIENCE**

38

**PRACTICE AREAS**

Breach of Contract Claims
Class Action
High Tech Litigation
Insurance Bad Faith
Personal Injury

**BAR ADMISSIONS**

- Arizona
- Colorado

**COURT ADMISSIONS**

- Supreme Court of the United States
- U.S. Court of Appeals for the Seventh Circuit
- U.S. Court of Appeals for the Ninth Circuit
- U.S. Court of Appeals for the Tenth Circuit
- U.S. Court of Appeals for the Federal Circuit
- Various Federal District Courts

**EDUCATION**

- Harvard University, John F. Kennedy School of Government, State & Local Government Program, 1992
- University of Denver, M.B.A., J.D., 1986
- Arizona State University, B.S., 1983

**PARTNER, EXECUTIVE COMMITTEE MEMBER**

# Robert B. Carey

Rob added to HB's office a built-in mock courtroom, complete with jury box, audio-visual equipment to record witnesses and lawyers, and separate deliberation rooms for two juries.

## INTRODUCTION

Mr. Carey handles various types of injury and consumer claims. Mr. Carey was lead counsel on a jury trial that produced the largest medical-malpractice verdict in 2018, secured class certification in class actions on behalf of consumers and workers where damages are almost $2 billion, and investigated the dialysis industry's role in deaths caused by central venous catheter infections and misuse of dialysis solutions.

## CURRENT ROLE

- Partner & Executive Committee Member, Hagens Berman Sobol Shapiro LLP
- Leads Phoenix office
- Practice focuses on class-action lawsuits, including auto defect, insurance, right of publicity and fraud cases. Mr. Carey's work also extends to bad-faith insurance, personal injury and medical malpractice, with several trials involving verdicts in the hundreds of millions.
- Frequently asked to handle jury trials for high-value cases

## RECENT SUCCESS

- In June 2018, a Denver jury awarded a monumental $383.5 million jury verdict against GranuFlo dialysis provider, DaVita Inc. culminating lawsuits brought by families of three patients who suffered cardiac arrests and died after receiving dialysis treatments at DaVita clinics. Each of the three parties was awarded $125 million in punitive damages from the jury, with compensatory damages ranging from $1.5 million to $5 million.
- Over the summer of 2012, Rob was lead counsel in Robin Antonick's case against Electronic Arts, where a jury heard evidence that Electronic Arts failed to pay Antonick for over 20 years for his work in coding and developing the legendary Madden NFL Football video game. This trial, held in the Northern District of California, resulted in two verdicts for Antonick and was dubbed a "Top Trial Verdict of 2013" by *The Daily Journal*, a leading legal publication.
- Prevailed at the Arizona Court of Appeals for the second time, keeping intact class certification for tens of thousands of truck drivers suing to recover underpayments caused by misuse of Rand McNally's HHG software by Swift Transportation.
- Helped originate the Toyota Sudden Unintended Acceleration case, filing the initial Hagens Berman complaints for a case that eventually settled for $1.6 billion.
- Led Hagens Berman's efforts on the $97 million settlement with Hyundai and Kia corporations over misrepresentations about MPG ratings.

AWARDS

THE NATIONAL LAW JOURNAL
2018 TOP VERDICTS
MEDICAL MALPRACTICE
$383,500,000

- Helped secure a first-ever ($60 million) settlement for collegiate student-athletes (Keller, consolidated with O'Bannon) from Electronic Arts (EA) and the NCAA for the misappropriation of the student-athletes' likenesses and images for the EA college football video game series. This groundbreaking suit went up to the U.S. Supreme Court before a settlement was reached, providing student-athletes — even current ones — with cash recoveries for the use of their likenesses without permission.
- Represented Donnovan Hill against Pop Warner after he was paralyzed at 13. With Rachel Freeman, Rob secured a settlement that "forever changed youth football" (*OC Weekly*) and was "unprecedented" and owed a debt of gratitude by those who care about the safety of kids playing football (*Washington Post*). Donnovan died tragically during a 2016 surgery.
- Rob secured a record verdict for a mother suing her deceased son's estate for negligence in starting a home fire. He then took an assignment of the estate's claim and pursued a bad faith claim against the insurer, resulting in lifetime financial security for the badly burned mother.
- After successfully reforming an insurance policy to cover a client – a student-athlete injured in a roll-over accident that caused incomplete tetraplegia and traumatic brain injury – Rob went to the jury, which awarded damages for all harms and losses requested and for insurance bad faith, with a verdict exceeding over 15 times policy limits.
- Rob sued the leading auto carrier for refusal to fully cover a pedestrian struck by the carrier's driver. The verdict was valued over seven figures, and included a finding of willful and wanton conduct, trebling the damages.
- After Rob cross-examined the CEO and CFO of a pharmacy benefits company, the jury entered a verdict for his client in the liability phase of a $75 million dispute.
- During his representation of a driver paralyzed by a car's roof collapse, the insurance company ignored that the agent did not understand or offer required high-end coverages. The jury returned a verdict with a value over seven figures, including a finding for treble damages.
- Rob represented passengers of drunk driver, and persuaded the jury to award future earning capacity, essential services, medical bills and to find willful and wanton conduct against the insurer (treble damages). After a successful trip to the state supreme court, the verdict was maintained and had a value in excess of 15 times the policy limits.

## EXPERIENCE

- While serving as Arizona Chief Deputy Attorney General Mr. Carey helped secure a $4 billion divestiture and a landmark $165 million antitrust settlement. He also was a principal drafter of the first major overhaul of Arizona's criminal code and authored the section of the federal Prisoner Litigation Reform Act of 1995 for Senators Dole and Kyl that virtually eliminated frivolous prisoner lawsuits. Mr. Carey oversaw all major legal, policy, legislative and political issues for the Arizona attorney general's office. He developed and spearheaded passage of Arizona's law requiring the DNA testing of all sex offenders and the law requiring that criminals pay the cost of victims' rights.
- Campaign staffer, intern, and staff member for U.S. Senator John McCain, during and after Senator McCain's first run for public office.

- Adjunct Professor, Sandra Day O'Connor College of Law, teaching class actions. Has taught law and policy courses at other universities.
- Judge Pro Tempore, Maricopa County Superior Court, presiding over contract and tort jury trials.
- In the 90s, he served as trial counsel on claims by counties for damages stemming from tobacco-related illnesses (and acted as special counsel for Hagens Berman in seeking to recover damages in the landmark tobacco litigation), and since then has led dozens of consumer and insurance class actions in various states.

## LEGAL ACTIVITIES

- Member and Former Chairman, Arizona State Bar Class Action and Derivative Suits Committee

## RECOGNITION

- The Best Lawyers in America, Insurance Litigation, Best Lawyers, 2023-2026
- The Best Lawyers in America, Plaintiffs Personal Injury Litigation, Best Lawyers, 2023-2026
- 500 Leading Plaintiff Consumer Lawyers, Lawdragon, 2019-2025
- 500 Leading Lawyers in America, 2025
- 500 Leading Plaintiff Consumer Lawyers, Lawdragon, 2020-2025
- Top 100 Trial Lawyer, Arizona's Finest Lawyers, 2008-2023
- Top 100 Trial Lawyer, National Trial Lawyers, 2008-2023
- Member of Hagens Berman's Toyota team selected as a finalist for Trial Lawyer of the Year, Public Justice, 2014
- Recognized for outstanding contributions to the justice system, Judges of the Superior Court of Arizona in Maricopa County
- Selected as a Leading Plaintiff Financial Lawyer in America and a Leading Plaintiff Consumers Lawyer in America
- Recognized for victims' rights efforts, U.S. Department of Justice

## NOTABLE CASES

- *Propane Exchange Tank Litigation*
- *Hyundai/Kia MPG Litigation*
- *Swift Truckers Litigation*
- *Toyota Unintended Acceleration Litigation*
- *NCAA Student-Athlete Name and Likeness Licensing Litigation*
- Hyundai Subframe Defect Litigation
- Hyundai Occupant Classification System / Airbag Litigation
- Hyundai Horsepower Litigation
- Arizona v. McKesson False Claims and Consumer Protection Litigation (representing State of Arizona)

- Apple Refurbished iPhone/iPad Litigation
- *Jim Brown v. Electronic Arts*
- LifeLock Sales and Marketing Litigation
- Rexall Sundown Cellasene Litigation

## PUBLICATIONS

- Co-author, "7 Punitive Damages Strategies," *Trial Magazine*, April 2019
- Co-author, Arizona chapter of the ABA's "*A Practitioner's Guide to Class Actions*"
- Co-author, Arizona and Colorado chapters of the ABA's "*A Practitioner's Guide to Class Actions*," 2nd edition



PARTNER

# Leonard W. Aragon

Before attending college, Mr. Aragon fulfilled his dream as a scout for the 2/68 Armored Tank Battalion.

leonard@hbsslaw.com

T 602-840-5900
F 602-840-3012

11 West Jefferson Street
Suite 1000
Phoenix, AZ 85003

### YEARS OF EXPERIENCE

23

### PRACTICE AREAS

Appellate Advocacy
Class Action
Commercial Litigation
High Tech Litigation
Mass Torts
Personal Injury

### INDUSTRY EXPERIENCE

- Consumer Fraud
- Catastrophic Personal Injury
- Sports Law
- Health Care
- Pharmaceuticals
- Election Law
- Administrative Procedures Act

### COURT ADMISSIONS

- U.S. District Court for the District of Arizona
- U.S. District Court for the District of Colorado

### EDUCATION

- Stanford Law School, J.D., 2001
- Arizona State University, B.A., History and Political Science, summa cum laude, 1998

### AWARDS




## CURRENT ROLE

- Partner and Best Practices Committee Member, Hagens Berman Sobol Shapiro LLP
- Practice focuses on nationwide class actions and other complex litigation
- Currently lead counsel for *Cherkin, et al. v. PowerSchool Holdings, Inc.*, a putative nationwide-class action challenging the company's use of student data for commercial purposes, Plaintiffs' Steering Committee Member in *PowerSchool Customer Data Security Breach MDL*, a case arising from the large-scale data breach affecting approximately 62 million students and nearly 10 million educators and staff across the U.S. and Canada; Lead counsel in a certified class action against Williams-Sonoma, Inc., alleging misrepresentations in consumer bedding products; Counsel for the State of Arizona in multiple cases against Amazon and RealPages.

## RECENT SUCCESS

- Successfully represented eight families through confidential settlements arising from the death of their infants in a defective infant product.
- Working closely with the Arizona Attorney General, recovered millions for the State of Arizona in litigation against GM, Mercedes-Benz, Robert Bosch LLC, and Volkswagen.
- Successfully resolved a nationwide class action involving a defective and incredibly dangerous product used by infants across the country.

## PRO BONO

- Pro bono work in insurance, immigration, family and contract law

## LEGAL ACTIVITIES

- Adjunct Professor, Sandra Day O'Connor College of Law, Arizona State University, Class Actions and Complex Litigation
- Stanford Law School Board of Visitors
- Contributing author to the American Bar Association's "A Practitioner's Guide to Class Actions"
- State Bar of Arizona Bar Leadership Institute Class I
- Member State Bar Committee on Civil Rules and Procedure

## RECOGNITION

- 500 Leading Plaintiff Consumer Lawyers, Lawdragon, 2024-2025
- Rising Star, Super Lawyers, 2012-2014

## NOTABLE CASES

- *In re NCAA Student-Athlete Name and Likeness Licensing Litigation*
- *Keller, et al. v. Electronic Arts, Inc.*
- *In re: Arizona Theranos, Inc. Litigation*
- *John Doe v. Arizona Board of Regents*
- *Jim Brown v. Electronic Arts, Inc.*
- *Liebich v. Maricopa County Community College District*

## PERSONAL INSIGHT

Before entering the practice of law, Mr. Aragon was a scout for the 2/68 Armored Tank Battalion, communications director for a successful congressional campaign, and waited on season tickets holders at America West Arena so that he could secretly watch the Phoenix Suns.



whitneys@hbsslaw.com

T 708-628-4966
F 708-628-4950

455 N. Cityfront Plaza Drive
Suite 2410
Chicago, IL 60611

**YEARS OF EXPERIENCE**

11

**PRACTICE AREAS**

Civil & Human Rights
Class Action
Employment Litigation
Personal Injury
Sexual Abuse & Harassment

**BAR ADMISSIONS**

- Illinois

**COURT ADMISSIONS**

- Supreme Court of the United States
- U.S. Court of Appeals for the First Circuit
- U.S. Court of Appeals for the Second Circuit
- U.S. Court of Appeals for the Seventh Circuit
- U.S. District Court for the Northern District of Illinois

**CLERKSHIPS**

- Extern for Judge George C. Smith in the Southern District of Ohio

**EDUCATION**

- The Ohio State University Moritz College of Law, J.D., cum laude, 2013
- Northwestern University, B.A., 2009

**PARTNER**

# Whitney K. Siehl

Ms. Siehl works tirelessly and has achieved millions of dollars in settlements for her clients. Her passion and empathy are unmatched.

