1  Robyn E. Bladow
2  KIRKLAND & ELLIS LLP
   555 South Flower Street, Suite 3700
3  Los Angeles, CA 90071
   Telephone: (213) 680-8400
4  robyn.bladow@kirkland.com

5  Martin L. Roth, P.C. (*pro hac vice*)
6  Alyssa C. Kalisky, P.C. (*pro hac vice*)
   Zharna Shah (*pro hac vice*)
7  Amelia H. Bailey (*pro hac vice*)
   KIRKLAND & ELLIS LLP
8  333 West Wolf Point Plaza
   Chicago, IL 60654
9  Telephone: (312) 862-2000
10 martin.roth@kirkland.com
   alyssa.kalisky@kirkland.com
11 zharna.shah@kirkland.com
   amelia.bailey@kirkland.com
12
13 Olivia Adendorff, P.C. (*pro hac vice*)
   Cristina Martinez Squiers (*pro hac vice*)
14 Eugene Temchenko (*pro hac vice*)
   KIRKLAND & ELLIS LLP
15 4550 Travis Street
   Dallas, TX 75205
16 Telephone: (214) 972-1770
   olivia.adendorff@kirkland.com
17 cristina.squiers@kirkland.com
   eugene.temchenko@kirkland.com
18

19 *Attorneys for Defendant PowerSchool Holdings, Inc.*

20                    **UNITED STATES DISTRICT COURT**
                     **NORTHERN DISTRICT OF CALIFORNIA**
21                        **SAN FRANCISCO DIVISION**

22  EMILY CHERKIN, et al            )   CASE NO. 3:24-cv-02706-JD
23                                  )
        Plaintiffs,                 )   **DEFENDANT POWERSCHOOL**
24                                  )   **HOLDINGS, INC.'S NOTICE OF**
    v.                              )   **MOTION AND MOTION TO**
25                                  )   **EXCLUDE THE OPINIONS OF**
                                    )   **CATHERINE O'NEIL**
26  POWERSCHOOL HOLDINGS, INC.,     )
                                    )   Judge: Hon. James Donato
27      Defendant.                  )   Hearing Date: April 23, 2026
                                    )   Time: 11:00 a.m.
28                                      Courtroom: 11, 19th Floor

---

# NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on April 23, 2026, at 11:00am PT, or as soon thereafter as this matter may be heard, in the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, in Courtroom 11, 19th Floor, before the Honorable James Donato, Defendant PowerSchool Holdings, Inc. ("PowerSchool") will and hereby does move the Court to exclude Plaintiffs' proffered expert Catherine O'Neil and strike her expert report.

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ............................................................................................................. 2

    A. O'Neil summarizes PowerSchool products based on directions from Plaintiffs' counsel and opines that these products could not function without student data. .................................................................................................................. 2

    B. O'Neil opines that PowerSchool offers untested, ready-made algorithms that might be biased or inaccurate and "could" harm students. ............................ 3

    C. O'Neil testifies that she did not assess any PowerSchool algorithm, only partially read a handful of case materials, and is unaware of any actual harm resulting from a PowerSchool product. ................................................................ 4

III. LEGAL STANDARD ..................................................................................................... 6

IV. ARGUMENT .................................................................................................................. 7

    A. O'Neil's main opinion concerning the supposed risks of algorithms is unreliable because it is based on sheer speculation and untethered to the facts in this case. ........................................................................................................ 7

    B. O'Neil's opinion that PowerSchool products require student data requires no expertise and is, in any event, based on a misreading of PowerSchool documents. ....................................................................................................... 13

V. CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    613 F. Supp. 3d 1308 (S.D. Cal. 2020) ............................................................................... 14

*Biotech. Value Fund, L.P. v. Celera Corp.*,
    2015 WL 138168 (N.D. Cal. Jan. 9, 2015) .......................................................................... 14

*Brooks v. It Works Marketing, Inc.*,
    2022 WL 2217253 (E.D. Cal. June 21, 2022) ................................................................ 12, 13

*CZ Services, Inc. v. Express Scripts Holding Co.*,
    2020 WL 4518978 (N.D. Cal. Aug. 5, 2020) ....................................................................... 14

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ................................................................................................... 6, 9, 12

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ............................................................................................................ 6, 9

*Klein v. Meta Platforms, Inc.*,
    766 F. Supp. 3d 956 (N.D. Cal. 2025) .......................................................................... 6, 7, 12

*Ollier v. Sweetwater Union High Sch. Dist.*,
    768 F.3d 843 (9th Cir. 2014) ................................................................................................ 7

*Otto v. LeMahieu*,
    2021 WL 1615311 (N.D. Cal. Apr. 26, 2021) ..................................................................... 12

