Robyn E. Bladow
Kirkland & Ellis LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Zharna Shah (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
zharna.shah@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
Kirkland & Ellis LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| EMILY CHERKIN, et al | ) | CASE NO. 3:24-cv-02706-JD |
| Plaintiffs, | ) ) | **DEFENDANT POWERSCHOOL** |
| | ) | **HOLDINGS, INC.'S NOTICE OF** |
| v. | ) | **MOTION AND MOTION TO** |
| | ) | **EXCLUDE THE OPINIONS OF** |
| POWERSCHOOL HOLDINGS, INC., | ) | **DR. K. SUZANNE BARBER** |
| Defendant. | ) ) ) ) | Judge: Hon. James Donato Hearing Date: April 23, 2026 Time: 11:00 a.m. Courtroom: 11, 19th Floor |

## NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on April 23, 2026, at 11:00am PT, or as soon thereafter as this matter may be heard, in the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, in Courtroom 11, 19th Floor, before the Honorable James Donato, Defendant PowerSchool Holdings, Inc. ("PowerSchool") will and hereby does move the Court to exclude Plaintiffs' proffered expert K. Suzanne Barber and strike her Expert Report.

## **TABLE OF CONTENTS**

I.    Introduction ...................................................................................................................1

II.   Background ....................................................................................................................2

    A.    Opinion 1: Whether PowerSchool processes "sensitive" data.....................................3

    B.    Opinions 2-3: Whether PowerSchool exposes PII.......................................................5

    C.    Opinion 4: Whether PII can cause harm. ....................................................................5

    D.    Opinion 5: Whether PowerSchool's data processing exposes students to harm. ........6

III.  Legal Standard ..............................................................................................................7

IV.   Argument .......................................................................................................................8

    A.    Dr. Barber's opinions are not the product of reliable expert methodology. ................8

        1.    Opinion 1:  Dr. Barber failed to investigate actual uses of PowerSchool products as is necessary to assess what data PowerSchool hosts and whether it is sensitive................................................................................................................8

        2.    Opinion 2-3:  Dr. Barber failed to assess PowerSchool's data processing practices as is necessary to opine on risks of exposure. ...............................10

        3.    Opinion 4:  Dr. Barber offered no method for associating UTCID's data crimes with PowerSchool's data processing. ............................................................11

        4.    Opinion 5:  Dr. Barber's calculation of monetary value and risk of exposure based on the UTCID database is based on ipse dixit, riddled with errors, and lacks sound foundation. ...............................................................................11

        5.    Dr. Barber's errors and shifting theories make her unreliable........................12

    B.    Dr. Barber cannot offer a factual narrative on what data PowerSchool holds and how data has been misused in data fraud cases in the guise of expert testimony...........................13

    C.    Dr. Barber's opinions fail the "fit" test.....................................................................15

V.    Conclusion. ..................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R&R Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002).................................................................................10

*In re Apple Inc. Sec. Litig.*,
  2023 WL 4556765 (N.D. Cal. July 17, 2023)......................................................15

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  613 F. Supp. 3d 1308 (S.D. Cal. 2022), *aff'd*, 9 F.4th 1102 (9th Cir. 2021)...........14

*Clear Channel Outdoor, Inc. v. Bently Hldgs. Cal. LP*,
  2011 WL 6099394 (N.D. Cal. Dec. 7, 2011)........................................................15

*CZ Services, Inc. v. Express Scripts Holding Co.*,
  2020 WL 4518978 (N.D. Cal. Aug. 5, 2020) ...............................................9, 11, 15

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)......................................................................................8, 13

*Dep't of Toxic Substances Ctrl. v. Technichem, Inc.*,
  2016 WL 1029463 (N.D. Cal. Mar. 15, 2016).....................................................14

*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*,
  2022 WL 254348 (N.D. Cal. Jan. 27, 2022) .......................................................13

*Elsayed Mukhtar v. Cal. State Univ.*,
  299 F. 3d 1053 (9th Cir. 2002) .............................................................................8

*Engilis v. Monsanto Co.*,
  151 F.4th 1040 (9th Cir. 2025) ............................................................................7

*GPNE Corp. v. Apple, Inc.*,
  2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ......................................................9

*Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*,
  2021 WL 12255004 (E.D. Mich. Sept. 29, 2021).................................................10

*Klein v. Meta Platforms, Inc.*,
  766 F. Supp. 3d 956 (N.D. Cal. 2025) ..................................................................7

*Koger v. Costco Wholesale Corp.*,
  2023 WL 8188842 (N.D. Cal. Nov. 27, 2023) ...............................................8, 14

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)............................................................................................8

*Lord Abbett Mun. Income Fund, Inc. v. Asami*,
  2014 WL 3417941 (N.D. Cal. July 11, 2014) ........................................................13

*Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*,
  713 F. Supp. 3d 660 (N.D. Cal. 2024) ...................................................................7

*Siqueiros v. GM LLC*,
  2022 WL 74182 (N.D. Cal. Jan. 7, 2022) ..............................................................14

*Sonneveldt v. Mazda Motor of Am., Inc.*,
  2024 WL 5242611 (9th Cir. Dec. 30, 2024) ....................................................11, 12

*Townsend v. Monster Beverage Corp.*,
  303 F. Supp. 3d 1010 (C.D. Cal. 2018) ..................................................................7

*In re Toyota Motor Corp.*,
  978 F. Supp. 2d 1053 (C.D. Cal. 2013) ......................................................9, 10, 11

