# Exhibit B

1

1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4   ------------------------X
    EMILY CHERKIN, et al.      )
5                              )
            Plaintiffs,        )
6                              )
        v.                     )   CASE NO. 3:24-CV-02706-JD
7                              )
    POWERSCHOOL HOLDINGS,      )
8   INC.,                      )
                               )
9           Defendant.         )
    ------------------------X
10

11        INCLUDES CONFIDENTIAL TESTIMONY

12      REMOTE VIDEOTAPED DEPOSITION OF

13      KATHLEEN SUZANNE BARBER SIMONS

14          Monday, March 2, 2026

15       9:04 a.m. CST to 6:12 p.m. CST

16

17

18  Reported by:  Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR,
    CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460,
19  NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime
    Court Reporter, NY Association Certified Reporter, OR
20  CSR 230105, TN CSR 998, TX CSR 12778, WA CSR 23005926,
    Remote Counsel Reporter, LiveLitigation Authorized
21  Reporter, Notary Public

22  Job No. 2026-1012179

26

```
 1                    Is that fair?

 2        A.      Maybe so, but --

 3        Q.      Your hourly rate is $750 an hour,

 4   correct?

 5        A.      That answer, I do know.

 6                Yes.

 7        Q.      Is it -- in total, have you been

 8   paid about $30,000 for your work on this case?

 9        A.      No.  I've been paid more than

10   that.

11                So -- and I get -- so maybe it's

12   closer to -- if I take all of the reading of

13   reports and I take conversations, and

14   everything, it might be closer to between 80

15   and 100 hours.  I mean, just everything.

16        Q.      Okay.  So in total, you've been

17   paid somewhere between 60- and $75,000 for

18   your work on this case; is that correct?

19                ATTORNEY L. ARAGON:  Objection:

20          form.

21                THE WITNESS:  See, I think --

22          yeah, it's closer to 75, maybe 80.
```

27

1    BY ATTORNEY Z. SHAH:

2        Q.    So you may have spent upwards of

3    100 hours working on this case; is that right?

4        A.    Yes.  Yeah.

5        Q.    Okay.  Did -- did anyone help you

6    prepare your report?

7        A.    I did get one of my students to

8    run some queries for me in -- in our database.

9        Q.    And when you say our database,

10   are you referring to the UTCID database?

11       A.    I am.

12       Q.    Okay.  What was the name of the

13   student?

14       A.    Emma Niu, N-I-U.

15       Q.    Were they compensated for their

16   work?

17       A.    I have not.

18       Q.    How many hours would you estimate

19   that Ms. Niu spent helping you prepare your

20   report?

21       A.    Very few, yeah.

22       Q.    Less than 10?

28

```
 1          A.     Yes.  Yes, yes, yes.

 2          Q.     Okay.  Do you expect to be

 3     compensated for additional work in this case

 4     going forward?

 5          A.     I don't know if there's any

 6     additional -- I don't know.

 7          Q.     So you don't expect to be

 8     compensated for any additional work in this

 9     case going forward?

10                    ATTORNEY L. ARAGON:  Objection:

11          form.

12                    THE WITNESS:  I don't know if

13          there's any additional work after this

14          deposition.

15                    So . . .

16     BY ATTORNEY Z. SHAH:

17          Q.     Did you meet with anyone to

18     prepare for this deposition?

19          A.     I met with Leonard.

20          Q.     When?

21          A.     I think that was last Monday.

22          Q.     Anyone else?
```

49

1                          --oOo--

2                  THE WITNESS:  Yeah, I just

3           don't remember the difference between

4           those two attachments is what I'm --

5    BY ATTORNEY Z. SHAH:

6        Q.     We'll go through that.

7        A.     Okay.  All right.

8               Okay.  Good.

9        Q.     Okay.  So, Dr. Barber, does this

10   look like the spreadsheet that you used to

11   prepare your January 20th, 2026 report?

12       A.     It does.

13       Q.     When did you create this

14   spreadsheet?

15       A.     In the process of working on my

16   report.

17       Q.     So before January 20th, 2026; is

18   that right?

19       A.     That's right.

20       Q.     At a very high level, because we

21   will talk in more detail about how you went

22   about creating this spreadsheet -- actually,

50

1    you know what?  Strike that.

2                    Did you look at the

3    underlying source -- the -- the underlying

4    UTCID database source data to create this

5    spreadsheet?

6        A.    No, because I did -- the query to

7    the database allowed me to create the exposure

8    and the monetization and -- in the

9    vulnerability and the influence, but then I

10   took the numbers of vulnerability and

11   influence, and I ranked them within the

12   context of these -- the data that's reported

13   because I thought it would provide a better

14   reflection of relative importance or

15   relative -- you know, relative vulnerability

16   or relative influence of the data.

17                   So these monetization value -- I

18   guess I'll just repeat that:  Monetization

19   value and risk of exposure were based on just

20   querying the CID database, and then I took the

21   raw values of vulnerability and influence,

22   actually -- which are on the left-hand side in

51

```
 1    C and D -- and then I created a ranking of

 2    them, which I thought would be a more

 3    intuitive way of reporting it.

 4              And that's what I included in my

 5    report, was those rankings.

 6         Q.    So when you say you did a query

 7    to the database, where's the query?

 8         A.    I don't really know what you mean

 9    by that.

10              So . . .

11         Q.    How did you create the database?

12         A.    Oh, I asked my student to -- to

13    query the database.  You just ask, you know,

14    Give me all the monetization values for all of

15    the nodes in the graph.  And then as I

16    provided the, you know -- the CID is making

17    those calculations based on what I disclosed

18    about how the calculations occur.

19         Q.    So break this down for me.

20              Your student goes to a Web

21    portal and types something in.

22              Is that the query?
```

52

1      A.     It looks more like a source code

2   kind of command line query, but yes.

3      Q.     Where -- where is the source code

4   command line query being entered?  Is there an

5   application?

6               ATTORNEY L. ARAGON:  Objection:

7         form.

8               THE WITNESS:  There is an

9         application, yes, but not in the -- in

10        like a -- the -- I would say it's more

11        source code that then you type a

12        command line query to ask the -- the

13        question.

14             I don't think --

15   BY ATTORNEY Z. SHAH:

16     Q.     Where does the source code live?

17     A.     At a server at the University of

18   Texas.

19     Q.     So how does the student access

20   it?

21     A.     Well, in -- by logging on to that

22   computer.  I . . .

53

1        Q.     Does the source -- is the source

2    code only accessible from that computer?

3        A.     No.  I imagine -- I don't know,

4    but I imagine anybody could log in to -- I

5    don't know.

6        Q.     Sitting here today, on your

7    computer, could you log in and execute a

8    query?

9        A.     From the -- the computer that I

10   have now, no.

11       Q.     What computer would you have to

12   use to execute the query?

13       A.     Well, actually, that's not

14   entirely true.  So I could -- the -- the

15   interface that I provided in my report, I

16   could visually see those nodes, and I could

17   look at the monetization value, but . . .

18       Q.     So, Dr. Barber, I'm not trying to

19   hide the ball here --

20       A.     Right.

21       Q.     -- but an expert is supposed to

22   provide the bases and the methodology for

56

1          A.      Sure.

2          Q.      -- code?

3          A.      Sure.

4          Q.      And let's go back to Exhibit 2,

5   which is the January 28th e-mail from

6   Mr. Aragon.

7                      And you can see in the top

8   part of the e-mail Mr. Aragon says:   In

9   preparing the underlying data for production,

10  Mrs. Barber identified five errors in her

11  data.

12                      Is that correct?

13         A.      Let me -- can I -- I'm just going

14  to read that because I -- I haven't seen this

15  e-mail, so -- I'm sure he used what I -- let

16  me just read it.

17                   (Whereupon, the proceedings

18                    paused while the witness

19                    reviewed the materials.)

20                   THE WITNESS:  Yeah, so what

21          the -- that was simply a

22          copy-and-paste issue of copying from

```
 1              the spreadsheet that we just looked at
 2              into the table that I provided, so
 3              I . . .
 4   BY ATTORNEY Z. SHAH:
 5         Q.     Is it correct that you identified
 6   five errors in your data when you were
 7   preparing the underlying data for production?
 8         A.     It wasn't errors in the data.  It
 9   was -- well, it wasn't errors in the
10   calculations.  It was errors in me -- I
11   copied, like, the value for -- like, let's
12   just take this first one here.
13              It says -- I copied the wrong
14   monetization value for a respective attribute,
15   so the values that were calculated right, I
16   copied in -- in -- so it was -- it was just a
17   copy-and-paste problem, and --
18         Q.     Okay --
19         A.     -- so it was just -- yeah.
20         Q.     -- that's fine.  I want to -- we
21   only have seven hours, and I have a fair
22   amount of material to get through, Dr. Barber.
```

58

 1   So it's okay -- if you don't know exactly, you

 2   can just say that.

 3                    But it sounds like you

 4   identified five copy-and-paste errors in the

 5   data.

 6                    Is that fair?

 7        A.    Right.  And that the -- what I

 8   provided -- and I corrected that and -- and

 9   provided that.

10        Q.    Okay.  How did you identify those

11   errors?

12        A.    I don't remember.  I don't know

13   if it was because I was looking at the -- the

14   source data and it -- I don't remember.

15        Q.    And you'll see, if we scroll down

16   a little bit --

17        A.    Yeah.

18        Q.    -- Mr. Aragon summarizes the five

19   errors that you identified.

20                    Is this description

21   accurate?

22        A.    Yeah, I -- because I was very

CHERKIN v                        Includes Confidential Testimony Kathleen Suzanne Barber Simons
POWERSCHOOL HOLDINGS, INC.

```
 1   explicit about which ones were copied

 2   incorrectly from the data sheet, yeah.

 3        Q.    Okay.  Did you prepare this

 4   description that appears in Mr. Aragon's

 5   e-mail?

 6        A.    I did.

 7        Q.    Then Mr. Aragon attaches a second

 8   Excel spreadsheet that's titled PowerSchool

 9   PII Valuation and Harms (reported on 27

10   January '26).

11               Do you see that?

12               ATTORNEY Z. SHAH:  We may have

13          to scroll up a little bit, Jacob, to

14          the Attachment line.

15               (Scrolling.)

16   BY ATTORNEY Z. SHAH:

17        Q.    Do you see the second attachment,

18   Dr. Barber?

19        A.    Yes, I do.

20        Q.    Does that spreadsheet reflect the

21   corrected --

22        A.    It does.
```

1  Eikhart (phonetic) paper that we just

2  submitted -- it's in there.  I'm pretty sure

3  that the one with -- that talks about the

4  invasion of data exposed by blind people

5  ex- -- exist, or it's in that publication.

6              This has been -- especially the

7  monetary value and exposure has been kind of a

8  long-standing way that we've calculated -- the

9  influence and the -- and the vulnerability are

10  more recent.

11      Q.    Is it fair to say this document,

12  Exhibit 6, lays out the methodology that was

13  used to compute the numbers reflected in

14  Appendix A to your report?

15      A.    It does, yes.

16      Q.    Now, other than the formulas that

17  are specified in this document, are there any

18  other formulas or calculations that connect

19  the values from the UTCID source data to your

20  Appendix A?

21              ATTORNEY L. ARAGON:  Objection:

22        form.

66

1           THE WITNESS:  In other words,

2       are you asking did I just use these

3       formulas to create the values for

4       Appendix A?

5   BY ATTORNEY Z. SHAH:

6       Q.    Correct.

7       A.    That's correct, yeah.

8       Q.    So if I take these formulas and I

9   apply them to the source data, I should be

10  able to replicate the values in Appendix A.

11              Is that your testimony?

12      A.    Yes.  But there is an error that

13  I found in the algorithm that calculated the

14  monetary value.

15      Q.    What is the error?

16      A.    The error is that -- so if you

17  look at the loss for a case, divided by the

18  number of attributes -- and the algorithm

19  takes the union of the attributes.  So if you

20  have a case and it had -- I don't know --

21  5 inputs and 5 outputs, let's say, then it

22  would have, you know, 10 attributes, okay.

Case 3:24-cv-02706-JD    Document 134-3    Filed 03/09/26    Page 17 of 151

CHERKIN v                    Includes Confidential Testimony Kathleen Suzanne Barber Simons
POWERSCHOOL HOLDINGS, INC.

67

1                And the algorithm was intended to

2    union -- take a union of that set, the 5

3    set -- 5 in the set of inputs, 5 in the set of

4    outputs, union those, and then you would be

5    dividing the monetary value or loss by 10.

6                And that un- -- union algorithm

7    was actually taking the union of all the

8    characters instead of the actual elements.

9    So, in fact, it was dividing by many more

10   numbers than the actual elements.

11               Turns out that it's still highly

12   correlated, and it represented about 1 percent

13   error.  And it doesn't change any of my

14   conclusions, but we were dividing by a much

15   higher number in the number of attributes than

16   is reported in this calc- -- in this equation.

17       Q.    So this equation is not correct.

18               Is that your testimony?

19       A.    This equation is correct.  The

20   actual implementation in code, when it added,

21   like, you know, how many attributes -- it

22   added the inputs and the outputs, is what --

68

1    in which is what I describe in my report,

2    instead of adding the actual elements, like

3    Social Security number, name, address,

4    student ID, whatever those elements were.

5                Instead of adding, like -- and

6    being 10 elements, in my example, it was

7    adding the number of characters in the inputs

8    and outputs, which made the monetary loss,

9    divided by the attribute value, that number of

10   attributes being much higher.  So the actual

11   implementation was dividing by a much larger

12   number.

13      Q.    Okay.  If I'm following

14   correctly, when you say the actual

15   implementation, you were referring to the

16   source code that is used to execute the query

17   on the UTCID data; is that right?

18      A.    Not the query, but the actual

19   code to do the calculation, you're right, the

20   source code to -- to create this calculation.

21      Q.    Okay.  And the code to create the

22   calculation lives in a GitHub repository and

69

1  can be re- -- produced to us; is that right?

2                ATTORNEY L. ARAGON:  Objection:

3       form.

4                THE WITNESS:  Yes.

5  BY ATTORNEY Z. SHAH:

6       Q.    And that code that was used to

7  execute the query contained an error in which

8  you are computing monetary loss by dividing by

9  larger denominator than you intended; is that

10 right?

11      A.    That is correct.

12      Q.    And when you divide by a larger

13 denominator, you get a smaller monetary loss;

14 is that right?

15      A.    That's right.

16                So that would be -- my numbers

17 would be smaller than -- my reported numbers

18 would be smaller than this calculation -- or

19 this equation represents.

20      Q.    Okay.  And when you say the

21 reported numbers, you mean the numbers

22 reported in Appendix A to your report?

