Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Zharna Shah (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
zharna.shah@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| EMILY CHERKIN, et al | ) CASE NO. 3:24-cv-02706-JD |
| | ) |
| Plaintiffs, | ) **DEFENDANT POWERSCHOOL** |
| | ) **HOLDINGS, INC.'S NOTICE OF** |
| v. | ) **MOTION AND MOTION TO** |
| | ) **EXCLUDE THE OPINIONS OF** |
| | ) **CHRISTOPHER SCHULTE** |
| POWERSCHOOL HOLDINGS, INC., | ) |
| | ) Judge: Hon. James Donato |
| Defendant. | ) Hearing Date: April 23, 2026 |
| | ) Time: 11:00 a.m. |
| | Courtroom: 11, 19th Floor |

# NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on April 23, 2026, at 11:00am PT, or as soon thereafter as this matter may be heard, in the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, in Courtroom 11, 19th Floor, before the Honorable James Donato, Defendant PowerSchool Holdings, Inc. ("PowerSchool") will and hereby does move the Court to exclude Plaintiffs' proffered damages expert Christopher Schulte.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................................................................ 1

II.     BACKGROUND ............................................................................................................. 3

        A.      Schulte's "actual damages" calculation assigns value to student data based on
                a single poor comparator drawn from an unimplemented third-party contract. ........... 4

        B.      Schulte's "unjust enrichment" calculation measures PowerSchool's revenue
                from schools or districts minus certain costs—not any benefit obtained from
                the putative class. ........................................................................................................... 5

        C.      Schulte offered no estimate of class size, leaving damages calculations
                unfinished ........................................................................................................................ 6

III.    LEGAL STANDARDS .................................................................................................... 7

IV.     ARGUMENT ................................................................................................................... 8

        A.      Schulte's actual damages opinion is not the product of reliable methodology
                because it relies on a single, non-comparable, and unimplemented transaction. ......... 8

        B.      Schulte's actual damages opinion should be excluded because it will not help
                the trier of fact. ............................................................................................................. 10

        C.      Both of Schulte's damages opinions fail Rule 702's relevance and fit
                requirements. ................................................................................................................. 11

                1.      Schulte's "actual damages" does not fit the invasion of privacy claim
                        because it does not measure actual injuries to Plaintiffs or the class. ............. 11

                2.      Schulte's "unjust enrichment" calculation does not fit the unjust
                        enrichment claim because it does not measure PowerSchool's profit
                        from the wrongful conduct at issue. ................................................................. 12

        D.      Schulte abandoned his opinion that class members can be identified or
                quantified, or that he can calculate classwide damages. ............................................. 14

        E.      Schulte should be barred from presenting undisclosed rebuttal opinions ................... 15

V.      CONCLUSION ............................................................................................................... 15

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Biotech Value Fund, L.P. v. Celera Corp.*,
2015 WL 138168 (N.D. Cal. Jan. 9, 2015) ..................................................................10

5

6

*Castillo v. United States*,
2024 WL 5265644 (C.D. Cal. Apr. 24, 2024) .............................................................15

7

*Cherkin v. PowerSchool Holdings, Inc.*,
2025 WL 844378 (N.D. Cal. Mar. 17, 2025) ..............................................................12

8

9

*Clear Channel Outdoor, Inc. v. Bently Holdings California LP*,
2011 WL 6099394 (N.D. Cal. Dec. 7, 2011) ..............................................................14

10

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ......................................................................................................14

11

12

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014) ...............................................................................10

13

14

*Cranford v. City of Huntington Beach*,
2012 WL 687860 (Cal. App. Mar. 2, 2012) ...............................................................12

15

*CZ Services, Inc. v. Express Script Holdings Co.*,
2020 WL 4518978 (N.D. Cal. Aug. 5, 2020) ..........................................................9, 11

16

17

*DataQuill Ltd. v. High Tech Computer Corp.*,
887 F. Supp. 2d 999 (S.D. Cal. 2011) ..........................................................................8

18

19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ........................................................................................... *passim*

20

*Diaz v. Oakland Tribune, Inc.*,
139 Cal. App. 3d 118 (1983) ......................................................................................11

21

22

*Elsayed Mukhtar v. Cal. State Univ.*,
299 F. 3d 1053 (9th Cir. 2002) .....................................................................................8

23

24

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) .....................................................................................7

25

*Fidelitad, Inc. v. Instu, Inc.*,
2016 WL 7508843 (E.D. Wash. July 8, 2016) ............................................................14

26

27

*Gen. Elec. Co. v. Joiner*,
522 U.S. 135 (1997) ....................................................................................................13

28

*Goodness Films, LLC v. TV One, LLC*,
   2014 WL 12780291 (C.D. Cal. May 19, 2014) ..............................................8

*Gray v. Cytokine Pharms., Inc.*,
   2002 WL 853549 (Del. Ch. Apr. 25, 2002) ..................................................8

*Klein v. Meta Platforms, Inc.*,
   766 F. Supp. 3d 956 (N.D. Cal. 2025) ......................................................7, 9

*Krueger v. Wyeth, Inc.*,
   396 F. Supp. 3d 931 (S.D. Cal. 2019) .........................................................14

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ......................................................................................8

*Metabyte, Inc. v. Canal+Techs., S.A.*,
   2005 WL 6032845 (N.D. Cal. June 17, 2005) .............................................9

*Miller v. Nat'l Broadcasting Co.*,
   187 Cal. App. 3d 1463 (1986) .....................................................................11

