# Exhibit B

                                                                    1

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                    SAN FRANCISCO DIVISION

4

5    EMILY CHERKIN, et al,

6            Plaintiff,

7      -vs-                              No. 3:24-CV-02706-JD

8                                        Hon. James Donato

9    POWERSCHOOL HOLDINGS, INC.,

10           Defendant.

11   _____/

12

13   PAGE 1 TO 277

14

15      The Videotape Deposition of CHRISTOPHER SCHULTE,

16      Taken at 120 West Huron Street,

17      Ann Arbor, Michigan,

18      Commencing at 8:53 a.m.,

19      Thursday, February 26, 2026

20      Before Laura J. Steenbergh, CSR-3707, RPR, CRR, RMR

21

22

23

24

25

14

```
 1        basis in a bit.
 2                   But right now, let's take a look at your
 3        report.
 4                   MS. BAILEY:  I'll mark this as Exhibit 1.
 5                   SCHULTE EXHIBIT 1
 6                   Expert Report of Christopher L. Schulte
 7                   WAS MARKED BY THE REPORTER
 8                   FOR IDENTIFICATION
 9                   THE WITNESS:  Thank you.
10                   MS. BAILEY:  Um-hum (affirmatively).
11   BY MS. BAILEY:
12   Q.   Okay.  So I've handed you what's been marked as
13        Exhibit 1, Mr. Schulte.  Does this appear to be a
14        complete and accurate copy of the report you disclosed
15        in this case?
16   A.   It appears to be, yes.
17   Q.   In preparing your report, you understood that you were
18        required to provide a complete statement of all the
19        opinions you'll express in this case and the basis and
20        the reasons for those opinions, correct?
21                   MS. SIEHL:  Object to the form.
22                   THE WITNESS:  That is correct.
23   BY MS. BAILEY:
24   Q.   And you also understood that you were required to sign
25        your report, correct?
```

15

1   A.   That is correct.

2   Q.   And if you take a look at page 66, you'll see that you

3        did sign your report there.

4   A.   Yes, that's correct.

5   Q.   Okay.  By signing your report, you've endorsed all the

6        opinions and bases and reasons that you offer above your

7        signature, fair?

8   A.   That is fair, yes.

9   Q.   And your report, up through your signature, those pages

10       contain all the opinions that you're prepared to offer

11       in this case, along with the basis and the reasons for

12       those opinions, right?

13  A.   That is correct.  But I will note that I have, as I

14       indicate in my report, I reserve my right to examine

15       other documents as -- to the extent that additional

16       information becomes available.

17  Q.   Okay.  But when you were preparing your report, you

18       understood that you would not be permitted to offer

19       opinions that are not disclosed and described in your

20       report, fair?

21  A.   That's fair, yes.

22  Q.   And sitting here today, are there any opinions that you

23       presently intend to offer that are not in this report or

24       the supplemental exhibits we received last night?

25  A.   I would note that I have opinions regarding certain of

Christopher Schulte - February 26, 2026

16

1          the rebuttal work that we received, including the work

2          from Ms. Bartlett, but my affirmative opinion is set

3          forth in this report.

4     Q.   And you did not submit a rebuttal report in this case,

5          correct?

6     A.   That is correct.

7     Q.   We'll talk about the Bartlett reports in a bit.  But

8          just to go back to your report, your report describes

9          any and all analysis you have done to support your

10         opinions in this case, correct?

11    A.   That's correct.

12    Q.   And you're being compensated for your time in this case,

13         correct?

14    A.   My firm is being compensated for my time in this case.

15    Q.   And through your firm, you are receiving compensation,

16         fair?

17    A.   Yes.  I'm a salaried employee of my firm.

18    Q.   Your hourly rate is $565 per hour?

19    A.   That is correct.

20    Q.   And so for your time here today to testify, you're being

21         paid $565 an hour, correct?

22    A.   That is correct.

23    Q.   If you were to testify at trial, will you be paid that

24         same rate, $565 per hour?

25    A.   Yes.  My firm would invoice my time at that same rate.

Christopher Schulte - February 26, 2026

```
                                                            17
 1   Q.   And you charge the same rate for document review?
 2   A.   That is correct.
 3   Q.   And then the same rate for time spent preparing your
 4        report, is that right?
 5   A.   That is correct.
 6   Q.   And you're being paid in this case by counsel for
 7        plaintiffs, correct?
 8   A.   My firm is being paid in this case by counsel for
 9        plaintiffs, yes.
10   Q.   And do you know if it's specifically Hagens Berman that
11        is paying your firm for your time in this case?
12   A.   I understand that my invoices are being sent to Hagens
13        Berman.  The actual payment is handled by my payments
14        team.
15   Q.   And speaking of the invoices, how many hours have you
16        spent working on this case since you were first engaged?
17   A.   Through my January invoice, I believe that my time was
18        roughly 200 hours.
19   Q.   And then you mentioned that you have a team helping you
20        through Encoura, is that right?
21   A.   That's correct.
22   Q.   How many people are on that team?
23   A.   There are two primary assistants on this case.
24   Q.   How many hours, roughly, do you think they have spent on
25        working on this case?
```

21

1       right?

2   A.  That is correct.

3   Q.  Okay.  Looking at the designated expert engagements on

4       your CV, which of these engagements involved consumer

5       privacy damages?

6   A.  None of the engagements under the designated expert

7       engagement category relates to data privacy, as I

8       understand the term.

9   Q.  Do any of these engagements involve the valuation of

10      consumer data?

11  A.  I hesitate that the answer -- there -- I would say

12      there's shades of gray.  The Sheffler v. Americold

13      Realty Trust matter does indeed involve valuation of

14      data.

15  Q.  Okay.  And you issued a report in Sheffler and sat for a

16      deposition in that case, is that right?

17  A.  That's correct.

18  Q.  Other than Sheffler, have you ever issued a report on

19      the valuation of consumer data?

20  A.  I have designed the damages analyses and written the

21      reports in matters such as this, so while I have not

22      signed those reports as the designated expert, I have

23      designed and developed and managed those analyses.

24  Q.  But I'm correct that the only report that was issued in

25      your name and signed by you that involved the valuation

22

1    of consumer damages was in the Sheffler case, is that

2    fair?

3  A.   Consumer damages?

4  Q.   Sorry.  The valuation of consumer data.  Thank you for

5       the correction.  Yeah.  Let me just ask it again so the

6       record's clear.

7             The only case in which you have issued a

8       report in your name and signed that report involving the

9       valuation of consumer data is in the Sheffler

10      litigation, correct?

11 A.   I believe that that's correct.

12 Q.   And the only litigation in which you have testified in a

13      deposition on the value of consumer data is the Sheffler

14      litigation, correct?

15 A.   That is correct.

16 Q.   Have you ever issued an expert opinion as to the value

17      of student data prior to your work in this case?

18 A.   No, I have not specifically valued student data.

19 Q.   And have you ever issued an expert opinion as to the

20      value of student records prior to your work in this

21      case?

22 A.   No, I have not.

23 Q.   And have you ever issued an expert opinion as to the

24      value of the data from minors?

25 A.   No, I have not.

Christopher Schulte - February 26, 2026

23

1    Q.   As a designated expert, how many times have you offered

2         an opinion regarding the application of damages on a

3         class-wide basis?

4    A.   I have been deposed in one class action matter regarding

5         the calculation of -- it involved the calculation of

6         damages on a class-wide basis.  There are several

7         ongoing engagements for which I have not yet been

8         deposed.

9    Q.   Okay.  Was the case where you were deposed that involved

10        the application of damages on the class-wide basis, was

11        that Sheffler also?

12   A.   Yes.

13   Q.   Okay.  How many current engagements do you have that

14        involve the application of damages on a class-wide

15        basis?

16   A.   I think it's four, could be five.

17   Q.   And I should ask this.  How many total expert

18        engagements do you have going on right now?

19   A.   Unfortunately, a couple too many.  I think that there

20        are eight ongoing engagements on my board right now.

21   Q.   Okay.  Now talking about your consulting experience, am

22        I correct that in these circumstances you were assisting

23        a designated expert, is that fair?

24   A.   That's correct, yes.

25   Q.   Which of these engagements, if any, involved the

28

1  A.  I believe that's incorrect.

2  Q.  Okay.  Have you -- is it your testimony that you've been

3      employed by an educational institution?

4  A.  I've been retained to assist educational institutions.

5  Q.  Okay.  So let me ask it this way.  You've never been

6      employed by an educational institution, is that fair?

7  A.  That is fair, yes.

8  Q.  And when -- which educational institutions did you

9      consult for?

10 A.  Over the course of my career, I've been engaged by

11     several universities to value intellectual property and

12     other transactional issues, typically on behalf of their

13     technical -- their technology transfer offices.

14 Q.  Have you ever been retained by an educational

15     institution to advise on anything to do with student

16     records?

17 A.  I don't believe that those matters specifically related

18     to student records.

19 Q.  You do not consider yourself an expert in algorithms,

20     correct?

21 A.  That is correct.

22 Q.  You've never built an algorithm, fair?

23 A.  Can you help me -- can you help me define algorithm?

24 Q.  Yeah.  Well, that's something we're going to talk about

25     today.  But let me ask this.  What is your understanding

29

1           of what an algorithm is?

2    A.    I understand that an algorithm is a program for

3          processing data with -- in order to derive an output.

4    Q.    Is that the definition of algorithm you assumed in this

5          case?

6                    MS. SIEHL:  Object to form.

7                    THE WITNESS:  I'm not aware of any instance in

8          which I had to define algorithm for purposes of this

9          case.

10   BY MS. BAILEY:

11   Q.    So it was not -- you did not think it was necessary for

12         you to define algorithm to render your opinions in this

13         case, is that correct?

14   A.    That is correct.

15   Q.    Going back to my question, you have never built an

16         algorithm, correct?

17   A.    Over the course of my career, I have been involved in

18         some fairly complex analyses of data and valuation

19         concepts.  I'm not sure that -- I'm not sure whether or

20         not any of those engagements and those exercises would

21         fall under your use of the term algorithm.

22   Q.    Well, going by your definition, which I believe was a

23         program for processing data that drives output, have

24         you built -- that was the definition you gave to me of

25         algorithm, right?

Christopher Schulte - February 26, 2026

30

1   A.   Yes, off the top of my head.

2   Q.   Under that definition, have you ever been built an

3        algorithm?

4   A.   I have built models that have processed data.  Again,

5        I'm not sure whether or not those would meet your use of

6        the term algorithm.

7   Q.   Well, and again, I'm just going by your definition, but

8        I think you answered the question.

9             You don't consider yourself an expert in data

10       privacy, correct?

11  A.   I consider myself an expert with respect to the damages

12       aspects related to data privacy.

13  Q.   Would --

14  A.   But I'll differentiate myself from, for example,

15       Dr. Barber who I understand is extending -- is being

16       extended as a data privacy expert.

17  Q.   Right.  You do not hold yourself out, in this case or

18       otherwise, as an expert in data privacy, is that fair?

19  A.   Only valuation issues relating to data privacy.

20  Q.   And you don't hold yourself out as an expert in consumer

21       privacy, correct?

22  A.   Again, valuations and -- valuation and damages concepts

23       relating to consumer privacy.

24  Q.   Other than valuation and damages issues, you do not hold

25       yourself out as an expert in consumer privacy, fair?

57

1    Q.    And those are unjust enrichment and actual damages,

2          right?

3    A.    That is correct.

4    Q.    So just to be clear, you are not submitting opinions on

5          any type of damages beyond unjust enrichment and actual

6          damages, correct?

7    A.    I am not submitting opinions specific to any other form

8          of damages.  To the extent that my analysis, as set

9          forth here, is applicable to other measures of relief

10         that -- and I'm not sure that that's the case, but I

11         ultimately don't know, you know, necessarily where this

12         case moves from here and the various measures of relief

13         that are evaluated over time.  I do not intend to

14         address such matters.

15   Q.    The opinions you are offering in this case are limited

16         to unjust enrichment and actual damages, fair?

17   A.    That's correct.

18   Q.    Okay.  In paragraph 62 of your report, you state that

19         you understand from counsel that statutory damages and

20         injunctive relief are other potentially available

21         remedies for the alleged wrongful conduct.

22                And I think we basically just covered this,

23         but just to confirm, we both agree that you are not

24         offering any opinions on statutory damages or injunctive

25         relief, correct?

58

1   A.   That is correct.

2   Q.   Okay.  Going back to paragraph 7 of your report, you

3        state there that you were asked to provide analysis

4        regarding the monetary relief that may be appropriate if

5        liability is found against PowerSchool for the alleged

6        wrongful conduct described in the Complaint.

7             What is your understanding of the alleged

8        wrongful conduct described in the Complaint?

9   A.   Plaintiffs contend that PowerSchool's alleged wrongful

10       conduct includes invasion of privacy by intrusion upon

11       seclusion, violations of the California Invasion of

12       Privacy Act, violations of California's Comprehensive

13       Data Access and Fraud Act, invasion of privacy under the

14       California Constitution, and unjust enrichment.

15  Q.   And are you reading from footnote 1 of your report?

16  A.   Yes.

17  Q.   You agree footnote 1 reflects the claims that plaintiffs

18       brought in their Complaint against defendants, correct?

19  A.   That is my understanding, yes.

20  Q.   So my question was a little bit different.  What is your

21       understanding of the alleged wrongful conduct, like, the

22       factual allegations regarding the wrongful conduct

23       described in the Complaint?

24  A.   I have summarized my understanding of the alleged

25       wrongful conduct in Section 6.2 of my report.  In

Christopher Schulte - February 26, 2026

59

```
 1          general, though, I would say -- my general understanding
 2          is that plaintiffs contend that PowerSchool collects,
 3          processes, and stores student data, and that that
 4          student data is used to make predictions and purported
 5          insights that are untested and without consent.
 6   Q.     And you mentioned that Section 6.2 of your report
 7          summarizes the factual allegations of alleged wrongful
 8          conduct in the Complaint, is that right?
 9   A.     Section 6.2 summaries my understanding of the alleged
10          wrongful conduct.  Section 6.2 does not summarize what I
11          would say -- does not summarize the facts at issue.
12   Q.     Okay.  That's fair.
13                  If the case is narrowed from what you've
14          summarized in Section 6.2, would you need to amend your
15          report?
16                  MS. SIEHL:  Object to form.
17                  THE WITNESS:  That's a fairly broad question.
18          I would say that my report is intended to be
19          comprehensive of the alleged wrongful conduct and the
20          related damages as I understand them.  To the extent
21          that the claims and contentions are narrowed in some
22          regard, there may or may not be some aspect of my
23          analysis that would have to be modified.
24   BY MS. BAILEY:
25   Q.     What would that depend on?
```

Christopher Schulte - February 26, 2026

60

1   A.    Can you be more specific?

2   Q.    Yeah.  You said there could be a need for you to amend

3         depending on how the allegations of wrongful conduct are

4         narrowed.  And I'm just asking what would that depend

5         on, what would the need to amend depend on?

6               MS. SIEHL:  Object to the form.

7               THE WITNESS:  Maybe I should clarify that.  As

8         I indicate in my report, there are -- well, actually,

9         both in my report and subsequent to my report there's

10        been a motion for class certification.  And I reference

11        that by example because I understand that there are

12        nationwide class -- a proposal for nationwide classes.

13        I also understand, though, that in the alternative,

14        there are state-only classes.  To the extent that the

15        conduct or the proceedings here are limited to

16        state-only classes, there would be a narrowing of my

17        opinion with respect to those specific class members and

18        the activity specific to those geographies.

19  BY MS. BAILEY:

20  Q.    Have you read the motion for class certification?

21  A.    I have.

22  Q.    And are you aware of how the class definitions have been

23        narrowed just beyond geographical limitations?

24  A.    I'm aware of the revised proposed class definitions.  I

25        don't know that I would characterize them as being

65

1  Q.   You are not offering any opinion that PowerSchool has

2       ever sold student data, correct?

3  A.   I pause there because, as I indicated in my report, I

4       believe that the record is clear that PowerSchool has

5       sold data.

6  Q.   And is that an opinion that you rendered and are

7       offering in this case?

8  A.   That is -- that's a conclusion that I've reached from my

9       review of the record in rendering -- in rendering the

10      opinions in my report.

11 Q.   And is that a necessary conclusion that you needed to

12      make to reach your actual damages opinion?

13               MS. SIEHL:  Object to the form.

14               THE WITNESS:  I believe that it is relevant to

15      my actual damages opinion because I'm aware of

16      PowerSchool's position that it does not sell or

17      commercialize student data.  But that is in conflict

18      with the documents that I reference in my report.

19               MS. BAILEY:  I'm not sure you answered my

20      question.  So I'll try it again.

21 BY MS. BAILEY:

22 Q.   Is the conclusion that PowerSchool sells data a

23      necessary conclusion you needed to make to reach your

24      actual damages opinion?

25               MS. SIEHL:  Same objection.

66

1              THE WITNESS:  And I'll answer it again.  I

2      think it is relevant to my analysis in understanding the

3      economics of PowerSchool's activity.

4  BY MS. BAILEY:

5  Q.   But not --

6  A.   I don't -- I don't know that I can provide a different

7      answer to your question.  You're asking me if it's

8      necessary.  I -- I don't have an opinion regarding

9      whether it's necessary or not.  I find it relevant.

10 Q.   If it was determined by the Court that PowerSchool never

11     sold data, would you -- would that require you to amend

12     your actual damages analysis?

13              MS. SIEHL:  Object to form.

14              THE WITNESS:  I don't -- I don't -- I can't

15     identify a way in which I would have to amend my

16     analysis.

17 BY MS. BAILEY:

18 Q.   And is it -- you are not offering any opinion on whether

19     or not any putative class member suffered harm in this

20     case, is that fair?

