Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Zharna Shah (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
zharna.shah@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| EMILY CHERKIN, et al<br><br>       Plaintiffs,<br><br>v.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>       Defendant. | CASE NO. 3:24-cv-02706-JD<br><br>**DEFENDANT POWERSCHOOL HOLDINGS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Judge: Hon. James Donato<br>Hearing Date: April 23, 2026<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |

## **TABLE OF CONTENTS**

**INTRODUCTION**..................................................................................................... 1

**BACKGROUND** ...................................................................................................... 3

    I.     There is a complex and varied regime of state and local laws that govern EdTech privacy, thereby setting privacy expectations that differ significantly by location. ........... 3

    II.    Under specific individualized contracts, schools control their data and PowerSchool's actions. ........................................................................... 5

    III.   The products at issue are inherently very different, and schools vary in how they use these products to store, analyze, or share their data. ................................... 6

    IV.   Plaintiffs' individual circumstances demonstrate a lack of uniformity and unique defenses. ...................................................................................... 8

    V.    After discovery closed, Plaintiffs pivoted legal theories. ................................. 10

**ARGUMENT** .......................................................................................................... 11

    I.     Each proposed class lacks the commonality necessary under Rule 23(a) because the factual record proves there is no common answer to any central question................. 11

         A.    There are no common answers to central questions regarding Plaintiffs' invasion of privacy claims. ..................................................... 12

         B.    There is no central question regarding Plaintiffs' unjust enrichment claim. ........ 16

    II.    Plaintiffs cannot meet the typicality or adequacy requirements of Rule 23(a) because they face unique defenses, and they have conflicts of interest........................... 17

    III.   Individual issues concerning the elements of Plaintiffs' claims predominate, and there is no classwide method to determine damages, precluding a damages class under Rule 23(b)(3)............................................................................ 19

         A.    Individualized inquiries required dwarf anything common.............................. 19

         B.    There is no common method for calculating reliable classwide damages........... 20

    IV.   California common and constitutional law claims cannot support a nationwide class, and Plaintiffs cannot add new Washington law claims at class certification......... 24

**CONCLUSION** ...................................................................................................... **25**

1

## **<u>TABLE OF AUTHORITIES</u>**

2

**Page(s)**

3

**Cases**

4

*Alberghetti v. Corbis Corp.*,
5
263 F.R.D. 571 (C.D. Cal. 2010), *aff'd*, 476 F. App'x 154 (9th Cir. 2012) ...................................19

6

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)......................................................................................................................17

7

*Anderson Living Tr. v. WPX Energy Prod., LLC*,
8
306 F.R.D. 312, 439 (D.N.M. 2014), *adhered to on reconsideration,* 312 F.R.D. 620
(D.N.M. 2015)................................................................................................................................15
9

*Astiana v. Ben & Jerry's Homemade, Inc.*,
10
2014 WL 60097 (N.D. Cal. Jan. 7, 2014) ....................................................................................20

11

*Brown v. Google LLC*,
12
525 F. Supp. 3d 1049 (N.D. Cal. 2021) .......................................................................................18

13

*Campbell v. Facebook Inc.*,
315 F.R.D. 250 (N.D. Cal. 2016)..................................................................................................13
14

*Cave Consulting Grp. v. Truven Health Analytics Inc.*,
15
2017 WL 1436044 (N.D. Cal. Apr. 24, 2017) ..........................................................................8, 24

16

*Clear Channel Outdoor, Inc. v. Bently Holdings Cal. LP*,
17
2011 WL 6099394 (N.D. Cal. Dec. 7, 2011) ...............................................................................16

18

*Comcast Corp. v. Behrend*,
19
569 U.S. 27 (2013)................................................................................................................*passim*

20

*Corvello v. Wells Fargo Bank N.A.*,
2016 WL 3995909 (N.D. Cal. Jan. 29, 2016) ..............................................................................12

21

*Cruz v. Dollar Tree Stores, Inc.*,
22
2011 WL 2682967 (N.D. Cal. July 8, 2011).............................................................................21, 22

23

*Davidson v. Hewlett-Packard Co.*,
2021 WL 4222130 (N.D. Cal. Sept. 16, 2021), *aff'd,* 2022 WL 17352186 (9th Cir.
24
Dec. 1, 2022)................................................................................................................................12

25

*Erica P. John Fund, Inc. v. Halliburton Co.*,
26
563 U.S. 804 (2011)......................................................................................................................19

27

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. May 19, 2025) ...............................................................13, 18, 19, 25

28

*Fukaya v. Daiso Cal. LLC*,
    2025 WL 2644747 (N.D. Cal. Sept. 15, 2025) .................................................................23

*Garrabrants v. Erhart*,
    98 Cal. App. 5th 486 (2023) ...............................................................................................12

*In re Google Inc. Gmail Litig.*,
    2014 WL 1102660 (N.D. Cal. Mar. 30, 2023).....................................................................19

*Gustafson v. BAC Home Loans Servicing, LP*,
    294 F.R.D. 529 (C.D. Cal. 2013) .........................................................................................25

*Hammerling v. Google LLC*,
    615 F. Supp. 3d 1069 (N.D. Cal. 2022) ...............................................................................12

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ...............................................................................................17

*Hart v. TWC Prod. & Tech. LLC*,
    2023 WL 3568078 (N.D. Cal. Mar. 30, 2023).....................................................................22

*Jovel v. Boiron, Inc.*,
    2014 WL 1027874 (C.D. Cal. Feb. 27, 2014).......................................................................19

*Just Film, Inc. v. Buono*,
    847 F.3d 1108 (9th Cir. 2017) .............................................................................................17

*Katz-Lacabe v. Oracle Am., Inc.*,
    668 F. Supp. 3d 928 (N.D. Cal. 2023) .................................................................................25

*Kim v. Allison*,
    87 F.4th 994 (9th Cir. 2023) ...............................................................................................18

*Libeman v. Prupes*,
    2015 WL 3823954 (C.D. Cal. June 18, 2018) ....................................................................24

*Lierboe v. State Farm. Mut. Auto. Ins. Co.*,
    350 F.3d 1018 (9th Cir. 2003) .............................................................................................11

*Martell v. Antelope Valley Hosp. Med. Ctr.*,
    79 Cal. Rptr. 2d 329 (1998) .................................................................................................18

*May v. Gladstone*,
    562 F. Supp. 3d 709 (C.D. Cal. 2021) .................................................................................19

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ...............................................................................................24

*New Jersey v. T.L.O.*,
    469 U.S. 325 (1985) (Powell, J., concurring) ......................................................................14

*Nguyen v. Nissan N. Am., Inc.*,
    487 F. Supp. 3d 845 (N.D. Cal. Sept. 13, 2020) ...................................................................17

*Opperman v. Path, Inc.*,
    2016 WL 3844326 (N.D. Cal. July 15, 2016) .......................................................................25

*Perrine v. Sega of Am., Inc.*,
    2015 WL 2227846 (N.D. Cal. May 12, 2015) .......................................................................23

*Rojas v. Bosch Solar Energy Corp.*,
    2022 WL 717567 (N.D. Cal. Mar. 9, 2022) ..........................................................................24

*Small v. Allianz Life Ins. Co. of N. Am.*,
    122 F.4th 1182 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2852 (2025) ...........................17

*Torres v. Nutrisystem, Inc.*,
    289 F.R.D. 587 (C.D. Cal. 2013) ...........................................................................................11

*Valenzuela v. Union Pac. R.R. Co.*,
    2017 WL 679095 (D. Ariz. Feb. 21, 2017), *vacated in part* (Mar. 3, 2017), *opinion
    reinstated*, 2017 WL 1398593 (D. Ariz. Apr. 19, 2017) ......................................................19

*Waine-Golston v. Time Warner Ent.-Advance/New House P'ship*,
    2012 WL 6591610 (S.D. Cal. Dec. 18, 2012) .......................................................................24

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................................................*passim*

*White v. Symetra Assigned Benefits Serv. Co.*,
    104 F.4th 1182 (9th Cir. 2024) ...............................................................................................11

*Xsolla (USA), Inc. v. Aghanim Inc.*,
    2025 WL 1222196 (C.D. Cal. Apr. 28, 2025). .....................................................................24

**Statutes**

20 U.S.C. § 1232(g) ...................................................................................................................5, 14

20 U.S.C. § 7908 ..............................................................................................................................3

16 R.I. Gen. Laws Ann. § 16-104-1(b) ..........................................................................................15

105 Ill. Comp. Stat. Ann. § 85/17 ....................................................................................................4

105 Ill. Comp. Stat. Ann. § 85/28 ....................................................................................................4

Ariz. Rev. Stat. Ann. § 15-1046 .......................................................................................................4

Cal. Bus. & Prof'l Code § 22584 ..................................................................................................4, 15

Cal. Code Civ. Proc. § 23 ........................................................................................2, 11, 19, 25

Cal. Code Civ. Proc. § 352 ..............................................................................................18

Cal. Educ. Code § 48645-48650 ......................................................................................15

Cal. Educ. Code § 49061 ...................................................................................................5

Cal. Educ. Code § 49073 ...................................................................................................5

Cal. Educ. Code § 49073.1 ..............................................................................................15

K.R.S. § 365.734(2) ....................................................................................................4, 15

Wash. Rev. Code Ann. § 28A.604.010............................................................................4, 15

Wash. Rev. Code Ann. § 28A.604.030(1) ..........................................................................4

**Rules**

34 C.F.R. § 99.31 .............................................................................................................3

34 C.F.R. § 99.33 .............................................................................................................3

**Other Authorities**

FTC, *COPPA and Schools*, https://perma.cc/TXL7-MVKJ ................................................14

FTC, *COPPA for EdTech*, https://perma.cc/2GFH-4JD9.....................................................14

Judicial Council of California Civil Jury Instructions (2025) CACI No. 1800 .....................................12

Public Interest Privacy Ctr., *State Student Privacy Laws*, https://perma.cc/MK9E-TZ4G .................14

## INTRODUCTION

Plaintiffs' motion for class certification barely resembles the Complaint's allegations that allowed them to survive dismissal. Plaintiffs seek certification only for California claims of invasion of privacy and unjust enrichment based solely on schools' ordinary usage of PowerSchool's data storage services and highly customizable analytics products—products that allow school administrators to do things like comply with state reporting requirements or address chronic absenteeism. Plaintiffs no longer assert that PowerSchool uses student data for its own product development, tracks students using cookies, sells data, or builds data-dossiers on students. In other words, Plaintiffs have abandoned the allegations this Court held sufficient to proceed past the motion to dismiss. *See* Dkt. 65 at 3-4, 6-7, 12. Plaintiffs also do not continue to claim that PowerSchool deceptively designs products or conducts targeted advertising. Gone are the allegations that PowerSchool wiretaps communications—in fact, Plaintiffs have withdrawn their CIPA wiretapping and CDAFA claims (Counts III and V) and their request for a Parent Class altogether. Plaintiffs relinquish their theories for good reason—discovery has proved them false. But even after their effort to manufacture a narrowed class capable of certification, Plaintiffs' motion fails.

