Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
904 Rio Grande Street, Suite 100
Austin, Texas 78701
Telephone: (737) 351-5855
julie.liddell@edtech.law
andrew.liddell@edtech.law

Leonard W. Aragon (*pro hac vice*)
E. Tory Beardsley (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
leonarda@hbsslaw.com
toryb@hbsslaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| EMILY CHERKIN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>Defendant. | Case No.: 3:24-cv-02706-JD<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Judge: The Honorable James Donato<br><br><u>Hearing</u><br>Date: April 23, 2026<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................................... 1

   A.   PowerSchool makes several factual errors in its Opposition...................................................... 1

II.     ARGUMENT............................................................................................................................ 4

   A.   Plaintiffs Satisfy Rule 23(a)'s Commonality and 23(b)(3)'s Predominance Requirements. .................... 4

        1.   PowerSchool's "no common policy or practice" argument fails. ........................................ 4

        2.   Whether students have a reasonable expectation of privacy in their personal data under California law is a common question answerable by common proof................................................. 6

        3.   Whether PowerSchool's conduct is highly offensive to a reasonable person is an objective inquiry common to the class.......................................................................................... 7

        4.   Consent is a common question. ........................................................................................ 8

        5.   Causation does not require individualized inquiries because PowerSchool's product architecture is the common cause of the injury. .................................................................................... 9

   B.   Common Issues Also Predominate for Plaintiffs' Unjust Enrichment Claim........................................ 10

   C.   Plaintiffs Are Typical and Adequate Class Representatives..................................................................... 11

   D.   Damages Are Capable of Classwide Measurement. ................................................................................ 13

   E.   California Law Applies to the Nationwide Classes. ................................................................................ 14

   F.   Rule 23(b)(2) Certification Is Appropriate. ............................................................................................ 15

III.    CONCLUSION ........................................................................................................................ 15

REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION                                      3:24-cv-02706-JD

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brickman v. Fitbit, Inc.*,
No. 3:15-cv-02077-JD, 2017 WL 5569827 (N.D. Cal. Nov. 20, 2017)........................................................ 11

*Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*,
15-CV-02177-SI, 2017 WL 1436044 (N.D. Cal. Apr. 24, 2017) ................................................... 14

*In re Celera Corp. Sec. Litig.*,
No. 5:10-CV-02604-EJD, 2014 WL 722408 (N.D. Cal. Feb. 25, 2014) ....................................... 13

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)............................................................................................................13, 14

*Corral v. Staples the Office Superstore LLC*,
2023 WL 2347445 (C.D. Cal. Feb. 6, 2023) ...................................................................... 13

*Crypto Asset Fund, LLC v. OPSkins Grp. Inc.*,
478 F. Supp. 3d 919 (C.D. Cal. 2020) ............................................................................. 14

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011)........................................................................................... 12

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020)...................................................................................... 7, 11

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. 2025) ........................................................................... *passim*

*In re Google Inc.*,
No. 13-MD-02430-LHK, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ...................................2

*Leibman v. Prupes*,
2015 WL 3823954 (C.D. Cal. June 18, 2015)............................................................... 15

*Lytle v. Nutramax Lab'ys., Inc.*,
114 F.4th 1011 (9th Cir. 2024) ...................................................................................4

*N.J. v. T.L.O.*,
469 U.S. 325 (1985)..........................................................................................................8

*Parents for Priv. v. Barr*,
949 F.3d 1210 (9th Cir. 2020) ........................................................................................8

*Rogers v. Roseville SH, LLC*,
75 Cal. App. 5th 1065 (2022)........................................................................................9

REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION                    3:24-cv-02706-JD

*Shields v. Walt Disney Parks and Resorts US, Inc.*,
  279 F.R.D. 529 (C.D. Cal. 2011) ................................................................................................. 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) ................................................................................................. 7

*Van v. LLR, Inc.*,
  61 F.4th 1053 (9th Cir. 2023) ...................................................................................................... 5

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................................................................... 4, 6

*Ward v. United Airlines, Inc.*,
  No. 19-cv-03423-LB, 2021 WL 534364 (N.D. Cal. Feb. 12, 2021) ............................................ 15

**Statutes**

Cal. Code Civ. P. § 352(a) ............................................................................................................. 13

COPPA ............................................................................................................................................. 7

**Other Authorities**

Fed. R. Civ. P. 23 ................................................................................................................ 4, 6, 10, 15

Fed. R. Civ. P. 33 ............................................................................................................................. 2

REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION                    3:24-cv-02706-JD

### I.     INTRODUCTION

PowerSchool's opposition to Plaintiffs' motion for class certification ("Opposition") (Dkt. 138) is a masterclass in misdirection. Faced with undisputed evidence of a uniform corporate policy and practice of warehousing and monetizing the sensitive personal data of millions of K-12 students *without* obtaining effective parental consent—and ███████████ the prediction products powered by data obtained without consent—PowerSchool points to variations at the margins. But differences in school configurations, state directory-information designations, and handbook language do not defeat certification where *PowerSchool's own uniform conduct*—its company-wide policy of not seeking parental consent to collect data and not validating its prediction tools—gives the common answers to resolve this litigation.

