Shana E. Scarlett (217895)
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EdTech Law Center PLLC
P.O. Box 300488
Austin, Texas 78705
Telephone: (737) 351-5855
julie.liddell@edtech.law
andrew.liddell@edtech.law

Leonard W. Aragon (*pro hac vice*)
E. Tory Beardsley (*pro hac vice*)
Hagens Berman Sobol Shapiro LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
leonard@hbsslaw.com
toryb@hbsslaw.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EMILY CHERKIN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>    Defendant. | Case No.: 3:24-cv-02706-JD<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT POWERSCHOOL HOLDINGS, INC.'S MOTION TO EXCLUDE THE OPINIONS OF DR. K. SUZANNE BARBER**<br><br>Judge: The Honorable James Donato<br><br><u>Hearing</u><br>Date: April 23, 2026<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................................... 1

II.     LEGAL STANDARD ............................................................................................................... 1

III.    BACKGROUND ........................................................................................................................ 2

IV.     ARGUMENT .............................................................................................................................. 3

   A.   Opinion 1: PowerSchool processes "sensitive" data. ..................................................... 4

   B.   Opinions 2 and 3: PowerSchool risks exposing personally identifiable information. ........................... 7

   C.   Opinion 4: PowerSchool risks harm to students by its collection and storage of personally identifiable information. ........................... 9

   D.   Opinion 5: The information collected and stored by PowerSchool has value. ..................................... 10

        1.   The first opinion and statement. ........................................... 11

        2.   The second opinion and statement. ........................................ 12

        3.   The third opinion and statement. .......................................... 13

        4.   The fourth opinion and statement. ........................................ 13

        5.   Dr. Barber's opinions and methodology do not merely summarize documents. ........................... 14

        6.   Dr. Barber's opinions are tied to the claims and facts of this case. .................................. 15

V.      CONCLUSION ......................................................................................................................... 15

OPPOSITION TO MOTION TO EXCLUDE THE OPINIONS OF DR. K SUZANNE BARBER          3:24-cv-02706-JD

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R&R Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) .................................................................................................8

*In re Apple Inc. Sec. Litig.*,
    2023 WL 4556765 (N.D. Cal. July 17, 2023) ..................................................................... 15

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    613 F. Supp. 3d 1308 (S.D. Cal. 2022), *aff'd*, 9 F.4th 1102 (9th Cir. 2021) ..................... 15

*CZ Services, Inc. v. Express Scripts Holding Co.*,
    2020 WL 4518978 (N.D. Cal. Aug. 5, 2020) .................................................................. 5, 9

*Dep't of Toxic Substances Ctrl. v. Technichem, Inc.*,
    2016 WL 1029463 (N.D. Cal. Mar. 15, 2016) ................................................................... 14

*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*,
    2022 WL 254348 (N.D. Cal. Jan. 27, 2022) ...................................................................... 14

*ESG Cap. Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) ...........................................................................................3

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ..............................................................................2, 3, 4, 15

*In re Google Location Hist. Litig.*,
    428 F. Supp. 3d 185 (N.D. Cal 2019) ..................................................................................3

*GPNE Corp. v. Apple, Inc.*,
    2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) .....................................................................6

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002) ........................................................................................ 5, 7

*Hernandez v. Hillsides, Inc.*,
    47 Cal. 4th 272, 97 Cal.Rptr.3d 274, 211 P.3d 1063 (2009) ...............................................3

*Innovation Ventures, LLC v. Custom Nutrition Labs, LLC*,
    2021 WL 122 55004 (E.D. Mich. Sept. 29, 2021) ...............................................................7

*Koger v. Costco Wholesale Corp.*,
    2023 WL 8188842 (N.D. Cal. Nov. 27, 2023) ............................................................. 14, 15

*Osborn v. Boeing Airplane Co.*,
    309 F.2d 99 (9th Cir. 1962) ...............................................................................................3

OPPOSITION TO MOTION TO EXCLUDE THE OPINIONS OF DR. K SUZANNE BARBER          3:24-cv-02706-JD

*Porter v. Martinez,*
    68 F.4th 429 (9th Cir. 2023) ...............................................................................................1

*Reflex Media, Inc. v. SuccessfulMatch.com,*
    758 F. Supp. 3d 1046 (N.D. Cal. 2024).............................................................................1

*Siqueiros v. GM LLC,*
    2022 WL 74182 (N.D. Cal. Jan. 7, 2022) ....................................................................... 15

*Sonnevelt v. Mazda Motor of Am., Inc.,*
    2024 WL 5242611 (9th Cir. Dec. 30, 2024) ................................................................... 10

*In re Toyota Motor Corp.,*
    978 F. Supp. 2d 1053 (C.D. Cal. 2013) .................................................................6, 9, 10

*U.S. v. Cal.,*
    932 F.2d 1346 (9th Cir. 1991), *aff'd*, 507 U.S. 746 (1993).................................3, 4, 15

