# Attachment 2

# Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

-------------------------------------------

EMILY CHERKIN, et al.,

Plaintiffs,

vs.

Case No. 3:24-CV-02706-JD

POWERSCHOOL HOLDINGS, INC.,

Defendant.

-------------------------------------------

REMOTE VIDEO DEPOSITION OF CATHERINE O'NEIL

Wednesday, February 25, 2026

9:02 a.m. (PST)

Reported by:
Jaclyn Urzia, RPR, CRR
Job No. 2026-1013470

lawsuit is about?

A My understanding is that this lawsuit is about the fact that data is being absorbed and used with predictive algorithms without the understanding and knowledge of parents and children in possibly risky ways.

Q And when you say that "data is being absorbed and used," who or what entity do you believe is using that data?

A Well, I think PowerSchools provides a platform, and the school systems put data onto the platform and then that data is being absorbed by the platform and used for predictions about the students.

Q So you understand that the schools own that data, fair?

MR. LIDDELL: Objection. Form.

BY MS. LOGAN:

Q You can answer.

A I don't -- I don't agree to the notion of owning data. I don't think that makes sense actually.

Once data is out there, the question isn't who owns it, the question is

how is it used and by whom and for what purposes. It's more complicated than ownership.

Like you might think that we own our health data, but that doesn't make sense. It's just -- I just don't think it's a relevant way of describing data.

Q I appreciate that.

You also mentioned that you think the lawsuit is about data being used with predictive algorithms.

Based on your understanding, who or what entity is creating predictive algorithms?

A I'm sorry, what's the question?

Q Who or what entity do you believe is creating predictive algorithms related to this case?

A See, that's a little bit tricky to answer because I think there's a lot of work being done by PowerSchool to make it seem like that the school systems are creating the algorithm, the final algorithm, but I think PowerSchool is providing all of the basic building blocks

of the algorithm.

And so from the perspective of a person like myself who builds algorithms, I think that it's PowerSchool that's providing the algorithm, and the school systems are choosing, you know, final -- making final choices to make the algorithms work with their data.

You know, so they're doing the final polishing things, but -- so again, like I guess I'm suggesting that the word who's building -- I don't know exactly how you phrased it.

Can you repeat the question?

Q Yeah.

I think I said who is creating the algorithms.

A Yeah.

So I think it's both PowerSchool and the school district in different ways, but I think the bulk of the building of the algorithms is PowerSchools.

Q What basic building blocks do you understand PowerSchool is providing for those algorithms?

A The entire infrastructure of what it means to build, for example, an early warning system, which is to say like the notion of risk factors and a threshold, the threshold being like, you know, when is something risky enough -- so it's kind of a risk score, like with various possible ingredients for that risk score, and then the notion of like having a risk score that's high enough to set off an alarm or a threshold that would be the early warning.

So that's a lot of infrastructure.

Q So it's your understanding that PowerSchool is providing the risk factors for the early warning systems.

Did I hear that correctly?

A They're providing a list of risk factors, and they're providing the infrastructure for that to be built into an early warning system, which is to say they have a way of delivering the early warning, they have a way of displaying, you know, the students that are setting off that early warning system. It's like the whole

delivery of the early warning system.

Q And then you said that you believe PowerSchool is providing the threshold for the warnings.

Did I hear that correctly?

A They're providing the infrastructure for that threshold.

I would love to know more, but I haven't been shown how it actually works, I haven't been given a demo, but my understood is that they're offering an early warning system, so it means they're offering the entire delivery system of that.

It doesn't necessarily mean that they're choosing threshold. They might be letting the student -- the school system do that.

It doesn't necessarily mean they're choosing exactly what the ingredients are, which are the risk factors are chosen for this particular early warning system, but it means that they are, you know, offering a set of factors that can be chosen.

So it's the infrastructure, if you see what I mean.

Q So --

A It's like -- like, you know, like Expedia will offer you to choose a flight and it will tell you how much it costs and it will -- but you get to decide which flight and like whether you wanted to fly coach or first class. Like it's facilitating those choices.

So it's providing the infrastructure for buying an airplane ticket, like that's the same kind of idea.

Q So it's your understanding that PowerSchool is facilitating the schools making the choice of what goes into these early warning systems?

A I mean, for that matter, I would be very interested to know whether there is a default choice, but I don't know. I mean, I -- here's the thing. Like most school systems, if they are making real choices, they're going to have the expertise to make wise choices.

So I think it's pretty likely

that the school systems are being steered towards certain choice by PowerSchool, but yes, to answer your question, I think that -- that the student -- the school systems are probably making final choices to decide exactly how those early warning systems work.

Q Did you ask whether there's any defaults provided to schools?

A Yes. I asked Andy.

Q And what response did you get to that question?

A My memory -- if memory serves, he said that they don't know, and that they asked, but they don't know.

Q So --

A I certainly didn't hear a yes.

Q Did you ask any schools whether there's a default provided?

A I didn't talk to any schools.

Q And you said you haven't been given a demo.

Did you ask for a demo?

A Yes.

Q And what was the response to

that request?
A It wasn't available.
Q Do you know why it wasn't available?
A No.
Q Do you know if a demo exists?
A I assume a demo exists. It's a product that people want to sell. So I'm guessing there is a demo.
Q So you assume a demo exists, but you don't know for certain, is that fair?
A Yeah.
Q What is your basis for your statement that PowerSchool is steering the choices that schools are making with respect to these early warning risk factors?
A My basis is only that people who are not actual modelers don't make well-informed choices to build models.
This is a model. PowerSchool's offering -- my understanding is that PowerSchool offers school systems sort of the last few steps of configuring a model, and I'm -- my experience with the general

public and talking about models is that they have no idea how to build a model.

So the only way I could imagine that working out is if the PowerSchool representative who's helping configure the whole setup is also helping to configure the model.

That's what I mean by steerage.

Q Do you know if any schools have modelers?

A Very few schools have modelers.

I mean, I have a lot of friends in education, and the biggest problem they have is that they're afraid of modeling. They're afraid of AI. They're afraid of technology. Most of the teachers are afraid of that stuff.

So I spend a lot of time talking to educators about how to get teachers and administrators less afraid of technology and less afraid of modeling. So I know that, from my experience, they're going to defer to someone who seems like an expert.

Q You said very few schools have modelers.

Are you aware of any schools that do have modelers?

A I'm sure there must be some schools at some level, right?

In fact, I wasn't looking at the Massachusetts job site because I desperately want a job with a pension, and there was like a data science -- head of data science for like, you know, the school system.

So at that highest level, I think there are modelers at the high level of school systems but, you know, in a given school, you know, it's very -- I would expect it to be extremely rare.

Q Some school systems have modelers, fair?

A I'm guessing that's true.

I mean, school systems -- I mean, I already said there's like -- at least the Massachusetts level school system has a modeler. So yes.

Q In your report, you talk about how an algorithm has two ingredients, is that right?

A Could you say more?
Q I believe you say that the two ingredients -- and we can look at this in a little bit -- are -- the two ingredients are a definition of success and historical data, is that correct?
A Right. That's -- I mean, to be clear, when you're actually building a model, you usually make many, many specifications, but at a -- at sort of a high level, the answer is yes, an algorithm has historical data and a definition of success.
Q What other specifications go into building a model?
A I mean, absolutely tons, right?
So it depends on at what granular level -- level of granularity you want me to answer this.
Q Would you say it's more than ten specifications?
A Yes.
Q More than 100 specifications?
A It depends on the level of granularity you want honestly.

assist in drafting this report?

A I mean, it's possible that he -- I think what actually happened was he like looked it over and made comments. He might have formatted it. But I did the writing, and it look a long time.

Q What's Mr. Appel's job title?

