# Attachment 4

# Exhibit B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

```
---------------------------X
EMILY CHERKIN, et al.      )
                           )
         Plaintiffs,       )
                           )
    v.                     )  CASE NO. 3:24-CV-02706-JD
                           )
POWERSCHOOL HOLDINGS,      )
INC.,                      )
                           )
         Defendant.        )
---------------------------X
```

INCLUDES CONFIDENTIAL TESTIMONY

REMOTE VIDEOTAPED DEPOSITION OF

KATHLEEN SUZANNE BARBER SIMONS

Monday, March 2, 2026

9:04 a.m. CST to 6:12 p.m. CST

Reported by: Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR, CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460, NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime Court Reporter, NY Association Certified Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778, WA CSR 23005926, Remote Counsel Reporter, LiveLitigation Authorized Reporter, Notary Public

Job No. 2026-1012179

Is that fair?
A. Maybe so, but --
Q. Your hourly rate is $750 an hour, correct?
A. That answer, I do know.
Yes.
Q. Is it -- in total, have you been paid about $30,000 for your work on this case?
A. No. I've been paid more than that.
So -- and I get -- so maybe it's closer to -- if I take all of the reading of reports and I take conversations, and everything, it might be closer to between 80 and 100 hours. I mean, just everything.
Q. Okay. So in total, you've been paid somewhere between 60- and $75,000 for your work on this case; is that correct?
ATTORNEY L. ARAGON: Objection: form.
THE WITNESS: See, I think -- yeah, it's closer to 75, maybe 80.

BY ATTORNEY Z. SHAH:

Q. So you may have spent upwards of 100 hours working on this case; is that right?

A. Yes. Yeah.

Q. Okay. Did -- did anyone help you prepare your report?

A. I did get one of my students to run some queries for me in -- in our database.

Q. And when you say our database, are you referring to the UTCID database?

A. I am.

Q. Okay. What was the name of the student?

A. Emma Niu, N-I-U.

Q. Were they compensated for their work?

A. I have not.

Q. How many hours would you estimate that Ms. Niu spent helping you prepare your report?

A. Very few, yeah.

Q. Less than 10?

A. Yes. Yes, yes, yes.

Q. Okay. Do you expect to be compensated for additional work in this case going forward?

A. I don't know if there's any additional -- I don't know.

Q. So you don't expect to be compensated for any additional work in this case going forward?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: I don't know if there's any additional work after this deposition.

So . . .

BY ATTORNEY Z. SHAH:

Q. Did you meet with anyone to prepare for this deposition?

A. I met with Leonard.

Q. When?

A. I think that was last Monday.

Q. Anyone else?

--oOo--

THE WITNESS: Yeah, I just don't remember the difference between those two attachments is what I'm --

BY ATTORNEY Z. SHAH:

Q. We'll go through that.

A. Okay. All right.

Okay. Good.

Q. Okay. So, Dr. Barber, does this look like the spreadsheet that you used to prepare your January 20th, 2026 report?

A. It does.

Q. When did you create this spreadsheet?

A. In the process of working on my report.

Q. So before January 20th, 2026; is that right?

A. That's right.

Q. At a very high level, because we will talk in more detail about how you went about creating this spreadsheet -- actually,

you know what? Strike that.

Did you look at the underlying source -- the -- the underlying UTCID database source data to create this spreadsheet?

A. No, because I did -- the query to the database allowed me to create the exposure and the monetization and -- in the vulnerability and the influence, but then I took the numbers of vulnerability and influence, and I ranked them within the context of these -- the data that's reported because I thought it would provide a better reflection of relative importance or relative -- you know, relative vulnerability or relative influence of the data.

So these monetization value -- I guess I'll just repeat that: Monetization value and risk of exposure were based on just querying the CID database, and then I took the raw values of vulnerability and influence, actually -- which are on the left-hand side in

C and D -- and then I created a ranking of them, which I thought would be a more intuitive way of reporting it.

And that's what I included in my report, was those rankings.

Q. So when you say you did a query to the database, where's the query?

A. I don't really know what you mean by that.

So . . .

Q. How did you create the database?

A. Oh, I asked my student to -- to query the database. You just ask, you know, Give me all the monetization values for all of the nodes in the graph. And then as I provided the, you know -- the CID is making those calculations based on what I disclosed about how the calculations occur.

Q. So break this down for me.

Your student goes to a Web portal and types something in.

Is that the query?

A. It looks more like a source code kind of command line query, but yes.

Q. Where -- where is the source code command line query being entered? Is there an application?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: There is an application, yes, but not in the -- in like a -- the -- I would say it's more source code that then you type a command line query to ask the -- the question.

I don't think --

BY ATTORNEY Z. SHAH:

Q. Where does the source code live?

A. At a server at the University of Texas.

Q. So how does the student access it?

A. Well, in -- by logging on to that computer. I . . .

Q. Does the source -- is the source code only accessible from that computer?

A. No. I imagine -- I don't know, but I imagine anybody could log in to -- I don't know.

Q. Sitting here today, on your computer, could you log in and execute a query?

A. From the -- the computer that I have now, no.

Q. What computer would you have to use to execute the query?

A. Well, actually, that's not entirely true. So I could -- the -- the interface that I provided in my report, I could visually see those nodes, and I could look at the monetization value, but . . .

Q. So, Dr. Barber, I'm not trying to hide the ball here --

A. Right.

Q. -- but an expert is supposed to provide the bases and the methodology for

A. Sure.
Q. -- code?
A. Sure.
Q. And let's go back to Exhibit 2, which is the January 28th e-mail from Mr. Aragon.

And you can see in the top part of the e-mail Mr. Aragon says: In preparing the underlying data for production, Mrs. Barber identified five errors in her data.

Is that correct?
A. Let me -- can I -- I'm just going to read that because I -- I haven't seen this e-mail, so -- I'm sure he used what I -- let me just read it.

(Whereupon, the proceedings paused while the witness reviewed the materials.)

THE WITNESS: Yeah, so what the -- that was simply a copy-and-paste issue of copying from

the spreadsheet that we just looked at into the table that I provided, so I . . .

BY ATTORNEY Z. SHAH:

Q. Is it correct that you identified five errors in your data when you were preparing the underlying data for production?

A. It wasn't errors in the data. It was -- well, it wasn't errors in the calculations. It was errors in me -- I copied, like, the value for -- like, let's just take this first one here.

It says -- I copied the wrong monetization value for a respective attribute, so the values that were calculated right, I copied in -- in -- so it was -- it was just a copy-and-paste problem, and --

Q. Okay --

A. -- so it was just -- yeah.

Q. -- that's fine. I want to -- we only have seven hours, and I have a fair amount of material to get through, Dr. Barber.

So it's okay -- if you don't know exactly, you can just say that.

But it sounds like you identified five copy-and-paste errors in the data.

Is that fair?

A. Right. And that the -- what I provided -- and I corrected that and -- and provided that.

Q. Okay. How did you identify those errors?

A. I don't remember. I don't know if it was because I was looking at the -- the source data and it -- I don't remember.

Q. And you'll see, if we scroll down a little bit --

A. Yeah.

Q. -- Mr. Aragon summarizes the five errors that you identified.

Is this description accurate?

A. Yeah, I -- because I was very

explicit about which ones were copied incorrectly from the data sheet, yeah.

Q. Okay. Did you prepare this description that appears in Mr. Aragon's e-mail?

A. I did.

Q. Then Mr. Aragon attaches a second Excel spreadsheet that's titled PowerSchool PII Valuation and Harms (reported on 27 January '26).

Do you see that?

ATTORNEY Z. SHAH: We may have to scroll up a little bit, Jacob, to the Attachment line.

(Scrolling.)

BY ATTORNEY Z. SHAH:

Q. Do you see the second attachment, Dr. Barber?

A. Yes, I do.

Q. Does that spreadsheet reflect the corrected --

A. It does.

Eikhart (phonetic) paper that we just submitted -- it's in there. I'm pretty sure that the one with -- that talks about the invasion of data exposed by blind people ex- -- exist, or it's in that publication.

This has been -- especially the monetary value and exposure has been kind of a long-standing way that we've calculated -- the influence and the -- and the vulnerability are more recent.

Q. Is it fair to say this document, Exhibit 6, lays out the methodology that was used to compute the numbers reflected in Appendix A to your report?

A. It does, yes.

Q. Now, other than the formulas that are specified in this document, are there any other formulas or calculations that connect the values from the UTCID source data to your Appendix A?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: In other words,
are you asking did I just use these
formulas to create the values for
Appendix A?

BY ATTORNEY Z. SHAH:

Q. Correct.

A. That's correct, yeah.

Q. So if I take these formulas and I apply them to the source data, I should be able to replicate the values in Appendix A.
Is that your testimony?

A. Yes. But there is an error that I found in the algorithm that calculated the monetary value.

Q. What is the error?

A. The error is that -- so if you look at the loss for a case, divided by the number of attributes -- and the algorithm takes the union of the attributes. So if you have a case and it had -- I don't know -- 5 inputs and 5 outputs, let's say, then it would have, you know, 10 attributes, okay.

And the algorithm was intended to union -- take a union of that set, the 5 set -- 5 in the set of inputs, 5 in the set of outputs, union those, and then you would be dividing the monetary value or loss by 10.

And that un- -- union algorithm was actually taking the union of all the characters instead of the actual elements. So, in fact, it was dividing by many more numbers than the actual elements.

Turns out that it's still highly correlated, and it represented about 1 percent error. And it doesn't change any of my conclusions, but we were dividing by a much higher number in the number of attributes than is reported in this calc- -- in this equation.

Q. So this equation is not correct.
Is that your testimony?

A. This equation is correct. The actual implementation in code, when it added, like, you know, how many attributes -- it added the inputs and the outputs, is what --

in which is what I describe in my report, instead of adding the actual elements, like Social Security number, name, address, student ID, whatever those elements were.

Instead of adding, like -- and being 10 elements, in my example, it was adding the number of characters in the inputs and outputs, which made the monetary loss, divided by the attribute value, that number of attributes being much higher. So the actual implementation was dividing by a much larger number.

Q. Okay. If I'm following correctly, when you say the actual implementation, you were referring to the source code that is used to execute the query on the UTCID data; is that right?

A. Not the query, but the actual code to do the calculation, you're right, the source code to -- to create this calculation.

Q. Okay. And the code to create the calculation lives in a GitHub repository and

can be re- -- produced to us; is that right?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: Yes.

BY ATTORNEY Z. SHAH:

Q. And that code that was used to execute the query contained an error in which you are computing monetary loss by dividing by larger denominator than you intended; is that right?

