Robyn E. Bladow
Kirkland & Ellis LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Zharna Shah (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
zharna.shah@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
Kirkland & Ellis LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

EMILY CHERKIN, et al

Plaintiffs,

v.

POWERSCHOOL HOLDINGS, INC.,

Defendant.

CASE NO. 3:24-cv-02706-JD

**DEFENDANT POWERSCHOOL HOLDINGS, INC.'S REPLY IN SUPPORT OF MOTION TO EXCLUDE THE OPINIONS OF DR. K. SUZANNE BARBER**

Judge: Hon. James Donato
Hearing Date: April 23, 2026
Time: 11:00 a.m.
Courtroom: 11, 19th Floor

## TABLE OF CONTENTS

I. ARGUMENT .....3

A. Dr. Barber's opinions lack a reliable, scientific methodology.....3

1. Opinion 1: The Opposition reveals that Dr. Barber opines about data sensitivity based solely on her ipse dixit.....4

2. Opinions 2-3: Plaintiffs admit that Dr. Barber had no methodology for assessing whether PowerSchool creates actual risk of data exposure. .....6

3. Opinions 4-5: Dr. Barber's method of relying on the UTCID crime database is fundamentally unreliable. .....7

B. Dr. Barber's report is not relevant to whether PowerSchool's licensing of products to schools is "highly offensive" or "unjust." .....8

C. Dr. Barber impermissibly relies on inadmissible hearsay. .....9

II. CONCLUSION .....10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1625 Riviera Homeowners Ass'n v. Uponor, Inc.*, 2026 WL 776964 (N.D. Cal. Mar. 19, 2026) .......... 9

*In re Accellion, Inc. Data Breach Litig.*, 2025 WL 2799102 (N.D. Cal. Sept. 30, 2025) .......... 3

*Babakhanlou v. Los Angeles Cty.*, 2026 WL 637321 (C.D. Cal. Jan. 28, 2026) .......... 4, 5

*CZ Servs., Inc. v. Express Scripts Hldgs. Co.*, 2020 WL 4518978 (N.D. Cal. Aug. 5, 2020) .......... 4, 6

*Daubert v. Merrell Dow Pharma., Inc.*, 43 F.3d 1311 (9th Cir. 1995) .......... 3, 5

*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) .......... 9

*Hammerling v. Google LLC*, 615 F. Supp. 3d 1069 (N.D. Cal. 2022) .......... 9

*Hernandez v. Hillsides, Inc.*, 211 P.3d 1063 (Cal. 2009) .......... 8

*Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956 (N.D. Cal. 2025) .......... 3, 8

*Koger v. Costco Wholesale Corp.*, 2023 WL 818842 (N.D. Cal. Nov. 27, 2023) .......... 2, 10

*Mezger v. Bick*, 66 Cal. App. 5th 76 (Ct. App. 2021) .......... 8

*Pascal v. Nissan N. Am.*, 2022 WL 19076763 (C.D. Cal. Dec. 21, 2022) .......... 5

*San Diego Comic Conv. v. Dan Farr Prods.*, 2017 WL 4227000 (S.D. Cal. Sept. 22, 2017) .......... 5

*Schoen v. State Farm Fire & Cas. Co.*, 638 F. Supp. 3d 1323 (S.D. Ala. 2022) .......... 7

*Siqueiros v. Gen. Motors LLC*, 2022 WL 74182 (N.D. Cal. Jan. 7, 2022) .......... 5

*United States v. California*,
932 F.2d 1346 (9th Cir. 1991) ....................................................................................................9

**Rules**

Fed. R. Evid. 703 ...............................................................................................................10

