Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Zharna Shah (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
zharna.shah@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Ethan Levinton (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
ethan.levinton@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | | |
|---|---|---|
| EMILY CHERKIN, et al | ) | CASE NO. 3:24-cv-02706-JD |
| | ) | |
| Plaintiffs, | ) | **DEFENDANT POWERSCHOOL HOLDINGS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | ) | |
| POWERSCHOOL HOLDINGS, INC., | ) | Judge: Hon. James Donato<br>Hearing Date: August 13, 2026<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |
| Defendant. | ) | |

# TABLE OF CONTENTS


BACKGROUND ..........3

I. PowerSchool provides software and services for schools to manage their own data. ..........3

II. Federal and state law require schools to collect and share student information and allow schools to hire vendors to support these functions without parental consent. ..........5

III. Local governmental entities hire PowerSchool with community support. ..........6

IV. Schools represent to PowerSchool that they have authority and all required consents. ..........9

ARGUMENT ..........10

I. PowerSchool is entitled to present as a defense that various government entities authorize the challenged conduct through legislation and contracts. ..........10

A. PowerSchool's compliance with statutes is a defense to Plaintiffs' claims ..........10

B. The comprehensive federal and state regulatory scheme authorizing PowerSchool's services preempts claims that are inconsistent with the scheme. ..........13

1. State law allows data sharing with school contractors without parental consent. ..........15

2. FERPA allows data sharing with school contractors without parental consent. ..........17

C. Statutes create a defense by modifying any common law consent requirements. ..........19

II. Federal and state law—and basic principles of representative government—allow schools to contract with PowerSchool on behalf of parents. ..........21

A. Common law agency is not relevant to this defense. ..........21

B. Constitutional law and statutes allow schools to bind parents and students. ..........21

III. PowerSchool's contracts with schools requiring them to obtain all necessary parental consents are relevant evidence, but do not relate to PowerSchool's first defense. ..........24

CONCLUSION ..........25

# TABLE OF AUTHORITIES


Page(s)

**Cases**

*Able v. United States*,
44 F.3d 128 (2d Cir.1995)....22

*In re Accellion, Inc. Data Breach Litig.*,
713 F. Supp. 3d 623 (N.D. Cal. 2024)....25

*Babb. v. Cal. Teachers Ass'n*,
378 F. Supp. 3d 875 (C.D. Cal. 2019)....14

*Bokenfohr v. Gladen*,
828 F. App'x 485 (9th Cir. 2020)....25

*Boy Scouts v. Graham*,
86 F.3d 861 (9th Cir. 1996)....20

*C.N. v. I.G.C.*,
316 So. 3d 287 (Fla. 2021)....14

*In re Calhoun*,
121 Cal. App. 4th 1315 (2004)....14

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005)....22

*Cohen v. Apple Inc.*,
46 F.4th 1012 (9th Cir. 2022)....14

*Costello v. Grundon*,
651 F.3d 614 (7th Cir. 2011)....11

*Crockett v. NEA-Alaska*,
367 F. Supp. 3d 996 (D. Alaska 2019)....14

*DeGrassi v. City of Glendora*,
207 F.3d 636 (9th Cir. 2000)....11, 12

*Diaz v. California*,
2024 WL 5125840 (E.D. Cal. Dec. 16, 2024)....21

*Dubbs v. Head Start, Inc.*,
336 F.3d 1194 (10th Cir. 2003)....25

*Dudding v. Automatic Gas Co.*,
193 S.W.2d 517 (Tex. 1946)....11

*E.E.O.C. v. Waffle House, Inc.*,
534 U.S. 279 (2002) (Mot. 13) ....................23

*Farnsworth v. Massey*,
365 S.W.2d 1 (Tex. 1963).....................11

*Foote v. Ludlow Sch. Comm.*,
128 F.4th 336 (1st Cir. 2025).....................22

*Fraser v. Goodale*,
342 F.3d 1032 (9th Cir. 2003) ....................12

*Fresno Unified Sch. Dist. v. K.U. ex rel. A.D.U.*,
980 F. Supp. 2d 1160 (E.D. Cal. 2013).....................10

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002).....................10

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020) ....................17

*Herndon v. Chapel Hill–Carrboro City Bd. of Educ.*,
89 F.3d 174 (4th Cir. 1996) ....................22

*Jacob B. v. Cty. of Shasta*,
154 P.3d 1003 (Cal. 2007).....................17

*Jones v. Google LLC*,
73 F.4th 636 (9th Cir. 2023) ....................13

*Kramer v. Phoenix Life Ins. Co.*,
15 N.Y.3d 539 (2010) ....................14

*Littlefield v. Forney Indep. Sch. Dist.*,
268 F.3d 275 (5th Cir. 2001) ....................22

*Malek v. United States*,
634 F. Supp. 3d 326 (W.D. Tex. 2022), *aff'd*, 2024 WL 3534483 (5th Cir. July 25, 2024) ....................12

*Moore v. Mut. of Enumclaw Ins. Co.*,
855 P.2d 626 (Or. 1993) ....................20

*Myrick v. Mastagni*,
185 Cal. App. 4th 1082 (2010) ....................13

*Nexus Pharma., Inc. v. Ctrl. Admixture Pharma. Servs., Inc.*,
48 F.4th 1040 (9th Cir. 2022) ....................11, 15

*Ramirez v. Plough, Inc.*,
863 P.2d 167 (Cal. 1993) ....................11, 12

*Rogers v. Roseville SH, LLC*,
75 Cal. App. 5th 1065 (2022) ....................24

*Rookard v. Mexicoach*,
680 F.2d 1257 (9th Cir. 1982) ....................24

*Shanahan v. IXL Learning, Inc.*,
2026 WL 982855 (9th Cir. Apr. 13, 2026) ....................24

*Sierra Pac. Indus. v. Carter*,
104 Cal. App. 3d 579 (1980) ....................24

*St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*,
218 F.3d 232 (3d Cir. 2000)....................11

*Swanson v. Guthrie Indep. Sch. Dist. No. 1–L*,
135 F.3d 694 (10th Cir. 1998) ....................22

*Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.*,
35 S.W.3d 591 (Tex. 2000)....................14

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices & Prods. Liab. Litig.*,
2011 WL 13160303 (C.D. Cal. 2011)....................20

*Urenia v. Pub. Storage*,
2013 WL 4536562 (C.D. Cal. Aug. 27, 2013)....................11

*Valentine v. Plum Healthcare Grp., LLC*,
37 Cal. App. 5th 1076 (2019) ....................24

*Veterans of Am. v. McPherson*,
2008 WL 4183981 (N.D. Cal. Sept. 9, 2008) ....................12

*Wake Cares, Inc. v. Wake Cty. Bd. of Educ.*,
675 S.E.2d 345 (N.C. 2009)....................22

*Young v. Coloma-Agaran*,
2001 WL 1677259 (D. Haw. Dec. 27, 2001), *aff'd*, 340 F.3d 1053 (9th Cir. 2003)....................14

*Zamani v. Carnes*,
491 F.3d 990 (9th Cir. 2007) ....................13

**Statutes**

5 U.S.C. § 553....................19

20 U.S.C. § 1232g....................1, 15, 18, 23

20 U.S.C. § 1418 ....... 6
20 U.S.C. § 6311 ....... 6
Cal. Bus. & Prof. Code § 22584 ....... 1, 6, 15, 16
Cal. Code Regs. Tit. 5, § 437 ....... 6
Cal. Code Regs. Tit. 5, § 16023 ....... 6
Cal. Code Regs. Tit. 5, § 16024 ....... 6
Cal. Educ. Code § 33126 ....... 6
Cal. Educ. Code §§ 48645-48650 ....... 6
Cal. Educ. Code § 49073 ....... 15
Cal. Educ. Code § 49073.1 ....... *passim*
Cal. Educ. Code § 49073.1(a) ....... 1
Cal. Educ. Code § 49076 ....... 1, 15, 20
Cal. Gov't Code § 200 ....... 22
Cal. Gov't Code § 270 ....... 22
K.R.S. § 365.734 ....... 6
Tex. Educ. Code § 32.152 ....... 11
Tex. Educ. Code § 32.153 ....... 11
Tex. Educ. Code § 32.154 ....... 11
Wash. Rev. Code Ann. § 28A.604.010 ....... 6
Wash. Rev. Code Ann. § 28A.604.030 ....... 6

**Rules**

Fed. R. Evid. 803(8) ....... 12
Fed. R. Evid. 902(5) ....... 12

**Other Authorities**

34 C.F.R. § 99.2 ....... 19
34 C.F.R. §§ 99.4-99.5 ....... 19

34 C.F.R. §§ 99.30-99.39 .......... 19

34 C.F.R. § 99.31 .......... *passim*

34 C.F.R. § 99.32 .......... 19

34 C.F.R. § 99.33 .......... 6, 12, 19

34 C.F.R. § 99.60 .......... 19

Cal. Const. art. IV, § 1 .......... 21

Cal. Const. art. IX, § 14 .......... 22

Plaintiffs' motion ignores the relevant legal framework and the actual allegations of PowerSchool's pleadings. PowerSchool's first affirmative defense states that it cannot be held liable for processing student data because it has "authorization [for the challenged data processing] from schools, school districts, state … agencies and governments"—i.e., approval from the elected officials who represent the Plaintiffs and putative class. Dkt. 146, Am. Ans. 114. Plaintiffs ask the Court to disregard this authorization as a matter of law and require that before PowerSchool (and by extension, any school vendor) performs any processing on behalf of the schools, PowerSchool must first secure verified, written consent from every parent of every student in every school. *See infra* pp. 15-19. The longstanding legal framework governing student privacy requires no such thing.

