# Exhibit 50



COMMENTARIES

ON THE

LAWS OF ENGLAND.

IN FOUR BOOKS.

BY

SIR WILLIAM BLACKSTONE, KNT.

ONE OF THE JUSTICES OF HIS MAJESTY'S COURT OF COMMON PLEAS

WITH

NOTES SELECTED FROM THE EDITIONS OF ARCHBOLD, CHRISTIAN, COLERIDGE, CHITTY, STEWART, KERR, AND OTHERS,

BARRON FIELD'S ANALYSIS,

AND

Additional Notes, and a Life of the Author,

BY

GEORGE SHARSWOOD,

CHIEF JUSTICE OF THE SUPREME COURT OF PENNSYLVANIA.

IN TWO VOLUMES.

VOL. I.—BOOKS I. & II.

PHILADELPHIA:
J. B. LIPPINCOTT COMPANY.
1893.

# Edition Used:

*Commentaries on the Laws of England in Four Books. Notes selected from the editions of Archibold, Christian, Coleridge, Chitty, Stewart, Kerr, and others, Barron Field's Analysis, and Additional Notes, and a Life of the Author by George Sharswood. In Two Volumes.* (Philadelphia: J.B. Lippincott Co., 1893). Vol. 1 - Books I & II.

Author: Sir William Blackstone
Editor: George Sharswood

## About Liberty Fund:

Liberty Fund, Inc. is a private, educational foundation established to encourage the study of the ideal of a society of free and responsible individuals.

## Copyright Information:

The text is in the public domain.

## Fair Use Statement:

This material is put online to further the educational goals of Liberty Fund, Inc. Unless otherwise stated in the Copyright Information section above, this material may be used freely for educational and academic purposes. It may not be used in any way for profit.

[Back to Table of Contents]

# COMMENTARIES ON THE LAWS OF ENGLAND.

## BOOK THE FIRST. Of The Rights Of Persons.

## CHAPTER I.

## OF THE ABSOLUTE RIGHTS OF INDIVIDUALS.

The objects of the laws of England are so very numerous and extensive, that, in order to consider them with any tolerable ease and perspicuity, it will be necessary to distribute them methodically under proper and distinct heads; avoiding as much as possible divisions too large and comprehensive on the one hand, and too trifling and minute on the other; both of which are equally productive of confusion.

*

[*122

Now, as municipal law is a rule of civil conduct, commanding what is right, and prohibiting what is wrong; or as Cicero,(*a*) and after him our Bracton,(*b*) have expressed it, *sanctio justa, jubens honesta et prohibens contraria,* it follows that the primary and principal object of the law are rights and wrongs. In the prosecution, therefore, of these commentaries, I shall follow this very simple and obvious division; and shall, in the first place, consider the *rights* that are commanded, and secondly the *wrongs* that are forbidden, by the laws of England.

Rights are, however, liable to another subdivision; being either, first, those which concern and are annexed to the persons of men, and are then called *jura personarum,* or the *rights of persons;* or they are, secondly, such as a man may acquire over external objects, or things unconnected with his person, which are styled *jura rerum,* or the *rights of things.* Wrongs also are divisible into, first, *private wrongs,* which, being an infringement merely of particular rights, concern individuals only, and are called civil injuries; and, secondly, *public wrongs,* which, being a breach of general and public rights, affect the whole community, and are called crimes and misdemesnors.

The objects of the laws of England falling into this fourfold division, the present commentaries will therefore consist of the four following parts: 1. *The rights of persons,* with the means whereby such rights may be either acquired or lost. 2. *The rights of things,* with the means also of acquiring or losing them. 3. *Private wrongs,* or civil injuries, with the means of redressing them by law. 4. *Public wrongs,* or crimes and misdemesnors, with the means of prevention and punishment.1

We are now first to consider the *rights of persons,* with the means of acquiring and losing them.

*

Now the rights of persons that are commanded to be observed by the municipal law are of two sorts: first, such as are due *from* every citizen, which are usually called civil *duties;* and, secondly, such as belong *to* him, which is the more popular acceptation of *rights* or *jura.* Both may indeed be comprised in this latter division; for, as all social duties are of a relative nature, at the same time that they are due *from* one man, or set of men, they must also be due *to* another. But I apprehend it will be more clear and easy to consider many of them as duties required from, rather than as rights belonging to, particular persons. Thus, for instance, allegiance is usually, and therefore most easily, considered as the duty of the people, and protection as the duty of the magistrate; and yet they are reciprocally the rights as well as duties of each other. Allegiance is the right of the magistrate, and protection the right of the people. *123]

Persons also are divided by the law into either natural persons, or artificial. Natural persons are such as the God of nature formed us; artificial are such as are created and devised by human laws for the purposes of society and government, which are called corporations or bodies politic.

