Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for the Defendant PowerSchool Holdings, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EMILY CHERKIN, et al<br><br>Plaintiffs,<br><br>v.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>Defendant. | CASE NO. 3:24-cv-02706-JD<br><br>**DEFENDANT POWERSCHOOL HOLDINGS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(1)**<br><br>Judge: Hon. James Donato<br>Hearing Date: November 19, 2026<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |

## NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on November 19, 2026, at 11:00 a.m. PT, or as soon thereafter as this matter may be heard, in the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, in Courtroom 11, 19th Floor, before the Honorable James Donato, Defendant PowerSchool Holdings, Inc. ("PowerSchool") will and hereby does move the Court to dismiss Plaintiffs' Corrected First Amended Class Action Complaint for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................2

I. Plaintiffs allege vague injuries based on schools' ordinary use of PowerSchool products. ........................................................................................................2

II. Fact discovery reveals that Plaintiffs suffered no harm. ........................................3

A. L.M.C. and M.M.C. never used PowerSchool products and were not harmed by PowerSchool products. ........................................................................3

B. PowerSchool does not host data for S.G.'s district, and S.G. was not harmed by PowerSchool's products. ........................................................................4

III. Plaintiffs' experts fail to establish Plaintiffs' injuries. ........................................6

ARGUMENT ........................................................................................................7

I. Plaintiffs have no concrete, particularized, or actual or imminent injury. ...............7

A. Plaintiffs have no concrete harm. ........................................................................7

B. Plaintiffs have no particularized injury. ........................................................................11

C. Plaintiffs have no actual or imminent injury. ........................................................................12

II. Plaintiffs' purported injuries stem from schools' discretionary decisions and thus are not traceable to PowerSchool. ........................................................................13

III. Plaintiffs' claims are not redressable because schools will continue to collect, share, and analyze student records. ........................................................................14

IV. The putative damages classes lack standing. ........................................................................15

CONCLUSION ........................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barrales v. Reckitt Benckiser LLC*,
2026 WL 2212867 (N.D. Cal. July 31, 2026)....8

*Campbell v. Select Med. Corp.*,
2026 WL 2056651 (C.D. Cal. July 14, 2026)....8

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....12

*Correia v. Lulu & Georgia, Inc.*,
2026 WL 2343093 (S.D. Cal., Aug. 12, 2026)....8

*Diaz v. Paramount Skydance Corp.*,
2026 WL 1090958 (C.D. Cal. Apr. 20, 2026)....9

*In re Facebook Internet Tracking Litig.*,
140 F.Supp.3d 922 (N.D. Cal. 2015)....9

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....1

*Garcia v. Blackhawk Network, Inc.*,
2026 WL 925028 (C.D. Cal. Apr. 1, 2026)....10

*Healy v. Milliman, Inc.*,
164 F.4th 701 (9th Cir. 2026)....2, 15

*Juliana v. U.S.*,
947 F.3d 1159 (9th Cir. 2020)....13, 14

*Khamooshi v. Politico LLC*,
2025 WL 2822879 (N.D. Cal. Oct. 2, 2025)....8, 9, 11

*Kisil v. Illuminate Educ., Inc.*,
2025 WL 2589000 (9th Cir. Sept. 8, 2025)....8, 9, 12

*Krzyzek v. OpenX Techs., Inc.*,
817 F. Supp. 3d 857 (N.D. Cal. 2026)....8

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014)....7

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)....13

*Maghoney v. DotDash Meredith, Inc.*,
2026 WL 497402 (S.D. Cal. Feb. 23, 2026) ........ 9

*Murthy v. Missouri*,
603 U.S. 43 (2024) ........ 7, 12, 14

*Nat'l Park Serv. v. Nat'l Tr. for Hist. Pres. in the U.S.*,
2026 WL 2564318 (U.S. Aug. 31, 2026) ........ 1

*Phillips v. U.S. CBP*,
74 F.4th 986 (9th Cir. 2023) ........ 10

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ........ 8, 9

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........ 7, 11

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ........ 14

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 7, 12

*Turaani v. Wray*,
988 F.3d 313 (6th Cir. 2021) ........ 14

*Wooten v. BioLife Plasma Servs. L.P.*,
807 F. Supp. 3d 1139 (E.D. Cal. 2025) ........ 9

**Statutes**

Cal. Educ. Code § 49073.1 ........ 3

RCW 28A.650.060 ........ 5

**Rules**

Fed. R. Civ. P. 12(h)(3) ........ 2

## INTRODUCTION

The quintessential question of standing is: "What's it to you?" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). A plaintiff must have an answer to this question because "distress at or disagreement with the activities of others is not a basis under Article III for a plaintiff to bring a federal lawsuit." *Nat'l Park Serv. v. Nat'l Tr. for Hist. Pres. in the U.S.*, 2026 WL 2564318, at *2 (U.S. Aug. 31, 2026). Here, Plaintiffs cannot answer this fundamental question because their case is about "distress at or disagreement with" how PowerSchool functions—not about how they were harmed, because they weren't.

