Robyn E. Bladow
Kirkland & Ellis LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
Kirkland & Ellis LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for the Defendant PowerSchool Holdings, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

EMILY CHERKIN, et al,

Plaintiffs,

v.

POWERSCHOOL HOLDINGS, INC.,

Defendant.

CASE NO. 3:24-CV-02706-JD

**DEFENDANT POWERSCHOOL HOLDINGS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

Complaint Filed Date: May 6, 2024

Judge: The Hon. James Donato
Hearing Date: November 19, 2026
Time: 11:00 a.m.
Courtroom: Courtroom 11, 19th Floor

**NOTICE OF MOTION**

PLEASE TAKE NOTICE THAT on November 19, 2026, at 11:00 am PT, or as soon thereafter as this matter may be heard, in the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, in Courtroom 11, 19th Floor, before the Honorable James Donato, Defendant PowerSchool Holdings, Inc. ("PowerSchool") will and hereby does move the Court for summary judgment on Plaintiffs' claims.

# TABLE OF CONTENTS


I. INTRODUCTION ....................1

II. STATEMENT OF FACTS ....................2

A. PowerSchool contracts with schools for education software and services. ....................2

B. Schools control their data and use of PowerSchool products, including whether and what data to share. ....................3

C. Federal, state, and local laws permit schools to contract with PowerSchool without express parental consent. ....................5

D. There is minimal data about the named Plaintiffs and no data about putative class members in the record. ....................7

E. Relevant procedural history ....................9

III. ARGUMENT ....................10

A. Plaintiffs' consent theory fails as a matter of law. ....................10

1. There is little to no student data in the record. ....................11

2. Federal and state law authorize PowerSchool's data processing without consent. ....................12

B. PowerSchool is entitled to summary judgment on Plaintiffs' invasion of privacy claims because ordinary data processing cannot support a reasonable expectation of privacy or highly offensive conduct. ....................15

1. No reasonable expectation of privacy. ....................17

2. No highly offensive conduct. ....................17

C. PowerSchool is entitled to summary judgment on unjust enrichment because no benefit was conferred by Plaintiffs, and it is not unjust for PowerSchool to retain software licensing fees from schools. ....................19

D. Plaintiffs are not entitled to punitive damages as a matter of law. ....................22

CONCLUSION ....................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Video Duplicating, Inc. v. City Nat'l Bank*,
2020 WL 6882735 (C.D. Cal. Nov. 20, 2020) ........ 19, 20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 10

*Basich v. Allstate Ins. Co.*,
105 Cal. Rptr. 2d 153 (2001) ........ 21

*Campbell v. Select Med. Corp.*,
2026 WL 2056651 (C.D. Cal. July 14, 2026) ........ 16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 10

*Coto Settlement v. Eisenberg*,
593 F.3d 1031 (9th Cir. 2010) ........ 20

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ........ 19

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........ 16

*Folgelstrom v. Lamps Plus, Inc.*,
195 Cal. App. 4th 986 (2011) ........ 17

*Gonzales v. Uber Techs., Inc.*,
305 F. Supp. 3d 1078 (N.D. Cal. 2018) ........ 1, 11, 12

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ........ 17

*Heeger v. Facebook, Inc.*,
No. 18-cv-06399-JD, 2019 WL 7282477 (N.D. Cal. Dec. 27, 2019) ........ 15

*Heldt v. Guardian Life Ins. Co. of Am.*,
No. 16-cv-885-BAS-NLS, 2019 WL 651503 (S.D. Cal. Feb. 15, 2019) ........ 15

*Hernandez v. Hillsides, Inc.*,
211 P.3d 1063 (Cal. 2009) ........ 2, 15, 16, 17

*Hill v. Nat'l Collegiate Athletic Assn.*,
7 Cal. 4th 1 (1994) ........ 15, 16

*Lachtman v. Regents of Univ. of Cal.*,
70 Cal.Rptr. 3d 147 (Cal. Ct. App. 2007) ........................................16

*Loomis v. Cornish*,
836 F.3d 991 (9th Cir. 2016) ........................................8

*Lowry v. City of San Diego*,
858 F.3d 1248 (9th Cir. 2017) ........................................10

*McLellan v. Fitbit, Inc.*,
2018 WL 2688781 (N.D. Cal. June 5, 2018) ........................................19

*Olivier v. Baca*,
913 F.3d 852 (9th Cir. 2019) ........................................10

*Phillips v. U.S. Customs & Border Prot.*,
74 F.4th 986 (9th Cir. 2023) ........................................11

*Rodriguez v. Google LLC*,
772 F. Supp. 3d 1093 (N.D. Cal. 2025) ........................................18

*Sisti v. Bosley Inc.*,
831 F. Supp. 3d 979 (C.D. Cal. 2026) ........................................1, 11

*Soremekun v. Thrifty Payless, Inc.*,
509 F.3d 978 (9th Cir. 2007) ........................................10

*State of Cal. v. Iipay Nation of Santa Ysabel*,
898 F.3d 960 (9th Cir. 2018) ........................................10

*Stephens v. Union Pac. Railroad Co.*,
935 F.3d 852 (9th Cir. 2019)........................................18

*Twitter, Inc. v. Barr*,
445 F. Supp. 3d 295 (N.D. Cal. 2020) ........................................10

*Vizcarra v. Michaels Stores, Inc.*,
710 F. Supp. 3d 718 (N.D. Cal. 2024) ........................................19

*Wall v. Wescom Cent. Credit Union*,
2024 WL 1158361 (C.D. Cal. Mar. 18, 2024)........................................19

**Statutes**

Cal. Bus. & Prof. Code §§Code §§ 22584(a)(2-3), 22584(e)(3) ........................................16

Cal. Bus. & Prof. Code §§Code § 22584(a)(3), (b), (e)........................................6

Cal. Civ. Code § 3294........................................21

Cal. Educ. Code §§ 49073.1, 49073.6, 49076(a)(2)(G)(i) .......... 6

Cal. Educ. Code § 49073.1(a) .......... 14, 16

Cal. Educ. Code §§ 49073.1(a)–(b), 48645–48650 .......... 6

Cal. Educ. Code § 49076(a)(2)(G)(i) .......... 13

Wash. Rev. Code Ann. §§ 28A.604.010, 28A.604.030(1) .......... 6

**Rules**

L.R. 5-1 .......... 1

Rule 12(b)(6) .......... 9

**Other Authorities**

34 C.F.R. § 99.7(a)(3)(iii) .......... 6

34 C.F.R. § 99.31 .......... 13, 16

34 C.F.R. §§ 99.31(a)(1), 99.33 .......... 6

# I. INTRODUCTION

Fundamentally, Plaintiffs' case challenges schools' ordinary use of educational technology ("EdTech") products. This is not a typical data privacy case involving questions about the effectiveness or accuracy of disclosures regarding data collection or whether data was used outside the bounds of those disclosures. Plaintiffs make no claims based on targeted advertising or the improvement of products based on consumers' data. Nor is this a pixel tracking case about sharing or intercepting private communications.

Instead, Plaintiffs bring just two claims—invasion of privacy and unjust enrichment—based on PowerSchool simply designing and selling various products for data processing without first obtaining the consent of every parent of every student whose schools choose to use those products. This consent theory fails as a matter of law.

First, lack of consent alone is insufficient to assess whether an invasion of privacy has occurred; consent is not uniformly required for data processing under U.S. law. What matters is "the nature of the information in which [a plaintiff] alleges a privacy interest," and what the defendant did "with this information." *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1092-93 (N.D. Cal. 2018) (citation omitted); *see also Sisti v. Bosley Inc.*, 831 F. Supp. 3d 979, 987 (C.D. Cal. 2026) (where "it is not clear what 'sensitive information' Plaintiff claims was disclosed," there can be no intrusion upon seclusion or unjust enrichment claim) (citation omitted). Yet Plaintiffs fail to specify what exact data is at issue and what PowerSchool allegedly did with that specific data. That is unsurprising given that the record contains ***only minimal, basic data*** about Plaintiffs and ***no data at all*** about potential class members. Put simply, there is no evidence from which a factfinder could conclude there was any invasion of privacy or unjust conduct.

