Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for the Defendant PowerSchool Holdings, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | | |
|---|---|---|
| EMILY CHERKIN, et al<br><br>Plaintiffs,<br><br>v.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 3:24-CV-02706-JD<br><br>**DEFENDANT POWERSCHOOL HOLDINGS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE OPINIONS OF DR. K. SUZANNE BARBER**<br><br>Judge: Hon. James Donato<br>Hearing Date: November 19, 2026<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |

**NOTICE OF MOTION**

PLEASE TAKE NOTICE THAT on November 19, 2026, at 11:00am PT, or as soon thereafter as this matter may be heard, in the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, in Courtroom 11, 19th Floor, before the Honorable James Donato, Defendant PowerSchool Holdings, Inc. ("PowerSchool") will and hereby does move the Court to exclude Plaintiffs' proffered expert Dr. K. Suzanne Barber and strike her Expert Report.

**TABLE OF CONTENTS**

**Page**

**I. INTRODUCTION ....... 1**

**II. BACKGROUND ....... 2**

**III. LEGAL STANDARD ....... 5**

**IV. ARGUMENT ....... 6**

A. Dr. Barber's Opinion Regarding "Minimum" Data Elements Collected by PowerSchool Products Invades the Province of the Jury. ....... 6

B. Dr. Barber's Opinion About Data "Sensitivity" Relies Solely on *Ipse Dixit*, Not Any Reliable Methodology. ....... 6

C. Dr. Barber Has No Basis to Speculate that Data Stored by PowerSchool Is at Risk of Exposure. ....... 7

D. Dr. Barber Has No Reliable Basis to Opine that PowerSchool "Exposed" Students to the Risk of Harm. ....... 9

1. Dr. Barber Impermissibly Relies on Inadmissible Hearsay. ....... 10

2. Dr. Barber's Reliance on the UTCID Database to "Calculate" the Monetary Value and Risk of Exposure of Data Is Unreliable. ....... 10

3. There Is No "Fit" Between the UTCID Database and the Facts of this Case. ....... 11

**V. CONCLUSION ....... 14**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple Inc. Sec. Litig.*,
2023 WL 4556765 (N.D. Cal. July 17, 2023)....................9, 11

*Bakst v. Cmty. Mem'l Health Sys., Inc.*,
2011 WL 13214315 (C.D. Mar. 7, 2011)....................8

*CZ Servs., Inc. v. Express Scripts Holding Co.*,
2020 WL 4518978 (N.D. Cal. Aug. 5, 2020) (Donato, J.)....................6

*Daubert v. Merrell Dow Pharms.*,
43 F.3d 1311 (9th Cir. 1995)....................10

*Daubert v. Merrell Dow Pharms, Inc.*,
509 U.S. 579 (1993).................... *passim*

*Dep't of Toxic Substances Control v. Technichem, Inc.*,
2016 WL 1029463 (N.D. Cal. Mar. 15, 2016)....................8, 9, 10

*Domingo ex rel. Domingo v. T.K.*,
289 F.3d 600 (9th Cir. 2002)....................10, 13, 14

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025)....................5

*Fahmy v. Jay Z*,
2015 WL 5680299 (C.D. Cal. Sept. 24, 2015)....................11

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....................5, 7, 9, 12

*GPNE Corp. v. Apple, Inc.*,
2014 WL 1494247 (N.D. Cal. Apr. 16, 2014)....................7

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022)....................13

*Hernandez v. Hillsides, Inc.*,
2011 P. 3d 1063 (Cal. 2009)....................13

*Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*,
2021 WL 12255004 (E.D. Mich. Sep. 29, 2021)....................7

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025)....................5

*Koger*, *v. Costco Wholesale Corp.*,
2023 WL 8188842 (N.D. Cal. Nov. 27, 2023) (Donato, J.) ....................10

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................5

*Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*,
713 F. Supp. 3d 660 (N.D. Cal. 2024) ....................5

*Ollier v. Sweetwater Union High Sch. Dist.*,
768 F.3d 843 (9th Cir. 2014) ....................8

*Pascal v. Nissan N. Am., Inc.*,
2022 WL 19076763 (C.D. Cal. Dec. 21, 2022) ....................7

*S.F. Baykeeper v. City of Sunnyvale*,
627 F. Supp. 3d 1085 (N.D. Cal. 2022) ....................8

*Siqueiros v. Gen. Motors LLC*,
2022 WL 74182 (N.D. Cal. Jan. 7, 2022) ....................6, 7, 9

*Sonneveldt v. Mazda Motor of Am., Inc.*,
2024 WL 5242611 (9th Cir. Dec. 30, 2024) ....................12

