# Exhibit B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

--------------------------X
EMILY CHERKIN, et al. )
)
Plaintiffs, )
)
v. ) CASE NO. 3:24-CV-02706-JD
)
POWERSCHOOL HOLDINGS, )
INC., )
)
Defendant. )
--------------------------X

INCLUDES CONFIDENTIAL TESTIMONY

REMOTE VIDEOTAPED DEPOSITION OF

KATHLEEN SUZANNE BARBER SIMONS

Monday, March 2, 2026

9:04 a.m. CST to 6:12 p.m. CST

Reported by: Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR, CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460, NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime Court Reporter, NY Association Certified Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778, WA CSR 23005926, Remote Counsel Reporter, LiveLitigation Authorized Reporter, Notary Public

Job No. 2026-1012179

BY ATTORNEY Z. SHAH:

Q. So you may have spent upwards of 100 hours working on this case; is that right?

A. Yes. Yeah.

Q. Okay. Did -- did anyone help you prepare your report?

A. I did get one of my students to run some queries for me in -- in our database.

Q. And when you say our database, are you referring to the UTCID database?

A. I am.

Q. Okay. What was the name of the student?

A. Emma Niu, N-I-U.

Q. Were they compensated for their work?

A. I have not.

Q. How many hours would you estimate that Ms. Niu spent helping you prepare your report?

A. Very few, yeah.

Q. Less than 10?

you know what? Strike that.

Did you look at the underlying source -- the -- the underlying UTCID database source data to create this spreadsheet?

A. No, because I did -- the query to the database allowed me to create the exposure and the monetization and -- in the vulnerability and the influence, but then I took the numbers of vulnerability and influence, and I ranked them within the context of these -- the data that's reported because I thought it would provide a better reflection of relative importance or relative -- you know, relative vulnerability or relative influence of the data.

So these monetization value -- I guess I'll just repeat that: Monetization value and risk of exposure were based on just querying the CID database, and then I took the raw values of vulnerability and influence, actually -- which are on the left-hand side in

C and D -- and then I created a ranking of them, which I thought would be a more intuitive way of reporting it.

And that's what I included in my report, was those rankings.

Q. So when you say you did a query to the database, where's the query?

A. I don't really know what you mean by that.

So . . .

Q. How did you create the database?

A. Oh, I asked my student to -- to query the database. You just ask, you know, Give me all the monetization values for all of the nodes in the graph. And then as I provided the, you know -- the CID is making those calculations based on what I disclosed about how the calculations occur.

Q. So break this down for me.

Your student goes to a Web portal and types something in.

Is that the query?

A. It looks more like a source code kind of command line query, but yes.

Q. Where -- where is the source code command line query being entered? Is there an application?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: There is an application, yes, but not in the -- in like a -- the -- I would say it's more source code that then you type a command line query to ask the -- the question.

I don't think --

BY ATTORNEY Z. SHAH:

Q. Where does the source code live?

A. At a server at the University of Texas.

Q. So how does the student access it?

A. Well, in -- by logging on to that computer. I . . .

Q. You didn't review the depositions of the named Plaintiffs in this case, correct?
A. I don't recall.
Q. You didn't review the depositions -- well, hold on.
Let me go back. I do not see on your list the depositions of the named Plaintiffs in this case.
So did you review their depositions?
A. I did not.
Q. You didn't review the depositions of any PowerSchool employees other than Mr. Flagg, right?
A. That's correct.
Q. Do you know who Mishka McCowan is?
A. I do not.
Q. You did not review Mr. McCowan's deposition, correct?
A. I did not.
Q. You didn't review the depositions

of the heads of the PowerSchool products that discuss the data that is collected and stored by those products, right?

A. I did not.

Q. Would the testimony of the chief information security officer at PowerSchool be relevant to your opinions regarding data security?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I wasn't asked to -- to comment or review PowerSchool's security.

BY ATTORNEY Z. SHAH:

Q. It's your testimony that your opinion -- you are not opining on PowerSchool's security practices?

A. That's correct.

Q. You didn't review the deposition of any third-party witnesses in this case, correct?

A. Yeah. The documents I reviewed

A. That's what I said, that I think that there are more data. I don't -- yes, I am aware of that.

Q. Okay. But you did not discuss the data elements involving any products other than the nine products we just discussed, right?

A. Right --

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: -- I mean, yes.

BY ATTORNEY Z. SHAH:

Q. And those nine products were selected for you by counsel; is that right?

A. I did see these products on the website; but, yes, I got these DPIA documents from counsel.

Q. Okay. Let's look at the data elements you report for one of those products, and we can go to Paragraph 33, which lists the elements for PowerSchool's SIS.

A. Okay.

Q. In Paragraph 33, you say: PowerSchool SIS collects at least the following data elements.
Do you see that?
A. Yes.
Q. And then you list about [redacted] different elements, right?
A. Yes.
THE WITNESS: Can you scroll a little bit?
(Scrolling.)
THE WITNESS: Yes.
BY ATTORNEY Z. SHAH:
Q. You copied this list from PowerSchool's DPIA report for its SIS product, right?
A. Correct.
Q. And that's the same methodology used for other PowerSchool products that are discussed in your report, you copied the list from the DPIA, correct?
A. Yes.

