Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for the Defendant PowerSchool Holdings, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EMILY CHERKIN, et al<br><br>Plaintiffs,<br><br>v.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>Defendant. | CASE NO. 3:24-cv-02706-JD<br><br>**DEFENDANT POWERSCHOOL HOLDINGS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE OPINIONS OF CATHERINE O'NEIL**<br><br>Judge: Hon. James Donato<br>Hearing Date: November 19, 2026<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |

**NOTICE OF MOTION**

PLEASE TAKE NOTICE THAT on November 19, 2026, at 11:00 a.m. PT, or as soon thereafter as this matter may be heard, in the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, in Courtroom 11, 19th Floor, before the Honorable James Donato, Defendant PowerSchool Holdings, Inc. ("PowerSchool") will and hereby does move the Court to exclude Plaintiffs' proffered expert Catherine O'Neil and strike her expert report.

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

A. O'Neil summarizes PowerSchool products and, at the direction of Plaintiffs' other expert, opines that these products could not function without student data. .......... 2

B. O'Neil opines that PowerSchool offers untested algorithms that might be biased or inaccurate and "could" harm students. .......... 3

C. O'Neil testifies that she did not assess any PowerSchool algorithm, only partially read a handful of case materials, and is unaware of any actual harm resulting from a PowerSchool product. .......... 4

III. LEGAL STANDARD .......... 6

IV. ARGUMENT .......... 6

A. O'Neil's opinion that PowerSchool products require student data is not a proper expert opinion. .......... 7

B. O'Neil's main opinion concerning the supposed risks of untested algorithms is unreliable and an improper legal opinion. .......... 8

V. CONCLUSION .......... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
613 F. Supp. 3d 1308 (S.D. Cal. 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021) ....8

*Biotech. Value Fund, L.P. v. Celera Corp.*,
2015 WL 138168 (N.D. Cal. Jan. 9, 2015) ....7

*Brooks v. It Works Marketing, Inc.*,
2022 WL 2217253 (E.D. Cal. June 21, 2022) ....12

*Camenisch v. Umpqua Bank*,
763 F. Supp. 3d 871 (N.D. Cal. 2025) ....6, 12

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ....6

*Ditton v. BNSF Ry. Co.*,
2014 WL 12928305 (C.D. Cal. Jan. 6, 2014) ....12

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ....6, 11

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025) ....6, 9, 11, 12

*Morris v. BNSF Ry. Co.*,
790 F. Supp. 3d 1129 (W.D. Wash. 2025) ....12

*Ollier v. Sweetwater Union High Sch. Dist.*,
768 F.3d 843 (9th Cir. 2014) ....6

*Otto v. LeMahieu*,
2021 WL 1615311 (N.D. Cal. Apr. 26, 2021) ....9

*Siqueiros v. Gen. Motors LLC*,
2022 WL 74182 (N.D. Cal. Jan. 7, 2022) ....7

*U.S. v. Hermanek*,
289 F.3d 1076 (9th Cir. 2002) ....10

*White v. Ford Motor Co.*,
312 F.3d 998 (9th Cir. 2002) ....8

**Rules**

Rule 23 ......................................................................................................................6

Rule 30(b)(6)..............................................................................................................5

Rule 702 ....................................................................................................................7

Rule 702(d) ................................................................................................................9

**Other Authorities**

Wright & Miller, *Fed. Practice & Procedure*, § 6268.2 Subdivision (d) ..........................................9

## I. INTRODUCTION

Although retained as an "algorithmic auditor," Catherine O'Neil conducted no audit. Ex. A, O'Neil Tr. 38:10-13. She did not examine any algorithm or model related to a PowerSchool product. *Id.* at 36:3-38:23, 62:2-22, 129:5-130:24. She did not review any case materials other than portions of a single deposition and some documents she found to be mostly "gibberish." *Id.* at 45:2-55:9. O'Neil communicated with no schools about the predictive models they use, the way they use them, or the actions they took based on those models. *Id.* at 26:18-20. She does not know the names of the Plaintiffs or anything about their use (or lack thereof) of PowerSchool products. *Id.* at 64:1-65:19. When asked at deposition whether her opinions about algorithmic risk were specific to any PowerSchool products, O'Neil emphatically answered: "No. No, not at all. Absolutely not. No." *Id.* at 125:15-20. Rather, her opinions in this case are, in her own words, "extremely general statements about algorithmic harm." *Id.* at 125:15-22, 133:10-18.

