Robyn E. Bladow
Kirkland & Ellis LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
Kirkland & Ellis LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EMILY CHERKIN, et al<br><br>Plaintiffs,<br><br>v.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>Defendant. | CASE NO. 3:24-CV-02706-JD<br><br>**DEFENDANT POWERSCHOOL HOLDINGS, INC.'S RENEWED OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Judge: Hon. James Donato<br>Hearing Date: November 5, 2026<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |

# TABLE OF CONTENTS

Page

**INTRODUCTION** .......... **1**

**BACKGROUND** .......... **2**

**I. School Districts Determine How PowerSchool Products Are Used.** .......... **2**

**II. Plaintiffs' Proposed Theories and Classes.** .......... **6**

**ARGUMENT** .......... **6**

**I. The Multistate Classes Are Not Certifiable Because the Applicable Law Varies by State.** **6**

A. Plaintiffs Cannot Show Class Members Had "Significant Contacts" with California. .......... 6

B. Even Setting Aside the Lack of "Significant Contacts," Conflicts Analysis Dictates That California Law Cannot Apply to Non-California Class Members. .......... 8

**II. Plaintiffs Failed to Prove Rule 23's Commonality and Predominance Requirements** .......... **10**

A. No Common Answers About Whether the Alleged Invasion of Privacy Occurred. .......... 10

1. Whether Consent Was Provided Cannot Be Resolved on a Classwide Basis. .......... 12

2. There Are No Common Answers to Whether the Student Data Processed Is "Sensitive" or How the Data Was Used (If at All). .......... 14

3. There Are No Common Answers to Whether Students Expect Privacy. .......... 17

4. Whether PowerSchool's Conduct Is Offensive Cannot Be Answered Classwide. .......... 18

B. No Common Answer About the Alleged Unjust Enrichment. .......... 20

**III. Plaintiffs Have Not Shown That Damages Can Be Determined on a Classwide Basis** .......... **21**

**CONCLUSION** .......... **24**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson Living Tr. v. WPX Energy Prod., LLC*,
306 F.R.D. 312 (D.N.M. 2014)....................12

*In re Apple Data Priv. Litig.*,
824 F. Supp. 3d 888 (N.D. Cal. 2026)....................14

*Berger v. Home Depot USA, Inc.*,
741 F.3d 1061 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017)....................20

*Bruce v. Teleflora, LLC*,
2013 WL 5310623 (C.D. Cal. Sept. 19, 2013)....................6

*Cherkin v. PowerSchool Holdings, Inc.*,
2025 WL 844378 (N.D. Cal. Mar. 7, 2025)....................18

*Clear Channel Outdoor, Inc. v. Bently Holdings Cal. LP*,
2011 WL 6099394 (N.D. Cal. Dec. 7, 2011)....................20

*Cole v. Gene by Gene, Ltd.*,
322 F.R.D. 500 (D. Alaska 2017)....................13

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013).................... *passim*

*Corcoran v. Sw. Bell Tel. Co.*,
572 S.W.2d 212 (Mo. Ct. App. 1978)....................8

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig.*,
277 F.R.D. 586 (S.D. Cal. 2011)....................20

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. 2023)....................14

*Doe v. Gonzaga Univ.*,
143 Wash. 2d 687 (2001), *rev'd on other grounds*, 536 U.S. 273 (2002)....................9

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020)....................8, 14, 17, 19

*Fisher v. State ex rel. Dep't of Health*,
125 Wash. App. 869 (Wa. 2005)....................9

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Folgelstrom v. Lamps Plus, Inc.*,
195 Cal. App. 4th 986 (2011) ....................19

*Forcellati v. Hyland's, Inc.*,
2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) ....................7

*Frasco v. Flo Health*,
349 F.R.D. 557, 574 (N.D. Cal. 2025) ....................9, 12

*Gonzalez v. Am. Honda Motor Co.*,
720 F. Supp. 3d 833 (C.D. Cal. 2024) ....................7

*Hageman v. Hyundai Motor Am.*,
2024 WL 694378 (C.D. Cal. Jan. 5, 2024) ....................7

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ....................19

*Hataishi v. First Am. Home Buyers*,
223 Cal. App. 4th 1454 (2014) ....................18

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) ....................19

*Hubbard v. Google LLC*,
2024 WL 3302066 (N.D. Cal. July 1, 2024) ....................18, 19

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ....................14

*Jacobson v. CBS Broad., Inc.*,
19 N.E.3d 1165 (Ill. App. 2014) ....................8

*Jones v. Micron Tech. Inc.*,
400 F. Supp. 3d 897 (N.D. Cal. 2019) ....................6

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ....................9, 17

*Kight v. CashCall, Inc.*,
231 Cal. App. 4th 112 (2014) ....................18

*Leibman v. Prupes*,
2015 WL 3823954 (C.D. Cal. June 18, 2015) ....................6

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) ....................6, 7, 8, 9

*Melder v. Sears, Roebuck & Co.*,
731 So. 2d 991 (La. App. 4 Cir. 3/31/99) ....................8

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ....................14

*Miller v. Travel Guard Grp., Inc.*,
2023 WL 7106479 (N.D. Cal. Sept. 15, 2023) ....................23

*Moon v. County of Orange*,
2020 WL 2332164 (C.D. Cal. Mar. 18, 2020) ....................18

*Murray v. Fin. Visions, Inc.*,
2008 WL 4850328 (D. Ariz. Nov. 7, 2008) ....................19

*Peterson v. Aaron's, Inc.*,
2017 WL 364094 (N.D. Ga. Jan. 25, 2017) ....................14

*Petri v. Valarity, LLC*,
2015 WL 7253061 (E.D. Mo. Nov. 17, 2015) ....................8

*Pro Golf Mfg., Inc. v. Trib. Rev. Newspaper Co.*,
570 Pa. 242 (2002) ....................8

*Reisberg et al. v. Renaissance Learning, Inc.*,
2026 WL 2678223 (C.D. Cal. Sept. 11, 2026) ....................18, 19

*Shah v. MyFitnessPal, Inc.*,
824 F. Supp. 3d 906 (N.D. Cal. 2026) ....................17

*Sparks v. Phillips & Cohen Assocs., Ltd.*,
641 F. Supp. 2d 1234 (S.D. Ala. 2008) ....................8

*Stromberg v. Qualcomm Inc.*,
14 F.4th 1059 (9th Cir. 2021) ....................6, 9

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .................... *passim*

*Wiley v. Universal Music Grp., Inc.*,
826 F. Supp. 3d 1121 (N.D. Cal. 2025) ....................17

**Statutes**

16 R.I. Gen. Laws Ann. § 16-104-1(b) ....................17

20 U.S.C. § 1232g(a)(5) ....................17

Cal. Educ. Code §§ 49061(c), 49073 ....................17

Cal. Educ. Code § 49073.1(a)-(b) ....................17

K.R.S. § 365.734(2) ....................17

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

Wash. Rev. Code Ann. § 28A.604.010 ........ 17

**Rules**

Fed. R. Civ. P. 23 ........ *passim*

# INTRODUCTION

Plaintiffs' renewed motion for class certification, Dkt. 197 ("Motion" or "Mot."), still fails to meet the requirements of Rule 23. It should be denied for multiple reasons.

***First***, California law cannot apply to out-of-state class members because the challenged conduct occurred elsewhere and the laws of the states within the proposed multistate classes conflict significantly. For invasion of privacy, applying California law requires Plaintiffs to prove that the last step in the conduct giving rise to the claim occurred in California. Plaintiffs cannot. PowerSchool's data processing for non-California customers occurs solely at the direction of out-of-state school districts, under contracts with schools requiring application of local law, and via servers in [redacted]. PowerSchool's California headquarters and the Terms of Use ("ToU") governing its marketing website (which do *not* govern any data processing at issue) cannot change that. And although Plaintiffs have narrowed their nationwide class to 35 states that supposedly follow the Restatement of Torts, significant conflicts between California law and the laws of the other 34 states abound on key elements. The multistate classes should not be certified.

***Second,*** all Plaintiffs' proposed classes fail Rule 23(a)(2)'s commonality requirement, and the damages classes fail Rule 23(b)(3)'s predominance requirement. Plaintiffs admit that the conduct giving rise to their claims is ***schools'*** use of varying PowerSchool products to store and analyze records. *See* Mot. 1-6. Plaintiffs' case spans nine highly customizable enterprise products that PowerSchool implemented for the bespoke data processing needs of over 10,000 school districts, which use and share records under individual state laws, local board policies, handbooks, and parental/student permission slips. There is no common set of sensitive data at issue; Plaintiffs broadly define "student data" to encompass anything students may provide to their schools—from public information to confidential details about a student's performance. Such variation precludes common answers for all classes and defeats predominance for the damages classes.

