# Exhibit 19

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

EMILY CHERKIN, et al,

Plaintiff,

-vs- No. 3:24-CV-02706-JD

Hon. James Donato

POWERSCHOOL HOLDINGS, INC.,

Defendant.

_________________________________/

PAGE 1 TO 277

The Videotape Deposition of CHRISTOPHER SCHULTE,
Taken at 120 West Huron Street,
Ann Arbor, Michigan,
Commencing at 8:53 a.m.,
Thursday, February 26, 2026
Before Laura J. Steenbergh, CSR-3707, RPR, CRR, RMR

using Naviance?

A. Yes, I am aware of that specific product and Ms. Cherkin.

Q. Okay. And did the fact that students or their parents can opt out of using PowerSchool products impact your opinions at all?

MS. SIEHL: Objection to the form.

THE WITNESS: I can't think of a way that that impacted my opinions. And again, it's my understanding that the ability to opt out of PowerSchool products is -- is a controversial topic in this matter.

BY MS. BAILEY:

Q. Did the fact that schools who used certain PowerSchool products will sometimes only use them in certain classrooms or for certain students impact your opinions in this case at all?

A. I considered that. It doesn't impact my opinions.

Q. You agree that a proper unjust enrichment analysis accounts for only the revenues that resulted from the alleged unlawful conduct, right?

MS. SIEHL: Object to form.

THE WITNESS: That is correct. But I would say that there are caveats.

BY MS. BAILEY:

Q. But generally speaking, that's a basic principle of an

from that product would not be amended to the extent that there are such, I would say, sort of lawful functionality included in that product.

Q. Did you do any work in this case to determine if those four products do indeed include functionality that does not provide analytics, insights, or predictions?

A. It's my understanding that they do include functionalities that are not insights, analytics, or predictions.

Q. Okay. You state in paragraph 40 of your report that Attendance Intervention includes a communication tool, right?

A. That's correct. That's from PowerSchool's documents.

Q. And we can agree that a communication tool is not providing analytics, insights, or predictions, correct?

A. Would it be communicating analytics, insights, and predictions?

Q. Did you do any work to determine whether the communication tool was providing analytics, insights, or predictions?

A. I did not. I did not investigate that, no.

Q. And do you have any basis to dispute that the communication tool described as part of Attendance Intervention in paragraph 40 of your report is a tool used by teachers and school staff to communicate with

parents?
A. I don't have any basis to disagree with that.
Q. You were not asked by counsel to make an assumption that a communication tool is unlawful, correct?
A. Not in and of itself, no.
Q. And we agree that PowerSchool's profits from the communication tool included with Attendance Intervention are included in your unjust enrichment calculation, right?
A. The revenues and profits from those products in their entirety are included in my unjust enrichment calculations.
Q. And that would include any profits and revenues from the communication tool specifically, right?
A. I'm not aware of any information that credibly attributes revenues and to profits to the communication tool.
Q. But you did not exclude any revenues or profits from the communication tool from your unjust enrichment calculation, correct?
A. Same answer, I'm not aware of any information that would credibly attribute any such revenue to those functions.
Q. Did you ask counsel if there was information that would allow you to exclude profits from the communication tool included with Attendance Intervention?

A. I don't think I can say one way or the other, no.
Q. And sitting here today, you have no basis to dispute that the four products included in your unjust enrichment analysis include functionalities that only collect, store, or process roster information, correct?
A. I don't have any basis to dispute that.
Q. And you made no effort in this case to exclude profits from functionalities of the four products focused on in your unjust enrichment analysis that only collect, store, or process roster information, correct?
A. I made an effort to understand the products and -- so I -- I guess I stumble on this idea that I made no effort in this regard.
Q. Yeah. My question was just a little bit different. I understand you made efforts to understand the products. I appreciate that.
My question was, you made no effort in this case to exclude profits from functionalities of the four products at issue in your unjust enrichment analysis that only collected, stored, or processed roster information, correct?
A. (No response.)
Q. And why don't I -- I can ask a simpler question, Mr. Schulte, and that might help.
You didn't make any effort to exclude the

revenues from any specific functionalities of the four products that were the focus of your unjust enrichment analysis?

A. I did not exclude revenues that are attributable to specific functions of those products.

Q. Okay.

A. As I indicate in my report, my understanding is that, in seeking unjust enrichment -- I'm reading from paragraph 63 -- in seeking unjust enrichment, plaintiffs may present evidence of the total or gross amount of the benefit from the alleged misconduct, or a reasonable approximation thereof. And then the defendant may present evidence of further costs, expenses, and other deductions to show the actual or net benefit the defendant received.

