# Exhibit 21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

-----------------------------------------

EMILY CHERKIN, et al.,

Plaintiffs,

vs.

Case No. 3:24-CV-02706-JD

POWERSCHOOL HOLDINGS, INC.,

Defendant.

-----------------------------------------

REMOTE VIDEO DEPOSITION OF CATHERINE O'NEIL

Wednesday, February 25, 2026

9:02 a.m. (PST)

Reported by:

Jaclyn Urzia, RPR, CRR

Job No. 2026-1013470

Q Fair.
Are there any materials you asked for but were not given?
A I asked for a demo. I asked for the data so that I could audit these things, but those weren't available.
Q Anything else that you asked for and were not given?
A I asked if they knew of actual harm that had been perpetrated by some of these algorithms or actual stories of harm or actual use cases for these.
And they didn't have them for me.
Q They didn't have any examples of actual harm caused --
A Correct.
Q -- by a PowerSchool product, correct?
A Right. That's right, which is why I don't have a claim that there has been actual harm in this report.
Q So you're not providing an opinion that there has been actual harm from any PowerSchool product, correct?

A That's correct.
MR. LIDDELL: Objection. Form.
BY MS. LOGAN:
Q And looking at these DPIAs, these are the PowerSchool products that you analyzed for the purposes of this report, correct?
A I'm going to assume these are the same as the footnotes, DPIAs, and say yes.
Q Did you read the complaint in this case?
A I might have read the complaint at the very beginning.
Q You don't recall specifically reading the complaint in this case?
A I don't.
I certainly talked to the counsels about it.
Q Did you have any communications with fact witnesses?
A No.
Q Did you have -- did you ever speak to the named plaintiffs in this case?
A No.

early warning indicators to include
[redacted]
A I don't know the answer to that question. It might not be every school.
But the fact that it is available is what I'm interested in.
Q Are you aware of any school that configures Performance Matters to display early warning indicators of [redacted]
A I'm not aware of any school that does that.
Q Is it possible that some schools do not configure Performance Matters to display, for example, [redacted]
A Yes, that's possible.
MR. LIDDELL: Objection. Form.
A That's possible.
Q Is it possible some schools do not collect the data required for certain of those early warning indicators?
MR. LIDDELL: Objection. Form.
A That's possible.
Q Would you agree that the data elements stored for any given product will

vary based on the school?
MR. LIDDELL: Objection. Form.
A I very much assume it does vary.
Q Would you agree that the data elements stored for any given product would vary based on the student?
MR. LIDDELL: Objection. Form.
A I mean, different students in different schools or different students in the same school?
Q We can start with different students at different schools.
A Right. So the answer is yes because I assume different schools do it differently. So obviously for a given student in different schools like it would be different.
For two students at the same school, it probably would be less different, but there might be differences.
Q There might be differences in the data elements stored for a given product between students at the same school?
MR. LIDDELL: Objection. Form.

"algorithm" without saying "ready made," it could be an abstract notion rather than something that's been implemented on a machine.

Q What configurations would be left to determine?

A Like which particular factors are going to be used for the graduation alert system.

As you pointed out earlier, not every school is going to collect the same exact data elements, so the choice of the data elements, the weightings of the data elements, how much do we care about this versus that, the threshold and, of course, the students' data.

Those are most obvious choices, but there's probably other configurations, like how it's presented, whether it's a daily report or a monthly report, or is it an e-mail to a teacher or is it an e-mail to the principal. Is it -- and, of course, there's also the question of how it's used. It could be used in many, many ways.

But in terms of like going from

So I don't agree that it's not -- they're not helping. They might not have a person representing PowerSchool talking to the person at that moment. They might not be in person, they might not even be online chatting, but the very fact that it's set up the way it must be is help.

It's the framework of -- it's like they're going basically through like a -- at the very least, they'd have to go through something like a user guide to figure out how to set it up, how to configure it.

Q At the end of the day, the schools make the choices of what those configurations actually will be, fair?

MR. LIDDELL: Objection. Form.

A I will assume that. I don't know that for sure.

As I said, I don't even know if there's a default setting. So it's possible that there is a way of bypassing all those choices and just say, Give me the default. I don't know.

Q Right. You don't know if

single case, some problematic inaccuracies and problematic biases.

Q And that's with respect to your experience with algorithms generally, correct?

