Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
904 Rio Grande Street, Suite 100
Austin, Texas 78701
Telephone: (512) 200-8028
julie.liddell@edtech.law
andrew.liddell@edtech.law

[Additional Counsel on Signature Page]

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

EMILY CHERKIN, et al.,

Plaintiffs,

v.

POWERSCHOOL HOLDINGS, INC.,

Defendant.

Case No.: 3:24-cv-02706-JD

**PLAINTIFFS' NOTICE OF MOTION, MOTION FOR CLASS CERTIFICATION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Judge: The Honorable James Donato

Hearing
Date: November 5, 2026
Time: 11:00 a.m.
Courtroom: 11, 19th Floor

**TO THE COURT, DEFENDANT, AND ITS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on November 5, 2026, at 11:00 a.m. or as soon thereafter as the matter may be heard, in Courtroom 11, 19th Floor of the Court located at 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs move the Court for an Order under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) that grants the following relief:

**Multistate Injunctive Relief Class under Rule 23(b)(2)**

Certifies a **35-State Multistate Injunctive Relief Class** under Rule 23(b)(2) for students in 35 states, each of which adopts the Restatement (Second) of Torts' articulation of the cause of action for Intrusion Upon Seclusion, defined as:

> All persons in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Texas, Utah, Vermont, Washington, and West Virginia (collectively the "**Restatement States**") who, from October 29, 2020, to the present, attended a K-12 school or school district that used any of the following PowerSchool products:[1]
>
> 1) PowerSchool Student Information Solutions ("**PowerSchool SIS**")
> 2) Schoology Learning
> 3) Performance Matters
> 4) Naviance
> 5) MTSS
> 6) Behavior Support
> 7) Attendance Intervention
> 8) Data, Analytics and Insights f/k/a Unified Insights
> 9) Connected Intelligence

**Multistate Damage Class under Rule 23(b)(3)**

Certifies two **35-State Multistate damages** classes, also based on the Restatement (Second) of Torts' articulation of the cause of action for Intrusion Upon Seclusion, for damages under Rule 23(b)(3): (1) the Student Data Warehouse Class; and (2) the Student Profiling and Prediction Class defined as:

---

[1] Excluded from all classes defined herein are Defendant, its employees, co-conspirators, officers, directors, board members, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judge and court staff to whom this case is assigned.

> **<u>Multistate Student Data Warehouse Class</u>**
>
> All persons in the Restatement States who, from October 29, 2020, to the present, attended a K-12 school or school district that used any of the following PowerSchool Products (collectively "**Student Data Warehouse Products**"), *and* PowerSchool hosts the collected data for at least one product:
>
> 1) PowerSchool SIS
> 2) Connected Intelligence
>
> **<u>Multistate Student Profiling and Prediction Class</u>**
>
> All persons in the Restatement States who, from October 29, 2020, to the present, attended a K-12 school or school district that used any of the following PowerSchool Products (collectively "**Student Profiling and Prediction Products**"), and PowerSchool hosts the collected data for at least one product:
>
> 1) Data, Analytics and Insights f/k/a Unified Insights
> 2) Performance Matters
> 3) Behavior Support
> 4) Attendance Intervention

In addition, Plaintiffs ask the Court to certify three California subclasses, which mirror the proposed Multistate Classes for injunctive relief under Rule 23(b)(2) and damages under 23(b)(3), but also arise under the California Constitution's guarantee of privacy[2] and quasi-contract/unjust enrichment[3] causes of action asserted in the Complaint. The subclasses are defined as:

> **<u>California Injunctive Relief Class</u>**
>
> All persons in California who, from October 29, 2020, to the present, attended a K-12 school or school district that used any of the following PowerSchool products:
>
> 1) PowerSchool SIS
> 2) Schoology Learning
> 3) Performance Matters
> 4) Naviance
> 5) MTSS

---

[2] *See* Judicial Council of Cal., Civil Jury Instr. No. 1800 (recognizing overlap between common law and constitutional rights to privacy and recognizing that state constitutional privacy provision is self-executing and serves as the basis for injunctive relief).

[3] *See id.* No. 1800 (confirming availability of damages for privacy claims) and No. 375 (setting forth right to restitution on quasi contract/unjust enrichment claim); *see also* Compl. Causes of Action Counts I, II, III.

6) Behavior Support

7) Attendance Intervention

8) Data, Analytics and Insights f/k/a Unified Insights

9) Connected Intelligence

**<u>California Student Data Warehouse Class</u>**

All persons in California who, from October 29, 2020, to the present, attended a K-12 school or school district that used any of the **Student Data Warehouse Products,** *and* PowerSchool hosts the collected data for at least one product.

**<u>California Student Profiling and Prediction Class</u>**

All persons in California who, from October 29, 2020, to the present, attended a K-12 school or school district that used any of the **Student Profiling and Prediction Products**, *and* PowerSchool hosts the collected data for at least one product.

**Multistate Class Representatives and Counsel**: Plaintiffs further request that the Court appoint (1) Plaintiffs S.G., by and through her mother Emily Cherkin, and M.M.C. and L.M.C., by and through their father, David Concepcion, as the Class Representatives for the Multistate Classes; and (2) Hagens Berman Sobol Shapiro LLP and EdTech Law Center PLLC as Class Counsel for each class.

**California Class Representative and Counsel**: Plaintiffs further request that the Court appoint (1) Plaintiffs M.M.C., and L.M.C., by and through their father, David Concepcion, as the Class Representatives for each California subclass, and (2) Hagens Berman Sobol Shapiro LLP and EdTech Law Center PLLC as Class Counsel for each California subclass.

The grounds for this motion are that this case meets all the requirements for class treatment under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

This motion is supported by the following **Memorandum of Points and Authorities**, and the accompanying Declarations in Support of Class Certification by the following persons:

- Leonard W. Aragon and accompanying exhibits;
- W. Andrew Liddell;
- Emily Cherkin;
- David Concepcion and accompanying exhibits;

as well as the following expert reports:

- Christopher Schulte;

- Catherine O'Neil, Ph.D.;
- K. Suzanne Barber, Ph.D.

In the Memorandum of Points and Authorities that follows this Motion, those declarations and reports shall be referred to by the last name of the declarant, followed by the abbreviation "Decl." or "Rpt." (for example: "Aragon Decl." or "Schulte Rpt.").

This Motion is also based on the pleadings and papers on file in this action and all matters of which this Court may take judicial notice.

A proposed form of order is submitted herewith.

Dated: September 28, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ Leonard W. Aragon

Leonard W. Aragon (*pro hac vice*)
E. Tory Beardsley (*pro hac vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
leonard@hbsslaw.com
toryb@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
904 Rio Grande Street, Suite 100
Austin, Texas 78701
Telephone: (512) 200-8028
julie.liddell@edtech.law
andrew.liddell@edtech.law

Whitney Siehl (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite2410
Chicago, Illinois 60611
whitneys@hbsslaw.com

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: 510.725.3000
shanas@hbsslaw.com

Attorneys for Plaintiffs

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. STATEMENT OF COMMON FACTS ..... 1

A. Data Warehouse Class ..... 1

B. Student Profiling and Prediction Products Class ..... 4

C. Plaintiffs ..... 6

III. PROPOSED CLASSES TO BE CERTIFIED ..... 9

IV. CLASS REPRESENTATIVE(S) AND CLASS COUNSEL ..... 10

V. STANDARD FOR CLASS CERTIFICATION ..... 11

VI. ARGUMENT ..... 11

A. The Proposed Classes Meet Rule 23(a)'s Requirements. ..... 11

1. Rule 23(a)(1): Numerosity is satisfied ..... 11

2. Rule 23(a)(2): Common questions of law and fact exist ..... 12

3. Rule 23(a)(3): Plaintiffs' claims are typical. ..... 12

4. Rule 23(a)(4) Plaintiffs and Lead Counsel are Adequate ..... 14

B. The Proposed Damages Classes Meet Rule 23(b)(3)'s Requirements. ..... 15

1. Because California Law Applies to the Multistate Classes, common questions predominate ..... 15

2. The elements of the Intrusion Upon Seclusion claim can be answered by common questions that generate common answers ..... 17

a. Do students have a reasonable expectation of privacy in their own personal information and was that information used intentionally? ..... 17

b. Is PowerSchool's collection and use of data highly offensive to a reasonable person? ..... 18

c. Did PowerSchool obtain consent before taking, using, or disclosing students' personal information? ..... 19

3. The claims for Intrusion Upon Seclusion and Invasion of Privacy under the California Constitution by the California Damages Subclasses can be resolved using common evidence that generates common answers. ..... 20

4. The claims for Unjust Enrichment/California Quasi-Contract by the California Student Profiling and Prediction Class can be determined using common evidence that generates common answers. ..... 20

5. Class Actions are superior to multiple individual actions. .......... 21
6. The Classes are Ascertainable .......... 22
7. Damages are capable of Classwide measurement. .......... 22
C. Class Certification Under Rule 23(b)(2) for the Injunctive Relief Classes is Proper. .......... 24
V. CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcantar v. Hobart Servs.*,
800 F.3d 1047 (9th Cir. 2015) ........ 12

