Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
904 Rio Grande Street, Suite 100
Austin, Texas 78701
Telephone: (512) 200-8028
julie.liddell@edtech.law
andrew.liddell@edtech.law

[Additional Counsel Listed on Signature Page]

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EMILY CHERKIN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>Defendant. | Case No.: 3:24-cv-02706-JD<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Judge: The Honorable James Donato<br><br>Hearing<br>Date: November 5, 2026<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. WHAT PLAINTIFFS ASK THE COURT TO CERTIFY .......... 1

III. ARGUMENT .......... 2

A. California Law Governs the Multistate Classes, and in Any Event There Is No Material Conflict Among the 35 Restatement States. .......... 2

1. California has significant contacts with every class member's claim. .......... 2

2. PowerSchool has not shown a material conflict among the 35 Restatement States. .......... 4

3. California's interest would be most impaired. .......... 5

4. If the Court has concerns about specific states, it should narrow the classes, not deny them. .......... 5

B. Common Questions Predominate for the Damages Classes, and the Injunctive Classes Share Common Questions. .......... 6

1. The relevant conduct is PowerSchool's, and it is uniform. .......... 6

2. The narrowed class definitions eliminate PowerSchool's hosting objection. .......... 6

3. PowerSchool's "data variation" evidence does not create individual issues that predominate. .......... 7

4. The third-party "sharing" evidence is common. .......... 9

5. The Profiling and Prediction evidence is common. .......... 9

6. Consent is a common question, and PowerSchool's own positions prove it. .......... 10

7. Whether students reasonably expect privacy in their education records is an objective, common question. .......... 11

8. Whether PowerSchool's conduct is highly offensive is an objective, common question. .......... 12

C. Common Questions Predominate for the Unjust Enrichment Claim. .......... 13

D. Damages Are Measurable on a Classwide Basis. .......... 13

1. The unjust enrichment model measures exactly the theory of liability. .......... 13

2. The actual damages model measures the value of the data PowerSchool used without consent. .......... 14

E. The Injunctive Relief Classes Satisfy Rule 23(a)(2) and (b)(2). .......... 15

IV. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013) .......... 14

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) .......... 12

*Brickman v. Fitbit, Inc.*,
No. 3:15-CV-02077-JD .......... 13

*Caldera v. Am. Med. Collection Agency*,
320 F.R.D. 513 (C.D. Cal. 2017) .......... 10

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) .......... 11

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......... 1, 13, 14

*Doe v. Gonzaga Univ.*,
24 P.3d 390 (Wash. 2001), *rev'd*, 536 U.S. 273 (2002) .......... 4

*Edwards v. Oportun, Inc.*,
193 F. Supp. 3d 1096 (N.D. Cal. 2016) .......... 15

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 4, 11, 13, 15

*Fairfield v. Am. Photocopy Equip. Co.*,
138 Cal. App. 2d 82 (1955) .......... 14

*Folgelstrom v. Lamps Plus, Inc.*,
195 Cal. App. 4th 986 (2011) .......... 12

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. 2025) .......... 6, 8, 11

*Gonzalez v. Am. Honda Motor Co., Inc.*,
720 F. Supp. 3d 833 (C.D. Cal. 2024) .......... 3

*Hageman v. Hyundai Motor Am.*,
No. CV 23-01045-CJC (C.D. Cal. Jan. 5, 2024) .......... 3

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020) (Donato, J.) .......... 5

*Hernandez v. Hillsides, Inc.*,
211 P.3d 1063 (Cal. 2009) .......... 5

*Hubbard v. Google LLC*,
No. 19-CV-07016-SVK (N.D. Cal. July 1, 2024) .......... 12

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) .......... 13

*L.B. v. LinkedIn Corp.*,
No. 5:24-CV-06832-EJD (N.D. Cal. Oct. 10, 2025) .......... 9

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) .......... 8, 13

*Lytle v. Nutramax Lab'ys, Inc.*,
114 F.4th 1011 (9th Cir. 2024) .......... 6, 13

*Manigault-Johnson v. Google, LLC*,
No. 2:18-CV-1032-BHH (D.S.C. Mar. 31, 2019) .......... 5

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) .......... 2, 3, 5

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) .......... 4

*Nat'l Foam, Inc. v. Zurich Am. Ins. Co.*,
No. 23-CV-03873-LB (N.D. Cal. Mar. 30, 2026) .......... 4, 5

*Opperman v. Path, Inc.*,
87 F. Supp. 3d 1018 (N.D. Cal. 2014) .......... 9

*Phillips v. Smalley Maint. Servs., Inc.*,
435 So. 2d 705 (Ala. 1983) .......... 4

*Reisberg v. Renaissance Learning, Inc.*,
No. 8:25-CV-01379-FWS-JDE (C.D. Cal. Sept. 11, 2026) .......... 12

*Rodriguez v. Google LLC*,
No. 20-CV-04688-RS (N.D. Cal. Jan. 3, 2024) .......... 11, 14

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 15

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) .......... 15

*Van v. LLR, Inc.*,
61 F.4th 1053 (9th Cir. 2023) .......... 6

*Zinser v. Accufix Rsch. Inst., Inc.*,
253 F.3d 1180 (9th Cir.), *amended*, 273 F.3d 1266 (9th Cir. 2001) ....4

