Shana E. Scarlett (217895)
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EdTech Law Center PLLC
904 Rio Grande Street, Suite 100
Austin, Texas 78701
Telephone: (512) 200-8028
julie.liddell@edtech.law
andrew.liddell@edtech.law

[Additional Counsel Listed on Signature Page]

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

EMILY CHERKIN, et al.,

Plaintiffs,

v.

POWERSCHOOL HOLDINGS, INC.,

Defendant.

Case No.: 3:24-cv-02706-JD

**PLAINTIFFS' OPPOSITION TO DEFENDANT POWERSCHOOL HOLDINGS, INC.'S MOTION TO EXCLUDE THE OPINIONS OF DR. K. SUZANNE BARBER**

Judge: The Honorable James Donato

<u>Hearing</u>
Date: January 14, 2027
Time: 11:00 a.m.
Courtroom: 11, 19th Floor

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. LEGAL STANDARD .......... 1

III. BACKGROUND .......... 2

IV. ARGUMENT .......... 3

A. Dr. Barber's use of data elements, methodology, and analysis are reliable .......... 5

B. Dr. Barber's opinion on "sensitive" data constitutes permissible expert opinion .......... 7

C. PowerSchool risks exposing personally identifiable information .......... 9

D. PowerSchool risks harm to students by its collection and storage of sensitive information. .......... 11

E. The information collected and stored by PowerSchool has value. .......... 12

F. Dr. Barber does not repackage hearsay .......... 13

G. Dr. Barber's opinions are tied to the claims and facts of this case. .......... 14

V. CONCLUSION .......... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple Inc. Sec. Litig.*,
No. 4:19-CV-02033-YGR, 2023 WL 4556765 (N.D. Cal. July 17, 2023) .......... 10, 14

*BladeRoom Grp. Ltd. v. Facebook, Inc.*,
No. 5:15-CV-01370-EJD, 2018 WL 1611835 (N.D. Cal. Apr. 3, 2018) .......... 13

*CZ Services, Inc. v. Express Scripts Holding Co.*,
No. 3:18-CV-04217-JD, 2020 WL 4518978 (N.D. Cal. Aug. 5, 2020) .......... 6

*Dep't of Toxic Substances Control v. Technichem, Inc.*,
No. 12-CV-05845-VC, 2016 WL 1029463 (N.D. Cal. Mar. 15, 2016) .......... 10

*Domingo ex rel. Domingo v. T.K.*,
289 F.3d 600 (9th Cir. 2002) .......... 11

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) .......... 3

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 3, 4, 14

*In re Google Location Hist. Litig.*,
428 F. Supp. 3d 185 (N.D. Cal 2019) .......... 3

*GPNE Corp. v. Apple, Inc.*,
No. 12-CV-02885-LHK, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) .......... 7

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) .......... 14

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) .......... 6, 8

*Hernandez v. Hillsides, Inc.*,
211 P.3d 1063 (Cal. 2009) .......... 3, 14

*Innovation Ventures, LLC v. Custom Nutrition Labs, LLC*,
No. 4:12-CV-13850-TGB-MJH, 2021 WL 12255004 (E.D. Mich. Sept. 29, 2021) .......... 8

*Koger v. Costco Wholesale Corp.*,
No. 3:20-CV-08759-JD, 2023 WL 8188842 (N.D. Cal. Nov. 27, 2023) .......... 13, 14

*Osborn v. Boeing Airplane Co.*,
309 F.2d 99 (9th Cir. 1962) .......... 3

*Pascal v. Nissan N. Am., Inc.*,
No. 820-CV-00492-JLS-JDE, 2022 WL 19076763 (C.D. Cal. Dec. 21, 2022) ....................7

*Porter v. Martinez*,
68 F.4th 429 (9th Cir. 2023) ....................1

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) ....................1

*Reflex Media, Inc. v. SuccessfulMatch.com*,
758 F. Supp. 3d 1046 (N.D. Cal. 2024) ....................1

*Siqueiros v. GM LLC*,
No. 16-CV-07244-EMC, 2022 WL 74182 (N.D. Cal. Jan. 7, 2022) ....................6, 10, 14

*Sonneveldt v. Mazda Motor of Am., Inc.*,
No. 23-55325, 2024 WL 5242611 (9th Cir. Dec. 30, 2024) ....................11

*In re Toyota Motor Corp.*,
978 F. Supp. 2d 1053 (C.D. Cal. 2013) ....................7, 8

*U.S. v. Cal.*,
932 F.2d 1346 (9th Cir. 1991), *aff'd*, 507 U.S. 746 (1993) ....................3, 4, 14

*Waymo LLC v. Uber Techs., Inc.*,
No. C 17-00939 WHA, 2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ....................10, 14

*Wendell v. GlaxoSmithKline LLC*,
858 F.3d 1227 (9th Cir. 2017) ....................2

