Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
904 Rio Grande St., Suite 100
Austin, Texas 78701
Telephone: (512) 200-8028
julie.liddell@edtech.law
andrew.liddell@edtech.law

[Additional Counsel on Signature Page]

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EMILY CHERKIN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>Defendant. | Case No.: 3:24-cv-02706-JD<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT POWERSCHOOL HOLDINGS, INC.'S MOTION TO EXCLUDE THE OPINIONS OF CATHERINE O'NEIL**<br><br>Judge: The Honorable James Donato<br><br><u>Hearing</u><br>Date: January 14, 2027<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |

## TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. STANDARD OF REVIEW ..... 1

III. BACKGROUND ..... 2

IV. ARGUMENT ..... 5

A. PowerSchool does not dispute Dr. O'Neil's qualifications ..... 5

B. Dr. O'Neil's testimony will help the jury understand PowerSchool's complex products. ..... 6

C. Dr. O'Neil bases her testimony on sufficient facts and data. ..... 8

D. Dr. O'Neil's testimony is the product of reliable principles and methods, reliably applied. ..... 9

V. CONCLUSION ..... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013) .................... 9, 10

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
613 F. Supp. 3d 1308 (S.D. Cal. 2020) .................... 7

*Bardin v. Nissan Motor Co., Ltd.*,
No. 1:21-CV-00144-GNS-HBB, 2023 WL 6392743 (W.D. Ky. Sept. 29, 2023) .................... 12

*Biotechnology Value Fund, L.P. v. Celera Corp.*,
No. C 13-03248 WHA, 2015 WL 138168 (N.D. Cal. Jan. 9, 2015) .................... 7

*Camenisch v. Umpqua Bank*,
763 F. Supp. 3d 871 (N.D. Cal. 2025) .................... 7, 8

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) .................... 11

*Clausen v. M/V New Carissa*,
339 F.3d 1049 (9th Cir. 2003) .................... 11

*In re Coll. Athlete NIL Litig.*,
No. 20-CV-03919 CW, 2023 WL 8372788 (N.D. Cal. Nov. 3, 2023) .................... 9

*CZ Servs., Inc. v. Express Scripts Holding Co.*,
No. 3:18-CV-04217-JD, 2020 WL 4518978 (N.D. Cal. Aug. 5, 2020) .................... 7

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .................... 12

*ESG Capital Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) .................... 3

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .................... 3, 5, 13

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d at 599–600 (9th Cir. 2020) .................... 3, 4

*In re Google Location History Litigation*,
428 F. Supp. 3d 185 (N.D. Cal 2019) .................... 3

*Hernandez v. Hillsides, Inc.*,
211 P.3d 1063 (Cal. 2009) .................... 3

*Hyer v. City & Cnty. of Honolulu*,
118 F.4th 1044 (9th Cir. 2024) .................... 8

*JH Kelly, LLC v. AECOM Tech. Servs., Inc.*,
605 F. Supp. 3d 1295 (N.D. Cal. 2022) .................... 11

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025) ..... 11, 12

*MediaTek inc. v. Freescale Semiconductor, Inc.*,
No. 11-CV-5341 YGR, 2014 WL 971765 (N.D. Cal. Mar. 5, 2014) ..... 10

*Mighty Enters., Inc. v. She Hong Indus. Co.*,
745 F. App'x 706 (9th Cir. 2018) ..... 9

*Montgomery v. Mitsubishi Motors Corp.*,
448 F. Supp. 2d 619 (E.D. Pa. 2006) ..... 12

*Osborn v. Boeing Airplane Co.*,
309 F.2d 99 (9th Cir. 1962) ..... 4

*OWLink Tech., Inc. v. Cypress Tech. Co.*,
No. 8-21-CV-00717-SPG-KES-X, 2023 WL 4291486 (C.D. Cal. Feb. 16, 2023) ..... 10

*Perez v. Rash Curtis & Assocs.*,
No. 16-CV-03396-YGR, 2019 WL 1491694 (N.D. Cal. Apr. 4, 2019) ..... 10

*Porter v. Martinez*,
68 F.4th 429 (9th Cir. 2023) ..... 2

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) ..... 1

*Reflex Media, Inc. v. SuccessfulMatch.com*,
758 F. Supp. 3d 1046 (N.D. Cal. 2024) ..... 1

*Siqueiros v. General Motors LLC*,
No. 16-CV-07244-EMC, 2022 WL 74182 (N.D. Cal. Jan. 7, 2022) ..... 7