## CURRENT ROLE

- Partner, Hagens Berman Sobol Shapiro LLP
- Ms. Siehl's Plaintiffs' litigation practice focuses on complex class-action and individual cases in the areas of data privacy, sexual abuse, sexual harassment, consumer protection, antitrust and sports law. Her notable cases include:
  - Representing students against U.S. colleges and universities that closed and only offered online courses due to the outbreak of COVID-19 but continued to charge full tuition and fees
  - *In Re: MOVEit Customer Data Breach Security Litigation* (MDL No. 1:23-md-03083-ADB) (D. Mass) representing consumers against Progress Software and over 100 other Defendants. The 2023 MOVEit data breach is believed to be the largest data breach in history, compromising the sensitive personal information of more than 85 million people.
  - Represented an actress and entertainment industry class against The Weinstein Company, Harvey Weinstein and related companies for racketeering and sexual assault
  - Represented students and alumnae of the University of Southern California in a class-action lawsuit against the university and Dr. George Tyndall for his alleged decades-long sexual abuse of patients

## RECENT SUCCESS

- *Shaffer v. George Washington University* (D.C. Circuit), $5.4 million settlement
- *Rocchio et al v. Rutgers, the State University of New Jersey* (Superior Court N.J.), $5.0 million settlement
- *Metzner v. Quinnipiac University* (D. Conn.), $2.5 million settlement
- *Choi et al. v. Brown University* (D.R.I.), $1.4 million settlement
- *Geiss et al. v. The Weinstein Company Holdings LLC* (S.D.N.Y.), part of team that secured $17.1 million settlement fund on behalf of survivors of Harvey Weinstein's sexual harassment and abuse.
- *USC, Dr. Tyndall Sexual Harassment*, (C.D. Cal.), part of team that secured $215 million settlement on behalf of class of sexual assault survivors against university and OB-GYN
- Played a significant role in a $4 million settlement for a child who suffered severe and permanent brain damage due to the medical providers' delay in recognizing a placental abruption

AWARDS

Super Lawyers RISING STARS

- Assisted in a $3.5 million settlement for a child with a hypoxic-ischemic brain injury that resulted from too much Pitocin and a physician's failure to recognize fetal distress

## EXPERIENCE

- Prior to joining Hagens Berman, worked as an associate in the Chicago office of a well-respected Plaintiffs' firm representing families and children in birth injury and birth trauma litigation nationwide
- Worked previously at another Chicago firm where she gained experience in all aspects of civil litigation with a focus on medical malpractice and professional liability matters

## PRO BONO

- In 2017, received an Award for Excellence in Pro Bono Service from the United States District Court for the Northern District of Illinois and the Chicago Chapter of the Federal Bar Association for her dedication to representing underserved individuals in employment discrimination matters

## ACTIVITIES

- Board Member, Chicago Area Runners Association, a non-profit organization committed to serving and advocating for the local Chicago running community.
- Professional Board Member, PAWS Chicago — the Midwest's largest no-kill animal shelter, 2015-2020
    - TEAM PAWS Marathon Team 2015--2019

## LEGAL ACTIVITIES

Whitney is the immediate Past President of the Women's Bar Association of Illinois ("WBAI"). Among her many initiatives to support and empower women, she started WBAI's Mentoring Circles program to bring together early career lawyers and law students, formed partnerships with the Chicago Sky and Red Stars, introduced the Employer Diversity Equity and Inclusion and Flexible Workplace Awards to WBAI's Top Women Lawyers in Leadership Awards, and started a monthly walking club.

- Women's Bar Association of Illinois; President 2023 -2024, First Vice President, 2022-2023, Second Vice President 2021-2022, Financial Secretary 2020-2021, Recording Secretary 2019-2020, Board of Directors, 2017-present, Chair of Golf Outing 2015-2023, Chair of Mentoring Committee, among others.
- Illinois State Bar Association, Sports and Entertainment Law Section Council, Secretary Women and the Law Committee, Tort Law Section Council, 2024-2025
- Chicago Bar Association, Election Committee, 2024
- Advisory Council Member, Illinois Supreme Court Commission's Initiative to Eliminate Bullying in the Legal Profession, 2023-2024
- Founding Member, Force of Lawyers Against Sexual Harassment ("FLASH")
- Founding Member, Bar Presidents' Leadership Council, to strengthen partnerships and succession planning among bar associations.
- Member, American Association for Justice
- Member, Illinois Trial Lawyers Association

  - Member, ITLA Women's Caucus
- Member of numerous bar associations

## RECOGNITION

Whitney has been recognized for her excellence in law, dedication to mentoring, pro bono, and community service, and advocacy for a more inclusive legal profession, including:

- Illinois Rising Star, Super Lawyers, 2019-2026
- Lawdragon 500 X – The Next Generation, 2023-2025
- Top Women in Law Award, Chicago Law Bulletin Media, 2024, selected from over 375 nominations
- Presidential Award, Cook County Bar Association, the nation's oldest association of African-American lawyers and judges, 2024
- Maurice Weigle Exceptional Young Lawyer Award, Chicago Bar Foundation, 2023
- Service Award, Women's Bar Association of Illinois, 2022-2023
- Excellence in Pro Bono Service, U.S. District Court for the Northern District of Illinois and the Federal Bar Association Chicago Chapter, 2017
- National Champion Team Member, Sutherland Cup National Constitutional Law Moot Court Competition, 2013
- CALI Award for Highest Grade in Legislation Clinic, Dispute Systems Design, and Comparative Legal Professions
- Public Service Fellow with Dean's Special Recognition, The Ohio State University Moritz College of Law, 2013

## PUBLICATIONS

- "#Us Too: Gender Inequality in the Legal Profession," American Association for Justice, Birth Trauma Litigation Group Newsletter, February 2018

## PERSONAL INSIGHT

Whitney is an avid golfer and chairs the annual golf outing for the Women's Bar Association of Illinois. At Northwestern, she was a member of the women's golf team. She was previously a member of the Miami University cross country and track teams, where the cross country team was selected as NCAA Academic All-Americans. As a four-sport athlete, Whitney was recently inducted into the Port Clinton High School Athletic Hall of Fame.

Whitney is the 2006 Women's Catawba Island Club Golf Champion. She enjoys volunteer marathon pace coaching with Chicago Area Runners Association, guiding first-time marathoners to achieve what they once thought was impossible. In 2021, she received her training location's Service Award. She has completed 16 marathons and multiple triathlons including Ironman 70.3 Ohio and the Escape from Alcatraz in San Francisco.

## RELATED ACTIVE CASES

- College Tuition & Fees Payback
- Emory University College Tuition & Fees Payback

- Hofstra University College Tuition Payback
- Humira Overpricing
- Oregon State University College Tuition Payback
- Pepperdine University College Tuition Payback
- Progress Software MOVEit Data Breach
- Real Estate Commissions Antitrust
- University of Oregon Tuition Payback
- University of Southern California (USC) Tuition Payback
- University of Washington College Tuition Payback

### RELATED SETTLED CASES

- Brown University College Tuition Payback
- George Washington University Tuition Payback
- Quinnipiac University College Tuition Payback
- Rutgers University College Tuition Payback

# EXHIBIT 46

# General Terms of Use

## PLEASE READ THROUGH THE GENERAL TERMS OF USE CAREFULLY BEFORE USING THE SITE

This public website (www.powerschool.com) or any PowerSchool Product (excluding our Publicly Accessible Products as mentioned on our public website or Global privacy statement), hereinafter collectively referred as "**Site**" is brought to you ("**User**") by PowerSchool Group LLC ("**PowerSchool**") References to "**us**," "**we**," "**our**," or "**PowerSchool**" in these Terms of Use, are referring to PowerSchool Group LLC and its affiliates. References to "**you**", "**your**" or "**User**" in this General Terms of Use document are referring to the end user (student, parents, teachers, admin staff, or other user type that is accessing the PowerSchool Product, or a visitor to the public website) unless mentioned specifically. References to "**Customer**" in this Terms of Use document are referring to the respective School or School District who have licensed any PowerSchool Product (excluding our Publicly Accessible Products) and the User is connected to in capacity as a student, parent, teacher, admin or a member of staff.

Your use of this Site is subject to all terms and policies posted on this Site (including the Global Privacy Statement, collectively referred to as "**Terms of Use**" or "**ToU**"). This ToU informs you the rules for using the Site. This general ToU is a general agreement between PowerSchool, licensor of the product/ service and the User who avail any services from PowerSchool. IF YOU ARE UNDER 18 YEARS OF AGE, PLEASE BE SURE TO READ THESE TERMS OF USE AND GLOBAL PRIVACY STATEMENT WITH YOUR PARENTS OR GUARDIAN AND ASK QUESTIONS ABOUT THINGS YOU DO NOT UNDERSTAND.

The Terms of Use may be revised from time to time through an updated posting, and therefore you should check the Terms of Use periodically. Revisions are effective upon posting and your continued use of this Site following the posting of revisions to the Terms of Use will indicate your acceptance of such revisions.

It is important to us that this Site provides a helpful and reliable experience to Users. To protect our rights and yours, we have prepared these Terms of Use that apply to all Users of this Site. If you have any questions concerning the Terms of Use, please Contact Us.

BY USING THIS SITE, YOU REPRESENT THAT YOU HAVE READ AND UNDERSTOOD THESE TERMS OF USE AND THE PRIVACY STATEMENT AND AGREE TO BE BOUND BY THEM. IF YOU DO NOT AGREE WITH ANY PART OF THESE TERMS OF USE OR THE PRIVACY STATEMENT GOVERNING THIS SITE, YOU SHOULD NOT USE THIS SITE. BY USING OR DOWNLOADING INFORMATION FROM THIS SITE, YOU AGREE TO USE OUR SERVICES IN A MANNER CONSISTENT WITH ALL APPLICABLE LAWS AND REGULATIONS AND IN ACCORDANCE WITH THESE TERMS OF USE AND ANY APPLICABLE LICENSE AGREEMENT WITH YOUR EDUCATIONAL INSTITUTION AND POWERSCHOOL.

# A. Applicable for PowerSchool Products

This section and section B apply to all Users of PowerSchool product(s).

### Access and Security

Access to sections of any PowerSchool product or service may be restricted based on the assigned role the User has per their school or school district, or the type of application to which the User has access. Usernames and passwords are personal to the registered User and may not be shared or transferred with any other party. Usernames and passwords must be kept confidential. You are fully responsible for all activities that occur under your username and password. You agree to (a) immediately notify your school or district's authorized administrator of any unauthorized use of your username and password, or another User's username and password, or any other breach of security, and (b) ensure that you log out from use of this site under your username and password at the end of each session.

to the Site if information you have submitted is inaccurate or becomes inaccurate at a later date. If required by the Customer, PowerSchool may assist in such access termination.

## Information Accuracy

The User of a PowerSchool product licensed to a school or school district has an obligation to provide true and correct information and at all times keep the data up to date, wherever applicable. PowerSchool cannot guarantee the accuracy of information provided by the Users and therefore cannot be held responsible for any incorrect information of the User presented in the PowerSchool product. The information, software, products, and services published on this website may include inaccuracies or typographical errors. PowerSchool cannot be held responsible for complete information or flow not appearing due to faults in certain software, applications, or devices you may be using.