*Siqueiros v. Gen. Motors LLC*,
    2022 WL 74182 (N.D. Cal. Jan. 7, 2022) ............................................................................ 14

*United States v. Hermanek*,
    289 F.3d 1076 (9th Cir. 2002) .............................................................................................. 7

*White v. Ford Motor Co.*,
    312 F.3d 998 (9th Cir. 2002) .............................................................................................. 14

**Rules**

Fed. R. Evid. 702(b)-(d) ................................................................................................................ 6

## I. INTRODUCTION

Although retained as an "algorithmic auditor," Catherine O'Neil conducted no audit. She did not examine any algorithm or model involving a PowerSchool product. She didn't review any case materials other than portions of a single deposition and some documents she found to be mostly "gibberish." O'Neil communicated with no schools about the predictive models they use, the way they use them, and the actions they took based on those models. She does not know the names of the Plaintiffs or anything about their use (or lack thereof) of PowerSchool products. When asked at deposition whether her opinions about algorithmic risk were specific to any PowerSchool products, O'Neil emphatically answered: "No. No, not at all. Absolutely not. No." Rather, her opinions in this case are "extremely general statements about algorithmic harm." Ex. A, O'Neil Tr. 125:18-22, 133:10-18.

These admissions define the problem. Without any real-world analysis of PowerSchool's products, O'Neil offers two opinions in this case: (1) PowerSchool offers ready-made and untested algorithms that carry a *risk* of inaccuracy and bias and *might* cause harm to someone someday; and (2) PowerSchool products require student data to function. The Court should exclude both based on a lack of reliability and relevance in helping the trier of fact decide the issues in the case.

First, O'Neil's algorithm opinion is an irrelevant house of cards. It is based on numerous assumptions that have no support in this case. The undisputed evidence shows there is no such thing as a "ready-made" predictive algorithm because schools configure their own custom predictive models using their own data and preferences. The documents and PowerSchool witnesses explain this, but O'Neil did not bother to consult any of these sources. The rest of O'Neil's opinion is, by her own admission, pure assumption and speculation based on what she believes to be true of all of predictive algorithms—they *could* be opaque, inaccurate, and biased.

Moreover, even though Plaintiffs rely on O'Neil to demonstrate purported classwide harm, O'Neil makes clear that she "can't really talk about harms" without knowing how each school uses its algorithms. Ex. A, O'Neil Tr. 89:4-90:10. According to her, her opinion on the algorithms in PowerSchool products is really just about the *risks* of bias and inaccuracy. But she can't estimate or quantify these risks in any way. *Id.* at 130-133.

Second, O'Neil's opinion that PowerSchool products require student data to function is not an expert opinion. Any lay person can visit PowerSchool's website and deduce that, as an educational technology company, its products store and process student data. Regardless, O'Neil admitted at her deposition that she only included this opinion at the direction of Plaintiffs' damages expert who thought the point was "completely obvious." Ex. A, O'Neil Tr. 134-136.

Accordingly, the Court should exclude O'Neil's testimony in its entirety. Her testimony will not assist the Court at class certification and, if presented at trial, would risk confusing the trier of fact by conferring the imprimatur of expert authority on speculative assumptions or propositions needing no expertise.

## II. BACKGROUND

Plaintiffs retained Catherine O'Neil, who describes herself as an "algorithmic auditor," to "look into and form an opinion on PowerSchool's claims of having built and offering to sell to school systems algorithms that will predict, among other things, a student's chance of graduating." Ex. B, O'Neil Rep. 1. O'Neil proffers two main opinions: (1) PowerSchool offers products that "would not function" or "would have reduced functionality" without student data; and (2) PowerSchool offers "ready-made algorithms that predict the chances an individual student will graduate based on an opaque scoring system." *Id.* at 7, 9, 11-12, 15, 18-19, 22, 25. These algorithms, as with any other "predictive models," risk being inaccurate and racially biased. *Id.* at 27. According to O'Neil, PowerSchool could test algorithms to mitigate these risks, but it chooses not to. *Id.* at 28-30.

### A. O'Neil summarizes PowerSchool products based on directions from Plaintiffs' counsel and opines that these products could not function without student data.

O'Neil's report spans approximately 30 pages. About 22 of those pages are summary descriptions of nine different PowerSchool products. *Id.* at 2-25. Some of these products have nothing to do with algorithms, and O'Neil never explains in her report why she chose these particular products. In her deposition, O'Neil admitted that "counsel helped me with" the products she decided to describe in her report. Ex. A, O'Neil Tr. 47:14-21. The products listed, and the order they're listed in, match the products in Plaintiffs' motion for class certification. *Compare* Ex. B, O'Neil Rep. 2-24, *with* Dkt. 116 at 1 (motion for class certification).