*Waymo LLC v. Uber Techs., Inc.*,
  2017 WL 5148390 (N.D. Cal. Nov. 2, 2017) .........................................................14

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000).................................................................................................8

**Rules**

Fed. R. Evid. 702 ..........................................................................................7, 8, 10

## I.    INTRODUCTION

Plaintiffs proffer Dr. K. Suzanne Barber, a software engineering professor at the University of Texas, to "consider issues regarding data controlled, shared and processed by PowerSchool products." Ex. A, Barber Rep. ¶ 5.    Plaintiffs are suing PowerSchool Holdings, Inc. ("PowerSchool") under California state-law claims for invasion of privacy and unjust enrichment based on PowerSchool's storage and processing of student data for school districts.    *See* Dkt. 18, 21 (class certification motion); Dkt. 1 at 69, 85 (claim allegations).    Plaintiffs assert that Dr. Barber's report establishes two points relevant to commonality and causation for class certification: (1) that "PowerSchool's products" "collect" "minimum data elements"; and (2) that PowerSchool's "controlling and processing of" "even the minimum data fields" "expose[s]" "students" to "diverse, longstanding, and significant harm." Dkt. 116 at 16 n.84, 20.

But Dr. Barber disavowed both of Plaintiffs' conclusions concerning her own report.    Although Plaintiffs claim that Dr. Barber can testify to the "minimum" data elements PowerSchool processes, Dr. Barber actually has ***no opinion*** on minimum data fields and "wasn't asked to review that."  Ex. B, Barber Tr. 103:12-106:2,  107:1-15,  122:6-123:8,  142:22-143:12,  152:10-19.    Similarly, while Plaintiffs claim that Dr. Barber can testify about actual harm to students, Dr. Barber again disclaims that opinion, stating that she was only testifying about the "***potential*** of harm" created by any storage of PII.  *Id.* at 291:6-293:3.

The Court should exclude Dr. Barber's opinions because they lack a reliable expert methodology, amount to mere recitation of Plaintiffs' preferred factual narrative, and are irrelevant. As explained below, Dr. Barber's analysis consists of:

1.    a recitation of what she believes PowerSchool said about the kinds of data its products can process,

2.    a recitation of the ways data has been misused in ***other cases*** by hackers, fraudsters, and thieves, and

3.    an assertion that PowerSchool stores data that has value to such hackers, fraudsters, and thieves,

Dr. Barber confirmed that she ***never investigated any actual use*** of a PowerSchool product and saw no evidence that anyone was actually harmed because of PowerSchool's data processing activities.

The only basis for her opinions about potentialities is that Dr. Barber's university student assistant queried a proprietary University of Texas database tracking other cases involving data misuse to identify cases involving data fields with similar names to the data field names used in PowerSchool products. According to Dr. Barber, the mere fact that schools **can** use PowerSchool's products to store student PII means that there is **potential** for harm, which is true of any data processing. That is not an expert opinion or the product of a scientific methodology. At best, it is a policy opinion against all data storage, connected to this case only by the fact PowerSchool stores student PII. At worst, it is an attempt to confuse the factfinder into believing that PowerSchool's data hosting has harmed the putative class despite there being no evidence of any harm. The Court should exclude Dr. Barber's report in its entirety.

## II.    BACKGROUND

Dr. Barber represents herself "as a technical expert" with experience in "software engineering, digital identity, cybersecurity, digital trust and information security and privacy." Ex. A, Barber Rep. ¶¶ 2-3. Dr. Barber admitted that she prepared her report based solely on review of two sets of documents.

*First*, Dr. Barber reviewed a few PowerSchool documents, one deposition, and one PowerSchool contract with a school **solely** to see what data PowerSchool said it could process. Ex. B, Barber Tr. 96:14-100:20, 134:2-22, 164:11-19. She did not "independent[ly] inspect[]" or "use[] the products" and had no opinion about actual product implementations. *Id.* She reviewed the record just to recite what "PowerSchool says" its products are capable of collecting. *Id.* 142:22-143:12, 147:18-148:17.

*Second*, Dr. Barber had one of her students (without compensation) run queries through her university's proprietary database, the "UTCID Ecosystem," which compiles data on identity theft, fraud, and abuse cases. *Id.* at 50:2-51:5, 27:5-14, 51:11-52:18. This database is a novel project that a team of modelers at her university created in 2019 to model how data criminals gained access to systems and committed their crimes.[1] Dr. Barber did not study or validate the underlying data in

---

[1]   Dr. Barber's Report does not explain how the UTCID Ecosystem was created, who was involved, or why its methodology should be deemed consistent or reliable. Based on a publicly available 2019 publication from her university (which, while not cited in her report, listed Barber as an

reaching her conclusions in this case, *id.* at 50:2-5, intending to "just … report[] on what [she] … found in" the database.  *Id.* at 217:4-220:2.  This database supposedly reflects publicly reported data on "5000 identity theft, fraud and abuse cases," and was compiled by the University of Texas based on news articles discussing financial losses and data elements worldwide.  Ex. A, Barber Rep. ¶ 80; Ex. B, Barber Tr. 310:4-16, 311:10-315:7.  Dr. Barber testified that, based on her experience with the database, approximately 90% of the cases reported do not involve data from a school, and that most involve misappropriation of adult data.  *Id.* at 308:22-309:2, 309:15-18.