70

1          A.     Yes.

2          Q.     So when I asked you earlier

3    whether there were any changes to Appendix A,

4    do you intend to change Appendix A to reflect

5    monetary value numbers that are consistent

6    with the methodology that you set forth in

7    Exhibit 6?

8          A.     I'd be happy to do so if

9    requested.

10         Q.     But you have not done so yet; is

11   that right?

12         A.     That's right.

13         Q.     And you determined that the

14   margin of error for this error in the query

15   was 1 percent; is that right?

16         A.     Yes, for some of them, it -- it

17   didn't change, yes, and that it's very

18   correlated.  But I'm happy to update those.

19   I -- it's a very recent discovery.

20                So . . .

21         Q.     How recent?

22         A.     When I got the rebuttal report

71

```
 1    and I was then -- I went and -- so in the last

 2    week.

 3         Q.    So since receiving PowerSchool's

 4    rebuttal report, you discovered an additional

 5    error in the query that was used to generate

 6    the monetary values in Appendix A.

 7                    Is that fair?

 8         A.    It was the error in how we

 9    calculated -- how we counted the number of

10    attributes, yes.

11         Q.    And part of that error is that

12    the way that you actually counted the number

13    of attributes is different from how you say

14    you counted the number of attributes in

15    Exhibit 6 --

16                    ATTORNEY L. ARAGON:  Objection:

17         form.

18    BY ATTORNEY Z. SHAH:

19         Q.    -- is that right?

20         A.    So the -- they should just be

21    calculated based on the number of inputs and

22    outputs.  They were not -- they were
```

Case 3:24-cv-02706-JD   Document 134-3   Filed 03/09/26   Page 22 of 151

CHERKIN v                    Includes Confidential Testimony Kathleen Suzanne Barber Simons
POWERSCHOOL HOLDINGS, INC.

72

1    calculated based on the number of characters

2    in those inputs and outputs.  So that count

3    was incorrect, resulting in a lower

4    monetization value than was reported.

5         Q.     When you say the number of

6    characters, what do you mean?

7         A.     So when you use -- when you have

8    a set, you know, and you union that set, you

9    basically combine the set, right.  So if I

10   have a set of inputs -- let's say 5 inputs --

11   and I have a set of outputs, 5 outputs, and I

12   union them, then I have a set now that's of

13   10, right.

14              And so I would've expected for

15   that monetary loss to be divided by the number

16   in the set.

17              Okay.

18              And what this library function

19   that we were using union -- the union

20   calculation unioned and added the number of

21   characters in the set, not the number of

22   elements in the set.

73

1          Q.     When you say the number of

2   characters, do you mean the number of letters

3   in the word?

4          A.     I do.

5          Q.     So to give an example, if the

6   number of data elements was two -- or let me

7   -- let me take an even simpler example.

8                    To give an example, if a

9   case of identity theft, fraud or abuse

10  involved one data element, someone's name, is

11  the denominator for monetary value supposed to

12  be 1 and instead was 4 because name is a

13  four-letter word?

14         A.     That's right.

15         Q.     Okay.  The GitHub query that you

16  reference -- what programming language is it

17  in?

18         A.     Java.

19         Q.     Okay.

20                 ATTORNEY Z. SHAH:  Jacob, let's

21      go back to Exhibit 1.

22                 ATTORNEY L. ARAGON:  We've been

74

```
 1    going about an hour or two.  Whenever

 2    you guys are ready for a break, I

 3    would like to take one.

 4            ATTORNEY Z. SHAH:  Actually --

 5            ATTORNEY L. ARAGON:  It doesn't

 6    have to be now, but --

 7            ATTORNEY Z. SHAH:  -- yeah,

 8    actually, let's do this:  Can we just

 9    quickly mark the source data as well

10    as an exhibit, and then we can take --

11    we can take the break?

12            Is that okay, Leonard?

13            ATTORNEY L. ARAGON:  Yep, yep.

14            ATTORNEY Z. SHAH:  Okay.

15            Sorry, jacob, I'm all over the

16    place.

17            Can we pull up Tab 7 and mark

18    it as Exhibit 7?

19                       --oOo--

20            (Barber Deposition Exhibit Number

21             7, Excel spreadsheet, UTCID

22             Identity Ecosystem Source Data
```

86

1    over 100,000 documents have been produced in

2    this case?

3         A.     I'm not.

4         Q.     How did you go about selecting

5    the nine documents you rely on for your

6    opinions?

7         A.     I -- it was a selection of

8    products that PowerSchool has that -- just

9    giving an example of how the data that we have

10   in the ecosystem maps to the PowerSchool

11   products.  So based on website, based on DPIA

12   reports that have been provided to counsel

13   that counsel provided to me.

14              So . . .

15        Q.     So is it fair to say you

16   selected -- your method for selecting

17   documents that you reviewed and relied on for

18   your opinions was to look at what counsel gave

19   you?

20              ATTORNEY L. ARAGON:  Objection:

21        form; foundation.

22              THE WITNESS:  Yeah.  But I --

1          in combination, I had looked at, you

2          know, at least website and products

3          that were mentioned in the deposition

4          with Flagg and -- but, yes, counsel

5          did provide me some.  But I also

6          looked at products on my own from the

7          website and from that deposition.

8    BY ATTORNEY Z. SHAH:

9          Q.    So is it fair to say that you

10   selected documents to review based on what

11   counsel gave you and your review of publicly

12   available information?

13         A.    I think that's fair.

14         Q.    How did you come to select

15   Mr. Flagg's deposition to review?

16         A.    I think it was in the

17   conversation of, you know, where had

18   discussions existed about which data

19   PowerSchool controls and processes.  And

20   either I asked for, you know, where is that

21   mentioned or counsel provided it to me.  I

22   don't remember.  But that's -- that was the

88

1    motivation for using that deposition, because

2    the discussion around what PowerSchool

3    controls and processes existed in that

4    deposition, so it seemed like a good source.

5        Q.    Okay.  So -- so is it fair to say

6    you asked counsel, Where can I find the data

7    sources -- data elements collected by

8    PowerSchool, and counsel pointed you to this

9    deposition and so you reviewed that

10   deposition?

11              ATTORNEY L. ARAGON:  Objection:

12        form.

13              THE WITNESS:  Yeah, I mean,

14        I -- I think the same goes for the

15        DPIs [sic], you know, in trying to

16        understand how the data that I know

17        about and what it harms and what --

18        you know, the characterizations I know

19        about the data, which -- I needed to

20        know what data does PowerSchool hold,

21        and so I needed those sources.

22

89

BY ATTORNEY Z. SHAH:

Q.    Okay.  So to learn what data

PowerSchool holds, you relied exclusively on

documentation that counsel provided to you; is

that right -- and publicly available

information?

A.    Yes.

Q.    You agree, Dr. Barber, that it's

important to read an entire deposition to have

the full context for the testimony, right?

ATTORNEY L. ARAGON:  Objection:

form; foundation.

THE WITNESS:  I don't -- no.  I

mean, I just needed what data does

PowerSchool collect.  That was all I

needed from that -- or what data does

it control and process.  That's all I

needed from -- from these sources.

BY ATTORNEY Z. SHAH:

Q.    Okay.  Did you review Mr. Flagg's

deposition in its entirety?

A.    No.  I mean, I -- I flipped

90

```
1    through it, but I -- when I -- when you say

2    review, then I -- I was looking for statements

3    about what data PowerSchool controls and

4    processes.

5         Q.    Do you -- you did not read

6    Mr. Flagg's deposition in its entirety; is

7    that right?

8              ATTORNEY L. ARAGON:  Objection

9         to form.

10             THE WITNESS:  I would say no.

11   BY ATTORNEY Z. SHAH:

12        Q.    Are you aware, Dr. Barber, that

13   16 other witnesses have been deposed in this

14   case?

15        A.    I was not aware of that.

16        Q.    Did you ask to review any other

17   depositions?

18        A.    If I wasn't aware of them, I

19   don't know how I would have asked for them.  I

20   was only looking for data that PowerSchool

21   controls and processes and documents related

22   to that.
```

91

1          Q.      You didn't review the depositions

2    of the named Plaintiffs in this case, correct?

3          A.      I don't recall.

4          Q.      You didn't review the

5    depositions -- well, hold on.

6                        Let me go back.  I do not

7    see on your list the depositions of the named

8    Plaintiffs in this case.

9                        So did you review their

10   depositions?

11         A.      I did not.

12         Q.      You didn't review the depositions

13   of any PowerSchool employees other than

14   Mr. Flagg, right?

15         A.      That's correct.

16         Q.      Do you know who Mishka McCowan

17   is?

18         A.      I do not.

19         Q.      You did not review Mr. McCowan's

20   deposition, correct?

21         A.      I did not.

22         Q.      You didn't review the depositions

95

```
 1          A.     That's what I said, that I think

 2    that there are more data.  I don't -- yes, I

 3    am aware of that.

 4          Q.     Okay.  But you did not discuss

 5    the data elements involving any products other

 6    than the nine products we just discussed,

 7    right?

 8          A.     Right --

 9                 ATTORNEY L. ARAGON:  Objection:

10         form; foundation.

11                 THE WITNESS:  -- I mean, yes.

12    BY ATTORNEY Z. SHAH:

13          Q.     And those nine products were

14    selected for you by counsel; is that right?

15          A.     I did see these products on the

16    website; but, yes, I got these DPIA documents

17    from counsel.

18          Q.     Okay.  Let's look at the data

19    elements you report for one of those products,

20    and we can go to Paragraph 33, which lists the

21    elements for PowerSchool's SIS.

22          A.     Okay.
```

96

1          Q.      In Paragraph 33, you say:

2    PowerSchool SIS collects at least the

3    following data elements.

4                          Do you see that?

5          A.      Yes.

6          Q.      And then you list about ■

7    different elements, right?

8          A.      Yes.

9                    THE WITNESS:  Can you scroll a

10          little bit?

11                    (Scrolling.)

12                    THE WITNESS:  Yes.

13   BY ATTORNEY Z. SHAH:

14         Q.      You copied this list from

15   PowerSchool's DPIA report for its SIS product,

16   right?

17         A.      Correct.

18         Q.      And that's the same methodology

19   used for other PowerSchool products that are

20   discussed in your report, you copied the list

21   from the DPIA, correct?

22         A.      Yes.

97

1    Q.    You did not independently inspect

2  the SIS product, correct?

3    A.    That's correct.

4    Q.    You've not personally used the

5  SIS product, right?

6    A.    That's correct.

7    Q.    You don't know how data is stored

8  for the SIS product, right?

9    A.    That's correct.

10    Q.    You don't know how data tables

11  are configured for the SIS product, right?

12    A.    That's correct.

13    Q.    You don't know the security

14  configurations of the SIS product, correct?

15    A.    I wasn't asked to evaluate

16  security measures, no.

17    Q.    So you don't -- you don't know

18  the security configurations for the SIS

19  product, right?

20    A.    That's correct.

21    Q.    And you don't know what

22  encryption is used for the SIS product,

Case 3:24-cv-02706-JD    Document 134-3    Filed 03/09/26    Page 34 of 151
CHERKIN v                    Includes Confidential Testimony Kathleen Suzanne Barber Simons
POWERSCHOOL HOLDINGS, INC.

98

1    correct?

2         A.    That's correct.  I was only asked

3    to look at the inherent value and harms that

4    have empirically been seen from these data

5    set -- these data.  That's kind of the scope

6    of my -- yeah.

7         Q.    And the same is true for the

8    other PowerSchool products that are discussed

9    in your report, isn't it --

10        A.    Yes.

11        Q.    -- you didn't -- you didn't --

12   you didn't independently inspect those

13   products, correct?

14        A.    I did not.

15        Q.    You have not personally used

16   those products, correct?

17        A.    That is correct.

18        Q.    You don't know how the data is

19   stored or configured for any of those

20   products, right?

21        A.    That is correct.

22        Q.    You don't know the security

99

1    configurations for any of those products,

2    correct?

3         A.    That is correct.

4         Q.    And you don't know what

5    encryption is used for any of those products,

6    right?

7         A.    That's correct.

8         Q.    So your report just copies the

9    data elements that are listed in PowerSchool's

10   DPIAs, true?

11              ATTORNEY L. ARAGON:  Objection:

12        form.

13              THE WITNESS:  Yeah, to -- to

14        understand what data is -- is

15        controlled and processed by

16        PowerSchool, because that was my --

17        that was really the only question I

18        was asking about PowerSchool's

19        products, is what data is held.

20   BY ATTORNEY Z. SHAH:

21        Q.    Right.  But in order to

22   investigate what data is held, the only thing

100

1    you looked at was the DPIA, right?

2                      ATTORNEY L. ARAGON:  Objection:

3          form.

4                      THE WITNESS:  And -- and also

5          the Flagg deposition and the -- the

6          websites and power -- like you said,

7          the public domain listed information.

8    BY ATTORNEY Z. SHAH:

9        Q.    Okay.  So in order to understand

10   what data is stored by PowerSchool products,

11   you looked at the DPIAs, the Flagg deposition

12   and publicly available websites.

13                   Is that fair?

14       A.    That is fair.

15                      ATTORNEY L. ARAGON:  Objection:

16         form; foundation.

17   BY ATTORNEY Z. SHAH:

18       Q.    You did not look at the products

19   themselves, correct?

20       A.    I did not.

21       Q.    In Paragraph 30 --

22                      ATTORNEY Z. SHAH:  If we could

101

1          scroll up.

2                    (Scrolling.)

3    BY ATTORNEY Z. SHAH:

4          Q.    Dr. Barber, what is your basis

5    for saying that these are the minimum data

6    elements processed by PowerSchool products?

7                    ATTORNEY L. ARAGON:  Objection:

8          form.

9                    THE WITNESS:  Well, because in

10         some of the -- sometimes it said

11    ████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████

17         ████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████

███████████████████████████████

███████████████████████████████

102



4    BY ATTORNEY Z. SHAH:

5         Q.      Dr. Barber --

6         A.      -- somebody --

7         Q.      -- Dr. Barber -- Dr. Barber, I --

8    I'm not asking you what the documents say.

9    I'm asking you what is your basis for saying

10   these are the minimum data elements processed

11   by PowerSchool products.

12                      Where does your

13   understanding come from that these are the

14   minimum data elements?

15        A.      My understanding of data --

103

1    ███████████████████████████████

███████████████████████████████████

███████████████████████

4         Q.    So let -- let's take a concrete

5    example.  Let's look at the SIS example.

6         A.    Okay.

7         Q.    If we scroll to PDF Page 16,

8    which is the beginning of the list of data

9    elements for SIS.

10                    (Scrolling.)

11   BY ATTORNEY Z. SHAH:

12        Q.    Do you know, one way or another,

13   whether the SIS instance for every single

14   school has all of the data elements that are

15   listed in Paragraph 33 of your report?