*Mission Viejo Florist, Inc. v. Orchard Supply Co.*,
   2019 WL 13045054 (C.D. Cal. Feb. 28, 2019) ...........................................10

*Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*,
   713 F. Supp. 3d 660 (N.D. Cal. 2024) .........................................................7

*Sali v. Corona Regional Medical Center*,
   909 F.3d 996 (9th Cir. 2018) ........................................................................7

*Timed Out, LLC v. Youabian, Inc.*,
   229 Cal. App. 4th 1001 (2014) ...................................................................11

*Townsend v. Monster Beverage Corp.*,
   303 F. Supp. 3d 1010 (C.D. Cal. 2018) ........................................................7

*Uzyel v. Kadisha*,
   188 Cal. App. 4th 866 (2010) .................................................................12, 14

*Waymo LLC v. Uber Techs., Inc.*,
   2017 WL 5148390 (N.D. Cal. Nov. 2, 2017) ..............................................10

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000) ......................................................................................8

**Rules**

Fed. R. Civ. P. 26 ...............................................................................................15

Fed. R. Civ. P. 37 ...............................................................................................15

Fed. R. Evid. 702 ...............................................................................2, 7, 8, 11

**Other Authorities**

CACI 1800 ...........................................................................................12

CACI 1803 ...........................................................................................12

CACI 1820 ...........................................................................................12

## I.    INTRODUCTION

Only two damages claims remain against PowerSchool Holdings, Inc.: a California common law invasion of privacy claim and a California quasi-contract unjust enrichment claim.  Dkt. 116 at 18, 21 (class certification motion); Dkt. 1 at 69, 85 (claim allegations).  Notably, Plaintiffs do not seek recovery on behalf of students who actually used a PowerSchool product or were injured by any product functionality, but instead seek recovery on behalf of students whose "***school … used***" certain PowerSchool products to store records (the "Data Warehouse" products) or to generate "insights" or "predictions" (the "Predictions" products),[1] so long as PowerSchool hosted some portion of the school's data.  Dkt. 116 at 9-10 (emphasis added).

Plaintiffs retained Christopher Schulte to opine on "PowerSchool's unjust enrichment and Plaintiffs' and Class Members' actual damages."  *See* Ex. A (Schulte Rep.) ¶ 7.  They contend that Schulte can "apportion any aggregate recovery among Class members" without "individualized inquiries."  Dkt. 116 at 22.  But Schulte's report should be excluded because:

*1.  **Schulte's actual damages opinion rests on unreliable methodology.***  Schulte does not assess actual injuries to Plaintiffs or the putative class but instead asserts that actual damages should equal the market value of student data.  He then values every student's data of whatever type in whatever context based on a single, highly flawed comparator transaction that was never actually implemented.  First off, reliance on a single comparator is not a proper method of valuation.  Moreover, the supposed comparator is not actually comparable to the wide variety of data at issue.  The comparator relates only to application data about ███████ ████████████████████████████████████████, with the valuation drawn from a transaction that was never implemented.  This methodological approach is unreliable and does not meet the standards of Schulte's field, as required by *Daubert*.

*2.  **Schulte's actual damages opinion does no more than restate the factual record.***  Schulte's actual damages opinion is not the product of any expert analysis and therefore offers no value to the trier of fact.  His actual damages calculation merely states the terms of a contract between

---

[1]    These product labels were invented by Plaintiffs and do not correspond to any product categories used by PowerSchool.

1   PowerSchool and a third party (███).  The fact finder is equally capable of reading the relevant

2   terms in a contract if they accept Plaintiffs' arguments, just as Schulte himself did.

3       ***3.  Both of Schulte's damages opinions do not fit Plaintiffs' liability theories***.  Schulte's

4   report and testimony do not fit Plaintiffs' liability theories or measure damages attributable to

5   the allegedly wrongful conduct—i.e., PowerSchool's alleged invasion of student data privacy

6   and unjust enrichment by creating insights using student data.  For "actual damages"—which

7   Plaintiffs seek on behalf of a putative class of students whose schools use any Data Warehouse

8   products, *see* Dkt. 116 at 22—Schulte admitted that his analysis does not measure any

9   "diminution in value" of data, any "loss of privacy," or the difference between the "but-for

10  world where PowerSchool never stored [putative class members'] data and the real world

11  where it did." Ex. B, Schulte Tr. 171:25-173:1.  Instead, Schulte **assigns** a per class member

12  value to all data stored ($0.40), as described above, and **assumes** that all putative class

13  members had data stored, allegedly entitling them to 40 cents of compensation, regardless of

14  the actual record.  *Id.* at 73:11-18.  That is not a measure of actual damages recoverable for

15  invasion of privacy.  For "unjust enrichment"—which Plaintiffs seek on behalf of a putative

16  class of students whose school uses any Predictions products, *see* Dkt. 116 at 23—Schulte

17  likewise did not tie revenues to the alleged wrongful conduct or to any putative class member.

18  Instead, he **assumes** that products with "prediction" or "insight" functionality are unlawful and

19  treated **all** revenue from those products as unjust—regardless of whether a school used the

20  product to make predictions at all (as opposed to using it for other functions offered in the

21  product).  *See* Ex. B, Schulte Tr. 247:22-249:9.  Because Schulte's opinions are not tied to

22  Plaintiffs' theories of liability, they fail Rule 702's relevance requirement.

23  As a result, Schulte's report does not meet the standards set forth in *Daubert v. Merrell Dow*

24  *Pharmaceuticals, Inc*., 509 U.S. 579, 589 (1993), and should be excluded in full.