21              MS. SIEHL:  Object to the form.

22              THE WITNESS:  I am not offering opinion

23     regarding any specific harm for the specific named

24     plaintiffs.

25

Christopher Schulte - February 26, 2026

67

```
 1   BY MS. BAILEY:

 2   Q.   What about any of the putative class members?

 3   A.   My -- same answer.

 4   Q.   And are you -- you stated you're not offering any

 5        opinion regarding any specific harm for plaintiffs.  Are

 6        you offering any opinion about whether they were harmed

 7        or not?

 8              MS. SIEHL:  Object to the form.

 9              THE WITNESS:  I'm trying not to parse words.

10        I have quantified measures of actual harm.  I am not

11        rendering an opinion regarding that harm in and of

12        itself.

13   BY MS. BAILEY:

14   Q.   Going back to the question of whether -- actually,

15        strike that.

16              You are not offering any opinion on whether or

17        not a class can be certified in this case, correct?

18              MS. SIEHL:  Objection to form.

19              THE WITNESS:  That strikes me as a legal

20        question, that would be outside of my scope.

21   BY MS. BAILEY:

22   Q.   You are not offering any opinion on whether or not harm

23        can be assessed on a class-wide basis in this case, is

24        that fair?

25              MS. SIEHL:  Object to the form.
```

                                                          68

1              THE WITNESS:  I don't know that that's fair.

2     I would -- I would look to specific language in my

3     report regarding that issue.

4  BY MS. BAILEY:

5  Q.   So my understanding is you are opining in this case that

6       damages can be assessed on a class-wide basis, is that

7       correct?

8  A.   That is correct.

9  Q.   And so what I'm wondering is, are you offering an

10      opinion in this case on whether or not harm can be

11      assessed on a class-wide basis?

12             MS. SIEHL:  Same objection.

13             THE WITNESS:  I'm offering opinion that actual

14     damages can be calculated on a class-wide basis.  I

15     don't know how to answer your question otherwise.  You

16     seem to be drawing a delineation that I don't

17     appreciate.  Maybe you can help me out.

18  BY MS. BAILEY:

19  Q.   Yeah.  Let me ask it this way.  Were you asked in this

20       case to assume that all class members had been injured?

21             MS. SIEHL:  Objection the form.

22             THE WITNESS:  I was asked to assume that

23     PowerSchool collects and processes student data without

24     consent, and that PowerSchool makes predictions and

25     purported insights on the basis of that data.  I believe

72

1          the assumptions, as I've stated in my report, are those

2          that I've made in performing the work.

3    Q.    Sure.

4    A.    Now, again, we can -- you can keep asking.  I'm trying

5          to answer your question.  I don't understand it.

6    Q.    Yeah.  So let me ask it this way.

7                  It sounds like from your testimony it was not

8          part of your analysis and you did not perform any work

9          to determine if there were members of the putative

10         classes that were not entitled to damages, is that fair?

11                  MS. SIEHL:  Object to the form.

12                  THE WITNESS:  I did not undertake an analysis

13         of specific class members that would not be -- that

14         would not be -- for whom damages would not be available

15         here.  Again, I don't understand your question.

16   BY MS. BAILEY:

17   Q.    Well, I think you'd answered it, but again, I'm just

18         trying to get at, like, what I think is a simple

19         concept, which is, it seems like either you assumed that

20         everyone in the putative classes was going to get part

21         of the damages number, or you did not assume that, which

22         is fine.  And I'm just asking, if you did not assume

23         that, was there any work done to see if there, indeed,

24         were people within the putative class that wouldn't be

25         entitled to damages.  And it sounds like, no, that was

73

```
 1        outside of your purview.  Is that all fair?
 2                MS. SIEHL:  Object to the form.
 3                THE WITNESS:  You indicated there that I've
 4        answered your question.  I don't necessarily understand
 5        your questions, so I'm not sure how to best re-answer
 6        those questions.  The -- I'm not sure how we're talking
 7        past each other on this issue, and I'm sorry for that.
 8                MS. BAILEY:  Yeah.  Let me just ask one
 9        clarifying question here to try and wrap this up.
10   BY MS. BAILEY:
11   Q.   You agree that you did not perform any analysis in this
12        case to try and identify any possible class members that
13        would not be entitled to damages, correct?
14                MS. SIEHL:  Object to the form.
15   BY MS. BAILEY:
16   Q.   It's just a yes-or-no question.
17   A.   I believe that's correct.  But I do -- again, I am not
18        clear on the -- on the intent of the question.
19   Q.   You are not offering any opinion regarding punitive
20        damages in this case, correct?
21   A.   I don't use the word punitive in my report.  And
22        ultimately, how various measures of damages align with
23        punitive damages, it seems to me is -- it's a legal
24        question.  So I don't -- again, I'm not sure how to best
25        answer that.  If, for example, if disgorgement of
```

Christopher Schulte - February 26, 2026

74

1    profits are considered a punitive damage.

2   Q.   Yeah.  You did not perform any calculation regarding

3        punitive damages specifically, correct?

4   A.   Same answer.

5   Q.   Are you familiar with the legal term punitive damages?

6   A.   I am generally familiar with the term punitive damages,

7        yes.

8   Q.   And you understand that they are separate and apart and

9        different from compensatory damages?

10  A.   That seems reasonable.

11  Q.   Okay.  You did not perform a specific calculation

12       separate and apart from your unjust enrichment and

13       actual damages analyses regarding punitive damages, is

14       that fair?

15  A.   I believe that's fair.

16  Q.   Okay.  In paragraph 9 of your report, you lay out some

17       assumptions you were asked by counsel to make for

18       purposes of your opinions in this case, right?

19  A.   That's correct.

20  Q.   Okay.  You state in that paragraph that you were asked

21       by counsel to assume that the collection, storage, and

22       processing of certain data elements such as roster

23       information, attendance, and grades in the PowerSchool

24       products implicated by the alleged wrongful conduct may

25       not be unlawful to the extent that this collection,

75

```
1        storage, and processing does not exceed a reasonable
2        expectation of privacy.
3                  Did I read that correctly?
4  A.   You did, yes.
5  Q.   Does that assumption apply to your entire report?
6  A.   Yes.
7  Q.   So you were asked to assume that PowerSchool is not
8        found liable for the collection, storage, and processing
9        of any student data for purposes of your opinions in
10       this case?
11                 MS. SIEHL:  Objection to form.
12                 THE WITNESS:  I -- I can't agree to the
13       narrowing of your question in that regard.  I've
14       clearly -- I've set forth here that I was asked to
15       assume that the collection, storage, and processing of
16       certain data elements such as roster information,
17       attendance, and grades in the PowerSchool products
18       implicated by the alleged wrongful conduct may not be
19       unlawful to the extent that this collection, storage,
20       and processing does not exceed a reasonable expectation
21       of privacy.  That sentence is correct.  It's also one
22       sentence of several related sentences in that same
23       paragraph.
24  BY MS. BAILEY:
25  Q.   Right.  So I have your report, and I've read
```

76

1    paragraph 9, we just read it into the record.  So I

2    understand the words that are on the page.  What I don't

3    understand is exactly what it means, which is all I'm

4    trying to figure out right now.

5            So this assumption, as you testified, applies

6    to your entire report.  And the way that I read this

7    sentence is that you were asked to assume that -- I

8    mean, what you say here is that the collection, storage,

9    and processing that certain PowerSchool products perform

10   may not be unlawful.

11           And so what I'm just asking you is, does that

12   mean you were asked to assume that PowerSchool is not

13   found liable for the collection, storage, and processing

14   of any student data?

15           MS. SIEHL:  Objection to form.

16           THE WITNESS:  No.

17   BY MS. BAILEY:

18   Q.   Okay.  So I'm a little confused.  Is any part of your

19        report applicable to any finding of liability against

20        PowerSchool over the collection, storage, and processing

21        of student data?

22           MS. SIEHL:  Object to the form.

23           THE WITNESS:  Yes.  I believe the answer is

24   yes.

25

Christopher Schulte - February 26, 2026

77

1  BY MS. BAILEY:

2  Q.    And is that your actual damages analysis?

3  A.    That is consistent with my actual damages analysis and

4        my analysis of unjust enrichment.

5  Q.    All right.  Let's talk about that.  So in your unjust

6        enrichment opinion, you focused on four products,

7        correct?

8  A.    I focused on four products, as I indicate in my report.

9        I also examined and calculated revenues and attendant

10       profits from other products as well.

11 Q.    And those -- the revenues and profits from those other

12       products beyond the four products that are the focus of

13       your unjust enrichment opinion, those attendant profits

14       were not included in your final unjust enrichment

15       number, correct?

16 A.    I want to make sure that we're clear on what you're

17       considering to be the final unjust enrichment number.

18 Q.    The total unjust enrichment calculation, which under

19       your amended exhibits, I believe, is 297.8 million,

20       correct?

21 A.    That is the -- those are the profits related to

22       products, as you indicated, I focused on for purposes of

23       that portion of my unjust enrichment analysis.

24 Q.    Right.  And those four products are products that I

25       believe you describe as providing analytics, insights,

Christopher Schulte - February 26, 2026

78

1      or predictions, correct?

2  A.   That is correct, but I'll note that those products also

3       are affiliated with the collection, storage, and

4       processing of certain data.

5  Q.   And so for purposes of your unjust enrichment opinion,

6       were you assuming that the collection, storage, and

7       processing of data was lawful or unlawful?

8  A.   I believe that the answer to that question lies in a

9       complete reading of these sentences that relates to

10      whether or not they exceed a reasonable expectation of

11      privacy.

12 Q.   When -- but you've testified earlier you are not

13      providing any opinion on what does or does not exceed a

14      reasonable expectation of privacy, correct?

15 A.   I'm not offering any opinion in that regard.  I have

16      been asked to assume what's set forth in this -- in this

17      sentence.

18 Q.   Right.  But what I don't understand is, this sentence

19      doesn't actually tell me anything, because it says may

20      be unlawful, and it says if it does not exceed a

21      reasonable expectation of privacy.

22           So when did you assume, for purposes -- what

23      parts of your report did you assume that collection,

24      storage, and processing exceeds a reasonable expectation

25      of privacy, and what parts of your report did you make

79

1    the opposite assumption?

2                    MS. SIEHL:  Objection, form.

3                    THE WITNESS:  As I indicate on page 4 of my

4    report, it's actually beginning on page 3, under Summary

5    of Analyses and Opinions, continuing on to page 4, this

6    is the first of several indications in this report where

7    I expand on that assumption, and I say, for example,

8    I've been asked by counsel to assume that the

9    collection, storage, and processing of certain data

10   elements such as ███████████████, that sentence

11   continues.

12  BY MS. BAILEY:

13  Q.   It just repeats.

14  A.   Yeah.  And then I say --

15  Q.   That's what you repeat, right?  Okay.

16  A.   Excuse me.  Relatedly, I have been asked by counsel to

17       assume that the solution offerings that PowerSchool

18       markets as its student information solutions,

19       Personalized Learning solutions, and college, career,

20       and life readiness solutions, may have functionalities

21       that are lawful to the extent that they do not exceed a

22       reasonable expectation of privacy.

23                    This paragraph continues regarding what I

24       understand to be unlawful.

25  Q.   Right.  Okay.  So again, let me just -- again, here --

80

1    because you use words like may and could, so I just --

2    I'm not trying to question you, I'm just trying to

3    understand, okay, Mr. Schulte?

4            So for purposes of your unjust enrichment

5    analysis, you assumed that products and product

6    functionalities that provide purported analytics,

7    insights, and predictions were unlawful.  Are we on the

8    same page about that?

9  A.  That is correct.

10 Q.  Okay.  And for purposes of your unjust enrichment

11    analysis, did you also assume that solutions offerings

12    that PowerSchool markets as its SIS, Personalized

13    Learning, and CCLR products are lawful?

14            MS. SIEHL:  Objection to form.

15            THE WITNESS:  I understand that certain of the

16    functionalities in those products would be considered

17    lawful, based on the assumptions that I've been asked to

18    adopt here.

19 BY MS. BAILEY:

20 Q.  Were you asked to assume that certain functionalities of

21    the SIS, Personalized Learning, and CCLR products were

22    unlawful?

23 A.  I understand that that is the contention here.  I don't

24    know that I was asked -- I was not asked to assume that.

25 Q.  Okay.  Were you asked to assume or did you understand

Christopher Schulte - February 26, 2026

81

1          that certain functionalities within the products you

2          state provide purported analytics, insights, and

3          predictions were lawful?

4    A.    I was asked to assume that those products exceed a

5          reasonable expectation of privacy and are unlawful.

6    Q.    In their entirety?

7    A.    That's correct.

8    Q.    Okay.  So am I correct, then, that for purposes of your

9          unjust enrichment damages, you were asked to assume that

10         PowerSchool is not found liable for the collection,

11         storage, and processing of any student data?

12                  MS. SIEHL:  Objection to the form.

13                  THE WITNESS:  Can I hear that question again,

14         please?

15                  MS. BAILEY:  Yeah.

16   BY MS. BAILEY:

17   Q.    For purposes of your opinions regarding unjust

18         enrichment damages, were you asked to assume that

19         PowerSchool is not found liable for the collection,

20         storage, and processing of any student data?

21                  MS. SIEHL:  Objection to form.

22                  THE WITNESS:  I'm not clear on the question.

23         Can you rephrase?

24   BY MS. BAILEY:

25   Q.    Regarding your unjust enrichment opinion, in which you

Christopher Schulte - February 26, 2026

82

| | |
|---|---|
| 1 | focused on products that provide analytics, insights, |
| 2 | and predictions, and did not focus on SIS, Personalized |
| 3 | Learning, and CCLR, were you asked to assume that |
| 4 | PowerSchool is not found liable for the collection, |
| 5 | storage, and processing of any student data? |
| 6 | A.  I don't think I was asked to assume that. |
| 7 | Q.  Why did you make the decision to focus on the products |
| 8 | you claim provide purported analytics, insights, and |
| 9 | predictions, and not the other products such as SIS, |
| 10 | Personalized Learning, and CCLR? |
| 11 | A.  As I indicate in my report, I analyzed PowerSchool's |
| 12 | unjust enrichment attributable to the alleged wrongful |
| 13 | conduct under the assumption that in the absence of that |
| 14 | conduct, PowerSchool would not have generated the |
| 15 | revenues and attendant profits it historically realized |
| 16 | with the products that you're indicating that I |
| 17 | purportedly focused on in my report. |
| 18 | As I indicate in the foot -- in footnote 3, |
| 19 | I've also quantified PowerSchool's revenues and |
| 20 | attendant profits from SIS, Personalized Learning, and |
| 21 | CCLR, and my analysis of those products from a |
| 22 | quantitative standpoint are it is unchanged from that of |
| 23 | my analysis of the other products in this report.  But |
| 24 | as I indicate in that footnote, I am not aware of |
| 25 | information sufficient to apportion PowerSchool's |

83

1    historical revenues and profits from SIS, Personalized

2    Learning, and CCLR to the alleged wrongful conduct.

3  Q.   You were not asked to assume, and you are not providing

4       any opinion on SIS, Personalized Learning, or CCLR

5       having any functionalities that provide purported

6       analytics, insights, or predictions, correct?

7              MS. SIEHL:  Object to the form.

8              THE WITNESS:  The only assumption that I am

9       aware of, to answer your question, is that there is

10      functionality embedded in those products that may not be

11      unlawful; indeed, as I indicated, the collection,

12      storage, and processing of ███████████████████████

     ████████████████████████████████████ to the extent that those do not

14      exceed a reasonable expectation of privacy.

15  BY MS. BAILEY:

16  Q.   And I guess what you're saying in footnote 3 is that you

17       felt you were not able to apportion the revenues from

18       SIS, Personalized Learning, and CCLR to the collection,

19       storage, and processing of ████████████████, is that

20       fair?

21  A.   That's one way of saying it, yeah.

22  Q.   Okay.  And that's why you did not include those products

23       in your total unjust enrichment calculation listed in

24       your report, correct?

25  A.   I did quantify and list in my report the revenues and

94

1  BY MS. BAILEY:

2  Q.  So at the time of your report, the 40 cents calculation

3      applied to everyone in the first class definition

4      included in paragraph 10, is that fair?

5  A.  That's correct.

6  Q.  Okay.  For purposes of your report, did counsel ask you

7      to assume that any student who attended a school within

8      a district that purchased a PowerSchool product had

9      their data stored, processed, or analyzed by that

10     product?

11             MS. SIEHL:  Object to the form.

12             THE WITNESS:  I don't remember -- I don't

13     recall any such assumption.

14  BY MS. BAILEY:

15  Q.  But you didn't do any work in this case to determine if

16     every student attending a school within a district that

17     purchased a PowerSchool product had their data stored,

18     processed, or analyzed by that product, fair?

19  A.  I think that's fair, as I understand the question.

20  Q.  And sitting here today, you don't have any basis to say

21     that just because a school district purchased, for

22     example, Performance Matters, every school in that

23     district used Performance Matters, correct?