Plaintiffs' new nationwide class definitions for one injunction class and two damages classes are based on two discrete legal theories:

(1) Students suffered an invasion of privacy purely because their school **used** PowerSchool's "**data warehouse products**," which allegedly store school records without student consent.

(2) Students suffered an invasion of privacy because their school **used** any of four "**student profiling and prediction products**" that offer schools the ability to draw "insights" from data or use predictive functionality via algorithms.[1]

Their class definitions rest *exclusively* on whether a school or district used certain PowerSchool products; they do *not* turn on whether an actual putative class member's data was ever actually stored in a PowerSchool product or was used to generate a prediction. Unsurprisingly, the proposed classes thus suffer a fundamental defect: They contain students whose data was *never* stored in, processed by, or analyzed using a PowerSchool product, refuting any possible claim of classwide harm. But even if data regarding a student was processed, the wide variability here—the tens of thousands of school districts, schools, and teachers that make individual choices regarding which products to use, in what scenarios, for

---

[1] PowerSchool does not use these product naming conventions or categories, but for ease of reference, PowerSchool uses Plaintiffs' labels in this motion.

which grades or classrooms, and what data to collect—destroys any notion of class cohesion.

Plaintiffs' hopelessly diverse proposed classes fail for four reasons: *First*, Plaintiffs cannot meet the commonality requirement of Rule 23(a)(2). While Plaintiffs pose supposedly common questions, the facts of this case preclude common *answers* as required by *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Answering whether students have a reasonable expectation of privacy depends on whether a putative class member's data was collected or used at all, whether the data was sensitive or private (as compared to data that is public by law, such as data covered by various state directory laws), whether the student's school notified the student or obtained consent, and what expectations are reasonable in light of the varied state laws governing the use of EdTech vendors. The record reflects significant variation on these issues, as extensively catalogued by PowerSchool's unrebutted expert, Dr. Hristina Bartlett, in the attached report. More generally, given the undisputed diversity in how schools use and configure the products, Plaintiffs fail to point to any common practice that holds their claims together.

*Second*, Plaintiffs are not typical or adequate as required by Rule 23(a)(3) and (4), and are each subject to disqualifying unique defenses. For S.G., PowerSchool does not host Seattle Public Schools' data for its data warehouse product. Seattle stores data on its own on-premises servers; data is **never sent** to PowerSchool. As to predictions, S.G. is atypical because her school generates its own analytics using outside consultants, not PowerSchool algorithms. There is also no evidence any predictions were made regarding S.G. As for L.M.C. and M.M.C., they have never used PowerSchool products, and there is no record evidence that PowerSchool hosts non-public or sensitive data about them. Regarding the predictions class, their district only licensed one product at issue for a one-year period. And there is no data from that product tied to L.M.C. or M.M.C. Worse, the Cherkins have a financial conflict of interest, as they are using this lawsuit to market their consulting business. The Concepcions provided false statements in the Complaint and discovery responses, undermining their credibility. *See* Dkt. 128.

*Third,* resolving Plaintiffs' claims would require countless individualized inquiries, failing the predominance standard required for Rule 23(b)(3) damages classes. Those inquiries include what relevant state EdTech laws apply, whether a student's school collected or analyzed their data, the choice-of-law provision included in the contract between the school and PowerSchool, whether a school hosts its own data, whether and how a school relies on or customizes predictions, what data a school imports into any

given product, whether the school shares that data with any third parties, and what types of disclosures or consent each school requires. These inquiries dwarf any common ones.

Moreover, their damages expert has provided no feasible or reliable method of calculating damages on a classwide basis. *See also* Dkt. 136 (*Daubert* motion). For the data warehouse classes, Plaintiffs' expert impermissibly assigns an arbitrary damages amount of $0.40 per class member regardless of the data stored (if any) about the putative class member. The expert bases this estimate on a contract PowerSchool never implemented concerning a product not within the proposed damages classes. Likewise, for the predictions class, Plaintiffs rely on an unjust enrichment model that assigns putative class members damages regardless of whether any school ever made a prediction about them.[2]

*Fourth*, California law cannot support nationwide classes because it applies only to individuals injured in California. For the data warehouse class, the supposed injury occurs where data is stored, which is either on each school's local servers or in ███████. For the predictions class, the supposed injury occurs when a school somehow changes the treatment of a student based on a data-based prediction. That injury would occur locally where the student lives (through the action of the school). Aware of these problems, Plaintiffs propose an alternative Washington state class using Washington law, but they did not plead Washington state law claims. Plaintiffs cannot use their motion to very belatedly amend their Complaint.[3]

For all of these reasons, the Court should deny Plaintiffs' Motion in full.

## BACKGROUND

**I. There is a complex and varied regime of state and local laws that govern EdTech privacy, thereby setting privacy expectations that differ significantly by location.**

Federal laws permit schools to share student data with EdTech providers without parental consent,[4] but in addition, there are *hundreds* of state and local regulations that govern EdTech. These state and local laws are as numerous and diverse as the locations they govern. Because Plaintiffs' new theory is

---

[2] PowerSchool is also moving to exclude Plaintiffs' other experts. *See* Dkts. 132, 134.
[3] Tellingly, Plaintiffs moved to amend their complaint in response to PowerSchool's Rule 11 Motion. *See* Dkt. 126. With the Court's leave, Dkt. 130, they are removing their CIPA and CDAFA claims, as well as other false allegations. Oddly, however, they did not move to add Washington claims or classes.
[4] The Federal Educational Rights and Privacy Act ("FERPA") permits schools to share student data with EdTech providers "without [parental] consent" if the provider performs a "service or function" that the school would have performed (e.g., recordkeeping) and does so "under the [school's] direct control." *See* 34 C.F.R. §§ 99.31, 99.33. Federal law also requires schools to share students' data (including name, address, date of birth, and degree) with military recruiters, employers, and colleges without parental consent, unless a student opts out. 20 U.S.C. § 7908.

that even schools' routine, contracted-for use of EdTech products for educational purposes invades student privacy, these varying laws that set privacy and notification requirements for EdTech directly affect what is a reasonable expectation of privacy in a given jurisdiction. *Cf.* Dkt. 65 at 3-6 (motion to dismiss order allowing invasion-of-privacy claims to proceed based on abandoned allegations that PowerSchool used data in a manner that exceeded "bona fide educational purposes").

For example, California's K-12 Pupil Online Personal Information Protection Act ("KOPIPA"), allows EdTech providers to use or disclose students' "personally identifiable information" *without parental consent* for any educational purposes or for certain "legitimate research purposes." Cal. Bus. & Prof'l Code § 22584(a)(3), (b), (e). The law even allows providers to develop student profiles for educational purposes. Cal. Bus. & Prof'l Code § 22584(a)(3), (b), (e). Washington law is similar. *See* Wash. Rev. Code Ann. §§ 28A.604.010, 28A.604.030(1). Other states, like Kentucky, are much more basic, allowing schools to contract for "cloud computing services" without parental consent but saying nothing more. K.R.S. § 365.734(2); *see* App. A (summarizing variation in state laws).

State laws also vary on what type of disclosures must be provided to parents and students. For example, some school districts (like West Contra Costa where L.M.C. and M.M.C. attend) condition the use of technology products on parents agreeing that "anything [students] do online is public and can be monitored" and that "[i]nformation stored on the district's network and school-based or district issued devices *are not private*."[5] These types of disclosures and agreements necessarily impact expectations of privacy—or a lack thereof. Arizona allows local education agencies to contract with EdTech providers so long as parents receive the ability to opt students out of using products. *See* Ariz. Rev. Stat. Ann. § 15-1046. Illinois requires schools to post EdTech vendor contracts or make them available for inspection, *see* 105 Ill. Comp. Stat. Ann. § 85/17, and requires the state board of education to develop a model notice that schools must use to provide notice to parents and students about such vendors. *Id.* § 85/28.

Further, as explained in Dr. Bartlett's unrebutted expert report,[6] individual schools have adopted unique policies on data collection, monitoring, disclosures, and consent. For example:

- Data public by law. FERPA broadly allows schools to publicize "directory information" without any

---

[5] Ex. 1, WCCUSD Handbook § 8.10A. Citations to "Ex. __" refer to exhibits appended to the declaration of O. Adendorff filed with this brief.
[6] Ex. 2, H. Bartlett Expert Rep. 57-63 (describing variations specific school policies).

consent but defers the decision of what qualifies as such information to state law and school policies. *See* 20 U.S.C. § 1232(g)(a)(5); *see also* Cal. Educ. Code §§ 49061(c), 49073.  A sampling of just five districts (including Plaintiffs' districts) shows that districts vary, with some choosing as few as 6 categories (Milwaukee) and others as many as 17 (Seattle, where S.G. attends school).[7]

- Disclosures concerning EdTech products and data categories.  Some districts (Seattle) disclose all EdTech products used (including PowerSchool products) and all data categories implicated.[8]  Other districts (Brownsville, TX) identify only the data categories stored, without identifying the vendor.[9]

- Parental consent.  Some districts (Chicago and Fairfax, VA) have decided that parents have the right to "know which authorized software is being used in the classroom" and to "provide consent to the use of [such] software."[10]  Other districts (West Contra where L.M.C. and M.M.C. attend) condition use of technology on agreement the district can consent to EdTech providers on students' behalf.[11]

Plaintiffs mention none of these various laws, nor do they accuse PowerSchool of violating them.