The core facts remain undisputed. PowerSchool admits it never received informed, voluntary consent from parents for its data practices and instead relies on the representations of school personnel alone. PowerSchool further admits it shared student data with over 213 third parties. ██████████ ████████████████████████████████████████████████████████ ████████ These company-wide policies and practices apply uniformly to every class member, exactly the kind of common conduct that supports certification. PowerSchool's effort to manufacture individual issues from school-level variation fails as a matter of law, fact, and logic.

Finally, PowerSchool's argument that various legal standards govern Plaintiffs' claims and thus prevent classwide analysis is unsupported, as Plaintiffs establish that California law governs the putative nationwide class claims, and the alleged variations do not create substantive individual issues.

**A.     PowerSchool makes several factual errors in its Opposition.**

PowerSchool misstates Plaintiffs' legal theories. Plaintiffs allege the following:

(1) Students suffered an invasion of privacy because PowerSchool's products collect, store, and process student data without effective parental consent, and PowerSchool shared that data with over 213 third parties.

(2) Students suffered an invasion of privacy because schools use PowerSchool's ██████ Student Profiling and Prediction Products to make "insights" about students using student data obtained without effective parental consent.

Notably, PowerSchool's Opposition admits that there are many common questions that can be resolved classwide, such as (1) whether PowerSchool's Main Service Agreement and Data Privacy Security Addendum contracts with schools (which are uniform on salient issues) shield it from liability because the

REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION                          3:24-cv-02706-JD

contracts allow schools to decide "if and how to seek parental consent," "data storage policies and practices," and "data deletion" policies; (2) whether schools are "data controllers" based on the contracts; and (3) whether PowerSchool can eliminate students' rights in their data by simply stating that it "belong[s] to the school district" in its contracts, to which students and parents are not parties. Opposition ("Opp.") at 5. These issues are irrelevant, but present common questions if asserted as a defense to Plaintiffs' claims.

PowerSchool, moreover, unduly relies on its appendices and misstates certain facts:[1]

**Appendix A** lists "state law privacy and notification requirements." But conspicuously absent is any state law allowing PowerSchool's conduct. This case is not about laws allowing schools to share data with cloud-hosting partners, the right to contract with vendors, or vendor obligations. (App. A at 1). PowerSchool itself distinguishes between "third party processors" who are necessary to provide its services, such as Amazon Web Services (cloud storage) and Azure (data backup, storage, and processing), and other entities, such as third-party partners, with whom it is not necessary to share data. *See, e.g.,* Dkt. 119-1 at Ex. 13 at 16-25. This case is about the latter, not the former.

**Appendix B**, **Table 1** titled "disclosures and consent," ostensibly lists disclosures that permit PowerSchool's practices. Dkt. 138 at Appx. B at 1, 7-12. But this appendix contains no evidence that PowerSchool ever obtains effective parental consent to its data practices, and no such evidence exists. *See In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *13 (N.D. Cal. Sept. 26, 2013) (Disclosures must "explicitly notify" users of the conduct to provide actual consent). Miscellaneous statements about students' privacy when using the "district's network" or "district issued devices" is not consent. Dkt. 138 at Appx. B at 7-8.

**Appendix B**, **Table 2** identifies *when* data may be shared with third parties, *id.* at 2-3, 8-9, but nothing in that list attempts to reconcile it with third parties with whom PowerSchool shared data. This case is obviously not about "authorized government representatives," "appropriate persons in an emergency" or other similar entities or persons listed in the chart. Nor does PowerSchool point to anyone who allows the sharing of the baseline personal, sensitive data collected by PowerSchool's products, which is the crux of this case.

**Appendix B, Table 3** identifies data elements collected by schools that vary slightly, *id.* at 4-6, 8-12, but ignores that Baseline Data[2] is collected for each product. *Compare* Dkt. 119-1, Ex. 2 at 5 *with* Dkt. 138, Appx. B at 4-6 (PowerSchool's Data Privacy Assessment for its PowerSchool SIS product describing 31 baseline data elements collected by the product and summary of 10 districts collecting between 27 and 45 data elements but combining some elements (such as health information) into one category). Indeed, the school that allegedly collects the least amount of data, Los Angeles

---

[1] The Hristina Bartlett report is rife with errors, and Plaintiffs reserve the right to move to strike PowerSchool's experts' opinions and improper summaries of evidence prior to the Court's *Daubert* deadline.

[2] "Baseline Data," as explained in the Plaintiffs' Motion for Class Certification, means the data fields defined in PowerSchool's DPIAs and interrogatory responses asking PowerSchool to define data fields for each product. *See, e.g.,* Dkt. 119-1, Exs. 2-3, 6-8, 19-21 (DPIAs for each product); Dkt. 119-1 at Ex. 13 at 7 (Responding to interrogatory asking to identify data elements collected by each product: "…PowerSchool will produce, pursuant to Fed. R. Civ. P. 33(d), the Data Privacy Impact Assessments ('DPIAs') for each product identified in Interrogatory No. 1, *which identify the categories and uses of data relating to each such product*") (emphasis added).