*Waymo LLC v. Uber Techs, Inc.,*
    2017 WL 5148390 (N.D. Cal. Nov. 2, 2017) ................................................................. 14

*Wendell v. GlaxoSmithKline LLC,*
    858 F.3d 1227 (9th Cir. 2017) ............................................................................................1

**Other Authorities**

Fed. R. Civ. P. 33(d) ...................................................................................................... 12

Fed. R. Evid. 702 ..................................................................................................... 1, 3, 4

Fed. R. Evid. 703 ............................................................................................................ 14

## I.     INTRODUCTION

PowerSchool's motion to exclude the opinions of Plaintiffs' expert witness, Dr. K. Suzanne Barber ("Motion") (Dkt. 134), mischaracterizes Dr. Barber's opinions and the purposes of her testimony. Dr. Barber's opinions relate to the risk of harm associated with PowerSchool's collection and storage of students' personally identifiable information. The opinions will aid the jury in determining whether PowerSchool's conduct was highly offensive for the purposes of proving Plaintiffs' privacy claims, and whether PowerSchool's conduct was unfair or unjust for the purposes of proving Plaintiffs' quasi-contract claim. In its Motion, PowerSchool mischaracterizes Dr. Barber's report and opinions, alleging, among other things, that they relate to actual instances of harm or that they merely summarize data when in fact they pertain to risk of harm and are based on Dr. Barber's application of data to a scientifically valid methodology. PowerSchool's criticisms of Dr. Barber's report go to weight, not admissibility. Because PowerSchool's arguments are based on mischaracterizations or otherwise fail, the Motion should be denied.

## II.     LEGAL STANDARD

Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "The touchstones for admissibility under Rule 702 are the relevance and reliability of the expert witness's opinions." *Reflex Media, Inc. v. SuccessfulMatch.com*, 758 F. Supp. 3d 1046, 1049 (N.D. Cal. 2024) (Donato, J.) (citation and quotation omitted). "The test of reliability is flexible, and the Court looks at whether the reasoning and methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* (citation and quotation omitted). Importantly, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Porter v. Martinez*, 68 F.4th 429, 444 (9th Cir. 2023) (citations and quotations omitted). Ultimately, "Rule 702 should be applied with a liberal thrust favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citations and quotations omitted). Against these standards, Defendant's Motion must be denied.

1

### III.    BACKGROUND

PowerSchool misunderstands Plaintiffs' claims and the evidence needed to support them. This is not a data-breach case. Rather, this is a case about PowerSchool not obtaining effective consent to generate, collect, use, share, and monetize information about schoolchildren. Plaintiffs do not offer Dr. Barber's testimony to aid the jury in determining actual harm to Plaintiffs; they offer it to aid the jury in determining the *risk* of harm to Plaintiffs, which, as explained further below, relates to the issues of whether PowerSchool's conduct was highly offensive for the purposes of proving Plaintiffs' privacy claims, and whether PowerSchool's conduct was unjust for the purposes of proving Plaintiffs' quasi-contract claim.

Key facts are not in dispute. PowerSchool admits to collecting large volumes of information on schoolchildren. *See* Plaintiffs' Notice of Motion, Motion for Class Certification, and Memorandum of Points and Authorities in Support. Dkt. 119 ("Class Cert. Mot.") at 1–6. And it admits to sharing that information widely, with more than 213 third-party partners, and monetizing it. *See id.* at 2–3. All this is done without effective consent. Thus, Plaintiffs assert claims for common law intrusion upon seclusion and invasion of privacy under the California Constitution, Class Cert. Mot. at 18–21, and a claim for unjust enrichment and disgorgement under a quasi-contract theory, *id.* at 21. These claims require, respectively, evidence that PowerSchool's privacy invasions are highly offensive and evidence that PowerSchool's actions are unfair or unjust.

**Privacy.** To state a claim for intrusion upon seclusion under California common law, a plaintiff must plead that (1) a defendant "intentionally intrude[d] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy[,]" and (2) the intrusion "occur[red] in a manner highly offensive to a reasonable person." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020) (citing *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286, 97 Cal.Rptr.3d 274, 211 P.3d 1063 (2009)).

A claim for invasion of privacy under the California Constitution involves similar elements. Plaintiffs must show that (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is "so serious . . . as to constitute an egregious breach of the social norms" such that the breach is "highly offensive." *Id.* (citing *Hernandez*, 47 Cal. 4th at 287). Because of the similarity of the tests, courts tend to consider the claims together and ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive. *Id.*

OPPOSITION TO MOTION TO EXCLUDE THE OPINIONS OF DR. K. SUZANNE BARBER    3:24-cv-02706-JD

In determining liability under these claims, the jury must therefore assess, *inter alia*, whether the intrusion is highly offensive to a reasonable person. *In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 196 (N.D. Cal 2019) (cleaned up).