A He's chief -- oh, my God.

I forgot his -- forget his title. It's on the website. I can look at it.

Q His job title is on the ORCAA, O-R-C-A-A, website, correct?

A Correct, yeah.

Q Did anyone else assist you in drafting this report?

A No.

Q I know you said it took a long time. Do you have an estimate of how long it took to draft this report?

A I mean, I can look in the hours I charged for my time, but I would say on the order of like 12 hours.

Q Has anyone else assisted with any other part of your engagement as an

expert in this case?
A No.
Q Have you conducted any analysis of any data as part of this litigation?
A No.
Q Did counsel provide you with any assumptions to make in drafting this report?
A Counsel provided me with some of the information in this report --
Q What --
A -- which I asked for.
Q What information did counsel provide you with that's in this report?
A Like excerpts from the website and references to the DPIA about the various products --
Q Did --
A -- but I wrote the report and I did the screenshots myself.
Q Did counsel provide you with the entire website and entire DPIAs?
A Well, I mean, I found the website on my own, but they did provide me with some documentation, including the

DPIAs, for these products --

Q Were you asked --

A -- and I asked for the transcript of one of the other depositions.

Q And that was the deposition of Mr. Flagg, is that correct?

A I don't remember his name, but it's in this report, like I referred to the deposition, because it was -- the important part for me was the fact that in the deposition, that person said that they don't do testing.

Q We'll take a look at that in just a second.

Were you asked to assume that PowerSchool uses predictive algorithms for this report?

A No. I mean, no, I wasn't asked to assume that.

Q And what --

A And I wouldn't assume that, by the way. Like that was the biggest conversation I had with them, is like, when I first looked at the website, which I did on my own, I didn't -- I didn't see proof

that there was -- there were predictive algorithms being used by PowerSchool, and I didn't know if I could be an expert witness.

Q So you didn't see proof from the website that PowerSchool was using predictive algorithms, is that right?

A Not on the first look. And then I looked more carefully with their help and I was like, oh, no, really looks like there is stuff here.

Q Were --

A So --

Q Were you asked to assume that any algorithms were harmful?

A No. I would not assume that.

Q Sitting here today, are there any changes you would make to your report?

A No.

Q Stand behind everything that's in this report?

A Yes.

Q Does this report contain all of the opinions that you intend to offer in this case?

A For now, yes.
Q For now?
A I mean, I'm eager to get a demo. I'm eager to audit the actual algorithms. You know, if I were given more access, then I would have more to say.
Q So you haven't been given a demo, correct?
A That's correct.
Q And you haven't audited any algorithms related to PowerSchool's products, correct?
A That's correct.
Q Do you understand that discovery in this case is closed?
A I did not know that.
Q Are there any additional opinions you intend to offer in this case?
A I mean, not right now.
I guess if you're saying that discovery is closed, that means there'll never be more, you know, opportunities to like learn about stuff, but...
Q So --
A Could you repeat the question?

Sorry.
Q Sure.
Sitting here today, are there any additional opinions you plan to offer in this case beyond what is in your report?
A I don't plan to offer anything more unless I get more information from PowerSchools.
Is that a fair -- is that sufficient for you?
Q Yeah, I think that's fair. And --
A Like suppose discovery gets reopened, so, you know, it's possible that you guys would reopen discovery and then I'd get more data and then I'd have more things to say.
Q I hope not, but we'll see.
Did you form any opinions that plaintiffs' counsel asked you not to disclose in this case?
A No. I would not like agree to work with people who did that.
Q I respect that.
Did you form any opinions that

Q You can give me a month or if it was --
A I want to say like late November, early December is what I want to say. It was before the Christmas break.
Q Was anyone else present on that call with Mr. Schulte?
A Yeah. I think it was Andy here and Leonard Aragon.
I'm not sure Leonard was there, but I know Andy was there.
Q And what was discussed in that conversation?
A Like what he wanted to leave to me to be an expert on, and that was -- the gist of that was that these products require student data.
Q And when you say, "he," you mean what Mr. -- sorry, Dr. Schulte wanted to leave to you --
A Yes.
Q -- for your expert analysis?
A Yes, exactly.
Q Did you take any notes from that conversation?

A No, because it was very simple.
Q Did you review Mr. Schulte's report?
A No, I did not.
Q Other than with counsel, did you speak with anyone about what student data is used by PowerSchool's products?
A No.
Q Other than with counsel, did you speak with anyone about algorithms that PowerSchool products may or may not use?
A No.
Q Did you speak with anyone about any harm suffered on account of PowerSchool products?
A No.
Q Did you speak with anyone else about preparing this expert report?
A No.
I mean, except Jake, my colleague.
Q Sure.
Have you read any expert reports that were submitted in this case other than your own?

A No.
Q You haven't read Dr. Bartlett's opening report?
A No.
Q You haven't read Mr. White's opening report?
A No.
Q Have you read Dr. Bartlett's rebuttal report?
A Nope.
Q Have you read Mr. White's rebuttal report?
A Nope.
Q Can we turn to Appendix A of your report?
Which this is Exhibit 1.
And this appendix doesn't have a page number, but it's towards the end.
There we are. Can you scroll back up a little bit?
Okay. Appendix A is titled "Materials Considered," correct?
A Well, this is stuff that they sent me, but it's not -- I didn't read it all.

Q Okay. What documents on this list did you not read?
A Did I not read?
Q Correct.
A Oh, my God.
I read the DPIAs.
I went to the PowerSchool.com.
I'm just going to have to go through it one at a time I'm afraid.
Q That's okay.
Did you -- so you looked at PowerSchool.com, correct?
A Yeah, for sure --
Q Did you --
A -- because I did all those screenshots.
Q Did you review the second link, uc.powerschool-docs.com?
A Yeah, because a lot of the -- a lot of the data stuff I got from that, like the references within the text of my report.
Q Did you review the PowerSchool SIS DPIA?
A Yeah, all the DPIAs, I think I

looked at all of them.

Q And for the DPIAs, did you look at the whole document or only excerpts provided by counsel?

A I scanned them all. I scanned all of them thoroughly. I thoroughly scanned each of them and then I certainly looked more carefully at the data element part of it.

Q And when you say you scanned all of them, you read all of them?

A Yeah. I mean, a lot of it was gibberish to me to be clear. So when you say I read it, it doesn't mean I understood it all.

Q Do you recall what about it -- or about the DPIAs was gibberish?

A A lot of the stuff was talking about sort of pipelines like of computer -- the computer setups, which I don't understand because that's not my expertise.

Q Fair.

So some parts of the DPIAs were gibberish to you?

A Mm-hmm.

Q There were certain parts of the DPIAs that you didn't quite understand, fair?

A I didn't understand the stuff about how the computers were set up, but I certainly understood the data elements part of each of them.

Q And I know you list them here as "PowerSchool Data Processing Impact Report (DPIA)."

Those documents are the data privacy impact assessments, correct?

A Are you saying that I got the acronym wrong?

Q Maybe.

A I apologize. I'm very bad with that kind of thing.

Q That's okay.

A DPIAs, yeah.

So instead of processing, it should be privacy?

Q Data privacy impact assessment --

A Got it.

Q -- does that sound correct?

A I mean, I believe you. I guess I got that wrong in my bibliography.

Q And you looked at the DPIA for PowerSchool SIS, Schoology Learning, Performance Matters, Naviance, PowerSchool MTSS, Behavior Support, Attendance Intervention, Analytics and Insights and Connected Intelligence, correct?

A Correct.

Q Did you look at any other DPIAs?

A I don't think so. I think I would have listed it here if I looked at it.

Q How did you decide which DPIAs to review?

A Well, whichever of the products that I was looking into.

Q How did you decide which products to look into?