A. That is correct.

Q. And when you divide by a larger denominator, you get a smaller monetary loss; is that right?

A. That's right.

So that would be -- my numbers would be smaller than -- my reported numbers would be smaller than this calculation -- or this equation represents.

Q. Okay. And when you say the reported numbers, you mean the numbers reported in Appendix A to your report?

A. Yes.
Q. So when I asked you earlier whether there were any changes to Appendix A, do you intend to change Appendix A to reflect monetary value numbers that are consistent with the methodology that you set forth in Exhibit 6?
A. I'd be happy to do so if requested.
Q. But you have not done so yet; is that right?
A. That's right.
Q. And you determined that the margin of error for this error in the query was 1 percent; is that right?
A. Yes, for some of them, it -- it didn't change, yes, and that it's very correlated. But I'm happy to update those. I -- it's a very recent discovery.
So . . .
Q. How recent?
A. When I got the rebuttal report

and I was then -- I went and -- so in the last week.

Q. So since receiving PowerSchool's rebuttal report, you discovered an additional error in the query that was used to generate the monetary values in Appendix A.

Is that fair?

A. It was the error in how we calculated -- how we counted the number of attributes, yes.

Q. And part of that error is that the way that you actually counted the number of attributes is different from how you say you counted the number of attributes in Exhibit 6 --

ATTORNEY L. ARAGON: Objection: form.

BY ATTORNEY Z. SHAH:

Q. -- is that right?

A. So the -- they should just be calculated based on the number of inputs and outputs. They were not -- they were

calculated based on the number of characters in those inputs and outputs. So that count was incorrect, resulting in a lower monetization value than was reported.

Q. When you say the number of characters, what do you mean?

A. So when you use -- when you have a set, you know, and you union that set, you basically combine the set, right. So if I have a set of inputs -- let's say 5 inputs -- and I have a set of outputs, 5 outputs, and I union them, then I have a set now that's of 10, right.

And so I would've expected for that monetary loss to be divided by the number in the set.

Okay.

And what this library function that we were using union -- the union calculation unioned and added the number of characters in the set, not the number of elements in the set.

Q. When you say the number of characters, do you mean the number of letters in the word?
A. I do.
Q. So to give an example, if the number of data elements was two -- or let me -- let me take an even simpler example.
To give an example, if a case of identity theft, fraud or abuse involved one data element, someone's name, is the denominator for monetary value supposed to be 1 and instead was 4 because name is a four-letter word?
A. That's right.
Q. Okay. The GitHub query that you reference -- what programming language is it in?
A. Java.
Q. Okay.
ATTORNEY Z. SHAH: Jacob, let's go back to Exhibit 1.
ATTORNEY L. ARAGON: We've been

going about an hour or two. Whenever you guys are ready for a break, I would like to take one.

ATTORNEY Z. SHAH: Actually --

ATTORNEY L. ARAGON: It doesn't have to be now, but --

ATTORNEY Z. SHAH: -- yeah, actually, let's do this: Can we just quickly mark the source data as well as an exhibit, and then we can take -- we can take the break?

Is that okay, Leonard?

ATTORNEY L. ARAGON: Yep, yep.

ATTORNEY Z. SHAH: Okay.

Sorry, jacob, I'm all over the place.

Can we pull up Tab 7 and mark it as Exhibit 7?

--oOo--

(Barber Deposition Exhibit Number 7, Excel spreadsheet, UTCID Identity Ecosystem Source Data

over 100,000 documents have been produced in this case?

A. I'm not.

Q. How did you go about selecting the nine documents you rely on for your opinions?

A. I -- it was a selection of products that PowerSchool has that -- just giving an example of how the data that we have in the ecosystem maps to the PowerSchool products. So based on website, based on DPIA reports that have been provided to counsel that counsel provided to me.

So . . .

Q. So is it fair to say you selected -- your method for selecting documents that you reviewed and relied on for your opinions was to look at what counsel gave you?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: Yeah. But I --

in combination, I had looked at, you know, at least website and products that were mentioned in the deposition with Flagg and -- but, yes, counsel did provide me some. But I also looked at products on my own from the website and from that deposition.

BY ATTORNEY Z. SHAH:

Q. So is it fair to say that you selected documents to review based on what counsel gave you and your review of publicly available information?

A. I think that's fair.

Q. How did you come to select Mr. Flagg's deposition to review?

A. I think it was in the conversation of, you know, where had discussions existed about which data PowerSchool controls and processes. And either I asked for, you know, where is that mentioned or counsel provided it to me. I don't remember. But that's -- that was the

motivation for using that deposition, because the discussion around what PowerSchool controls and processes existed in that deposition, so it seemed like a good source.

Q. Okay. So -- so is it fair to say you asked counsel, Where can I find the data sources -- data elements collected by PowerSchool, and counsel pointed you to this deposition and so you reviewed that deposition?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: Yeah, I mean, I -- I think the same goes for the DPIs [sic], you know, in trying to understand how the data that I know about and what it harms and what -- you know, the characterizations I know about the data, which -- I needed to know what data does PowerSchool hold, and so I needed those sources.

BY ATTORNEY Z. SHAH:

Q. Okay. So to learn what data PowerSchool holds, you relied exclusively on documentation that counsel provided to you; is that right -- and publicly available information?

A. Yes.

Q. You agree, Dr. Barber, that it's important to read an entire deposition to have the full context for the testimony, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I don't -- no. I mean, I just needed what data does PowerSchool collect. That was all I needed from that -- or what data does it control and process. That's all I needed from -- from these sources.

BY ATTORNEY Z. SHAH:

Q. Okay. Did you review Mr. Flagg's deposition in its entirety?

A. No. I mean, I -- I flipped

through it, but I -- when I -- when you say review, then I -- I was looking for statements about what data PowerSchool controls and processes.

Q. Do you -- you did not read Mr. Flagg's deposition in its entirety; is that right?

ATTORNEY L. ARAGON: Objection to form.

THE WITNESS: I would say no.

BY ATTORNEY Z. SHAH:

Q. Are you aware, Dr. Barber, that 16 other witnesses have been deposed in this case?

A. I was not aware of that.

Q. Did you ask to review any other depositions?

A. If I wasn't aware of them, I don't know how I would have asked for them. I was only looking for data that PowerSchool controls and processes and documents related to that.

Q. You didn't review the depositions of the named Plaintiffs in this case, correct?
A. I don't recall.
Q. You didn't review the depositions -- well, hold on.
Let me go back. I do not see on your list the depositions of the named Plaintiffs in this case.
So did you review their depositions?
A. I did not.
Q. You didn't review the depositions of any PowerSchool employees other than Mr. Flagg, right?
A. That's correct.
Q. Do you know who Mishka McCowan is?
A. I do not.
Q. You did not review Mr. McCowan's deposition, correct?
A. I did not.
Q. You didn't review the depositions

A. That's what I said, that I think that there are more data. I don't -- yes, I am aware of that.

Q. Okay. But you did not discuss the data elements involving any products other than the nine products we just discussed, right?

A. Right --

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: -- I mean, yes.

BY ATTORNEY Z. SHAH:

Q. And those nine products were selected for you by counsel; is that right?

A. I did see these products on the website; but, yes, I got these DPIA documents from counsel.

Q. Okay. Let's look at the data elements you report for one of those products, and we can go to Paragraph 33, which lists the elements for PowerSchool's SIS.

A. Okay.

Q. In Paragraph 33, you say:
PowerSchool SIS collects at least the following data elements.

Do you see that?

A. Yes.

Q. And then you list about [redacted] different elements, right?

A. Yes.

THE WITNESS: Can you scroll a little bit?

(Scrolling.)

THE WITNESS: Yes.

BY ATTORNEY Z. SHAH:

Q. You copied this list from PowerSchool's DPIA report for its SIS product, right?

A. Correct.

Q. And that's the same methodology used for other PowerSchool products that are discussed in your report, you copied the list from the DPIA, correct?

A. Yes.

Q. You did not independently inspect the SIS product, correct?

A. That's correct.

Q. You've not personally used the SIS product, right?

A. That's correct.

Q. You don't know how data is stored for the SIS product, right?

A. That's correct.

Q. You don't know how data tables are configured for the SIS product, right?

A. That's correct.

Q. You don't know the security configurations of the SIS product, correct?

A. I wasn't asked to evaluate security measures, no.

Q. So you don't -- you don't know the security configurations for the SIS product, right?

A. That's correct.

Q. And you don't know what encryption is used for the SIS product,

correct?

A. That's correct. I was only asked to look at the inherent value and harms that have empirically been seen from these data set -- these data. That's kind of the scope of my -- yeah.

Q. And the same is true for the other PowerSchool products that are discussed in your report, isn't it --

A. Yes.

Q. -- you didn't -- you didn't -- you didn't independently inspect those products, correct?

A. I did not.

Q. You have not personally used those products, correct?

A. That is correct.

Q. You don't know how the data is stored or configured for any of those products, right?

A. That is correct.

Q. You don't know the security

configurations for any of those products, correct?

A. That is correct.

Q. And you don't know what encryption is used for any of those products, right?

A. That's correct.

Q. So your report just copies the data elements that are listed in PowerSchool's DPIAs, true?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: Yeah, to -- to understand what data is -- is controlled and processed by PowerSchool, because that was my -- that was really the only question I was asking about PowerSchool's products, is what data is held.

BY ATTORNEY Z. SHAH:

Q. Right. But in order to investigate what data is held, the only thing

you looked at was the DPIA, right?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: And -- and also the Flagg deposition and the -- the websites and power -- like you said, the public domain listed information.

BY ATTORNEY Z. SHAH:

Q. Okay. So in order to understand what data is stored by PowerSchool products, you looked at the DPIAs, the Flagg deposition and publicly available websites.

Is that fair?

A. That is fair.

ATTORNEY L. ARAGON: Objection: form; foundation.

BY ATTORNEY Z. SHAH:

Q. You did not look at the products themselves, correct?

A. I did not.

Q. In Paragraph 30 --

ATTORNEY Z. SHAH: If we could

scroll up.

(Scrolling.)

BY ATTORNEY Z. SHAH:

Q. Dr. Barber, what is your basis for saying that these are the minimum data elements processed by PowerSchool products?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: Well, because in some of the -- sometimes it said [redacted]

[redacted]

BY ATTORNEY Z. SHAH:

Q. Dr. Barber --

A. -- somebody --

Q. -- Dr. Barber -- Dr. Barber, I -- I'm not asking you what the documents say. I'm asking you what is your basis for saying these are the minimum data elements processed by PowerSchool products.

Where does your understanding come from that these are the minimum data elements?