In their attempt to salvage Dr. Barber's opinions from exclusion, Plaintiffs retreat from how they previously presented her work. In their motion for class certification, Plaintiffs claimed that Dr. Barber "describ[es] the minimum data elements collected by PowerSchool's products," "summariz[es] harms ***caused*** by PowerSchool's practice of controlling and processing student data," and concludes that "PowerSchool controlling and processing … data … expose[s] [students] to 'diverse, longstanding, and significant harm.'" Dkt. 116 at 16 nn.84 & 86, 20-21. Plaintiffs now concede that Dr. Barber did not, in fact, investigate the data elements PowerSchool processes, but only reviewed the ***kinds*** of data PowerSchool ***might*** process per its Data Privacy Impact Assessments ("DPIAs") to state that this ***kind*** of data is "sensitive." Opp. 5. They also assert that "Plaintiffs do not offer Dr. Barber's testimony to aid the jury in determining actual harm to Plaintiffs." *Id.* at 2, 8. And, they admit that "Dr. Barber's opinion in no way addresses or purports to address PowerSchool's particular system controls and protocols." *Id.* at 8. Plaintiffs' willingness to abandon their positions is even more remarkable because their initial characterization of Dr. Barber's report was their ***only evidence*** (self-created as it was) that PowerSchool's processing of data ***caused*** harm. Dkt. 116 at 16 nn.84 & 86, 20-21. Tellingly, Plaintiffs' reply in support of their class certification motion no longer cites Dr. Barber's report.

Having disavowed their initial description of Dr. Barber's conclusions, Plaintiffs now say that Dr. Barber's opinion is the result of three steps:

1. "[O]btain[] the data elements collected and processed by PowerSchool directly from … DPIA Reports[] produced by PowerSchool in discovery." Opp. 5.

2. Assert that data is sensitive "based on her extensive experience, expertise, and research" if its exposure could "cause significant harm." *Id.* at 6.

3. Conclude that the types of data PowerSchool processes have "levels of risk and value" and "are sensitive" by "appl[ying]" the UTCID model. *Id.* at 5-6, 9-11.

Thus, Dr. Barber merely summarizes PowerSchool's documents, asserts that data is sensitive based on *ipse dixit*, and claims that the UTCID database is relevant to schools' use of PowerSchool's products. The Court should exclude Dr. Barber for three reasons:

***Dr. Barber lacks a reliable methodology.*** None of Dr. Barber's steps involve any reliable methodology. Reading documents to assert what data PowerSchool processes is not expert methodology. Nor can Dr. Barber assert that data is sensitive solely "based on her experience, expertise,

and education"; that is the hallmark of untestable and unverifiable expert *ipse dixit* that courts routinely exclude. Plaintiffs also failed to prove that querying UTCID database is a reliable method of proving the value of data or risk of exposure. They do not meaningfully explain the method, because it makes no sense on its face. The UTCID database consists of an unidentified "team of modelers[']" summary of (i) data fields identified as stolen in third-party public sources and (ii) financial loss that third parties reported from that theft. Dr. Barber extrapolates—with no scientific basis—that the frequency at which data fields appear in the database is somehow indicative of the risks those fields pose and their value. So, if someone's name appears more frequently in reported crime cases than their bank account number, routing information, and pin, their name is suddenly more valuable than banking information. Unsurprisingly, Plaintiffs have pointed to no objective support for Dr. Barber's use of the UTCID database. Lastly, Plaintiffs cannot flip the burden on PowerSchool. Opp. 9-10. It is ***Plaintiffs' burden*** to demonstrate that Dr. Barber's use of the UTCID database is "'scientifically reliable.'" *Koger v. Costco Wholesale Corp.*, 2023 WL 818842, at *2 (N.D. Cal. Nov. 27, 2023). Plaintiffs do not even attempt to bridge the analytical gap between UTCID's summaries of criminal cases (such as stealing social security numbers from corporations) and schools' use of PowerSchool products for ordinary cloud storage. And, Plaintiffs gloss over clear inconsistencies in Dr. Barber's methodology, which gives vastly different assessments of risk (***6700% higher***) to the ***same data field*** depending on if it is listed as "email" or "email address." This warrants exclusion.