Conspicuously absent from Plaintiffs' motion is a proper recitation of the robust, overlapping, and repeated government authorization of PowerSchool's services. Specifically:

- **U.S. Congress**: In the Family Educational Rights and Privacy Act ("FERPA"), Congress authorized schools to designate any party serving "legitimate educational interests" as a "school official" that can receive student data "***without the written consent of the[] [students'] parents***." 20 U.S.C. § 1232g (emphasis added).

- **U.S. Department of Education**: The DOE has enacted regulations to protect the privacy of parents and students and, under those regulations, permitted schools to "disclose [PII] … ***without [parental] consent***" to any vendor that "[p]erforms an institutional service … for which the [school] would otherwise use employees … under the direct control of the [school]." 34 C.F.R. § 99.31 (emphasis added).

- **California[1] Legislature**: The California legislature authorized schools to "enter into a contract with a third party" for "services, including cloud-based services, for the digital storage, management, and retrieval of pupil records," or for other "digital educational software that authorizes a third-party provider … to access, store, and use pupil records." Cal. Educ. Code § 49073.1(a). The legislature also passed laws which state that ***parental consent is not required*** for schools to release student records to a school contractor pursuant to "a formal written agreement," *id.* § 49076(a)(2)(G), and which broadly allow EdTech providers to use and store student data – including for analytics – "in furtherance of K-12 school purposes," Cal. Bus. & Prof'l Code § 22584(b)(2), (4).

- **School Districts**: Individual school districts approved PowerSchool's specific services at locally held board meetings. For example, the school district attended by the Washington Plaintiffs (Cherkins) voted to renew PowerSchool's contract after specifically considering these Plaintiffs' concerns and being assuaged by district staff that student privacy was already adequately protected.[2]

In short, all levels of government authorize school contractors to provide services without separately securing parental consent. This makes sense since PowerSchool is merely an instrumentality of the school

---

[1] State laws vary as explained in PowerSchool's opposition to Plaintiffs' Motion for Class Certification. PowerSchool uses California as an example since Plaintiffs are relying exclusively on California law.

[2] Ex. 1, Cherkin 190:12-192:25; Ex. 2, SPS Board Meeting Minutes; Ex. 3, CHERKIN_027321.

when it provides cloud hosting services or supplies the school with software—no different than any other vendor, caterer, or substitute teacher employed by the school pursuant to its constitutional and statutory authority to hire agents for various administrative functions. Yet Plaintiffs want the Court to ignore this authorization as a matter of law.

Notably, discovery revealed ***Plaintiffs have long agreed*** that student privacy laws meant they could not sue PowerSchool solely for providing services to schools without parental consent. Plaintiff Cherkin published articles and petitioned the DOE to change its regulations because those regulations allow schools to hire EdTech vendors without parental consent.[3] Plaintiff even admitted that "parents can't sue Ed Tech" under "state privacy laws" due to "the direct contractual relationship" with schools and the framework under FERPA.[4] Likewise, Plaintiff Concepcion testified at deposition that he cannot complain about PowerSchool's services to the extent they are provided per contracts "reviewed by the attorneys at the school, the school board," and approved through the democratic process.[5]

Plaintiffs now completely avoid explaining how the vast and consistent framework of laws governing student privacy is irrelevant. Instead, Plaintiffs affirm the worthy aim of FERPA (which is unquestionably to protect student data from ***certain kinds*** of unauthorized sharing), while omitting any mention of the plain text of the statute authorizing PowerSchool's conduct. Next, they argue incorrectly that defendants cannot point to their own compliance with a law if that law does not provide a private right of action. Finally, Plaintiffs ignore basic principles of democracy, arguing that elected representatives are only empowered to act if they obtain express contractual authorization from each parent. All their arguments fail.

*First*, Plaintiffs' focus on FERPA alone is inappropriate since PowerSchool's defense is based on government authorization ***at every level***, not just from the U.S. Congress. Regardless, compliance with statutes and regulations protects defendants even if those statutes do not create private rights of action. Statutes can preempt and bar claims, and legislative acts can modify common law requirements.

*Second*, government institutions can bind constituents not because they are the constituents' common law agents, but because of their constitutional and statutory authority to do so. Courts have long

[3] Ex. 4, The Hill Article (Aug. 3, 2022); Ex. 5 at '5303 (Feb. 17, 2022 SDPP letter to DOE).
[4] Ex. 4, The Hill Article (Aug. 3, 2022).
[5] Ex. 6, Concepcion 146:12-147:2; 161:23-162:20.

rejected sovereign citizen arguments that would require individual consent to every government decision. In a democracy, individuals unhappy with democratic outcomes cannot use the court system as a backdoor mechanism to achieve an outcome different than what their representatives chose.

*Third*, Plaintiffs throw in an evidentiary objection, asking the Court to decide whether PowerSchool's contracts that require schools to obtain all necessary consent are independently sufficient to prove that parents gave express consent. Such evidentiary issues are not appropriate for a summary judgment motion, but the argument over evidence of parental consent is neither here nor there in a motion concerning ***government*** authorization of PowerSchool's conduct.

Finally, Plaintiffs also challenge a portion of PowerSchool's third defense, but that portion is no longer relevant to this case. It stated that students' continued use of PowerSchool's products can amount to implied consent. Plaintiffs have abandoned theories relying on students' actual use of PowerSchool products; they now challenge only PowerSchool's processing or storing of data *about* students, even if students do not use PowerSchool products at all. Thus, PowerSchool no longer has any reason to raise its implied consent defense and agrees to withdraw that portion of the third affirmative defense.

Plaintiffs' motion should be denied, and once PowerSchool has an opportunity to cross move for summary judgment, PowerSchool will demonstrate that, in fact, government authorization defeats all of Plaintiffs' claims as a matter of law.[6]

## BACKGROUND

### I. PowerSchool provides software and services for schools to manage their own data.

Plaintiffs' motion attempts to focus on the issue of whether PowerSchool acts with "consent," but their motion never identifies ***what action*** is even at issue. Plaintiffs' ever-shifting theories of liability still obscure the specific conduct purportedly giving rise to liability. Per the class certification briefing, Plaintiffs' invasion of privacy and unjust enrichment claims are based exclusively on PowerSchool's supposed "corporate policy" of providing hosting services (or "data warehousing," as Plaintiffs call it) and licensing a set of products that Plaintiffs contend schools use to make "predictions" about students, such as whether they are likely to graduate. Dkt. 148, Pls.' Reply Br. 1, 7.

[6] PowerSchool respectfully asks the Court to defer ruling on Plaintiffs' motion until PowerSchool has filed its own dispositive motion on the governments' authorization of its conduct. As the Court stayed all deadlines, *see* Dkt. 167, PowerSchool has refrained from filing its own counter motion.

Plaintiffs' "data warehousing" allegations relate solely to two products—Student Information Systems ("SIS") and Connected Intelligence. *See* Dkt. 116, Mot. for Class Cert. 1. SIS is merely a "repository" or "receptacle" for data input by the school; it functions like a spreadsheet product and allows schools to either manually type in the data or populate the fields using custom import features.[7] Schools use SIS for, *inter alia*, gradebooks, "registration, … class scheduling, … [and] to meet their … federal and state compliance reporting" obligations.[8] Like spreadsheet software, SIS is fully customizable and PowerSchool does not track what data schools choose to store on their students.[9]

Connected Intelligence is a product that enables a school (or district) to store data from multiple of its data sources in a single server, which is still exclusively accessible by the licensing school.[10] In other words, if a school uses one product for recording attendance and another for grades, Connected Intelligence enables the school to access those records in a single place. It has no pre-built analytics features, and schools are the only ones who decide what to store and how to use the data stored.[11]

When PowerSchool hosts records for a school, it hosts them solely for the school's benefit. The data is segregated by customer and never comingled.[12] PowerSchool does not use schools' records (anonymized or otherwise) to develop or improve its products.[13] PowerSchool does not review the school's data except at the school's request (such as to fix a bug).[14] PowerSchool facilitates data sharing (anonymized or otherwise) outside the school only at the school's direction, request, ***and*** authorization.[15] As a technical matter, for example, it is impossible for a third party to access any data stored for a school in SIS unless that ***school*** provides that third party an authentication key.[16] And the sole examples in the record of "data sharing" outside of the school involve schools sending data to state or federal agencies

[7] Ex. 7, McCowan 50:8-52:2; Ex. 8, Shinton 76:22-78:22. Ex. 9 at '4399.
[8] Ex. 10, Brook 57:17-58:2; Ex. 11, Rangarajan 34:1-15; Ex. 9 at '4399.
[9] Ex. 11, Rangarajan 36:16-39:14, 40:1-11.
[10] Ex. 12, Swingle 107:8-18, 108:14-18, 110:3-6; Ex. 13, Ahmad 70:18-71:5.
[11] Ex. 12, Swingle 116:3-16, 108:1-13; Ex. 10, Brook 37:5-11, 40:3-41:6, 42:2-16.
[12] Ex. 11, Rangarajan 34:22-35:5, 36:1-15, 109:6-10; Ex. 12, Swingle 77:17-78:2, 92:5-17, 93:11-15, 311:16-19; Ex. 7, McCowan 86:3-10, 110:9-111:13; Ex. 14, Flagg 161:10-162:1; Ex. 15, Cirillo 190:21-192:2; Ex. 16, Maharana 168:3-11; Ex. 13, Ahmad 124:14-16.
[13] Ex. 16, Maharana 134:14-135:10; Ex. 11, Rangarajan 119:21-120:6; Ex. 13, Ahmad 310:18-311:6; Ex. 14, Flagg 429:15-17.
[14] Ex. 12, Swingle 330:3-6, 336:2-10; Ex. 11, Rangarajan 122:8-21; Ex. 13, Ahmad 310:2-9.
[15] Ex. 17, Sharp 69:6-70:2, 78:3-79:7; Ex. 10, Brook 113:14-20; Ex. 11, Rangarajan 62:14-63:3, 121:4-6; Ex. 14, Flagg 341:6-17.
[16] Ex. 17, Sharp 37:10-38:2, 118:7-11.