The rights of persons considered in their natural capacities are also of two sorts, absolute and relative. Absolute, which are such as appertain and belong to particular men, merely as individuals or single persons: relative, which are incident to them as members of society, and standing in various relations to each other. The first, that is, absolute rights, will be the subject of the present chapter.

By the absolute *rights* of individuals, we mean those which are so in their primary and strictest sense; such as would belong to their persons merely in a state of nature, and which every man is entitled to enjoy, whether out of society or in it. But with regard to the absolute *duties,* which man is bound * to perform considered as a mere individual, it is not to be expected that any human municipal law should at all explain or enforce them. For the end and intent of such laws being only to regulate the behaviour of mankind, as they are members of society, and stand in various relations to each other, they have consequently no concern with any other but social or relative duties. Let a man therefore be ever so abandoned in his principles, or vicious in his practice, provided he keeps his wickedness to himself, and does not offend against the rules of public decency, he is out of the reach of human laws. But if he makes his vices public, though they be such as seem principally to affect himself, (as drunkenness, or the like,) then they become, by the bad example they set, of pernicious effects to society; and therefore it is then the business of human laws to correct them. Here the circumstance of publication is what alters the nature of the case. *Public* sobriety is a relative duty, and therefore enjoined by our laws; *private* sobriety is an absolute duty, which, whether it be performed or not, human tribunals can never know; and therefore they can never enforce it by any civil sanction.[2] But, with respect to *rights,* the case is different Human laws define and enforce as well those rights which belong to a man considered as an individual, as those which belong to him considered as related to others. *124]

For the principal aim of society is to protect individuals in the enjoyment of those absolute rights, which were vested in them by the immutable laws of nature, but which could not be preserved in peace without that mutual assistance and intercourse which is gained by the institution of friendly and social communities. Hence it follows, that the first and primary end of human laws is to maintain and regulate these *absolute* rights of individuals. Such rights as are social and *relative* result from, and are posterior to, the formation of states and societies: so that to maintain and regulate these is clearly a subsequent consideration. And, therefore, the principal view of human laws is, or ought always to be, to explain, protect, and enforce such rights as are absolute, which in * themselves are few and simple: and then such rights as are relative, which, arising from a variety of connections, will be far more numerous and more complicated. These will take up a greater space in any code of laws, and hence may appear to be more attended to—though in reality they are not—than the rights of the former kind. Let us therefore proceed to examine how far all laws ought, and how far the laws of England actually do, take notice of these absolute rights, and provide for their lasting security.3

[*125

The absolute rights of man, considered as a free agent, endowed with discernment to know good from evil, and with power of choosing those measures which appear to him to be most desirable, are usually summed up in one general appellation, and denominated the natural liberty of mankind. This natural liberty consists properly in a power of acting as one thinks fit, without any restraint or control, unless by the law of nature; being a right inherent in us by birth, and one of the gifts of God to man at his creation, when he endued him with the faculty of free will. But every man, when he enters into society, gives up a part of his natural liberty, as the price of so valuable a purchase; and, in consideration of receiving the advantages of mutual commerce, obligos himself to conform to those laws, which the community has thought proper to establish. And this species of legal obedience and conformity is infinitely more desirable than that wild and savage liberty which is sacrificed to obtain it. For no man that considers a moment would wish to retain the absolute and uncontrolled power of doing whatever he pleases: the consequence of which is, that every other man would also have the same power, and then there would be no security to individuals in any of the enjoyments of life. Political, therefore, or civil liberty, which is that of a member of society, is no other than natural liberty so far restrained by human laws (and no farther) as is necessary and expedient for the general advantage of the public.(*c*) Hence we may collect that the law, which restrains a man from doing * mischief to his fellow-citizens, though it diminishes the natural, increases the civil liberty of mankind; but that every wanton and causeless restraint of the will of the subject, whether practised by a monarch, a nobility, or a popular assembly, is a degree of tyranny: nay, that even laws themselves, whether made with or without our consent, if they regulate and constrain our conduct in matters of more indifference, without any good end in view, are regulations destructive of liberty: whereas, if any public advantage can arise from observing such precepts, the control of our private inclinations, in one or two particular points, will conduce to preserve our general freedom in others of more importance; by supporting that state of society, which alone can secure our independence. Thus the statute of king Edward IV.,(*d*) which forbade the fine

*126]

gentlemen of those times (under the degree of a lord) to wear pikes upon their shoes or boots of more than two inches in length, was a law that savoured of oppression; because, however ridiculous the fashion then in use might appear, the restraining it by pecuniary penalties could serve no purpose of common utility. But the statute of king Charles II.,*(e)*4 which prescribes a thing seemingly as indifferent, (a dress for the dead, who are all ordered to be buried in woollen,) is a law consistent with public liberty; for it encourages the staple trade, on which in great measure depends the universal good of the nation. So that laws, when prudently framed, are by no means subversive, but rather introductive, of liberty; for, as Mr. Locke has well observed,*(f)* where there is no law there is no freedom. But then, on the other hand, that constitution or frame of government, that system of laws, is alone calculated to maintain civil liberty, which leaves the subject entire master of his own conduct, except in those points wherein the public good requires some direction or restraint.5