PowerSchool is a software provider that contracts with schools for schools' data processing needs. PowerSchool does not interact directly with students or their parents. Moreover, PowerSchool does nothing with student data beyond what schools request or beyond educational purposes. There is no targeted advertising, using student data to test or train products, or sharing student data other than at a school's request. Schools choose which PowerSchool products to implement, what data to collect and put into those products, and how to configure those products. As such, PowerSchool requires schools to obtain any necessary consent for the data processing the schools choose to do. Federal and state law explicitly permit this model.

Plaintiffs take issue with all of this because they want PowerSchool to seek consent from each individual student and parent before a school uses their products, including before a school uses a PowerSchool product to share data with a third party at that school's direction. Plaintiffs also object to certain analytics products as being "untested" for things like racial bias.

A threshold problem with these objections is that they are disconnected from Plaintiffs' own experiences. Even after full discovery, there are only a few data points in the record about Plaintiff S.G., and Plaintiffs do not allege that those data points were taken without consent obtained by her school, shared with anyone, or put into any analytics products. For Plaintiffs L.M.C. and M.M.C., the only data in the record about them is their names. And their school only licenses one of the nine products at issue in this case. Thus, for L.M.C. and M.M.C. too, there is no data they could point to that was shared or put into an "untested" analytics product. Their school does not even license any analytics products.

Moreover, Plaintiffs' experts, two of whom opine on harm, disclaimed having opinions on any harms experienced by Plaintiffs. Cathy O'Neil, Plaintiffs' algorithm expert, even asked Plaintiffs' counsel if they "knew of actual harm that had been perpetrated by some of these algorithms or actual stories of harm or actual use cases…. And they didn't have them for me," so "I don't have a claim that there has been actual harm." Ex. 1, O'Neil Dep. 62:7-63:1.

What all of this means is that Plaintiffs cannot meet any of the three elements of Article III standing: injury, traceability, and redressability. Plaintiffs have no concrete, particularized, or imminent injury. Lack of consent alone is insufficient for a concrete harm. Regardless, Plaintiffs point to no data PowerSchool (or their school, using a PowerSchool product) actually used in any way, much less in a way that caused them an identifiable harm. Plaintiffs also fail the traceability requirement, as any purported injury would be caused by their *schools'* use of PowerSchool products, not actions by PowerSchool. Similarly, Plaintiffs' claims are not redressable because the monetary and injunctive relief they seek would do nothing to change the actions of their schools.

Further, these deficiencies also plague the claims of absent class members. There is *no data at all* about any absent class member in the record. And thus, there is no harm anyone in the putative classes can identify based on any alleged use of their data.

Where, as here, Plaintiffs lack standing, the Court must dismiss their claims. Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). And where, as here, class members seeking damages lack standing, the Court must dismiss those class claims. *See Healy v. Milliman, Inc.*, 164 F.4th 701, 710 (9th Cir. 2026) (explaining that, at summary judgment, both "named and unnamed members of a certified class for money damages" must "demonstrate that there is a genuine dispute of material fact over standing.").

## BACKGROUND

### I. Plaintiffs allege vague injuries based on schools' ordinary use of PowerSchool products.

PowerSchool's customers are schools, and PowerSchool provides software tools to these schools with a variety of features. *See generally,* Ex. 2, White Expert Report. Some of these tools are exclusively for administrative purposes. Others can be used by parents or students, but only schools decide whether any student or parent gets an account.

Further, schools alone decide what PowerSchool products to use and how to use them. Ex. 3, Shinton Dep. 62:12-63:17; Ex. 4, Cirillo Dep. 42:20-45:8; Ex. 5, Dec. 18, 2025, Jaeger Dep. 22:8-22. PowerSchool does not do anything with student data unless directed to by a school. This includes any data sharing. Ex. 2, White Rep. ¶¶ 45-68. And PowerSchool does not sell customer data or use data to develop its own insights or improve products. *Id.*

After discovery revealed this state of affairs, disproving Plaintiffs' original allegations about PowerSchool collecting and using data outside of schools' direction and control, Plaintiffs dropped their CIPA and CDAFA claims (for wiretapping and hacking), their request for a Parent class, and their allegations that PowerSchool uses data for any non-educational purposes, such as targeted advertisements or the building of detailed profiles. *See* Dkt. 196-3. Thus, Plaintiffs are now pursuing only intrusion upon seclusion under California common law, invasion of privacy under the California Constitution, and unjust enrichment. *Id.* They seek to certify various 35-state classes and California subclasses based on *schools' use* of PowerSchool products. *Id.* at 1.