Second, even assuming the consent theory were viable without identifying the data at issue, Plaintiffs do not argue that PowerSchool did anything with student data other than what schools requested for educational purposes. Both federal and state law explicitly allow schools to contract with vendors like PowerSchool for educational purposes without PowerSchool obtaining express parental consent. Thus, the key consent question here is legal, not factual: Is PowerSchool obligated to obtain consent? It is not.

Aside from the fundamental flaws of their consent theory, Plaintiffs' claims fail as a matter of law

for independent reasons. Regarding their invasion of privacy claims, Plaintiffs have no reasonable expectation of privacy concerning their schools' ordinary data processing using PowerSchool products. Nor could such routine data processing be "highly offensive" or an "egregious breach of social norms." *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1080 (Cal. 2009).

Plaintiffs' quasi-contract, unjust enrichment claim—based on PowerSchool receiving licensing fees from schools for certain analytics products—fares no better. For the same reasons there is no "invasion" here, there is nothing "unjust." Further, Plaintiffs conferred no benefit on PowerSchool—schools paid the licensing fees. Plaintiffs' argument that these fees are unjust because PowerSchool does not "test" its analytics products for potential racial bias or inaccuracy does not save this claim. By Plaintiffs' own expert's admission, testing would assess how *schools* customize these algorithms and make decisions based on them, as the products require schools to enter their own parameters of interest to produce predictions.[1] Plaintiffs do not explain why PowerSchool would be legally obligated to conduct this type of testing (they are not) or why not doing so is unjust when the alleged "harm" from predictive algorithms is based on schools' intervening decisions.

Finally, Plaintiffs are not entitled to punitive damages as a matter of law. There is no evidence to support any claim, much less to clear the high bar for punitive damages.

All in all, there are no questions in this case for a factfinder. Plaintiffs' case instead poses legal questions about whether PowerSchool is obligated to obtain consent and whether PowerSchool is obligated to test its analytics products. The answer to both of those questions is "no," and thus PowerSchool is entitled to summary judgment on Plaintiffs' claims.

## II. STATEMENT OF FACTS[2]

### A. PowerSchool contracts with schools for education software and services.

PowerSchool sells cloud-based K–12 software products and related services to schools, districts,

---

[1] For example, a feature to identify students at risk of dropping out may consider a student's attendance history, but the school would need to decide whether 10 absences or 20 is the appropriate threshold for concern. *See* O'Neil Tr. at 120–122 ( "not every school is going to collect the same data elements, so the choice of the data elements, the weightings of the data elements, how much do we care about this versus that, the threshold and, of course, the students' data…there's probably other configurations").

[2] Unless otherwise noted, all references to exhibits in the footnotes are to exhibits attached to the Declaration of Olivia Adendorff, filed concurrently in support of this Motion for Summary Judgment.

and departments of education, rather than to individual students or parents. Its products support enrollment, attendance, grading, and college and career readiness,[3] while its offerings include software subscriptions, cloud hosting, and implementation and support services.[4] Schools and school districts use these products to manage their own records and meet applicable federal and state legal requirements.[5] Approximately 99% of PowerSchool's revenue comes from software licensing fees, training and consultation fees, and hardware sales to educational institutions.[6] And this revenue is tied to institutional contracts, not to the amount or type of data hosted or the school or district's use of the applications.[7]

**B. Schools control their data and use of PowerSchool products, including whether and what data to share.**

The nine products at issue fall into three categories: SIS and Connected Intelligence are data-storage products—SIS is a configurable database product that schools use for storing information for scheduling, grading, attendance, and compliance reporting, while Connected Intelligence enables schools to consolidate their data from multiple sources into a single, dedicated server;[8] Analytics & Insights, Performance Matters, MTSS, Behavior Support, and Attendance Intervention are tools that allow school staff to visualize, track, or analyze selected data, such as graphing attendance trends, administering assessments, or tracking behavioral metrics;[9] and Schoology and Naviance are student-facing platforms—Schoology is a learning management system that enables teachers to distribute course materials, collect and grade student submissions, and communicate with students and parents, while Naviance is a college, career, and life readiness platform that helps students develop tailored college application plans based on

---

[3] Ex. 1, PowerSchool Holdings, Inc., Annual Report (Form 10-K) at 5, 7 (Feb. 29, 2024) ("2023 10-K").

[4] *Id.*

[5] Ex. 2, Dep. of Judith Jaeger ("Jaeger Dep. 12/5/2025") at 27:3–6, 29:21–30:4 (describing PowerSchool products and their educational functions); Ex. 3, Dep. of Darron Flagg (30(b)(6)) ("Flagg (30(b)(6)) Dep.") at 33:5–7, 34:16–35:5.

[6] Ex. 1, 2023 10-K at 61, 64-65, 67; PowerSchool's Suppl. Resps. & Objs. to Pls.' Non-Uniform Interrogs. Nos. 1, 4, 5, at 17–18, Dkt. No. 119-1, at 99–100.

[7] Ex. 4, David White Expert Rep. ¶ 29; PowerSchool's Suppl. Resps. & Objs. to Pls.' Non-Uniform Interrogs. Nos. 1, 4, 5, at 17–18, Dkt. No. 119-1, at 99–100.

[8] *See* Ex. 5, SIS DPIA (PWRSCHL_00644395 at 397–99); Ex. 6, Connected Intelligence DPIA (PWRSCHL_00644386 at 390); Ex. 7, Dep. of Christopher Cirillo ("Cirillo Dep.") at 244:16–245:7.

[9] Ex. 3, Flagg (30(b)(6)) Dep. at 33:5–7, 34:16–35:5; Ex. 8, Analytics & Insights DPIA (PWRSCHL_00645530); Ex. 9, Performance Matters DPIA (PWRSCHL_00645375); Ex. 10, MTSS DPIA (PWRSCHL_00646371 at 373); Ex. 11, Behavior Support DPIA (PWRSCHL_00644501); Ex. 12, Attendance Intervention DPIA (PWRSCHL_00645551).

their strengths, interests, and career goals.[10] Six of the nine products—SIS, Connected Intelligence, Analytics & Insights, MTSS, Behavior Support, and Attendance Intervention—are accessible only to school staff; students cannot access them at all.[11]

For all of these products, it is the schools and school districts—not PowerSchool—that decide what information to collect and what to do with that information.[12] Put differently, PowerSchool is the "Data Processor," while schools are the "Data Controller."[13] It is the schools that select and configure products, choose which data fields to use, and retain control of all data at all times.[14] Regarding analytical models, PowerSchool works with each customer (school or school district) to help them configure the tools the customer selects.[15] The customer selects the data and parameters for any model, and the models are not trained on another customer's information.[16] PowerSchool supplies no ready-made models and does not determine the analytical criteria or the models a customer builds.[17]

Further, PowerSchool does not use any individual student data to train, test, or develop products.[18] Nor does it combine customer data to provide or monetize analytics or report, improve products, or train AI models; instead, it keeps each school or school district's raw data in separated storage.[19] Each customer's data is used only for that customer's services.[20] PowerSchool has never accessed customer or student data without a school's permission.[21]

---

[10] Ex. 13, Schoology Learning DPIA (PWRSCHL_00644375 at 377); Ex. 14, Naviance DPIA (PWRSCHL_00644472 at 474, 476); Christopher Schulte Expert Rep., Dkt. No. 142-1, at 15-16.