*Townsend v. Monster Beverage Corp.*,
303 F. Supp. 3d 1010 (C.D. Cal. 2018) ....................5

*In re Toyota Motor Corp.*,
978 F. Supp. 2d 1053 (C.D. Cal. 2013) ....................7

*Waymo LLC v. Uber Techs., Inc.*,
2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ....................9

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000)....................5

**Rules**

Fed. R. Evid. 702 ....................9, 10, 12

## I. INTRODUCTION

Plaintiffs offer Dr. K. Suzanne Barber, a software engineering professor at the University of Texas, to support their claims for invasion of privacy and unjust enrichment. Dr. Barber offers five overlapping opinions: (1) PowerSchool products control and process highly "sensitive" Personally Identifying Information ("PII"); (2) the kind of PII stored by PowerSchool is under constant attack by various threats and thus requires diligent protection; (3) there are numerous possible ways PII stored by PowerSchool could be hacked or exposed; (4) exposure of the PII stored by PowerSchool could cause diverse, longstanding, and significant harms; and (5) by controlling and processing student PII without permission and informed consent, PowerSchool exposes students to the risk of diverse, longstanding, and significant harm. Ex. A, Barber Rep. ¶ 3. Each opinion suffers from multiple, compounding problems, and none clears the hurdle for admissibility.

***First***, all of Dr. Barber's opinions turn on her conclusion about the specific data fields PowerSchool's products store and process. But Dr. Barber admitted at her deposition that she does not know which data fields PowerSchool's products actually store and process, only the data fields each product is ***capable*** of capturing—and even that "opinion" is based only on a recitation of PowerSchool documents. Ex. B, Barber Tr. 95:18-99:7, 121:8-123:8, 146:14-148:17. Her opinions thus rest on no expert analysis of PowerSchool products, let alone a reliable one.

***Second***, Dr. Barber's determination that data stored and processed by PowerSchool is "sensitive" is based on nothing more than her say-so. She created her own definition of "sensitive data" unsupported by any objective source. She deemed "sensitive" any data listed in an unverified third-party database that tracks news reports of identity theft and fraud, without explanation or justification. This "methodology" is a black box that cannot be verified or tested, rendering it unreliable under *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993).

***Third***, Dr. Barber's opinions that data stored and processed by PowerSchool is under "constant threat" by "numerous" bad actors, and therefore PowerSchool exposes class member data to risk of exposure simply by processing it, are unsupported and impermissibly speculative. Dr. Barber has no idea how PowerSchool stores data for any of its products, Ex. B, Barber Tr. at 98:18-21, and "really [doesn't] know anything about PowerSchool's . . . network configurations and cybersecurity," *id.* at 280:13-281:3.

She thus conceded that she does not know the actual risk of exposure for any data held by PowerSchool. *Id.* at 277:16-278:8 ("[Q.] Is it your opinion that by simply storing student data, PowerSchool creates a risk of exposure? . . . [A.] I don't know what their risk of exposure is. I don't know what their cybersecurity practices are."). Because her opinions regarding the risk of exposure posed by PowerSchool's products depend entirely on her speculation, they are inadmissible.

***Fourth***, Dr. Barber's opinion that PowerSchool storing PII exposes class members to the risk of quantifiable harm rests entirely on an unreliable methodology—conclusions drawn from an unreliable, unverified third-party database regarding data breaches in dissimilar situations. Her exclusive reliance on this dataset supplies multiple independent reasons to exclude her testimony. Dr. Barber's use of the database is improper reliance on inadmissible hearsay, as she admitted her role in the case is "just reporting on what [she] found in those [database] cases [she] looked at." Ex. B, Barber Tr. 217:4-220:2. It also renders her methodology unreliable, as she cannot show that anyone in her field has ever used the database to estimate risk of exposure or harm associated with any data element. And finally, it does not "fit" the facts of this case. The database records almost exclusively information about data breaches involving the misappropriation of adult data (e.g., bank account information, driver license), *id.* at 307:3-309:18, and thus Dr. Barber's reliance on it improperly equates harm to students in this case to the kind of financial harm that can be suffered by adult victims of identity theft (i.e., victims with bank accounts and net worths). Dr. Barber never bridges this massive analytical gap.

The Court should exclude Dr. Barber's opinions in their entirety.

## II. BACKGROUND

Dr. Barber represents herself "as a technical expert" with experience in "software engineering, digital identity, cybersecurity, digital trust and information security and privacy." Ex. A, Barber Rep. ¶¶ 2-3. Plaintiffs offer her testimony for the following opinions.