Q. You did not independently inspect the SIS product, correct?
A. That's correct.
Q. You've not personally used the SIS product, right?
A. That's correct.
Q. You don't know how data is stored for the SIS product, right?
A. That's correct.
Q. You don't know how data tables are configured for the SIS product, right?
A. That's correct.
Q. You don't know the security configurations of the SIS product, correct?
A. I wasn't asked to evaluate security measures, no.
Q. So you don't -- you don't know the security configurations for the SIS product, right?
A. That's correct.
Q. And you don't know what encryption is used for the SIS product,

correct?
A. That's correct. I was only asked to look at the inherent value and harms that have empirically been seen from these data set -- these data. That's kind of the scope of my -- yeah.
Q. And the same is true for the other PowerSchool products that are discussed in your report, isn't it --
A. Yes.
Q. -- you didn't -- you didn't -- you didn't independently inspect those products, correct?
A. I did not.
Q. You have not personally used those products, correct?
A. That is correct.
Q. You don't know how the data is stored or configured for any of those products, right?
A. That is correct.
Q. You don't know the security

configurations for any of those products, correct?

A. That is correct.

Q. And you don't know what encryption is used for any of those products, right?

A. That's correct.

Q. So your report just copies the data elements that are listed in PowerSchool's DPIAs, true?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: Yeah, to -- to understand what data is -- is controlled and processed by PowerSchool, because that was my -- that was really the only question I was asking about PowerSchool's products, is what data is held.

BY ATTORNEY Z. SHAH:

Q. Right. But in order to investigate what data is held, the only thing

you looked at was the DPIA, right?
ATTORNEY L. ARAGON: Objection:
form.
THE WITNESS: And -- and also
the Flagg deposition and the -- the
websites and power -- like you said,
the public domain listed information.
BY ATTORNEY Z. SHAH:
Q. Okay. So in order to understand
what data is stored by PowerSchool products,
you looked at the DPIAs, the Flagg deposition
and publicly available websites.
Is that fair?
A. That is fair.
ATTORNEY L. ARAGON: Objection:
form; foundation.
BY ATTORNEY Z. SHAH:
Q. You did not look at the products
themselves, correct?
A. I did not.
Q. In Paragraph 30 --
ATTORNEY Z. SHAH: If we could

[redacted]

Q. So let -- let's take a concrete example. Let's look at the SIS example.

A. Okay.

Q. If we scroll to PDF Page 16, which is the beginning of the list of data elements for SIS.

(Scrolling.)

BY ATTORNEY Z. SHAH:

Q. Do you know, one way or another, whether the SIS instance for every single school has all of the data elements that are listed in Paragraph 33 of your report?

A. I do not.

Q. So in Paragraph 33, where you say SIS collects at least a [redacted]

ATTORNEY L. ARAGON: Objection:

form; foundation.

THE WITNESS: That's not what I was asked to -- I don't have an opinion about that because I wasn't asked to evaluate that.

BY ATTORNEY Z. SHAH:

Q. So when you say SIS collects at least -- all of these data elements, that's not true, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I don't know if it's true. What I know is --

BY ATTORNEY Z. SHAH:

Q. You don't know.

A. -- but I know that PowerSchool said that these are the elements, these are the data that this product processes and controls.

That -- I was relying on information from PowerSchool --

Q. And I understand that. But I'm

not --

A. -- and then --

Q. -- asking whether these are the data elements that are processed. I am asking where your understanding comes from that these are minimum or at least the elements that are processed by every single PowerSchool product.

ATTORNEY Z. SHAH: Objection to form.

THE WITNESS: And I'm trying to explain that my definition of minimum is because things like performance on this list -- my expertise tells me that there [redacted]

BY ATTORNEY Z. SHAH:

Q. Okay. So let's take that --

A. -- and so that's what I mean -- but that's what I mean by minimum -- I mean --

Q. Okay.

A. -- you're taking minimum as a different definition that I don't really --

Q. And I -- I want to make sure I have your definition --

A. Okay.

Q. -- so when you say -- when you say that SIS collects at least [redacted]

Is that fair --

ATTORNEY L. ARAGON: Objection: form --

BY ATTORNEY Z. SHAH:

Q. -- that is not your opinion?

ATTORNEY L. ARAGON: -- form; foundation.

THE WITNESS: Yeah; I wasn't asked to look at every instance and see -- and evaluate that. I don't --

BY ATTORNEY Z. SHAH:

Q. Okay.

So you -- you were not -- you're not actually offering an opinion on whether every single instance of SIS collects all of the data elements that are listed in Paragraph 33 of your report.

Is that fair?

A. That is fair.

Q. Okay. Because you don't actually know if that's true for every single student whose data is stored in SIS, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: All I -- I wasn't asked to look at instances. I was asked to look at -- well, I think I --

BY ATTORNEY Z. SHAH:

Q. Yeah, I --

A. -- you keep repeating the same thing.

Q. -- I think -- I think we're on the same -- I think we're on --

A. Okay.

these configurations, I just don't know what their variations could be.

BY ATTORNEY Z. SHAH:

Q. Okay. You didn't look into whether there are any variations?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I just looked at the inher- -- yeah. I just --

BY ATTORNEY Z. SHAH:

Q. You just -- you just copied the DPIAs?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: And then based -- yes.

BY ATTORNEY Z. SHAH:

Q. And you are making an assumption that that's actually how the PowerSchool products work, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I wouldn't say assumption. I mean, PowerSchool said that these are the data elements that are controlled and processed in these documents, so I -- I just -- yeah.