These admissions define the problem. Without any real-world analysis of PowerSchool's products, O'Neil offers two opinions in this case: (1) PowerSchool products require student data to function; and (2) PowerSchool unreasonably fails to test its algorithms, despite the fact that algorithms *generally* carry a *risk* of inaccuracy and bias, which *might* cause harm to someone someday. The Court should exclude both opinions for failure to meet the standards for expert evidence.

O'Neil's first opinion that PowerSchool products require student data to function is not actually her own opinion at all, nor is it an expert opinion. Indeed, O'Neil admitted at her deposition that Plaintiffs' damages expert "gave me th[is] opinion"—but not based on any of his own expertise; he thought this point was "completely obvious." *Id.* at. 134:2-136:12. Her report's "analysis" on this point is nothing more than quotes from PowerSchool documents. It is thus improper expert testimony that simply summarizes facts.

O'Neil's second opinion is, by her own admission, pure assumption and speculation based on what she believes to be true of all predictive algorithms—they *could* be opaque, inaccurate, and biased and thus should be tested for these risks. O'Neil attributes these risks to PowerSchool and opines that PowerSchool has a duty to conduct testing to address these risks. But, at the same time, O'Neil admits that these risks are the result of *schools'* actions, and she lacks any knowledge of how the challenged

products are used by schools. *Id.* at 25:14-26:7, 37:23-38:23, 78:7-22, 89:4-91:18; Ex. B, O'Neil Rep. at 1. Thus, she concludes she "can't really talk about harms" to the class or to Plaintiffs without knowing how schools are using then acting on predictive models. Ex. A, O'Neil Tr. 89:4-90:10; *see also id.* at 130:3-133:14. Plaintiffs rely heavily on this speculative opinion to support their theories of classwide injury and unjust enrichment. The problem is that this opinion is not based on any methodology, much less a methodology reliably applied to the facts of the case, and it is an impermissible legal opinion on PowerSchool's supposed duty to test its products for "bias." The Court should therefore reject not just the opinion but also, ultimately, the theory of injury Plaintiffs use the opinion to support. *See* Dkts. 200-1, 202-2.

Accordingly, the Court should exclude O'Neil's testimony in its entirety. Her testimony will not assist the Court at class certification and, if presented at trial, would risk confusing the trier of fact by conferring the imprimatur of expert authority on propositions needing no expertise, speculative assumptions untethered to the facts of this case, or improper legal conclusions.

## II. BACKGROUND

### A. O'Neil summarizes PowerSchool products and, at the direction of Plaintiffs' other expert, opines that these products could not function without student data.

O'Neil's report spans approximately 30 pages. About 22 of those pages are summary descriptions of nine different PowerSchool products—many of which have nothing to do with algorithms—drawn from PowerSchool documents. Ex. B, O'Neil Rep. 2-25. The products listed, and the order they're listed in, match the products in Plaintiffs' motion for class certification. *Compare id*. at 2-24, *with* Dkt. 196-3, Mot. for Class. Cert. 1.