Whether PowerSchool tortiously invaded any student's privacy will rise or fall based on what data is at issue, who accessed it, how, why, what the school told each student or parent about such processing, whether that processing was highly offensive in context, and what harm it caused. Yet what Plaintiffs offer as supposedly common evidence—namely, PowerSchool relying on schools to obtain consent and

documents about what data PowerSchool products could potentially process—does not answer any of these critical questions. Thus, Plaintiffs' claims cannot be judged on the basis of classwide proof.

***Third,*** Plaintiffs have not shown that damages are capable of classwide measurement. Plaintiffs' "actual damages" model purports to measure the "market value" of data allegedly "misappropriated" from K-12 students without consent. But the calculation itself is based on a single "comparator" involving data from a tiny subset of the class, disclosed to a specific recipient servicing a unique downstream market, and provided ***with consent***. Plaintiffs' expert admitted he had no basis to say that data provided by the entire class, to a different recipient, or without consent would be valued the same way—conceding that he did not measure the harm alleged by Plaintiffs but something else entirely. Plaintiffs' unjust enrichment model fares no better. It includes revenue from services that everyone agrees are lawful, and neither Plaintiffs nor their expert made any effort to exclude that lawful revenue from their final unjust enrichment calculation. Nor did Plaintiffs' expert isolate the damages relevant to the proposed California class—the only one for which Plaintiffs now seek unjust enrichment damages. Both models thus "identif[y] damages that are not the result of the wrong." *Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013). "Without presenting another methodology, [Plaintiffs] cannot show Rule 23(b)(3) predominance." *Id.* at 34.

As a result, Plaintiffs' renewed motion should be denied.

## BACKGROUND

### I. School Districts Determine How PowerSchool Products Are Used.

Unlike data privacy cases involving a single product used by all class members, Plaintiffs' proposed classes encompass numerous PowerSchool products with distinct functions. The proposed "Data Warehouse" class concerns products that districts use to store or organize student records; the proposed "Profiling and Predictions" class concerns products that allow school staff to visualize, track, or analyze selected data, such as graphing attendance trends, administering assessments, or tracking behavioral metrics.[1]

PowerSchool provides its products to school districts pursuant to district-specific contracts that define the data processing services scope, so functionality varies even among districts using the same

[1] *See* Exs. 1-5; Aragon Decl. ISO Pfs. Mot. for Class Cert., Exs. 19-21.

product.[2] At all times, PowerSchool processes student data only at a district's direction and control.[3] School districts—not PowerSchool—make the decisions regarding the conduct that Plaintiffs challenge, including obtaining parental consent, what data (if any) is stored in PowerSchool's products, whether data is stored on district servers or the PowerSchool cloud, and what analytics (if any) are performed.[4]

***Parental Consent.*** School districts take individualized and varying approaches to informing parents of their technology practices and obtaining consent. For example, some require that parents sign technology policies explicitly disclosing vendor relationships, some get parental consent only for certain software products, and others take the position that students legally have no expectation of privacy on school devices or systems.[5] These practices vary significantly by district and often turn on state or local law requirements.[6] PowerSchool has no direct relationship or communication with parents or students, and thus there is no mechanism for PowerSchool to obtain direct consent. Nor could consent be secured "in product" because, for example, the products and features challenged in the damages classes are intended for school administrators and staff, not students or parents.[7]

***Data and Hosting.*** Here, there is no uniform set of student data or common set of data fields that is processed or required by the products included for each class.[8] The challenged products serve a wide variety of functions, from recording daily attendance to analyzing whether school districts need more schools to address population growth.[9] The data stored in each product varies accordingly and even more so according to how school districts use the products. School districts, not PowerSchool, decide what data to upload into PowerSchool products based on their individual educational needs. To demonstrate the variety at issue, PowerSchool prepared a summary chart of the data fields that just 10 districts—out of the 10,000 districts that license PowerSchool products—disclose they ***may*** collect, including Plaintiffs' school

---

[2] Ex. 6, PWRSCHL_00161580, at '580-82 (DPA); Ex. 7, PWRSCHL_00162703 (MSA).
[3] Ex. 6 at '581-82 (DPA); *see also* Ex. 7 at '706 (MSA, same); Ex. 8, Ahmad Dep. 110:21-111:14.
[4] Ex. 9, Bartlett Expert Rep. 38-50, 57-63; Ex. 8, Ahmad Dep. 99:15-101:12, 109:17-111:14; Ex. 10, White Expert Rep. 16-18; Ex. 11, Maharana Dep. 41:15-46:20.
[5] Ex. 9, Bartlett Expert Rep. 57-63.
[6] *Id.*
[7] Ex. 1, PWRSCHL 00644395, at '397 (SIS Data Privacy Impact Assessment ("DPIA")); Ex. 2, PWRSCHL 00644386, at '388 (CI DPIA); Aragon Ex. 19, PWRSCHL_00644311, at '313-14 (Analytics and Insights DPIA); Aragon Ex. 21, PWRSCHL 00644447, at '449 (PS DPIA); Aragon Ex. 20, PWRSCHL_00644501, at '503 (BS DPIA); Ex. 12, PWRSCHL 00644221, at '223 (AI DPIA); Ex. 13, Cirillo Dep. 35:1-10; 308:9-21; 312:3-12; 319:4-12.
[8] Ex. 8, Ahmad Dep. 109:17-110:20.
[9] Ex. 11, Maharana Dep. 57:9-22; Ex. 14, Shinton Dep. 97:22-98:15, 120:3-12.

districts Seattle Public Schools ("SPS") and West Contra Costa ("WCCUSD"). *See* App. A. Just among these districts, there are 82 different data fields collected by the districts in total, with minimal overlap from school to school. Contrary to Plaintiffs' unsupported assertion that there are "uniform data elements taken by the relevant PowerSchool products, [redacted] Mot. at 18, multiple schools on the list do not track [redacted], and only 1 of the 10 tracks [redacted].[10]

In addition, school districts sometimes choose to maintain student data on their own on-site servers rather than having PowerSchool host it.[11] For example, Plaintiff S.G.'s school district, SPS, uses SIS—a product included in Plaintiffs' proposed Data Warehouse class—but stores the data it wishes to process within the SIS application on the district's local servers, so PowerSchool does not store nor process SPS's SIS data within its cloud network at all.[12] In contrast, Plaintiffs L.M.C. and M.M.C.'s school district, WCCUSD, has PowerSchool host its SIS data.[13] Because certain districts process and store some or all of their data on their own servers, Plaintiffs have no common evidence of what data, much less what sensitive data, is processed using PowerSchool products for any class member.

***"Sharing."*** Despite Plaintiffs' misleading assertions to the contrary, PowerSchool ***does not ever*** unilaterally share student data with third parties. When data is disclosed to third parties, it is always at the direction, and with the express consent, of schools (and, at times, even students).[14] While Plaintiffs focus on the 213 partners PowerSchool disclosed in discovery, the reality is no school uses 213 partners; each integrates with a varying number of partners or none at all. Plus, none of these partners ever received data without a school first requesting and then directing what exactly was shared.

---

[10] App. A (showing that the Seattle, Georgetown County, and Los Angeles Unified school districts do not track SSNs; Forest Hills, Georgetown County, and Los Angeles Unified school districts do not track GPA/Grades; and only Goshen County 1 school district tracks class rank).

[11] Ex. 6 at '581-82 (DPA); Ex. 8, Ahmad Dep. 99:15-101:10; Ex. 15, Sharp Dep. 53:12-55:15; Ex. 16, Jaeger Dep. (12/5/2025) 44:2-45:6; Ex. 17, Flagg Dep. 61:22-63:7; Exs. 1-5 (sample of DPIAs); Ex. 18, White Rebuttal Expert Rep. 4-5. *See also* Plaintiffs' proposed experts agreeing at Ex. 19, Schulte Dep. 203:2-17, 205:12-206:7; Ex. 20, Barber Dep. 103:12-107:15, 176:10-22; Ex. 21, O'Neil Dep. 123:14-24, 71:24-72:3, 121:5-24.

[12] Ex. 22, Jaeger Dep. (12/18/2025) 18:4-24, 30:10-31:20, 38:2-42:19, 110:11-25; Ex. 8, Ahmad Dep. 309:8-11. [redacted] of schools host SIS on their premises. Ex. 8, Ahmad Dep. 99:15-101:10; Ex. 14, Shinton Dep. 45:22-46:5.