So my analysis related to providing the -- not only the total or gross amount of the benefit, I took it further and said, what is the net benefit with respect to the deduction of various expenses. To the extent that PowerSchool contends that there should be other deductions, I will leave that to PowerSchool and its experts.

Q. And paragraph 63, that was an understanding you came to based on things counsel told you, is that right?

A. My understanding in that regard is consistent with my

a basis to say that, correct?

MS. SIEHL: Object to the form.

THE WITNESS: Can you try to just read your question back to me?

BY MS. BAILEY:

Q. Sitting here today, you have no basis to say one way or the other whether students ever use any of the products for which plaintiffs are seeking damages, correct?

A. I think that's correct.

Q. Okay.

MS. SIEHL: Note objection to the record. I didn't get it out. Thank you.

BY MS. BAILEY:

Q. You state in paragraph 93 of your report that your actual damages analysis is based on the value of the student data that PowerSchool allegedly aggregated and used without consent from or compensation to plaintiffs and class members, correct?

A. That's correct. That sounds like a fair reading. I wasn't there yet, but that seems reasonable.

Q. So for your actual damages analysis, you attempted to calculate the market value of student data stored and processed by PowerSchool, is that fair?

A. That's fair.

Q. And your actual damages analysis does not measure any

diminution in value of the student data stored and processed by PowerSchool, correct?
A. That's correct.
Q. Your damages -- your actual damages analysis does not measure the alleged loss of privacy experienced by putative class members, correct?
A. I don't put a dollar value on the loss of privacy, that's correct.
Q. Your actual damages analysis does not measure the difference between the position of putative class members in the but-for world where PowerSchool never stored their data and the real world where it did, correct?
MS. SIEHL: Object to the form.
THE WITNESS: To the extent I understand your question, I think that that is that correct.
BY MS. BAILEY:
Q. Do you want me to repeat it?
A. Yes, please.
Q. Your actual damages analysis does not measure the difference between the position of putative class members in the but-for world where PowerSchool never stored their data and the real world where it did, fair?
MS. SIEHL: Object to the form.
THE WITNESS: That's fair.

BY MS. BAILEY:
Q. Your actual damages analysis does not measure an economic injury allegedly suffered by putative class members, correct?
MS. SIEHL: Object to the form.
THE WITNESS: As I indicated before, my actual damages number is based on a market -- on the market-based evidence of PowerSchool's own negotiations and determinations of student data.
BY MS. BAILEY:
Q. Right.
A. I find that number to be applicable to the determination of damages.
Q. Sure. But what you're doing in your actual damages analysis, that is not attempting to measure an economic injury allegedly suffered by putative class members, right? That's not the analysis you performed.
MS. SIEHL: Objection, form.
THE WITNESS: I have to -- I think I've answered the question. If you look back at my prior answer --
BY MS. BAILEY:
Q. Well, I rephrased the question, so that one deserves an answer. I can repeat it.

Q. Are you familiar with the term relevant -- well, let me just state this.
You claimed that you looked at available indicators of the market value of data, similar to the data at issue in this case.
A. That's correct.
Q. What's the market?
A. A market is an extraction of a buyer and a seller.
Q. So were there any specific parameters that you used to define the market in this case?
A. I looked for transactions involving the provision and purchase of student data.
Q. From an economic perspective, what does the market value of an asset reflect?
A. Typically, the market value and asset represents the price at which a willing buyer and a willing seller would transact a given product.
Q. What indicators of market value of data similar to that at issue here did you analyze?
A. I searched for other transactions. I'm not aware of any such transaction. It's a fairly unique fact set here dealing with the exchange of data for minors.
Q. [redacted], nothing else was analyzed as an indicator of market value of data similar to that at issue here, is that fair?