A That's correct.

Q But you didn't do any specific analysis of the likelihood of those risks materializing from PowerSchool products, fair?

A That's fair.

MR. LIDDELL: Objection to form.

A That's correct.

Q Without looking at any algorithms or how schools have used them from a PowerSchool product, could you assess the likelihood of those risks materializing?

MR. LIDDELL: Objection. Form.

A I could not precisely estimate the risk, but I would estimate the risk to be larger than zero. But I don't -- I can't actually assess them because I don't have access to them.

Q What would you need to do that

sort of analysis?

A It depends on which kind of analysis you want me to do, accuracy, bias or usage risk.

Each of those require usage knowledge, like the context of how it's being used. But if I wanted to assess the accuracy, like whether it's accurate, I would need historical data, and quite a lot of it, like 10,000 or more data points.

So like a prediction of the -- with a particular time horizon of how likely -- like what is early -- who's getting risk -- who's getting flagged for like likelihood of not graduating on time and then I'd need to see the output, like the results, who actually graduated on time, who didn't. I'd need to see that over the appropriate time horizons for a lot of examples.

That would be an accuracy audit. If I wanted to look at a bias audit, I'd have to have additional information, like I'd have to know the ethnicity or race of the folks and all that data. And I'd need

more data because I'd want to be able to compare different -- how it works for different races or genders. I could do that, too.

Q So you would --

A Or learning disability status.

I apologize for interrupting you.

Q No, I appreciate your input.

So you would need to know each -- how each school uses the algorithms to assess the likelihood of those risks, fair?

MR. LIDDELL: Objection. Form.

A Well, let me put it this way: I could figure out whether there's a bias or whether there's inaccuracies without knowing context, but I wouldn't be able to assess harm without the context because harm isn't just an abstract thing. Harm is like somebody actually lost an opportunity or they suffered.

And that I would not be able to assess unless I knew the way it was being used. But I could say, Hey, this algorithm

is biased, but maybe no one's looking at it, maybe it's never actually used.
So I want to distinguish those two things.
Q Sure.
So it matters how each school is using the algorithm?
A In terms of harm.
Q Yeah.
These risks we're talking about, the inaccuracy, bias, usage, they're not specific to any algorithm used at any school that works with PowerSchool products, fair?
A No, not at --
MR. LIDDELL: Objection. Form.
A These are extremely general statements about algorithmic harm.
Q You've calculated damages in other cases, correct?
MR. LIDDELL: Objection. Form.
A I've worked on attorneys' general cases with like consumer fraud issues, like sub prime auto loans or payday loans, and I've helped them compute

Q He, I think you mentioned earlier, told you sort of what opinion should go in your report generally, is that right?

MR. LIDDELL: Objection. Form. Misstates prior testimony.

A The way I would characterize it is he said what he wanted to leave to me as the data expert, which is to say that these products, the PowerSchool products, required data -- student data to work.

Q Did he tell you whether he believed PowerSchool products required student data to work?

A Yeah. He thought he -- yes, he did. He gave me that opinion.

Q Did Mr. Schulte give you any other instructions for your analysis in this case?

A I wouldn't even consider the first thing like instruction to be honest, but he -- that was the only thing I got from him as I recall.

Q Did he give you any structure you should follow for your report?

A No.
Q Did he tell you why he wanted you to cover whether PowerSchool products required student data to work?
A Yes.
Q And what was that basis?
A Because he's not a data scientist, that even though he thinks it's completely obvious that these products need data -- student data to work, he wants an official data expert to say that.
So that was me.
Q Are you aware of whether your opinion factored into Mr. Schulte's damages analysis?
A I don't know. I have not talked to him.
MS. LOGAN: Okay. We can go off the record.
THE VIDEOGRAPHER: The time is 1:22 p.m. We're going off the record.
(Whereupon, a brief recess was taken from 1:22 p.m. to 1:28 p.m.)
THE VIDEOGRAPHER: The time is 1:28 p.m. We're back on the record.

REPORTER CERTIFICATE

I, JACLYN URZIA, do hereby certify:

That said deposition was taken at the time and place herein named; and that the transcript is a true record of the testimony as reported by me, a disinterested person, and was thereafter transcribed.

I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of February, 2026.



JACLYN URZIA, RPR, CRR