*Am. Acad. of Pediatrics v. Lungren*,
940 P.2d 797 (Cal. 1997) ........ 20

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........ 11

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ........ 11

*Barefield v. Chevron, U.S.A., Inc.*,
No. C 86-2427 TEH, 1988 WL 188433 (N.D. Cal. Dec. 6, 1988) ........ 23

*Brickman v. Fitbit, Inc.*,
No. 15-cv-02077-JD, 2017 WL 5569827 (N.D. Cal. Nov. 20, 2017) ........ 20

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ........ 22

*Brown v. Google, LLC*,
No. 20-CV-3664-YGR, 2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ........ 25

*Caldera v. Am. Med. Collection Agency*,
320 F.R.D. 513 (C.D. Cal. 2017) ........ 19

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) ........ 19

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ........ 22

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014) ........ 24

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*,
270 F.R.D. 521 (N.D. Cal. 2010) ........ 25

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ........ 14

*In re Facebook Biometric Info. Priv. Litig.*,
326 F.R.D. 535 (N.D. Cal. 2018) (Donato, J.) ........ 11

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 18, 23, 24

*Forcellati v. Hyland's, Inc.*,
CV 12-1983-GHK .......... 16

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. 2025) .......... 17, 19

*In re Google Location History Litigation*,
428 F.Supp.3d 185 (N.D. Cal 2019) .......... 17

*Heeger v. Facebook, Inc.*,
509 F.Supp.3d 1182 (N.D. Cal. 2020) (Donato, J.) .......... 20

*In re Heritage Bond Litig.*,
No. CV 01-5752 DT, 2004 WL 1638201 (C.D. Cal. Jul. 12, 2004) .......... 13

*Howard v. Aspen Way Enters., Inc.*,
406 P.3d 1271 (Wyo. 2017) .......... 16

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) .......... 15

*Jackson v. First Nat'l Bank of Omaha*,
No. CV 20-1295 DSF (JCX) .......... 23

*James v. Uber Techs. Inc.*,
338 F.R.D. 123 (N.D. Cal. 2021) .......... 12, 13, 14

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) .......... 13, 22

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*,
609 F. Supp. 3d 942 (N.D. Cal. 2022) .......... 12

*Lytle v. Nutramax Labs., Inc.*,
114 F.4th 1011 (9th Cir. 2024) .......... 15

*Manigault-Johnson v. Google, LLC*,
No. 2:18-CV-1032-BHH .......... 17

*Mazza v. Am. Honda Motor Corp.*,
666 F.3d 581 (9th Cir. 2012) .......... 15, 16, 17

*New Jersey v. T.L.O.*,
469 U.S. 325 (1985) .......... 4

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) .......... 17

*Rim of the World Unified Sch. Dist. v. Superior Ct.*,
104 Cal.App.4th 1393 (2002) .......... 19

*Rodriguez v. Google LLC*,
823 F. Supp. 3d 986 (N.D. Cal. 2026) .......... 24

*Rodriguez v. Google LLC*,
No. 20-CV-04688-RS .......... 17, 19

*Simpson v. Fireman's Fund Ins. Co.*,
231 F.R.D. 391 (N.D. Cal. 2005) .......... 14

*Varnado v. Midland Funding LLC*,
43 F.Supp.3d 985 (N.D. Cal 2014) .......... 17

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 12

*Walters v. Reno*,
145 F.3d 1032 (9th Cir. 1998) .......... 25

*Ward v. United Airlines, Inc.*,
No. 19-CV-03423-LB .......... 25

*Zinser v. Accufix Rsch. Inst., Inc.*,
253 F.3d 1180 (9th Cir.) .......... 15, 16, 21

**Statutes**

15 U.S.C. § 6501 .......... 18

20 U.S.C. § 1232g .......... 17

COPPA .......... 17, 18

Federal Education Rights and Privacy Act .......... 4, 17, 19

**Other Authorities**

16 CFR Part 312 .......... 18

34 CFR Part 99 .......... 17, 18

64 F.R. 59888 .......... 18

California Constitution .......... 20

Fed. R. Civ. P. 23 .......... 11, 12, 15

Rule 23(a)(2) .......... *passim*

## STATEMENT OF THE ISSUES PRESENTED

Whether the Court should certify the proposed classes under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

## I. INTRODUCTION

This case is about parents' rights to control how their children's personal information is used by private companies. PowerSchool exploits its access to K-12 classrooms to bypass parental consent by taking and using the private information of millions of students for its own profit. While masquerading as a tool to support education, PowerSchool creates, collects, processes, stores, and shares an unlimited trove of sensitive data, from health records to intimate family information, without obtaining effective (meaning "informed and voluntary") consent from parents. It then uses this personal information to fuel untested prediction products that purport to generate predictions and insights about students' behavior, performance, and life outcomes without effective consent. By transforming compulsory education into a conduit for unchecked corporate surveillance and profiling of children, PowerSchool prioritizes its billion-dollar bottom line over the fundamental privacy rights of families. This pervasive, nonconsensual exploitation inflicts irreparable harm on students, turning schools from safe places to learn into centers for corporate data mining. Plaintiffs seek certification of a 35-State Injunctive Relief Class under Rule 23(b)(2), two 35-State Multistate Damage Classes under Rule 23(b)(3), and three California subclasses under Rule 23(b)(2) and Rule 23(b)(3).

## II. STATEMENT OF COMMON FACTS

PowerSchool, headquartered in California, is used by schools and school districts across the country,[4] including 90 of the 100 largest school districts by student enrollment in the U.S.[5] PowerSchool represents that its products are used by more than 60 million students globally, with a concentrated presence in U.S. school districts.[6] In 2024, the then-public company went private in a $5.6 billion dollar deal led by Bain Capital.[7] Plaintiffs' claims against this multi-billion dollar company are based on two fact-patterns, each proven by common evidence.

### A. Data Warehouse Class.

PowerSchool's Data Warehouse Products,[8] used by virtually all its customers (schools and school

---

[4] ECF No. 66, Answer ¶¶ 10, 33-36.
[5] *Id.* ¶ 36.
[6] *See* PowerSchool, *Bain Capital Partnership* (Oct. 1, 2024), https://www.powerschool.com/bain-capital/ (last visited Feb. 4, 2026).
[7] Aragon Decl. Ex. 1, PWRSCHL_00006701 at 724.
[8] PowerSchool SIS and Connected Intelligence (collectively "Data Warehouse Products.").

districts), collect, process, and store massive amounts of student data, including highly personal, sensitive data such as: [redacted].[9] PowerSchool then shares or makes this data available to third parties without receiving effective consent from parents.[10] PowerSchool admits that the student data its products collect is extraordinarily valuable, calling it "priceless."[11] Nonetheless, PowerSchool actively solicits the sharing of student data[12] and profits from sharing student data with third parties.[13] To date, PowerSchool admits that it has shared student data with over 213 third-parties.[14]

PowerSchool does not itself obtain informed, voluntary consent from parents to allow its products to collect, process, and share "priceless" student data with third parties, and it does not ensure that consent was

---

[9] Aragon Decl. Ex. 2, Data Processing Impact Report ("DPIA") – PowerSchool SIS, PWRSCHL_00644395 at 398–99 ("performs large-scale processing operations aimed at processing considerable amounts of data and could affect many individuals"); Ex. 3, PWRSCHL_00644386 at 390, DPIA – Connected Intelligence [redacted]; Ex. 4, Christopher Cirillo Tr. 244:16–245:7 (confirming that Connected Intelligence gives customers access to data in products that customer has purchased); *see also* Ex. 5, DPIA – Naviance, PWRSCHL_00644472 at 74–77 (utilizes student data to assess "college, career, and life readiness"); Ex. 6, DPIA – Schoology Learning (learning management system used to disseminate and collect lessons and materials from students); Ex. 7, DPIA – MTSS, PWRSCHL_00646371 at 73 (allowing the creation of "personalized student plans and intervention teams" using student data).

[10] *See, e.g.*, Aragon Decl. Ex. 8, PowerSchool's Responses and Objections to Interrogatories at 18-25.

[11] Aragon Decl. Ex. 9, Darron Flagg 30(b)(6) Tr. 419:2–420:8; *Student Data Privacy: Everything You Need to Know* (June 20, 2023), https://www.powerschool.com/blog/student-data-privacy-everything-you-need-to-know (last visited Feb. 9, 2026) (stating that, according to the U.S. Dept. of Education, "the value of a student record on the black market is $250 to $350").

[12] Aragon Decl. Ex. 10, PWRSCHL_00003280 at 48 (data architecture schema showing data sharing as a primary element); Ex. 2 at § 4(d) (describing key functionality and use of PowerSchool SIS is sharing data with "partners or other third parties."); Ex. 11, PWRSCHL_00004347 at 67-70 (data flow summary presentation during private equity acquisition showing sharing of student data with partners); PowerSchool, *PowerSchool Partner Program*, https://www.powerschool.com/company/partners/ (accessed Feb. 6, 2026) (describing "partner" program, identifying certain partners and relationships, and soliciting others to "become a partner").