**Statutes**

20 U.S.C. § 1232g ....5

Cal. Educ. Code §§ 49060–49085 ....5

**Other Authorities**

34 C.F.R. Part 99 ....5

California Constitution ....2

Fed. R. Civ. P. 12 .... 15

Fed. R. Civ. P. 23 ....1, 2, 4, 15

Fed. R. Civ. P. 26 ....8

Fed. R. Evid. 801, 901 ....8

Restatement (Second) of Torts § 652B .... 1, 4

Restatement (Third) of Restitution .... 14

# I. INTRODUCTION

PowerSchool's primary arguments are (1) California law cannot reach out-of-state class members; (2) district-level variation defeats commonality and predominance; and (3) Plaintiffs' damages models fail *Comcast*. None survives the narrowed classes. Plaintiffs no longer seek a nationwide class. The multistate classes are limited to 35 states that follow Restatement (Second) of Torts § 652B. The damages classes are limited to students whose districts used defined products that collect a defined set of baseline data and whose data PowerSchool itself hosts. Mot. at 9-10. The California constitutional and quasi-contract claims are limited to California subclasses, *id.* at 10, and the unjust enrichment damages model is limited to four Student Profiling and Prediction Products, measured by PowerSchool's own revenue and cost records. *Id.* at 23-24.

Those changes answer most of PowerSchool's opposition. PowerSchool spends pages on districts that host their own data, but those students are not in the damages classes. It spends pages on what districts tell parents but admits it has "no direct relationship or communication with parents or students" and "no mechanism ... to obtain direct consent." And it spends pages on what schools might upload, while designating its product-level Data Privacy Impact Assessments ("DPIAs") as the documents identifying the baseline data collected by each product. Dkt. 197-1, Ex. 48 at 6-7.

The core facts are undisputed and common. PowerSchool sells products that collect data and decides, as a uniform policy, that it does not need parental consent to use the data. Dkt. 197-1, Ex. 8 at 18-25. It then makes student records available to at least 213 partners and feeds them into predictive analytics products that it admits are [redacted], all without consent. Whether that uniform conduct invades a reasonable expectation of privacy in a highly offensive way is a question a jury can answer once, for everyone.

# II. WHAT PLAINTIFFS ASK THE COURT TO CERTIFY

**Damages classes (Rule 23(b)(3)).** Two 35-state classes and two mirror California subclasses: (1) the Student Data Warehouse Class (PowerSchool SIS or Connected Intelligence), and (2) the Student Profiling and Prediction Class (Data, Analytics and Insights f/k/a Unified Insights, Performance Matters, Behavior Support, and Attendance Intervention). Each is limited to students whose district used a listed product "and PowerSchool hosts the collected data for at least one product." Mot. at 9 & n.72. "Hosts" means the data is stored by PowerSchool in its cloud (AWS, Azure, or Snowflake) or in a PowerSchool-operated data center, in "contrast" to districts hosting their own data. *Id.*; Dkt. 197-1, Exs. 10, 16, 17.

**Injunctive classes (Rule 23(b)(2)).** A 35-state class and a California subclass covering nine products. Mot. at 1-3, 24-25.

**Claims**. Intrusion upon seclusion for all classes. Invasion of privacy under the California Constitution and quasi-contract/unjust enrichment for the California subclasses only. Mot. at 10, 20-21.[1]

## III. ARGUMENT

### A. California Law Governs the Multistate Classes, and in Any Event There Is No Material Conflict Among the 35 Restatement States.

PowerSchool's lead argument, choice of law, fails at each step of *Mazza*. And any doubts about particular states warrant carving them out, not denying certification.

#### 1. California has significant contacts with every class member's claim.

The threshold question is whether California has "significant contact or significant aggregation of contacts" to each class member's claims, such that applying its law is not arbitrary or unfair. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589-90 (9th Cir. 2012). The record easily clears it. First, PowerSchool is headquartered in Folsom, California, Dkt. 197-1, Exs. 1, 62, 63, 64, its contracts direct notices there, and its substantive customer communications issue from there. Dkt. 197-1, Exs. 25 at PWRSCHL_00007271, 65. The decisions underlying every claim, including that PowerSchool need not obtain parental consent and can fuel its predictive products with student data, are company-wide policies set by leadership. *See also* Mot. at 16 & nn. 86-87; Dkt. 195 ¶¶ 405-06.

Second, PowerSchool chose California law to govern its relationship with students. Its current Terms of Use, which apply to students who use its products or website, provide that "the relationship between you and PowerSchool will be governed by the laws of the State of California," and define "you" to include "student[s]" and "parents." Dkt. 197-1, Ex. 46 at 1, 5. PowerSchool calls this a "marketing website" document, Opp. at 1, 7, but it applies to anyone who uses the website or a "PowerSchool product." Dkt. 197-1, Ex. 46 at 1.[2] Class members, moreover, routinely use PowerSchool's website because district "Parent

---

[1] PowerSchool correctly notes that unjust enrichment, as a stand-alone cause of action in quasi-contract, is sought only by the California Student Profiling and Prediction Class, Opp. at 21 n.64; but Plaintiffs also seek unjust enrichment as a measure of damages for the Multistate Student Profiling and Prediction Classes as permitted by California law. Mot. at 23-24.

[2] *Cf.* Dkt. 197-1, Ex. 25 at PWRSCHL_00007322 § 14.1 (January 2021 standard Main Services Agreement, incorporated into the West Contra Costa ("WCC") contract, provides that U.S. customer agreements are governed by California law with venue in San Francisco).