**Other Authorities**

California Constitution ....................2, 3

Fed. R. Civ. P. 33(d) ....................6

Fed. R. Evid. 702(a) ....................*passim*

Fed. R. Evid. 703 ....................13

# TABLE OF EXHIBITS

**Exhibits already of record**

| Dkt. | Exhibit | Description | Page |
|---|---|---|---|
| Dkt. 151-1 | A | Excerpts of the March 2, 2026 Deposition of Dr. K. Suzanne Barber and Exhibit 11 | 4, 8, 9, 11, 12, 13 |
| Dkt. 197 | C | Expert Report of K. Suzanne Barber | 4, 5, 6, 7, 10, 11 |
| Dkt. 197-1 | 2 | DPIA Report – PowerSchool SIS [PWRSCHL_00644395] | 5 |
| Dkt. 197-1 | 3 | DPIA Report – Connected Intelligence [PWRSCHL_00644386] | 5 |
| Dkt. 197-1 | 5 | DPIA Report – Naviance [PWRSCHL_00644472] | 5 |
| Dkt. 197-1 | 6 | DPIA Report – Schoology Learning [PWRSCHL_00644375] | 5 |
| Dkt. 197-1 | 7 | DPIA Report – MTSS [PWRSCHL_00646371] | 5 |
| Dkt. 197-1 | 48 | PowerSchool Holdings, Inc.'s Supplemental Responses and Objections to Plaintiffs' Non-Uniform Interrogatories 2, 3, 7, 8 | 6 |

## I. INTRODUCTION

PowerSchool's renewed motion to exclude the opinions of Plaintiffs' expert witness, Dr. K. Suzanne Barber ("Mot." or "Motion") (Dkt. 204), largely repackages the arguments PowerSchool made in its prior motion (Dkt. 134) and, like that motion, mischaracterizes Dr. Barber's opinions and the purposes of her testimony. Dr. Barber's opinions relate to the risk of harm associated with PowerSchool's collection and storage of students' personally identifiable information. The opinions will aid the jury in determining whether PowerSchool's conduct was highly offensive for the purposes of proving Plaintiffs' privacy claims, and whether PowerSchool's conduct was unfair or unjust for the purposes of proving Plaintiffs' quasi-contract claim. PowerSchool recasts those opinions as claims of actual harm or as mere summaries of data. They are neither. Dr. Barber opines on the risk of harm, and she reaches her opinions by applying PowerSchool's own data to a published, peer-reviewed model. PowerSchool's criticisms of Dr. Barber's report go to weight, not admissibility. Because PowerSchool's arguments are based on mischaracterizations or otherwise fail, the Motion should be denied.

## II. LEGAL STANDARD

Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The "district judge is a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (internal quotation and citation omitted). "The touchstones for admissibility under Rule 702 are the relevance and reliability of the expert witness's opinions.'" *Reflex Media, Inc. v. SuccessfulMatch.com*, 758 F. Supp. 3d 1046, 1049 (N.D. Cal. 2024) (Donato, J.) (citation and quotation omitted). "The test of reliability is flexible, and the Court looks at whether the reasoning and methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* (citation and quotation omitted). Importantly, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Porter v. Martinez*, 68 F.4th 429, 444 (9th Cir. 2023) (citations and quotations omitted).

Ultimately, "Rule 702 should be applied with a liberal thrust favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citations and quotations omitted). Against these standards, Defendant's Motion must be denied.

## III. BACKGROUND

PowerSchool misunderstands Plaintiffs' claims and the evidence needed to support them. This is not a data-breach case. Rather, this is a case about PowerSchool not obtaining effective consent to collect and share information about schoolchildren and sell [redacted] products that are fueled by student data. PowerSchool's 2024 data breach is not the basis of Plaintiffs' claims; it is one real-world illustration of the risk to which PowerSchool exposes students by collecting and holding their information without effective consent. *See* Mot. at 8–9. Plaintiffs do not offer Dr. Barber's testimony to aid the jury in determining actual harm to Plaintiffs; they offer it to aid the jury in determining the *risk* of harm to Plaintiffs, which, as explained further below, relates to the issues of whether PowerSchool's conduct was highly offensive for the purposes of proving Plaintiffs' privacy claims, and whether PowerSchool's conduct was unjust for the purposes of proving Plaintiffs' quasi-contract claim.

Key facts are not in dispute. PowerSchool admits to collecting large volumes of information about schoolchildren. *See* Dkt. 197, Plaintiffs' Notice of Motion, Motion for Class Certification, and Memorandum of Points and Authorities in Support at 1–6. And it admits to sharing that information widely, with more than 213 third-party partners, and monetizing it. *See id.* at 2–3. It also admits that it sells prediction products to schools that are [redacted] for accuracy, bias, or reliability. *Id.* at 4-6. Those [redacted] prediction products, moreover, are fueled by student data. All this is done without effective consent. Thus, Plaintiffs seek certification of claims for common law intrusion upon seclusion and invasion of privacy under the California Constitution, and a claim for unjust enrichment and disgorgement under a quasi-contract theory, Dkt. 197, at 9–10. These claims require, respectively, evidence that PowerSchool's privacy invasions are highly offensive and evidence that PowerSchool's actions are unfair or unjust.