*State Farm Gen. Ins. Co. v. Maytag Corp.*,
No. C 04-02990 JW, 2005 WL 8177756 (N.D. Cal. Nov. 30, 2005) ..... 12

*Townsend v. Monster Beverage Corp.*,
303 F. Supp. 3d 1010 (C.D. Cal. 2018) ..... 8

*U.S. v. Cal.*,
932 F.2d 1346 (9th Cir. 1991), *aff'd*, 507 U.S. 746 (1993) ..... 4, 5

*Wendell v. GlaxoSmithKline LLC*,
858 F.3d 1227 (9th Cir. 2017) ..... 2, 5

*White v. Ford Motor Co.*,
312 F.3d 998 (9th Cir. 2002) ..... 7

**Other Authorities**

California Constitution ..... 2, 3

Fed. R. Evid. 702(a) ..... *passim*

# TABLE OF EXHIBITS

**<u>Exhibits already of record</u>**

| Dkt. | Exhibit | Description | Page |
|---|---|---|---|
| Dkt. 197-1 | 9 | Excerpts of the December 1, 2025 30(b)(6) Deposition of Darron Flagg | 12 |
| Dkt. 197-1 | 48 | PowerSchool Holdings, Inc.'s Supplemental Responses and Objections to Plaintiffs' Non-Uniform Interrogatories 2, 3, 7, 8 | 8 |

## I. INTRODUCTION

Defendant PowerSchool Holdings, Inc. moves to exclude the expert opinions of Plaintiffs' expert witness, Catherine O'Neil, Ph.D. *See generally* Dkt. 206 ("Mot."). PowerSchool relies on a handful of cases reciting Rule 702's general principles, but those principles do not resolve the arguments before the Court. Indeed, PowerSchool's own arguments confirm that Dr. O'Neil's opinions raise issues for cross-examination, not admissibility. Dr. O'Neil's testimony satisfies each of Rule 702's requirements. First, she is qualified, a point PowerSchool does not contest. Second, her opinions—as presented by Dr. O'Neil, not as edited by PowerSchool—will help the jury understand PowerSchool's claims about its algorithms. Fed. R. Evid. 702(a). Third, Dr. O'Neil bases her testimony on sufficient facts or data. Fed. R. Evid. 702(b). PowerSchool's arguments on this issue go to weight, not admissibility. Finally, PowerSchool's miscellaneous attacks on the reliability of Dr. O'Neil's testimony (*e.g.*, on the accuracy of her statements and assumptions, and that she, like PowerSchool, [redacted] PowerSchool's algorithms because the data needed to do so was not produced) merely raise issues for cross-examination. Because PowerSchool's attacks—at best—go to the weight of Dr. O'Neil's testimony, the motion to exclude should be denied in its entirety.

## II. STANDARD OF REVIEW

PowerSchool omits key aspects of the standard of review applicable here. Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The "district judge is a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (internal quotation and citation omitted). "The touchstones for admissibility under Rule 702 are the relevance and reliability of the expert witness's opinions.'" *Reflex Media, Inc. v. SuccessfulMatch.com*, 758 F. Supp. 3d 1046, 1049 (N.D. Cal. 2024) (Donato, J.) (citation and quotation omitted). "The test of reliability is flexible, and the Court looks at whether the reasoning and methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* (citation and

quotation omitted). Importantly, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Porter v. Martinez*, 68 F.4th 429, 444 (9th Cir. 2023) (ellipsis in original, citations and quotations omitted). Ultimately, "Rule 702 should be applied with a liberal thrust favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citations and quotations omitted). Against these standards, PowerSchool's motion to exclude must be denied.

## III. BACKGROUND

PowerSchool misunderstands Plaintiffs' claims and the evidence needed to support them. This is not a data-breach case. Rather, this is a case about exceeding the scope of consent to generate, collect, use, share, and sell information about schoolchildren and sell [redacted] products that are fuel by student data. Plaintiffs do not offer Dr. O'Neil's testimony to aid the jury in determining actual harm to Plaintiffs or to estimate damages; they offer it to aid the jury in determining the increased *risk* of harm to Plaintiffs, which, as explained further below, relates to the issues of whether PowerSchool's conduct was highly offensive for the purposes of proving Plaintiffs' privacy claims, and whether PowerSchool's conduct was unfair or unjust for the purposes of proving Plaintiffs' quasi-contract claim.