## Content

PowerSchool does not guarantee the accuracy or completeness of any information or content posted by the User or the "Customer" i.e. the School or School District. You agree that you must evaluate, and bear all risks associated with, the use of any content, including any reliance on the accuracy, completeness, or usefulness of such content.

## Submissions and Posting

You are responsible for your own communications, if any, and are responsible for the consequences of posting your data/ communications. You must not, and by using this site you agree not to, do the following things:

1. post material that is copyrighted, unless you are the copyright owner or have the permission of the copyright owner to post it; post material that reveals trade secrets, unless you own them or have the permission of the owner;
2. post material that infringes on any other intellectual property rights of others or on the privacy or publicity rights of others;
3. post material that is obscene, defamatory, threatening, harassing, abusive, hateful, or embarrassing to another user or any other person or entity;
4. post a sexually explicit image or statement;
5. post advertisements or solicitations of business, post chain letters or pyramid schemes;
6. impersonate another person; or
7. post material that contains viruses, Trojan horses, worms, time bombs, cancelbots or other computer programming routines or engines that are intended to damage, detrimentally interfere with, surreptitiously intercept or expropriate any system, data or information.
8. your postings will not be used to carry out or solicit any unlawful activity and/or be used to make commercial solicitations.

## Retention policy

Any personal data (like name, email id, demographic data, educational data, etc.) provided by the User in the application is retained for as long as you maintain an active account in the application, or for as long as you do not modify or delete the data. When you delete your account within the application, all personally identifiable data associated with your account is permanently removed.

Please note that certain aggregated data may still be stored in our database for administrative purposes. Please read the Global Privacy Statement to know more on the Retention policy.

1. Modifications of any materials on this Site or use of the materials for any purpose other than as contemplated in this Site is a violation of PowerSchool's copyright and proprietary rights.
2. Unless expressly allowed by the product, you may not reproduce, upload, post, transmit, download, or distribute any part of this site other than printing out or downloading portions of the text and images for your own personal, non-commercial use, without written approval of PowerSchool.
3. You will not use this Site for any purpose that is unlawful or prohibited by the ToU.
4. You agree not to upload, post, transmit, publish, or distribute or use any material or information in this Site that is unlawful, or which may potentially be perceived as being harmful, threatening, or objectionable in any manner that could damage, disable, overburden, or impair this Site or interfere with any other party's use and enjoyment of this Site.
5. You agree not to obtain or attempt to obtain through this Site any materials or information not intentionally made available to you through this Site.

## Product Suspension or Termination

PowerSchool reserves the right at any time, and from time to time, to modify or discontinue, suspend, temporarily or permanently, this Site, or any part thereof, with or without notice to the respective school or school district licensing the Site.

## Links to Other Sites

This Site may provide links to third party websites or resources. Because PowerSchool does not control such websites and resources, you acknowledge and agree that PowerSchool is not responsible or liable for the content, products or performance of such third party websites and resources, and you hereby irrevocably waive any claim against PowerSchool with respect to such websites and resources. PowerSchool acts as a facilitator in such cases and may not have direct control over the third-party services. PowerSchool reserves the right to remove such third party links within a PowerSchool product at any time without notice. The inclusion of a link to such another website or resource does not necessarily constitute an endorsement of, sponsorship of, or affiliation to PowerSchool of that third-party website or resource, or any products or services provided therein. The information practices of those websites are not covered by this Privacy Statement or any other policies or terms applicable to this Site. We recommend that you review any terms of use and privacy policy of any linked third party website before providing any information to that website or using its products and services. Domain names and trademarks of any linked website, and all content of such linked website, are the sole property of their respective owners. You may elect to explore and register with such third -party sites, choosing to share your personal data directly with such vendors.  If you consent to sharing your data with such vendors, you acknowledge that PowerSchool is not requiring you to make that decision.

PowerSchool will not be party to any legal proceedings between a User and a party contracted through the site. In case PowerSchool is implicated in any legal proceedings, costs will be recovered from the party that names PowerSchool. PowerSchool, however, will abide with any court order served on it through due process.

Please note that this Site may also provide links to other sites (whether PowerSchool products, or third parties sites) brought to you by the applicable school or school district.  The Terms of Use for our publicly accessible PowerSchool products will vary.

## Limitation of Liability

This Site is only a venue. You assume all risks associated with dealing with other Users with whom you come in contact through the site and in no event shall PowerSchool be liable for any direct, indirect, incidental, special, consequential, punitive or exemplary damages, damages for loss of profits, goodwill, use or data, or other intangible losses, fines, fees, penalties, or liabilities (even if advised of the possibility of such damages), resulting from: (i) the loss of data and/or the use or delay or the inability to use this Site; (ii) the cost of procurement of substitute goods and services resulting from any goods, data, information or services purchased or obtained or messages received or transactions entered into through or from this Site; (iii) unauthorized access to or lteration of your transmissions or data; (iv) statements or conduct of any third party on this Site; (v) for any information,

(vii) any other matter relating to this Site.

As user authentication on the Internet is difficult, PowerSchool cannot and does not confirm that each user is who they claim to be. Because PowerSchool does not and cannot be involved in user-to-user dealings or control the behavior of participants on the site, in the event that you have a dispute with one or more users, you release PowerSchool (and our agents and employees) from claims, demands and damages (actual and consequential, direct and indirect) of every kind and nature, known and unknown, suspected and unsuspected, disclosed and undisclosed, arising out of or in any way connected with such disputes.

If you are a California resident, you waive California Civil Code d1542, which says: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

PowerSchool is under no legal obligation to, and generally does not, control the information provided by other users which is made available through this site. By its very nature, other people's information may be offensive, harmful, or inaccurate, and in some cases will be mislabeled or deceptively labeled.

PowerSchool expects that you will use caution and common sense when using this Site. You acknowledge and agree that you are solely responsible for the form, content and accuracy of any information placed by you on this Site.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF CERTAIN WARRANTIES OR THE LIMITATION OR EXCLUSION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, SOME OF THE ABOVE LIMITATIONS OF THE ABOVE MAY NOT APPLY TO YOU. IN NO EVENT WILL THE AGGREGATE LIABILITY OF POWERSCHOOL, OUR AFFILIATES, AND OUR RESPECTIVE SUPPLIERS AND LICENSORS FOR ANY DAMAGES ARISING OUT OF OR RELATED TO ANY DEFAULT HEREUNDER, REGARDLESS OF THE FORM OF THE ACTION, EXCEED THE AMOUNT OF FEES ACTUALLY PAID BY YOU FOR USE OF THIS SITE.

## B. GENERALLY APPLICABLE SECTIONS

This section is applicable to all Users, whether viewing our PowerSchool public website or accessing any PowerSchool product(s).

### Prohibited Actions

By your use of the Site, you agree that you will NOT: reverse engineer, duplicate, publish, modify, extract data using automated processes such as bots and webcrawlers (scraping), or otherwise distribute the materials on this Site unless specifically authorized in writing by PowerSchool to do so.

### Copyright and Trademark Notices

The entire content of this Site and any supporting software are the proprietary property of PowerSchool and/or its licensors and are protected by U.S. and international copyright and other intellectual property laws. The reproduction, redistribution, modification or publication of any part of this Site without the express written consent of PowerSchool and/or its licensors is strictly prohibited.

You agree not to display, disparage, dilute, or taint our trademarks or use any confusing similar marks or use our trademarks in such a way that would misrepresent the ownership of such marks. Any permitted use of our trademarks by you shall be to the benefit of PowerSchool.

Any suggestions received through 'contact us' shall become the property of PowerSchool without any obligation, and you shall not be entitled to any claim or compensation under any circumstances.

## Disclaimer of Warranties

YOU EXPRESSLY UNDERSTAND AND AGREE THAT:

YOUR USE OF THIS SITE IS AT YOUR OWN RISK. THIS SITE IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. POWERSCHOOL EXPRESSLY DISCLAIMS ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT.

THROUGH THIS SITE WILL MEET YOUR EXPECTATIONS, AND (V) ANY ERRORS OR DEFECTS IN THIS SITE WILL BE CORRECTED.

ANY MATERIAL UPLOADED/DOWNLOADED OR OTHERWISE OBTAINED, FROM THIS SITE IS DONE AT YOUR OWN DISCRETION AND RISK; POWERSCHOOL SHALL NOT BE LIABLE, AND YOU WILL BE SOLELY RESPONSIBLE, FOR ANY AND ALL LOSS, OR CORRUPTION, OF DATA UPLOADED OR INPUTTED BY YOU THROUGH THE USE OF THIS SITE, AND ALL SERVICING, REPAIR, OR CORRECTION AND ANY DAMAGE TO YOUR HARDWARE AND SOFTWARE THAT MAY RESULT FROM THE USE OF THIS SITE.

## Digital Millennium Copyright Act Compliance

If you have any copyright concerns about any materials posted on this Site by others, please let us know. We comply with the provisions of the Digital Millennium Copyright Act ("DMCA") applicable to Internet service providers (17 U.S.C. § 512). Unless otherwise stated in any specific DMCA designation provided by PowerSchool, please provide us with written notice ("Notice") by contact-using our Designated Agent at the following address:

Designated Agent
PowerSchool Group LLC
150 Parkshore Dr
Folsom, CA 95630
email: legalnotices@powerschool.com

To be effective, the Notice must include the following:

- A physical or electronic signature of the owner, or a person authorized to act on behalf of the owner, ("Complaining Party") of an exclusive right that is allegedly being infringed upon;
- Information reasonably sufficient to permit PowerSchool to contact the Complaining Party, such as an address, telephone number, and if available, an electronic mail address;
- Identification of the allegedly infringing material on the PowerSchool Site ("Infringing Material"), and information reasonably sufficient to permit PowerSchool to locate such material on the PowerSchool Site;
- Identification of the copyrighted work claimed to have been infringed upon ("Infringed Material"), or if multiple copyrighted works at a single PowerSchool Site are covered by a single Notice, a list of each copyrighted work claimed to have been infringed (please be specific as to which Infringing Material is infringing on which Infringed Material);
- A statement that the Complaining Party has a good faith belief that use of Infringing Material in the manner complained of is not authorized by the copyright owner, its agent, or the law; and
- A statement that the information in the Notice is accurate, and under penalty of perjury, that the Complaining Party is the owner or is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

## General Information; Governing Law

This ToU constitutes the entire understanding between you and PowerSchool with respect to your use of PowerSchool public website. For your access and use of any PowerSchool product, the license agreement executed between PowerSchool and the Customer shall control in case of any conflict between the terms of this ToU and such license agreement. These Terms of Use and the relationship between you and PowerSchool will be governed by the laws of the State of California without regard to its conflict of law provisions. The United Nations Convention on Contracts for the International Sale of Goods is expressly disclaimed. The failure of PowerSchool to exercise or enforce any right or provision of these Terms of Use shall not constitute a waiver of such right or provision. If any provision of these Terms of Use is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision, and the other provisions of these Terms of Use remain in full force and effect. You agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of this Site or these Terms of Use must be filed within one (1)

Any rights not expressly granted herein are reserved.

Please report any violations of these Terms of Use to Data Subject Access Form

## Violations

Please Contact Us to report any violations of the Terms of Use.

PowerSchool Group (Revised – August 2024).

# EXHIBIT 47

PowerSchool

# MAIN SERVICES AGREEMENT
**2024 version**

This Main Services Agreement (with all attached exhibits and referenced documents and links, the "**Main Services Agreement**"), combined with active Quotes and Statements of Work for Professional Services or any other duly executed documents referencing this Main Services Agreement, will constitute the "**Agreement**", as may be amended from time to time. The Quotes and SOWs, including any addenda and supplements thereto, may be individually referred to as an "**Ordering Document**" or collectively referred to as the "**Ordering Documents**".