For each of the 22 pages of product summaries, most of the page is taken up by screenshots of PowerSchool's public website. The other information comes from PowerSchool's Data Privacy Impact Assessments ("DPIAs"). *See* Ex. B, O'Neil Rep. 2-25. O'Neil incorrectly calls these documents "Data Processing Impact Reports," *id.*, and she testified that "a lot of it was gibberish to me to be clear. So when you said I read it, it doesn't mean I understood it all." Ex. A, O'Neil Tr. 45:10-21. O'Neil also relies on PowerSchool's "internal wiki when relevant." Ex. B, O'Neil Rep. 4. After describing the products, O'Neil concludes for each that "the product would not function effectively without access to student data." *Id.* at 4. In her deposition, O'Neil testified that Christopher Schulte, Plaintiffs' damages expert, "gave me th[is] opinion." Ex. A, O'Neil Tr. 135:1-136:12. According to O'Neil, Schulte "thinks it's completely obvious that these products need data - student data to work." *Id.* But he wanted "an official data expert to say that." *Id.* So O'Neil did.

**B.   O'Neil opines that PowerSchool offers untested, ready-made algorithms that might be biased or inaccurate and "could" harm students.**

For the last 5 pages of her report, O'Neil pivots to her algorithm opinion—the only one she specifies that she was retained to provide. Ex. B, O'Neil Rep. 1. She first concludes that "PowerSchool offers their customers ready-made algorithms that predict the chances an individual student will graduate based on an opaque scoring system that depends on data that the school is to provide." *Id.* at 25. This conclusion is based on one sentence from PowerSchool's website and one paragraph of testimony from PowerSchool's corporate representative. *Id.* O'Neil states clearly that these are her only "two sources of evidence for this." *Id.* The testimony excerpt involves a discussion about feature testing on a *de-identified* database (in other words, data not tied to any identified student). *Id.* O'Neil concludes that the excerpt "supports a finding" that the dataset "was used to train algorithms." *Id.* As she sees it, "[t]here would be no reason to build a de-identified dataset" to test features "unless they use it to test and train algorithms for their clients." *Id.*

In her deposition, O'Neil admitted that the corporate representative testimony she relies on says nothing about training algorithms. Ex. A, O'Neil Tr. 109:4-18. She also conceded that someone could use a de-identified dataset for reasons other than training algorithms, such as "using it for [] descriptive types of statistics" or for demonstrating new features. Ex. A, O'Neil Tr. 111:12-22. But

she's making an "assumption" that the dataset is used for training algorithms even though she does not know what data is in the set, how large the dataset is, or what other PowerSchool witnesses testified about the dataset and how it is used. Ex. A, O'Neil Tr. 110-119.

As to her statement that PowerSchool offers ready-made algorithms that are "based on an opaque scoring system," O'Neil testified that this is her belief about any predictive model that has an "early warning system." Ex. A, O'Neil Tr. 124:10-125:22. This opinion is "not at all" unique to any PowerSchool product. *Id.*

O'Neil next concludes that algorithms in PowerSchool's products "risk being inaccurate and racially biased." Ex. B, O'Neil Rep. 27. This opinion is based on her belief that "the ingredients" in any prediction of whether an individual student will graduate high school, such as behavior or test scores, are the problem. *Id.* at 27-28. That is because of "unintentional implicit bias" in statistics about students. *Id.* Based on these "sources of bias," O'Neil states that the "predictive algorithms that PowerSchool provides" must be "working against students of color." *Id.* at 28. (Notably, Plaintiffs class definitions are in no way limited by students' race or ethnicity.)

Finally, O'Neil concludes, again based on a few sentences of testimony from PowerSchool's corporate representative, that PowerSchool does not test its algorithms for "accuracy or fairness." *Id.* She believes this lack of testing "is unreasonable" and that testing the algorithms "would be relatively easy and inexpensive." *Id.* at 28, 30. O'Neil notes that she has not tested PowerSchool's algorithms, but if she was "given sufficient data," she "could" conduct a seven-step process. *Id.* at 29-30. That auditing would require, among many other things, "all of the graduation predictions" available to teachers and administrators, the scores and the races of all students, and "probably a written description of the behavior" of every student. *Id.* at 29-30.

**C.  O'Neil testifies that she did not assess any PowerSchool algorithm, only partially read a handful of case materials, and is unaware of any actual harm resulting from a PowerSchool product.**

O'Neil confirmed in her deposition that she has "not done any analysis on PowerSchool's algorithms." Ex. A, O'Neil Tr. 83:10-12. Nor has she audited any algorithms. *Id.* at 38:10-13. She did not realize that discovery was closed in the case and that she would not get another opportunity to "learn about stuff" related to any algorithms in PowerSchool's products. *Id.* at 38:2-23.