Based solely on (1) a list of what she thinks PowerSchool says it processes and (2) the queries run on her university's database, Dr. Barber purports to offer five opinions:

(1) "PowerSchool products control and process highly sensitive [PII]";

(2) "The PII controlled and processed by PowerSchool products is under constant attack by a variety of threats so this PII required diligent and dedicated protection";

(3) "There are numerous possible causes for exposure of the PII controlled and processed by PowerSchool products, including malicious threats and business practices aimed to monetize the PII," because "PowerSchool experienced a data breach where massive amounts of PII was infiltrated";

(4) "The exposure of the PII controlled and processed by PowerSchool products can cause diverse, longstanding, and significant harms"; and

(5) "By controlling and processing student PII, without permission and informed consent, students and parents are exposed to the risk of diverse, longstanding, and significant harm, and to the extent that student PII was infiltrated in the PowerSchool data breach, research suggests those individuals have been harmed and are experiencing elevated risks to their PII."

Ex. A, Barber Rep. ¶ 3.

## A.    Opinion 1: Whether PowerSchool processes "sensitive" data.

Barber's first opinion "copie[s] th[e] list [of data elements] from PowerSchool's [Data Privacy Impact Assessment ('DPIA')] report[s],"[2] and then declares each product to process "sensitive data."

---

author) the database was assembled by "[a] team of modelers" who "analyze[d] identity theft and fraud stories on a daily basis" and inputted "this information" into their database using another research group's "Identity Threat Assessment and Prediction" "assessment tool."  The Identity Ecosystem at 39:3, https://identity.utexas.edu/sites/default/files/2020-09/The%20Identity%20Ecosystem.pdf.

[2] A DPIA is "a compliance document" PowerSchool creates to "help [schools] … understand what products they might be interested in" and "address many of the standard questions that schools should be asking [PowerSchool] about [its] products."  Ex. C, Flagg Tr. 40:20-41:16.  Undisputed record testimony is that the DPIAs do not provide ***minimum*** data field, but instead a representation of "the types of data elements that are normally processed by other customers."  *Id.* at 42:12-46:19.

Ex. B, Barber Tr. 96:14-100:20; Ex. A, Barber Rep. ¶¶ 30-64.

*First*, at deposition Dr. Barber clarified that she is not actually opining that PowerSchool's products always process any minimum set of data fields. Dr. Barber testified that she did not "independent[ly] inspect[]" or "use[] the products." Ex. B, Barber Tr. 96:14-100:20, 134:2-22. Dr. Barber reviewed the DPIAs just to understand "what data … PowerSchool hold[s].'" Ex. B, Barber Tr. 88:5-89:7, 89:20-90:7. She did not know if the data elements listed were actually "minimum" fields, "wasn't asked to evaluate" actual "configurations," could not "comment on … implementation," and was not "offering an opinion on whether every single instance of [the product] collects all of the data elements … listed in … [her] report." *Id.* at 103:12-106:2, 107:1-15, 122:6-123:8, 125:13-21. Instead, when her report says that PowerSchool processes "minimum" data fields, she is only conveying that "PowerSchool ***says*** [its] product[s] control[] and process[] … information" listed in her report—i.e., they have "the capability of storing this information." *Id.* at 142:22-143:12, 147:18-148:17.

*Second*, Dr. Barber clarified that she was not attempting to reach any formal legal opinion about sensitivity of the data and was not opining that data was "sensitive" under any "particular legal standard." *Id.* at 193:15-195:9. Dr. Barber concluded that a particular data type listed in PowerSchool's documents was sensitive simply because similarly named data types appeared in the UTCID Ecosystem, suggesting that some threat actor used potentially similar data to identify or locate an individual or otherwise cause harm. Ex. A, Barber Rep. ¶¶ 34, 37, 40, 44, 47, 50, 53, 58, 64; Ex. B, Barber Tr. 200:17-201:4, 215:10-18, 216:4-217:12. Dr. Barber was "not … asked to look" and was not aware of any evidence that "the data collected by PowerSchool was actually used to identify" or locate students, that PowerSchool's processing of data "actually … result[ed] in significant … harm," that data was "actually monetized" or "actually exploited," or that the students' data "was actually used … to create longitudinal harm." Ex. B, Barber Tr. 199:10-200:4, 200:17-202:4, 203:13-206:17, 212:12-213:6, 213:15-19, 215:4-9, 216:18-217:12. Thus, her conclusions about the sensitivity of the data types comes exclusively from an observation of data types listed in the UTCID Ecosystem. *Id.* at 200:17-201:4, 215:10-18, 216:4-217:12.

### B.      Opinions 2-3: Whether PowerSchool exposes PII.

Dr. Barber's Opinions 2-3 span less than two pages and consist of: (1) a citation to public study about the likelihood of data breaches involving PII; (2) an assertion that PII can be exposed maliciously, intentionally, or accidentally; (3) an assertion that some users could use their PII for login credentials to multiple systems; and (4) a reference to the facts that data in PowerSchool products is shared between "school districts, PowerSchool, data vendors, and subprocessors" and that "PowerSchool was hacked" once in 2024.  Ex. A, Barber Rep. ¶¶ 65-71.