16        A.    I do not.

17        Q.    So in Paragraph 33, where you say

18   SIS collects at least ███████████████████████

███████████████████████████████████

█████████████████████████████████████

██████████████████

22                    ATTORNEY L. ARAGON:  Objection:

104

```
 1           form; foundation.

 2                   THE WITNESS:  That's not what I

 3           was asked to -- I don't have an

 4           opinion about that because I wasn't

 5           asked to evaluate that.

 6   BY ATTORNEY Z. SHAH:

 7       Q.    So when you say SIS collects at

 8   least -- all of these data elements, that's

 9   not true, right?

10                   ATTORNEY L. ARAGON:  Objection:

11           form; foundation.

12                   THE WITNESS:  I don't know if

13           it's true.  What I know is --

14   BY ATTORNEY Z. SHAH:

15       Q.    You don't know.

16       A.     -- but I know that PowerSchool

17   said that these are the elements, these are

18   the data that this product processes and

19   controls.

20           That -- I was relying on

21   information from PowerSchool --

22       Q.    And I understand that.  But I'm
```

105

1    not --

2            A.      -- and then --

3            Q.      -- asking whether these are the

4    data elements that are processed.  I am asking

5    where your understanding comes from that these

6    are minimum or at least the elements that are

7    processed by every single PowerSchool product.

8                    ATTORNEY Z. SHAH:  Objection to

9            form.

10                   THE WITNESS:  And I'm trying to

11           explain that my definition of minimum

12           is because things like performance on

13           this list -- my expertise tells me

14           that there ████████████████████████

████████████████████████████████████

████████████████████████████████

██████████████████████████

18   BY ATTORNEY Z. SHAH:

19           Q.      Okay.  So let's take that --

20           A.      -- and so that's what I mean --

21   but that's what I mean by minimum -- I mean --

22           Q.      Okay.

1        A.      -- you're taking minimum as a

2   different definition that I don't really --

3        Q.      And I -- I want to make sure I

4   have your definition --

5        A.      Okay.

6        Q.      -- so when you say -- when you

7   say that SIS collects at least ███████████

   ████████████████████████████████████████████

   ████████████████████████████████████████

   ████████████████████████████████

11                    Is that fair --

12                    ATTORNEY L. ARAGON:  Objection:

13           form --

14   BY ATTORNEY Z. SHAH:

15        Q.      -- that is not your opinion?

16                    ATTORNEY L. ARAGON:  -- form;

17           foundation.

18                    THE WITNESS:  Yeah; I wasn't

19           asked to look at every instance and

20           see -- and evaluate that.  I don't --

21   BY ATTORNEY Z. SHAH:

22        Q.      Okay.

107

```
 1                    So you -- you were not --

 2    you're not actually offering an opinion on

 3    whether every single instance of SIS collects

 4    all of the data elements that are listed in

 5    Paragraph 33 of your report.

 6                    Is that fair?

 7        A.     That is fair.

 8        Q.     Okay.  Because you don't actually

 9    know if that's true for every single student

10    whose data is stored in SIS, correct?

11                    ATTORNEY L. ARAGON:  Objection:

12         form; foundation.

13                    THE WITNESS:  All I -- I wasn't

14         asked to look at instances.  I was

15         asked to look at -- well, I think I --

16    BY ATTORNEY Z. SHAH:

17        Q.     Yeah, I --

18        A.     -- you keep repeating the same

19    thing.

20        Q.     -- I think -- I think we're on

21    the same -- I think we're on --

22        A.     Okay.
```

108

```
 1        Q.       -- the same page here,
 2    Dr. Barber.
 3                        You don't know if it's
 4    actually true for every single student whose
 5    data is stored in SIS whether each and every
 6    single one of these data elements is
 7    collected, correct?
 8                   ATTORNEY L. ARAGON:  Objection:
 9         form; foundation.
10                   THE WITNESS:  I don't know
11         about every instance, no.
12    BY ATTORNEY Z. SHAH:
13        Q.      No.
14                        And it's possible -- if we
15    go back to ████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████
18                   ATTORNEY L. ARAGON:  Objection:
19         form; foundation.
20                   THE WITNESS:  I don't know.
21    BY ATTORNEY Z. SHAH:
22        Q.      But it's possible, right, that
```

121

1      ████████████ is collected in every instance?

2          A.    No --

3                    ATTORNEY L. ARAGON:  Objection:

4          form.

5                    THE WITNESS:  -- that's not

6          what --

7   BY ATTORNEY Z. SHAH:

8          Q.    So when you say that

9   performance -- that SIS collects at least the

10  following data elements, are you not saying

11  that PowerSchool collects ████████████  in every

12  instance?

13                    ATTORNEY L. ARAGON:  Objection:

14         form.

15                    THE WITNESS:  That's not what

16         that statement means.

17  BY ATTORNEY Z. SHAH:

18         Q.    Okay.  So you're not offering an

19  opinion that all of these data elements are

20  collected; is that right?

21         A.    That's right, I'm not offering an

22  opinion about particular instances, because

122

1    one of the things that -- to realize is that I

2    was looking at mapping data elements that were

3    mentioned in the DPIAs to the data that I know

4    about and the characterizations that I know

5    about.

6        Q.    I get that.  I get that,

7    Dr. Barber, and we will get to your mapping

8    exercise, but I want to understand this

9    portion of your opinion.  And when you are

10   talking about minimum data elements, I want to

11   be really clear that your opinion is not that

12   every single PowerSchool product collects all

13   of the data fields reflected on the DPIAs --

14                ATTORNEY L. ARAGON:  Objection

15         --

16   BY ATTORNEY Z. SHAH:

17       Q.    -- and as I understand it, that

18   is not your opinion, correct?

19                ATTORNEY L. ARAGON:  -- object

20         to form.

21                THE WITNESS:  Right, because

22         there's a difference between data

1          elements -- let's say, ███████

█████████████████████████  and the actual instance

3          of that --

4    BY ATTORNEY Z. SHAH:

5          Q.     Right.

6          A.     -- and what I -- I wasn't asked

7    to evaluate instances of data or instances of

8    configurations.

9          Q.     Okay.  Let me ask you about the

10   named Plaintiffs in this case.

11                  You told me you don't know

12   what their names are, right?

13         A.     Well, other than --

14                  ATTORNEY L. ARAGON:  Objection:

15         form.

16                  THE WITNESS:  -- listed on the

17         Complaint.

18   BY ATTORNEY Z. SHAH:

19         Q.     Okay.  Sitting here today, do you

20   know their names?

21         A.     Yeah, as listed, Cherkin -- I

22   mean, I -- I really have done no investigation

1   of these individuals.

2        Q.     Okay.  You don't know what

3   schools they went to, right?

4        A.     That's right.

5        Q.     You don't know what PowerSchool

6   products they used, right?

7        A.     That's right.

8        Q.     You don't actually know if they

9   used any PowerSchool products, right?

10       A.     That's not what I was asked to

11  evaluate.

12       Q.     Right.  You don't know what data

13  elements are stored for the named Plaintiffs,

14  correct?

15       A.     That's correct.

16       Q.     All right.  You don't know if any

17  data elements are stored for the named

18  Plaintiffs, correct?

19       A.     I wasn't asked to evaluate those

20  --

21       Q.     So you don't know --

22       A.     I don't know.

125

1        Q.      -- right?

2                    You don't know -- you did

3    not review the data for the named Plaintiffs

4    that was produced in this case, correct?

5        A.      Correct.

6        Q.      You don't know if the named

7    Plaintiffs opted out of using certain

8    technology at their schools, right?

9        A.      I don't know.

10        Q.      You didn't read their

11    depositions, correct?

12        A.      Correct.

13        Q.      You agree that if students opt

14    out of using certain products, those products

15    won't use -- won't store their data, right?

16                    ATTORNEY L. ARAGON:  Objection:

17            form; foundation.

18                    THE WITNESS:  I don't know

19            anything about the instances of -- I

20            just -- I can't comment on that

21            implementation --

22

126

```
 1   BY ATTORNEY Z. SHAH:

 2        Q.     Okay.

 3        A.     -- I just . . .

 4        Q.     So my question was:  You agree

 5   that if a student opts out of using a certain

 6   product, then that product is not going to

 7   store their data.

 8                    Do you agree with that?

 9                    ATTORNEY L. ARAGON:  Objection:

10          form; foundation.

11                    THE WITNESS:  I don't know what

12          PowerSchool's implementation of the

13          opt-out procedure is.  There's many

14          different -- I don't know.

15   BY ATTORNEY Z. SHAH:

16        Q.     It's not something you looked

17   into when forming your opinions, right?

18        A.     That's right.  That's right.

19        Q.     Okay.  And you didn't -- strike

20   that.

21                    Did you know that the

22   Plaintiffs discussed opting out of using
```

133

1          form.

2                    THE WITNESS:  To my memory and

3          because it's listed here that there

4          was a reference to that in the Flagg

5          exhibit, that's why I must have put

6          that here and that I think there was,

7          kind of, reconciling -- reconciling

8          between what was in the DPIA and what

9          was in the Flagg deposition.

10   BY ATTORNEY Z. SHAH:

11        Q.     Dr. Barber, how does

12   Connected Intelligence work?  Can you describe

13   it to me?

14        A.     No -- well, other than ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████ But I

18   don't have any intimate knowledge of how it

19   works.

20                    I'm simply looking for, in my

21   analysis, data that PowerSchool is declaring

22   that they controlled and processed either, you

134

1    know, in testimony or in DPIAs.

2        Q.    Okay.  So your entire

3    understanding of how Connected Intelligence

4    works comes from the DPIA, a public website,

5    and Flagg Exhibit 6, which I believe is also

6    the DPIA; is that right?

7                ATTORNEY L. ARAGON:  Objection:

8            form; foundation.

9                THE WITNESS:  Yes, the -- the

10           documents that I listed, yes, that's

11           right.

12   BY ATTORNEY Z. SHAH:

13       Q.    You have not seen any actual

14   evidence that supports your statement that

15   Connected Intelligence actually processes

16   ██████████████████████  right?

17                ATTORNEY L. ARAGON:  Objection:

18           form.

19                THE WITNESS:  Other than what

20           -- what was mentioned in those

21           depositions or in the documents that

22           we just described, that's right.

135

1  BY ATTORNEY Z. SHAH:

2       Q.    You've never seen the

3  Connected Intelligence interface, right?

4       A.    That's right.

5       Q.    You've never seen an instance, a

6  single instance, of █████████████ being

7  used by Connected Intelligence, right?

8              ATTORNEY L. ARAGON:  Objection:

9         form.

10              THE WITNESS:  I have only seen

11         what PowerSchool has documented, yeah,

12         about what is controlled and

13         processed.

14  BY ATTORNEY Z. SHAH:

15       Q.    But you have not seen what is

16  actually controlled and processed, right?

17              ATTORNEY L. ARAGON:  Objection:

18         form; foundation.

19              THE WITNESS:  As in the --

20         like, interfacing with the actual

21         implementation, no.

22

1    Counsel, can we go off the record so I

2    can start a new video file, please?

3          ATTORNEY Z. SHAH:  Yes.

4          VIDEO TECHNICIAN FIGUEROA:

5    Thank you.

6          The time is 11:20 a.m.  We're

7    going off the record.

8                    --oOo--

9       (Whereupon, a recess was taken from

10        11:20 a.m. CST to 11:34 a.m. CST.)

11                   --oOo--

12        VIDEO TECHNICIAN FIGUEROA:  The

13   time is 11:34 a.m.  We are back on the

14   record for Video Media 2.

15        ATTORNEY Z. SHAH:  Let's go

16   ahead and mark Tab 15 as, I believe,

17   Exhibit 8.

18                    --oOo--

19      (Barber Deposition Exhibit Number

20        8, Data Privacy Impact

21        assessment (DPIA Report)

22        PowerSchool SIS, marked for

142

```
 1                  identification for purposes of

 2                  the record.)

 3                          --oOo--

 4   BY ATTORNEY Z. SHAH:

 5        Q.    Dr. Barber, do you recognize this

 6   as the DPIA report for the PowerSchool SIS

 7   product?

 8        A.    Yes.

 9        Q.    You reviewed this DPIA report in

10   preparing your opinions in this case; is that

11   right?

12        A.    Yes.

13                 ATTORNEY Z. SHAH:  Let's scroll

14      down to PDF Page 5, please.

15                 (Scrolling.)

16   BY ATTORNEY Z. SHAH:

17        Q.    Do you see the table of data

18   elements listed on this page?

19        A.    I do.

20        Q.    And I want to be really clear

21   about your opinions, Dr. Barber.

22                 Is it your opinion that
```

143

1    PowerSchool SIS automatically collects all of

2    these data elements for every instance of SIS?

3                    ATTORNEY L. ARAGON:  Objection:

4            form; foundation.

5                    THE WITNESS:  It's only my

6            opinion that PowerSchool says the

7            product controls and processes this

8            information.

9                    In terms of what instances are

10           collected by different users, I do

11           not know.  I wasn't asked to review

12           that.

13   BY ATTORNEY Z. SHAH:

14       Q.    Okay.  And so it's not your

15   opinion that SIS automatically collects all of

16   these data elements for all schools, right?

17                   ATTORNEY L. ARAGON:  Objection:

18           form; foundation.

19                   THE WITNESS:  It's probably not

20           an automatic collection for any of

21           them.

22                   Don't people enter the data?

144

```
 1              What do you mean by automatic?

 2  BY ATTORNEY Z. SHAH:

 3      Q.    Well, that's my question to you.

 4                  Is it your opinion that all

 5  of these data elements are automatically

 6  collected for every school that uses the SIS

 7  product?

 8                  ATTORNEY L. ARAGON:  Objection:

 9          form; foundation.

10                  THE WITNESS:  I wasn't asked to

11          review instances of implementations.

12  BY ATTORNEY Z. SHAH:

13      Q.    Okay.  And so it -- that's not

14  your opinion, right?  It's not your opinion

15  that each of these data elements is

16  automatically collected for every school,

17  right?

18                  ATTORNEY L. ARAGON:  Objection:

19          form; foundation.

20                  THE WITNESS:  I don't have an

21          opinion about it.

22
```

146

1          credentials, what does that mean?

2          That probably has a lot of different

3          elements in it and so different types

4          of elements.

5                   Schools and universities

6          attended -- that probably has

7          graduation date.  It probably has

8          school name.

9                   There's a lot of different

10         data elements inside these.  That's

11         what was meant by minimum.

12   BY ATTORNEY Z. SHAH:

13         Q.    Yes.  And I -- I understand that.

14               And I want to make very sure

15   that when you say minimum, you are not saying

16   there's a baseline set of data elements that

17   are inherent in the product that are present

18   for every school that uses the product.

19               And my understanding is

20   that's not your opinion; is that correct?