25      In addition to excluding Schulte's damages theories, the Court should limit Schulte from

26  testifying to opinions disclaimed or left out of his expert report.  At deposition Schulte made clear he

27  is not providing any opinion about identifying injured class members or those who are entitled to

28  damages.  He had no opinion regarding the "maximum" or even "average" damages, no opinion on

"the quantification and identification of potential class members," and offered only a general speculation—based on "experience"—that undiscovered and unidentified PowerSchool's records should be able to identify class members. *Id.* at 142:22-144:5, 236:7-13. As a result, Schulte should be prohibited from identifying class members or calculating class sizes at trial. Further, Schulte did not file a rebuttal report in this case. At deposition, he mentioned for the first time that he had (undisclosed) opinions on Defendant's expert reports, Ex. B, Schulte Tr. 15:25-16:6, but because those opinions were not timely disclosed, Schulte cannot testify to them at trial.

## II.    BACKGROUND

Plaintiffs retained Christopher Schulte to calculate "Plaintiffs' and Class Members' actual damages" from "Data Warehouse" products and "PowerSchool's unjust enrichment" from its so-called "Prediction" products. Schulte clearly stated that he relied on assumptions supplied by counsel about what products should be treated as unlawful and who should be considered injured. Ex. A, Schulte Rep. ¶ 9. When asked whether his analysis would change if the scope of allegedly unlawful conduct were narrower, Schulte conceded that "there may or may not be some aspects of [his] analysis that would have to be modified." Ex. B, Schulte Tr. at 59:13-23. Schulte offers three opinions:

*First*, he opines that "actual damages" should be measured by multiplying the (undetermined) number of putative class members by a price for each student's data (regardless of what data it is or even whether the class member had any data stored), with the price drawn from a contract between PowerSchool and third party ▮▮▮ regarding a product (▮▮▮▮▮) that is not within the class definition. Ex. A, Schulte Rep. 5-6.

*Second*, he opines that "unjust enrichment" can be calculated by treating ***all*** revenue from the four PowerSchool products that include predictive or analytical functionality as unlawful revenue, regardless of whether the product's predictive capabilities were ever used by the school or on any putative class member's data. *Id*. at 3-4.

*Third*, he speculates that potential class members could be identified and quantified using PowerSchool's business records, without being able to identify what records those would be. *Id*. at 6.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**A.    Schulte's "actual damages" calculation assigns value to student data based on a single poor comparator drawn from an unimplemented third-party contract.**

Schulte's report states: "the analysis of actual damages in this matter is reasonably based on the value of the student data that PowerSchool allegedly aggregated and used without consent – or compensation to – Plaintiffs and class members." Ex. A, Schulte Rep. ¶ 93.  Schulte conceded that his analysis does not measure any recognized form of economic injury, including diminution in value of data, loss of privacy, economic loss, or risk of identity theft.  Ex. B, Schulte Tr. 171:25-173:10.  Although he described his approach as estimating "compensation that was not paid," *id.* at 175:11-21, he admitted that he does not assess the price at which students might be willing to sell their data, if at all, *id.* at 185:12-15, or the price at which PowerSchool would be willing to purchase their data, if at all, *id.* at 183:7-10, 185:9-10.  Nor did he make any effort to limit his damages estimate to students whose data PowerSchool actually hosted.  *Id.* at 156:1-4, 171:6-9, 228:4-11.

Instead, Schulte attempts to estimate "the market value of [student] data" by "search[ing] for and analyz[ing] available indicators of the market value of data similar to that at issue." Ex. A, Schulte Rep. ¶ 93.  He found none.  At his deposition, Schulte testified that he was "not aware of any … market transactions of student data" and had never previously attempted to value such data.  Ex. B, Schulte Tr. 22:16-18, 178:17-180:17, 180:3-5.  As a result, he was left to rely on just one supposed comparator—an arrangement in a contract between PowerSchool and a third party, ▮▮▮ ("▮▮ Agreement").  Ex. A, Schulte Rep. ¶¶ 93, 96-115; Ex. B, Schulte Tr. 179:18-180:5.  Under this agreement, ▮▮ would help market PowerSchool's ▮▮▮▮▮ product, ▮▮ (not at issue in this case).  *See* Ex. A, Schulte Rep. ¶ 96.  The ▮▮ Agreement also required ▮▮ and PowerSchool to develop an integration in ▮▮▮ that could share ▮▮▮ data from ▮▮▮▮—such as ▮▮▮▮▮▮▮▮▮—with ▮▮ ***if*** the parties could develop a "consent protocol to ensure" that the parties proceeded with students' "***express[] consent***". *Id.*  ¶ 110;  Ex. C,  PWRSCHL_00191203,  at  '214-216  (emphasis  added);  Ex. D, PWRSCHL_00003235, at '239, '247-48.  If it were implemented, the contract provided that PowerSchool would have earned about 40 cents per student.  Ex. A, Schulte Rep. ¶ 110.  But the

integration was ***never launched***, and PowerSchool never received compensation.[2]  *Id.* ¶ 126; Ex. B, Schulte Tr. 232:8-10.  This arrangement forms the ***sole basis*** for Schulte's valuation of all student data, despite the fact that the ███████ and ███████ products are not within the relevant class definitions.  Ex. B, Schulte Tr. 179:18-180:5.  Schulte acknowledged that the ███████ arrangement involved, in his characterization, a "unique buyer" seeking data "specific to ███████ students" and that the downstream market consisted of ██████████████████████████████████ ███████. *Id.* 186:10-16, 192:5-19.