24  A.  I don't have an opinion in that regard.  I would imagine

25     that that -- I would expect that information to be

95

 1      discernible from PowerSchool's contemporaneous records.
 2  Q.  But you did not do any work and you don't have any basis
 3      to say that that's untrue, correct?
 4  A.  I understand that schools within a district can opt not
 5      to use certain products or product functionalities.
 6  Q.  Did that impact your opinions at all in this case?
 7  A.  Not as set forth in my report.  I think that those
 8      questions would be relevant to the determination of the
 9      class.  And that's outside the scope for me.
10  Q.  Did you perform any work in this case to try and
11      identify unharmed class members?
12              MS. SIEHL:  Object to form.
13              THE WITNESS:  I did not -- I did not perform
14      work to identify specifically unharmed class members.
15  BY MS. BAILEY:
16  Q.  That was not something counsel asked you to do, correct?
17  A.  I was not asked to undertake an investigation in that
18      regard.  And I -- it seems like we're -- it seems like
19      the question obscures the makeup of the class.
20      Potential class members could be unharmed, but it seems
21      to me that members of the class would be -- would
22      generally be those that have experienced harm.  Now, as
23      I indicated before, I also understand that there's not
24      necessarily a one-to-one relationship between harm and
25      the availability of monetary relief, for example, with

Christopher Schulte - February 26, 2026

96

1      profit disgorgement.

2  Q.  So is it your assumption -- did you make the assumption

3      in this case that the class definition would only

4      include class members that were harmed by PowerSchool?

5              MS. SIEHL:  Object to the form.

6              THE WITNESS:  That's not -- that's not an

7      assumption that I've made, full stop.

8  BY MS. BAILEY:

9  Q.  But you did no work in this case to confirm or verify if

10     there were individuals included within the class

11     definition that were unharmed, fair?

12 A.  That is outside of the scope of my assignment in this

13     matter.

14 Q.  Okay.  Are you aware that there are circumstances where

15     a school will use a PowerSchool product, but only in

16     certain classrooms or for certain students?

17 A.  I'm aware of -- I'm aware of that possibility, yes.

18 Q.  You don't have any basis to dispute that that occurs in

19     real life, correct?

20 A.  No, I do not.

21 Q.  Are you aware that at certain schools students have the

22     ability to opt out of using PowerSchool products?

23             MS. SIEHL:  Object to the form.

24             THE WITNESS:  Am I aware that that is a

25     contention by PowerSchool in this case?  I understand

Christopher Schulte - February 26, 2026

97

1        that it's -- that there's controversy regarding the

2        extent of one's ability to fully opt out of PowerSchool

3        products.

4   BY MS. BAILEY:

5   Q.    But you did not perform any work in this case yourself

6         to look into whether that occurs, correct?

7   A.    That's correct.  That would be outside of the scope of

8         my assignment.

9   Q.    So sitting here today, you don't have any basis to

10        dispute that at certain schools students have the

11        ability to opt out of using PowerSchool products,

12        correct?

13                MS. SIEHL:  Object to the form.

14                THE WITNESS:  I don't think that's correct.  I

15        don't know that I can agree to that one.

16                MS. BAILEY:  Okay.

17                THE WITNESS:  Maybe you can read it back and

18        I'll try again.

19                MS. BAILEY:  Yeah.

20                THE WITNESS:  That strikes me as -- something

21        there strikes me as not fully aligned with my

22        understanding.

23  BY MS. BAILEY:

24  Q.    Let me just try the next one.  Are you aware that named

25        plaintiff, Emily Cherkin, opted her children out of

105

1   and insights functionalities.

2   Q.   So you made the determination about which products

3        provided purported analytics, insights, or predictions?

4   A.   I didn't make that determination.  I reviewed the record

5        and discussed with counsel, this is my understanding,

6        and it was -- it was, I guess I would say, agreed that

7        those are reasonable products to focus on, to use your

8        word, the primary unjust enrichment calculation.

9   Q.   So I guess where I'm having trouble, counsel did not

10       direct you to focus on those four products, it was a

11       decision made in discussions between you and counsel?

12  A.   Ultimately -- ultimately, I was asked to assume that

13       those are the -- that those products are unlawful.  My

14       analysis was an iterative process that looked at

15       PowerSchool's products in general.

16  Q.   Beyond what counsel -- beyond counsel's directions, are

17       you relying on anything else for your decision to focus

18       on those four products in your unjust enrichment

19       analysis?

20  A.   Again, I don't know that it was a decision.  It was my

21       understanding that those -- that those products have

22       that analytic and prediction functionality.  I was asked

23       to assume that those products are unlawful, as they

24       exceed a reasonable expectation of privacy.  To the

25       extent that I am -- my understanding, rather, in that

106

1    regard, is based on my review of the available record.

2  Q.  So let me break that down.  Counsel asked you to assume

3      that any product that provides purported analytics,

4      insights, or predictions is unlawful and exceeds a

5      reasonable expectation of privacy, is that fair?

6  A.  That's fair.

7  Q.  And then in determining which of PowerSchool's products

8      provide purported analytics, insights or predictions,

9      that was a determination made by you based on your

10     review of the record?

11 A.  I don't know that I can delineate what was made by me

12     and what was -- what was -- what I was asked to assume.

13     I think that it's -- it's a process of investigating

14     these products and looking at the marketing around those

15     products and saying does this make -- does this make

16     sense with my understanding of what I'm being asked to

17     assume.

18 Q.  Are you offering an opinion that Data, Analytics &

19     Insights, Performance Matters, Behavior Support, and

20     Attendance Intervention all provide purported analytics,

21     insights, or predictions?  Is that an opinion you have

22     reach in the course of your work in this case?

23 A.  It's not an opinion.  It's an understanding.

24 Q.  And that understanding was provided to you by counsel?

25 A.  No.  Counsel does not provide my understandings.  I

Christopher Schulte - February 26, 2026

107

1      reach my understanding regarding the functionality of

2      those products.  The -- I was asked by counsel to assume

3      that those products are unlawful.

4   Q.  Because they provide analytics, insights, or

5      predictions?

6   A.  That's correct.

7   Q.  And so I -- you know, I think -- I hear your testimony

8      that you -- I believe you said you can't delineate

9      between an assumption and a conclusion you reached, but

10     I do think those are very clear differences.  And let me

11     ask it one more time.

12            Did counsel ask you to assume that Data,

13     Analytics & Insights, Performance Matters, Behavior

14     Support, and Attendance Intervention all provide

15     purported analytics, insights, or predictions?

16  A.  Ultimately, I was asked to make that assumption, yes.

17     I'm not a technical expert, and so I would say that I

18     reached an understanding of the functionality of these

19     products.  In the course of performing my work, I was

20     asked to assume, once I reached that understanding, that

21     those are, indeed, unlawful.

22  Q.  Your unjust enrichment analysis relies on the total

23     revenue for those four products, right?

24  A.  With adjustments, namely, to the U.S. geography, that's

25     correct.

109

1    that's a fair distinction.

2              If a student in one of the classes attends a

3    school district that, for example, only used Schoology

4    and none of the four products; meaning Data, Analytics &

5    Insights, Performance Matters, Behavior Support, and

6    Attendance Intervention, instead, they just used --

7    their school district just used Schoology and just paid

8    for Schoology, are they entitled to unjust enrichment

9    damages under your analysis?

10             MS. SIEHL:  Object to the form.

11             THE WITNESS:  The revenues from Schoology

12   would be included under my quantification of

13   personalized learning solutions.  Those revenues from

14   Schoology are -- would be separate and apart from the

15   revenues that I've quantified in relation to DA&I,

16   Performance Matters, Behavior Support, and Attendance

17   Intervention.

18             MS. BAILEY:  I don't believe you answered my

19   question.

20             THE WITNESS:  I don't understand your

21   question.  I'm sorry, I'm doing my best here.

22   BY MS. BAILEY:

23   Q.   If a student in one of the classes attends a school that

24        just used SIS, and did not use one of the four products

25        focused on in your unjust enrichment analysis; meaning

110

1      Data, Analytics & Insights, Performance Matters,

2      Behavior Support, and Attendance Intervention; instead,

3      they just used SIS, are they entitled to unjust

4      enrichment damages under your analysis?

5                  MS. SIEHL:  Object to the form.

6                  THE WITNESS:  To the extent that the trier of

7      fact determines that those revenues are -- that some

8      aspect of those revenues are attributable to unlawful

9      conduct, I would say potentially.

10  BY MS. BAILEY:

11  Q.    Okay.  For your work in this case, how did you define

12        analytics?

13  A.    I don't know that it was necessary to define analytics.

14  Q.    Did you ever ask for a definition of analytics from

15        counsel?

16  A.    In my discussion with counsel, I understood that one

17        aspect of analytics is, for example, making what are

18        described -- predictions, insights, based on -- based on

19        that data.  Based on student data, excuse me.  I

20        generally understood that the analytics that are

21        considered unlawful here would include those profile

22        and -- you know, profiles, predictions, and insights

23        using student data.

24  Q.    Okay.  But agree that you did not think it was necessary

25        to define analytics to render the opinions you're

Christopher Schulte - February 26, 2026

111

| | | |
|---|---|---|
| 1 | | offering in this case? |
| 2 | A. | I think that's appropriate. |
| 3 | Q. | For your work in this case, how did you define insights? |
| 4 | A. | My work in this case involved the consideration of |
| 5 | | PowerSchool's marketing materials and PowerSchool's own |
| 6 | | use of the term insights.  I understand insights to be |
| 7 | | somewhat analogous to analytics and predictions. |
| 8 | Q. | But you did not reach any specific definition of |
| 9 | | insights as part of your work in this case, is that |
| 10 | | fair? |
| 11 | A. | I didn't find that necessary, that's correct. |
| 12 | Q. | And for your work in this case, how did you find -- how |
| 13 | | did you define predictions? |
| 14 | A. | Again, I'd say my answer would be consistent with that |
| 15 | | for insights, which is, I'm aware of use of that term |
| 16 | | throughout PowerSchool's marketing documents, certain |
| 17 | | products.  I find it to be somewhat analogous to |
| 18 | | Analytics & Insights.  I don't necessarily draw a |
| 19 | | distinction between those three terms as they're used |
| 20 | | here. |
| 21 | Q. | Got it.  So fair to say you didn't think it was |
| 22 | | necessary to define predictions to render the opinions |
| 23 | | you're offering in this case? |
| 24 | A. | I did not find it necessary to define predictions. |
| 25 | Q. | Based on your understanding, would something like a |

Christopher Schulte - February 26, 2026

112

1    dashboard that summarizes data in a visual way be

2    considered analytics, insights, or predictions?

3            MS. SIEHL:  Object to form.

4            THE WITNESS:  The first part of your question,

5    you said a dashboard that summarizes --

6  BY MS. BAILEY:

7  Q.  Data in a visual way.  For example, instead of just raw

8    data, it creates a pie chart or a bar graph or some

9    other visual representation of data.  Would that be

10    considered analytics, insights, or predictions?

11            MS. SIEHL:  Same objection.

12            THE WITNESS:  Not necessarily, you know, if

13    we're talking about display of factual information.

14  BY MS. BAILEY:

15  Q.  Would an Excel spreadsheet that a teacher uses to

16    aggregate and visualize her students' data be considered

17    analytics, insights, or predictions?

18  A.  A simple spreadsheet as an input form?

19  Q.  Yeah.  But that a teacher may then use to, like, create

20    charts or, you know, do heat maps or certain

21    visualization of the data within Excel.  Is that

22    considered analytics, insights, or predictions?

23  A.  Not necessarily.  I -- no.

24  Q.  When you were -- let's talk about -- I know we spoke

25    about this already a bit, but let's talk more about how

Christopher Schulte - February 26, 2026

113

1     you identified these four products as the products that

2     provide analytics, insights, and predictions.  So who

3     identified those four products first, you or counsel?

4  A.  I don't know that the answer is consistent across all

5     four of those products, so maybe I could break it down.

6          I understand, for example, that in my initial

7     conversations there was discussions of Unified Insights.

8     As I went about my analysis independently, I identified

9     other terms in PowerSchool's documentation that were

10    consistent with those of Analytics -- I'm sorry, Unified

11    Insights -- Data, Analytics & Insights, that product

12    family; namely, the certain analysis functions,

13    predictions, and insights.

14         In my conversations with counsel, I inquired

15    as to the relevance or irrelevance, from their

16    standpoint, of certain products.  So I would say that,

17    in my conversations with them, I would say that Unified

18    Insights was probably an initial focus.  As my work went

19    on, I asked questions about specific products, and

20    counsel undertook an analysis of whether they should be

21    or whether they would or would not include those in the

22    purportedly unlawful products.

23 Q.  Okay.

24 A.  So --

25 Q.  I didn't mean to interrupt you.

119

```
 1        regard.  I understand that they could be.
 2   BY MS. BAILEY:
 3   Q.   Did you calculate -- or, strike that.
 4               Are you offering an opinion in this case about
 5        the unjust enrichment damages for the Student Data
 6        Warehouse Class?
 7   A.   Not specifically.  I've quantified revenues and profits
 8        from products, but I am not offering an opinion in that
 9        regard.
10   Q.   Okay.  Let's talk about the Behavior Support product,
11        which is one of the four products you focused on in your
12        unjust enrichment analysis and that you state provides
13        analytic, insights, or predictions, correct?
14   A.   That's my understanding, yes.
15   Q.   What analytics does Behavior Support provide, in your
16        understanding?
17   A.   I recall information on -- in PowerSchool's product
18        marketing indicating that it provides analytics.
19   Q.   So PowerSchool's marketing for Behavior Support includes
20        the word analytics, is that what your testimony is?
21   A.   I believe that's correct.
22   Q.   Okay.  Any other basis to say Behavior Support provides
23        analytics?
24   A.   I think I would note the, sort of the other terms we've
25        been using today, insights and predictions.  And I
```

120

1    understand that the Behavior Support product provides or

2    purports to provide such insights and predictions.

3  Q.  What is your basis to say that Behavior Support purports

4    to provide insights?

5  A.  My understanding of the products themselves.  I don't

6    know that I can point to a specific and singular basis.

7  Q.  Well, was it also the marketing materials that formed

8    your basis to say that Behavior Support provides

9    analytics?

10  A.  My understanding of that product comes in part from the

11    marketing documents, that's right.

12  Q.  What else formed the basis of your understanding

13    regarding Behavior Support and its ability to provide

14    insights?

15  A.  Besides discussions with counsel, I would defer to my

16    report and look back at the specific sections where I

17    talk about that product.

18  Q.  Okay.  So is it safe to say for all of the products, all

19    of the four products, Behavior Support; Data, Analytics

20    & Insights, Performance Matters, and Attendance

21    Intervention, your understanding of those four products

22    comes from documents cited in your report and

23    discussions with counsel?

24  A.  Yes.

25  Q.  Okay.  When a school uses the Behavior Support product,

Christopher Schulte - February 26, 2026

121

1       is it the school or PowerSchool that is creating an

2       insight or prediction, in your opinion?

3                MS. SIEHL:  Object to the form.

4                THE WITNESS:  I don't have an opinion in that

5       regard.

6   BY MS. BAILEY:

7   Q.   That was not something you felt was important to

8       determine for purposes of your opinions in this case, is

9       that fair?

10  A.   I think that that's correct.  I would say that I

11      understand that the product provides the functionality

12      for such analytics, insights, and predictions.  To the

13      extent that an individual teacher makes his or her own,

14      then that -- I'm not considering that in my analysis.

15  Q.   Same question for Data, Analytics & Insights, when a

16      school uses the Data, Analytics & Insights product, is

17      it the school or PowerSchool that is creating an insight

18      or prediction?

19  A.   My understanding that the functionality of the product

20      allows for analytics, insights, and predictions.  Again,

21      to the extent that the school makes separate insights

22      and predictions, that's not a part of my analysis.

23  Q.   Right.  I think my question was a little bit different,

24      though.  I understand your testimony that the Data,

25      Analytics & Insights product provides functionality

122

1    that, in your opinion, allows the creation of insights

2    or predictions.  But my question is, who is doing that

3    creating of the insight or prediction through the Data,

4    Analytics & Insights product?  Is it the school or

5    PowerSchool?  And your answer may be I don't know or I

6    didn't look into it.  That's fine, too.  I'm just --

7  A.  Yeah, I guess I would have to answer with an I don't

8    know.  I don't know that I can make a clear distinction.

9    But I understand that it's the functionality of the

10    product.

11  Q.  Okay.  And is -- would you give that same answer to the

12    same question for both Performance Matters and

13    Attendance Intervention?  In other words, you don't know

14    if it's the school or PowerSchool that creates insights

15    or predictions with those products?

16  A.  I don't know that that was my answer.  I understand that

17    the functionality of the product allows for the

18    predictions and insights.  That's my understanding.  I

19    don't have an opinion in that regard.

20  Q.  Right.  And I'm not -- I'm not asking for your opinion,

21    I'm asking for your understanding.  And I'll ask it

22    again.  And I -- you know, I don't want to waste a lot

23    of time on this, but I don't feel like I'm getting a

24    straight answer to my question.  So let me go back to

25    Data, Analytics & Insights.  And I understand your

125

1    provide analytics, insights, or predictions, your

2    opinion would need to be amended?

3              MS. SIEHL:  Object to the form.

4              THE WITNESS:  To the extent that those

5    products include other functionalities, is that your

6    question?

7              MS. BAILEY:  Yes.

8              THE WITNESS:  I do not agree that my opinion

9    or analyses would need to be modified to the extent that

10   there are functions that -- embedded within those

11   products that do not exceed a reasonable expectation of

12   privacy.

13 BY MS. BAILEY:

14 Q.  Okay.  So if I'm understanding your testimony correctly,

15   the fact that those four products may contain

16   functionalities that do not exceed a reasonable

17   expectation of privacy does not at all impact your

18   unjust enrichment analysis, is that right?

19 A.  I would say it's partially correct in that I understand

20   that those products, they provide the purported

21   analytics, insights, and predictions, and that they,

22   therefore, exceed a reasonable expectation of privacy,

23   and they are, therefore, unlawful.

24 Q.  Right.

25 A.  Such that my calculations of the revenues and profits

126

1    from that product would not be amended to the extent

2    that there are such, I would say, sort of lawful

3    functionality included in that product.