## II. Under specific individualized contracts, schools control their data and PowerSchool's actions.

Individual contracts with the school districts define the scope of data processing PowerSchool provides.  Specifically, schools execute a Main Services Agreement ("MSA") and a Data Privacy and Security Addendum ("DPA") to define the scope of PowerSchool's duties.[12]  Many contracts contain choice-of-law provisions that specify the governing law is the state in which the school is located.[13]

Per these contracts, student records belong to the school district.[14]  Schools are thus the data controllers, and PowerSchool processes data (if at all) only under their direction.  For example:

- Schools decide if and how to seek parental consent.  Schools agree to obtain any required "informed, voluntary, and verified consent from the relevant parent or guardian of the child or minor."[15]

- Schools decide data storage policies and practices.  As demonstrated *infra* pp. 7-8, schools heavily customize PowerSchool products as to the data elements stored, method of storage, and internal and external sharing practices.  Only the school can direct PowerSchool to share data with third parties.[16]

- Schools control data deletion.  As Plaintiffs acknowledge (at 4), PowerSchool must delete all data it hosts once a school terminates its subscription, at which point it transfers all hosted data to the school.[17]

---

[7] App. C; *compare* Ex. 3, PWRSCHL_00399986, at '992 (Milwaukee – labeling as non-private student name, awards, degrees, school, sports, and height/weight), *with* Ex. 4 (Seattle – labeling as non-private address, date of birth, email, enrollment status, grade, field of study, photo, telephone number, video, etc.).
[8] *See* App. B tbls 1-3 (comparing disclosures for 10 schools); Exs 4-7 (Seattle public disclosures).
[9] Ex. 8, PWRSCHL_00390447, at '454.  Plaintiffs summarily assert PowerSchool "never presented evidence to support" consent, Mot. 19, despite these and other documents cited in the Bartlett report.
[10] Ex. 9, PWRSCHL_00402348, at '349-50; Ex. 10, PWRSCHL_00403549, at '549; *see* App. B tbl. 1.
[11] *See* App. B tbl. 1; Ex. 1, WCCUSD Handbook § 8.10A.
[12] Ex. 11, PWRSCHL_00161580, '580-82 (DPA); Ex. 15, PWRSCHL_00162703 (MSA).
[13] Ex. 12, PWRSCHL_00162868, at '870, '878 (Seattle); Ex. 13, PWRSCHL_00163869, at '869, 874 (Gwinnett, Georgia); Ex. 14, PWRSCHL_00163924, at '927, 941 (Maine Department of Education).
[14] Ex. 11 at '581 (DPA); *see also* Ex. 15 at '706 (MSA, same); Ex. 16, Ahmad 110:21-111:14
[15] Ex. 11 at '582 (DPA); *see also* Ex. 15 at '706 (MSA, same).
[16] Ex. 11 at '581-82 (DPA); *see also* Ex. 17, Sharp 53:12-55:15; Ex. 18, Jaeger (12/5) 44:2-45:6.
[17] Ex. 11 at '584 (DPA); Ex. 16, Ahmad 124:17-126:8; Ex. 19, Flagg 71:2-17.

**III. The products at issue are inherently very different, and schools vary in how they use these products to store, analyze, or share their data.**

The nine products Plaintiffs challenge vary greatly in terms of purpose, capabilities, and user:

| Class | Product | Purpose | Capabilities | Users |
|---|---|---|---|---|
| **Data Warehouse; Injunction** | SIS (Ex. 25) | Enables schools to store records | Schools import, export, and store data, and generate reports | Staff |
| | Connected Intelligence (Ex. 26) | Enables schools to store data from disparate sources in a single server | Schools import, export and store any data from any source in a dedicated cloud location | Staff |
| **Predictions & Profiling; Injunction** | Analytics & Insights (Aragon Decl. Ex. 19) | Enables schools to visualize and analyze data | Schools graph data or run regression analyses | Staff |
| | Behavior Support (Aragon Decl. Ex. 20) | Enables schools to store and visualize behavioral data | Schools track and graph data on their preferred behavioral metrics | Staff |
| | Attendance Intervention (Ex. 20) | Enables schools to track and visualize attendance data, automate notices | Schools track and graph attendance data; alert parents if a student is absent | Staff |
| | Performance Matters (Aragon Decl. Ex. 21) | Enable schools to administer student assessments | Schools create, distribute, and collect student assessments; track and visualize results | Staff & students |
| **Injunction** | Schoology (Ex. 28) | Enables schools to create digital classrooms | Teachers create pages to share lessons and assignments, and collect and grade assignments | Staff, students, & parents |
| | Naviance (Ex. 27) | Enables schools to provide digital career counseling | Counselors and students explore and discuss post-graduation opportunities | Staff, students, & parents |
| | MTSS (Ex. 29) | Enables schools to store and visualize data on student success | Schools track and graph data on their preferred metrics for helping students succeed | Staff |

As the table above shows, students cannot even access two-thirds of the products in Plaintiffs' classes. Some products, like Naviance, only apply to older students, while others, like Schoology, can apply to students of all ages. Some products are for recordkeeping and compliance with reporting obligations. A representative from S.G.'s school district testified that without these products, it would be "very, very difficult" for the district to comply with its "state data reporting obligations."[18] Other products provide a variety of functions—*e.g.*, Attendance Intervention can enable schools to record and visualize attendance data and/or send alerts to parents to "reduce chronic absenteeism and increase daily attendance."[19]

In the hope of manufacturing commonality among these diverse products, Plaintiffs claim (at 20) there "is no evidence that [schools] collect less data" than certain default fields configured in PowerSchool

---

[18] Ex. 18, Jaeger (12/5) 26:21-27:16.
[19] Ex. 20, PowerSchool's Webpage on Attendance Intervention.

products.  But this wishes away the actual record, which confirms there are *no* "minimum" data fields collected for any product.  *See also* App. B tbl. 3 (showing variation in data fields ten schools state they collect).  Each of Plaintiffs' experts admitted that there are no minimum data fields.[20]  In fact, Dr. Bartlett's unrebutted report contains 28 pages detailing the wide variation in data collection, including:

**Product implementation.**  PowerSchool's customer subscription data demonstrates over 950 unique product combinations, with individual products designed to store as few as 3 to as many as 100 data elements, before accounting for further customization.[21]  Seattle Public Schools (where S.G. attends) testified that the district uses third-party contractors to perform "extensive customization" in-house.[22]

**Data ingested.**  Plaintiffs assert (at 16, 20) that PowerSchool's products have "minimum" data fields based on a marketing website and Data Privacy Impact Assessments ("DPIA").  But PowerSchool's other unrebutted experts explained (and PowerSchool's corporate representative confirmed), these sources simply summarize ***possible*** product configurations.[23]  Even Plaintiffs' experts admit that "schools and their administrators could elect to make additions or deletions to those standard" fields.[24]  Indeed, the *only* data element the DPIAs identify as "common" across the products at issue in this case is "name."[25]

**Hosting.**  Schools subscribing to PowerSchool's products can choose to store all or nearly all of their data on their own servers (such that PowerSchool cannot access the data at all).[26]  S.G.'s district is a good example:  Seattle subscribes to multiple products but stores its records for its *only* "Data Warehouse" product (SIS) on its own servers and sets up its data on "[its] own."[27]  While Seattle still has PowerSchool host some data for a few other products, Seattle's approach means that *PowerSchool does not have* S.G.'s social security number, "grades, ranking, health treatment, medication, health symptoms, 'online account credential or information' [or] 'online user name and password,'" which Plaintiffs asserted were "uniform data [elements] taken by the relevant PowerSchool products."[28]

---

[20] Ex. 21, Schulte 203:2-17; Ex. 22, Barber 103:12-107:15; Ex. 23, O'Neil 123:14-24, 135:1-136:12.
[21] Ex. 24, Bartlett Rep. Exhibit 2.
[22] Ex. 18, Jaeger (12/5) 73:12-74:11, 74:25-76:10.
[23] Exs. 25-29 (sample of DPIAs); Ex. 30, White Rebuttal Rep. 4-5; Ex. 19, Flagg 61:22-63:7.
[24] Ex. 21, Schulte 205:15-206:7; Ex. 22, Barber 176:18–176:22; Ex. 23, O'Neil 121:5-121:24; 71:23-72:3.
[25] App. D (summary table of DPIA elements for 9 products).  Two products, Analytics & Insights and Connected Intelligence, are designed to ingest any data element a school identifies.  Ex. 26, PWRSCHL_00644385 (Connected Intelligence); Aragon Decl., Ex. 19 (Analytics & Insights).
[26] Ex. 16, Ahmad 99:15-101:10 (████ of schools host SIS on premises); Ex. 31, Shinton 45:22-46:5.
[27] Ex. 32, Jaeger (12/18) 18:4-24; 30:10-31:20, 38:2-42:19, 110:11-25; Ex. 16, Ahmad 309:8-11.
[28] *Compare* Mot. 20, *with infra* note 43 and accompanying text.

*Analytics.*  Plaintiffs' motion lacks any detail concerning what "analytics" PowerSchool provides. To be clear, the products in PowerSchool's "Profiling and Predictions" class do not provide some futuristic Gattaca-like functions.  Rather, PowerSchool's prediction products largely allow schools to visualize data (e.g., plotting overall attendance numbers on a graph) or run regression analyses on their own data to plot trend lines (e.g., if a student continues to be absent at the same rate, are they likely to have too many absences to graduate?).[29]  Individual schools work with PowerSchool to implement and validate their preferred models, and PowerSchool does not have any off-the-shelf models.[30]  Thus, no two analytical models are alike.[31]  Further, some schools (S.G.'s district) do not rely on PowerSchool for models at all; they purchase an empty product and design their own models with the help of independent contractors.[32]

*Data Sharing.*  The record consistently reflects that PowerSchool shares school's data *only* at the direction of and with express permission of the school.[33]  During its decades of working with over 10,000 districts, PowerSchool has worked with at least 214 publicly disclosed partners *at schools' direction*.[34] Schools' partnerships with these third parties vary, and schools decide which third parties (if any) will receive their data.[35]  *See* App. B at tbl. 2 (showing variation in disclosed third-party data recipients for ten schools).  Accordingly, there is tremendous variability in whether schools share any data and with whom.