2

Unified, still collects the same highly sensitive information such as health records, discipline and "incident" records, "DOB (verification document)," "special programs" the child is enrolled in, and standardized test scores. Dkt. 138, Appx. B at 4-6.

**Appendix C** is a useless document describing five schools that allow disclosure of directory information, a non-issue in a case alleging collection, storage, and use of Baseline Data without effective consent that far exceeds roster information.

**Chart on page six of Opposition** has a glaring error where it states that only staff can use ███████████████████████████████████████████████████████████████ Dkt. 119-1, Ex. 2 at 4; Ex. 3 at 4.

**Hosting**: Bartlett is incorrect that PowerSchool does not host Seattle Public Schools' data for its warehouse products. There is evidence ██████████████████████████████████████████████████████

**Minimum data fields**: PowerSchool claims that "Plaintiffs' experts admitted that there are no minimum data fields," (Opp. at 7), but Plaintiffs' experts were never tasked with determining whether there are "minimum data fields," as PowerSchool's own documents establish the Baseline Data elements taken by its products.

**Analytics**: PowerSchool argues that "Plaintiffs' motion lacks any detail concerning what 'analytics' PowerSchool provides," (Opp. at 8) but ignores that PowerSchool's own documents, cited in the Motion for Class Certification, state exactly what type of analytics the product produces. ██████████████████████████████ Dkt. 119-1, Ex. 19 at 4.

**The Concepción Family**: PowerSchool bizarrely claims that there is no evidence in the record of data PowerSchool hosts, that the children use PowerSchool's products, or damage suffered by the children, but Mr. Concepción testified as to the data he submitted to PowerSchool via the PowerSchool SIS and that he uses the product regularly, the PowerSchool documents showing the district subscribes to PowerSchool SIS and Naviance are in the record; Mr. Concepción received a notice that his data was affected in the PowerSchool data breach (confirming his data is held by PowerSchool), the children described what privacy means to them, and the interrogatory responses describe harms caused by PowerSchool. Dkt. 119-1, Exs. 24-30; 33-35; Dkt. 119, Ex. D; Dkt. 143-2; Dkt. 138-1, Exs. 40 at 2-4, 41 at 2-4, and 42 at 2-4.

**S.G.**: PowerSchool claims that it has no data about S.G. but then attaches spreadsheets with her data. It claims that it is largely "incomprehensible code" that only the school can decipher (Opp. at 9), ██████████████████████████████████████████████████████████████ It appears that PowerSchool wanted to say that there is no PowerSchool SIS data, but that is expected because SPS moved from PowerSchool hosting its data to Seattle hosting its own data. One would not expect PowerSchool to have S.G.'s SIS data given its claim that student data is deleted once a contract is terminated. SPS, however, contracts with PowerSchool to hold its data regarding Naviance and Unified Insights, and (as mentioned above) PowerSchool once hosted PowerSchool SIS data during

3

the class period. A reasonable inference is that the data in the spreadsheet identified by PowerSchool relates to Naviance and Unified Insights, as PowerSchool should not otherwise have S.G.'s data. PowerSchool also claims that S.G. never identified injuries, but that is plainly wrong—PowerSchool just disagrees with the alleged injury. *See* Dkt. 119 at n. 67-68; Dkt. 138-1, Ex. 57 at 3-4.

## II.   ARGUMENT

**A.   Plaintiffs Satisfy Rule 23(a)'s Commonality and 23(b)(3)'s Predominance Requirements.**

This Court assesses "Rule 23(a)(2) commonality and Rule 23(b)(3) predominance together, with a careful eye toward their differences as warranted." *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 574 (N.D. Cal. 2025) (Donato, J.) (cleaned up). The inquiry asks "whether the common, aggregation-enabling, issues in the case are more prevalent or more important than the non-common, aggregation-defeating, individual issues," *id.* at 571, and whether the "method of proof would apply in common to all class members." *Lytle v. Nutramax Lab'ys., Inc.,* 114 F.4th 1011, 1026 (9th Cir. 2024). Critically, "[e]ach element of a claim need not be susceptible to classwide proof," and "important questions apt to drive the resolution of the litigation are given more weight" over individualized questions "of considerably less significance." *Frasco*, 349 F.R.D. at 571–72. The commonality inquiry requires "a common contention . . . capable of classwide resolution" such that "determination of its truth or falsity will resolve an issue . . . central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

PowerSchool identifies five issues it contends defeat commonality and predominance: (1) that privacy expectations allegedly vary by state law and product use; (2) whether the intrusion is highly offensive varies by product or school; (3) the recipient of any unjust benefit varies by school; (4) causation varies because schools use its products differently; and (5) consent varies by school. Not one survives scrutiny.

### 1.   PowerSchool's "no common policy or practice" argument fails.

As a threshold matter, PowerSchool tries to obscure the issues by arguing that variations among school districts defeat commonality and predominance. This argument misconstrues Plaintiffs' claims and the applicable legal standard. The relevant actor here is PowerSchool, not the schools, and PowerSchool's uniform conduct—the conduct that gives rise to the claims—is not varied but common. Three common questions creating common answers central to the claims include:

- *Did PowerSchool obtain informed, voluntary consent from parents before collecting, storing, and sharing student data?* █████████████████

4

[BLACK REDACTION] Dkt. 119 at n. 24; Dkt. 119-1, Ex. 8 at 18-25 (confirming that PowerSchool does not obtain effective consent directly from parents).