"Plaintiffs must show more than an intrusion upon reasonable privacy expectations. Actionable invasions of privacy also must be 'highly offensive' to a reasonable person, and 'sufficiently serious' and unwarranted as to constitute an 'egregious breach of the social norms.'" *Hernandez*, 211 P.3d at 1078 (cleaned up); *see* CACI No. 1800 (Right of Privacy) at 1118. Whether an alleged invasion is "highly offensive," "serious," or an "egregious breach of social norms" requires "holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *See In re Facebook*, 956 F.3d at 606. "While analysis of a reasonable expectation of privacy primarily focuses on the nature of the intrusion, the highly offensive analysis focuses on the degree to which the intrusion is unacceptable as a matter of public policy." *Id.*; *Hernandez*, 211 P.3d at 1073 (weighing the degree of offensiveness "essentially involves a 'policy' determination as to whether the alleged intrusion is 'highly offensive' under the particular circumstances").

**Quasi-contract/unjust enrichment.** For this claim, "a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016). Quasi-contract liability is dictated by the needs of justice and fairness, and rests upon equitable considerations. *See U.S. v. Cal.*, 932 F.2d 1346, 1350 (9th Cir. 1991), *aff'd*, 507 U.S. 746 (1993); *Osborn v. Boeing Airplane Co.*, 309 F.2d 99, 102 (9th Cir. 1962).

### IV.     ARGUMENT

Dr. Barber is qualified as an expert "by knowledge, skill, experience, training or education," which PowerSchool does not dispute. Fed. R. Evid. 702; Mot. at 1. Nor could it reasonably argue otherwise: Dr. Barber is a professor at The University of Texas at Austin, where she is the AT&T Endowed Professor in Engineering in the Department of Electrical and Computer Engineering, the Founding Director of the Center for Identity, and the Founding Director of the Masters Degree Program in Information Security and Privacy. *See* Class Cert. Mot., Ex. C. She has extensive experience in cybersecurity, artificial intelligence, information security, privacy, digital identity, digital trust, and software engineering. *Id.* ¶ 9 She and others at

3

the Center for Identity developed the University of Texas Center for Identity Ecosystem model ("UTCID model") several years ago with real-world data from nearly 6,000 reported identity theft and fraud cases. Declaration of Leonard W. Aragon ("Aragon Decl."), Ex. A at Dep. Ex. 11. The UTCID model provides research-based insights into a variety of personal, organizational, and device identifiable information ("data elements")—*i.e.*, social security number, medical information, and mental-health condition—and determines which of the data elements are most frequently targeted by actors in identity theft and fraud cases. *Id.*

Contrary to PowerSchool's characterization of Dr. Barber's opinions as a "mere recitation of Plaintiffs' preferred factual narrative," each of Dr. Barber's opinions will aid the jury in determining whether PowerSchool's conduct was highly offensive for the purposes of proving Plaintiffs' privacy claims, and whether PowerSchool's conduct was unjust for the purposes of proving Plaintiffs' quasi-contract claim. Fed. R. Evid. 702(a) (expert's opinions, more likely than not, "will help the trier of fact to understand the evidence or to determine a fact in issue"). Dr. Barber's opinions concern "the likelihood of serious harm to the victim," which is relevant in determining both offensiveness and unfairness. *See In re Facebook,* 956 F.3d at 606; *Cal.*, 932 F.2d at 1350. Specifically, Dr. Barber opines as to whether the information that PowerSchool collects is sensitive and identifies which PowerSchool products hold sensitive personally identifiable information. *See generally* Class Cert. Mot., Ex. C at 10–28. She then explains that this information is not only under frequent attack from hackers but also can be exposed as a part of a company's business practices, and that PowerSchool both intentionally shares information with at least 151 third-party partners and was hacked in 2024. *Id.* at 29–30. Dr. Barber details the breadth and depth of how personally identifiable information can be used to harm people, including that knowledge of certain categories of information about a person make it easy to discover significantly more information about that person. *Id.* at 29–37. What information counts as sensitive, the uses to which that information can be put, the ability to link one data element to many others—these are all complex issues that a layperson is unlikely to understand without expert assistance, and they provide the context for the jury to evaluate whether PowerSchool's conduct is offensive and unfair. For these reasons, PowerSchool's Motion should be denied in its entirety.

**A.      Opinion 1: PowerSchool processes "sensitive" data.**

PowerSchool contends that Dr. Barber's opinion on the sensitivity of the data collected and processed by PowerSchool should be excluded because "Dr. Barber failed to investigate actual uses of

4

PowerSchool products as is necessary to assess what data PowerSchool hosts and whether it is sensitive." Mot. at 8. But such an investigation was not a necessary prerequisite. As Dr. Barber explained in her report, she obtained the data elements collected and processed by PowerSchool directly from several "Data Privacy Impact Assessments" ("DPIA Reports") produced by PowerSchool in discovery. Class Cert. Mot., Ex. C at 9, 11–28. In those DPIA Reports, PowerSchool admits to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dkt. 119-1, Exs. 2–3, 5–7. Dr. Barber then applied the data elements to the UTCID model, which has a data set from nearly 6,000 identity theft, fraud, and abuse cases and assigned levels of risk and value associated with data elements present in the data set and in PowerSchool's system. Class Cert. Mot., Ex. C at 30–37, and Appx. A.