A That was part of what the -- my counsel helped me with.

Q So plaintiffs' counsel told you which PowerSchool products to look into, fair?

A Well, they encouraged me to look

into certain ones, and I looked into those.
Q Did you review number 12 on this list, schoolcounselor.org?
A I can't remember reviewing that.
Q You don't know one way or another whether you reviewed number 12, correct?
A Right. These are the -- I mean, correct. Unless it's -- if it's in my report as a reference, then I did.
I don't -- of course, when I look at websites -- this looks like a URL -- I don't memorize the URL. If you showed me what the website looks like, I might remember reading it.
But actually, this -- this, now that I'm looking at ASCA-Mindsets-Behavior-for-Student-Success, I believe that I did look at this website because this was like one of the things that was touted on PowerSchool's website as like a standard that was being used.
So I think I did look at this.
But I can't promise you that I looked at this particular reference for

ASCA. But, you know, if it's in my report, that's why I listed it here.

Q Do you recall reviewing number 13, redefiningready.org?

A And this is probably the same thing as the ASCA thing, which is like I was trying to understand sort of references that were started -- that started on PowerSchool.com, and I was like looking into them, which is why I went to this link. And I probably reference it in my report and sent the link like as a footnote.

So I was there, if that's the case.

Q Did you review number 14, casel.org?

A I think that's the same exact situation as the previous two.

Q Number 15 is the deposition of Darron James Flagg, is that correct?

A That looks like it.

Q That's the one deposition you mentioned you reviewed earlier, correct?

A Yeah.

Q Why did you select Mr. Flagg's deposition to review?
A Because it had the statement about not doing testing.
Q Did you review Mr. Flagg's deposition in its entirety?
A I did -- I spent a couple hours with it. I'm not sure I finished the entire thing, it was really quite lengthy but I did spend a few hours with it, and I do remember getting to that point.
Q And did you find that point that you're referencing or did plaintiffs' counsel point it out to you?
A I think both. I think plaintiffs' counsel suggested I read this deposition -- I think it was Leonard, because maybe Leonard took this deposition -- and I read it and found it.
And then at some point, I also asked him to like remind me of where exactly it was because I lost track.
So it might have been both.
Q Did plaintiffs' counsel suggest that you read any other depositions in this

case?
A I mean, they suggested I read a lot of things, but I didn't actually read most of those things.
Q Is there anything that plaintiffs' counsel suggested you read that you decided not to?
A Let me put it this way: They sent me a bunch of stuff at the beginning, and I was like, oh, my God this is way too much stuff. So I didn't read it all.
I sound like a bad expert, but like I just -- I just didn't think I needed to read it all, so I didn't.
Q Okay. I'm just trying to understand what all you've been through.
Are you aware that 16 witnesses have been deposed in this case?
A Nope.
Q And of those 16 depositions, you've only reviewed this one deposition of Mr. Flagg, correct?
A Yes.
Q Did you ask to review any other depositions?

A No.
Q Why not?
A Because I didn't think I needed other depositions.
Q Were you given any overview of who has provided a deposition in this case?
A No, but I didn't ask for that.
Q You didn't review the depositions of any of the named plaintiffs in this case, correct?
A Correct.
Q You --
A I mean, unless Flagg is a named plaintiff.
Q He is not. I'll represent to you that he is a PowerSchool affiliate.
So you did not review the depositions of any named plaintiffs in this case, correct?
A That's right. That's right.
Q You did not review the depositions of any other PowerSchool employees in this case, correct?
A This is the only deposition I reviewed.

Q You did not review the deposition of Joseph Swingle, correct?
A Correct.
Q You did not review the deposition of Sujit Maharana, correct?
A Correct.
Q You mentioned Analytics and Insight product in your report.
Does that sound familiar?
A Yes.
Q And Analytics and Insights is one of the DPIAs, number 10, on your materials considered list, correct?
A That's correct.
Q Would it be helpful for your analysis of Analytics and Insights to review the deposition of the lead engineer for Analytics and Insights?
A It might be.
Q It might provide some insight into what that product does, fair?
A Yes.
Q And part of your opinion is about what the Analytics and Insights product provides, correct?

A Yes.
Q You didn't review the deposition of any third-party witnesses in this case, correct?
A That's correct.
Q Number 24 on this list is "PowerSchool Responses and Objections to Non-Uniform Interrogatories; Supplemental Responses and Objections to Non-Uniform Interrogatories 2, 3, 7, 8; PowerSchool Supplemental Responses and Objections to Non-Uniform Interrogatories 1, 4, 5."
Did I read that correctly?
A Yes.
Q You didn't review any other written discovery provided by PowerSchool in this case, correct?
A Say that again, please.
Q You did not review any other written discovery provided by PowerSchool in this case other than the interrogatory responses listed in number 24?
MR. LIDDELL: Objection. Form.
A I don't really know what you mean, I'm afraid. It's like too much of a

legal thing for me to know if I can answer that -- how to answer that.

Are you asking me if I read 24?

Q We can start there, yes.

Did you review all of the interrogatory responses listed in point number 24 on your materials considered list?

A I did not read them.

Q Did --

A I don't even know what an interrogatory is.

Q Fair.

Number 25 is "Other Publications found on the CV of Catherine O'Neil."

Did I read that correctly?

A Yes.

Q And the other publications found on the CV of Catherine O'Neil, do you recall which specific publications you considered in drafting this report?

A Well, I remember in the section where I talked about what is an algorithm. I took -- you know, not verbatim, but I took the idea from my Weapons of Math

Destruction book, because I have an example of like cooking dinner as an algorithm.

Q So you considered your Weapons of Math Destruction book, correct?

A For example, yes.

Q Any other publications you recall specifically considering in drafting your report?

A Not that I can remember.

Q And if it's helpful, we can scroll down to the next page, which is Appendix B. And then the second page of Appendix B, there's a list of publications, correct?

A Mm-hmm.

Q Do you -- other than Weapons of Math Destruction, did you rely on any other publications in this list specifically in drafting this report?

A No.

Q Your book Weapons of Math Destruction, is that publication related to educational technologies, or EdTech?

A It's a very general book. Different chapters have to do with

algorithms in college admissions and insurance and the justice system, hiring teachers, teacher evaluations.

So I guess you could consider that EdTech.

Q Does that section reference any educational technology specifically?

A I mean, I think like the intersection of the college admissions chapter and like Naviance is nontrivial because like Naviance had like that college-readiness stuff.

Q Does Weapons of Math Destruction mention Naviance specifically?

A I don't think so.

Q Is any part of Weapons of Math Destruction specifically related to K-through-12 students?

A Yeah, because I was talking about getting into college, and I was talking about teaching to the test and like teacher evaluations of K-through-12 students.

Q Going back to Appendix A -- so if we can go back up a few pages...

Other than the DPIA reports, the deposition of Mr. Flagg, and PowerSchool's discovery responses, the items on this list that you considered are publicly available sources, is that correct?

MR. LIDDELL: Objection to form.

A I mean -- so some of these things I got to on my own through browser, many of these things, like certainly the tampabay.com links and stuff, and the PowerSchool stuff.

And the DPIAs I was sent. The deposition I was sent. The settlement agreement I was sent. The number 24 thing presumably I was sent.

Q You have not reviewed any proprietary data from any PowerSchool product, correct?

A By the way, I just want to -- if you don't mind, could I make a comment --

Q Sure.

A -- to one of your earlier points?

Like it's possible that there is a reference in this report to that number

24, it's just I'm not very -- I don't have a perfect memory for legalese.

So like it just -- it's possible I did, in fact, look into that and it's listed in my report, but I -- unless I go through my report and look at all the footnotes, I won't know.