A. My understanding of data --

[redacted]

[redacted]

Q. So let -- let's take a concrete example. Let's look at the SIS example.

A. Okay.

Q. If we scroll to PDF Page 16, which is the beginning of the list of data elements for SIS.

(Scrolling.)

BY ATTORNEY Z. SHAH:

Q. Do you know, one way or another, whether the SIS instance for every single school has all of the data elements that are listed in Paragraph 33 of your report?

A. I do not.

Q. So in Paragraph 33, where you say SIS collects at least [redacted]

ATTORNEY L. ARAGON: Objection:

form; foundation.

THE WITNESS: That's not what I was asked to -- I don't have an opinion about that because I wasn't asked to evaluate that.

BY ATTORNEY Z. SHAH:

Q. So when you say SIS collects at least -- all of these data elements, that's not true, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I don't know if it's true. What I know is --

BY ATTORNEY Z. SHAH:

Q. You don't know.

A. -- but I know that PowerSchool said that these are the elements, these are the data that this product processes and controls.

That -- I was relying on information from PowerSchool --

Q. And I understand that. But I'm

not --

A. -- and then --

Q. -- asking whether these are the data elements that are processed. I am asking where your understanding comes from that these are minimum or at least the elements that are processed by every single PowerSchool product.

ATTORNEY Z. SHAH: Objection to form.

THE WITNESS: And I'm trying to explain that my definition of minimum is because things like performance on this list -- my expertise tells me that there [redacted]

BY ATTORNEY Z. SHAH:

Q. Okay. So let's take that --

A. -- and so that's what I mean -- but that's what I mean by minimum -- I mean --

Q. Okay.

A. -- you're taking minimum as a different definition that I don't really --

Q. And I -- I want to make sure I have your definition --

A. Okay.

Q. -- so when you say -- when you say that SIS collects at least [redacted]

Is that fair --

ATTORNEY L. ARAGON: Objection: form --

BY ATTORNEY Z. SHAH:

Q. -- that is not your opinion?

ATTORNEY L. ARAGON: -- form; foundation.

THE WITNESS: Yeah; I wasn't asked to look at every instance and see -- and evaluate that. I don't --

BY ATTORNEY Z. SHAH:

Q. Okay.

So you -- you were not -- you're not actually offering an opinion on whether every single instance of SIS collects all of the data elements that are listed in Paragraph 33 of your report.

Is that fair?

A. That is fair.

Q. Okay. Because you don't actually know if that's true for every single student whose data is stored in SIS, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: All I -- I wasn't asked to look at instances. I was asked to look at -- well, I think I --

BY ATTORNEY Z. SHAH:

Q. Yeah, I --

A. -- you keep repeating the same thing.

Q. -- I think -- I think we're on the same -- I think we're on --

A. Okay.

Q. -- the same page here,
Dr. Barber.
You don't know if it's actually true for every single student whose data is stored in SIS whether each and every single one of these data elements is collected, correct?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: I don't know about every instance, no.
BY ATTORNEY Z. SHAH:
Q. No.
And it's possible -- if we go back to [redacted]
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: I don't know.
BY ATTORNEY Z. SHAH:
Q. But it's possible, right, that

[redacted] is collected in every instance?

A. No --

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: -- that's not what --

BY ATTORNEY Z. SHAH:

Q. So when you say that performance -- that SIS collects at least the following data elements, are you not saying that PowerSchool collects [redacted] in every instance?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: That's not what that statement means.

BY ATTORNEY Z. SHAH:

Q. Okay. So you're not offering an opinion that all of these data elements are collected; is that right?

A. That's right, I'm not offering an opinion about particular instances, because

one of the things that -- to realize is that I was looking at mapping data elements that were mentioned in the DPIAs to the data that I know about and the characterizations that I know about.

Q. I get that. I get that, Dr. Barber, and we will get to your mapping exercise, but I want to understand this portion of your opinion. And when you are talking about minimum data elements, I want to be really clear that your opinion is not that every single PowerSchool product collects all of the data fields reflected on the DPIAs --

ATTORNEY L. ARAGON: Objection --

BY ATTORNEY Z. SHAH:

Q. -- and as I understand it, that is not your opinion, correct?

ATTORNEY L. ARAGON: -- object to form.

THE WITNESS: Right, because there's a difference between data

elements -- let's say, [redacted] and the actual instance of that --

BY ATTORNEY Z. SHAH:

Q. Right.

A. -- and what I -- I wasn't asked to evaluate instances of data or instances of configurations.

Q. Okay. Let me ask you about the named Plaintiffs in this case.

You told me you don't know what their names are, right?

A. Well, other than --

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: -- listed on the Complaint.

BY ATTORNEY Z. SHAH:

Q. Okay. Sitting here today, do you know their names?

A. Yeah, as listed, Cherkin -- I mean, I -- I really have done no investigation

of these individuals.
Q. Okay. You don't know what schools they went to, right?
A. That's right.
Q. You don't know what PowerSchool products they used, right?
A. That's right.
Q. You don't actually know if they used any PowerSchool products, right?
A. That's not what I was asked to evaluate.
Q. Right. You don't know what data elements are stored for the named Plaintiffs, correct?
A. That's correct.
Q. All right. You don't know if any data elements are stored for the named Plaintiffs, correct?
A. I wasn't asked to evaluate those --
Q. So you don't know --
A. I don't know.

Q. -- right?
You don't know -- you did not review the data for the named Plaintiffs that was produced in this case, correct?
A. Correct.
Q. You don't know if the named Plaintiffs opted out of using certain technology at their schools, right?
A. I don't know.
Q. You didn't read their depositions, correct?
A. Correct.
Q. You agree that if students opt out of using certain products, those products won't use -- won't store their data, right?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: I don't know anything about the instances of -- I just -- I can't comment on that implementation --

BY ATTORNEY Z. SHAH:

Q. Okay.

A. -- I just . . .

Q. So my question was: You agree that if a student opts out of using a certain product, then that product is not going to store their data.

Do you agree with that?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I don't know what PowerSchool's implementation of the opt-out procedure is. There's many different -- I don't know.

BY ATTORNEY Z. SHAH:

Q. It's not something you looked into when forming your opinions, right?

A. That's right. That's right.

Q. Okay. And you didn't -- strike that.

Did you know that the Plaintiffs discussed opting out of using

form.

THE WITNESS: To my memory and because it's listed here that there was a reference to that in the Flagg exhibit, that's why I must have put that here and that I think there was, kind of, reconciling -- reconciling between what was in the DPIA and what was in the Flagg deposition.

BY ATTORNEY Z. SHAH:

Q. Dr. Barber, how does Connected Intelligence work? Can you describe it to me?

A. No -- well, other than [redacted] But I don't have any intimate knowledge of how it works.

I'm simply looking for, in my analysis, data that PowerSchool is declaring that they controlled and processed either, you

know, in testimony or in DPIAs.

Q. Okay. So your entire understanding of how Connected Intelligence works comes from the DPIA, a public website, and Flagg Exhibit 6, which I believe is also the DPIA; is that right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: Yes, the -- the documents that I listed, yes, that's right.

BY ATTORNEY Z. SHAH:

Q. You have not seen any actual evidence that supports your statement that Connected Intelligence actually processes [redacted] right?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: Other than what -- what was mentioned in those depositions or in the documents that we just described, that's right.

BY ATTORNEY Z. SHAH:

Q. You've never seen the Connected Intelligence interface, right?

A. That's right.

Q. You've never seen an instance, a single instance, of [redacted] being used by Connected Intelligence, right?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: I have only seen what PowerSchool has documented, yeah, about what is controlled and processed.

BY ATTORNEY Z. SHAH:

Q. But you have not seen what is actually controlled and processed, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: As in the -- like, interfacing with the actual implementation, no.

Counsel, can we go off the record so I can start a new video file, please?

ATTORNEY Z. SHAH: Yes.

VIDEO TECHNICIAN FIGUEROA: Thank you.

The time is 11:20 a.m. We're going off the record.

--oOo--

(Whereupon, a recess was taken from 11:20 a.m. CST to 11:34 a.m. CST.)

--oOo--

VIDEO TECHNICIAN FIGUEROA: The time is 11:34 a.m. We are back on the record for Video Media 2.

ATTORNEY Z. SHAH: Let's go ahead and mark Tab 15 as, I believe, Exhibit 8.

--oOo--

(Barber Deposition Exhibit Number 8, Data Privacy Impact assessment (DPIA Report) PowerSchool SIS, marked for

identification for purposes of
the record.)

--oOo--

BY ATTORNEY Z. SHAH:

Q. Dr. Barber, do you recognize this as the DPIA report for the PowerSchool SIS product?

A. Yes.

Q. You reviewed this DPIA report in preparing your opinions in this case; is that right?

A. Yes.

ATTORNEY Z. SHAH: Let's scroll down to PDF Page 5, please.

(Scrolling.)

BY ATTORNEY Z. SHAH:

Q. Do you see the table of data elements listed on this page?

A. I do.

Q. And I want to be really clear about your opinions, Dr. Barber.

Is it your opinion that

PowerSchool SIS automatically collects all of these data elements for every instance of SIS?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: It's only my opinion that PowerSchool says the product controls and processes this information.

In terms of what instances are collected by different users, I do not know. I wasn't asked to review that.

BY ATTORNEY Z. SHAH:

Q. Okay. And so it's not your opinion that SIS automatically collects all of these data elements for all schools, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: It's probably not an automatic collection for any of them.

Don't people enter the data?

What do you mean by automatic?

BY ATTORNEY Z. SHAH:

Q. Well, that's my question to you.

Is it your opinion that all of these data elements are automatically collected for every school that uses the SIS product?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I wasn't asked to review instances of implementations.

BY ATTORNEY Z. SHAH:

Q. Okay. And so it -- that's not your opinion, right? It's not your opinion that each of these data elements is automatically collected for every school, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I don't have an opinion about it.

credentials, what does that mean?
That probably has a lot of different elements in it and so different types of elements.
Schools and universities attended -- that probably has graduation date. It probably has school name.
There's a lot of different data elements inside these. That's what was meant by minimum.

BY ATTORNEY Z. SHAH:

Q. Yes. And I -- I understand that.
And I want to make very sure that when you say minimum, you are not saying there's a baseline set of data elements that are inherent in the product that are present for every school that uses the product.
And my understanding is that's not your opinion; is that correct?

A. But I don't --

ATTORNEY L. ARAGON: Objection:

form; foundation.

THE WITNESS: -- that's -- that's also -- there's a -- you know, does the product ship with all of these data elements in its structure and then whether a school decides to create -- like, enter data inside that, I don't know.