***Dr. Barber's testimony is not relevant.*** Plaintiffs do not dispute that Dr. Barber knows nothing about PowerSchool's specific practices. They contend that her report is nevertheless relevant to whether PowerSchool's practices are "highly offensive." Opp. 1. That is not something Dr. Barber can testify about as she repeatedly disclaimed knowing how PowerSchool's products ***actually*** work and admitted she was aware of only the kinds of data that ***might*** be processed in those products. *See* Ex. B, Barber Tr. 96:14-100:20, 134:2-22, 142:22-143:12, 147:18-148:17, 164:11-19.[1] Thus, Dr. Barber's opinion has nothing to do with PowerSchool but is rather pontification about hypothetical risks associated with digital storage of any data.

***Dr. Barber relies on impermissible hearsay.*** Plaintiffs concede that Dr. Barber's opinions are

[1] The original Ex. B inadvertently omitted a few cited pages; a corrected Exhibit B was filed at Dkt. 153.

based on the UTCID database. Such reliance on a third-party database is wholly improper because the UTCID database is hearsay. Plaintiffs admit that Dr. Barber uses it to “assign[] levels of risk and value” to data categories and believe it proves “that some data elements … are more valuable than others.” Opp. 5, 8, 11. Thus, Plaintiffs indisputably use out-of-court statements in the UTCID database for the truth of its assertions. Such repackaging of hearsay is impermissible.

In sum, beyond merely reciting Dr. Barber’s qualification as an expert in ***something***, *see id.* at 3-4, Plaintiffs have wholly failed to meet their burden of proving that Dr. Barber had a ***reliable, scientific methodology*** for assessing risks of exposure and harm from data processing ***in this case***, or that her assessments of abstract risks from generic data hosting are relevant ***to the claims at issue***. Plaintiffs also cannot avoid the conclusion that Dr. Barber recites and relies on third-party hearsay, which is not admissible expert testimony. As a result, all of her opinions should be excluded.

# I. ARGUMENT

The Opposition turns the *Daubert* standard on its head with Plaintiffs arguing for a presumption of admissibility based on qualifications alone. *See id.* at 1, 3-4, 6-11. Plaintiffs spend their entire Opposition trying to distinguish cases without even attempting to meet ***their*** “burden of establishing the report’s admissibility by a preponderance of the evidence.” *In re Accellion, Inc. Data Breach Litig.*, 2025 WL 2799102, at *2 (N.D. Cal. Sept. 30, 2025). Plaintiffs needed to not only prove that their expert had some qualification but also “demonstrate that [her] testimony is relevant and reliable,” “‘based on sufficient facts or data,” “‘is the product of reliable principles and methods,’” and “‘reflects a reliable application of the principles and methods to the facts of the case.’” *Id.* They failed at all the above.

## A. Dr. Barber’s opinions lack a reliable, scientific methodology.

To prove that the expert has a reliable methodology, Plaintiffs had to demonstrate that “the reasoning and methodology underlying [Dr. Barber’s] testimony is scientifically valid and … properly can be applied to the facts at issue.” *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 961 (N.D. Cal. 2025). This requires (i) “a sufficient factual foundation,” such that the opinions are not the product of speculation; and (ii) a well-reasoned connection between the case specific data and the opinions offered, such that the opinions are not connected to the case “‘only by the *ipse dixit* of the expert.’” *Id.* An expert must “‘support … every necessary link’” in her theory for the opinion to be admissible. *Id.* at

961, 962-67 (excluding expert for failing to support every step for the conclusions offered). Further, scientific validity requires the Court to consider whether the methodology is susceptible to testing, has been peer reviewed, and has some "degree of acceptance in the relevant expert community." *Babakhanlou v. Los Angeles Cty.*, 2026 WL 637321, at *3-4 (C.D. Cal. Jan. 28, 2026). None of Barber's five opinions meet these requirements.