(for reporting), schools sharing records independently (such as with community organizations supporting particular students), and schools directing PowerSchool to build data-sharing integrations with other school vendors (such as 911 Inform, a software provider schools can use to help identify and reunite students with parents in case of an emergency).[17] Such data sharing occurs even without PowerSchool's involvement, as schools can simply export data fields and send them to third parties.[18]

Turning to the analytics allegations, Plaintiffs erroneously construe certain of PowerSchool's products into some big-brother-like crystal ball that "identify 'at-risk students[,]' … 'support personalized learning plans,'" or "identify 'students at risk of not graduating on time.'" Dkt. 148 at 3. But the reality is far simpler. The primary "analytics" product, PowerSchool's Analytics & Insights, provides a data processing platform that schools can use, if they so choose, to apply their own bespoke, internal data analysis or graphing ("like … the pivot table" function in Excel), such as to see if students' collective or individual attendance is trending up or down.[19] While PowerSchool provides tools for schools to use regression analysis and historic data modeling to make inferences from their records (as schools could do ***without*** PowerSchool), PowerSchool does not run analytics for them and does not provide predictions about students either—only schools make predictions about their students.[20]

In short, Plaintiffs' motion failed to identify the conduct challenged because it is so clearly benign and ordinary. PowerSchool is just assisting schools with managing and processing their own records.

## II. Federal and state law require schools to collect and share student information and allow schools to hire vendors to support these functions without parental consent.

PowerSchool does not dictate what data schools collect or how they use it. Individual schools have individualized data needs based on internal policies and practices, but some data collecting and sharing is mandated by federal and state law. For example, federal law requires schools to maintain and

[17] Ex. 11, Rangarajan 29:20-30:14; Ex. 18, Jaeger (12/5) 11:9-19; Ex. 19.

[18] Ex. 17, Sharp 30:20-33:16, 50:4-17, 208:8-19.

[19] Ex. 16, Maharana 55:21-57:5, 65:6-66:9, 68:19-69:17, 118:4-13, 120:15-123:8.

[20] Ex. 16, Maharana 54:8-55:16, 83:12-22, 102:7-103:6, 161:10-162:5, 292:14-18; Ex. 13, Ahmad 109:6-16; Ex. 15, Cirillo 202:2-8; 241:13-20. To illustrate, PowerSchool found that it hosts some data on Plaintiff S.G. in the supposedly "prediction" products (but not in the "warehousing" products since her school self-hosts), including data Plaintiffs claim reflects her PII. *Compare* Dkt. 138, Class Cert. Opp 9 & n.40-44, *with* Dkt. 148, Class Cert. Reply 3 (arguing that the data hosted in prediction products contains PII). While PowerSchool might host some data, PowerSchool does not and cannot run analytics on that data, since S.G.'s school implements and runs analytics fully in-house, using independent contractors. Ex. 23, Jaeger (12/18) 38:2-42:19, 106:15-107:16, 114:22-118:11. Thus, S.G. is neither exposed to data warehousing (since no data about her is in "warehousing" products) nor to "predictions."

report annually to the Department of Education ("DOE"), *inter alia*: student performance on standardized testing; high school graduation rates; English language proficiency; special education utilization; graduation and dropout rates; behavioral data; English language proficiency; and disability. *See* 20 U.S.C. §§ 1418, 6311. California law requires collection and reporting of similar data and other more granular categories, such as academics; English learner progress; absenteeism; college/career preparedness; family engagement; school climate; and student academic, social-emotional, behavioral, and physical health. *See* Cal. Educ. Code § 33126; Cal. Code Regs. Tit. 5, §§ 437, 16023(c)(2), 16024.

In the face of rising complexity of school administration, schools have relied on contractors with express authorization of federal and state law. FERPA and DOE regulations permit schools to share student data with vendors "without [parental] consent" if the provider performs a "service or function" that the school would have performed (e.g., recordkeeping) and does so "under the [school's] direct control." 34 C.F.R. §§ 99.31, 99.33. States, like California, passed their own statutes requiring particular contract provisions in schools' agreements with vendors. Cal. Educ. Code §§ 49073.1, 48645-48650. As explained *infra* pp. 15-17, these statutes reflect that states believed such provisions and contracts would sufficiently safeguard against privacy concerns. Moreover, California legislatures elected to allow EdTech providers to use or disclose students' "personally identifiable information" without parental consent for ***any*** educational purposes or even for certain "legitimate research purposes." Cal. Bus. & Prof'l Code §§ 22584(a)(3), 22584(b), 22584(e). California law further allows providers to develop student profiles for educational purposes. *Id.* Washington law is similar. Wash. Rev. Code Ann. §§ 28A.604.010, 28A.604.030(1). Other states like Kentucky have broader statutes, allowing schools to contract for "cloud computing services" without parental consent. K.R.S. § 365.734(2).

In all instances, PowerSchool provides data hosting services and software products only in compliance with all applicable laws and only pursuant to contracts with school districts.[21] As explained below, these contracts define the scope of PowerSchool's services, and PowerSchool acts only at the direction and control of individual school districts. There is no record evidence to the contrary.

## III. Local governmental entities hire PowerSchool with community support.

PowerSchool's contracts with schools are typically the result of a robust procurement process

[21] Ex. 20 (contract with Seattle); Ex. 21 (contract with Gwinnett, GA); Ex. 22 (contract with ME DOE).

ultimately governed by the vote of a school board (typically democratically elected by the community). Individual districts can vary, but Plaintiffs' schools—Seattle Public Schools, WA ("Seattle" or "SPS") and West Contra Costa Unified School District, CA ("West Contra" or "WCCUSD")—are illustrative.

***Example 1: Seattle.*** Seattle's school records are managed by a team of professionals employed by the district.[22] "[M]ost" requests for student records in this district come from "internal actors," such as "principals," "staff from a [school] department," "superintendent," or "the chief of academics."[23] Seattle shares records outside the district only to "the state" and "community-based partners [with] formal agreement … with [the district] to provide services directly to individual students," with data limited to the students actively supported.[24] Seattle relies on EdTech providers (including PowerSchool) for software "to manage student data," create "a central repository … throughout the whole school district" that serves "roughly 50,000 students," and comply with state and federal reporting requirements.[25] But, Seattle does not rely on PowerSchool for "data warehousing"—i.e., while it licenses PowerSchool's SIS product, it has always hosted all SIS data on its own local servers, rather than hosting it on PowerSchool's cloud servers.[26] And, while Seattle licenses some products Plaintiffs labeled as "prediction" products (namely, Analytics & Insights), Seattle does not rely on PowerSchool for data analytics, but rather creates its own analytical models in-house.[27]

Seattle schools are governed by a board consisting of seven elected directors (and Plaintiff Cherkin's spouse unsuccessfully ran for the board).[28] The Board votes to approve the district's data processing practices and the selection of its EdTech vendors.[29] PowerSchool's services for Seattle are all the result of contracts approved at public hearings by the board.[30] For example, in April 2019, the Board received a publicly-available report from the superintendent recommending licensing PowerSchool SIS and other software for 36 months without optional cloud hosting.[31] The Board voted to approve the