The idea and practice of this political or civil liberty flourish in their highest vigour in these kingdoms, where it falls *

*127]

little short of perfection, and can only be lost or destroyed by the folly or demerits of its owner: the legislature, and of course the laws of England, being peculiarly adapted to the preservation of this inestimable blessing even in the meanest subject. Very different from the modern constitutions of other states, on the continent of Europe, and from the genius of the imperial law; which in general are calculated to vest an arbitrary and despotic power, of controlling the actions of the subject, in the prince, or in a few grandees. And this spirit of liberty is so deeply implanted in our constitution, and rooted even in our very soil, that a slave or a negro, the moment he lands in England, falls under the protection of the laws, and so far becomes a freeman;*(g)* though the master's right to his service may *possibly* still continue.6

The absolute rights of every Englishman, (which, taken in a political and extensive sense, are usually called their liberties,) as they are founded on nature and reason, so they are coeval with our form of government; though subject at times to fluctuate and change: their establishment (excellent as it is) being still human. At some times we have seen them depressed by overbearing and tyrannical princes; at others so luxuriant as even to tend to anarchy, a worse state than tyranny itself, as any government is better than none at all.7 But the vigour of our free constitution has always delivered the nation from these embarrassments: and, as soon as the convulsions consequent on the struggle have been over, the balance of our rights and liberties has settled to its proper level; and their fundamental articles have been from time to time asserted in parliament, as often as they were thought to be in danger.8

First, by the great charter of liberties, which was obtained, sword in hand, from king John, and afterwards, with some alterations, confirmed in parliament by king Henry the Third, his son. Which charter contained very few new grants; but, as Sir Edward Coke*(h)* observes, was for the most part declaratory of the principal grounds of the fundamental *

*128]

laws of England. Afterwards by the statute called *confirmatio cartarum,(i)* whereby the great charter is directed to be allowed as the common law; all judgments contrary to it are declared void; copies of it are

ordered to be sent to all cathedral churches, and read twice a year to the people; and sentence of excommunication is directed to be as constantly denounced against all those that, by word, deed, or counsel, act contrary thereto, or in any degree infringe it. Next, by a multitude of subsequent corroborating statutes, (Sir Edward Coke, I think, reckons thirty-two,)(*k*) from the first Edward to Henry the Fourth. Then, after a long interval, by *the petition of right;* which was a parliamentary declaration of the liberties of the people, assented to by king Charles the First in the beginning of his reign: which was closely followed by the still more ample concessions made by that unhappy prince to his parliament before the fatal rupture between them; and by the many salutary laws, particularly the *habeas corpus* act, passed under Charles the Second. To these succeeded *the bill of rights,* or declaration delivered by the lords and commons to the Prince and Princess of Orange, 13th of February, 1688; and afterwards enacted in parliament, when they became king and queen; which declaration concludes in these remarkable words:—"and they do claim, demand, and insist upon, all and singular the premises, as their undoubted rights and liberties." And the act of parliament itself(*l*) recognises "all and singular the rights and liberties asserted and claimed in the said declaration to be the true, ancient, and indubitable rights of the people of this kingdom." Lastly, these liberties were again asserted at the commencement of the present century, in *the act of settlement,*(*m*) whereby the crown was limited to his present majesty's illustrious house: and some new provisions were added, at the same fortunate era, for better securing our religion, laws, and liberties; which the statute declares to be "the birthright of the people of England," according to the ancient doctrine of the common law.(*n*)

*

Thus much for the *declaration* of our rights and liberties. The rights themselves, thus defined by these several statutes, consist in a number of private immunities; which will appear, from what has been premised, to be indeed no other, than either that *residuum* of natural liberty, which is not required by the laws of society to be sacrificed to public convenience; or else those civil privileges, which society hath engaged to provide, in lieu of the natural liberties so given up by individuals. These, therefore, were formerly, either by inheritance or purchase, the rights of all mankind; but, in most other countries of the world being now more or less debased and destroyed, they at present may be said to remain, in a peculiar and emphatical manner, the rights of the people of England. And these may be reduced to three principal or primary articles; the right of personal security, the right of personal liberty, and the right of private property: because, as there is no other known method of compulsion, or abridging man's natural free will, but by an infringement or diminution of one or other of these important rights, the preservation of these, inviolate, may justly be said to include the preservation of our civil immunities in their largest and most extensive sense. *129]

I. The right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation.

1. Life is the immediate gift of God, a right inherent by nature in every individual; and it begins in contemplation of law as soon as an infant is able to stir in the mother's womb. For if a woman is quick with child, and by a potion or otherwise, killeth it in

her womb; or if any one beat her, whereby the child dieth in her body, and she is delivered of a dead child; this, though not murder,9 was by the ancient law homicide or manslaughter.(*o*) But the modern law doth not look * upon this offence in quite so atrocious a light,10 but merely as a heinous misdemesnor.(*p*)