Plaintiffs also now argue that what happened to individual students, including themselves, does not matter, as their case is focused "on the defendants' conduct … not the injury caused to the plaintiff." *Id.* at 14. They even claim that the lack of evidence about their data in particular, or any class member's data, is "immaterial." *Id.* at 21. According to Plaintiffs, what matters is not what happened to any individual student, but that, in general, PowerSchool relies on schools obtaining consent for their use of PowerSchool products. *Id.*

## II. Fact discovery reveals that Plaintiffs suffered no harm.

### A. L.M.C. and M.M.C. never used PowerSchool products and were not harmed by PowerSchool products.

L.M.C. and M.M.C. are students in the West Contra Costa Unified School District in California ("West Contra"). *See* Dkt. 1 ¶¶ 15-16. Of the nine PowerSchool products Plaintiffs now challenge, *see* Dkt. 116, West Contra currently subscribes only to one: the Student Information Systems ("SIS"). *See* Ex. 6. West Contra hired PowerSchool under California Education Code § 49073.1, which permits schools to "contract with a third party" for "services, including cloud-based services, for the digital storage, management, and retrieval of [student] records." West Contra's Board, whose members the

community elects, voted to approve PowerSchool's services at public board meetings. Exs. 7-9.

Plaintiffs took no discovery to ascertain what data PowerSchool hosts concerning L.M.C. and M.M.C., Ex. 10, and the only confirmed data in the record is their names. Exs. 11-12. From 2021 to 2022, West Contra tested one other relevant product—Analytics & Insights—but the district did not renew its subscription. Exs. 6, 9. There is no data from that subscription in the record.

Regarding their purported injuries, PowerSchool asked for details in interrogatories but received only a list of generalized harms, such as feeling surveilled or losing the value of their data, which was a copy-paste response all Plaintiffs provided. Exs. 13-14 at 3-4. L.M.C. and M.M.C.'s father promptly walked each of these assertions back at his deposition, confirming that he was not seeking "money based on the value of [their] data" and did not feel surveilled. Ex. 15, Concepción Dep. 207:13-216:19. He conveyed a single concern—that PowerSchool was using his kids' information "to create products or to improve" products. *Id.* at 211:21-212:22. But he agreed that the mere fact that PowerSchool "store[d] some of [their] data" "on behalf of the[ir] school district" caused them no harm. *Id.* at 212:24-213:7. Further, L.M.C. and M.M.C.'s parent confirmed that the children do not use the products they said they did in the Complaint and their verified interrogatory responses. *See* Dkt. 128 at 3-5 (Rule 11 motion). L.M.C and M.M.C testified to the same. Ex. 16, L.M.C. Dep. 18:10-17, 49:16-22; Ex. 17, M.M.C. Dep. 22:2-9, 34:10-35:25. When asked if they could "think of any way that" they were harmed by PowerSchool products, they both said: "No." Ex. 16, L.M.C. Dep. 32:6-9, 35:17-36:1, 40:11-17; Ex. 17, M.M.C. Dep. 34:2-9. After PowerSchool pointed out that the allegations in the complaint about L.M.C. and M.M.C. directly using any products were false, Plaintiffs amended their complaint to remove those allegations. *See* Dkt. 128 at 1-2; Dkt. 143 at 1.

### B. PowerSchool does not host data for S.G.'s district, and S.G. was not harmed by PowerSchool's products.

S.G. is a teenage student in the Seattle Public School District in Washington ("Seattle"). Dkt. 131 ¶ 13. Seattle subscribes to several PowerSchool products but hosts its educational records on *its own servers* and designs analytical models *internally*. Ex. 5, Dec. 18, 2025, Jaeger Dep. 18:4-24, 30:10-33:14, 38:2-42:19, 105:21-107:16, 110:11-25, 129:24-130:18. This means that data stored in Seattle's "data warehouse" product (Plaintiffs' first class definition) isn't hosted by or accessible to

PowerSchool, and thus S.G. does not fit into that class definition, as it is limited to situations where "PowerSchool hosts the collected data." Dkt. 196-3, Notice at 2. PowerSchool is also not involved with the design or effect of Seattle's predictive analytics (Plaintiffs' second class definition). *Id.*

From the limited data hosting it provides, PowerSchool located few records about S.G.: (1) her name, gender, race, age, and school name; (2) login statistics[1] for one product (Schoology); and (3) spreadsheets of code for analytics products created and used *solely* by Seattle's internal personnel/contractors—not S.G. (or any student, for that matter). Exs. 19-28.

Seattle partnered with PowerSchool under Washington law RCW 28A.650.060, which empowers districts to negotiate contracts with EdTech providers. The Seattle Board publicly voted to contract with PowerSchool. Ex. 29, Cherkin Dep. 168:13-15, 169:14-173:3; Ex. 30. Before the vote, the Board received comprehensive reports from internal staff and considered community feedback and the impact on underprivileged groups. *Id.* at 1-5. Importantly, Plaintiff Cherkin personally advocated against Seattle's renewal of its agreement with PowerSchool in 2025, conveying the allegations in this lawsuit. *Seattle's democratically elected school board still voted to contract with PowerSchool.* Ex. 29, Cherkin Dep. 114:3-119:15, 189:24-192:20.