[11] Ex. 5, SIS DPIA; Ex. 6, Connected Intelligence DPIA; Ex. 10, MTSS DPIA; Ex. 11, Behavior Support DPIA; Ex. 12, Attendance Intervention DPIA.

[12] Ex. 15, Dep. of Nicole Shinton ("Shinton Dep.") at 63:8–14, 77:11–18; Ex. 3, Flagg (30(b)(6)) Dep. at 187:8–189:5; Ex. 16, Dep. of Sai Prasad Rangarajan ("Rangarajan Dep.') at 147:13–14; White Expert Rebuttal Rep. at ¶ 25, Dkt. No. 138-26, at 10–11.

[13] Ex. 5, SIS DPIA (PWRSCHL_00644395 at 397); Ex. 15, Shinton Dep. at 63:8–14, 77:11–18; Ex. 3, Flagg (30(b)(6)) Dep. at 43:21–44:8; *see also* Ex. 16, Rangarajan Dep. at 147:13–14; Joint Case Mgmt. Statement at 2, Dkt. No. 40.

[14] *Id.*

[15] Ex. 17, Dep. of Sujit Maharana ("Maharana Dep.") at 55:17–57:5.

[16] White Expert Rep. at ¶ 47, Dkt. No. 139-23, at 4; Ex. 17, Maharana Dep. at 42:16–46:2.

[17] *Id.* at 291:14–292:13; Ex. 18, Dep. of Judith Jaeger ("Jaeger. Dep. 12/18/2025") at 38:2–42:19, 105:21–107:16, 114:22–118:11.

[18] Ex. 3, Flagg (30(b)(6)) Dep. at 396:8–13, 429:15–20; White Expert Rep. at ¶¶ 45–46, Dkt. No. 139-23, at 1–3.

[19] *Id.* at ¶ 45, Dkt. No. 139-23, at 1–2.

[20] *Id.*

[21] Ex. 19, Dep. of Shahzad Ahmad ("Ahmad Dep.") at 310:2–9.

At times, Plaintiffs have pointed to a single internal testing dataset, referred to as "[redacted]," to imply an improper use of data.[22] But this dataset has nothing to do with Plaintiffs or the putative class. It is derived from a single school district—not Plaintiffs' school districts—that gave express permission for this use, and the data predates the class period.[23] Moreover, before using it, PowerSchool de-identified the data in the set and combined it with synthetic data such that it "in no way resembles the original" customer data, and it is never augmented with data from any other customer.[24] This dataset is used solely to test whether a product can handle large data volumes when new features are released.[25] PowerSchool does not use de-identified data (or identifiable data, for that matter) to develop products and has never used the [redacted] dataset to develop a product.[26]

Finally, regarding data sharing, schools—not PowerSchool—control what data third parties receive.[27] "At any time, a school has the right to export the data processed by PowerSchool (such as through a CSV file) and provide it to whoever they wish; the school is solely responsible for such sharing."[28] Plaintiffs do not contest this fact and do not accuse PowerSchool of sharing data outside of a school's authorization or direction.

### C. Federal, state, and local laws permit schools to contract with PowerSchool without express parental consent.

PowerSchool operates in a sector subject to an array of federal and state student-privacy laws. Turning to federal law first, under FERPA, schools may disclose education records to contractors without obtaining individual consent, provided the contractor is a "school official" with "legitimate educational interests" that (i) performs institutional services that the school would otherwise perform itself, (ii) remains under the school's direct control, and (iii) complies with FERPA's restrictions on use and

---

22 Ex. 3, Flagg Dep. at 386:18–387:9, 389:19–390:5; Cathy O'Neil Expert Rep. at 25, Dkt. No. 142-2.
23 Ex. 3, Flagg (30(b)(6)) Dep. at 386:18-18-387:9; 389:19-390:5.
24 *Id.* at 388:20–389:4, 389:14–16 ("Q. Does it ever get augmented with other customers— A. No. No.").
25 *Id.* at 386:18–387:9.
26 *Id.* at 429:15–20 ("Q. Do you use de-identified data at PowerSchool in developing product? A. No. Q. Have you ever used the [redacted] data that you testified about when developing product? A. No.").
27 Ex. 20, Dep. of Brian Sharp ("Sharp Dep.") at 31:1–32:6, 37:17–38:2; Ex. 15, Shinton Dep. at 76:22-77:18; Ex. 3, Flagg (30(b)(6)) Dep. at 173:1–8; Ex. 13, Schoology DPIA (PWRSCHL_00644375 at 381); Ex. 21, PowerSchool MSA § 3.2 (PWRSCHL_00162703).
28 PowerSchool's Suppl. Resps. & Objs. to Pls.' Non-Uniform Interrogs. Nos. 1, 4, 5, at 17, Dkt. No. 119-1, at 99-100.

redisclosure.[29] Importantly, it is the schools—not PowerSchool or Plaintiffs—that define both who is deemed to be a "school official" and the scope of "legitimate educational interests." Under FERPA, "schools [have] significant discretion to determine who constitutes a 'school official' and what constitutes a 'legitimate educational interest,'" and each school must specify those criteria in its annual notification of FERPA rights.[30] PowerSchool's contracts reinforce this allocation of responsibilities: Schools represent that PowerSchool provides services solely as a "school official" for "legitimate educational interests," and PowerSchool in turn processes data "only as expressly authorized by [the school] for the sole and express purpose of fulfilling its obligations under [the contracts with the school]."[31]

California and Washington, where Plaintiffs reside, provide their own, more specific statutory frameworks that further support this model. California law expressly permits schools to engage contractors to process student data without written parental consent,[32] and both states permit schools, without parental consent, to use EdTech providers for "digital storage, management, and retrieval of [student] records," to share student information with other agencies, and to store, use, and share data with third parties as authorized by law.[33]

At an even more local level, school districts choose whether and which PowerSchool products to use through public procurement and board processes. Seattle's democratically elected school board, for example, approved a three-year enterprise license covering SIS and several other PowerSchool products and services.[34] The board renewed that license in July 2025—*after* Plaintiff Cherkin testified at a public hearing and urged the board not to renew, and after district staff responded to and rebutted her concerns

---

[29] 34 C.F.R. §§ 99.31(a)(1), 99.33(a); Joint Case Mgmt. Statement at 2, Dkt. No. 40; PowerSchool Privacy Statement, Ex. 1 to Mot. to Dismiss at 2, Dkt. No. 37-2; Ex. 22, PowerSchool Privacy Statement, (PWRSCHL_00640864).

[30] U.S. Dep't of Educ., FERPA: Guidance for School Officials (Apr. 12, 2023) at 3, Dkt. No. 170-40, at 4; 34 C.F.R. § 99.7(a)(3)(iii).

[31] PowerSchool DPA (PWRSCHL_00161580) at §§ 6.2, 6.5, Dkt. No. 139-5; Seattle Pub. Schs. & PowerSchool Group LLC, Data Privacy Agreement (PWRSCHL_00162868) at 1, Dkt. No. 139-6.

[32] Cal. Educ. Code §§ 49073.1, 49073.6, 49076(a)(2)(G)(i) (permitting release of pupil records to a contractor with a "legitimate educational interest" and a "formal written agreement" for outsourced institutional services "without written parental consent").

[33] Cal. Educ. Code §§ 49073.1(a)–(b), 48645–48650; Cal. Bus. & Prof. Code §§ 22584(a)(3), (b), (e); Wash. Rev. Code Ann. §§ 28A.604.010, 28A.604.030(1).