***First***, Dr. Barber opines that PowerSchool products "automatically" collect "minimum" data elements and thus "control and process highly sensitive [PII]." Dkt. 196-3, Mot. for Class Cert. 13, n.79, 18, n.95; Ex. A, Barber Rep. ¶ 3. To determine what information PowerSchool products "control and process," Dr. Barber simply regurgitates PowerSchool's Data Privacy Impact Assessment ("DPIA") reports, which she asserts list the "data elements processed by PowerSchool products." *Id.* at ¶ 30; Ex. B,

Barber Tr. 96:14-100:20, 134:2-22, 164:11-19. At deposition, however, Dr. Barber admitted that she could not say whether every PowerSchool product collects all of the data fields listed in the DPIAs. *Id.* at 118:11-123:8 ("[Q.] So you're not offering an opinion that all of these data elements are collected [by the PowerSchool product]; is that right? A. That's right."). Rather, she admitted that the DPIA merely describes PowerSchool's "***capability*** of storing this information," not what any product ***actually*** stores from any student. *Id.* at 146:14-148:17 (emphasis added); *see also id.* at 121:8-123:8. She does not know what data elements PowerSchool products actually collect for any school or student because she never independently inspected or used any PowerSchool product. *Id.* at 95:18-99:7. Ultimately, she conceded that she offers ***no opinion*** on minimum data fields as she "wasn't asked to review that." *Id.* at 103:12-106:2, 107:1-15, 122:6-123:8, 142:22-143:12, 152:10-19.

Dr. Barber next opines that the data PowerSchool products may process is "highly sensitive." For this conclusion, she relies on her own definition of "sensitive data": "information that if exposed, shared, misused, or accessed without authorization, can cause significant harm, discrimination, financial loss, or privacy violations for individuals or organizations." Ex. A, Barber Rep. ¶ 20. To apply that definition, she compared the data fields in PowerSchool's DPIA reports to those in a proprietary University of Texas database (the "UTCID database") of known data breaches. *Id.* at ¶¶ 34, 37, 40, 44, 47, 50, 53, 58, 64; Ex. B, Barber Tr. 200:17-201:4, 215:10-18, 216:4-217:12. The UTCID database was created in 2019 by a "team of modelers" who "analyze[d] identity theft and fraud news stories" and "aggregate[d] data" on "identity thieves' and fraudsters' processes and patterns."[1] Dr. Barber was "not . . . asked to look" and was not aware of any evidence that "the data collected by PowerSchool was actually used [by anyone] to identify" or locate students, that PowerSchool's processing of data "actually . . . resulted in significant . . . harm[]" to students through breaches and the like, that data was "actually monetized" or "actually exploited" by bad actors, or that the students' data "was actually used . . . to create longitudinal harm." Ex. B, Barber Tr. 199:10-200:4, 200:17-202:4, 203:13-206:17, 212:12-213:6, 213:15-19, 215:4-9, 216:18-217:12. Her sensitivity conclusions thus are entirely based on whether PowerSchool has the capability to

[1] Razieh Nokhbeh Zaeem, et al., The Identity Ecosystem 39:3 (UTCID Report #19-08, 2019), https://identity.utexas.edu/sites/default/files/2020-09/The%20Identity%20Ecosystem.pdf.

store data of the same type as the data types that happen to be listed in the UTCID database of news reports. *Id.* at 200:17-201:4, 215:10-18, 216:4-217:12.

***Second***, Dr. Barber opines that data held by PowerSchool products "is under constant attack" and that there are "numerous possible causes for [its] exposure." Ex. A, Barber Rep. ¶ 3. But she admitted at deposition that she does not know PowerSchool's "risk of exposure" because she did no work to investigate its cybersecurity practices. Ex. B, Barber Tr. 277:22-278:8. For example, she did not know whether any "data in this case has been harvested" by any bad actor, *id.* at 260:2-9, and she "can't speak to" whether "PowerSchool products cause harm." *Id.* at 280:13-281:3. Her opinion is instead limited to explaining that "deciding to store particular [kinds of] data elements . . . can cause more harm than others." *Id.* at 277:22-278:8.