BY ATTORNEY Z. SHAH:

Q. Okay. Because I -- I --

A. It doesn't feel like an assumption. It just feels like a -- I just took PowerSchool's word about this is the --

Q. Okay. But I -- I -- I want to focus in on the portion of your opinion where you say these are at least the data elements -- or these are the minimum data elements. And my understanding of that is you were saying that these data elements are required for all students who use those products.

Is that --

A. That's not --

Q. -- not your opinion?

ATTORNEY L. ARAGON: Objection:

form.

THE WITNESS: -- that's not what I was saying. I'm saying at a minimum, these are the data elements that PowerSchool says they control and process, that some of these data elements have other data elements inside of them --

BY ATTORNEY Z. SHAH:

Q. Okay.

A. -- so -- that are not disclosed in --

Q. Okay.

A. -- these documents. That's --

Q. Right.

A. -- what I'm saying.

Q. Okay. And I -- I -- I understand that.

So when you say PowerSchool SIS collects [redacted], you are saying it could collect other information in addition to [redacted], right?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: I'm saying the data structure that is [redacted] is -- probably got a lot of other pieces in it. And if you say [redacted] well, what is that? And that probably has a lot of data elements that describes student intervention --

BY ATTORNEY Z. SHAH:

Q. Okay.

A. -- or -- you know, there was a part that said derived data. Well -- so I was just saying that there's probably data elements inside the larger data element descriptions in these DPIAs --

Q. Okay --

A. -- that's all I'm saying.

Q. -- I get that --

A. Okay.

Q. -- but are you saying that

[redacted] is collected in every instance?

A. No --

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: -- that's not what --

BY ATTORNEY Z. SHAH:

Q. So when you say that performance -- that SIS collects at least the following data elements, are you not saying that PowerSchool collects [redacted] in every instance?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: That's not what that statement means.

BY ATTORNEY Z. SHAH:

Q. Okay. So you're not offering an opinion that all of these data elements are collected; is that right?

A. That's right, I'm not offering an opinion about particular instances, because

one of the things that -- to realize is that I was looking at mapping data elements that were mentioned in the DPIAs to the data that I know about and the characterizations that I know about.

Q. I get that. I get that, Dr. Barber, and we will get to your mapping exercise, but I want to understand this portion of your opinion. And when you are talking about minimum data elements, I want to be really clear that your opinion is not that every single PowerSchool product collects all of the data fields reflected on the DPIAs --

ATTORNEY L. ARAGON: Objection --

BY ATTORNEY Z. SHAH:

Q. -- and as I understand it, that is not your opinion, correct?

ATTORNEY L. ARAGON: -- object to form.

THE WITNESS: Right, because there's a difference between data

elements -- let's say, [redacted] and the actual instance of that --

BY ATTORNEY Z. SHAH:

Q. Right.

A. -- and what I -- I wasn't asked to evaluate instances of data or instances of configurations.

Q. Okay. Let me ask you about the named Plaintiffs in this case.

You told me you don't know what their names are, right?

A. Well, other than --

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: -- listed on the Complaint.

BY ATTORNEY Z. SHAH:

Q. Okay. Sitting here today, do you know their names?

A. Yeah, as listed, Cherkin -- I mean, I -- I really have done no investigation

know, in testimony or in DPIAs.

Q. Okay. So your entire understanding of how Connected Intelligence works comes from the DPIA, a public website, and Flagg Exhibit 6, which I believe is also the DPIA; is that right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: Yes, the -- the documents that I listed, yes, that's right.

BY ATTORNEY Z. SHAH:

Q. You have not seen any actual evidence that supports your statement that Connected Intelligence actually processes [redacted] right?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: Other than what -- what was mentioned in those depositions or in the documents that we just described, that's right.

identification for purposes of
the record.)

--oOo--

BY ATTORNEY Z. SHAH:

Q. Dr. Barber, do you recognize this as the DPIA report for the PowerSchool SIS product?

A. Yes.

Q. You reviewed this DPIA report in preparing your opinions in this case; is that right?

A. Yes.

ATTORNEY Z. SHAH: Let's scroll down to PDF Page 5, please.

(Scrolling.)

BY ATTORNEY Z. SHAH:

Q. Do you see the table of data elements listed on this page?

A. I do.

Q. And I want to be really clear about your opinions, Dr. Barber.

Is it your opinion that

PowerSchool SIS automatically collects all of these data elements for every instance of SIS?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: It's only my opinion that PowerSchool says the product controls and processes this information.

In terms of what instances are collected by different users, I do not know. I wasn't asked to review that.

BY ATTORNEY Z. SHAH:

Q. Okay. And so it's not your opinion that SIS automatically collects all of these data elements for all schools, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: It's probably not an automatic collection for any of them.

Don't people enter the data?

credentials, what does that mean? That probably has a lot of different elements in it and so different types of elements.

Schools and universities attended -- that probably has graduation date. It probably has school name.

There's a lot of different data elements inside these. That's what was meant by minimum.

BY ATTORNEY Z. SHAH:

Q. Yes. And I -- I understand that.

And I want to make very sure that when you say minimum, you are not saying there's a baseline set of data elements that are inherent in the product that are present for every school that uses the product.

And my understanding is that's not your opinion; is that correct?

A. But I don't --

ATTORNEY L. ARAGON: Objection:

form; foundation.

THE WITNESS: -- that's -- that's also -- there's a -- you know, does the product ship with all of these data elements in its structure and then whether a school decides to create -- like, enter data inside that, I don't know.