For each of the 22 pages of product summaries, most of the page is taken up by screenshots of PowerSchool's public website. The other information comes from PowerSchool's Data Privacy Impact Assessments ("DPIAs"). *See* Ex. B, O'Neil Rep. 2-25. O'Neil incorrectly calls these documents "Data Processing Impact Report[s]," *id.*, and she testified that "a lot of it was gibberish to me to be clear. So when you say I read it, it doesn't mean I understood it all." Ex. A, O'Neil Tr. 45:10-21. O'Neil also relies on PowerSchool's "internal wiki when relevant." Ex. B, O'Neil Rep. 4. After describing the products, O'Neil concludes for each that "the product would not function

effectively without access to student data." *Id.* In her deposition, O'Neil testified that Christopher Schulte, Plaintiffs' damages expert, "gave me th[is] opinion." Ex. A, O'Neil Tr. 135:1-136:12. According to O'Neil, Schulte "thinks it's completely obvious that these products need data - student data to work," *id.*, but he wanted "an official data expert to say that." *Id.* So O'Neil did.

**B. O'Neil opines that PowerSchool offers untested algorithms that might be biased or inaccurate and "could" harm students.**

For the last five pages of her report, O'Neil pivots to her algorithm opinion—the only one she specifies that she was retained to provide. Ex. B, O'Neil Rep. 1, 25. There, O'Neil concludes that predictive algorithms in PowerSchool's products "risk being [i]naccurate and [r]acially [b]iased." *Id.* at 27. This opinion is based on her belief that "the ingredients" in any prediction of whether an individual student will graduate high school, such as a school's behavior records or test scores, "embody implicit racial bias." *Id.* at 27-28. Based on these "sources of bias," O'Neil states that the "predictive algorithms that PowerSchool provides" must be "working against students of color." *Id.* at 28. (Notably, Plaintiffs class definitions are in no way limited by students' race or ethnicity, and there is no data regarding any student's race—including the named plaintiffs—in the record at all.)

O'Neil makes clear that these various risks are the result of "the use [of] algorithms by [students'] schools or by third party entities." *Id.* at 1. Some examples O'Neil provides include a school (that is not a PowerSchool customer) sharing student data "with a local Sheriff's Office," and the students then being labeled "high risk of committing crimes." *Id.* at 28-29. O'Neil then admits that these "students were not directly harmed" and actually received "counseling and mentorship." *Id.* at 29. But she believes that "the risk remains that another school system could similarly share such data" with third parties who would "take punitive action based on risk scores." *Id.* O'Neil provides no data or other support to back up this hypothetical scenario; it is purely her assumption. She also notes an example of a school (again, not a PowerSchool customer) "purg[ing] low-performing students" based on their disruptive behavior. *Id.* She opines that some other hypothetical school that "care[s] deeply about having high graduation rates" may similarly "target" a student with "a low graduation prediction." *Id.* At her deposition, O'Neil conceded that none of the examples in her report have any connection to the use of PowerSchool products. Ex. A, O'Neil Tr. 89:4-91:18.

As part of this opinion, O'Neil also points to testimony from PowerSchool's corporate representative that PowerSchool does not test its predictive algorithms for "accuracy or fairness." Ex. B, O'Neil Rep. 28. O'Neil believes this lack of testing "is unreasonable" and that testing "would be relatively easy and inexpensive." *Id.* at 28, 30. O'Neil notes that she has not tested PowerSchool's algorithms herself, but if she was "given sufficient data" *from schools* she "could" conduct a seven-step process. *Id.* at 29-30. That type of auditing would require, among many other things, "all of the graduation predictions" available to teachers and administrators, the scores and the races of all students, and "probably a written description of the behavior" of every student. *Id.* O'Neil then concludes that PowerSchool could and should conduct this testing. *Id.*

### C. O'Neil testifies that she did not assess any PowerSchool algorithm, only partially read a handful of case materials, and is unaware of any actual harm resulting from a PowerSchool product.

O'Neil confirmed in her deposition that she has "not done any analysis on PowerSchool's algorithms." Ex. A, O'Neil Tr. 83:11-12. Nor has she audited any algorithms. *Id.* at 38:10-13. She did not realize that discovery was closed in the case and that she would not get another opportunity to "learn about stuff" related to any algorithms in PowerSchool's products. *Id.* at 38:2-23.