[13] Ex. 8, Ahmad Dep. 308:18-309:7.

[14] Aragon Ex. 8, PowerSchool's Responses and Objections to Interrogatories at 10-16 and Aragon Ex. 13, PowerSchool's Suppl. Responses and Objections to Non-Uniform Interrogatories 1, 4, 5 at pp. 15-26.

Whether and to what extent student data is ever shared with a third party is thus entirely school-specific and varies greatly across the classes. The school chooses its partners and what data is shared with them to facilitate an educational purpose. For instance, SPS self-manages data sharing and de-identification with its "community-based partners"—which include the county department of public health, the City of Seattle, and the Boys & Girls Club. It shares data only when a particular student enrolls in a partner's support services, independently decides what data to share, and ***de-identifies*** the data itself when transmitting it for solely statistical purposes.[15] And there is ***no evidence*** at all suggesting that any data was ever shared regarding the named Plaintiffs, much less that PowerSchool had a role in it.

***Analytics.*** Schools also vary drastically in their use of analytics. While PowerSchool developed software to display data or plot trends (among other analytics), ***schools*** design and implement their own predictive models (with and without PowerSchool's technical support).[16] Schools decide what data to analyze and how to design their analytical models.[17] SPS, for example, develops its own analytics models with outside contractors rather than relying on PowerSchool; it merely runs those external models using PowerSchool's visualization program, in the same way a district might use Excel.[18] WCCUSD licensed PowerSchool's "Analytics and Insights" product only for a one-year trial that ended in 2022, and there is no evidence at all that any student's data was ever used by the district as part of that trial.[19]

A district licensing the Analytics and Insights product chooses how to use it.[20] It could examine population growth trends to see if it needs more schools,[21] or it could analyze freshmen at one low performing school to identify students with high absenteeism at risk of dropping out.[22] In one scenario, the tool may process data on every student in the district; in another, only students in a particular segment of one school. PowerSchool lacks visibility into how any school or district uses student data within its Analytics and Insights products, including which data the school or district enters into the product.[23]

---

[15] Ex. 22, Jaeger Dep. (12/18/2025) 143:13-147:13.
[16] Ex. 11, Maharana Dep. 46:14-47:10, 50:2-13.
[17] *See* Ex. 10, White Expert Rep. 16-17; Ex. 11, Maharana Dep. 41:15-46:20.
[18] Ex. 16, Jaeger Dep. (12/5/2025) 74:25-76:10; Ex. 22, Jaeger Dep. (12/18/2025) 38:2-42:19, 105:21-107:16.
[19] Ex. 23, WCCUSD Minutes.
[20] Ex. 11, Maharana Dep. 80:14-84:16.
[21] Ex. 14, Shinton Dep. 97:22-98:15, 120:3-12.
[22] Ex. 11, Maharana Dep. 42:16-46:2.
[23] Ex. 15, Sharp Dep. 111:18-112:5, 206:2-9, 264:5-265:2; Ex. 14, Shinton Dep. 67:12-21; Ex. 8, Ahmad Dep. 103:21-104:5; Ex. 24, Swingle Dep. 336:2-10; Ex. 9, Bartlett Expert Rep. 48-54.

## II. Plaintiffs' Proposed Theories and Classes.

Plaintiffs seek class certification of claims for intrusion upon seclusion, invasion of privacy under the California Constitution, and unjust enrichment. *See* Mot. 1-6. They propose injunctive relief-only and damages classes, including 35-state and California-only damages classes focused on two sets of products. First, Plaintiffs' proposed "Data Warehouse" damages classes challenge PowerSchool's cloud-based hosting via two products, neither of which is used by students. Second, Plaintiffs' proposed Profiling and Predictions damages classes challenge schools' use of student data to generate alleged "prediction and insights" via four products. *See id*. The injunctive relief classes include all six products at issue in the damages classes, plus three products Plaintiffs do not categorize or describe in any way.

## <u>ARGUMENT</u>

## I. The Multistate Classes Are Not Certifiable Because the Applicable Law Varies by State.

At the outset, the Court should reject Plaintiffs' multistate classes because Plaintiffs failed—again—to show that California law governs the claims of class members residing in other states.

### A. Plaintiffs Cannot Show Class Members Had "Significant Contacts" with California.

Plaintiffs fail to meet their threshold burden of proving that "California has 'significant contact or significant aggregation of contacts' to the claims of each class member." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012). This inquiry must occur ***before*** any conflicts analysis. *See id.*; *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1067-68 (9th Cir. 2021). For a tort like invasion of privacy, California courts look to whether the injury-causing conduct occurred in the state. *See Bruce v. Teleflora, LLC*, 2013 WL 5310623, at *3 (C.D. Cal. Sept. 19, 2013); *Leibman v. Prupes*, 2015 WL 3823954, at *8 (C.D. Cal. June 18, 2015); *see also Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 908 (N.D. Cal. 2019) ("Courts in the Ninth Circuit have consistently held that a plaintiff in a putative class action lacks standing to assert claims under the laws of states other than those where the plaintiff resides or was injured."). Plaintiffs here cannot show that non-California class members were impacted by any of PowerSchool's data processing within California. Any data processing practices were negotiated and implemented by out-of-state school districts, pursuant to contracts requiring application of local law, with data collected

by out-of-state schools from out-of-state students, and processed (if at all) on PowerSchool's servers in [redacted].[24]

Rather than address any of these facts, Plaintiffs recycle two arguments: (1) PowerSchool's headquarters are in California; and (2) PowerSchool has a marketing webpage that, since August 2024, stated California law would apply unless a contract provided otherwise. *Compare* Mot. at 16-17, *with*, Dkt. 193, Aug. 19, 2026 Tr. of Aug. 13, 2026 Hr'g at 8:8-9:21. Neither withstands scrutiny.

***First***, the Ninth Circuit has expressly rejected Plaintiffs' argument that PowerSchool's California headquarters supplies the required "significant contacts." *See Mazza*, 666 F.3d at 590 (applying other states' laws despite Honda's California headquarters). Courts within this Circuit routinely apply this precedent. *See id.*; *Gonzalez v. Am. Honda Motor Co.*, 720 F. Supp. 3d 833, 846 (C.D. Cal. 2024) (same, despite Honda directing sales, marketing, warranties, and recalls from California); *Hageman v. Hyundai Motor Am.*, 2024 WL 694378, at *4 (C.D. Cal. Jan. 5, 2024); *Teleflora*, 2013 WL 5310623, at *3. Against this binding Ninth Circuit precedent, Plaintiffs rely on a single district court decision. Mot. at 16 (citing *Forcellati v. Hyland's, Inc.*, 2014 WL 1410264, at *2 (C.D. Cal. Apr. 9, 2014)). But the defendant in that case failed to challenge the Court's prior holding that California had significant "contacts to the claims of each putative class member." *Id.* Moreover, the holding, specific to false advertising claims, ultimately turned on defendant's failure to identify any material differences between the law of California and other states. *Id.* at *3-4. That one case therefore says nothing about the situation here, where Plaintiffs have identified no substantial relationship between the claims and California such that out-of-state class members could invoke California law and PowerSchool has presented evidence of the opposite.

***Second***, Plaintiffs' arguments based on the PowerSchool website's Terms of Use ("ToU") make no legal or factual sense. There is no evidence in the record that any of the Plaintiffs accepted the website's ToU, and multiple Plaintiffs affirmatively testified that they never visited the PowerSchool website at all.[25] Indeed, there is no evidence ***any*** student accepted the ToU. Plaintiffs also ignore that the ToU required application of ***New York*** law until ***August 2024***—months after Plaintiffs filed suit under

---

[24] Ex. 7, PWRSCHL_00162703, at '711-12 (MSA); Ex. 25, PWRSCHL_00162868, at '870, '878 (Seattle); Ex. 26, PWRSCHL_00163869, at '869, '874 (Georgia); Ex. 27, PWRSCHL_00163924, at '927, '941 (Maine); Ex. 8, Ahmad 218:4-10.

[25] Ex. 28, S.G. Dep. 75:3-7; Ex. 29, L.M.C. Dep. 47:24-48:16; Ex. 30, M.M.C. Dep. 36:20-37:6.

California law and years after the start of the proposed class period.[26] And the current ToU specifies that the license agreement between PowerSchool and each district controls over the ToU.[27] The license agreements select the law of the state "in which Customer resides or has its principal place of business."[28] Contractually, therefore, the applicable law is that of the state where each district is located—not California.[29] The ToU thus cannot provide the hook for significant contacts.