A. It's fair to say that I think that this is the best available evidence.
Q. Was it the only available evidence?
A. Again, I'm not aware of any other market transactions of student data.
Q. Okay. Are you aware of any authority that suggests there is a market value for consumers' data?
A. Yes.
Q. What are those authorities?
A. I've been dealing with consumer data for years, and I'm aware of several indications of markets for consumer data.
Q. What about, are you aware of any authority that suggests there's a market value for student data?
A. As I indicated before, I'm not aware of any other transaction involving the offer for sale and the sale of student data.
Q. Are you aware of any authority that suggests there is a market value for school student -- student school records?
A. I do believe that PowerSchool has created that market.
Q. [redacted], are you aware of any authority that suggests there is a market value

indicating here PowerSchool's sale of student data.
Q. But you agree that for purposes of your damages analysis, that contemplates PowerSchool paying students for their data, correct?
A. I think that that would be the mechanics of a damages payment.
Q. But that's what you're trying to capture in your damages analysis, correct? What PowerSchool should have and would have paid students for their data, right?
A. That's not correct.
Q. Okay. What are you capturing?
A. As I've indicated in my report, that this amount of no less than 40 cents represents a conservative and reasonable indicator of the financial consideration each plaintiff and class member would reasonably expect to receive in exchange for PowerSchool's alleged aggregation and use of their data.
Q. Right. That plaintiff and class members would reasonably expect to receive in exchange for PowerSchool's alleged aggravation and use of their data. If PowerSchool is not paying plaintiff and class members for the ability to aggregate and use their data, who's paying plaintiff and class member?
A. Again, PowerSchool has not paid for students' data.
Q. I understand that --

A. I'm not aware of any indication that PowerSchool has elected to buy student data. Instead, my understanding is that its products collect that information.

Q. I'm going to ask my question again and I ask that you listen closely to it, Mr. Schulte.

You did not perform any analysis to determine at what price PowerSchool would be willing to buy student data, correct?

A. I'm not aware of the price at which PowerSchool would buy student data. I'm aware of the price at which PowerSchool is willing to sell student data.

Q. You did not perform any analysis to determine at what price students would be willing to sell their data, correct?

A. That's correct.

Q. You did not cite any sources in your report that reflect what consumers have said or done in regards to disclosing their personal data or how they value that data, correct?

A. I am not referencing other transactions in which consumers have elected to sell their data.

Q. You do not cite any sources in your report that reflect what parents have said or done in regards to disclosing their children's data or how they value that data, correct?

A. That's correct. If that's not in my report, then it's not in my opinion.

Q. [redacted]

[redacted] -- your counsel has an opportunity to ask you questions at the end, and we are moving along and we're going to get to, I think, some of the things you want to talk to. What I ask of you now is that you listen closely to the question I ask, and just answer that question. So let me ask it one more time.

MS. SIEHL: And I would admonish Counsel not to tell the witness how to testify.

MS. BAILEY: You --

MS. SIEHL: He's entitled to answer the question how he sees fit.

BY MS. BAILEY:

Q. [redacted]

[redacted]

a GPA between a high schooler and a 6th grader.
Q. Is there a difference in the market value of the address of a high school junior versus the address of a 3rd grader?
A. I'm not aware of any difference.
Q. Would the value of the address of a 3rd grader depend on who the buyer is?
A. Potentially. But your question seems to indicate that there is a wealth of buyers of addresses of 3rd graders.
Q. I'm just -- there wasn't -- well --
A. I'm answering your questions the best I can.
Q. Yeah, and you're --
A. You're phrasing hypotheticals that I find to be detached from --
Q. Right.
A. -- reality here.
Q. But you're adding a lot of commentary, Mr. Schulte, and my questions are yes-or-no questions.
A. I disagree.
Q. So let me just ask it again. Well, they quite literally are. Let me just ask it again one more time for the record.
Does the value of the address of a 3rd grader depend on who the buyer is, yes or no?
MS. SIEHL: The witness is entitled to answer

[redacted]

BY MS. BAILEY:

Q. If I owned a small business that provided music classes for kids and I wanted to send out a mailing advertisement, would the value -- just common sense, would the address of a 3rd grader or the address of a high school senior be more valuable to me?

A. I don't know that that's an answerable hypothetical.

Q. That's not something that you looked into as part of your work in this case, how the value of student data may change depending on the buyer, correct?

A. I considered that the value of student data could vary based on the parties to a transaction; and again, I've identified a market-based indicator, two, actually, that indicate PowerSchool's own negotiation for the value of student data.

Q. You -- true or false, you analyzed only one buyer and only one seller of data from high schoolers, correct? That's true?

A. Speaking as someone who has a high school student, I'm quite glad that there is no other transaction for the data regarding high school students.