[13] *See, e.g.*, Aragon Decl. Ex. 12, PowerSchool Holdings, Inc. Form 10-K for the Fiscal Year Ended Dec. 31, 2023, PWRSCHL_00005197 at 64-65 (identifying revenues from licenses, royalty fees, and reseller arrangements); *see also* Ex. A, Christopher L. Schulte Report ("Schulte Rpt.") at 41-62 ([redacted]).

[14] *See, e.g.*, Aragon Decl. Ex. 8, PowerSchool's Responses and Objections to Interrogatories at 10-16 and Ex. 13, PowerSchool's Suppl. Responses and Objections to Non-Uniform Interrogatories 1, 4, 5 at pp. 15-26 (listing third parties with whom PowerSchool shares student data).

obtained on its behalf.[15] Nor does it disclose to parents or students that it receives money when transmitting student data.[16] Notably, PowerSchool's fact witnesses denied that PowerSchool profited from sharing data, but PowerSchool's corporate representative admitted that it receives money from transmitting student data.[17] Indeed, one of the primary purposes of its Data Warehouse Products is to enable PowerSchool to share student data with third parties.[18] PowerSchool, moreover, profits by sharing such data with third parties and by promoting its products' ability to collect and share data.[19]

Further, when sharing data, PowerSchool does not use proper protocols to anonymize data shared with others.[20] Instead, it relies on Darron Flagg, a lawyer with no meaningful experience in data anonymization, and one of his product engineers to arbitrarily determine which data fields are removed.[21] PowerSchool has never tested its de-identification methodology or hired an expert or consultant to ensure that its de-identified data cannot be re-identified.[22] PowerSchool has never even considered the risk that its de-identified data can be re-identified, let alone performed testing to determine if the data is properly protected.[23] PowerSchool also admits that it places no guardrails on how widely this information can be shared or how it can be used, and that schools can do "whatever they wish with it."[24]

When asked how it obtains consent from parents and students to collect and use student data, PowerSchool stated that its consent defense is based on federal law, state law, contracts with schools, and individual school practices, but it never produced evidence that it obtains effective consent for its data practices from parents or students.[25] PowerSchool asserts that it has no duty to obtain consent from parents

[15] *See* Aragon Decl. Ex. 14, Nicole Shinton Tr. 15:21-18:8 (Group Vice-President Product Management); Ex. 4, Cirillo Tr. 240:12-241:12 (Group Vice-President Product management); Ex. 15, Paul Brook (Chief Customer Officer) Tr. 26:20-27:8; Ex. 9, Flagg 30(b)(6) Tr. 350:5–15 [redacted], 365:7–18 (same).
[16] *Id.*
[17] Aragon Decl. Ex. 9, Flagg 30(b)(6) Tr. 350:5–15; 365:7–15; Ex. 16, Swingle Deposition, 328:3-8; Ex. 17, McCowan Tr. 237:6-10; Ex. 18, Ahmad Tr. 310:10-17.
[18] *Supra* at nn. 15-16.
[19] *Id.*
[20] Aragon Decl. Ex. 9, Flagg 30(b)(6) Tr. 382:6-383:7.
[21] *Id.*; *see also* Aragon Decl., Ex. 9, Flagg 30(b)(6) Tr. 381:22–383:7.
[22] Aragon Decl. Ex. 9, Flagg 30(b)(6) Tr. 383:11–14.
[23] *Id.* 399:11–16.
[24] *See, e.g.*, Aragon Decl. Ex. 9, Flagg 30(b)(6) Tr. 172:16–179:2, 235:16–236:22.
[25] Aragon Decl. Ex. 8, PowerSchool's Responses and Objections to Interrogatories at 18-25.

or students and that consent, if any, may be obtained exclusively from schools, who collect and own the data.[26] But no law wholly confers ownership of all student information to schools or grants schools carte blanche authority to consent to the sweeping collection and use of student information by a third party. *See New Jersey v. T.L.O.*, 469 U.S. 325, 337–42 (1985) (explaining that children do not forgo their right to privacy simply by attending school and that invasions of that right must be carefully balanced against the state's interest); Cong. Rec. at 13990–92 (daily ed. May 13, 1975) (remarks of Sen. Buckley in support of the Federal Education Rights and Privacy Act ("FERPA")).

The Data Warehouse Class can show with the common evidence cited above—generating common answers—that PowerSchool (1) uses the Data Warehouse Products to collect, process, and store student data; (2) offers that data to third parties; (3) shares that data with third parties; (4) does not receive effective consent for its collection, use, or disclosure of student data; and (5) violated applicable law in doing so.

**B. Student Profiling and Prediction Products Class**

PowerSchool's Student Profiling and Prediction Products[27] produce "insights" and predictions about students[28] without parent or student consent.[29] Worse, these products are not tested for validity, accuracy, or reliability.[30] PowerSchool could, but chooses not to, confirm the fairness and accuracy of its prediction products.[31] PowerSchool's corporate representative confirmed this fact: "So when you say, how is PowerSchool confirming the accuracy [of its prediction products], it's not something we would do[.]"[32] "Q: So PowerSchool has done nothing to validate the accuracy of the factors it considers important that it identifies

---

[26] *Id.*; *see also* Ex. 14, Shinton Tr. 12:3-13; 15:21-18:8 (Group Vice-President Product Management) (explaining that PowerSchool does not obtain and has no duty to obtain "informed voluntary consent" to collect student data); Ex. 4, Cirillo Tr. 240:12-241:12 (Group Vice-President Product management) (explaining he is not aware of any documents at PowerSchool that discuss the need to obtain consent from parents and student for a customer (school or school district) to collect and use student data).

[27] Data, Analytics and Insights f/k/a Unified Insights; Performance Matters; Behavior Support; and Attendance Intervention (collectively "**Student Profiling and Prediction Products**").

[28] Aragon Decl. Ex. 19, DPIA Analytics and Insights, PWRSCHL_00644311-320; Ex. 20, DPIA Behavior Matters, PWRSCHL_00644501 at 504-06; Ex. 21, DPIA Performance Matters, PWRSCHL_00644447-456.

[29] *See, e.g.*, Aragon Decl. Ex. 14, Shinton Tr. 22:13-23:12 (Group Vice-President Product Management); Ex. 4, Cirillo Tr. 240:12-241:12 (Group Vice-President Product management).

[30] Aragon Decl. Ex. 9, Flagg 30(b)(6) Tr. 222:3-230:3.

[31] *See* Aragon Decl. Ex. 9, Flagg 30(b)(6) Tr. 222:3–230:3.

[32] *Id.* 224:7–10.

in the risk analysis? A: Correct."[33] "We could [validate our risk models], but then that would be different for every school, right. And then there would be no value to PowerSchool to do that."[34] Its excuse for never testing its Student Profiling and Prediction Products for bias, accuracy, or reliability is that schools can modify the algorithm, but this ignores that the products sold and used by all schools and school districts suffer from the same deficiency: the underlying algorithm, whether used as shipped or altered by the customer, was never tested or proven to work[35] before it is used to make life-altering predictions and insights about students.

But even if the algorithms were tested and worked properly, parents do not provide effective consent for PowerSchool to use Class Members' data to power the Student Profiling and Prediction Products.[36] PowerSchool's unlawful conduct—producing untested, unreliable predictions based on data it has no right to use—has real world consequences. For example, predictive algorithms regarding graduation rates create a feedback loop that could result in student neglect by categorizing students into risk tiers, encouraging schools to divert critical resources away from "high-risk" students to prioritize those deemed more "viable" for graduation.[37] This algorithm-based triage has serious financial consequences, as a high school diploma increases estimated lifetime earnings by 57% for women and 36% for men.[38] By including biased disciplinary records and test scores, these algorithms also automate implicit racial bias and often unfairly label students as "high risk" regardless of their true ability.[39] Finally, the lack of testing and oversight could trigger inaccurate student risk labels, leading to the devastating and potentially life-altering withdrawal of support from the students who need it most.[40]

Compounding these harms, PowerSchool's unvetted prediction products exist largely as an upsell opportunity. [redacted][41] Indeed, PowerSchool

---

[33] *Id.* 224:14–19.
[34] *Id.* 226:19–227:7.
[35] *Supra* at n. 31.
[36] *Supra* at nn. 29-30.
[37] Ex. B, Catherine O'Neil Expert Report ("O'Neil Rpt.") at 27.
[38] *Id.* at 26.
[39] *Id.* at 27-28.
[40] *Id.* at 27.
[41] Aragon Decl. Ex. 9, Flagg 30(b)(6) Tr. 329:19–331:20; Ex. 22, PWRSCHL_00002785 at tab 8: X-Sell/Upsell by Product; Ex. 23, PWRSCHL_00425124 at 17 (identifying opportunities and past cross-selling successes).

profits handsomely from selling, cross-selling, and upselling its unvetted prediction products to schools. Seattle Public Schools—the school attended by Plaintiff S.G.—for example, paid approximately $200,000 for Unified Insights and $185,000 for Performance Matters on an annual contract of about $1.1 million, or about 35% of PowerSchool's revenue for that contract.[42] Plaintiffs' damages expert conservatively estimates that PowerSchool has unjustly enriched itself by approximately $341 million by selling the untested Student Profiling and Prediction products—driven entirely by class members' data—to customers.[43]

In sum, Plaintiffs will show with the common evidence cited in this section, which will generate common answers, that PowerSchool (1) uses Class Members' data to produce predictions and insights about students; (2) never tested its Student Profiling and Prediction Products for accuracy, bias, or reliability, (3) does not obtain effective consent for its use of student data in the Student Profiling and Prediction Products, (4) profited from its conduct, and (5) violated applicable law.