Portals" used to upload materials into PowerSchool's products link to PowerSchool.com.[3]

PowerSchool nonetheless says no named plaintiff "accepted" the Terms of Use—although the terms are "accepted" simply by visiting the website—yet invokes district license agreements selecting a district's home state. Opp. at 7-8. It cannot disclaim its contracts when they point to California and wield them when they point elsewhere. Regardless, the Terms of Use yield to a customer agreement only "in case of any conflict," and there is none. Dkt. 197-1, Ex. 46 at 5. The customer agreements' governing-law clause reaches only disputes "as between the parties," Dkt. 197-1, Ex. 25 at PWRSCHL_00007322 § 14.1, and students are not parties. Although Plaintiffs do not sue on any contract, the Terms of Use show PowerSchool treats California as governing its direct relationships with students. Its prior selection of New York law, Opp. at 7-8, is no longer operative and says nothing about where PowerSchool made its decisions.

Third, PowerSchool's premise that non-California data is processed "via servers in [redacted]," Opp. at 6-7, misstates its witness, who testified that cloud regions are "determined by customers' locations typically" and that WCC's SIS is hosted in Azure's West Coast region in [redacted] Adendorff Ex. 8, Ahmad Tr. at 307:1-309:7. The [redacted] testimony concerns a disaster-recovery hypothetical. *Id.* at 218:4-10. Server location is, in any event, a poor proxy for where the decision to share and analyze children's data without consent was made: California. And PowerSchool's DPIAs state that data is held in the United States, not any particular state, confirming that the relevant conduct occurred in California, not where servers sit. *See* Dkt. 197-1, Exs. 2-3, 5-7, 19-21.

Fourth, *Mazza* did not hold that California headquarters cannot supply significant contacts; it assumed the threshold was met, in part because the company was in California, and decided the case on conflicts. 666 F.3d at 590. *Gonzalez* and *Hageman* were decided the same way. *Gonzalez v. Am. Honda Motor Co., Inc.,* 720 F. Supp. 3d 833, 846 (C.D. Cal. 2024); *Hageman v. Hyundai Motor Am.,* Case No.: SACV 23-01045-CJC, 2024 WL 694378, at *4 (C.D. Cal. Jan. 5, 2024).

Last, PowerSchool invokes the rule that a named plaintiff lacks "standing" to assert claims under other states' laws. Opp. at 6. But Plaintiffs assert one claim under one body of law, California's, which they contend applies to every class member. And once a named plaintiff has standing, whether she may represent

---

[3] *See, e.g., PowerSchool SIS*, WCCUSD, wccusd.powerschool.com/public/ (last visited Oct. 26, 2026).

absent class members is a Rule 23 question, not an Article III one. *Melendres v. Arpaio*, 784 F.3d 1254, 1261-62 (9th Cir. 2015).

**2. PowerSchool has not shown a material conflict among the 35 Restatement States.**

The burden now shifts to PowerSchool to show that each state's law materially differs from California's. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir.), *amended*, 273 F.3d 1266 (9th Cir. 2001); *Nat'l Foam, Inc. v. Zurich Am. Ins. Co.*, No. 23-CV-03873-LB, 2026 WL 873448, at *3 (N.D. Cal. Mar. 30, 2026) (explaining that "differs materially" means the "application of the laws leads to different results"). All 35 states follow the same § 652B standard for intrusion upon seclusion, which imposes liability for an intentional intrusion "upon the solitude or seclusion of another or his private affairs or concerns ... if the intrusion would be highly offensive to a reasonable person." Mot. at 16; Dkt. 197-1, Ex. 61. PowerSchool does not dispute that. It can only identify alleged differences in six states, but none are material.

**Alabama, Illinois, and Pennsylvania**. PowerSchool says these states require an intrusion that "caused or could be expected to cause mental suffering." Opp. at 8. That is not a separate element; it comes from a long-standing formulation of offensiveness: an intrusion "in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *See, e.g., Phillips v. Smalley Maint. Servs., Inc.*, 435 So. 2d 705, 708 (Ala. 1983) (applying § 652B). Measured by a "person of ordinary sensibilities," that test is objective and tracks the Restatement's "highly offensive to the ordinary reasonable man" standard, Restatement (Second) of Torts § 652B cmt. d, which is the same inquiry California applies.

**Louisiana**. PowerSchool cites a decision balancing the plaintiff's privacy interest against the defendant's interest in its course of conduct. Opp. at 8 (citing *Melder v. Sears, Roebuck & Co.*, 731 So. 2d 991, 1000 (La. App. 4 Cir. 1999)). California likewise weighs "the intruder's motives and objectives" and "countervailing interests." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606 (9th Cir. 2020).

**Missouri**. PowerSchool says Missouri requires "a secret and private subject matter." Opp. at 8. So does § 652B, which requires "private affairs or concerns." Whether hosted education records are private is the same question in both states, with a common answer.

**Washington**. PowerSchool claims Washington imposes a heightened causation standard but cites jury instructions expressly "based on Restatement (Second) of Torts § 652B (1977)." *Doe v. Gonzaga Univ.*, 24 P.3d 390, 399 (Wash. 2001), *rev'd,* 536 U.S. 273 (2002). And *Fisher*'s "deliberate" action requirement is

identical to California's and the Restatement's requirement that one "intentionally intrude." *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1072 (Cal. 2009).

At most, PowerSchool points to minor variations in phrasing without explaining how they are material.[4] Courts have found substantial similarity between California and states requiring additional elements, including requiring a "private" matter like Missouri does. *Manigault-Johnson v. Google, LLC*, No. 2:18-CV-1032-BHH, 2019 WL 3006646, at *4 n.3 (D.S.C. Mar. 31, 2019). Even within California, common law intrusion (two elements) and constitutional claims (three elements) are analyzed together because they involve "largely parallel elements." *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1193 (N.D. Cal. 2020) (Donato, J.). Differences in phrasing matter only if a standard "leads to different results," *Nat'l Foam*, 2026 WL 873448, at *3, which is not the case here.