**Privacy.** To state a claim for intrusion upon seclusion under California common law, a plaintiff must plead that (1) a defendant "intentionally intrude[d] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy[,]" and (2) the intrusion "occur[red] in a manner highly

offensive to a reasonable person." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020) (citing *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1072 (Cal. 2009)).

A claim for invasion of privacy under the California Constitution involves similar elements. Plaintiffs must show that (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is "so serious . . . as to constitute an egregious breach of the social norms" such that the breach is "highly offensive." *Id.* (citing *Hernandez*, 211 P.3d at 1073). Because of the similarity of the tests, courts tend to consider the claims together and ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive. *Id.*

In determining liability under these claims, the jury must therefore assess, *inter alia*, whether the intrusion is highly offensive to a reasonable person. *In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 196 (N.D. Cal 2019) (citation modified); *see also* Judicial Council of Cal., Civil Jury Instr. No. 1800 (Right of Privacy) at 1118. Whether an alleged invasion is "highly offensive," "serious," or an "egregious breach of social norms" requires "holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 606. "While analysis of a reasonable expectation of privacy primarily focuses on the nature of the intrusion, the highly offensive analysis focuses on the degree to which the intrusion is unacceptable as a matter of public policy." *Id.*; *Hernandez*, 211 P.3d at 1073 (weighing the degree of offensiveness "essentially involves a 'policy' determination as to whether the alleged intrusion is 'highly offensive' under the particular circumstances").

**Quasi-contract/unjust enrichment.** For this claim, "a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016). Quasi-contract liability is dictated by the needs of justice and fairness, and rests upon equitable considerations. *See U.S. v. Cal.*, 932 F.2d 1346, 1350 (9th Cir. 1991), *aff'd*, 507 U.S. 746 (1993); *Osborn v. Boeing Airplane Co.*, 309 F.2d 99, 102 (9th Cir. 1962).

## IV. ARGUMENT

Dr. Barber is qualified as an expert "by knowledge, skill, experience, training or education," which PowerSchool does not dispute. Fed. R. Evid. 702; *see* Mot. at 2. Nor could it reasonably argue otherwise:

Dr. Barber is a professor at The University of Texas at Austin, where she is the AT&T Endowed Professor in Engineering in the Department of Electrical and Computer Engineering, the Founding Director of the Center for Identity, and the Founding Director of the Masters' Degree Program in Information Security and Privacy. *See* Dkt. 197, Ex. C. She has extensive experience in cybersecurity, artificial intelligence, information security, privacy, digital identity, digital trust, and software engineering. *Id.* ¶ 9. The Center for Identity, which Dr. Barber founded and directs, developed the University of Texas Center for Identity Ecosystem model ("UTCID model") several years ago with real-world data from more than 5,000 reported identity theft and fraud cases. Dkt. 151-1, Ex. A at Dep. Ex. 11. The UTCID model provides research-based insights into a variety of personal, organizational, and device identifiable information ("data elements")—*e.g.*, social security number, medical information, and mental-health condition—and determines which data elements are most frequently targeted by actors in identity theft and fraud cases. *Id.*

The UTCID model is not a litigation construct. Developed and formalized in The Identity Ecosystem (UTCID Report #19-08, 2019), the model is an empirically grounded framework mapping the lifecycle, vulnerability vectors, and exploitation pathways of compromised PII. The model's data and methods were published and subjected to peer review years before this litigation. *See* Dkt. 197, Ex. C, Appx. B (listing, *e.g.*, J. Zaiss, R.N. Zaeem & K.S. Barber, *Identity Threat Assessment and Prediction*, 53(1) J. Consumer Affs. (2019); C. Chen, R.N. Zaeem & K.S. Barber, *Statistical Analysis of Identity Risk of Exposure and Cost Using the Ecosystem of Identity Attributes*, Proc. Eur. Intelligence & Sec. Informatics Conf. 32–39 (2019)). PowerSchool's new contention that Dr. Barber has not shown that her use of the database has been subjected to peer review or is generally accepted, Mot. at 10–11, therefore fails on the record.

Contrary to PowerSchool's characterization of Dr. Barber's opinions as speculation and a "conduit for attorney argument," Mot. at 9, each of Dr. Barber's opinions will aid the jury in determining whether PowerSchool's conduct was highly offensive for the purposes of proving Plaintiffs' privacy claims, and whether PowerSchool's conduct was unjust for the purposes of proving Plaintiffs' quasi-contract claim. Fed. R. Evid. 702(a) (expert's opinions, more likely than not, "will help the trier of fact to understand the evidence or to determine a fact in issue"). Dr. Barber's opinions concern "the likelihood of serious harm to the victim," which is relevant in determining both offensiveness and unfairness. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 606; *Cal.*, 932 F.2d at 1350.