Key facts are not in dispute. PowerSchool admits to collecting large volumes of information on schoolchildren. *See* Plaintiffs' Notice of Motion, Motion for Class Certification, and Memorandum of Points and Authorities in Support. Dkt. 197 ("Class Cert. Mot.") at 1–6. And it admits to sharing that information widely, with more than 213 third parties. *See id.* at 2. It also admits that it sells prediction products to schools that are [redacted] for accuracy, bias, or reliability. *Id.* at 4-6. Those [redacted] prediction products, moreover, are fueled by student data. All this is done without informed consent. Thus, Plaintiffs seek certification of claims for common law intrusion upon seclusion and invasion of privacy under the California Constitution, and a claim for unjust enrichment under a quasi-contract theory. Dkt. 197 at 9–10. These claims require, respectively, evidence that PowerSchool's privacy invasions are highly offensive and evidence that PowerSchool's actions are unjust.[1]

[1] PowerSchool argues that because "Plaintiffs rely almost exclusively on [Dr.] O'Neil for . . . their request for $341 million in damages," the Court must deny class certification if it grants PowerSchool's motion. Mot. at 12. Not so: Christopher Schulte, not Dr. O'Neil, is Plaintiffs' damages expert, and his unjust enrichment model measures PowerSchool's profits from its Student Profiling and Prediction Products. In

**Privacy.** "To state a claim for intrusion upon seclusion under California common law, a plaintiff must plead that (1) a defendant intentionally intruded into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy, and (2) the intrusion occurred in a manner highly offensive to a reasonable person." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020) (citing *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1072 (Cal. 2009)) (citation modified).

"A claim for invasion of privacy under the California Constitution involves similar elements. Plaintiffs must show that (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is 'so serious . . . as to constitute an egregious breach of the social norms' such that the breach is 'highly offensive.'" *Id.* (citing *Hernandez*, 211 P.3d at 1073). "Because of the similarity of the tests, courts consider the claims together and ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *Id.*

In determining liability under these claims, the jury must therefore assess, *inter alia*, whether the intrusion is highly offensive to a reasonable person. *In re Google Location History Litigation*, 428 F. Supp. 3d 185, 196 (N.D. Cal 2019) (citation modified); *see also* Judicial Council of Cal., Civil Jury Instr. No. 1800 (Right of Privacy) at 1123. Whether an alleged invasion is "highly offensive," "serious," or an "egregious breach of the social norms" requires "holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *See In re Facebook*, 956 F.3d at 606. "While analysis of a reasonable expectation of privacy primarily focuses on the nature of the intrusion, the highly offensive analysis focuses on the degree to which the intrusion is unacceptable as a matter of public policy." *Id.*; *Hernandez*, 211 P.3d at 1073 (weighing the degree of offensiveness "essentially involves a 'policy' determination as to whether the alleged intrusion is 'highly offensive' under the particular circumstances").

**Quasi-contract/unjust enrichment.** For this claim, "a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense." *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038–39 (9th Cir. 2016). California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss. *See, e.g., In re*

---

any event, that argument belongs in PowerSchool's opposition to class certification, not in a Rule 702 motion.

*Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 599–600 (California recognizes disgorgement of unjustly earned profits "even where an individual has not suffered a corresponding loss"). Quasi-contract liability is dictated by the needs of justice and fairness, and rests upon equitable considerations. *See U.S. v. Cal.*, 932 F.2d 1346, 1350 (9th Cir. 1991), *aff'd*, 507 U.S. 746 (1993); *Osborn v. Boeing Airplane Co.*, 309 F.2d 99, 102 (9th Cir. 1962).

**Dr. O'Neil's report.** Plaintiffs retained Dr. O'Neil, a mathematician and data scientist "to look into and form an opinion on PowerSchool's claims of having built and offering to sell to school systems algorithms that will predict, among other things, a student's chances of graduating." O'Neil Report at 1 (filed as Def.'s Ex. B). While jurors may have heard of the term "algorithm," it has a particular connotation in this case, which Dr. O'Neil explains. *Id.* at 2. After discussing what an algorithm is, Dr. O'Neil details the PowerSchool products at issue here, opining that each product would not function without the student data set forth in PowerSchool's documents and would have reduced functionality without additional student data. *Id.* at 2–25.

Having established this background, Dr. O'Neil proceeds to counter the suggestion "that PowerSchool . . . only provides a platform with which school systems can build their own predictions for graduation rates or likelihoods for individual students." *Id.* at 25. Applying her expertise, she notes that the evidence she reviewed supports the conclusion that "they [PowerSchool] do in fact provide algorithms." *Id.* at 25–26. She then provides a background on graduation predictions (*id.* at 26), explaining how PowerSchool's algorithms could be accurate yet harmful (*id.* at 27) and present a risk of being inaccurate and racially biased (*id.* at 27–28). Dr. O'Neil opines that PowerSchool does not test its algorithms for fairness (*id.* at 28) and identifies other risks that data sharing poses for students (*id.* at 28–29), including how schools have purged low performers for more than a decade and its implication on graduation predictions (*id.* at 29). Finally, she explains that the PowerSchool algorithm could be and should be tested for bias and accuracy. *Id.* at 29–30.