This Agreement is entered into by and between the applicable PowerSchool Contracting Entity (as defined below) ("**PowerSchool**") and Customer identified below and governs Customer's access and use of Services. This Agreement is effective and accepted on the earliest of the following: (i) the date that the last Party directly signs this Main Services Agreement, (ii) the date that the last Party signs the Quote that references this Main Services Agreement (or if the Quote is not signed, then the date of the purchase order received by PowerSchool), or (iii) the date on which Customer is granted access to the Services (the "**Effective Date**")**.** Each PowerSchool and Customer is individually referred to as a "**Party**" and collectively as the "**Parties**".

## 1. DEFINITIONS.

**1.1.** "**Account Country**" is the country associated with the Customer account. If Customer has provided a valid tax registration number for Customer's account, then Customer's Account Country is the country associated with such tax registration. If Customer has not provided a valid tax registration, then Customer's Account Country is the country where the Customer billing address is located.

**1.2.** "**Customer**" means the school, school district, college, university, institution, agency, or other entity that purchases one or more of the Services, as identified on the applicable Ordering Document.

**1.3.** "**Customer Data**" means all data (including Personal Data), files, documents and records uploaded to a Subscription Service or transmitted to PowerSchool under this Agreement by or on behalf of Customer.

**1.4.** "**De-identified Data**" means information generated by the data processor that does not contain Personal Data and any direct or indirect personal identifiers, and that is not used or linked to identify any individual.

**1.5.** "**Documentation**" means user manuals describing the functionality, features and operating characteristics of the applicable PowerSchool Software as made available to Customer by PowerSchool, including any updates thereto.

**1.6.** "**Excluded Claims**" means claims or liability arising out of: (a) a Party's violation of the other Party's proprietary or intellectual property rights; (b) PowerSchool's violation of its obligations under this Agreement (including the applicable data privacy agreement) pertaining to Customer Data; or (c) either Party's indemnity obligations under this Agreement.

**1.7.** "**Intellectual Property Rights**" means any and all, now or hereafter in existence, unpatented inventions, patent applications, patents, design rights, copyrights, Trademarks, mask work rights, know-how, trade secret rights, moral rights, database protection, and all other intellectual property and proprietary rights, modifications, adaptations, derivatives thereof, and improvements thereto, and forms of protection of a similar nature anywhere in the world.

**1.8.** "**Licensed Applications**" means software applications developed by third parties that are licensed by PowerSchool and are embedded in or bundled with the Subscription Services provided by PowerSchool hereunder.

**1.9.** "**Licensed Site(s)**" means the internet address of the web-based location for accessing a Subscription or, if for an on-premise implementation, the initial location where the PowerSchool Software listed on the applicable Quote is installed.

**1.10.** "**Personal Data**" means information that alone, or in combination with other information about an individual, identifies, relates to, or could reasonably be linked to a natural person.

**1.11.** "**PowerSchool Contracting Entity**" means the entity identified in the table below, based on Customer's Account Country.

PowerSchool

| Account Country | PowerSchool Contracting Entity | Mailing Address |
|---|---|---|
| Canada | PowerSchool Canada ULC | PowerSchool Canada ULC<br>150 Parkshore Drive<br>Folsom, CA 95630 |
| United States | PowerSchool Group LLC | PowerSchool Group LLC<br>150 Parkshore Drive<br>Folsom, CA 95630 |
| Any other country that is not Canada, the United States, India, or UAE[1] | PowerSchool Group LLC | PowerSchool Group LLC<br>150 Parkshore Drive<br>Folsom, CA 95630 |

**1.12. "PowerSchool Software**" means PowerSchool's proprietary software applications and the associated Licensed Applications, including any and all updates and subsequent versions thereto. PowerSchool Software does not include Third-Party Software.

**1.13.** "**Professional Services**" means work performed by PowerSchool or its permitted subcontractors or channel partners under an Ordering Document, including implementation, training, consulting, customization and other professional services, and any deliverables specified in an Ordering Document.

**1.14.** "**Quote**" means PowerSchool's standard order form that (i) specifies the Services provided to Customer; (ii) references this Agreement or the applicable agreement; and (iii) is signed or incorporated into or referenced in a signed agreement by authorized representatives of both Parties. Unless otherwise agreed in writing by the Parties, Customer's issuance of a purchase order is deemed as acceptance of the terms and conditions set forth in the applicable Quote.

**1.15.** "**Services**" means any Subscription Service(s), including all content made available by PowerSchool through the Subscription Services, and any Professional Services provided to Customer hereunder.

**1.16.** "**Statement of Work**" or "**SOW**" means a statement of work document that describes the Professional Services to be performed hereunder and that is entered into between Customer and PowerSchool or is otherwise incorporated into a Quote entered into between Customer and PowerSchool.

**1.17. "Subscription Services**" means the provision of the PowerSchool Software to Customer on a subscription basis as a cloud-based service, a term license, or as an on-premise installation, including any hosting services or Support Services provided as part of the Subscription Services or otherwise purchased by Customer.

**1.18. "Subscription Term**" has the meaning set forth in Section 13.2 (Subscription Term).

**1.19.** "**Support Services**" means the maintenance and support for the Subscription Services or as purchased by Customer, as described in PowerSchool's standard support policy at https://www.powerschool.com/Support-Policy-SLA_2024/.

**1.20. "Term"** has the meaning set forth in Section 13.1 (Agreement Term).

**1.21. "Third-Party Software"** means software products supplied or developed for a particular purpose by someone other than PowerSchool and not licensed by PowerSchool hereunder.

**1.22.** "**Trademarks**" means all trademarks, service marks, logos, slogans, trade names, business names, and other source identifiers, including domain names, whether registered or unregistered, and including all of the goodwill of the business related to the foregoing.

**1.23. "Transaction Data"** means system performance information monitoring the PowerSchool Software alone and at times of usage as the User may access and progress through the features and functions of a Subscription Service.

**1.24. "User(s)"** means individuals authorized by Customer to access PowerSchool Software, including teachers, students, parents, guardians, employees, authorized personnel, and job applicants as applicable to the respective PowerSchool Software.

## 2. PROVISION OF SERVICES AND RESTRICTIONS.

---

[1] PowerSchool Offerings in India and United Arab Emirates are under a different Main Services Agreement.

PowerSchool

**2.1 Subscription Services.** If Customer makes all payments on time, PowerSchool will: (a) for cloud-based Subscription Services, make such Subscription Services available to the Customer and for the contracted quantity at each Licensed Site in conformance with the applicable Documentation and the terms of this Agreement, and host such Subscription Services consistent with the service level agreement set forth at https://www.powerschool.com/Support-Policy-SLA_2024/; (b) for on-premise Subscription Services, grant Customer a restricted, personal, non-exclusive, non-transferable, terminable access to use such Subscription Service specified in the applicable Quote, only at the Licensed Sites, not to exceed the maximum quantity identified on the applicable Quote; and (c) provide the applicable standard Support Services (or upgraded Support Services if purchased). Customer must purchase separate Support Services for on-premise implementation of the Subscription Services.

**2.2 Professional Services.** If purchased, PowerSchool will provide the Professional Services specified in the applicable SOW, subject to Customer's payment of all applicable fees and to the terms of PowerSchool's Professional Services Policy set forth at https://www.powerschool.com/Professional-Services-Policy_2024/, which is incorporated herein by reference.

**2.3 Restrictions.** Subscription Service(s) will only be used as expressly authorized by this Agreement and in compliance with all applicable laws and regulations. All rights not expressly granted to Customer herein are expressly reserved by PowerSchool.

**2.3.1** Customer will use the Services only for the internal purposes of Customer and only for Licensed Sites through the stated Subscription Term in the Quote. Customer shall not exceed the maximum quantity for the Subscription Services as stated in the Quote without additional payment.

**2.3.2** Customer will not, and will not permit Users or third parties to: (a) make any of the Services, its results, outputs or deliverables available to anyone other than Customer or Users, or use them for the benefit of anyone other than Customer; (b) sell, resell, rent, lease, license, distribute, sublicense, or otherwise include any of the Services to a third party or in a service bureau or outsourcing offering; (c) make any use of the Services for which Customer has not paid; (d) store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of third-party privacy rights; (e) interfere with or disrupt the integrity or performance of any of the Services; or (f) remove or obscure any proprietary or other notices contained in any PowerSchool Services. Customer shall not use plugins that are not approved by PowerSchool.

**2.3.3** Customer and its Users shall keep user identification and password information strictly confidential and not share such information with any unauthorized person and shall be responsible for any and all activities that occur under all Customer accounts. If unauthorized access to, or use of, the Services occurs, Customer shall promptly notify PowerSchool.

**2.3.4** Customer shall be prohibited from performing penetration testing against PowerSchool-hosted Services, applications, data stores, or systems. Penetration tests, if not performed properly and under the supervision and coordination of the PowerSchool information security team, can have unintended consequences such as corrupting data, unauthorized access to data, and degradation of systems. PowerSchool allows vulnerability scanning from PowerSchool-approved vendors, such as the Cybersecurity & Infrastructure Security Agency (CISA).

**2.3.5** PowerSchool may (or may ask Customer to) suspend or terminate any User's access to the Services upon notice to Customer if PowerSchool reasonably determines that such User has violated any of the terms of the Agreement.

**2.4 Updates to Subscription Services**. During the Term, PowerSchool may, at no cost to Customer, update or upgrade features, functionality, software, or user types that Customer and Users access pursuant to a Quote; provided that such updates will not materially degrade existing features and functionality. After giving Customer reasonable advance notice, PowerSchool may update and/or upgrade the Subscription Services provided to Customer so that it remains current with the then-current version of the PowerSchool Software available to PowerSchool's customers generally.

**2.5 Sustaining Application Planning Program (SAP)**. PowerSchool reserves the right to discontinue a PowerSchool Software as part of its sustaining application planning program (SAP). PowerSchool shall provide Customer with twelve (12) months' advanced notice for PowerSchool's proprietary Software affected, and for affected Licensed Applications, as much notice as practical after PowerSchool receives notice from the applicable licensors. PowerSchool will use commercially reasonable efforts to transition Customer to a PowerSchool Software with substantial similar functions and features. If PowerSchool does not have a substantially similar PowerSchool Software, then PowerSchool will credit to Customer any unused portion of the prepaid fee for such PowerSchool Software that is discontinued. Such credit can be applied towards the future purchase of a Service

within twelve (12) months of issuance. Unused credits will expire after twelve (12) months of their issuance.

**2.6 Background Checks**. PowerSchool conducts thorough nation-wide and province-wide background checks, including criminal records, terrorist watch list, sex offender database and a multi-panel drug test on all employees. PowerSchool also requires its contractors, under its separate agreement, to conduct a background check of its employees before any assignment of services from PowerSchool to the Customer.

**3. CUSTOMER DATA.**

**3.1 Rights in Customer Data**. As between Customer and PowerSchool, Customer is and will remain the sole and exclusive owner of all right, title and interest in and to all Customer Data, including all Intellectual Property Rights relating thereto, subject to the rights and permissions granted in this Section 3 (Customer Data). Customer is responsible for the accuracy and legality of any content provided to PowerSchool as Customer Data. PowerSchool will ensure that its use of the Customer Data always complies with this Agreement, PowerSchool's privacy statement, and all applicable laws, regulations, and conventions.