O'Neil also testified that her report includes a "Materials Considered" list in Appendix A, but the list does not reflect what she actually reviewed. Rather, the list represents what Plaintiffs' counsel sent her, and she "didn't read it all." Ex. A, O'Neil Tr. 51:5-11. She did not prepare Appendix A herself and did not verify that it corresponded to the sources cited in her report. *Id*. at 60:23-61:3. She further testified that she did not read all of the materials that counsel provided to her because: "[O]h my God this is way too much stuff. So I didn't read it all. I sound like a bad expert, but like I just— I just didn't think I needed to read it all, so I didn't." *Id*. at 51:5-14.

Despite listing them among the materials considered, she did not read PowerSchool's interrogatory responses and testified that she did not "even know what an interrogatory is." *Id*. at 55:5-12. She confirmed that she did not review other written discovery provided by PowerSchool. *Id*. at 54:19-55:9. She did not review, let alone analyze, any data. *Id*. at 59:17-20. Nor did she review the depositions of the named Plaintiffs, *id*. at 52:17-20, or the deposition of Mr. Maharana, the engineering vice-president responsible for the relevant analytics platforms. *Id*. at 53:4-6. In fact, O'Neil could not even recall whether she reviewed the Complaint. *Id*. at 63:11-19.

The only case-specific materials she definitively reviewed were the deposition of Darron Flagg (PowerSchool's Chief Privacy Officer and Rule 30(b)(6) witness), certain DPIAs, and publicly available website materials. As to the Flagg deposition, she was "not sure" she read it in full. *Id*. at 50:5-11. She later questioned whether Mr. Flagg was a named Plaintiff. *Id*. at 52:8-14. With respect to the DPIAs, she acknowledged that portions were "gibberish" to her and that reading them did not mean she "understood it all." *Id*. at 44:23-45:15. As to the website materials, she testified that she initially "didn't see proof" of predictive algorithms and did not know whether she could serve as an expert until receiving "help" from Plaintiffs' counsel. *Id*. at 36:21-37:11.

O'Neil also testified that she does not know the Plaintiffs' names, where they attended school, what PowerSchool products they used, or whether any Plaintiff received the graduation likelihood analysis central to her report. *Id*. at 64:1-65:15. She did not speak with any named Plaintiff or other fact witness. *Id*. at 42:13-16, 63:23-25. When asked about her familiarity with the Plaintiff named first in the case caption, Emily Cherkin, she stated, "I saw a word—the word 'Cherkin' is like

resonating with me right now." *Id*. at 127:17-19. Despite offering opinions concerning racial bias, she does not know the race of any named Plaintiff. *Id*. at 64:18-23.

Finally, O'Neil testified that she is unaware of any actual harm resulting from an algorithm in a PowerSchool product. Plaintiffs' counsel could identify no such harm when she specifically requested examples from counsel of "actual harm" or "actual use cases" involving PowerSchool's predictive tools. *Id*. at 62:7-22, 102:18-25, 103:1-6. O'Neil made clear that she does not, and could not, offer an opinion about harm unless she knew how schools were using the algorithms. *Id*. at 132:10-133:2. Rather, her opinions are "extremely general" and focused on risks. *Id*. at 130-133. But she cannot "estimate the risks[s]" other than to say they are "larger than zero." *Id*. 130:14-22.

Plaintiffs rely on O'Neil's opinions in their motion for class certification to argue that: (1) The use of PowerSchool products to generate "predictions or insights" is "actionable" because of the risks identified in O'Neil's report; and (2) these risks present a common injury across the proposed classes. Dkt. 116 at 5, 16. In other words, Plaintiffs' rely on O'Neil to demonstrate common proof of both liability and damages.

## III. LEGAL STANDARD

The district court serves as gatekeeper to ensure that proposed expert testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Relevance, or "fit," requires the testimony to be tied to the facts of the case in a way that assists the trier of fact in resolving a disputed issue. *Id.* at 591. Reliability requires more than generalized expertise or subjective belief. The expert must ground her opinion in sufficient case-specific facts and apply a reliable methodology to these facts. *See* Fed. R. Evid. 702(b)-(d); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Where there is too great an analytical gap between the record data and the proposed expert's opinion, the opinion should be excluded. *See Gen. Elec. Co.*, 522 U.S. at 146.

These standards apply with equal force at class certification. The Court must ensure that expert testimony offered to establish Rule 23 requirements is reliable and relevant. *See Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 959 (N.D. Cal. 2025) (Donato, J.) (excluding unreliable expert testimony and denying class certification where it "rises or falls on the validity and reliability of the opinions" of the expert).