In her deposition, Dr. Barber explained that these "opinions" are very limited as she was not accusing PowerSchool of sharing student data or exposing it to a higher risk of unauthorized disclosure.  Dr. Barber "d[id]n't know what [PowerSchool's] risk of exposure [was]," since she did not "know what [its] cybersecurity practices" were.  Ex. B, Barber Tr. 277:22-278:8.  For the same reasons, she "can't speak to" whether "PowerSchool products cause harm."  *Id.* at 280:13-281:3.  Her opinion is "just … that … deciding to store particular data elements … can cause more harm than others" (there's a greater potential for harm if a provider stores social security numbers than if it stores data on someone's hair color).  *Id.* at 277:22-278:8.  Thus, Dr. Barber did not know whether any "data in this case has been harvested" by any bad actor.  *Id.* at 260:2-9.  And Dr. Barber stated that she referenced PowerSchool's prior data incident "just [to] say[] it happens"; "the breach … wasn't [in the] scope" of her report.  *Id.* at 260:14-261:1.  For that reason, she did nothing to investigate what data was exposed, from what schools, about what students, or if anyone was actually harmed.  *Id.* at 224:9-225:1, 235:4-20, 241:21-242:5.

### C.      Opinion 4: Whether PII can cause harm.

Dr. Barber's fourth opinion concerns potential harms.  Dr. Barber states that "[e]xposed, used, or misused PII ***can*** cause financial harm"; it "***can*** cause reputation harm"; it "***can*** cause emotional distress"; it "***can*** increase the probability of exposing additional PII data elements"; and "[l]ongitudinal harm … ***can*** result when PII is used … to damage current reputations, impose emotional distress, and introduce barriers to future opportunities."  Ex. A, Barber Rep. ¶¶ 72, 74-76, 78-79 (emphasis added).  Dr. Barber based these assertions on the fact that "50% of victims" of data fraud cases (as drawn from the UTCID database) "experienc[e] some financial loss," "80% … some

degree of reputational damages," and "67.8%" experience "emotional distress." *Id.* ¶¶ 72-75. Longitudinal harms refer to public studies discussing "secondary financial consequences" from identity theft, such as denial of loans or housing. *Id.* ¶ 78.

Again, Dr. Barber clarified she was not opining "that the class members in this case are exposed to diverse, long-standing and significant harms," as she did not study actual use of PowerSchool products. Ex. B, Barber Tr. 291:6-17. Her opinion was all about discussing "the potential of harm" that is inherent to any system that stores PII. *Id.* at 291:6-17, 292:17-293:3. Dr. Barber did not look for and was unaware of any evidence suggesting that any of the harms she discussed resulted from PowerSchool products. *Id.* at 199:10-202:4, 203:13-206:17, 212:12-213:19, 215:4-9, 216:18-217:12.

**D.    Opinion 5: Whether PowerSchool's data processing exposes students to harm.**

In one paragraph, Dr. Barber summarizes that PowerSchool identified "data elements … in the DPIA[s]" that, in her opinion, "have a Monetary Value, Risk of Exposure … , Vulnerability … and Influence" based on her study of the UTCID database of data breach and fraud cases. Ex. A, Barber Rep. ¶ 94. Per Dr. Barber, she is "not opining about instances of use or monetization for the PowerSchool case"; rather, she is "just … reporting on what [she] … found in those [UTCID] cases [she] looked at." Ex. B, Barber Tr. 217:4-220:2. In other words, Dr. Barber is not claiming that the data PowerSchool processes has actual value or is actually at risk of exposure, but rather that data of *that same category* (i.e., name) has been monetized and exposed per the UTCID database.

***1. Monetary Value.*** To derive her conclusion regarding monetary value, Dr. Barber takes the total financial loss in each UTCID case and divides it equally among the PII data elements involved, regardless of what they are, then adds up those per-element values for every case. Ex. A, Barber Rep. ¶ 92. Thus, if a criminal stole $100,000 and the news reported that he got 5 data elements, one of which is Social Security Number and the other "School ID number," Dr. Barber's calculation assigns each of the five data elements an equal $20,000 of value. *Id.* Then, if multiple cases involved "School ID number" she *adds up* the allocated value from each of the individual cases into a single composite "Monetary Value" figure. For instance, her methodology estimates an email address apparently has a monetary value of $60 million because it is such a common element in the database of cases. Ex. B,

Barber Tr. 378:9-17.  Dr. Barber explained that this does not reflect the actual value of data or harm but rather is just a number suggesting that data is valuable and some data is more valuable than other data.  *Id.* at 375:4-378:2.

**2. Risk of Exposure.**  Dr. Barber's assessment of risk of exposure is based on her analysis of how often a data element appears in incidents tracked by UTCID.  *Id.* at 334:13-335:5.  It does not reflect risk that an individual's data will be exposed or misused, which Dr. Barber said depends on data security controls, encryption, monitoring, and access controls, none of which Dr. Barber analyzed.  *Id.* at 334:8-16.

**3-4. Vulnerability & Influence.**  Dr. Barber also assesses the likelihood that having a piece of PII leads to disclosure of other PII or vice versa.  Ex. A, Barber Rep. ¶¶ 90-91.  To evaluate this, she value-ranks PII against other PII—the highest ranked PII is the most likely to be disclosed if other PII is disclosed, and the lowest ranked is the least likely to be disclosed if other PII is disclosed.  *Id.* ¶ 91.

Whether because of the subjective nature of the inquiry, her reliance on uncompensated students, or reliance on a non-party database, Dr. Barber admitted several errors with her original report.  The query Dr. Barber's student ran relied on a miscalculated denominator, resulting in erroneous "Monetary Value."  *Id.* at 66:12-71:10, 72:5-73:14.  She also made five "copy-paste errors" when preparing her summary of the UTCID data.  *Id.* at 42:2-43:8.  Then, there are several suspect items in the data itself.  "Email" has a risk of exposure of 11.59%, but "email address" has a risk of only 0.17%—a difference of nearly two orders of magnitude for two functionally identical data elements.  Ex. A, Barber Rep., App. A.  "Address" has a risk of exposure of 35.95%, but "physical address" is 2.33% and "mail address" is 11.61%.  *Id.*  Dr. Barber never tackles these issues in her report.