21         A.    But I don't --

22               ATTORNEY L. ARAGON:  Objection:

147

1          form; foundation.

2                    THE WITNESS:  -- that's --

3          that's also -- there's a -- you know,

4          does the product ship with all of

5          these data elements in its structure

6          and then whether a school decides to

7          create -- like, enter data inside

8          that, I don't know.

9                    I would --

10    BY ATTORNEY Z. SHAH:

11         Q.    That's --

12         A.      -- assume that it ships with all

13    of these data elements that make it possible

14    for a user to populate, but --

15         Q.    Okay.  So I want to -- I want to

16    break that down.

17         A.    Okay.

18         Q.    You say you assume the product

19    ships -- ships with all of these data

20    elements; is that right?

21         A.    Like, the -- I as a --

22                    ATTORNEY L. ARAGON:  Objection:

148

```
 1              form.

 2                      THE WITNESS:  -- a document

 3              would tell me that PowerSchool is

 4              capable of controlling and processing

 5              these data, so that if I get the

 6              product as a user, I would expect that

 7              I have the ability -- whether I

 8              populate it or not, I don't know; I

 9              didn't -- I wasn't -- I wasn't asked

10              to opine on that, but that it has that

11              capability of storing this

12              information --

13     BY ATTORNEY Z. SHAH:

14         Q.    Okay.  What is --

15         A.      -- that is what I assume these

16     data -- that's what I assume PowerSchool was

17     saying in these documents.

18         Q.    And that's -- that's your

19     assumption about how the product is configured

20     at the time that it ships to a customer; is

21     that right?

22                      ATTORNEY L. ARAGON:  Objection:
```

149

```
 1          form.

 2                    THE WITNESS:  That's what the

 3          document is saying, you know, the --

 4   BY ATTORNEY Z. SHAH:

 5          Q.    Do you know, Dr. Barber, whether

 6   the SIS product, when it ships to a customer

 7   -- whether it actually has all of these data

 8   elements?  Do you know that?

 9                    ATTORNEY L. ARAGON:  Objection:

10          form; foundation.

11                    THE WITNESS:  I did rely on

12          PowerSchool --

13   BY ATTORNEY Z. SHAH:

14          Q.    Okay.  Where in this document --

15          A.    -- documenting their data

16   elements.  I --

17          Q.    -- where in this document --

18          A.    -- relied on this --

19                    (Simultaneous speech; as a result,

20                    portions of the testimony could not

21                    be reflected in the record.)

22
```

151

```
 1    ships with a feature that allows schools to

 2    ████████████████████████████████████████

 3                      If that is your opinion, I

 4    would like to know what your basis for that

 5    opinion is --

 6        A.     My basis for that opinion --

 7        Q.     -- the DPIA does not say that.

 8                  ATTORNEY L. ARAGON:  Objection:

 9           form; foundation.

10                  THE WITNESS:  Well, if I was --

11           I took PowerSchool at its word in

12           these documents that these documents

13           are -- that the product is capable and

14           controls and processes these data.

15                  I wouldn't expect it --

16           PowerSchool to say it is capable of

17           controlling and documenting data that

18           it doesn't.  I --

19    BY ATTORNEY Z. SHAH:

20        Q.     Dr. Barber, do you know the

21    difference between a required data element and

22    an optional data element?
```

152

1          A.      Yes.  But to be optional, it has

2     to be in the -- in the product.

3          Q.      Okay.  Do you know whether these

4     are required or optional data fields?

5          A.      Required for what?

6          Q.      To -- for the product to

7     function?

8                         Do you know?

9          A.      I do not know.

10          Q.      Do you know whether every

11     instance of SIS ships with all of these data

12     elements?

13                    ATTORNEY L. ARAGON:  Objection:

14          form; foundation.

15                    THE WITNESS:  I don't know.

16          But if it doesn't, I would wonder why

17          PowerSchool has it in their

18          documentation that they have that

19          capability.

20     BY ATTORNEY Z. SHAH:

21          Q.      Did you --

22          A.      I --

153

1      Q.      -- did you read Mr. Flagg's

2   explanation?

3      A.      That there are configurations, I

4   get that.  And so --

5      Q.      So is it your testimony that

6   every single instance of SIS ships with the

7   capability to populate all of these data

8   elements?  Do you know?

9      A.      I haven't looked at all those

10  configuration shipments, no.

11     Q.      So you don't know, right?

12     A.      I don't know.

13     Q.      Okay.  And it's not your opinion

14  that every single instance of SIS

15  automatically collects all of these data

16  elements, right?

17              ATTORNEY L. ARAGON:  Objection:

18        form.

19              THE WITNESS:  No, I wasn't

20        looking at any instances.  I think

21        I've made that super clear.

22

163

```
 1                    September 16, 2020, Bates

 2                    stamped PWRSCHL_00007183 through

 3                    PWRSCHL_00007225, marked for

 4                    identification for purposes of

 5                    the record.)

 6                         --oOo--

 7   BY ATTORNEY Z. SHAH:

 8        Q.    This is the student data privacy

 9   agreement between PowerSchool and Seattle

10   School District Number 1, right?

11                    Is that right, Dr. Barber?

12        A.    Yes.

13        Q.    Why did you select this agreement

14   to review?

15        A.    It was an instance that counsel

16   provided me.

17        Q.    Do you know if any of the named

18   Plaintiffs went to Seattle School District?

19        A.    I do not.

20        Q.    You didn't ask to review any

21   other data privacy agreements between

22   PowerSchool and any other school district,
```

1    right?

2        A.    I was just looking for an

3    example.

4        Q.    Okay.  You reviewed this data

5    privy agreement and relied on it when

6    preparing your report, correct?

7        A.    Yes, just -- yes.  And, you know,

8    I had that section in the -- Appendix A where

9    I was explicit about what I extracted from it.

10   I just extracted the data elements identified.

11       Q.    You extracted the data elements

12   identified in the agreement, but you didn't

13   read the rest of the agreement.

14                Is that fair?

15       A.    Oh, I mean, I think I read the

16   agreement, but, I mean, just in terms of what

17   you said, relied on, that's -- I was really

18   focused on what data is controlled and

19   processed in this instance.

20                So . . .

21       Q.    And let's take a look at PDF

22   Page 2.  The first paragraph just at the top

165

1   of this page, it says: ███████████

███████████████████████

████████████████████████████

████████████████████████████

██████████████████████████████████

███████████████

7                    Do you see that?

8       A.      Yes.

9       Q.      ████████████████████

███████████████████████

███████████████████████

12      A.      Yes.

13              ATTORNEY Z. SHAH:  Let's turn

14         to -- it's the bottom of PDF Page 2

15         onto PDF Page 3.  It's Article I,

16         Paragraph 1.

17              (Scrolling.)

18              ATTORNEY Z. SHAH:  Right there.

19         Perfect.

20   BY ATTORNEY Z. SHAH:

21      Q.     And the last sentence of this

22   paragraph, which starts at the top of PDF

192

```
 1          form.
 2                    THE WITNESS:  I guess you would
 3          have to give me the legal standard --
 4   BY ATTORNEY Z. SHAH:
 5          Q.     Well, I --
 6          A.      -- and then ask.
 7          Q.      -- think if you don't know what
 8   the legal standard is, you're not offering an
 9   opinion that the data is sensitive under that
10   legal standard, right?
11                    ATTORNEY L. ARAGON:  Objection.
12                    She never said that.  She just
13          said which legal standard are you
14          referring to.
15   BY ATTORNEY Z. SHAH:
16          Q.     Are -- are you -- Dr. Barber, is
17   it your understanding that you're opining that
18   data is sensitive under a specific legal
19   standard?  If so, tell me what that standard
20   is.
21                    ATTORNEY L. ARAGON:  Objection:
22          form.
```

193

1          THE WITNESS:  I did not include

2      that in my report --

3   BY ATTORNEY Z. SHAH:

4      Q.    Okay.  Because once --

5      A.    -- I think I -- I think I did

6   mention that particular laws do consider

7   children's data sensitive and declare, you

8   know, some age thresholds around that.  And

9   then there are other laws that talk about

10  types of data that -- but -- that are, you

11  know, in these sensitive categories, but I --

12  I did not include that in my report, other

13  than the -- the children's data being

14  sensitive.

15     Q.    Okay.  I -- I want to be really

16  clear, Dr. Barber.

17              What's sensitive under the

18  law is a legal conclusion, right?

19              ATTORNEY L. ARAGON:  Objection:

20      form; foundation.

21              THE WITNESS:  This -- this

22      sensitivity is based -- the statement

194

1          I made here in this paragraph is based

2          on our empirical findings.

3    BY ATTORNEY Z. SHAH:

4          Q.    I'm not asking you that.  I'm not

5    asking you that.

6          A.    Okay.  I'm sorry.

7          Q.    Dr. Barber, what is sensitive

8    under the law is a legal conclusion, correct?

9                ATTORNEY L. ARAGON:  Objection:

10         form; foundation.

11               THE WITNESS:  Yes, and

12         different laws consider different data

13         sensitive.

14   BY ATTORNEY Z. SHAH:

15         Q.    Yes.

16               And you are not a lawyer,

17   right?

18         A.    That is correct.

19         Q.    And you are not offering a legal

20   opinion about what is sensitive under a

21   particular legal standard, correct?

22         A.    I am not mapping -- I am not.

195

```
1        Q.    Okay.  You're not qualified to

2   opine on whether something is sensitive under

3   a particular legal standard, right?

4                ATTORNEY L. ARAGON:  Objection:

5         form; foundation.

6                THE WITNESS:  I don't know.  I

7         mean, I know a lot about the laws that

8         govern PII, but that's not the opinion

9         I'm offering here.

10  BY ATTORNEY Z. SHAH:

11       Q.    Okay.  You're not offering an

12  opinion about what's sensitive under the law,

13  right?

14                ATTORNEY L. ARAGON:  Objection:

15         form; foundation.

16                THE WITNESS:  I -- I am not in

17         this statement, no.

18  BY ATTORNEY Z. SHAH:

19       Q.    Now, the first reason that you

20  say the data collected by PowerSchool is

21  sensitive is because it can be used to

22  identify individuals and/or their devices,
```

196

 1    correct?

 2         A.    That's right.

 3         Q.    When you say can be used, you

 4    mean it's possible, not that it always

 5    happens, right?

 6                    ATTORNEY L. ARAGON:  Objection:

 7         form; foundation.

 8                    THE WITNESS:  I -- we have to

 9         have some way of identifying people,

10         and this is the data that we use.

11    BY ATTORNEY Z. SHAH:

12         Q.    That's not what I'm asking you.

13         A.    I know --

14         Q.    I'm --

15         A.    -- but I don't understand what

16    you're asking me.

17         Q.    Well, it's a -- it's a very

18    simple -- it's a question of the English

19    language.  Okay?

20                    When you say something can

21    be used, you are not saying it will always be

22    used, correct?

198

1        A.        That's what I'm --

2        Q.        -- is this data can be used --

3        A.        That's right.

4        Q.        -- and you use the word can,

5    which is, to me, a statement of possibility,

6    not that it is always used.

7                        Is it your opinion that this

8    data is always used to identify individuals

9    and their devices?

10                   ATTORNEY L. ARAGON:  Objection:

11        form; foundation.

12                   THE WITNESS:  If you're talking

13        about the list above and the paragraph

14        below, that, yes, it can be, but

15        it's -- this is not always the list

16        used.

17    BY ATTORNEY Z. SHAH:

18        Q.        Okay.  That's all I'm asking.

19        A.        Okay.  Well, thanks.

20        Q.        Okay.  I didn't think we had a

21    disagreement.  I thought I was reading your

22    report --

199

```
1        A.      Yeah, yeah --

2        Q.      -- very closely --

3        A.      -- yeah, I --

4        Q.      -- but --

5               CERTIFIED STENOGRAPHER:  Let

6          the record reflect we have to have one

7          person talking at one time, please.

8               THE WITNESS:  Okay.

9   BY ATTORNEY Z. SHAH:

10       Q.     Okay.  Dr. Barber, have you seen

11  any evidence that the data collected by

12  PowerSchool was actually used to identify an

13  individual and/or their devices?

14              ATTORNEY L. ARAGON:  Objection:

15         form; foundation.

16              THE WITNESS:  That's not what I

17         was asked to look at.

18  BY ATTORNEY Z. SHAH:

19       Q.     So the answer is, no, you have

20  not seen any evidence, right?

21              ATTORNEY L. ARAGON:  Objection:

22         form; foundation.
```

200

```
1              THE WITNESS:  I mean, the

2         documents do say that this data is

3         used for -- I don't have -- I'll just

4         say no.

5   BY ATTORNEY Z. SHAH:

6         Q.    Okay.  The second point you make

7   in Paragraph 34 is -- you say the data that

8   was collected can be used to locate

9   individuals in cyberspace and in the physical

10  world.

11                  Now, again, that's a

12  possibility statement, correct?

13        A.    It is.

14             ATTORNEY L. ARAGON:  Objection:

15         form; foundation.

16  BY ATTORNEY Z. SHAH:

17        Q.    You have not seen any evidence

18  that the data collected by PowerSchool was

19  actually used to locate individuals in

20  cyberspace and in the physical world, correct?

21        A.    No.  I've just --

22             ATTORNEY L. ARAGON:  Objection:
```

201

```
 1           form; foundation.

 2                    THE WITNESS:  -- I've just seen

 3           it in -- in our empirical studies of,

 4           like, over 5,000 cases, but yes.

 5   BY ATTORNEY Z. SHAH:

 6        Q.    Okay.  But not -- not in the case

 7   of the PowerSchool data, right?

 8        A.    Yeah.  I wasn't asked to look at

 9   that.

10        Q.    And you did not see anything

11   consistent --

12                    ATTORNEY L. ARAGON:  Objection:

13           form; foundation.

14   BY ATTORNEY Z. SHAH:

15        Q.    -- with -- with -- you did not

16   see any evidence, right, that the data

17   collected by PowerSchool was actually used to

18   locate individuals in cyberspace and the

19   physical world, right?

20        A.    I didn't look --

21                    ATTORNEY L. ARAGON:  Objection:

22           form; foundation.
```

202

```
1              THE WITNESS:  -- yeah, I didn't

2         look.  I wasn't asked to opine on

3         that.

4   BY ATTORNEY Z. SHAH:

5       Q.    And you didn't see it, right?

6              ATTORNEY L. ARAGON:  Objection:

7         form; foundation.

8              THE WITNESS:  I wasn't asked

9         to --

10  BY ATTORNEY Z. SHAH:

11      Q.    Because you weren't asked, you

12  didn't see it, right?

13             ATTORNEY L. ARAGON:  Objection:

14        form; foundation.

15             THE WITNESS:  That's a

16        different question.

17             If I wasn't asked, I didn't

18        see it.  But there's a -- that's

19        different than saying I was asked; I

20        looked at it; and I didn't see it.

21        Those are two different things.

22
```

CHERKIN v                Includes Confidential Testimony Kathleen Suzanne Barber Simons
POWERSCHOOL HOLDINGS, INC.