Nevertheless, Schulte characterized his calculation (40 cents times the unidentified number of people in the class) as a "conservative floor" for actual damages, leaving it to the "trier of fact" to determine what ultimate damages should be awarded based on the quantity and nature of data associated with individual students.  *Id.* at 208:21-25, 214:18-216:5.  His calculation thus reflects neither a maximum nor an average value of student data.  *Id.* at 212:4-6, 213:5-215:8, 236:7-13.  It is not tied to any specific data elements and provides no framework to distinguish between class members tied to minimal student data (e.g., a student's name only) and class members tied to more extensive personal data (e.g., a holistic college application with a social security number).  Similarly, Schulte makes no effort to "account for differences in … data fields" for the products at issue, *compare* Ex. B, Schulte Tr. 203:2-21 *with* Schulte Rep. ¶¶ 16-52 (discussing the products and data elements), despite the fact that he frankly conceded that some data may be worth more than other data.  *Id*. at 208:8-20.

The entire valuation that Schulte labeled "actual damages" thus rests on assigning 40 cents to each class member based on a single, unimplemented transaction between two willing parties in a limited, unique market involving data from a narrow subset of ███████ students.

### B.  Schulte's "unjust enrichment" calculation measures PowerSchool's revenue from schools or districts minus certain costs—not any benefit obtained from the putative class.

Schulte's unjust enrichment analysis is a simple calculation of PowerSchool's purported profits made from sales to schools or school districts of four products.  Schulte was "asked … to assume" that

---

[2]  PowerSchool and ███ ultimately launched a different solution.  Because Schulte did not rely on that solution in his analysis, it is not relevant to his opinions here.

these products provided "analytics," "insights," or "predictions" that are unlawful.  Ex. A, Schulte Rep. ¶ 65.  Based on this assumption, Schulte identifies product-specific revenues from a PowerSchool spreadsheet and projects present-day revenues for those products.  The products are sold to schools and school districts; the revenue was not earned from the putative class members.  Once Schulte calculates the revenue, he subtracts certain costs using PowerSchool's income statements to estimate profit.  *Id.* ¶¶ 68-79.  Although his report suggests that those cost deductions were based on PowerSchool testimony, Schulte testified that he relied largely on his own experience in determining which costs to exclude.  *See* Ex. B, Schulte Tr. 133:21-134:12, 137:14-138:2, 259:1-260:24.  The resulting figure reflects nationwide revenues and expenses associated with the four products as a whole.  Ex. A, Schulte Rep. ¶ 91.

Schulte makes no attempt to determine whether the revenues he identified were tied to any class member's data or to allegedly unlawful conduct by PowerSchool.  Schulte claimed that whether PowerSchool's products were used to analyze any student's data or generate predictions about a particular student is not "germane to [his] work."  Ex. B, Schulte Dep. 156:5-24.  He offered no opinion as to whether any student's data was actually used in predictive analytics.  *Id.* at 171:6-9, 228:4-10.  Indeed, Schulte testified that his unjust enrichment calculation would remain unchanged ***even if no school actually ran predictions on any student's data***.  *Id.* at 245:18-249:9.

Under Schulte's approach, all revenue from the four products reflects unlawful conduct, even if the products provide numerous other functionalities (e.g., a communication tool allowing schools to communicate efficiently with parents).  *Id.* at 126:10-21.  He also treats PowerSchool's revenue as unjust even where schools design and implement their own analytical models while using PowerSchool software merely as a platform.  *Id.*  The record reflects that some schools, including the Plaintiffs' own Seattle Public Schools, design and implement their own analytics within PowerSchool products without PowerSchool's involvement.  Ex. F, Jaeger Dep. (12/18/25) 38:2-42:19, 105:21-107:16; Ex. E, Jaeger Dep. (12/05/25) 74:25-75:9.  In such circumstances, students are not exposed to PowerSchool-developed analytics or algorithms at all.

**C.  Schulte offered no estimate of class size, leaving damages calculations unfinished.**

Schulte's report asserts that "[a]ll of the calculations discussed in [the] report and detailed in

the corresponding exhibits can be readily apportioned across the Classes and among the Class Members." Ex. A, Schulte Rep. ¶ 134. But the report provides no methodology supporting that conclusion. Instead, Schulte relied on Plaintiffs' counsel's representation that potential class members could be identified and quantified at some point in the future. *Id*. Plaintiffs and Schulte have provided no information on how that could occur, nor have they indicated that they have any data on which to base a later calculation.

At his deposition, Schulte disclaimed any ability to identify or quantify class members. He testified that he was "not advancing" the figures or documents referenced in his report as a way "to provide a definitive count regarding the class," and that he was "not aware of information that would currently answer that question." Ex. B, Schulte Tr. 148:5-18. He even testified that determining the class itself is "outside … the scope of [his] work in this case." *Id*. at 150:16-23.

In light of that testimony, Schulte withdrew the premise underlying his report's assertion that "the quantification and identification of potential Class Members could be reasonably based on PowerSchool's contemporaneous business records." Ex. A, Schulte Rep. 6. His report therefore offers no methodology for estimating the class size, identifying class members or apportioning damages among them. Accordingly, the actual damages number he seeks to offer the fact finder is only on a per putative class member basis, and his unjust enrichment number is a lump sum, to be divided between an unknown number of putative class members.