4  Q.  Did you do any work in this case to determine if those

5    four products do indeed include functionality that does

6    not provide analytics, insights, or predictions?

7  A.  It's my understanding that they do include

8    functionalities that are not insights, analytics, or

9    predictions.

10  Q.  Okay.  You state in paragraph 40 of your report that

11    Attendance Intervention includes a communication tool,

12    right?

13  A.  That's correct.  That's from PowerSchool's documents.

14  Q.  And we can agree that a communication tool is not

15    providing analytics, insights, or predictions, correct?

16  A.  Would it be communicating analytics, insights, and

17    predictions?

18  Q.  Did you do any work to determine whether the

19    communication tool was providing analytics, insights, or

20    predictions?

21  A.  I did not.  I did not investigate that, no.

22  Q.  And do you have any basis to dispute that the

23    communication tool described as part of Attendance

24    Intervention in paragraph 40 of your report is a tool

25    used by teachers and school staff to communicate with

Christopher Schulte - February 26, 2026

127

1          parents?

2    A.    I don't have any basis to disagree with that.

3    Q.    You were not asked by counsel to make an assumption that

4          a communication tool is unlawful, correct?

5    A.    Not in and of itself, no.

6    Q.    And we agree that PowerSchool's profits from the

7          communication tool included with Attendance Intervention

8          are included in your unjust enrichment calculation,

9          right?

10   A.    The revenues and profits from those products in their

11         entirety are included in my unjust enrichment

12         calculations.

13   Q.    And that would include any profits and revenues from the

14         communication tool specifically, right?

15   A.    I'm not aware of any information that credibly

16         attributes revenues and to profits to the communication

17         tool.

18   Q.    But you did not exclude any revenues or profits from the

19         communication tool from your unjust enrichment

20         calculation, correct?

21   A.    Same answer, I'm not aware of any information that would

22         credibly attribute any such revenue to those functions.

23   Q.    Did you ask counsel if there was information that would

24         allow you to exclude profits from the communication tool

25         included with Attendance Intervention?

Christopher Schulte - February 26, 2026

128

1  A.  I don't know that I made any inquiry to counsel in that

2      regard.  I searched for information that might answer

3      that question.

4  Q.  And you searched for information that might answer that

5      question because you thought it was important to try and

6      exclude revenues and profits from the communication tool

7      included with Attendance Intervention, right?

8  A.  I searched for that in order to understand the

9      functionality of these products.

10 Q.  Why did you want to understand the functionality of

11     these products?

12 A.  In order to reach a reasonable opinion in this matter.

13 Q.  A reasonable opinion regarding what?

14 A.  The way that these products operate, the way -- the

15     basis on which they're sold, the basis on which schools

16     and school districts sign up for those products.

17     It's -- there's just -- I don't know that that's

18     necessarily specific to any aspects of my analysis.

19 Q.  You don't know if what is necessarily specific to any

20     aspect of your analysis?

21 A.  I don't think that there is a singular aspect of my

22     analysis that that -- that that is specific to.  I seek

23     to understand the product such that I can come here and

24     give you as -- and give you a complete opinion regarding

25     my understanding of those products.

Christopher Schulte - February 26, 2026

129

1   Q.   Do you have a complete opinion of all of the

2        functionalities included in the four products that are

3        the focus of your unjust enrichment opinion?

4   A.   I'm sorry if I misspoke, I don't -- I don't -- I'm

5        not -- I don't have any opinion regarding the

6        functionalities.

7   Q.   And when you searched for information that might answer

8        the question of whether you were able to exclude profits

9        from the communication tool included with Attendance

10       Intervention, what did you find when you did that

11       search?

12  A.   To clarify, I searched, generally, for information

13       regarding the functionalities of these products.  I

14       don't know that I specifically looked for information

15       that was uniquely related to the communication tool.

16       What -- again, I sought to understand these products in

17       their entirety, and my understanding of these products

18       in their entirety is consistent with the assumption I

19       was asked to assume, which was, these products contained

20       functionalities that exceed a reasonable expectation of

21       privacy and they are, therefore, unlawful.

22  Q.   And so sitting here today, you're not able to tell me

23       all of the functionalities included in all four of those

24       products, correct?

25  A.   I am not able to itemize all of the functionalities

Christopher Schulte - February 26, 2026

130

1    involved in all four of those products, certain of which

2    are product families that include several sub-products.

3  Q.  And you are not able to tell me how many functionalities

4    each product has that do not provide analytics,

5    insights, or predictions, correct?

6  A.  Yeah.  My understanding is that these products are based

7    on those functionalities, so I don't -- I don't know how

8    to enumerate functionalities in their entirety, or even

9    in one silo or another, to the extent you're trying to

10   make this distinction.

11 Q.  And you didn't make any effort in this case to do that,

12   right?

13 A.  I disagree.  I think that I -- I did make efforts to

14   independently understand these products.

15 Q.  That wasn't my question.

16         Did you make any effort in this case to, as

17   you put it, enumerate functionalities into the silo of

18   providing analytics, insights, or predictions or into

19   the silo of not doing that?

20 A.  That was not a part of my analysis, no.

21 Q.  Okay.  And so beyond the communication tool mentioned in

22   your report for Attendance Intervention, you can't say

23   if that product includes any other functionalities that

24   do not provide analytics, insights, or predictions,

25   correct?

Christopher Schulte - February 26, 2026

131

1   A.    I don't think I can say one way or the other, no.

2   Q.    And sitting here today, you have no basis to dispute

3         that the four products included in your unjust

4         enrichment analysis include functionalities that only

5         collect, store, or process roster information, correct?

6   A.    I don't have any basis to dispute that.

7   Q.    And you made no effort in this case to exclude profits

8         from functionalities of the four products focused on in

9         your unjust enrichment analysis that only collect,

10        store, or process roster information, correct?

11  A.    I made an effort to understand the products and -- so

12        I -- I guess I stumble on this idea that I made no

13        effort in this regard.

14  Q.    Yeah.  My question was just a little bit different.  I

15        understand you made efforts to understand the products.

16        I appreciate that.

17              My question was, you made no effort in this

18        case to exclude profits from functionalities of the four

19        products at issue in your unjust enrichment analysis

20        that only collected, stored, or processed roster

21        information, correct?

22  A.    (No response.)

23  Q.    And why don't I -- I can ask a simpler question, Mr.

24        Schulte, and that might help.

25              You didn't make any effort to exclude the

Christopher Schulte - February 26, 2026

132

```
1           revenues from any specific functionalities of the four

2           products that were the focus of your unjust enrichment

3           analysis?

4    A.     I did not exclude revenues that are attributable to

5           specific functions of those products.

6    Q.     Okay.

7    A.     As I indicate in my report, my understanding is that, in

8           seeking unjust enrichment -- I'm reading from

9           paragraph 63 -- in seeking unjust enrichment, plaintiffs

10          may present evidence of the total or gross amount of the

11          benefit from the alleged misconduct, or a reasonable

12          approximation thereof.  And then the defendant may

13          present evidence of further costs, expenses, and other

14          deductions to show the actual or net benefit the

15          defendant received.

16                 So my analysis related to providing the -- not

17          only the total or gross amount of the benefit, I took it

18          further and said, what is the net benefit with respect

19          to the deduction of various expenses.  To the extent

20          that PowerSchool contends that there should be other

21          deductions, I will leave that to PowerSchool and its

22          experts.

23   Q.     And paragraph 63, that was an understanding you came to

24          based on things counsel told you, is that right?

25   A.     My understanding in that regard is consistent with my
```

Christopher Schulte - February 26, 2026

133

| | |
|---|---|
| 1 | work in profit disgorgement matters over the past |
| 2 | 20 plus years.  That's not -- that's not an |
| 3 | understanding that is unique to this case or directions |
| 4 | from counsel in this case. |
| 5 | Q.  And your work in profit disgorgement, that's primarily |
| 6 | been in IP cases, correct? |
| 7 | A.  That has been a focus of my career for quite some time. |
| 8 | I would say that over the past five or six years there's |
| 9 | been an increasing amount of work that I've done and |
| 10 | I've managed with respect to similar data privacy |
| 11 | matters.  And the quantification of unjust enrichment |
| 12 | was part and parcel to that work. |
| 13 | Q.  But you agree that, more than any other type of |
| 14 | litigation, you've done primarily IP in your career, is |
| 15 | that fair? |
| 16 | A.  Over the course of the last -- I think it's -- I can't |
| 17 | believe it's 23 years, yeah. |
| 18 | Q.  Okay. |
| 19 | A.  That's correct.  But I would say that over the last five |
| 20 | or six, it would -- it's tough to make that distinction. |
| 21 | Q.  To calculate revenues for your unjust enrichment |
| 22 | analysis, you rely on PowerSchool documents related to |
| 23 | the 2024 acquisition of PowerSchool by Bain, correct? |
| 24 | A.  Those are some of the documents that I rely on in that |
| 25 | regard, that's correct. |

Christopher Schulte - February 26, 2026

134

1    Q.    And again, I'm focusing specifically on your calculation

2          of revenues.  Those are the only documents you rely on

3          for your calculation of revenues that actually list

4          revenues for PowerSchool, correct?

5    A.    Those are the documents that represent revenues for

6          specific PowerSchool products.  I identify and rely upon

7          other PowerSchool documents to corroborate those

8          documents.  Indeed, I look at my --

9    Q.    Right.

10   A.    When I look at my report and I look at the

11         product-specific revenues, they tie out to PowerSchool's

12         publicly available financials.

13   Q.    But the publicly available financials don't include

14         revenue by product, correct?

15   A.    That is correct.

16   Q.    Right.

17   A.    And that's why I'm making this clarification.

18   Q.    Yeah.  So for revenue by product, you relied on the

19         documents related to the Bain acquisition in 2024,

20         correct?

21   A.    Yes.  That -- I believe that's complete.

22   Q.    You state in your report that those Bain acquisition

23         documents are the most appropriate and reliable

24         documents for calculating unjust enrichment, correct?

25   A.    I believe that's a bit inconsistent with what I've said

135

1      in my report.  I said that PowerSchool's contemporaneous

2      documents are the most appropriate basis, and those

3      contemporaneous documents include the documents that

4      were prepared in conjunction with that acquisition.

5   Q.  But you agree if you did not think the Bain transaction

6      documents were the most reliable and appropriate for

7      calculating unjust enrichment, you wouldn't have relied

8      on them, right?

9   A.  I think I can -- I have to agree to that one, yes.

10  Q.  Yeah.  What's your basis for finding the Bain

11     acquisition documents reliable and appropriate?

12  A.  I reached that conclusion on the basis of several data

13     points identified in my report.  First and foremost,

14     Bain Capital took the company private at a ███████████

15     valuation, I believe, and I understand that these

16     documents were prepared in conjunction with that

17     transaction.  In my experience, that would make these

18     documents quite credible from a reliance standpoint.

19            I also note that those documents are

20     consistent with PowerSchool's financials as they've

21     reported to their investors when the company was

22     publicly traded.  I'm not aware of any indication that

23     those documents are in any way unreliable.

24  Q.  You agree that those documents were prepared several

25     years ago, right?

Christopher Schulte - February 26, 2026

136

1   A.   They were prepared at the time of the acquisition, yes.

2   Q.   They only include financial information through 2023?

3   A.   That is the information -- actually, I would say yes, so

4        as not to quibble, certain of those documents do include

5        information through partial year 2024, and they also

6        include product-specific predictions and projections

7        that go out, I believe, to 2030.

8   Q.   That's fair.  Let me rephrase my question.

9             You agree that those Bain documents only

10       include revenues through 2023, correct?  You can look at

11       paragraph 71 of your report, if helpful.

12  A.   They do include product-specific revenues.  That is by

13       no means the complete contents of those documents.

14  Q.   So I'm asking about revenues.  You agree that the Bain

15       documents only include product-specific revenues through

16       2023, correct?

17  A.   That is the information that was made available to me in

18       this case.

19  Q.   Okay.  But just, I'd ask that you listen to my question,

20       Mr. Schulte.

21            The Bain documents that you relied on to

22       calculate revenues for your unjust enrichment analysis,

23       those only include product-specific revenue through

24       2023, yes or no?

25  A.   Yes.

Christopher Schulte - February 26, 2026

137

1  Q.    Okay.  Did you ask counsel to see more recent financials

2        for PowerSchool?

3  A.    As I believe I indicated earlier in this deposition, I

4        queried counsel to their knowledge of any additional

5        product-specific revenue quantification.  My

6        understanding from them was consistent with my

7        independent search of the record, which was PowerSchool

8        has not produced product-specific revenues subsequent to

9        this -- to the 2023 to 2024 period.

10 Q.    And you agree that the Bain documents -- or the

11        documents related to the Bain acquisition were prepared

12        for purposes of a transaction, correct?

13 A.    That's my understanding, yes.

14 Q.    Agree that they were prepared for purposes of an unjust

15        enrichment analysis, correct?

16 A.    I'm not aware of any documents that are prepared

17        specifically for purposes of an unjust enrichment

18        analysis, with exceptions of, forgive me, the --

19        certain -- a document that Ms. Bartlett relied upon in

20        her report.  I don't know that anyone ever produces a

21        document in a contemporaneous business setting --

22 Q.    So we --

23 A.    -- specific to an unjust enrichment calculation.

24 Q.    So we can agree that the documents related to the Bain

25        transaction were not prepared for purposes of an unjust

138

1          enrichment analysis, correct?

2     A.   Yes, we can agree there.

3     Q.   Okay.  You had to project revenues for the four products

4          that were the focus of your unjust enrichment analysis

5          for 2024 through 2025, correct?

6     A.   That is correct.  I also projected revenues similarly

7          for the other products quantified in my report.

8     Q.   Sure.  But I want to focus on the products that are

9          included in the body of your report.  So again, those

10         four products that you state provide analytics,

11         insights, or predictions.

12              You used PowerSchool's predictions of growth

13         revenue included in separate documents related to the

14         Bain transaction to project the revenues for those four

15         products, correct?

16    A.   Correct, to the extent that they were physically

17         different documents.  These were files that were

18         different.

19    Q.   Yeah.

20    A.   I understand that they were all under the umbrella of

21         Project Picasso documents.

22    Q.   Right.  And I -- yes, I agree with you.  But just to be

23         clear, in order to estimate and project revenues for the

24         four products in your unjust enrichment analysis, you

25         used PowerSchool's product-specific growth rates that

Christopher Schulte - February 26, 2026

139

1    were indicated in, as you put it in paragraph 73, a

2    separate Project Picasso document, correct?

3  A.  That's correct.

4  Q.  Okay.  If those -- if the growth rates included in the

5    Project Picasso document you rely on were inaccurate,

6    you agree that your projections of product-specific

7    revenues would also be inaccurate, right?

8  A.  It strikes me as a self-answering question.  Yeah, I

9    would agree with that.

10  Q.  Okay.  And you agree that if the growth rates included

11    in the Project Picasso document were inaccurate, you

12    would need to amend your report, correct?

13  A.  I'm not aware of any basis to say that those are correct

14    or incorrect.

15  Q.  Right.  This is a --

16  A.  I'm saying that to the extent that they are incorrect, I

17    would look to PowerSchool to produce product-specific

18    revenues.  It seems to be a fact question.  This isn't

19    really something that I have an opinion on.

20  Q.  Right.

21  A.  This is the best available information in preparing my

22    report.

23  Q.  And I'm just asking you a hypothetical, Mr. Schulte,

24    which I'm, for better or worse, permitted to do all day

25    long at this deposition.

141

```
 1        reflective of actual growth rates in 2024-2025?
 2   A.   I verified the growth rates with respect to the
 3        historical performance of those products.  It strikes me
 4        as reasonable.  And again, these are documents that were
 5        prepared in the course of a multibillion dollar
 6        transaction, so I'm not aware of any indication that
 7        they are -- that they would be unreasonable in any way,
 8        shape, or form.
 9   Q.   Right.  But they are predictions, right?  The growth
10        rates are projections for revenue into the future,
11        correct?
12   A.   By definition, they are projections.  This is -- again,
13        this is, it seems to me, a question of fact.  To the
14        extent that there is other information, I would
15        absolutely review it.
16   Q.   Right.  And all I'm asking is, did you do any work in
17        this case to verify if the projections included in the
18        Project Picasso documents were indeed reasonably
19        accurate or reflective of growth rates in 2024 and 2025?
20   A.   Yes.
21   Q.   What did you do?
22   A.   I examined those growth rates in light of historical
23        revenue growth of those products, and I sought
24        information that would provide any other indicator of
25        that growth.  I find those documents to be reasonable.
```

1  Q.   You did not -- but I guess we may be talking past each

2       other.  You did not do anything to determine if the

3       projections that were made in 2023, prior to the

4       completion of the Bain transaction were reflective of

5       what actually happened in 2024 and 2025, fair?

6  A.   I don't -- I disagree.

7  Q.   What did you do?

8  A.   I searched for information that would indicate that

9       those growth rates are somehow unrealistic.  I'm not

10      aware of any such information.

11 Q.   Okay.

12 A.   They represent the best available information in my

13      experience and in my opinion.

14 Q.   Okay.

15           MS. BAILEY:  Let's go off the record.

16           THE VIDEOGRAPHER:  Off the record at 12:59.

17           (A lunch recess was taken)

18           THE VIDEOGRAPHER:  Back on the record at

19      1:34 p.m.

20           MS. BAILEY:  Great.

21 BY MS. BAILEY:

22 Q.   So, Mr. Schulte, you state in paragraph 136 of your

23      report that you understand from counsel that the

24      quantification and identification of potential class

25      members could be based on PowerSchool's contemporaneous

143

1       business records.

2   A.  Yes, that's correct.

3   Q.  So that was an assumption that counsel asked you to

4       make, that the quantification and identification of

5       potential class members could be based on PowerSchool's

6       contemporaneous business records, fair?