**IV. Plaintiffs' individual circumstances demonstrate a lack of uniformity and unique defenses.**

*L.M.C. and M.M.C.*  L.M.C. and M.M.C. sued PowerSchool, claiming they used certain products on their school and home devices, but discovery proved those statements false.  These Plaintiffs attend school in West Contra Costa, CA, which licenses only one data warehouse product—SIS.[36]  Previously, West Contra licensed one predictions product, but the district cancelled its subscription after just one year

---

[29] *See* Ex. 33, White Expert Rep. 16-17; Ex. 34, Maharana 41:15-46:20.
[30] Ex. 34, Maharana 55:17-57:5.  Plaintiffs claim that such models exist because of their "algorithm expert's" *ipse dixit*.  Dkt. 132, Motion to Exclude O'Neil.  Their expert relies on her understanding of PowerSchool's marketing pages, and she did not investigate any actual algorithms or review deposition testimony from employees who designed the products at issue.  *See* Ex. 30, White Rebuttal Rep. 3, 6-9.
[31] Ex. 34, Maharana 46:14-47:10, 50:2-13.
[32] Ex. 18, Jaeger (12/5) 74:25-76:10; Ex. 32, Jaeger (12/18) 38:2-42:19, 105:21-107:16.
[33] Ex. 17, Sharp 30:21-33:16; Ex. 19, Flagg 334:19-337:6.
[34] Aragon Decl., Ex. 13, PowerSchool's Suppl. R&Os to ROGs 1, 4, and 5, at 17-18.
[35] Ex. 17, Sharp 53:12-55:15; Ex. 18, Jaeger (12/5) 44:2-11.
[36] Ex. 35, Excerpt of PWRSCHL_00008714.  West Contra never licensed Naviance, but one high school in the district—El Cerrito Senior High—did.  *See* Aragon Decl., Ex. 29.  L.M.C. and M.M.C. are years away from attending High School.

in 2022, and *PowerSchool found no data concerning Plaintiffs from that one-year license.*[37]  The school district licenses no other products in the "Profiling and Predictions" class.  L.M.C. and M.M.C. did not use any PowerSchool products themselves, and there is no evidence in the record of data PowerSchool hosts concerning them other than their names.[38]  In their written discovery responses and depositions, Plaintiffs could not identify any specific injury to L.M.C. or M.M.C.[39]

      *S.G.*  S.G. is a student in Seattle, WA, which licenses several PowerSchool products.[40]  As Plaintiffs acknowledge (at 8): "Notably, [Seattle] hosts much of its own data on-premise," meaning PowerSchool has no access to the data.  Seattle also designs predictive models *internally*, so PowerSchool has no control over the predictions Seattle creates using their data.[41]  Further, S.G. barely uses any EdTech products because Cherkin decided to opt her out.[42]  PowerSchool searched for data mentioning S.G. within any cloud-hosted portion of the products Seattle licenses, and found that PowerSchool has only basic directory information (name, gender, race, age, and school name), S.G.'s login statistics and requests for one student-facing product, and several excels of largely incomprehensible code her school tracks that only her school can interpret.[43]  There is nothing in the record suggesting that her data was shared with anyone.  In discovery, Plaintiffs could not identify any specific injury to S.G. other than vague concerns about her future employment and college prospects.[44]

      *No evidence of any data hosted in California.*  Plaintiffs also have no evidence that PowerSchool hosted their data in California.  When data is stored by PowerSchool (and not stored on premises by the

---

[37] Ex. 35, Excerpt of PWRSCHL_00008714.

[38] With WCCUSD's permission, PowerSchool allowed Plaintiffs to access WCCUSD's SIS data, but Plaintiffs rejected this offer.  Ex. 36, PowerSchool's R&Os to Inspection Request.

[39] Ex. 37, Concepcion 212:11-212:22; Ex. 38, L.M.C. 35:17-36:1; Ex. 39, M.M.C. 34:1-9; Ex. 40, Concepcion's R&Os to ROG 2 (reiterating the same speculative harms and identifying no specific injury); Ex. 41, L.M.C.'s R&Os to ROG 2 (same); Ex. 42, Pl. M.M.C.'s R&Os to ROG 2 (same).

[40] Ex. 35, Excerpt of PWRSCHL_00008714.

[41] Ex. 32, Jaeger (12/18) 38:2-42:19, 106:15-107:16, 114:22-118:11; Ex. 16, Ahmad 109:6-110:8.

[42] Ex. 43, Cherkin 149:1-150:3, 157:1-4; Ex. 44, S.G. 12:5-14:21, 20:25-21:4, 43:5-9, 62:9-19, 79:11-14.

[43] Ex. 45, PWRSCHL_00702678; Ex. 46, PWRSCHL_00702665; Ex. 47, PWRSCHL_00702666; Ex. 48, PWRSCHL_00702667; Ex. 49, PWRSCHL_00702668; Ex. 50, PWRSCHL_00702669; Ex. 51, PWRSCHL_00702682; Ex. 52, PWRSCHL_00702683; Ex. 53, PWRSCHL_00702671 to _00702676; Ex. 54, PWRSCHL_00702677.  The Schoology log shows the page that S.G.'s browser requested to access or to which it submitted the information, but it does not reflect the content of the submission.  *See* Ex. 55, Seattle Board Action Report – Schoology.  Seattle expressly asked PowerSchool to log such data. *Id*. at RFQ p. 8 of 15.  The analytics data logs suggest that PowerSchool is hosting some assessment data.

[44] Ex. 43, Cherkin 279:25-283:20; Ex. 44, S.G. 96:3-97:8; Ex. 56, Cherkin's R&Os to ROG 2 (reiterating the same speculative harms and identifying no specific injury); Ex. 57, S.G.'s R&Os to ROG 2 (same).

1    school or district), the servers are in ████.[45]

2        ***Circumstances unique to Plaintiffs.***  The Cherkins run a consulting business to convince parents

3    and schools to minimize student screentime.[46]  Since the filing of this lawsuit, the Cherkins have added

4    several paid offerings to schools and parents, including litigation consulting services.  The Cherkins have

5    advertised those services by directly referencing this litigation.[47]  As for the Concepcions, they filed suit

6    based on false representations concerning their use of PowerSchool products, *see* Dkts. 127, 128.

7    **V.  After discovery closed, Plaintiffs pivoted legal theories.**

8        Plaintiffs' Motion varies significantly from the Complaint.  They no longer assert PowerSchool

9    deceptively designs products, conducts targeted advertising, uses student data for product development,

10   tracks students using cookies, exposes children to dangerous content, intercepts communications, or

11   eavesdrops on communications.  Thus, Plaintiffs no longer allege the very reasons the Court allowed their

12   claims to proceed to discovery.  *See* Dkt. 65 at 3-6, 8, 9-10.  In fact, Plaintiffs' Motion never asserts

13   PowerSchool does anything for non-educational purposes or without school permission.[48]

14       Plaintiffs are now only pursuing intrusion upon seclusion under California common law, invasion

15   of privacy under the California Constitution, and unjust enrichment.  They seek to certify one nationwide

16   injunctive class, alleging PowerSchool has "allow[ed] the collection, use, sale, and solicitation of student

17   data using the Data Warehouse Products, and … s[old] and us[ed] its [Prediction] Products despite not

18   having consent to use student data to generate insights and predictions about students."  Mot. 25.  They

19   also seek two nationwide damages classes—one based on the collection, processing, and storing of data

---

[45] Ex. 16, Ahmad 218:7 (identifying server location except in cases of emergencies).
[46] Ex. 43, Cherkin 32:4-22, 34:19-35:22, 40:9-14.
[47] *Id.* at 33:11-34:2, 49:20-25, 58:10-62:5.
[48] Without these allegations, Plaintiffs now rely on a vague assertion that PowerSchool "monetize[es]" data.  *See* Mot. 21.  But there is no evidence that PowerSchool "monetized" student data outside of its contracts with schools.  Since 2021, PowerSchool earned approximately ████% of its revenue from school districts paying for subscription and support services (i.e., product licensing and technical support); ████% from individual services sold to schools (e.g., training); and ████% from hardware sales and licensing arrangements.  Ex. 58, PWRSCHL_00003828, at 3926; Aragon Decl. Ex. 12, PWRSCHL_00005197, at '64-65.  While Plaintiffs speculate (Mot. 2 n.11) that licensing revenue might reflect payment for student data, discovery proved otherwise; undisputed testimony shows that such revenue reflects other school vendors paying PowerSchool to license and receive support for proprietary software code so that *schools can share data* with those vendors under the schools' full control.  Ex. 17, Sharp 32:17-33:16.

in the Data Warehouse products and the other based on the use of student data to produce "predictions and insights" in the Predictions products. *Id.* at 6. In the alternative, Plaintiffs seek to certify California and Washington classes, and for the Washington classes, they seek to apply unpled Washington law.

Notably, Plaintiffs' Complaint alleged only intrusion upon seclusion nationwide. *See* Dkt. 1 at 69. Plaintiffs pled the other two claims "on behalf of the California Parent Class and California Student Class" only. *Id.* at 82, 85. The Complaint never mentioned a Washington class or Washington law.

## ARGUMENT

Plaintiffs bear the burden of satisfying each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b). *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1191 (9th Cir. 2024). The Court must subject Plaintiffs' evidence to a "rigorous analysis," "prob[ing] behind the pleadings" and considering "the merits of [the] underlying claim[s]." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-94 (2013). Here, Plaintiffs cannot satisfy commonality, typicality, or adequacy as required by Rule 23(a) for all classes, or predominance as required by Rule 23(b)(3) for the damages classes.[49] Moreover, their California claims cannot support nationwide classes, and their last-ditch attempt to amend their Complaint through class certification should fail.

## I. Each proposed class lacks the commonality necessary under Rule 23(a) because the factual record proves there is no common answer to any central question.