- *Did PowerSchool test its Student Profiling and Prediction Products for accuracy, bias, or reliability before selling them to schools* [BLACK REDACTION]

- *Do students have a reasonable expectation of privacy in their personal information in the context of compulsory K-12 education?* This question is the same for every class member, as no evidence shows that PowerSchool obtained effective parental consent before taking, using, and sharing Baseline Data.

- *Is it highly offensive for a for-profit company to collect, store, and process Baseline Data, which includes sensitive personal records of minors, without their parents' knowledge or consent?* This objective question is the same for every class member, and the data the jury must consider is the same for each product. These are not questions whose answers vary by district—they are answered by PowerSchool's own uniform corporate policies and practices—and generate common answers that are central to each claim.

PowerSchool's reliance on school-level variation is a red herring. There is no evidence that schools collect less data than described in the DPIA and interrogatory responses; and the fact that some schools collect *additional* data elements is not a defense to Plaintiffs' claims. *Van v. LLR, Inc.,* 61 F.4th 1053, 1067 (9th Cir. 2023) (holding that opponent of certification must provide "sufficient evidence" that individualized issues bar recovery on at least some claims). That some schools collect more data does not impact the common question of whether data collected by the Baseline Data fields built into every product without effective consent is an invasion of privacy.

Nor is there any meaningful variation in Baseline Data. PowerSchool's own (1) DPIAs, created to summarize each product's data collection, storage, and processing, and (2) interrogatory response stating that the DPIAs represent the "categories and uses of data" for each product, identify a consistent Baseline Data collection across each relevant product, regardless of school-level customization. PowerSchool's argument that the only consistent data element is name (Opp. at 7) is baseless. The Data Warehouse Class has only two products at issue—PowerSchool SIS and Connected Intelligence. The two products have the exact same Baseline Data elements because Connected Intelligence pulls data from PowerSchool SIS. Similarly, the Student Profiling and Prediction Products use four sets of Baseline Data, and the data in each product is the same. At most, the jury will consider four sets of Baseline Data, one for each of the four products in the Student Profiling and Prediction Class, to determine whether that data satisfies the elements

5

of the claims. Even if the Baseline Data is insufficient to meet the elements of the claims, the question is common to all class members.[3]

And while the products in the Injunctive Relief Class have some variation in Baseline Data elements, there are only nine products, and the Baseline Data elements remain the same for each product. More importantly, predominance is not an element for an injunctive relief class. *See* Fed. R. Civ. P. 23(b)(2). The jury need only consider the Baseline Data elements for nine products. If the jury determines that the data collected by a certain product is insufficient to meet a claim, the product can be excluded from the final judgment.[4] As such, there can be no real dispute that there are common questions for the Injunctive Relief Class under the less stringent commonality standard of Rule 23(a).

PowerSchool's reliance on *Dukes* is misplaced. *Dukes* involved discretionary decisions made "in a largely subjective manner" and did not involve allegations that Wal-Mart had an express corporate policy against the advancement of women. 564 U.S. at 343-44. Here, Plaintiffs invoke a common corporate policy and practice that PowerSchool (1) does not obtain effective consent before collecting, storing, and processing student data, (2) collects the same Baseline Data for all products, and (3) ███████████ its predictive analytics products before unleashing them on students. These uniform policies and practices, absent in *Dukes*, support commonality and predominance.

### 2. Whether students have a reasonable expectation of privacy in their personal data under California law is a common question answerable by common proof.

When claims of common-law intrusion upon seclusion under California law and invasion of privacy under the California Constitution are brought on the same factual basis, "it is appropriate to assess the two claims together," with the Court considering "(1) the nature of any intrusion upon reasonable expectations of privacy, and (2) the offensiveness or seriousness of the intrusion, including any justification and other relevant interests." *Frasco*, 349 F.R.D. at 580 (cleaned up).

---

[3] To the extent these three questions defeat predominance, Plaintiffs ask that the Court modify the class to include only students whose district uses Unified Insights, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ (Schulte Report).

[4] And if the Court believes that it is too burdensome for the jury to consider nine products, the Court can simply include PowerSchool SIS as the only product for the Injunctive Relief Class as that product is used by ██████████████████████ Ex. 119 at n. 46.

REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION                    3:24-cv-02706-JD

PowerSchool argues that the existence of a reasonable privacy expectation varies across school districts because of (1) differing state laws and (2) school-level disclosure practices. The first point fails because Plaintiffs seek nationwide application of California law, so other states' laws are irrelevant, and a single standard will govern the analysis.[5] Further, PowerSchool's arguments as to when school vendors can take, use, and share student information without parental consent under California law go to the merits of Plaintiffs' claims, not whether their class may be certified. The second point fails because PowerSchool has adduced no evidence that *any* school has provided parents all disclosures necessary to support informed consent. *Frasco*, 349 F.R.D. at 575 (recognizing that defendants' burden is to "invok[e] individualized issues and provid[e] sufficient evidence that the individualized issues bar recovery on at least some claims, thus raising the spectre of class-member-by-class-member adjudication.") And even if it had, PowerSchool cites no law that it can unilaterally extinguish, by way of disclosures, the expectations of privacy expressly enshrined in federal laws such as FERPA and COPPA, especially when PowerSchool collects, uses, and shares protected student information on the basis of school authorization alone irrespective of parental consent. PowerSchool has thus failed to carry its burden.

### 3. Whether PowerSchool's conduct is highly offensive to a reasonable person is an objective inquiry common to the class.

PowerSchool argues that the "highly offensive" element varies because schools use its products for different purposes, some of which are legitimate educational ones. This argument, too, fails. The "highly offensive" element is evaluated under an objective standard. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606 (9th Cir. 2020) (applying "reasonable person" standard). What varies by school is *how much* data (always more) is collected and for what purpose—but the common, class-wide question is whether PowerSchool's own uniform conduct in collecting, warehousing, and monetizing student data without effective parental consent is highly offensive to a reasonable person. That question is answered the same way for every class member, because it concerns PowerSchool's conduct, not schools' conduct.

---

[5] If a nationwide class is not certified, then California and Washington law will govern the subclasses, and PowerSchool cites no material differences between those states' laws. PowerSchool is incorrect that Plaintiffs cannot assert claims under Washington law, as Plaintiffs reserved the right to do so (Dkt. 1, ¶ 421) and PowerSchool has not shown that this narrowing of the class definition would result in additional discovery or otherwise prejudice defendants. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 590–91 (N.D. Cal. 2010), amended in part, M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011).

REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION                    3:24-cv-02706-JD

The data at issue is uniformly and objectively sensitive. PowerSchool's DPIAs and interrogatory responses confirm that its products collect, at minimum, names, demographic data, academic records, behavioral assessments, and health-related information. Dkt. 119-1, Exs. 2-3, 6-8, 19-21 and 13 at 7. PowerSchool itself describes this data as ▮▮▮▮▮▮ Dkt. 119 at n. 9. Having recognized the extraordinary value of student data, PowerSchool cannot credibly argue that collecting and monetizing it without consent is merely "routine commercial behavior." Further, as this Court has observed, FERPA establishes that all students have a legally protected expectation of privacy in their education records. Dkt. 65 at 4. Student privacy is further protected under the Fourth and Fourteenth Amendments. *N.J. v. T.L.O.*, 469 U.S. 325, 341–42 (1985); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1222 (9th Cir. 2020). The offensiveness of PowerSchool's conduct is a common question resolvable by evidence of PowerSchool's uniform policies and practices—and unaltered by individual school product configurations.

In *Frasco*, this Court rejected a nearly identical argument. There, defendants contended that variations in information shared during users' onboarding necessarily resulted in "a variation in expectations of privacy." 349 F.R.D. at 582. This Court found that the defendants offered no evidence but "merely speculat[ed]" that different choices during onboarding necessarily entailed different expectations of privacy. *Id.* So too here. PowerSchool speculates that school-level product variations create different offensiveness assessments, but it presents no evidence that any school's product use makes the unconsented collection and monetization of children's sensitive data any less offensive to a reasonable person.

### 4. Consent is a common question.

PowerSchool argues that consent is non-uniform because different schools have different disclosure and handbook practices. But, as discussed, PowerSchool has produced no evidence that any school has provided parents legally sufficient information about PowerSchool's data practices as would be necessary to support informed consent. In fact, the evidence on which it relies shows that it does *not* seek parental consent and instead relies on the consent of schools alone. Dkt. 119-1, Ex. 8 at 23-25; Dkt. 138, Ex. 1. For example, nothing in the WCCUSD school handbook shows an agreement by parents to PowerSchool's data practices; rather, the handbook (falsely) informs parents that their consent is unnecessary and that student information is not private. *Id.* It does not even describe PowerSchool's data practices, let alone seek parental consent to them. *See Frasco*, 349 F.R.D. at 574-75 (recognizing that consent must be "actual" and "is only

effective if the person alleging harm consented 'to the particular conduct, or to substantially the same conduct' and if the alleged tortfeasor did not exceed the scope of that consent.") (citation omitted).

Further, compulsory attendance laws mandate school attendance for children, and there is no evidence that, when a school uses PowerSchool products, parents can ever prevent PowerSchool from taking, using, and sharing their children's personal information. Indeed, ██████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Dkt. 119 at n.13.

Finally, schools are not parents' agents as a matter of law (that would be a conservatorship), and schools' statements alone that they serve as parents' agents for consenting to PowerSchool's data practices are insufficient: it is PowerSchool's burden to prove that parents in fact have authorized schools to serve as their agents for this purpose, and no such evidence exists. *Rogers v. Roseville SH, LLC*, 75 Cal. App. 5th 1065, 1074 (2022) ("[C]onduct by the principal is essential to create the agency."); Restat. (Third) of Agency § 3.01 (an agent's authority stems only from, and is governed by, an agreement with the principal). Both evidence and law thus establish that PowerSchool never seeks—let alone obtains—effective parental consent before taking, using, and sharing student information, thereby foreclosing any individualized consent issues.