Next, PowerSchool mischaracterizes Dr. Barber's testimony, arguing that Dr. Barber "simply quot[ed] a PowerSchool document" and "[m]erely report[ed] the contents of the documents" because she obtained the data elements from PowerSchool's DPIA Reports. Mot. at 8–9. But Dr. Barber did not obtain the data elements from PowerSchool's DPIA Reports and stop there: she then applied the data elements to a scientific model that allowed her to assess a level of value and risk associated with each one. Class Cert. Mot., Ex. C at 30–37, and Appx. A. Further, Dr. Barber's use of data sets from PowerSchool's own documents and responses to Plaintiffs' interrogatory requests is permissible, as she "used the best available data, which came from the defendant itself." *See Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (cleaned up). If PowerSchool objects to the data elements it provided in its own documents, it could have provided further documentation showing ways in which the elements varied in different circumstances, but it did not do so. *Id.* at 1188–89. It can also cross-examine Dr. Barber on any points it feels are pertinent.

As support, PowerSchool cites *CZ Services, Inc. v. Express Scripts Holding Co.*, 2020 WL 4518978, at *2 (N.D. Cal. Aug. 5, 2020) (Donato, J.). Mot. at 9. But in *CZ Services*, this Court excluded an expert's opinions because they were "little more than reports of what [the expert witness] personally saw in visits to various [pharmacy] locations, or in documents she reviewed about [the pharmacies] operations" without "any methodological discussion at all." *Id.* The Court noted that the expert's "'method' consisted mainly of walking into CZ Pharmacies' properties and taking pictures and notes." *Id.* Dr. Barber's collection of data from PowerSchool's documents, application of that data to the UTCID model, and analysis of the results is readily distinguishable from the failure to apply a methodology in *CZ Services*.

PowerSchool next contends that Dr. Barber's opinion on the sensitivity of the data elements PowerSchool collects from students "is not the product of a discernable, scientific methodology" because Dr. Barber "had no established standard for assessing sensitivity and, rather, agreed that it posed a legal question." Mot. at 9. However, Dr. Barber does not purport to make a legal determination about what constitutes sensitive data, which is why she did not claim to do so in her deposition. "Aragon Decl., Ex. A at 194:7–22. Rather, she defines "sensitive data" in her report as "information that, if exposed, shared, misused, or accessed without authorization, can cause significant harm, discrimination, financial loss, or privacy violations for individuals or organizations" based on her extensive experience, expertise, and research in digital identity, cybersecurity, digital trust, and information security and privacy. Class Cert. Mot., Ex. C at 1, 10. She then examined whether the data collected and processed by PowerSchool fell within that definition. If PowerSchool objects to her understanding of what constitutes sensitive data, it can cross-examine her.

PowerSchool cites two cases in support of its argument, both of which are distinguishable. Mot. at 9, *citing GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014); *In re Toyota Motor Corp.*, 978 F. Supp. 2d 1053, 1067 (C.D. Cal. 2013). In *GPNE*, the court excluded the expert witness's damages testimony because the expert did not provide a methodology in making one of his damages calculations, did not perform an apportionment analysis, and cited to documents that did not support his calculation. 2014 WL 1494247, at *4. Again, Dr. Barber does not merely state that certain data elements collected by PowerSchool are sensitive and stop there: she determines that they are sensitive based on her application of the elements to the published UTCID model, which uses data elements from nearly 6,000 identity theft, fraud, and abuse cases, provides a statistical analysis, and allows for Dr. Barber to determine which elements are most valuable, most at risk for theft or fraud, and most useful in gathering additional information about a person. Aragon Decl., Ex. A at Dep. Ex. 11.

The second case cited by PowerSchool, *Toyota*, is distinguishable because in that case, the court excluded an expert's testimony because the expert did not have relevant training, education, or experience and made conclusions without providing any basis for them. 978 F. Supp. 2d at 1067–68. None of the problems identified in *Toyota* are present in this case. Dr. Barber is qualified to state her opinions on the issues at hand, and PowerSchool does not argue otherwise. Further, the basis of Dr. Barber's opinion

6

regarding the sensitivity of certain data elements collected by PowerSchool is her years of experience in cybersecurity, artificial intelligence, information security, privacy, digital identity, digital trust, and software engineering; her development and application of the UTCID model, her application of the data elements collected by PowerSchool to the UTCID model, and her analysis of the results.

PowerSchool next challenges the data in the UTCID model, arguing that "[a] determination of data sensitivity should not be based on the whims of reporters or happenstance of data fields in public articles about data fraud cases." Mot. at 10. The data in the UTCID model comes from the Identity Threat Assessment and Prediction (ITAP) project, which aggregates data on identity theft from multiple sources, including law enforcement, fraud cases, and news stories. Aragon Decl., Ex. A at Dep. Ex. 11. Although the data is gathered primarily from news stories, the magnitude of the cases and the repeating patterns seen across them support the conclusions of the research. The critiques raised by PowerSchool—that the news stories may be inaccurate—go to the weight of Dr. Barber's testimony, not the admissibility. *See Hemmings*, 285 F.3d at 1188 (objections to inadequacy of study are in most cases objections to weight of evidence rather than admissibility).