I'm just saying that because I realized that like at first number 12 looked unfamiliar, but then I looked at it more and I was like, oh, no that is something I referred to in my report. So I don't want to be making that mistake with one of these other ones.

Would you repeat your previous question?

Q You have not reviewed any proprietary data from any PowerSchool product, correct?

A That's true.

Q And with respect to number 24, those interrogatory responses, you don't know whether or not you reference those interrogatory responses in this report, correct?

A I could look. I haven't memorized the footnotes of my report.

Q You have not reviewed any source code for any PowerSchool product, correct?

A That's correct.

Q You have not reviewed any algorithm that you claim the schools that use PowerSchool's products use, fair?

A I'm sorry, could you say that again?

Q You have not reviewed any algorithm for this case, fair?

A That's correct.

Q Did you rely on any other materials that are not listed in Appendix A of your report?

A I guess I would like to just ask if this is a list of all of my footnotes?

Because I'm absolutely sure the footnotes are a full listing of the things that I relied on for this report, but I don't know if this is the same list.

Q Did you prepare this Appendix A?

A I did not.

Q Did you check whether everything

included in the footnotes of your report was included in Appendix A?

A No.

Q Other than -- so you can only say for certain that you reviewed the materials in the footnotes of your report, fair?

A That's fair, yes.

And I can check right now, but I didn't actually already check appendix -- I asked those guys, the counsel, Andy and Leonard, to do the formating for this for me.

Q I won't make you go through that exercise right now.

A Okay. Thank you.

Q So we'll focus on the footnotes of your report.

A I appreciate that.

Q Yes.

Is there anything that you considered in drafting this report that's not included in a footnote of your report?

A No. I mean, except my own brain.

Q Fair.
Are there any materials you asked for but were not given?
A I asked for a demo. I asked for the data so that I could audit these things, but those weren't available.
Q Anything else that you asked for and were not given?
A I asked if they knew of actual harm that had been perpetrated by some of these algorithms or actual stories of harm or actual use cases for these.
And they didn't have them for me.
Q They didn't have any examples of actual harm caused --
A Correct.
Q -- by a PowerSchool product, correct?
A Right. That's right, which is why I don't have a claim that there has been actual harm in this report.
Q So you're not providing an opinion that there has been actual harm from any PowerSchool product, correct?

A That's correct.
MR. LIDDELL: Objection. Form.
BY MS. LOGAN:
Q And looking at these DPIAs, these are the PowerSchool products that you analyzed for the purposes of this report, correct?
A I'm going to assume these are the same as the footnotes, DPIAs, and say yes.
Q Did you read the complaint in this case?
A I might have read the complaint at the very beginning.
Q You don't recall specifically reading the complaint in this case?
A I don't.
I certainly talked to the counsels about it.
Q Did you have any communications with fact witnesses?
A No.
Q Did you have -- did you ever speak to the named plaintiffs in this case?
A No.

Q Do you know the names of the named plaintiffs in this case?
A Nope.
Q Do you know where any of the students who are plaintiffs in this case attended school?
A Nope.
Q Do you know how old any of the student plaintiffs in this case are?
A No.
Q Do you know what states the plaintiffs in this case live in?
A No.
Q Do you know -- or have you reviewed any records for any plaintiffs' attendance or behavioral history at school?
A No.
Q Some of your opinions relate to racial bias, correct?
A Yes.
Q Do you know the race of any plaintiff in this case?
A No.
Q Do you know which PowerSchool products the plaintiffs in this case used?

A No.
Q Do you know whether any of the student plaintiffs received a graduation likelihood analysis through a PowerSchool product?
A Could you ask that again? Sorry.
Q One of the analyses that you address in your report is a graduation likelihood analysis, is that right?
A Yes.
Q Do you know whether that analysis has been done with data from the plaintiffs in this case?
A No.
Q Do you know whether the named plaintiffs have experienced any actual harm from a PowerSchool product?
A No.
Q You're aware that this is a class action, correct?
A Yes.
Q And plaintiffs are bringing this case on behalf of a class of people, fair?
A Yes.

chances of graduating and on an algorithm for early warning systems, correct?

A Each early warning system is an algorithm.

Q Do you know how many early warning systems there are?

A Well, we have the Attendance Intervention product, which is spotting early warning signs of absenteeism. I'm just -- this is a quote.

And then there's Performance Matters which can be configured to display early warning indicators for categories, including attendance, behavior and mobility.

And then the Analytics and Insights product is a warning system to identify students at risk of not graduating.

So those are all the different productive algorithms that I am claiming carry a lot of risk.

Q Are there any other algorithms that you are offering opinions on in this case?

A Not specifically.
Q Generally --
A But --
Q -- are there any other algorithms that you're offering opinions on in this case?
A Well, for example, when I quoted that thing -- that second part, that Performance Matters, it can be configured to just like quote early warning indicators for a category including the three I mentioned, [redacted]
But there could be others. You know, I would be worried about any early warning indicator. Any of those would like comprise of risky thing that should be monitored and audited.
So yeah, I want to keep it general in that sense.
Q When you say that Performance Matters can be configured to display these early warning indicators including [redacted] are you aware of whether every school configures

early warning indicators to include
[redacted]
A I don't know the answer to that question. It might not be every school.
But the fact that it is available is what I'm interested in.
Q Are you aware of any school that configures Performance Matters to display early warning indicators of [redacted]
A I'm not aware of any school that does that.
Q Is it possible that some schools do not configure Performance Matters to display, for example, [redacted]
A Yes, that's possible.
MR. LIDDELL: Objection. Form.
A That's possible.
Q Is it possible some schools do not collect the data required for certain of those early warning indicators?
MR. LIDDELL: Objection. Form.
A That's possible.
Q Would you agree that the data elements stored for any given product will

vary based on the school?
MR. LIDDELL: Objection. Form.
A I very much assume it does vary.
Q Would you agree that the data elements stored for any given product would vary based on the student?
MR. LIDDELL: Objection. Form.
A I mean, different students in different schools or different students in the same school?
Q We can start with different students at different schools.
A Right. So the answer is yes because I assume different schools do it differently. So obviously for a given student in different schools like it would be different.
For two students at the same school, it probably would be less different, but there might be differences.
Q There might be differences in the data elements stored for a given product between students at the same school?
MR. LIDDELL: Objection. Form.

A Could you repeat the question?
Q You don't know one way or another whether those early warning indicators are based on a predictive model, is that fair?
A No, that's not fair.
Q What's your basis for stating that these early warning indicators are based on a predictive model?
A My basis is that an early warning indicator is a predictive model.
Q Could you explain that for me?
A The only reason you would know whether something warned -- this is just speaking in plain English.
The only reason you'd know something is an early warning is if you had notion that something is to come and this is a bad sign for that thing if it's a bad thing that might come.
That is based on a prediction, based on historical information, like when I saw this red flag, then later on it turned out bad things happened.
But the notion of a red flag

means you're using historical information to train your future predictions. So early warning indicators are predictive algorithms. They might be very simple but they're very predictive.

Q You haven't conducted any analysis of any algorithm underlying an early warning indicator, fair?

A You mean for PowerSchools?

Q Correct.

A I have not done any analysis on PowerSchool's algorithms.

Q Is there a difference between a predictive algorithm and a rule-based model?

A It depends on what the rule-based model does.

Q What do you understand a rule-based model to be?

A I mean, you could think of a recipe to cook meatloaf as a rule-based model and then there wouldn't be a predictive algorithm.

Q Would an example --

(Simultaneous crosstalk.)

A -- instructions.

Sorry, go ahead.

Q Apologies for cutting you off.

Would an example of a rule-based model be if X happens 10 times, then Y results, is that rule-based?

MR. LIDDELL: Objection. Form.

Q Sorry, what was your answer?