I would --

BY ATTORNEY Z. SHAH:

Q. That's --

A. -- assume that it ships with all of these data elements that make it possible for a user to populate, but --

Q. Okay. So I want to -- I want to break that down.

A. Okay.

Q. You say you assume the product ships -- ships with all of these data elements; is that right?

A. Like, the -- I as a --

ATTORNEY L. ARAGON: Objection:

form.

THE WITNESS: -- a document would tell me that PowerSchool is capable of controlling and processing these data, so that if I get the product as a user, I would expect that I have the ability -- whether I populate it or not, I don't know; I didn't -- I wasn't -- I wasn't asked to opine on that, but that it has that capability of storing this information --

BY ATTORNEY Z. SHAH:

Q. Okay. What is --

A. -- that is what I assume these data -- that's what I assume PowerSchool was saying in these documents.

Q. And that's -- that's your assumption about how the product is configured at the time that it ships to a customer; is that right?

ATTORNEY L. ARAGON: Objection:

form.

THE WITNESS: That's what the document is saying, you know, the --

BY ATTORNEY Z. SHAH:

Q. Do you know, Dr. Barber, whether the SIS product, when it ships to a customer -- whether it actually has all of these data elements? Do you know that?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I did rely on PowerSchool --

BY ATTORNEY Z. SHAH:

Q. Okay. Where in this document --

A. -- documenting their data elements. I --

Q. -- where in this document --

A. -- relied on this --

(Simultaneous speech; as a result, portions of the testimony could not be reflected in the record.)

ships with a feature that allows schools to
[redacted]
If that is your opinion, I would like to know what your basis for that opinion is --

A. My basis for that opinion --

Q. -- the DPIA does not say that.

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: Well, if I was -- I took PowerSchool at its word in these documents that these documents are -- that the product is capable and controls and processes these data.

I wouldn't expect it -- PowerSchool to say it is capable of controlling and documenting data that it doesn't. I --

BY ATTORNEY Z. SHAH:

Q. Dr. Barber, do you know the difference between a required data element and an optional data element?

A. Yes. But to be optional, it has to be in the -- in the product.

Q. Okay. Do you know whether these are required or optional data fields?

A. Required for what?

Q. To -- for the product to function?

Do you know?

A. I do not know.

Q. Do you know whether every instance of SIS ships with all of these data elements?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I don't know. But if it doesn't, I would wonder why PowerSchool has it in their documentation that they have that capability.

BY ATTORNEY Z. SHAH:

Q. Did you --

A. I --

Q. -- did you read Mr. Flagg's explanation?

A. That there are configurations, I get that. And so --

Q. So is it your testimony that every single instance of SIS ships with the capability to populate all of these data elements? Do you know?

A. I haven't looked at all those configuration shipments, no.

Q. So you don't know, right?

A. I don't know.

Q. Okay. And it's not your opinion that every single instance of SIS automatically collects all of these data elements, right?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: No, I wasn't looking at any instances. I think I've made that super clear.

September 16, 2020, Bates stamped PWRSCHL_00007183 through PWRSCHL_00007225, marked for identification for purposes of the record.)

--oOo--

BY ATTORNEY Z. SHAH:

Q. This is the student data privacy agreement between PowerSchool and Seattle School District Number 1, right?

Is that right, Dr. Barber?

A. Yes.

Q. Why did you select this agreement to review?

A. It was an instance that counsel provided me.

Q. Do you know if any of the named Plaintiffs went to Seattle School District?

A. I do not.

Q. You didn't ask to review any other data privacy agreements between PowerSchool and any other school district,

right?

A. I was just looking for an example.

Q. Okay. You reviewed this data privy agreement and relied on it when preparing your report, correct?

A. Yes, just -- yes. And, you know, I had that section in the -- Appendix A where I was explicit about what I extracted from it. I just extracted the data elements identified.

Q. You extracted the data elements identified in the agreement, but you didn't read the rest of the agreement.

Is that fair?

A. Oh, I mean, I think I read the agreement, but, I mean, just in terms of what you said, relied on, that's -- I was really focused on what data is controlled and processed in this instance.

So . . .

Q. And let's take a look at PDF Page 2. The first paragraph just at the top

of this page, it says: [redacted]

Do you see that?

A. Yes.

Q. [redacted]

A. Yes.

ATTORNEY Z. SHAH: Let's turn to -- it's the bottom of PDF Page 2 onto PDF Page 3. It's Article I, Paragraph 1.

(Scrolling.)

ATTORNEY Z. SHAH: Right there. Perfect.

BY ATTORNEY Z. SHAH:

Q. And the last sentence of this paragraph, which starts at the top of PDF

form.

THE WITNESS: I guess you would have to give me the legal standard --

BY ATTORNEY Z. SHAH:

Q. Well, I --

A. -- and then ask.

Q. -- think if you don't know what the legal standard is, you're not offering an opinion that the data is sensitive under that legal standard, right?

ATTORNEY L. ARAGON: Objection. She never said that. She just said which legal standard are you referring to.

BY ATTORNEY Z. SHAH:

Q. Are -- are you -- Dr. Barber, is it your understanding that you're opining that data is sensitive under a specific legal standard? If so, tell me what that standard is.

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: I did not include that in my report --

BY ATTORNEY Z. SHAH:

Q. Okay. Because once --

A. -- I think I -- I think I did mention that particular laws do consider children's data sensitive and declare, you know, some age thresholds around that. And then there are other laws that talk about types of data that -- but -- that are, you know, in these sensitive categories, but I -- I did not include that in my report, other than the -- the children's data being sensitive.

Q. Okay. I -- I want to be really clear, Dr. Barber.

What's sensitive under the law is a legal conclusion, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: This -- this sensitivity is based -- the statement

I made here in this paragraph is based on our empirical findings.

BY ATTORNEY Z. SHAH:

Q. I'm not asking you that. I'm not asking you that.

A. Okay. I'm sorry.

Q. Dr. Barber, what is sensitive under the law is a legal conclusion, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: Yes, and different laws consider different data sensitive.

BY ATTORNEY Z. SHAH:

Q. Yes.

And you are not a lawyer, right?

A. That is correct.

Q. And you are not offering a legal opinion about what is sensitive under a particular legal standard, correct?

A. I am not mapping -- I am not.

Q. Okay. You're not qualified to opine on whether something is sensitive under a particular legal standard, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I don't know. I mean, I know a lot about the laws that govern PII, but that's not the opinion I'm offering here.

BY ATTORNEY Z. SHAH:

Q. Okay. You're not offering an opinion about what's sensitive under the law, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I -- I am not in this statement, no.

BY ATTORNEY Z. SHAH:

Q. Now, the first reason that you say the data collected by PowerSchool is sensitive is because it can be used to identify individuals and/or their devices,

correct?

A. That's right.

Q. When you say can be used, you mean it's possible, not that it always happens, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I -- we have to have some way of identifying people, and this is the data that we use.

BY ATTORNEY Z. SHAH:

Q. That's not what I'm asking you.

A. I know --

Q. I'm --

A. -- but I don't understand what you're asking me.

Q. Well, it's a -- it's a very simple -- it's a question of the English language. Okay?

When you say something can be used, you are not saying it will always be used, correct?

A. That's what I'm --
Q. -- is this data can be used --
A. That's right.
Q. -- and you use the word can, which is, to me, a statement of possibility, not that it is always used.
Is it your opinion that this data is always used to identify individuals and their devices?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: If you're talking about the list above and the paragraph below, that, yes, it can be, but it's -- this is not always the list used.
BY ATTORNEY Z. SHAH:
Q. Okay. That's all I'm asking.
A. Okay. Well, thanks.
Q. Okay. I didn't think we had a disagreement. I thought I was reading your report --

A. Yeah, yeah --
Q. -- very closely --
A. -- yeah, I --
Q. -- but --
CERTIFIED STENOGRAPHER: Let the record reflect we have to have one person talking at one time, please.
THE WITNESS: Okay.

BY ATTORNEY Z. SHAH:

Q. Okay. Dr. Barber, have you seen any evidence that the data collected by PowerSchool was actually used to identify an individual and/or their devices?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: That's not what I was asked to look at.

BY ATTORNEY Z. SHAH:

Q. So the answer is, no, you have not seen any evidence, right?
ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I mean, the documents do say that this data is used for -- I don't have -- I'll just say no.

BY ATTORNEY Z. SHAH:

Q. Okay. The second point you make in Paragraph 34 is -- you say the data that was collected can be used to locate individuals in cyberspace and in the physical world.

Now, again, that's a possibility statement, correct?

A. It is.

ATTORNEY L. ARAGON: Objection: form; foundation.

BY ATTORNEY Z. SHAH:

Q. You have not seen any evidence that the data collected by PowerSchool was actually used to locate individuals in cyberspace and in the physical world, correct?

A. No. I've just --

ATTORNEY L. ARAGON: Objection:

form; foundation.
THE WITNESS: -- I've just seen it in -- in our empirical studies of, like, over 5,000 cases, but yes.
BY ATTORNEY Z. SHAH:
Q. Okay. But not -- not in the case of the PowerSchool data, right?
A. Yeah. I wasn't asked to look at that.
Q. And you did not see anything consistent --
ATTORNEY L. ARAGON: Objection: form; foundation.
BY ATTORNEY Z. SHAH:
Q. -- with -- with -- you did not see any evidence, right, that the data collected by PowerSchool was actually used to locate individuals in cyberspace and the physical world, right?
A. I didn't look --
ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: -- yeah, I didn't look. I wasn't asked to opine on that.

BY ATTORNEY Z. SHAH:

Q. And you didn't see it, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I wasn't asked to --

BY ATTORNEY Z. SHAH:

Q. Because you weren't asked, you didn't see it, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: That's a different question.

If I wasn't asked, I didn't see it. But there's a -- that's different than saying I was asked; I looked at it; and I didn't see it. Those are two different things.

BY ATTORNEY Z. SHAH:

Q. I understand that.

But you didn't look -- you didn't -- you have not seen any, right?

A. I didn't look.

Q. And you have not seen any?

ATTORNEY L. ARAGON: Objection: form; foundation.

BY ATTORNEY Z. SHAH:

Q. You have not seen any, correct, Dr. Barber?

A. As a result of not looking, yes.

Q. And the third point you say is the data collected by PowerSchool is valuable and its monetization by threat actors can result in significant financial, emotional and reputational harms.

Do you see that?

A. Yes.

Q. Now, again, when you talk about threat actors, you're talking about criminal misuse, correct?

A. Not always. That can be insider threat. That can be misuse. You know, people mistakes. It can be because it wasn't protected. It could be a -- there's a wide range there.