### 1. *Opinion 1: The Opposition reveals that Dr. Barber opines about data sensitivity based solely on her* ipse dixit.

The Opposition confirms that Dr. Barber's first opinion should be excluded because it is the result of untestable *ipse dixit*, not scientific methodology.

Dr. Barber's first opinion is simply that the data PowerSchool processes is "sensitive."[2] Plaintiffs concede that Dr. Barber did not actually know what data PowerSchool processes for schools. *See* Opp. 5 ("[S]uch an investigation was not a necessary prerequisite [to her opinions]."). Instead, Dr. Barber merely identifies data categories that PowerSchool supposedly processes by quoting PowerSchool's DPIA—which is documentation reflecting the categories of data that PowerSchool products ***may*** process. *Compare* Mot. 8-9, *with* Opp. 5; Ex. B, Barber Tr. 142:22-143:12, 147:18-148:17 (clarifying that she is only opining as to what PowerSchool says its product[s] "control[] and process[]"). There is also no dispute that Dr. Barber's opinion would be fully excludable if she simply quoted the DPIAs, as courts routinely hold that experts cannot merely recite the contents of documents. *E.g.*, *CZ Servs., Inc. v. Express Scripts Hldgs. Co.*, 2020 WL 4518978, at *2 (N.D. Cal. Aug. 5, 2020).

Plaintiffs contend, however, that this first opinion is the product of expert methodology because Dr. Barber concludes that the data listed in the DPIAs is "sensitive." Opp. 6. As PowerSchool initially noted, however, the assessment of sensitivity is a "'black box'" with no discernable methodology. *See*

[2] Dr. Barber's report initially made an affirmative claim that PowerSchool processes some minimum data elements, purportedly supporting Plaintiffs' class certification arguments. At her deposition, Dr. Barber disclaimed offering such an opinion and Plaintiffs do not defend this opinion. Plaintiffs now attempt to prove that PowerSchool's products have some "Baseline Data" fields by misquoting PowerSchool's interrogatory response and the DPIAs. *See* Dkt. 149 at 2 n.2, 5. Plaintiffs misrepresent PowerSchool's interrogatories, which objected to cataloging individual school uses and data collection, and instead agreed solely to produce the DPIAs to illustrate "the ***categories*** and uses of data ***relating*** to each … product." Dkt. 119, Ex. 13 at 7. Plaintiffs' attempt to turn the DPIAs into some admission of "Baseline Data" fields also fails since every witness—including Plaintiffs' own experts—testified that PowerSchool's products have no minimum data fields. *See* Dkt. 139, Ex. 19, Flagg Tr. 61:22-63:7; *id.*, Ex. 21, Schulte Tr. 203:2-17; *id.*, Ex. 22, Barber Tr. 103:12-107:15; *id.*, Ex. 23, O'Neil Tr. 123:14-24, 135:1-136:12; *id.*, Exs. 25-29; *id.*, Ex. 30, White Rebuttal Rep. 4-5.

Mot. 9. In response, Plaintiffs attempt to salvage this opinion by contending that Dr. Barber decided data sensitivity by applying her own definition and seeing if the data fit that definition:

> [Dr. Barber] defines "sensitive data" in her report as "information that, if exposed, shared, misused, or accessed without authorization, can cause significant harm, discrimination, financial loss, or privacy violations for individuals or organizations" based on her extensive experience, expertise, and research in digital identity, cybersecurity, digital trust, and information security and privacy. … She then examined whether the data collected and processed by PowerSchool fell within that definition.