[22] Ex. 18, Jaeger (12/5) 9:6-25, 12:16-14:8 (testimony of SPS Executive Direct of Technology).
[23] *Id.* at 10:18-11:8.
[24] *Id.* at 10:18-12:6.
[25] *Id.* at 14:22-19:6, 22:15-24:12.
[26] Ex. 23, Jaeger (12/18) 18:4-24, 30:10-31:20, 38:2-42:19, 110:10-25; Ex. 13, Ahmad 309:8-11.
[27] Ex. 23, Jaeger (12/18) 38:2-42:19, 106:15-107:16, 114:22-118:11.
[28] Ex. 1, Cherkin 110:11-15.
[29] Ex. 18, Jaeger (12/5) 34:3-35:7; Ex. 23, Jaeger (12/18) 69:1-10; Ex. 1, Cherkin 108:23-110:22; Ex. 24, Seattle School Board; Ex. 25, Seattle Board Action Report (2020).
[30] *E.g.*, Ex. 26, Seattle Board Action Report (2019); Ex. 25, Seattle Board Action Report (2020).
[31] Ex. 26, Seattle Board Action Report at 1 of 24, 7 of 24, 23 of 24 (2019) (explaining that hosting services

contract after considering how the district used these products, alternatives available to the district, fiscal impact, community feedback, effect on equity and students, and the specific terms of the PowerSchool agreement.[32] As another example, in August 2020, the superintendent publicly recommended to the Board to license PowerSchool's Schoology—a digital classroom product teachers and students use—in a 218 page report (available publicly), which laid out the competitive bidding process, the district's specific requests to the bidders (such as enabling schools to track user engagement), and a fulsome explanation of what services PowerSchool would provide.[33] As with the SIS approval, the Board decided that the contract was in the best interest of everyone in the district after considering alternatives, fiscal impact, community feedback, effect on equity and students, the specific terms of the PowerSchool agreement, and review by the internal Seattle staff.[34] Then, in the summer of 2025, one of the Plaintiffs directly advocated against the district renewing its agreements with PowerSchool based on allegations raised in this case, and, after she was given the opportunity to voice her concerns at a public board hearing on the issue, the Board ***still*** voted to retain PowerSchool after the district staff responded to and rebutted Plaintiffs' concerns about student data privacy.[35]

***Example 2: West Contra.*** West Contra is similar. It is governed by an elected school board, which Plaintiffs agree represents all district constituents—parents, students, and staff—and which acts with authority to bind such constituents.[36] PowerSchool provides West Contra a single set of products[37] and services at issue to this district: SIS with cloud-hosting. The relevant contracts were approved by the board, who explicitly voted to use "PowerSchool [as its] central data source," hosting data on "[a]ll students and their families, all teachers and all staff," conditioned on "[a]ttain[ing] > or = 80% satisfaction rate by key stakeholders (Community Engagement, sites, families)."[38] More recently, the West Contra Board and its contract review subcommittee reviewed and approved PowerSchool's hosting services for

---

are charged separately, with no provision for hosting on the invoice).

[32] *See generally id.* Cherkin attended this board meeting but never objected to the district approving PowerSchool's services. Ex. 1, Cherkin 131:14-132:21, 170:14-172:15; Ex. 27, Cherkin Dep. Ex. 6.

[33] Ex. 25, Seattle Board Action Report at 36 of 218 to 41 of 218 (2020).

[34] *See generally id.*

[35] Ex. 1, Cherkin 190:12-192:25.

[36] Ex. 6, Concepcion 146:12-147:2, 148:9-150:19; 161:23-162:20.

[37] Ex. 28, Excerpt of PWRSCHL_00008714. West Contra piloted the use of Analytics & Insights from 2021 to 2022. Ex. 29, WCCUSD Board Approval for Hoonuit Pilot. There is no evidence showing that this product was ever deployed as to any particular student, much less Plaintiffs.

[38] *E.g.*, Ex. 30, WCCUSD Ecollect Contract Approval at 1-2.

SIS in July 2024 and again in April 2026.[39]

## IV. Schools represent to PowerSchool that they have authority and all required consents.

In PowerSchool's contract with a school, PowerSchool generally asks the school to "represent[] and warrant[] that [the school] has obtained all necessary consents and government authorizations required under [the relevant state law] to permit" PowerSchool to provide its services.[40] The school must also represent that PowerSchool is providing services solely as a "school official" under FERPA—i.e., for "legitimate educational interests"—which is why PowerSchool agrees to process data "only as expressly authorized by [the school] for the sole and express purpose of fulfilling its obligations under [the contracts with the school]."[41] Importantly, Plaintiffs have no evidence that PowerSchool breached any of these agreements or that their schools lacked authority to approve these contracts.

The evidence shows that schools may in fact secure parental consent. For example, West Contra has parents review ***and sign*** an annual handbook that (i) states the children's records would be stored in a PowerSchool product, (ii) details the precise categories of information stored "on [the] [SIS]," (iii) explains that the district cooperates with community agencies like "the community police," and (iv) lists fourteen categories of records the district would make "available to various persons, agencies or institutions."[42] This comprehensively advises parents in West Contra about PowerSchool's services for the district and amounts to express, written parental consent.

Prior to filing their suit, Plaintiffs agreed that these laws, regulations, and democratic processes barred their common law privacy claim. They publicly stated that they "can't sue Ed Tech because the schools have the direct contractual relationship" and "state privacy laws are of little help" as "FERPA allows schools to consent on parents' behalf."[43] Concepcion also testified, on behalf of his family, that there would be nothing wrong with PowerSchool's services so long as they were provided per contracts "reviewed by the attorneys at the school, the school board," and the democratic approval process.[44]

---

[39] *See* Ex. 31, WCCUSD Contract Rev. Comm. (2026); Ex. 32, WCCUSD Regular Bd. Meeting (2024).
[40] Ex. 33 at '1582.
[41] *Id.* at '1581-82.
[42] Ex. 34, 2021-2022 WCCUSD Handbook 6, 14, 22, 35, 126-28, 132.
[43] Ex. 4, The Hill Article (Aug. 3, 2022); Ex. 5 at '5303 (Feb. 17, 2022 SDPP letter to DOE).
[44] Ex. 6, Concepcion 146:12-147:2; 161:23-162:20.

## ARGUMENT

### I. PowerSchool is entitled to present as a defense that various government entities authorize the challenged conduct through legislation and contracts.

Plaintiffs misconstrue PowerSchool's first affirmative defense as arguing that "FERPA" "create[s] a[] private defense, including a consent defense"; indeed, Plaintiffs spend much of their brief arguing that the statutory text and legislative history of FERPA say nothing about "private defenses." *See* Mot. 4-10. This is a red herring, as there is no such thing as a "private right of defense." Rather, it is black letter law that compliance with a statute ***is*** a defense to common law claims through the doctrines of the "defense of statutory compliance" (§ II(A)); statutory preemption of common law claims (§ II(B)); and statutory displacement of common law elements (§ II(C)). Moreover, Plaintiffs oversimplify the defense, suggesting it relates to FERPA alone, Mot. 2, 4. That is incorrect. While FERPA is certainly relevant to PowerSchool's first affirmative defense, the defense does not mention FERPA at all. In fact, PowerSchool's asserted defense relates broadly to governmental authorization of the challenged data hosting without parental consent in many overlapping ways—through federal, state, and local statutes ***and*** affirmative actions like elected school boards' procurement processes. *See* Dkt. 146 at 114 (referring to "authorization from schools, school districts, state and tribal agencies and governments," as well as "legislat[ion]" and "executed agreements with Educators and Representatives"). PowerSchool will ultimately prevail on these defenses but, for purposes of Plaintiffs' motion, the clear legal and factual support for the defense is fatal to Plaintiffs' positions.

#### A. PowerSchool's compliance with statutes is a defense to Plaintiffs' claims.

Plaintiffs spend a third of their motion arguing nothing in FERPA itself creates a "private consent defense," *see* Mot. 4-10, but a federal or state statute does not need to "create" a "private defense" for it to bar Plaintiffs' claims. Indeed, Plaintiffs have no authority at all for their "private … defense" argument; Plaintiffs merely cite cases holding that FERPA does not create a ***private right of action***, which does not address whether the statute impacts parties' rights or creates ***defenses*** to civil claims. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286 (2002) ("[T]here is no basis for a private suit" under FERPA); *Fresno Unified Sch. Dist. v. K.U. ex rel. A.D.U.*, 980 F. Supp. 2d 1160, 1182 (E.D. Cal. 2013) (same). Plaintiffs did not cite cases in support for their position because it is wrong: "No private right of action under a statute is

necessary to assert … that statute as an affirmative defense."[45] *Costello v. Grundon*, 651 F.3d 614, 622-24 (7th Cir. 2011) (collecting examples of statutes raised as affirmative defenses despite no private right of action under that statute, and reversing a trial court's denial of the affirmative defense premised on plaintiff's statutory violations); *St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*, 218 F.3d 232, 241 (3d Cir. 2000) (same, for preemption defense).

In fact, California recognizes the "defense of statutory compliance" where "the evidence shows" that the defendant's challenged conduct falls within an "ordinary situation contemplated by the statute or administrative rule." *Ramirez*, 863 P.2d at 171-72.[46] For example, since federal and state drug labeling laws define the contours of product labeling, a plaintiff cannot bring a product liability action against a manufacturer for failing to include warnings in Spanish where federal and state law required warnings in English. *See id.* at 172-77; *DeGrassi v. City of Glendora*, 207 F.3d 636, 643-44 (9th Cir. 2000) (barring civil conspiracy claim due to defendant's compliance with statute). Importantly, ***the statute does not need to contain any words creating the defense***. A government's legislative authorization ***alone*** is sufficient to present a triable defense. *Ramirez*, 863 P.2d at 172-77.