*130]

An infant *in ventre sa mere,* or in the mother's womb, is supposed in law to be born for many purposes.11 It is capable of having a legacy, or a surrender of a copyhold estate, made to it. It may have a guardian assigned to it;(*q*) and it is enabled to have an estate limited to its use, and to take afterwards by such limitation, as if it were then actually born.(*r*) And in this point the civil law agrees with ours.(*s*)

2. A man's limbs (by which for the present we only understand those members which may be useful to him in fight, and the loss of which alone amounts to mayhem by the common law) are also the gift of the wise Creator, to enable him to protect himself from external injuries in a state of nature. To these therefore he has a natural inherent right; and they cannot be wantonly destroyed or disabled without a manifest breach of civil liberty.

Both the life and limbs of a man are of such high value, in the estimation of the law of England, that it pardons even homicide if committed *se defendendo,* or in order to preserve them. For whatever is done by a man to save either life or member, is looked upon as done upon the highest necessity and compulsion. Therefore, if a man through fear of death or mayhem is prevailed upon to execute a deed, or do any other legal act; these, though accompanied with all other the requisite solemnities, may be afterwards avoided, if forced upon him by a well-grounded apprehension of losing his life, or even his limbs, in case of his non-compliance.(*t*) And the same is also a sufficient excuse for the commission of many misdemesnors, as will appear in the fourth book. The constraint a man is under in these circumstances is called in law *duress,* from the Latin *durities,* of which there are two * sorts: duress of imprisonment, where a man actually loses his liberty, of which we shall presently speak; and duress *per minas,* where the hardship is only threatened and impending, which is that we are now discoursing of. Duress *per minas* is either for fear of loss of life, or else for fear of mayhem, or loss of limb. And this fear must be upon sufficient reason; "*non,*" as Bracton expresses it, "*suspicio cujuslibet vani et meticulosi hominis, sed talis qui possit cadere in virum constantem; talis enim debet esse metus, qui in se contineat vitæ periculum, aut corporis cruciatum.*"(*u*) A fear of battery, or being beaten, though never so well grounded, is no duress; neither is the fear of having one's house burned, or one's goods taken away and destroyed, because in these cases, should the threat be performed, a man may have satisfaction by recovering equivalent damages:(*x*) but no suitable atonement can be made for the loss of life or limb. And the indulgence shown to a man under this, the principal, sort of duress, the fear of losing his life or limbs, agrees also with that maxim of the civil law; *ignoscitur ei qui sanguinem suum qualiter redemptum voluit.*12

[*131

The law not only regards life and member, and protects every man in the enjoyment of them, but also furnishes him with every thing necessary for their support. For there

is no man so indigent or wretched, but he may demand a supply sufficient for all the necessities of life from the more opulent part of the community, by means of the several statutes enacted for the relief of the poor, of which in their proper places. A humane provision; yet, though dictated by the principles of society, discountenanced by the Roman laws. For the edicts of the Emperor Constantine, commanding the public to maintain the children of those who were unable to provide for them, in order to prevent the murder and exposure of infants, an institution founded on the same principle as our foundling hospitals, though comprised in the Theodosian code,(y) were rejected in Justinian's collection.

*

*132]

These rights of life and member, can only be determined by the death of the person; which was formerly accounted to be either a civil or natural death. The civil death commenced, if any man was banished or abjured the realm(z) by the process of the common law, or entered into religion; that is, went into a monastery, and became there a monk professed: in which cases he was absolutely dead in law, and his next heir should have his estate. For such banished man was entirely cut off from society; and such a monk, upon his profession, renounced solemnly all secular concerns: and besides, as the popish clergy claimed an exemption from the duties of civil life and the commands of the temporal magistrate, the genius of the English laws would not suffer those persons to enjoy the benefits of society, who secluded themselves from it, and refused to submit to its regulations.(a) A monk was therefore counted *civiliter mortuus,* and when he entered into religion might, like other dying men, make his testament and executors; or if he made none, the ordinary might grant administration to his next of kin, as if he were actually dead intestate. And such executors and administrators had the same power, and might bring the same actions for debts due *to* the religious, and were liable to the same actions for those due *from* him, as if he were naturally deceased.(b) Nay, so far has this principle been carried, that when one was bound in a bond to an abbot and his successors, and afterwards made his executors, and professed himself a monk of the same abbey, and in process of time was himself made abbot thereof; here the law gave him, in the capacity of abbot, an action of debt against his own executors to recover the money due.(c) In short, a monk or religious was so effectually dead in law, that a lease made even to a third person, during the life (generally) of one who afterwards became a monk, determined by such his entry into religion; for which reason leases, and other conveyances for life, were usually made to have and to hold for the term of one's *natural* life.(d) But, *