S.G. provided interrogatory responses regarding her supposed injuries that were nearly identical to those L.M.C. and M.M.C. provided. Ex. 31, at 3-4. S.G.'s mother also admitted at her deposition that she did not know if her daughter [redacted] or [redacted] in the interrogatory response. Ex. 29, Cherkin Dep. 280:17-23. Indeed, her mother could not [redacted] any way that S.G. was harmed, testifying that she simply has [redacted] *Id.* at 279:25-280:5, 283:2-284:9. Those potential harms are that: [redacted] may [redacted] might learn [redacted] and there might be [redacted] risks or dangers. *Id.* at 280:6-16. There is no evidence in the record that any of these things have occurred or will occur for S.G. (or anyone). *Id.* at 280:17-23.

At her deposition, S.G. also could not specify any harm she has experienced. She claimed that she would be harmed only if evidence showed that PowerSchool "[took] a lot of [her] information

---

[1] Seattle requested vendors to track "user login statistics." Ex. 18, RFQ p. 8 of 15.

without [her] consent and" then "sold it to other companies and people." Ex. 32, S.G. Dep. 96:3-24. She did not contend this had actually occurred, and in fact, the evidence shows PowerSchool does not sell data. *Id.* S.G. agreed that she would not be harmed by her "school [holding her] data," or PowerSchool storing her data "on behalf of [her] school." *Id.* at 113:5-115:5.

**III. Plaintiffs' experts fail to establish Plaintiffs' injuries.**

After voluminous fact discovery for over 16 months, including hundreds of thousands of documents produced, 17 depositions, and 16 third-party subpoenas, the parties exchanged expert reports. Adendorff Decl. ¶ 36. Plaintiffs disclosed three experts—Cathy O'Neil, Dr. Suzanne Barber, and Christopher Schulte. Dkt. 196-3, Not. of Mot. at 3-4.

Notably, none of Plaintiffs' experts mention any injury to L.M.C., M.M.C., or S.G. Nor did any of the experts mention any injury to an absent class member (*i.e.*, any student who would fit into any of Plaintiffs' class definitions). *First*, Plaintiffs' algorithm expert, O'Neil, argues that algorithms "could result" in harm if they are misused *by school administrators or teachers* to perpetuate implicit bias or are otherwise inaccurate. Ex. 33, O'Neil Expert Report 27-28. At her deposition, O'Neil did not know who the Plaintiffs were, was unaware of any harm to them or anyone else, had not analyzed any PowerSchool algorithms, and admitted that algorithms could only cause injury if individual schools or teachers misused them. Ex. 1, O'Neil Dep. 38:2-23, 62:7-65:9, 83:6-12, 89:4-90:11.

*Second*, Plaintiffs' data expert, Dr. Barber, asserts that hosting data "can cause" reputational harm, emotional distress, identity theft, and future "bias and discrimination" *if* the data is exposed to a bad actor. Ex. 34, Barber Expert Report 30-31. At her deposition, Dr. Barber disclaimed investigating any actual use of a PowerSchool product—by Plaintiffs or anyone else. Ex. 35, Barber Dep. 96:14-100:20, 134:2-135:21, 164:11-19. She did not know who the Plaintiffs are or what data their schools collected using PowerSchool products. *Id.* at 84:18-22, 114:4-7. And she did not see any evidence that anyone was harmed. *Id.* at 199:10-206:17, 212:12-217:12, 291:6-292:6.

*Third*, Plaintiffs' damages expert, Schulte, provides a damages model based on a contract PowerSchool never implemented that, in any event, had nothing to do with Plaintiffs or their schools. Ex. 36, Schulte Expert Report ¶¶ 9-115. Further, the contract concerned a product that is not within the proposed damages classes in this case. He also provides an unjust enrichment model based on

revenue PowerSchool earned for certain predictions products. *Id.* ¶ 91. At his deposition, Schulte admitted that these models do not reflect injury to students and include students whose data was never in a PowerSchool product or used for any predictive algorithm. Ex. 37, Schulte Dep. 96:2-12, 171:25-173:14, 177:1-178:11, 247:22-249:9. Schulte also made clear that he is not "offering an opinion regarding any specific harm for the specific-named plaintiffs." *Id.* at 66:18-25.

## ARGUMENT

The Court should dismiss Plaintiffs' claims under Rule 12(b)(1) for lack of subject matter jurisdiction because Plaintiffs lack standing. To have Article III standing, a plaintiff must "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Now that discovery has closed, Plaintiffs cannot "mere[ly] alleg[e]" standing. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Rather, each individual Plaintiff must prove that they have standing "under the same evidentiary standard that governs in the summary judgment context," *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (cleaned up). Here, there is no evidence to support any of the elements of standing.