[34] Seattle Pub. Schs., Board Action Report (CHERKIN_027321–25) at 1–4, Dkt. No. 186-2.

about student privacy.[35] West Contra Costa's board (the board governing Plaintiffs L.M.C. and M.M.C.'s school) likewise selected PowerSchool's products for its data management.[36] Plaintiffs' school districts, like all other districts, decide the extent of disclosures to students and their families about their usage of EdTech products based on the governing laws and school policies.[37]

### D. There is minimal data about the named Plaintiffs and no data about putative class members in the record.

***Plaintiff S.G.*** It is unsurprising that there is little data in the record about S.G. given that her school district, Seattle Public Schools, hosts its own SIS data on premises and creates its own analytical models internally—*i.e.*, without PowerSchool's involvement.[38] SIS is the only product S.G.'s school licenses in the "Data Warehouse" damages class. This means Seattle's SIS data is *never* actually transferred to or stored with PowerSchool at all. For the data analytics products in the "Profiling and Prediction Class," there is no evidence in the record about the specific data in Seattle's analytics models or how any staff or administrator acts on those models.[39] Further, S.G.'s mother opted her out of various EdTech products, so there is no data stored in those products concerning S.G.[40]

The limited data regarding S.G. in the record consists of: (1) S.G.'s name, gender, race, age, and school name; (2) Schoology login statistics; and (3) spreadsheets of analytics code created and used solely by Seattle's internal personnel and contractors.[41]

***Plaintiffs L.M.C. and M.M.C.*** Of the nine products at issue, L.M.C. and M.M.C.'s school district,

---

[35] Seattle Pub. Schs., Board Meeting Minutes (July 2, 2025) at 7, Dkt. No. 170-3; Ex. 23, Dep. of Emily Cherkin ("Cherkin Dep.") at 190:15–191:22.

[36] Ex. 24, Dep. of David Concepción ("Concepción Dep.") at 146:12–147:2, 148:9–150:19; West Contra Costa Unified School District ("WCCUSD") Board of Education Regular Meeting, June 23, 2021, Agenda Item C.16, Dkt. No. 138-47.

[37] Seattle Pub. Schs. & PowerSchool Group LLC, Data Privacy Agreement (PWRSCHL_00162868) at art. III, § 1, Dkt. No. 139-5; Ex. 15, Shinton Dep. at 80:22-81:14.

[38] *See* Ex. 18, Jaeger Dep. 12/18/2025 at 38:2–42:19, 105:21–107:16, 114:22–118:11; Ex. 19, Ahmad Dep. at 109:6–110:8.

[39] *Id.*

[40] Cherkin's Resps. & Objs. to Def.'s First Set of Interrogs., No. 1, at 2, Dkt. No. 138-43, at 4; Ex. 23, Cherkin Dep. at 149:1–150:3.

[41] *See* Ex. 25, PWRSCHL_00702678; Ex. 26, PWRSCHL_00702665; Ex. 27, PWRSCHL_00702666; Ex. 28, PWRSCHL_00702667; Ex. 29, PWRSCHL_00702668; Ex. 30, PWRSCHL_00702669; Ex. 31, PWRSCHL_00702682; Ex. 32, PWRSCHL_00702683; Ex. 33, PWRSCHL_00702671–76; Ex. 34, PWRSCHL_00702677.

West Contra Costa, currently subscribes only to one—SIS.[42] And while the district briefly piloted Analytics & Insights on a one-year trial basis (2021–2022), the district did not renew the subscription, and PowerSchool found no data from that trial connected to L.M.C. or M.M.C.[43] The only confirmed data PowerSchool hosts concerning L.M.C. and M.M.C. are their names.[44]

In their depositions, neither L.M.C. nor M.M.C. could recall ever personally using a PowerSchool product.[45] L.M.C. and M.M.C.'s father, David Concepción, testified about certain data he believes are in PowerSchool products, such as social security numbers, health insurance information, and school grades.[46] But he admitted that he merely suspects this data is in PowerSchool products because "at one point or another," this information was "discussed and/or exchanged with school staff through email or through the platform."[47] Further, when shown screenshots of various PowerSchool product dashboards during his deposition, Mr. Concepción did not recognize any PowerSchool products and instead selected other non-PowerSchool platforms, including Google Classroom and Clever, as the applications his children use.[48] Thus, other than L.M.C.'s and M.M.C.'s names, there is no evidence in the record about these Plaintiffs' data in any PowerSchool product.

***Putative class members.*** There is also no evidence in the record about any putative class members' data. Plaintiffs point to PowerSchool's Data Privacy Impact Assessments ("DPIAs") as evidence of what data PowerSchool collects,[49] but DPIAs describe only the categories of data that *may be* collected depending on a school's configuration of a product.[50] Indeed, the documents are not for data processing but instead provide a basic "framework" for "vendors to document how they have addressed privacy

---

[42] Ex. 35, PWRSCHL_00008714 (PowerSchool product subscription data showing WCCUSD's current product subscriptions).

[43] Ex. 35, PWRSCHL_00008714; WCCUSD Board of Education Regular Meeting, June 23, 2021, Agenda Item C.16, Dkt. No. 138-47.

[44] *See* Ex. 36, L.M.C. data records (PWRSCHL_00702679); Ex. 37, M.M.C. data records (PWRSCHL_00702680).

[45] Ex. 38, Dep. of L.M.C. ("L.M.C. Dep.") at 18:10–17, Nov. 24, 2025; Ex. 39, Dep. of M.M.C. ("M.M.C. Dep.") at 22:2–9.

[46] Ex. 24, Concepción Dep. at 206:8–207:1.

[47] *Id.*

[48] *Id.* at 99:1–100:23.

[49] Pls.' Mot. for Class Cert. at 2, Dkt. No. 197; O'Neil Expert Rep. at 7–10, Dkt. No. 142-2.

[50] White Expert Rebuttal Rep. ¶¶ 10–11, Dkt. No. 138-26, at 4–5; Ex. 5, SIS DPIA (PWRSCHL_00644395 at 402).

considerations in the tools they offer."[51] As such, the DPIAs document *possible* product capabilities and do not establish that particular data elements are present in any given customer's instance.[52] Possibilities like this are insufficient at summary judgment. *See Loomis v. Cornish*, 836 F.3d 991, 997–98 (9th Cir. 2016); 5B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1357 n.71 (4th ed.) (summary judgment standards are "far more demanding than standards at Rule 12(b)(6) stage"). Plaintiffs have no other evidence of what data, if any, PowerSchool's products contain about any putative class member.[53]

**E. Relevant procedural history**

***Plaintiffs' Motion for Partial Summary Judgment.*** Plaintiffs moved for partial summary judgment on two of PowerSchool's affirmative defenses, arguing that: (1) FERPA does not provide a private defense; (2) schools are not parents' agents for the purpose of consenting to PowerSchool's conduct; (3) PowerSchool's contracts with schools do not establish that schools obtained express parental consent; and (4) there is no evidence of implied parental consent.[54] The Court denied Plaintiffs' motion, holding that "[c]ontested questions of fact with respect to consent preclude judgment without a trial."[55]

***Plaintiffs' Corrected First Amended Complaint and Renewed Motion for Class Certification.*** Plaintiffs originally brought a bevy of privacy-related claims under various common-law torts and statutes, including CIPA, CDAFA, and UCL. Now that discovery has foreclosed many of these claims, Plaintiffs pursue only three: (1) intrusion upon seclusion under California common law (Count I); (2) invasion of privacy under the California Constitution (Count II); and (3) unjust enrichment (Count III).[56]

In their recently renewed Motion for Class Certification, Plaintiffs narrowed the proposed classes from nationwide to 35 states, requested certification of California subclasses, and isolated their unjust enrichment and California Constitution claims to the proposed California subclasses.[57] The core assertions regarding invasion of privacy, however, remain the same: that PowerSchool provides data-