***Third***, Dr. Barber opines that "[t]he exposure of the PII controlled and processed by PowerSchool products can cause diverse, longstanding, and significant harms." Barber Rep. ¶ 3; *see also* Dkt. 196-3, Mot. for Clas Cert. 14, n.81 (relying on this opinion to establish that "PowerSchool's practice of controlling and processing student data" actually "cause[s]" harm to class members). For this opinion, she again relied exclusively on the UTCID database. Ex. B, Barber Tr. 27:5-14, 50:2-51:5, 51:11-52:18. By her own estimate, approximately 90 percent of the data-breach cases in the database do not involve school data, and most involve misappropriation of adult data. *Id.* at 308:3-309:2, 309:15-18. Dr. Barber had no role in creating this dataset, never independently validated it, and never explains why it is consistent or reliable. *Id.* at 50:2-51:5. Nevertheless, she had a student query the UTCID database for data elements resembling those in the DPIAs and then "roughly and by hand matched PII names from the UTCID database . . . to PII data elements listed in the DPIA," *id.* at 330:20-331:12—a process she admitted did not follow a "systematic method." *Id.* at 331:13-20.

From this matching exercise, Dr. Barber derived four metrics: (1) "Monetization Value," indicating some "non-0 value" associated with each data element, *id.* at 378:9-379:1; (2) "Risk of Exposure," measuring how frequently a data element appears in reported identity theft and fraud cases; and (3) "Vulnerability" and (4) "Influence," measuring the likelihood that exposure of one data element leads to exposure of others. Ex. A, Barber Rep. ¶¶ 88, 90-92; Ex. B, Barber Tr. 334:13-335:5. Dr. Barber conceded that "Monetization Value" ***does not represent*** how much someone could sell the data for, how

much malicious actors have profited from that data element, or the financial loss an individual suffers from having their PII exposed. *Id.* at 374:10-379:21. Instead, it answers a single yes-or-no question: "[D]oes PowerSchool hold valuable data?" *Id.* at 377:18-378:2. From these metrics, she asserts that the data elements listed in PowerSchool's DPIA—i.e., data that PowerSchool products are "capable" of holding—carries some unknown monetary value and some unspecified degree of exposure risk. *Id.* at 375:3-378:2. Contrary to Plaintiffs' assertion that her analysis shows PowerSchool products "cause" harm, Dr. Barber testified that she offers only an opinion about the "***potential*** of harm" created by any storage of PII. *Id.* at 291:6-293:3 (emphasis added). In other words, she does not claim that the data PowerSchool processes has actual value or is actually at risk of exposure—nor could she, since she does not know what data PowerSchool actually has. She claims only that data of ***that same category*** (e.g., "name") has been monetized and exposed from some individual in some other circumstance by some bad actor per the UTCID database.

## III. LEGAL STANDARD

The party offering expert testimony bears the burden of establishing, by a preponderance of the evidence, that the testimony is both reliable and helpful to the trier of fact.[2] *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025). A district court serves as a gatekeeper, ensuring that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. A court need not admit "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and may exclude testimony where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137, 146 (1997) (citation omitted). The Court must apply "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

---

[2] District courts in this Circuit routinely apply *Daubert* at the class certification stage. *See, e.g., Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956 (N.D. Cal. 2025); *Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 713 F. Supp. 3d 660 (N.D. Cal. 2024); *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010 (C.D. Cal. 2018).

## IV. ARGUMENT

### A. Dr. Barber's Opinion Regarding "Minimum" Data Elements Collected by PowerSchool Products Invades the Province of the Jury.

Dr. Barber's first opinion (on which she bases her others) should be excluded because she has no basis—factual, scientific, or otherwise—to opine that any PowerSchool product automatically collected "minimum" data elements for any class member. Indeed, she disclaimed this opinion at deposition. Ex. B, Barber Tr. 121:8-123:8 ("Q. [Y]our opinion is not that every single PowerSchool product collects all of the data fields reflected on the DPIAs . . . that is not your opinion, correct? A. Right . . . I wasn't asked to evaluate instances of data or instances of configurations."). But even if Dr. Barber had not abandoned this opinion, it is inadmissible because it "merely summarizes" PowerSchool's DPIAs without applying any additional analysis. *Siqueiros v. Gen. Motors LLC*, 2022 WL 74182, at *9 (N.D. Cal. Jan. 7, 2022) (excluding opinions that "restate nothing more than . . . what is stated in the [record]" because an expert cannot "restate or summarize record evidence and then state a conclusion without applying a methodology that is reliable and which evinces his/her expertise") (citation omitted). Dr. Barber's only basis to opine on what data PowerSchool collects, or that each product collects "minimum" data fields, is PowerSchool's DPIAs. She never inspected or used any PowerSchool product nor reviewed product configurations or testimony by product managers about what data PowerSchool products actually collect and store. Ex. B, Barber Tr. 91:22-92:4, 97:1-99:7. Her "analysis" thus begins and ends with copying data elements from PowerSchool's DPIA documents. *Id.* at 96:14-22, 117:11-16. There is no "expert analysis" in that exercise. *CZ Servs., Inc. v. Express Scripts Holding Co.*, 2020 WL 4518978, at *2 (N.D. Cal. Aug. 5, 2020) (Donato, J.) (excluding opinions "akin to percipient witness observations . . . [t]hat is hardly a matter of specialized analysis or inquiry"). Because the jury is "capable of drawing its own inferences" and is in as good of a position as Dr. Barber to "draw conclusions" from the DPIAs, this opinion should be excluded. *Siqueiros*, 2022 WL 74182, at *9.