I would --

BY ATTORNEY Z. SHAH:

Q. That's --

A. -- assume that it ships with all of these data elements that make it possible for a user to populate, but --

Q. Okay. So I want to -- I want to break that down.

A. Okay.

Q. You say you assume the product ships -- ships with all of these data elements; is that right?

A. Like, the -- I as a --

ATTORNEY L. ARAGON: Objection:

form.

THE WITNESS: -- a document would tell me that PowerSchool is capable of controlling and processing these data, so that if I get the product as a user, I would expect that I have the ability -- whether I populate it or not, I don't know; I didn't -- I wasn't -- I wasn't asked to opine on that, but that it has that capability of storing this information --

BY ATTORNEY Z. SHAH:

Q. Okay. What is --

A. -- that is what I assume these data -- that's what I assume PowerSchool was saying in these documents.

Q. And that's -- that's your assumption about how the product is configured at the time that it ships to a customer; is that right?

ATTORNEY L. ARAGON: Objection:

A. Yes. But to be optional, it has to be in the -- in the product.

Q. Okay. Do you know whether these are required or optional data fields?

A. Required for what?

Q. To -- for the product to function?

Do you know?

A. I do not know.

Q. Do you know whether every instance of SIS ships with all of these data elements?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I don't know. But if it doesn't, I would wonder why PowerSchool has it in their documentation that they have that capability.

BY ATTORNEY Z. SHAH:

Q. Did you --

A. I --

right?

A. I was just looking for an example.

Q. Okay. You reviewed this data privy agreement and relied on it when preparing your report, correct?

A. Yes, just -- yes. And, you know, I had that section in the -- Appendix A where I was explicit about what I extracted from it. I just extracted the data elements identified.

Q. You extracted the data elements identified in the agreement, but you didn't read the rest of the agreement.

Is that fair?

A. Oh, I mean, I think I read the agreement, but, I mean, just in terms of what you said, relied on, that's -- I was really focused on what data is controlled and processed in this instance.

So . . .

Q. And let's take a look at PDF Page 2. The first paragraph just at the top

A. Yeah, yeah --
Q. -- very closely --
A. -- yeah, I --
Q. -- but --
CERTIFIED STENOGRAPHER: Let the record reflect we have to have one person talking at one time, please.
THE WITNESS: Okay.
BY ATTORNEY Z. SHAH:
Q. Okay. Dr. Barber, have you seen any evidence that the data collected by PowerSchool was actually used to identify an individual and/or their devices?
ATTORNEY L. ARAGON: Objection: form; foundation.
THE WITNESS: That's not what I was asked to look at.
BY ATTORNEY Z. SHAH:
Q. So the answer is, no, you have not seen any evidence, right?
ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I mean, the documents do say that this data is used for -- I don't have -- I'll just say no.

BY ATTORNEY Z. SHAH:

Q. Okay. The second point you make in Paragraph 34 is -- you say the data that was collected can be used to locate individuals in cyberspace and in the physical world.

Now, again, that's a possibility statement, correct?

A. It is.

ATTORNEY L. ARAGON: Objection: form; foundation.

BY ATTORNEY Z. SHAH:

Q. You have not seen any evidence that the data collected by PowerSchool was actually used to locate individuals in cyberspace and in the physical world, correct?

A. No. I've just --

ATTORNEY L. ARAGON: Objection:

form; foundation.

THE WITNESS: -- I've just seen it in -- in our empirical studies of, like, over 5,000 cases, but yes.

BY ATTORNEY Z. SHAH:

Q. Okay. But not -- not in the case of the PowerSchool data, right?

A. Yeah. I wasn't asked to look at that.

Q. And you did not see anything consistent --

ATTORNEY L. ARAGON: Objection: form; foundation.

BY ATTORNEY Z. SHAH:

Q. -- with -- with -- you did not see any evidence, right, that the data collected by PowerSchool was actually used to locate individuals in cyberspace and the physical world, right?

A. I didn't look --

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: -- yeah, I didn't look. I wasn't asked to opine on that.

BY ATTORNEY Z. SHAH:

Q. And you didn't see it, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I wasn't asked to --

BY ATTORNEY Z. SHAH:

Q. Because you weren't asked, you didn't see it, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: That's a different question.

If I wasn't asked, I didn't see it. But there's a -- that's different than saying I was asked; I looked at it; and I didn't see it. Those are two different things.

BY ATTORNEY Z. SHAH:
Q. I understand that.
But you didn't look -- you didn't -- you have not seen any, right?
A. I didn't look.
Q. And you have not seen any?
ATTORNEY L. ARAGON: Objection: form; foundation.
BY ATTORNEY Z. SHAH:
Q. You have not seen any, correct, Dr. Barber?
A. As a result of not looking, yes.
Q. And the third point you say is the data collected by PowerSchool is valuable and its monetization by threat actors can result in significant financial, emotional and reputational harms.
Do you see that?
A. Yes.
Q. Now, again, when you talk about threat actors, you're talking about criminal misuse, correct?

A. Not always. That can be insider threat. That can be misuse. You know, people mistakes. It can be because it wasn't protected. It could be a -- there's a wide range there.

Q. Okay. That's fair.

When you say the data can result in significant financial and emotional and reputational harms, you mean that that is a possible thing that could occur, right?