O'Neil also testified that her report includes a "Materials Considered" list in Appendix A, but the list does not reflect what she actually reviewed. Rather, the list represents what Plaintiffs' counsel sent her, and she "didn't read it all." *Id.* at 51:5-11. She did not prepare Appendix A herself and did not verify that it corresponded to the sources cited in her report. *Id.* at 60:23-61:3. She further testified that she did not read all of the materials that counsel provided to her because: "[O]h my God this is way too much stuff. So I didn't read it all. I sound like a bad expert, but like I just—I just didn't think I needed to read it all, so I didn't." *Id.* at 51:5-14.

Despite listing them among the materials considered, she did not read PowerSchool's interrogatory responses and testified that she did not "even know what an interrogatory is." *Id.* at 55:5-12. She confirmed that she did not review other written discovery provided by PowerSchool. *Id.* at 54:19-55:9. She did not review, let alone analyze, any data. *Id.* at 59:17-20. Nor did she review the depositions of the named Plaintiffs, *id.* at 52:17-20, or the deposition of Mr. Maharana, the

engineering vice-president responsible for analytics platforms relevant to her report. *Id*. at 53:4-6. In fact, O'Neil could not even recall whether she reviewed the Complaint. *Id*. at 63:11-19.

The only case-specific materials she definitively reviewed were the deposition of Darron Flagg (PowerSchool's Chief Privacy Officer and Rule 30(b)(6) witness), certain DPIAs, and publicly available website materials. As to the Flagg deposition, she was "not sure" she read it in full. *Id*. at 50:5-11. She later questioned whether Mr. Flagg was a named Plaintiff. *Id*. at 52:8-14. With respect to the DPIAs, she acknowledged that portions were "gibberish" to her and that reading them did not mean she "understood it all." *Id*. at 44:23-45:15. As to the website materials, she testified that she initially "didn't see proof" of predictive algorithms and did not know whether she could serve as an expert until receiving "help" from Plaintiffs' counsel. *Id*. at 36:21-37:11.

O'Neil also testified that she does not know the Plaintiffs' names, where they attended school, what PowerSchool products they used, or whether any Plaintiff received the graduation likelihood analysis central to her report. *Id*. at 64:1-65:15. When asked about her familiarity with the Plaintiff named first in the case caption, Emily Cherkin, she stated, "I saw a word—the word 'Cherkin' is like resonating with me right now." *Id*. at 127:17-19. Despite offering opinions concerning racial bias, she does not know the race of any named Plaintiff. *Id*. at 64:18-23.

Finally, O'Neil testified that she is unaware of any actual harm resulting from an algorithm in a PowerSchool product. She specifically requested examples from counsel of "actual harm" or "actual use cases" involving PowerSchool's predictive tools, and counsel could not identify *any*. *Id*. at 62:7-22, 102:18-103:6. O'Neil made clear that she does not, and could not, offer an opinion about harm unless she knew how schools were using the algorithms. *Id*. at 132:10-133:2. Rather, her opinions are "extremely general" and focused on risks. *Id*. at 130:4-133:14. But she cannot "estimate the risks[s]" other than to say that they are "larger than zero." *Id*. 130:14-22.

Plaintiffs rely on O'Neil's opinions in their renewed motion for class certification to argue that: (1) there is a classwide injury based on "untested predictive analytic products;" and (2) this supposed injury supports Plaintiffs' unjust enrichment damages model. Dkt. 196-3, Mot. for Class Cert. 13-14, 20-21. In other words, Plaintiffs rely on O'Neil to demonstrate common proof of both liability and damages.

## III. LEGAL STANDARD

The district court serves as gatekeeper to ensure that proposed expert testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Relevance, or "fit," requires the testimony to be tied to the facts of the case in a way that assists the trier of fact in resolving a disputed issue. *Id.* at 591. This means that an expert may not offer a legal opinion, as that does not assist the factfinder. *See Camenisch v. Umpqua Bank*, 763 F. Supp. 3d 871, 881 (N.D. Cal. 2025).