### B. Even Setting Aside the Lack of "Significant Contacts," Conflicts Analysis Dictates That California Law Cannot Apply to Non-California Class Members.

Plaintiffs' failure to establish the requisite contacts between the members of the proposed multi-state classes and California ends the inquiry. But regardless, they also fail the second requirement of the choice of law analysis: conflicts of laws. There, the burden would shift to PowerSchool to show material conflicts under the governmental interest test, which asks (1) whether the states' laws differ; (2) if so, whether a true conflict exists; and (3) which state's interest would be more impaired if its law were not applied. *Mazza*, 666 F.3d at 590. Each step forecloses application of California law.

At steps one and two, California law materially conflicts with the laws of multiple states within Plaintiffs' multistate classes, notwithstanding whether the states "adopt" the Restatement. This includes Washington, where Plaintiff S.G. resides. For example:

- ***Alabama, Illinois, and Pennsylvania***: Require evidence that the intrusion caused or could be expected to cause mental suffering. *Pro Golf Mfg., Inc. v. Trib. Rev. Newspaper Co.,* 570 Pa. 242, 248 (2002); *Jacobson v. CBS Broad., Inc.*, 19 N.E.3d 1165, 1180 (Ill. App. 2014); *Sparks v. Phillips & Cohen Assocs., Ltd.*, 641 F. Supp. 2d 1234, 1252 (S.D. Ala. 2008). Plaintiffs' experts admitted to having no evidence of any mental anguish.[30]

- ***Louisiana***: Requires a broad, business-friendly balancing of interests where a plaintiff's interest "in protecting his [or her] privacy" can be outweighed by "the defendant's interest in pursuing his course of conduct." *Melder v. Sears, Roebuck & Co.,* 731 So. 2d 991, 1000 (La. App. 4 Cir. 3/31/99). California law provides no such deference to businesses, instead focusing on whether any invasion exceeds societal norms or legitimate societal interests. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 603 (9th Cir. 2020).

- ***Missouri***: Requires a heightened showing of privacy—*i.e.*, "a secret and private subject matter" that the plaintiff has a right "to keep … private." *Corcoran v. Sw. Bell Tel. Co.*, 572 S.W.2d 212, 215 (Mo. Ct. App. 1978); *see also Petri v. Valarity, LLC*, 2015 WL 7253061, at *2 (E.D. Mo. Nov. 17, 2015) (applying Missouri law). Plaintiffs' claims—based on educational records schools collect in the

[26] Ex. 31, July 2015 Terms of Use (August 3, 2024 archive version).
[27] Aragon Decl., Ex. 46, 2024 Terms of Use at 'General Information; Governing Law.'
[28] Ex. 7, PWRSCHL_00162703, at '711-12 (MSA).
[29] *See, e.g.* Ex. 25, PWRSCHL_00162868, at '870, '878 (Seattle); Ex. 26, PWRSCHL_00163869, at '869, '874 (Georgia); Ex. 27, PWRSCHL_00163924, at '927, '941 (Maine).
[30] Ex. 20, Barber Dep. 212:2-10; 442:22-444:12; Ex. 21, O'Neil Dep. 62:7-63:1.

ordinary course—do not fit the Missouri standard at all.

- ***Washington (S.G.'s residence)***: Imposes a heightened causation standard of proximate cause, *Doe v. Gonzaga Univ.*, 143 Wash. 2d 687, 705-06 (2001), *rev'd on other grounds*, 536 U.S. 273 (2002), and requires evidence that the defendant "acted deliberately . . . with the certain belief" that the intrusion would occur as a result of their conduct, *Fisher v. State ex rel. Dep't of Health*, 125 Wash. App. 869, 879 (Wa. 2005). Plaintiffs' claims already face an insurmountable hurdle because schools' data choices are intervening causes, so they could never meet the proximate cause requirement under Washington law. Nor can Plaintiffs establish that PowerSchool deliberately invaded anyone's privacy, especially when the evidence shows that PowerSchool asked school districts to obtain all necessary consents.[31]

Courts here reject nationwide classes based on these same types of material differences, even as between states that both "follow" the Restatement. *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 948 (N.D. Cal. 2023) (material differences between California and Florida law on intrusion upon seclusion warrant dismissal of nationwide class claims, even though both states followed the Restatement).

Plaintiffs show no reason for a different result here. They cite *Frasco v. Flo Health, Inc.* for the proposition that no conflict exists between California law and the law of other states for intrusion upon seclusion. Mot. at 17 (citing 349 F.R.D. 557, 574 (N.D. Cal. 2025)). But the defendants there neither objected to using California law for a nationwide class nor identified any conflicts between state law, meaning the Court was not required to perform a full governmental interest analysis. *Id.*

Finally, Plaintiffs fail at step three of the conflicts analysis: California law may apply classwide ***only if*** "the interests of other states are not found to outweigh California's interest." *Mazza*, 666 F.3d at 590 (quotation omitted). But the non-California states have a strong interest in applying their own laws to conduct within their borders, particularly conduct relating to state-funded public schools. Moreover, the place of the purported wrong (the other states)—where "the last event necessary to make the actor liable occurred"—"has the predominant interest." *Id.* at 593-94; *see also Stromberg*, 14 F.4th at 1070 (reversing certification where court gave "too little weight to each state's interest in promoting business—the exact type of outcome [CAFA] intended to avoid"). And applying California law to a 35-state class would impair other states' interests in regulating data privacy for public school children, a core area of state policy that is "inherently tied to community standards." *Katz-Lacabe*, 668 F. Supp. 3d at 948. Since 2014, nearly 150 student privacy laws have been passed in 47 states,[32] and local boards decide what data

[31] Ex. 7, PWRSCHL_00162703, at '706 (MSA).
[32] Public Interest Privacy Ctr., *State Student Privacy Laws*, https://perma.cc/MK9E-TZ4G.

can be publicly released as "directory information" and what notice rights parents should receive.[33] Overriding these state-specific judgments would offend the interstate comity that case law protects.

California law thus cannot apply to out-of-state class members, and Plaintiffs' proposed multi-state classes cannot be certified for that reason.

## II. Plaintiffs Failed to Prove Rule 23's Commonality and Predominance Requirements.

Under Rule 23, Plaintiffs must show that, for all proposed classes, a trial can provide a ***classwide answer*** to common questions driving resolution of the case. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Comcast*, 569 U.S. at 30. For the damages classes, Plaintiffs must also show that common questions predominate over individual ones. *Id.* Moreover, Plaintiffs cannot just assert that there are common questions with common answers; they must provide "evidentiary proof" to satisfy both 23(a) and 23(b). *Comcast*, 569 U.S. at 33. Plaintiffs cannot meet these requirements.

### A. No Common Answers About Whether the Alleged Invasion of Privacy Occurred.

Plaintiffs' privacy claims ask whether putative class members suffered an invasion of privacy from the storage, processing, or use of student data via certain PowerSchool products. The classes are defined principally by whether a student's school district used these products. But even if a district purchased one of these products to use for ***some*** school or class within the district, whether an ***individual class member's*** data was ever hosted or used by PowerSchool depends on widely varying facts.

For the proposed Data Warehouse classes, individualized inquiry is required to determine whether PowerSchool ***ever*** hosted ***any*** data for ***each*** class member. The named Plaintiffs prove the point. Plaintiffs point to PowerSchool's SIS contract with SPS—where Plaintiff S.G. attended—as an example of a school that collected a wide range of data. Mot. at 18 & n.94. But Plaintiffs ignore that ***PowerSchool hosts none of SPS's SIS data***.[34] An SPS representative testified that SPS hosts all these records on its own local servers.[35] As a result, PowerSchool is not—and cannot be—involved in SPS's storage and use of student data from SIS. Meanwhile, Plaintiffs are silent about WCCUSD hiring PowerSchool for cloud hosting, because there is no evidence in the record about what data PowerSchool hosts for L.M.C. and M.M.C.

---

[33] Ex. 9, Bartlett Expert Rep. 57-63.
[34] Ex. 22, Jaeger Dep. (12/18/2025) 18:4-24, 30:10-31:20, 38:2-42:19, 110:11-25; Ex. 8, Ahmad Dep. 307:1-308:11, 309:8-15.
[35] Ex. 22, Jaeger Dep. (12/18/2025) 18:4-24, 30:10-31:20, 38:2-42:19, 110:11-25.

other than their names. *See* Dkt. 198 at 3-4. So even for the named Plaintiffs, there is no basis to say ***any*** invasion of privacy occurred, because there is no evidence PowerSchool ever hosted their sensitive data. Even assuming other class members had sensitive data stored with PowerSchool (which Plaintiffs developed no evidence to prove), individualized inquiries are necessary to identify who those individual class members are.