Q. That wasn't my question. That wasn't my question. I'll

ask it one more time, and I ask that you listen very closely --
A. I was.
Q. -- and answer my question.
True or false, you analyzed only one buyer and one seller -- only one seller for data from high schoolers as part of your work in this case?
A. That is true.
Q. Okay. In paragraph 35 of your report, you cite a press release from PowerSchool which describes the Naviance product as one used by high school students to research and explore colleges, correct?
A. That's correct.
Q. [redacted]

You're aware that both the 2021 --

THE VIDEOGRAPHER: At a convenient point, could we just take one minute to change the video?

MS. BAILEY: Yeah, let's actually -- we can take a break now.

THE VIDEOGRAPHER: This is the end of media number 3. We're going off record at 2:51.

(A short recess was taken)

THE VIDEOGRAPHER: Here marks the beginning of media number 4 in the deposition of Christopher Schulte. We're on record at 2:58 p.m.

BY MS. BAILEY:

Q. [redacted]

A. That's my understanding.
Q. [redacted] I think it was -- I'd have to defer to Mr. Flagg, but I believe that he said standard.
Q. You did no work in this case to account for differences in mandatory data fields for each product depending on each school's customization, is that fair?
A. I think that's fair.
Q. And your opinions do not account for any differences in mandatory data fields across PowerSchool's customers, is that fair?
A. I don't -- I don't think that one's fair.

A. Yeah, for sure.
Q. Okay. Figure 4 is a list of standard data elements included in this SIS DPIA, right?
A. That's correct.
Q. And then Figure 7 is the same thing, but for Performance Matters, right?
A. That's correct.
Q. Now, these figures include some of the same data elements, right? They both include [redacted] right?
A. Yeah. That's correct, there is overlap.
Q. But you agree that there are differences between the two figures, too, right?
A. No disagreement.
Q. [redacted]

[redacted]

Q. And so sitting here today, you can't say if the value of those data elements is more or less than 40 cents, right?

A. I don't have a basis to say that it's more or less than 40 cents, [redacted]

Q. Well, and I'm glad you brought up [redacted] are included in your Figures 33, 40, or 47, correct?

A. I -- yeah, I would agree with you that those aren't

A. Correct.
Q. And it was important for you to exclude those revenues because the classes in this case are defined to include only U.S. students, correct?
A. That was the intent, yes.
Q. If you had included revenues attributable to conduct beyond the class definitions, that would render your unjust enrichment calculation overinclusive, fair?
MS. SIEHL: Object to form.
THE WITNESS: Yeah, I think that's fair.
BY MS. BAILEY:
Q. Sitting here today, are you aware if any of the four products that were the focus of your unjust enrichment analysis are used by schools to process or analyze data on teachers or school staff?
A. I understand that -- is it -- I believe it is Data, Analytics & Insights, which could have a talent aspect. I tried to disclosed that in my description of the product, which is why I'm flipping.
Yeah. Under Figure 13, I understand that talent analytics could be an aspect of the Data, Analytics & Insights solutions product area.
Q. Did you make any effort in this case to exclude revenues associated with analytics, insights, or predictions generated using teacher or school staff data?

A. I investigated the availability of what I'll say finer levels of detail than the product-specific revenues that I relied on in performing my work. I'm not aware of anything that is more, I would say, sort of disaggregated or detailed than that which I relied upon. To the extent that that information exists, I could consider it.

Q. So if that information did exist, if there was information that showed the revenues that were attributable for those four products to analytics, insights, or predictions generated from teacher or school staff data, that's something that you would consider and potentially rely on for your opinion, is that correct?

A. Yeah. I definitely wouldn't foreclose on looking at or relying on that information not knowing about what it would contain. But just to clarify, you're saying data that is regarding the sort of talent aspect?

Q. Correct.

A. Yeah. I would -- I would consider it. I would find that reasonable to consider.

Q. And would you consider excluding the revenues attributable to the talent data if that was ascertainable?

A. Potentially. In my mind, a question exists regarding

CERTIFICATE OF NOTARY

STATE OF MICHIGAN )
) SS
COUNTY OF MACOMB )

I, LAURA J. STEENBERGH, Certified Shorthand Reporter, a Notary Public in and for the above county and state, do hereby certify that the above deposition was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, and nothing but the truth, that the foregoing questions asked and answers made by the witness were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to either party nor interested in the event of this cause.

Laura Steenbergh

LAURA J. STEENBERGH
CSR 3707 Notary Public,
Macomb County, Michigan

My Commission expires: 2/14/28