**C. Plaintiffs**

[redacted] The school district uses Student Data Warehouse Products, specifically PowerSchool SIS[46] and Naviance,[47] to collect, process, and store their data. PowerSchool SIS is the workhorse for PowerSchool, containing massive amounts of data about students and their families.[48] The district also used Unified Insights,

[42] *Approval of License and Subscription Fees for PowerSchool Platform*, Seattle Public Schools (Aug. 31, 2022) at 10-11, https://www.seattleschools.org/board-meetings/august-31-2022-regular-board-meeting/ (follow hyperlink at VI.A.7.) (last visited September 25, 2026).
[43] Schulte Rpt. at 28-39.
[44] *See* Ex. D, Concepcion Decl. at ¶ 8.
[45] *See, e.g.,* Aragon Decl. Ex. 28 (contracts for SIS at WCC from July 1, 2020, to June 2025); Ex. 49 (email from WCC containing M.M.C.'s data and stating that current information was available through PowerSchool); Ex. 50 (email containing L.M.C.'s data and stating that current information was available through PowerSchool); Ex. 51 (email from WCC's principal stating that all families are required to complete annual forms on PowerSchool, including submission of medical information); Ex. 52 (email from WCC asking David to input information into PowerSchool); Ex. 53 (email from WCC requesting that David send M.M.C.'s birth certificate to the district so that it could make a change in its system run by PowerSchool).
[46] Aragon Decl. Exs. 24-28.
[47] Aragon Decl. Ex. 29; Ex. 30; Ex. 27 (contracts for Naviance from July 1, 2021 to June 30, 2025).
[48] *See, e.g.*, Aragon Decl. Ex. 31, PWRSCHL_00141839 at 15 (stating that 94.4% of school districts (6,548 of 6,939) use PowerSchool SIS); Ex. 12, PWRSCHL_00005197 at 11 (confirming that PowerSchool SIS is "used by nearly every school constituent on a day-to-day basis"); Ex. 2 (PowerSchool SIS DPIA).

a Student Profiling and Prediction Product that was once known as Hoonuit and is now known as Analytics and Insights from at least 2021 through at least 2023, when L.M.C. and M.M.C. were attending school there.[49] Unified Insights is the bedrock for PowerSchool's Student Profiling and Prediction Products. It is a "comprehensive K-12 student data analytics platform that brings together an organization's disparate data from multiple sources to create a dashboard and analytics related to the aggregated data."[50] This includes "student analytics" that identify "at risk students and support personalized learning plans."[51] Again, this product is untested for reliability, bias, or accuracy.[52]

Plaintiff David Concepcion, L.M.C.'s and M.M.C.'s father, testified that PowerSchool is misusing his children's information without his or his children's authorization.[53] He explained that PowerSchool misuses student data when it, without permission, "[takes] information and [does] not [hold] it … solely for the use of [WCC]..."[54] His children also testified that their personal data is private and invaluable.[55] M.M.C. explained that privacy means "keeping it secret" and "not . . . sharing it with other people."[56]

[redacted].[57] The school district uses the following Data Warehouse Products: PowerSchool SIS, Schoology, Naviance, and MTSS.[58] The district also uses Analytics and Insights and Performance Matters, each a Student Profiling and Prediction Product.[59] Notably, SPS hosts some of its data on-premises, meaning that the district

---

[49] Aragon Decl. Ex. 25, PWRSCHL_00007269 at p. 75 (contract between PowerSchool and WCC showing Unified Insights and Hoonuit); Ex. 26 (showing that PowerSchool trained WCC on the Unified Insights product); Ex. 38 (showing that WCC used Hoonuit); Ex. 54 (listing PowerSchool products used by WCC); Ex. 55 (showing that WCC used Hoonuit).

[50] Aragon Decl. Ex. 19 at 4; Ex. 9, Flagg 30(b)(6) Tr. 179:9–183:3.

[51] Aragon Decl. Ex. 19 at 5.

[52] *See supra* at nn. 30-31.

[53] *See generally* Aragon Decl. Ex. 33, Concepcion Tr. 126:13-134:22.

[54] Aragon Decl. Ex. 33, Concepcion Tr. 129:9-18.

[55] Aragon Decl. Ex. 34, M.M.C. Tr. 38:24-39:5 ("My privacy is too important . . .."); Aragon Decl. Ex. 35, L.M.C. Tr. 40:8-10 ("I mean, I wouldn't sell it because it's like my personal stuff.").

[56] Aragon Decl. Ex. 34, M.M.C. Tr. 37:9-13.

[57] Aragon Decl. Ex. 36, S.G. Tr. 9:19-20; 10:23-25; 11:1-25; 12:1-23.

[58] Aragon Decl. Exs. 26, 28, 30, 32 [redacted], 37-41; *see also* Seattle Public Schools, *PowerSchool Products*, https://www.seattleschools.org/departments/dots/software-information/powerschool-product/ (last accessed Feb. 5, 2026) (describing PowerSchool products used by SPS).

[59] *Id.*

has its own servers or hardware that it elects to maintain to house its own data.[60] SPS, however, hosts its data for Unified Insights and Naviance on PowerSchool's cloud servers.[61]

There is substantial evidence that S.G.'s data was collected using PowerSchool's products.[62] Plaintiff Emily Cherkin, S.G.'s mother, also testified that PowerSchool is violating her daughter's privacy rights because it "collects and sells and profits from data about children without informed consent."[63] She believes that PowerSchool should "[s]top collecting children's data without parental consent and compensate for any harm they've caused."[64] Ms. Cherkin further testified regarding school information systems, noting they must be deployed "effectively, safely, and legally."[65] Safety is the "bare minimum protecting privacy of student information [s]o . . . it stays within the school itself."[66] Cherkin's privacy concerns extended beyond the threat of "bad actors," pointing specifically to the commercial practices of PowerSchool.[67] She cautioned that PowerSchool is allowed to "take the data, sell it, and profit from it,"[68] turning sensitive student records into a commodity. Ultimately, Ms. Cherkin clarified that her concerns focus on student privacy and PowerSchool's misuse of private data: "my problem, again, is about consent, collection, and sale of data."[69]

S.G. testified she did not give PowerSchool "permission to collect and use her data to make money" expressing concerns that her personal information is being sold to third parties or used to develop predictive AI products.[70] She maintains her privacy is respected if the information she shared with her teachers and school remains strictly between them.[71]

---

[60] Aragon Decl. Ex. 14, Shinton Tr. 45:10-21.
[61] Aragon Decl. Ex. 42, Judith Jaeger Tr. 50:24-51:9; Ex. 43 (confirming that PowerSchool hosts SPS data).
[62] *See, e.g.*, Aragon Decl. Ex. 56 (PowerSchool spreadsheet containing S.G.'s data); Ex. 57 (PowerSchool spreadsheet containing S.G.'s assessment data); Ex. 58 (PowerSchool spreadsheet containing S.G.'s sensitive personal data); Ex. 59 (PowerSchool spreadsheet containing S.G.'s sensitive personal data); Ex. 60 (showing a log and timestamps for S.G.'s online activity).
[63] Aragon Decl. Ex. 44, Emily Cherkin Tr. 281:17-19.
[64] *Id.* 284:13-15.
[65] *Id.* 175:22-23.
[66] *Id.* 175:23-25.
[67] *Id.* 175:6-11.
[68] *Id.* 175:9-11.
[69] *Id.* 175:20-21.
[70] Aragon Decl. Ex. 36, S.G. Tr. 155:24-156:1; 154:4-155:7.
[71] *Id.* 80:11-22.

## III. PROPOSED CLASSES TO BE CERTIFIED

To address PowerSchool's conduct, Plaintiffs seek certification of the following classes (collectively, "the Classes"):

> **35-State Multistate Injunctive Relief Class under Rule 23(b)(2)**
>
> All persons in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Texas, Utah, Vermont, Washington, and West Virginia (collectively the "**Restatement States**") who, from October 29, 2020, to the present, attended a K-12 school or school district that used any of the following PowerSchool products: PowerSchool SIS, Schoology Learning, Performance Matters, Naviance, MTSS, Behavior Support, Attendance Intervention, Data, Analytics and Insights (f/k/a Unified Insights), or Connected Intelligence.
>
> **35-State Multistate Damage Classes under Rule 23(b)(3)**
>
> **Multistate Student Data Warehouse Class**: All persons in the **Restatement States** who, from October 29, 2020, to the present, attended a K-12 school or school district that used the following PowerSchool products—PowerSchool SIS or Connected Intelligence—and PowerSchool hosts[72] the collected data for at least one product.
>
> **Multistate Student Profiling and Prediction Class:** All persons in the **Restatement States** who, from October 29, 2020, to the present, attended a K-12 school or school district that used Data, Analytics and Insights (f/k/a Unified Insights), Performance Matters, Behavior Support, or Attendance Intervention (collectively the "Student Profiling and Prediction Products"), and PowerSchool hosts the collected student data for at least one product.
>
> **California subclasses**: In addition, Plaintiffs request certification of California-specific Injunctive Relief, Student Data Warehouse, and Student Profiling and Prediction subclasses for California residents mirroring the definitions above.