**3. California's interest would be most impaired.**

Even with a true conflict, PowerSchool must show that another state's interest would be more impaired than California's. *Mazza*, 666 F.3d at 590. PowerSchool cites states' interests in their schools. Opp. at 9-10. But Plaintiffs do not challenge any school's conduct, and no cited statute authorizes a third-party vendor to share or process student data, as alleged here, without parental consent. FERPA (20 U.S.C. § 1232g; 34 C.F.R. Part 99) and its California counterpart (Cal. Educ. Code §§ 49060–49085) regulate schools' disclosures and do not immunize vendors. Dkt. 175 at 4-6. None of the student privacy laws passed since 2014, Opp. at 9, purports to be less protective of student privacy than FERPA, and no state would jeopardize its federal education funding by flouting it. Applying California law to a California company's uniform practices alters no state's education policy. It holds a California company to California standards.

**4. If the Court has concerns about specific states, it should narrow the classes, not deny them.**

If any state presents a material conflict, the remedy is to exclude it, not deny certification. Alternatively, Plaintiffs propose a multistate class omitting any conflicting state.[5] The California subclasses, moreover, raise no choice-of-law issue, and PowerSchool does not argue otherwise.

---

[4] *Katz-Lacabe v. Oracle America, Inc.* turned on a difference with Florida law, 668 F. Supp. 3d 928, 948-49 (N.D. Cal. 2023), and Florida is not in the classes.

[5] If the Court finds a conflict based on Washington law, Plaintiffs propose a Washington-only class represented by S.G.

### B. Common Questions Predominate for the Damages Classes, and the Injunctive Classes Share Common Questions.

PowerSchool's second argument is that district "variation" defeats commonality and predominance. Opp. at 10-21. The question is not whether districts are identical, but "whether the common, aggregation-enabling, issues in the case are more prevalent or more important than the non-common, aggregation-defeating, individual issues." *Frasco v. Flo Health, Inc.,* 349 F.R.D. 557, 571 (N.D. Cal. 2025) (cleaned up). The "method of proof" must "apply in common to all class members," not necessarily prevail. *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1026 (9th Cir. 2024). And PowerSchool must produce "sufficient evidence" that individualized issues will actually bar recovery, not merely speculate that they might. *Van v. LLR, Inc.*, 61 F.4th 1053, 1067 (9th Cir. 2023).

#### 1. The relevant conduct is PowerSchool's, and it is uniform.

PowerSchool mis-frames this case as "schools' use of varying PowerSchool products." Opp. at 1. It is about PowerSchool's own conduct, which does not vary. PowerSchool designs each product and documents, in a DPIA, the data it processes, how its products work, and who bears responsibility for notice and consent. Dkt. 197-1, Exs. 2-3, 5-7, 19-21. PowerSchool also designates those DPIAs as the documents that "identify the categories and uses of data relating to each such product." Dkt. 197-1, Ex. 48 at 6-7.

Every DPIA allocates responsibility the same way: PowerSchool is the "data processor," and it is PowerSchool's customer who must fulfill the notice and consent obligation. *See, e.g.,* Dkt. 197-1, Ex. 2 at PWRSCHL_00644404; *accord* Adendorff Ex. 6 §§ 6.6, 16.2; Adendorff Ex. 7 § 3.2. There is no evidence of any parent or adult student consenting to PowerSchool's practices, and PowerSchool admits it has "no mechanism for PowerSchool to obtain direct consent." Opp. at 3. And its designee testified that it [redacted] of its predictive analytics, and internal documents confirm those products are fueled by class members' data. Dkt. 197-1, Ex. 9, Flagg 30(b)(6) Tr. at 222:3-224:19, 226:19-227:10; Dkt. 197-1, Exs. 19-21. A jury can resolve these facts once for the classes.

#### 2. The narrowed class definitions eliminate PowerSchool's hosting objection.

PowerSchool's lead example of variation is that some districts, including S.G.'s, self-host SIS on servers that the districts themselves own and control. Opp. at 10. The damages classes, however, include only students whose data PowerSchool hosts on its cloud servers. Mot. at 9 & n.72. That is an objective fact in PowerSchool's systems, and its Cloud Operations officer explained it can look up by customer ID to see "if

they are hosted or not hosted." Adendorff Ex. 8, Ahmad Tr. at 307:6-19. PowerSchool produced hosting reports and bookings data identifying hosted customers by product. Dkt. 197-1, Exs. 24, 28, 43. Class membership turns on PowerSchool's records, not individual inquiry.

PowerSchool's remaining hosting arguments concern the named plaintiffs, but the record confirms their schools hold baseline data for them. PowerSchool, for example, claims there is no evidence of what it hosts for the Concepción children "other than their names." Opp. at 10-11. But its witness testified it hosts WCC's SIS in Azure, Adendorff Ex. 8, Ahmad Tr. at 308:7-309:2, and its bookings show WCC paying for "PowerSchool SIS Hosting" throughout the class period for the entire district's enrollment. Dkt. 197-1, Ex. 28. WCC also sent the family PowerSchool-generated reports coded for medical and behavioral issues, Dkt. 197-1, Exs. 49-50, and required medical information, IEP documents, and a birth certificate to be uploaded to PowerSchool. Dkt. 197-1, Exs. 51-53. Further, Mr. Concepción interacts with the PowerSchool parent portal to upload and receive sensitive data, and was notified by PowerSchool that his family's data within the PowerSchool SIS was affected by the PowerSchool breach. Aragon Reply Decl. Ex. 1; *see also* Dkt. 197-1 at 6-7 (citing nn. 44-49) (describing PowerSchool's use at WCC); Dkt. 143-2 at ¶¶ 10-11 (March 13, 2026, Decl. of David Concepción).