Specifically, Dr. Barber opines as to whether the information that PowerSchool collects is sensitive and identifies which PowerSchool products hold sensitive personally identifiable information. *See generally* Dkt. 197, Ex. C at 10–28. She then explains that this information is not only under frequent attack from hackers but also can be exposed as a part of a company's business practices, and that PowerSchool both intentionally shares information with at least 213 third-party partners and was hacked in 2024. *Id.* at 29–30. Dr. Barber details the breadth and depth of how personally identifiable information can be used to harm people, including that knowledge of certain categories of information about a person make it easy to discover significantly more information about that person. *Id.* at 29–37. She also explained what information counts as sensitive, she explains that PowerSchool's products hold sensitive information, identifies the uses to which that information can be put, and the ability to link one data element to many others. *Id.*; *see also* 10-29. These are all complex issues that a layperson is unlikely to understand without expert assistance, and they provide the context for the jury to evaluate whether PowerSchool's conduct is offensive and unfair. For these reasons, PowerSchool's Motion should be denied in its entirety.

**A. Dr. Barber's use of data elements, methodology, and analysis are reliable.**

PowerSchool contends that Dr. Barber's opinion regarding the data elements collected and processed by PowerSchool's products "invades the province of the jury" because she "has no basis—factual, scientific, or otherwise—to opine that any PowerSchool product automatically collected 'minimum' data elements" and "merely summarizes" PowerSchool's DPIAs. Mot. at 6. But an investigation of individual product implementation was not a necessary prerequisite. As Dr. Barber explained in her report, she obtained the data elements collected and processed by PowerSchool directly from several "Data Privacy Impact Assessments" ("DPIA Reports") produced by PowerSchool in discovery. Dkt. 197, Ex. C at 9, 11–28. In those DPIA Reports, PowerSchool admits to collecting and processing highly sensitive data elements from students when students use its products. Dkt. 197-1, Exs. 2–3, 5–7. Dr. Barber then applied those data elements to the UTCID model, which has a data set from over 5,000 identity theft, fraud, and abuse cases and assigned levels of risk and value associated with data elements present in the data set and in PowerSchool's system. Dkt. 197, Ex. C at 30–37, and Appx. A.

Next, PowerSchool mischaracterizes Dr. Barber's work, arguing that her "'analysis' thus begins and ends with copying data elements from PowerSchool's DPIA documents." Mot. at 6. But Dr. Barber did not

obtain the data elements from PowerSchool's DPIA Reports and stop there—she then applied the data elements to a scientific model that allowed her to assess a level of value and risk associated with each one. Dkt. 197, Ex. C at 30–37, and Appx. A. Further, Dr. Barber's use of data sets from PowerSchool's own documents and responses to Plaintiffs' interrogatory requests is permissible, as she "used the best available data, which came from the defendant itself." *See Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (citation modified). Indeed, in response to Plaintiffs' Interrogatory No. 3, which asked for the categories of data collected by each product, PowerSchool itself pointed to the DPIAs as identifying "the categories and uses of data" relating to each of its products. *See, e.g.*, Dkt. 197-1, Ex. 48 at 6–7 ("PowerSchool will produce, pursuant to Fed. R. Civ. P. 33(d), the Data Privacy Impact Assessments ('DPIAs') for each product identified in Interrogatory No. 1, which identify the categories and uses of data relating to each such product."). PowerSchool cannot designate the DPIAs as its answer to what data its products collect and then fault Plaintiffs' expert for relying on them. If PowerSchool objects to the data elements it provided in its own documents, it could have provided further documentation showing ways in which the elements varied in different circumstances, but it did not do so. *Hemmings,* 285 F.3d at 1188–89. It can also cross-examine Dr. Barber on any points it feels are pertinent.

As support, PowerSchool cites *CZ Services, Inc. v. Express Scripts Holding Co.*, No. 3:18-CV-04217-JD, 2020 WL 4518978, at *2 (N.D. Cal. Aug. 5, 2020) (Donato, J.) and *Siqueiros v. GM LLC*, No. 16-CV-07244-EMC, 2022 WL 74182, at *9 (N.D. Cal. Jan. 7, 2022). Mot. at 6. But in *CZ Services*, this Court excluded an expert's opinions because they were "little more than reports of what [the expert witness] personally saw in visits to various [pharmacy] locations, or in documents she reviewed about [the pharmacies] operations" without "any methodological discussion at all." 2020 WL 4518978, at *2. The Court noted that the expert's "'method' consisted mainly of walking into CZ Pharmacies' properties and taking pictures and notes." *Id.* Likewise, in *Siqueiros*, the expert merely summarized deposition testimony and other record evidence without analysis or applying any methodology. 2022 WL 74182, at *9–10. Dr. Barber's collection of data from PowerSchool's documents, application of that data to the UTCID model, and analysis of the results is readily distinguishable from the failure to apply a methodology in *CZ Services* and *Siqueiros*.