In sum, Dr. O'Neil's opinions will help the jury understand how PowerSchool's prediction algorithms work and the risks they pose to students. As to Plaintiffs' privacy claims, Dr. O'Neil's testimony will allow the jury to determine whether it is highly offensive for PowerSchool to sell schools its prediction products that rely exclusively on student data to make predictions without receiving effective consent from

parents, especially when those products are [redacted] for bias or accuracy and may be used to significantly shape students' life outcomes. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 606. As to Plaintiffs' quasi-contract claim, Dr. O'Neil's testimony will allow the jury to determine whether it is unjust for PowerSchool to retain its profits from selling these [redacted] products to schools. *Cal.*, 932 F.2d at 1350 ("[Q]uasi-contract liability is dictated by the needs of justice and fairness.").

## IV. ARGUMENT

Dr. O'Neil's opinions meet all admissibility requirements. As Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Nevertheless, PowerSchool makes two main arguments based on factual disputes, namely (1) that Dr. O'Neil's opinion "that PowerSchool products require student data is not a proper expert opinion," Mot. at 7–8, and (2) that Dr. O'Neil's opinion regarding the risks posed by PowerSchool's use of student data "is unreliable and an improper legal opinion." Mot. at 8–12. Because neither argument overcomes Rule 702's liberal policy favoring admission of Dr. O'Neil's testimony, the Court should deny PowerSchool's motion to exclude. *See Wendell*, 858 F.3d at 1232.

### A. PowerSchool does not dispute Dr. O'Neil's qualifications.

PowerSchool does not contest Dr. O'Neil's qualifications. *See generally* Mot. at 7–15. For good reason, as Dr. O'Neil is qualified: she is a mathematician and data scientist, who received her Ph.D. in mathematics from Harvard University in 1999. O'Neil Report at 1. After teaching mathematics at MIT and Columbia College, she worked in finance as a quantitative analyst and risk researcher. *Id.* Thereafter, she became a data scientist, starting an algorithmic auditing company called ORCAA in 2016. *Id.* Since 2016, ORCAA has audited dozens of AI and other automated systems in high-stakes areas including credit, insurance, hiring, housing, and social media. *Id.* This work includes auditing algorithms for bias and

accuracy. *Id.* at 29. Dr. O'Neil's background clearly qualifies her to opine on PowerSchool's claims about its algorithms. PowerSchool cannot argue otherwise on reply.

**B. Dr. O'Neil's testimony will help the jury understand PowerSchool's complex products.**

Dr. O'Neil's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Specifically, her expertise will help the jury understand PowerSchool's claims about its algorithms, including risks of inaccuracy and bias arising from PowerSchool's admission that the products are [redacted] O'Neil Report at 1–2 (describing background). PowerSchool nevertheless argues that Dr. O'Neil's opinion that "PowerSchool products require student data" requires no expertise and therefore should be excluded. Mot. at 7. But PowerSchool reaches that conclusion only by isolating a truncated snippet of Dr. O'Neil's opinion from its critical context. *See id.* (asserting that "stating that PowerSchool—an educational technology company—offers products that use student data requires no expertise").

The Court should reject PowerSchool's strawman argument. As an initial matter, PowerSchool cannot have it both ways: its position here—that it is obvious its products require student data—is irreconcilable with its summary judgment argument that there is "no evidence in the record about any putative class members' data." *See* PowerSchool's Motion for Summary Judgment, Dkt. 201 at 8. More fundamentally, while PowerSchool paints this subcomponent of her opinion as a simple one requiring no expertise, her full opinions are more complicated and reflect the application of her specialized knowledge and expertise to the facts of this case. Using PowerSchool's SIS product as an example, Dr. O'Neil's full opinion is not just that SIS "requires student data" but also that "PowerSchool SIS would not function without the student data set forth in the DPIA, and would have reduced functionality without the additional student data set forth on the product documentation page." O'Neil Report at 7. The same is true for the other products at issue. *See id.* at 9 (Schoology Learning); *id.* at 11 (Performance Matters); *id.* at 12 (Naviance); *id.* at 15 (MTSS); *id.* at 18 (Behavior Support); *id.* at 19 (Attendance Intervention). Thus, the premise that "PowerSchool products require student data" lays the foundation for Dr. O'Neil's other, more substantial opinions, including that specific data is necessary for each product to function and that the products would have reduced functionality without additional data.