**3.2 Consent to Use Customer Data.** Customer hereby grants all such rights and permissions in or relating to Customer Data to PowerSchool, its subprocessors and the PowerSchool personnel as are necessary to provide, perform and deliver the Services. The Customer further agrees to establish a basis for the processing of Personal Data, including, where required by applicable laws and regulations, by obtaining the relevant informed and voluntary consent from any applicable data subject (in the case of when the data subject is a child or minor, then informed, voluntary, and verified consent from the relevant parent or guardian of the child or minor is required) for: (a) PowerSchool to process the data subject's information, in the form of Customer Data; and (b) the Customer to be allowed to transfer Personal Data to PowerSchool for processing, by sharing such Personal Data with its other approved data subprocessors. Except as provided in Section 5.4 (Compelled Disclosure), PowerSchool will not share the Customer Data with third parties without Customer's express consent. PowerSchool will not rent or sell Customer Data and will treat such data as Confidential Information. "

**3.3 Data Privacy and Security.** By executing the MSA or an Ordering Document or issuing a purchase order referencing an Ordering Document, each Party agrees to the terms of the specified PowerSchool statewide data privacy agreement set forth at https://www.powerschool.com/Customer-State-DPA_2024/ for the Customer's applicable state ("**PowerSchool State DPA**"). However, if the Parties, at the time of execution of this MSA or an Ordering Document, expressly agree in writing to supersede such PowerSchool State DPA with a separately negotiated data privacy agreement executed by and between the Parties ("**Negotiated DPA**"), such Negotiated DPA shall govern the Customer Data processed under this Agreement. Such Negotiated DPA, if existing, shall be executed and either submitted with the applicable Ordering Document or separately returned to PowerSchool as a stand-alone document. The Parties agree to comply with the PowerSchool State DPA or the Negotiated DPA, as applicable, and such applicable DPA shall supplement the terms of this Agreement.

**3.4 Security Training**. Customer agrees to require annual cyber security training for User(s) when reasonably applicable. Customer will also require User(s) to utilize multi-factor authentication to access computer systems with the Services when available within the applicable Service. Customer agrees to keep a record of such training and PowerSchool may request to see them as part of compliance verification.

**4. PROPRIETARY RIGHTS**

**4.1 PowerSchool Services and Software.** PowerSchool and its licensors solely and exclusively own all right, title, and interest, including all related Intellectual Property Rights, in and to the Services and PowerSchool Software. This Agreement is not a sale and does not convey to Customer any rights of ownership in or related to the Services or PowerSchool Software, or the Intellectual Property Rights owned or licensed by PowerSchool.

**4.2 Transaction Data.** Notwithstanding anything to the contrary, PowerSchool has the right to collect and use Transaction Data solely for internal research and to develop, improve, support, and operate its products and services during and after the Term.

**4.3 De-Identified Data**. Notwithstanding anything to the contrary, Customer hereby agrees and acknowledges that PowerSchool shall have the right to process, aggregate and analyze De-Identified Data relating to the provision, use and performance of various aspects of the Services and related systems and technologies, and PowerSchool will be free (during and after the Term) to: (i) use such De-identified Data to improve and enhance the Services and for other development, diagnostic and corrective purposes in connection with the Services and other PowerSchool products and services, and (ii) use De-identified Data for internal use only and for training and conducting demonstrations.

**4.4 Feedback**. If Customer or any User provides PowerSchool with any suggestions, comments,

PowerSchool

enhancement requests, or other feedback relating to the PowerSchool Services or any other PowerSchool's products or services (collectively, "**Feedback**"), Customer grants to PowerSchool a worldwide, perpetual, irrevocable, royalty-free, and transferable license to use and incorporate into PowerSchool Services and PowerSchool Software such Feedback (excluding any Customer Confidential Information contained in the Feedback).

**4.5 PowerSchool Trademarks.** PowerSchool exclusively owns all of its Trademarks associated with the Services. No right or license is granted by this Agreement to their use.

**4.6 No Use of Trademarks.** Except as set forth below, neither Party nor its affiliates shall use the other Party's Trademarks in any form or substance in any medium or for any purpose without the other Party's prior written consent (which consent can be via e-mail if such e-mail is from an authorized representative of the consenting Party).

**4.7 Marketing.** Subject to Customer's trademark usage guidelines, Customer grants PowerSchool a non-exclusive, worldwide, royalty-free right to include Customer's Trademark and other related transactional information (including enrollment count, names of the Services ordered by Customer, etc., but excluding pricing) in any customer listing appearing on or in any PowerSchool websites, brochures, fliers, presentations, press releases, annual reports and any other marketing materials. Customer may withdraw or terminate the foregoing license at any time by providing PowerSchool with thirty (30) days' prior written notice of its intent to terminate. Such notice of withdrawal or termination must be sent via e-mail to champions@powerschool.com with a copy to legalnotices@powerschool.com, and the email subject line must state "Trademark Consent Withdrawal". After such thirty (30) day period, the foregoing license will terminate, and PowerSchool will remove Customer's Trademarks from its website and cease from creating any new marketing material containing the same. However, PowerSchool's right to continue to use any marketing materials produced, published, or disseminated prior to such termination will continue until the supply, publication, dissemination and/or use of such materials is exhausted or terminates.

**5. CONFIDENTIALITY.**

**5.1 Confidential Information**. Each Party (as may disclose or make available Confidential Information to the other Party. "**Confidential Information**" means non-public information disclosed by a Party (the "**Disclosing Party**") to the other Party (the "**Receiving Party**"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure, including business and marketing plans, technology and technical information, product plans, roadmaps, and designs, and business processes. Confidential Information of Customer includes Customer Data; and Confidential Information of PowerSchool includes the Services, PowerSchool Software, and, subject to Section 5.4 (Public Records Act), the terms of this Agreement and each Ordering Document (including pricing). However, Confidential Information does not include any information that the Receiving Party can reasonably demonstrate by written or other documentary records: (i) is or becomes publicly known or available without breach of any obligation owed to the Disclosing Party; (ii) was known by the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party; (iii) is received from a third party without knowledge of any breach of any obligation owed to the Disclosing Party; or (iv) is independently developed by the Receiving Party without the aid, application or use of the Confidential Information. For the avoidance of doubt, the non-disclosure obligations set forth in this "Confidentiality" section apply to Confidential Information exchanged between the Parties in connection with the evaluation of additional PowerSchool services.

**5.2 Protection of Confidential Information**. The Receiving Party will use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but not less than reasonable care) to (i) not use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement, and (ii) except as otherwise authorized by the Disclosing Party in writing, limit access to Confidential Information of the Disclosing Party to those of its and its affiliates' employees, contractors, sub-processors and agents who need that access for purposes consistent with this Agreement and who have signed confidentiality agreements with the Receiving Party containing protections not materially less protective of the Confidential Information than those herein. The Receiving Party's obligations under Section 5 (Confidentiality) shall survive the termination or expiration of this Agreement and continue in effect thereafter for a period of five (5) years with respect to Confidential Information that does not qualify as a trade secret under applicable law, and, with respect to Confidential Information that qualifies as a trade secret under applicable law, in perpetuity after the termination or expiration of the Agreement.

PowerSchool

**5.3 Compelled Disclosure**. The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent compelled by law to do so, provided the Receiving Party gives the Disclosing Party prior notice of the compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure.

**5.4 Public Record Act.** Notwithstanding anything herein to the contrary, PowerSchool acknowledges that, to the extent Customer is subject to public record acts or freedom of information acts, (a) PowerSchool will reasonably work with Customer to provide appropriate information in response to such requests, to the extent such requested information is not PowerSchool's proprietary information or otherwise exempted from disclosure; and (b) Customer shall provide PowerSchool a reasonable opportunity to object to any such request as permitted under applicable law.

**6. FEES AND PAYMENT.**

**6.1 Fees**. Customer agrees to pay PowerSchool for all fees charged for the Services consistent with the terms on the Quote and invoice. Unless Customer provides PowerSchool with evidence of its tax-exemption status, Customer will be responsible for paying all applicable sales, use, value-added, or other taxes or duties, however designated, except for taxes based on PowerSchool's net income. Customer agrees to pay for PowerSchool's pre-approved reasonable travel and lodging expenses for Professional Services performed at Customer's premises. All fees set forth in any Quote or invoice will be in the currency set forth in the applicable Quote.

**6.2 Enrollment Increases**. If fees for any of the Services are based on quantity or student count and Customer accesses such Services with more than the quantity identified in the applicable Quote, then Customer will pay the fees for the excess usage based on its then-current per individual and support fees. Any such increase in quantity will be maintained through the end of the then-current subscription period.

**6.3 Payment**. Unless otherwise set forth in the applicable Quote or invoice, Customer shall make all payments on or before the due date specified on the applicable invoice by the method specified on the invoice. PowerSchool may accept credit card payment; however, credit card payments shall subject Customer to a transaction fee and a $250,000 transaction limit. Subject to the "Payment Disputes" section below, if an invoiced amount is overdue by thirty (30) or more days, PowerSchool reserves the right to charge a late fee of 1.5% monthly (18% annually) or the maximum rate allowed by law, whichever is lower, on the amounts overdue.

**6.4 Payment Disputes**. If Customer reasonably and in good faith disputes all or any portion of any invoice, Customer shall notify PowerSchool in writing of its objection within twenty (20) days from the date of the applicable invoice, provide a detailed description of the reasons for the objection, and pay the portion of the invoice which is not in dispute. If Customer does not object in a timely manner within this time period, the amount invoiced shall be conclusively deemed correct by the Parties. If the Parties are unable to resolve such payment dispute within thirty (30) days from PowerSchool's receipt of Customer's written objection, each Party shall have the right to seek any remedies it may have under this Agreement, at law or in equity, irrespective of any terms that would limit remedies on account of a dispute. For clarity, any undisputed amounts must be paid in full.

**6.5 No Deductions or Setoffs**. Subject to Customer's right to dispute an invoice under Section 6.4 (Payment Dispute), all amounts payable to PowerSchool under this Agreement shall be paid by Customer to PowerSchool in full without any setoff, deduction, or withholding for any reason.

**7. PRODUCT-SPECIFIC AND PASS-THROUGH TERMS.**

**7.1 Licensed Applications**. If the Services include Licensed Applications, provision of such Licensed Applications may be subject to additional license terms identified at https://www.powerschool.com/Product-Specific-Terms_2024/, which terms are incorporated herein by reference and are required by PowerSchool's licensors to pass through to Customer without any modification. Such licensors audit PowerSchool to ensure compliance with this requirement.,

**7.2 Third-Party Software**. Third-Party Software is licensed directly to the Customer pursuant to separate license terms between Customer and a third-party supplier. All support, warranties, and services related to Third-Party Software are provided by the supplier of the Third-Party Software under such third party's terms and conditions, and not by PowerSchool. PowerSchool will have no obligations or liability regarding any Third-Party Software.

**7.3 Product-Specific Terms**. Certain Services may be subject to additional product-specific terms identified at https://www.powerschool.com/Product-Specific-Terms_2024/, which are incorporated herein by reference.

**8. LIMITED WARRANTY.**

PowerSchool

PowerSchool warrants that the PowerSchool Software included in the Services will operate in substantial conformity with the applicable Documentation under normal use and circumstances. If Customer notifies PowerSchool in writing of a breach of this warranty, PowerSchool will, at its option, either: (a) use commercially reasonable efforts to correct the reported non-conformity, at no charge to Customer, or (b) if PowerSchool determines such remedy to be impracticable, issue Customer a credit of a portion of the fees pre-paid by Customer for the nonconforming Subscription Service that fairly reflects (at PowerSchool's reasonable determination) the diminished value of the non-conforming Subscription Service. The foregoing constitutes Customer's sole and exclusive remedy for any breach of this limited warranty. This warranty will not apply: (i) unless Customer makes a claim within thirty (30) days of the date on which Customer first noticed the non-conformity, or (ii) if the non-conformity was caused by misuse, unauthorized modifications, or third-party hardware, software, or services.

**9. DISCLAIMER OF WARRANTIES.** EXCEPT AS EXPRESSLY SET FORTH IN SECTION 8 (WARRANTIES), THE SERVICES, POWERSCHOOL SOFTWARE AND THIRD-PARTY SOFTWARE ARE PROVIDED "AS IS", AND POWERSCHOOL AND ITS LICENSORS EXPRESSLY DISCLAIM ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT, AND ALSO ANY WARRANTIES THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE. CUSTOMER MAY HAVE OTHER STATUTORY RIGHTS, BUT THE DURATION OF STATUTORILY REQUIRED WARRANTIES, IF ANY, SHALL BE LIMITED TO THE SHORTEST PERIOD PERMITTED BY LAW. THE ABOVE DISCLAIMER APPLY TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW.