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' EXPERT O'NEIL                    6                    CASE NO. 3:24-CV-02706-JD

## IV. ARGUMENT

Both of O'Neil's opinions should be excluded. First, her opinion that PowerSchool offers untested, ready-made algorithms that risk being inaccurate or biased is unreliable. O'Neil did not assess a single PowerSchool product, much less any algorithm, or how a school uses a particular product or algorithm. In other words, she has no methodology. This opinion is just a sandcastle—constructed entirely of assumptions either unsupported or directly contradicted by the record. Second, her opinion that PowerSchool products need student data to function requires no expertise. Her basis for this opinion is over 20 pages of screenshots from PowerSchool's public website and misstatements about the Data Privacy Impact Assessments that PowerSchool provides its customers. Thus, neither opinion is reliable or able to assist the trier of fact.

### A. O'Neil's main opinion concerning the supposed risks of algorithms is unreliable because it is based on sheer speculation and untethered to the facts in this case.

If an expert's opinions "do not rest on a sufficient factual foundation and are 'speculative,'" those opinions are "inherently unreliable." *Klein*, 766 F. Supp. 3d at 961 (citing *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014)); *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002). The Court should exclude O'Neil's core opinion—that PowerSchool provides "ready-made," untested algorithms that carry a risk of bias and inaccuracy—for this very reason.

To reach this opinion, O'Neil makes the following leaps: (1) PowerSchool provides schools with "ready-made algorithms that predict the chances an individual student will graduate;" (2) those algorithms are "based on an opaque scoring system that depends on data that the school is to provide;" (3) those algorithms carry risks of inaccuracy and bias; (4) and PowerSchool could easily and cheaply test these algorithms, but it chooses not to. The problem is that each of these premises is either sheer speculation or directly contradicted by the record in this case—a record O'Neil concedes she did not review in any detail.

*First*, there is nothing in the record to support O'Neil's claim that PowerSchool provides "ready-made algorithms." O'Neil bases this false statement on just two pieces of information—neither of which support the proposition. The first is a one-sentence marketing statement that the Analytics

& Insights product "uses multiple PowerSchool-designed algorithms." Ex. B, O'Neil Rep. 25. But O'Neil's reasoning conflates different terminologies.

Throughout her report, O'Neil uses the terms "algorithm," "predictive algorithm," and "predictive model" interchangeably even though these terms are not synonymous. An algorithm is a general set of computational instructions; a predictive model reflects the application of such instructions to historical data through feature selection, training, validation, and calibration. Ex. C, White Rebuttal Rep. ¶ 17. Thus, when O'Neil claims that PowerSchool offers "ready-made algorithms that predict" possible graduation outcomes, she really means that PowerSchool offers predictive models. O'Neil admits that building such a model requires "absolutely tons" of specifications and design choices. Ex. A, O'Neil Tr. 30:7-16.

Regardless, even her overly simplistic use of the word "algorithm" requires "historical data and a definition of 'success.'" Ex. B, O'Neil Rep. 2. In other words, for an algorithm to predict anything, it needs historical data. O'Neil never explains how PowerSchool could offer "ready-made" predictive algorithms about the "the chances an individual student will graduate" when those algorithms would require very specific historical data from the schools on their own students. There is simply nothing "ready-made" about a predictive model.

In fact, the website O'Neil cites (at 25 n.2) makes this point clear by stating that the models *schools can build* using PowerSchool products are "based on your district's historical data and other critical factors."[1] The website also notes that these models are "district-specific" and require the "district's data to develop predictions."[2] Another page of PowerSchool's website, speaking to schools, clearly explains that "you should be able to use your own district's data to develop predictions.… Doing so makes you more likely to predict accurate outcomes based on your district's historical data

---

[1] *PowerSchool Risk Analysis*, https://www.powerschool.com/product-demo/risk-analysis/ (last visited March 9, 2026).

[2] *PowerSchool Risk Analysis*, https://tinyurl.com/42wanben.

1  and other factors that matter most in your system."³  Thus, even O'Neil's own "source" for her
2  statement about "ready-made" algorithms undermines that very statement.

3  Further, the engineer responsible for the analytics product O'Neil references testified that
4  predictive models are configured for individual customers, and there is no "out-of-box" (i.e. ready-
5  made) predictive setting.  Ex. D, Maharana Tr. 46:14-48:20, 63:8-10.  O'Neil did not review this
6  testimony (or any testimony provided by this engineer) even though it directly relates to her opinions.
7  Ex. A, O'Neil Tr. 53:4-6.