## III.  LEGAL STANDARD

The party offering expert testimony bears the burden of establishing, by a preponderance of the evidence, that the testimony is both reliable and helpful to the trier of fact under Federal Rule of Evidence 702.[3]  *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025).  A district court

---

[3]  District courts in this Circuit routinely apply Daubert at the class certification stage.  *See, e.g.*, *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956 (N.D. Cal. 2025); *Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 713 F. Supp. 3d 660 (N.D. Cal. 2024); *Townsend v.*

therefore serves as a gatekeeper, ensuring that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

"Maintaining Daubert's standards is particularly important considering the aura of Authority experts often exude, which can lead juries to give more weight to their testimony." *Elsayed Mukhtar v. Cal. State Univ.*, 299 F. 3d 1053, 1063-64 (9th Cir. 2002).  The Court must apply "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), to "make certain that an expert … employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

## IV.    ARGUMENT

### A.    Dr. Barber's opinions are not the product of reliable expert methodology.

Under Daubert, expert testimony must be "the product of reliable principles and methods." Fed. R. Evid. 702(c).  "Expert testimony relying on undisclosed or poorly described methodology must be excluded, because opinions based on 'unsubstantiated and undocumented information is the antithesis of … scientifically reliable expert opinion.'" *Koger v. Costco Wholesale Corp.*, 2023 WL 8188842, at *2 (N.D. Cal. Nov. 27, 2023) (Donato, J.).  Dr. Barber never laid out any specific methodology for her report because, as explained *infra* pp. 13-14, she is simply attempting to report her view of the facts and the contents of a database compiled by others, which is not an expert methodology at all.  Each of her opinions lacks a scientifically rigorous method.

#### 1.    *Opinion 1:  Dr. Barber failed to investigate actual uses of PowerSchool products as is necessary to assess what data PowerSchool hosts and whether it is sensitive.*

Dr. Barber's first opinion lacks a reliable, scientific methodology because she concludes that PowerSchool processes data simply by quoting a PowerSchool document, and that the data is sensitive solely because a similarly named data field appears in the UTCID database, supposedly demonstrating that data field is of interest to hackers.  *See supra* pp. 3-4.

*First*, Dr. Barber's opinion on the data PowerSchool processes is not the product of a scientific methodology.  She admitted that she just "copied th[e] list [of data elements] from PowerSchool's [Data Privacy Impact Assessment ('DPIA')] report[s]," without reviewing or evaluating **any** actual

_____

*Monster Beverage Corp.*, 303 F. Supp. 3d 1010 (C.D. Cal. 2018).

product implementations. Ex. B, Barber Tr. 103:12-106:2, 107:1-15, 122:6-123:8, 125:13-21, 134:2-22, 142:22-143:12, 147:18-148:17. She even caveated her first opinion as reporting on what "PowerSchool *says* [its] product[s] control[] and process[]." *Id.* at 142:22-143:12, 147:18-148:17. Merely reporting the contents of documents is not an expert methodology. This Court has previously found similar methodology deficient, excluding an expert in *CZ Services, Inc. v. Express Scripts Holding Co.* for doing "little more than report[ing] of what [the expert]" saw "in documents reviewed." 2020 WL 4518978, at *2 (N.D. Cal. Aug. 5, 2020) (Donato, J.). An expert intending to opine on what PowerSchool processes would have had to review, at a minimum, a representative sample of actual product implementations and conduct some testing or other validation on those implementations. Thus, she cannot opine on what PowerSchool processes based only on *ipse dixit*.

*Second*, Dr. Barber's opinion on whether certain data elements are sensitive is not the product of a discernable, scientific methodology. Dr. Barber had no established standard for assessing sensitivity and, rather, agreed that it posed a legal question. Ex. B, Barber Tr. 193:15-195:9. Such "black box" assessments are not admissible. *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014); *In re Toyota Motor Corp.*, 978 F. Supp. 2d 1053, 1067 (C.D. Cal. 2013) (excluding expert's opinions that "are not based on a reliable foundation or methodology … [and] amount to … ipse dixit").

At best, Dr. Barber appears to base her assessment that a data type is sensitive solely on the fact that a similarly named data type appears in the UTCID Ecosystem. Ex. B, Barber Tr. 200:17-201:4, 215:10-18, 216:4-217:12. The UTCID Ecosystem, however, is just a spreadsheet with columns summarizing detail from publicly reported cases including a malware attack, misuse of data by a company insider, and fraudulent tax returns. *Id.* at 302:11-304:3. UTCID's "team of modelers" populated its database based on whatever information was publicly reported[4]; "sometimes the[] cases … had a lot of detail to them" and "sometimes they didn't"; and, if information was missing (e.g., there was no reported loss from a malware attack), UTCID would mark the field null (e.g., reporting no loss from the malware attack). *Id.* at 299:7-302:10. Dr. Barber conceded that nearly all cases in

---

[4]  The Identity Ecosystem at 39:3, https://identity.utexas.edu/sites/default/files/2020-09/The%20Identity%20Ecosystem.pdf.

the database are distinguishable, agreeing that "90 percent of these cases don't involve data from a school." *Id.* at 308:22-309:2. Thus, Dr. Barber's methodology on data sensitivity boils down to: If some news agency reported on a data field in the context of a data crime (regardless of setting) and UTCID saw that field in the article and recorded it in its database (correctly or incorrectly), then the field is automatically sensitive.