203

1    BY ATTORNEY Z. SHAH:

2        Q.     I understand that.

3               But you didn't look -- you

4    didn't -- you have not seen any, right?

5        A.     I didn't look.

6        Q.     And you have not seen any?

7               ATTORNEY L. ARAGON:  Objection:

8         form; foundation.

9    BY ATTORNEY Z. SHAH:

10       Q.     You have not seen any, correct,

11   Dr. Barber?

12       A.     As a result of not looking, yes.

13       Q.     And the third point you say is

14   the data collected by PowerSchool is valuable

15   and its monetization by threat actors can

16   result in significant financial, emotional and

17   reputational harms.

18               Do you see that?

19       A.     Yes.

20       Q.     Now, again, when you talk about

21   threat actors, you're talking about criminal

22   misuse, correct?

204

1          A.      Not always.  That can be insider

2     threat.  That can be misuse.  You know, people

3     mistakes.  It can be because it wasn't

4     protected.  It could be a -- there's a wide

5     range there.

6          Q.     Okay.  That's fair.

7                      When you say the data can

8     result in significant financial and emotional

9     and reputational harms, you mean that that is

10    a possible thing that could occur, right?

11         A.     Yes.  We've seen that and

12    reported on other organizations that have seen

13    the same thing.

14         Q.     You were not suggesting that the

15    ordinary collection of data by PowerSchool

16    automatically results in monetization by

17    threat actors, correct?

18                     ATTORNEY L. ARAGON:  Objection:

19          form; foundation.

20                     THE WITNESS:  Sometimes the --

21          sometimes things can be compromised

22          even in their ordinary collection

205

```
1              processes.  But, again, I didn't look

2              at any instances, business practices

3              or implementation, so I can't speak to

4              that.

5    BY ATTORNEY Z. SHAH:

6         Q.    So you're -- you're not opining

7    that the ordinary collection of data by

8    PowerSchool in this case automatically

9    resulted in the monetization of that data by

10   threat actors, correct?

11                   ATTORNEY L. ARAGON:  Objection

12             --

13                   THE WITNESS:  I am not --

14                   ATTORNEY L. ARAGON:  -- form;

15             foundation.

16                   THE WITNESS:  -- that is not

17             what I'm -- I wasn't asked to opine,

18             so, therefore, I'm not.

19   BY ATTORNEY Z. SHAH:

20        Q.    You have not seen any evidence

21   that the data collected by PowerSchool was

22   actually monetized by threat actors, correct?
```

206

```
 1              ATTORNEY L. ARAGON:  Objection:

 2         form; foundation.

 3              THE WITNESS:  I didn't look.

 4         So it's unfair for me to comment.

 5   BY ATTORNEY Z. SHAH:

 6      Q.    Why didn't you look?

 7              ATTORNEY L. ARAGON:  Objection:

 8         form; foundation.

 9              THE WITNESS:  I wasn't asked

10         to.  I was asked to see -- look at

11         what -- based on empirical studies

12         that we've seen, what -- how is this

13         data used, how often is it used, how

14         often does it create harm, how

15         powerful is it to collect other data.

16         I was asked to comment on the inherent

17         value, risk, harms of the data.

18   BY ATTORNEY Z. SHAH:

19      Q.    Okay.  And when you say the data,

20   you don't mean PowerSchool's data; you mean

21   these data elements generally, right?

22      A.    That's right --
```

207

```
 1              ATTORNEY L. ARAGON:  Objection:

 2         form; foundation.

 3              THE WITNESS:  -- the -- lists

 4         that were declared in the DPIAs and

 5         the -- the documents that we talked

 6         about.

 7    BY ATTORNEY Z. SHAH:

 8         Q.    Right.

 9              You have not seen any actual

10    evidence that the actual PowerSchool data was

11    monetized by a threat actor, correct?

12              ATTORNEY L. ARAGON:  Objection:

13         form; foundation.

14              THE WITNESS:  Other than the --

15         the breach.

16    BY ATTORNEY Z. SHAH:

17         Q.    Let's put the breach aside.

18              Other than the breach, have

19    you seen any evidence -- and I will get to the

20    breach, I promise -- have you seen any actual

21    evidence that the data collected by

22    PowerSchool was actually monetized by threat
```

211

1    were looking at Paragraph 34 of your report.

2                    ATTORNEY Z. SHAH:  Jacob, could

3         we pull that back up again?

4                    Thank you.

5    BY ATTORNEY Z. SHAH:

6         Q.    Now, I want to focus on the facts

7    of this case, and I want to be clear.

8                    You are not offering an

9    opinion regarding any specific harm to any

10   specific named Plaintiff in this case, right?

11        A.    That's right.

12                    ATTORNEY L. ARAGON:  Objection:

13        form; foundation.

14   BY ATTORNEY Z. SHAH:

15        Q.    And you don't know if the named

16   Plaintiffs' data was exposed as part of any

17   data breach, right?

18        A.    I did not look at that.

19        Q.    You have not seen any evidence

20   that the named Plaintiffs' specific

21   information was actually monetized by a threat

22   actor, correct?

212

1          A.      I did not do that investigation.

2          Q.      And you've not seen any evidence

3    that the data collected by PowerSchool has

4    actually resulted in significant financial,

5    emotional and reputational harms, correct?

6                        ATTORNEY L. ARAGON:  Objection:

7              form; foundation.

8                        THE WITNESS:  I have -- I have

9              not looked at -- I have not, no.  It's

10             not what I looked at.

11   BY ATTORNEY Z. SHAH:

12         Q.      The fourth thing you say in this

13   paragraph is:  Much of the data collected by

14   PowerSchool is used extensively in our

15   society, often called a digital currency,

16   offering many opportunities for threat actors

17   to exploit the data.

18                        Did I read that correctly?

19         A.      Yes.

20         Q.      And, again, when you say

21   opportunities, you mean there's a possibility

22   that data will be exploited at some point,

213

 1   right?

 2        A.    Yes, that's what our --

 3              ATTORNEY L. ARAGON:  Objection:

 4        form; foundation.

 5              THE WITNESS:  -- yes, that's

 6        what our data shows.

 7   BY ATTORNEY Z. SHAH:

 8        Q.    And actually, Dr. Barber, maybe

 9   for the record, what we can do is upload -- if

10   you'll just pause for a second and let

11   Mr. Aragon get in his objection.  It might be

12   cleaner for the record.

13        A.    Okay.  Will do.

14        Q.    Thank you.

15              Dr. Barber, you have not

16   seen any evidence that the data collected by

17   PowerSchool was actually exploited by threat

18   actors, right?

19        A.    No.  I haven't looked at that.

20        Q.    And you haven't seen any evidence

21   that the named Plaintiffs' specific

22   information was actually exploited by threat

214

```
1   actors, correct?

2        A.    I did not conduct that

3   investigation.

4        Q.    Is it your understanding that the

5   Plaintiffs in this case are alleging that

6   their information was exploited by a threat

7   actor?

8              ATTORNEY L. ARAGON:  Objection:

9         form; foundation.

10             THE WITNESS:  I only -- I -- I

11        did not look at -- that's not

12        something I investigated.

13  BY ATTORNEY Z. SHAH:

14       Q.    Okay.  You don't know whether

15  Plaintiffs --

16       A.    No.

17       Q.    -- in this case are alleging that

18  their information was exploited by a threat

19  actor, correct?

20       A.    I don't know.

21       Q.    The fifth thing you say in this

22  Paragraph 34 is the data can be used to
```

215

1    discover other valuable PII to compound harm,

2    right?

3         A.    Yes.

4         Q.    Have you seen any evidence that

5    the data collected by PowerSchool was actually

6    used to discover other valuable PII?

7         A.    That's not what I investigated.

8    I just -- we've seen it in the theft -- in the

9    5,000 cases we've looked at.

10        Q.    Okay.  So you've seen it for

11   other cases, but you have not seen it in the

12   PowerSchool case, correct?

13        A.    Yes, a lot of other cases, yes.

14        Q.    Yes.

15                    But not the PowerSchool

16   case, correct?

17        A.    I did not look specifically at

18   the PowerSchool case.

19        Q.    The sixth thing you say in this

20   paragraph is:  Much of the data does not

21   change or changes infrequently, allowing it to

22   be used over time to produce longitudinal

216

1    harm.

2                        Do you see that?

3        A.    Yes.

4        Q.    And, again, when you say allowing

5    it to be used to -- over time to produce

6    longitudinal harm, you're talking about the

7    possibility that data can be used over time to

8    produce longitudinal harm, right?

9        A.    Yes, that's what our empirical

10   data shows.

11       Q.    Okay.  And that's empirical data

12   about other cases, not PowerSchool data,

13   right?

14       A.    That's right.

15                ATTORNEY L. ARAGON:  Objection:

16         form; foundation.

17   BY ATTORNEY Z. SHAH:

18       Q.    You have not seen any evidence

19   that the data collected by PowerSchool was

20   actually used over time to create longitudinal

21   harm, right?

22       A.    I did not look specifically at

217

1    the PowerSchool --

2         Q.    And --

3         A.    -- instance, I guess.

4         Q.    Okay.  And when you say you

5    didn't -- you didn't look specifically at the

6    PowerSchool instance, you didn't look because

7    counsel did not ask you to, right?

8         A.    I was really looking at cases

9    that we had already looked at, like, over

10   5,000.  We have a lot of data points, and so I

11   was just mapping that to what we found as

12   patterns in other cases.

13        Q.    So were you making an assumption

14   that what happened in other cases will happen

15   in the PowerSchool case?

16             ATTORNEY L. ARAGON:  Objection:

17        form; foundation.

18             THE WITNESS:  I think

19        assumption is not a fair -- I was

20        applying it, said this -- how this

21        data has been used in over 5,000 other

22        cases.

218

1    BY ATTORNEY Z. SHAH:

2         Q.    Okay.  But you're comparing it to

3    the PowerSchool case, right, so what's the

4    point of the comparison other than to

5    speculate that that's what's going to happen

6    here?

7         A.    When this data -- the -- it's not

8    a speculation.  It's a -- and I -- I mean,

9    it's not 100 percent, but it is -- the data

10   shows that -- and, you know, this kind of data

11   can be used.  And so the inherent value, the

12   range of those values, the range of the

13   harms -- that's what I was asked to look at --

14        Q.    Okay.

15        A.       -- for this case.

16        Q.    So your -- your opinion is that

17   this data can be used, not that it actually

18   has been used, right?

19                  ATTORNEY L. ARAGON:  Objection:

20        form; foundation.

21                  THE WITNESS:  What actually has

22        been used in these over 5,000 cases.

223

```
1                THE WITNESS:  My -- no, my --

2           it's to evaluate harms, consequences

3           of the data that's held and processed

4           by PowerSchool products.

5  BY ATTORNEY Z. SHAH:

6      Q.    Okay.  So your report looks at

7  harm from storage of data, not harm from the

8  data breach; is that correct?

9                ATTORNEY L. ARAGON:  Objection:

10          form; foundation.

11               THE WITNESS:  Yes, the -- it is

12          the -- yeah, the -- the data that is

13          controlled and processed by those

14          products and based on my experience in

15          cases that we have looked at, yes.

16 BY ATTORNEY Z. SHAH:

17     Q.    Okay.  But not harm from the data

18 breach, correct?

19               ATTORNEY L. ARAGON:  Objection:

20          form; foundation.

21               THE WITNESS:  No, I don't --

22          I'm not opining about the breach, no.
```

224

```
 1            I mean, I do -- there were data

 2            elements used in conducting the breach

 3            that just -- that I mentioned in my

 4            report that made it possible for the

 5            breach to happen, but I -- I -- I

 6            should just say no because I . . .

 7   BY ATTORNEY Z. SHAH:

 8       Q.    Let me make sure.

 9                You are not opining on the

10   harm from the data breach, correct?

11       A.    That's right.

12       Q.    You are not opining that every

13   Class member's data in this case was exposed

14   in the data breach, correct?

15                ATTORNEY L. ARAGON:  Objection:

16          form; foundation.

17                THE WITNESS:  That is true.

18   BY ATTORNEY Z. SHAH:

19       Q.    You are not opining that the

20   Class members in this case were harmed because

21   of the data breach, correct?

22       A.    That's right, I'm -- that's
```

225

1    right.

2         Q.    Okay.  Let's turn to Paragraph 67

3    of your report, which is Exhibit 1, and it is

4    PDF Page 30 into 31.

5              In this paragraph, you

6    discuss a CrowdStrike investigation report

7    dated February 28th, 2025.

8              Do you see that?

9         A.    I do.

10        Q.    Is this -- is the CrowdStrike

11   report the only material you reviewed to

12   inform yourself about the PowerSchool data

13   breach?

14        A.    No.  There was another article I

15   referenced, I thought.

16        Q.    You know what?  I remember that

17   article, too.

18              It was a news article,

19   right?

20        A.    That's right.

21        Q.    Okay.  So other than the

22   CrowdStrike report and the news article, is

226

1    there any other material you reviewed to

2    inform yourself about the PowerSchool data

3    breach?

4        A.    Not that I really looked at.  I

5    mean, I -- I may have -- no.  I just --

6        Q.    Okay.

7                ATTORNEY Z. SHAH:  And let's

8            mark as Exhibit 10 the CrowdStrike

9            report, which is Tab 9.

10                        --oOo--

11            (Barber Deposition Exhibit Number

12                10, Investigation Report,

13                February 28, 2025, marked for

14                identification for purposes of

15                the record.)

16                        --oOo--

17    BY ATTORNEY Z. SHAH:

18        Q.    Dr. Barber, do you recognize this

19    as the CrowdStrike report that's referenced in

20    your report?

21        A.    I do.

22                ATTORNEY Z. SHAH:  Okay.  Let's

234

1        is not answering the question

2        directly.

3                ATTORNEY L. ARAGON:  She is

4        answering the question.

5                ATTORNEY Z. SHAH:  And,

6        Leonard, you should refrain from

7        speaking objections.

8                ATTORNEY L. ARAGON:  You should

9        refrain from harassing my witness.  At

10       this point, she's answered the

11       question.  It's time to move on.

12               You can bring it up with the

13       Judge.  You've asked the same

14       question; she's given you the answer.

15               ATTORNEY Z. SHAH:  I am very

16       happy --

17               ATTORNEY L. ARAGON:  Her --

18               ATTORNEY Z. SHAH:  -- to bring

19       it up with the Judge.