## III. LEGAL STANDARDS

The party offering expert testimony bears the burden of establishing, by a preponderance of the evidence, that the testimony is both reliable and helpful to the trier of fact under Federal Rule of Evidence 702.[3] *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025). A district court therefore serves as a gatekeeper, ensuring that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

---

[3] Schulte is offered as a merits expert, but Plaintiffs rely on his opinion in their Motion for Class Certification as well. Dkt. 116. Regardless, district courts in this Circuit routinely apply Daubert at the class certification stage. *See, e.g.*, *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956 (N.D. Cal. 2025); *Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 713 F. Supp. 3d 660 (N.D. Cal. 2024); *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010 (C.D. Cal. 2018); *see also Sali v. Corona Regional Medical Center*, 909 F.3d 996 (9th Cir. 2018).

1    "Maintaining *Daubert*'s standards is particularly important considering the aura of Authority

2    experts often exude, which can lead juries to give more weight to their testimony." *Elsayed Mukhtar*

3    *v. Cal. State Univ.*, 299 F. 3d 1053, 1063-64 (9th Cir. 2002). The Court must apply "exacting standards

4    of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), to "make certain that an expert …

5    employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert

6    in the relevant field," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

7    **IV.    ARGUMENT**

8        **A.    Schulte's actual damages opinion is not the product of reliable methodology**
             **because it relies on a single, non-comparable, and unimplemented transaction.**
9

10    Schulte actual damages opinion should be excluded because it is not based on a reliable

11    methodology. Rule 702 requires that an expert apply a valid methodology grounded in sufficient facts

12    and data. *See Daubert*, 509 U.S. at 592-93. Courts also evaluate whether the expert's reasoning is

13    reliable and whether it is properly applied to the facts of the case. *Id*. The inquiry ensures that "the

14    expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of

15    an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

16    Economists like Schulte may rely on precedent transactions to value assets, but only when

17    those transactions are sufficiently comparable, there is a sufficient number of comparators, and the

18    expert accounts for relevant economic or technological differences. *DataQuill Ltd. v. High Tech*

19    *Computer Corp.*, 887 F. Supp. 2d 999, 1021-23 (S.D. Cal. 2011) (rejecting royalty analysis based on

20    non-comparable transaction). "When conducting a comparative analysis, to meet the reliability that

21    *Daubert* demands, an expert must select samples that are truly comparable," and the expert must

22    ensure that "the comparison is one between 'apples and apples' rather than one between 'apples and

23    oranges.'" *Goodness Films, LLC v. TV One, LLC*, 2014 WL 12780291, at *2 (C.D. Cal. May 19,

24    2014) (citation omitted). Indeed, a valuation analysis based on comparable transactions is not

25    appropriate if the only transactions in the record are too different. *E.g.*, *Gray v. Cytokine Pharms.,*

26    *Inc.*, 2002 WL 853549, at *9 (Del. Ch. Apr. 25, 2002) (business valuation analysis based on 10

27    companies was impermissibly unreliable when all companies were much larger than the target and

28    only one was in the same industry). Here, to value any and all of the myriad types of data at issue,

1  Schulte relied on just one data point: the price per student assigned by the unimplemented ███

2  Agreement for students █████████████████. *See supra* pp. 5-6. That approach suffers

3  from two fatal methodological defects.

4        ***First***, Schulte relies on a single "comparable" transaction to support a damages estimate

5  reaching tens of millions of dollars. *See* Ex. A, Schulte Rep. ¶¶ 93, 138. As this Court noted in *CZ*

6  *Services, Inc. v. Express Scripts Holding Co.*, "it is questionable that a reasonable expert would rely

7  on just one transaction for a valuation determination." 2020 WL 4518978, at *7 (N.D. Cal. Aug. 5,

8  2020) (Donato, J.). When an expert performs a valuation based on a single transaction, even "a

9  few … significant differences" make the valuation "unreasonable." *Metabyte, Inc. v. Canal+Techs.,*

10 *S.A.*, 2005 WL 6032845, at *3 (N.D. Cal. June 17, 2005) (excluding expert). Put another way, one

11 dot does not make a line; conducting a valuation analysis entirely based on one (poor) comparator is

12 not reliable economic analysis. Yet that is what Schulte attempts to do here: He values all student

13 data solely using the ███ Agreement. His reliance on the ███ Agreement is particularly suspect

14 because PowerSchool never actually earned any revenue under that agreement. *Klein*, 766 F. Supp.

15 3d at 964 (Donato, J.) (rejecting damages calculation based on "internal trial balloons that never

16 ripened into serious proposals"). This calls into serious question whether it is even a reliable indicator

17 of any market value.

18       ***Second***, Schulte's comparator-based valuation analysis does not meet the *Daubert* standard of

19 reliability because the ███ Agreement is not in fact comparable. Schulte acknowledged that the

20 agreement involved key application data from ███ students for ███████ purposes.