7   A.  I think that's fair, yeah.

8   Q.  And are you aware of specific contemporaneous business

9       records from PowerSchool that allow quantification and

10      identification of potential class members?

11  A.  To some degree, yes.  And I've done my best to try to

12      identify those documents in this section of my report.

13  Q.  Are you offering any opinion in this case that the

14      quantification and identification of potential class

15      members could be based on PowerSchool's contemporaneous

16      business records?

17  A.  I don't have an opinion in that regard.  It would seem

18      reasonable to me, but that's the extent of my opinion in

19      that regard, I guess, that it would be reasonable.

20  Q.  Your opinion -- you are offering an opinion in this case

21      that it would be reasonable to quantify and identify

22      potential class members based on PowerSchool's

23      contemporaneous business records?

24  A.  Let me rephrase.  It's my experience that

25      contemporaneous business records are often the best

Christopher Schulte - February 26, 2026

144

```
 1        source of this type of information.  I'm not aware of
 2        any specific records in this regard, but my
 3        understanding from counsel is consistent with my
 4        experience, so I'm not offering an opinion in that
 5        regard.
 6   Q.   Okay.  In paragraph 137 of your report, as well as
 7        Figure 55 --
 8   A.   Um-hum (affirmatively).
 9   Q.   -- you cite to documents from the Bain transaction that
10        you state could be used to estimate the number of
11        students that used various PowerSchool products in 2023,
12        correct?
13   A.   The only clarification is that I indicate that it could
14        be could be used to estimate the minimum number of class
15        members.  But otherwise, I agree with your -- I would
16        agree with your question.
17   Q.   So is it your opinion that the data included in
18        Figure 55 of your report is the floor for the number of
19        class members?
20   A.   I think it provides information regarding the potential
21        estimate of the minimum number of class members on a --
22        because this information does provide various student
23        counts by product, but as indicated on the face of
24        Figure 55, these are -- these are general student
25        counts.  These are not specific, nor do they identify
```

Christopher Schulte - February 26, 2026

145

1      specific students.

2  Q.  I'm sorry, I think I'm just a little bit confused.  Can

3      you explain again why is it your belief and opinion that

4      these represent the minimum number of class members?

5  A.  I understand that Figure 55 is a current student count,

6      or then current, as of the -- as of approximately

7      December 31, 2023.  As I've indicated, and as I've

8      understood, I -- I understood in preparation of my

9      report that the class -- that a class period would

10     likely begin prior to this date such that there could be

11     students that use these products in prior periods that

12     would not be included in these then-current student

13     counts.

14 Q.  And do you have any understanding of what could be

15     relied on or used to account for the differences you

16     just identified between the numbers in Figure 55 and

17     what you believe is the entire class?

18 A.  You're asking to my belief?  My -- what was the -- can

19     you -- just the first two questions of your -- or, the

20     first two words of your question.

21 Q.  Yeah.  So Figure 55, according to you, represents a

22     minimum number of class members.  And what I understand

23     you to have testified to is that this does not represent

24     or reflect the total number of class members for the

25     class period in this case, is that right?

147

```
 1  BY MS. BAILEY:
 2  Q.   Right.  So you don't have any basis to dispute that the
 3       student counts in Figure 55 reflect the total number of
 4       enrolled students for each PowerSchool customer that
 5       purchases each of the products listed here, not the
 6       number of students whose data was stored, processed, or
 7       analyzed by each of the PowerSchool products listed
 8       here, no reason to dispute that?
 9            MS. SIEHL:  Same objection.
10            THE WITNESS:  I think I understand your
11       question.  I don't have any basis to determine any
12       difference between these numbers and the number of
13       students for which data was stored.  I would -- again, I
14       would expect to be able to look to PowerSchool's
15       contemporaneous records in order to make that more
16       specific and necessary determination.
17  BY MS. BAILEY:
18  Q.   And did you attempt to do that as part of your work in
19       this case, review the contemporaneous business records
20       to determine if the student counts in Figure 55 reflect
21       the number of students whose data was stored, processed,
22       or analyzed by PowerSchool products?
23  A.   I made an effort to try to identify records that
24       provided any indication of student counts to the extent
25       that there are students for which data was not captured,
```

148

1    collected, processed by PowerSchool.  I searched for

2    such information.  I'm not aware of any such

3    information.

4  Q.   And so sitting here -- well, let me ask this.

5            If there were students captured in the student

6    counts in Figure 55 whose data was never processed,

7    stored or, analyzed by PowerSchool, these student counts

8    would be overinclusive in regards to your damages

9    analysis, correct?

10           MS. SIEHL:  Object to the form.

11           THE WITNESS:  They could be.  Again, I'm not

12   -- I'm identifying these documents as examples of

13   information that could be used to make estimates.  I am

14   not advancing these documents or these figures or any of

15   the others in the documents that I've relied upon in my

16   report to provide a definitive count regarding the

17   class.  I'm not aware of information that would

18   currently answer that question.

19  BY MS. BAILEY:

20  Q.   Okay.  In Figure -- well, let me ask you this, actually.

21   In Figure 55, where is Performance Matters captured in

22   this figure?

23  A.   My understanding is that -- let me look, so we -- I do

24   believe that Performance Matters is either the

25   Assessment Management line item or the analytics line

Christopher Schulte - February 26, 2026

149

1    item.  I think that the analytics is most likely the

2    Data, Analytics & Insights product; whereas Assessment

3    Management, those terms are -- those are terms that are

4    used in PowerSchool's contemporaneous financial

5    documents to represent Performance Matters, as I

6    understand it.

7  Q.  But sitting here today, you can't say for sure if

8    Performance Matters is captured in the Analytics line

9    item or the Assessment Management line item, fair?

10  A.  I would fairly defer that question to PowerSchool.

11  Q.  Okay.  In Figure 56 of your report, you include some

12    student count numbers for certain PowerSchool products

13    that you took from the PowerSchool website, correct?

14  A.  That's right.

15  Q.  Specifically, you note that the PowerSchool website

16    notes 17 million student users of SIS, correct?

17  A.  At the time of my report, yes.

18  Q.  You don't have any basis to say if that 17 million

19    number on the PowerSchool website includes students

20    outside of the U.S., fair?

21  A.  I believe that's fair.  Those numbers, again, are --

22    that's what PowerSchool publicly promotes.  I would say

23    it's generally in the range of the student information

24    system counts in Figure 55.  We're talking about

25    17 million versus 19.7 for the U.S.  But, no, I don't

150

1     have any basis to dispute that.  I would defer to

2     PowerSchool in that regard.

3   Q.   ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

11  BY MS. BAILEY:

12  Q.   And you don't have any basis to dispute that, right?

13       That's not something you verified or looked into as part

14       of your work in this case?

15  A.   I don't have any basis to dispute Mr. Ahmad's testimony.

16  Q.   And you agree students whose data was never transferred

17       to, stored, or processed by PowerSchool would not be

18       entitled to damages in this case, correct?

19             MS. SIEHL:  Object to the form.

20             THE WITNESS:  I believe that that's correct,

21       but you're -- that question gets towards the

22       determination of the class, which is outside of my, the

23       scope of my work in this case.

24  BY MS. BAILEY:

25  Q.   So if the 17 million number here included students whose

151

1    SIS data was hosted on-premise, that would be

2    overinclusive in terms of the size of the class,

3    correct?

4              MS. SIEHL:  Object to form.

5              THE WITNESS:  I don't know that I can answer

6    that question one way or another.  I -- this is -- based

7    on the information that I'm aware of, which is the

8    testimony from Mr. Ahmad regarding SIS, this information

9    or the information about the number of students that

10   would be, I guess, affiliated with on-prem versus

11   off-prem systems, I'm not aware of any basis to quantify

12   that, other than Mr. Ahmad's estimate of ████████.

13             MS. BAILEY:  So I'm not sure you answered my

14   question, so let me try and ask it again.

15   BY MS. BAILEY:

16   Q.   You agree, Mr. Schulte, that students -- if the 17

17        million number here included students whose SIS data was

18        hosted on-premise, meaning it was never transferred to,

19        stored, or processed by PowerSchool, the 17 million

20        member would be overinclusive regarding the class size

21        in this case, correct?

22             MS. SIEHL:  Object to the form.

23             THE WITNESS:  It could be.

24   BY MS. BAILEY:

25   Q.   If an estimate or quantification of class size includes

155

1    correct?

2              MS. SIEHL:  Object to the form.

3              THE WITNESS:  My only response, I guess,

4    doubles back to the proposed definitions of the class --

5    classes, excuse me, which, as proposed, as currently

6    proposed, is more inclusive than students who -- for

7    whom their data has been analyzed in that regard.  The

8    proposed class definition is, I believe, while it's

9    consistent with my analysis, I don't know that it is

10   definitive.  And I don't know how to answer your

11   question otherwise.  This is -- yeah, I guess I don't

12   know how to answer your question otherwise.

13             MS. BAILEY:  Yeah, maybe let me ask it a

14   different way.

15 BY MS. BAILEY:

16 Q.   Your analysis assumes that every member of the classes

17      -- well, let's actually be more specific.  Let's start

18      with the Student Warehousing Class.

19 A.   Okay.

20 Q.   Your analysis assumes that every member of the Student

21      Warehousing Class had their data stored, processed --

22      what's the terminology you use -- stored and processed

23      by PowerSchool, let's say.

24 A.   Is that a question?

25 Q.   Yeah.  Let me rephrase, just so the record's clear.

156

1          Your damages analysis assumes that every

2     member of the Student Warehousing Class had their data

3     stored and processed by PowerSchool, is that fair?

4  A.  I believe that's correct.

5  Q.  And your damages analysis assumes that every member of

6     the -- what I'll call the Predictions Class, had their

7     data used to provide analytics, insights, or

8     predictions, is that fair?

9  A.  Did you say is that my opinion?

10 Q.  I can ask it again.

11          Your damages analysis assumes that every

12     member of the Predictions Class had their data used to

13     provide analytics, insights, or predictions, correct?

14 A.  I don't think that that's an assumption that I've made

15     in my report or in my analysis.

16 Q.  So is it your opinion that members of the Predictions

17     Class who never had their own data used to generate

18     analytics, insights, or predictions are still entitled

19     to damages?

20 A.  This gets -- this gets back to questions of termination

21     of the class and entitlement to damages.  I'm not

22     expressing an opinion in that regard.  I don't know that

23     these are assumptions that are -- that are germane to my

24     work to date.

25 Q.  Let me ask it this way.  You do understand that the --

Christopher Schulte - February 26, 2026

157

1    and let me get the exact terminology right -- the

2    Student Profiling and Predictions Class, that is defined

3    as any student who attended a K through 12 school whose

4    school or district used any of the following products,

5    Data, Analytics & Insights, Performance Matters,

6    Behavior Support, and Attendance Intervention, correct?

7  A.   That is my understanding of the currently proposed class

8       definition.

9  Q.   The class definition does not require that a class

10      member had their data used by those products, correct?

11      It just requires them to attend a school or district

12      that used those products, right?  Do you see that

13      distinction?

14 A.   I see your distinction.  I think it's outside of the

15      scope of my work, opinions, and analysis.

16 Q.   So you are agnostic in your opinions about whether or

17      not an individual putative class member's data was ever

18      used by the products, the four products at issue in your

19      unjust enrichment analysis, is that fair?

20           MS. SIEHL:  Object to the form.

21           THE WITNESS:  I don't think that it's within

22      my purview to determine who was in or out of the class.

23 BY MS. BAILEY:

24 Q.   I understand that.  And all I'm trying to clarify is, it

25      did not matter to you one way or the other if an

170

1              Regarding all of the products for which

2    plaintiffs are seeking damages, which we just reviewed

3    one by one, you did not perform any work in this case to

4    determine if students ever used those products, fair?

5              MS. SIEHL:  Object to the form.

6              THE WITNESS:  Same answer with respect to use.

7    Again, the output of these products, I do not know that

8    I -- that there is a singular answer on who is a

9    consumer of that information or not.

10   BY MS. BAILEY:

11   Q.  Sitting here today, you cannot say for any of the

12       products for which plaintiffs are seeking damages that

13       students ever used those products, fair?

14              MS. SIEHL:  Object to the form.

15              THE WITNESS:  I think we're going in circles.

16   Again, I do not know that we can rule out whether

17       students used --

18   BY MS. BAILEY:

19   Q.  I'm not asking you to rule out.  I'm not asking you to

20       rule out.

21   A.  I'm answering your questions.

22   Q.  What I'm asking you is, you don't have any basis,

23       sitting here today, to say with any certainty that for

24       the products for which plaintiffs are seeking damages

25       students ever used those products, fair?  You don't have

171

1         a basis to say that, correct?

2                    MS. SIEHL:  Object to the form.

3                    THE WITNESS:  Can you try to just read your

4         question back to me?

5    BY MS. BAILEY:

6    Q.    Sitting here today, you have no basis to say one way or

7          the other whether students ever use any of the products

8          for which plaintiffs are seeking damages, correct?

9    A.    I think that's correct.

10   Q.    Okay.

11                   MS. SIEHL:  Note objection to the record.  I

12        didn't get it out.  Thank you.

13   BY MS. BAILEY:

14   Q.    You state in paragraph 93 of your report that your

15         actual damages analysis is based on the value of the

16         student data that PowerSchool allegedly aggregated and

17         used without consent from or compensation to plaintiffs

18         and class members, correct?

19   A.    That's correct.  That sounds like a fair reading.  I

20         wasn't there yet, but that seems reasonable.

21   Q.    So for your actual damages analysis, you attempted to

22         calculate the market value of student data stored and

23         processed by PowerSchool, is that fair?

24   A.    That's fair.

25   Q.    And your actual damages analysis does not measure any

Christopher Schulte - February 26, 2026

172

```
 1          diminution in value of the student data stored and
 2          processed by PowerSchool, correct?
 3   A.     That's correct.
 4   Q.     Your damages -- your actual damages analysis does not
 5          measure the alleged loss of privacy experienced by
 6          putative class members, correct?
 7   A.     I don't put a dollar value on the loss of privacy,
 8          that's correct.
 9   Q.     Your actual damages analysis does not measure the
10          difference between the position of putative class
11          members in the but-for world where PowerSchool never
12          stored their data and the real world where it did,
13          correct?
14                  MS. SIEHL:  Object to the form.
15                  THE WITNESS:  To the extent I understand your
16          question, I think that that is that correct.
17   BY MS. BAILEY:
18   Q.     Do you want me to repeat it?
19   A.     Yes, please.
20   Q.     Your actual damages analysis does not measure the
21          difference between the position of putative class
22          members in the but-for world where PowerSchool never
23          stored their data and the real world where it did, fair?
24                  MS. SIEHL:  Object to the form.
25                  THE WITNESS:  That's fair.
```

Christopher Schulte - February 26, 2026

173

1

2    BY MS. BAILEY:

3    Q.    Your actual damages analysis does not measure an

4          economic injury allegedly suffered by putative class

5          members, correct?

6                    MS. SIEHL:  Object to the form.

7                    THE WITNESS:  As I indicated before, my actual

8          damages number is based on a market -- on the

9          market-based evidence of PowerSchool's own negotiations

10         and determinations of student data.

11   BY MS. BAILEY:

12   Q.    Right.

13   A.    I find that number to be applicable to the determination

14         of damages.

15   Q.    Sure.  But what you're doing in your actual damages

16         analysis, that is not attempting to measure an economic

17         injury allegedly suffered by putative class members,

18         right?  That's not the analysis you performed.

19                    MS. SIEHL:  Objection, form.

20                    THE WITNESS:  I have to -- I think I've

21         answered the question.  If you look back at my prior

22         answer --

23   BY MS. BAILEY:

24   Q.    Well, I rephrased the question, so that one deserves an

25         answer.  I can repeat it.

Christopher Schulte - February 26, 2026

174

1          What you're doing in your actual damages

2     analysis is not attempting to measure an economic injury

3     allegedly suffered by putative class members, that's not

4     the analysis you've performed, correct?

5          MS. SIEHL:  Object, form.

6          THE WITNESS:  To clarify, I'm identifying an

7     objective baseline that can be used to measure damages.

8  BY MS. BAILEY:

9  Q.   Right.  And -- but you did not -- you did not perform an

10     analysis to measure an economic injury suffered by

11     putative class members, correct?

12          MS. SIEHL:  Same objection.

13          THE WITNESS:  I would go back to the language

14     of my report where I indicate that this is a value that

15     each plaintiff and class member would reasonably expect

16     to receive in exchange for PowerSchool's aggregation and

17     use of their data without their knowledge or consent.

18     You seem to be drawing -- I think you -- it seemed like

19     you're drawing a delineation between one measure of harm

20     and another.  I don't -- we're talking past each other.

21  BY MS. BAILEY:

22  Q.   You've calculated lost profits in your expert work

23     before, correct?

24  A.   That's correct.

25  Q.   That measures an alleged economic injury suffered by a

Christopher Schulte - February 26, 2026

175

1      plaintiff, correct?

2  A.    That's one measure, yes.

3  Q.    You did not -- you did not perform an analysis, whether

4      it was lost profits or some other type of analysis, to

5      measure an economic injury suffered by the plaintiffs in

6      this case, that's not what you did as part of your

7      damages analysis here, correct?

8              MS. SIEHL:  Object to form.

9              THE WITNESS:  I don't know that's correct.

10 BY MS. BAILEY:

11 Q.    What did you do to measure the economic injury allegedly

12      suffered by plaintiffs in this case?

13 A.    I've identified a market value of student data that

14      PowerSchool negotiated and expected to receive and that

15      students did not.