Commonality requires not just common questions, but "the capacity of a class-wide proceeding to generate common answers *apt to drive the resolution of the litigation*." *Dukes*, 564 U.S. at 350; *Torres v. Nutrisystem, Inc.*, 289 F.R.D. 587, 591 (C.D. Cal. 2013). Plaintiffs must demonstrate there is a "common contention" that is "capable of classwide resolution" such that the "determination of its truth or falsity will resolve an issue … central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

In less than a page, Plaintiffs claim they "easily satisfy" the commonality requirement based on ten questions—five for each proposed damages class. Mot. 15. This cursory argument can be "easily" disposed of. For starters, one question in each of these sets is whether PowerSchool "violated California

---

[49] Importantly, Plaintiffs' Motion fails at the outset for lack of standing, which "is the threshold issue in any suit" and a prerequisite to class certification. *Lierboe v. State Farm. Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003). As will be explained in PowerSchool's forthcoming Motion to Dismiss for Lack of Standing, Plaintiffs cannot prove that they suffered a concrete harm (to seek damages) or face an imminent, threat of irreparable harm (to seek injunctive relief). This is fatal to their case and the Motion. *Id.* 1022-23.

law," *id.*, which the Supreme Court has held is "quite obviously" too general to demonstrate commonality. *Dukes*, 564 U.S. at 350; *see also Corvello v. Wells Fargo Bank N.A.*, 2016 WL 3995909, at *6 (N.D. Cal. Jan. 29, 2016). None of Plaintiffs' eight remaining questions satisfies commonality, either.[50] As explained below, these questions address high-level generalizations that are unmoored from the elements of Plaintiffs' claims.[51] *See* Mot. 15, 18-21. Regardless, there are no common answers to the questions because there is tremendous variability regarding schools' use of PowerSchool products.

### A. There are no common answers to central questions regarding Plaintiffs' invasion of privacy claims.

Plaintiffs' privacy claims turn on two elements: "(1) the nature of any intrusion upon reasonable expectations of privacy, and (2) the offensiveness or seriousness of the intrusion, including any justification and other relevant interests." Dkt. 65 at 3. Both elements are highly dependent on the particular facts and circumstances surrounding the alleged intrusion, including the "customs of the time and place." *Garrabrants v. Erhart*, 98 Cal. App. 5th 486, 500 (2023); CACI 1800. For the second element, "[t]his District sets a high bar when assessing the 'highly offensive' requirement"; data practices constituting "routine commercial behavior" do not qualify. *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1088, 1090 (N.D. Cal. 2022). Even disclosure of personal information, such as social security numbers, does not necessarily constitute an "egregious breach of the social norms" to establish an invasion of privacy claim. *Davidson v. Hewlett-Packard Co.*, 2021 WL 4222130, at *4 (N.D. Cal. Sept. 16, 2021), *aff'd,* 2022 WL 17352186 (9th Cir. Dec. 1, 2022). Plaintiffs' proposed common questions ignore these foundational legal elements and the record evidence.

### 1. There is no common policy undergirding Plaintiffs' claims.

The lack of any common practice or policy here means there is no "glue" holding Plaintiffs' claims together that could produce a common question or common answer. *Dukes*, 564 U.S. at 352. Plaintiffs cannot manufacture commonality by pretending that PowerSchool is like any other app provider where

---

[50] Plaintiffs' remaining questions for its damages and injunction classes are: (A) for the Data Warehouse Class, "whether PowerSchool (1) uses the Data Warehouse Products to collect, process, and store student data; (2) offers that data to third parties [and] (3) shares that data with third parties; and (B) for the Prediction Class, "(1) whether PowerSchool, using the Student Profiling and Prediction Products, uses student data to produce prediction and insights about students; (2) whether the Student Profiling and Prediction Products were tested for accuracy, bias, or reliability, [and] (3) whether PowerSchool profited from its conduct." Mot. 15. Plaintiffs also ask for each class whether PowerSchool obtains consent. *Id.*
[51] PowerSchool maintains that unjust enrichment is not a standalone cause of action. *See* Dkt. 37 (MTD).

consumers use the same product based on the same privacy disclosures to share similar data, which the provider chooses to send to the same third parties. *See, e.g.*, *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 572-74 (N.D. Cal. May 19, 2025) (certifying class where "all plaintiffs and class members used the Flo App and were subject to the same app and SDK practices"); *Campbell v. Facebook Inc.*, 315 F.R.D. 250, 262 (N.D. Cal. 2016) (commonality based on Facebook's "uniform conduct" of "creat[ing] a share object every time a message is sent with a URL."). This is not that kind of case. The record is clear that over 10,000 individual school districts, which are governed by varying applicable state and local laws, mix and match many PowerSchool products in over 950 combinations, choosing between 3 and 100 data elements per product.[52] Schools individually negotiate contracts and customize products. Only they decide who receives access to their data. Thus, Plaintiffs "wish to sue about literally millions of [] decisions at once"—many of which are made by schools not a party to this case. *Dukes*, 564 U.S. 338, 352 (2011). Another California court already rejected as facially implausible that schools "all operate like a monolith" when it comes to EdTech, and even Plaintiffs admitted EdTech is "not done the same" by school districts, schools, or even teachers.[53]

Just taking the products the Named Plaintiffs' school districts license demonstrates the point. The only products both Plaintiffs' school districts used are SIS (Data Warehouse class) and Analytics & Insights (Predictions Class). But the two districts use these products differently. As for SIS, West Contra relies on PowerSchool to host its data, but Seattle hosts its data on *its own servers* without PowerSchool's involvement.[54] Thus, the answer to whether PowerSchool "uses the Data Warehouse Products to collect, process, and store student data" differs among even these two.

Regarding Analytics & Insights, West Contra only licensed the product on a one-year trial basis, and there is no data concerning L.M.C. and M.M.C. (or anyone else) in this product.[55] S.G.'s school district has licensed Analytics & Insights for years, but the district designs its own analytical models internally without PowerSchool's involvement.[56] That means there is also no common answer among Plaintiffs to whether PowerSchool "uses student data to produce predictions and insights about students."

---

[52] Ex. 2, Bartlett Expert Rep. 38-50; Ex. 24, Bartlett Expert Rep., Exhibit 2.
[53] Ex. 59, *Hernandez-Silva v. Instructure, Inc.* Hr'g Tr. 11:5-14; Ex. 43, Cherkin 162:10-163:9.
[54] Ex. 16, Ahmad 308:7-309:11.
[55] Ex. 35, Excerpt of PWRSCHL_00008714; Ex. 60, WCCUSD Board Approval for Hoonuit Pilot.
[56] Ex. 32, Jaeger (12/18) 38:2-42:19, 105:21-107:16, 114:22-118:11, 124:12-125:15.

1    Plaintiffs attempt to wave these differences away with the explanation that "all PowerSchool

2    products are shipped with a default set of data fields." Mot. 20. But the DPIAs they cite are only meant

3    to help schools understand the "features and functionalities available to them."[57] They do not reflect

4    mandatory minimum data fields; even the DPIAs state that actual data selection is "at the School/District's

5    discretion." *See supra* pp. 7-8. Plaintiffs' own schools do not process fields that appear in the DPIAs.

6    *Id.* at 8-9. The reality is there is no "default set of data fields," as Plaintiffs' experts admit. *Id.* at 7 n.24.

7    Plaintiffs cannot simply ignore uncontroverted evidence.

8                   ***2. There are numerous and varying expectations of privacy regarding EdTech use.***

9    Because Plaintiffs' new legal theory is that PowerSchool is invading students' privacy simply

10   because schools use EdTech products as intended, the Court must now consider the varying state and local

11   laws governing the normal use of EdTech to assess the relevant customs and social norms embedded in

12   Plaintiffs' invasion-of-privacy claims.

13   First, the Supreme Court has explicitly disagreed with Plaintiffs' basic premise, holding that

14   "students within the school environment have a lesser expectation of privacy than members of the

15   population generally." *New Jersey v. T.L.O.*, 469 U.S. 325, 348 (1985) (Powell, J., concurring). FERPA

16   and COPPA operate in this context, and importantly, both statutes permit schools to consent on behalf of

17   or instead of parents to the use of EdTech products.[58] In fact, Plaintiff Emily Cherkin has lamented this

18   reality publicly, stating in an article she co-authored that "state privacy laws are of little help when consent

19   for sharing is given—and FERPA allows schools to consent on parents' behalf."[59]

20   Moreover, and as explained in detail above, *supra* pp. 3-5 & App. A, there are a host of other state

21   and local laws Plaintiffs completely disregard. Since 2014, "state policymakers have passed nearly 150

22   student privacy laws in 47 states," creating a "complex landscape of state student privacy laws."[60] These

23   laws vary district to district, and they bear directly on reasonable expectations of privacy. For example,

24   California and Washington statutes put residents on notice that schools can, without parental consent: hire

25   _____
     [57] Ex. 30, White Rebuttal Rep. 4; Ex. 19, Flagg 61:22-63:7; Exs. 25-29 (sample of DPIAs).

26   [58] 20 U.S.C. § 1232(g); FTC, *COPPA for EdTech*, https://perma.cc/2GFH-4JD9 ("In the educational
     context, however, schools can consent on behalf of parents to the collection of student personal

27   information — but only if such information is used for a school-authorized educational purpose and for
     no other commercial purpose."); FTC, *COPPA and Schools*, https://perma.cc/TXL7-MVKJ.

28   [59] Ex. 61, Cherkin's The Hill Article.
     [60] Public Interest Privacy Ctr., *State Student Privacy Laws*, https://perma.cc/MK9E-TZ4G.

vendors for "digital storage, management, and retrieval of [student] records"; share student data with other agencies; and use EdTech providers to store, use, and share data with third parties. Cal. Educ. Code §§ 49073.1(a)-(b), 48645-48650; Cal. Bus. & Prof'l Code § 22584(a)(3), (b), (e); Wash. Rev. Code Ann. § 28A.604.010. And L.M.C and M.M.C's school sends an annual form to students and parents where they *agree* that they have *no expectation of privacy* at all in the information their school processes.[61] In contrast, Rhode Island and Kentucky have statewide laws permitting schools to contract with EdTech vendors only for "cloud computing services." 16 R.I. Gen. Laws Ann. § 16-104-1(b); K.R.S. § 365.734(2).