### 5. Causation does not require individualized inquiries because PowerSchool's product architecture is the common cause of the injury.

PowerSchool argues that causation varies because schools use its products differently—some run their own analytics, some store data on-premises, and some collect different data fields. But this ignores that Plaintiffs' claims are based on (1) the Baseline Data fields used in PowerSchool's products, not a school's choice to collect *additional* data, and (2) that the prediction products are ██████ not that schools alter the products to make new, untested algorithms. These injuries occur whenever a school uses a PowerSchool product and PowerSchool hosts and processes the resulting student data—regardless of how the school configures the product. The relevant class definitions are also carefully drawn to include only those students for whom PowerSchool hosts data, eliminating the on-premises hosting variation PowerSchool emphasizes with respect to S.G.'s school district's SIS data. ██████████████████████████████ ████████████████████████████████████████████ (Dkt. 119 at 8, n.56-59), making S.G. an appropriate representative for each class.

9

The Student Profiling and Prediction Class is the only class that includes schools that host their own data on premises (rather than on PowerSchool's servers). But that Class asserts that no student data collected without effective consent should be used in connection with PowerSchool's ▮▮▮ prediction products. PowerSchool provides districts who use the product baseline predictive algorithms, which it ▮▮▮ ▮▮▮ for accuracy or bias, and which require effective consent before they may be used to process student information. That some schools may tweak these algorithms does not obviate the need for consent. To the extent PowerSchool contends that some schools use its products in ways that are entirely benign, it is free to argue that at trial, although there is no evidence to support that argument. The existence of a potential defense for some class members does not defeat predominance where, as here, the central questions—such as whether PowerSchool collects and monetizes student data without effective consent— are answered by common evidence applicable to the class as a whole. *Frasco*, 349 F.R.D. at 572 ("Certification is permissible under Rule 23(b)(3) where one or more of the central issues in the action are common to the class and can be said to predominate even if other important matters will have to be tried separately.") (cleaned up).

**B.    Common Issues Also Predominate for Plaintiffs' Unjust Enrichment Claim.**

Unjust enrichment presents an equally common set of questions. Plaintiffs allege that PowerSchool sold and profited from its Student Profiling and Prediction Products—products that were ▮▮▮ for accuracy, bias, or reliability and fueled by student data taken without effective consent. The question of whether it would be unjust to allow PowerSchool to retain those profits is answerable classwide.

Using a strawman argument, PowerSchool argues there is no "central question" for unjust enrichment declaring that who received an unjust benefit differs by school. In fact, the unjust benefit at issue is not something received *by schools*—it is the revenue and enterprise value PowerSchool received by selling *to schools* ▮▮▮ prediction products powered by nonconsensually collected student data. Those revenues are centrally determined by PowerSchool's own pricing and sales records, without reference to any school's individual practices. Plaintiffs' damages expert, Christopher Schulte, calculated PowerSchool's unjust enrichment from its Student Profiling and Prediction Products using PowerSchool's own business records—a methodology applicable classwide.

As to the detriment, "California law recognizes a right to disgorgement of profits resulting from

10

unjust enrichment, even where an individual has not suffered a corresponding loss." *In re Facebook*, 956 F.3d at 599. The common question is whether PowerSchool should have sold and profited from these products at all, given that (1) they were ███████ and (2) plaintiffs and class members never gave effective consent for their data to be used to generate predictions. Both questions are resolved by common evidence. *See Brickman v. Fitbit, Inc.*, No. 3:15-cv-02077-JD, 2017 WL 5569827, at \*7 (N.D. Cal. Nov. 20, 2017) (Donato, J.) (unjust enrichment meets predominance where defendant's "conduct is the same as to all members of the putative class" because "it is difficult to conceive of any significant equitable differences between class members").

**C.    Plaintiffs Are Typical and Adequate Class Representatives.**

**The Concepción children are typical and adequate**: PowerSchool argues the Concepción children are atypical and inadequate because the family does not use PowerSchool's products and PowerSchool found no data for them, or anyone else, in the one-year the school used Unified Insights. The first argument is factually incorrect and the second is irrelevant. The Concepción children's school used PowerSchool SIS—a Data Warehouse product—and PowerSchool hosts the Concepción family's data. Dkt. 119 at 7-8, n.43-54; Dkt. 143-2, ¶¶ 10-11. The only evidence to the contrary is that the family was unable to identify—at deposition—the PowerSchool SIS website when it was shown to them and the children did not recall using the product. But Mr. Concepción described how his family used PowerSchool SIS, confirmed that he received notice that his family's data was likely compromised in the PowerSchool data breach (confirming PowerSchool has his family data), and explained that he did not recognize the website because he accesses it on his phone and uses a stored password so the website looked unfamiliar in print. *Id.*

Second, the district unquestionably used Unified Insights on a one-year trial basis and did not retain any data for any student after the trial ended. Opp. at 13. It is unclear how this makes the Concepción children atypical. The claims are not premised on retaining student data used by the prediction products, as data retention is not required to make a claim. It also does not follow that the products were not used to make predictions about the Concepción family or other students in the district. It means, at most, that the district did not retain the insights it created about students. It is reasonable to infer that the product was used in connection with the students' data during the year-long trial and that schools do not purchase products they do not use. Nothing more is required to make a claim.