PowerSchool cites *Innovation Ventures, LLC v. Custom Nutrition Labs, LLC*, 2021 WL 122 55004, at *17 (E.D. Mich. Sept. 29, 2021) as support. But as the court in *Innovation* notes, "[a]lthough [the expert's] comparison of sales data from an aggregate report compiled by a third-party against sales data that is self-reported from an employee within Costco raises questions, it does not necessarily disqualify [his] analysis as reliable for purposes of a *Daubert* motion. Expert testimony even if based on allegedly erroneous or questionable facts has generally been held admissible 'when there is some support for those facts in the record.'" *Id.* The court in that case declined to exclude the expert's testimony on that basis but excluded it because the expert concluded that certain sales to Costco were "significant" without defining "significant" or using a basis or methodology to support the conclusion. *Id.* Unlike that expert, Dr. Barber did define "sensitive data" and disclosed her basis for doing so.

**B.      Opinions 2 and 3: PowerSchool risks exposing personally identifiable information.**

PowerSchool argues that Dr. Barber's testimony regarding the risks of exposure associated with PowerSchool's collection of students' personally identifiable information should be excluded because "Dr. Barber failed to assess PowerSchool's data processing practices as is necessary to opine on risks of

exposure," contending that Dr. Barber did not assess its data security controls, encryption, monitoring, and access controls. Mot. at 10. As a threshold matter, disclosure is an established fact, not a mere risk: PowerSchool admits that it discloses student information to hundreds of partners, and that it was hacked in late 2024.[1] Further, Dr. Barber's opinion is about the risk of exposure and harm based on the types of data PowerSchool collects and stores about children, not about an actual instance of harm. Thus, Dr. Barber need not assess PowerSchool's data-security and other specific controls, as she is merely determining that PowerSchool stores sensitive data about children that carries varying levels of risk of harm if exposed or used improperly.

PowerSchool next contends that Dr. Barber "admitted" that a proper assessment of the risk of exposure depends on issues like data-security, encryption, and other "system-specific factors," but that is wrong. Dr. Barber explained several times in her deposition that her opinion on the risk of exposure was based only on the types of data elements PowerSchool collected and stored, not PowerSchool's specific cybersecurity protocols. Aragon Decl., Ex. A at 205:20–206:17, 275:18–278:19, 345:3–18, 377:19–378:2, 510:10–512:18. Dr. Barber's opinion in no way addresses or purports to address PowerSchool's particular system controls and protocols. Yet, PowerSchool uses its erroneous characterization of her methodology to contend that her opinion should be excluded because she "failed to apply her stated methodology reliably." Mot. at 10 (cleaned up); *citing Amorgianos v. Nat'l R&R Passenger Corp.*, 303 F.3d 256, 268-69 (2d Cir. 2002). As explained above, Dr. Barber's "stated methodology" is not related to PowerSchool's cybersecurity protocols.

Further, the case cited by PowerSchool, *Amorgianos*, is inapposite. In *Amorgianos*, the court upheld the exclusion of an expert witness's testimony because the witness testified that his ultimate determination depended on certain variables and then failed to include those variables in his calculations. 303 F.3d at 268–69. Dr. Barber does not purport to base her analysis on PowerSchool's cybersecurity protocols and does not comment on them. The facts in *Amorgianos* bear no similarity to this case.

---

[1] *See* Notice of Data Breach For Individuals in the United States, POWERSCHOOL, https://www.powerschool.com/security/sis-incident/notice-of-united-states-data-breach/ (last visited Mar. 21, 2026).

OPPOSITION TO MOTION TO EXCLUDE THE OPINIONS OF DR. K. SUZANNE BARBER          3:24-cv-02706-JD

PowerSchool further argues that Dr. Barber's opinions about the value and risk of exposure of certain data elements collected and stored by PowerSchool rely on public sources and PowerSchool's own statements, purportedly making her opinions "common sense points that any untrained layman would be qualified to determine intelligently" and thus "not the proper subject for expert testimony." Mot. at 10. But PowerSchool again mischaracterizes her testimony. Dr. Barber has extensive experience and expertise in information security, privacy, and digital identity and does not simply note the data elements collected by PowerSchool and stop there. She applies the data elements to the UTCID model for statistical analysis.

PowerSchool again cites *Toyota* to argue that Dr. Barber's opinion should be excluded because it is "based entirely on her generalized assertion that data breaches happen," yet another mischaracterization of her opinion. Mot. at 10. Her opinion is based on the application of the data elements collected and stored by PowerSchool to statistical analysis using the UTCID model. *Toyota* involved an unqualified expert who failed to provide a basis for his conclusions. 978 F. Supp. 2d at 1067–68.