A I don't -- I don't know. It depends on whether Y is a necessary consequence of X happening 10 times or whether it's a prediction -- or actually, if you're talking about a rule -- I don't really know what you mean by a rule-based model. I'm sorry. You'll have to be more precise.

Q You said there's a difference between whether there's -- whether it's a necessary consequence or a prediction.

Did I hear that correctly?

A But I was answering it -- the question that I thought you asked, which is not the question you actually asked. So like you'll have to ask a question.

So that wasn't really an answer.

Q Could you explain for me the difference between a necessary consequence versus a prediction?

A Yeah. I mean, let me just differentiate, as I did for the counsels that I'm working with, like the difference between a descriptive statistic and a predictive statistic.

A descriptive statistic is something like Johnny went -- Johnny missed school last week. Johnny missed geography class on Tuesday of last week. That's just a description. That happened.

And you could also even count how many times did Johnny miss geography in the last semester. That would be a descriptive statistic.

But as soon as you say, this is a warning sign, or this is an early warning sign, or this is a bad sign, or this -- as soon as you're saying something along those lines, you're saying, This is meaningful for the future, that's prediction. That's predicting.

Now, it's a vague prediction

right now, but when you implement it as an early warning system, then it becomes a very precise prediction.

So does that help?

Q That helps.

And I know we talked a bit earlier about whether you were aware of any actual harm as a result of PowerSchool products.

Do you remember that conversation?

A Yeah.

Q In your report, you're providing opinions on the risk of future harm, is that fair?

A I'm definitely providing my opinion on risk.

To be clear, I don't know there hasn't been harm either. So I don't want to just focus on the future. There could have been risk -- there could have been harm in the past or presently.

But I definitely think there's risk. There is risk present. That is my report. I'm a risk -- that's my job is to

understand and to measure risk, and I definitely -- I definitely find risk in this product. That's what I'm talking about here.

So to be clear, I'm not claiming there has been harm or there will be harm, I'm claiming there is a lot of risk for harm, and there could have been harm already.

Q So your opinions are related to the risk for harm, correct?

A That's correct.

Q And it's the risk of harms that may occur in the future, fair?

A Or may have occurred in the past, yes.

Q What risks specifically are you providing opinions on in this case?

A There's a lot of different -- there's three categories of risk, but I don't want to -- yeah, let me just talk about the categories of risk, and we can go into those if you'd like.

There's the risk of inaccuracy, but it's just a bad -- it's a bad

prediction, you know, that you're just getting it wrong, that PowerSchool is not doing a good job of predicting things. That's inaccuracy.

There's one category, and there's harms that could come out of that. We could talk about that.

And the second category of harm is that it's biased. So it is more likely to alert people to a type of risk for certain types of students and not other students, and there's harm -- there's different kinds of harms associated to bias.

And then the third type of category is usage, which is to say that this -- these things, even if they're completely accurate and even if they're completely unbiased, they could still harm students depending on how they're used.

So we could talk about that as well.

Q I would like to talk about each of those.

Starting with the first category

you listed, that was the risk of inaccuracy, is that correct?

A Yes.

Q What harms, in your opinion, would result from an algorithm being inaccurate?

A To be clear, all of the answers to these harms questions are going to depend on the usage. So I can't really talk about harms without stipulating a way it's being used because it's not harmful abstractly.

Abstractly -- you know, truly abstractly, if a scoring system or an early warning system goes off and no one pays attention, there's absolutely no harm to it. It's just a computer talking to itself.

So the only possible way it could be harmful to a student is if a teacher or an administrator acts on it in a certain way.

So I have to imagine that they care enough about these early warning systems to act on them in some way.

So with that stipulation, if you want me to go into what could go wrong if it's inaccurate -- would you like me to do that?

Q I guess, first -- so it's your opinion that all of the harms that could result from these categories depends on what the school systems or the administrators do with the information, is that correct?

A Yeah.

And by the way, could we get rid of this for this part of the conversation so I could see your face?

Q Yes. Yes.

A I appreciate that.

Q Thank you.

A Thanks.

Yes, I agree with that. It all depends on how it's being used.

Q And it depends on how it's being used by the school, fair?

A Yes.

Or, I mean, or anybody who has access to it. Like if the police

department has access to it, it could be used badly by them, too.

Q The police department would have access to it if the school shared it with the police department, fair?

A Yes.

Q Are you aware of any schools that have shared information from a PowerSchool product with a police department?

A Not from a PowerSchool product, but I do think in my report I refer to a different school system that did share such type of information about attendance and so on with a police department and that was really scary.

So I know that kind of thing happens.

Q Going back to inaccuracy, what harms could result from an algorithm being inaccurate?

A Okay. Well, there's three types of harms I would start out with, and I wouldn't end with, but I'll start out with over reaction or underreaction or misguided

reaction.

So, for example, if it's inaccurate because it just doesn't -- it scores people too low on average, then not -- and if the teachers and administrators trust it, then they would underreact.

Similarly, if it scored people way too high, they would overreact. And then it's possible that they just -- it's like random. It's not -- it's like it doesn't -- it doesn't pertain to the correct type of outcome.

And then it would just be all over the place and they would be wasting their energy on calling parents to warn them of their kid not graduation -- graduating when it was completely irrelevant to what's actually happening with the kid.

So it's just misdirection.

Q So the --

A Sorry, I just should have finished by saying that's assuming that that's how the teachers and the

administrators would respond to that.

There are worse case scenarios where the harm is greater.

Q The risk of inaccuracy here comes from how the schools or school systems respond, fair?

MR. LIDDELL: Objection. Form.

A Say that again, please.

Q The -- this risk from inaccuracy comes from how the schools or the school systems respond, correct?

A No.

MR. LIDDELL: Objection. Form.

A I wouldn't -- that's not the characterization I would give what I'm trying to describe.

It's the whole thing. The risk comes from the fact that it's a score -- it's a scoring system with a threshold, so it's a predictive algorithm. It's a warning system built by a company that is filled with experts and that the school system is being given, and it's described as an early warning system and it's been configured. And so it has already a lot of

trust engendered in it.

And then the school system gets to decide how to use it. And the trust might lead it to use it in very high-stakes ways, but I don't think it's -- I wouldn't blame the school system for using it, I would blame the system itself for not being accurate. And for engendering trust that is not deserved.

Q So the risk comes in part from how the school system uses that information, fair?

MR. LIDDELL: Objection. Form.

A It's all of a piece. Like you can't talk about what the harm looks like unless you know exactly how it's being used. I'll give you that.

Q And how it's being used is how the school is using it, fair?

A How the school is using it, yes.

And I would just add that like one of the things I would like to see in any setup like this where it is high risk is not only an audit for accuracy and an audit for bias, but also a very clear

description of the use cases that are reasonable versus unreasonable or inappropriate.

So in other words, I would like some of it -- some of or if not many -- much of the accountability for usage to be on the company that is providing these predictive algorithms.

Q Do you know -- I guess on your last point about accountability for usage, who decides or determines that usage?

A I don't know, but I'm supposing that the school systems do ultimately.

Q With respect to the risk of inaccuracy, do you know whether that risk has materialized for any named plaintiff in this case?

A I don't know.

Q Do you know whether that risk of inaccuracy has materialized for any student at any school that uses a PowerSchool predict?

A I just want to say that every algorithm has some inaccuracy. So, you know, it doesn't make sense for me to say

that there's -- that I'm not aware of any accuracy because every algorithm has inaccuracy, right? So it's just like -- but I don't know of a specific instance of inaccuracy.

Q You're not aware of any specific instance of inaccuracy causing harm to a student related to PowerSchool, fair?

A Correct. That's fair, yes.

Q Okay. Your second category was the risk of bias, correct?

A That's correct.