Q. Okay. That's fair.

When you say the data can result in significant financial and emotional and reputational harms, you mean that that is a possible thing that could occur, right?

A. Yes. We've seen that and reported on other organizations that have seen the same thing.

Q. You were not suggesting that the ordinary collection of data by PowerSchool automatically results in monetization by threat actors, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: Sometimes the -- sometimes things can be compromised even in their ordinary collection

processes. But, again, I didn't look at any instances, business practices or implementation, so I can't speak to that.

BY ATTORNEY Z. SHAH:

Q. So you're -- you're not opining that the ordinary collection of data by PowerSchool in this case automatically resulted in the monetization of that data by threat actors, correct?

ATTORNEY L. ARAGON: Objection --

THE WITNESS: I am not --

ATTORNEY L. ARAGON: -- form; foundation.

THE WITNESS: -- that is not what I'm -- I wasn't asked to opine, so, therefore, I'm not.

BY ATTORNEY Z. SHAH:

Q. You have not seen any evidence that the data collected by PowerSchool was actually monetized by threat actors, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I didn't look. So it's unfair for me to comment.

BY ATTORNEY Z. SHAH:

Q. Why didn't you look?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I wasn't asked to. I was asked to see -- look at what -- based on empirical studies that we've seen, what -- how is this data used, how often is it used, how often does it create harm, how powerful is it to collect other data. I was asked to comment on the inherent value, risk, harms of the data.

BY ATTORNEY Z. SHAH:

Q. Okay. And when you say the data, you don't mean PowerSchool's data; you mean these data elements generally, right?

A. That's right --

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: -- the -- lists that were declared in the DPIAs and the -- the documents that we talked about.

BY ATTORNEY Z. SHAH:

Q. Right.

You have not seen any actual evidence that the actual PowerSchool data was monetized by a threat actor, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: Other than the -- the breach.

BY ATTORNEY Z. SHAH:

Q. Let's put the breach aside.

Other than the breach, have you seen any evidence -- and I will get to the breach, I promise -- have you seen any actual evidence that the data collected by PowerSchool was actually monetized by threat

were looking at Paragraph 34 of your report.

ATTORNEY Z. SHAH: Jacob, could we pull that back up again?

Thank you.

BY ATTORNEY Z. SHAH:

Q. Now, I want to focus on the facts of this case, and I want to be clear.

You are not offering an opinion regarding any specific harm to any specific named Plaintiff in this case, right?

A. That's right.

ATTORNEY L. ARAGON: Objection: form; foundation.

BY ATTORNEY Z. SHAH:

Q. And you don't know if the named Plaintiffs' data was exposed as part of any data breach, right?

A. I did not look at that.

Q. You have not seen any evidence that the named Plaintiffs' specific information was actually monetized by a threat actor, correct?

A. I did not do that investigation.

Q. And you've not seen any evidence that the data collected by PowerSchool has actually resulted in significant financial, emotional and reputational harms, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I have -- I have not looked at -- I have not, no. It's not what I looked at.

BY ATTORNEY Z. SHAH:

Q. The fourth thing you say in this paragraph is: Much of the data collected by PowerSchool is used extensively in our society, often called a digital currency, offering many opportunities for threat actors to exploit the data.

Did I read that correctly?

A. Yes.

Q. And, again, when you say opportunities, you mean there's a possibility that data will be exploited at some point,

right?

A. Yes, that's what our --

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: -- yes, that's what our data shows.

BY ATTORNEY Z. SHAH:

Q. And actually, Dr. Barber, maybe for the record, what we can do is upload -- if you'll just pause for a second and let Mr. Aragon get in his objection. It might be cleaner for the record.

A. Okay. Will do.

Q. Thank you.

Dr. Barber, you have not seen any evidence that the data collected by PowerSchool was actually exploited by threat actors, right?

A. No. I haven't looked at that.

Q. And you haven't seen any evidence that the named Plaintiffs' specific information was actually exploited by threat

actors, correct?
A. I did not conduct that investigation.
Q. Is it your understanding that the Plaintiffs in this case are alleging that their information was exploited by a threat actor?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: I only -- I -- I did not look at -- that's not something I investigated.
BY ATTORNEY Z. SHAH:
Q. Okay. You don't know whether Plaintiffs --
A. No.
Q. -- in this case are alleging that their information was exploited by a threat actor, correct?
A. I don't know.
Q. The fifth thing you say in this Paragraph 34 is the data can be used to

discover other valuable PII to compound harm, right?

A. Yes.

Q. Have you seen any evidence that the data collected by PowerSchool was actually used to discover other valuable PII?

A. That's not what I investigated. I just -- we've seen it in the theft -- in the 5,000 cases we've looked at.

Q. Okay. So you've seen it for other cases, but you have not seen it in the PowerSchool case, correct?

A. Yes, a lot of other cases, yes.

Q. Yes.

But not the PowerSchool case, correct?

A. I did not look specifically at the PowerSchool case.

Q. The sixth thing you say in this paragraph is: Much of the data does not change or changes infrequently, allowing it to be used over time to produce longitudinal

harm.

Do you see that?

A. Yes.

Q. And, again, when you say allowing it to be used to -- over time to produce longitudinal harm, you're talking about the possibility that data can be used over time to produce longitudinal harm, right?

A. Yes, that's what our empirical data shows.

Q. Okay. And that's empirical data about other cases, not PowerSchool data, right?

A. That's right.

ATTORNEY L. ARAGON: Objection: form; foundation.

BY ATTORNEY Z. SHAH:

Q. You have not seen any evidence that the data collected by PowerSchool was actually used over time to create longitudinal harm, right?

A. I did not look specifically at

the PowerSchool --
Q. And --
A. -- instance, I guess.
Q. Okay. And when you say you didn't -- you didn't look specifically at the PowerSchool instance, you didn't look because counsel did not ask you to, right?
A. I was really looking at cases that we had already looked at, like, over 5,000. We have a lot of data points, and so I was just mapping that to what we found as patterns in other cases.
Q. So were you making an assumption that what happened in other cases will happen in the PowerSchool case?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: I think assumption is not a fair -- I was applying it, said this -- how this data has been used in over 5,000 other cases.

BY ATTORNEY Z. SHAH:

Q. Okay. But you're comparing it to the PowerSchool case, right, so what's the point of the comparison other than to speculate that that's what's going to happen here?

A. When this data -- the -- it's not a speculation. It's a -- and I -- I mean, it's not 100 percent, but it is -- the data shows that -- and, you know, this kind of data can be used. And so the inherent value, the range of those values, the range of the harms -- that's what I was asked to look at --

Q. Okay.

A. -- for this case.

Q. So your -- your opinion is that this data can be used, not that it actually has been used, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: What actually has been used in these over 5,000 cases.

BY ATTORNEY Z. SHAH:
Q. No, but I'm talking about the PowerSchool case.
A. Yes.
Q. Your opinion is that in the PowerSchool case, the data can be used, not that it actually has been used, true.
A. I did not --
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: Oh, sorry. Yeah.
Yeah, I'm not opining about instances of use or monetization for the PowerSchool case. I'm just commenting in -- I'm just reporting on what we have found in those cases we've looked at.
BY ATTORNEY Z. SHAH:
Q. In other cases but not --
A. That's right.
Q. -- the PowerSchool case --
A. That's right --

Q. -- is that right?

A. -- that's right. That's right.

ATTORNEY Z. SHAH: Okay. Let's take a break.

VIDEO TECHNICIAN FIGUEROA: The time is 12:39 p.m. We're going off the record.

--oOo--

(Whereupon, at 12:39 p.m. CST, a luncheon recess was taken.)

--oOo--

THE WITNESS: My -- no, my -- it's to evaluate harms, consequences of the data that's held and processed by PowerSchool products.

BY ATTORNEY Z. SHAH:

Q. Okay. So your report looks at harm from storage of data, not harm from the data breach; is that correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: Yes, the -- it is the -- yeah, the -- the data that is controlled and processed by those products and based on my experience in cases that we have looked at, yes.

BY ATTORNEY Z. SHAH:

Q. Okay. But not harm from the data breach, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: No, I don't -- I'm not opining about the breach, no.

I mean, I do -- there were data elements used in conducting the breach that just -- that I mentioned in my report that made it possible for the breach to happen, but I -- I -- I should just say no because I . . .

BY ATTORNEY Z. SHAH:

Q. Let me make sure.

You are not opining on the harm from the data breach, correct?

A. That's right.

Q. You are not opining that every Class member's data in this case was exposed in the data breach, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: That is true.

BY ATTORNEY Z. SHAH:

Q. You are not opining that the Class members in this case were harmed because of the data breach, correct?

A. That's right, I'm -- that's

right.

Q. Okay. Let's turn to Paragraph 67 of your report, which is Exhibit 1, and it is PDF Page 30 into 31.

In this paragraph, you discuss a CrowdStrike investigation report dated February 28th, 2025.

Do you see that?

A. I do.

Q. Is this -- is the CrowdStrike report the only material you reviewed to inform yourself about the PowerSchool data breach?

A. No. There was another article I referenced, I thought.

Q. You know what? I remember that article, too.

It was a news article, right?

A. That's right.

Q. Okay. So other than the CrowdStrike report and the news article, is

there any other material you reviewed to inform yourself about the PowerSchool data breach?

A. Not that I really looked at. I mean, I -- I may have -- no. I just --

Q. Okay.

ATTORNEY Z. SHAH: And let's mark as Exhibit 10 the CrowdStrike report, which is Tab 9.

--oOo--

(Barber Deposition Exhibit Number 10, Investigation Report, February 28, 2025, marked for identification for purposes of the record.)

--oOo--

BY ATTORNEY Z. SHAH:

Q. Dr. Barber, do you recognize this as the CrowdStrike report that's referenced in your report?

A. I do.

ATTORNEY Z. SHAH: Okay. Let's

is not answering the question directly.

ATTORNEY L. ARAGON: She is answering the question.

ATTORNEY Z. SHAH: And, Leonard, you should refrain from speaking objections.

ATTORNEY L. ARAGON: You should refrain from harassing my witness. At this point, she's answered the question. It's time to move on.

You can bring it up with the Judge. You've asked the same question; she's given you the answer.

ATTORNEY Z. SHAH: I am very happy --

ATTORNEY L. ARAGON: Her --

ATTORNEY Z. SHAH: -- to bring it up with the Judge.