Opp. 6. By Plaintiffs' own confession, there is thus no methodology for her assessment of data sensitivity beyond her own say-so based on her "experience." *Id.*

This is not enough for Plaintiffs to meet their burden. Plaintiffs offered no evidence that this standard of sensitivity has any scientific basis or industry recognition. *Babakhanlou*, 2026 WL 637321, at *3-4. Plaintiffs and Dr. Barber neither point to "independent research" based on "[p]eer review and publication" nor show that her definition is based in "some objective source—a learned treatise, the policy statement of a professional association, … or the like." *Daubert v. Merrell Dow Pharma., Inc.*, 43 F.3d 1311, 1317-19 (9th Cir. 1995) (plaintiffs failed to prove admissibility absent evidence of objective support for methodology). Her methodology is neither falsifiable nor replicable, as tests are when they possess the necessary scientific rigor. *Pascal v. Nissan N. Am.*, 2022 WL 19076763, at *3 (C.D. Cal. Dec. 21, 2022). It is also vague, basing "sensitivity" on an undefined and unexplored finding of "significant" harm. Dr. Barber offered no explanation of how this standard works, what factors are considered, what level of loss qualifies as "significant" harm, or how the data at issue meets the standard. *San Diego Comic Conv. v. Dan Farr Prods.*, 2017 WL 4227000 (S.D. Cal. Sept. 22, 2017) (linguist expert opining that an allegedly infringed-upon phrase was generic was excluded for failure to explain what factors the expert analyzed and why) . Dr. Barber's definition incredibly causes her to treat all data as equally sensitive regardless of how specific or non-personal (declaring equally sensitive one's name, school attended, postal code, and social security number). *E.g.*, Ex. A, Barber Rep. ¶¶ 33-34. Plaintiffs contend that Dr. Barber can declare data sensitive solely because of her "extensive experience," but that explanation is precisely the *ipse dixit* methodology that courts deem inadmissible. *Siqueiros v. Gen. Motors LLC*, 2022 WL 74182, at *14 (N.D. Cal. Jan. 7, 2022).

Thus, the Opposition confirms that the Court should preclude Dr. Barber from offering her first

opinion—that PowerSchool hosts data that is sensitive—based solely on Dr. Barber's say-so.

### 2. *Opinions 2-3: Plaintiffs admit that Dr. Barber had no methodology for assessing whether PowerSchool creates actual risk of data exposure.*

The Opposition provides no explanation of what methodology Dr. Barber used to determine that PowerSchool creates a "risk[] of exposure … of students' personally identifiable information." Opp. 7. Instead, Plaintiffs assert that such "disclosure is an established fact," again falsely claiming that "PowerSchool admits that it discloses student information to hundreds of partners." *Id.* at 8. This assertion is simply wrong, as PowerSchool has repeatedly explained—including by recently citing ***undisputed testimony***—that PowerSchool works with other companies only "at schools' direction."[3] Dkt. 138 at 8 nn.34-35.

Regardless, Dr. Barber cannot dress Plaintiffs' factual allegations as expert testimony. *CZ Servs.*, 2020 WL 4518978, at *1 (excluding an expert for merely reciting facts). Plaintiffs have offered no methodological basis for Dr. Barber to testify that PowerSchool creates a risk of exposure, and Plaintiffs concede that Dr. Barber never assessed PowerSchool's data security controls or processes (which she admitted at her deposition). Opp. 7-8. To the extent she is opining that the data PowerSchool processes is at risk simply because data has been stolen in 6,000 other cases, this could only confuse the jury, as it fails to put that number into any context, much less one relevant to PowerSchool. How many entities store personal data in some way? Are data breaches likely simply because an entity has information? Are they more likely if the entity processes more information? Dr. Barber offers no answers. There is no actual methodology to support Dr. Barber's inferential leap from the existence of the UTCID database to her opinion that having data creates risk of exposure. Finally, Plaintiffs weakly imply that Dr. Barber's opinions should be trusted because she has "extensive experience and expertise," *id.* at *9,* but this does not allow her to broadly declare PowerSchool's processes as risky without any identifiable or verifiable methodology.[4]

---

[3] Plaintiffs also contend that "disclosure is an established fact" because PowerSchool "was hacked in late 2024." Opp. 8. But Plaintiffs simultaneously admit that their reference to a data breach incident is irrelevant because "[t]his is not a data-breach case." *Id.* at 2.