All of PowerSchool's services are provided to public schools with state, federal and local government's permission and oversight. DOE regulations under FERPA allow schools to "disclose personally identifiable information from an education record of a student without [parental] consent" to PowerSchool if it "[p]erforms an institutional service or function for which the [school] would otherwise use employees," "[i]s under the direct control of the [school] with respect to the use and maintenance of education records," and is prohibited from re-disclosing the information except in compliance with the

[45] There are many statutes that serve as defenses but do not create new claims. A property owner in a foreclosure action can raise the violation of HUD guidelines as a defense to "prevent a foreclosure before it occurs," but cannot "bring a private right of action against the lenders" "after a foreclosure happens." *Urenia v. Pub. Storage*, 2013 WL 4536562, at *2 (C.D. Cal. Aug. 27, 2013). Consumers cannot sue for violations of the Food, Drug, and Cosmetic Act, *Nexus Pharma., Inc. v. Ctrl. Admixture Pharma. Servs., Inc.*, 48 F.4th 1040, 1049-50 (9th Cir. 2022), but compliance with those same regulations can bar products liability suits, *Ramirez v. Plough, Inc.*, 863 P.2d 167, 172-77 (Cal. 1993).

[46] Other states also recognize this defense. In Texas, for example, "[a]cts which are ***expressly or impliedly*** authorized by law" cannot form the basis of liability under a generalized cause of action. *Farnsworth v. Massey*, 365 S.W.2d 1, 5 (Tex. 1963) (no actionable fraud claims when board of directors disposed of assets in accordance with statutorily proscribed procedures); *Dudding v. Automatic Gas Co.*, 193 S.W.2d 517, 520-21 (Tex. 1946) (no actionable nuisance claim when industrial equipment installed according to a legislatively enacted regulatory scheme). Since Texas law allows EdTech vendors to provide hosting services, services, and data analytics, *see* Tex. Educ. Code §§ 32.152(a)(2), 32.153(a), 32.154, PowerSchool cannot be held liable to any Texas putative class member.

same regulations. 34 C.F.R. §§ 99.31(a)(1)(i)(B), 99.33. Per DOE guidance, "schools … will usually be able to establish direct control through a contract signed by both the school or district and the provider." Ex. 35, DOE, *Protecting Student Privacy* at 4 (Feb. 2014).[47] Contrary to Plaintiffs' assertion (at 6), these regulations also apply to PowerSchool, including by requiring it to comply with FERPA's data re-disclosure requirements. *See* 34 C.F.R. § 99.31(a)(1)(i)(B)(3).

Further, while state statutes vary substantially, *see* Dkt. 138, Class Cert. Opp., App. A, states like California have prescribed terms for these contracts, authorizing EdTech companies to provide cloud-hosting services or digital software to schools based on a compliant contract alone. *See* Cal. Educ. Code § 49073.1(b). These statutes are like the ones California courts have deemed to support a compliance-with-statute defense, as they authorize particular conduct and specify the requirements prior to a party engaging in such conduct. *Ramirez*, 863 P.2d at 171-72; *DeGrassi*, 207 F.3d at 643-44.

There is ample evidence that PowerSchool complies with all these requirements. PowerSchool works with schools only after executing contracts that define the scope of PowerSchool's duties.[48] These contracts comply with all state laws.[49] School representatives have testified that they retain EdTech vendors like "PowerSchool [to] help[]… fulfill educational purposes" as they would otherwise have to return to tracking data entirely on paper, making school administration significantly more cumbersome (if at all feasible).[50] Schools also remain as the "stewards of the [student] data [that] collect it and take care of it" and decide who "is able to access" it.[51] Indeed, school representatives have testified that they control PowerSchool's data processing.[52] PowerSchool witnesses also testified that "data is [always] controlled by the schools, fed by the schools, and managed by the schools."[53] PowerSchool does not share any data

---

[47] Plaintiffs alluded to challenging admissibility of public materials of various schools and agencies that PowerSchool referenced in discovery and its pleadings. Mot. 15 n.6. While PowerSchool does need to cite only admissible evidence to defeat Plaintiffs' motion, *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003), all these records are admissible. PowerSchool is relying on self-authentication publications "issued by … public authorit[ies]." Fed. R. Evid. 902(5); *Veterans of Am. v. McPherson,* 2008 WL 4183981, at *7 (N.D. Cal. Sept. 9, 2008). Such records also fall within the hearsay exception for "[a] record or statement of a public office." Fed. R. Evid. 803(8); *Malek v. United States,* 634 F. Supp. 3d 326, 337 n.5 (W.D. Tex. 2022), *aff'd*, 2024 WL 3534483 (5th Cir. July 25, 2024).
[48] Ex. 33 at '580-82 (DPA); Ex. 36 (MSA).
[49] *E.g.*, Ex. 37 at '3015, '3030-35 (West Contra agreement).
[50] Ex. 18, Jaeger (12/5) 60:8-61:16; Ex. 23, Jaeger (12/18) 69:11-20.
[51] Ex. 18, Jaeger (12/5) 41:9-44:11.
[52] *See id.* 44:2-45:6.
[53] Ex. 13, Ahmad 96:17-97:14; Ex. 14, Flagg 56:3-14.

unless directed to by the school.[54] And, as Plaintiffs have previously acknowledged, PowerSchool retains data only so long as its contract with the school remains active, at which point it transfers any hosted data to the school.[55] Tellingly, ***Plaintiffs have not once accused PowerSchool of violating these terms of its contracts with schools.*** All this evidence supports PowerSchool ultimately prevailing on its first defense, but at minimum, when viewed in the light most favorable to PowerSchool, precludes granting Plaintiffs' motion for summary judgment.[56]

### B. The comprehensive federal and state regulatory scheme authorizing PowerSchool's services preempts claims that are inconsistent with the scheme.

The first affirmative defense[57] also raises statutory preemption that bars Plaintiffs' claims. Federal and state laws expressly allow PowerSchool to host student data for schools and to provide tools to schools for data analytics purposes without separate parental consent. Plaintiffs are asking the Court to subvert all these statutes and—using common law principles never applied in this context—make PowerSchool liable for providing services at the direction and control of government entities. Preemption doctrines prohibit this outcome.

Both federal and state courts recognize the preemption doctrine, under which federal laws and regulations invalidate inconsistent state statutes, and state statutes invalidate any common law principles inconsistent with the statute. As to federal principles, even in the absence of express statutory language, federal conflict preemption applies "when state law conflicts with a federal statute" by "prevent[ing] or frustrat[ing] the accomplishment of a federal objective." *Jones v. Google LLC*, 73 F.4th 636, 644 (9th Cir. 2023) (holding that Child Online Privacy Protection Act preempted only state laws that are inconsistent with its terms). This requires an analysis of not only statutory language and legislative history

[54] Ex. 33 at '581-82 (DPA); *see also* Ex. 17, Sharp 53:12-55:15; Ex. 18, Jaeger (12/5) 44:2-45:6.
[55] Ex. 13, Ahmad 124:17-126:8; Ex. 14, Flagg 71:2-17; *see also* Ex. 33 at '584 (DPA).
[56] Although they never challenged this doctrine in their opening brief and should be barred from doing so on reply, *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007), Plaintiffs may claim that the defense of statutory compliance is a disfavored defense as statutes "ordinarily define[] a minimum standard of conduct," rather than a standard that is sufficient to insulate a defendant from liability. *See Myrick v. Mastagni*, 185 Cal. App. 4th 1082, 1087-88 (2010). Such cases are irrelevant here, as federal and state laws all reflect legislative and administrative determination that independent parental consent is not required when a vendor provides services at the direction and control of a school district. Unlike a statute generally requiring building owners to inspect a property that would not insulate the owner from liability for failure to fix a dangerous condition, *see id.*, federal and state governments here expressly authorized data sharing with PowerSchool while considering statutes on student privacy.
[57] PowerSchool's twenty fourth defense also raised preemption, but Plaintiffs do not challenge it.

(which is all that Plaintiffs focus on, *see* Mot. 4-10), but also of "the purposes and objectives of the" federal agency enforcing FERPA—the DOE—and its regulatory scheme. *Cohen v. Apple Inc.*, 46 F.4th 1012, 1028 (9th Cir. 2022) (citation modified). State laws and regulations cannot prohibit conduct "expressly authorized by … federal" regulations. *Young v. Coloma-Agaran*, 2001 WL 1677259, at *4-9 (D. Haw. Dec. 27, 2001) (voiding state law that prohibited commerce allowed by a federal license), *aff'd*, 340 F.3d 1053 (9th Cir. 2003).

As to California law, where there is an inconsistency between a state statute and common law, the statute "preempts" the common law and bars the claim.[58] *See Babb. v. Cal. Teachers Ass'n*, 378 F. Supp. 3d 875, 877-78 (C.D. Cal. 2019). This doctrine applies not only to preclude claims based on the state statute, but also to common law torts premised on authorized conduct. *See id.* at 867, 877-78 (C.D. Cal. 2019) (holding that state law claims for conversion, trespass, replevin, unjust enrichment and restitution against an association for collecting member dues were all barred by California statute "expressly authoriz[ing] the collection of agency fees"). Simply put, "there can be no common law liability for conduct authorized by state statute." *Id.*; *Crockett v. NEA-Alaska*, 367 F. Supp. 3d 996, 1008-09 (D. Alaska 2019) (even though statute authorizing collection of agency fees was later held to be unconstitutional, a common law tort could not be based on fees collected when the statute was in effect); *In re Calhoun*, 121 Cal. App. 4th 1315, 1347 (2004) (statute on administration of antipsychotic drugs at state hospitals impliedly abrogated common law right to refuse drugs even for competent adults).