[*133

even in the times of popery, the law of England took no cognizance of *profession* in any foreign country, because the fact could not be tried in our courts;(e) and therefore, since the Reformation, this disability is held to be abolished:(f) as is also the disability of banishment, consequent upon abjuration, by statute 21 Jac. I. c. 28.13

This natural life, being, as was before observed, the immediate donation of the great Creator, cannot legally be disposed of or destroyed by any individual, neither by the person himself, nor by any other of his fellow-creatures, merely upon their own authority. Yet nevertheless it may, by the divine permission, be frequently forfeited for the breach of those laws of society, which are enforced by the sanction of capital

punishments; of the nature, restrictions, expedience, and legality of which, we may hereafter more conveniently inquire in the concluding book of these commentaries. At present, I shall only observe, that whenever the *constitution* of a state vests in any man, or body of men, a power of destroying at pleasure without the direction of laws, the lives or members of the subject, such constitution is in the highest degree tyrannical; and that, whenever any *laws* direct such destruction for light and trivial causes, such laws are likewise tyrannical, though in an inferior degree; because here the subject is aware of the danger he is exposed to, and may, by prudent caution, provide against it. The statute law of England does therefore very seldom, and the common law does never, inflict any punishment extending to life or limb, unless upon the highest necessity;14 and the constitution is an utter stranger to any arbitrary power of killing or maiming the subject without the express warrant of law. "*Nullus liber homo,*" says the great charter,(*g*) "*aliquo modo destruatur, nisi per legale judicium parium suorum aut per legem terræ.*" Which words, "*aliquo modo destruatur,*" according to Sir Edward Coke,(*h*) include a prohibition, not only of *killing* and *maiming,* but also of *torturing,* (to which our laws are strangers,) and of every oppression by colour of an illegal authority. And it is enacted by the statute of 5 Edw. III. c. 9, that no man shall be forejudged of life or limb contrary to the great charter and the *
law of the land; and again, by statute 28 Edw. III. c. 3, that no man shall be put to death, without being brought to answer by due process of law. [*134

3. Besides those limbs and members that may be necessary to a man in order to defend himself or annoy his enemy, the rest of his person or body is also entitled, by the same natural right, to security from the corporal insults of menaces, assaults, beating, and wounding; though such insults amount not to destruction of life or member.

4. The preservation of a man's health from such practices as may prejudice or annoy it; and

5. The security of his reputation or good name from the arts of detraction and slander, are rights to which every man is entitled by reason and natural justice; since, without these, it is impossible to have the perfect enjoyment of any other advantage or right. But these three last articles (being of much less importance than those which have gone before, and those which are yet to come,) it will suffice to have barely mentioned among the rights of persons: referring the more minute discussion of their several branches to those parts of our commentaries which treat of the infringement of these rights, under the head of personal wrongs.

II. Next to personal security, the law of England regards, asserts, and preserves the personal liberty of individuals. This personal liberty consists in the power of locomotion, of changing situation, or moving one's person to whatsoever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law. Concerning which we may make the same observations as upon the preceding article, that it is a right strictly natural; that the laws of England have never abridged it without sufficient cause; and that, in this kingdom, it cannot ever be abridged at the

mere discretion of the magistrate, without the explicit permission of the laws. Here again the language of the great * charter(*i*) is, that no freeman shall be taken or imprisoned but by the lawful judgment of his equals, or by the law of the land.15 And many subsequent old statutes(*j*) expressly direct, that no man shall be taken or imprisoned by suggestion or petition to the king or his council, unless it be by legal indictment, or the process of the common law. By the petition of right, 3 Car. I., it is enacted, that no freeman shall be imprisoned or detained without cause shown, to which he may make answer according to law. By 16 Car. 1. c. 10, if any person be restrained of his liberty by order or decree of any illegal court, or by command of the king's majesty in person, or by warrant of the council board, or of any of the privy council, he shall, upon demand of his counsel, have a writ of *habeas corpus,* to bring his body before the court of king's bench or common pleas, who shall determine whether the cause of his commitment be just, and thereupon do as to justice shall appertain. And by 31 Car. II. c. 2, commonly called the *habeas corpus* act, the methods of obtaining this writ are so plainly pointed out and enforced, that, so long as this statute remains unimpeached, no subject of England can be long detained in prison, except in those cases in which the law requires and justifies such detainer.16 And, lest this act should be evaded by demanding unreasonable bail or sureties for the prisoner's appearance, it is declared by 1 W. and M. st. 2, c. 2, that excessive bail ought not to be required.