### I. Plaintiffs have no concrete, particularized, or actual or imminent injury.

On the first element of standing—injury in fact—each "plaintiff must show that he or she suffered an invasion of a legally protected interest that is [1] concrete and [2] particularized and [3] actual or imminent." *Spokeo*, 578 U.S. at 339 (internal quotations omitted). Plaintiffs cannot meet any of the three requirements.

#### A. Plaintiffs have no concrete harm.

There is no concrete injury here because Plaintiffs have no evidence of tangible or intangible harm. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). A concrete injury is one that is "real" or "actually exist[s]." *Spokeo*, 578 U.S. at 340. A concrete injury can be tangible—like monetary loss or physical injury, or it can be intangible, such as reputational harm. *TransUnion*, 594 U.S. at 425. For an invasion of privacy claim, the harm must be "analogous to the common-law privacy torts," such that "it involves disclosure of a kind that would be '*highly offensive*' to a reasonable person." *Khamooshi v. Politico LLC*, 2025 WL 2822879, at *3 (N.D. Cal. Oct. 2, 2025).

Just last year, the Ninth Circuit in *Popa v. Microsoft Corporation* rejected a "free-roaming privacy right," holding that a plaintiff cannot establish standing for a data privacy suit merely by alleging a violation of a statutory privacy right. 153 F.4th 784, 792 (9th Cir. 2025). Later in the year, the Ninth Circuit, in *Kisil v. Illuminate Education, Inc.*, reiterated this message, holding that a plaintiff in a data breach case could not establish standing merely by bringing "common law actions that are supposedly 'injuries in themselves.'" 2025 WL 2589000, at *1 (9th Cir. Sept. 8, 2025).

Under these standards, *Popa* dismissed for lack of standing claims that Microsoft collected data on a user's interaction with a website to create a video replay of her behavior, 153 F.4th at 791-93. And *Kisil* dismissed for lack of standing claims that Illuminate violated students' privacy by allowing a data breach involving sensitive educational records. 2025 WL 2589000, at *1-2. Missing in both cases were allegations that the defendant or hackers misused "embarrassing [or] invasive" data or gave "publicity to a matter that concerns the [plaintiff's] private life." *Popa*, 153 F.4th at 791-92. In other words, *even in a malicious data breach case*, the plaintiffs needed to show not just the fact of a nonconsensual collection, use, or disclosure of data, but a use or "disclosure of a kind that would be 'highly offensive' to a reasonable person," like the sale of data for targeted advertising or publication of embarrassing private facts. *Khamooshi*, 2025 WL 2822879, at *3.

Since *Popa*, courts have drawn a line that elucidates what type of activity counts as analogous enough to a common-law tort to constitute a concrete injury. On one side of the line is the creating of a "cradle-to-grave profile" over a long period of time without a user's consent, *Krzyzek v. OpenX Techs., Inc.*, 817 F. Supp. 3d 857, 863 (N.D. Cal. 2026), or telling customers they can opt out of cookies and trackers then tracking their online activity anyway. *See, e.g.*, *Barrales v. Reckitt Benckiser LLC*, 2026 WL 2212867, at *4 (N.D. Cal. July 31, 2026) (collecting cases); *Correia v. Lulu & Georgia, Inc.*, 2026 WL 2343093 (S.D. Cal., Aug. 12, 2026) (same). In those circumstances, courts have held that plaintiffs have standing. Some courts have also held that where the specific information at issue is highly sensitive, such as "a specific kind of appointment related to a specific type of medical condition," the unauthorized sharing of that information for targeted advertisements is sufficient for standing. *See Campbell v. Select Med. Corp.*, 2026 WL 2056651, at *3 (C.D. Cal. July 14, 2026).

On the other side of the line is conduct that is routine commercial behavior, such as the

collection of metadata, or allegations that are too vague and fail to specify the data at issue such that the disclosure or use of that data could not be considered "highly offensive." In these circumstances, courts dismiss data-privacy claims for lack of standing. *See, e.g.*, *Diaz v. Paramount Skydance Corp.*, 2026 WL 1090958, at *5 (C.D. Cal. Apr. 20, 2026) (dismissing claims because "Plaintiffs' allegations do not concern specific, sensitive information, but rather, vaguely 'personally identifiable information,'" and "Plaintiffs have not sufficiently alleged disclosing such information was 'highly offensive.'").

Here, Plaintiffs' theories of injury clearly fall on the lack-of-standing side of the line. Plaintiffs claim they "suffered injur[ies]" because (1) PowerSchool relied on schools to obtain consent for schools' use of PowerSchool products; (2) PowerSchool's analytics products are "untested;" and (3) Plaintiffs and absent class members were not compensated for their data. *See* Dkt. 196-3 at 13. These harm theories fail for myriad reasons.