---

[51] White Expert Rebuttal Rep. at ¶ 11, Dkt. No. 138-26, at 4–5.
[52] *Id.* at ¶¶ 10–11, Dkt. No. 138-26, at 4–5.
[53] Hristina Bartlett Expert Rep. at ¶¶ 69–71, Dkt. No. 138-7.
[54] Pls.' Mot. for Sum. J., Dkt. No. 164, at 1.
[55] Order Den. Pls.' Mot. for Sum. J., Dkt. No. 187.
[56] Pls.' Corrected First Am. Class Action Compl. at ¶¶ 438–476, Dkt. No. 194.
[57] Pls.' Mot. for Class Cert. at 1, 15, 19, 20–21, Dkt. No. 197.

hosting and analytics services to schools without obtaining effective parental consent.[58] And their unjust enrichment theory is based on the assertion that PowerSchool offers "untested" analytics products to schools, and then schools use those products without parental consent.[59]

## III. ARGUMENT

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Because Plaintiffs bear the ultimate burden of proof, PowerSchool "need only point out 'that there is an absence of evidence to support [Plaintiffs'] case.'" *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)); *see also Twitter, Inc. v. Barr*, 445 F. Supp. 3d 295, 302 (N.D. Cal. 2020). The burden then shifts to Plaintiffs to set forth "specific facts showing that there is a genuine issue for trial." *Lowry v. City of San Diego*, 858 F.3d 1248, 1255 (9th Cir. 2017). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Further, where there is an issue of statutory interpretation and application, that is a legal question and not a question for the factfinder. *State of Cal. v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 964 (9th Cir. 2018).

Here, PowerSchool is entitled to summary judgment on all of Plaintiffs' claims because there is no genuine dispute as to any material fact, in part because FERPA and similar state statutes foreclose Plaintiffs' claims, and no evidence on which the jury could find for Plaintiffs.

### A. Plaintiffs' consent theory fails as a matter of law.

The central theory animating Plaintiffs' invasion of privacy and unjust enrichment claims is that PowerSchool processed student data, including by sharing that data and allowing schools to input that data into analytics products, while relying on schools to obtain any necessary consent rather than PowerSchool seeking consent directly from each parent or student. Although the Court denied Plaintiffs' motion for partial summary judgment because it held that whether PowerSchool obtained consent was a fact question,[60] Plaintiffs' motion asked the wrong question. The relevant question here is not whether

[58] *Id.* at 1–6.
[59] *Id.* at 20–21.
[60] *See* Order Den. Pls.' Mot. for Summ. J., Dkt. No. 187.

PowerSchool obtained consent from every student who attended a school using a PowerSchool product. The relevant questions are (1) whether Plaintiffs' consent theory is legally viable when Plaintiffs have failed to specify the data at issue and what PowerSchool did with that specific data; and (2) whether PowerSchool was legally obligated to obtain consent. These are *purely legal questions*, and the undisputed record shows that the answer to both is "no."

*1. There is little to no student data in the record.*

First, Plaintiffs' consent theory fails because "a plaintiff's lack of consent does not matter so much as the nature of the information in which he or she alleges a privacy interest" and what exactly the defendant did with "this information." *Gonzales*, 305 F. Supp. 3d at 1092; *Sisti* 831 F. Supp. 3d at 993 (same for intrusion upon seclusion and unjust enrichment). Here, there is minimal data in the record, and even so, that data is disconnected from Plaintiffs' claims based on lack of consent.

The only evidence in the record about the "nature of information" at issue is a handful of data points about S.G., including her name, some login statistics, and some assessments *made by her school*.[61] For L.M.C. and M.M.C., there is no data in the record other than their names.[62] Plaintiffs do not explain how this limited information—whether given to their schools or created by their schools—gives rise to a privacy interest. Nor do they connect this small set of data to their other legal theories, such as unauthorized data sharing or schools' use of "untested" analytics products. Nothing in the record demonstrates that PowerSchool shared this information with anyone or that this information was used in any analytics products.

As to the putative class, Plaintiffs' lack-of-consent theory is even weaker because the record contains no data at all about absent class members. Plaintiffs attempt to fill this gap by pointing to the DPIAs as establishing some set of baseline data elements input into PowerSchool products.[63] But, as explained above, those DPIAs are merely privacy assessments that state what categories of data a school

---

[61] Ex. 25, PWRSCHL_00702678; Ex. 26, PWRSCHL_00702665; Ex. 27, PWRSCHL_00702666; Ex. 28, PWRSCHL_00702667; Ex. 29, PWRSCHL_00702668; Ex. 30, PWRSCHL_00702669; Ex. 31, PWRSCHL_00702682; Ex. 32, PWRSCHL_00702683; Ex. 33, PWRSCHL_00702671 to 00702676; Ex. 34, PWRSCHL_00702677.

[62] *See* Ex. 36, L.M.C. data records (PWRSCHL_00702679); Ex. 37, M.M.C. data records (PWRSCHL_00702680).

[63] Pls.' Mot. for Class Cert. at 2, Dkt. No. 197; O'Neil Expert Rep. at 7–10, Dkt. No. 142-2.

*could potentially* input into a PowerSchool product.[64] Further, the only common data element across the nine product DPIAs is [redacted][65] Plaintiffs cannot seriously contest that their entire case rests on the [redacted] of Plaintiffs and absent class members. *See Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 996 (9th Cir. 2023) (holding that "[a] person's 'name, address, date and place of birth, place of employment, . . . and social security number' are not 'generally considered private'") (citation omitted).

Perhaps because of the complete lack of evidence concerning the data at issue, Plaintiffs now pivot to argue that the processing of an individual's data is "immaterial" to their argument around the analytics products. Plaintiffs argue instead that what matters is that PowerSchool allegedly used "the entire class's data" in the analytics products without consent.[66] This argument has no support in the record. Plaintiffs' cited sources[67] demonstrate that an individual district can combine its own data across its own products to feed into that specific school's use of the analytics products—*not* that schools can combine their own data with *other* school districts' data for some larger set across the purported class.[68] Indeed, the same sources Plaintiffs cite make clear that it is impossible for the entire class's data to be fed into any product because each district's data lives in individually segregated servers; there is no sharing or combining of data across customers.[69] Regardless, the question still remains: What data from the students is allegedly put into the analytics products without consent? Every single piece of information students have given their school? Only certain information? There is no evidence to answer any of these questions, and thus no identification of the "nature of the information" at issue, which is critical to Plaintiffs' claims. *Gonzales*, 305 F. Supp. 3d at 1092. Without these critical details, Plaintiffs' invasion of privacy and unjust enrichment claims fail, and there is no genuine issue of material fact for a jury to decide.

*2. Federal and state law authorize PowerSchool's data processing without consent.*

Second, Plaintiffs' claims fail because PowerSchool is legally authorized to process student data without parental consent.

The undisputed record is clear that PowerSchool does nothing with student data unless schools

[64] White Expert Rebuttal Rep. at ¶¶ 10–11, Dkt. No. 138-26, at 4–5.
[65] Ex. 40, Bartlett Expert Rep., Ex. 2 at 3.
[66] Pls.' Mot. for Class Cert. at 21, Dkt. No. 197.
[67] *Id.*; *See, e.g.*, Ex. 3, Flagg (30(b)(6)) Dep. at 179:9–183:3, Ex. 10, DPIA MTSS (PWRSCHL_00646371 at 73); Ex. 15, Shinton Dep. at 22:13–23:12.
[68] *Id.*
[69] Pls.' Mot. for Class Cert. at 21, Dkt. No. 197; *See, e.g.*, Ex. 7, Cirillo Dep. at 244:16–245:7.

ask, including sharing data with third parties, and schools maintain complete control over all data at all times.[70] Relatedly, PowerSchool does nothing regarding student data outside of the educational purposes laid out in its contracts with schools. PowerSchool is a vendor that provides software and services to schools; it does not unilaterally collect, access, or process student data.[71] Nor does it use student data to develop products.[72]

Schools determine what data to collect, which PowerSchool products to deploy, what information to input into those products, what analytics to run, what to do about the results of those analytics, and whether and with whom to share any data.[73] PowerSchool's contracts reinforce this: Schools must represent that PowerSchool provides services solely as a "school official" with "legitimate educational interests" pursuant to FERPA, and PowerSchool in turn processes data "only as expressly authorized by [the school] for the sole and express purpose of fulfilling its obligations under [the contracts with the school]." There is no evidence in the record that PowerSchool ever exceeds the scope of school authorization or its contracts.[74] Importantly, Plaintiffs do not argue otherwise. They do not accuse PowerSchool of acting outside the scope of schools' contracts and directions, nor do they accuse PowerSchool of using student data for non-educational purposes.