### B. Dr. Barber's Opinion About Data "Sensitivity" Relies Solely on *Ipse Dixit*, Not Any Reliable Methodology.

Dr. Barber's assessment of data "sensitivity" in her first opinion is also improper because it applies an obviously nonsensical and unreliable methodology. The definition of "sensitive" data she applies in analyzing PowerSchool's DPIAs relies on nothing more than her say-so and thus must be excluded. *Id.*

at *14 (excluding "opinion evidence which is connected to existing data only by the *ipse dixit* of the expert") (citation omitted).

To determine which data is "sensitive," Dr. Barber considered whether a data type appears in the UTCID database of data breaches. Ex. A, Barber Rep. ¶¶ 20, 34, 37, 40, 44, 47, 50, 53, 58, 64; Ex. B, Barber Tr. 200:17-201:4, 215:10-18, 216:4-217:12. In other words, if the UTCID database recorded a data breach in which hackers took a particular data type, it must be sensitive. This assumes that all data ever hacked must be sensitive—a rather nonsensical and circular assumption.

Dr. Barber's methodology is neither falsifiable nor replicable. *Pascal v. Nissan N. Am., Inc.*, 2022 WL 19076763, at *9 (C.D. Cal. Dec. 21, 2022) (excluding expert testimony where "there is no way anyone else can recreate his testing and verify its results"). She provides no explanation as to why the UTCID included some data breaches or may have excluded others. There is no explanation of the UTCID creators' methodology at all. And yet inclusion in the data base is determinative of whether or not data is "sensitive," in Dr. Barber's view. Such an arbitrary and untestable determination cannot meet *Daubert*'s reliability standard. *See, e.g.*, *Gen. Elec. Co.*, 522, U.S. at 146 ("[A] district court [is not required] to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *5 (N.D. Cal. Apr. 16, 2014) (excluding expert testimony where the analysis was an "impermissible black box without 'sound economic and factual predicates'" or any "methodology other than his . . . 'years of experience'"); *In re Toyota Motor Corp.*, 978 F. Supp. 2d 1053, 1067-68 (C.D. Cal. 2013) (excluding expert opinions "not based on a reliable foundation or methodology"); *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 2021 WL 12255004, at *17 (E.D. Mich. Sep. 29, 2021) (excluding expert testimony that "merely concludes . . . that it is so" as "not . . . helpful to the jury").

### C. Dr. Barber Has No Basis to Speculate that Data Stored by PowerSchool Is at Risk of Exposure.

Dr. Barber next opines that because PowerSchool products hold sensitive PII data (as established by the unreliable methodology described above), that data (1) "is under constant attack by a variety of threats," and (2) can be exposed due to "malicious threats and business practices aimed to monetize the

PII." Ex. A, Barber Rep. ¶ 3. These opinions are inadmissible because they are speculation untied to any facts of this case.

As a preliminary matter, any opinion that data held by PowerSchool is "under threat" or could be exposed to bad actors should turn on PowerSchool's specific business practices and security controls. But Dr. Barber did ***no*** work to investigate either. She never inspected or used any PowerSchool product and did not review actual product configurations or testimony by product managers about how PowerSchool products actually collect and store data. Ex. B, Barber Tr. at 91:22-92:4, 97:1-99:7. Nor did she review PowerSchool's cybersecurity practices, security controls, encryption, monitoring, or access controls. *Id.* at 277:22-278:8, 280:13-281:3. Although her report references PowerSchool's 2024 data breach, she admitted that she saw no evidence that PowerSchool's data was ever harvested, monetized, exploited, or used to harm students. *Id.* at 199:10-206:17, 212:12-213:19, 215:4-9, 216:18-217:12. She does not know PowerSchool's "risk of exposure" and "can't speak to" whether "PowerSchool products cause harm." *Id.* at 277:22-278:8, 280:13-281:3.