A. Yes. We've seen that and reported on other organizations that have seen the same thing.

Q. You were not suggesting that the ordinary collection of data by PowerSchool automatically results in monetization by threat actors, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: Sometimes the -- sometimes things can be compromised even in their ordinary collection

processes. But, again, I didn't look
at any instances, business practices
or implementation, so I can't speak to
that.
BY ATTORNEY Z. SHAH:
Q. So you're -- you're not opining
that the ordinary collection of data by
PowerSchool in this case automatically
resulted in the monetization of that data by
threat actors, correct?
ATTORNEY L. ARAGON: Objection
--
THE WITNESS: I am not --
ATTORNEY L. ARAGON: -- form;
foundation.
THE WITNESS: -- that is not
what I'm -- I wasn't asked to opine,
so, therefore, I'm not.
BY ATTORNEY Z. SHAH:
Q. You have not seen any evidence
that the data collected by PowerSchool was
actually monetized by threat actors, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I didn't look. So it's unfair for me to comment.

BY ATTORNEY Z. SHAH:

Q. Why didn't you look?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I wasn't asked to. I was asked to see -- look at what -- based on empirical studies that we've seen, what -- how is this data used, how often is it used, how often does it create harm, how powerful is it to collect other data. I was asked to comment on the inherent value, risk, harms of the data.

BY ATTORNEY Z. SHAH:

Q. Okay. And when you say the data, you don't mean PowerSchool's data; you mean these data elements generally, right?

A. That's right --

A. I did not do that investigation.

Q. And you've not seen any evidence that the data collected by PowerSchool has actually resulted in significant financial, emotional and reputational harms, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I have -- I have not looked at -- I have not, no. It's not what I looked at.

BY ATTORNEY Z. SHAH:

Q. The fourth thing you say in this paragraph is: Much of the data collected by PowerSchool is used extensively in our society, often called a digital currency, offering many opportunities for threat actors to exploit the data.

Did I read that correctly?

A. Yes.

Q. And, again, when you say opportunities, you mean there's a possibility that data will be exploited at some point,

right?

A. Yes, that's what our --

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: -- yes, that's what our data shows.

BY ATTORNEY Z. SHAH:

Q. And actually, Dr. Barber, maybe for the record, what we can do is upload -- if you'll just pause for a second and let Mr. Aragon get in his objection. It might be cleaner for the record.

A. Okay. Will do.

Q. Thank you.

Dr. Barber, you have not seen any evidence that the data collected by PowerSchool was actually exploited by threat actors, right?

A. No. I haven't looked at that.

Q. And you haven't seen any evidence that the named Plaintiffs' specific information was actually exploited by threat

discover other valuable PII to compound harm, right?

A. Yes.

Q. Have you seen any evidence that the data collected by PowerSchool was actually used to discover other valuable PII?

A. That's not what I investigated. I just -- we've seen it in the theft -- in the 5,000 cases we've looked at.

Q. Okay. So you've seen it for other cases, but you have not seen it in the PowerSchool case, correct?

A. Yes, a lot of other cases, yes.

Q. Yes.

But not the PowerSchool case, correct?

A. I did not look specifically at the PowerSchool case.

Q. The sixth thing you say in this paragraph is: Much of the data does not change or changes infrequently, allowing it to be used over time to produce longitudinal

harm.
Do you see that?
A. Yes.
Q. And, again, when you say allowing it to be used to -- over time to produce longitudinal harm, you're talking about the possibility that data can be used over time to produce longitudinal harm, right?
A. Yes, that's what our empirical data shows.
Q. Okay. And that's empirical data about other cases, not PowerSchool data, right?
A. That's right.
ATTORNEY L. ARAGON: Objection: form; foundation.
BY ATTORNEY Z. SHAH:
Q. You have not seen any evidence that the data collected by PowerSchool was actually used over time to create longitudinal harm, right?
A. I did not look specifically at

the PowerSchool --

Q. And --

A. -- instance, I guess.

Q. Okay. And when you say you didn't -- you didn't look specifically at the PowerSchool instance, you didn't look because counsel did not ask you to, right?

A. I was really looking at cases that we had already looked at, like, over 5,000. We have a lot of data points, and so I was just mapping that to what we found as patterns in other cases.

Q. So were you making an assumption that what happened in other cases will happen in the PowerSchool case?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I think assumption is not a fair -- I was applying it, said this -- how this data has been used in over 5,000 other cases.

BY ATTORNEY Z. SHAH:

Q. Okay. But you're comparing it to the PowerSchool case, right, so what's the point of the comparison other than to speculate that that's what's going to happen here?

A. When this data -- the -- it's not a speculation. It's a -- and I -- I mean, it's not 100 percent, but it is -- the data shows that -- and, you know, this kind of data can be used. And so the inherent value, the range of those values, the range of the harms -- that's what I was asked to look at --

Q. Okay.

A. -- for this case.

Q. So your -- your opinion is that this data can be used, not that it actually has been used, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: What actually has been used in these over 5,000 cases.

BY ATTORNEY Z. SHAH:

Q. No, but I'm talking about the PowerSchool case.

A. Yes.

Q. Your opinion is that in the PowerSchool case, the data can be used, not that it actually has been used, true.

A. I did not --

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: Oh, sorry. Yeah.

Yeah, I'm not opining about instances of use or monetization for the PowerSchool case. I'm just commenting in -- I'm just reporting on what we have found in those cases we've looked at.