Regarding reliability, an expert must have reliable principles and methods, and "those principles and methods [must] have been properly applied to the facts of the case." *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 963 (N.D. Cal. 2025). Where there is too great an analytical gap between the record data and the proposed expert's opinion, the opinion should be excluded. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Further, if an expert's opinions "do not rest on a sufficient factual foundation and are 'speculative,'" those opinions are "inherently unreliable." *Klein*, 766 F. Supp. 3d at 961 (citing *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014)). An expert's testimony is also "inadmissible if it simply 'presents a narrative of the case which a lay juror is equally capable of constructing.'" *Camenisch,* 763 F. Supp. 3d at 882. Thus, an expert may not provide testimony that simply summarizes the facts of the case. *Id.*

These standards apply with equal force at class certification. The Court must ensure that expert testimony offered to establish Rule 23 requirements is both reliable and relevant. *See Klein*, 766 F. Supp. 3d at 959 (excluding unreliable expert testimony and denying class certification where it "rises or falls on the validity and reliability of the opinions" of the expert).

## IV. ARGUMENT

Both of O'Neil's opinions should be excluded. First, her opinion that PowerSchool products need student data to function requires no expertise. This "opinion" consists of nothing more than excerpts of over 20 pages of screenshots from PowerSchool's public website and the Data Privacy Impact Assessments that PowerSchool provides its customers. A summary of the record like this, especially one given at the direction of another expert, is not a proper expert opinion. Second, her opinion that PowerSchool offers algorithms that risk being inaccurate or biased and thus should be tested by PowerSchool is unreliable. This opinion attributes these risks to PowerSchool without any

foundation or methodology, and it conflicts with the admission in her own report that the risks and resulting harms from the use of predictive algorithms stem from schools' actions. Further, her opinion that PowerSchool has an obligation to test algorithms customized and acted on by schools is a legal conclusion and thus improper. O'Neil's two opinions therefore should be excluded as unreliable and unlikely to assist the trier of fact.

### A. O'Neil's opinion that PowerSchool products require student data is not a proper expert opinion.

When an expert "does little more than read depositions and deposition exhibits and other such materials," and then offers conclusions untethered to a reliable methodology, exclusion is warranted. *Biotech. Value Fund, L.P. v. Celera Corp.*, 2015 WL 138168, at *1-3 (N.D. Cal. Jan. 9, 2015); *see also Siqueiros v. Gen. Motors LLC*, 2022 WL 74182, at *10 (N.D. Cal. Jan. 7, 2022) (excluding portions of expert report that "consist[ed] of unadorned restatements or summaries of evidence already in the record" as "not appropriate under Rule 702"). Here, O'Neil did even less. Her "opinion" about student data comes from only a handful of documents—she admitted she read essentially nothing in the record. Thus, the Court should exclude this opinion as unhelpful to the jury.

Despite being an "algorithmic auditor" retained to analyze PowerSchool's algorithms, *see* Ex. B, O'Neil Rep. 29, O'Neil spends the bulk of her report summarizing how numerous PowerSchool products function, including those that do not use predictive algorithms. For nine different products, she screenshots or summarizes a website description of the product and the type of data supposedly used in the product. *Id.* at 2-25. She then concludes, for each, that they "would not function effectively without access to student data." *Id.* at 4.

But stating that PowerSchool—an educational technology company—offers products that use student data requires no expertise. Any lay person could visit PowerSchool's website and see the various products it offers, including ones that help schools track student enrollment and others that help schools deliver and grade student assessments.[1] It is telling that more than half of O'Neil's report—16 of the 31 pages—is simply screenshots from PowerSchool's public website.

---

[1] *All PowerSchool Products*, https://www.powerschool.com/solutions/products/ (last visited March 9, 2026).