Questions raised by the proposed Profiling and Predictions classes are just as individualized. The products in those classes do not apply a single analytical model uniformly to student data. Districts determine what data to analyze and how the available analytics functionality is configured and used. SPS, for example, develops its own analytics models with outside contractors rather than relying on PowerSchool,[36] while WCCUSD licensed Analytics & Insights only for a one-year trial that ended in 2022.[37] The record contains no evidence of how these two districts (or any of the thousands of others) used these analytics. And there is no evidence that the named Plaintiffs had any of their data analyzed by or stored in these products.[38] The mere existence of a district's license for a product included in the Profiling and Predictions classes thus does not establish that the district ran analytics or generated "predictions and insights" for all its students. Answering Plaintiffs' "common questions" for the Profiling and Predictions classes instead requires, at minimum, district-specific evidence concerning product implementation and use.

The lack of common answers becomes even more obvious when considering the supposedly "common questions" that Plaintiffs posited, or lack thereof. For their Injunctive Relief Classes, Plaintiffs do not identify one set of questions common to the entire class. They instead identify one set of common questions for the Data Warehouse Classes and a different set of common questions for the Profiling and Prediction Classes. Mot. at 12, 25. Plaintiffs thus concede that there is no set of common questions that applies across their Injunctive Relief Classes, which include all of the products in the Data Warehouse Classes, all of the products in the Profiling and Predictions Classes, plus three additional products—Naviance, Schoology, and MTSS—that they fail to tie to their allegations in any way. Mot. at 1-3. This alone defeats Plaintiffs' Injunctive Relief Classes.

---

[36] Ex. 22, Jaeger Dep. (12/18/2025) 38:2-42:19, 105:24-107:16, 114:22-118:11, 124:12-125:15.
[37] Ex. 32, PWRSCHL_00008714; Ex. 23, WCCUSD Board Approval for Hoonuit Pilot.
[38] Ex. 32, PWRSCHL_00008714; Ex. 23, WCCUSD Board Approval for Hoonuit Pilot.

The Injunctive Relief classes also fail for the same reason as the Damages Classes: even assuming "common questions" exist, they are not resolvable on a classwide basis. This is true even when adopting Plaintiffs proposed "common questions" for both types of damages classes, which are: (i) whether "effective consent" was provided, (ii) whether and how a given student's data was stored, processed, or disclosed by PowerSchool (for the Data Warehouse Classes) or used to generate "predictions and insights about students" (for the Profiling and Predictions Classes), (iii) whether PowerSchool's conduct was an intentional intrusion on a reasonable expectation of privacy, and (iv) whether that conduct was highly offensive. *See* Mot. at 12 (listing common questions for both types of classes as whether: the products at issue store, process, or disclose student data or use it to "produce predictions and insights about students"; PowerSchool receives "effective consent"; and PowerSchool's conduct "violates intrusion upon seclusion law").

**1. Whether Consent Was Provided Cannot Be Resolved on a Classwide Basis.**

Despite Plaintiffs' assertions to the contrary, Mot. at 12, consent is not "sufficient, on its own, to establish commonality" because it is an affirmative defense. *Anderson Living Tr. v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 439 n.87 (D.N.M. 2014), *adhered to on reconsideration,* 312 F.R.D. 620 (D.N.M. 2015). Even so, whether parents effectively consented to PowerSchool's EdTech services cannot be determined "in one stroke." *Dukes*, 564 U.S. at 350. PowerSchool's contracts provide that ***school districts*** will secure appropriate consent.[39] Each district employs its own disclosure and consent practices.[40] Determining whether parents consented to the challenged conduct therefore requires examination of the practices of each of the 10,000 districts within the proposed classes, as well as the conduct of each parent.

Plaintiffs' schools illustrate the point. WCCUSD issues an annual handbook that identifies PowerSchool as the software provider for the district's student information system, describes categories of information that it stores, and describes which district partners (*e.g.*, other state agencies) would receive the data.[41] L.M.C.'s and M.M.C.'s father signed the district handbooks annually beginning in 2021,[42] meaning the Concepcións had full notice of and consented to PowerSchool's data processing. *Frasco*,

[39] Ex. 7, PWRSCHL_00162703 (MSA).
[40] Ex. 9, Bartlett Expert Rep. 57-63.
[41] Ex. 33, 2021-22 WCCUSD Handbook at 14, 22, 126-27, 132, 144.
[42] Ex. 33, 2021-22 WCCUSD Handbook at 132, 144-45; Ex. 34, Concepción, Dep. 184:2-19.

349 F.R.D. at 574-75 ("actual consent" is a defense if "the disclosure explicitly notifies users of the conduct at issue"). By contrast, SPS, where S.G. attends school, identifies the PowerSchool products it uses on its website and maintains an electronic resources policy stating that "[n]o student or staff user should have any expectation of privacy when using the district's network."[43] SPS did not seek a parent signature or express consent to that policy. The thousands of districts in the proposed classes take varying approaches as well. For example:

- Chicago Public Schools says that parents and guardians have the right to "know which authorized software is being used in the classroom" and to "provide consent to the use of authorized software."[44]
- Fairfax County Public Schools mandates that parental consent is required for students to use some but not all educational software products.[45]
- Colorado Springs School District 11 says that students have "no expectation of privacy" on District devices, systems, tools, and storage, and that "[a]ll material and information accessed/received through District technology devices shall remain the property of the District."[46] It maintains a list of approved vendors[47] and details products' rationale and purposes in board materials.[48]
- Anne Arundel County Public Schools ("AACPS") says that students "shall have no expectation of privacy in the contents of their electronic files on any AACPS-provided systems and storage devices," including "all technology related services under contract with AACPS, regardless of their physical location."[49] It also details products' rationale and purposes in board materials.[50]

These examples illustrate the commonality problem without requiring the Court to decide whether any district's practices establish legally effective consent. Answering Plaintiffs' consent questions requires looking at ***each school's*** specific policies ***and parents' actions in response***, precluding the resolution of the consent defense "in one stroke." *Dukes*, 564 U.S. at 350; *see also Cole v. Gene by Gene, Ltd.*, 322 F.R.D. 500 (D. Alaska 2017) (finding variability in disclosures and consent mechanisms was

---

[43] Ex. 35, Seattle PowerSchool Products; Ex. 36, Seattle Policy 2022SP at 7.
[44] Ex. 37, PWRSCHL_00402348-352 ("Parents' Rights," Chicago Public Schools), at '349-50.
[45] Ex. 38, PWRSCHL_00403549-550 ("SeeSaw," Fairfax County Public Schools, July 29, 2024) at '549; *see* Ex. 39, PWRSCHL_00403684-685 ("Product Details: Schoology," Fairfax County Public Schools, December 4, 2024) at 684; Ex. 40, PWRSCHL_00403766-767 ("Product Details: Naviance," Fairfax County Public Schools, November 15, 2024) at '766; Ex. 41, PWRSCHL_00404273-274 ("Performance Matters," Fairfax County Public Schools, September 16, 2024) at '273.
[46] Colorado Springs School District 11, Technology Resources and Internet Safety Responsible Use for Students, Revised May 29, 2019, https://perma.cc/TRF8-F6SR.
[47] Student Data Privacy, Colorado Springs Schools, https://perma.cc/Q5ZF-Q62A.
[48] Dec. 4, 2024 Board Meeting Minutes, https://perma.cc/U9MA-VJ5E.
[49] Ex 42, PWRSCHL_00393853-867 ("Technology Use and Security," Anne Arundel County Public Schools, November 20, 2024) at '853, '857.
[50] June 18, 2025 Board Discussion Materials, https://perma.cc/G3LB-LH48.; May 15, 2024 Board Discussion Materials, https://perma.cc/ETG8-YW2F. ; Oct. 2, 2024 Board Meeting Minutes, https://perma.cc/RMP7-ZQHM.

"substantially at odds with the uniformity" that would support predominance); *Peterson v. Aaron's, Inc.*, 2017 WL 364094, *10 (N.D. Ga. Jan. 25, 2017) (denying certification for class of computer lessees and finding "the issue of consent will be an individual inquiry" because "some class members may have been aware of the software or may have requested it be activated on their computers").

Moreover, a jury cannot assess a consent defense unless it compares the disclosure to the actual conduct at issue—what products/services PowerSchool provided, what data it received and how, what it did with the data, and why—all of which require individual inquiry, as explained below.