The 35-State Multistate Injunctive Relief Class, Multistate Student Data Warehouse Class, and Student

---

[72] Hosts means that collected data is stored by PowerSchool, either on the "cloud" or at a data warehouse operated by PowerSchool. *See, e.g.*, Aragon Decl. Ex. 10, PWRSCHL_00003280 at 164 (describing transition to cloud from legacy hosting at physical locations); Ex. 17, McCowan Tr. 56:5-22 (explaining that student data is stored in Amazon Web Services ("AWS") or Microsoft Azure), 58:1-10; Ex. 16, Swingle Tr. 269:10-270:1 ([redacted]). This contrasts with schools and school districts that host their own data. *See also* Ex. 43 (identifying schools and school districts with student data hosted by PowerSchool. Note that Seattle Public Schools, the district Plaintiff S.G. attends, is listed as Seattle School District No. 1, the legal name for the district).

Profiling and Prediction Class assert claims under the common law protections against invasion of privacy known as intrusion upon seclusion. *See* Corrected First Amended Complaint ("Compl.") Cause of Action Count I. The California subclasses, which mirror the proposed Multistate Classes for injunctive relief under Rule 23(b)(2) and damages under Rule 23(b)(3), assert claims under the California Constitution's guarantee of privacy and unjust enrichment/quasi-contract, as well as common law intrusion upon seclusion. *See* Compl. Causes of Action Counts I, II, III.

## IV. CLASS REPRESENTATIVE(S) AND CLASS COUNSEL

Each proposed Class Representative, with the assistance of their respective parent, has diligently represented the class by, among other things, (1) answering interrogatories and requests for admissions from Defendant, (2) responding to all requests for production, (3) sitting for in-person depositions, (4) reviewing and approving the class action complaint, (5) responding to all inquiries from their attorneys, (6) attending mediation twice, in person and (7) promoting the claims of unnamed Class members at all times.[73] Further, there are no conflicts between the proposed class representatives and the classes they seek to represent. For these reasons, Plaintiffs respectfully request that the Court appoint Class Representatives as follows:

**Multistate Class Representatives:** Plaintiffs S.G., M.M.C. and L.M.C. are minors. As such, Plaintiffs request that the Court appoint (1) Plaintiffs S.G., by and through her mother Emily Cherkin, and (2) M.M.C. and L.M.C., by and through their father, David Concepcion as the Class Representatives for the multistate Rule 23(b)(2) and 23(b)(3) classes.

**California Class Representatives:** Plaintiffs further request that the Court appoint Plaintiffs M.M.C., and L.M.C., by and through their father, David Concepcion, as the Class Representatives for each California subclass. M.M.C., L.M.C., and David Concepcion are all California residents.

**Class Counsel:** With respect to any Class certified by the Court, Plaintiffs respectfully request that the Court appoint Hagens Berman Sobol Shapiro LLP and EdTech Law Center PLLC as Class Counsel for the certified Class under Rule 23(g). Plaintiffs' counsel in this case have (1) identified and researched the claims giving rise to this case, (2) defeated a motion to dismiss and proceeded on the original complaint, (3) defeated a motion to intervene, (4) conducted substantial fact discovery, including all depositions permitted by the

[73] *See* Aragon Decl. ¶ 50; Ex. D, Concepcion Decl. at ¶¶ 11-22; Ex. E, Cherkin Decl. at ¶¶ 11-22.

Court and the identification, collection, and review of over 110,000 documents from defendants, voluminous ESI productions from Plaintiffs, and boxes of hard-copy documents (5) defended depositions of all putative Class Representatives, including the in-person deposition of three minors, (6) resolved multiple discovery disputes with Defendant, (7) retained and supervised experts to address issues related to privacy and damages, (8) attended three mediations, and (9) diligently represented the Classes' interests.[74] The primary attorneys handling this case from both firms—Robert Carey, Leonard Aragon, and Whitney Siehl from Hagens Berman, and Julie Liddell and Andrew Liddell from EdTech Law Center—have substantial experience handling class actions and complex litigation, are well versed in the underlying law, and are prepared to devote whatever additional resources are necessary to favorably resolve this case.[75]

## V. STANDARD FOR CLASS CERTIFICATION

To certify a class, Plaintiffs must meet all requirements under Fed. R. Civ. P. 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation, as well as the requirements of either Fed. R. Civ. P. 23(b)(1), (2), or (3). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14 (1997). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* The class-certification analysis is not "an alternative form of summary judgment or an occasion to hold a mini-trial on the merits." *In re Facebook Biometric Info. Priv. Litig.*, 326 F.R.D. 535, 542 (N.D. Cal. 2018) (Donato, J.).

## VI. ARGUMENT

### A. The Proposed Classes Meet Rule 23(a)'s Requirements.

#### 1. Rule 23(a)(1): Numerosity is satisfied.

Rule 23(a)(1) is satisfied when the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This case readily meets the numerosity prerequisite, as each Proposed Class consists of millions of U.S. K-12 students, as reflected on PowerSchool's website and records.[76]

---

[74] Aragon Decl. ¶ 55; Liddell Decl. ¶ 6.

[75] Aragon Decl. ¶¶ 55-62, Ex. 45 (Firm resume); Liddell Decl. ¶¶ 6-12, Ex. 1 (Firm resume).

[76] *See Bain Capital Completes Acquisition*, https://www.powerschool.com/bain-capital/("PowerSchool supports over 60 million students and over 18,000 customers in more than 90 countries, including more than 90 of the

**2. Rule 23(a)(2): Common questions of law and fact exist.**

The commonality requirement is satisfied if "there are questions of law or fact common to the class." *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, 609 F. Supp. 3d 942, 960 (N.D. Cal. 2022) (quoting Fed. R. Civ. P. 23(a)(2)). Commonality "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011). "A common contention need not be one that 'will be answered, on the merits, in favor of the class[,]' … [i]t only 'must be of such a nature that it is capable of classwide resolution.'" *Alcantar v. Hobart Servs.*, 800 F.3d 1047, 1053 (9th Cir. 2015) (first quoting *Amgen*, 568 U.S. at 459; and then quoting *Wal-Mart*, 564 U.S. at 350). Importantly, not all questions must be common. Rather, "for purposes of Rule 23(a)(2) even a single common question will do." *Wal-Mart*, 564 U.S. at 359 (citation modified).

Plaintiffs easily satisfy commonality. Common issues for the Student Data Warehouse Class include whether PowerSchool (1) uses the Data Warehouse Products to collect, process, and store student data; (2) offers that data to third parties, (3) shares that data with third parties, (4) does not receive effective consent for its actions, and (5) violates intrusion upon seclusion law, as defined by the Restatement, in doing so.[77]

Common issues for the Student Profiling and Prediction Class include (1) whether PowerSchool, using the Student Profiling and Prediction Products, uses student data to produce predictions and insights about students; (2) whether the Student Profiling and Prediction Products were tested for accuracy, bias, or reliability, (3) whether PowerSchool obtains effective consent for the use of student data to make predictions and insights about students, (4) whether PowerSchool profited from its conduct, and (5) whether PowerSchool violated intrusion upon seclusion law as codified by the Restatement.[78]

The same common questions apply to the injunctive relief class, and whether the class is entitled to injunctive relief. Commonality is easily met here.

**3. Rule 23(a)(3): Plaintiffs' claims are typical.**

Rule 23(a)(3) typicality requires a showing that "the [legal] claims or defenses of the representative parties [are] typical of the claims or defenses of the class.'" *James v. Uber Techs. Inc.*, 338 F.R.D. 123, 132 (N.D.

---

top 100 districts by student enrollment in the United States."); *see also* Aragon Decl. at ¶ 51 (describing student counts by states and documents used to identify class members).

[77] *See* common proof for the Data Warehouse Class *supra* at 1-4.

[78] *See* common proof for the Student Profiling and Prediction Class *supra* at 4-6.

Cal. 2021) (quoting Fed. R. Civ. P. 23(a)(3)). Typicality requires that the representatives' claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Id.* at 132 (citation modified). As a result, "the typicality requirement is not demanding." *In re Heritage Bond Litig.*, No. CV 01-5752 DT, 2004 WL 1638201, at *4 (C.D. Cal. Jul. 12, 2004).

Plaintiffs' claims are typical of the claims of the absent Class members they seek to represent. For the Student Data Warehouse Class, Plaintiffs and Class members:

(1) **allege the same course of conduct by PowerSchool**: its collection, processing, and sharing of student data with third parties without effective parental consent;

(2) **assert the same legal arguments to show PowerSchool's liability**: that PowerSchool's conduct violated their right to privacy by sharing their data without effective consent; and

(3) **suffered the "same or similar injury"**: PowerSchool's failure to obtain consent for its collection, use, and disclosure of their data to third parties and failure to compensate them for the value of their data.

*Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (holding "[m]easures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct").