As to S.G., PowerSchool says, "there is no evidence PowerSchool ever hosted [S.G.'s] sensitive data." Opp. at 11. But SPS's witness testified that PowerSchool stores SPS student data in the cloud in its "analytics and insights module, which holds student intervention data, and then also Naviance," Dkt. 197-1, Ex. 42, Jaeger Tr. at 50:24-51:9, and PowerSchool's own records show PowerSchool previously hosted SPS's SIS data during the class period. Dkt. 197-1, Ex. 43. PowerSchool also produced records with S.G.'s sensitive information including the following fields: gender, age, race, ethnicity, language, special-education, gifted status, English-learner, homeless, "at risk" indicator fields, standardized-test scores, birthdate, email, class year, 504-accommodations, IEP fields, login logs with timestamps, and IP addresses. Dkt. 197-1, Exs. 56-60.

**3. PowerSchool's "data variation" evidence does not create individual issues that predominate.**

PowerSchool claims "[t]here is no uniform set of student data." Opp. at 3, 14-15. Not so. First, its own DPIAs list each product's data elements, which its designee called the "standard" elements, and which PowerSchool's interrogatory responses identify as each product's "categories and uses of data." Dkt. 197-1, Ex. 48 at 6-7. PowerSchool's economist concedes the SIS import template has 34 baseline fields, including 11

required fields for every student. Adendorff Ex. 9, Bartlett Rpt. ¶ 64 & n.142. And Connected Intelligence replicates whatever is in the products that feed it, including PowerSchool SIS. Dkt. 197-1, Ex. 3.

Second, Appendix A to PowerSchool's Opposition does not measure what is in PowerSchool's products despite PowerSchool having access to such information; it ostensibly summarizes what ten districts "disclose they may collect" in handbooks and policies. Opp. at 3-4; App. A at 4. It's unclear how the materials were collected or analyzed, or why PowerSchool did not analyze the actual data elements its products collect for those schools. The materials should be disregarded as undisclosed, unauthenticated, unhelpful hearsay. Fed. R. Civ. P. 26(a); Fed. R. Evid. 801, 901. Even if they are considered, every district collects 23-45 categories of data. That some may omit certain data elements is of no consequence because it confirms that districts collect a baseline student record that is consistent with the DPIA and that districts collect substantially more than the baseline elements in the DPIAs. Even PowerSchool's cherry-picked districts show at least seven identical data elements collected, including protected health information. App. A at 1-3.

Third, the amount of data stored does not change the liability question. The Data Warehouse Class challenges PowerSchool's hosting and processing of education records without effective consent; the Profiling and Prediction Class challenges its use of students' data to power products PowerSchool [redacted]. Neither depends on whether a district added a field for shoe size. *See* Adendorff Ex. 9 ¶ 63 (example of additional data elements schools can collect). Whether hosting the baseline record without consent is a highly offensive intrusion has the same answer for every class member. Variation in additional data goes, at most, to damages, and "the presence of individualized damages cannot, by itself, defeat class certification." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

This Court rejected the same argument in *Frasco*, finding it "not obvious that fine degrees of privacy expectations [were] in play." 349 F.R.D. at 582. PowerSchool says the data there was uniformly sensitive, Opp. at 15, but so is a minor's education record held by a for-profit company, which includes at least identity, school, grade, and enrollment, Adendorff Ex. 9 ¶ 64, plus demographics, grades, attendance, and, for SIS, health data. Dkt. 197-1, Ex. 2 at PWRSCHL_00644399, 00644403. Whether a reasonable person expects that record to be private is one question with one answer.

PowerSchool's cases are not helpful. *In re iPhone Application Litigation* and *Cousin v. Sharp Healthcare* are pleading-stage decisions about whether particular data—not at issue here—was sensitive enough to state a claim. Opp. at 14. They show that sensitivity is decided on an objective, category-wide basis, which is exactly why the sensitivity question is common here. Similarly, *In re Meta Pixel Healthcare Litig.* distinguished actionable health communications from non-actionable "usage and engagement" data, a distinction a jury can draw across the class here, if it is relevant at all given that usage and engagement data is not the basis for Plaintiffs' claims. 647 F. Supp. 3d 778, 801 n.13 (N.D. Cal. 2022).

**4. The third-party "sharing" evidence is common.**

PowerSchool says sharing is district-specific because it occurs "at the direction ... of schools." Opp. at 4-5, 15-16. That is itself a common answer. PowerSchool's sharing is governed by uniform contract terms and PowerSchool's own partner integrations, which PowerSchool identified in its interrogatory responses. Dkt. 197-1, Ex. 8 at 10-16, Ex. 13 at 15-26. PowerSchool's own diligence materials describe a standard "Basic Data Flow" in which either the "Customer directs PowerSchool to share customer data" or a "Partner requests PowerSchool share customer data." Dkt. 197-1, Ex. 11 at PWRSCHL_00004414. Whether PowerSchool's sharing through that standard architecture, without parental consent, contributes to an actionable intrusion is a question with a classwide answer.