**B. Dr. Barber's opinion on "sensitive" data constitutes permissible expert opinion.**

PowerSchool next contends that Dr. Barber's sensitivity assessment "relies on nothing more than her say-so," arguing that because she considered whether a data type appears in the UTCID database, her approach "assumes that all data ever hacked must be sensitive—a rather nonsensical and circular assumption," that is "neither falsifiable nor replicable." Mot. at 6–7. That is wrong on each count. Dr. Barber defines "sensitive data" in her report as "information that, if exposed, shared, misused, or accessed without authorization, can cause significant harm, discrimination, financial loss, or privacy violations for individuals or organizations" based on her extensive experience, expertise, and research in digital identity, cybersecurity, digital trust, and information security and privacy. Dkt. 197, Ex. C at 1, 10. The UTCID data is not a substitute for that definition. It is empirical evidence of whether, and how often, a given data element has actually been used to cause the harms the definition describes. That is the opposite of circular: a data element is sensitive under her definition because the documented cases show its exposure leads to harm, not merely because it was taken. *See, e.g.*, Dkt. 197, Ex. C ¶¶ 20, 34–64. Nor is her analysis untestable. Dr. Barber disclosed the data elements she drew from the DPIAs, the UTCID measures she applied, and the resulting values for each element in Appendix A to her report. Dkt. 197, Ex. C, Appx. A. If PowerSchool objects to her understanding of what constitutes sensitive data, it can cross-examine her.

PowerSchool's cases are distinguishable. Mot. at 7 (*Pascal v. Nissan N. Am., Inc.*, No. 820-CV-00492-JLS-JDE, 2022 WL 19076763, at *9 (C.D. Cal. Dec. 21, 2022); *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *5 (N.D. Cal. Apr. 16, 2014); *In re Toyota Motor Corp.*, 978 F. Supp. 2d 1053, 1067–68 (C.D. Cal. 2013)). In *Pascal*, the expert ran a "haphazard," non-uniform experiment—testing four Nissan Altimas under arbitrary durations, HVAC modes, and mechanical configurations to show that carbon monoxide accumulated in the passenger cabin—so "there [was] no way anyone else [could] recreate his testing and verify its results . . .." 2022 WL 19076763, at *8–9. Dr. Barber's analysis bears no resemblance to that experiment: she disclosed her inputs, measures, and results, and anyone can replicate them.

In *GPNE*, the court excluded the expert witness's damages testimony because the expert did not provide a methodology in making one of his damages calculations, did not perform an apportionment analysis, and cited to documents that did not support his calculation. 2014 WL 1494247, at *4. Again, Dr.

Barber does not merely state that certain data elements collected by PowerSchool are sensitive and stop there: she determines that they are sensitive based on her application of the elements to the published UTCID model, which uses data elements from over 5,000 identity theft, fraud, and abuse cases, provides a statistical analysis, and allows for Dr. Barber to determine which elements are most valuable, most at risk for theft or fraud, and most useful in gathering additional information about a person. Dkt. 151-1, Ex. A at Dep. Ex. 11.

*Toyota* is distinguishable because the court excluded an expert's testimony because the expert did not have relevant training, education, or experience and made conclusions without providing any basis for them. 978 F. Supp. 2d at 1067–68. None of the problems identified in *Toyota* are present in this case. Dr. Barber is qualified to state her opinions on the issues at hand, and PowerSchool does not argue otherwise. Further, the basis of Dr. Barber's opinion regarding the sensitivity of certain data elements collected by PowerSchool is her years of experience in cybersecurity, artificial intelligence, information security, privacy, digital identity, digital trust, and software engineering; her work with the UTCID model, her application of the data elements collected by PowerSchool to the UTCID model, and her analysis of the results.

PowerSchool next challenges the data in the UTCID model, arguing that Dr. Barber "provides no explanation as to why the UTCID included some data breaches or may have excluded others" and that "[t]here is no explanation of the UTCID creators' methodology at all." Mot. at 7. The data in the UTCID model comes from the Identity Threat Assessment and Prediction (ITAP) project, which aggregates data on identity theft from multiple sources, including law enforcement, fraud cases, and news stories. Dkt. 151-1, Ex. A at Dep. Ex. 11. Although the data is gathered primarily from news stories, the magnitude of the cases and the repeating patterns seen across them support the conclusions of the research. The critiques raised by PowerSchool—that particular cases may have been included or excluded, or that reports may be inaccurate—go to the weight of Dr. Barber's testimony, not its admissibility. *See Hemmings*, 285 F.3d at 1188 (objections to inadequacy of study are in most cases objections to weight of evidence rather than admissibility).

PowerSchool cites *Innovation Ventures, LLC v. Custom Nutrition Labs, LLC*, No. 4:12-CV-13850-TGB-MJH, 2021 WL 12255004, at *17 (E.D. Mich. Sept. 29, 2021) as support. Mot. at 7. But as the court in *Innovation* notes, "[a]lthough [the expert's] comparison of sales data from an aggregate report compiled by a

third-party against sales data that is self-reported from an employee within Costco raises questions, it does not necessarily disqualify [his] analysis as reliable for purposes of a *Daubert* motion. Expert testimony even if based on allegedly erroneous or questionable facts has generally been held admissible 'when there is some support for those facts in the record.'" *Id.* The court in that case declined to exclude the expert's testimony on that basis but excluded it because the expert concluded that certain sales to Costco were "significant" without defining "significant" or using a basis or methodology to support the conclusion. *Id.* Unlike that expert, Dr. Barber did define "sensitive data" and disclosed her basis for doing so.