One of PowerSchool's own cases dooms its argument here. Specifically, PowerSchool relies on *Siqueiros v. General Motors LLC,* No. 16-CV-07244-EMC, 2022 WL 74182, at *10 (N.D. Cal. Jan. 7, 2022). Mot. at 7. But key language that PowerSchool omitted from its citation confirms *Siqueiros* undermines its position because Dr. O'Neil did what Dr. Dahm did not—she applied her expertise. *See Siqueiros*, 2022 WL 74182, at *36. ("Thus, the Court finds that the portions of Dr. Dahm's report which essentially summarize evidence already in the record *without the application of his expertise through reliable methodologies* invade the province of the jury and are not appropriate under Rule 702.") (emphasis added). Dr. O'Neil is "entitled . . . to explain the facts on which she bases her opinions," which is all that PowerSchool attacks here. *Camenisch v. Umpqua Bank*, 763 F. Supp. 3d 871, 882 (N.D. Cal. 2025). PowerSchool's manufactured arguments to the contrary should be rejected.

Because Dr. O'Neil's actual opinion on data use involves the application of her expertise to PowerSchool's products, not simply opinions on issues that a jury is otherwise expected to know or determine independently, PowerSchool's cited authority differs from the facts here. *See White v. Ford Motor Co.,* 312 F.3d 998, 1008–09 (9th Cir. 2002) (certain testimony would be lay testimony as it was offered outside area of expertise); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322 (S.D. Cal. 2020) (expert's testimony intruded on the province of the jury where the expert "impermissibly interprets the contractual provisions at issue in this case, she forms conclusions as to their effects on competition and states of mind of industry participants") (history omitted); *CZ Servs., Inc. v. Express Scripts Holding Co.*, No. 3:18-CV-04217-JD, 2020 WL 4518978, at *2 (N.D. Cal. Aug. 5, 2020) (certain opinions were "little more than reports of what Dr. Wooten personally saw in visits to various CZ Pharmacies locations, or in documents she reviewed about CZ Pharmacies' operations"); *Biotechnology Value Fund, L.P. v. Celera Corp.*, No. C 13-03248 WHA, 2015 WL 138168, at *1 (N.D. Cal. Jan. 9, 2015) (involving challenge "made to findings and opinions that purport to tell the jury what actually occurred in our case").

Nor does the brief interaction between Dr. O'Neil and Plaintiffs' damages expert, Christopher Schulte, render Dr. O'Neil's entire opinion a "descriptive recitation." Mot. at 8. PowerSchool suggests Dr. O'Neil's opinions are unhelpful because Mr. Schulte thought it *likely* that PowerSchool's products required student data to function, *id.*, but the record reveals a simpler reality: Mr. Schulte admitted "he's not a data scientist," O'Neil Tr. at 136:2–11, and so he suggested that opinions regarding the functionality of

PowerSchool's products should be "le[ft] to [Dr. O'Neil] as the data expert." *Id.* at 135:1–9. Dr. O'Neil, who *is* a data scientist, then analyzed the products and concluded that they would not function, or would have reduced functionality, without student data. O'Neil Report at 2–25. It is one thing for a layperson to suspect something is true, but quite another for an expert to verify it. This subcomponent of Dr. O'Neil's opinion is therefore not an inadmissible "witness observation" merely because Mr. Schulte believed it *could* be true. Mot. at 8.

Because Dr. O'Neil's specialized knowledge will help the jury understand PowerSchool's algorithms and evaluate their attendant risks, Dr. O'Neil's testimony satisfies Rule 702(a).

**C. Dr. O'Neil bases her testimony on sufficient facts and data.**

Dr. O'Neil also bases her testimony on sufficient facts or data. Fed. R. Evid 702(b). Dr. O'Neil used the types of evidence that experts in her field are expected to rely on, including publicly available information specific to PowerSchool and its products, PowerSchool's Data Privacy Impact Assessments ("DPIAs") and other non-public records, and PowerSchool's corporate deposition testimony and discovery responses. *See generally* O'Neil Report. Her reliance on the DPIAs is particularly well-founded: PowerSchool itself designated the DPIAs, in its interrogatory responses, as the documents that identify "the categories and uses of data" relating to each of its products. *See* Dkt. 197-1, Ex. 48 at 6–7. PowerSchool cannot credibly argue that an expert who relies on the very documents PowerSchool identified as describing its products' data lacks a sufficient factual foundation.