**10. INDEMNIFICATION.**

**10.1 PowerSchool Indemnity**. PowerSchool will defend Customer and its board members, officers, staff, employees and representatives ("**Customer Indemnitees**") from and against any claim, demand, suit or proceeding brought by a third party against Customer Indemnitee (a "**Claim Against Customer**"): (i) alleging any Service, when used as authorized under this Agreement, infringes or misappropriates a third party's Intellectual Property Rights; (ii) to the extent arising from the Services being provided in an unlawful manner or in violation of the Agreement or regulations; (iii) alleging a confirmed data breach (as defined by the applicable state law) to the extent attributable to PowerSchool resulting from PowerSchool's violation of the data security provisions expressly set forth in this Agreement or the DPA executed between the Parties; or (iv) to the extent arising out of death, personal injury or damage to tangible property to the extent caused by PowerSchool personnel or subcontractors in their performance of the Services. PowerSchool will indemnify and hold Customer harmless from any damages, attorney fees, and costs finally awarded against Customer as a result of, or for amounts paid by Customer under a settlement approved by PowerSchool in writing of, a Claim Against Customer.

**10.1.1 Mitigation**. If Customer's use of the Services is enjoined or, in PowerSchool's reasonable opinion, is likely to be enjoined, PowerSchool may (i) substitute for the Services, a substantially and functionally similar product(s) and documentation; (ii) procure for Customer the right to continue using the Services; or if (i) or (ii) is not possible after reasonable commercial efforts from PowerSchool, then PowerSchool may terminate this Agreement and credit a pro-rated return of unused portion of the fees prepaid by Customer for the applicable Services.

**10.1.2 Exclusions**. The above defense and indemnification obligations do not apply to the extent the Claim Against Customer arises from: (i) modifications to the Services by any party other than PowerSchool or its subcontractor; (ii) the combination of the Services with software, hardware, data, products or processes not provided by PowerSchool, if the Services or use thereof would not infringe without such combination; (iii) Customer's breach of this Agreement or violation of applicable law; or (iv) Customer Data, or any deliverables or components not provided by PowerSchool or its subcontractor.

**10.2 Indemnification by Customer**. To the extent permitted under applicable law, Customer will defend PowerSchool and its affiliates and each of their respective directors, officers, employees, representatives and agents (collectively, "**PowerSchool Indemnitees**") from and against any claim, demand, suit or proceeding brought by a third party against a PowerSchool Indemnitee (a "**Claim Against PowerSchool**") to the extent arising out of: (a) any Customer Data or use of Customer Data with the Services; (b) any information or content (other than PowerSchool-provided content) transmitted or submitted by Customer or its Users through the Services or shared with any third party; or (c) Customer's use of the Services or content therein in an unlawful manner or in violation of the Agreement. Customer will indemnify and hold PowerSchool harmless from any damages, attorney fees, and costs finally awarded against PowerSchool as a result of, or for amounts paid by PowerSchool under a

PowerSchool

settlement approved by Customer in writing of, a Claim Against PowerSchool. The above defense and indemnification obligations do not apply if a Claim Against PowerSchool arises from PowerSchool's breach of the Agreement or violation of applicable law.

**10.3 Procedure**. The indemnifying Party's obligations are expressly conditioned upon the following: (a) the indemnified Party will promptly notify the indemnifying Party in writing of any Claim Against Customer or Claim against PowerSchool, as applicable (the "**Claim**"); (b) the indemnifying Party will have sole control of the defense and settlement of the Claim; (c) the indemnified Party gives all reasonable assistance, at the indemnifying Party's expense, to facilitate the settlement or defense of the Claim; and (d) the indemnifying Party will not settle any claim or suit in a manner that results in an admission of liability by the indemnified Party, without the indemnified Party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

**10.4 Sole and Exclusive Remedy**. THIS "INDEMNIFICATION" SECTION STATES THE INDEMNIFYING PARTY'S SOLE LIABILITY TO, AND THE INDEMNIFIED PARTY'S EXCLUSIVE REMEDY AGAINST, THE OTHER PARTY FOR ANY THIRD-PARTY CLAIM DESCRIBED IN THIS SECTION.

**11. LIMITATION OF LIABILITY.**

**11.1 EXCLUSION OF DAMAGES**. TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY OR ITS AFFILIATES BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR FUNDING, REVENUES, GOODWILL, OR INDIRECT, INCIDENTAL, CONSEQUENTIAL, COVER, BUSINESS INTERRUPTION OR PUNITIVE DAMAGES, WHETHER AN ACTION IS IN CONTRACT OR TORT AND REGARDLESS OF THE THEORY OF LIABILITY, AND EVEN IF A PARTY OR ITS AFFILIATES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR IF A PARTY'S OR ITS AFFILIATES' REMEDY OTHERWISE FAILS OF ITS ESSENTIAL PURPOSE. THE FOREGOING DISCLAIMER WILL NOT APPLY TO THE EXTENT PROHIBITED BY LAW.

**11.2 CAP ON MONETARY LIABILITY.** TO THE MAXIMUM EXTENT PERMITTED BY LAW AND EXCEPT AS STATED HEREIN, IN NO EVENT SHALL THE AGGREGATE LIABILITY OF EACH PARTY TOGETHER WITH ALL OF ITS AFFILIATES ARISING OUT OF OR RELATED TO THIS AGREEMENT EXCEED THE TOTAL AMOUNT PAID BY CUSTOMER AND ITS AFFILIATES HEREUNDER FOR THE SERVICES GIVING RISE TO THE LIABILITY IN THE TWELVE (12) MONTHS PRECEDING THE FIRST INCIDENT OUT OF WHICH THE LIABILITY AROSE. NOTWITHSTANDING THE FOREGOING, IN NO EVENT SHALL THE AGGREGATE LIABILITY OF EACH PARTY TOGETHER WITH ALL OF ITS AFFILIATES ARISING OUT OF OR RELATED TO THE EXCLUDED CLAIMS EXCEED TWO TIMES (2X) THE TOTAL AMOUNT PAID BY CUSTOMER AND ITS AFFILIATES HEREUNDER FOR THE SERVICES GIVING RISE TO THE LIABILITY IN THE TWELVE (12) MONTHS PRECEDING THE FIRST INCIDENT OUT OF WHICH THE LIABILITY AROSE. THE FOREGOING LIMITATION WILL APPLY WHETHER AN ACTION IS IN CONTRACT OR TORT AND REGARDLESS OF THE THEORY OF LIABILITY BUT WILL NOT LIMIT CUSTOMER'S AND ITS AFFILIATES' PAYMENT OBLIGATIONS UNDER THE "FEES AND PAYMENT" SECTION ABOVE.

**11.3 EXCEPTIONS**. THE FOREGOING LIMITATIONS SHALL NOT APPLY TO LIABILITY ARISING OUT OF A PARTY'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR FRAUD.

**12. INSURANCE.** Each Party will maintain, at its own expense during the Term, insurance appropriate to its obligations under this Agreement, including as applicable general commercial liability, errors and omissions, employer liability, cyber liability, automobile liability, and worker's compensation insurance as required by applicable law**.** PowerSchool's current certificate of insurance ("**COI**") is found at https://www.powerschool.com/Certificate of Insurance 2024/, which will be updated annually and not subject to any modifications by Customer. Upon Customer's request, PowerSchool agrees to include Customer as a certificate holder (but not as additional insured) on such COI. PowerSchool will provide notice and an updated COI to Customer in the event of a cancellation or other material change to the insurance coverage described in such COI. The obligation for PowerSchool to maintain insurance coverage as set forth herein shall in no way impact the terms of the "Limitation of Liability" Section.

**13. TERM AND TERMINATION**

**13.1 Agreement Term.** This Agreement commences on the Effective Date and continues until all the Services hereunder have expired or terminated pursuant to the terms of this Agreement (the "**Term**").

**13.2 Subscription Term.** The subscription term of each Subscription Service (the "**Subscription Term**") will be as specified in the applicable Quote. The start date of the Subscription Term shall be the later of (i) the start date specified on the Quote, or (ii) the date last signed on the Quote (or if the Quote is not signed, then the date

PowerSchool

of the Customer purchase order received by PowerSchool referencing the applicable Quote number). Except as otherwise specified in the applicable Quote, Subscription Services will automatically renew for successive twelve (12) month periods, unless either Party gives the other Party written notice (email acceptable) at least sixty (60) days before the end date specified on the applicable Quote. Customer shall send any notice of non-renewal to nonrenewal@powerschool.com. Except as otherwise specified in the applicable Quote, renewal of Subscription Services will be subject to an uplift, and renewal of promotional or one-time priced subscriptions or licenses will be at PowerSchool's applicable list price in effect at the time of the applicable renewal.

**13.3 Suspension.** If Customer's account is thirty (30) days or more overdue for any PowerSchool product or service (except with respect to charges then under reasonable and good faith dispute), PowerSchool reserves the right, in addition to any of its other rights or remedies, to suspend any of Customer's Services until such amounts are paid in full, provided that, other than for customers paying by credit card or direct debit and whose payment has been declined, PowerSchool has given Customer at least ten (10) business days' prior notice that its account is overdue in accordance with the "Notices" section below. In addition, PowerSchool will have the right to suspend provision of the Services under this Agreement if: (a) Customer or User accessed or used the Services beyond the scope of the rights granted or for purpose not authorized under this Agreement; (b) Customer or any User is or has been involved in any fraudulent, misleading or unlawful activities relating to or in connection with any of the Services; or (c) Customer is notified that an objective security threat arises so great as to warrant immediate action by PowerSchool to protect the security of Customer Data and the PowerSchool systems, including if the Subscription Services are experiencing denial of service attacks, mail flooding, or other attacks or disruptions outside of PowerSchool's control.

**13.4 Termination for Breach.** A Party may terminate this Agreement for cause (i) upon 30 days written notice to the other Party of a material breach if such breach remains uncured at the expiration of such 30-day period, or (ii) if the other Party becomes the subject of a petition in bankruptcy or any other proceeding relating to insolvency, receivership, liquidation or assignment for the benefit of creditors.

**13.5 Termination for Non-Appropriation for Governmental Entities Only.** The Parties acknowledge and agree that if Customer is a governmental entity that is bound to statutory provisions that prevent it from committing to the payment of funds beyond its fiscal year, and if funds are not allocated for the Services specified on a Quote following the commencement of any succeeding fiscal year during which the Quote may continue, then Customer may terminate the Quote without liability for any termination charges or penalties at the end of its last fiscal period or the Subscription Term for which funds were appropriated, subject to Customer's providing the required notice herein. Customer will pay all charges incurred through the end of the last fiscal period or Subscription Term for which funds were appropriated. Customer will give PowerSchool written notice that funds have not been appropriated and that Customer wants to terminate the Agreement: (a) immediately after Customer receives notice of such non-appropriation; and (b) at least thirty (30) days prior to the end of the applicable fiscal period or Subscription Term. Customer will not utilize this clause as a right to terminate any Quote or this Agreement for convenience. PowerSchool reserves the right to request, and Customer shall provide, documentation deemed reasonably sufficient by PowerSchool evidencing such non-appropriation of funds.

**13.6 Mutual Termination**. The Parties may terminate this Agreement by mutual written agreement.

**13.7 No Other Termination Right**. Except as expressly set forth in this Agreement, neither Party has a right to terminate this Agreement or any Quote prior to its expiration.

**13.8 Effect of Termination**. In the event of any termination of all or any portion of this Agreement, Customer will not be relieved of any obligation to pay any sums of money that have accrued prior to the date of termination. In addition, the provisions of Sections 1 (Definitions), 4 (Proprietary Rights), 6 (Fees and Payment), 7 (Product-Specific and Pass-Through Terms), 9 (Disclaimer of Warranties), 10 (Indemnification), 11 (Limitation of Liability), 13.8 (Effect of Termination), and 14 (General Provisions) will survive termination or expiration of this Agreement. The protection of Customer Data as stated in the applicable DPA will survive any termination or expiration of this Agreement for so long as PowerSchool retains possession of Customer Data. Once the Customer Data has been made available to return to Customer and is permanently deleted, the executed DPA associated with this Agreement will automatically expire.