8  O'Neil's second "source of evidence" is even worse.  She infers that PowerSchool's sole set
9  of de-identified data must have been used to train predictive algorithms because there "would be no
10 reason to build a de-identified dataset … unless they use it to test and train algorithms." Ex. B, O'Neil
11 Rep. 25.  The Court should reject this tautology.  *See Gen. Elec. Co.*, 522 U.S. at 146 ("[N]othing in
12 either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence
13 that is connected to existing data only by the ipse dixit of the expert.").

14 Not only is it circular reasoning, but it also contradicts the record.  O'Neil admitted that her
15 cite for this proposition—testimony from PowerSchool's 30(b)(6) witness—does not state that this
16 dataset was used to test or train algorithms.  Ex. A, O'Neil Tr. 109:4-11.  She also agreed that the
17 dataset could have been used for other purposes, including demonstrations, feature testing, or
18 performance testing.  *Id*. at 114:9-25.  Indeed, the excerpt from the 30(b)(6) deposition she cites
19 explains that the dataset is in fact used for these other purposes.  Ex. B, O'Neil Rep. 25.  O'Neil did
20 not speak with anyone about why the dataset was created, does not know the size of the dataset, and
21 did not examine any model allegedly trained on the dataset.  *Id*. 117:15-21, 117:22-118:6, 118:7-23.
22 Ultimately, she conceded that her conclusion was an assumption: "I'm assuming that the [de-
23 identified] dataset was collected for that purpose." *Id*. 117:20-22.

24 In short, O'Neil has no support for her statement that PowerSchool offers "ready-made"
25 algorithms that can predict the chances an individual student will graduate.  Such a prediction, even
26 by O'Neil's own definition of algorithm, could *never* be ready made.

---

³ *How to Boost Your Students' On-Time Graduation Rates*, https://www.powerschool.com/blog/how-to-boost-your-students-on-time-graduation-rates/ (last visited March 9, 2026).

***Second,*** O'Neil conceded that her statement that the "ready-made algorithms" are "based on an opaque scoring system" is an assumption from her general beliefs about all algorithms. She admitted that this assumption had nothing to do with PowerSchool's products in particular ("No. Not, not at all. Absolutely not. No.") and that she "would say that about any early warning system." *Id.* 125:19-22; 126:4-6 ("Q. And you're assuming that that scoring system is opaque, fair? A. That's fair."). Indeed, her assumption could not be specific to PowerSchool's products because, in her own words: "I have not done any analysis on PowerSchool's algorithms." *Id.* at 83:11-12. Thus, this premise is also unsupported by the facts in this case.

***Third,*** O'Neil's statement that the algorithms used in PowerSchool's products carry risks of inaccuracy and bias is also just an assumption based on her general views. At deposition, O'Neil acknowledged that these opinions are "extremely general statements about algorithmic harm" and that she "would say that about any early warning system." Ex. A, O'Neil Tr. 125:15-22; 133:10-18. Again, she did not assess any PowerSchool product or how any school configured any PowerSchool product. Nor did she assess whether the supposed risks of bias or inaccuracy have materialized in any way based on anyone's use of a PowerSchool product. *Id.* at 70:21-71:12; 95:14-96:9, 99:15-23, 129:17-130:11. The only specific examples of bias or inaccuracy she provides come from news articles and academic commentary that have nothing to do with PowerSchool. *See, e.g.*, Ex. B, O'Neil Rep. 29 nn. 68-69; Ex. A, O'Neil Tr. 91:7-16 (Q. Are you aware of any schools that have shared information from a PowerSchool product with a police department? A. Not from a PowerSchool product, but I do think in my report I refer to a different school system.").

Moreover, O'Neil improperly attributes these risks to PowerSchool even though she concedes that schools are "making [the] final choices to make the algorithms work with their data." Ex. A, O'Neil Tr. 21:16-25:2. Her report, while placing the blame on PowerSchool, simultaneously says that the "various risks to students" are caused "by the use of algorithms by their schools or by third party entities." Ex. B, O'Neil Rep. 1. This internal inconsistency undermines her opinion.

But even if O'Neil's "risk" analysis was proper, no harm can be inferred from O'Neil's opinions. Indeed, O'Neil herself rejected such an application of her report: "I'm definitely providing my opinion on risk… So to be clear, I'm not claiming there has been harm or there will be harm."

Ex. A, O'Neil Tr. 86:13-87:12.  O'Neil further testified that "the only possible way [an algorithm] could be harmful to a student is if a teacher or an administrator acts on it in a certain way." *Id.* 89:19-22; *see also id.* at 94:10-95:3 (harm depends on "how the school is using it").  She even "asked if [Plaintiffs' counsel] knew of actual harm that had been perpetrated by some of these algorithms or actual stories of harm or actual use cases for these. And they didn't have them for me." *Id.* at 62:7-14.  Thus, all O'Neil offers is hypothetical risks based on schools' final actions (which are, of course, entirely out of PowerSchool's control).