A determination of data sensitivity should not be based on the whims of reporters or happenstance of data fields listed in public articles about data fraud cases. Such "an arbitrary and undefined definition … cannot meet the reliability standard demanded under Daubert." *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 2021 WL 12255004, at *17 (E.D. Mich. Sept. 29, 2021).

### 2.    *Opinion 2-3: Dr. Barber failed to assess PowerSchool's data processing practices as is necessary to opine on risks of exposure.*

Dr. Barber's second and third opinions that PowerSchool exposes PII are also unreliable. These two opinions span less than two pages. They rely on public sources and PowerSchool's own statements explaining that data breaches occur and that the data PowerSchool processes for schools has been shared between "school districts, PowerSchool, data vendors, and subprocessors." Ex. A, Barber Rep. ¶¶ 65-71. These are common sense points that any "untrained layman would be qualified to determine intelligently" and are not the proper subject for expert testimony. Fed. R. Evid. 702 adv. comm. notes.

Regardless, these opinions fail because of Dr. Barber's own testimony, as she admitted that a proper assessment of the risk of exposure depends on system-specific factors—data security controls, encryption, monitoring, and access controls—none of which Dr. Barber's calculation accounts for. Ex. B, Barber Tr. 277:22-278:8, 280:13-281:3, 334:8-16. An expert cannot proffer testimony if he or she "fail[ed] to apply his [or her] stated methodology reliably." *Amorgianos v. Nat'l R&R Passenger Corp.*, 303 F.3d 256, 268-69 (2d Cir. 2002). The Court should not allow Dr. Barber to opine that PowerSchool exposes or can expose data based entirely on her generalized assertion that data breaches happen. *In re Toyota Motor Corp.*, 978 F. Supp. 2d at 1067 (excluding opinion based on *ipse dixit*).

3.    **Opinion 4:  Dr. Barber offered no method for associating UTCID's data crimes with PowerSchool's data processing.**

Dr. Barber's assessment that PII can cause harm is merely a tautological acknowledgement that, in 5000 cases where reporters stated that data was used to commit crime, PII was used to cause harm.  Again, such "report[ing] of what [the expert]" saw "in documents reviewed" is not a reliable expert methodology.  *CZ Servs.*, 2020 WL 4518978, at *1.  It is not a methodology at all, as it simply assets that something can happen because it has happened in the past to others.

From a methodological perspective, Dr. Barber's conclusion is unsound because Dr. Barber associates PowerSchool's data processing with the UTCID's data crime cases ***without any*** facts, data, or methodology to support this association.  *Sonneveldt v. Mazda Motor of Am., Inc.*, 2024 WL 5242611, at *2 (9th Cir. Dec. 30, 2024) (stating that for an expert's opinion to be admissible, there must be "sufficient facts and data to support every necessary link in his theory" (cleaned up)).  She acknowledged that she saw no evidence that PowerSchool's products were ever misused in any way. *See*  Ex. B,  Barber  Tr.  199:10-202:4,  203:13-206:17,  212:12-213:19,  215:4-9,  216:18-217:12. Moreover, Dr. Barber did not study the UTCID "source data"—i.e., the articles reporting the data crimes—in reaching her conclusions in this case, and thus did not assess whether there were any actual similarities between PowerSchool's data processing and any of the UTCID data crimes.  From her prior experience with the database, she knew that approximately 90% of the cases in the UTCID database do not involve data from a school, and that most involve misappropriation of adult data.  *Id.* at 308:22-309:2, 309:15-18.  She relied entirely on her "judgment" and personal approximation to associate the data at issue in this case with the UTCID database.  *Id.* at 331:13-332:7, 400:3-19272:23-273:10, 329:14-330:3.  Again, this is not a reliable expert methodology.  *In re Toyota Motor Corp.*, 978 F. Supp. 2d at 1067.

4.    **Opinion 5:  Dr. Barber's calculation of monetary value and risk of exposure based on the UTCID database is based on ipse dixit, *riddled with errors, and lacks sound foundation.***

Dr. Barber's final opinion fails for the same reason as Opinion 4.  In her Fifth Opinion, Dr. Barber had a university student run queries through the UTCID database to see whether the data elements PowerSchool supposedly hosted had "monetary value" (i.e., were data elements referenced

in prior data crimes resulting in financial loss), had "risk of exposure" (i.e., were data elements referenced in prior data crimes), and had "vulnerability" or "influence" scores (i.e., were data elements exposed together with other data elements in data crimes). *See supra* pp. 5-6. The methodology thus boils down to: *Is PowerSchool processing a data element that was among the data elements reported in a data crime case?*

The methodology is unreliable for all the same reasons as for Opinion 4. Dr. Barber has no facts, data, or methodology to associate the data PowerSchool hosts with the data at issue in the UTCID's data crime database. *See Sonneveldt*, 2024 WL 5242611, at *2. The only reason Dr. Barber believes that she can apply values from UTCID database to PowerSchool's data elements is her own judgment. This is classic *ipse dixit* that should be excluded under Rule 702.