20               ATTORNEY L. ARAGON:  Happily --

21  BY ATTORNEY Z. SHAH:

22       Q.    Dr. Barber --

235

1                    ATTORNEY L. ARAGON:   --

2          happily.

3    BY ATTORNEY Z. SHAH:

4          Q.      -- Dr. Barber, you have not seen

5    any evidence that there is a data breach

6    involving the other eight products you discuss

7    in your report, correct?

8                    ATTORNEY L. ARAGON:  Objection:

9          form and foundation.

10                   THE WITNESS:  I haven't seen it

11         because I haven't looked.

12   BY ATTORNEY Z. SHAH:

13         Q.     You have not seen any evidence

14   that data collected by the other eight

15   products discussed in your report was exposed,

16   correct?

17                   ATTORNEY L. ARAGON:  Objection:

18         form; foundation.

19                   THE WITNESS:  I haven't seen it

20         because I haven't looked.

21   BY ATTORNEY Z. SHAH:

22         Q.     You have not seen any evidence

236

1    that the data stored by the other eight

2    products you discuss in your report was

3    monetized by a threat actor, correct?

4                    ATTORNEY L. ARAGON:  Objection:

5         form; foundation.

6                    THE WITNESS:  Other than the

7         fact that these were stolen and

8         compromised credentials, so the --

9         they were stored somewhere in some

10        PowerSchool product, and that act- --

11        threat actor was able to use that PII,

12        which is online access credentials, to

13        access the product.

14                    So -- and that's what I was

15        mainly interested in looking at, is

16        what data was --

17   BY ATTORNEY Z. SHAH:

18        Q.    Dr. Barber --

19                    ATTORNEY Z. SHAH:  I'm going to

20        strike -- I'm going to strike this

21        answer as nonresponsive.

22

240

1          saying that.

2                    I'm saying I just haven't seen

3          it because I haven't looked, so I

4          have not seen it.

5    BY ATTORNEY Z. SHAH:

6          Q.     Do you have any reason to believe

7    it exists?

8          A.     I -- as you say, I shouldn't -- I

9    shouldn't go on any kind of assumptions or --

10   I'm just saying what I investigated.

11         Q.     Okay.  You didn't investigate it,

12   right?

13                    ATTORNEY L. ARAGON:  Objection:

14          form.

15                    THE WITNESS:  I'm sorry.  Could

16          you answer [sic] that question again?

17   BY ATTORNEY Z. SHAH:

18         Q.     You have not investigated whether

19   the data from the eight other PowerSchool

20   products was exposed in a data breach, right?

21   You didn't investigate that, right?

22         A.     I did not.

241

1    Q.    And you have not seen any

2  evidence that the data from the eight other

3  PowerSchool products was exposed in a data

4  breach, correct?

5                    ATTORNEY L. ARAGON:  Objection:

6          form; foundation.

7                    THE WITNESS:  I haven't looked,

8          so I haven't -- I -- I have not seen

9          it.

10  BY ATTORNEY Z. SHAH:

11    Q.    Let's turn to PDF Page 5, which

12  has the key findings.

13                    Number 3 says:  The threat

14  actor exfiltrated data from the Teachers and

15  Students tables of the PowerSchool SIS

16  instances for certain PowerSchool customers.

17  CrowdStrike found no evidence of data

18  exfiltration from any other tables.

19                    Do you see that?

20    A.    I do.

21    Q.    Have you done any analysis to

22  determine which PowerSchool customers were

242

1   affected by the data breach?

2          A.     I have not.

3          Q.     You don't know, one way or

4   another, which schools were affected, correct?

5          A.     Correct.

6          Q.     You don't know if any of the

7   Class members in this case attended those

8   schools or not, correct?

9          A.     Correct.

10         Q.     Have you done any analysis to

11  determine whether the SIS data elements listed

12  in Paragraph 33 of your report were stored in

13  the Teachers and Students tables of the SIS

14  product?

15                ATTORNEY L. ARAGON:  Objection:

16         form; foundation.

17                THE WITNESS:  It's -- can you

18         ask the question one more time?  And

19         then I'm --

20  BY ATTORNEY Z. SHAH:

21         Q.     Sure --

22         A.     -- going to --

243

1        Q.      -- do you --

2        A.      -- I'm going to look at my

3    report --

4        Q.      Sure --

5        A.      -- just to let you know.

6        Q.      -- and you -- you can -- you have

7    your report in front of you, so you're more

8    than welcome to reference it.

9                        As you see here, Number 3

10   says the data that was exfiltrated was stored

11   in the teeth -- in the Teachers and Students

12   tables of the PowerSchool SIS instances for

13   certain customers, right?

14       A.      Right.

15       Q.      Do you know whether the data

16   elements listed in Paragraph 33 of your report

17   are stored in the Teachers and Students tables

18   of the PowerSchool SIS instances?

19                       ATTORNEY L. ARAGON:  Objection:

20           form; foundation.

21                       THE WITNESS:  I don't know,

22           other than the fact that, again, there

1    intentional.  It can be nonintentional.  It

2    can be, you know, an outsider.  It can be a

3    business partner.  It can be -- yeah.

4         Q.    Okay.  All right.

5              Then you say:  Exposure can

6    cause diverse, long-standing and significant

7    harms, correct?

8         A.    That's right.

9         Q.    And that means exposure can

10   possibly result in harm, but not that it

11   necessarily or always results in harm, true?

12        A.    True.

13              ATTORNEY L. ARAGON:  Objection:

14         form; foundation.

15              THE WITNESS:  I -- I mean,

16         sometimes we don't know about the

17         harm.  There -- we've seen where the

18         data's been exposed and,

19         quote/unquote, harvested and not --

20         those harms are not seen for many

21         years.

22              So . . .

260

1    BY ATTORNEY Z. SHAH:

2         Q.    Okay.  You're not opining that

3    data in this case has been harvested and that

4    we're not going to see the harm for many, many

5    years, right?

6                   ATTORNEY L. ARAGON:  Objection:

7          form; foundation.

8                   THE WITNESS:  It's possible.

9                   I -- I don't know.

10   BY ATTORNEY Z. SHAH:

11        Q.    Is that -- Dr. Barber, is that an

12   opinion?

13                   Like, I need to understand.

14                   Are you going to go in front

15   of a jury and testify that data in this case

16   has been collected and one day we will see its

17   misuse?

18                   ATTORNEY L. ARAGON:  Objection:

19          form; foundation.

20                   THE WITNESS:  My intent was not

21          to opine about the breach.  This

22          wasn't my scope.  But I'm just saying

261

```
 1        it happens.

 2   BY ATTORNEY Z. SHAH:

 3        Q.    I'm not asking about what could

 4   happen --

 5        A.    You said can it happen?

 6        Q.    -- clear -- no, no, no.  I want

 7   to be clear, Dr. Barber.

 8              You said, sometimes we see

 9   data can be harvested and we won't see the

10   harms for many, many years?

11        A.    That's true.

12        Q.    You are not opining that data in

13   this case has been harvested and we won't see

14   the harm for many, many years, correct?

15              ATTORNEY L. ARAGON:  Objection:

16         form; foundation.

17              THE WITNESS:  I was just

18         opining that -- you said can, and so I

19         was -- I was opining -- I was just

20         commenting about what can happen.

21   BY ATTORNEY Z. SHAH:

22        Q.    Okay.  But not that that is what
```

262

 1  will happen, correct?

 2                  ATTORNEY L. ARAGON:  Objection:

 3        form; foundation.

 4                  THE WITNESS:  I -- I don't

 5        know, yeah.

 6  BY ATTORNEY Z. SHAH:

 7       Q.    You are not opining that data in

 8  this case has been harvested and will be

 9  misused in the future, correct?

10                  ATTORNEY L. ARAGON:  Objection:

11        form; foundation.

12                  THE WITNESS:  I'm opining it

13        happens.  I don't know if it'll happen

14        in this case.

15  BY ATTORNEY Z. SHAH:

16       Q.    So you are not opining that it

17  will happen in this case, correct?

18                  ATTORNEY L. ARAGON:  Objection:

19        form --

20                  THE WITNESS:  I don't know.

21                  ATTORNEY L. ARAGON:   --

22        foundation.

272

```
 1              responded in terms of emotional

 2              distress as well and some level of

 3              finances.

 4                    So I -- I really can't speak

 5              beyond the cases that I've looked at

 6              specifically.

 7    BY ATTORNEY Z. SHAH:

 8         Q.    You can't offer opinions about

 9    harm in any cases other than the 5,000 cases

10    you looked at in the UTCID database, right?

11         A.    Because the --

12                    ATTORNEY L. ARAGON:  Objection:

13              form; foundation.

14                    THE WITNESS:  -- the idea was

15              to look at so many that it created

16              patterns of -- that we could then make

17              some conclusions from, and so --

18    BY ATTORNEY Z. SHAH:

19         Q.    Okay.

20         A.    -- that's what I'm speaking to,

21    is that we saw the patterns of harms; the

22    range of harms; the inherent harms that can
```

273

```
1   come from, you know, theft, fraud and abuse,

2   yes.

3          Q.    But you can't offer opinions

4   about harms in any cases other than the 5,000

5   cases you looked at in the UTCID database,

6   right?

7                    ATTORNEY L. ARAGON:  Objection:

8          form; foundation.

9                    THE WITNESS:  I can speak to

10         the patterns that I saw from that

11         data.

12  BY ATTORNEY Z. SHAH:

13         Q.    Sure.  But those -- those are

14  patterns in that data, right?

15         A.    There's 5,000 of them --

16         Q.    Okay.

17         A.    -- yeah.

18         Q.    But, again --

19         A.    -- I mean, it's a lot.

20         Q.    -- you are speaking -- you are

21  speaking from the database of 5,000 cases and

22  that's the universe from which you are drawing
```

274

```
 1    all your conclusions, right?

 2                    ATTORNEY L. ARAGON:   Objection:

 3          form; foundation.

 4                    THE WITNESS:   From the

 5          quantifiable, qualitative analysis,

 6          yes, that's where I'm drawing my

 7          opinion.

 8    BY ATTORNEY Z. SHAH:

 9          Q.    Okay.  And let's take a look at

10    the last bullet in this paragraph.  You say:

11    By controlling and processing student PII

12    without consent -- sorry -- without -- let me

13    strike that and start this whole thing over.

14                    Paragraph 3, last bullet,

15    you say: By controlling and processing student

16    PII without permission and informed consent,

17    students and parents are exposed to the risk

18    of diverse, long-standing and significant

19    harm.

20                    Did I read that correctly?

21          A.    Yes.

22          Q.    Now, when you say PowerSchool is
```

276

```
 1          form; foundation.

 2                    THE WITNESS:  The storage of

 3          it?

 4                    I can only speak to how this

 5          data can be used and my -- and the

 6          harms that it can cause, that it

 7          inherently has the ability to be used

 8          in the following ways and -- and

 9          cause the following harms.

10                    That's really what I can speak

11          to.

12  BY ATTORNEY Z. SHAH:

13          Q.    So you can't speak to whether by

14  storing student data, PowerSchool creates a

15  risk of exposure?

16                    ATTORNEY L. ARAGON:  Objection

17          to form.

18                    THE WITNESS:  Well, the types

19          of data that are stored are incredibly

20          sensitive, so if I just -- for

21          example, if I just stored name and my

22          zodiac sign, I'd have less harm and
```

277

```
1              less potential for harm than when I'm

2              storing health information and

3              behavioral information and where

4              somebody logs in and their IP address

5              and their cookies and their -- you

6              know, all of the data that's listed.

7                   So, you know, the data that an

8              organization and a product decides to

9              collect introduce certain risk

10             because -- yeah, because that has the

11             potential for greater harm than --

12             the data has more potential for harm

13             than others.

14   BY ATTORNEY Z. SHAH:

15        Q.    Okay.  I -- I thought then I

16   asked you this question:  Is it your opinion

17   that by simply storing student data,

18   PowerSchool creates a risk of exposure?

19                   Is that your opinion?

20                   ATTORNEY L. ARAGON:  Objection:

21             form; foundation.

22                   THE WITNESS:  A risk of
```

278

```
1              exposure.  I don't know what their

2              risk of exposure is.  I don't know

3              what their cybersecurity practices

4              are.  I'm just saying that this data

5              has -- deciding to store particular

6              data elements, some data has -- can

7              cause more harm than others.  That's

8              all I'm saying.

9   BY ATTORNEY Z. SHAH:

10       Q.    I don't -- okay.

11                   You testified, the data that

12  an organization and a product decide to

13  collect introduce certain risk because that

14  has the potential for greater harm.

15                   Is that your testimony?

16       A.    I would -- my testimony is that

17  some data can cause more harm than others and

18  so deciding what you decide to collect and

19  store makes a difference.

20       Q.    Okay.  And the harm comes from

21  the risk of exposure, right?

22                   ATTORNEY L. ARAGON:  Objection:
```

279

```
 1              form.

 2                      THE WITNESS:  No, not just from

 3              the risk of exposure, but that if

 4              exposed or if -- how it can be used --

 5              like, I can't use your name and your

 6              Zodiac sign to create a lot of harm,

 7              but I can use your health information

 8              and your financial information, your

 9              Social Security number to create harm.

10                      So I'm just saying that some

11              data can create more harm than

12              others.

13   BY ATTORNEY Z. SHAH:

14       Q.    Okay.  But the way it creates

15   harm is through exposure or misuse, correct?

16                  ATTORNEY L. ARAGON:  Objection:

17              form; foundation.

18   BY ATTORNEY Z. SHAH:

19       Q.    If I just -- Dr. Barber, if I

20   just had data, am I creating harm?

21                  ATTORNEY L. ARAGON:  Objection:

22              form.
```

280

1          THE WITNESS:  I would just say

2      that the potential for -- am I

3      creating harm just to hold that data?

4              I'm just speaking about what

5      data can cause more harm than others.

6      That's all I'm saying.

7  BY ATTORNEY Z. SHAH:

8      Q.    I'm not -- Dr. Barber, your

9  opinion written here on this page is:  The

10 exposure of PII controlled and processed by

11 PowerSchool products can cause harm.

12     A.    Yes.

13     Q.    I am asking you:  Is the way that

14 PowerSchool products cause harm through

15 exposure or misuse of the data?

16     A.    And I can't speak to that because

17 I don't know what PowerSchool's cybersecurity

18 practices are; I don't know -- other than, you

19 know, I -- I do know that not having

20 multifactor authentication was a factor in the

21 breach and did introduce additional risk.  But

22 I really don't know anything about

281

 1    PowerSchool's, you know, network

 2    configurations and cybersecurity, so I can't

 3    speak to that.

 4          Q.    Okay.  I don't disagree with any

 5    of that.