21 Ex. B, Schulte Tr. 186:10-16; 192:5-19. He further conceded that PowerSchool products process

22 highly variable data fields and that different types of data may have different values (including to the

23 students themselves). *Id.* at 203:2-21, 208:8-20. He even acknowledged that the $0.40 figure he

24 derived from the ███ Agreement did not represent a price that PowerSchool would pay students for

25 their data or that students would accept. *Id.* at 183:7-10, 185:6-15. Yet he made no attempt to account

26 for those differences in value. Further, he made no attempt to account for differences in the amount

27 of data from a student at issue; he equated the handful of data fields at issue in the ███ Agreement

28 (███████████████) to *any* data on a student in *any* context—whether that be their

name on a one time basis or their entire 13 years of student records.  Allowing Schulte to value all student data (no matter how minor or fulsome) based on a single, unimplemented agreement is the equivalent of allowing an expert to value all forms of transport from skateboards to private jets based on the price someone was offered for their Honda.  This is not methodology that is widely accepted in the field.  Schulte's methodology leaves "too great an analytical gap between the data and the opinion proffered."  *Mission Viejo Florist, Inc. v. Orchard Supply Co.*, 2019 WL 13045054, at *4 (C.D. Cal. Feb. 28, 2019).

### B.    Schulte's actual damages opinion should be excluded because it will not help the trier of fact.

Expert opinions are admissible only if they are the product of "scientific knowledge."  *Daubert*, 509 U.S. at 590.  An expert cannot appear merely to offer "evidence" that "can speak for itself," with the expert's "only contribution … be[ing] to pile on a misleading façade of expertise."  *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 2, 2017).  Schulte's "actual damages" opinion fails this requirement because the entire analysis reduces to reciting the terms of one uncompleted transaction he found in the documentary record and labeling the number "actual damages."  *See* Ex. B, Schulte Tr. 206:8-14, 208:11-25, 211:21-212:6.  Courts routinely exclude such testimony where the expert simply summarizes record evidence rather than applying specialized expertise.  *Biotech Value Fund, L.P. v. Celera Corp.*, 2015 WL 138168, at *1-3 (N.D. Cal. Jan. 9, 2015).  Allowing Schulte to testify on this record information would suggest that Schulte is applying far more expert "analysis" than he actually is, confusing the trier of fact into affording the record evidence undue weight because of his "façade of expertise."  *Waymo*, 2017 WL 5148390, at *5.

Moreover, the result of Schulte's calculation is neither a maximum nor average valuation, but a minimum "estimate" with no guidance as to how to calculate a final damages figure.  Ex. B, Schulte Tr. 208:21-25, 212:4-6, 213:5-215:8, 214:18-216:5, 236:7-13.  Schulte leaves that calculation to the "trier of fact" depending on whatever factors the trier of fact decides to consider.  *Id.* at 208:21-25, 214:18-216:5.  In other words, he simply wants to throw the 40 cent number to the trier of fact to apply as they will.  This is the kind of unhelpful information that is more likely to confuse the trier of fact than help them accurately assess damages.  *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D.

Cal. 2014) (striking expert's damages calculations as being too "incomplete … to be []admissible," since the expert just described methodologies for calculating damages without actually undertaking the calculation). Informing the trier of fact that class member damages are somewhere north of 40 cents per class member is not a proper expert opinion.

> **C.** **Both of Schulte's damages opinions fail Rule 702's relevance and fit requirements.**

Schulte's damages opinions should be excluded because they are connected to the issues in this case only by labels, are not tied to Plaintiffs' liability theories, and thus are not helpful.

Plaintiffs pursue certification on two damages claims: (1) California common law invasion of privacy based on PowerSchool's allegedly offensive intrusion into sensitive student data; and (2) quasi-contractual unjust enrichment based on PowerSchool allegedly depriving Plaintiffs of their "property, security, privacy, and autonomy." Dkt. 1 ¶¶ 442-56, 556-66; Dkt. 116 at 18, 21.

Schulte's opinions are only admissible if they "are tied to [Plaintiffs'] claims or damages theories in this case." *CZ Servs.*, 2020 WL 4518978, at *5. This Court's opinion in *CZ Services* is particularly instructive. There, the plaintiff's expert attempted to calculate damages for defamation, unfair competition, and tortious interference based on the change in the company's valuation but failed to "tie[]" the decrease in valuation to a defamatory statement or loss of specific customers; further, valuation damages were not recoverable for the tort of unfair competition. *Id.* at *5. After explaining what damages were recoverable under the legal theories at issue, this Court excluded the expert's damages calculation for lack of "fit." *Id.*

As explained below, Schulte's opinions should be excluded for the same reasons.

> **1.** ***Schulte's "actual damages" does not fit the invasion of privacy claim because it does not measure actual injuries to Plaintiffs or the class.***

The standard measures of damages for invasion of privacy are "mental suffering and anguish," *Miller v. Nat'l Broadcasting Co.*, 187 Cal. App. 3d 1463, 1485 (1986), "out-of-pocket losses," and "impairment of reputation and standing in the community," *Diaz v. Oakland Tribune, Inc.*, 139 Cal. App. 3d 118, 137 (1983).[4] A plaintiff cannot recover damages for invasion of privacy without

---

[4]    California law recognizes a "right of publicity" that is "distinct from the right of privacy" that allows an individual "to prevent others from misappropriating the economic value generated … through the merchandising of the 'name, voice, signature, photograph, or likeness' of the

demonstrating that the plaintiff suffered some injury from the invasion. *See Cranford v. City of Huntington Beach*, 2012 WL 687860, at *13 (Cal. App. Mar. 2, 2012) (affirming jury verdict for defendant on the invasion of privacy claim because the evidence supported their finding that plaintiff's "emotional distress was not the result of the disclosure of … medical information"); *see also* CACI 1800 (jury instruction requiring plaintiffs to prove that the invasion was a "substantial factor" in their harm).