16 Q.    What is the economic injury plaintiffs suffered in this

17      case?  What -- describe that to me.  What money have

18      they lost?

19              MS. SIEHL:  Object to the form.

20              THE WITNESS:  I look at it as compensation

21      that was not paid.

22 BY MS. BAILEY:

23 Q.    But they -- they did not lose money that they had by

24      virtue of going to schools that used PowerSchool

25      products, correct?

Christopher Schulte - February 26, 2026

176

```
 1   A.   I would agree with that.
 2   Q.   And other than lost profits, what are the other ways to
 3        measure an economic injury?
 4   A.   In which context?
 5   Q.   Any -- as a damages expert.  Give me some examples of
 6        ways you can measure an economic injury.
 7   A.   I would imagine -- or I would characterize a reasonable
 8        royalty and the nonpayment of a reasonable royalty as an
 9        economic injury.  It is a measure of damages.
10   Q.   And, first of all, you did not perform a lost profits
11        analysis here, correct?
12   A.   That's correct.
13   Q.   You didn't perform a nonpayment of a reasonable royalty
14        here, correct?
15   A.   That's correct.
16   Q.   What you did is you looked at a comparable market
17        transaction, right?
18   A.   I -- that was part of my analysis, is looking at --
19   Q.   Correct.
20   A.   -- comparable market transactions, yes.
21   Q.   That's what I'm asking, yeah.
22             So you did not -- well, let me ask this way.
23        Is it your opinion that plaintiffs have suffered an
24        economic injury in this case?
25   A.   It's my understanding that plaintiffs have been damaged.
```

Christopher Schulte - February 26, 2026

177

1  Q.   That's not my question.  Is it your opinion that

2       plaintiffs have suffered an economic injury in this

3       case?

4  A.   To the extent that you are defining this as students

5       losing money from attending these schools, the answer is

6       no.

7  Q.   So you would agree, then, that, based on the definition

8       I'm using, you did not measure an economic injury

9       allegedly suffered by putative class members in this

10      case, correct?

11               MS. SIEHL:  Object to the form.

12               THE WITNESS:  I think we can agree on that,

13      yes.

14 BY MS. BAILEY:

15 Q.   Your actual damages analysis does not measure the cost

16      to putative class members of the risk of identity theft

17      or some other privacy risk, correct?

18 A.   That's correct.

19 Q.   And your actual damages analysis does not attempt to

20      measure the cost of an increased risk of data leaks from

21      a data breach, correct?

22 A.   That's correct.  I think that's a separate question.

23 Q.   And your actual damages analysis is not measuring any

24      alleged emotional distress experienced by the putative

25      class members, correct?

178

1   A.    That's correct.

2   Q.    ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

█████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████

███████████████████████████████████████████

██████████████████████████

17  Q.    Looking at paragraph 93 of your report, you state here

18        that in order to complete your actual damages analysis,

19        you searched for and analyzed available indicators of

20        the market value of data similar to that at issue in

21        this matter, right?

22  A.    That's correct.

23  Q.    What is the relevant market in this case?

24  A.    The relevant market?  Help me understand your question.

25        That --

179

1    Q.    Are you familiar with the term relevant -- well, let me

2          just state this.

3                You claimed that you looked at available

4          indicators of the market value of data, similar to the

5          data at issue in this case.

6    A.    That's correct.

7    Q.    What's the market?

8    A.    A market is an extraction of a buyer and a seller.

9    Q.    So were there any specific parameters that you used to

10         define the market in this case?

11   A.    I looked for transactions involving the provision and

12         purchase of student data.

13   Q.    From an economic perspective, what does the market value

14         of an asset reflect?

15   A.    Typically, the market value and asset represents the

16         price at which a willing buyer and a willing seller

17         would transact a given product.

18   Q.    What indicators of market value of data similar to that

19         at issue here did you analyze?

20   A.    I searched for other transactions.  I'm not aware of any

21         such transaction.  It's a fairly unique fact set here

22         dealing with the exchange of data for minors.

23   Q.    ███████████████████████████████, nothing

24         else was analyzed as an indicator of market value of

25         data similar to that at issue here, is that fair?

180

1   A.   It's fair to say that I think that this is the best

2       available evidence.

3   Q.   Was it the only available evidence?

4   A.   Again, I'm not aware of any other market transactions of

5       student data.

6   Q.   Okay.  Are you aware of any authority that suggests

7       there is a market value for consumers' data?

8   A.   Yes.

9   Q.   What are those authorities?

10   A.   I've been dealing with consumer data for years, and I'm

11       aware of several indications of markets for consumer

12       data.

13   Q.   What about, are you aware of any authority that suggests

14       there's a market value for student data?

15   A.   As I indicated before, I'm not aware of any other

16       transaction involving the offer for sale and the sale of

17       student data.

18   Q.   Are you aware of any authority that suggests there is a

19       market value for school student -- student school

20       records?

21   A.   I do believe that PowerSchool has created that market.

22   Q.   ███████████████████████████████████████████████████

      ███████████████

      █████████████████████████████████████████ are you aware

25       of any authority that suggests there is a market value

181

```
1          for student school records?
2    A.    I am not aware of any other transaction for student
3          records -- or any other market or transaction involving
4          student records.
5    Q.    And are you aware ware of any -- putting aside actual
6          transactions, are you aware of any textbooks, papers,
7          authorities in the academic sense that suggest there is
8          a market value for student data or student school
9          records?
10   A.    Logically, there is a value of those -- of that data.  I
11         am not aware of any indication of a market for that data
12         other than that which I've identified in my report.
13   Q.    Okay.  ████████████████████████████████████████
     ████████████████████████████████████████████████████████
     ████████████████████████████████████████  Does that
16         make sense?  Or can you understand me, like, you know
17         what I'll be talking about?
18   A.    Yes.  My -- in my report, I typically address those as
19         ████████████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████████████████████████████
     ████████████████████████████████████████
23   A.    Okay.  That's fine.  That's fair.
24   Q.    ████████████████████████████████████████
     ████████████████████████████████████████████████████████
```

182



```
1
```

```
23   Q.   Is it your opinion that PowerSchool is a willing buyer

24        of student data?

25   A.   I'm not aware of PowerSchool buying student data.   I'm
```

Christopher Schulte - February 26, 2026

183

1    indicating here PowerSchool's sale of student data.

2  Q.  But you agree that for purposes of your damages

3    analysis, that contemplates PowerSchool paying students

4    for their data, correct?

5  A.  I think that that would be the mechanics of a damages

6    payment.

7  Q.  But that's what you're trying to capture in your damages

8    analysis, correct?  What PowerSchool should have and

9    would have paid students for their data, right?

10  A.  That's not correct.

11  Q.  Okay.  What are you capturing?

12  A.  As I've indicated in my report, that this amount of no

13    less than 40 cents represents a conservative and

14    reasonable indicator of the financial consideration each

15    plaintiff and class member would reasonably expect to

16    receive in exchange for PowerSchool's alleged

17    aggregation and use of their data.

18  Q.  Right.  That plaintiff and class members would

19    reasonably expect to receive in exchange for

20    PowerSchool's alleged aggravation and use of their data.

21    If PowerSchool is not paying plaintiff and class members

22    for the ability to aggregate and use their data, who's

23    paying plaintiff and class member?

24  A.  Again, PowerSchool has not paid for students' data.

25  Q.  I understand that --

184

1   A.   Are you going to let me finish, or are you going to keep

2        going?

3   Q.   Well, you've taken up quite a bit of time, Mr. Schulte,

4        with your avoidance of answering my questions.  So let

5        me withdraw the question and ask it again.

6              Your damages analysis, as you just stated,

7        reflects the financial consideration each plaintiff and

8        class member would reasonably expect to receive in

9        exchange for PowerSchool's alleged aggregation and use

10       of their data.  And my question to you is, how is it

11       possible that that explanation of your damages analysis

12       does not contemplate PowerSchool being the buyer of

13       student data?

14  A.   ███████████████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████████

    ███████████████████████████████████████████

    ██████████████████████████████████████████

    ████████████████████████████████████████████████████

    ████████████████████

23  Q.   You did not perform any analysis to determine at what

24       price PowerSchool would be willing to buy student data,

25       fair?

Christopher Schulte - February 26, 2026

185

1  A.    I'm not aware of any indication that PowerSchool has

2        elected to buy student data.  Instead, my understanding

3        is that its products collect that information.

4  Q.    I'm going to ask my question again and I ask that you

5        listen closely to it, Mr. Schulte.

6              You did not perform any analysis to determine

7        at what price PowerSchool would be willing to buy

8        student data, correct?

9  A.    I'm not aware of the price at which PowerSchool would

10       buy student data.  I'm aware of the price at which

11       PowerSchool is willing to sell student data.

12 Q.    You did not perform any analysis to determine at what

13       price students would be willing to sell their data,

14       correct?

15 A.    That's correct.

16 Q.    You did not cite any sources in your report that reflect

17       what consumers have said or done in regards to

18       disclosing their personal data or how they value that

19       data, correct?

20 A.    I am not referencing other transactions in which

21       consumers have elected to sell their data.

22 Q.    You do not cite any sources in your report that reflect

23       what parents have said or done in regards to disclosing

24       their children's data or how they value that data,

25       correct?

186

1   A.    That's correct.  If that's not in my report, then it's

2         not in my opinion.

3   Q.



187

1         ██████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

████████████████████████ -- your counsel has an

6     opportunity to ask you questions at the end, and we are

7     moving along and we're going to get to, I think, some of

8     the things you want to talk to.  What I ask of you now

9     is that you listen closely to the question I ask, and

10     just answer that question.  So let me ask it one more

11     time.

12           MS. SIEHL:  And I would admonish Counsel not

13     to tell the witness how to testify.

14           MS. BAILEY:  You --

15           MS. SIEHL:  He's entitled to answer the

16     question how he sees fit.

17 BY MS. BAILEY:

18 Q. ████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

████████████████████████

██████████████████████████████████

████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

191

BY MS. BAILEY:

Q.  If I owned a small business that provided music classes
    for kids and I wanted to send out a mailing
    advertisement, would the value -- just common sense,
    would the address of a 3rd grader or the address of a
    high school senior be more valuable to me?

A.  I don't know that that's an answerable hypothetical.

Q.  That's not something that you looked into as part of
    your work in this case, how the value of student data
    may change depending on the buyer, correct?

A.  I considered that the value of student data could vary
    based on the parties to a transaction; and again, I've
    identified a market-based indicator, two, actually, that
    indicate PowerSchool's own negotiation for the value of
    student data.

Q.  You -- true or false, you analyzed only one buyer and
    only one seller of data from high schoolers, correct?
    That's true?

A.  Speaking as someone who has a high school student, I'm
    quite glad that there is no other transaction for the
    data regarding high school students.

Q.  That wasn't my question.  That wasn't my question.  I'll

192

1  ask it one more time, and I ask that you listen very

2  closely --

3  A.  I was.

4  Q.  -- and answer my question.

5        True or false, you analyzed only one buyer and

6  one seller -- only one seller for data from high

7  schoolers as part of your work in this case?

8  A.  That is true.

9  Q.  Okay.  In paragraph 35 of your report, you cite a press

10  release from PowerSchool which describes the Naviance

11  product as one used by high school students to research

12  and explore colleges, correct?

13  A.  That's correct.

14  Q.  ██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████



193

23  Q.    Okay.  Understood.

24              Going back to my question, though -- and

25      actually, I'm going to ask a different question.

202

1   A.   Yeah, I believe that's correct.

2   Q.   And then a student whose data was stored and processed

3        only by Performance Matters, they would also have

4        damages of 40 cents, correct?

5   A.   Yes.  And it's my opinion that this can be applied

6        across the classes.

7   Q.   What types of data did PowerSchool allegedly aggregate

8        and use without consent?

9   A.   There's quite a list of data types, of data elements

10       that were collected.  And I've identified those to the

11       best of my ability in the figures -- most -- generally,

12       in the Background section of my report.

13  Q.   Okay.  We can agree that the types of data stored and

14       processed by PowerSchool products vary by product,

15       right?

16  A.   That's my understanding, that there is some variability

17       there.

18  Q.   And you highlight some of that variability in the

19       figures in the Background section of your report, right?

20  A.   That's correct.

21  Q.   You took the list of data elements for each product

22       included in your Background section from the DPIAs for

23       each product, right?

24  A.   Yes.  I thought that was a reasonable reference point.

25  Q.   And DPIA stands for Data Privacy Impact Assessment?

203

1  A.    That's my understanding.

2  Q.    ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████

██████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

█████████████████████████

████████████████████████████ I think

16       it was -- I'd have to defer to Mr. Flagg, but I believe

17       that he said standard.

18  Q.    You did no work in this case to account for differences

19       in mandatory data fields for each product depending on

20       each school's customization, is that fair?

21  A.    I think that's fair.

22  Q.    And your opinions do not account for any differences in

23       mandatory data fields across PowerSchool's customers, is

24       that fair?

25  A.    I don't -- I don't think that one's fair.

204

1   Q.   How does your -- how do your opinions account for

2        differences in mandatory data fields across

3        PowerSchool's customers?

4   A.   Again, I've said several times, this idea of mandatory

5        is not my understanding of the data fields in DPIA, but

6        as I indicated with respect to Figures 40, and I believe

7        it was 33 in my report, ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

11  Q.   But I think -- so I understand what you're saying.  My

12       question was a little bit different.  Well, I guess I

13       think -- I think I understand what you're saying.

14              You -- sitting here today, you don't have any

15       sense of how the mandatory data fields vary customer by

16       customer, is that fair?

17  A.   I do not have any basis to say how the standard data

18       fields varied by customer.

19  Q.   Okay.  I'd like you to look at two figures from your

20       Background section.

21  A.   Okay.

22  Q.   I'm hoping this works.  I want you to look at Figure 4

23       and Figure 7 at the same time.

24  A.   Got it.

25  Q.   Is that possible?

205

1   A.   Yeah, for sure.

2   Q.   Okay.  Figure 4 is a list of standard data elements

3        included in this SIS DPIA, right?

4   A.   That's correct.

5   Q.   And then Figure 7 is the same thing, but for Performance

6        Matters, right?

7   A.   That's correct.

8   Q.   Now, these figures include some of the same data

9        elements, right?  They both include ██████████████

10       right?

11  A.   Yeah.  That's correct, there is overlap.

12  Q.   But you agree that there are differences between the two

13       figures, too, right?

14  A.   No disagreement.

15  Q.   ████████████████████████████████████████

206

1   ████████████

████████████████████████████████████

████████████████████████

████████████████████████████████████

██████████████████████████

████████████████████████████████████

████████████████████████████████

8   Q.   And so sitting here today, you can't say if the value of

9        those data elements is more or less than 40 cents,

10       right?

11  A.   I don't have a basis to say that it's more or less than

12       40 cents, ████████████████████████████████

████████████████████████████████

████████████████████████████████

15  Q.   Well, and I'm glad you brought up ████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████

██████████████████████████████████

████████████████████████████████

███████████████████████████████

████████████████████████

███████████████████████████ are included in

24       your Figures 33, 40, or 47, correct?

25  A.   I -- yeah, I would agree with you that those aren't

207



1    included.  Those would seem to be additive to the data

2    elements in Figure 40.

3  Q.   If you go back to Figures 4 and 7 --

4  A.   Okay.

5  Q.   The list of data elements for SIS in Figure 4 also

6       includes ████████████████████████, right?

7  A.   Correct.

8  Q.   That data element is not included in the list in

9       Figure 7 for Performance Matters, right?

10 A.   That is correct.

11 Q.   What is the value of a ████████████████████████?

12 A.   I have not reached a conclusion.  I have not examined

13      the specific value of a ████████████████████.

14 Q.   So sitting here today, you can't say if it's more or

15      less than 40 cents, right?

16 A.   ████████████████████████████████

███████████████████████████████████

████████████████████████

19 ███████████████████████████████

████████████████████████████████

███████████████████████████

██████████████████████

██████████████████████████████████

█████████████████████████████████

█████████████████████████

208

1  Q.  ██████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████
   ██████████████████████

5  Q.  Look again at Figure 4.  ████████████████ is a
6      data elements that's listed for SIS in Figure 4, right?
7  A.  Yes.
8  Q.  ██████████████████ is not a data element included
9      for Performance Matters in Figure 7, right?
10 A.  That's correct.
11 Q.  What is the value of ██████████████████ for a
12     student?
13 A.  From my work in other matters, I understand that ██████
   █████████████████████ come with additional sensitivity over
15     other data elements.  That being said, I'm not aware of
16     anything in this matter that would indicate the specific
17     value of ██████ for a student.
18 Q.  So sitting here today, you can't say if it's more or
19     less than 40 cents, right?
20 A.  I would presume that it's more than 40 cents.
21 Q.  But that's not something that you specifically analyzed
22     as part of your work in this case, is that fair?
23 A.  It's not something I specifically analyzed, but it's one
24     of the reasons why I indicated that 40 cents would
25     represent a conservative or a floor for such damage.

209

1   Q.   ██████████████████████████████████████████████

    ████████████████████████████████████████████████

    ██████████████████████████████████

    ██████████████████████

5   Q.   If you look at Figure 7, you see that the list of data

         elements for Performance Matters includes an element for

7        ███████████████ and an element for ████████████

    ████████████████  correct?

9   A.   That's correct.

10  Q.   Those elements are not included in the list of data

11       elements for SIS in Figure 4, right?

12  A.   I think that they are somewhat related issues, but

13       those --████████████████████████████████████

    ███████████████

15  Q.   And you didn't perform any work in this case to

16       specifically analyze the value of data on ████████

    ████████████████████████████  correct?

18  A.   I did not provide -- I did not perform work specific to

19       those data elements.