At the more local level, legislatures and school boards decide what data to publicly designate as public directory information, how much information a school must share about the use of EdTech vendors and data processing, and what consent rights to afford to parents.[62]

What all of this means for class-certification purposes is that Plaintiffs' questions cannot generate common answers that will "resolve an issue" central to their invasion-of-privacy claims: What is an objectively reasonable expectation of privacy regarding the specific student data at issue? The answer depends on the particular type of data, the particular locality and its laws, and the expectations set by a putative class member's school or school district's disclosure practices.[63]

### 3. The issue of consent is not common to the class.

The only questions left in Plaintiffs' list concern consent. Consent is an affirmative defense, and thus not "sufficient, on its own, to establish commonality." *Anderson Living Tr. v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 439 n.87 (D.N.M. 2014), *adhered to on reconsideration,* 312 F.R.D. 620 (D.N.M. 2015). Regardless, consent is also unanswerable on a classwide basis. Laws and practices differ from school to school. *See supra* pp. 3-5 & Apps. A-B. Once again, the differences between Plaintiffs confirm the point. L.M.C. and M.M.C's father annually signed school handbooks since 2021 agreeing that the school can consent to the use of EdTech providers on his behalf, listing specific data categories processed,

---

[61] Ex. 1, WCCUSD Handbook § 8.10A ("Information stored … [is] not private").

[62] App. B tbl. 1 (comparing disclosures from 10 schools); Ex. 2, Bartlett Expert Rep. 57-63, 72-75 (discussing variations); Ex. 1, WCCUSD Handbook § 8.10A (example of disclosures from West Contra); Exs. 5-7 (same, Seattle); Ex. 8, PWRSCHL_00390447, at '454 (Brownsville); Ex. 9, PWRSCHL_00402348, at '349-50 (Chicago); Ex. 10, PWRSCHL_00403549, at '549 (Fairfax) .

[63] Notably absent from Plaintiffs' questions are whether PowerSchool stored or analyzed data for non-educational purposes, beyond the parameters of a school's request, or beyond the requirements of the many local, state, and federal laws at play here. Plaintiffs do not ask these questions because there is no evidence to support such claims.

1    and disclosing categories of third parties who will receive the data.[64]    Seattle does not have a similar

2    handbook but instead posts on its website the list of PowerSchool products the district uses and an

3    agreement regarding the use of electronic resources, which states that "[n]o student or staff user should

4    have any expectation of privacy when using the district's network."[65]    Simply put, answering Plaintiffs'

5    consent questions requires looking at *each schools'* specific policies *and parents' actions in response*,

6    precluding the resolution of the consent defense "in one stroke."  *Dukes*, 564 U.S. at 350.

7            **B. There is no central question regarding Plaintiffs' unjust enrichment claim.**

8            As an initial matter, there is no commonality for the unjust enrichment claim for the same reasons

9    as the invasion-of-privacy claims.  The Court allowed unjust enrichment to proceed past the motion to

10   dismiss because "Plaintiffs have plausibly alleged severe intrusions on public-school students' privacy"

11   based on their allegations of tracking, building profiles, and selling data.  *See* Dkt. 65 at 12.  In other

12   words, Plaintiffs' remaining claims fall and rise together, so there is no commonality across the board.

13           Nevertheless, Plaintiffs also disregard the elements and evidence regarding their California "quasi-

14   contract" unjust enrichment theory by asking only "whether PowerSchool profited from its conduct."

15   Mot. at 15.  Tellingly, Plaintiffs do not specify what exact "conduct" is at issue, and their questions about

16   whether prediction products "were tested for accuracy, bias, or reliability" (which has nothing to do with

17   privacy) or were made "using data fed into" them are in the passive voice with no discernible subject.  *See*

18   *id.*  But the "conduct" at issue and the actor matter greatly because Plaintiffs' unjust enrichment claim

19   requires that PowerSchool obtain a benefit "*from the plaintiff* by fraud, duress, conversion, or similar

20   conduct."  *Clear Channel Outdoor, Inc. v. Bently Holdings Cal. LP*, 2011 WL 6099394, at *9 (N.D. Cal.

21   Dec. 7, 2011) (emphasis added).  Plaintiffs do not ask questions addressing how PowerSchool obtained

22   profits *from putative class members* (who never paid for products). Nor do they explain how they could

23   provide a common answer to whether data was taken from putative class members by "fraud," etc. given

24   that schools have widely different practices regarding notice.  *Supra* pp. 4-5 & App. B tbl. 1.  Thus,

25   answering Plaintiffs' highly abstracted question about whether PowerSchool profits when it sells a product

26   to schools does nothing to resolve Plaintiffs' unjust-enrichment claim.  All in all, Plaintiffs have not a

27

28   [64] Ex. 62, 2021-2022 WCCUSD Handbook at 132, 144-45.
     [65] Ex. 5, Seattle PowerSchool Products; Ex. 63, Seattle Policy 2022SP.

single common question that is central to their case and can be answered on a classwide basis.

## II.  Plaintiffs cannot meet the typicality or adequacy requirements of Rule 23(a) because they face unique defenses, and they have conflicts of interest.

Plaintiffs also fail to meet other core requirements of 23(a)—typicality and adequacy.  Typicality "ensures that the interest of the class representative 'aligns with the interests of the class.'"  *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017).  "The adequacy inquiry is addressed by answering two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1202 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2852 (2025).  A plaintiff who did not suffer the same injury as other putative class members is not typical or adequate.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).  Moreover, "[c]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *Nguyen v. Nissan N. Am., Inc.*, 487 F. Supp. 3d 845, 858-60 (N.D. Cal. Sept. 13, 2020).

Starting with typicality, Plaintiffs are atypical because they have no injury common to the class.  They assert that they and all putative class members "suffered injuries arising from" two privacy violations: "(1) their data was collected, processed, stored, and offered to third parties without consent for the Student Data Warehouse Class, and (2) that data was leveraged without effective parental consent to generate predictive analytics for the Student Profiling and Prediction Class."  Mot. 16.  But indisputable evidence concerning these Named Plaintiffs shows the opposite:

| | L.M.C. and M.M.C. | S.G. |
|---|---|---|
| *Does PowerSchool host any data concerning Plaintiffs in "Data Warehouse" products?* | **No evidence** in the record on this question, as Plaintiffs did not use PowerSchool products directly, and Plaintiffs chose not to take discovery regarding their school's use. | **No.**  PowerSchool does not host any data for Seattle in a Data Warehouse product (i.e., SIS). |
| *Does PowerSchool offer Plaintiffs' data to third parties without consent?* | **No evidence** in the record on this question (though evidence shows schools, not PowerSchool, direct all sharing). | **No evidence** in the record on this question (though evidence shows schools, not PowerSchool, direct all sharing). |
| *Did PowerSchool generate predictive analytics using Plaintiffs' data?* | **No.**  No data from L.M.C. or M.M.C. in any analytical product, and district only purchased one-year trial. | **No.**  The school attested to designing its own analytics. |

*See supra* pp. 8-9.  Thus, there is no evidence Plaintiffs suffered the alleged classwide injuries.

1    Moreover, Plaintiffs are subject to unique consent and statute of limitations defenses:

2    ***Consent***. "Actual consent" is a defense if "the disclosure explicitly notifies users of the conduct at

3    issue." *Frasco*, 349 F.R.D. at 574-75 (cleaned up). L.M.C. and M.M.C's district, West Contra, licenses

4    only one of the nine products listed in the class definitions (SIS—a "Data Warehouse" product), so the

5    sole issue for the Concepcions is whether they consented to "their data [being] collected, processed, stored,

6    and offered to third parties." Mot. 16. The Concepcions agreed to West Contra's handbook, which: (i)

7    stated the children's records would be stored in a PowerSchool product, (ii) detailed the precise categories

8    of information stored "on [the] [SIS]," (iii) explained that the district cooperates with community agencies

9    like "the community police," and (iv) listed fourteen categories of records the district would make

10   "available to various persons, agencies or institutions."[66] The handbook even expressly states the school

11   will "consent to the collection of personal information on behalf of all of its students."[67]

12   ***Statute of Limitations***. Plaintiffs' claims are subject to a two-year limitations period and are

13   therefore barred if they arose before May 6, 2022. *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1069

14   (N.D. Cal. 2021). Plaintiffs learned of PowerSchool's data processing between 2019 and 2021, as the

15   Cherkins have been advocating against PowerSchool since 2019, and the Concepcions have been signing

16   the handbook mentioned above since at least 2021.[68] All of their claims are thus barred. While Plaintiffs

17   may cite California Code of Civil Procedure § 352(a) to argue all minors' claims are tolled, these

18   provisions do not apply to government agents like PowerSchool. *Martell v. Antelope Valley Hosp. Med.*

19   *Ctr.*, 79 Cal. Rptr. 2d 329, 333 (1998) (citing Cal. Code Civ. Proc. § 352(b).). Regardless, Plaintiffs must

20   litigate these specific defenses.

21   Regarding adequacy, Plaintiffs cannot meet this requirement because they face conflicts of

22   interest. *See Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023). The Cherkins earn revenue for their

23   consulting business in part by marketing their involvement in this case. The Cherkins therefore have a

24   financial incentive to take positions that better advertise their business, rather than those that would curtail

25   the litigation (like settlement) or are otherwise in the interest of the class. *See May v. Gladstone*, 562 F.

---

26   [66] Ex. 62, 2021-22 WCCUSD Handbook at 6, 14, 22, 35, 126-27, 128, 132. At board meetings, West

27   Contra was explicit that it would use "PowerSchool [as its] central data source," affecting data on "[a]ll
     students and their families, all teachers and all staff." Ex. 64, Sept. 9, 2020 WCCUSD Ecollect Contract.
     [67] Ex. 62, 2021-22 WCCUSD Handbook at 6, 145

28   [68] Ex. 43, Cherkin 133:4-8, 148:9-21; Ex. 62, 2021-2022 WCCUSD Handbook at 144.

Supp. 3d 709, 713 (C.D. Cal. 2021); *Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 580 (C.D. Cal. 2010), *aff'd*, 476 F. App'x 154 (9th Cir. 2012). The Concepcions have a conflict because they made false allegations in the Complaint and falsely attested during discovery that they used PowerSchool's products, despite lacking any legitimate basis for such a claim. *See* Dkts. 127, 128. *See Jovel v. Boiron, Inc.*, 2014 WL 1027874, at *3 (C.D. Cal. Feb. 27, 2014) (collecting cases where named plaintiff inadequate "because of credibility issues material to a case," and holding that plaintiff was inadequate because of his inconsistent statements in complaint versus deposition). Because Plaintiffs cannot meet the typicality or adequacy requirements of Rule 23(a), all of their proposed classes fail.