11

PowerSchool's argument that the Concepción children are atypical because they consented to PowerSchool's conduct is baseless for the reasons already stated—the family did not give effective consent to PowerSchool's practices as they were never presented with those practices. *See*, e.g., Dkts. 138-49 (alleged disclosure by WCCUSD). As to adequacy, PowerSchool's statement that the Concepción family made false allegations is not supported by the record. *See generally* Dkt. 143.

**S.G. is typical and adequate:** PowerSchool argues S.G. is atypical because Seattle Public Schools ("SPS") hosts its SIS data on-premises and designs its own analytics models. But PowerSchool currently hosts SPS ████████████████████ on its servers and hosted SPS data collected using PowerSchool SIS data during the class period before SPS switched to hosting its own data. Those products, all hosted by PowerSchool, fall squarely within each respective Class. The current on-premise SIS-hosting does not make S.G. atypical; it is precisely why the class definitions are limited to instances where PowerSchool *hosts* the relevant data.

PowerSchool's argument that SPS designs its own analytics models does not change the fact that the underlying algorithms are ████ or that the alterations somehow make the underlying algorithms unbiased, reliable, and accurate. Again, this argument does not create individual issues because product modification does not defeat Plaintiffs' claim that the ████ product sold to schools that runs off nonconsensually collected data should not have been sold to class members' schools. The prediction products are still ████ and still serve as the data pipeline and infrastructure through which schools build and deploy student predictions. The injury is the same for S.G. and all other class members: student data flows through PowerSchool's ████ systems without effective parental consent to generate predictions about students. Whether PowerSchool's baseline algorithm or SPS's custom model of the baseline algorithm produces the final output, PowerSchool's ████ infrastructure is the conduit, and PowerSchool profits from the arrangement.

As to adequacy, PowerSchool's challenges Emily Cherkin's, not S.G.'s, adequacy by alleging her advocacy for student privacy creates a financial interest adverse to the Class. It does not. The adequacy inquiry asks whether class representatives have interests antagonistic to the class. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). Ms. Cherkin's interests are aligned with the Class interest: *winning this case for the Class,* not a settlement or outcome that benefits her at the Class's expense. Professional or

REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION                    3:24-cv-02706-JD

personal engagement with the subject matter of a lawsuit is not a conflict of interest. *Shields v. Walt Disney Parks and Resorts US, Inc.*, 279 F.R.D. 529, 555 (C.D. Cal. 2011) (disabled plaintiffs' "willingness to bring claims similar to those in this lawsuit against another company demonstrates [their] commitment to these issues [and] underscores [their] adequacy as class representatives.").

**The statutes of limitations**: PowerSchool's argument that Plaintiffs are atypical because their claims are barred by the statute of limitation is frivolous because (1) statutes of limitations for minors are tolled. Cal. Code Civ. P. § 352(a); (2) PowerSchool has failed to demonstrate it is a "government agent" exempt from the statute. *Id.* at §352(b) (exempting only those entities for whom a claim is required to be presented under California's claims against public entities statute); (3) PowerSchool's conduct as to each Plaintiff is a continuing violation; and (4) there is no evidence that any "defense" to typicality will become the focus of the litigation. *See Corral v. Staples the Office Superstore LLC,* 2023 WL 2347445, at *15 (C.D. Cal. Feb. 6, 2023) (rejecting typicality challenge because plaintiff raise plausible defense to SOL argument).

**D.    Damages Are Capable of Classwide Measurement.**

PowerSchool attacks Schulte's ▮▮▮ per-student actual damages figure for the Data Warehouse Class, arguing it is based on executed but unimplemented contracts for a product ▮▮▮ not in the damages class. This attack misunderstands the methodology. Schulte does not claim the ▮▮▮ contracts sets the precise value of every class member's data—he uses it as an arm's-length benchmark to establish a *minimum* fair market value for student data that PowerSchool shared with third parties without consent. The ▮▮▮ contracts, produced by PowerSchool and negotiated by PowerSchool, ▮▮▮ ▮▮▮ Thus, PowerSchool's *Comcast* objection fails because Schulte's actual damages model *is* tied to Plaintiffs' theory of harm: PowerSchool misappropriated the value of student data without consent. The fair market value of that data is the minimum Plaintiffs are owed. Any argument that variations exist in data collected go to allocation, not predominance. *In re Celera Corp. Sec. Litig.*, No. 5:10-CV-02604-EJD, 2014 WL 722408, at *4 (N.D. Cal. Feb. 25, 2014) (allocation of classwide damages does not cause individual issues to predominate).