**C.    Opinion 4: PowerSchool risks harm to students by its collection and storage of personally identifiable information.**

PowerSchool contends that Dr. Barber's conclusions regarding risk of harm based on her application of data elements collected and stored by PowerSchool to the UTCID "is not a methodology at all, as it simply asse[r]ts that something can happen because it has happened in the past to others." Mot. at 11. Again, Dr. Barber's opinion uses data elements provided by PowerSchool in its own production of documents and applies them to the research data gathered from nearly 6,000 cases of harm to create a statistical analysis of the value and risk associated with the data elements collected and stored by PowerSchool. Her opinion is not, as PowerSchool contends, a "reporting of what [she] saw in documents reviewed." *Id.* (cleaned up), citing *CZ Servs.*, 2020 WL 4518978, at *1. *CZ Services* differs, as that case involved an expert witness who offered only reports of what she saw on site visits without "any methodological discussion at all." *Id.* at *2.

PowerSchool further argues that Dr. Barber's conclusion regarding risk of harm should be excluded because Dr. Barber applies the data elements collected and stored by PowerSchool to the UTCID "without any facts, data, or methodology to support this association." Mot. at 11 (emphasis omitted). Specifically, PowerSchool contends that Dr. Barber saw no evidence that PowerSchool's products were misused, did not

9

study each of the nearly 6,000 articles from which data was used for the UTCID, and testified that approximately 90 percent of the cases in the UTCID did not involve data obtained from schools. But PowerSchool has not explained why it matters how the data elements were taken and why Dr. Barber's testimony should be excluded. At best, this is cross-examination material, nothing more. For example, if a Social Security Number stolen from a large corporation is so fundamentally different than a Social Security Number taken in a data breach at a school, PowerSchool can explain that to a jury. But any difference in how the data elements were taken—and PowerSchool has not explained what those differences are and why it requires exclusion—is not a basis for exclusion.

The two cases cited by PowerSchool do not apply. *See In re Toyota*, 978 F. Supp. 2d at 1067–68 (testimony excluded where proffered expert did not have experience, expertise, or education to make determinations and provided no basis for them); *Sonnevelt v. Mazda Motor of Am., Inc.*, 2024 WL 5242611, at *2 (9th Cir. Dec. 30, 2024) (testimony excluded where proffered expert did not explain or support his purported methodology, did not offer observations that proved his theory, and used a small sample size of only four items). PowerSchool has raised no similar issues regarding Dr. Barber's proposed testimony. Dr. Barber is qualified to testify based on her experience, expertise, and education—which PowerSchool does not dispute—and she explains and supports her application of the PowerSchool data elements to the UTCID model and analyzes the value and risk of harm of each element. PowerSchool has not shown that power of the data fields to produce harm depends on where they were acquired, let alone proven that this somehow makes Dr. Barber's opinions inadmissible. PowerSchool can raise this issue on cross examination, but it is not a basis for exclusion.

**D.     Opinion 5: The information collected and stored by PowerSchool has value.**

PowerSchool contends that the court should exclude as unreliable Dr. Barber's opinion on the value of the data elements collected and stored by PowerSchool because she "has no facts, data, or methodology to associate the data PowerSchool hosts with the data at issue in the UTCID's data crime database." Mot. at 11–12. The reality: Dr. Barber obtains the data elements PowerSchool collects and stores from PowerSchool's own documents and matches them to the same data elements in the UTCID. The data elements themselves and the risk of harms associated with them are the focus of her analysis. Dr. Barber explained several times in her deposition that the values she assigned to data elements are not purported

10

market values but rather are a method for showing how some data elements are more valuable to actors in identity theft and fraud cases than others. Aragon Decl., Ex. A at 323:15–324:11, 373:7–18, 375:9–12. Further, the case cited by PowerSchool, *Sonneveldt*, differs because in that case, the expert did not explain or support his purported methodology and did not offer observations that proved his theory. 2024 WL 542611, at *2.

PowerSchool also contends that Dr. Barber's methodology "yields incredible results" in its calculations of approximate monetary values of data elements when obtained and misused by actors in identity theft and fraud cases. Mot. at 12. PowerSchool argues that Dr. Barber has no basis for her "monetary value" calculations. *Id.* But as Dr. Barber explained in her deposition, she did not assign actual market values to data elements held by PowerSchool; rather, she used valuation comparatively to show that some data elements held by PowerSchool are more valuable than others. Aragon Decl., Ex. A at 373:3–22, 377:12–379:14.