Q What -- can you explain what you mean by a risk of bias?

A Yeah. There's a very famous article in ProPublica about recidivism risk algorithms being biased against black defendants where their risk scores were much higher on average, and there were examples where a black defendant got a high risk score and -- even though they had much less of a record than a white defendant and they didn't actually recidivate but the black -- the white defendant who had like a longer rap sheet did, and he got out

earlier, the white did -- the whiter defendant did because his risk score was lower.

So it's -- that's just an example that's really well-known, it's public. But to be honest, like I'm an algorithmic auditor, so I measure this all the time. This is kind of my job.

And it's endemic. It's like every time you look for a racial bias, you find it.

Q And are you aware of any racial bias in any PowerSchool product specifically?

A I'm not aware of any -- I have not investigated and -- because I haven't had access to it.

Q Where does the risk of bias come from?

A Historical prejudice in ways that people aren't even aware of themselves.

I think I referred in my report to the fact that the same behavior displayed by white or black students will

be more likely to get reprimanded if they're black.

So, you know, when I look at information such as, you know, early like behavioral data and early warning signs about behavior, I worry that it might be biased against black kids.

Q You mentioned the risk of being reprimanded.

Is that something the school would do?

A Presumably, yes.

Q So the risk of bias comes from, in part, the school, fair?

MR. LIDDELL: Objection. Form.

A This is a well-known fact about student behavioral data. So I would like to think about it at a holistic level.

Anybody who's dealing in behavioral statistics or students would be aware of this. I would have to monitor for this problem, would have to alert anybody who's using algorithms based on behavioral data, there's a likelihood of a racial bias here, we have to keep track of it. We have

to monitor it. We have to mitigate it if it's there.

So I don't want to, you know, place the blame for this society-wide historical problem at the feet of teachers.

Q You have not analyzed any model used by a PowerSchool product for the risk of racial bias, correct?

A That's correct.

Q Are you providing any opinion on a risk of racial bias against any students other than black students?

A Certainly like Hispanic students would be part of that.

Q Do you know whether the risk of racial bias has materialized for any named plaintiff in this case?

A I do not know.

Q Do you know whether the risk of racial bias has materialized for any student in the potential classes in this case?

A I do not know.

Q So you don't know whether any harms have occurred from the risk of racial

bias for any named plaintiff in this case, correct?

A That's correct.

Q And you don't know whether any harms from the risk of racial bias have occurred for any specific student in a potential class in this case, correct?

A Correct.

Q The third risk category you mentioned was usage, which I think we've talked about a little bit in the context of the rest of these, that risk of usage is -- you said it depends on how the analysis is used, correct?

A Correct.

Q And as we've discussed when we're talking about how the analysis is used, that's how it's used by schools, correct?

A That's right.

Q So the risk of usage comes from how the school uses the analysis, fair?

A I agree.

And I also want to remind us that like I think it would be only

appropriate and should be required that PowerSchools would suggest inappropriate or appropriate use cases for these powerful, high-stakes algorithms.

And I used -- I suggested something in my report for the graduation algorithm -- prediction algorithm where it doesn't have to do with bias or accuracy. I could assume it's completely accurate and completely unbiased, which, of course, nothing is completely inaccurate -- completely accurate and nothing is completely unbiased.

But even imagining that in some kind of idealized situation, like you could still have an inappropriate usage for the graduation prediction algorithm in the sense of like deciding which students to, you know, pay attention to to get them over the hump and get them to graduate and ignoring student that's fall below that threshold, that would -- that would punish -- unfairly punish the students that fall just below that threshold.

Q Are you aware of any

inappropriate usage of that graduation likelihood analysis for any student?
A For the PowerSchool version of that algorithm, is that what you're referring to?
Q Correct, yes.
A I'm not aware of that being done using PowerSchool products, but I certainly think that it has been done in the past to get -- to optimize to graduation rate at the -- like in harming the students.
So it is a kind of thing that happens.
Q And those past use cases you're discussing have nothing to do with PowerSchool, fair?
A That's fair.
Q So between the risk of inaccuracy, the risk of bias and the risk that comes from usage of algorithms, you're not aware of any harm to the plaintiffs in this case resulting from PowerSchool product from any of those categories, correct?
A Correct.

Q And same question with respect to any student in a potential class in this case, correct, you're not aware of any harm that's resulted from inaccuracy, bias or usage from a PowerSchool product?

A Correct.

Q You mentioned earlier that there are many different specifications that can go into a model, correct?

A Correct.

Q Are you aware of what specifications go into any of the models that you are providing opinions on in this case?

A I don't know specifics because I haven't had access to them.

Q Dr. O'Neil, how did you prepare for today's deposition?

A Last Friday, I was -- I had a short meeting, 40-minute meeting, with Andy and a woman at his law firm, I believe, and I forget her name. And we just talked about general rules about depositions, which I pretty much already knew. But no content-specific preparations.

Q I want to look at page 25 of your report, which is Exhibit 1.
And in the first paragraph of Section V, you say: "In some statements, it might seem that PowerSchool does not provide ready-made algorithms, but only provides a platform with which school systems can build their own predictions for graduation rates or likelihoods for individual students."
Did I read that correctly?
A Yeah.
Q What do you mean by a "ready-made algorithm"?
A Like algorithms that are ready to like plug and play with student data.
Q What do you need to plug -- so it's the student data that you would need to plug into the algorithm?
A Well, that and a few configuration issues, but yes.
Q What would a ready-made algorithm already contain?
A The underlying logic of what to do with the data and how to build a score

and whether it, you know -- once it knows with the threshold, like whether -- how to make a red flag and how to make that apparent or like how to display those results to the user.

Q So in order for the algorithm to work, it needs a threshold, a way to know what the red flag is, correct?

A Yes.

Q And it needs the data, correct?

A Yes. And it might need a couple more things, too.

Q In your report, this first paragraph, you go on to say: "However, there is also evidence that they do in fact provide algorithms. There are two sources of evidence for this. First, their own webpage, and [redacted]

Did I read that correctly?

A Yeah.

Q And we've spoken a bit about the webpage. I want to talk about this second bit, [redacted]

[redacted]

Did I read that correctly?

A Yes.

Q And that's from the deposition of Mr. Darron Flagg, correct?

A Can you scroll down to the bottom of the page, please?

Yeah, that's the Flagg deposition.

[redacted]

[redacted]

[redacted]

Q In your opinion, algorithms, as we said, require historical data, correct?

A Yes.

Q Does the historical data need to be specific to the customer in order to be accurate?

A What do you mean by that?

Q If an algorithm was trained on de-identified data, would it affect the accuracy of the algorithm?

A I think you're missing part of the notion. Like if you're trying to train it on de-identified historical data and then apply it to a school a thousand miles away -- so you mean accurate on those new students in the new school?

Q Yes.

A Yeah, that could be a problem

for sure.

So, I mean, that's an example of one of the reasons that recidivism risk algorithms are problematic, is that they train them on populations of -- in New Mexico of female prisoners in 1954 and then they're still using them on men in Pittsburgh.

You know, so it's just like irrelevant, old data. It's definitely a problem for accuracy.

Q In your report, you say there's no reason to build a de-identified dataset other than to train algorithms.

Are there any other reasons to build a de-identified dataset in your opinion?

A Well, I mean, it occurred to me that you could -- you could be just using it for the descriptive types of statistics that we talked about earlier, but that's not really -- that's so dumb.

That's kind of like as dumb as like an Excel spreadsheet, you know. It's like making a bunch of artificial data in

an Excel spreadsheet to show that you could add things up.

So I don't think anybody would bother to build a de-identified historical dataset with consent, which is also part of this paragraph, that the students gave consent to be part of this. I don't think anybody would bother to do that for descriptive, statistic-type testing.