ATTORNEY L. ARAGON: Happily --

BY ATTORNEY Z. SHAH:

Q. Dr. Barber --

ATTORNEY L. ARAGON: --
happily.
BY ATTORNEY Z. SHAH:
Q. -- Dr. Barber, you have not seen any evidence that there is a data breach involving the other eight products you discuss in your report, correct?
ATTORNEY L. ARAGON: Objection: form and foundation.
THE WITNESS: I haven't seen it because I haven't looked.
BY ATTORNEY Z. SHAH:
Q. You have not seen any evidence that data collected by the other eight products discussed in your report was exposed, correct?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: I haven't seen it because I haven't looked.
BY ATTORNEY Z. SHAH:
Q. You have not seen any evidence

that the data stored by the other eight products you discuss in your report was monetized by a threat actor, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: Other than the fact that these were stolen and compromised credentials, so the -- they were stored somewhere in some PowerSchool product, and that act- -- threat actor was able to use that PII, which is online access credentials, to access the product.

So -- and that's what I was mainly interested in looking at, is what data was --

BY ATTORNEY Z. SHAH:

Q. Dr. Barber --

ATTORNEY Z. SHAH: I'm going to strike -- I'm going to strike this answer as nonresponsive.

saying that.
I'm saying I just haven't seen it because I haven't looked, so I have not seen it.
BY ATTORNEY Z. SHAH:
Q. Do you have any reason to believe it exists?
A. I -- as you say, I shouldn't -- I shouldn't go on any kind of assumptions or -- I'm just saying what I investigated.
Q. Okay. You didn't investigate it, right?
ATTORNEY L. ARAGON: Objection: form.
THE WITNESS: I'm sorry. Could you answer [sic] that question again?
BY ATTORNEY Z. SHAH:
Q. You have not investigated whether the data from the eight other PowerSchool products was exposed in a data breach, right? You didn't investigate that, right?
A. I did not.

Q. And you have not seen any evidence that the data from the eight other PowerSchool products was exposed in a data breach, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I haven't looked, so I haven't -- I -- I have not seen it.

BY ATTORNEY Z. SHAH:

Q. Let's turn to PDF Page 5, which has the key findings.

Number 3 says: The threat actor exfiltrated data from the Teachers and Students tables of the PowerSchool SIS instances for certain PowerSchool customers. CrowdStrike found no evidence of data exfiltration from any other tables.

Do you see that?

A. I do.

Q. Have you done any analysis to determine which PowerSchool customers were

affected by the data breach?
A. I have not.
Q. You don't know, one way or another, which schools were affected, correct?
A. Correct.
Q. You don't know if any of the Class members in this case attended those schools or not, correct?
A. Correct.
Q. Have you done any analysis to determine whether the SIS data elements listed in Paragraph 33 of your report were stored in the Teachers and Students tables of the SIS product?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: It's -- can you ask the question one more time? And then I'm --
BY ATTORNEY Z. SHAH:
Q. Sure --
A. -- going to --

Q. -- do you --

A. -- I'm going to look at my report --

Q. Sure --

A. -- just to let you know.

Q. -- and you -- you can -- you have your report in front of you, so you're more than welcome to reference it.

As you see here, Number 3 says the data that was exfiltrated was stored in the teeth -- in the Teachers and Students tables of the PowerSchool SIS instances for certain customers, right?

A. Right.

Q. Do you know whether the data elements listed in Paragraph 33 of your report are stored in the Teachers and Students tables of the PowerSchool SIS instances?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I don't know, other than the fact that, again, there

intentional. It can be nonintentional. It can be, you know, an outsider. It can be a business partner. It can be -- yeah.

Q. Okay. All right.

Then you say: Exposure can cause diverse, long-standing and significant harms, correct?

A. That's right.

Q. And that means exposure can possibly result in harm, but not that it necessarily or always results in harm, true?

A. True.

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I -- I mean, sometimes we don't know about the harm. There -- we've seen where the data's been exposed and, quote/unquote, harvested and not -- those harms are not seen for many years.

So . . .

BY ATTORNEY Z. SHAH:
Q. Okay. You're not opining that data in this case has been harvested and that we're not going to see the harm for many, many years, right?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: It's possible. I -- I don't know.
BY ATTORNEY Z. SHAH:
Q. Is that -- Dr. Barber, is that an opinion?
Like, I need to understand.
Are you going to go in front of a jury and testify that data in this case has been collected and one day we will see its misuse?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: My intent was not to opine about the breach. This wasn't my scope. But I'm just saying

it happens.

BY ATTORNEY Z. SHAH:

Q. I'm not asking about what could happen --

A. You said can it happen?

Q. -- clear -- no, no, no. I want to be clear, Dr. Barber.

You said, sometimes we see data can be harvested and we won't see the harms for many, many years?

A. That's true.

Q. You are not opining that data in this case has been harvested and we won't see the harm for many, many years, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I was just opining that -- you said can, and so I was -- I was opining -- I was just commenting about what can happen.

BY ATTORNEY Z. SHAH:

Q. Okay. But not that that is what

will happen, correct?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: I -- I don't know, yeah.
BY ATTORNEY Z. SHAH:
Q. You are not opining that data in this case has been harvested and will be misused in the future, correct?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: I'm opining it happens. I don't know if it'll happen in this case.
BY ATTORNEY Z. SHAH:
Q. So you are not opining that it will happen in this case, correct?
ATTORNEY L. ARAGON: Objection: form --
THE WITNESS: I don't know.
ATTORNEY L. ARAGON: -- foundation.

responded in terms of emotional distress as well and some level of finances.

So I -- I really can't speak beyond the cases that I've looked at specifically.

BY ATTORNEY Z. SHAH:

Q. You can't offer opinions about harm in any cases other than the 5,000 cases you looked at in the UTCID database, right?

A. Because the --

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: -- the idea was to look at so many that it created patterns of -- that we could then make some conclusions from, and so --

BY ATTORNEY Z. SHAH:

Q. Okay.

A. -- that's what I'm speaking to, is that we saw the patterns of harms; the range of harms; the inherent harms that can

come from, you know, theft, fraud and abuse, yes.

Q. But you can't offer opinions about harms in any cases other than the 5,000 cases you looked at in the UTCID database, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I can speak to the patterns that I saw from that data.

BY ATTORNEY Z. SHAH:

Q. Sure. But those -- those are patterns in that data, right?

A. There's 5,000 of them --

Q. Okay.

A. -- yeah.

Q. But, again --

A. -- I mean, it's a lot.

Q. -- you are speaking -- you are speaking from the database of 5,000 cases and that's the universe from which you are drawing

all your conclusions, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: From the quantifiable, qualitative analysis, yes, that's where I'm drawing my opinion.

BY ATTORNEY Z. SHAH:

Q. Okay. And let's take a look at the last bullet in this paragraph. You say: By controlling and processing student PII without consent -- sorry -- without -- let me strike that and start this whole thing over.

Paragraph 3, last bullet, you say: By controlling and processing student PII without permission and informed consent, students and parents are exposed to the risk of diverse, long-standing and significant harm.

Did I read that correctly?

A. Yes.

Q. Now, when you say PowerSchool is

form; foundation.

THE WITNESS: The storage of it?

I can only speak to how this data can be used and my -- and the harms that it can cause, that it inherently has the ability to be used in the following ways and -- and cause the following harms.

That's really what I can speak to.

BY ATTORNEY Z. SHAH:

Q. So you can't speak to whether by storing student data, PowerSchool creates a risk of exposure?

ATTORNEY L. ARAGON: Objection to form.

THE WITNESS: Well, the types of data that are stored are incredibly sensitive, so if I just -- for example, if I just stored name and my zodiac sign, I'd have less harm and

less potential for harm than when I'm storing health information and behavioral information and where somebody logs in and their IP address and their cookies and their -- you know, all of the data that's listed.

So, you know, the data that an organization and a product decides to collect introduce certain risk because -- yeah, because that has the potential for greater harm than -- the data has more potential for harm than others.

BY ATTORNEY Z. SHAH:

Q. Okay. I -- I thought then I asked you this question: Is it your opinion that by simply storing student data, PowerSchool creates a risk of exposure?

Is that your opinion?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: A risk of

exposure. I don't know what their risk of exposure is. I don't know what their cybersecurity practices are. I'm just saying that this data has -- deciding to store particular data elements, some data has -- can cause more harm than others. That's all I'm saying.

BY ATTORNEY Z. SHAH:

Q. I don't -- okay.

You testified, the data that an organization and a product decide to collect introduce certain risk because that has the potential for greater harm.

Is that your testimony?

A. I would -- my testimony is that some data can cause more harm than others and so deciding what you decide to collect and store makes a difference.

Q. Okay. And the harm comes from the risk of exposure, right?

ATTORNEY L. ARAGON: Objection:

form.

THE WITNESS: No, not just from the risk of exposure, but that if exposed or if -- how it can be used -- like, I can't use your name and your Zodiac sign to create a lot of harm, but I can use your health information and your financial information, your Social Security number to create harm.

So I'm just saying that some data can create more harm than others.

BY ATTORNEY Z. SHAH:

Q. Okay. But the way it creates harm is through exposure or misuse, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

BY ATTORNEY Z. SHAH:

Q. If I just -- Dr. Barber, if I just had data, am I creating harm?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: I would just say that the potential for -- am I creating harm just to hold that data?

I'm just speaking about what data can cause more harm than others. That's all I'm saying.

BY ATTORNEY Z. SHAH:

Q. I'm not -- Dr. Barber, your opinion written here on this page is: The exposure of PII controlled and processed by PowerSchool products can cause harm.

A. Yes.

Q. I am asking you: Is the way that PowerSchool products cause harm through exposure or misuse of the data?

A. And I can't speak to that because I don't know what PowerSchool's cybersecurity practices are; I don't know -- other than, you know, I -- I do know that not having multifactor authentication was a factor in the breach and did introduce additional risk. But I really don't know anything about

PowerSchool's, you know, network configurations and cybersecurity, so I can't speak to that.

Q. Okay. I don't disagree with any of that.

A. Okay.

Q. I don't disagree that you don't know about PowerSchool's data security practices. I'm asking whether your opinion is that there is a potential risk of future misuse of the data stored in PowerSchool products and that's why they cause harm or whether it's just the act of storage itself that causes harm.

Do you understand the difference?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: In the act of storing, no. The kind of data stored, yes.

BY ATTORNEY Z. SHAH:
Q. Your testimony is that the act of storing data does not cause harm?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: Yeah, I'm saying the type of data reintroduces different kinds of risk.
BY ATTORNEY Z. SHAH:
Q. Okay.
So storing alone does not cause harm, correct?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: Right. It matters what kind of data you're storing.
BY ATTORNEY Z. SHAH:
Q. Okay. And then depending on the kind of data, there are different levels of risk of harm.
Is that fair?

providing this information.