[4] Tellingly, Plaintiffs now act as though Dr. Barber's second and third opinions as stated in her report simply do not exist. Dr. Barber originally stated that "PII controlled and processed by PowerSchool products is under constant attack" and that "[t]here are numerous possible causes for exposure of the PII controlled and processed by PowerSchool." Ex. A, Barber Rep. ¶ 3. Yet after Dr. Barber admitted at deposition that she had no basis to opine about PowerSchool's actual practices, Plaintiffs now claim that

### 3. *Opinions 4-5: Dr. Barber's method of relying on the UTCID crime database is fundamentally unreliable.*

Dr. Barber's use of the UTCID database to reach her Opinions 4 and 5 is facially unreliable.

Dr. Barber did not create the UTCID database. A team of modelers at University of Texas populated the database from third-party sources, such as news media, law enforcement, and fraud cases.[5] *See* Opp. 7. Dr. Barber did not query the database herself but had a student do it. Ex. B, Barber Tr. 50:2-51:5, 27:5-14, 51:11-52:18. Dr. Barber did not review the underlying data in forming her conclusions. *Id.* at 50:2-6. She testified that her goal was just to "report[] on what [her student] found in" that database. *Id.* at 217:4-220:2. This alone should be enough to preclude Dr. Barber from testifying based on the UTCID database. *Schoen v. State Farm Fire & Cas. Co.*, 638 F. Supp. 3d 1323, 1336-37 (S.D. Ala. 2022) (precluding expert from merely conveying observations of a separate inspector); *infra* pp. 9-10 (an expert cannot simply restate third-party hearsay).

But more fundamentally, Plaintiffs do not refute that querying the UTCID is a facially unreliable methodology given the vastly different results it produces for similarly named fields and the fact that it simply assumes that all data fields in a criminal case have equal value. *See* Mot. 12. How can the UTCID database be reliable if it presents a risk of exposure of 11.59% for "email" but 0.17% for "email address" (a difference of over 6700%)? Why does Dr. Barber assume that someone's "name" has the same "monetization value" as their social security number just because a news agency reported that a person lost $100,000 when a criminal stole both pieces of data? Plaintiffs do not address these basic challenges to the reliability of Dr. Barber's reliance of the UTCID database and simply brush off all such issues by claiming that Dr. Barber "will … address any errors" at some later time. Opp. 11. But these are not mere arithmetic errors; they fundamentally undermine the scientific reliability of the entire analysis. Dr. Barber did no math wrong in the email address example; her application of the database (*i.e.*, her methodology) just produces ridiculous results.

Even if one were to ignore the facial defects in reliability, neither Dr. Barber nor Plaintiffs

---

"Dr. Barber's opinion in no way addresses or purports to address PowerSchool's particular system controls and protocols." Opp. 8. But how could Dr. Barber opine about attacks on or exposure of PII that PowerSchool processes, if Dr. Barber "in no way addresses … PowerSchool's particular system controls and protocols"? Plaintiffs do not explain this contradiction.

[5] *See* The Identity Ecosystem at 39:3, https://identity.utexas.edu/sites/default/files/2020-09/The%20Identity%20Ecosystem.pdf (explaining how the data was populated)

provide any appropriate scientific justification for applying the UTCID database to the data PowerSchool processes. For Dr. Barber to draw any conclusions using the UTCID database, she must conclude that, at a minimum: (1) the data at issue in the UTCID cases is sufficiently similar to the data at issue here; (2) the risks created by the data in the UTCID cases are sufficiently similar to the risks at issue here; and (3) the harms facing individuals in the UTCID cases are sufficiently analogous to the harms at issue here. *See Klein*, 766 F. Supp. 3d at 961 (laying out each logical step underlying the conclusion before analyzing whether it is sufficiently supported). Dr. Barber performed none of this analysis even though she saw ***nothing*** in the record analogizing PowerSchool's data processing to the crime cases studied by University of Texas. *See* Ex. B, Barber Tr. 199:10-202:4, 203:13-206:17, 212:12-213:19, 215:4-9, 216:18-217:12. Dr. Barber knew that most of the cases studied did not even involve school records, but rather misappropriation of adult data, *id.* at 308:22-309:2, 309:15-18, and yet turned a blind eye to whether this significant difference could affect the reliability of her methodology.