Plaintiffs' motion fails because they never address preemption and instead ask the Court to use their common law and broad constitutional claims to overturn state statutes and undermine the DOE's FERPA regulation.[59] Thus, Plaintiffs' motion completely ignores the actual language of state statutes —

---

[58] Other states also recognize this principle. *E.g.*, *Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.*, 35 S.W.3d 591, 596 (Tex. 2000) ("[T]he common law applies only when it does not conflict with a statute."); *Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539 (2010) (State statutory insurance scheme modifies state common law limitations on assignment); *C.N. v. I.G.C.*, 316 So. 3d 287, 291 (Fla. 2021) ("To the extent a common law rule is inconsistent with the statutory text, the statute takes precedence.").

[59] Confusingly, Plaintiffs argue that data disclosure under FERPA is within the "exclusive" province of the DOE, *see* Mot. 6, but nevertheless ask this Court to interpret FERPA as creating a blanket privacy expectation that they can then enforce through their common law claim, *see id.* at 4-5. This tactic does not work. If the Court accepts Plaintiffs' argument that the DOE's authority over FERPA is exclusive, *see id.* at 5-6, Plaintiffs' claims are barred by the DOE's authority as well. *See Nexus*, 48 F.4th at 1048-49 (holding that FDA's exclusive authority over FDCA barred all civil suits based on the FDCA). If Plaintiffs are correct that FERPA sets students' privacy expectations when it states that parental consent is generally required, *see* Mot. 4, then FERPA can also limit privacy expectations when it states that

with Plaintiffs summarily claiming state law is "more protective" of student privacy than federal law (it is not)—of FERPA, and of DOE regulation and guidance.

***1. State law allows data sharing with school contractors without parental consent.***

PowerSchool's services are expressly authorized by ***state*** statutes, which Plaintiffs ignore. *See* Mot. 4-10. Plaintiffs attempt to hold PowerSchool liable for providing schools with cloud-hosting services and software products with analytical or data-sharing capabilities, but California law[60] allows schools—consistent with any policy adopted by their governing boards—to "enter into a contract with a third party" for "services, including cloud-based services, for the digital storage, management, and retrieval of pupil records," or for other "digital educational software that authorizes a third-party provider … to access, store, and use pupil records" as specified in the school contract. Cal. Educ. Code § 49073.1(a). While Plaintiffs argue repeatedly that PowerSchool can only perform its services to schools with express parental consent, the California legislature has decided that written parental consent is ***not required*** for schools to "release information from pupil records to …. [a] contractor or consultant with a legitimate educational interest" and "a formal written agreement … with the school district regarding the provision of outsourced institutional services or functions by the contractor." *Id.* § 49076(a)(2)(G). Despite Plaintiffs' attempt to hold PowerSchool liable for enabling their schools to share data, California law expressly empowers schools to define the scope of releasable student information and the identity of "individuals, officials, or organizations [who] may receive [such] information." *Id.* § 49073. Further, by statute, a data services provider like PowerSchool must maintain pupil records until the school directs their deletion, Cal. Bus. & Prof. Code § 22584(d)(2), and is allowed to "amass … profile[s] about a pupil" and "disclose pupil records" "in furtherance of K-12 school purposes," *id.* § 22584(b)(2)-(4). In other words, PowerSchool acts pursuant to clear statutory authorization when its services "take place at the direction of the … school, teacher, or local educational agency" for any "school activities," whether "in the classroom or at home" or for "administrative activities, and collaboration between pupils, school personnel, or parents." *Id.* § 22584(a)(3) (broadly defining "K-12 school purposes"). Plaintiffs do not address these statutes at all.

---

schools can share data with their vendors without parental consent, *see* 20 U.S.C. § 1232g(b)(1)(A).

[60] For simplicity, PowerSchool cites only California law here. As demonstrated in its Opposition to Class Certification, Dkt. 138 at 3-5 & App. A, there is significant variation among state laws.

In enacting these statutes, the California legislature considered all the same privacy concerns and issues Plaintiffs now attempt to raise through common law and ***still*** decided to authorize schools to hire EdTech vendors without individual parental consent. Specifically, the proponents of Section 49073.1, which allows schools to retain EdTech vendors through a written contract, considered common law and constitutional privacy rights as well as FERPA, and passed Section 49073.1 to "fill[] th[e] gap by outlining specific actions and specifying certain provisions that [EdTech vendors] must contractually agree to that ***ensure student privacy***." Ex. 38, Cal. Comm. Rep., 2013 CA A.B. 1584 (NS) (June 23, 2014). In fact, the legislature concluded that contracts for EdTech services that met the statutory requirements ***did not violate*** any existing California constitutional "right to pursue and obtain privacy," the "tort [of] an invasion of privacy," "federal law [governing] an operator of an Internet Web site … directed to a child," or FERPA, as they expressly authorized such contracts in the context of this "existing law." *Id.* To be sure, the legislature knew that some schools were using data contractors "without parental knowledge or consent." Ex. 39, Cal. Comm. Rep., 2013 CA A.B. 1584 (NS) (Aug. 22, 2014). The legislature also knew that such data sharing without parental consent was lawful, as the bill's proponents noted, "***California law expressly permits a school to release information*** to a '***contractor*** … ***[under] a formal written agreement*** or contract with the school….'" Ex. 40, Cal. Comm. Rep., 2013 CA A.B. 1584 (Apr. 27, 2014) (emphasis added). The legislature decided not to change this law.[61]

In sum, the California legislature knew that Section 49073.1 authorized vendors to receive and process student data pursuant to agreements with the schools without parental consent. The legislature decided that mandating specific terms in the school agreement was all that was required "to ensure that

---

[61] California also rejected other positions Plaintiffs have taken in this litigation. The legislature recognized that EdTech "technologies" were valuable because they "present schools with new opportunities for cost savings, service flexibility, and endurance, allowing schools to deploy on-demand resources to users 24 hours a day." Ex. 38, Cal. Comm. Rep., 2013 CA A.B. 1584 (NS) (June 23, 2014). The California legislature decided ***against*** prohibiting all use of student PII "for commercial or advertising purposes," deeming the prohibition "too restrictive" and susceptible to overbroad interpretation, deciding to prohibit only "targeted advertising." *See* Ex. 41, Cal. Comm. Rep., 2013 CA A.B. 1584 (NS) (Aug. 25, 2014). The California legislature also decided that "[s]oftware and application developers ***should be able to*** use aggregated deidentified information for further product development and improvement and for marketing purposes." *Id.* (emphasis added). The legislature decided not to "assign[] … liability in the event of [a]n unauthorized disclosure of pupil data," concluding that it was sufficient for the vendor to have a process "for notifying the affected pupil and parent or legal guardian." *Id.* The legislature considered and rejected the requirement that pupil records can be maintained only until the "pupil is no longer enrolled in the [school]," deciding that the vendor should maintain them until the "completion of the terms of the contract." *Id.*

… student privacy is properly protected." Ex. 40, Cal. Comm. Rep., 2013 CA A.B. 1584 (Apr. 27, 2014). As explained *supra* pp. 12-13, uncontroverted evidence shows that PowerSchool entered into contracts that comply with California law and that PowerSchool's data processing activities (including everything at issue in this case) complies with PowerSchool's contracts with the schools. Plaintiffs cannot overturn these statutes and clear legislative intent by this common law action. PowerSchool will thus prevail on its first affirmative defense by showing that California statutes preempt Plaintiffs claims; summary judgment for Plaintiffs on the defense is inappropriate.

These state statutes also bar Plaintiffs' claim for invasion of the right to privacy under the California constitution, which courts ordinarily hold is duplicative of the common law claim. *See Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1193 (N.D. Cal. 2020). "The constitutional right to privacy has never been absolute" and state statutes define the scope of the privacy right. *See Jacob B. v. Cty. of Shasta*, 154 P.3d 1003, 1011-12 (Cal. 2007) (holding that a statute creating litigation privilege controlled and barred a claim for violation of the constitutional right to privacy). This is because the California constitution ordinarily requires courts to balance the "right of privacy" against the challenged conduct "on a case-by-case basis," but a statute on point means that "the *Legislature* has already done the balancing." *Id.* (emphasis added). Since the California legislature has determined to allow schools to share data with EdTech vendors pursuant to a contract that complies with California statute, Plaintiffs cannot succeed on their claim for violation of the California constitution either. At minimum, this too precludes summary judgment for Plaintiffs on PowerSchool's first affirmative defense.

***2. FERPA allows data sharing with school contractors without parental consent.***

Even focusing solely on federal law, Plaintiffs are wrong that FERPA does not afford PowerSchool a defense for two reasons: (1) Plaintiffs glide over provisions of FERPA allowing disclosures of student information without parental consent; and (2) Plaintiffs entirely ignore DOE enabling regulations that unambiguously allow PowerSchool and other vendors to receive student information under a contract with a school and without individual parental consent.