*135]

Of great importance to the public is the preservation of this personal liberty; for if once it were left in the power of any the highest magistrate to imprison arbitrarily whomever he or his officers thought proper, (as in France it is daily practised by the crown,)(*k*) there would soon be an end of all other rights and immunities. Some have thought that unjust attacks, even upon life or property, at the arbitrary will of the magistrate, * are less dangerous to the commonwealth than such as are made upon the personal liberty of the subject. To bereave a man of life, or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism, as must at once convey the alarm of tyranny throughout the whole kingdom; but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary government. And yet sometimes, when the state is in real danger, even this may be a necessary measure. But the happiness of our constitution is, that it is not left to the executive power to determine when the danger of the state is so great as to render this measure expedient; for it is the parliament only, or legislative power, that, whenever it sees proper, can authorize the crown, by suspending the *habeas corpus* act for a short and limited time, to imprison suspected persons without giving any reason for so doing; as the senate of Rome was wont to have recourse to a dictator, a magistrate of absolute authority, when they judged the republic in any imminent danger. The decree of the senate, which usually preceded the nomination of this magistrate, "*dent operam consules ne quid respublica detrimenti capiat,*" was called the *senatus consultum ultimæ necessitatis.* In like manner this experiment ought only to be tried in cases of extreme emergency; and in these the nation parts with its liberty for a while, in order to preserve it forever.

[*136

The confinement of the person, in any wise, is an imprisonment; so that the keeping a man against his will in a private house, putting him in the stocks, arresting or forcibly detaining him in the street, is an imprisonment.(*l*) And the law so much discourages unlawful confinement, that if a man is under *duress of imprisonment,* which we before explained to mean a compulsion by an illegal restraint of liberty, until he seals a bond or the like, he may allege this duress, and avoid the extorted bond. But if a man be lawfully imprisoned, * and, either to procure his discharge, or on any other fair account, seals a bond or a deed, this is not by duress of imprisonment, and he is not at liberty to avoid it.(*m*) To make imprisonment lawful, it must either be by process from the courts of judicature, or by warrant from some legal officer having authority to commit to prison; which warrant must be in writing, under the hand and *seal* of the magistrate, and express the causes of the commitment, in order to be examined into, if necessary, upon a *habeas corpus.*17 If there be no cause expressed, the jailer is not bound to detain the prisoner;(*n*) for the law judges, in this respect, saith Sir Edward Coke, like Festus the Roman governor, that it is unreasonable to send a prisoner, and not to signify withal the crimes alleged.

*137]

A natural and regular consequence of this personal liberty is, that every Englishman may claim a right to abide in his own country so long as he pleases; and not to be driven from it unless by the sentence of the law. The king, indeed, by his royal prerogative, may issue out his writ *ne exeat regno,* and prohibit any of his subjects from going into foreign parts without license.(*o*) This may be necessary for the public service and safeguard of the commonwealth. But no power on earth, except the authority of parliament, can send any subject of England *out* of the land against his will; no, not even a criminal. For exile and transportation are punishments at present unknown to the common law; and, wherever the latter is now inflicted, it is either by the choice of the criminal himself to escape a capital punishment, or else by the express direction of some modern act of parliament.18 To this purpose the great charter(*p*) declares, that no freeman shall be banished, unless by the judgment of his peers, or by the law of the land. And by the *habeas corpus* act, 31 Car. II. c. 2, (that second *magna carta,* and stable bulwark of our liberties,) it is enacted, that no subject of this realm, who is an inhabitant of England, Wales, or Berwick, shall be sent prisoner into Scotland, Ireland, Jersey, Guernsey, or places beyond the seas, (where * they cannot have the full benefit and protection of the common law;) but that all such imprisonments shall be illegal; that the person, who shall dare to commit another contrary to this law, shall be disabled from bearing any office, shall incur the penalty of a *præmunire,* and be incapable of receiving the king's pardon; and the party suffering shall also have his private action against the person committing, and all his aiders, advisers, and abettors; and shall recover treble costs; besides his damages, which no jury shall assess at less than five hundred pounds.

*138]

The law is in this respect so benignly and liberally construed for the benefit of the subject, that, though *within* the realm the king may command the attendance and service of all his liegemen, yet he cannot send any man *out of* the realm, even upon the public service; excepting sailors and soldiers, the nature of whose employment necessarily implies an exception: he cannot even constitute a man lord deputy or

lieutenant of Ireland against his will, nor make him a foreign ambassador.(q) For this might, in reality, be no more than an honourable exile.

III. The third absolute right, inherent in every Englishman, is that of property: which consists in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land. The original of private property is probably founded in nature, as will be more fully explained in the second book of the ensuing commentaries: but certainly the modifications under which we at present find it, the method of conserving it in the present owner, and of translating it from man to man, are entirely derived from society; and are some of those civil advantages, in exchange for which every individual has resigned a part of his natural liberty. The laws of England are therefore, in point of honour and justice, extremely watchful in ascertaining and protecting this right. Upon this principle the great charter(r) has declared that no freeman shall be disseised, or divested, of his freehold, or of his liberties, or free *

[*139

customs, but by the judgment of his peers, or by the law of the land. And by a variety of ancient statutes(s) it is enacted, that no man's lands or goods shall be seized into the king's hands, against the great charter, and the law of the land; and that no man shall be disinherited, nor put out of his franchises or freehold, unless he be duly brought to answer, and be forejudged by course of law; and if any thing be done to the contrary, it shall be redressed, and holden for none.