To start, the first two categories are not harms to Plaintiffs or anyone else. They are focused solely on PowerSchool's alleged conduct and say nothing about whether and how that conduct affected Plaintiffs. The third theory is unsupported because there is essentially no data that PowerSchool has about Plaintiffs in the record. It is therefore unclear what data Plaintiffs want to be compensated for. Regardless, Mr. Concepción, L.M.C. and M.M.C.'s father, testified that he did not want to be compensated for his children's data, and there is no legal explanation as to why Plaintiffs should be compensated for data schools collect about students simply because such information is now collected electronically. Concepción Dep. 208:7-14, 207:24-209:6; *In re Facebook Internet Tracking Litig.*, 140 F.Supp.3d 922, 930 (N.D. Cal. 2015) (noting that "generalized assertions of economic harm based solely on the alleged value of personal information" are insufficient for standing).

*Second*, to the extent Plaintiffs argue that the purported privacy violation here—their schools using PowerSchool products without PowerSchool obtaining individual consent—is an injury in itself, the Ninth Circuit already rejected that exact argument in *Popa* and *Kisil*. District courts, following these decisions, have repeatedly done the same. *Wooten v. BioLife Plasma Servs. L.P.*, 807 F. Supp. 3d 1139, 1144 (E.D. Cal. 2025); *Khamooshi,* 2025 WL 2822879, at *4; *Maghoney v. DotDash Meredith, Inc.,* 2026 WL 497402, at *5 (S.D. Cal. Feb. 23, 2026); *Garcia v. Blackhawk Network, Inc.*,

2026 WL 925028, at *5-6 (C.D. Cal. Apr. 1, 2026).

As the above cases demonstrate, there has to be something more than a purported lack of consent. The mere collection and retention of data, *even PII unlawfully obtained*, "does not give rise to a concrete injury necessary for standing." *Phillips v. U.S. CBP*, 74 F.4th 986, 988-89, 995-96 (9th Cir. 2023).

Here, Plaintiffs fail to demonstrate something more than lack of consent—even after the close of discovery. Their theory of injury is based on *schools*' ordinary use of PowerSchool products to store and analyze their own students' data, which is "far from the 'highly offensive' interferences or disclosures that were actionable at common law." *Id.* Plaintiffs attempt to divert from these facts by stating that PowerSchool disclosed "data to third parties" and used student data to power certain untested "predictive products." Dkt. 196-3 at 21. But the undisputed record shows that PowerSchool facilitates data sharing with other school vendors only at a school's request, and schools alone decide what data to put into any analytics products and how to use those products. This is hardly "highly offensive" conduct. Even so, Plaintiffs do not say that their own data was shared or put into any predictive product; they certainly do not have evidence their data was shared with *anyone* or that it was ever used to power a predictive product. L.M.C. and M.M.C.'s school did not even use predictive products when the students were there.

*Third,* Plaintiffs also attempt to fill this evidentiary gap through their experts. But the supposed harms those experts identify are also not concrete because there is no evidence that Plaintiffs (or absent class members) experienced any of them. For example, Plaintiffs' algorithm expert, O'Neil, identifies potential harms that are irrelevant to this case and Plaintiffs' own experiences. O'Neil offers her view that using a predictive model concerning on-time graduation may cause harm to a student who is flagged by such a model, and the output of the model could potentially be inaccurate or racially biased. Ex. 33, O'Neil Rep. 27. She surmises that a school analyzing the outputs of the model could divert resources from an at-risk student and "concentrate their efforts on the kids" more likely to graduate. *Id.* But O'Neil has never seen any PowerSchool product or predictive algorithm in a PowerSchool product. Ex. 1, O'Neil Dep. 38:7-13, 59:17-60:13. Nor has she seen any documentation about how a school used such a predictive algorithm. *Id.* 61:21-25, 130:14-24, 133:10-18. Most importantly,

neither she nor the Plaintiffs claim these hypothetical harms affected them.

The harms Dr. Barber cites fare no better, as they are sheer speculation about things like reputational harm, emotional distress, identity theft, and future "bias and discrimination." Ex. 34, Barber Rep. 30-31. Plaintiffs also do not claim they experienced any of these harms, and Dr. Barber testified that she did not see any evidence that anyone was harmed because of PowerSchool's data processing activities. Ex. 35, Barber Dep. at 199:10-206:17, 212:12-217:12, 291:6-292:6.

Finally, Plaintiffs' damages expert, Schulte, provides actual damages and unjust enrichment calculations that are not based on any harm to Plaintiffs or anyone else. *See supra* pp. 5-6. They couldn't be. There is no evidence concerning L.M.C.'s and M.M.C.'s data, including for any of the predictions products at issue in the unjust enrichment calculation. *Supra* pp. 3-4. And there are only a few data fields concerning S.G. in the record and nothing about any analytics, which is unsurprising given that her school hosts almost all of its own data and runs its own analytics. *Supra* pp. 3-5. Thus, Schulte's numbers do nothing to clarify the injury Plaintiffs supposedly suffered.

In sum, even after discovery, including numerous expert reports about purported harm, Plaintiffs can point to no concrete injury.