What all of this means is that the data processing at issue here—schools' ordinary use of PowerSchool products for educational purposes—is expressly authorized by federal, state, and local law. FERPA permits schools to share student data with vendors "**without [parental] consent**" if the provider performs a "service or function" that the school would have performed and does so "under the [school's] direct control." 34 C.F.R. § 99.31 (emphasis added). California law similarly authorizes this conduct. Under a provision titled "Access to records by persons **without written parental consent** or under judicial

---

[70] *Id.* at II.e.

[71] Ex. 40, Bartlett Expert Rep. ¶¶ 24, 27–28; Ex. 3, Flagg (30(b)(6)) Dep. at 45:7–19, 336:1–2; Ex. 7, Cirillo Dep. at 75:8–13, 144:3-6; Ex. 15, Shinton Dep. at 80:13–21; Ex. 41, Dep. of Joseph Swingle ("Swingle Dep.") at 82:18–83:4.

[72] Ex. 19, Ahmad Dep. at 310:12–311:20; Ex. 7, Cirillo Dep. at 318:8–22, Ex. 17, Maharana Dep. at 291:14–292:13.

[73] As discussed above, PowerSchool has used one dataset for internal testing, the [redacted] dataset, which came from a single consenting customer and was historically de-identified. Ex. 3, Flagg. (30(b)(6)) Dep. at 386:18–387:9, 389:19–390:5; O'Neil Expert Rep. at 25, Dkt. No. 142-2. This dataset does not, and never has, contained class-member data.

[74] *See* Pls.' Reply Br. at 5, Dkt. No. 175 ("True: Plaintiffs have not sued PowerSchool for breach of contract[.]")

order," school districts "may release information from pupil records to . . . "[a] contractor or consultant with a legitimate educational interest who has a formal written agreement or contract with the school district regarding the provision of outsourced institutional services or functions by the contractor or consultant." Cal. Educ. Code § 49076(a)(2)(G)(i) (emphasis added). A neighboring law provides that schools may "enter into a contract with a third party" for "services, including cloud-based services, for the digital storage, management, and retrieval of pupil records," or for other "digital educational software that authorizes a third-party provider . . . to access, store, and use pupil records" as specified in a contract with the school. Cal. Educ. Code § 49073.1(a). Thus, even under California law, which Plaintiffs insist applies here, schools may contract with PowerSchool for exactly the kind of services it provides without PowerSchool needing to obtain or ensure parental consent to the sharing of pupil records.[75]

Local school districts understand this statutory authorization in the same way PowerSchool does. For example, L.M.C. and M.M.C.'s school district, West Contra Costa, has a handbook parents must sign that states that "[t]he law permits school districts … to consent to the collection of personal information on behalf of all of its students, thereby eliminating the need for individual parental consent given directly to the website operator."[76]

Plaintiffs' only response to this legal framework is to say that these laws cover schools—not PowerSchool.[77] But these laws allow the schools to contract with PowerSchool for the exact data processing at issue in this case. In other words, the law covers the conduct of both the schools and the EdTech vendors the schools choose to use. If it were otherwise, as Plaintiffs argue, these laws would be meaningless. It makes no sense to admit that a statute expressly permits A to give B something, but then argue that unstated common law does not allow B to receive the thing from A. The specific statutory authorization described above clearly governs. Thus, as a matter of law, PowerSchool need not obtain consent from each individual student.

All in all, there is little to no data in the record and thus no evidence from which a jury could

---

[75] PowerSchool applies California law throughout this motion because that is the law Plaintiffs rely on in their own briefing. However, PowerSchool maintains that California law does *not* apply to these claims on a classwide basis, as will be explained in PowerSchool's forthcoming opposition to Plaintiffs' motion for class certification.

[76] Ex. 42, 2021–2022 WCCUSD Handbook at 144.

[77] Pls.' Mot. for Class. Cert. at 19, Dkt. No. 197.

decide whether there was a privacy invasion or unjust conduct. There is also no evidence that PowerSchool does anything with student data outside of a school's direction or for non-educational purposes, which makes PowerSchool's ordinary data processing—without parental consent—expressly permitted by law. Thus, Plaintiffs' lack-of-consent theory undergirding both their invasion of privacy and unjust enrichment claims fails.

**B. PowerSchool is entitled to summary judgment on Plaintiffs' invasion of privacy claims because ordinary data processing cannot support a reasonable expectation of privacy or highly offensive conduct.**

Plaintiffs' two privacy claims—common law intrusion upon seclusion and constitutional invasion of privacy—are "distinct claims with different elements," but "[w]hen brought together on the same factual basis . . . it is appropriate to assess the two claims together and examine the largely parallel elements of these two claims." *Heeger v. Facebook, Inc.*, No. 18-cv-06399-JD, 2019 WL 7282477, at *3 (N.D. Cal. Dec. 27, 2019*)* (internal quotations omitted). Those elements are: "(1) the nature of any intrusion upon reasonable expectations of privacy, and (2) the offensiveness or seriousness of the intrusion, including any justification and other relevant interests." *Id.* Whether a plaintiff has a reasonable expectation of privacy and whether a defendant's conduct is "highly offensive" "are mixed questions of law and fact" that "may be adjudicated as a matter of law." *Hill v. Nat'l Collegiate Athletic Assn*., 7 Cal. 4th 1, 40 (1994); *see also Hernandez*, 211 P.3d at 1073 (courts may resolve privacy claims at summary judgment when "the crucial facts are undisputed and only one conclusion about the defendant's conduct is possible"); *Heldt v. Guardian Life Ins. Co. of Am.*, No. 16-cv-885-BAS-NLS, 2019 WL 651503, at *4 (S.D. Cal. Feb. 15, 2019) (same).

Here, there are no genuine disputes of material fact on either element of Plaintiffs' privacy claims, and thus these claims may be adjudicated as a matter of law. Even if Plaintiffs' consent theory were viable (it is not), the ordinary data processing at issue here is ubiquitous. EdTech products are not merely tolerated in modern education—they are critical to the contemporary classroom and are almost universally used by educators today. PowerSchool products are specifically referenced in student handbooks, which detail how and what kinds of student information will be stored or made available to third parties.[78] School

[78] Ex. 42, 2021–2022 WCCUSD Handbook at 6, 14, 22, 35, 126–28, 132.

staff rely on PowerSchool products for everyday administrative, reporting, and pedagogical functions.[79] PowerSchool products also enable school districts to maintain data essential for operations, comply with state and federal reporting requirements, meet student health and safety needs, and receive school funding.[80] PowerSchool has become so integral to its school district customers that its loss would be "severely detrimental to school operations," according to the deposition testimony from Plaintiff S.G.'s own school district.[81] This is why an entire regulatory regime exists via federal, state, and local rules that acknowledges the need for EdTech like PowerSchool and allows for its use.[82] In fact, Plaintiffs themselves do not expect a technology-free classroom.[83]

Because privacy standards are "best viewed flexibly and in context" and are "founded on broadly based and widely accepted community norms," *Hill*, 865 P.2d at 655,[84] the common and ordinary use of EdTech must inform the privacy analysis here. The facts here are light years away from other data privacy cases where courts have held there were actionable common-law privacy claims. There are no "cradle-to-grave profiles" being created about students. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020). Nor is there "highly sensitive" data at issue being shared for targeted advertisements. *See Campbell v. Select Med. Corp.*, 2026 WL 2056651, at *3 (C.D. Cal. July 14, 2026) (allowing privacy claims to proceed based on allegations that defendant shared sensitive information, such as "a specific kind of appointment related to a specific type of medical condition," for targeted advertisements).