Lacking any specific facts, Dr. Barber's opinions rest on "speculation rather than on a systematic assessment" of PowerSchool's business practices. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014). Courts regularly exclude such speculative opinions as failing *Daubert*'s threshold reliability requirement. *See, e.g.*, *id.*; *Bakst v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214315, at *20 (C.D. Mar. 7, 2011) (excluding expert testimony "based on factual assumptions that are entirely unsupported in the record" as impermissibly "speculative" and "fail[ing to] meet the second prong of *Daubert*"); *Dep't of Toxic Substances Control v. Technichem, Inc.*, 2016 WL 1029463, at *1 (N.D. Cal. Mar. 15, 2016) (excluding expert testimony "based on speculation" because "speculative testimony is inherently unreliable") (citation omitted); *S.F. Baykeeper v. City of Sunnyvale*, 627 F. Supp. 3d 1085, 1093-94 (N.D. Cal. 2022) (excluding opinion where expert testified at deposition that he "did not have actual direct cost data to rely on"). The same result should follow here.

Without any understanding of PowerSchool's practices, Dr. Barber can offer only the basic opinion that PII data might be exposed maliciously, intentionally, or accidentally. But her "methodology" for this opinion amounts to (i) quoting one IBM report titled "2025 Cost of a Data Breach" and (ii) referencing a prior PowerSchool data breach just to say that "it happens." Ex. A, Barber Rep. ¶¶ 65-71; Ex. B, Barber

Tr. 260:14-261:1. Putting aside that this case has nothing to do with any data breach, her opinion fails because she does nothing more than summarize irrelevant evidence and "then state a conclusion without applying a methodology that is reliable and which evinces [her] expertise." *Siqueiros*, 2022 WL 74182 at *9 (citation omitted). Such a flimsy opinion is unreliable and invades the province of the jury. *Id.*; *Dep't of Toxic Substances Control*, 2016 WL 1029463, at *1 (excluding expert because he did not "analyze his source materials so much as repeat their contents" and his "investigation otherwise appears to have been cursory and unscientific") (citation omitted). It also impermissibly acts as a "conduit for attorney argument" that cloud hosting is inherently harmful. *In re Apple Inc. Sec. Litig.*, 2023 WL 4556765, at *5 (N.D. Cal. July 17, 2023) (excluding expert who simply summarized documents to "provide context" regarding Apple's earning calls because he was "substitut[ing] his own judgment for [the jury's]"); *see also Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 6, 2017) (excluding expert because there was "no reason for [him] to serve as a mouthpiece for arguments that Waymo's lawyers can make"). Nor can Dr. Barber's experience save this opinion; she never explains "why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts," rendering any opinion inadmissible *ipse dixit.* Fed. R. Evid. 702 advisory committee's note (2000); *Gen. Elec. Co.*, 522 U.S. at 146.

### D. Dr. Barber Has No Reliable Basis to Opine that PowerSchool "Exposed" Students to the Risk of Harm.

Dr. Barber's final two related opinions are (i) if the data stored by PowerSchool was exposed, it could "cause diverse, longstanding, and significant harms," and (ii) thus, PowerSchool "exposed" students "to the risk of diverse, longstanding, and significant harm" by "controlling and processing student PII." Ex. A, Barber Rep. ¶ 3. The sole basis for these opinions is her review of the UTCID database of data breach and fraud cases. *Id.* ¶ 94. Specifically, based on the UTCID reported data breach information, Dr. Barber assigned values to the data elements she asserts PowerSchool products store across four metrics: (i) Monetary Value, (ii) Risk of Exposure, (iii) Vulnerability, and (iv) Influence. *Id.* This "methodology" runs afoul of the requirements for admissible expert testimony for three independent reasons.

#### ***1. Dr. Barber Impermissibly Relies on Inadmissible Hearsay.***

"Experts are not permitted to prepackage inadmissible hearsay as expert testimony." *Koger*, *v. Costco Wholesale Corp.*, 2023 WL 8188842, at *2 (N.D. Cal. Nov. 27, 2023) (Donato, J.). Yet that is what Dr. Barber does—taking a university database, reciting or summarizing its contents, and asserting that the database proves the fact and magnitude of the alleged harm caused by PowerSchool to Plaintiffs. She described her role in the case as "just reporting on what [she] found in those [UTCID] cases [she] looked at." Ex. B, Barber Tr. 217:4-220:2. She admitted that she was not the database's architect and did ***not*** study the UTCID "source data" in reaching her conclusions in this case. *Id.* 27:5-14, 50:2-16. She did not even review the database herself; her student assistant ran the queries. *Id.* at 50:2-51:5, 27:5-14, 51:11-52:18. Her sole role is thus to introduce the supposed content of this inadmissible hearsay evidence to demonstrate "the potential harm" that is inherent to any system storing PII. *Id.* at 309:15-18. But an expert who "does not analyze [her] source materials so much as repeat their contents" cannot meet the threshold requirements of *Daubert* and Rule 702. *Dep't of Toxic Substances Control*, 2016 WL 1029463, at *1 (excluding expert that just attempted to summarize facts) (citation omitted). Because Dr. Barber "merely recite[d] the conclusions of [the UTCID database] without further discussion of [its] data or methodology," her testimony is inadmissible. *Koger*, 2023 WL 8188842, at *2.