BY ATTORNEY Z. SHAH:

Q. In other cases but not --

A. That's right.

Q. -- the PowerSchool case --

A. That's right --

Q. -- is that right?
A. -- that's right. That's right.

ATTORNEY Z. SHAH: Okay. Let's take a break.

VIDEO TECHNICIAN FIGUEROA: The time is 12:39 p.m. We're going off the record.

--oOo--

(Whereupon, at 12:39 p.m. CST, a luncheon recess was taken.)

--oOo--

BY ATTORNEY Z. SHAH:

Q. Okay. You're not opining that data in this case has been harvested and that we're not going to see the harm for many, many years, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: It's possible. I -- I don't know.

BY ATTORNEY Z. SHAH:

Q. Is that -- Dr. Barber, is that an opinion?

Like, I need to understand.

Are you going to go in front of a jury and testify that data in this case has been collected and one day we will see its misuse?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: My intent was not to opine about the breach. This wasn't my scope. But I'm just saying

it happens.

BY ATTORNEY Z. SHAH:

Q. I'm not asking about what could happen --

A. You said can it happen?

Q. -- clear -- no, no, no. I want to be clear, Dr. Barber.

You said, sometimes we see data can be harvested and we won't see the harms for many, many years?

A. That's true.

Q. You are not opining that data in this case has been harvested and we won't see the harm for many, many years, correct?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I was just opining that -- you said can, and so I was -- I was opining -- I was just commenting about what can happen.

BY ATTORNEY Z. SHAH:

Q. Okay. But not that that is what

responded in terms of emotional distress as well and some level of finances.

So I -- I really can't speak beyond the cases that I've looked at specifically.

BY ATTORNEY Z. SHAH:

Q. You can't offer opinions about harm in any cases other than the 5,000 cases you looked at in the UTCID database, right?

A. Because the --

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: -- the idea was to look at so many that it created patterns of -- that we could then make some conclusions from, and so --

BY ATTORNEY Z. SHAH:

Q. Okay.

A. -- that's what I'm speaking to, is that we saw the patterns of harms; the range of harms; the inherent harms that can

come from, you know, theft, fraud and abuse, yes.

Q. But you can't offer opinions about harms in any cases other than the 5,000 cases you looked at in the UTCID database, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I can speak to the patterns that I saw from that data.

BY ATTORNEY Z. SHAH:

Q. Sure. But those -- those are patterns in that data, right?

A. There's 5,000 of them --

Q. Okay.

A. -- yeah.

Q. But, again --

A. -- I mean, it's a lot.

Q. -- you are speaking -- you are speaking from the database of 5,000 cases and that's the universe from which you are drawing

less potential for harm than when I'm storing health information and behavioral information and where somebody logs in and their IP address and their cookies and their -- you know, all of the data that's listed.

So, you know, the data that an organization and a product decides to collect introduce certain risk because -- yeah, because that has the potential for greater harm than -- the data has more potential for harm than others.

BY ATTORNEY Z. SHAH:

Q. Okay. I -- I thought then I asked you this question: Is it your opinion that by simply storing student data, PowerSchool creates a risk of exposure?

Is that your opinion?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: A risk of

exposure. I don't know what their risk of exposure is. I don't know what their cybersecurity practices are. I'm just saying that this data has -- deciding to store particular data elements, some data has -- can cause more harm than others. That's all I'm saying.

BY ATTORNEY Z. SHAH:

Q. I don't -- okay.

You testified, the data that an organization and a product decide to collect introduce certain risk because that has the potential for greater harm.

Is that your testimony?

A. I would -- my testimony is that some data can cause more harm than others and so deciding what you decide to collect and store makes a difference.

Q. Okay. And the harm comes from the risk of exposure, right?

ATTORNEY L. ARAGON: Objection:

THE WITNESS: I would just say that the potential for -- am I creating harm just to hold that data?

I'm just speaking about what data can cause more harm than others. That's all I'm saying.

BY ATTORNEY Z. SHAH:

Q. I'm not -- Dr. Barber, your opinion written here on this page is: The exposure of PII controlled and processed by PowerSchool products can cause harm.

A. Yes.

Q. I am asking you: Is the way that PowerSchool products cause harm through exposure or misuse of the data?

A. And I can't speak to that because I don't know what PowerSchool's cybersecurity practices are; I don't know -- other than, you know, I -- I do know that not having multifactor authentication was a factor in the breach and did introduce additional risk. But I really don't know anything about

PowerSchool's, you know, network configurations and cybersecurity, so I can't speak to that.

Q. Okay. I don't disagree with any of that.

A. Okay.

Q. I don't disagree that you don't know about PowerSchool's data security practices. I'm asking whether your opinion is that there is a potential risk of future misuse of the data stored in PowerSchool products and that's why they cause harm or whether it's just the act of storage itself that causes harm.

Do you understand the difference?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: In the act of storing, no. The kind of data stored, yes.

reasons that we have it, is to help
people mitigate some of the risk or
unders- -- or give them agency in
the -- in the process.

BY ATTORNEY Z. SHAH:

Q. It's not your opinion that the Class members in this case are exposed to diverse, long-standing and significant harms, right?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: Yeah, I can't speak to the actual instances. I can only speak to the -- what this data has the potential of harm, the risk of harm to create. That's all I can speak to.

BY ATTORNEY Z. SHAH:

Q. So, again, you cannot opine that the Class members here are harmed, right?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: Yeah; not that they are harmed, but that -- because of the data that is collected, this type of data, some of it has more risk than others, and I've -- that's what I was reporting on.