O'Neil admitted as much in her deposition. She explained that Plaintiffs' damages expert, Christopher Schulte, directed that her report should state that the products "require[] student data," because he wanted "an official data expert to say" that, "even though he thinks it's completely obvious that these products need data - student data to work." Ex. A, O'Neil Tr. 136:2-12. Tellingly, Schulte did not even cite O'Neil's report in his own report. That is because O'Neil's purported "opinion" about how various PowerSchool products need student data is unnecessary.

Courts in this District often exclude expert testimony, like O'Neil's, that amounts to little more than descriptive recitation. In *CZ Serv. v. Express Scripts Holding*, this Court excluded testimony that was "akin to percipient witness observations" (what the "expert" observed in documents and site visits), rather than "a matter of specialized analysis or inquiry." 2020 WL 4518978, at *2 (N.D. Cal. Aug. 5, 2020). The Court should likewise reject O'Neil's opinion about whether and to what extent PowerSchool products contain student data. This opinion "ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion." *White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002); *see also Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322-23 (S.D. Cal. 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021) (excluding expert testimony where factfinder was "capable of evaluating the same evidence and drawing conclusions without [the expert's] testimony").

**B. O'Neil's main opinion concerning the supposed risks of untested algorithms is unreliable and an improper legal opinion.**

O'Neil's report dances around what her actual algorithm opinion is. Without ever having seen an algorithm from any PowerSchool product, she states that these algorithms "risk being inaccurate and racially biased," which creates "risks to students." Ex. B, O'Neil Rep. 1, 27. She makes clear that these risks are the result of "the use [of] algorithms by their schools." *Id.* To illustrate the different kinds of harm that might occur when schools use algorithms to generate labels or predictions about students, O'Neil provides some examples of instances where schools (not using PowerSchool products) shared student data with local law enforcement or used behavior records to suspend disruptive students. *See id.* at 26, 28-29. Notably, these examples have nothing to do with PowerSchool, the proposed classes, or this case. There is no evidence—in the examples provided or

in this case—of any labels or predictions regarding students, much less evidence that those characterizations were in fact inaccurate or biased. Nor is there evidence of harm based on the use of any predictive algorithm. Nevertheless, O'Neil attributes the risks of bias and inaccuracy to PowerSchool and claims that PowerSchool could and should conduct tests for different types of "bias and accuracy." *Id.* at 29-30.

For several reasons explained further below, the Court should exclude this opinion in its entirety, as it is based solely on O'Neil's generalized theory about algorithms and thus untethered to the facts of this case, internally inconsistent, and an improper legal opinion. *Otto v. LeMahieu*, 2021 WL 1615311, at *5 (N.D. Cal. Apr. 26, 2021) (excluding expert testimony as "inherently unreliable" where expert "concedes he has no specific experience with the" platform at issue and based his opinion instead on "his general experience").

First, O'Neil has no methodology or principles for the Court to assess, much less a methodology or principle that was reliably applied to the facts of the case. This is critical because "[e]ven if the expert employs reliable general principles developed by reliable methods, evidence may be excluded under Rule 702(d) if the specific application of those principles to the facts of the case is suspect." Wright & Miller, *Fed. Practice & Procedure*, § 6268.2 Subdivision (d)—Reliable Application. Put differently, "theory alone does not make [an expert's] opinions admissible. The Court must "scrutinize . . . whether those principles and methods have been properly applied to the facts of the case." *Klein*, 766 F. Supp. 3d at 963.