### 2. There Are No Common Answers to Whether the Student Data Processed Is "Sensitive" or How the Data Was Used (If at All).

Plaintiffs devote only a few sentences to the critical question of what data is actually at issue in this case—what data schools disclosed to PowerSchool, what data PowerSchool shared with third parties, and what data was used in PowerSchool's analytical products—offering unsupported assertions and speculation rather than concrete answers. But an intrusion upon seclusion claim requires consideration of "whether the data itself is sensitive and whether the manner it was collected … violates social norms." *In re Facebook Internet Tracking*, 956 F.3d at 601; *see also In re Apple Data Priv. Litig.*, 824 F. Supp. 3d 888, 903 (N.D. Cal. 2026). A proper consideration of these factors shows Plaintiffs' claims are not susceptible to classwide proof.

***First***, the potential data at issue here spans a wide range of potential sensitivity. What data PowerSchool products may ingest or process for any given student depends on choices made by administrators, teachers, parents, and students: what data to upload, which products to license, and how to configure them.[51] A student's name in a district directory, for example, differs in kind and sensitivity from a behavior-intervention record. That distinction is determinative. *See In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (disclosure of a "unique device identifier number, personal data, and geolocation information" including a social security number is not an egregious breach of social norms); *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1126-27 (S.D. Cal. 2023) (browsing history on a public hospital website is not highly offensive, but sensitive health information entered on the same webpage may be); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 799, 801 & n.13

[51] Ex. 8, Ahmad Dep. 109:17-111:14; Ex. 15, Sharp Dep. 53:12-55:15; Ex. 11, Maharana Dep. 41:15-46:20, 246:9-248:5, 291:14-292:13.

(N.D. Cal. 2022) (health communications are "almost uniquely personal," unlike "common, basic digital information" or "usage and engagement" data). The fact finder cannot determine on a classwide basis whether a reasonable person would expect privacy in the overbroad category "student data." Nor can a fact finder determine on a classwide basis whether disclosure of such "student data" was highly offensive, when that term encompasses such varying kinds of information, depending on the school, product, and student.

These facts differ fundamentally from those in *Flo*. There, the defendants argued that users' different onboarding choices set different privacy expectations. This Court rejected that argument because the defendants "did not proffer any evidence" of such variation; what is more, the Court found that *every* choice involved highly sensitive reproductive data (*e.g.*, a user's last menstrual period and number of weeks of pregnancy) and Flo "made the same substantive representations to all users." *Flo*, 349 F.R.D. at 582. It was thus "not obvious that fine degrees of privacy expectations [were] in play." *Id.* None of those premises hold here. The record shows that the data PowerSchool products process range widely in terms of sensitivity (or lack thereof).[52] And there is no classwide evidence regarding the data uploaded or analyzed or how schools and classrooms configured and used PowerSchool products.[53] To the contrary, even a brief review of 10 districts' practices shows significant variation in the data schools collect from students. *See* App. A. The variation that was "not obvious" in *Flo* defines this case.

Plaintiffs' contrary arguments do not move the needle in their favor. They cite PowerSchool's marketing materials and their experts' purported interpretations of them to claim that PowerSchool's products collect uniform data fields. *See* Mot. at 1-2, 18. But at their depositions, all of Plaintiffs' experts admitted the opposite: there are ***no*** minimum data fields collected by PowerSchool products.[54] This is because implementation by each school unquestionably varies (and is determinative), no matter how much Plaintiffs try to find a least common denominator. *See* App. A.

***Second,*** there are no common answers on data shared with third parties. Plaintiffs misrepresent the record when they claim, "PowerSchool admits that it has shared student data with over 213 third-

---

[52] Ex. 9, Bartlett Expert Rep. 39-40, 43-44, Ex. 43, Rangarajan Dep. 31:9-34:16.
[53] Ex. 43, Rangarajan Dep, 39:15-40:10; Ex. 11, Maharana Dep. 42:16-46:2; Ex. 24, Swingle Dep. 231:18-232:9; Ex. 8, Ahmad Dep. 110:21-111:14.
[54] Ex. 19, Schulte Dep. 203:2-17; Ex. 20, Barber Dep. 103:12-107:15; Ex. 21, O'Neil Dep. 123:14-24, 135:1-136:12.

parties." Mot. at 2-3 & nn. 9, 14, 20-24; *see id.* at 12 (Data Warehouse questions 2-3). Plaintiffs' primary evidence is PowerSchool's Interrogatory Responses, but those responses stress—repeatedly—that PowerSchool does ***not*** itself share data with third parties and that any sharing is done by the schools or at their behest.[55] Testimony from the schools also disproves Plaintiffs' position and highlights the complexity of determining what was shared and with whom. Plaintiff S.G.'s school district, SPS, for example, has an entire department that manages the data it exchanges for only specified students with "community-based partners," and which performs data de-identification before sharing, if appropriate.[56] Data sharing thus varies district-by-district and student-by-student, leaving no common answers.

***Third,*** Plaintiffs are similarly wrong that PowerSchool's alleged use of student data "to produce predictions and insights about students" is susceptible to a common answer. *See* Mot. at 12. Their own experiences disprove commonality. S.G.'s school district buys analytical software from PowerSchool but works with outside contractors, rather than PowerSchool, to build its own models.[57] And S.G. was never subject to the allegedly "untested" PowerSchool algorithm; not a single document in the record shows analytics were performed on her data, which is consistent with testimony that her parent opted her out.[58] The Concepcións' district licensed an analytics product for a single year, but there is no evidence the product was ever used on them in any way.[59] Here again, answering questions concerning use of student data "to produce predictions and insights" will require a district-by-district inquiry into what data was used, from whom, by whom (school, PowerSchool, or a non-party), and why. Plaintiffs' evidence that PowerSchool sells products capable of analytics and earns profit from them does not answer any of these questions. *See* Mot. at 4-6.

Plaintiffs admit that analytical models and data inputs by schools vary, *see id.* 14, 21, so they instead claim that any use of "class members' data" in "untested" products cause harm. To support this testing theory, Plaintiffs point to their "algorithm" expert, but she testified that determining whether an

---

[55] Aragon Ex. 8, PowerSchool's Responses and Objections to Interrogatories at 10-16; Aragon Ex. 13, PowerSchool's Suppl. Responses and Objections to Non-Uniform Interrogatories 1, 4, 5 at pp. 15-26 ("PowerSchool's … disclosure … of Data is governed by the individual contracts with and direction of each of its educational customers.").

[56] Ex. 22, Jaeger Dep. (12/18/2025) 143:13-147:13.

[57] Ex. 22, Jaeger Dep. (12/18/2025) 38:2-42:19, 105:24-107:16, 114:22-118:11, 124:12-125:15.

[58] Ex. 44, Cherkin Dep. 149:1-4.

[59] Ex. 32, PWRSCHL_00008714; Ex. 23, WCCUSD Board Approval for Hoonuit Pilot.

algorithm caused class members harm would require extremely individualized and context-specific review. Ex. 21, O'Neil 130:14-133:8 (explaining that she would need to assess each individual school's use of any algorithm to determine harm, "like 10,000 or more data points" to assess an algorithm's accuracy, and the ethnicity or race of each individual student to determine bias). Such case-by-case determinations cannot be decided "in one stroke." *Dukes*, 564 U.S. at 350.

### 3. There Are No Common Answers to Whether Students Expect Privacy.

Plaintiffs' efforts to show that there is common, classwide evidence capable of proving all students' reasonable expectation of privacy are unavailing. The governing legal regimes vary significantly at the state and local level, and they shape the relevant "customs, practices, and circumstances" that inform whether a reasonable expectation of privacy exists. *In re Facebook, Inc. Internet Tracking*, 956 F.3d at 602; *see also Shah v. MyFitnessPal, Inc.*, 824 F. Supp. 3d 906, 916 (N.D. Cal. 2026) (state privacy laws "necessarily shape" users' expectations); *Wiley v. Universal Music Grp., Inc.*, 826 F. Supp. 3d 1121, 1132 (N.D. Cal. 2025) (same). Since 2014, state policymakers have passed nearly 150 different student privacy laws in 47 states.[60] For example, California and Washington expressly authorize schools to hire vendors for "digital storage, management, and retrieval" of student records without parental consent. Cal. Educ. Code § 49073.1(a)-(b); Wash. Rev. Code Ann. § 28A.604.010. Rhode Island and Kentucky, by contrast, permit EdTech contracting only for "cloud computing services." 16 R.I. Gen. Laws Ann. § 16-104-1(b); K.R.S. § 365.734(2). Such differences are material to individual claims because privacy "is an evolving area of law that is inherently tied to community standards." *Katz-Lacabe*, 668 F. Supp. 3d at 948. It is impossible to determine whether PowerSchool invaded a protected interest without considering the varying expectations set by local/state laws.