Likewise, for the Student Profiling and Prediction Class, Plaintiffs and Class members:

(1) **allege the same course of conduct by PowerSchool**: its use of their data to fuel untested predictive analytic products without effective parental consent;

(2) **advance the same legal arguments as to PowerSchool's liability**: that PowerSchool's conduct violated their right to privacy and resulted in PowerSchool's unjust enrichment at their expense; and

(3) **suffered the "same or similar injury"**: PowerSchool's failure to obtain effective consent and failure to compensate them for its use of their data in an untested product that never should have been sold or used by their schools and districts.

PowerSchool will argue that the Class Representatives are atypical because their respective schools may not collect the exact same data elements. This ignores that PowerSchool prepares Data Privacy Impact Assessments ("DPIAs") that set forth the data elements that each of its Products automatically collects.[79] While schools may configure PowerSchool's products to collect additional categories of student information,[80]

[79] *See, e.g.*, Aragon Decl. Exs. 2, 3, 5-7; *see also* Ex. C, Dr. Suzanne Barber Report at 12-24 (describing the minimum data elements collected by PowerSchool's products) ("Barber Rpt."); Ex. 48, PowerSchool Holdings, Inc.'s Supplemental Responses and Objections to Plaintiffs' Non-Uniform Interrogatories 2, 3, 7, 8 at pp. 6-7 (responding to Interrogatory No. 3 asking what data is collected by each product).
[80] *See supra* at n. 9.

that variability does not defeat typicality because there is a baseline set of data elements inherent in the product. Plaintiffs' claims remain actionable—and typical of the class—based on the minimum, baseline data elements collected and maintained through the products, regardless of any further information a particular school elects to capture.[81]

Further, the quantum of data considered by the Student Profiling and Prediction Products is irrelevant to prove the claims. The relevant question is whether PowerSchool is permitted to feed student data into an untested prediction product without effective consent. It does not matter that some students may have had more data fed into the products than others. This is because when considering typicality, "the focus should be on the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff." *Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D. 391, 396 (N.D. Cal. 2005) (citation modified). It only matters that student data is used to feed the products without consent because, again, typicality does not require that "all class members suffer the same injury as the named class representative." *Id.*

**4. Rule 23(a)(4) Plaintiffs and Lead Counsel are Adequate.**

The Rule 23(a)(4) adequacy determination requires that the Class Representatives and their counsel must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Class Representatives satisfy adequacy if they have "no conflicts of interest with other class members[,]" and class counsel satisfy adequacy if they "will prosecute the action vigorously on behalf of the class." *James*, 338 F.R.D. at 132–33. "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

Here, the Plaintiffs and undersigned counsel's declarations demonstrate that the requirements for Rule 23(a)(4) adequacy are fully satisfied.[82] Specifically, there are no divergent interests between the Class Representatives and the proposed Classes, and the proposed Class Representatives and their counsel are

[81] *See* Barber Rpt. at 1-2 (summarizing harms caused by PowerSchool's practice of controlling and processing student data); O'Neil Rpt. (explaining risks to students based on the use of PowerSchool's Student Profiling and Prediction Products).

[82] *See* Aragon Decl. ¶¶ 49-50; 52-61; Liddell Decl. ¶¶ 2-12; Ex. E, Cherkin Decl. ¶¶ 2-23; Ex. D, Concepcion Decl. ¶¶ 2-23.

committed to the vigorous prosecution of this litigation.[83] Further, Class Counsel possess the necessary knowledge, experience, and resources to prosecute this matter fairly and effectively and have devoted significant time and resources to the case.[84]

**B. The Proposed Damages Classes Meet Rule 23(b)(3)'s Requirements.**

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. Proc. 23(b)(3). The predominance inquiry "is whether the method of proof would apply in common to all class members," and "not whether the method of proof would or could prevail." *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1026 (9th Cir. 2024) (citation modified). Here, the relevant claims and defenses can be decided by common evidence that predominates over individual questions.

**1. Because California Law Applies to the Multistate Classes, common questions predominate.**

Where the states in the proposed class follow the same legal standard, there is no need for individualized, state-by-state legal analysis, and common questions of law predominate. *See In re Hyundai & Kia Fuel Econ. Litig.,* 926 F.3d 539, 561-562 (9th Cir. 2019) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 823 (1985)). Here, California's intrusion upon seclusion law can be applied to the Multistate Classes because each state has adopted the standard set forth in section 652B of the Restatement (Second) of Torts' ("Restatement") for intrusion upon seclusion claims.[85]

A federal court sitting in diversity applies the forum state's choice-of-law rules to determine the controlling substantive law. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir.), *opinion amended on denial of reh'g,* 273 F.3d 1266 (9th Cir. 2001). Under California's choice-of-law rules, Plaintiffs must first demonstrate that California has a "significant contact or significant aggregation of contacts" with the claims of each class member. *Mazza v. Am. Honda Motor Corp.*, 666 F.3d 581, 589 (9th Cir. 2012) (quoting *Wash. Mut. Bank v. Super. Ct.*, 24 Cal. 4th 906, 921 (2001)). Once that threshold showing is made, a defendant challenging the classwide application of California law bears the burden of demonstrating that "foreign law, rather than

---

[83] *See* Aragon Decl. ¶¶ 49-50; 52-55; Liddell Decl. ¶¶ 2-6; Ex. E, Cherkin Decl. ¶¶ 10-22; Ex. D, Concepcion Decl. ¶¶ 10-22.

[84] *See* Aragon Decl. ¶¶ 55-61; Liddell Decl. ¶¶ 6-12; Fed. R. Civ. P. 23(g)(4).

[85] *See* Aragon Decl. Ex. 61 (spreadsheet with the states that follow section 652B of the Restatement).

California law, should apply to class claims." *Id.* at 590.

Plaintiffs readily satisfy the threshold requirement. PowerSchool is a Delaware corporation headquartered in California, with its leadership team based in California.[86] The critical decisions giving rise to Plaintiffs' claims—including PowerSchool's determination that it does not need parental consent to share student data—were made in California.[87] PowerSchool's own Terms of Use ("TOU") require that claims filed by parents and students who use its website or products be brought in California under California law, unless certain narrow exceptions not applicable here apply.[88] And "[g]iven that [PowerSchool is] headquartered in California . . . application of California law poses no constitutional concerns in this case." *Forcellati v. Hyland's, Inc.*, CV 12-1983-GHK MRWX, 2014 WL 1410264, at *2 (C.D. Cal. Apr. 9, 2014.)

The burden thus falls on PowerSchool to demonstrate that a material conflict exists between California law and the laws of the other states in the Multistate Classes. It cannot do so. Under the governmental interest approach, the "foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California." *Zinser*, 253 F.3d at 1187. Only if the laws are materially different must the court proceed to the remaining steps. *Id.*

Here, there are no material differences between California's intrusion upon seclusion law and the law of the other 34 states. All 35 states follow the standard set forth in section 652B of the Restatement, which provides that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Each of the 35 states in the Multistate Classes has adopted this same formulation. *See* Aragon Decl. Ex. 61 (spreadsheet of states that follow section 652B of the Restatement); *Howard v. Aspen Way Enters., Inc.*, 406 P.3d 1271, 1275 (Wyo. 2017) (listing states that follow section 652B).

Courts have confirmed that states adopting the Restatement's intrusion upon seclusion standard have

---

[86] *See* Aragon Decl. Ex. 62 (10-K stating that PowerSchool's corporate headquarters are in Folsom, California); Ex. 63 (8-K stating the same); Ex. 64 (10-Q stating the same); Ex. 65 (PowerSchool's quote for WCC for analytics software sent from California).

[87] *See supra* at n. 86; Aragon Decl. Ex. 66 (PowerSchool's report describing systems of California facility).

[88] *See* Answer ¶ 10; *compare* Aragon Decl. Ex. 46, PowerSchool's Current Terms of Use ("TOU") (contract between PowerSchool and parents and students) *with* Ex. 47, PowerSchool's 2024 Main Services Agreement (contract between PowerSchool and educational entity customers).

"substantially similar" law that is not materially different, eliminating any conflict. *Manigault-Johnson v. Google, LLC*, No. 2:18-CV-1032-BHH, 2019 WL 3006646, at *4 n.3 (D.S.C. Mar. 31, 2019) (finding no conflict of law between California and South Carolina intrusion upon seclusion standards where both states followed the Restatement); *see also Phillips*, 472 U.S. at 816 ("There can be no injury in applying [one state's] law if it is not in conflict with that of any other jurisdiction connected to this suit."). Because no material conflict exists among the laws of the 35 states in the Multistate Classes, it is unnecessary to proceed further in the governmental interest analysis, and California law applies. *See Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 574 (N.D. Cal. 2025) (applying California law and certifying a class for intrusion upon seclusion claims where no conflict of law was identified). And because every class member's intrusion upon seclusion claim is governed by the same Restatement formulation—regardless of the state in which the class member resides—predominance is met. *See Mazza*, 666 F.3d at 589–90; *Frasco*, 349 F.R.D. at 574.

**2. The elements of the Intrusion Upon Seclusion claim can be answered by common questions that generate common answers.**

An intrusion upon seclusion claim requires two elements: "(1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." *In re Google Location History Litigation*, 428 F.Supp.3d 185, 196 (N.D. Cal 2019) (citation modified). "The intrusion must be intentional," and "the plaintiff must have had an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source." *Varnado v. Midland Funding LLC*, 43 F.Supp.3d 985, 992 (N.D. Cal 2014) (citation modified). Here, each question can be answered with common evidence generating common answers.