More fundamentally, the Data Warehouse claim does not depend on proof that each class member's data was shared with a third party. The intrusion is PowerSchool making student records available to at least 213 partners without effective consent. *See Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1058-59 (N.D. Cal. 2014) ("The intrusion itself makes the defendant subject to liability" (citing Restatement (Second) of Torts § 652B cmt. a)). Sharing, which PowerSchool does not dispute, is additional common evidence of offensiveness and motive. *L.B. v. LinkedIn Corp.*, No. 5:24-CV-06832-EJD, 2025 WL 2899514, at *7 (N.D. Cal. Oct. 10, 2025).

**5. The Profiling and Prediction evidence is common.**

PowerSchool says districts configure their own analytics. Opp. at 5, 11, 16. But the claim turns not on which model a district runs, but on PowerSchool ingesting student data into its analytics products that it sold [redacted]. Mot. at 4-5, 14. That conduct is uniform. PowerSchool admits that its analytics products draw data "mostly [from] SIS" and that data from all products can be uploaded into Unified Insights for

analysis. Dkt. 197-1, Ex. 9, Flagg Tr. at 181:6-182:12. PowerSchool prices analytics subscriptions by enrolled student, not by students analyzed. Dkt. 197-1, Ex. 65 ([redacted]). Also, the DPIAs confirm that the products are fueled by student data, *id.* at Exs. 19-21, and the company's own designee admitted it does [redacted] the products' algorithms or outputs. *Id.* at Ex. 9 at 222:3-224:19. The evidence proving the claim is common.

PowerSchool says S.G. opted out of analytics. Opp. at 16 (citing Adendorff Ex. 44, Cherkin Tr. 149:1-4). But the cited testimony concerns S.G.'s brother and an unrelated curriculum, Adendorff Ex. 44 at 149, and SPS's Analytics and Insights module, hosted by PowerSchool, "holds student intervention data" and derives its data from PowerSchool's SIS, which undisputedly holds S.G.'s data. Dkt. 197-1, Ex. 42 at 50:24-51:4. As for the Concepción children, PowerSchool calls WCC's analytics license a "one-year trial," Opp. at 5, 11, but its bookings show WCC subscribing to hosted analytics across the district's full enrollment. Dkt. 197-1, Exs. 26, 28, 65. The claim, moreover, does not rest on individual predictions but on PowerSchool's use of class data to power untested products. Mot. at 21.[6]

**6. Consent is a common question, and PowerSchool's own positions prove it.**

PowerSchool argues consent cannot be resolved "in one stroke" across 10,000 districts. Opp. at 12-14. Three things defeat that argument. First, PowerSchool has told this Court its consent defense "does not turn at all on whether parents also consented," but on authorization by "governments—including legislatures and elected school boards." Dkt. 170 at 31. Its summary judgment motion similarly argues that actual consent is not required at all under FERPA and California law. Dkt. 201 at 1-2, 10. Each position is a legal question with one answer. PowerSchool cannot argue for summary judgment that consent is legally irrelevant for every student while insisting it be tried student-by-student.

Second, the record shows a uniform absence of direct consent. Opp. at 3; Dkt. 197-1, Ex. 2 at PWRSCHL_00644404; Ex. 14, Shinton Tr. at 15:16-18:8; Adendorff Ex. 6 §§ 6.6, 16.2. Absent evidence of individualized consent, courts "will not presume that resolving such issues requires individualized inquiries." *Caldera v. Am. Med. Collection Agency*, 320 F.R.D. 513, 519 (C.D. Cal. 2017).

[6] Dr. O'Neil's testimony that assessing harm to a particular student would require individualized review, Opp. at 16-17, is beside the point. Plaintiffs do not ask the jury to assess any prediction. Her opinions go to offensiveness and to the equities of unjust enrichment, both common questions.

Third, PowerSchool's examples are district-level documents, not individual consents, and none "explicitly notif[ies]" parents of "the conduct at issue." *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024); *Frasco*, 349 F.R.D. at 574-75. They address network privacy, "directory information," and approved software. Opp. at 12-13. None disclose that a private company will host children's education records, feed them into [redacted] analytics products, or make them available to 213 partners. The WCC handbook, for example, states that the law permits districts "…to consent to the collection of personal information on behalf of all of its students…." Dkt. 197-1, Ex. 8 at 23 (quoting WCC Handbook § 8.10A). That is not informed consent; it says the district will consent to collection, which Plaintiffs do not contest. Whether PowerSchool may then share that data with partners or feed it into an [redacted] prediction product is a common question for trial.

**7. Whether students reasonably expect privacy in their education records is an objective, common question.**

PowerSchool argues expectations of privacy vary with state laws and local policies. Opp. at 17-18. But the inquiry is objective, *Rodriguez v. Google LLC*, No. 20-CV-04688-RS, 2024 WL 38302, at *4-5 (N.D. Cal. Jan. 3, 2024), and considers the "customs, practices, and circumstances" surrounding the data. *In re Facebook Internet Tracking*, 956 F.3d at 602. Here, those circumstances are common: compulsory attendance, a minor's education record, and a for-profit vendor that hosts and uses data without asking parents. State statutes do not change that. The statutes PowerSchool cites, Opp. at 17, regulate what *schools* may collect or disclose; they do not authorize third-party *vendors* to share records without consent, fuel [redacted] prediction products, or otherwise create a vendor defense. *See* Dkt. 175 at 4-6. PowerSchool's California cases, *Moon*, *Kight*, and *Hataishi*, involved different laws and claims with different elements and turned on each person's individual *informed* consent or their varying "business relationship" with the defendants. Opp. at 18. Here, no class member was ever given the opportunity to provide informed consent, and every class member uniformly lacked any business relationship with PowerSchool.