**C. PowerSchool risks exposing personally identifiable information.**

PowerSchool argues that Dr. Barber's opinions that student data held by PowerSchool is under constant threat and can be exposed are "speculation untied to any facts of this case," because she did not review PowerSchool's "cybersecurity practices, security controls, encryption, monitoring, or access controls." Mot. at 7–8. As a threshold matter, disclosure is an established fact, not a mere risk: PowerSchool admits that it discloses student information to hundreds of partners, and that it was hacked in late 2024.[1] Further, Dr. Barber's opinion is about the risk of exposure and harm based on the types of data PowerSchool collects and stores about children, not about an actual instance of harm. Thus, Dr. Barber need not assess PowerSchool's data-security and other specific controls, as she is merely determining that PowerSchool stores sensitive data about children that carries varying levels of risk of harm if exposed or used improperly.

Dr. Barber explained several times in her deposition that her opinion on the risk of exposure was based only on the types of data elements PowerSchool collected and stored, not PowerSchool's specific cybersecurity protocols. Dkt. 151-1, Ex. A at 205:20–206:17, 275:18–278:19, 345:3–18, 377:19–378:2, 510:10–512:18. Her opinion rests on facts in this record: the data elements PowerSchool identifies in its own DPIAs, PowerSchool's sharing of student data with third parties, and PowerSchool's 2024 breach. That distinguishes the cases PowerSchool cites, each of which involved opinions built on assumptions with no support in the record. *See* Mot. at 8 (citing *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th

---

[1] *See* Notice of Data Breach For Individuals in the United States, POWERSCHOOL, https://www.powerschool.com/security/sis-incident/notice-of-united-states-data-breach/ (last visited October 29, 2026).

Cir. 2014) (affirming exclusion of expert testimony in Title IX case where experts' opinions were found to be based on personal opinions and speculation after a superficial inspection of athletic facilities); *Bakst v. Cmty. Mem'l Health Sys., Inc.*, No. CV0908241MMMFFMX, 2011 WL 13214315, at *19-20 (C.D. Cal. Mar. 7, 2011) (excluding expert damages calculation premised on speculative, unsupported factual assumptions); *Dep't of Toxic Substances Control v. Technichem, Inc.*, No. 12-CV-05845-VC, 2016 WL 1029463, at *1 (N.D. Cal. Mar. 15, 2016) (testimony excluded where proffered expert speculated, "regurgitate[d] information given to him by other sources," and used cursory and unscientific methods); *S.F. Baykeeper v. City of Sunnyvale*, 627 F. Supp. 3d 1085, 1093–94 (N.D. Cal. 2022) (excluding part of expert testimony not supported by sufficient record facts)). An opinion about the risk inherent in holding, using, and sharing particular categories of children's data does not become speculative merely because it does not also evaluate a different question—how well that data is secured.

PowerSchool further argues that Dr. Barber's "methodology" for these opinions "amounts to (i) quoting one IBM report titled '2025 Cost of a Data Breach' and (ii) referencing a prior PowerSchool data breach just to say that 'it happens,'" and that she thereby acts as a "conduit for attorney argument" whose experience cannot save the opinion. Mot. at 8–9. But PowerSchool again mischaracterizes her testimony. Dr. Barber has extensive experience and expertise in information security, privacy, and digital identity, and she relies on industry research together with her own application of the data elements collected by PowerSchool to the UTCID model for statistical analysis. Dkt. 197, Ex. C at 29–37, and Appx. A. That is far afield from the experts in *In re Apple Inc. Sec. Litig.*, No. 4:19-CV-02033-YGR, 2023 WL 4556765, at *5 (N.D. Cal. July 17, 2023), and *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 6, 2017), who merely summarized documents or performed arithmetic counsel could do on an easel.

PowerSchool also relies on *Siqueiros* and *Technichem* to argue that she "does nothing more than summarize irrelevant evidence." Mot. at 9. As explained above, Dr. Barber's opinion is based on the application of the data elements collected and stored by PowerSchool to statistical analysis using the UTCID model, not on a summary of record evidence.

**D. PowerSchool risks harm to students by its collection and storage of sensitive information.**

PowerSchool contends that Dr. Barber's opinions that exposure of the data PowerSchool holds can cause significant harm, and that PowerSchool exposes students to that risk, rest solely on the UTCID database and are unreliable and do not "fit" this case. Mot. at 9–14. Again, Dr. Barber's opinion uses data elements provided by PowerSchool in its own production of documents and applies them to the research data gathered from over 5,000 cases of harm to create a statistical analysis of the value and risk associated with the data elements collected and stored by PowerSchool. Her opinion is not a recitation of record evidence.