Rule 702's sufficient facts or data element "requires foundation, not corroboration." *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1056 (9th Cir. 2024) (citation and quotation omitted). "In other words, the key inquiry under Rule 702 is whether an expert had sufficient factual grounds on which to draw conclusions, not whether the expert's hypothesis is correct or corroborated by other evidence on the record." *Id.* (citation and quotation omitted). Thus, "[w]eakness in the factual basis of an expert witness' opinion generally bear[s] on the weight of the evidence rather than the admissibility." *Camenisch*, 763 F. Supp. 3d at 884 (citation and quotation omitted); *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1039 (C.D. Cal. 2018) (collecting cases and noting "[t]he relative strength or weakness of the factual underpinnings of [expert] opinion, go to the weight of [the expert's] testimony, not its admissibility").

Dr. O'Neil also provides a variety of examples that demonstrate the risks of harm posed by [redacted] algorithms. O'Neil Report at 28–29. PowerSchool correctly notes that none of those examples involves PowerSchool itself. Mot. at 8. But that makes Dr. O'Neil's point for her: PowerSchool made no effort to investigate whether its own products present those risks, and it did not produce data that would allow anyone else to do so. Dr. O'Neil's examples illustrate some potential consequences of [redacted] algorithms, and the fact that those examples are not specific to PowerSchool does not render them "unreliable and irrelevant." Mot. at 10.

So, although PowerSchool specifically disagrees with Dr. O'Neil's opinions that PowerSchool's "lack of interrogation [of their own algorithm] is unreasonable," O'Neil Report at 28, and testing is "relatively easy and inexpensive," *id.* at 30, those disagreements go to weight not admissibility. PowerSchool's failure to properly assess its own algorithm, or even attempt to gather data to do so, is proper foundation for Dr. O'Neil's opinions. Her testimony is based on sufficient facts or data to satisfy Rule 702(b).

**D. Dr. O'Neil's testimony is the product of reliable principles and methods, reliably applied.**

Finally, Dr. O'Neil's testimony is the product of reliable principles and methods (Rule 702(c)), which she reliably applied to facts of the case (Rule 702(d)). On reliability, citing little case law, PowerSchool first contends that Dr. O'Neil "has no methodology or principles for the Court to assess, much less a methodology or principle that was reliably applied to the facts of the case." Mot. at 9. More specifically, PowerSchool declares that Dr. O'Neil's opinion should be excluded because "O'Neil's algorithm opinion is based solely on her generalized theories about the supposed risks inherent in every algorithm" and "did not assess any PowerSchool product or . . . how any school configured or implemented any PowerSchool product." *Id.*

This challenge "amount[s] to impeachment." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.,* 738 F.3d 960, 968–69 (9th Cir. 2013) (noting defendant challenge to the expert's assumptions and comparisons while "colorable," did not "go to admissibility."). "An expert can use assumptions, inferences, and comparisons." *Mighty Enters., Inc. v. She Hong Indus. Co.*, 745 F. App'x 706, 709 (9th Cir. 2018). "Such assumptions are admissible; their reliability is impeachable." *Id.* As a result, courts in this Circuit and District routinely recognize that similar challenges to an expert's assumptions are matters of weight. *See, e.g.*, *In re Coll. Athlete NIL Litig.*, No. 20-CV-03919 CW, 2023 WL 8372788, at *5 (N.D. Cal. Nov. 3, 2023)

(defendant's challenges to "assumptions do not go to admissibility"); *OWLink Tech., Inc. v. Cypress Tech. Co.*, No. 8-21-CV-00717-SPG-KES-X, 2023 WL 4291486, at *2 (C.D. Cal. Feb. 16, 2023) (denying motions to exclude, noting "Plaintiff's arguments regarding [the expert's] report which, at bottom, are objections to [the expert's] assumptions, are more appropriately addressed through cross-examination."); *Perez v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2019 WL 1491694, at *5 (N.D. Cal. Apr. 4, 2019) (denying motion to exclude where movant argued expert's "methodology relied on a false assumption [which] goes to the weight, not the admissibility, of her opinion. The same is true of defendant's argument that the third-party sources [the expert] used provided inaccurate data."); *MediaTek inc. v. Freescale Semiconductor, Inc.*, No. 11-CV-5341 YGR, 2014 WL 971765, at *2 (N.D. Cal. Mar. 5, 2014) ("Lawton appropriately disclosed, in advance, the factual basis and assumptions for her opinions. If at trial those are found to be inaccurate or ill-founded, then the jury may afford the opinion less weight, if any. However, it is not grounds for striking that portion of the anticipated testimony.").