**13.9 Return or Disposal of Customer Data**. Upon termination or expiration of the Agreement, PowerSchool shall return to Customer or delete the Customer Data in its possession, custody or control in accordance with the terms of the DPA, unless otherwise required by applicable law.

## 14. GENERAL PROVISIONS

**14.1 Governing Law**. This Agreement will be governed by the laws of the country, territory, province, or

state in which Customer resides or has its principal place of business, without regard to its conflicts of laws rules or the United Nations Convention on the International Sale of Goods or the Uniform Computer Information Transactions Act.

**14.2 Venue**. The state, provincial, and federal courts located the country, territory, province, state, or county in which Customer resides or has its principal place of business will have exclusive jurisdiction and venue over any dispute relating to this Agreement, and each Party consents to the exclusive jurisdiction of those courts.

**14.3 Amendment**. This Agreement may only be amended or modified by a writing specifically referencing the particular section(s) of this Agreement to be modified and signed by authorized representatives of the Parties.

**14.4 Force Majeure**. Neither Party will be liable to the other for any delay or failure to perform any obligation under this Agreement (except for a failure to pay fees owed) if the delay or failure results from any cause beyond such Party's reasonable control, including acts of God or of a public enemy, acts of terrorism, war, United States or foreign governmental acts or restrictions in either a sovereign or contractual capacity, labor strikes, fire, power outages, road icing or inclement conditions, flood, epidemic or pandemic as designated by the World Health Organization, earthquakes, or tsunamis.

**14.5 Severability**. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision will be deemed null and void, and the remaining provisions of this Agreement will remain in effect.

**14.6 No Waiver**. No failure or delay by either party in exercising any right under this Agreement will constitute a waiver of that right.

**14.7 Notices**. All notices under this Agreement must be in writing and delivered and will be deemed to have been received by the addressee: (i) if given by hand, immediately upon receipt; (ii) if given by overnight courier service, the first business day following dispatch; (iii) if given by registered or certified mail, postage prepaid and return receipt requested (or the equivalent delivery method in an international jurisdiction), the second business day after such notice is deposited in the mail; or (iv) if given by email, immediately upon confirmed receipt. Notices delivered personally are deemed given upon documented receipt or refusal by recipient to accept receipt. In the case of notices to PowerSchool, such notices must be sent to:

**PowerSchool Group LLC,**
**Attn: Chief Legal Officer**
**150 Parkshore Drive,**
**Folsom, CA 95630**
**legalnotices@powerschool.com**

In the case of notices to Customer, such notices will be sent to PowerSchool's address of record for Customer. Either Party may change its notice address by notifying the other Party in like manner.

**14.8 Assignment.** Neither PowerSchool nor Customer shall assign or transfer this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other Party; provided, however, that PowerSchool may assign its rights and obligations under this Agreement without the consent of the Customer in the event PowerSchool hereafter effects a corporate reorganization, consolidates with, or merges into, any entity or transfers all or substantially all of its properties or assets to any entity. This Agreement will inure to the benefit of and be binding upon the Parties, their respective successors and permitted assigns.

**14.9 No Reliance**. Each Party acknowledges that it has not made any promise or representation that is not expressed in this Agreement; and that it has not been induced into entering this Agreement by any representation about the nature and extent of its existing or potential claims or damages made by the other Party or by the other Party's attorney, representative, or agent.

**14.10 Export Compliance.** Customer shall not use the Services for any reason if Customer or any User is subject to sanctions or otherwise designated on any list of prohibited or restricted parties, including but not limited to the lists maintained by the U.S. Government (e.g., the Specially Designated Nationals List and Foreign Sanctions Evaders List of the U.S. Department of Treasury, and the Entity List of the U.S. Department of Commerce), the European Union or its Member States, or other applicable government authority. Customer shall not use the Services to export or re-export any information or technology to any country, individual, or entity to which such export or re-export is restricted or prohibited.

**14.11 Anti-Corruption**. Neither Party has received or been offered any illegal or improper bribe, kickback, payment, gift, or thing of value from an employee or agent of the other party in connection with this Agreement. Reasonable gifts and entertainment provided in the ordinary course of business do not violate the above restriction.

**14.12 Relationship of the Parties**. This Agreement does not create a partnership, franchise, joint venture,

PowerSchool

agency, fiduciary or employment relationship between the Parties.

**14.13 Entire Agreement; Order of Precedence.** This Agreement and/or exhibits referenced herein, and any addendums and amendments, constitute the complete and entire agreement between the Parties with respect to its subject matter, and supersedes all prior, written or oral, discussions, understandings, arrangements, proposals, responses to proposals, and negotiations with respect to the same. The Parties acknowledge and understand that the disclaimers and limitations of liability set forth in this Agreement form an essential basis of the agreement between the Parties. The Parties agree that any term or condition stated in a Customer purchase order or in any other Customer order documentation (excluding Quotes and SOWs) is void. In the event of any conflict or inconsistency among the following documents, the order of precedence shall be: (1) the applicable executed Quote, (2) the body of this Agreement; and (3) any referenced and applicable exhibit, schedule, addendum, or amendment to this Agreement. Titles and headings of sections of this Agreement are for convenience only and shall not affect the construction of any provision of this Agreement.

**14.14 Third-Party Beneficiaries**. There are no third-party beneficiaries under this Agreement.

**14.15 Counterparts**. This Agreement may be executed electronically and in counterparts.

# EXHIBIT 48

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, California 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Zharna Shah (*pro hac vice*)
Taylor Rothman (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
zharna.shah@kirkland.com
taylor.rothman@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Ethan Joel Levinton (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
oliva.adendorff@kirkland.com
ethan.levinton@kirkland.com

*Attorneys for Defendant*
*PowerSchool Holdings, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EMILY CHERKIN, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>Defendant | CASE NO. 3:24-CV-02706-JD<br><br>**POWERSCHOOL HOLDINGS, INC.'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' NON-UNIFORM INTERROGATORIES 2, 3, 7, 8** |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendant PowerSchool Holdings, Inc. ("PowerSchool") hereby provides supplemental responses and objections to certain of

Plaintiffs' First Set of Non-Uniform Interrogatories, as well as the Definitions and Instructions incorporated therein (collectively the "Interrogatories" and individually the "Interrogatory"), which were served on PowerSchool on September 13, 2024.

## GENERAL OBJECTIONS AND CONDITIONS

The following General Objections and Conditions apply to each Interrogatory set forth below. Each Objection and Condition is hereby incorporated into the Response to each individually numbered Request as if fully set forth therein:

1. PowerSchool objects to the definitions of the following terms:

(a) PowerSchool objects to the definitions of "And" and "or" insofar as they request PowerSchool to interpret words contrary to their plain meaning.

(b) PowerSchool objects to the definitions of "Documents" and "All documents" to the extent the definitions purport to supersede the parties' agreed-upon forthcoming ESI Protocol or Stipulated Protective Order, including insofar as the definitions require production of exact duplicates. PowerSchool will interpret "Documents" and "All documents" consistent with the parties' forthcoming ESI Protocol and Stipulated Protective Order.

(c) PowerSchool objects to the definition of "Category of data" to the extent it attempts to impose an obligation to produce documents derivative of other documents until "the smallest discrete data element" is identified for any data referenced by such documents. PowerSchool further objects to the definition as overly broad to the extent that it includes data that is not Personally Identifiable Information ("PII"). PowerSchool agrees to confer with Plaintiffs as to a reasonable definition of this term.

(d) PowerSchool objects to the definition of "Communication(s)" as vague, ambiguous, overly broad, unduly burdensome, and disproportionate to the needs of discovery to the extent it purports to require PowerSchool to reference all forms of communications, regardless of burden and relevance. PowerSchool will interpret "Communication(s)" consistent with the parties' forthcoming ESI Protocol and Stipulated Protective Order and will only review such records as identified through a reasonable search.

(e) PowerSchool objects to the definitions of "Defendant" and "You" to the extent they refer to third parties, including any entity not controlled by PowerSchool and "person[s] … purporting to act on [PowerSchool's] behalf." PowerSchool further objects to the definitions of "You" and "Defendant" as vague, ambiguous, overly broad, unduly burdensome, and disproportionate to the needs of discovery to the extent that they purport to include entities other than PowerSchool. PowerSchool will interpret "Defendant" and "You" to include PowerSchool, its wholly owned subsidiaries, branches, divisions, officers, directors, employees, representatives, and persons acting on its behalf. PowerSchool further objects to the extent the definition seeks documents or information not within the direct possession or custody of PowerSchool and its employees, and objects to the extent documents are sought beyond that scope.

(f) PowerSchool objects to the definition of "Data" to the extent the definition covers types or categories of data not alleged to have been wrongfully collected, processed, or shared in the Plaintiffs' complaint, ECF No. 1 (the "Complaint"). PowerSchool further objects to the extent the definition concerns data not within PowerSchool's possession, custody, or control. PowerSchool further objects to the definition as overly broad to the extent that it includes data that is not PII. PowerSchool will interpret "Data" to mean, collectively, Customer Data, Collected Data, and Transaction Data, as those terms are defined in PowerSchool's Global Privacy Statement, available at https://www.powerschool.com/privacy/, and will respond as to the products and solutions offered to schools or school districts as alleged in the Complaint.

(g) PowerSchool objects to the definition of "Parent" or "parents" as overly broad to the extent it includes the parents who may not have legal custody over their child(ren) and parents or legal guardians of students who have not used the PowerSchool products or services purchased by schools or school districts at issue in the Complaint. PowerSchool will interpret "Parent" or "parents" to include only individuals who have legal custody over an individual attending grades K-12 in a public institution and who used PowerSchool products or services identified in the Complaint.

(h) PowerSchool objects to the definition of "Student" or "students" as overly broad in that it includes students who have not used the PowerSchool products or services at issue in the Complaint. PowerSchool will interpret "Student" or "students" to include only an individual attending grades K-12 in a public institution and who used PowerSchool products or services purchased by schools or school districts as alleged in the Complaint.

(i) PowerSchool objects to the definition of "Third party" as vague and ambiguous insofar as it includes persons or entities with whom PowerSchool has no contractual relationship, as the definition as written encompasses prospective partners. PowerSchool will interpret "Third-Party Partners" to refer to members of its Partner Program and any other entity with whom it has a direct contractual relationship for sharing, exchanging, disclosing, or using student or parent data.

2. PowerSchool objects to the Interrogatories to the extent they require PowerSchool to respond with information within the "custody, control or possession of [PowerSchool's] investigators, accountants, consultants, employees, attorneys or other agents" because such requests would require PowerSchool to (i) divulge information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, immunity, or protection ("privileged information") and (ii) muster all its evidence and conduct third-party discovery at the outset of this litigation. PowerSchool will not divulge any privileged information, and it will respond only with information presently available to it based on the limited investigation and discovery conducted to date.

3. PowerSchool objects to the Interrogatories to the extent they seek to impose on PowerSchool any duty or obligation that is inconsistent with or in excess of those that are imposed by the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, or any other applicable rule, court order, or case law. PowerSchool will respond to the Interrogatories in the manner required by the Federal Rules of Civil Procedure and any other applicable rule or case law. PowerSchool objects to Plaintiffs' attempt to impose an obligation to identify documents with any greater specificity than is necessary for Plaintiffs to locate said documents.

4. PowerSchool objects to Instruction No. 4 because it attempts to impose an obligation to identify documents with any greater specificity than is necessary for Plaintiffs to locate said person.

Where PowerSchool identifies a document or person in response to an Interrogatory, it will provide only the reasonable information necessary and sufficient to locate such document or person.

5. PowerSchool objects to Instruction No. 5 because it attempts to impose an obligation to identify people with knowledge to support an objection based on privilege. PowerSchool will not engage in discovery on discovery at this juncture.