**Fourth,** O'Neil states that PowerSchool could easily and cheaply test any algorithms, but it chooses not to.  Ex. B, O'Neil Rep. 30.  But she did not test any of PowerSchool's algorithms and provides no reason that she assumes such testing could be done at all, much less in a "relatively easy and inexpensive" way. *Id.*

Additionally, O'Neil's list of things she "could do," but didn't, to audit any algorithms undermines her own conclusion that PowerSchool should be doing such an analysis.  O'Neil prescribes a complicated seven-step process that she "could do" if "given sufficient data." *Id.* at 29-30.  The first step alone requires "all of the graduation predictions at whatever time(s) they were available to teachers and administrators of a given school," as well as "the information of whether the student graduated or not at the appropriate time." *Id.* at 29.  For another step, O'Neil wants "a written description of the behavior by the school representative" for every student affected. *Id.* at 30.  Indeed, every step she mentions is based on troves of data from the school about their particular students.  If she wanted to assess the accuracy of any model, she claims she would need "like 10,000 or more data points." Ex. A, O'Neil Tr. 130:25-132:4.

O'Neil went even further in her deposition, admitting that assessing these predictive models "require[s] usage knowledge, like the context of how it's being used" at each school. *Id.*  In her words, any "graduation alert system"—the only model her report is specifically concerned about—is different at every school:

> [N]ot every school is going to collect the same exact data elements, so the choice of the data elements, the weightings of the data elements, how much do we care about this versus that, the threshold and, of course, the students' data. Those are most obvious choices, but there's probably other configurations, like how its presented, whether it's a daily report or a monthly report, or is it an e-mail to a teacher or is it an e-mail to the

      principal. Is it—and, of course, there's also the question of how it's used. It could be used in many, many ways."

Ex. A, O'Neil Tr. 121:7-24.  How PowerSchool would go about testing each of the individual configurations of any predictive model across tens of thousands of schools who can and do configure their models in countless ways is anyone's guess. O'Neil certainly does not say.

* * *

      All in all, the core of O'Neil's entire expert report—that PowerSchool offers untested ready-made algorithms that may result in bias or inaccuracy—has no credible basis.  O'Neil didn't assess any algorithm or any school's implementation of any algorithm, so there is no methodology the Court can even evaluate.  Rather, O'Neil stacks unsupported assumption on top of unsupported assumption. As demonstrated above, just a simple probing into any of the premises of her main conclusion causes the entire opinion to fall apart.  Her opinion therefore does "not add anything,"—"[s]he merely regurgitates information untethered to any methodology and is otherwise speculative.  This is exactly the type of testimony that fails under the *Daubert* standard—even at the class certification stage." *Otto v. LeMahieu*, 2021 WL 1615311, at *5 (N.D. Cal. Apr. 26, 2021) (excluding expert testimony as "inherently unreliable" where expert "concedes he has no specific experience with the" platform at issue and based his opinion instead on "his general experience").

      The Court should therefore reject O'Neil's opinion that PowerSchool offers ready-made, untested algorithms that risk being biased or inaccurate.  The Court should also reject any downstream conclusions from this opinion, such as Plaintiffs' argument that there is "actionable" harm to the prediction class based on these supposed risks.  *See* Dkt. 116 at 5, 16; *Klein*, 766 F. Supp. 3d at 964-68 (excluding expert opinion and resultantly denying class certification for lack of common proof of harm where the experts' conclusions were nothing "more than a fanciful application of economic theory untethered to real-world evidence" in the case); *Brooks v. It Works Marketing, Inc.*, 2022 WL 2217253, at *5 (E.D. Cal. June 21, 2022) (refusing to credit expert declarations on "possible harms that the public *might* face," finding them "speculative and ... not specific to plaintiff." (emphasis added)).

**B.  O'Neil's opinion that PowerSchool products require student data requires no expertise and is, in any event, based on a misreading of PowerSchool documents.**

Despite being an "algorithmic auditor" retained to analyze PowerSchool's algorithms, *see* Ex. B, O'Neil Rep. 29, O'Neil spends the bulk of her report summarizing how numerous PowerSchool products function, including those that do not use predictive algorithms. For nine different products, she summarizes a website description of the product and the type of data supposedly used in the product. *Id.* at 2-25. She then concludes, for each, that they "would not function effectively without access to student data." *Id*. at 4. But stating that PowerSchool—an educational technology company—offers products that use student data requires no expertise. Nonetheless, O'Neil's opinion is still flawed because it is based on a fundamental misunderstanding of PowerSchool's DPIAs.