This methodology yields incredible results that have no support in any scientific literature. Per Dr. Barber, she assigns a person's "School ID Number" a "monetization value" of "$20k" so long as a hacker stole the school ID number along with information necessary to open a credit card—"'Name,' 'Address,' 'Date of Birth,' *and* 'Social Security Number'"—causing a person "a $100k financial loss." Ex. A, Barber Rep. ¶ 92. Since email addresses are often used to log into banking systems, Dr. Barber's analysis shows that a person's email address has a monetary value of $60 million. Ex. B, Barber Tr. 378:9-17. Dr. Barber cites no support of anyone in any industry ever determining "monetary value" based on this analysis. Further, Dr. Barber's methodology produces wild swings in results, depending on which variation of the data element one selects: UTCID stated that "Email" apparently presents a risk of exposure of 11.59%, while "email address" of only 0.17%; "[a]ddress" has a risk of exposure of 35.95%, while "physical" and "mail address" of 2.33% and 11.61%, respectively. Ex. A, Barber Rep., App. A. This variation among types of PII is nonsensical. When confronted with it, Dr. Barber agreed that her methodology cannot give concrete calculations and admitted that she is "not giving actual numbers" but just trying to illustrate that some data "is more valuable than other[]" data. *Id.* at 375:4-378:2. The Court should exclude such unreliable "calculations."

### 5.    *Dr. Barber's errors and shifting theories make her unreliable.*

The issues with Dr. Barber's methodology become even more glaring in light of her report's

errors and inconsistencies. Dr. Barber admitted several errors with her original report. The query her student assistant ran in the UTCID data wrongly calculated the number of data elements involved, resulting in erroneous "Monetary Value." *Id.* at 66:12-71:10, 72:5-73:14. She also made five "copy-paste errors" when preparing her summary of the UTCID data. *Id.* at 57:5-58:14. Then, there is a persistent disconnect between what Dr. Barber's written report appears to say and what she explained she meant:

| Purported Opinion | Dr. Barber's Explanation |
|---|---|
| "PowerSchool products control and process highly sensitive Personally Identifiable Information…." Ex. A at 1. | "It's only my opinion that **PowerSchool says** the product controls and process this information[,] … **I do not know**" what specific customers collected. I am not offering an opinion on data sensitivity "under a particular legal standard." Ex. B at 142:22-143:12, 194:18:195:9. |
| "There are numerous possible causes for exposure of the PII controlled and processed by PowerSchool products, including malicious threats and business practices aimed to monetize the PII." Ex. A at 1. | "I **don't know** what [PowerSchool's] risk of exposure is" or "what their cybersecurity practices are. I'm just saying that … deciding to store particular data elements … can cause more harm than others." Ex. B at 277:22-278:8. |
| "By controlling and processing student PII, without permission and informed consent, students and parents are exposed to the risk of diverse, longstanding, and significant harm." Ex. A at 1. | It is "not [my] opinion that the class members in this case are exposed to diverse, long-standing and significant harms." I "**can't speak to the actual instances**"; only to "potential of harm." Ex. B at 291:6-17. |
| "[T]o the extent that student PII was infiltrated in the PowerSchool data breach, research suggests those individuals have been harmed and are experiencing elevated risks to their PII." Ex. A at 1. | "My intent was **not** to opine about the breach. This wasn't my scope. But I'm just saying it happens." Ex. B at 260:14-261:1. |

In sum, Dr. Barber methodology is unsound and untested, she either did not apply the methodology she admitted she needed to or made basic errors applying it, and the conclusions she draws from her analyses differ significantly from her written report. These are all hallmarks of an unreliable expert that the Court should strike under *Daubert.*

**B. Dr. Barber cannot offer a factual narrative on what data PowerSchool holds and how data has been misused in data fraud cases in the guise of expert testimony.**

Another flaw with Dr. Barber's opinions is that they "merely summarize the record evidence and gratuitously interpret it." *Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, 2022 WL 254348, at *10 (N.D. Cal. Jan. 27, 2022) (quoting *Lord Abbett Mun. Income Fund, Inc. v. Asami*, 2014 WL 3417941, at *13 n.8 (N.D. Cal. July 11, 2014)). An expert cannot appear merely to offer "evidence" that "can speak for itself," with the expert's "only contribution … be[ing] to pile on a

misleading façade of expertise." *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at \*5 (N.D. Cal. Nov. 2, 2017).  Nor can an expert merely "repeat the[] contents" of "his source materials" without independent analysis, *Dep't of Toxic Subs. Ctrl. v. Technichem, Inc.*, 2016 WL 1029463, at \*1 (N.D. Cal. Mar. 15, 2016) (excluding expert for offering "unadorned restatements or summaries of evidence already in the record"); *Siqueiros v. GM LLC*, 2022 WL 74182, at \*10 (N.D. Cal. Jan. 7, 2022).

Yet this is precisely what Dr. Barber is attempting to do.  Her testimony specific to PowerSchool merely "copie[s]" the "DPIA report[s];" she admitted that she did not "independent[ly] inspect[]" or "use the products." Ex. B, Barber Tr. 96:14-100:20, 134:2-22.  Indeed, she thought that her role did not involve understanding how exactly PowerSchool's products work, and that she could simply recite what she thought "PowerSchool **says**" about its data hosting.  *Id.* at 103:12-106:2, 107:1-15, 122:6-123:8, 125:13-21, 142:22-143:12, 147:18-148:17.  Plaintiffs cannot use Dr. Barber "for the purpose of constructing" their preferred "factual narrative based upon record evidence." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322 (S.D. Cal. 2022), *aff'd*, 9 F.4th 1102 (9th Cir. 2021).  Dr. Barber thus cannot offer any opinions about what PowerSchool does (Opinions 1, 2-3, 5).