 6          A.    Okay.

 7          Q.    I don't disagree that you don't

 8    know about PowerSchool's data security

 9    practices.  I'm asking whether your opinion is

10    that there is a potential risk of future

11    misuse of the data stored in PowerSchool

12    products and that's why they cause harm or

13    whether it's just the act of storage itself

14    that causes harm.

15                    Do you understand the

16    difference?

17                    ATTORNEY L. ARAGON:  Objection:

18          form; foundation.

19                    THE WITNESS:  In the act of

20          storing, no.  The kind of data stored,

21          yes.

22

282

1    BY ATTORNEY Z. SHAH:

2        Q.    Your testimony is that the act of

3    storing data does not cause harm?

4                    ATTORNEY L. ARAGON:  Objection:

5            form; foundation.

6                    THE WITNESS:  Yeah, I'm saying

7            the type of data reintroduces

8            different kinds of risk.

9    BY ATTORNEY Z. SHAH:

10       Q.    Okay.

11                   So storing alone does not

12   cause harm, correct?

13                   ATTORNEY L. ARAGON:  Objection:

14           form; foundation.

15                   THE WITNESS:  Right.  It

16           matters what kind of data you're

17           storing.

18   BY ATTORNEY Z. SHAH:

19       Q.    Okay.  And then depending on the

20   kind of data, there are different levels of

21   risk of harm.

22                   Is that fair?

290

1          providing this information.

2    BY ATTORNEY Z. SHAH:

3          Q.     How does informed consent

4    mitigate the risk of exposure?

5                    ATTORNEY L. ARAGON:  Objection:

6          form.

7                    THE WITNESS:  If I understand

8          that I'm giving you sensitive data, I

9          may monitor that sensitive data more,

10         I may ask questions about where you --

11         so I -- it gives the individual agency

12         to try to take action to reduce the

13         risk.

14   BY ATTORNEY Z. SHAH:

15         Q.     Okay.  But it cannot eliminate

16   the risk, correct?

17         A.     It doesn't --

18                    ATTORNEY L. ARAGON:  Objection:

19         form.

20                    THE WITNESS:  -- eliminate it,

21         but I think mitigate -- I think -- I

22         think informed consent is one of the

291

```
 1              reasons that we have it, is to help

 2              people mitigate some of the risk or

 3              unders- -- or give them agency in

 4              the -- in the process.

 5   BY ATTORNEY Z. SHAH:

 6        Q.    It's not your opinion that the

 7   Class members in this case are exposed to

 8   diverse, long-standing and significant harms,

 9   right?

10                   ATTORNEY L. ARAGON:  Objection:

11              form.

12                   THE WITNESS:  Yeah, I can't

13              speak to the actual instances.  I can

14              only speak to the -- what this data

15              has the potential of harm, the risk of

16              harm to create.  That's all I can

17              speak to.

18   BY ATTORNEY Z. SHAH:

19        Q.    So, again, you cannot opine that

20   the Class members here are harmed, right?

21                   ATTORNEY L. ARAGON:  Objection:

22              form.
```

292

1          THE WITNESS:  Yeah; not that

2       they are harmed, but that -- because

3       of the data that is collected, this

4       type of data, some of it has more risk

5       than others, and I've -- that's what I

6       was reporting on.

7   BY ATTORNEY Z. SHAH:

8       Q.    Okay.

9             Dr. Barber, you agree that

10  any organization that stores personal data

11  creates some risk of exposure, correct?

12      A.    It depends on the type of data

13  that they -- they collect and that they use.

14  So for some of the -- yeah, it depends, but

15  some -- again, some are more at risk and

16  harmful than others.

17      Q.    Okay.  But no system is zero

18  risk, correct?

19      A.    When it comes to PII, probably

20  not.

21      Q.    Okay.  And your opinion is that

22  the risk of harm is a function of the quantity

293

1    of PII that is being held; is that right?

2         A.    No.  The type of PII that's being

3    held.

4         Q.    It's both type and quantity,

5    right?

6              ATTORNEY L. ARAGON:  Objection:

7         form.

8              THE WITNESS:  Well, for an

9         individual, no. I mean, it's the type

10        of data you're -- it matters --

11        quantity may -- it matters who the

12        harm is to, to the organization or to

13        the individual.

14              If you're storing thousands

15        and thousands of -- of records, I

16        only really care, as an individual,

17        about mine and the harm to me.

18    BY ATTORNEY Z. SHAH:

19        Q.    Respectfully, that's not an

20    answer to my question at all.

21        A.    Well, then please answer [sic]

22    again, because I thought -- I was trying to be

294

1    responsive.

2              VIDEO TECHNICIAN FIGUEROA:

3         Hey, Counsel, can we go off the record

4         so I can start a new video file,

5         please?

6              ATTORNEY Z. SHAH:  Yeah, sure.

7         Let's go off the record.

8              VIDEO TECHNICIAN FIGUEROA:

9         Thank you.

10             The time is 2:15 p.m.  We're

11        going off the record.

12                    --oOo--

13           (Whereupon, a recess was taken from

14            2:15 p.m. CST to 2:20 p.m. CST.)

15                    --oOo--

16             VIDEO TECHNICIAN FIGUEROA:  The

17        time is 2:20 p.m.  We're back on the

18        record for Video Media 3.

19   BY ATTORNEY Z. SHAH:

20        Q.    Dr. Barber, let's talk about the

21   calculations in Appendix A of your report.

22   And before we do that, I want to take a look

299

1    yeah, I'm -- I'm not speaking to any

2    particular event or instance, yes.

3         Q.    Okay.  And, in fact --

4              ATTORNEY Z. SHAH:  And I'm

5         sorry to do this, Jacob.

6    BY ATTORNEY Z. SHAH:

7         Q.    But if you, kind of, scroll

8    across Story0 and you look at some of these

9    other columns, you'll see Story0 involved

10   hackers who targeted Regeneron Pharmaceutical

11   [sic] employees in Tarrytown, New York.

12              Does that sound right to

13   you?

14        A.    I don't have these 5,000

15   memorized, so we can walk through it together.

16              So we -- yeah, who -- who -- who

17   were the -- characterization, the performers,

18   what kind of resources, steps that we tried

19   to -- you know, kind of which steps they went

20   through and then -- can you stop right here?

21              Was it an inside -- you know,

22   were they outside the organization, or were

300

1    they an insider?  Or sometimes it was both.

2    Sometimes we knew -- I'll just say very

3    quickly, sometimes these cases were -- had a

4    lot of detail to them; sometimes they didn't.

5    Sometimes they were an abstraction of -- of

6    data; sometimes they were very specific.  We

7    just modeled what was known, right, so --

8    yeah.

9        Q.    Let -- let me ask you this

10   question because it's unfair for me -- for us

11   to just scroll through.  I know it's a big

12   spreadsheet --

13       A.    Yeah.

14       Q.    -- but you agree that this case

15   doesn't involve hackers or a -- pharmaceutical

16   company employees in Tarrytown, does it?

17       A.    I don't know.  Keep going.  I --

18   I --

19       Q.    Well, I'm asking you about this

20   case, about this litigation.

21                    To your knowledge, this case

22   doesn't involve hackers or pharmaceutical

301

1    company employees in Tarrytown, does it?

2         A.    Yeah, my analysis was

3    datacentric, not comparing events across

4    market sectors, like, comparing market sectors

5    or behaviors.  It was just -- and that's

6    really the focus of the research as well, is

7    very datacentric.

8         Q.    I -- I understand that,

9    Dr. Barber.  I'm just asking you what this

10   case is about, right?

11                  And this case is not about

12   pharmaceutical company employees in Tarrytown

13   at Regeneron Pharmaceuticals, right?

14        A.    It is not.

15        Q.    Okay.  And if you look at

16   Column T for this Case 0, the loss in that --

17   in this case is marked as 0, right?

18        A.    Correct.

19        Q.    And -- actually, let's just make

20   a note -- or if we scroll back to Column B,

21   which is the outputs, this case involved

22   names, right?

302

1          A.      Right.

2                  So let me just say again that 0

3    meant that we did not know, right?  So

4    because -- it's going to be fed into an

5    algorithm, so it's got to be a number.  So

6    we -- if we didn't know, we just put 0, which

7    means that the -- the data and the analysis is

8    extremely conservative because we didn't --

9    there might have been, but we don't know, so

10   we marked it 0.

11         Q.      Okay.  Story2 in the source data

12   includes a case where malware was injected,

13   right?

14         A.      It does.

15         Q.      This case doesn't involve

16   injected malware, true?

17         A.      Yeah; we're not looking at a --

18   not to my knowledge.

19                 What I compared was the use of --

20         Q.      Dr. Barber, I'm not asking about

21   what you compared.  I'm just asking about what

22   this case is about.

303

```
 1                    Story3 is a case where

 2   employees -- employee access to a database was

 3   misused.

 4                    Do you see that?

 5        A.     Yes, I do.

 6        Q.     This case doesn't involve

 7   employee access to a database being misused,

 8   right?

 9        A.     No.

10        Q.     Story5 is a case where PII was

11   retained illegally by employees of the

12   Corner Bakery Cafe in Texas.

13                    This case doesn't involve

14   the legal retention of PII by employees of the

15   Corner Bakery Cafe in Texas, does it?

16        A.     It does not.  It --

17                    (Simultaneous speech; as a result,

18                     portions of the testimony could

19                     not be reflected in the record.)

20   BY ATTORNEY Z. SHAH:

21        Q.     Story9 involves fraudulent tax

22   returns.
```

304

```
 1                    To your knowledge, this case

 2    doesn't involve fraudulent tax returns, right?

 3         A.    That's correct.

 4         Q.    Story14 involves a case where an

 5    ATM pin and credit card numbers were stolen

 6    and a credit/debit card skimmer was installed.

 7                    This case doesn't involve

 8    storing stolen credit cards, true?

 9         A.    It does not.

10         Q.    Story16 is a case where a

11    celebrity was impersonated.

12                    This case doesn't involve

13    any celebrities being impersonated, right?

14         A.    Right.  And I -- I didn't use

15    data -- when I looked at the data, I mapped

16    data to data that PowerSchool used.  I -- and

17    so I was just mapping, Okay.  This is the data

18    that PowerSchool controls and processes, how

19    is that data being used for harm?

20                    So where you get the data and

21    then how -- where you use it for the harm is

22    a -- two different things, so I was just
```

308

1    data elements.  I do understand that --

2         A.    Okay.  Good.

3         Q.    -- but, Dr. Barber, of these

4    5,000 cases, according to the 2017 ITAP

5    report, 90 percent of them involve

6    noneducation market sectors.

7                    Does that sound right to

8    you?

9         A.    Fair enough.  Yeah, in terms of

10   where the information was collected, not

11   necessarily where it was used to create the

12   harm, yeah.

13        Q.    Well, and also where it was used

14   to create the harm, right?

15                    Ninety percent of these

16   cases do not involve the education sector,

17   right?

18        A.    In terms of where the data was

19   acquired, yes.  Like, I can acquire it from

20   an -- a school, but I might go use it at a

21   bank, you know, so --

22        Q.    Okay.  Well, 90 percent of these

309

1    cases don't involve data from a school, right?

2        A.    That's right.

3        Q.    They don't involve data from the

4    education sector in any way, right?

5                ATTORNEY L. ARAGON:  Objection:

6            form; foundation.

7                THE WITNESS:  I don't believe

8            they don't -- I -- can you say -- ask

9            that again?

10   BY ATTORNEY Z. SHAH:

11       Q.    That's okay.  The ITAP report

12   speaks for itself.

13                Column I, the Age Group of

14   Victims.

15                Is it fair to say that the

16   UTCID data primarily concerns the

17   misappropriation of adult data?

18       A.    Yes.

19                And, you know, there are -- there

20   are other reports --

21       Q.    I didn't ask --

22       A.    -- other than --

310

```
 1         Q.       -- Dr. Barber, I didn't ask you

 2    about other thoughts you have.  I just want

 3    you to answer my question.

 4              Dr. Barber, when we look at

 5    Column P, Location of Event, is it fair to say

 6    that the UTCID data includes cases of identity

 7    theft, fraud and abuse outside of the

 8    United States?

 9         A.      Yes.  But if you looked at the

10    ITAP reports, then you would know that the

11    harms that are experienced for the

12    international and the U.S. are extremely

13    similar in the kind of data that is

14    compromised is extremely similar, so -- but,

15    yeah, there are some -- there are some

16    international cases in there, yes.

17         Q.      According to the 2019 ITAP

18    report, there are about 900 international

19    incidences in this data set, right?

20         A.      I don't know the exact number.

21         Q.      Does that --

22         A.      I don't remember.
```

311

1     Q.     -- sound right to you?

2     A.     It sounds a little high, but if

3   that's what we had in the report, then it's

4   accurate.  I'll stand by that.

5     Q.     Okay.

6            ATTORNEY L. ARAGON:  And let's

7        look at Column T, which is Loss

8        Amount.

9   BY ATTORNEY L. ARAGON:

10    Q.     Now, I understand you reported 0

11  when the loss amount was unknown based on the

12  news article or publication that you used to

13  populate the data set.

14            Is that fair?

15    A.     That is.  And then, one, if we

16  knew there was some amount but we -- it wasn't

17  quantified -- or wasn't reported as a actual

18  number, so we -- we didn't report numbers we

19  didn't see in the article.

20    Q.     Is the difference between 0 and 1

21  that 0 could be no harm and 1 means there was

22  some harm --

312

1      A.      No --

2      Q.      -- but just not quantifiable?

3      A.      -- you can't -- you can't

4    inference that, no.

5      Q.      Then what's the difference?

6      A.      We had to have a number, and

7    we've just tried to signify that you could

8    create a -- they could all be 0.  It --

9    because within the calculation, it just -- it

10   wasn't a factor, right?

11     Q.      So what's the difference between

12   when the loss amount is unknown and when the

13   loss amount is not quantifiable?

14     A.      Well, they say there are losses

15   but they didn't give us a number, if we didn't

16   have a number to go by.

17     Q.      Okay.  But isn't that the same as

18   saying the loss is unknown?

19     A.      I'm happy for that to be the

20   conclusion.

21     Q.      Well, I'm asking you how -- what

22   your --

313

```
 1                  CERTIFIED STENOGRAPHER:  I'm

 2         sorry.  I didn't get the end of the

 3         question.  Please repeat the question.

 4                  ATTORNEY Z. SHAH:  Sorry,

 5         Cindy.

 6                  Let me ask a better question.

 7   BY ATTORNEY Z. SHAH:

 8         Q.   Give me an example of a case

 9   where the loss is not quantifiable but still

10   unknown -- but not unknown.

11                  ATTORNEY L. ARAGON:  Objection:

12         form.

13                  ATTORNEY Z. SHAH:  Actually,

14         strike that.  That's not -- that

15         doesn't make sense.

16   BY ATTORNEY Z. SHAH:

17         Q.   Dr. Barber, can you give me an

18   example of an instance where a loss is unknown

19   but still quantifiable?

20         A.   So 0, like, they didn't -- we

21   didn't know anything about it, right, like,

22   they didn't even mention about the -- the
```

314

1   losses, they might say something like lots of

2   charges were made against the credit card or

3   property was purchased, or something like

4   that, or -- but there wasn't a number.