Schulte's "actual damages" calculation is not based on non-economic harm to the putative class or any out-of-pocket losses. Instead, it is based on a (very flawed) valuation of student data. Plaintiffs and Schulte make no attempt to explain why this is a proper measure of actual damages; they do not contend that the putative class members would have sold their data at this value if it had not been allegedly misappropriated. Indeed, Schulte acknowledged that his calculations did not reflect "the difference between the position of putative class members in the but-for world where PowerSchool never stored their data and the real world where it did." Ex. B, Schulte Tr. 171:25-173:14. The generic value of the data allegedly invaded (without a showing of individualized harm) is not a cognizable measure of damages for this tort, particularly since the tort requires proof of causation and injury. *Cranford*, 2012 WL 687860, at *13. Schulte's "actual damages" calculation thus does not fit Plaintiffs' theories because it is not tied to injuries Plaintiffs or the putative class suffered *as a result* of PowerSchool's data processing.

### 2.     *Schulte's "unjust enrichment" calculation does not fit the unjust enrichment claim because it does not measure PowerSchool's profit from the wrongful conduct at issue.*

To recover unjust enrichment damages and fit damages to the alleged unlawful conduct,[5] Plaintiffs must trace the unlawful benefits (profits) to benefits that **Plaintiffs** conferred on

---

[holder].'" *Timed Out, LLC v. Youabian, Inc.*, 229 Cal. App. 4th 1001, 1006 (2014). As the Judicial Council of California notes, the right to sue for "[t]he commercial value of [plaintiff's] name or lines" is "intended *only* for cases involving violation of privacy by [such] appropriation." CACI 1820 & Directions for Use; *see also* CACI 1803 (instruction for the misappropriation claim). Plaintiffs did not assert a misappropriation of name or likeness claim here.

[5]   This argument is made only *arguendo*; PowerSchool does not concede that an unjust enrichment claim even exists under California law. *See Cherkin v. PowerSchool Holdings, Inc.*, 2025 WL 844378, at *7 (N.D. Cal. Mar. 17, 2025) (noting disagreement in California law over whether it is an independent claim).

1  PowerSchool *as a result of* the unlawful conduct.  *See Uzyel v. Kadisha*, 188 Cal. App. 4th 866, 889-
2  91 (2010) (denying disgorgement for profits earned on certain stock purchases despite a finding that
3  defendant was liable for misappropriating trust assets, because plaintiff failed to show that the stock
4  was purchased with the misappropriated assets).

5     Schulte's unjust enrichment calculation fails the fit test because Schulte did not try to measure
6  PowerSchool's revenues from the allegedly wrongful conduct that impacted Plaintiffs or the class
7  members—that is, revenues from the class based on "mak[ing]" "insights or predictions about [class
8  members] using data fed into PowerSchool's … products" without their consent.  Dkt. 116 at 21
9  (explaining the basis for Plaintiffs' unjust enrichment claim).

10    Here, to calculate unjust enrichment for the Prediction classes, Schulte identifies all revenues
11 associated with four PowerSchool products that offer analytical functionality.  He then subtracts
12 selected costs to arrive at a general profit figure for those four products.  Ex. A, Schulte Rep. ¶¶ 68-
13 79, 91.

14    But PowerSchool's so-called "Prediction" products offer customers a variety of functions, not
15 all of which involve the kind of analytics Plaintiffs now challenge.  Ex. B, Schulte Tr. 126:10-21
16 (agreeing that he ignored the fact that a product enabled school to communicate efficiently with parents
17 and included all its revenue in his calculation because of a single purportedly analytical function).
18 Schulte admitted that he did no work to determine what constitutes "analytics," "insights," or
19 "predictions" functions.  *Id.* at 29:4-9, 110:11-112:23.  Instead, he identified products by reviewing
20 marketing descriptions and assumed that every dollar of revenue from those products would disappear
21 absent the challenged analytical functionality.  *Id.* at 106:7-17, 126:4-21, 129:22-130:20.  But experts
22 may not connect conclusions to data "only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*,
23 522 U.S. 135, 146 (1997).  Schulte offered no analysis showing that schools license those products
24 solely for predictive analytics, and he failed to consider undisputed third-party testimony that schools
25 often license the products for other functionalities or design their own analytics to use through those
26 products using independent contractors.  Ex. F, Jaeger Dep. (12/18/25) 38:2-42:19, 105:21-107:16.[6]
27 In fact, the products offer numerous non-predictive functions, such as communications and basic data

28 ───────────────
[6]  Schulte did not even review testimony from this school representative.  *See* Ex. A, Schulte Rep.

storage.  Ex. B, Schulte Tr. 126:10-21.  Because Schulte did not perform the required isolation of profits from these products derived from allegedly unlawful conduct, his calculation does not fit Plaintiffs' unjust enrichment theory.  *Uzyel*, 188 Cal. App. 4th at 889-91 (denying plaintiff's theory that it could recover profits not traceable to the misuse of plaintiff's funds); *Fidelitad, Inc. v. Instu, Inc.*, 2016 WL 7508843, at *4-5 (E.D. Wash. July 8, 2016) (excluding disgorgement calculation that focused on defendant's profit rather than the value of the challenged services); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013) (rejecting "a methodology that identifies damages that are not the result of the wrong" as incapable of establishing classwide damages).