20  ████████████████████████████████████████████

    ████████████████████████████████████████████████

    ██████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████

210

1    A.    We can, yes.

2    Q.    Okay.  Go back to Figure 7.  The list of data elements

3          for Performance Matters includes ███████████████

     █████████████████████████████████ right?

5    A.    That's correct.

6    Q.    That data element is not included in the list of data

7          elements for SIS in Figure 4, right?

8    A.    That is correct.

9    Q.    And you did not perform any analysis as part of your

10         work in this case to determine the specific value of

11         █████████████████████████████████ correct?

12   A.    I considered it with respect to the agreements, and I

13         think that that's analog -- I think that that's part and

14         parcel to ████████████████████████████████████

     █████████████████████████

16   Q.    And what is the value of data on ████████████?

17   A.    I did not specifically quantify the data on ████████

     ██████████████████ Again, this is one of the reasons why I

19         represent the measure of actual damages here as no less

20         than 40 cents, I think it would be additive.

21   Q.    So sitting here -- sorry, when you say additive, what do

22         you mean by that?

23   A.    ███████████████████████████████████████████

     ███████████████████████████████████████████████████

     ███████████████████████████████████████████████

211

5  Q.    And you believe it's conservative because you think

6        ████████████████ is worth more than 40 cents?

7  A.    I do believe that additional data comes with -- is often

8        of a -- comes with additional value.

9  Q.    We can agree that both Performance Matters and the ███

14  A.    I agree.

15  Q.    SIS does not include any data element on a ████████████

        ████████████████ right?

17  A.    That is correct.

18  Q.    So again, we can agree that the data stored and

19        processed by PowerSchool varies by product, fair?

20  A.    I think that's fair, yes.

21  Q.    ████████████████████████████████████

25  Q.    You did no work in this case to account for the possible

212

1    differences in value of different types of data stored

2    and processed by PowerSchool products, right?

3  A.  I think that was a consideration, but my -- it was a

4    consideration of my analysis.  I did not put a specific

5    dollar value on those, excuse me, additional data

6    elements.

7  Q.  Your report assumes that the value of each putative

8    class member's data is the same regardless of which

9    PowerSchool product they used, correct?

10  A.  I don't know that I make that connection in that way.  I

11    think that they -- that additional data could have

12    additional value, but that, again, the transaction that

13    I'm looking at as my baseline measure of actual damages

14    here would not be impacted by the inclusion of that

15    additional data, as set forth in the parties' contracts.

16  Q.  And so another way to state that is, you have assigned

17    the exact same damages value for each putative class

18    member regardless of which PowerSchool product they

19    used, correct?

20  A.  I think it's reasonable to apply this number across the

21    class.

22  Q.  Right.  And so the answer to my question was yes.

23  A.  Yeah.  I'm just thinking and making sure I'm trying to

24    answer your questions.

25  Q.  Your actual damages opinion assumes that the value of

213

1     each putative class member's data is the same regardless

2     of how long they used any one product, correct?

3 A.  I do not make that assumption my report.  In fact, I

4     speak to that differently.

5 Q.  But you agree that a putative class member who is in

6     11th grade and has used PowerSchool products since

7     kindergarten will receive the same amount in damages as

8     a high school senior that has used PowerSchool products

9     for six months, correct?

10 A.  To best answer your question, I'm referencing page 63,

11     the final bullet on page 63, where I recognize that

12     ██████████████████████████████████████████

    ███████████████████████████████████████████████

    ███████████████████████████████████████████████

    ██████████████████████████████████████████

    ████████████████  I say, in my opinion, this suggests that it

17     could also be reasonable to calculate actual damages on

18     a class-wide basis as 40 cents per class member per year

19     of PowerSchool product use.

20           So I do recognize that with additional

21     PowerSchool use, there could be additional data

22     transfers, and that that would be valuable.  As I

23     indicate here, I understand that data sufficient to

24     determine the number of years during which a class

25     member used PowerSchool products is not available.

Christopher Schulte - February 26, 2026

214

1    Q.    I see.  So your ultimate damages calculation is 40 cents

2          per class member, is that fair?

3    A.    This should read as no less than 40 cents per class

4          member.

5    Q.    Okay.  So that -- okay.  So you want to change the

6          wording of your report to say no less than 40 cents per

7          class member, is that fair?

8    A.    As I'm looking at this section, I don't know that -- I

9          think that, ultimately, my conclusion here is -- I think

10         it's stated separately, that no less than 40 cents.  And

11         the exclusion of those, that no less than was --

12   Q.    Okay.

13   A.    That's an oversight on my part.

14   Q.    Okay.  But just to be clear, your ultimate actual

15         damages calculation is no less than 40 cents per class

16         member, fair?

17   A.    That's correct.

18   Q.    But it is also your opinion that if it was determinable

19         how many years each class member used PowerSchool, you

20         would then calculate damages as 40 cents per class

21         member per year, is that fair?

22   A.    It's my opinion that that could be reasonable.

23         Ultimately, I think we're talking about an equitable

24         measure of relief that's up to the trier of fact.

25   Q.    What would --

Christopher Schulte - February 26, 2026

215

1  A.    I'm indicating here I think that it could be reasonable.

2  Q.    What would it depend on?  What the -- you said what the

3        trier of fact determines?

4  A.    That's correct.

5  Q.    What do they need to determine to decide if that's

6        reasonable or not?

7  A.    I'm going to have to defer to the trier of fact on that

8        one.

9  Q.    Well, what -- but what are the open issues left to be

10       decided that are necessary in order to determine if

11       that's a reasonable opinion or not?

12  A.    I think it is -- I think, at this time, it is reasonable

13       that you could calculate actual damages in that manner,

14       per class member per year of PowerSchool product use.

15       I -- the additional information necessary to perform

16       that calculation would be -- would include information

17       regarding the number of years in which a class member

18       used PowerSchool products.

19  Q.    And so if you had that information, would this be your

20       ultimate damages calculation?  Because you understand,

21       this is different than what your conclusion says in --

22       at the beginning of paragraph 133, right?

23  A.    Yeah.  This entire section is the conclusion regarding

24       actual damages.  And I'm saying here that it could be

25       reasonable to calculate damages in this way.

216

1  Q.   Is it reasonable to calculate damages as no less than

2       approximately 40 cents per class member?  Is that

3       your -- that's -- is that reasonable?

4  A.   That's the -- that's my -- yeah, that's my opinion

5       regarding the -- a conservative minimum value.

6  Q.   Why did you choose that instead of 40 cents per class

7       member per year?

8  A.   Ultimately, based on my expectations regarding the

9       availability of information in this case.

10 Q.   Okay.  Why would the appropriate damages calculation not

11      be 40 cents per class member per month?

12 A.   I go back to the source of this information, of this

13      indicator is the ██████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

█████████████████

█████████████████████████████████████████████████

217

1    ███████████████████████████████████

2  Q.   Would they change on a month-over-month basis?

3  A.   Certain of them could.  Such as, you know, I would

4       imagine your ████ could change on a month-over-month

5       basis.

6  Q.   Sure.  So do you have any basis to say 40 cents per

7       class member per month is an unreasonable damages

8       calculation?

9  A.   It's not my understanding that that would be consistent

10      with this contract.

11 Q.   Even though you agree that certain data elements could

12      change on a month-by-month basis?

13 A.   Certain of them could, yes.

14 Q.   Is 40 cents per class member per day a reasonable

15      damages calculation?

16 A.   I'm not aware of any indication that that is how this

17      was envisioned.

18 Q.   And so the reason -- so do you think it's an

19      unreasonable calculation?

20 A.   Yes.

21 Q.   Based on what?

22 A.   My understanding of these agreements and the -- and the

23      parties' interest in negotiating these contracts.  I

24      don't know that -- I don't know that that would be a

25      reasonable way to interpret this.

227

1    data regarding students could be publicly available.

2  Q.   And was your conclusion from that consideration that

3       your damages analysis was the same, correct?

4  A.   I think that my damages conclusion is a reasonable

5       baseline across class members regardless of whether

6       certain data elements are publicly available.

7  Q.   Do you agree that if a student or parent received notice

8       that the student's data was being stored, processed, or

9       analyzed by PowerSchool products, that student would be

10      unharmed?

11              MS. SIEHL:  Object to the form.

12              THE WITNESS:  I'm sorry, could you say that

13      one more time?

14 BY MS. BAILEY:

15 Q.   Do you agree that if a student or parent received notice

16      that the student's data was being stored, processed, or

17      analyzed by PowerSchool products, that student would be

18      unharmed?

19              MS. SIEHL:  Object to form.

20              THE WITNESS:  I don't have an opinion in that

21      regard.

22 BY MS. BAILEY:

23 Q.   Okay.  So you can't answer whether you agree or

24      disagree, is that fair?

25 A.   I -- I'm sorry, I've lost the plot on that question.

228

1           And again, I'm sorry that I am asking you to repeat

2       these questions.

3   Q.  Let me ask a different one.

4               Do you agree that if a student or parent

5       consented to the student's data being stored, processed,

6       or analyzed by PowerSchool products, that student would

7       be unharmed?

8               MS. SIEHL:  Object to form.

9   BY MS. BAILEY:

10  Q.  And if you can't answer, you can't answer.

11  A.  I can't answer.  I don't have an opinion in that regard.

12  Q.  Do you agree that if a student or parent consented to

13      the student's data being stored, processed, or analyzed

14      by PowerSchool products, that student would not be

15      entitled to damages?

16              MS. SIEHL:  Object to form.

17              THE WITNESS:  Again, that gets -- that strikes

18      me as a question regarding who's in the class, and I

19      don't have an opinion or an answer to that question.

20  BY MS. BAILEY:

21  Q.  Okay.  And so for that reason, it sounds like it's fair

22      to say that neither your actual damages analysis nor

23      your unjust enrichment analysis accounts for any notices

24      or disclosures that were provided to students or parents

25      regarding PowerSchool's products, right?

Christopher Schulte - February 26, 2026

229

1  A.   I have an understanding that issues of notice and

2       disclosure are a part of the controversy here.  I don't

3       have an opinion regarding how that would impact the

4       quantification of damages.

5  Q.   Right.  It just didn't play a role in your

6       quantification at all, is that fair?

7  A.   I think that that's fair, yes.

8  Q.   Okay.  Do you agree that a proper calculation of damages

9       must account for any benefits received from the alleged

10      unlawful conduct?

11               MS. SIEHL:  Object to the form.

12               THE WITNESS:  Not necessarily.

13 BY MS. BAILEY:

14 Q.   What's your basis to say not necessarily?

15 A.   Again, I proposed a methodology here that's based on an

16      objective market-based transaction.  The -- to the

17      extent that there are -- that there's speculation

18      regarding the subjective beliefs and feelings of an

19      individual class member, my analysis does not turn on

20      that speculation.

21 Q.   And I wasn't asking about your opinion in this case,

22      Mr. Schulte.  I'm asking just about a general principle

23      and damages calculations.  Do you agree that a proper

24      calculation of damages must account for any benefits

25      received from alleged unlawful conduct?  I'm just asking

231

1      PowerSchool product because, as you testified, you

2      didn't consider that relevant to your calculation,

3      right?

4   A.  That's correct.

5   Q.  And you didn't perform any work in this case to analyze

6      how potential benefits from any PowerSchool product

7      might differ depending on the class member because,

8      again, benefits were not relevant to your calculation,

9      correct?

10  A.  I think, as I said before, my analysis did not turn on

11     speculation of the subjective feelings and beliefs of

12     individual class member.

13  Q.  Right.  And all I'm trying -- totally understand.  All

14     I'm trying to confirm is, because of that, you did not

15     perform any work in this case to analyze the potential

16     benefits or differences in benefits received by class

17     members from their school's use of PowerSchool products,

18     correct?

19  A.  I understand that there could be benefits from a

20     school's use of PowerSchool products.

21  Q.  You just didn't perform any work on that as part of your

22     work in this case, right?

23  A.  You're asking for quantification or consideration?

24  Q.  Your --

25  A.  By the way, for clarity, that was a question, not an

232

1    answer.

2  Q.  Right.  But I'm the only one that gets to ask questions.

3  A.  I understand.  I'm trying to clarify the question.

4  

8  Q.

11  Q.



235

1    ████████████████████████████████████████

2 Q.   But we've established that plaintiffs are not seeking

3      damages for Naviance either.  In their two damages

4      classes, Naviance is not one of those products.

5 A.   I'm sorry.  Yeah.  I'm sorry.  I was looking at the

6      injunctive class.  I don't have a disagreement.

7 Q.   And you're not attributing any damages to users of

8      Intersect, correct?

9 A.   That's correct.

10 Q.   ███████████████████████████████████████████████

   ████████████████████████

   ████████████████████████████████████

   ████████████████████████████████████████

   ████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   ███████████████████████████

   ███████████████████████████████████████████████

   █████████████████████████████████████

   ██████████████████████████████████████

   ███████████████████████████████████████████████

   ██████████████████████

   █████████████████████████

24 Q.   You've said a couple times now that the 40 cents per

25      class member calculation of actual damages is a baseline

236

1      calculation, right?

2  A.   I look at -- so as to clarify, I look at that as the

3      transaction provides a baseline value.  Then I -- my

4      ultimate conclusion that it's -- that it would be

5      reasonable to quantify actual damages with the 40 cents,

6      I look at that as a conservative minimum.

7  Q.   What is the maximum for class member damages?  Have you

8      done any work to calculate that?

9  A.   I don't have an opinion regarding the maximum.

10 Q.   What's the average of class member damages?  Did you do

11     any work to calculate that?

12 A.   I do not have an opinion regarding the average.  I've

13     provided an opinion regarding the conservative minimum.

14            MS. BAILEY:  Why don't we go off the record.

15            THE VIDEOGRAPHER:  Off the record, the time is

16     4:03 p.m.

17            (A short recess was taken)

18            THE VIDEOGRAPHER:  We're back on the record at

19     4:13 p.m.

20            MS. BAILEY:  Great.

21 BY MS. BAILEY:

22 Q.   So I actually want to go back and talk about your unjust

23     enrichment opinion again.

24 A.   Okay.

25 Q.   In your report, the period that you analyzed for

237

1    purposes of your unjust enrichment opinion was January

2    2019 through December 2025, right?

3  A.  That's correct.

4  Q.  And when you wrote your report, did counsel ask you to

5    assume that was the relevant time period for this case?

6  A.  No.  There was no direction in that regard at the time.

7    I -- I would say that it was non-specific with respect

8    to the period of damages.  I looked at damages -- I

9    looked at quantifying revenues and profits over the

10    period for which I had information under the

11    understanding that the damages period could be subject

12    to change.

13  Q.  So was it you and your team that determined January 2019

14    through December 2025 was the relevant time period when

15    you submitted your report?

16  A.  That's what I quantified, I -- but I indicate in my

17    report that the methodology was set up to anticipate and

18    accommodate any other date that -- I think there's a

19    specific footnote that we could turn to if you'd like,

20    but it relates to the fact that damages could be -- my

21    damages calculation could be mechanically truncated.

22  Q.  And sitting here today, you're obviously aware now that

23    plaintiffs only seek damages beginning on October 29th,

24    2020, correct?

25  A.  That's my understanding of the class period, yes.

244

1    whether those -- whether those revenues would have been

2    generated at all in the absence of the other product

3    functionalities or product features, such that I'm -- I

4    think a follow-up question would need to be asked

5    regarding is that a separately salable aspect of

6    these -- of these products.

7  Q.  Sitting here today, can you say if the talent aspects of

8    those four products drive or do not drive the revenues

9    of those products?

10 A.  I'm not aware of any indication that those drive or --

11   that those drive demand for those products.

12 Q.  One way or the other, correct?

13 A.  Agreed, yeah.

14 Q.  I want to run another hypothetical by you.  I'll be very

15   up front about the fact that I'm asking a hypothetical

16   this time.  If a school district purchased Performance

17   Matters, but never used it, under the assumptions you

18   made for your unjust enrichment opinion, no unlawful

19   conduct would have occurred, right?

20 A.  It's an interesting question.  I -- to the extent that

21   there was no data sharing, I understand that that would

22   mean that there was no lawful -- unlawful conduct in

23   that regard.  But as I alluded to earlier, a question

24   remains as to, you know, the basis on which those

25   products were sold, and the fact that PowerSchool would

245

```
 1         have recognized revenue from those products.
 2  Q.    Okay.
 3  A.    I'm sorry, there's no question that PowerSchool would
 4         have --
 5  Q.    Correct.
 6  A.    -- would have recognized revenue from those products.
 7         To the extent that the data sharing did or did not
 8         occur, I would agree with you that if there is no
 9         sharing of data, then the unlawful conduct, as I
10         understand it, would not have occurred.
11  Q.    Sure.  And you agree that if no analytics, insights, or
12         predictions were ever generated with student data, even
13         if a school purchased Performance Matters, no unlawful
14         conduct would have occurred?
15              MS. SIEHL:  Objection to form.
16              THE WITNESS:  I think it's a similar answer.
17  BY MS. BAILEY:
18  Q.    Okay.  Let me just ask a clarifying question.  If a
19         school or school district purchased Performance
20         Matters --
21  A.    Um-hum (affirmatively).
22  Q.    -- did you assume unlawful conduct occurred regardless
23         of anything else, just the purchase itself was enough
24         for unlawful conduct to occur?
25  A.    I didn't make an assumption one way or the other.  To
```

Christopher Schulte - February 26, 2026

246

1    the extent that there are revenues recognized from that

2    product, I included them in my calculation.

3  Q.   And you agree that if a school or school district

4    purchased Performance Matters, but then never used the

5    product, no student attending that school or school

6    district would have been harmed, correct?