### III. Individual issues concerning the elements of Plaintiffs' claims predominate, and there is no classwide method to determine damages, precluding a damages class under Rule 23(b)(3).

For a court to certify a damages class, questions of law or fact common to class members "must predominate over any questions affecting only individual members." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Predominance requires common questions "be a significant aspect of the case that can be resolved for all members of the class in a single adjudication." *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *12 (N.D. Cal. Mar. 30, 2023). Further, the damages sought must be "capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. Here, Plaintiffs cannot prove predominance or a feasible method for calculating classwide damages.

#### A.    Individualized inquiries required dwarf anything common.

As explained above, Plaintiffs cannot satisfy commonality, so by definition they cannot satisfy the "more demanding" predominance standard. *Frasco*, 349 F.R.D. at 571. Plaintiffs' claims turn on numerous different products and individual practices at over 10,000 school districts. PowerSchool's consent defense also requires an individualized analysis of each school's consent and disclosure procedures. *See Valenzuela v. Union Pac. R.R. Co.,* 2017 WL 679095, at *9 (D. Ariz. Feb. 21, 2017), *vacated in part* (Mar. 3, 2017), *opinion reinstated,* 2017 WL 1398593 (D. Ariz. Apr. 19, 2017) (collecting cases where affirmative defenses, like notice or statute of limitations, "destroyed predominance"). Abridging PowerSchool's right to litigate individualized defenses would violate the Rules Enabling Act, which "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,'" namely PowerSchool's right to defend each student's claim fully. *See Dukes*, 564 U.S. at 367.

As the chart below demonstrates, all of this variation means that essentially every claim-dispositive issue will be highly individualized and there is no predominance of common issues:

| Issue | Summary of Evidence Showing Individualized Issues Predominate |
|---|---|
| **Privacy Expectation** (*supra* pp. 3-5 & Apps. A-B) | • Nearly every state has a different law concerning what schools are permitted to do without parental consent via EdTech providers.<br>• Every school has different practices regarding disclosures to parents' regarding district technology practices. |
| **Offensiveness of intrusion** (*supra* pp. 7-8, Apps. A-B) | • Each product functions differently, and schools/teachers/students' use of purchased products varies greatly.<br>• PowerSchool does not host any set of uniform data—even within any single product. Schools decide what data to collect, analyze, and use. |
| **Receipt of "unjust" benefit** (*supra* pp. 6-9) | • Each school uses the products differently, and each product has functionalities other than "predictions."<br>• Schools can generate their own analytics, as S.G.'s school does.<br>• There is no evidence regarding predictions of the Named Plaintiffs or whether schools tested the predictions they customized and ran. |
| **Causation** (*supra* pp. 6-9) | • Each school makes different decisions on what product to use, what data to store and how, who to share data with, what analytics to run, who those analytics are run on, and what action to take based on any "predictions." |
| **Consent** (*supra* p. 5 & App. B) | • The record shows variation regarding whether parents/students consent and/or what notice they received regarding the practices at issue. |

## B.    There is no common method for calculating reliable classwide damages.

Aside from their predominance problem, Plaintiffs cannot prove classwide damages. Plaintiffs offer two damages models through their expert, Christopher Schulte: (i) an "actual damages" calculation for the Data Warehouse class at $0.40 per class member; and (ii) an unjust enrichment calculation for the Predictions class, which is simply PowerSchool's total profits for the four "Predictions" products. Both fail for the same reasons: Neither captures damages attributable only to the alleged wrongdoing. *Comcast*, 569 U.S. at 35, 37. The Court should thus reject both. *See Astiana v. Ben & Jerry's Homemade, Inc.*, 2014 WL 60097, at *13 (N.D. Cal. Jan. 7, 2014) (denying certification for lack of "damages evidence").

*First*, Schulte's $0.40 per class member calculation is based on an irrelevant contract that was never implemented regarding a product (█████████) not in any damages class. Thus, his selected number is not just unreliable; it's inapplicable. To calculate actual damages, Schulte attempts to value the data stored for each class member by relying on a single comparator—████████████████████ ██████████████████████████████████████████████████████ (40 cents per student).[69] But PowerSchool and ████ never implemented the program contemplated.[70] Moreover, this

---

[69] Ex. 21, Schulte 188:12-24, 192:4-19.
[70] *Id*. at 232:8-10.

1  number does not account for the variance in the data processed for each class member.  Schulte even

2  conceded at his deposition that he has no basis to say PowerSchool and ███ would have assigned the

3  same monetary value to data from a different subset of students ████████████████████████

4  or different data ████████████████████████.[71]  He further conceded the ███

5  data is ***not*** the same as the student data stored, processed, or analyzed by the Data Warehouse products.[72]

6  Schulte nonetheless uniformly applies the $0.40 valuation to the entire class without regard to the product

7  at issue, the data fields processed, or even whether there was any transmission of data to PowerSchool in

8  the first place.  In other words, he simply *assumes* common damages, instead of actually providing a

9  common methodology for assessing actual damages.

10  The Supreme Court has rejected plaintiffs' attempts to certify a class based on a "Trial by Formula"

11  where plaintiffs measure damages for a "sample" and then apply the result uniformly across the class.

12  *See, e.g.*, *Dukes*, 564 U.S. at 366-67 (rejecting attempt to measure backpay for "[a] sample set of the class

13  members" to determine each class member's damages as impermissible "Trial by Formula"); *Cruz v.*

14  *Dollar Tree Stores, Inc.*, 2011 WL 2682967, at *6 (N.D. Cal. July 8, 2011) (decertifying due to plaintiffs'

15  proposal to measure individualized damages "in a formulaic manner").  Here, Schulte's "actual damages"

16  analysis is even worse because what he measures is the purported value of specific data ***never used***, based

17  on a program that was ***never implemented***, related to a product that is ***not at issue***.  Thus, it is not just that

18  his calculation is based on a limited sample of the class that cannot be appropriately extrapolated; his

19  sample is not relevant at all.  The Court should therefore reject Plaintiffs' argument (at 22), based solely

20  off Schulte's report, that this $0.40 is a common damages model.

21  ***Second***, Plaintiffs' unjust enrichment calculation for the Predictions class fares no better, as it is

22  based on unreliable assumptions and disregards differences in the products and their functionalities.[73]  For

23  this "model," Schulte took PowerSchool's revenues from four products and assumed based on "directions

24  from counsel" that PowerSchool would not have made *any* revenue from the products without the "alleged

25

---

26  [71] *Id.* at 192:14-24 (no basis to say ███ would value data from ████████████ students the same); *id.* at 188:17-20 (potential difference in the value ███ would assign to data of ████████████

27  ████████ is "[not] germane to [his] analysis.").
    [72] *Id.* at 206:8-14, 211:21-212:6.

28  [73] *Id.* at 81:4-7 (assumes products are entirely unlawful), 124:24-125:12 (no change to analysis even if products have lawful functions), 126:4-9, 131:23-132:5 (agreeing products have non-analytical functions).

wrongful conduct," i.e., allowing schools to use analytics functionality to analyze their students' data.

Schulte's own testimony undermines the assumptions in his model, as he admitted that the four products in the class definition (i) include non-analytics functionalities that he was asked to assume were lawful, (ii) include subproducts specific to teachers and school staff he admitted are lawful, and (iii) were used by schools to analyze data from only a subset of students, meaning some students were unharmed.[74] Schulte made no attempt to exclude profits attributable to lawful conduct nor from unharmed class members,[75] rendering his calculation overinclusive, unreliable, and insufficient to prove monetary damages through classwide proof.  *Comcast*, 569 U.S. at 37 (rejecting "a methodology that identifies damages that are not the result of the wrong" as incapable of establishing classwide damages).

Further, Schulte fails to explain the actual source of harm from the use of these products.[76]  In fact, his baked-in assumption that these products caused harm is pure speculation.  The motion and Plaintiffs' experts point to no actual analytical model that PowerSchool developed nor anyone harmed by such a model.   Indeed, Plaintiffs' designated analytics expert, O'Neil, testified at deposition that she has never analyzed a model relevant to this case and is unaware of any actual harm even though she asked Plaintiffs' counsel for instances of actual harm.[77]  She also conceded that the risks she discusses in her report are simply generalized harms that can occur from any algorithm—they are not specific to PowerSchool products.[78]  Yet Schulte simply accepts O'Neil's assumption—that perhaps some students could be harmed if the school uses a model in the future to discriminate against them—and uses it to support dividing up profits from four different products with varying functionalities among all students in the class.[79]  This assumption is fatal to Plaintiffs' damages model and thus Plaintiffs have "failed to satisfy their burden to set forth adequate methods of calculating damages and restitution."  *Hart v. TWC Prod. & Tech. LLC*, 2023 WL 3568078, at *13 (N.D. Cal. Mar. 30, 2023).

---

[74] *Id.* at  98:13-17 (no impact to opinion even if product was used by only a subset of students), 126:4-9, 131:23-132:5 (agreeing products have non-analytical functions), 126:10-127:2 (did not exclude revenue from communication tool), 160:3-10 (products contain functionalities specific to teachers/staff).
[75] *Id.* at 131:23-132:5, 242:23-243:7.
[76] *Compare* Mot. 9-10 (proposed class definitions), *and* Dkt. 1 at 85 (asserting unjust enrichment only for the California subclass), *with* Mot. Ex. A, Schulte Rep. 28, 40 (calculating nationwide damages from 2019 through 2025 for all "analytics").
[77] Ex. 23, O'Neil 62:2-63:1.
[78] *Id.* at 133:10-18, 129:13-130:13.
[79] Ex. 21, Schulte 47:18-48:4.

Plaintiffs' argument (at 23) that unjust enrichment does not require that individuals have "suffered a corresponding loss" is misplaced. A proper damages model would assign damages only to students who actually suffered this (hypothetical) injury, *see Comcast*, 569 U.S. at 37, and nothing about distributing all PowerSchool profits to all students in a school district that used any product that had any analytics functionality does that. Here, the purported injury appears to stem from schools using PowerSchool products that are "untested" and "generate life-altering predictions and insights." Mot. 23. But there is no evidence in the record that putative class members suffered this injury and thus it is inappropriate for Schulte to base an unjust enrichment calculation on the assumption that such injury occurred.