PowerSchool's *Comcast* challenge to Schulte's unjust enrichment model fails because his methodology *is* tied to Plaintiffs' theory of liability. Plaintiffs contend that PowerSchool should not have sold the Prediction Products at all—because they were ▮▮▮ and use nonconsensually collected data—

13

REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION                    3:24-cv-02706-JD

and are entitled to disgorgement of all revenue earned from those products. Schulte's model does exactly that: it calculates PowerSchool's total revenues from the four Prediction Products over the class period using PowerSchool's own financial records. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), requires only that the damages model reflect the theory of liability, which it does.[6]

**E.      California Law Applies to the Nationwide Classes.**

PowerSchool's choice-of-law arguments fail for four reasons. First, PowerSchool expressly chose California law to govern disputes arising from end users' use of its products. Its Terms of Use ("ToU") expressly identify "students" and "parents" as "Users" and specify that California law governs their relationship with PowerSchool. PowerSchool cannot invoke that choice-of-law clause as a sword to require California-law adjudication against out-of-state students while simultaneously disavowing it to resist a California-law class action. *See Crypto Asset Fund, LLC v. OPSkins Grp. Inc.*, 478 F. Supp. 3d 919, 928 (C.D. Cal. 2020). Equitable estoppel[7] bars that maneuver.

Second, PowerSchool's argument that the injury occurs where data is allegedly stored— ▮▮▮ — mislocates the actionable conduct. The invasion of privacy at issue is PowerSchool's corporate *decision* to collect, commercialize, and monetize student data without parental consent, decisions made at PowerSchool's California headquarters. California has a strong interest in regulating the conduct of California corporations that exploit the private information of minors without consent, regardless of where server infrastructure happens to be located. As such, this case is meaningfully distinguishable from cases where the defendant had no California nexus beyond corporate registration.

Third, PowerSchool's argument that Plaintiffs' intrusion upon seclusion claim cannot be applied extraterritorially is not supported by its own case law. *See, e.g., Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, 15-CV-02177-SI, 2017 WL 1436044, at *6–7 (N.D. Cal. Apr. 24, 2017) (refusing to apply unfair competition and intentional interference claims extraterritorial because Plaintiff provided no authority extraterritorial application). As PowerSchool's own authorities state, the inquiry for whether state law can be

---

[6] Plaintiffs incorporate their responses to PowerSchool's motions to exclude Mr. Schulte, Dr. Cathy O'Neil, and Dr. Suzanne Barber as though fully set forth herein.

[7] Plaintiffs are not asserting a contract claim; they argue that California law applies based on equitable estoppel. As such, the fact that the contract once applied New York law is of no consequence as PowerSchool currently demands that all claims are brought under California law.

REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION                    3:24-cv-02706-JD

applied extraterritorially is whether the conduct giving rise to liability occurs in California, such as "critical decisions" giving rise to the suit. *Leibman v. Prupes*, 2015 WL 3823954, at *7 (C.D. Cal. June 18, 2015) (cleaned up). Here, the evidence establishes that the corporate decisions giving rise to the complaint occurred in California at PowerSchool's corporate headquarters (Dkt. 66, ¶¶ 409-410), and there is recent authority for applying intrusion upon seclusion claims nationwide. *See Frasco*, 349 F.R.D. at 584; *see also Rodriguez*, 2024 WL 38302, at *4 (collecting cases).

Fourth, in *Frasco*, this Court applied California law to a nationwide class without objection from the defendants and noted that Flo's terms of use specified California law and that "decisions about SDK design and advertising may reasonably be understood to have occurred [in California]." 349 F.R.D. at 574. The same reasoning applies here: PowerSchool's own contract calls for application of California law, and its decisions about product design, data monetization, and its deliberate choice never to obtain parental consent were made in California and radiate outward from California to all class members nationwide.

## F.      Rule 23(b)(2) Certification Is Appropriate.

PowerSchool devotes minimal attention to the injunctive relief class. Rule 23(b)(2) certification requires only that the defendant "has acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). PowerSchool's policies apply identically to every class member: it never sought consent for data collection and monetization; it ███████ its prediction products; it shared data with over 213 third parties without informing parents. A single injunction requiring PowerSchool to obtain meaningful consent, cease using ██████ prediction products, and provide comprehensive notice of its data practices would benefit every class member uniformly. "Rule 23(b)(2) does not require courts to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Ward v. United Airlines, Inc.*, No. 19-cv-03423-LB, 2021 WL 534364, at *7 (N.D. Cal. Feb. 12, 2021) (cleaned up). That standard is amply met here.

### III.      CONCLUSION

For these reasons, Plaintiffs respectfully ask the Court to grant the Motion for Class Certification.

15

Dated: March 23, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By   /s/ Leonard W. Aragon
Leonard W. Aragon (*pro hac vice*)
E. Tory Beardsley (*pro hac vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602)840-5900
leonarda@hbsslaw.com
toryb@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
P.O. Box 300488
Austin, Texas 78705
Telephone: (737) 351-5855
julie.liddell@edtech.law
andrew.liddell@edtech.law

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: 510.725.3000
shanas@hbsslaw.com

Attorneys for Plaintiffs

REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION                                3:24-cv-02706-JD