PowerSchool further argues that Dr. Barber herself is unreliable due to errors in her report and her "shifting theories." Mot. at 12–13. But Dr. Barber either addressed or will promptly address any errors. With respect to an error in her calculation, she extensively discussed the issue with PowerSchool's counsel during her deposition, explaining that the error once corrected was "still highly correlated" and "represented about 1 percent error." Aragon Decl., Ex. A at 66:12–73:14. Contrary to PowerSchool's assertion in its Motion, the other issues PowerSchool raises were not raised by PowerSchool in Dr. Barber's deposition, and Dr. Barber will correct those issues promptly. And the so-called "shifting theories" alleged by PowerSchool are anything but. Specifically, PowerSchool sets forth a table showing four of Dr. Barber's "[p]urported [o]pinion[s]" in her report and ways in which it claims she changed her opinions or theories during her deposition. Mot. at 13. But all of the statements cited from her deposition are consistent with her opinions.

### 1.    The first opinion and statement.

In the first opinion cited by PowerSchool, Dr. Barber stated that "PowerSchool products control and process highly sensitive [p]ersonally [i]dentifiable [i]nformation." Class Cert. Mot., Ex. C at 1. PowerSchool points to two statements Dr. Barber made in her deposition testimony as purportedly inconsistent with that opinion. The first statement was in response to a question asking whether it was Dr. Barber's opinion that PowerSchool's products automatically collected all of the data elements listed in the

11

product's DPIA Report. Dr. Barber responded: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Aragon Decl., Ex. A at 142:20–143:12. Dr. Barber's deposition statement follows her opinion and analysis, which address and use the data elements that PowerSchool admits to collecting as set forth in its DPIA Reports and discovery responses. Namely, in its response to Plaintiffs' Interrogatory No. 3, which asked for the categories of data collected by each product, PowerSchool cited the DPIAs as identifying "the categories and uses of data" relating to each of its products. *See, e.g.*, Dkt. 119-1, Ex. 13 at 6–7 ("PowerSchool will produce, pursuant to Fed. R. Civ. P. 33(d), the Data Privacy Impact Assessments ('DPIAs') for each product identified in Interrogatory No. 1, which identify the categories and uses of data relating to each such product."). Dr. Barber's opinion and analysis do not address—and do not purport to address—the specific data elements collected by the schools or districts that use PowerSchool's products.

The second allegedly inconsistent statement was in response to a question from PowerSchool's counsel: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Aragon Decl., Ex. A at 194:19–22. Dr. Barber's statement is consistent with her report, opinions, and analysis. She states in her report that "PowerSchool products control and process highly sensitive [p]ersonally [i]dentifiable [i]nformation," but she does not state that she is opining about the level of sensitivity under a legal standard. Class Cert. Mot., Ex. C at 1. Rather, she defines "sensitive data" and explains why she determines that the data elements collected and stored by PowerSchool fall within that definition. Class Cert. Mot., Ex. C at 10-37. At no time does she purport to determine the sensitivity of the data under a legal standard.

2.     **The second opinion and statement.**

The next opinion cited by PowerSchool is Dr. Barber's opinion that "[t]here are numerous possible causes for exposure of the [personally identifiable information] controlled and processed by PowerSchool products, including malicious threats and business practices aimed to monetize the [personally identifiable information]." Mot. at 13. PowerSchool then cites to portions of Dr. Barber's deposition testimony in which she states she did not know what PowerSchool's risk of exposure or cybersecurity practices were, and that she was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12

███████ Aragon Decl. Ex. A at 278:1–7. Dr. Barber's opinion and statements are again consistent. Her opinions pertain to a risk of harm in PowerSchool's collection, storage, and use of specific data elements held by PowerSchool.

### 3.    The third opinion and statement.

The third opinion PowerSchool points to as purported evidence of Dr. Barber's changing theories is her opinion that "[b]y controlling and processing student [personally identifiable information] without permission and informed consent, students and parents are exposed to the risk of diverse, longstanding, and significant harm." Mot. at 13.

The statements PowerSchool cites as inconsistent are from the following:



Aragon Decl., Ex. A at 291:6–17. Dr. Barber's statement is once again consistent with her opinion. Her report addresses the *risk* of harm to which Plaintiffs are exposed through PowerSchool's conduct, and her testimony confirms that her opinions only speak to the risk of harm.

### 4.    The fourth opinion and statement.

The final opinion that allegedly contradicts a statement in Dr. Barber's deposition is the opinion that "to the extent that student [personally identifiable information] was infiltrated in the PowerSchool data breach, research suggests those individuals have been harmed and are experiencing elevated risks to their [personally identifiable information]." Mot. at 13. The deposition statement PowerSchool cites is Dr. Barber's statement that ████████████████████████████████████ ████████████████ Aragon Decl., Ex. A at 260:20–261:1. Shortly after she made that statement, Dr. Barber also stated that it was ████████████████████████████ ████████████████████████████████████ ████████████ Aragon Decl., Ex. A at 261:8–20, 263:11–21.

Her opinion as set forth in her report is only that research suggests that if any students' personally identifiable information was infiltrated in the PowerSchool data breach, those students have been harmed

13

and are experiencing elevated risks to their personally identifiable information. Class Cert. Mot., Ex. C at 2; Aragon Decl., Ex. A at 224:19–225:1. She does not state an opinion about the data breach as to the Plaintiffs here. There are no inconsistencies.