Q It's possible -- sorry.

A It's possible. It's possible, but I think it's very unlikely that that's the only way it was used. So that's why I wrote this.

Q It's possible that a de-identified dataset could be used for purposes other than training algorithms, fair?

A I think it's unlikely that it was only used for that.

Q But it's possible that a de-identified dataset could be used for purposes other than training algorithms, correct?

MR. LIDDELL: Objection. Form.

A It is possible.

Q Did you consider any other deposition testimony or documents to draw this conclusion that there would be no reason to build a de-identified dataset other than to train an algorithm?

A I did not.

Q Could a de-identified dataset be used for performance testing?

A Yes. But also, you could just put in random number and do performance testing and that would be a lot cheaper and a lot easier.

So I firmly believe that that's not the only reason it was built. This is a -- this is a difficult thing to build with a lot of work, with getting people to consent. It requires legal help. It requires a lot of work. And if you just wanted to do performance testing, you would just fill stuff up with synthetic data and test it that way.

[redacted]

[redacted]

Q And that's from this deposition testimony of Mr. Flagg, correct?

A Correct.

Q And those are each performance testing, feature testing, demos, purposes other than training algorithms, correct?

A I think the features are algorithmic. So I don't think that's different from what I'm saying.

Q You think that the product features are algorithmic, is that what you're saying?

A I'm saying that the product features, in my opinion, include the algorithms that I've been talking about, like the early warning systems.

Q What is your basis for that opinion?

A Because that's what you would need the historical data to train your model to make sure it was working in a reasonable way before selling it.

By the way, I would consider it inappropriate for them not to test these algorithms that they're selling.

Q Sure.

I'm talking about the PowerSchool products, even features other than algorithms, and whether this de-identified dataset could be used for demoing other features.

A It could be used for demoing other features.

Q That are unrelated to

algorithms, fair?
A Yes.
But I don't think that's why it was built.
Q And you don't think that's why it was built...
A That's right.
Q Just based on your general understanding?
A My general understanding of -- yes, of -- like I do this kind of thing myself and I -- if I wanted to do something just for a demo, I would not go to the trouble of getting consent from a bunch of students and de-identifying their data. I would just make synthetic data and display it in a demo.
Q Did you speak to anyone at PowerSchool about why this dataset was built?
A No, I did not.
[redacted]
MR. LIDDELL: Objection to form.

A I did not.
Q Are you aware that California and other states' laws actually allow EdTech providers to use de-identified data to improve educational products?
MR. LIDDELL: Objection. Form.
A I did not.
Q Are you aware that California and some other states' laws allow EdTech providers to use de-identified data to demonstrate the effectiveness of products?
MR. LIDDELL: Objection. Form.
A I do not -- I don't know the law. I'm not a lawyer.
[redacted]

[redacted]

[redacted]

What does it mean to make sure that it's working well if not testing?

Q When you say, "it's working well," isn't there other features in PowerSchool products, algorithms aside, that could be tested using de-identified data, correct?

A Yeah.

I mean, I have to read the law, but I'm just saying that it like -- it points to the idea of making sure things are accurate, which is to say an algorithm.

MS. LOGAN: I'm in a good place to stop, if we want to take our lunch break. I know it will be a little longer because of your doctor's appointment.

We can go off the record.

THE VIDEOGRAPHER: The time is 11:35 a.m., and we're going off the record.

(Whereupon, a brief recess was

taken from 11:35 a.m. to 1:03 p.m.)

THE VIDEOGRAPHER: This begins media 3. The time is 1:03 p.m. We're back on the record.

BY MS. LOGAN:

Q Dr. O'Neil, before the lunch break, we were talking about ready-made algorithms.

Do you remember that discussion?

A Yeah.

Q Could you help me understand the difference between a ready-made algorithm and an algorithm generally?

A I mean, there's really -- I mean, a ready-made algorithm is an algorithm. It just means that it's like nearly implemented. It just -- it requires the last few things, which in this case means like the data -- the input data itself and some configurations about hyper parameters and factors.

So like last-minute choices and then you implement it. Like it's basically ready to go. So it's an algorithm.

I mean, if I use the phrase

"algorithm" without saying "ready made," it could be an abstract notion rather than something that's been implemented on a machine.

Q What configurations would be left to determine?

A Like which particular factors are going to be used for the graduation alert system.

As you pointed out earlier, not every school is going to collect the same exact data elements, so the choice of the data elements, the weightings of the data elements, how much do we care about this versus that, the threshold and, of course, the students' data.

Those are most obvious choices, but there's probably other configurations, like how it's presented, whether it's a daily report or a monthly report, or is it an e-mail to a teacher or is it an e-mail to the principal. Is it -- and, of course, there's also the question of how it's used. It could be used in many, many ways.

But in terms of like going from

a ready-to-go -- ready-made algorithm to actually being implemented, those are the kinds of things I'm talking about.

Q And those configurations in this case would be determined by the school, correct?

A Presumably.

As I said before, I doubt that a typical person at a school would have a strong opinion about that and would probably rely on the -- PowerSchool's representative to help choose those things.

Q But you don't know what help PowerSchool provides --

A Nope, I don't.

Q So it's possible PowerSchool does not provide any help with respect to what those configurations should or will be?

MR. LIDDELL: Objection to form.

A I think that it's implicit in the list of possible choices that -- that's help. I mean, that's not only help, but it's like validation that these things would be reasonable to choose.

So I don't agree that it's not -- they're not helping. They might not have a person representing PowerSchool talking to the person at that moment. They might not be in person, they might not even be online chatting, but the very fact that it's set up the way it must be is help.

It's the framework of -- it's like they're going basically through like a -- at the very least, they'd have to go through something like a user guide to figure out how to set it up, how to configure it.

Q At the end of the day, the schools make the choices of what those configurations actually will be, fair?

MR. LIDDELL: Objection. Form.

A I will assume that. I don't know that for sure.

As I said, I don't even know if there's a default setting. So it's possible that there is a way of bypassing all those choices and just say, Give me the default. I don't know.

Q Right. You don't know if

there's a default, say, like an out-of-box setting, fair?

A I don't know.

But it doesn't really matter from my perspective because any set of choices represents risks.

Q I want to turn to page 25 again of Exhibit 1 --

A Okay.

Q -- your report.

And I want to look at the very last paragraph on this page that begins "My conclusion."

And you say: "My conclusion is that PowerSchool offers their customers ready-made algorithms that predict the chances an individual student will graduate based on an opaque scoring system that depends on data that the school is to provide related to attendance, behavior, grades, standardized tests, and school credits."

Did I read that correctly?

A Yes.

Q When you say that PowerSchool

offers these ready-made algorithms that make these prediction based on an opaque scoring system, what is your basis for stating that there is an opaque scoring system used in any PowerSchool product?

A Just what I was saying earlier, that anything that's predictive, like an early warning system, has to at its basis rely on a scoring system.

Q So anything predictive in your opinion has an opaque scoring system?

A If it becomes a warning, that means that the score has crossed some kind of threshold.

Q And this opinion that anything predictive is based on an opaque scoring system, that's not unique to any PowerSchool product, correct?

A No. No, not at all. Absolutely not. No.

I would say that about any early warning system.

Q Sure.

So this opinion about PowerSchool using an opaque scoring system,

you're assuming that there is an opaque -- that there's a scoring system at all, fair?

A Yes.

Q And you're assuming that that scoring system is opaque, fair?

A That's fair.

Q And --

A It's a little opaque to me.

Q Sure.

And having not looked at any algorithm from a PowerSchool product, you're assuming that those algorithms are ready-made, is that fair?

A Yes.

Q Are you familiar with the Student Data Privacy Project?

A No.