BY ATTORNEY Z. SHAH:

Q. How does informed consent mitigate the risk of exposure?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: If I understand that I'm giving you sensitive data, I may monitor that sensitive data more, I may ask questions about where you -- so I -- it gives the individual agency to try to take action to reduce the risk.

BY ATTORNEY Z. SHAH:

Q. Okay. But it cannot eliminate the risk, correct?

A. It doesn't --

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: -- eliminate it, but I think mitigate -- I think -- I think informed consent is one of the

reasons that we have it, is to help people mitigate some of the risk or unders- -- or give them agency in the -- in the process.

BY ATTORNEY Z. SHAH:

Q. It's not your opinion that the Class members in this case are exposed to diverse, long-standing and significant harms, right?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: Yeah, I can't speak to the actual instances. I can only speak to the -- what this data has the potential of harm, the risk of harm to create. That's all I can speak to.

BY ATTORNEY Z. SHAH:

Q. So, again, you cannot opine that the Class members here are harmed, right?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: Yeah; not that they are harmed, but that -- because of the data that is collected, this type of data, some of it has more risk than others, and I've -- that's what I was reporting on.

BY ATTORNEY Z. SHAH:

Q. Okay.

Dr. Barber, you agree that any organization that stores personal data creates some risk of exposure, correct?

A. It depends on the type of data that they -- they collect and that they use. So for some of the -- yeah, it depends, but some -- again, some are more at risk and harmful than others.

Q. Okay. But no system is zero risk, correct?

A. When it comes to PII, probably not.

Q. Okay. And your opinion is that the risk of harm is a function of the quantity

of PII that is being held; is that right?

A. No. The type of PII that's being held.

Q. It's both type and quantity, right?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: Well, for an individual, no. I mean, it's the type of data you're -- it matters -- quantity may -- it matters who the harm is to, to the organization or to the individual.

If you're storing thousands and thousands of -- of records, I only really care, as an individual, about mine and the harm to me.

BY ATTORNEY Z. SHAH:

Q. Respectfully, that's not an answer to my question at all.

A. Well, then please answer [sic] again, because I thought -- I was trying to be

responsive.

VIDEO TECHNICIAN FIGUEROA:
Hey, Counsel, can we go off the record so I can start a new video file, please?

ATTORNEY Z. SHAH: Yeah, sure.
Let's go off the record.

VIDEO TECHNICIAN FIGUEROA:
Thank you.

The time is 2:15 p.m. We're going off the record.

--oOo--

(Whereupon, a recess was taken from 2:15 p.m. CST to 2:20 p.m. CST.)

--oOo--

VIDEO TECHNICIAN FIGUEROA: The time is 2:20 p.m. We're back on the record for Video Media 3.

BY ATTORNEY Z. SHAH:

Q. Dr. Barber, let's talk about the calculations in Appendix A of your report. And before we do that, I want to take a look

yeah, I'm -- I'm not speaking to any particular event or instance, yes.

Q. Okay. And, in fact --

ATTORNEY Z. SHAH: And I'm sorry to do this, Jacob.

BY ATTORNEY Z. SHAH:

Q. But if you, kind of, scroll across Story0 and you look at some of these other columns, you'll see Story0 involved hackers who targeted Regeneron Pharmaceutical [sic] employees in Tarrytown, New York.

Does that sound right to you?

A. I don't have these 5,000 memorized, so we can walk through it together.

So we -- yeah, who -- who -- who were the -- characterization, the performers, what kind of resources, steps that we tried to -- you know, kind of which steps they went through and then -- can you stop right here?

Was it an inside -- you know, were they outside the organization, or were

they an insider? Or sometimes it was both. Sometimes we knew -- I'll just say very quickly, sometimes these cases were -- had a lot of detail to them; sometimes they didn't. Sometimes they were an abstraction of -- of data; sometimes they were very specific. We just modeled what was known, right, so -- yeah.

Q. Let -- let me ask you this question because it's unfair for me -- for us to just scroll through. I know it's a big spreadsheet --

A. Yeah.

Q. -- but you agree that this case doesn't involve hackers or a -- pharmaceutical company employees in Tarrytown, does it?

A. I don't know. Keep going. I -- I --

Q. Well, I'm asking you about this case, about this litigation.

To your knowledge, this case doesn't involve hackers or pharmaceutical

company employees in Tarrytown, does it?

A. Yeah, my analysis was datacentric, not comparing events across market sectors, like, comparing market sectors or behaviors. It was just -- and that's really the focus of the research as well, is very datacentric.

Q. I -- I understand that, Dr. Barber. I'm just asking you what this case is about, right?

And this case is not about pharmaceutical company employees in Tarrytown at Regeneron Pharmaceuticals, right?

A. It is not.

Q. Okay. And if you look at Column T for this Case 0, the loss in that -- in this case is marked as 0, right?

A. Correct.

Q. And -- actually, let's just make a note -- or if we scroll back to Column B, which is the outputs, this case involved names, right?

A. Right.

So let me just say again that 0 meant that we did not know, right? So because -- it's going to be fed into an algorithm, so it's got to be a number. So we -- if we didn't know, we just put 0, which means that the -- the data and the analysis is extremely conservative because we didn't -- there might have been, but we don't know, so we marked it 0.

Q. Okay. Story2 in the source data includes a case where malware was injected, right?

A. It does.

Q. This case doesn't involve injected malware, true?

A. Yeah; we're not looking at a -- not to my knowledge.

What I compared was the use of --

Q. Dr. Barber, I'm not asking about what you compared. I'm just asking about what this case is about.

Story3 is a case where employees -- employee access to a database was misused.

Do you see that?

A. Yes, I do.

Q. This case doesn't involve employee access to a database being misused, right?

A. No.

Q. Story5 is a case where PII was retained illegally by employees of the Corner Bakery Cafe in Texas.

This case doesn't involve the legal retention of PII by employees of the Corner Bakery Cafe in Texas, does it?

A. It does not. It --

(Simultaneous speech; as a result, portions of the testimony could not be reflected in the record.)

BY ATTORNEY Z. SHAH:

Q. Story9 involves fraudulent tax returns.

To your knowledge, this case doesn't involve fraudulent tax returns, right?

A. That's correct.

Q. Story14 involves a case where an ATM pin and credit card numbers were stolen and a credit/debit card skimmer was installed.

This case doesn't involve storing stolen credit cards, true?

A. It does not.

Q. Story16 is a case where a celebrity was impersonated.

This case doesn't involve any celebrities being impersonated, right?

A. Right. And I -- I didn't use data -- when I looked at the data, I mapped data to data that PowerSchool used. I -- and so I was just mapping, Okay. This is the data that PowerSchool controls and processes, how is that data being used for harm?

So where you get the data and then how -- where you use it for the harm is a -- two different things, so I was just

data elements. I do understand that --

A. Okay. Good.

Q. -- but, Dr. Barber, of these 5,000 cases, according to the 2017 ITAP report, 90 percent of them involve noneducation market sectors.

Does that sound right to you?

A. Fair enough. Yeah, in terms of where the information was collected, not necessarily where it was used to create the harm, yeah.

Q. Well, and also where it was used to create the harm, right?

Ninety percent of these cases do not involve the education sector, right?

A. In terms of where the data was acquired, yes. Like, I can acquire it from an -- a school, but I might go use it at a bank, you know, so --

Q. Okay. Well, 90 percent of these

cases don't involve data from a school, right?
A. That's right.
Q. They don't involve data from the education sector in any way, right?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: I don't believe they don't -- I -- can you say -- ask that again?
BY ATTORNEY Z. SHAH:
Q. That's okay. The ITAP report speaks for itself.
Column I, the Age Group of Victims.
Is it fair to say that the UTCID data primarily concerns the misappropriation of adult data?
A. Yes.
And, you know, there are -- there are other reports --
Q. I didn't ask --
A. -- other than --

Q. -- Dr. Barber, I didn't ask you about other thoughts you have. I just want you to answer my question.

Dr. Barber, when we look at Column P, Location of Event, is it fair to say that the UTCID data includes cases of identity theft, fraud and abuse outside of the United States?

A. Yes. But if you looked at the ITAP reports, then you would know that the harms that are experienced for the international and the U.S. are extremely similar in the kind of data that is compromised is extremely similar, so -- but, yeah, there are some -- there are some international cases in there, yes.

Q. According to the 2019 ITAP report, there are about 900 international incidences in this data set, right?

A. I don't know the exact number.

Q. Does that --

A. I don't remember.

Q. -- sound right to you?
A. It sounds a little high, but if that's what we had in the report, then it's accurate. I'll stand by that.
Q. Okay.
ATTORNEY L. ARAGON: And let's look at Column T, which is Loss Amount.
BY ATTORNEY L. ARAGON:
Q. Now, I understand you reported 0 when the loss amount was unknown based on the news article or publication that you used to populate the data set.
Is that fair?
A. That is. And then, one, if we knew there was some amount but we -- it wasn't quantified -- or wasn't reported as a actual number, so we -- we didn't report numbers we didn't see in the article.
Q. Is the difference between 0 and 1 that 0 could be no harm and 1 means there was some harm --

A. No --

Q. -- but just not quantifiable?

A. -- you can't -- you can't inference that, no.

Q. Then what's the difference?

A. We had to have a number, and we've just tried to signify that you could create a -- they could all be 0. It -- because within the calculation, it just -- it wasn't a factor, right?

Q. So what's the difference between when the loss amount is unknown and when the loss amount is not quantifiable?

A. Well, they say there are losses but they didn't give us a number, if we didn't have a number to go by.

Q. Okay. But isn't that the same as saying the loss is unknown?

A. I'm happy for that to be the conclusion.

Q. Well, I'm asking you how -- what your --

CERTIFIED STENOGRAPHER: I'm sorry. I didn't get the end of the question. Please repeat the question.

ATTORNEY Z. SHAH: Sorry, Cindy.

Let me ask a better question.

BY ATTORNEY Z. SHAH:

Q. Give me an example of a case where the loss is not quantifiable but still unknown -- but not unknown.

ATTORNEY L. ARAGON: Objection: form.

ATTORNEY Z. SHAH: Actually, strike that. That's not -- that doesn't make sense.

BY ATTORNEY Z. SHAH:

Q. Dr. Barber, can you give me an example of an instance where a loss is unknown but still quantifiable?

A. So 0, like, they didn't -- we didn't know anything about it, right, like, they didn't even mention about the -- the

losses, they might say something like lots of charges were made against the credit card or property was purchased, or something like that, or -- but there wasn't a number.