**B. Dr. Barber's report is not relevant to whether PowerSchool's licensing of products to schools is "highly offensive" or "unjust."**

Plaintiffs are wrong that Dr. Barber's opinions are relevant to whether PowerSchool engaged in a "highly offensive" invasion of privacy or was unjustly enriched when it sold software to schools or agreed to host their data—the sole basis Plaintiffs' offered for admission of her testimony. *See* Opp. 1. For one, Plaintiffs' attempt to use Dr. Barber's testimony to establish their claims against PowerSchool is inconsistent with their own characterization of her opinions, as they admit that she is merely showing that some data elements "are more valuable to ***actors in identity theft and fraud cases*** than others." *Id.* at 10-11 (emphasis added). As they affirm, this is not a case about a data incident. *Id.* at 2.

Even if they were trying to illustrate some possible harms from data storage, abstract risks are not relevant to any claim. To the extent harm is even a factor, the "highly offensive" element of an invasion of privacy claim considers materialized harms, not hypothetical ones. Indeed, the California Supreme Court in *Hernandez v. Hillsides, Inc.* reversed a lower court for allowing a privacy claim to go forward based "on the inchoate risk" of an intrusion from a recording device, holding that such evidence failed as a matter of law. 211 P.3d 1063, 1078-79 (Cal. 2009); *Mezger v. Bick*, 66 Cal. App. 5th 76, 87-88 (Ct. App. 2021) (affirming summary judgment for failure to prove a highly offensive intrusion since

plaintiff did not show a harm that was "more than 'slight or trivial'"). Further, the invasion of privacy claims must turn on ***PowerSchool's*** conduct, including a holistic analysis of the circumstances surrounding ***PowerSchool's*** data processing services. *See Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090-91 (N.D. Cal. 2022) (dismissing invasion of privacy claim for failure to allege that defendant's specific collection and use of the data was highly offensive). Harms others may or may not have suffered in other cases are not relevant to analyzing the supposed offensiveness of PowerSchool's conduct. Similarly, the unjust enrichment claim requires evidence that ***Plaintiffs*** "'conferred a benefit [on ***PowerSchool***] through mistake, fraud, coercion, or request,'" and that "'a prior relationship between the parties … resulted in unjust enrichment.'"[6] *1625 Riviera Homeowners Ass'n v. Uponor, Inc.*, 2026 WL 776964, at *18-19 (N.D. Cal. Mar. 19, 2026). Abstract risks are not relevant to any element.

Plaintiffs concede that Dr. Barber cannot testify about "actual instances of harm," just about "*risk* of harm," which is precisely the "inchoate risk" that California courts deem insufficient as a matter of law. Opp. 2. Dr. Barber's opinions are wholly irrelevant to all claims because she knows ***nothing*** about PowerSchool's actual practices or anyone's actual injuries. Ex. B, Barber Tr. at 103:12-106:2, 107:1-15, 122:6-123:8, 125:13-21, 199:10-202:3, 203:13-206:17, 212:12-213:19, 215:4-9, 216:18-217:12, 280:13-281:3. Indeed, Dr. Barber admitted that her opinion boils down to risks associated with "deciding to store particular data elements." *Id.* at 277:22-278:8. Thus, she merely discusses a generic risk facing every repository of data, whether paper, digital, app, personal, cloud, or otherwise. This is not relevant to the elements at hand.