*First*, Plaintiffs are wrong in claiming that FERPA "codif[ies] students' expectation of privacy" such that students are assured that no data will ***ever*** be disclosed without "written parental consent." Mot. 4-5 (citing 20 U.S.C. § 1232g(b)(2)(A)). FERPA unambiguously empowers schools to disclose

student information without parental consent in specific circumstances. 20 U.S.C. § 1232g(b). In fact, the legislative history to the 1974 amendment shows that FERPA's sponsors always intended for schools to continue to share or publicize student information without parental consent, such as by "print[ing] football players' weights in athletic programs," identifying "the cast of the school play," or providing de-identified information to third-party organizations to "develop and validate a number of tests which are used by institutions of higher education to predict the potential success of applicants for admission." Ex. 42, 120 Cong. Rec. 39,863. Further, FERPA's sponsors quickly amended FERPA to clarify that ***schools*** decide what third party has a "legitimate educational interest[]" in the data, such that the school can disclose the data without parental consent. *Id.* at 39,865 (amending section § 1232g(b)(1)(A) the same year as FERPA was enacted). Not even the DOE can dispute that determination.

Thus, FERPA's plain statutory language alone rejects Plaintiffs' position that their data can never be shared to vendors without parental consent. FERPA alerts parents and students that schools can disclose student information without parental consent to a host of third parties, including agents of the school, *id.* § 1232g(b)(1)(A), agents of other schools to which the student is transferring, *id.* § 1232g(b)(1)(B), representatives of state agencies, *id.* § 1232g(b)(1)(C), any third parties "in connection with a student's application for, or receipt of, financial aid," *id.* § 1232g(b)(1)(D), state and local authorities, *id.* § 1232g(b)(1)(E), research organizations using de-identified data, *id.* § 1232g(b)(1)(F), accrediting organizations, *id.* § 1232g(b)(1)(G), third parties assisting the school in connection with an emergency, *id.* § 1232g(b)(1)(I), any third parties in response to a subpoena, *id.* § 1232g(b)(1)(J), representatives and contractors of the Secretary of Agriculture and Food and Nutrition Services, *id.* § 1232g(b)(1)(K), and child welfare agency representatives and caseworkers, *id.* § 1232g(b)(1)(L). PowerSchool is entitled to demonstrate to the jury that it receives data from schools under FERPA's clear exception to the parental consent requirement for "school officials" hired to help the school discharge its services, which are "legitimate educational interests." *Id.* § 1232g(b)(1)(A).

*Second*, Plaintiffs' motion should additionally be denied because it ignores DOE enabling regulations under FERPA. The DOE is charged with enforcing FERPA and passing related regulations that are also binding under the Administrative Procedure Act. *See* 5 U.S.C. § 553.

The DOE regulations under FERPA support a federal preemption defense. These regulations "set

out requirements for the protection of privacy of parents and students," 34 C.F.R. § 99.2, limit information rights of parents and students, *id.* §§ 99.4-.5, specify instances for disclosure of student data with or without parental consent, *id.* §§ 99.30-.39, and create an enforcement process, *id.* § 99.60. As this Court previously observed, FERPA and federal regulations set out "the categories of persons to whom student education records may be disclosed without prior consent," which includes organizations hired by the school to further "legitimate educational interests." Dkt. 65 at 5-6. Under these regulations, schools "may disclose [PII] … without [parental] consent" if PowerSchool "(1) [p]erforms an institutional service … for which the agency or institution would otherwise use employees," "(2) [i]s under the direct control of the agency or institution with respect to the use and maintenance of education records," and "(3) [i]s subject to the [other] requirements [of FERPA] governing the use and redisclosure of personally identifiable information." 34 C.F.R. § 99.31(a)(1)(i)(B). Contrary to Plaintiffs' assertions, *see* Mot. 6, FERPA also regulates PowerSchool directly, authorizing it to "inspect the record relating to each student" when it is "responsible for the custody of the records," *id.* § 99.32(c)(2), and requiring it to observe limitations on redisclosure of information, *id.* § 99.33.[62]

This regulatory context must be considered in deciding whether PowerSchool can be held liable for providing schools with cloud-hosting services and educational software tools with analytical or data-sharing capabilities. This long-standing agency guidance is strong evidence that the DOE—the federal agency tasked with regulating schools nationwide and protecting students—considers contractual arrangements between a school and a vendor to be sufficient to address privacy concerns.

### C. Statutes create a defense by modifying any common law consent requirements.

State law and DOE regulations also bar Plaintiffs' claims based on the same foregoing evidence

[62] DOE guidance also authorizes PowerSchool to receive data without separate parental consent. Per the DOE, "FERPA vests schools with significant discretion to determine who constitutes a 'school official' and what constitutes a 'legitimate educational interest'" that would "permit[] … [the] school to disclose personally identifiable information from any student's education records[] without [parental] consent." Ex. 43, FERPA: Guidance for School Official (2023). For example, "[a] community-based organization … may have access to PII from education records, ***without consent***, under the school official exception, in order to perform the required institutional services and functions for the school" so long as the school hiring the organization "determine[d] that [the] organization meets" FERPA requirements. Ex. 44, Guidance on Community-Based Organizations; Ex. 45, Guidance on Right to Share Data (same). The DOE reached the same decision on EdTech vendors, dismissing complaints from Plaintiffs after deeming all such data sharing as lawful. Ex. 46 at '494 (June 29, 2023 letter); Ex. 47 at '734-36 (March 11, 2022 letter); Ex. 48 at '827-28 (Sept. 29, 2021 letter).

under a third doctrine—statutory displacement of common law elements. Courts across the country have recognized that statutes modify common law claims and defenses, even without express abrogation. *E.g.*, *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices & Prods. Liab. Litig.*, 2011 WL 13160303, at *4 (C.D. Cal. 2011) (allowing a plaintiff to state a claim for breach of implied warranty without a showing of privity because of statutory requirement that every manufacturer and retailer provide a warranty of merchantability); *Moore v. Mut. of Enumclaw Ins. Co.*, 855 P.2d 626 (Or. 1993) (holding that an insurance statute allowing waiver to occur only in writing prevented the insured from avoiding summary judgment by relying on common law oral waiver). The same result is appropriate here: Even if privacy law required consent before sharing data with a third party, state statutes and DOE regulation clearly suspend any such consent requirement in the school/EdTech context as long as the specific statutory requirements are met. *E.g.*, 34 C.F.R. § 99.31(a)(1)(i)(B); Cal. Educ. Code § 49076(a)(2)(G). Instead of a consent requirement, these laws require a contract between the vendor and the school that allows the school to control the vendor's data processing activities; that requirement is satisfied here, and Plaintiffs' motion for summary judgment thus cannot succeed.

* * *

Importantly, the Court does not need to resolve which doctrine above supports PowerSchool's defense. PowerSchool proffered evidence that the conduct Plaintiffs challenge occurs with federal, state, and local governments' authorization. Even if Plaintiffs could muster argument or evidence to the contrary, they would at most create a material dispute over "mixed questions of law and fact" that are still not susceptible to summary judgment. *See Boy Scouts v. Graham*, 86 F.3d 861, 864 (9th Cir. 1996). Tellingly, Plaintiffs omit that ***Plaintiffs*** for years interpreted FERPA to foreclose their claims, concluding that parents cannot "sue Ed Tech providers under … state privacy law because … FERPA allows schools to consent on [parents'] behalf."[63] Cherkin even published an article in *The Hill* reiterating that DOE regulations meant that "FERPA allows schools to consent on parents' behalf," such that individuals could not sue under "state privacy laws."[64] Schools (e.g., West Contra) interpret the law the same way, stating: "The law permits school districts … to consent to the collection of personal information on behalf of all

[63] Ex. 5 at '5303 (Feb. 17, 2022 SDPP letter to DOE); Ex. 4, The Hill Article (Aug. 3, 2022).
[64] Ex. 4, The Hill Article (Aug. 3, 2022).

of its students, thereby eliminating the need for individual parental consent given directly to the website operator."[65] The fact that every individual and entity involved has universally agreed that FERPA bars this suit is compelling evidence against Plaintiffs' motion.

## II. Federal and state law—and basic principles of representative government—allow schools to contract with PowerSchool on behalf of parents.

Plaintiffs are also wrong to treat the first defense as raising common law agency, argue that schools generally lack authority to represent the students, and assert that there is no evidence of parents forming an agency relationship with their school. Mot. 10. PowerSchool's first defense does not raise a principal-agent argument, but regardless, the record ***does*** contain evidence that parents delegate to the school authority over data sharing with PowerSchool, which precludes summary judgment.

### A. Common law agency is not relevant to this defense.

PowerSchool's defense does not raise common law agency when it asserts that parents "elect, appoint, or retain Educators and Representatives" who then authorize PowerSchool's service. Dkt. 146 at 114-15. Instead, PowerSchool's defense is premised on the constitutional and statutory authority of elected representatives at every level of government—in school boards, state legislatures, and the U.S. Congress (to name a few)—and Plaintiffs cannot seriously contend that they are not bound by legislative and procurement decisions made by their democratically elected representatives. *Cf. Diaz v. California*, 2024 WL 5125840, at *4 (E.D. Cal. Dec. 16, 2024) (observing that courts have rejected "sovereign citizen ideology" that "disclaim[s] any authority by governmental authorities over" the individual).

### B. Constitutional law and statutes allow schools to bind parents and students.

Plaintiffs' argument about common law agency misses the crux of PowerSchool's defense: Elected officials, including locally elected school officials, have the statutory authority to consent to PowerSchool's contracts on their constituents' behalf. Plaintiffs wholly ignore statutory authority.