So great moreover is the regard of the law for private property, that it will not authorize the least violation of it; no, not even for the general good of the whole community. If a new road, for instance, were to be made through the grounds of a private person, it might perhaps be extensively beneficial to the public; but the law permits no man, or set of men, to do this without consent of the owner of the land. In vain may it be urged, that the good of the individual ought to yield to that of the community; for it would be dangerous to allow any private man, or even any public tribunal, to be the judge of this common good, and to decide whether it be expedient or no. Besides, the public good is in nothing more essentially interested, than in the protection of every individual's private rights, as modelled by the municipal law. In this and similar cases the legislature alone can, and indeed frequently does, interpose, and compel the individual to acquiesce. But how does it interpose and compel? Not by absolutely stripping the subject of his property in an arbitrary manner; but by giving him a full indemnification and equivalent for the injury thereby sustained. The public is now considered as an individual, treating with an individual for an exchange. All that the legislature does is to oblige the owner to alienate his possessions for a reasonable price; and even this is an exertion of power, which the legislature indulges with caution, and which nothing but the legislature can perform.19

*

*140]

Nor is this the only instance in which the law of the land has postponed even public necessity to the sacred and inviolable rights of private property. For no subject of England can be constrained to pay any aids or taxes, even for the defence of the realm or the support of government, but such as are imposed by his own consent, or that of his representatives in parliament. By the

statute 25 Edw. I. c. 5 and 6, it is provided, that the king shall not take any aids or tasks, but by the common assent of the realm. And what that common assent is, is more fully explained by 34 Edw. I. st. 4, c. 1, which(*t*) enacts that no talliage or aid shall be taken without the assent of the archbishops, bishops, earls, barons, knights, burgesses, and other freemen of the land: and again by 14 Edw. III. st. 2, c. 1, the prelates, earls, barons, and commons, citizens, burgesses, and merchants, shall not be charged to make any aid, if it be not by the common assent of the great men and commons in parliament. And as this fundamental law had been shamefully evaded under many succeeding princes, by compulsive loans, and benevolences extorted without a real and voluntary consent, it was made an article in the petition of right 3 Car. I., that no man shall be compelled to yield any gift, loan, or benevolence, tax, or such like charge without common consent by act of parliament. And, lastly, by the statute 1 W. and M. st. 2, c. 2, it is declared, that levying money for or to the use of the crown, by pretence of prerogative, without grant of parliament, or for longer time, or in other manner, than the same is or shall be granted, is illegal.

In the three preceding articles we have taken a short view of the principal absolute rights which appertain to every Englishman.20 But in vain would these rights be declared, ascertained, and protected by the dead letter of the laws, if the * constitution had provided no other method to secure their actual enjoyment. It has therefore established certain other auxiliary subordinate rights of the subject, which serve principally as outworks or barriers to protect and maintain inviolate the three great and primary rights, of personal security, personal liberty, and private property. These are,

[*141

1. The constitution, powers, and privileges of parliament; of which I shall treat at large in the ensuing chapter.

2. The limitation of the king’s prerogative, by bounds so certain and notorious, that it is impossible he should either mistake or legally exceed them without the consent of the people. Of this, also, I shall treat in its proper place. The former of these keeps the legislative power in due health and vigour, so as to make it improbable that laws should be enacted destructive of general liberty: the latter is a guard upon the executive power by restraining it from acting either beyond or in contradiction to the laws, that are framed and established by the other.

3. A third subordinate right of every Englishman is that of applying to the courts of justice for redress of injuries. Since the law is in England the supreme arbiter of every man’s life, liberty, and property, courts of justice must at all times be open to the subject, and the law be duly administered therein. The emphatical words of *magna carta,*(*u*) spoken in the person of the king, who in judgment of law (says Sir Edward Coke)(*w*) is ever present and repeating them in all his courts, are these; *nulli vendemus, nulli negabimus, aut differemus rectum vel justitiam:* “and therefore every subject,” continues the same learned author, “for injury done to him *in bonis, in terris, vel persona,* by any other subject, be he ecclesiastical or temporal, without any exception, may take his remedy by the course of the law, and have justice and right for the injury done to him, freely without sale, fully without any denial, and speedily without delay.” It were endless to enumerate all the *affirmative* acts of parliament, *

[*142

wherein justice is directed to be done according to the law of the land; and what that law is every subject knows, or may know, if he pleases; for it depends not upon the arbitrary will of any judge, but is permanent, fixed, and unchangeable, unless by authority of parliament. I shall, however, just mention a few *negative* statutes, whereby abuses, perversions, or delays of justice, especially by the prerogative, are restrained. It is ordained by *magna carta,*(*x*) that no freeman shall be outlawed, that is, put out of the protection and benefit of the laws, but according to the law of the land. By 2 Edw. III. c. 8, and 11 Ric. II. c. 10, it is enacted, that no commands or letters shall be sent under the great seal, or the little seal, the signet, or privy seal, in disturbance of the law; or to disturb or delay common right: and, though such commandments should come, the judges shall not cease to do right; which is also made a part of their oath by statute 18 Edw. III. st. 4. And by 1 W. and M. st. 2, c. 2, it is declared that the pretended power of suspending, or dispensing with laws, or the execution of laws, by regal authority, without consent of parliament, is illegal.