**B. Plaintiffs have no particularized injury.**

For all the same reasons, Plaintiffs also cannot show their supposed injury is particularized. A particularized injury is one that "affect[s]" a plaintiff "in a personal and individual way." *Spokeo*, 578 U.S. at 339. But as noted above, there is little to no data about the Plaintiffs in the record, and thus they can point to no instance of actual harm from the use of that data.

S.G.'s school district stores almost all of its own data and runs its own analytics without PowerSchool's involvement. *Supra* p. 4. As noted above, there are only a handful of data points about S.G. in the record, and nowhere do Plaintiffs explain how the existence of that data harmed S.G. There is also no evidence about what data PowerSchool stores for L.M.C. and M.M.C. other than their names. Neither is there evidence about any "predictive analytics" concerning any Plaintiff. As a result, the purported injury in this case of alleged unauthorized data use did not affect Plaintiffs in any "personal and individual way." *Spokeo*, 578 U.S. at 339; *see also Khamooshi* 2025 WL 2822879, at *3 (dismissing for lack of standing because "[a]bsent specific allegations about the type of" data collected

or how it was used, there was no "privacy injury.").

**C. Plaintiffs have no actual or imminent injury.**

Finally, Plaintiffs have no actual or imminent injury, which they must prove for each type of relief they seek. *Murthy,* 603 U.S. at 61. For damages, Plaintiffs must prove that their asserted harm materialized in some way; the "mere risk" of future harm is not enough. *TransUnion*, 594 U.S. at 436. For injunctive relief, Plaintiffs "must establish a *substantial* risk of future injury." *Murthy,* 603 U.S. at 69 (emphasis added). Claims "of possible future injury" are insufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Starting with Plaintiffs' request for retrospective relief (damages), Plaintiffs have no harm at all, much less one that has materialized. In discovery, Plaintiffs and their experts affirmatively disclaimed any evidence or opinion on past injury. *See supra* pp. 3-6. As O'Neil conceded, she does not know whether any of the risks she discusses have materialized in any way for any Plaintiff. Ex. 1, O'Neil Dep. 95:14-18.

For prospective relief, Plaintiffs' experts also disclaimed opinions on future harm. They point to the mere risk of future harm, but do not quantify that risk. All O'Neil could say on the topic was that the risks were "larger than zero." *Id.* at 130:14-22. And the Ninth Circuit has already rejected the future harm Dr. Barber identifies related to potential fraudsters and hackers as unable to "support standing." *See Kisil*, 2025 WL 2589000, at *2.

The only thing left, then, is Plaintiff Cherkin's concern about [redacted] to S.G. Ex. 29, Cherkin Dep. 279:25-280:5. Those potential harms are that [redacted] might look [redacted] And that [redacted] might learn [redacted] *Id.* at 280:6-16.

But these concerns are not actual or imminent; they are vague and speculative. In Cherkin's own words, these are merely [redacted] that [redacted] affect an unspecified [redacted] *Id.* Regardless, there is no medical or behavior data regarding S.G. in the record. There is only minimal basic data, none of which creates a substantial risk of any harm. Accordingly, Plaintiffs lack the necessary actual or imminent injury to pursue any type of relief.

For any of these reasons—lack of concrete (real) injury, lack of particular injury, or lack of

actual or imminent injury—the Court should dismiss Plaintiffs' claims for lack of standing.

**II. Plaintiffs' purported injuries stem from schools' discretionary decisions and thus are not traceable to PowerSchool.**

Plaintiffs also cannot meet the second element of standing—traceability. To satisfy traceability, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The Ninth Circuit refers to traceability as "the Article III causation requirement." *Juliana v. U.S.*, 947 F.3d 1159, 1169 (9th Cir. 2020).

Even if Plaintiffs had a cognizable injury, that injury is not traceable to PowerSchool because independent decisions made by non-party schools or school districts caused the injury. The Court need look no further than Plaintiffs' class definitions, all of which start with the following: "All persons in [35 different states], who from October 29, 2020 to the present, attended a K-12 *school or school district that used* any of the following PowerSchool products." Dkt. 196-3 at 1. These definitions depend not on PowerSchool's actions or students having an interaction with a PowerSchool product; they depend solely on schools' decisions about which products to use and how to use them.

More importantly, Plaintiffs' purported injuries from data processing are the result of schools' decisions. The record is undisputed on this point: Schools decide what data to collect, what PowerSchool products to use, and how to use them. *See* Dkt. 139 at 4-5, 6-8 (PowerSchool's opposition to motion for class certification). That includes whether and with whom to share any student data and whether and how analytics are run. Ex. 38, Sharp Dep. 185:11-13, Ex. 39, Ahmad Dep. 96:17-97:14, Ex. 40, Maharana Dep. 42:16-44:7, 291:14-16, Ex. 41, Flagg (30(b)(6)) Dep. 187:8-188:5. PowerSchool "does not determine which specific metrics, thresholds, and risk factors" are used in its analytical tools, "nor does it dictate how risk scores or predictive outputs must be interpreted or acted upon—[t]hese decisions are made solely by the customer."[2]

Plaintiffs' experts agree. O'Neil explained that "the only possible way" an algorithm or analytic "could be harmful to a student is if a teacher or an administrator acts on it in a certain way."