The differences in this case—namely, the routine and nearly universal adoption of EdTech products for the exact data processing at issue—defeat both elements of Plaintiffs' invasion of privacy claims as a matter of law.

---

[79] Ex. 40, Bartlett Expert Rep. at ¶¶ 111–112 (summarizing academic research and case studies showing EdTech improves student learning outcomes, increases parent engagement, and helps schools comply with reporting requirements); Ex. 18, Jaeger Dep. 12/18/2025 at 70:14–71:13; Ex. 2, Jaeger Dep. 12/5/2025 at 27:3–8.

[80] Ex. 40, Bartlett Expert Rep. at ¶ 103.

[81] Ex. 18, Jaeger Dep. 12/18/2025 at 70:8–71:13; Ex. 2, Jaeger Dep. 12/5/2025 at 27:3–6, 29:21–30:8.

[82] *See* 34 C.F.R. § 99.31; Cal. Educ. Code § 49073.1(a); Cal. Bus. & Prof. Code §§ 22584(a)(2–3), (e)(3).

[83] Ex. 43, Dep. of S.G. ("S.G. Dep.") at 109:1–4 (stating she would want "[t]ech in a different way" rather than no technology).

[84] Order re Dismissal at 3, Dkt. No. 65.

*1. No reasonable expectation of privacy.*

In California, the reasonable expectation of privacy element rests on "(1) the identity of the intruder, (2) the extent to which other persons had access to the [subject] . . . and (3) the means by which the intrusion occurred." *Hernandez*, 211 P.3d at 1073. Here, for the reasons explained above, each factor weighs decisively in PowerSchool's favor. *See id.* at 1074–77. As to the identity of the intruder: PowerSchool is not an unwanted intruder—it is a school-authorized vendor who acts only at a school's direction and whose products have become integral to contemporary education. As to the extent of access: The student data at issue is the kind typically shared with schools and accessed daily as part of regular school functions; courts have recognized that academic information may be shared within the school setting without constituting a "serious invasion of privacy." *Lachtman v. Regents of Univ. of Cal.*, 70 Cal. Rptr. 3d 147, 168 (Cal. Ct. App. 2007) (affirming summary judgment where plaintiff's grades and personal academic information were shared with students and faculty members). As to the means by which the intrusion occurred, PowerSchool's access occurs through contractual arrangements expressly authorized by FERPA, California law, and local school district policies. For all of these factors, there is no evidence to the contrary. Thus, even putting aside that there is no data in the record for which the Court (or a factfinder) can assess an expectation of privacy, all of these factors foreclose any finding that Plaintiffs held a legally cognizable expectation of privacy based on PowerSchool offering data processing services to schools.

*2. No highly offensive conduct.*

For this element, too, the reasons described above preclude Plaintiffs' claims as a matter of law. This "District sets a high bar when assessing the 'highly offensive' requirement." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1088 (N.D. Cal. 2022). To clear that "high bar," a plaintiff must prove that the alleged conduct constitutes an "egregious breach of the social norms." *Hernandez*, 211 P.3d at 1073. This analysis considers "the degree and setting of the intrusion, and the intruder's motives and objectives." *Id.*

The setting here is the school environment, where the ordinary use of EdTech is ubiquitous.[85] And the degree of intrusion is minimal: PowerSchool does nothing unless schools ask, schools control all data, and PowerSchool's conduct is expressly authorized by federal, state, and local law. Far from offensive, PowerSchool's services support daily school operations and help schools comply with state and federal reporting requirements. Conduct within the ordinary course of a lawfully authorized business does not, as a matter of law, constitute a highly offensive invasion of privacy. *Folgelstrom v. Lamps Plus, Inc.*, 125 Cal.Rptr. 3d 260, 265 (Cal. Ct. App. 2011); *see also Hernandez*, 211 P.3d at 1080 (considering the defendant's "legitimate business reasons" in analyzing the offensiveness prong at summary judgment).

Further, PowerSchool's motives and objectives regarding the data are educational—there is no evidence of any non-educational use of student data. Plaintiffs make much of the fact that PowerSchool is a for-profit business and that schools pay for its services,[86] but that does not change the analysis. Plaintiffs cannot credibly argue that because PowerSchool charges for its products, its motives are nefarious, especially since the undisputed record shows that PowerSchool does nothing unless schools ask. *See Rodriguez v. Google LLC*, 772 F. Supp. 3d 1093, 1105 (N.D. Cal. 2025) (finding allegations that defendant profited from collection of user data "of little relevance" to the highly offensive analysis).

Plaintiffs also claim that PowerSchool's conduct is highly offensive based on the data elements listed in the DPIAs and their experts' speculative harms.[87] But, as discussed above, the DPIAs do not constitute evidence of the data actually collected.

As for Plaintiffs' experts, they offer only hypotheticals disconnected from the evidence in this case. O'Neil, Plaintiffs' algorithm expert, admitted that she did not look at any PowerSchool product or any algorithm. Instead, she opines only that a predictive algorithm *could* potentially harm a student *if* a school administrator acted on the results of such an algorithm in a particular way (an obvious intervening cause, if this speculation was even correct).[88] Tellingly, she admitted she asked Plaintiffs' counsel for specific examples of this type of harm occurring, and Plaintiffs' counsel "didn't have them."[89] Dr.

---

[85] As Plaintiffs themselves admit, PowerSchool products are used "by schools and school districts across the country, including 90 of the largest schools district." Pls' Mot. for Class Cert., Dkt. No. 196, at 1.

[86] *Id.* at 1, 5–6, 20, Dkt. No. 197.

[87] *Id.* at 18–19, Dkt. No. 197.

[88] O'Neil Expert Rep. at 27, 29, Dkt. No. 142-2

[89] Ex. 44, Dep. of Cathy O'Neil ("O'Neil Dep.") at 62:7–63:1.

Barber's report fares no better, as she too admitted that the risks she identified, such as reputational harm and identity theft, are only relevant *if* the data is exposed to a bad actor.[90] There is no evidence that these risks occurred or will occur with respect to any particular student or data. Dr. Barber, like O'Neil, also failed to investigate any actual use of a PowerSchool product or any data at issue—because there is no data in the record to investigate.[91]

Expert opinions about how data could *possibly* be exploited by bad actors or how analytics models *could* affect students if schools *perhaps* choose to act on those models do not establish evidence that PowerSchool *actually* used data in a highly offensive way. Thus, these experts' opinions do not create a genuine issue of material fact regarding the "highly offensive" element of Plaintiffs' privacy claims. *See Stephens v. Union Pac. Railroad Co.*, 935 F.3d 852, 856–57 (9th Cir. 2019) ("Expert testimony cannot create a genuine issue of material fact if it rests on assumptions that are not supported by evidence . . . A party's own speculation is insufficient to create a genuine issue of material fact . . . and a party cannot make it sufficient simply by finding an expert who is willing to assume its correctness.").

In sum, the undisputed record establishes that Plaintiffs cannot prove a reasonable expectation of privacy in the unspecified data their schools put into PowerSchool products, and PowerSchool's provision of products for educational purposes does not meet the standard for a highly offensive invasion. Thus, summary judgment should be granted in PowerSchool's favor on Plaintiffs' invasion of privacy claims.