#### ***2. Dr. Barber's Reliance on the UTCID Database to "Calculate" the Monetary Value and Risk of Exposure of Data Is Unreliable.***

Dr. Barber also fails to establish that using the UTCID database to estimate the risk of harm and exposure for any data is a scientifically valid methodology. She did no work to validate the underlying methodology used to compile the UTCID database. Ex. B, Barber Tr. at 50:2-51:5. Nor does she show that her use of the database has "been subjected to normal scientific scrutiny through peer review [or] publication" or point to any "objective source . . . to show [she has] followed the scientific method, as it is practiced by (at least) a recognized minority of [experts] in [her] field." *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1318-19 (9th Cir. 1995). Indeed, she fails to supply ***anything*** indicating that ***anyone*** in her field ***has ever*** used the UTCID database to estimate the risk of exposure or monetary harm associated with individual data fields, let alone the "widespread acceptance" of this methodology required for admission. *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002) (excluding expert

because "there was no evidence of widespread acceptance of [his] theory" nor any "other evidence to show that [he] followed a valid, scientific method in developing his theory").

The absurdity of Dr. Barber's conclusions underscores the unreliability of her approach. For instance, to derive "Monetary Value," Dr. Barber takes the total financial loss in each UTCID data-crime case, divides it equally among the PII data elements involved (regardless of what they are), then adds up those per-element values from every case to get the total "Monetary Value" assigned to each element. Ex. A, Barber Rep. ¶ 92. Thus, if news reports said a criminal stole five data elements from an individual—Name, Address, Date of Birth, Social Security Number, and School ID Number—and used them to extract $100,000, Dr. Barber's calculation assigns each of the five data elements an equal $20,000 of value. *Id.* This is so even if one of them—e.g., School ID Number—played no role in the theft and could not be used for any crime or wrongdoing in isolation. Her methodology also produces wild swings in results, depending on which variation of the data element one selects: UTCID stated that "Email Address" apparently presents a risk of exposure of 11.59%, while "Email" has a risk exposure of only 0.17%; "[a]ddress" has a risk of exposure of 35.95%, while "Physical Address" and "Mail Address" have risks of exposure of 2.33% and 11.61%, respectively. Ex. A, Barber Rep., App. A.

Dr. Barber's report never explains why these nominal variations in data elements should produce such radically different and nonsensical results. The Court should exclude these unreliable "calculations," and opinions based on them, which invite the factfinder to treat arbitrary numbers as scientific evidence of harm. *See, e.g.*, *In re Apple Inc. Sec. Litig.*, 2023 WL 4556765, at *9 (excluding expert opinion that was "likely to confuse the jury"); *Fahmy v. Jay Z*, 2015 WL 5680299, at *4-5 (C.D. Cal. Sept. 24, 2015) (excluding expert testimony because "presenting testimony with the degree of precision contained in [the expert's] report carries a substantial risk that the jury will attach undue weight to the numbers provided, even if they are ostensibly characterized to be only an illustration").

### ***3. There Is No "Fit" Between the UTCID Database and the Facts of this Case.***

Even if Dr. Barber's use of the UTCID database to estimate the monetary value of data was sufficiently reliable in ***some case***, its use in ***this case*** is plainly prohibited under *Daubert's* requirement that expert testimony "fit" the facts at issue. Dr. Barber offers ***no*** explanation for applying a database tracking criminal data fraud cases to the alleged risk of exposure and harm associated with class member

data stored and processed by PowerSchool. Given the obvious differences between the two, this failure is fatal to Dr. Barber's admissibility.

Under Rule 702, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. This standard requires a "valid scientific connection to the pertinent inquiry" in a case "as a precondition to admissibility." *Daubert*, 509 U.S. at 591–92. Dr. Barber must thus "connect" her reliance on the UTCID database to the data at issue here—i.e., data stored and processed by PowerSchool—and the alleged wrongful conduct underlying Plaintiffs' claims—i.e., storing and processing student data without consent. She cannot do so because, as discussed, she does not even know what data PowerSchool actually stored and processed, only the data it was ***capable*** of storing and processing. Ex. B, Barber Tr. at 95:18-99:7, 121:8-123:8, 146:14-148:17. Her opinion should be excluded for this reason alone. *Gen. Elec. Co.*, 522 U.S. at 146 (affirming exclusion of expert testimony because there was "simply too great an analytical gap between the data and opinion proffered").