BY ATTORNEY Z. SHAH:

Q. Okay.

Dr. Barber, you agree that any organization that stores personal data creates some risk of exposure, correct?

A. It depends on the type of data that they -- they collect and that they use. So for some of the -- yeah, it depends, but some -- again, some are more at risk and harmful than others.

Q. Okay. But no system is zero risk, correct?

A. When it comes to PII, probably not.

Q. Okay. And your opinion is that the risk of harm is a function of the quantity

of PII that is being held; is that right?

A. No. The type of PII that's being held.

Q. It's both type and quantity, right?

ATTORNEY L. ARAGON: Objection: form.

THE WITNESS: Well, for an individual, no. I mean, it's the type of data you're -- it matters -- quantity may -- it matters who the harm is to, to the organization or to the individual.

If you're storing thousands and thousands of -- of records, I only really care, as an individual, about mine and the harm to me.

BY ATTORNEY Z. SHAH:

Q. Respectfully, that's not an answer to my question at all.

A. Well, then please answer [sic] again, because I thought -- I was trying to be

Q. That's not my question, Dr. Barber.

My question is, Is it fair to say that this database primarily looks at cases outside of the education sector?

A. It is -- the educa- -- it is not the majority of the data --

Q. Okay. In --

A. -- the -- the mapping -- yeah.

Q. -- in the 2017 ITAP report -- are you familiar with the 2017 ITAP report?

A. Yes.

But I should -- I need to qualify that the cases -- you know, when you said outside the sector, the data that maps to the product -- PowerSchool product is not really outside the -- so -- and I have two different -- there -- there very -- are a lot of similarity in the kind of data that was used across sectors.

Q. I understand that the data elements are -- on their face are the same

data elements. I do understand that --

A. Okay. Good.

Q. -- but, Dr. Barber, of these 5,000 cases, according to the 2017 ITAP report, 90 percent of them involve noneducation market sectors.

Does that sound right to you?

A. Fair enough. Yeah, in terms of where the information was collected, not necessarily where it was used to create the harm, yeah.

Q. Well, and also where it was used to create the harm, right?

Ninety percent of these cases do not involve the education sector, right?

A. In terms of where the data was acquired, yes. Like, I can acquire it from an -- a school, but I might go use it at a bank, you know, so --

Q. Okay. Well, 90 percent of these

cases don't involve data from a school, right?

A. That's right.

Q. They don't involve data from the education sector in any way, right?

ATTORNEY L. ARAGON: Objection: form; foundation.

THE WITNESS: I don't believe they don't -- I -- can you say -- ask that again?

BY ATTORNEY Z. SHAH:

Q. That's okay. The ITAP report speaks for itself.

Column I, the Age Group of Victims.

Is it fair to say that the UTCID data primarily concerns the misappropriation of adult data?

A. Yes.

And, you know, there are -- there are other reports --

Q. I didn't ask --

A. -- other than --

One second. You were frozen there for a little bit.

We might have to reask that question.

THE WITNESS: Okay.

(Whereupon, the technical connectivity issues having been resolved, the examination resumed.)

BY ATTORNEY Z. SHAH:

Q. Dr. Barber, you did not do anything to verify whether the PII data elements listed in Appendix A were actually collected, right?

A. I didn't look at instances. I only looked at the DPI [sic] -- the documents that we discussed. That's right.

Q. Right. And -- and when we say -- well, okay. We'll strike that.

All right. Then Column E is titled PII Name.

Do you see that?

A. Yes.

Q. What methodology did you use to associate PII names from the UTCID data set to PowerSchool's documents?

A. Well, some of them were easy. Like, [redacted] And then sometimes it wasn't.

People -- you know, these are news stories. You -- you know, you can call things different names, you know. So I was trying to be very explicit and very transparent about the mapping that I used.

So -- and let me just --

Q. Hold on --

A. -- also say --

Q. -- Dr. Barber. No, no. Let me ask the next question. I want to keep this moving.

What is the -- let me ask you this: [redacted]

A. Each one of the cases that we had talked about different data elements. We did not rename them. We took them exactly as they were stated in the news story.

Q. Okay. So you -- you, sort of, roughly and by hand matched PII names from the UTCID database --

A. I did.

Q. -- to PII -- PII data elements listed in the DPIA or PowerSchool contract.

Is that fair?

A. That is fair.

Q. You didn't have a systematic method for associating PII names to PII data elements other than your personal, you know, information and approximation of what that element meant, right?

ATTORNEY L. ARAGON: Objection --

THE WITNESS: That's correct.

ATTORNEY L. ARAGON: -- objection: form.

BY ATTORNEY Z. SHAH:

Q. What's -- so when you say -- does -- let me ask you this: [redacted]

A. No. It just means what [redacted]

Q. Okay. So when we -- let's take a look at Rows 37 and 38 of this spreadsheet.

And you'll see here, you associated [redacted]

What's the basis for that association?

A. [redacted]

Q. Okay --

A. I mean, I really --

Q. -- the only reason you associated [redacted]

A. Well, when it says [redacted] who knows what's in that? So I don't know, yeah.

Q. Okay. [redacted] right?

A. Yes.

Q. When you --

ATTORNEY Z. SHAH: If we could go back to the top header, Row 1.