Here, O'Neil's algorithm opinion is based solely on her generalized theories about the supposed risks inherent in every algorithm. At deposition, O'Neil acknowledged that her opinions are simply "extremely general statements about algorithmic harm" and that she "would say that about any early warning system." Ex. A, O'Neil Tr. 125:15-22; 133:10-18. O'Neil did not employ any methodology to apply these "extremely general statements" to the facts in this case. She did not assess any PowerSchool product or, importantly, how any school configured or implemented any PowerSchool product. Nor did she assess whether the supposed risks of bias or inaccuracy have materialized in any way based on anyone's use of a PowerSchool product. *Id.* at 70:21-71:12; 95:14-

96:9, 99:15-23, 129:17-130:11. Indeed, the only specific examples of bias or inaccuracy she provides come from news articles and academic commentary that have nothing to do with PowerSchool and that do not in fact indicate any bias or inaccuracy occurred. *See, e.g.*, Ex. B, O'Neil Rep. 29 nn. 68-69; Ex. A, O'Neil Tr. 91:7-16.

For this reason, the jury cannot rely on O'Neil's opinion to infer any harm, or even risk of harm, to the named plaintiffs or putative class, as Plaintiffs propose a jury should do. *See* Dkt. 196-3, Mot. for Class Cert. 5 (listing the harms in O'Neil's report as relevant to supposed classwide harm). O'Neil herself rejected such an application of her report: "I'm definitely providing my opinion on risk [only]… So to be clear, I'm not claiming there has been harm or there will be harm" in this case. Ex. A, O'Neil Tr. 86:13-87:12. She even "asked if [Plaintiffs' counsel] knew of actual harm that had been perpetrated by some of these algorithms or actual stories of harm or actual use cases for these. And they didn't have them for me." *Id.* at 62:7-14. In other words, O'Neil's opinion is on its face speculative and untied to the issues the jury must decide. It should therefore be excluded as unreliable and irrelevant. *See U.S. v. Hermanek*, 289 F.3d 1076, 1095 (9th Cir. 2002) ("Without a link between [the expert's] knowledge and the particular matter he interpreted, 'there is simply too great an analytical gap between the data and the opinion proffered.'").

Second, O'Neil's opinion presents real risk of confusing a jury because she improperly attributes her hypothetical risks *to PowerSchool* even though she concedes that *schools* are "making [the] final choices to make the algorithms work with their data." Ex. A, O'Neil Tr. 21:16-25:2. Her report, while placing the blame on PowerSchool, simultaneously says that the "various risks to students" are caused "by the use [of] algorithms *by their schools or by third party entities*," such as local law enforcement. Ex. B, O'Neil Rep. 1, 28 (emphasis added). O'Neil further testified that "the only possible way [an algorithm] could be harmful to a student is *if a teacher or an administrator acts on it* in a certain way." Ex. A, O'Neil Tr. 89:19-22 (emphasis added); *see also id.* at 94:10-95:3 (harm depends on "how the school is using it"). In short, O'Neil speculates about harms that would inherently require someone other than PowerSchool to take action, which would be an obvious intervening cause not attributable to PowerSchool. This is yet another reason why her testimony

should be excluded. *See Joiner*, 522 U.S. at 146 (explaining that an expert should be excluded where there is "too great an analytical gap between the data and the opinion proffered").

Third, O'Neil's opinion that PowerSchool *could* and *should* conduct bias and accuracy testing is "untethered to real-world evidence," *see Klein*, 766 F. Supp.3d at 963, and an improper legal opinion. Regarding whether PowerSchool could test algorithms for inaccuracy or bias, O'Neil's own report directly undermines her opinion. Her proposal is that PowerSchool should conduct a wildly impractical seven-step process that she would apply were she to test PowerSchool's products. Ex. B, O'Neil Rep. 29-30. Just *one* of those steps would require "a written description of the behavior by the school representative" *for every student affected* across every different school implementing PowerSchool's product. *Id.* at 29-30. Indeed, every step she mentions would require troves of additional data *from schools* about their particular students. O'Neil even testified that if she wanted to assess the accuracy of any model, she would need "like 10,000 or more data points." Ex. A, O'Neil Tr. 130:25-132:4. There is nothing in the record that indicates how PowerSchool could possibly obtain such data from schools to test each school's configuration of PowerSchool's products.