Plaintiffs' reliance on FERPA and COPPA is misplaced and does not overcome the highly localized nature of privacy expectations. Under FERPA, some educational records are presumptively ***not*** private but are instead "directory information," which schools can publish widely without parental consent. Critically, FERPA leaves the categorization of "directory information" to individual states or districts. *See* 20 U.S.C. § 1232g(a)(5); *see also* Cal. Educ. Code §§ 49061(c), 49073. Determining what

---

[60] Public Interest Privacy Ctr., *State Student Privacy Laws*, https://perma.cc/MK9E-TZ4G.

qualifies as "directory information" under FERPA—and thus what information PowerSchool was undoubtedly authorized to possess—requires individualized analysis of state law and local school policies.

California courts have refused to certify classes asserting privacy claims with much less variation. In *Moon v. County of Orange*, the court struck class allegations at the pleading stage asserting privacy violations when a prison recorded phone calls, since each call's confidentiality depended on inmates requesting confidentiality in advance. 2020 WL 2332164, at *7 (C.D. Cal. Mar. 18, 2020) (finding that such "case-by-case adjudication" alone defeated certifiability); *see also Kight v. CashCall, Inc.*, 231 Cal. App. 4th 112, 130 (2014) (affirming decertification of class asserting CIPA 632 claim because "the trier of fact would have to determine whether a person ***under the particular circumstances and given the background and experience of each plaintiff*** would have understood that the particular call was not being monitored" (emphasis in original)); *Hataishi v. First Am. Home Buyers*, 223 Cal. App. 4th 1454, 1467-68 (2014) (affirming denial of class certification because whether each plaintiff's expectation of privacy was objectively reasonable "will require individualized proof"). Those cases involved variation in the length of the user relationship, prior exposure to the defendant's call-monitoring disclosures, and experience with call monitoring by other businesses—minor variations compared to the dizzying array of local laws, policies, and practices that impact students' expectations of privacy across the country.

#### 4. Whether PowerSchool's Conduct Is Offensive Cannot Be Answered Classwide.

Plaintiffs give short shrift to the offensiveness prong, claiming that the mere fact that PowerSchool holds data for some of the class, with some of it being presumably sensitive, suffices. *See* Mot. at 18. But the mere collection of student data is insufficient to prove the "highly offensive" prong. *Hubbard v. Google LLC*, 2024 WL 3302066, at *8 (N.D. Cal. July 1, 2024) (rejecting that collection of student data alone "constitutes highly offensive behavior"); *Reisberg et al. v. Renaissance Learning, Inc.*, 2026 WL 2678223, at *4-6 (C.D. Cal. Sept. 11, 2026) (holding that mere collection of student data by an EdTech provider without consent was insufficient to state a claim for invasion of privacy). Indeed, the Northern "District sets a high bar when assessing the 'highly offensive' requirement." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1088 (N.D. Cal. 2022). As this Court explained, "'California tort law provides no bright line' [on whether an intrusion is offensive] and 'each case must be taken on its facts.'" *Cherkin v.*

*PowerSchool Holdings, Inc.*, 2025 WL 844378, at *2 (N.D. Cal. March 17, 2025). Conduct within the ordinary course of a lawfully authorized business (even if it invades a privacy interest) does not, as a matter of law, constitute a highly offensive invasion of privacy. *Folgelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 992 (2011). Offensiveness instead "requires a holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *In re Facebook Internet Tracking*, 956 F.3d at 606. Even a cursory review of Plaintiffs' proffered evidence shows they have insufficient classwide proof for any of these factors.

***First***, Plaintiffs have not shown they can prove harm or the degree of alleged intrusion on a classwide basis. Lacking concrete proof of what data PowerSchool actually possessed for any class member, *see* Dkt. 201 at 7-9, they focus entirely on the ***capabilities*** of PowerSchool's products. *Compare* Mot. at 18, *with supra* (collecting evidence showing concrete variation in data hosting practices). Indeed, Plaintiffs developed no evidence of cognizable harm to themselves, *see* Dkt. 198, and offer only raw speculation that PowerSchool might be profiting from their data, *see* Mot. at 7-9. The Court cannot allow Plaintiffs to shift their burden of submitting ***evidence*** that these issues can be resolved on a class-wide basis. *Comcast*, 569 U.S. at 33 (explaining that both Rule 23(a) and 23(b) require "evidentiary proof"). As described above, for any one student, PowerSchool may have none of their data, only directory information, only non-sensitive data, or sensitive data; thus, there is no way to assess the likelihood of harm or the degree of any intrusion on a class-wide basis. *See Murray v. Fin. Visions, Inc.*, 2008 WL 4850328, *5 (D. Ariz. Nov. 7, 2008) (denying certification of class alleging invasion of privacy when emails with company were forwarded to internal executive because "the subject matter of each email" determined whether "forwarding could be deemed highly offensive").

***Second***, Plaintiffs never address how PowerSchool's services amount to an "egregious breach of the social norms," *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009), likely because the answer varies overwhelmingly based on the specific services considered. Two federal courts have already held that an EdTech company's processing of children's data, even without parental consent, is insufficient to prove an egregious breach of the social norms. *Hubbard*, 2024 WL 3302066, at *8; *Reisberg*, 2026 WL 2678223, at *4-6. To the extent Plaintiffs complain of different conduct (contrary to their analysis of this

prong, *see* Mot. at 18), the varying state laws, regulations, and school practices will inevitably require individualized assessment of whether data practices at a particular school go beyond the ordinary course of lawful business.

**B. No Common Answer About the Alleged Unjust Enrichment.**

Plaintiffs also fail to prove that any class is certifiable for their unjust enrichment claim, which is now limited just to a proposed California subclass.[61] This claim requires Plaintiffs to establish that PowerSchool obtained a benefit from Plaintiffs through fraud, conversion, or similarly wrongful conduct. *See Clear Channel Outdoor, Inc. v. Bently Holdings Cal. LP*, 2011 WL 6099394, at *9 (N.D. Cal. Dec. 7, 2011). Plaintiffs contend there are two common "facts" for this claim that "are provable through common evidence:" (i) that PowerSchool never tested the products and (ii) that Plaintiffs and class members never gave effective consent. Mot. at 21. But these supposed "facts" are not connected to the elements of Plaintiffs' claim—whether PowerSchool obtained a benefit *from Plaintiffs* through fraudulent or similarly wrongful means. For example, whether PowerSchool tested products has nothing to do with whether they received a benefit from Plaintiffs. And consent, as discussed above, cannot be answered classwide.

When looking at the actual elements of the claims, there is no common question that has a common answer. Whether (1) PowerSchool engaged in the predicate conduct that Plaintiffs characterize as wrongful as to a particular class member; (2) that conduct was authorized; and (3) PowerSchool obtained a benefit from that conduct, all depends on the same district-specific evidence discussed above (whether the school used a product, how it was used, etc.), precluding certification. *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1070 (9th Cir. 2014) (individualized assessment of whether funds received were "unjust or inequitable" precluded certification), *abrogated on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017). Indeed, the fact that schools play a key role in deciding what analytics to run, how, and on what data is itself dispositive. *See In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig.*, 277 F.R.D. 586, 608-09 (S.D. Cal. 2011) (denying certification because third parties—rather than defendant— were making representations at issue about defendant's product).

[61] PowerSchool maintains that unjust enrichment is not a standalone cause of action. *See* Dkt. 37 (MTD).

Plaintiffs' motion also fails under its own framework. Plaintiffs submit that a California unjust enrichment claim is certifiable so long as "the equitable circumstances between [PowerSchool] and ***each class member*** are the same." Mot. at 20-21 (emphasis added). Plaintiffs also claim that "all class members' data powered these predictive products." *Id.* at 21. But the named Plaintiffs themselves show this is not a common question with a common answer. There is no evidence that any data from the Concepcións—the only California plaintiffs for this California claim—was ever put into or analyzed by a PowerSchool "Predictions" product, and WCCUSD secured consent through handbook disclosures regardless. Large school districts in California also self-manage their analytics. LAUSD, for example, even maintains a public website for viewing summary compilations of its "information [on] graduation rates, state assessment scores, and college and career readiness."[62] Equities thus vary significantly from one class member to the next, precluding class certification.[63]

**III. Plaintiffs Have Not Shown That Damages Can Be Determined on a Classwide Basis.**

Plaintiffs' Motion fails for another, independent reason: Plaintiffs cannot prove classwide damages. Plaintiffs offer two damages models through their expert, Christopher Schulte: (i) for all damages classes, an "actual damages" calculation; and (ii) for the California Profiling and Prediction classes, an unjust enrichment calculation, which is simply PowerSchool's total profits for the four "Predictions" products.[64] Neither model is sufficient for certification because they do not "measure damages resulting from the particular … injury on which [Plaintiffs'] liability in this action is premised." *Comcast*, 569 U.S. at 36; *see also id.* at 37-38 ("Rule 23 (b)(3) cannot authorize treating" individuals "as

---

[62] https://opendata.lausd.org/.