**a. Do students have a reasonable expectation of privacy in their own personal information and was that information used intentionally?**

This presents a common question because the standard is objective. *See Rodriguez v. Google LLC*, No. 20-CV-04688-RS, 2024 WL 38302, at *5 (N.D. Cal. Jan. 3, 2024) (holding whether plaintiffs had an "objective, reasonable expectation of privacy . . . is a question capable of resolution class-wide"). In addition to the robust privacy protections that all Americans enjoy as to their personal information, students—especially young students—are entitled to even greater protections: FERPA demonstrates that all students have a reasonable expectation of privacy in their education records,[89] and COPPA demonstrates that children

[89] 20 U.S.C. § 1232g; *see also* 34 CFR Part 99 (FERPA Regulations).

under 13 have a reasonable expectation of privacy in their personal information online.[90] Only a student's parent can relinquish these protections on behalf of their children, and only with fully informed and voluntary consent.[91] Moreover, the relevant data elements at issue are uniform. At best, Defendant can show that schools take more data than the default settings in the relevant products. This does not change whether there is a reasonable expectation of privacy under an objective standard for the baseline data elements, and PowerSchool does not contest that they share student data with 213 third party partners or use it in their prediction products.

**b. Is PowerSchool's collection and use of data highly offensive to a reasonable person?**

This, too, is an objective standard. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606 (9th Cir. 2020). Plaintiffs identified uniform data elements taken by the relevant PowerSchool products, including [redacted].[92] PowerSchool's products can be configured to include additional data fields, but all PowerSchool products ship with a default set of data fields.[93] Further, there is no evidence that any customer collects *less* data than the products automatically collect. Indeed, the evidence regarding modifications by customers shows that customers collect substantially more data than is collected using the default settings.[94] Plaintiffs' data privacy expert opines that even the minimum data fields contain highly sensitive data and that, by controlling and processing such data without permission, PowerSchool exposes students to "diverse, longstanding, and significant harm."[95] PowerSchool

---

[90] 15 U.S.C. § 6501 *et seq.*; *see also* 16 CFR Part 312 (COPPA Rule); 64 F.R. 59888 (FTC's Statement of Basis and Purpose for the COPPA Rule).

[91] *See, e.g.*, 16 CFR Section 312.4(a) ("It shall be the obligation of the operator to provide notice and obtain verifiable parental consent prior to collecting, using, or disclosing personal information from children."); 34 CFR Section 99.7(a)(2)(iii) ("The notice [from an educational agency or institution] must inform parents or eligible students that they have the right to . . . consent to disclosure of personally identifiable information contained in the student's education records, except to the extent that the Act and §99.31 authorize disclosure without consent[.]").

[92] *See, e.g.*, *supra* at n. 9 (these data fields are from PowerSchool SIS).

[93] *Id.*

[94] *See, e.g.*, Aragon Decl. Ex. 32 [redacted]).

[95] Barber Rpt. at 3-4.

itself admits that the student data is extraordinarily valuable. As such, there are no relevant individual inquiries on this issue to defeat predominance.

**c. Did PowerSchool obtain consent before taking, using, or disclosing students' personal information?**

Consent is an affirmative defense. Whether parents consented to PowerSchool's data practices can easily be determined on a classwide basis because PowerSchool admits that it does not obtain express, effective consent from parents for its data practices and has not submitted any evidence to the contrary.[96] *Caldera v. Am. Med. Collection Agency*, 320 F.R.D. 513, 519 (C.D. Cal. 2017) ("Where a party has not submitted any evidence of . . . express consent, courts will not presume that resolving such issues requires individualized inquiries . . . Accordingly, there is no indication that individualized issues of consent would be an obstacle to managing this case as a class action."); *see also Van Patten*, 847 F.3d at 1044 (express consent is "an affirmative defense for which the defendant bears the burden of proof.").

Further, PowerSchool has not submitted records showing that schools obtained voluntary, informed consent from parents, such as logs and disclosures demonstrating effective consent to PowerSchool's practices. Even if it had, PowerSchool does not purport to directly inform parents of its practices or ensure that schools do so, so any purported actual consent that schools might have obtained on its behalf would not be effective. *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024) ("For consent to be actual, the disclosures must 'explicitly notify' users of the conduct at issue.") (quotation omitted).

To the extent PowerSchool intends to argue that state student-records laws require individualized inquiries, that argument fails because those laws regulate schools, not private companies, and because FERPA sets minimum protections against disclosure that preempt less protective state laws governing disclosure of student records. *See Rim of the World Unified Sch. Dist. v. Superior Ct.*, 104 Cal.App.4th 1393, 1399 (2002).

Last, "[c]onsent does not turn on individual class members' subjective understandings of privacy disclosures . . . and is not a bar to predominance" for certification of a class action. *Frasco,* 349 F.R.D. at 582 (citation modified). This element is evaluated under an objective standard. *Rodriguez,* 2024 WL 38302, at *4. As such, any disclosures ostensibly giving consent to PowerSchool's practices giving rise to Plaintiffs'

[96] *See* Aragon Decl. Ex. 8, PowerSchool's Responses and Objections to Interrogatories at 18-25.

claims—and Plaintiffs are unaware of any—present a common question that is readily resolved for the entire class.

**3. The claims for Intrusion Upon Seclusion and Invasion of Privacy under the California Constitution by the California Damages Subclasses can be resolved using common evidence that generates common answers.**

The predominance analysis set forth above for the Multistate Damages Classes applies with equal force to the California Damages Subclasses' intrusion upon seclusion claims. The same common evidence—PowerSchool's uniform data collection practices, the absence of effective consent, and the objective offensiveness of PowerSchool's conduct—resolves the intrusion upon seclusion claim for the California Damages Subclasses on a classwide basis. The California Damages Subclasses also allege invasion of privacy under the California Constitution, which affords a right of privacy protecting individuals against intrusion by private parties. *Am. Acad. of Pediatrics v. Lungren*, 940 P.2d 797, 811 (Cal. 1997). Courts in the Ninth Circuit analyze California constitutional privacy claims and common law intrusion upon seclusion claims together because they involve "largely parallel elements, examining "the nature of any intrusion upon reasonable expectations of privacy" and "the offensiveness or seriousness of the intrusion, including any justification and other relevant interests." *Heeger v. Facebook, Inc.*, 509 F.Supp.3d 1182, 1193 (N.D. Cal. 2020) (Donato, J.) (citation modified). Because the California constitutional privacy claim is evaluated under the same framework and relies on the same common proof, predominance is met for the California Damages Subclasses' claims for both common law intrusion upon seclusion and invasion of privacy under the California Constitution.

**4. The claims for Unjust Enrichment/California Quasi-Contract by the California Student Profiling and Prediction Class can be determined using common evidence that generates common answers.**

Plaintiffs argue that PowerSchool gained a multi-billion-dollar valuation and directly profited from monetizing children's data without their consent or compensation, and that it would be unjust to allow PowerSchool to retain benefits derived from its untested, unreliable Student Profiling and Prediction Products.[97] Courts have found predominance satisfied for unjust enrichment claims where the equitable circumstances between the defendant and each class member are the same, such that the claims are resolvable through generalized, common proof on a classwide basis. *See Brickman v. Fitbit, Inc.*, No. 15-cv-

---

[97] Compl. ¶¶ 466-76.

02077-JD, 2017 WL 5569827, at *7 (N.D. Cal. Nov. 20, 2017) (holding unjust enrichment claim meets predominance where the defendant's "conduct is the same as to all members of the putative class" because "it is difficult to conceive of any significant equitable differences between class members"). That standard is readily met here. Plaintiffs' unjust enrichment claim rests on two uniform facts applicable to every class member: (1) PowerSchool never tested its Student Profiling and Prediction Products for reliability, bias, or accuracy, and (2) Plaintiffs and Class members never gave effective consent for PowerSchool to use their data to generate insights or predictions through those untested products. Both facts are provable through common evidence—PowerSchool's own corporate testimony and product documentation—and yield common answers for the entire class.

Despite Defendant's arguments in previous briefing,[98] Plaintiffs do not argue that students were harmed merely because PowerSchool made individual predictions about them. Rather, Plaintiffs contend that PowerSchool was unjustly enriched because it used class members' data to build, market, and sell Student Profiling and Prediction Products that (1) were never tested for reliability, bias, or accuracy, and (2) are powered by student data obtained without effective consent. PowerSchool's own data architecture confirms that all class members' data powered these predictive products,[99] and PowerSchool's corporate representative admitted the products were never tested. Whether any individual class member was the subject of a specific prediction is immaterial: the unjust enrichment flows from PowerSchool's monetization of the entire class's data through a product that should never have been sold or used.

**5. Class Actions are superior to multiple individual actions.**

Rule 23(b)(3) also requires "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The factors to consider when determining superiority are: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*; *see also Zinser*, 253 F.3d at 1190.

A class action is superior here because individual litigation costs would dwarf any potential recovery

---

[98] *See* Def.'s Opposition to Pl.s' Mot. for Class Certification, Dkt. 138.