FERPA's "directory information" category does not help PowerSchool either. Opp. at 17-18. This case is not about a school publishing a student directory. It is about PowerSchool's sharing and use of complete education records. Directory information is a small subset of the record and, if relevant, could be excluded from the intrusion analysis on a classwide basis.

**8. Whether PowerSchool's conduct is highly offensive is an objective, common question.**

PowerSchool claims the mere collection of student data cannot be highly offensive but cites pleading-stage ed-tech decisions involving materially different collections, disclosures, and uses. *Hubbard v. Google LLC*, No. 19-CV-07016-SVK, 2024 WL 3302066, at *2, *7-8 (N.D. Cal. July 1, 2024) ("unique identifiers" in "cookies" that "reasonable users should expect" companies to collect); *Reisberg v. Renaissance Learning, Inc.,* No. 8:25-CV-01379-FWS-JDE, 2026 WL 2678223, at *2 and n. 2 (C.D. Cal. Sept. 11, 2026) ("metadata" the company disclosed it would use commercially). Plaintiffs allege more than collection, and no comparable disclosures or expectations exist. Those cases also support certification as each resolved offensiveness for every user at once, confirming the question is objective and resolvable classwide.

PowerSchool argues offensiveness may vary by locality, but the state laws it cites merely authorize *schools* to contract with vendors. Opp. at 17. No state or local law authorizes a vendor to engage in the conduct alleged here. *See id.* And the offensiveness factors turn on common evidence: what PowerSchool's products do, how PowerSchool uses and profits from the data those products collect, whether PowerSchool [redacted] them, and the baseline student records common to every class member. PowerSchool conflates laws permitting a vendor to collect data in the first instance with a vendor's subsequent sharing of that data with third parties, or using it to power [redacted] products, without informed consent. PowerSchool's reference to government agencies is also misplaced because Plaintiffs' claims are not based on disclosures to local, state, or federal officials but on sharing data with 213 third-party partners. As in *Reisberg* and *Hubbard*, which resolved offensiveness without considering local laws, a jury can decide on a classwide basis whether PowerSchool's conduct is highly offensive—a merits question that can wait for trial. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459-60, 466 (2013).

Last, PowerSchool's argument that conduct "within the ordinary course of a lawfully authorized business" cannot be highly offensive, Opp. at 19 (citing *Folgelstrom v. Lamps Plus, Inc.,* 195 Cal. App. 4th 986, 992 (2011)), is a merits defense that applies equally to every class member. It is also nonsensical, as the case law it cites has nothing to do with the egregious conduct at issue here. *See, e.g., Folgelstrom,* 195 Cal. App. 4th at 992 (finding that collecting zip codes from consumers and mailing coupons or advertisements is not an egregious breach of social norms).

### C. Common Questions Predominate for the Unjust Enrichment Claim.

PowerSchool argues that the unjust enrichment/quasi-contract claim depends on district-specific facts and that lack of testing and consent are not tied to the elements. Opp. at 20-21. Not so. The enrichment is PowerSchool's revenue from selling four [redacted] Student Profiling and Prediction Products powered by class members' data. Mot. at 20-21; *In re Facebook Internet Tracking*, 956 F.3d at 599-600 (California recognizes disgorgement of unjustly earned profits "even where an individual has not suffered a corresponding loss"). The unjustness is selling [redacted] products using student data without effective consent. Both elements are commonly proven. And unjust enrichment predominates where "it is difficult to conceive of any significant equitable differences between class members," *Brickman v. Fitbit, Inc.*, No. 3:15-CV-02077-JD, 2017 WL 5569827, at *7 (N.D. Cal. Nov. 20, 2017) (Donato, J.); there are none here because no school, district, or anyone else authorizes the uniform conduct at issue.

PowerSchool's cases do not apply. In *Berger v. Home Depot*, unjustness depended on what each customer was told; in *Countrywide*, independent brokers, rather than the defendant, made representations. 741 F.3d 1061, 1070 (9th Cir. 2014); 277 F.R.D. 586, 608-609 (S.D. Cal. 2011). In contrast, PowerSchool's conduct here is the same for all, as PowerSchool has not shown that any third party gave informed consent.[7]

### D. Damages Are Measurable on a Classwide Basis.

PowerSchool's third argument is that Schulte's models fail *Comcast*. Opp. at 21-24. A model need "measure only those damages attributable to" the liability theory, *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), not each member's damages precisely. *Leyva*, 716 F.3d at 513-14; *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120-21 (9th Cir. 2017). A reliable, not-yet-executed model suffices. *Lytle*, 114 F.4th at 1019.

#### 1. The unjust enrichment model measures exactly the theory of liability.

Plaintiffs' unjust enrichment theory is that PowerSchool should not have sold the four [redacted] products at all. Mot. at 20-21. Schulte measures PowerSchool's U.S. profits from those products, net of cost of revenues, from its internal records, excluding products he could not apportion. *See* Dkt. 197, Ex. A ("Schulte Rpt.") ¶¶ 4 & n.3, 66, 74-76, 87-91. The model fits the theory. *Comcast*, 569 U.S. at 35.

---

[7] PowerSchool's point about districts that "self-manage" analytics, Opp. at 21, is unclear, as it says nothing about PowerSchool's analytic products in the LAUSD or elsewhere. Defendant's claim there is no evidence the Concepcións' data was used in PowerSchool's prediction products is baseless. *See* analysis at III.B.2.