PowerSchool further argues there is no "fit" between the UTCID database and this case because approximately 90 percent of the cases in the database do not involve school data, most involve adult data, and "[t]here is simply no basis to assume that the email address of a middle schooler—an individual who almost certainly has no bank account—is worth anywhere close to" the value the database associates with email addresses. Mot. at 11–12. PowerSchool also contends that Dr. Barber matched UTCID data elements to DPIA data elements "roughly and by hand" without a "systematic method." Mot. at 4. But a data element's capacity to cause harm does not depend on whether it was taken from a school or a corporation. A child's name, date of birth, address, and Social Security number can be used to open fraudulent accounts precisely because the child has no credit history and the fraud may go undetected for years. *See, e.g.*, Dkt. 197, Ex. C ¶¶ 72–79 (longitudinal harm). And many of the harms Dr. Barber identifies—reputational harm, emotional distress, and the compounding exposure of additional data elements—do not depend on the victim having a bank account at all. Dkt. 197, Ex. C at 29–37. Dr. Barber explained how she extrapolated from the UTCID data to the data elements at issue here. *See* Dkt. 151-1, Ex. A at 377:12–379:14. Any remaining differences between the data set and the facts of this case are the proper subject of cross-examination, not exclusion.

The cases cited by PowerSchool do not apply. *See Sonneveldt v. Mazda Motor of Am., Inc.*, No. 23-55325, 2024 WL 5242611, at *2 (9th Cir. Dec. 30, 2024) (testimony excluded where proffered expert did not explain or support his purported methodology, did not offer observations that proved his theory, and used a small sample size of only four items); *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606–07 (9th Cir. 2002) (testimony of medical expert excluded where a known surgical risk occurred, and no publication, source,

peer review, clinical test or other evidence could show the expert followed a scientific method to develop theory or support for causation). PowerSchool has raised no similar issues regarding Dr. Barber's proposed testimony. Dr. Barber is qualified to testify based on her experience, expertise, and education—which PowerSchool does not dispute—and she explains and supports her application of the PowerSchool data elements to the UTCID model, drawn from more than 5,000 cases, and analyzes the value and risk of harm of each element. Nothing in the record suggests that the data fields' capacity to produce harm depends on where they were acquired, and PowerSchool offers no reason why it would. PowerSchool can raise this issue on cross-examination, but it is not a basis for exclusion.

**E. The information collected and stored by PowerSchool has value.**

PowerSchool contends that "[t]he absurdity of Dr. Barber's conclusions underscores the unreliability of her approach," pointing to her allocation of financial loss across the data elements involved in each UTCID case. Mot. at 11. But that critique misreads the analysis. Dr. Barber obtains the elements PowerSchool collects and stores from PowerSchool's own documents and matches them to the same elements in the UTCID. The data elements themselves and the risk of harms associated with them are the focus of her analysis. Dr. Barber explained several times in her deposition that the values she assigned to data elements are not purported market values but rather are a method for showing how some data elements are more valuable to actors in identity theft and fraud cases than others. Dkt. 151-1, Ex. A at 323:15–324:11, 373:7–18, 375:9–12.

PowerSchool also contends that variations among similar data elements (for example, "Email Address" and "Email") produce "wild swings in results," and that her numbers risk inviting the jury to attach undue weight to them. Mot. at 11 (citing *In re Apple*, 2023 WL 4556765, at *9; *Fahmy v. Jay Z*, No. 207CV05715CASPJWX, 2015 WL 5680299, at *4–5 (C.D. Cal. Sept. 24, 2015)). But as Dr. Barber explained in her deposition, she did not assign actual market values to data elements held by PowerSchool; rather, she used valuation comparatively to show that some data elements held by PowerSchool are more valuable than others. Dkt. 151-1, Ex. A at 373:3–22, 377:12–379:14. And the differences among similar elements reflect how those elements were recorded in the underlying cases and any concern about how the jury will weigh the figures can be addressed through cross-examination and, if necessary, a limiting instruction, not exclusion.

Finally, PowerSchool contrasts Dr. Barber's testimony that she offers an opinion about the "potential of harm" with the class certification motion's description of her opinions. Mot. at 5, 9. There is no inconsistency. Her report addresses the *risk* of harm to which Plaintiffs are exposed through PowerSchool's conduct, and her testimony confirms that her opinions speak to that risk. Dkt. 151-1, Ex. A at 291:6–17. That risk is precisely what is relevant to whether PowerSchool's conduct was highly offensive and unjust.

**F. Dr. Barber does not repackage hearsay.**

PowerSchool argues that Dr. Barber "impermissibly relies on inadmissible hearsay" because she takes "a university database, recit[es] or summariz[es] its contents," and her student assistant ran the queries. Mot. at 10. But, as discussed above, PowerSchool mischaracterizes the opinions. Dr. Barber does not merely summarize documents and draw a conclusion. She obtained the data elements that PowerSchool collects and stores from PowerSchool's own DPIA Reports and discovery responses and applied them to the UTCID model to assess the risk and value of each data element. And experts routinely rely on research assistants working under their direction to run queries and compile data; doing so does not make the resulting opinion any less the expert's own. *BladeRoom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-CV-01370-EJD, 2018 WL 1611835, at *4 (N.D. Cal. Apr. 3, 2018) ("An expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify." (quoting *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002)).