The Court's role, therefore, is not to opine on whether Dr. O'Neil's opinions are right or wrong. *Alaska Rent-A-Car,* 738 F.3d at 969–70 ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury."). PowerSchool is free to cross-examine Dr. O'Neil at trial for impeachment purposes, but it cannot justify exclusion of Dr. O'Neil's opinions just because they are not based on the kinds of evidence PowerSchool would prefer.

PowerSchool's related contention that there is no such thing as a "ready-made" predictive algorithm because schools configure their own models likewise presents a factual dispute, not a basis for exclusion. Dr. O'Neil grounded her conclusion in PowerSchool's own statement that its risk analysis tool "uses multiple PowerSchool-designed algorithms to identify individual factors' connection to graduation," and in PowerSchool's corporate testimony that its engineers use the de-identified "Cumberland" dataset (data from a school district that PowerSchool uses for testing) to test and show that new features work. O'Neil Report at 25–26. That districts may adjust thresholds or factors after PowerSchool builds the model does not undermine Dr. O'Neil's opinion, it is precisely the configurability she addressed. *See* O'Neil Report at 27 (discussing "District-Controlled Thresholds" that allow schools to keep default setting or set their own). At most, PowerSchool's contrary characterization of its products "is best settled by a battle of the experts

before the fact finder, not by judicial fiat." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014); *see JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 605 F. Supp. 3d 1295, 1309 (N.D. Cal. 2022) (assertion "that [the expert] made an unsupported assumption and therefore reached faulty conclusions bears on the weight of his testimony, not its admissibility").

PowerSchool next argues that Dr. O'Neil's opinions should be excluded because she contemplates certain risks of harm related to users' interactions—like those of students and schools—with PowerSchool's products, interactions that PowerSchool characterizes as "obvious intervening cause[s] not attributable to PowerSchool." Mot. at 10. Were Dr. O'Neil opining on *actual* harm that has occurred or will occur, a causation analysis might be warranted. *See Clausen v. M/V New Carissa*, 339 F.3d 1049, 1058 (9th Cir. 2003) ("A district court is justified in excluding evidence if an expert 'utterly fails . . . to offer an explanation for why the proffered alternative cause' was ruled out"). But Dr. O'Neil is "not claiming there has been harm or there will be harm," just that there is an increased risk of harm when using [redacted] prediction products. O'Neil Tr. 86:13–87:9. The prospect of intervening causes is therefore irrelevant to the admissibility of her opinions. And the risk she identifies originates with PowerSchool's own conduct—PowerSchool builds and sells the predictive products, and it [redacted] the algorithms or outputs those products generate, regardless of how a particular school configures them. *See* O'Neil Report at 25, 28. Variations in how schools and students use those products may bear on the magnitude of any downstream harm, but they do not sever the risk from the products PowerSchool designed, sold, and [redacted].

Next, PowerSchool attacks Dr. O'Neil's statement "that PowerSchool *could* and *should* conduct bias and accuracy testing," criticizing this component of her opinion because such testing, according to PowerSchool, is "wildly impractical," Mot. at 11, and the singular use of the word "should" transforms her expert opinion into an impermissible legal opinion. Mot. at 12. Again, PowerSchool's general disagreement with Dr. O'Neil's opinions is not grounds for exclusion. Contrary to what PowerSchool inaccurately frames as an onerous "seven-step process," Mot. at 11, Dr. O'Neil actually opined that there are several possible, non-exhaustive tests that, were she provided sufficient data, would assess the bias and accuracy of PowerSchool's algorithm. O'Neil Report at 29–30.

PowerSchool cites *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 963 (N.D. Cal. 2025), for the proposition that Dr. O'Neil must explain "[h]ow PowerSchool would go about testing each of the individual

configurations of any predictive model across tens of thousands of schools." Mot. at 11. But *Klein* excluded an economist's multistep antitrust analysis because one of its steps was deficient, 766 F. Supp. 3d at 963–64, it does not require an expert to design a defendant's testing program before opining that testing is feasible. And PowerSchool again misunderstands the purpose of Dr. O'Neil's testimony. The thrust of her opinion is that PowerSchool [redacted] its algorithms, even though PowerSchool had a training and testing regime available using the Cumberland dataset. O'Neil Report at 25. Indeed, PowerSchool's own designee admits that PowerSchool "could" validate its risk models but has not because "there would be no value to PowerSchool to do that." Dkt 197-1 at Ex. 9, Flagg 30(b)(6) Tr. 226:19–227:7. To provide a more comprehensive menu of testing options than the non-exhaustive list already in her report, Dr. O'Neil would need data PowerSchool did not produce. O'Neil Report at 29–30. PowerSchool cannot withhold its own data in discovery and then use the absence of that data to attack Dr. O'Neil's opinions under Rule 702.