**SPECIFIC RESPONSES AND OBJECTIONS**

Consistent with the foregoing General Objections and Conditions, and further subject to any specific objections made in connection with each of the below-numbered Interrogatories, PowerSchool responds to the Interrogatories as follows:

**INTERROGATORY NO. 2:**

For each product or solution identified in response to Interrogatory Request No.1 identify each CONTRACT you contend governs the relationship between YOU and a user of that product or solution, the effective date of each CONTRACT, and the termination date, if any, of each CONTRACT.

**RESPONSE TO INTERROGATORY NO. 2:**

Interrogatory No. 2 is an overbroad and unduly burdensome compound interrogatory. An interrogatory that contains "explicit and separately numbered or lettered" subparts or subparts that are "implicit and not separately numbered or lettered," must be treated as multiple interrogatories to preserve "the purposes of the numerical limit contained in Rule 33(a)." *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 443 (C.D. Cal. 1998); *see* Fed. R. Civ. P. 33 comm. notes to 1993 amend. (a) (explaining that the limit exists because interrogatories "can be costly and may be used as a means of harassment"). *See also Am. Bankers Ins. Co. of Fla. v. Nat'l Fire Ins. Co. of Hartford*, No. 4:19-cv-02237-HSG (KAW), 2020 WL 8996760, at *1-2 (N.D. Cal. July 9, 2020) (interrogatories requiring party to state, from four insurance policies, a quote of certain contract language and page number of certain provision, counted as eight separate interrogatories); *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 474-75 (N.D. Cal. 2004) (holding that a single interrogatory asking information about 26 allegedly infringing products constituted as 26 interrogatories). Interrogatory No. 2 comprises at least 26 separate interrogatories because, as explained below, it is asking for discrete information about 26 different products used by thousands of customers.

Subject to its objections and reserving all rights, PowerSchool supplements its response based on the three categories of information Plaintiffs stated they were seeking from this Interrogatory during the parties' December 19, 2024 conference: (1) a list of all PowerSchool customers; (2) Bates-stamped identification of the contracts PowerSchool will be producing pursuant to its sampling approach; and (3) Bates-stamped identification of any other agreements governing the relationship between PowerSchool and a user.

As to the first request, PowerSchool notes that such lists have already been produced to Plaintiffs as PWRSCHL_00002783, PWRSCHL_00002785, PWRSCHL_00007850, PWRSCHL_00008758, PWRSCHL_00008759, and PWRSCHL_00008760.

As to the second and third request, PowerSchool incorporates by reference its Responses and Objections to Interrogatory No. 1 and has produced documents responsive to this request under Fed. R. Civ. P. 33(d) as PWRSCHL_00161570 to PWRSCHL_00163120.

**INTERROGATORY NO. 3:**

For each product or solution identified in response to Interrogatory Request No. 1 identify each CATEGORY OF DATA collected by each product or service, and for each such CATEGORY OF DATA identify:

a) your educational interest in that CATEGORY OF DATA,

b) each THIRD PARTY to whom that CATEGORY OF DATA is disclosed, shared, sold, or otherwise used by, and

c) why you collect that CATEGORY OF DATA.

**RESPONSE TO INTERROGATORY NO. 3:**

Interrogatory No. 3 is an overbroad and unduly burdensome compound interrogatory because it requests information about 26 discrete products. An interrogatory that contains "explicit and separately numbered or lettered" subparts or subparts that are "implicit and not separately numbered or lettered," must be treated as multiple interrogatories to preserve "the purposes of the numerical limit contained in Rule 33(a)." *Safeco*, 181 F.R.D. at 443; *see* Fed. R. Civ. P. 33 comm. notes to 1993 amend. (a)

(explaining that the limit exists because interrogatories "can be costly and may be used as a means of harassment").

PowerSchool also objects to the term "collect" because PowerSchool products do not "collect" the data of their users in the way Plaintiffs allege in the complaint—*i.e.*, harvesting data from a student device, intercepting information, eavesdropping on communication, etc. Schools record student data in PowerSchool's products, use its products to store records, and/or access records in one PowerSchool product via a different product. For purposes of these Interrogatory Responses, PowerSchool will interpret this Interrogatory as seeking information about PowerSchool's processing of student records.

As limited by the foregoing objections and pursuant to the parties' discussions, PowerSchool will produce, pursuant to Fed. R. Civ. P. 33(d), the Data Privacy Impact Assessments ("DPIAs") for each product identified in Interrogatory No. 1, which identify the categories and uses of data relating to each such product. PowerSchool incorporates by reference its Response to Interrogatory No. 6 as to its educational interest in such data.

**INTERROGATORY NO. 7:**

Identify each entity YOU have acquired, whether by purchase, merger, or any other means, and for each entity so identified, identify the date of the acquisition, state the reason for the acquisition, describe the assets that were acquired, and describe how YOU integrated or otherwise made available any acquired product or service.

**RESPONSE TO INTERROGATORY NO. 7:**

PowerSchool objects to this Interrogatory because it is a compound interrogatory consisting of three separate requests: (1) for an identification of certain acquisitions; (2) for detail about the business justifications and considerations that led to each such acquisitions; and (3) for an explanation as to certain of PowerSchool's post-acquisition activities. *E.g.*, *Am. Bankers*, 2020 WL 8996760, at *1-2; *Collaboration Properties*, 224 F.R.D. at 474-75. PowerSchool will count this Interrogatory as three separate Interrogatories.

As limited by the foregoing, PowerSchool responds as follows:

- Hoonuit (October 2020) – PowerSchool acquired 100% of the unit capital of Hoonuit Holdings, LLC, and the purpose of the acquisition was to incorporate Hoonuit's advanced

analytics and data management tools with PowerSchool's existing suite of education technology solutions.

- Naviance (March 2021) – PowerSchool acquired 100% of the equity interests of Hobsons, Inc. Hobsons' businesses comprised of Naviance and Intersect. The purpose of the acquisition was to enhance and expand the PowerSchool product offering.
- Kickboard (December 2021) – PowerSchool acquired all of the equity interests of Kickboard, Inc. The purpose of the acquisition was to enhance and expand PowerSchool's product offering.
- Kinvolved (February 2022) – PowerSchool acquired all of the equity interests of Kinvolved, Inc. The purpose of the acquisition was to enhance and expand PowerSchool's product offering.
- Headed2 (June 2022) –PowerSchool acquired all of the equity interests of Headed2, LLC. The purpose of the acquisition was to enhance and expand PowerSchool's product offering.
- Chalk.com (May 2022) – PowerSchool acquired all of the equity interests of Chalk.com Education ULC. The purpose of the acquisition was to enhance and expand PowerSchool's product offering.
- Neverskip (August 2023) – PowerSchool acquired all of the equity interests of Jarulss Software Solutions Private Limited ("Neverskip"). The purpose of the acquisition was to enhance and expand PowerSchool's product offering.
- SchoolMessenger (October 2023) – PowerSchool acquired all of the equity interests of SchoolMessenger. The purpose of the acquisition was to enhance and expand PowerSchool's product offering.
- Allovue (January 2024) – PowerSchool acquired all of the equity interests of Allovue, Inc. The purpose of the acquisition was to enhance and expand PowerSchool's product offering.

As to each acquisition that resulted in PowerSchool obtaining a new product, PowerSchool made such product available by: (a) promoting the new product to existing customers; (b) assuming contracts with customers of any pre-acquisition entity; or (c) renegotiating contracts with customers of any pre-acquisition entity when appropriate.

**INTERROGATORY NO. 8:**

Identify all ways in which YOU monetize DATA collected from STUDENTS and PARENTS who use YOUR products or services.

**RESPONSE TO INTERROGATORY NO. 8:**

PowerSchool objects to the term "Data" as vague and ambiguous and overbroad, including insofar as it encompasses "Data" unrelated to Students or Parents who use PowerSchool products. PowerSchool will interpret "Data" to mean, collectively, Customer Data, Collected Data, and

Transaction Data, as those terms are defined in PowerSchool's Global Privacy Statement, available at https://www.powerschool.com/privacy/, and to the extent such Data is applicable to Students and Parents.

PowerSchool further objects to the term "monetize" as vague, ambiguous, and undefined, and because it presumes the validity of Plaintiffs' allegations, which are in dispute. PowerSchool will interpret the term "monetize" to mean "to sell" and not to include, for example, instances when a PowerSchool customer "directs [PowerSchool] to intentionally disclose personal information to another." *E.g.*, Cal. Civ. Code § 1798.140, subd. (t)(2)(A). PowerSchool additionally objects to this Request to the extent that it incorrectly contends that PowerSchool "collects" student data as opposed to processing such data on behalf of schools. As limited by the foregoing general and specific objections, PowerSchool responds that it does not sell data for money.

During the December 19, 2024 conference, Plaintiffs asked PowerSchool to interpret the Interrogatory as asking PowerSchool to describe its revenue streams. That is not how Plaintiffs wrote the Interrogatory. Plaintiffs asked PowerSchool for how it "monetizes Data," asking for revenue earned directly from Data, and PowerSchool responded to the question as written above. Nevertheless, in the spirit of compromise, PowerSchool will also respond to the Interrogatory as posed during the December 19, 2024 conference:

PowerSchool records four revenue streams: sale of product licenses or subscriptions with support, sale of professional consulting and implementation services, hardware sale, and other.

*First*, PowerSchool's primary source of revenue is its Software-as-a-Service product offerings made to school districts. The subscription software is provided via remote access, also referred to as "the cloud." The SaaS offering includes access to the hosted software, software maintenance, when-and-if available product updates/upgrades, and access to technical and developer support. Therefore, the product is accounted for as a service (*i.e.*, SaaS) and not as a software license, as the customer does not take possession of the software. The cloud-based software is provided to customers under an initial subscription pursuant to stated contract terms, generally lasting three years. Subscription fees are payable annually each of the three-year subscription periods and may increase by a CPI factor or a fixed percentage in subsequent periods after year one.

The Company's software offerings include a suite of different applications that are accessible via the PowerSchool platform. These applications allow educators, students, and administrators to effectively manage student data and school processes, and to connect diverse classroom technologies via a single centralized platform. The Company's sales offerings allow the customer to access the software through either a term subscription or via a perpetual license. The Company reports the revenue from these sales through either their '*Subscriptions and support'* (85-88% of annual revenue between 2020 and 2024) or '*License/other'* (2-4% of annual revenue) revenue line items, depending on how the software is sold.

*Second*, PowerSchool also generates revenue by providing professional consulting and implementation services in connection with the sale of software offerings. This stream accounts for 10-11% of PowerSchool's annual revenue. These services are identified as separate performance obligations within the sales contracts and are recognized through the '*Service'* revenue line in the statement of operations and comprehensive loss.

*Third*, PowerSchool records revenue for hardware sales and other ancillary activities related to the Company's software products; these sales are not expected to be material.

*Fourth*, PowerSchool classifies a small portion of its revenue as "other." Primarily, this is generated from its relationship with its independent software vendor partners.

Dated: March 31, 2025

/s/ *Taylor Rothman*
Taylor Rothman

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, California 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Zharna Shah (*pro hac vice*)
Taylor Rothman (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
zharna.shah@kirkland.com
taylor.rothman@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Ethan Joel Levinton (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
oliva.adendorff@kirkland.com
ethan.levinton@kirkland.com

*Attorneys for Defendant*
*PowerSchool Holdings, Inc.*

**VERIFICATION**

I declare under penalty of perjury that the Responses to Plaintiffs' Non-Uniform Interrogatories Nos. 2, 3, 7, and 8 are true and correct.

Dated: March 31, 2025

DocuSigned by:
/s/ Darron Flagg
A3AC3679AD71444...
Darron Flagg

**CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2025, I served the foregoing document to the following counsel of record via e-mail:

Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

Robert B. Carey
Leonard W. Aragon
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
rob@hbsslaw.com
leonard@hbsslaw.com

Julie Liddell
Andrew Liddell
EDTECH LAW CENTER PLLC
P.O. Box 300488
Austin, Texas 78705
Telephone: (737) 351-5855
julie.liddell@edtech.law
Andrew.liddell@edtech.law

*/s/ Taylor Rothman*
Taylor Rothman