First, it is unclear why any expertise, much less O'Neil's "algorithmic auditing" expertise, is needed for the statement that PowerSchool products require and use student data. Any lay person could visit PowerSchool's website and see the various products it offers, including ones that help schools track student enrollment and others that help schools deliver and grade student assessments.[4] It is telling that more than half of O'Neil's report—16 of the 31 pages—is simply screenshots from PowerSchool's public website.

O'Neil admitted as much in her deposition. She explained that Plaintiffs' damages expert, Christopher Schulte, directed that her report should state that the products "require student data," because he wanted "an official data expert to say" that "even though he thinks it's completely obvious that these products need data - student data to work." Ex. A, O'Neil Tr. 136:2-12. Schulte is correct that this point is "completely obvious." He did not even cite O'Neil's report in his own report.

Second, O'Neil relies on DPIAs to support her conclusion that PowerSchool products collect and require various types of student data, but this reliance is misplaced. O'Neil refers to these documents as "Data Processing Impact Reports" when they are actually "Data Privacy Impact Assessments." Even by the way she mislabels the document, O'Neil assumes what data is processed in a certain product. But DPIAs simply provide a "framework" for "vendors to document how they

---

[4] *All PowerSchool Products*, https://www.powerschool.com/solutions/products/ (last visited March 9, 2026).

have addressed privacy considerations in the tools they offer and to support their customers' own compliance programs." Ex. C, White Rebuttal Rep. ¶ 11. The documents themselves "confirm that PowerSchool's customers decide what fields to enable, what data import, and which functions to activate." *Id.* ¶ 12. As the rebuttal to O'Neil's report explains, her "statements that these tools would not function without student data set forth in the DPIA is based on a fundamental misunderstanding of the purpose of DPIA reports and PowerSchool's role as a service provider." *Id.* at 5. It is unsurprising that O'Neil's report misinterprets the DPIAs, considering that she testified that they were largely "gibberish" to her. *See* Ex. A, O'Neil Tr. 45:10-15.

Thus, O'Neil's purported opinion about how various PowerSchool products need student data is unnecessary and inaccurate. Courts in this District often exclude expert testimony, like O'Neil's, that amounts to little more than descriptive recitation. In *CZ Services v. Express Scripts Holding*, this Court excluded testimony that was "akin to percipient witness observations" (what the "expert" observed in documents and site visits), rather than "a matter of specialized analysis or inquiry." 2020 WL 4518978, at *2 (N.D. Cal. Aug. 5, 2020). When an expert "does little more than read depositions and deposition exhibits and other such materials" and then offer conclusions untethered to a reliable methodology, exclusion is warranted. *Biotech. Value Fund, L.P. v. Celera Corp.*, 2015 WL 138168, at *1-3 (N.D. Cal. Jan. 9, 2015); *see also Siqueiros v. Gen. Motors LLC*, 2022 WL 74182, at *10 (N.D. Cal. Jan. 7, 2022) (excluding portions of expert report that "consist[ed] of unadorned restatements or summaries of evidence already in the record" as "not appropriate under Rule 702").

What O'Neil does here is even worse than in these other cases because her "opinion" about student data does not come from a simple recitation of case materials. *Id.* She admitted she read essentially nothing in the case—not even the Complaint. Instead, O'Neil bases this opinion exclusively on public materials and a misunderstanding of the DPIAs.

The Court should therefore reject O'Neil's opinions about whether and to what extent PowerSchool products contain student data, as these are not expert opinions. *White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002) (explaining that a "lay[person], which is what an expert witness is when testifying outside of [her] area of expertise, ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion." ); *see also Aya*

*Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322-23 (S.D. Cal. 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021) (excluding expert testimony where factfinder was "capable of evaluating the same evidence and drawing conclusions without [the expert's] testimony").

## V.  CONCLUSION

For all these reasons, PowerSchool respectfully requests that the Court exclude the testimony and report of Catherine O'Neil in its entirety. Her testimony will not assist the Court at class certification and, if presented at trial, would risk conferring unwarranted expert authority on speculative and baseless assumptions.

| | | |
|---|---|---|
| 1 | DATED: March 9, 2026 | Respectfully submitted, |
| 2 | | KIRKLAND & ELLIS LLP |
| 3 | | */s/ Olivia Adendorff* |
| 4 | | Olivia Adendorff, P.C. |

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Zharna Shah (*pro hac vice*)
Amelia Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
zharna.shah@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' EXPERT O'NEIL                           16                    CASE NO. 3:24-CV-02706-JD