Her testimony about data fraud cases drawn from the UTCID database fares no better.  For one, "[e]xperts are not permitted to repackage inadmissible hearsay" as expert testimony.  *Koger*, 2023 WL 8188842, at \*2.  Yet that is what Dr. Barber attempts to do—take a university database, recite or summarize its contents, and assert that the database proves facts about PowerSchool's data practices. The entire database is inadmissible hearsay summarizing hearsay articles, and yet Dr. Barber sees her role as "just … reporting on what [she] … found in those [UTCID] cases [she] looked at."  Ex. B, Barber Tr. 217:4-220:2.  Indeed, Dr. Barber admitted that she did **not** study the UTCID "source data" in reaching her conclusions in this case.  Ex. B, Barber Tr. 50:2-16.  She did not even review the database herself and instead had her university student run queries in that database.  *Id.* at 50:2-51:5, 27:5-14, 51:11-52:18.  Thus, her sole role here is to introduce into the record the supposed content of this inadmissible hearsay evidence to demonstrate "the potential of harm" that is **inherent to any system storing PII**.  *Id.* at 309:15-18.  This is improper.  *See Technichem*, 2016 WL 1029463, at \*1 (excluding expert that just attempted to summarize facts).

In fact, Dr. Barber repeatedly admitted to knowing **nothing** about PowerSchool's practices, having **no evidence** that PowerSchool caused harm, and having **no opinion** on whether PowerSchool's products caused harm or increased the risk of harm, and yet Plaintiffs are already quoting her report as concluding that PowerSchool "control[s] and process[es]" "minimum data fields" and thus "expose[s]" students to "diverse, longstanding, and significant harms." Dkt. 116 at 16 n.84, 20. Even at face value, Dr. Barber's report attempts to associate PowerSchool's ordinary data processing services with identity theft, fraud and abuse cases merely because PowerSchool hosts data types that hackers and thieves stole in other cases. Plaintiffs cannot offer an expert merely to be a "conduit for attorney argument"—here, that cloud hosting is inherently bad. *In re Apple Inc. Sec. Litig.*, 2023 WL 4556765, at *5 (N.D. Cal. July 17, 2023).

### C.    Dr. Barber's opinions fail the "fit" test.

Lastly, Dr. Barber's opinions are not "tied to the claims and facts in a way that helps the [factfinder] decide" a disputed issue. *CZ Services*, 2020 WL 4518978, at *1. Plaintiffs have just two claims remaining—a California invasion of privacy/intrusion upon seclusion claim and an unjust enrichment claim. Liability for the privacy claim turns on "(1) the nature of any intrusion upon reasonable expectations of privacy, and (2) the offensiveness or seriousness of the intrusion, including any justification and other relevant interests." Dkt. 65 at 3 (the Court's motion to dismiss opinion). An unjust enrichment claim requires that PowerSchool obtain a benefit "*from the plaintiff* by fraud, duress, conversion, or similar conduct." *Clear Channel Outdoor, Inc. v. Bently Hldgs. Cal. LP*, 2011 WL 6099394, at *9 (N.D. Cal. Dec. 7, 2011) (emphasis added).

Dr. Barber, however, can say nothing relevant to these claims. Dr. Barber repeatedly and unequivocally disclaimed knowing anything about PowerSchool's specific practices or configurations. Instead, she intends to "just … report[] on what [she] … found in" the UTCID database about data elements with similar names. Ex. B, Barber Tr. 217:4-220:2. Opinions about data-related harms in unrelated data crime cases are not relevant to any part of Plaintiffs' claims. The lack of connection to PowerSchool makes her opinion irrelevant to this case.

### V.    CONCLUSION.

For the foregoing reasons, the Court should exclude the opinions of Dr. K. Suzanne Barber.

1    DATED: March 9, 2026                    Respectfully submitted,

2                                            KIRKLAND & ELLIS LLP

3                                            */s/ Olivia Adendorff*

4                                            Olivia Adendorff, P.C.

5                                            Robyn E. Bladow
                                             Kirkland & Ellis LLP
6                                            555 South Flower Street, Suite 3700
                                             Los Angeles, CA 90071
7                                            Telephone: (213) 680-8400
                                             robyn.bladow@kirkland.com
8

9                                            Martin L. Roth, P.C. (*pro hac vice*)
                                             Alyssa C. Kalisky, P.C. (*pro hac vice*)
10                                           Zharna Shah (*pro hac vice*)
                                             Amelia H. Bailey (*pro hac vice*)
11                                           Kirkland & Ellis LLP
                                             333 West Wolf Point Plaza
12                                           Chicago, IL 60654
                                             Telephone: (312) 862-2000
13                                           martin.roth@kirkland.com
                                             alyssa.kalisky@kirkland.com
14                                           zharna.shah@kirkland.com
                                             amelia.bailey@kirkland.com
15

16                                           Olivia Adendorff, P.C. (*pro hac vice*)
                                             Cristina Martinez Squiers (*pro hac vice*)
17                                           Eugene Temchenko (*pro hac vice*)
                                             Kirkland & Ellis LLP
18                                           4550 Travis Street
                                             Dallas, TX 75205
19                                           Telephone: (214) 972-1770
                                             olivia.adendorff@kirkland.com
20                                           cristina.squiers@kirkland.com
                                             eugene.temchenko@kirkland.com
21
                                             *Attorneys for Defendant PowerSchool*
22                                           *Holdings, Inc.*

23

24

25

26

27

28