5              These -- when we have a number,

6   that means in the case, in -- well, in the

7   report -- and these are instances of time,

8   right.  I mean, things may have happened after

9   this news report.  This is just one news

10  report and one instance of time that's -- as

11  reporting on a number that's found as an

12  actual loss.

13             So . . .

14  BY ATTORNEY Z. SHAH:

15      Q.    So in the instance where you

16  marked something as loss amount 0, could it

17  also be true that there is no loss?

18      A.    I don't know.  It could be no

19  loss at that moment and there was loss later

20  on.  It just wasn't reported in the story.

21             These -- this was a way of us

22  getting information about cases that

315

1    organizations often do not divulge.  And it

2    was a good source and we, you know, tried to

3    include as -- you know, in the thousands so

4    that we could look at some qualitative

5    patterns.  But it just -- this is what was in

6    the data.  We didn't try to estimate or

7    exaggerate or --

8         Q.    I'm not suggesting you did.  I'm

9    just trying to understand the difference

10   between 0 and 1.

11                  So my understanding is that

12   when loss amount equals 0, it's because you

13   don't know whether there is a loss, whether

14   some other harm has occurred, or whether no

15   harm has occurred.

16                  Is that fair?

17        A.    Yes.

18                  And also, you know, you can see

19   in the way we conduct the calculations that

20   the amount of impact on the calculations of a

21   0 or a 1 are -- are nonexistent.

22        Q.    Okay.  And the instances where

330

1      Q.      What methodology did you use to

2  associate PII names from the UTCID data set to

3  PowerSchool's documents?

4      A.      Well, some of them were easy.

5  Like, ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████  And then

8  sometimes it wasn't.

9              People -- you know, these are

10  news stories.  You -- you know, you can call

11  things different names, you know.  So I was

12  trying to be very explicit and very

13  transparent about the mapping that I used.

14              So -- and let me just --

15      Q.      Hold on --

16      A.      -- also say --

17      Q.      -- Dr. Barber.  No, no.  Let me

18  ask the next question.  I want to keep this

19  moving.

20                  What is the -- let me ask

21  you this:  ████████████████████████████████

████████████████████████████████████████████

331

1        A.      Each one of the cases that we had

2    talked about different data elements.  We did

3    not rename them.  We took them exactly as they

4    were stated in the news story.

5        Q.      Okay.  So you -- you, sort of,

6    roughly and by hand matched PII names from the

7    UTCID database --

8        A.      I did.

9        Q.      -- to PII -- PII data elements

10    listed in the DPIA or PowerSchool contract.

11                     Is that fair?

12        A.      That is fair.

13        Q.      You didn't have a systematic

14    method for associating PII names to PII data

15    elements other than your personal, you know,

16    information and approximation of what that

17    element meant, right?

18                  ATTORNEY L. ARAGON:  Objection

19        --

20                  THE WITNESS:  That's correct.

21                  ATTORNEY L. ARAGON:  --

22        objection: form.

332

```
 1    BY ATTORNEY Z. SHAH:

 2         Q.    What's -- so when you say -- does

 3    -- let me ask you this: ███████████████████

      ████████████████████████████████████████████

      ███████████████████

 6         A.    No.  It just means ██████████████

      ███████████

 8         Q.    Okay.  So when we -- let's take a

 9    look at Rows 37 and 38 of this spreadsheet.

10                    And you'll see here, you

11    associated ████████████████████████████████

      ██████████████████████████████████████

13                    What's the basis for that

14    association?

15         A.    ████████████████████████████████

      ██████████████████████████

17         Q.    Okay --

18         A.    I mean, I really --

19         Q.    -- the only reason you associated

20    ████████████████████████████████████████████

      ██████████████████████████████████████████████

      ██████████████████████████████████████████████
```

333

1                    Is that fair?

2                ATTORNEY L. ARAGON:  Objection:

3      form; foundation.

4             THE WITNESS:  ███████████

███████████████████████████████

██████████████████

7  BY ATTORNEY Z. SHAH:

8        Q.    Okay.

9        ██████████████████████████

████████████████████████████ but, yes,

11  I was trying to be very transparent about the

12  way I mapped the data elements.  Because some

13  -- you will see that some we did not have any,

14  right, ████████████████████

████████████████████████████████

█████████████████████████████

████████████████████████ so I didn't

18  try to map it.

19       Q.    Okay.  So there are even some

20  PowerSchool PII elements -- you don't even

21  know what they are, and so you didn't even

22  attempt to map them, right?

334

1      A.      Well, when it says ███████████

2   who knows what's in that?  So I don't know,

3   yeah.

4      Q.      Okay.  ████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████  right?

8      A.      Yes.

9      Q.      When you --

10                  ATTORNEY Z. SHAH:  If we could

11          go back to the top header, Row 1.

12   BY ATTORNEY Z. SHAH:

13      Q.      You say here:  Risk of exposure

14   reflects the likelihood of target for identity

15   theft, fraud and abuse, right?

16      A.      Um-hum.

17      Q.      So should the jury interpret the

18   0.08 risk of exposure for IP address to mean

19   there's a 0.08 chance that IP address

20   information collected by PowerSchool will be

21   exposed?

22      A.      No.  It just means that in all

335

1    the cases that we looked at, IP address was

2    not frequently used.  This is a frequency, how

3    frequently is this data element used and

4    targeted, involved in -- how often does it

5    occur in identity theft and fraud cases.

6         Q.    Okay.  And when you say how often

7    does it appear in the data, are you talking as

8    an input or an output?

9         A.    Both.

10        Q.    But isn't the data that's being

11   exposed only in the output column?

12        A.    Well, I wouldn't say expose --

13   well, what was reported here is how frequently

14   is this data being used.  And so the inputs

15   maybe have been exposed data, like compromised

16   credentials, you know, like in the PowerSchool

17   breach, and then how did they use that data to

18   get more data.

19             So, you know, it's just -- how

20   often did this data used in identity theft and

21   fraud.  That's what is being reported --

22        Q.    Okay --

336

```
 1          A.      -- so as you see --

 2          Q.      -- so we could really call this

 3   risk of use, not risk of exposure, right?

 4                    ATTORNEY L. ARAGON:  Objection:

 5          form.

 6                    THE WITNESS:  Maybe you could

 7          say frequency of use and exposure.

 8          But that's -- that's what the

 9          calculation is.

10   BY ATTORNEY Z. SHAH:

11          Q.      Okay.  So the jury should not

12   understand the term risk of exposure to mean

13   that the risk of exposure for this PowerSchool

14   data element is 0.08 percent; is that right?

15          A.      They should --

16                    ATTORNEY L. ARAGON:  Objection:

17          form.

18                    THE WITNESS:  -- they should

19          interpret it as the frequency in which

20          this data is involved either as an

21          input or an output in an identity

22          theft and fraud case.
```

374

```
 1              ATTORNEY Z. SHAH:  Okay.  We're
 2         going to mark -- Madam Court Reporter,
 3         can we please mark this part of the
 4         transcript?  Because I think it is a
 5         prime example for the Judge as to how
 6         this witness is comple- -- is offering
 7         totally useless, nonresponsive answers
 8         to my question.
 9  BY ATTORNEY Z. SHAH:
10         Q.    And I am entitled to know,
11  Dr. Barber, whether you intend to tell the
12  jury that monetization value represents the
13  monetary value of the PowerSchool student data
14  at issue in this case.
15              Does it?
16         A.    Give me your equation for how you
17  are valuing -- I don't -- am I valuing it --
18  yes, I am valuing it.  I am --
19         Q.    You're --
20         A.    -- valuing it.  I had given --
21         Q.    -- you -- it's your -- you are
22  valuing the PowerSchool data in this case.
```

1          Is that your testimony?

2      A.    In terms of its con- -- potential

3  consequences and risk, yes.

4      Q.    You intend to tell the jury that

5  the PowerSchool data in this case has a

6  monetary value of millions -- billions of

7  dollars.

8              Is that your testimony?

9      A.    I am not giving actual numbers.

10  I am giving the -- what is more valuable than

11  others.  I'm trying to give relative,

12  qualitative values to this data and -- yeah.

13          I -- I really am trying to answer

14  your question.  I just . . .

15      Q.    I think it's a really

16  straightforward question, Dr. Barber.

17              Does monetization value

18  represent the monetary value of the student

19  data at issue in this case?

20              Yes or no?

21      A.    Monetary value to who?  And how

22  do you calculate that?  There's value to who,

376

1    and its calculation can vary significantly.

2    And I've given you what my method is, but

3    I'm -- I don't have any other response to give

4    you.

5         Q.    So you are purporting to

6    calculate the monetary value of the data in

7    this case?

8         A.    Relative in terms of

9    qualitative -- we didn't have -- we -- we just

10   talked about the relative and qualitative

11   values that were seen in these cases.

12   That's -- and the same data is held by

13   PowerSchool.  That's -- I'm just trying to

14   make those qualitative comparisons.  I'm not

15   trying to create a, Here's how much you could

16   sell the data for, valuation.  I'm not trying

17   to do that.

18        Q.    I'm going to try this one -- one

19   more time, Dr. Barber --

20        A.    Okay.

21        Q.    -- and then I'm going to move on.

22        A.    Okay.

Includes Confidential Testimony Kathleen Suzanne Barber Simons

377

```
 1          Q.     My understanding is that

 2   monetization value represents the monetary

 3   value of the data elements in the 5,000 UTCID

 4   cases that you studied.

 5                     Is that fair?

 6          A.     It is.

 7          Q.     Okay.  Separately, you're opining

 8   that those same data elements are present in

 9   the PowerSchool set of products' DPIAs that

10   you looked at, right?

11          A.     Correct.

12          Q.     Now, are you going to be opining

13   that based on the fact that this data has

14   monetary value in 5,000 other cases, that that

15   data has the same value in this case?

16                     Is that an opinion you plan

17   to offer?

18          A.     Qualitatively, that -- does

19   PowerSchool hold valuable data?  That's what I

20   am saying, and that's -- some of it is more

21   powerful than -- valuable than others.  Some

22   of it is more at risk of exposure just because
```

378

1  the threat likes that data more than they do

2  others.  That's really my testimony.

3       Q.    Okay.  Let's take a very concrete

4  example.  Let's look at Row 14.  And we look

5  at E-mail?

6       A.    Um-hum.

7       Q.    Okay?

8       A.    Right.

9       Q.    You have assigned a monetization

10  value for a PII data name █████████████

   ████████████ at over $60 million, right?

12       A.    Right.

13       Q.    Is it your opinion ███████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████  are

17  worth $60 million?

18       A.    No, I'm not -- I'm opining that

19  █████████████████████████████████████████

   ████████████████████████████████████████

   ████████████████████  -- so I'm -- that it has

22  value and it has -- it's to be used for

379

1  comparative value, because -- yeah, that's --

2      Q.    Dr. Barber, that's great.  That's

3  great.

4      A.    Okay.

5      Q.    You are not opining that

6  ██████████████████████████████ is worth

7  $60 million.

8              Fair?

9      A.    I am not.

10      Q.    You are not opining that

11  monetization value in Column I represents the

12  amount that threat actors have made using the

13  Plaintiffs' data in this case, right?

14      A.    That's correct.

15      Q.    You are not opining that

16  monetization value represents the financial

17  impact of exposed PII in this case, right?

18      A.    I didn't look at that.  I --

19  yeah, I don't -- I haven't looked at the --

20      Q.    Okay.

21      A.    -- exposed data.  That's right.

22      Q.    Do you agree that the value of

399

1                    That's your testimony?

2        A.    No, my testimony --

3              ATTORNEY L. ARAGON:  Objection:

4          form.

5              THE WITNESS:  -- is that --

6              (Simultaneous speech; as a result,

7               portions of the testimony could

8               not be reflected in the record.)

9              THE WITNESS:  Yeah.

10             My testimony is that in these

11         cases that we looked at, only name

12         was mentioned.  I don't know in those

13         cases if there was a data field

14         ███████████████████████████████

   ███████████████████████████████████

16             It was --

17   BY ATTORNEY Z. SHAH:

18       Q.    Oh.  So you --

19       A.    ████████████████████████

20       Q.    -- so when you say --

21       A.    I don't know how the data was

22   represented --

400

```
 1        Q.     Dr. Barber --

 2        A.     No; let me finish.

 3               I don't know how the data was

 4   actually -- you know, ███████████████████

     ███████████████████

 6        Q.     Oh.  Okay.

 7                    So, Dr. Barber, in the -- in

 8   the 5,000 UTCID cases that you looked at, you

 9   don't know whether it was just ██████████

     ██████████████████████████

11                    Is that right?

12        A.     Yes, in the same way that I don't

13   know what --

14        Q.     Dr. Barber, just answer the

15   question.

16                    You don't know, right?

17        A.     I just know that █████ was

18   mentioned in these cases and how it was used.

19   That's all I know.

20        Q.     Okay.  You know the word█████

21   appears in a news article and based on that,

22   you've assigned it a monetary value of
```

401

```
 1    $112.5 million --

 2          A.      I didn't assign.

 3          Q.      -- and you don't know --

 4    Dr. Barber, let me finish the question -- you

 5    don't know whether that ███████████ is a

 6    data field in the PowerSchool SIS instance

 7    that's used by Seattle Public Schools, right?

 8                  ATTORNEY L. ARAGON:  Objection:

 9             form foundation.

10                  She didn't say that.

11                  THE WITNESS:  I didn't -- I

12             didn't assign the value.  I saw cases

13             that represented that financial

14             consequence.  And the reason I mapped

15             it here is because it seemed logical

16             that ████████████████████████

17             and that I was trying to provide a --

18             what data has value.

19                  This data has a non-0 value.

20             It has relatively high value as

21             compared to others.  That's what --

22                  ATTORNEY Z. SHAH:  I'm going to
```

529

ACKNOWLEDGMENT OF WITNESS

1

2          I, KATHLEEN SUZANNE BARBER SIMONS, do hereby

3    certify that I have read the foregoing pages herein,

4    and that the same is a correct transcription of the

5    answers given by me of the proceedings taken remotely

6    to the questions therein propounded under penalty of

7    perjury, except for the corrections or changes in form

8    or substance, if any, noted in the attached errata

9    sheet.

10

11   _____                    _____

12    DATE                          SIGNATURE

13

14

15

16   Subscribed and sworn to before me
     this _____ day of_____, 20_____.

17

18       My Commission expires:

19

20     _____

21     _____

22          Notary Public