Moreover, there is no record evidence to support that the products were used to create predictions on all putative class members.  Schulte did not analyze how many or whether any student's data was actually subjected to the allegedly unlawful data analytics practices.  He testified that whether PowerSchool products were used to analyze a particular student's data or generate predictions about that student was not "germane to [his] work."  Ex. B, Schulte Tr. 156:5-24.  He further admitted that his unjust enrichment calculation ***would remain unchanged even if no student's data was entered into or analyzed by the products at issue and no unlawful conduct occurred as to any student***.  *Id.* at 243:1-246:15.  By including revenues tied to students who were never affected by the alleged conduct, he fails to measure enrichment unlawfully obtained due to a benefit conferred ***by the putative class***.[7]  *Clear Channel Outdoor, Inc. v. Bently Hldgs. Cal. LP*, 2011 WL 6099394, at *9 (N.D. Cal. Dec. 7, 2011) (defendant must obtain benefit from plaintiff for unjust enrichment); *Krueger v. Wyeth, Inc.*, 396 F. Supp. 3d 931, 954-55 (S.D. Cal. 2019) (damages limited to amounts earned from injured class members, not all of defendant's profits).

### D.   Schulte abandoned his opinion that class members can be identified or quantified, or that he can calculate classwide damages.

The Court should also preclude Schulte from offering any opinion that he can identify potential class members, calculate actual damages classwide, or apportion damages among class members.

In his report, Schulte puts forth no definitive method to identify or quantify class members, but

---

[7]   Schulte testified that including and excluding uninjured class members was outside the scope of his engagement, leaving that task to the trier of fact.  Ex. B, Schulte Tr. 73:11-18, 96:9-13.

instead merely suggests that he could "identify other information produced or represented by PowerSchool that could be used to estimate the minimum number of Class Members based on student usage of PowerSchool products," classwide.  Ex. A, Schulte Rep. 6.  At deposition, he distanced himself from any ability to identify class members even further, as he testified that he was "not advancing" the PowerSchool materials referenced in his report as a method "to provide a definitive count regarding the class," and acknowledged that he was "not aware of information that would currently answer that question." Ex. B, Schulte Tr. 148:5-18.  He further stated that determining the identity of the class itself and testifying about class injury was "outside the scope of [his] work."  *Id.* at 66:18-67:12, 95:10-96:17, 150:16-23.  Schulte admitted that none of the documents he reviewed were sufficient to identify class members or determine the class size, *id.* at 148:5-18, even though a numerical class size is necessary for the trier of fact to derive a final damages calculation.

Because Schulte never provided a reliable supporting methodology, he should be barred from testifying about the identification or quantification of class members.[8]

### E. Schulte should be barred from presenting undisclosed rebuttal opinions.

An expert may not provide undisclosed opinions at trial.  *Castillo v. United States,* 2024 WL 5265644 (C.D. Cal. Apr. 24, 2024) (citing Fed. R. Civ. Pro. 26, 37) (excluding rebuttal testimony not disclosed in an expert report).  Schulte did not submit a rebuttal report in this case, and expert discovery closed long ago.  Nevertheless, at his deposition, Schulte suggested (though did not further explain) that he had rebuttal opinions not contained in his report.  Ex. B, Schulte Tr. 15:22-16:6.  Because these opinions were never disclosed in accordance with Federal Rule of Civil Procedure 26, Schulte should be barred from offering them.

## V. CONCLUSION

The Court should exclude the opinions of Christopher Schulte in their entirety, or at minimum preclude him from offering any opinions not properly disclosed in his report or that he abandoned.

---

[8] Even a cursory review of the sources Schulte cites reveals substantial discrepancies.  One source claims that schools use SIS for 19.7 million students, while another reports only 17 million.  Schulte does not address or reconcile these differences in his report.  *See* Ex. A, Schulte Rep. 65-66 & n.235.

1    DATED: March 9, 2026                    Respectfully submitted,

2                                            KIRKLAND & ELLIS LLP

3                                            */s/ Olivia Adendorff*

4                                            Olivia Adendorff, P.C.

5                                            Robyn E. Bladow
                                             KIRKLAND & ELLIS LLP
6                                            555 South Flower Street, Suite 3700
                                             Los Angeles, CA 90071
7                                            Telephone: (213) 680-8400

8                                            Martin L. Roth, P.C. (*pro hac vice*)
9                                            Alyssa C. Kalisky, P.C. (*pro hac vice*)
                                             Zharna Shah (*pro hac vice*)
10                                           Amelia Bailey (*pro hac vice*)
                                             KIRKLAND & ELLIS LLP
11                                           333 West Wolf Point Plaza
                                             Chicago, IL 60654
12                                           Telephone: (312) 862-2000
                                             martin.roth@kirkland.com
13                                           alyssa.kalisky@kirkland.com
                                             zharna.shah@kirkland.com
14                                           amelia.bailey@kirkland.com

15                                           Olivia Adendorff, P.C. (*pro hac vice*)
16                                           Cristina Martinez Squiers (*pro hac vice*)
                                             Eugene Temchenko (*pro hac vice*)
17                                           KIRKLAND & ELLIS LLP
                                             4550 Travis Street
18                                           Dallas, TX 75205
                                             Telephone: (214) 972-1770
19                                           olivia.adendorff@kirkland.com
                                             cristina.squiers@kirkland.com
20                                           eugene.temchenko@kirkland.com

21

22                                           *Attorneys for Defendant PowerSchool*
                                             *Holdings, Inc.*
23

24

25

26

27

28