7              MS. SIEHL:  Object to form.

8              THE WITNESS:  I think I can agree to that,

9    based on just my intuition of these hypotheticals.  I

10   liken it to, you know, someone buys a pack of cigarettes

11   but then never smokes them, right, the revenues are --

12   the sale has been made.  The harm may not have been

13   done.

14  BY MS. BAILEY:

15  Q.   Okay.  If a school district purchased Performance

16   Matters, but only used it to generate insights on the

17   data of students who had a grade average of C plus or

18   below, students who had a grade average of B minus or

19   above would have experienced no harm, correct?

20             MS. SIEHL:  Object to the form.

21             THE WITNESS:  Wow.  I have -- I have no

22   ability to answer that question.  That -- I don't

23   understand.

24  BY MS. BAILEY:

25  Q.   Yeah.  Let me repeat it, and maybe I can help rephrase

Christopher Schulte - February 26, 2026

247

1        it.
2              Okay.  Let's say a school district purchases
3        Performance Matters.
4   A.   Okay.
5   Q.   And the school district uses that product only to
6        analyze and look at students who have a grade average of
7        C plus or below; in other words, the only student data
8        that is entered into and analyzed by Performance Matters
9        is data from students who have a grade average of C plus
10       or below.  Are you with me so far?
11  A.   I'm with you so far.
12  Q.   Students who had a grade average of B minus or above
13       would have experienced no harm in that hypothetical,
14       correct?
15             MS. SIEHL:  Objection, form.
16             THE WITNESS:  I think that's correct, if I'm
17       correctly interpreting your hypothetical, which there is
18       no data input or shared for those students.
19             MS. BAILEY:  That's right.
20             THE WITNESS:  That would seem reasonable.
21  BY MS. BAILEY:
22  Q.   And so, therefore, no unlawful conduct occurred
23       regarding the students with a B minus grade average or
24       above, correct?
25  A.   I believe that's correct.

Christopher Schulte - February 26, 2026

248

```
 1   Q.   And you agree that you make no effort to exclude
 2        revenues associated with students whose data was never
 3        used to generate analytics, insights, or predictions by
 4        any of the four products included in your unjust
 5        enrichment analysis, correct?
 6                 MS. SIEHL:  Object to form.
 7                 THE WITNESS:  Yeah.  Going back to my analogy
 8        of the package of cigarettes being purchased, I don't
 9        think that that would be -- I don't think that that's a
10        reasonable deduction from an unjust enrichment
11        calculation.
12   BY MS. BAILEY:
13   Q.   Not reasonable to exclude revenues associated with
14        students who never had their data used to generate
15        analytics, insights, or predictions by the four products
16        that are the focus of your unjust enrichment analysis,
17        that's your testimony?
18   A.   To the extent that those products were purchased by a
19        school district and sold by PowerSchool, PowerSchool
20        would have received the revenues from those products.
21        To the extent that there are certain students within
22        that school district whose data was not input into that
23        program, I don't -- I can't envision a way in which
24        those students would have been harmed, but I can
25        envision, and I think I find it logical to conclude,
```

Christopher Schulte - February 26, 2026

249

1     that PowerSchool would still have been unjustly enriched

2     for the totality of those revenues.

3  Q.  And if there was a school or school district where only

4     a single student was harmed by PowerSchool's products in

5     that school, you would still count the entire amount of

6     revenues paid by that school to PowerSchool in your

7     analysis, correct?

8  A.  In my unjust enrichment analysis, yes, I think that's

9     reasonable.

10 Q.  Okay.  And are you aware that PowerSchool prices its

11     products based on a school district's enrollment number

12     and not based on the number of students whose data is

13     actually entered into and processed by its products?

14 A.  That's my understanding, yes.

15 Q.  Based on the assumptions you were asked to make for your

16     unjust enrichment opinion, if PowerSchool had obtained

17     consent from parents allowing their child's data to be

18     used to generate analytics, insights, or predictions

19     about that child, would PowerSchool still be engaged in

20     unlawful activity?

21         MS. SIEHL:  Object to the form.

22         THE WITNESS:  That's a legal determination

23     that I don't -- I don't know how to answer that

24     question.

25

250

1  BY MS. BAILEY:

2  Q.   Yeah.  I mean, and I -- if the answer is you don't know,

3       that's fine.  I was really just asking about the

4       assumptions you were asked to make.  And it sounds like

5       there was no delineation between whether parents

6       provided consent or didn't provide consent for their

7       child's data to be processed and analyzed by PowerSchool

8       products regarding whether activity was unlawful or not.

9  A.   There's no delineation of consent in my analysis.  To

10      the extent that information was available regarding

11      consent, mechanical adjustments could be made to my

12      calculation to apportion the revenues and profits

13      accordingly.  You know, for example, 10 percent of the

14      students in a district reported -- if there was consent

15      for, you know, for a portion of or specific students, it

16      could be reasonable to apportion revenues to make that

17      -- to fit it to that -- to those facts.

18 Q.   I think I understand.  Just let me ask a clarifying

19      question.

20 A.   Okay.

21 Q.   I think what you're saying is, if there was evidence or

22      proof that 10 percent of the class actually did provide

23      consent for their data to be processed and analyzed by

24      PowerSchool products, you could then reduce the unjust

25      enrichment amount by 10 percent?

Christopher Schulte - February 26, 2026

251

```
1   A.   There could be that type of mechanical adjustment.

2   Q.   Okay.

3   A.   But I can't be more -- I have to be super clear on the

4        fact that it strikes me as a legal question regarding

5        liability, and I am not expressing an opinion regarding

6        liability.

7   Q.   Okay.

8   A.   I have to defer to a group of attorneys and the trier of

9        fact regarding that point.

10  Q.   And so I think what I understand, based on your

11       testimony -- another hypothetical, but if PowerSchool

12       obtained consent from all parents of every student from

13       every customer that they sell product to, would you

14       agree that there's no unjust enrichment, then?

15            MS. SIEHL:  Object to the form.

16            THE WITNESS:  I don't have an opinion in -- or

17       any ability to agree or disagree with that.  That

18       strikes me as a legal question.  I'm not expressing an

19       opinion on that.

20  BY MS. BAILEY:

21  Q.   Okay.  And again, just to clarify, the reason you feel

22       like you can't answer that is because you feel like the

23       question of whether consent is sufficient to make

24       something that's unlawful lawful, you don't feel like

25       you're in a position to answer that question, is that
```

Christopher Schulte - February 26, 2026

252

1          fair?

2  A.     Yeah.  I don't think I'm in a position to answer

3          questions regarding consent.

4  Q.     Okay.  Okay.  And related to that, you did not perform

5          any work or analysis to determine if any parent provided

6          consent for their child's data to be used by any of the

7          four products included in your unjust enrichment

8          analysis, right?

9  A.     I think it's fair to say that I did not investigate

10         issues of consent.

11 Q.     We can agree that when calculating unjust enrichment you

12         must quantify and exclude the expenses that were

13         incurred in generating the revenues from the unlawful

14         conduct.

15 A.     That's my understanding of the construct.

16 Q.     Actually, I just want to go back and ask one more

17         question.  So -- actually, never mind.

18                  Is it your opinion that only variable costs

19         should be excluded from an unjust enrichment analysis?

20 A.     It's my opinion that variable costs are reasonably

21         deducted in the calculation of an unjust enrichment

22         amount.  That being said, and as I indicated in my

23         report, there are expenses that I've deducted from

24         revenues in this case that appear to be allocations of

25         expenses that may not be variable with revenues, and

Christopher Schulte - February 26, 2026

253

| 1 | that those deductions have been made in my report. |
|---|---|
| 2 | Q. How do you determine -- let me ask you this. |
| 3 | Is it your opinion that all costs should be |
| 4 | excluded from an unjust enrichment analysis, including |
| 5 | semi-variable costs and fixed costs? |
| 6 | A. I think it's on a case-by-case basis. But to the extent |
| 7 | that, for example -- and I'll provide the example. In |
| 8 | this instance, we're dealing with -- or I'm focusing on |
| 9 | products that represent roughly 10 to 14 percent of |
| 10 | PowerSchool's overall revenues. To the extent that all |
| 11 | of PowerSchool's revenues would be -- are at issue. |
| 12 | Then that changes the perspective on what expenses would |
| 13 | be reasonably deducted. |
| 14 | In this instance, I have deducted the expenses |
| 15 | that PowerSchool in the normal course of business |
| 16 | attributes to its products. And I have deducted a pro |
| 17 | rata portion of those expenses from the revenues |
| 18 | quantified in my report. |
| 19 | Q. Okay. So I understand your testimony to say whether you |
| 20 | deduct just variable costs or, in addition, |
| 21 | semi-variable and fixed costs, depends on the context |
| 22 | and circumstances of each case, is that fair? |
| 23 | A. I think that's fair. |
| 24 | Q. Okay. And here you excluded PowerSchool's cost of |
| 25 | revenues for each of the four products, right? |

258

1    their subscriptions revenues.  And the mix of those

2    subcategories changes on a product-by-product basis.  So

3    while the profitability of those revenue subcategories

4    could be consistent across PowerSchool's business, the

5    profitability of PowerSchool's individual products do

6    vary on a product-by-product basis.

7  Q.  You did not exclude any of PowerSchool's operating

8    expenses, correct?  And we'll talk about the reasoning

9    for that.  I'm just trying establish a yes-or-no

10   question here.  You didn't exclude them.

11 A.  I excluded operating expenses that are embedded in

12   PowerSchool's cost of revenues.

13 Q.  Okay.  You state in your report that the costs included

14   in PowerSchool's operating expenses that are variable

15   are largely subsumed within PowerSchool's costs of

16   revenues, right?

17 A.  Could you repeat that question, please?

18 Q.  Yeah.

19 A.  I think I'm pretty close to agreement, but I --

20   something in there doesn't sound right.

21 Q.  Yeah.  You state in your report --

22 A.  Do you have a page reference or something that I could

23   look at?

24 Q.  Yeah.  I think it's paragraph 85.

25 A.  Okay.  Got it.

259

1  Q.  So you state here that the cost included in

2      PowerSchool's operating expenses that are variable are

3      largely subsumed within PowerSchool's cost of revenue,

4      correct?

5  A.  That's what -- that's my conclusion, yes.

6  Q.  And so we can agree that at least some of the costs

7      included in PowerSchool's operating expenses are

8      variable, right?

9  A.  I would turn that slightly.  I would think that certain

10     of the expenses that I would consider operating expenses

11     are embedded in PowerSchool's costs of revenues.

12 Q.  Right.  And that wasn't my question.  I'm just trying to

13     establish that certain costs that PowerSchool

14     categorizes as operating expense are variable costs,

15     correct?

16 A.  That's correct, and they're common to those same

17     expenses and their cost of revenue.

18 Q.  I understand.  And you've said that a couple times now.

19     That is going to be crystal clear on the record.

20          You rely on the deposition testimony from

21     Darron Flagg for your determination of which of

22     PowerSchool's operating expenses are variable, right?

23 A.  That's part of my basis for this, yes.

24 Q.  What's your other basis for which costs within

25     PowerSchool's operating expenses were variable?

Christopher Schulte - February 26, 2026

260

1   A.   I would say that my experience and my work with company

2        financial statements over the past 20 plus years

3        would probably -- would be one basis for the conclusions

4        that I've reached regarding these documents.

5   Q.   And in your report, you don't go through every single

6        one of PowerSchool's operating expenses, correct?

7   A.   That is correct.  I identified the testimony that I --

8        that I found available.

9   Q.   Right.  And in your report, the only thing you cite to

10       support your determination of which costs within

11       PowerSchool's operating expenses were variable is Darron

12       Flagg's testimony?

13  A.   Again, I have to disagree.  The -- my -- part of the

14       basis of my determination of expenses are the detailed

15       financials that are examined and referenced in my

16       footnotes.

17  Q.   Did the de --

18  A.   Darron -- Mr. Flagg's testimony was not -- it was

19       supportive of my conclusions, it was helpful, but that

20       was not my basis for this calculation.

21  Q.   Did the detailed financials state which costs are

22       variable and which costs are fixed?

23  A.   No.  That delineation is not made in those documents on

24       their face.

25  Q.   Okay.  Mr. Flagg's testimony that you cite in your

Christopher Schulte - February 26, 2026

261

| | |
|---|---|
| 1 | report talks about four types of costs, rent, compliance |
| 2 | reporting requirements, cloud storage requirements, and |
| 3 | "other expenses associated with product packaging and |
| 4 | updates", right? |
| 5 | A. I'm sorry, there's a section in my report where I -- can |
| 6 | you give me a direction on where you're looking? |
| 7 | Q. Paragraphs 82 through 84. |
| 8 | A. Okay.  Those pages -- that occupies two pages in my |
| 9 | report in terms of how I've looked at that analysis. |
| 10 | Q. Right. |
| 11 | A. So I can't agree with your simplification of the |
| 12 | concepts there. |
| 13 | Q. So I'm just asking about the testimony from Mr. Flagg |
| 14 | that you discuss in your report.  And do you agree that |
| 15 | these paragraphs, 82 through 84, you cite as examples of |
| 16 | what Mr. Flagg is testifying about operating expenses, |
| 17 | correct? |
| 18 | A. Those -- those questions do relate to operating |
| 19 | expenses.  But I would also direct you to pages 34 and |
| 20 | 35, where embedded in these descriptions of these |
| 21 | expenses, we talk about -- or I reference Mr. Flagg's |
| 22 | testimony regarding professional services, wages for |
| 23 | employees supporting the products, payroll taxes, sort |
| 24 | of in my -- I'm sorry, he didn't reference payroll |
| 25 | taxes, but when I look at his testimony, I'd say |

266

```
 1        with Performance Matters that you're aware of?"
 2                   And he indicated:
 3            "A.  Aside from regular patching of the products
 4        that we would need to keep it going, nothing else
 5        immediately comes to mind."  I would assume for
 6        Performance Matters.  "In particular, it doesn't have
 7        the same compliance reporting function that SIS does."
 8                   So I appreciate that you're trying to narrow
 9        --
10   Q.   I'm not trying to narrow.
11   A.   -- this testimony.  My interpretation of this testimony
12        is not aligned with your questions.
13   Q.   And I wasn't asking for your interpretation.  I was
14        literally just asking you to confirm what is written in
15        your report, but it seems like that's not possible.
16                   You agree that in 82 through 84, your
17        understanding is that Mr. Flagg is talking about
18        operating expenses, correct?
19   A.   In general, yes.
20   Q.   I'm handing you what's been marked as Exhibit 4.  It's
21        Mr. Flagg's deposition.
22                   SCHULTE EXHIBIT 4
23                   Deposition of Darron James Flagg
24                   WAS MARKED BY THE REPORTER
25                   FOR IDENTIFICATION
```

267

1  BY MS. BAILEY:

2  Q.    Turn to towards the end of the transcript where there's

3        a word index.  And look for the word operating.

4  A.    Okay, I'm there.

5  Q.    Okay.  Take a look at the citations for operating on

6        page 76 and 339, and let me know if either of those

7        relate to operating expenses.  All you have to do is

8        look for the word operating --

9  A.    I'm with you.

10 Q.    -- and see if it refers to expenses.

11 A.    I'm sorry, I'm trying to get there.

12              Yeah, I'm not -- I don't see that he's

13        speaking about operating expenses in those areas.

14 Q.    Right.  So we can agree that Mr. Flagg was never

15        specifically asked and never specifically testified

16        about operating expenses during his deposition, right?

17 A.    No, I can't agree with that.

18 Q.    It's never mentioned in his deposition, correct?

19        Operating expenses is never a term mentioned in his

20        deposition, correct?  Yes or no?

21 A.    Operating expense was not used in his deposition.

22 Q.    Okay.

23 A.    He was clearly asked about operating expenses.

24 Q.    You said -- well, you just testified numerous times that

25        the same expenses are included in both cost of revenue

Christopher Schulte - February 26, 2026

268

1        and operating expenses.

2   A.   And I stand by those answers.

3   Q.   Okay.  So how would you possibly know what Mr. Flagg was

4        referring to in terms of those two buckets?

5   A.   I don't need Mr. Flagg's testimony to tell you that

6        there's overlap between the cost of revenues and the

7        operating expenses --

8   Q.   Right.

9   A.   -- in their detailed financial.

10  Q.   Right.  That wasn't my question.

11  A.   It sounded like it was.

12  Q.   No.

13  A.   I'm doing my best to answer your questions.

14  Q.   Yeah.

15  A.   I'm sorry that you're frustrated.

16  Q.   I'm not sure that you are, but that's+ okay.

17            What -- let's take a look at another document.

18       And let me ask you this.  Is it your understanding that

19       Mr. Flagg has any role in putting together PowerSchool's

20       financial statements?

21  A.   I believe that he testified that he's not involved with

22       that.

23  Q.   Okay.

24  A.   I understood that he was the designee on those topics.

25

277

1                    CERTIFICATE OF NOTARY

2

3    STATE OF MICHIGAN          )

4                               ) SS

5    COUNTY OF MACOMB           )

6

7        I, LAURA J. STEENBERGH, Certified Shorthand

8    Reporter, a Notary Public in and for the above county

9    and state, do hereby certify that the above deposition

10   was taken before me at the time and place hereinbefore

11   set forth; that the witness was by me first duly sworn

12   to testify to the truth, and nothing but the truth, that

13   the foregoing questions asked and answers made by the

14   witness were duly recorded by me stenographically and

15   reduced to computer transcription; that this is a true,

16   full and correct transcript of my stenographic notes so

17   taken; and that I am not related to, nor of counsel to

18   either party nor interested in the event of this cause.

19

20

21   _____

22        LAURA J. STEENBERGH

23        CSR 3707 Notary Public,

24        Macomb County, Michigan

25   My Commission expires:  2/14/28