**Third**, on identifying *injured* class members, Schulte simply expresses a belief that PowerSchool *might* have records to identify such persons. He disavows any responsibility to do so and admits the calculation and identification of class members (injured or not) is beyond his scope.[80] Although he repeatedly asserts a final damages calculation is achievable later,[81] it is insufficient to assert a damages calculation "will be a simple mathematical task" or "one that [defendant] can … generate[]" at a later point in time. *See Fukaya v. Daiso Cal. LLC*, 2025 WL 2644747, at *4 (N.D. Cal. Sept. 15, 2025). [82]

**Finally,** Plaintiffs offer next to nothing on punitive damages. They simply assert (at 23) that there is "common evidence" about "defendant's conduct toward the class as a whole," making punitive damages measurable on a classwide basis. As noted above regarding commonality, there is no "common evidence" about any common conduct. Plaintiffs' inability to say anything else on the topic says everything.

---

[80] *Id.* at 153:1-11.

[81] *Id*. at 158:8-19.

[82] As a result of Plaintiffs' overbroad class definitions, the proposed classes also cannot be certified because putative class members—injured or not—cannot be identified. The class definitions depend on schools' uses of a product, but Plaintiffs claim harm on behalf of students. Mot. 1. Plaintiffs' expert cannot identify the number of people in the proposed classes (Ex. 21, Schulte 152:13-153:11), nor can any PowerSchool data do so since the classes clearly contain students whose data was never processed by PowerSchool. The problem is even more acute for the predictions products, since the record shows that schools design their own models without PowerSchool's knowledge or involvement, merely treating PowerSchool's products as a malleable tool for storage and internal use. Ex. 32, Jaeger (12/18) 38:2-42:19, 105:21-107:16, 114:22-116:1. *Schools* may know how they use PowerSchool products and whether those products are used for staff or students, but schools are not parties to this litigation. *Perrine v. Sega of Am., Inc.*, 2015 WL 2227846, at *3-4 (N.D. Cal. May 12, 2015) (Donato, J.) (denying class certification since defendant lacked records that could be used to ascertain class members and class members could not reliably self-identify).

**IV. California common and constitutional law claims cannot support a nationwide class, and Plaintiffs cannot add new Washington law claims at class certification.**

The Complaint is clear that Plaintiffs sued under California law only, asserting a "California common law" claim for intrusion upon seclusion on behalf of a nationwide class, Dkt. 1 ¶ 443, a California constitutional claim for invasion of privacy *only* "on behalf of the California" subclass, *id.* at 82, and unjust enrichment *only* "on behalf of the California" subclass, *id.* at 85. Plaintiffs, however, ask the Court to certify nationwide classes under all three claims or for Washington classes under Washington law. Thus, Plaintiffs use their motion to amend their Complaint without satisfying Rule 15 over a year after the deadline to amend has passed, after they just opposed PowerSchool's motion for leave to amend one affirmative defense, and after they just filed a motion for leave to amend their complaint on other grounds. Dkts. 126. The Court should reject this tactic. *See Waine-Golston v. Time Warner Ent.-Advance/New House P'ship*, 2012 WL 6591610, at *3 (S.D. Cal. Dec. 18, 2012) ("Plaintiffs may not certify a class based on claims not asserted in the complaint."); *Rojas v. Bosch Solar Energy Corp.*, 2022 WL 717567, at *4 (N.D. Cal. Mar. 9, 2022) (plaintiffs cannot broaden scope of class at class certification stage).

Moreover, Plaintiffs cannot have a nationwide class under California common law for intrusion upon seclusion—their sole remaining claim that matches their Complaint. *See* Dkt. 1 ¶ 443. Courts have refused to give "California common law" any "extraterritorial effect," *Cave Consulting Grp. v. Truven Health Analytics Inc.*, 2017 WL 1436044, at *7 (N.D. Cal. Apr. 24, 2017), applying it only to "conduct which gives rise to liability" that "occurs in California." *Libeman v. Prupes*, 2015 WL 3823954, at *7 (C.D. Cal. June 18, 2018). Plaintiffs allegedly injured by out-of-state conduct cannot invoke California common law.[83] *See Xsolla (USA), Inc. v. Aghanim Inc.*, 2025 WL 1222196, at *15 (C.D. Cal. Apr. 28, 2025). Application of California common law is particularly improper here, as the undisputed evidence shows that PowerSchool processes data in ███████, and Plaintiffs point to no conduct that occurred in California.[84] It is telling that all Plaintiffs say on this point is that PowerSchool is headquartered in the

---

[83] California's choice of law analysis supports the same. "California law may only be used on a classwide basis if the interests of other states are not found to outweigh California's interest in having its law applied." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 590 (9th Cir. 2012). Under California law, "the place of the wrong"—state "where the last event" giving rise to liability"—"has the predominant interest" "with respect to regulating or affecting conduct within its borders[.]" *Id.* at 593.

[84] Ex. 16, Ahmad 218:7. While this Court certified common law and Constitutional claims in *Flo*, neither side briefed the applicability of California common law and Constitutional law to out-of-state plaintiffs.

1    state, *see* Mot. at 12, which is insufficient to justify applying California law to out-of-state residents. *See*

2    *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 948 (N.D. Cal. 2023).[85]

3         Plaintiffs attempt to get around these fatal facts by wrongly contending (at 12-14) PowerSchool

4    consented to have California law govern via its *corporate* website's Terms of Use ("ToU"). First,

5    Plaintiffs all testified they never visited the website and thus they could not have accepted the ToU.[86]

6    Indeed, there is no evidence *any* student accepted the ToU. Nor is equitable estoppel appropriate here, as

7    PowerSchool does not seek to enforce *any* provision of the ToU against class members.

8         But even if PowerSchool were bound by the ToU, Plaintiffs ignore that the ToU required

9    application of *New York* law through *August 2024*—months after Plaintiffs filed suit under California law

10    and years after the start of their proposed class definition.[87] Further, Plaintiffs gloss over that the current

11    version of the ToU requires the Court to apply the provision of the "license agreement[s] executed between

12    PowerSchool and [the school]."[88] Mot. 9. These agreements govern PowerSchool's relationship with end

13    users and the use of products, and they contain choice-of-law provisions requiring application of local

14    state law. For instance, S.G.'s school district's contracts require the application of Washington law,

15    contracts with Gwinnett County schools require the application of Georgia law, and contracts with the

16    State of Maine require the application of Maine law.[89] Thus, the ToU is irrelevant, and California law

17    does not apply to Plaintiffs' nationwide claims.

18                                        **CONCLUSION**

19         For all of these reasons, the Court should deny Plaintiffs' Motion in full.

---

*Flo* is also distinguishable because *Flo* defendants collected data in California, whereas PowerSchool
hosts or processes data for school districts – if at all – ████████. Ex. 16, Ahmad 218:7.

[85] As California law does not apply to Plaintiffs' nationwide classes their invasion-of-privacy and unjust
enrichment claims are subject to state laws across the country. There are material differences between
invasion-of-privacy claims in California and other states. *E.g.*, *Opperman v. Path, Inc.*, 2016 WL 3844326
at *9 (N.D. Cal. July 15, 2016). The same is true for unjust enrichment. *E.g.*, *Gustafson v. BAC Home
Loans Servicing, LP*, 294 F.R.D. 529, 548 (C.D. Cal. 2013) ("find[ing] that variances in state law and
individual fact issues defeat commonality and predominance on Plaintiffs' claim for unjust enrichment").
These differences are another reason Plaintiffs fail to satisfy Rule 23(b)(3)'s predominance requirement.

[86] Ex. 44, S.G. 75:3-7; Ex. 38, L.M.C. 47:24-48:16; Ex. 39, M.M.C. 36:20-37:6.

[87] Ex. 65, July 2015 Terms of Use (August 3, 2024 archive version).

[88] Aragon Decl., Ex. 46, 2024 Terms of Use at 'General Information; Governing Law.'

[89] Ex. 12, PWRSCHL_00162868, at '870, '878 (Seattle); Ex. 13, PWRSCHL_00163869, at '869, 874
(Georgia); Ex. 14, PWRSCHL_00163924, at '927, 941 (Maine). At a minimum, Plaintiffs' invocation of
contractual choice-of-law provisions would require an individualized inquiry as to each class member
concerning whether the member is subject to the ToU or another contract, and the applicable choice-of-
law provision.

1    DATED: March 9, 2026                          Respectfully submitted,

2                                                  KIRKLAND & ELLIS LLP

3                                                  */s/ Olivia Adendorff*

4                                                  Olivia Adendorff, P.C.

5                                                  Robyn E. Bladow
                                                   Kirkland & Ellis LLP
6                                                  555 South Flower Street, Suite 3700
7                                                  Los Angeles, CA 90071
                                                   Telephone: (213) 680-8400
8                                                  robyn.bladow@kirkland.com

9                                                  Martin L. Roth, P.C. (*pro hac vice*)
10                                                 Alyssa C. Kalisky, P.C. (*pro hac vice*)
                                                   Zharna Shah (*pro hac vice*)
11                                                 Amelia H. Bailey (*pro hac vice*)
                                                   Kirkland & Ellis LLP
12                                                 333 West Wolf Point Plaza
                                                   Chicago, IL 60654
13                                                 Telephone: (312) 862-2000
14                                                 martin.roth@kirkland.com
                                                   alyssa.kalisky@kirkland.com
15                                                 zharna.shah@kirkland.com
                                                   amelia.bailey@kirkland.com
16
                                                   Olivia Adendorff, P.C. (*pro hac vice*)
17                                                 Cristina Martinez Squiers (*pro hac vice*)
                                                   Eugene Temchenko (*pro hac vice*)
18                                                 Kirkland & Ellis LLP
                                                   4550 Travis Street
19                                                 Dallas, TX 75205
                                                   Telephone: (214) 972-1770
20                                                 olivia.adendorff@kirkland.com
                                                   cristina.squiers@kirkland.com
21                                                 eugene.temchenko@kirkland.com
22
                                                   *Attorneys for Defendant PowerSchool
23                                                 Holdings, Inc.*

24

25

26

27

28