**5.    Dr. Barber's opinions and methodology do not merely summarize documents.**

PowerSchool next repeats an argument already made: that Dr. Barber's opinions should be excluded because they "merely summarize the record evidence and gratuitously interpret it." Mot. at 13 (citing *Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, 2022 WL 254348, at *10 (N.D. Cal. Jan. 27, 2022)). But, as discussed above, PowerSchool mischaracterizes the opinions. Dr. Barber does not merely summarize documents and draw a conclusion. She obtained the data elements that PowerSchool collects and stores from PowerSchool's own DPIA Reports and discovery responses and applied them to the UTCID model to assess the risk and value of each data element.

PowerSchool next argues that Dr. Barber's application of the data to the UTCID model should be excluded because "experts are not permitted to repackage inadmissible hearsay as expert testimony." Mot. at 14 (cleaned up) (citing *Koger v. Costco Wholesale Corp.*, 2023 WL 8188842, at *2 (N.D. Cal. Nov. 27, 2023)). But in *Koger*, the court specifically stated that Rule 703 permits experts to rely on inadmissible evidence, including hearsay, as long as the evidence is not offered to establish the truth of its assertions. *Id.* Dr. Barber's use of the UTCID model is to assess the risk of harm associated with PowerSchool's collection and storage of certain data elements, not to prove individual harm to Plaintiffs or the victims in the cases in the model's data set. And Dr. Barber does not "repackage" UTCID data as her testimony. She applies the data elements collected and stored by PowerSchool to the UTCID model and analyzes the results.

All of PowerSchool's cases are distinguishable. *See Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, 2022 WL 254348, at *10 (N.D. Cal. Jan. 27, 2022) (testimony excluded where proffered expert "summarize[d] record evidence while making either obvious or conclusory observations" rather than using a methodology); *Waymo LLC v. Uber Techs, Inc.*, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 2, 2017) (testimony excluded where proffered expert had no specialized knowledge for damages calculations and "simply adopted the opinions of others and performed grade-school arithmetic counsel can do on an easel"); *Dep't of Toxic Substances Ctrl. v. Technichem, Inc.*, 2016 WL 1029463, at *1 (N.D. Cal. Mar. 15, 2016) (testimony excluded where proffered expert speculated, "regurgitate[d] information given to him by other sources," and

used cursory and unscientific methods); *Siqueiros v. GM LLC*, 2022 WL 74182, at *9-10 (N.D. Cal. Jan. 7, 2022) (testimony excluded where proffered expert merely summarized witness deposition testimony and other record evidence without applying methodology); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322 (S.D. Cal. 2022), *aff'd*, 9 F.4th 1102 (9th Cir. 2021) (testimony excluded where proffered expert "impermissibly interpret[ed] the contractual provisions at issue" and "form[ed] conclusions as to their effects"); *Koger*, 2023 WL 8188842, at *2 (testimony excluded where proffered expert "merely recite[d] the conclusions of . . . tests without further discussion of their data or methodology"); *In re Apple Inc. Sec. Litig.*, 2023 WL 4556765, at *5 (N.D. Cal. July 17, 2023) (testimony excluded where it required no special technical expertise and proffered expert "merely serve[d] as a conduit for attorney argument" by summarizing and quoting evidence without providing context for jury).

Here, Dr. Barber has the experience, education, and expertise necessary to render her opinions. She used PowerSchool's DPIA Reports only to obtain the data set to use in her analysis. She then applied the data set to a scientifically valid methodology for statistical analysis and determined the value and risk of harm associated with the data elements collected and stored by PowerSchool.

**6.      Dr. Barber's opinions are tied to the claims and facts of this case.**

Finally, PowerSchool contends that Dr. Barber's opinions have no relevance to Plaintiffs' claims. Mot. at 15. But Dr. Barber's opinions are directly tied to Plaintiffs' claims because they concern "the likelihood of serious harm to the victim," relevant to both the offensiveness element of Plaintiffs' privacy claims and the unfairness component of Plaintiffs' quasi-contract claim. *See In re Facebook,*, 956 F.3d at 606; *Cal.*, 932 F.2d at 1350.

**V.      CONCLUSION**

For these reasons, PowerSchool's motion to exclude the expert opinions of Dr. K. Suzanne Barber should be denied in its entirety.

Dated: March 23, 2026                    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By  /s/ Leonard W. Aragon
Leonard W. Aragon (*pro hac vice*)

15

E. Tory Beardsley (*pro hac vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602)840-5900
leonard@hbsslaw.com
toryb@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
P.O. Box 300488
Austin, Texas 78705
Telephone: (737) 351-5855
julie.liddell@edtech.law
andrew.liddell@edtech.law

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: 510.725.3000
shanas@hbsslaw.com

Attorneys for Plaintiffs

OPPOSITION TO MOTION TO EXCLUDE THE OPINIONS OF DR. K. SUZANNE BARBER          3:24-cv-02706-JD