Q Are you familiar with Screentime Consultant?

A No.

Q Are you familiar with Fairplay for Kids, The Screen Time Action Network?

A No.

Q Have you ever worked with Emily Cherkin in any professional capacity

before?
A No.
Q Have you ever worked with Emily Cherkin on anything else before?
A I mean, I'm very bad with names, so I could look for her name in my e-mail, but I certainly didn't remember her name or working with her.
Q You don't remember the name Emily Cherkin?
A No. I mean, I've heard the word Cherkin in the context of this lawsuit, but I don't know her.
Q You don't know one way or another whether Emily Cherkin specifically is affiliated with this lawsuit?
A I saw a word -- the word "Cherkin" is like resonating with me right now.
Q Have you been retained by plaintiffs' counsel to provide expert testimony in any other case?
MR. LIDDELL: Objection. Form.
A You mean like by EdTech Law Group?

Q Correct.
A Oh, no, I have not.
Q Have you been retained by Hagens Berman in -- to provide expert testimony in any other case?
A No.
Q Also, we can take down the -- Exhibit 1 --
A Thank you.
Q -- so you can see my face.
A Thank you.
Q We talked earlier about a few risks, and you gave me three risks, the inaccuracy, bias and usage.
Do you recall that?
A Can I just make an amend -- like can I add something to what we were saying about the last paragraph on page 25?
Q I think I -- sure.
A And I said this earlier, but I just want to like mention once again that instead of relying on a numerical scoring system, it could really be relying on some kind of ranking system or grading system but it's mathematically equivalent to a

scoring system.
I -- obviously, since I don't know it, I don't know exactly how it works, but it's going to be something like that.
Q Yeah. You don't know whether -- what scoring system it uses, if any?
A Right.
Well, I know it's a score system, but I don't know what it is.
Q Okay.
A Thank you.
Q Of course.
Going back to those three risks, inaccuracy, bias, usage, do you recall that?
A Yep.
Q Did you do anything in this case to assess the likelihood of those risks materializing with respect to any PowerSchool product?
MR. LIDDELL: Objection to form.
A I didn't have access to any PowerSchool product, but I have had a lot of history of looking at these kinds of questions and finding, in almost every

single case, some problematic inaccuracies and problematic biases.

Q And that's with respect to your experience with algorithms generally, correct?

A That's correct.

Q But you didn't do any specific analysis of the likelihood of those risks materializing from PowerSchool products, fair?

A That's fair.

MR. LIDDELL: Objection to form.

A That's correct.

Q Without looking at any algorithms or how schools have used them from a PowerSchool product, could you assess the likelihood of those risks materializing?

MR. LIDDELL: Objection. Form.

A I could not precisely estimate the risk, but I would estimate the risk to be larger than zero. But I don't -- I can't actually assess them because I don't have access to them.

Q What would you need to do that

sort of analysis?

A It depends on which kind of analysis you want me to do, accuracy, bias or usage risk.

Each of those require usage knowledge, like the context of how it's being used. But if I wanted to assess the accuracy, like whether it's accurate, I would need historical data, and quite a lot of it, like 10,000 or more data points.

So like a prediction of the -- with a particular time horizon of how likely -- like what is early -- who's getting risk -- who's getting flagged for like likelihood of not graduating on time and then I'd need to see the output, like the results, who actually graduated on time, who didn't. I'd need to see that over the appropriate time horizons for a lot of examples.

That would be an accuracy audit. If I wanted to look at a bias audit, I'd have to have additional information, like I'd have to know the ethnicity or race of the folks and all that data. And I'd need

more data because I'd want to be able to compare different -- how it works for different races or genders. I could do that, too.

Q So you would --

A Or learning disability status.

I apologize for interrupting you.

Q No, I appreciate your input.

So you would need to know each -- how each school uses the algorithms to assess the likelihood of those risks, fair?

MR. LIDDELL: Objection. Form.

A Well, let me put it this way: I could figure out whether there's a bias or whether there's inaccuracies without knowing context, but I wouldn't be able to assess harm without the context because harm isn't just an abstract thing. Harm is like somebody actually lost an opportunity or they suffered.

And that I would not be able to assess unless I knew the way it was being used. But I could say, Hey, this algorithm

is biased, but maybe no one's looking at it, maybe it's never actually used.

So I want to distinguish those two things.

Q Sure.

So it matters how each school is using the algorithm?

A In terms of harm.

Q Yeah.

These risks we're talking about, the inaccuracy, bias, usage, they're not specific to any algorithm used at any school that works with PowerSchool products, fair?

A No, not at --

MR. LIDDELL: Objection. Form.

A These are extremely general statements about algorithmic harm.

Q You've calculated damages in other cases, correct?

MR. LIDDELL: Objection. Form.

A I've worked on attorneys' general cases with like consumer fraud issues, like sub prime auto loans or payday loans, and I've helped them compute

restitution.

Q You've not done any calculation of damages in this case, correct?

A Not at all.

Q You mentioned earlier that you spoke with Dr. Schulte before you wrote your report, correct?

A That's correct.

Q Did he tell you which PowerSchool products to include in your report?

A No.

Q Did he tell you which PowerSchool products he thought had algorithms or predictive models?

A No.

Q Did he provide you with any documents?

A No.

Q Did he provide you with any other materials?

A No.

Q Did he tell you what he thought about plaintiffs' case?

A No.

Q He, I think you mentioned earlier, told you sort of what opinion should go in your report generally, is that right?

MR. LIDDELL: Objection. Form. Misstates prior testimony.

A The way I would characterize it is he said what he wanted to leave to me as the data expert, which is to say that these products, the PowerSchool products, required data -- student data to work.

Q Did he tell you whether he believed PowerSchool products required student data to work?

A Yeah. He thought he -- yes, he did. He gave me that opinion.

Q Did Mr. Schulte give you any other instructions for your analysis in this case?

A I wouldn't even consider the first thing like instruction to be honest, but he -- that was the only thing I got from him as I recall.

Q Did he give you any structure you should follow for your report?

A No.

Q Did he tell you why he wanted you to cover whether PowerSchool products required student data to work?

A Yes.

Q And what was that basis?

A Because he's not a data scientist, that even though he thinks it's completely obvious that these products need data -- student data to work, he wants an official data expert to say that.

So that was me.

Q Are you aware of whether your opinion factored into Mr. Schulte's damages analysis?

A I don't know. I have not talked to him.

MS. LOGAN: Okay. We can go off the record.

THE VIDEOGRAPHER: The time is 1:22 p.m. We're going off the record.

(Whereupon, a brief recess was taken from 1:22 p.m. to 1:28 p.m.)

THE VIDEOGRAPHER: The time is 1:28 p.m. We're back on the record.

MS. LOGAN: Thank you, Dr. O'Neil. I have no further questions at this time. So I'll pass it over to Mr. Liddell if he has any.

MR. LIDDELL: I have nothing further.

MS. LOGAN: Great.

THE VIDEOGRAPHER: Okay. Before going off the record, I would like to take the transcript and video orders.

Ms. Logan, will you be ordering the video?

MS. LOGAN: Yes. And we'd also like to request an expedited transcript.

THE VIDEOGRAPHER: Perfect. And for the video, would you like it to be synced with the transcript?

MS. LOGAN: Yes, please.

THE VIDEOGRAPHER: And would you like the video to be side by side the witness since there was documents shown on the sheen? Would you like the document to be shown --

MS. LOGAN: No, thank you. I

REPORTER CERTIFICATE

I, JACLYN URZIA, do hereby certify:

That said deposition was taken at the time and place herein named; and that the transcript is a true record of the testimony as reported by me, a disinterested person, and was thereafter transcribed.

I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of February, 2026.

JACLYN URZIA, RPR, CRR