These -- when we have a number, that means in the case, in -- well, in the report -- and these are instances of time, right. I mean, things may have happened after this news report. This is just one news report and one instance of time that's -- as reporting on a number that's found as an actual loss.

So . . .

BY ATTORNEY Z. SHAH:

Q. So in the instance where you marked something as loss amount 0, could it also be true that there is no loss?

A. I don't know. It could be no loss at that moment and there was loss later on. It just wasn't reported in the story.

These -- this was a way of us getting information about cases that

organizations often do not divulge. And it was a good source and we, you know, tried to include as -- you know, in the thousands so that we could look at some qualitative patterns. But it just -- this is what was in the data. We didn't try to estimate or exaggerate or --

Q. I'm not suggesting you did. I'm just trying to understand the difference between 0 and 1.

So my understanding is that when loss amount equals 0, it's because you don't know whether there is a loss, whether some other harm has occurred, or whether no harm has occurred.

Is that fair?

A. Yes.

And also, you know, you can see in the way we conduct the calculations that the amount of impact on the calculations of a 0 or a 1 are -- are nonexistent.

Q. Okay. And the instances where

Q. What methodology did you use to associate PII names from the UTCID data set to PowerSchool's documents?

A. Well, some of them were easy. Like, [redacted] And then sometimes it wasn't.

People -- you know, these are news stories. You -- you know, you can call things different names, you know. So I was trying to be very explicit and very transparent about the mapping that I used.

So -- and let me just --

Q. Hold on --

A. -- also say --

Q. -- Dr. Barber. No, no. Let me ask the next question. I want to keep this moving.

What is the -- let me ask you this: [redacted]

A. Each one of the cases that we had talked about different data elements. We did not rename them. We took them exactly as they were stated in the news story.

Q. Okay. So you -- you, sort of, roughly and by hand matched PII names from the UTCID database --

A. I did.

Q. -- to PII -- PII data elements listed in the DPIA or PowerSchool contract.

Is that fair?

A. That is fair.

Q. You didn't have a systematic method for associating PII names to PII data elements other than your personal, you know, information and approximation of what that element meant, right?

ATTORNEY L. ARAGON: Objection --

THE WITNESS: That's correct.

ATTORNEY L. ARAGON: -- objection: form.

BY ATTORNEY Z. SHAH:

Q. What's -- so when you say -- does -- let me ask you this: [redacted]

A. No. It just means [redacted]

Q. Okay. So when we -- let's take a look at Rows 37 and 38 of this spreadsheet.

And you'll see here, you associated [redacted]

What's the basis for that association?

A. [redacted]

Q. Okay --

A. I mean, I really --

Q. -- the only reason you associated [redacted]

Is that fair?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: [redacted]

BY ATTORNEY Z. SHAH:

Q. Okay.

[redacted] but, yes, I was trying to be very transparent about the way I mapped the data elements. Because some -- you will see that some we did not have any, right, [redacted] so I didn't try to map it.

Q. Okay. So there are even some PowerSchool PII elements -- you don't even know what they are, and so you didn't even attempt to map them, right?

A. Well, when it says [redacted] who knows what's in that? So I don't know, yeah.

Q. Okay. [redacted] right?

A. Yes.

Q. When you --

ATTORNEY Z. SHAH: If we could go back to the top header, Row 1.

BY ATTORNEY Z. SHAH:

Q. You say here: Risk of exposure reflects the likelihood of target for identity theft, fraud and abuse, right?

A. Um-hum.

Q. So should the jury interpret the 0.08 risk of exposure for IP address to mean there's a 0.08 chance that IP address information collected by PowerSchool will be exposed?

A. No. It just means that in all

the cases that we looked at, IP address was not frequently used. This is a frequency, how frequently is this data element used and targeted, involved in -- how often does it occur in identity theft and fraud cases.

Q. Okay. And when you say how often does it appear in the data, are you talking as an input or an output?

A. Both.

Q. But isn't the data that's being exposed only in the output column?

A. Well, I wouldn't say expose -- well, what was reported here is how frequently is this data being used. And so the inputs maybe have been exposed data, like compromised credentials, you know, like in the PowerSchool breach, and then how did they use that data to get more data.

So, you know, it's just -- how often did this data used in identity theft and fraud. That's what is being reported --

Q. Okay --

A. -- so as you see --
Q. -- so we could really call this risk of use, not risk of exposure, right?
ATTORNEY L. ARAGON: Objection: form.
THE WITNESS: Maybe you could say frequency of use and exposure. But that's -- that's what the calculation is.
BY ATTORNEY Z. SHAH:
Q. Okay. So the jury should not understand the term risk of exposure to mean that the risk of exposure for this PowerSchool data element is 0.08 percent; is that right?
A. They should --
ATTORNEY L. ARAGON: Objection: form.
THE WITNESS: -- they should interpret it as the frequency in which this data is involved either as an input or an output in an identity theft and fraud case.

ATTORNEY Z. SHAH: Okay. We're going to mark -- Madam Court Reporter, can we please mark this part of the transcript? Because I think it is a prime example for the Judge as to how this witness is comple- -- is offering totally useless, nonresponsive answers to my question.

BY ATTORNEY Z. SHAH:

Q. And I am entitled to know, Dr. Barber, whether you intend to tell the jury that monetization value represents the monetary value of the PowerSchool student data at issue in this case.

Does it?

A. Give me your equation for how you are valuing -- I don't -- am I valuing it -- yes, I am valuing it. I am --

Q. You're --

A. -- valuing it. I had given --

Q. -- you -- it's your -- you are valuing the PowerSchool data in this case.

Is that your testimony?
A. In terms of its con- -- potential consequences and risk, yes.
Q. You intend to tell the jury that the PowerSchool data in this case has a monetary value of millions -- billions of dollars.
Is that your testimony?
A. I am not giving actual numbers. I am giving the -- what is more valuable than others. I'm trying to give relative, qualitative values to this data and -- yeah.
I -- I really am trying to answer your question. I just . . .
Q. I think it's a really straightforward question, Dr. Barber.
Does monetization value represent the monetary value of the student data at issue in this case?
Yes or no?
A. Monetary value to who? And how do you calculate that? There's value to who,

and its calculation can vary significantly. And I've given you what my method is, but I'm -- I don't have any other response to give you.

Q. So you are purporting to calculate the monetary value of the data in this case?

A. Relative in terms of qualitative -- we didn't have -- we -- we just talked about the relative and qualitative values that were seen in these cases. That's -- and the same data is held by PowerSchool. That's -- I'm just trying to make those qualitative comparisons. I'm not trying to create a, Here's how much you could sell the data for, valuation. I'm not trying to do that.

Q. I'm going to try this one -- one more time, Dr. Barber --

A. Okay.

Q. -- and then I'm going to move on.

A. Okay.

Q. My understanding is that monetization value represents the monetary value of the data elements in the 5,000 UTCID cases that you studied.

Is that fair?

A. It is.

Q. Okay. Separately, you're opining that those same data elements are present in the PowerSchool set of products' DPIAs that you looked at, right?

A. Correct.

Q. Now, are you going to be opining that based on the fact that this data has monetary value in 5,000 other cases, that that data has the same value in this case?

Is that an opinion you plan to offer?

A. Qualitatively, that -- does PowerSchool hold valuable data? That's what I am saying, and that's -- some of it is more powerful than -- valuable than others. Some of it is more at risk of exposure just because

the threat likes that data more than they do others. That's really my testimony.

Q. Okay. Let's take a very concrete example. Let's look at Row 14. And we look at E-mail?

A. Um-hum.

Q. Okay?

A. Right.

Q. You have assigned a monetization value for a PII data name [redacted] at over $60 million, right?

A. Right.

Q. Is it your opinion [redacted] are worth $60 million?

A. No, I'm not -- I'm opining that [redacted] -- so I'm -- that it has value and it has -- it's to be used for

comparative value, because -- yeah, that's --

Q. Dr. Barber, that's great. That's great.

A. Okay.

Q. You are not opining that [redacted] is worth $60 million.

Fair?

A. I am not.

Q. You are not opining that monetization value in Column I represents the amount that threat actors have made using the Plaintiffs' data in this case, right?

A. That's correct.

Q. You are not opining that monetization value represents the financial impact of exposed PII in this case, right?

A. I didn't look at that. I -- yeah, I don't -- I haven't looked at the --

Q. Okay.

A. -- exposed data. That's right.

Q. Do you agree that the value of

That's your testimony?

A. No, my testimony --

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: -- is that --

(Simultaneous speech; as a result, portions of the testimony could not be reflected in the record.)

THE WITNESS: Yeah.

My testimony is that in these cases that we looked at, only name was mentioned. I don't know in those cases if there was a data field [redacted]

It was --

BY ATTORNEY Z. SHAH:

Q. Oh. So you --

A. [redacted]

Q. -- so when you say --

A. I don't know how the data was represented --

Q. Dr. Barber --
A. No; let me finish.
I don't know how the data was actually -- you know, [redacted]
Q. Oh. Okay.
So, Dr. Barber, in the -- in the 5,000 UTCID cases that you looked at, you don't know whether it was just [redacted]
Is that right?
A. Yes, in the same way that I don't know what --
Q. Dr. Barber, just answer the question.
You don't know, right?
A. I just know that [redacted] was mentioned in these cases and how it was used. That's all I know.
Q. Okay. You know the word [redacted] appears in a news article and based on that, you've assigned it a monetary value of

$112.5 million --

A. I didn't assign.

Q. -- and you don't know -- Dr. Barber, let me finish the question -- you don't know whether that [redacted] is a data field in the PowerSchool SIS instance that's used by Seattle Public Schools, right?

ATTORNEY L. ARAGON: Objection: form foundation.

She didn't say that.

THE WITNESS: I didn't -- I didn't assign the value. I saw cases that represented that financial consequence. And the reason I mapped it here is because it seemed logical that [redacted] and that I was trying to provide a -- what data has value.

This data has a non-0 value. It has relatively high value as compared to others. That's what --

ATTORNEY Z. SHAH: I'm going to

ACKNOWLEDGMENT OF WITNESS

I, KATHLEEN SUZANNE BARBER SIMONS, do hereby certify that I have read the foregoing pages herein, and that the same is a correct transcription of the answers given by me of the proceedings taken remotely to the questions therein propounded under penalty of perjury, except for the corrections or changes in form or substance, if any, noted in the attached errata sheet.

_________ ___________________________

DATE SIGNATURE

Subscribed and sworn to before me
this _____ day of____________, 20____.

My Commission expires:

_____________________________

_____________________________

Notary Public