**C. Dr. Barber impermissibly relies on inadmissible hearsay.**

Finally, the Court should exclude Dr. Barber because her opinions are built on hearsay.

As Plaintiffs concede, Dr. Barber "obtained the data elements that PowerSchool [supposedly] collects and stores from PowerSchool's own DPIA Reports and discovery responses" (*i.e.*, she simply

[6] None of Plaintiffs' cases support their attempt to introduce Dr. Barber's testimony to discuss abstract risks of harm. Plaintiffs cite the Ninth Circuit's opinion, *In re Facebook, Inc.*, which noted, in dictum, that the "'highly offensive'" prong "requires a holistic consideration" of the intruder's conduct. 956 F.3d 589, 606 (9th Cir. 2020). While the Ninth Circuit noted that "serious harm to the victim" is one factor, it was also clear that the analysis "focuses on the degree to which ***the intrusion*** is unacceptable," and Dr. Barber never considers PowerSchool's specific conduct. *Id.* As for Plaintiffs' assertion that risk of harm is relevant to the unjust enrichment claim, there is no support for that proposition at all. Neither *Facebook* nor *United States v. California*, 932 F.2d 1346 (9th Cir. 1991), the second case Plaintiffs cite, discuss risk of harm as being relevant to this quasi-contractual claim.

read PowerSchool documents) and then "applied them to the UTCID model to assess the risk and value of each data element." Opp. 14. While Plaintiffs try to make her work seem more robust contending she "applied [data] to the UTCID model," Dr. Barber confessed that her purported "application" here was to simply have a student query the UTCID database for a similarly sounding data element and copy-paste the result into Dr. Barber's table. *See* Ex. B, Barber Tr. 50:2-52:18, 217:4-220:2, 329:10-332:7, 398:19-400:19. This is a classic example of an expert taking hearsay and attempting to repackage it as her testimony. *Koger*, 2023 WL 8188842, at *2.

Plaintiffs have just one argument for why Dr. Barber's use of the UTCID database is permissible reliance on hearsay: the UTCID database "is not offered to establish the truth of its assertions." Opp. 14. But Plaintiffs' own Opposition disproves this claim:

- "[T]he … UTCID model … allows for Dr. Barber to determine which elements are most valuable, most at risk for theft or fraud, and most useful in gathering additional information about a person." *Id.* at 6.
- "[T]he magnitude of the cases and the repeating patterns seen across [the UTCID database] support the conclusions of the research." *Id.* at 7.

Dr. Barber is relying on the UTCID database for the truth of its supposed assertions regarding the value of data, the risk of theft, and the usefulness of the data to criminals. *See Koger*, 2023 WL 8188842, at *2 (excluding expert for reciting third-party hearsay report).

Further, Plaintiffs do nothing to demonstrate that the UTCID database is admissible under Rule 703. Plaintiffs have not identified a single industry professional that relies on the UTCID database to evaluate risks associated with data hosting, nor have they shown that its probative value outweighs its prejudicial effect. *See* Fed. R. Evid. 703. In fact, Plaintiffs' contention that PowerSchool can just cross-examine Dr. Barber about the UTCID database rings particularly hollow here since Dr. Barber was not its architect, did not query it, and did not even study it before using it for her opinions. Ex. B, Barber Tr. 27:5-14, 50:2-52:18, 217:4-220:2. PowerSchool cannot cross-examine Dr. Barber on the validity of the underlying data. This is precisely what the hearsay rule seeks to avoid. And, since Plaintiffs admit that the UTCID database underlies Dr. Barber's report, exclusion is the only remedy.

## II. CONCLUSION

For the foregoing reasons, the Court should exclude all of Dr. Barber's opinions.

DATED: March 30, 2026

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Olivia Adendorff*
Olivia Adendorff, P.C.

Robyn E. Bladow
Kirkland & Ellis LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Zharna Shah (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
zharna.shah@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
Kirkland & Ellis LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*