As in every U.S. state, "[t]he legislative power [of California]… is vested in the … [l]egislature" to the exclusion of the individual citizens. Cal. Const. art. IV, § 1. "The State has the rights … over persons within its limits, to be exercised in the cases and in the manner provided by law." Cal. Gov't Code § 200. The State can exercise these rights and powers over "[e]very person" that is "within the

[65] Ex. 49, 2024-25 WCCUSD Handbook 150.

State." *Id.* § 270. These statutes encapsulate the foundational principle of representative democracy that citizens cede unadulterated freedom to their representatives through the voting process, and they must obey the laws and decisions those representatives make on their behalf. *See* John Locke, *Two Treatises of Government* (1689). "[E]very man, when he enters into society, gives up a part of his natural liberty, as the price of so valuable a purchase; and, in consideration of receiving the advantages of mutual commerce, obliges himself to conform to those laws, which the community has thought proper to establish." Ex. 50, W. Blackstone, *Commentaries on the Laws of England* 95. Indeed, for law to "obtain the binding force which is proper to a law, it must … be applied to the men who have to be ruled by it." Ex. 51, St. Thomas Aquinas, *Summa Theologica* 2267; *cf. Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995) ("[P]olicies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference….").

These principles of democracy apply equally to the education context. The California Constitution specifically empowers "the governing boards of all school districts to initiate and carry on ***any*** programs, activities, or to otherwise act ***in any manner***" that does not violate the state statutes that establish the district. Cal. Const. art. IX, § 14 (emphasis added). The "[Supreme] Court observed that local control over the educational process affords citizens an opportunity to participate in decision making, permits the structuring of school programs to fit local needs, and encourages 'experimentation, innovation, and a healthy competition for educational excellence.'" *Chiras v. Miller*, 432 F.3d 606, 611 (5th Cir. 2005). Courts nationwide have accordingly upheld the authority of school administrators to determine curriculum and school administration. *See Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 351 (1st Cir. 2025). This is true across a range of decisions and even in the face of parental protest. *See*, *e.g.*, *Littlefield v. Forney Indep. Sch. Dist.,* 268 F.3d 275 (5th Cir. 2001) (upholding mandatory school uniform policy); *Swanson v. Guthrie Indep. Sch. Dist. No. 1–L,* 135 F.3d 694 (10th Cir. 1998) (upholding full-time attendance policy); *Herndon v. Chapel Hill–Carrboro City Bd. of Educ.*, 89 F.3d 174 (4th Cir. 1996) (upholding mandatory community service program); *see also Wake Cares, Inc. v. Wake Cty. Bd. of Educ.*, 675 S.E.2d 345, 348-51 (N.C. 2009) (parental consent not required before a school board assigns students to a year-round school calendar because the decisions over the calendar are within the statutory control of the board). Plaintiffs' reliance on cases like *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279 (2002) (Mot. 13), to

demonstrate that contracts cannot bind third parties are wholly inapposite; in those cases, no statute authorized the contracting party to act on behalf of the third party.

Here, both the U.S. Congress and the California legislature exercised their legislative power to authorize schools to act on parents' behalf to "enter into a contract with a third party" for "services, including cloud-based services, for the digital storage, management, and retrieval of pupil records," or for other "digital educational software that authorizes a third-party provider … to access, store, and use pupil records." Cal. Educ. Code § 49073.1(a); 20 U.S.C. § 1232g(b)(2)(A); 34 C.F.R. § 99.31(a)(1)(i)(B). Because their elected officials have already, through legislation, concluded that schools can contract for PowerSchool's services without separate parental consent, Plaintiffs' argument (Mot. 10) that PowerSchool must prove that parents authorized schools to consent fails.

Moreover, Plaintiffs ignore substantial evidence showing that PowerSchool's products and services are the result of a ***local*** governmental process. As illustrated by the Seattle and West Contra examples, *see supra* pp. 7-10, PowerSchool provides cloud-based hosting services and software products with approval of elected school boards. Seattle's Board, for example, solicited community feedback when evaluating PowerSchool's procurement proposal and engaged in a fulsome deliberative process that considered fiscal impact, equity, effect on students, and alternatives before deciding to engage PowerSchool.[66] West Contra conditioned continued reliance on PowerSchool as its "central data source" on 80% satisfaction in the community.[67] These schools have voted to hire PowerSchool within their constitutional and statutory authority to represent all the people living within the district, including Plaintiffs, and have renewed PowerSchool's contracts even in the face of Plaintiffs' specific complaints as raised in this case.[68] The Court should reject Plaintiffs' attempt to bar PowerSchool from presenting its defense based on the fact that under the constitutions and statutes of every state, school districts have the right to bind their constituents when acting within their statutory authority.

Plaintiffs' cases do not require a contrary holding because they are inapposite: None of those cases involved statutes authorizing consent by one party on behalf of another in the context at issue. *See Rogers v. Roseville SH, LLC*, 75 Cal. App. 5th 1065, 1074 (2022); *Valentine v. Plum Healthcare Grp., LLC*, 37

[66] *E.g.*, Ex. 26, Seattle Board Action Report (2019); Ex. 25, Seattle Board Action Report (2020).
[67] *E.g.*, Ex. 30, WCCUSD Ecollect Contract Approval at 1-2.
[68] Ex. 1, Cherkin 190:12-192:25; *see* Exs. 31-32 (recent WCCUSD contract approvals).

Cal. App. 5th 1076, 1087 (2019); *Sierra Pac. Indus. v. Carter*, 104 Cal. App. 3d 579, 581 (1980); *Rookard v. Mexicoach*, 680 F.2d 1257, 1262 (9th Cir. 1982). Further, their argument that schools are more akin to representatives of ***PowerSchool*** than parents turns the governmental structure on its head; school boards represent their constituents, and the schools' agreement to obtain any necessary consents from parents does not change that. Nor does the Ninth Circuit's recent decision in *Shanahan v. IXL Learning, Inc.* support Plaintiffs' position either, as it, too, concerned common law agency rather than schools' constitutional and statutory authority to represent and bind parents and students. *See* 2026 WL 982855, at *2 (9th Cir. Apr. 13, 2026) (concluding that schools' representation of authority to authorize data collection was not sufficient to bind parents to an arbitration agreement). Tellingly, the Ninth Circuit expressly left open the question of whether the schools' representations "that they had the authority to consent … to data collection" is binding on the parents. *See id.* As explained herein, schools can and do bind parents as their constitutional and statutory representatives, particularly when it concerns schools' selection of vendors assisting with routine school administration.

* * *

Thus, Plaintiffs are mistaken about the significance of school's authorization as a matter of law. As a matter of law, schools represent and bind parents because of statutes and principles of representative democracy, not common law agency.

### III. PowerSchool's contracts with schools requiring them to obtain all necessary parental consents are relevant evidence, but do not relate to PowerSchool's first defense.

Lastly, Plaintiffs ask the Court to pronounce that PowerSchool's contractual provisions requiring schools to obtain all necessary consents do not independently establish that parents consented. This argument is irrelevant to PowerSchool's first defense, and in any case, Plaintiffs are wrong to downplay the significance of PowerSchool contractually requiring schools to obtain all necessary consents.

Once again, PowerSchool's first defense asserts that governments—including legislatures and elected school boards—consented to and/or authorized the challenged conduct, and because of their authority as representatives of the people acting within their statutory authority, had the ability to do so on parents' behalf. The defense ***does not turn at all on whether parents also consented on their own behalf to the challenged conduct***. As a result, the question of whether schools actually obtained parental

consent per their contractual commitments to PowerSchool is irrelevant to the first defense. Nothing in PowerSchool's interrogatory response addressing evidence of "consent" broadly suggests otherwise. *See* Dkt. 164, Ex. A, PowerSchool Interrog. Resp. 6 ("To the extent you contend that consent is a defense to Plaintiffs' claims, state your contentions…").

This does not mean, however, that schools' contractual obligations to secure all necessary consents are irrelevant. For instance, Plaintiffs cannot "satisfy the element of 'intentional intrusion'" when the evidence shows PowerSchool requiring schools to obtain all requisite consents. *Bokenfohr v. Gladen*, 828 F. App'x 485, 486-87 (9th Cir. 2020); *In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 646-47 (N.D. Cal. 2024). The "intent" requirement turns on whether PowerSchool ***believed*** or was "***substantially certain***" that it lacked requisite "legal or personal permission" to provide data processing services at issue. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1220-21 (10th Cir. 2003). Thus, evidence of PowerSchool's contractual provisions will be highly relevant (if not outright dispositive) of Plaintiffs' claims, just not for the first affirmative defense.

## CONCLUSION

Plaintiffs' motion attacks a strawman as to PowerSchool's first defense and is moot as to the third defense on implied consent. Plaintiffs attempt to reinterpret PowerSchool's consent of government authorization as being all about a novel concept of a "private consent defense" under FERPA and common law agency, whereas the defense is really based on well-founded doctrines of compliance-with-statute, federal and state law preemption, abrogation of common law requirements, and constitutional and statutory agency. PowerSchool should be able to prove, as a matter of law, that it lawfully provides services and software with the authorization and under the direction and control of federal, state, and local governments. As a result, Plaintiffs' motion should be denied.

DATED: May 12, 2026

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Olivia Adendorff*

Olivia Adendorff, P.C.

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Zharna Shah (*pro hac vice*)
Amelia Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
zharna.shah@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Ethan Levinton (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
ethan.levinton@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*