Not only the substantial part, or judicial decisions, of the law, but also the formal part, or method of proceeding, cannot be altered but by parliament; for, if once those outworks were demolished, there would be an inlet to all manner of innovation in the body of the law itself. The king, it is true, may erect new courts of justice; but then they must proceed according to the old-established forms of the common law. For which reason it is declared, in the statute 16 Car. I. c. 10, upon the dissolution of the court of starchamber, that neither his majesty, nor his privy council, have any jurisdiction, power, or authority, by English bill, petition, articles, libel, (which were the course of proceeding in the starchamber, borrowed from the civil law,) or by any other arbitrary way whatsoever, to examine, or draw into question, determine, or dispose of the lands or goods of any subjects of this kingdom; but that the same ought to be tried and determined in the ordinary courts of justice, and by *course of law.*

4. *

*143]

If there should happen any uncommon injury, or infringement of the rights before mentioned, which the ordinary course of law is too defective to reach, there still remains a fourth subordinate right, appertaining to every individual, namely, the right of petitioning the king, or either house of parliament, for the redress of grievances.21 In Russia we are told(*y*) that the czar Peter established a law, that no subject might petition the throne till he had first petitioned two different ministers of state. In case he obtained justice from neither, he might then present a third petition to the prince; but upon pain of death, if found to be in the wrong: the consequence of which was, that no one dared to offer such third petition; and grievances seldom falling under the notice of the sovereign, he had little opportunity to redress them. The restrictions, for some there are, which are laid upon petitioning in England, are of a nature extremely different; and, while they promote the spirit of peace, they are no check upon that of liberty. Care only must be taken, lest, under the pretence of petitioning, the subject be guilty of any riot or tumult, as happened in the opening of the memorable parliament in 1640: and, to prevent this, it is provided by the statute 13 Car. II. st. 1, c. 5, that no petition to the king, or either house of parliament, for any alteration in church or state, shall be signed by above twenty persons, unless the matter thereof be approved by three justices of the peace,

or the major part of the grand jury22 in the country; and in London by the lord mayor, aldermen, and common council: nor shall any petition be presented by more than ten persons at a time. But, under these regulations, it is declared by the statute 1 W. and M. st. 2, c. 2, that the subject hath a right to petition; and that all commitments and prosecutions for such petitioning are illegal.

5. The fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defence, suitable to their condition and degree, and such as are *

[*144

allowed by law.23 Which is also declared by the same statute, 1 W. and M. st. 2, c. 2, and is indeed a public allowance, under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression.

In these several articles consist the rights, or, as they are frequently termed, the liberties of Englishmen: liberties more generally talked of, than thoroughly understood; and yet highly necessary to be perfectly known and considered by every man of rank and property, lest his ignorance of the points whereon they are founded should hurry him into faction and licentiousness on the one hand, or a pusillanimous indifference and criminal submission on the other. And we have seen that these rights consist, primarily, in the free enjoyment of personal security, of personal liberty, and of private property. So long as these remain inviolate, the subject is perfectly free; for every species of compulsive tyranny and oppression must act in opposition to one or other of these rights, having no other object upon which it can possibly be employed. To preserve these from violation, it is necessary that the constitution of parliament be supported in its full vigour; and limits, certainly known, be set to the royal prerogative. And, lastly, to vindicate these rights, when actually violated or attacked, the subjects of England are entitled, in the first place, to the regular administration and free course of justice in the courts of law; next, to the right of petitioning the king and parliament for redress of grievances; and, lastly, to the right of having and using arms for self-preservation and defence. And all these rights and liberties it is our birthright to enjoy entire; unless where the laws of our country have laid them under necessary restraints: restraints in themselves so gentle and moderate, as will appear, upon further inquiry, that no man of sense or probity would wish to see them slackened. For all of us have it in our choice to do every thing that a good man would desire to do; and are restrained from nothing but what would be pernicious either to ourselves or our fellow-citizens. So that this review *

*145]

of our situation may fully justify the observation of a learned French author, who indeed generally both thought and wrote in the spirit of genuine freedom,*(z)* and who hath not scrupled to profess, even in the very bosom of his native country, that the English is the only nation in the world where political or civil liberty is the direct end of its constitution. Recommending, therefore, to the student in our laws a further and more accurate search into this extensive and important title, I shall close my remarks upon it with the expiring wish of the famous father Paul to his country, "Esto Perpetua."