[2] Ex. 2, White Expert Rep. ¶¶ 25–26, Dkt. 138-26, at 10–11; *see also* Ex. 41, Flagg Dep. 187:8–189:5.

Ex. 1, O'Neil Dep. 89:4-90:4. She also explained that "you can't talk about what the harm looks like unless you know exactly how its being used … How the school is using it." *Id.* at 93:9-94:20, 132:9-133:8. Dr. Barber conceded that even though her report makes the claim that PowerSchool's SIS product collects certain data elements, she's not sure whether Plaintiffs' school districts (or any school) populates this information into the product. Ex. 35, Barber Dep. 112:11-113:17. While products may be "capable" of collecting such data, she did not look at any school's specific use of a PowerSchool product to know what data schools actually input into products. *Id.* at 142:5-144:21, 151:20-154:21. Also like O'Neil, Dr. Barber does not know what schools Plaintiffs attend, what PowerSchool products their schools use, or what data elements are stored in any PowerSchool products. *Id.* at 123:9-125:12.

At bottom, what Plaintiffs really blame PowerSchool for is providing products that *schools can then use* to store and analyze their students' data. Even after the close of discovery, Plaintiffs have no evidence of PowerSchool making independent decisions regarding their data. When a third party's action is a "necessary condition of the harm's occurrence," the Supreme Court has held traceability is lacking. *Texas v. United States*, 809 F.3d 134, 160 (5th Cir. 2015). Put differently, "unless the defendant's actions had a 'determinative or coercive effect' upon the third party, the claimant's quarrel is with the third party, not the defendant." *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021).

The unequivocal evidence in this case shows that everything PowerSchool offers is mediated and then implemented in a customized way by its school customers. Plaintiffs therefore lack standing for the additional reason that their claimed injuries are not traceable to PowerSchool.

**III. Plaintiffs' claims are not redressable because schools will continue to collect, share, and analyze student records.**

Plaintiffs lack standing for yet another reason—their alleged injuries are not redressable. For redressability, the Court "consider[s] the relationship between 'the judicial relief requested' and the 'injury' suffered." *Murthy*, 603 U.S. at 73. Where a third party causes the alleged injury, any relief the court provides will likely not redress that injury. *Id.* The Ninth Circuit also requires plaintiffs to show that the relief they seek is "substantially likely to redress their injuries." *Juliana*, 947 F.3d at 1170.

As an initial matter, and as explained above, there is no past harm to redress. Regardless, the Court cannot redress Plaintiffs' "injuries" for two additional reasons. *First*, any injunctive relief would

not apply to the schools and thus is not "substantially likely to redress" Plaintiffs' injuries. For example, Plaintiffs ask the Court to require that PowerSchool "automatically delete or turn over to class members their data once it is no longer needed *by the entity that caused it to be generated*." Dkt. 196-3 at 25. What this (awkwardly phrased) request concedes is that third parties (*i.e.*, schools) are collecting and using the data. How would Plaintiffs' harm be remedied by PowerSchool deleting data after the alleged injury of data collection and use has already occurred because of the schools' actions? It wouldn't. Nor would requiring "a disclosure of the categories of predictions and inferences that PowerSchool made," *see id.*, because PowerSchool does not make predictions—only schools do. The same is true for Plaintiffs' request that the Court require PowerSchool to ensure "that data is secured and shared with people and entities only on a need-to-know basis." *Id.* at 25. Only schools decide whether and with whom to share data, so this request would change nothing about how PowerSchool operates. In short, Plaintiffs take issue with how their schools use PowerSchool products. But schools are not a party to this case, and thus the Court cannot redress these purported injuries.

**IV. The putative damages classes lack standing.**

It is not just Plaintiffs who lack standing here—absent class members also cannot satisfy the three elements of Article III standing. At summary judgment, both "named and unnamed members of a certified class for money damages" must "demonstrate that there is a genuine dispute of material fact over standing." *Healy v. Milliman, Inc.*, 164 F.4th 701, 710 (9th Cir. 2026).

Here, Plaintiffs seek to certify a 35-state damages class, as well as a California damages class. *See* Dkt. 196-3. But there is no evidence about any data regarding any absent class member, and thus no evidence from which the Court could conclude that any class member was harmed by the processing of their data. Plaintiffs argue that they "suffered the 'same or similar injury'" as class members. *Id.* at 13. Because, as explained above, Plaintiffs lack any injury, class members do too.

**CONCLUSION**

Plaintiffs cannot proceed in federal court without an injury that is traceable to Defendant and redressable by the courts and parties in the case. The Court should therefore dismiss Plaintiffs' claims for lack of standing.

DATED: October 12, 2026

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Olivia Adendorff*

Olivia Adendorff, P.C.

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*