### C. PowerSchool is entitled to summary judgment on unjust enrichment because no benefit was conferred by Plaintiffs, and it is not unjust for PowerSchool to retain software licensing fees from schools.

In its motion-to-dismiss order, the Court noted that to have a standalone unjust enrichment claim, Plaintiffs had to bring a quasi-contract claim and "show that the defendant received and unjustly retained a benefit at the plaintiff's expense."[92] *See* Order re Dismissal at 12 (quoting *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016)). To prevail on a quasi-contract claim, it is not enough for a plaintiff to allege that the defendant acted wrongfully. *Vizcarra v. Michaels Stores, Inc.*, 710 F. Supp. 3d 718, 732 (N.D. Cal. 2024). The benefit must have been conferred on the defendant "through mistake,

---

90 Barber Expert Rep. at ¶ 30–31, Dkt. No. 142-3.

91 Barber Dep. 96:14–100:20, 134:2–135:21, 164:11–19, Dkt. No. 135-3.

92 As PowerSchool argued in its motion to dismiss, unjust enrichment is not an independent cause of action in California. *See McLellan v. Fitbit, Inc.*, 2018 WL 2688781, at *4 (N.D. Cal. June 5, 2018).

fraud, coercion, or request." 55 Cal. Jur. 3d Restitution § 2. If none of these predicates exist, the claim fails regardless of whether there is a benefit conferred. *Wall v. Wescom Cent. Credit Union*, 2024 WL 1158361, at *6 (C.D. Cal. Mar. 18, 2024). Further, where a defendant's profits come from third-party transactions rather than the plaintiff, the plaintiff has not conferred a benefit to support an unjust enrichment claim. *Am. Video Duplicating, Inc. v. City Nat'l Bank,* 2020 WL 6882735, at *6 (C.D. Cal. Nov. 20, 2020) (holding that unjust enrichment claim failed because "[t]he only benefit Defendants allegedly received—a lender fee—came from [a third party], not from Plaintiff"); *see also Wall*, 2024 WL 1158361 (dismissing unjust enrichment claim because the plaintiffs did not confer a benefit on the vendor, as the vendor's alleged benefit—profit—came through a separate contract with a third party).

Plaintiffs claim that PowerSchool was unjustly enriched by licensing fees schools paid for four analytics products—Data, Analytics & Insights; Performance Matters; Behavior Support; and Attendance Intervention—that allegedly used student data for predictive algorithms that were not tested for accuracy or bias.[93] As of their latest motion for class certification, Plaintiffs also now argue for the very first time that profits from these products are unjust because the products are "powered" by "all class members' data."[94]

As with their privacy theory, there is no evidence to support Plaintiffs' unjust enrichment claim. As an initial matter, the Court let this claim survive at the motion-to-dismiss stage because it held that "plaintiffs have plausibly alleged severe intrusions on public-school students' privacy" based on Plaintiffs' now-abandoned allegations of PowerSchool building data dossiers and using data for targeted advertising.[95] Because Plaintiffs have jettisoned those original allegations, and, as explained above, their new privacy theories fail, their unjust enrichment claim necessarily fails too. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1041 (9th Cir. 2010) ("Unjust enrichment is essentially another way of stating a tort claim and, consequently, once the underlying tort claim is dismissed, so is the unjust enrichment claim.").

In any event, Plaintiffs cannot establish the elements of an unjust enrichment claim. First, Plaintiffs did not confer any benefit on PowerSchool. Schools and school districts—not Plaintiffs—paid

[93] Pls.' Mot. for Class Cert. at 20-21, Dkt. No. 197.
[94] *Id*. at 21.
[95] Order re Dismissal, Dkt. No. 65, at 12.

for the challenged licensing revenue to use PowerSchool's software. And even if Plaintiffs' data went into PowerSchool products, the "benefit" (i.e. revenue) from those products came from third parties: schools. As a result, Plaintiffs' unjust enrichment claim based on PowerSchool's revenue from schools licensing analytics products fails as a matter of law. *See Am. Video Duplicating, Inc.,* 2020 WL 6882735, at *6.

Plaintiffs attempt to get around this reality with a new argument that the four analytics products are "powered" by "all class members' data."[96] As discussed above, though, what Plaintiffs are really arguing is that because schools use their own data to run their analytics, the analytics products use student data. That is circular, obvious, and says nothing about a benefit conferred from Plaintiffs to PowerSchool. Even so, there is no evidence in the record of what class member data was used to "power" analytics (because it would vary school by school).

Second, Plaintiffs' theory about these analytics products being "untested" fails. Plaintiffs point to no cases that suggest a lack of testing is unjust or unlawful. Instead, Plaintiffs baldly argue that "PowerSchool could, but chooses not to, confirm the fairness and accuracy of its prediction products."[97] But three of the four products at issue have no predictive functionalities, so there is nothing to test.[98] For the one product that does contain the tools schools can use to generate predictive algorithms—Data, Analytics & Insights—the functionality does not operate in the manner Plaintiffs suggest. PowerSchool's 30(b)(6) witness testified that the platform "is not really providing future predictions" but rather "brings together an organization's data from multiple sources to create dashboards and analytics off of them" to help schools "understand their data."[99]

Plaintiffs' algorithm expert, O'Neil, reinforces this point. She testified that in general, predictive algorithms are based on historical data and include a definition of success, and that in the case of PowerSchool's products, schools control both components.[100] That is why to test any algorithm, O'Neil would also need to know precisely how the school uses the algorithm.[101] In short, even if Plaintiffs'

---

[96] Pls.' Mot. for Class Cert. at 21, Dkt. No. 197.
[97] Dkt. No. 196–3 at 4.
[98] Ex. 3, Flagg (30(b)(6)) Dep. at 236:4–11.
[99] *Id.* at 179:12–19, 235:8–11.
[100] Ex. 44, O'Neil Dep. at 29:23-30:13, 31:4–11.
[101] *Id.* at 130:14-133:9.

testing theory were a basis for unjust enrichment (it is not), the record is clear that any testing would need to be done by the schools, not PowerSchool. This fits with the real concern behind Plaintiffs' claims—that the schools would create unreliable predictive models and take actions based on those models that would disadvantage a student. *See* Dkt. No. 197, at 4–5. But that hypothetical entirely involves the schools' actions, not any action by PowerSchool. And nothing about the hypothetical harmful conduct by the schools creates an unjust enrichment claim against PowerSchool.

For any of these reasons, the Court should grant PowerSchool's request for summary judgment on Plaintiffs' unjust enrichment claim.

**D. Plaintiffs are not entitled to punitive damages as a matter of law.**

Plaintiffs claim they are also entitled to punitive damages under California law. But punitive damages require clear and convincing evidence that the defendant acted with oppression, fraud, or malice. Cal. Civ. Code § 3294; *see Basich v. Allstate Ins. Co.,* 105 Cal. Rptr. 2d 153, 158 (2001) (granting summary judgment on punitive damages claim where plaintiff failed to present clear and convincing evidence of malice, oppression, or fraud). As explained above, there is no evidence for Plaintiffs' invasion of privacy or unjust enrichment claims because PowerSchool acted at all times only at the direction of the schools for educational purposes in ways expressly permitted by federal and state law. Plaintiffs therefore cannot, as a matter of law, meet the demanding burden for punitive damages. Even if Plaintiffs could meet the lower threshold for their claims, there is no evidence of "oppression, fraud, or malice." The Court should grant summary judgment on this request.

## CONCLUSION

There are no fact issues for a jury here. Accordingly, the Court should grant PowerSchool's motion for summary judgment on all of Plaintiffs' claims.

DATED: October 12, 2026

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Olivia Adendorff*

Olivia Adendorff, P.C.

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*