But even putting that fatal flaw aside, Dr. Barber's opinions should be excluded because she fails to tie the UTCID database to the facts at issue here. *Sonneveldt v. Mazda Motor of Am., Inc.*, 2024 WL 5242611, at *2 (9th Cir. Dec. 30, 2024) (stating that for an expert's opinion to be admissible, there must be "sufficient facts and data to 'support . . . every necessary link' in his theory") (citation omitted). To be sure, there was no basis for Dr. Barber to blindly assume that the UTCID database was an appropriate proxy for the alleged data and conduct at issue in this case; the differences between the two are readily apparent. As mentioned, Dr. Barber concedes that the UTCID database reflects data unlike the student data at issue here: approximately 90% of the cases reported do not involve data from a school, and most involve misappropriation of adult data. Ex. B, Barber Tr. 308:22-309:2, 309:15-18. And the monetary value Dr. Barber assigns each data field in the database is entirely untethered to the data fields she claims are stored and processed by PowerSchool. For example, Dr. Barber opines that a person's email address has a monetary value of over $60 million because email addresses are often used to log into banking systems. *Id.* at 378:9-379:9. There is simply no basis to assume that the email address of a middle schooler—an individual who almost certainly has no bank account—is worth anywhere close to that amount. Indeed, there is not a single allegation in this case that any class member data was used in connection with identity theft, fraud, or abuse.

Given these dramatic differences, Dr. Barber needed to explain her extrapolation from the UTCID database to Plaintiffs' allegations. *Domingo ex rel. Domingo*, 289 F.3d at 606 ("[W]hile studies involving similar but not identical situations may be helpful, an expert must set forth the steps used to reach the conclusion that the research is applicable."). But she failed to provide ***any*** facts or methodology supporting her extrapolation. Ex. B, Barber Tr. 199:10-202:3, 203:13-206:17, 212:12-213:19, 215:4-9, 216:18-217:12, 308:22-309:2, 309:15-18. She instead relied entirely on her "judgment" and personal approximation to associate the two. *Id.* at 272:8-273:14, 329:10-330:8, 331:13-332:7, 400:3-19. That is not sufficient to establish a "valid scientific connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591–92; *see also Domingo ex rel. Domingo*, 289 F.3d at 607 ("The reasoning between steps in a theory must be based on objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in the field.") (citation omitted).

Given Dr. Barber's failure to explain her extrapolation from the UTCID database to Plaintiffs' allegations, it is no surprise that she walked back many of her assertions at deposition. She admitted that the "monetary value" she assigned to each data element does not reflect the actual value of the data element, the amount a malicious actor could obtain for it, or the loss suffered by an individual. *Id.* at 374:10-379:21; *id.* at 379:5-18 ("Q. You are not opining that PowerSchool's e-mail address data is worth $60 million. Fair? A. I am not. Q. You are not opining that monetization value in Column I represents the amount that threat actors have made using the Plaintiffs' data in this case, right? A. That's correct. Q. You are not opining that monetization value represents the financial impact of exposed PII in this case, right? A. I didn't look at that."). Instead, according to Dr. Barber, "Monetary Value" indicates merely "a non-[zero] value" suggesting that data is valuable. *Id.* at 378:18-379:1; *see also id.* at 375:4-378:2 (conceding she is "not giving actual numbers" for monetary harm associated with any data element). But this generalized opinion that data has "a non-zero value" in the hands of bad actors has no relation to Plaintiffs' claims, which require Plaintiffs to show ***PowerSchool's conduct*** was "highly offensive," not some "inchoate risk" associated with storing data. *See, e.g.*, *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090-91 (N.D. Cal. 2022) (dismissing invasion of privacy claim for failure to allege that defendant's specific collection and use of the data was highly offensive); *Hernandez v. Hillsides, Inc.*, 2011 P. 3d

1063, 1078-79 (Cal. 2009) (overturning ruling allowing a privacy claim to go forward based "on the inchoate risk" of an intrusion from a record device).

Because Dr. Barber neither establishes that the UTCID database is applicable to the specific facts of this case nor provides the requisite "analytical support for [her] extrapolation," her testimony will not assist the jury and is thus inadmissible. *Domingo ex rel. Domingo*, 289 F.3d at 606.

## V. CONCLUSION

For the foregoing reasons, the Court should grant Defendant's Motion to Exclude the Opinions of Dr. K. Suzanne Barber.

DATED: October 12, 2026

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Olivia Adendorff*

Olivia Adendorff, P.C.

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*