BY ATTORNEY Z. SHAH:

Q. You say here: Risk of exposure reflects the likelihood of target for identity theft, fraud and abuse, right?

A. Um-hum.

Q. So should the jury interpret the 0.08 risk of exposure for IP address to mean there's a 0.08 chance that IP address information collected by PowerSchool will be exposed?

A. No. It just means that in all

the cases that we looked at, IP address was not frequently used. This is a frequency, how frequently is this data element used and targeted, involved in -- how often does it occur in identity theft and fraud cases.

Q. Okay. And when you say how often does it appear in the data, are you talking as an input or an output?

A. Both.

Q. But isn't the data that's being exposed only in the output column?

A. Well, I wouldn't say expose -- well, what was reported here is how frequently is this data being used. And so the inputs maybe have been exposed data, like compromised credentials, you know, like in the PowerSchool breach, and then how did they use that data to get more data.

So, you know, it's just -- how often did this data used in identity theft and fraud. That's what is being reported --

Q. Okay --

Is that your testimony?

A. In terms of its con- -- potential consequences and risk, yes.

Q. You intend to tell the jury that the PowerSchool data in this case has a monetary value of millions -- billions of dollars.

Is that your testimony?

A. I am not giving actual numbers. I am giving the -- what is more valuable than others. I'm trying to give relative, qualitative values to this data and -- yeah.

I -- I really am trying to answer your question. I just . . .

Q. I think it's a really straightforward question, Dr. Barber.

Does monetization value represent the monetary value of the student data at issue in this case?

Yes or no?

A. Monetary value to who? And how do you calculate that? There's value to who,

and its calculation can vary significantly. And I've given you what my method is, but I'm -- I don't have any other response to give you.

Q. So you are purporting to calculate the monetary value of the data in this case?

A. Relative in terms of qualitative -- we didn't have -- we -- we just talked about the relative and qualitative values that were seen in these cases. That's -- and the same data is held by PowerSchool. That's -- I'm just trying to make those qualitative comparisons. I'm not trying to create a, Here's how much you could sell the data for, valuation. I'm not trying to do that.

Q. I'm going to try this one -- one more time, Dr. Barber --

A. Okay.

Q. -- and then I'm going to move on.

A. Okay.

Q. My understanding is that monetization value represents the monetary value of the data elements in the 5,000 UTCID cases that you studied.
Is that fair?
A. It is.
Q. Okay. Separately, you're opining that those same data elements are present in the PowerSchool set of products' DPIAs that you looked at, right?
A. Correct.
Q. Now, are you going to be opining that based on the fact that this data has monetary value in 5,000 other cases, that that data has the same value in this case?
Is that an opinion you plan to offer?
A. Qualitatively, that -- does PowerSchool hold valuable data? That's what I am saying, and that's -- some of it is more powerful than -- valuable than others. Some of it is more at risk of exposure just because

the threat likes that data more than they do others. That's really my testimony.

Q. Okay. Let's take a very concrete example. Let's look at Row 14. And we look at E-mail?

A. Um-hum.

Q. Okay?

A. Right.

Q. You have assigned a monetization value for a PII data name [redacted] at over $60 million, right?

A. Right.

Q. Is it your opinion [redacted] are worth $60 million?

A. No, I'm not -- I'm opining that [redacted] -- so I'm -- that it has value and it has -- it's to be used for

comparative value, because -- yeah, that's --

Q. Dr. Barber, that's great. That's great.

A. Okay.

Q. You are not opining that [redacted] is worth $60 million.

Fair?

A. I am not.

Q. You are not opining that monetization value in Column I represents the amount that threat actors have made using the Plaintiffs' data in this case, right?

A. That's correct.

Q. You are not opining that monetization value represents the financial impact of exposed PII in this case, right?

A. I didn't look at that. I -- yeah, I don't -- I haven't looked at the --

Q. Okay.

A. -- exposed data. That's right.

Q. Do you agree that the value of

Q. Dr. Barber --
A. No; let me finish.
I don't know how the data was actually -- you know, [redacted]
Q. Oh. Okay.
So, Dr. Barber, in the -- in the 5,000 UTCID cases that you looked at, you don't know whether it was just [redacted]
Is that right?
A. Yes, in the same way that I don't know what --
Q. Dr. Barber, just answer the question.
You don't know, right?
A. I just know that [redacted] was mentioned in these cases and how it was used. That's all I know.
Q. Okay. You know the word [redacted] appears in a news article and based on that, you've assigned it a monetary value of

C E R T I F I C A T E

I, Cindy L. Sebo, Nationally Certified Court Reporter herein, do hereby certify the foregoing deposition of KATHLEEN SUZANNE BARBER SIMONS was taken before me pursuant to notice at the time and place indicated; that said witness duly swore to tell the truth, the whole truth and nothing but the truth under penalties of perjury; that said testimony of witness was correctly recorded to the best of my abilities in machine shorthand, thereafter transcribed under my supervision with computer-aided transcription; that deposition is a true and accurate record of the testimony given by the witness; that I am neither counsel, nor kin to any party in said action, nor interested in the outcome; that a copy of this transcript obtained from a source other than the court reporting firm, including an adversary or cocounsel in the matter, is uncertified and may not be used or circulated at trial.

CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR, RSA,
CA CSR 14409, NJ Certified CR 30XI0024460,
NJ Certified RT 30XR00019500, NM CSR 589,
NY Realtime Court Reporter, NY Association Certified
Reporter, OR CSR 230105, TN CSR 998,
TX CSR 12778, WA CSR 23005926, Notary Public