O'Neil went even further in her deposition, admitting that assessing these predictive models "require[s] usage knowledge, like the context of how it's being used" at each school individually. *Id.* In her words, any "graduation alert system"—the only model her report is specifically concerned about—will necessarily be different at every school:

> [N]ot every school is going to collect the same exact data elements, so the choice of the data elements, the weightings of the data elements, how much do we care about this versus that, the threshold and, of course, the students' data. Those are most obvious choices, but there's probably other configurations, like how it's presented, whether it's a daily report or a monthly report, or is it an e-mail to a teacher or is it an e-mail to the principal. Is it—and, of course, there's also the question of how it's used. It could be used in many, many ways.

*Id.* at 121:7-24. How PowerSchool would go about testing each of the individual configurations of any predictive model across tens of thousands of schools who can and do configure their models in countless ways is anyone's guess. O'Neil certainly does not say. She provides no reason to believe such testing could be done at all, much less in a "relatively easy and inexpensive" way. Ex. B, O'Neil Rep. 30. Thus, this opinion too is based on her testing "theory alone," and O'Neil did not "properly appl[y]" that theory "to the facts of the case." *Klein*, 766 F. Supp. 3d at 963.

O'Neil's opinion that PowerSchool *should* conduct this type of testing suffers from a different flaw—it is an impermissible legal opinion. While experts are allowed to proffer opinions "about industry practice or standards," they may not opine on legal duties. *Camenisch*, 763 F. Supp. 3d at 883 (permitting expert to testify about industry standards but not about whether [defendant] "had a duty under California law to monitor its accounts"); *see also Ditton v. BNSF Ry. Co.*, 2014 WL 12928305, at *9 (C.D. Cal. Jan. 6, 2014) (excluding expert opinion because he could "not opine on BNSF's ultimate legal duties."). Yet that is exactly what O'Neil does here. She states that PowerSchool "should" (*i.e.*, has a duty to) test its products containing algorithms for accuracy or bias. Even worse, O'Neil does not first establish that testing for bias is an industry standard. Her testing opinion is based on her own views—not industry norms. So while courts exclude experts for crossing the line from testifying about industry standards to testifying about legal duties under those standards, O'Neil skips the first permissible step and goes straight to the second impermissible step.

For these reasons, the Court should exclude O'Neil's testing opinion altogether. *Morris v. BNSF Ry. Co.*, 790 F. Supp. 3d 1129, 1140 (W.D. Wash. 2025) (explaining that experts may not offer legal opinions "based on [] standards or otherwise."). Moreover, the Court should also reject any downstream conclusions from O'Neil's testing opinion, such as Plaintiffs' argument that the lack of testing creates some unspecified classwide injury or provides a basis for their unjust enrichment claim. Dkt. 196-3, Mot. for Class Cert. 13, 21. Plaintiffs rely almost exclusively on O'Neil for this conclusion and their request for $341 million in damages. Where, as here, a plaintiff's only basis of injury is nothing "more than" their expert's "fanciful application" of generalized theory "untethered to real-world evidence" in the case, the expert should be excluded and the request for class certification denied.[2] *Klein*, 766 F. Supp. 3d at 963-68 (rejecting plaintiffs' expert on injury and thus rejecting request for class certification based on that purported injury); *see also Brooks v. It Works Marketing, Inc.*, 2022 WL 2217253, at *5 (E.D. Cal. June 21, 2022) (refusing to credit expert declarations on "possible harms that the public might face," finding them "speculative and ... not specific to plaintiff").

[2] *See* forthcoming opposition to Plaintiffs' motion for class certification.

## V. CONCLUSION

For all these reasons, PowerSchool respectfully requests that the Court exclude the testimony and report of Catherine O'Neil in its entirety. Her testimony will not assist the Court at class certification and, if presented at trial, would risk conferring unwarranted expert authority on speculative and baseless assumptions.

DATED: October 12, 2026

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Olivia Adendorff*
Olivia Adendorff, P.C.

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*