[63] For similar reasons, Plaintiffs' reference to *Brickman v. Fitbit, Inc.* is unavailing. Mot. at 20-21 (citing 2017 WL 5569827, at *7 (N.D. Cal. Nov. 20, 2017)). *Brickman* is nothing like this case, as it involved one, uniform technology for sleep-tracking marketed to consumers with the same representations that were allegedly uniformly false. *Id.* at *1.

[64] In their Motion, Plaintiffs appear to imply that Schulte's unjust enrichment model is applicable to the proposed Data Warehouse classes. *See* Mot. at 24. This is nonsensical. Schulte's unjust enrichment calculation measures revenue and expenses ***only*** from the four products included in the proposed Profiling and Predictions Classes. Ex. 45, Schulte Expert Rep. ¶¶ 66, 76, 89-91. Schulte admitted that he could not reliably calculate unjust enrichment for the products included in the proposed Data Warehouse Classes because he was "not aware of information sufficient to apportion PowerSchool's historical revenues and profits from [those products] to the alleged wrongful conduct." *Id.* at 4, n.3. In addition, Plaintiffs have not asserted that Schulte's unjust enrichment model is applicable to their proposed Multistate Profiling and Prediction Class, nor could they. They only bring a quasi-contract/unjust enrichment claim on behalf of the California classes. Mot. at 2, 20.

members of a single class" when their damages model "identifies damages that are not the result of the wrong").

***First***, despite Plaintiffs' arguments to the contrary, Schulte's "actual damages" calculation is simply inapplicable to the alleged harm experienced by the putative class members. Schulte did not measure any recognized form of economic injury,[65] but instead attempted to estimate "the market value of [student] data."[66] To do so, he relied on just one supposed "comparator"—a contractual arrangement between PowerSchool and a third party, [redacted], related to [redacted].[67] Beyond broader [redacted], the contract required [redacted] and PowerSchool to [redacted][68] [redacted][69] Critically, this arrangement was never implemented.[70]

Schulte's valuation bears no relation to the alleged conduct remaining in Plaintiffs' case. The products in Schulte's "comparator"—[redacted]—are not within any damages class definition.[71] The contemplated arrangement involved data from a narrowly targeted set of students—[redacted]—and focused on data relevant to [redacted][72] Yet Plaintiffs' class definitions, by contrast, include all K-12 students, regardless of age, grade, or [redacted]. Mot. at 1-3. And Plaintiffs' case is ***not*** focused on the same types of data at issue in the [redacted]/PowerSchool arrangement. Finally, the [redacted]/PowerSchool arrangement would have required [redacted]. While

---

[65] Ex. 19, Schulte Dep. 171:25-173:10, 183:7-10, 185:9-15.
[66] Ex. 45, Schulte Expert Rep. ¶ 93.
[67] *Id*. at ¶¶ 93, 96-115; Ex. 19, Schulte Dep. 179:18-180:5.
[68] Ex. 45, Schulte Expert Rep. ¶ 110; Ex. 46, PWRSCHL_00191203, at '214-216 (emphasis added); Ex. 47, PWRSCHL_00003235, at '239, '247-48.
[69] Ex. 17, Flagg Dep. 355:1-13.
[70] *Id*. at 428:2-22.
[71] Ex. 19, Schulte Dep. 179:18-180:5.
[72] *Id*. 186:10-16; 187:17-188:2; Ex. 45, Schulte Expert Rep. ¶¶ 97, 108.

PowerSchool denies any obligation to independently obtain consent, the crux of Plaintiffs' entire case is that PowerSchool possessed student data ***without consent***. This poses an insurmountable problem, as Schulte conceded he did not know whether the value proposed by [redacted] would apply beyond its very specific context:

- The [redacted] arrangement involved, in Schulte's characterization, a [redacted].
- Schulte had no basis to say PowerSchool and [redacted] would have assigned the same monetary value to data from [redacted]
- According to Schulte, other types of data potentially at issue in this case—for example, the address of a third grader— have no "value indicator."[75]
- Schulte had no basis to say that [redacted] would have assigned the same monetary value to data that was provided without consent.[76]

For all of these reasons, Schulte's actual damages model fails to "measure damages resulting from the particular … injury on which [Plaintiffs'] liability in this action is premised." *Comcast*, 569 U.S. at 36; *see also Dukes*, 564 U.S. at 366-67 (rejecting attempt to measure backpay for "[a] sample set of the class members" to determine each class member's damages as impermissible "Trial by Formula"); *Miller v. Travel Guard Grp., Inc.*, 2023 WL 7106479, at *17 (N.D. Cal. Sept. 15, 2023) (denying certification on fraud claims because plaintiffs' damages model "fail[ed] to measure the value of Defendants' assistance services" alleged to be fraudulent).

***Second***, Schulte's unjust enrichment model fails for similar reasons. Schulte took PowerSchool's revenues from the four products included in the proposed Profiling and Prediction classes and assumed (at the direction of counsel) that PowerSchool would not have made ***any*** revenue from those products without the "alleged wrongful conduct," *i.e.*, the analytics functionality used by schools to create insights using their students' data. But Schulte admitted his calculation includes revenue from product functionality that is ***not*** alleged to be unlawful, including (i) non-analytics functionalities that he was asked to assume were lawful, *e.g.*, a chat function to communicate with parents, and (ii) subproducts specific to

---

[73] Ex. 19, Schulte Dep. 186:10-16, 192:5-19.
[74] *Id.* at 192:14-24.
[75] *Id.* at 190:23-191:3.
[76] *Id.* at 194:18-24.

teachers and school staff he admitted are lawful.[77] Yet Schulte made no effort whatsoever to exclude profits attributable to this lawful conduct.[78] This runs directly into *Comcast*'s requirement that any damages model "purporting to serve as evidence of damages in this class action must measure ***only*** those damages attributable to [Plaintiffs'] theory" of liability. *Comcast*, 569 U.S. at 35 (emphasis added).

Plaintiffs' application of the model to the California-only Profiling and Predictions Class compounds its unreliability and overinclusiveness. Schulte based his unjust enrichment estimate on ***nationwide*** revenue for the PowerSchool products in the class definition. All the documents he relied on for his calculation reflect PowerSchool revenue and expenses at a global level. Although Schulte reduced global figures to US-specific figures based on certain internal PowerSchool documents,[79] there is ***nothing*** in the record that would allow him to limit these figures to just California. Plaintiffs' assertion that Schulte could "adjust [his unjust enrichment] figure for different periods of time, classes, or subclasses" is rank speculation. Mot. at 24 (cleaned up). There is no indication that anything in the record would allow Schulte to make those calculations at a later date. The Court is thus left with only Schulte's plainly overinclusive nationwide calculation. This is obviously insufficient and only exacerbates Plaintiffs' insurmountable problems under *Comcast*. 569 U.S. at 37.

## <u>CONCLUSION</u>

For all of these reasons, the Court should deny Plaintiffs' Motion in full.

In accordance with the Court's direction at the August 13, 2026 hearing that PowerSchool limit its renewed opposition to its "two or three best" certification arguments, PowerSchool has not re-briefed its additional arguments against certification presented in its prior opposition, including its objections concerning typicality and adequacy, ascertainability, and individualized defenses. PowerSchool respectfully preserves these previously presented objections and does not intend its compliance with the Court's express narrowing direction as an abandonment or waiver of the same, including for purposes of further review. *See* Dkt. 193 at 12:12-14.

---

[77] *Id.* at 98:13-17, 126:4-127:2, 131:23-132:5.
[78] *Id.* at 131:23-132:5, 242:23-243:7.
[79] Ex. 45, Schulte Expert Rep. ¶ 74-75, 87-88.

DATED: October 19, 2026

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Olivia Adendorff*

Olivia Adendorff, P.C.

Robyn E. Bladow
Kirkland & Ellis LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
Kirkland & Ellis LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*