[99] *See supra* at nn. 9 & 29; *see also* Aragon Decl. Ex. 9, Flagg 30(b)(6) Tr. 179:9–183:3.

for a single Class member. The reality is that the alternative to this action is no action. Moreover, every relevant factor weighs in favor of certification. There are no other pending cases asserting substantively similar claims, PowerSchool is based in California and does not contest that venue in this district is proper,[100] and there are no apparent difficulties in managing this class action. Although the classes are relatively large, they are homogeneous and the application of California law make them manageable. And any unforeseen manageability concerns are mitigated by the court's broad discretion to use procedural tools to manage class litigation and the objective metrics used to define the Classes.

**6. The Classes are Ascertainable**

Although ascertainability is not a requirement for class certification in the Ninth Circuit, *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017), there is ample evidence to identify Class members. PowerSchool produced numerous documents identifying its customers and the products they subscribe to.[101] Further, PowerSchool produced sales-related spreadsheets identifying customer names, start/end dates, revenues, and student count.[102] The documents can be used to ascertain Class members, but are too voluminous to attach here.

**7. Damages are capable of Classwide measurement.**

Plaintiffs will prove monetary damages through common, classwide proof. Damages "are capable of measurement on a classwide basis" when the damages calculation is attributable to a plaintiff's theory of harm. *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013). Plaintiffs "need to be able to allege that their damages arise from a course of conduct that impacted the class" but "need not show that each members' damages from that conduct are identical." *Just Film*, 847 F.3d at 1120. "Plaintiffs need only show that such damages can be determined without excessive difficulty and attributed to their theory of liability." *Id.* at 1121. Class certification is appropriate even when showing damages *could* be calculated on a classwide basis, even where such calculations have not yet been performed. *Id.* at 1120-21.

---

[100] Def.'s Answer to Pl.s' Corrected First Am. Compl., Dkt. 195.
[101] *See* Aragon Decl. at ¶ 51 (citing PWRSCHL_00566064 (containing approximately 108,000 rows of accounts reporting PowerSchool's customers and product subscriptions); PWRSCHL_00702684 (sales spreadsheet with over 300,000 entries identifying customers, products, start/end dates, and booking amounts); PWRSCHL_00077701 (enrollment data for customers broken down by state)).
[102] *Id.*

Here, damages are easily calculated on a classwide basis. Plaintiffs' damages expert, Christopher L. Schulte, explains that he can calculate actual damages by utilizing PowerSchool's contemporaneous business records for different periods of time, classes, or subclasses.[103] Mr. Schulte has also developed objective methodologies to apportion any aggregate recovery among Class members which do not require individualized inquiries.[104] Notably, Mr. Schulte calculates a minimum, conservative[105] fair market value of student data based on arm's length negotiations for student data shared with third parties.[106] This is an actual damages calculation based on the minimum amount a party should pay when receiving student data in an arm's length transaction.[107] [redacted] This number can be attributed to the classes as a benchmark for data misappropriated by PowerSchool without consent.[109]

The proposed Class Representatives and the classes are also entitled to punitive damages. *Jackson v. First Nat'l Bank of Omaha*, No. CV 20-1295 DSF (JCX), 2022 WL 423440, at *9 (C.D. Cal. Jan. 18, 2022) ("California courts and district courts in the Ninth Circuit have recognized punitive damages may be appropriate for common law invasion of privacy claims."). In determining punitive damages, the focus is on common evidence such as "defendant's conduct toward the class as a whole." *Barefield v. Chevron, U.S.A., Inc.*, No. C 86-2427 TEH, 1988 WL 188433, at *3 (N.D. Cal. Dec. 6, 1988). Accordingly, damages are capable of measurement on a classwide basis.

With respect to the Student Profiling and Prediction Classes, Plaintiffs allege that PowerSchool used student data—without student or parental consent—in untested products that generate life-altering predictions and insights, thereby unjustly enriching itself through the sale of the Student Profiling and Prediction Products. "California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss." *Facebook Tracking*, 956 F.3d at

---

[103] Schulte Rpt. ¶¶ 28-62 (describing unjust enrichment and actual damages calculations and classwide evidence used to create those calculations) and ¶ 135.
[104] Schulte Rpt. ¶ 134.
[105] Schulte Rpt. ¶ 10, pp. 4-6.
[106] *Id.*; *see also id.* ¶¶ 41-62.
[107] Schulte Rpt. ¶ 93.
[108] *Id.*; *see also* Schulte Rpt. at. 41–62 (discussing the monetization of student data by PowerSchool).
[109] *Id.*

599. And in California, a "stake in unjustly earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable." *Id.* at 600. Disgorgement, moreover, is "referred to as unjust enrichment," and is a proper remedy for an intrusion upon seclusion violation. *Rodriguez v. Google LLC*, 823 F. Supp. 3d 986, 993-97 (N.D. Cal. 2026). Here, Mr. Schulte determined that PowerSchool's unjust enrichment from PowerSchool's Student Profiling and Prediction Products is approximately $341 million over the period January 2019 through December 2025, and confirmed that he can adjust the figure for "different periods of time, classes, or subclasses" as necessary.[110] As such, damages for each Class can be measured on a classwide basis.

**C. Class Certification Under Rule 23(b)(2) for the Injunctive Relief Classes is Proper.**

Plaintiffs also seek class certification under Rule 23(b)(2) for equitable relief. "Ninth Circuit precedent indicates that the court can separately certify an injunctive relief class and if appropriate, also certify a Rule 23(b)(3) damages class." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 573 (C.D. Cal. 2014). Certification under Rule 23(b)(2) is appropriate where the defendant "has acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2).

Here, putative Class Representatives seek injunctive relief to stop PowerSchool's ongoing exploitation of their data without their consent by, at a minimum, (1) providing students and parents with clear and complete information regarding its data practices as necessary to support effective consent, and refraining from collecting data until it has obtained such consent; (2) requiring the development and implementation of a framework for data deletion and remediation to remedy the past nonconsensual generation of insights and predictions about students; (3) giving notice to each entity with which PowerSchool shared Class member data that the entity received data that was generated, collected, or shared without effective consent, and that the entity may face legal liability if it uses or shares that data for any reason; (4) giving a comprehensive notice of PowerSchool's past data practices, including identification of each entity with which PowerSchool shared Class member data; each entity's use or intended use of such Class member data; and a disclosure of the categories of predictions and inferences that PowerSchool made from such Class member data, including illustrative examples; (5) requiring that a minimal amount of data is

---

[110] Schulte Rpt. at 4, 64.

generated and collected; (6) requiring that data is used solely for the educational purpose for which it is generated, strictly defined; and that data is secured and shared with people and entities only on a need-to-know basis, as required by law, or with express consent; (7) requiring PowerSchool to automatically delete or turn over to class members their data once it is no longer needed by the entity that caused it to be generated; and (8) requiring an annual, independent audit to ensure PowerSchool's compliance with this relief.

There is no dispute that PowerSchool "has acted or refused to act on grounds that apply generally to the class" by (1) allowing the collection, use, sale, and solicitation of student data using the Data Warehouse Products, and (2) by selling and using its untested Student Profiling and Prediction Products despite not having consent to use student data to generate insights and predictions about students. "Rule 23(b)(2) does not require [courts] to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Ward v. United Airlines, Inc.*, No. 19-CV-03423-LB, 2021 WL 534364, at *7 (N.D. Cal. Feb. 12, 2021) (citation modified). That standard is easily met here. "Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998). Further, injunctive relief here would bring "important changes to reflect transparency in the system." *Brown v. Google, LLC*, No. 20-CV-3664-YGR, 2022 WL 17961497, at *20 (N.D. Cal. Dec. 12, 2022) (certifying classes under Rule 23(b)(2) for claims including invasion of privacy, intrusion upon seclusion where the plaintiffs sought similar injunctive relief related to collection, storage, and use of private data).[111]

For these reasons, Rule 23(b)(2) certification is appropriate because the requested relief applies uniformly to the Injunctive Relief Class and the challenged conduct is common to the entire Class, making a single injunction a proper and efficient remedy.

## V. CONCLUSION

Plaintiffs respectfully request the Court certify the classes under Rule 23(b)(2) and Rule 23(b)(3), appoint Plaintiffs as Class Representatives, and proposed counsel as Class Counsel.

---

[111] California law applies to the Multistate Injunctive Relief classes for the same reasons stated in Section VI.B.1. *See In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 529 (N.D. Cal. 2010) (certifying a nationwide Rule 23(b)(2) class after Defendant failed to identify any meaningful state-to-state variations in the applicable law).

Dated: September 28, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ Leonard W. Aragon

Leonard W. Aragon (*pro hac vice*)
E. Tory Beardsley (*pro hac vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
leonard@hbsslaw.com
toryb@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
904 Rio Grande Street, Suite 100
Austin, Texas 78701
Telephone: (512) 200-8028
julie.liddell@edtech.law
andrew.liddell@edtech.law

Whitney Siehl (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite2410
Chicago, Illinois 60611
whitneys@hbsslaw.com

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: 510.725.3000
shanas@hbsslaw.com

Attorneys for Plaintiffs