That the model may include revenue from "lawful" functionality, Opp. at 23-24, is an apportionment dispute, not a *Comcast* problem. Plaintiffs must reasonably approximate the gain; the defendant bears the burden of proving deductions and apportionment. Schulte Rpt. ¶ 63; Restatement (Third) of Restitution & Unjust Enrichment § 51(5)(d) (2011). PowerSchool's own economist utilized Schulte's methodology and, with her own inputs, calculated damages [redacted]. Aragon Reply Decl. Ex. 2. When both experts use the same classwide method, damages are measurable classwide.

Schulte also explained his figures "can be readily apportioned across the Classes," including to California using PowerSchool's records of students per state, district, or school. Schulte Rpt. ¶¶ 134-135. PowerSchool's bookings data contains each sale by customer, billing state, product, and booking amount, Dkt. 197-1, Ex. 28, and Schulte already apportioned U.S. from global revenue the same way. Schulte Rpt. ¶¶ 74-75, 87-88. Applying a state share drawn from PowerSchool's own state-level bookings is the same arithmetic on the same records. That is not "rank speculation."

**2. The actual damages model measures the value of the data PowerSchool used without consent.**

Plaintiffs' actual damages theory is that PowerSchool took and used something of value—students' data—without consent or compensation. Mot. at 23. Schulte values it using the price PowerSchool negotiated at arm's length for student records with a third-party partner, taking the most conservative figure, about [redacted] per record, as a classwide floor. Schulte Rpt. ¶¶ 93, 128-133. California recognizes general damages for invasion of privacy without proof of pecuniary loss. *See, e.g., Fairfield v. Am. Photocopy Equip. Co.*, 138 Cal. App. 2d 82, 88-89 (1955). And courts certify privacy classes using similar values. *Rodriguez*, 2024 WL 38302, at *11-13 (actual damages model based on fair market value of similar data).

PowerSchool's objections to the [redacted] comparator, Opp. at 22-23, "go to the weight of the testimony," not admissibility. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013). Each objection applies identically to every class member, and the jury can adjust the value figure classwide. And that consented data is worth more, Opp. at 23, only confirms that consent, which PowerSchool never obtained, is what makes data lawfully saleable.

*Wal-Mart Stores, Inc. v. Dukes*' "Trial by Formula" passage, Opp. at 23, rejected sampling under Title VII's statutory framework not at issue here. 564 U.S. 338, 366-67 (2011). Schulte, however, applies a single value to a class defined by PowerSchool's records, and representative evidence may establish classwide

damages where, as here, each class member could rely on the same evidence in an individual suit. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454-57 (2016).

### E. The Injunctive Relief Classes Satisfy Rule 23(a)(2) and (b)(2).

PowerSchool argues the injunctive classes lack common questions. Opp. at 11-12. But Rule 23(a)(2) requires only one. *Dukes*, 564 U.S. at 359. Every product and claim is covered by the same overarching policy: PowerSchool does not obtain parental consent for the alleged conduct. Dkt. 197-1, Ex. 8, PowerSchool's Responses and Objections to Interrogatories at 18-25; Ex. 14, Shinton Tr. at 15:16-18:8. Because PowerSchool "has acted or refused to act on grounds that apply generally to the class," a single injunction—notice, consent, deletion, and an independent audit—would provide relief to all, and predominance is not required. Fed. R. Civ. P. 23(b)(2); *Dukes*, 564 U.S. at 360. The Naviance, Schoology, and MTSS DPIAs show the same consent deficiencies, Dkt. 197-1, Exs. 5-7, and Naviance is the product through which PowerSchool contemplated [redacted]. Schulte Rpt. ¶¶ 93-133.[8] If the Court finds the class overbroad, it may exclude conflicting states, certify the California subclass alone, or limit the injunctive classes to the six damages-class products or to PowerSchool SIS, used by [redacted]. Dkt. 197-1, Ex. 31 at 15; *Edwards v. Oportun, Inc.*, 193 F. Supp. 3d 1096, 1100 (N.D. Cal. 2016) (court may "redefine the class at the class certification stage").

## IV. CONCLUSION

This case is about one company making a handful of choices: to host and offer to share children's education records without asking their parents, to sell [redacted] analytics built on that data, and to profit from both. Those choices, and the questions they raise, are common to every class member. The Court should certify the proposed classes, appoint Plaintiffs as class representatives, and appoint Hagens Berman Sobol Shapiro LLP and EdTech Law Center PLLC as class counsel, or, alternatively, certify the narrowed classes described in Part III.A.4.

---

[8] PowerSchool "preserves" arguments, Opp. at 24, that Plaintiffs addressed in their motion and previously, Dkt. 149 at 10-13, and the narrowed classes strengthen Plaintiffs' showing. As to PowerSchool's reference to its Rule 12(b)(1) motion, Opp. at 19, an intrusion on privacy is a concrete injury. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021); *In re Facebook Internet Tracking*, 956 F.3d at 598-99.

Dated: October 26, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By <u>/s/ Leonard W. Aragon</u>
Leonard W. Aragon (*pro hac vice*)
E. Tory Beardsley (*pro hac vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
leonarda@hbsslaw.com
toryb@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
904 Rio Grande Street, Suite 100
Austin, Texas 78701
Telephone: (512) 800-8028
julie.liddell@edtech.law
andrew.liddell@edtech.law

Whitney Siehl (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
Telephone: (708) 628-4949
whitneys@hbsslaw.com

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

Attorneys for Plaintiffs