PowerSchool relies on *Koger v. Costco Wholesale Corp.*, No. 3:20-CV-08759-JD, 2023 WL 8188842, at *2 (N.D. Cal. Nov. 27, 2023) (Donato, J.), for the proposition that "[e]xperts are not permitted to repackage inadmissible hearsay as expert testimony." Mot. at 10. But in *Koger*, the court specifically stated that Rule 703 permits experts to rely on inadmissible evidence, including hearsay, as long as the evidence is not offered to establish the truth of its assertions. *Id.* at *2. Dr. Barber's use of the UTCID model is to assess the risk of harm associated with PowerSchool's collection and storage of certain data elements, not to prove individual harm to Plaintiffs or the victims in the cases in the model's data set. And Dr. Barber does not "repackage" UTCID data as her testimony. She applies the data elements collected and stored by PowerSchool to the UTCID model and analyzes the results.

All of PowerSchool's cases are distinguishable. *See Waymo*, 2017 WL 5148390, at *5 (testimony excluded where proffered expert had no specialized knowledge for damages calculations and "simply adopted the opinions of others and performed grade-school arithmetic counsel can do on an easel"); *Siqueiros*, 2022 WL 74182, at *9–10 (testimony excluded where proffered expert merely summarized witness deposition testimony and other record evidence without applying methodology); *Koger*, 2023 WL 8188842, at *2 (testimony excluded where proffered expert "merely recite[d] the conclusions of . . . tests without further discussion of their data or methodology"); *In re Apple Inc.*, 2023 WL 4556765, at *5 (testimony excluded where it required no special technical expertise and proffered expert "merely serve[d] as a conduit for attorney argument" by summarizing and quoting evidence without providing context for jury).

Here, Dr. Barber has the experience, education, and expertise necessary to render her opinions. She used PowerSchool's DPIA Reports only to obtain the data set to use in her analysis. She then applied the data set to a scientifically valid methodology for statistical analysis and determined the value and risk of harm associated with the data elements collected and stored by PowerSchool.

**G. Dr. Barber's opinions are tied to the claims and facts of this case.**

Finally, PowerSchool contends that Dr. Barber's opinion that data has "a non-zero value" in the hands of bad actors "has no relation to Plaintiffs' claims, which require Plaintiffs to show PowerSchool's conduct was 'highly offensive,' not some 'inchoate risk' associated with storing data." Mot. at 13–14 (citing *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090–91 (N.D. Cal. 2022); *Hernandez*, 211 P.3d at 1078–79). But Dr. Barber's opinions are directly tied to Plaintiffs' claims because they concern "the likelihood of serious harm to the victim," which the Ninth Circuit has identified as a factor in the highly offensive analysis, and which is likewise relevant to the unfairness component of Plaintiffs' quasi-contract claim. *See In re Facebook*, 956 F.3d at 606; *Cal.*, 932 F.2d at 1350. Plaintiffs do not contend that risk alone establishes liability; the intrusion here is PowerSchool's collection, use, and sharing of students' information without effective consent, and Dr. Barber's testimony helps the jury assess how serious that intrusion is. Neither *Hammerling*, which addressed the sufficiency of allegations at the pleading stage, nor *Hernandez* holds that evidence of the risk of harm is irrelevant to offensiveness. PowerSchool's argument about what Plaintiffs must ultimately prove is a merits argument, not a basis for exclusion under Rule 702.

## V. CONCLUSION

PowerSchool does not dispute Dr. Barber's qualifications, and its renewed Motion rests on mischaracterizations of her opinions. Dr. Barber does not merely summarize PowerSchool's documents; she applies the data elements PowerSchool itself identified in its DPIAs to the published, peer-reviewed UTCID model, built from more than 5,000 identity theft and fraud cases, to assess the risk of harm associated with each element. Her opinions address the likelihood of serious harm, a factor directly relevant to whether PowerSchool's conduct was highly offensive and whether its retention of benefits was unjust. PowerSchool's remaining criticisms go to weight, not admissibility, and are properly tested through cross-examination. Under Rule 702's liberal thrust favoring admission, PowerSchool's motion to exclude the expert opinions of Dr. K. Suzanne Barber should be denied in its entirety.

Dated: November 3, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ Leonard W. Aragon

Leonard W. Aragon (*pro hac vice*)
E. Tory Beardsley (*pro hac vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
leonard@hbsslaw.com
toryb@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
904 Rio Grande Street, Suite 100
Austin, Texas 78701
Telephone: (512) 200-8028
julie.liddell@edtech.law
andrew.liddell@edtech.law

Whitney Siehl (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite2410
Chicago, Illinois 60611
Telephone: (708) 628-4949
whitneys@hbsslaw.com

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

Attorneys for Plaintiffs