To the extent PowerSchool continues to protest that Dr. O'Neil did not conduct first-hand testing, PowerSchool presents nothing that would require such testing to allow the Court to admit her testimony. In *Daubert v. Merrell Dow Pharms., Inc.*, the Supreme Court counseled that "[u]nlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." 509 U.S. 579, 592 (1993) (internal citations omitted). The proper place to contest an expert's purported failure to test is trial, particularly where, as here, Dr. O'Neil brings her years of algorithm auditing experience to bear in rendering her opinions. *See, e.g.*, *State Farm Gen. Ins. Co. v. Maytag Corp.,* No. C 04-02990 JW, 2005 WL 8177756, at *2 (N.D. Cal. Nov. 30, 2005) (rejecting argument "that [two experts'] reports should be excluded because they failed to test whether an electric current even existed in the wires when the machine was plugged in and not running"); *Bardin v. Nissan Motor Co., Ltd.*, No. 1:21-CV-00144-GNS-HBB, 2023 WL 6392743, at *5 (W.D. Ky. Sept. 29, 2023) ("Considering these experts relied on numerous materials in forming their opinions, the factors they failed to test or consider go to the weight of their testimony. [Plaintiff] may question [the experts] on cross-examination regarding data they did not collect, but the alleged shortcomings do not negate the information that they *did* rely on.") (internal citations omitted, emphasis in original); *Montgomery v. Mitsubishi Motors Corp.*, 448 F. Supp. 2d 619, 629 n.7 (E.D. Pa. 2006) ("While the lack of actual testing may be a primary focus for [defendant's] counsel at trial, the Court sees the opinions set forth in [the expert's] report as the product of an experienced professional's

review of certain documents and data related to the incident in dispute and that professional's subsequent opinion based upon that review.").

Dr. O'Neil's opinions on the feasibility and merits of bias and accuracy testing, moreover, are statements based on her experience leading ORCAA and "audit[ing] algorithms for bias and accuracy," not legal conclusions. O'Neil Report at 1, 29. Far from making a conclusion on duty—a legal term of art Dr. O'Neil does not invoke at any time in her report or deposition testimony—Dr. O'Neil aims to show these tests are *feasible*. This opinion will undoubtedly aid the jury in understanding the extent to which PowerSchool sought to understand its own algorithm's bias and accuracy–that [redacted]—which in turn informs the highly-offensive element of the privacy claims. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 606.

To the extent "should" suggests the contrary, that single word does not warrant rendering Dr. O'Neil's entire opinion inadmissible and can be omitted if necessary. Dr. O'Neil's challenged opinions are reliable and should not be excluded.

## V. CONCLUSION

Dr. O'Neil is a qualified algorithmic auditor who applied her expertise to PowerSchool's own documents, website, and corporate testimony to reach three primary opinions: PowerSchool's products depend on student data to function; PowerSchool designs and sells predictive algorithms that carry risks of inaccuracy and bias; and PowerSchool could test those algorithms [redacted].

Each opinion rests on a sufficient factual foundation and reflects the reliable application of her experience auditing algorithms for bias and accuracy. And each will help the jury decide questions at the heart of this case: whether PowerSchool's use of student data to power [redacted] prediction products is highly offensive, and whether it is unjust for PowerSchool to retain the profits from selling them.

PowerSchool's objections—that schools configure the models, that her examples do not involve PowerSchool, and that she did not test algorithms whose underlying data was never produced—are disagreements with her conclusions, not defects in her method. They are proper subjects for cross-examination and competing expert testimony, not grounds for exclusion.

For these reasons, the Court should deny PowerSchool's motion to exclude the opinions of Catherine O'Neil, Ph.D. in its entirety. Plaintiffs further request the Court grant them all such other relief that the Court deems necessary and appropriate.

Dated: November 3, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ *Leonard W. Aragon*
Leonard W. Aragon (*pro hac vice*)
E. Tory Beardsley (*pro hac vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602)840-5900
leonard@hbsslaw.com
toryb@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
904 Rio Grande St., Suite 100
Austin, Texas 78701
Telephone: (512) 200-8028
julie.liddell@edtech.law
andrew.liddell@edtech.law

Whitney Siehl (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
Telephone: (708) 628-4949
whitneys@hbsslaw.com

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

Attorneys for Plaintiffs