Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

Julie Liddell (*pro hac vice*)
Andrew Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
904 Rio Grande St. Suite 100
Austin, Texas 78701
Telephone: 512-200-8028
julie.liddell@edtech.law
andrew.liddell@edtech.law

[Additional Counsel Listed On Signature Page]

*Counsel for Plaintiffs and the Putative Class Members*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EMILY CHERKIN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>Defendant. | Case No.: 3:24-cv-02706-JD<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT POWERSCHOOL HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: The Honorable James Donato<br><br><u>Hearing</u><br>Date: January 14, 2027<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |

**FILED UNDER SEAL**

## TABLE OF CONTENTS


Page

I. INTRODUCTION .......... 1

II. LEGAL STANDARDS .......... 2

III. ARGUMENT .......... 2

A. The data PowerSchool's products collect and how it is used is in genuine dispute. .......... 2

B. FERPA does not authorize PowerSchool's conduct nor create a private defense to Plaintiffs' claims. .......... 8

a. FERPA was enacted to protect student privacy by requiring parental consent to disclosure of student information. .......... 8

b. The text of FERPA establishes that FERPA does not create a private defense. .......... 9

c. FERPA's legislative history precludes invocation of FERPA as a private defense. .......... 10

d. Construing FERPA as creating a private defense would frustrate its purpose. .......... 12

e. FERPA does not preempt more protective state law. .......... 13

C. Even if FERPA applies, whether PowerSchool is a "school official" is in genuine dispute. .......... 14

D. The California Education Code does not supply a defense to PowerSchool's conduct. .......... 16

E. "Reasonableness" and "offensiveness" are questions of fact for the jury. .......... 18

F. PowerSchool is not entitled to summary judgment as to unjust enrichment. .......... 22

G. Plaintiffs are entitled to punitive damages. .......... 24

IV. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**


*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 2, 8

*Brown v. Google, LLC*,
No. 20-CV-3664-YGR, 2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ........ 19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 2

*Cnty. of San Bernardino v. Walsh*,
69 Cal. Rptr. 3d 848 (Cal. Ct. App. 2007), *as modified on denial of reh'g* (Jan. 25, 2008), *as modified* (Jan. 28, 2008) ........ 22, 23

*CTC Real Est. Services v. Lepe*,
44 Cal. Rptr. 3d 823 (Cal. Ct. App. 2006) ........ 22

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........ *passim*

*First Nationwide Sav. v. Perry*,
15 Cal. Rptr. 2d 173 (Cal. Ct. App. 1992) ........ 10, 12, 23

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. 2025) ........ 19

*Frazier v. Fairhaven Sch. Comm.*,
276 F.3d 52 (1st Cir. 2002) ........ 9

*Fresno Unified Sch. Dist. v. K.U. ex rel. A.D.U.*,
980 F. Supp. 2d 1160 (E.D. Cal. 2013) ........ 9

*Ghirardo v. Antonioli*,
924 P.2d 996 (Cal. 1996) ........ 22

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002) ........ 9, 10, 13

*Helix Energy Sols. Grp., Inc. v. Hewitt*,
598 U.S. 39 (2023) ........ 10

*Hernandez v. Hillsides, Inc.*,
211 P.3d 1063 (Cal. 2009) ........ 18

*Howard v. Aspen Way Enters., Inc.*,
406 P.3d 1271 (Wyo. 2017) ........ 18

*Law v. Gen. Motors Corp.*, 114 F.3d 908 (9th Cir. 1997) .......... 13

*McBride v. Boughton*, 20 Cal. Rptr. 3d 115 (Cal. Ct. App. 2004) .......... 23

*Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357 (2025) .......... 13

*Mirabelli v. Olson*, 691 F. Supp. 3d 1197 (S.D. Cal. 2023) .......... 12

*In re Otter AI Priv. Litig.*, No. 25-CV-06911-EKL, 2026 WL 2351237 (N.D. Cal. Aug. 13, 2026) .......... 18

*Pressley v. Cap. Credit & Collection Serv., Inc.*, 760 F.2d 922 (9th Cir. 1985) .......... 13

*Ragusa v. Malverne Union Free Sch. Dist.*, 549 F. Supp. 2d 288 (E.D.N.Y. 2008) .......... 10

*Rim of the World Unified Sch. Dist. v. Superior Ct.*, 129 Cal. Rptr. 2d 11 (Cal. Ct. App. 2002) .......... 13

*Rodriguez v. Google LLC*, 823 F. Supp. 3d 986 (N.D. Cal. 2026) .......... 19

*Shulman v. Group W. Prods., Inc.*, 955 P.2d 469 (Cal. 1998) .......... 18

*Troxel v. Granville*, 530 U.S. 57 (2000) .......... 12

*Turney v. Collins,* 119 P.2d 954, 958 (Cal. Ct. App. 1941) .......... vi

*Ward v. Taggart*, 336 P.2d 534 (Cal. 1959) .......... 22

*White v. Davis*, 533 P.2d 222 (Cal. 1975) .......... 14

**Statutes and Regulations**

20 U.S.C. § 1221 .......... 10

20 U.S.C. § 1232g .......... 9, 10, 12, 13

34 C.F.R. Part 99 .......... 8, 17

34 C.F.R. § 99.30 .......... 9, 14

34 C.F.R. § 99.31 ........ 9, 15, 16

34 C.F.R. § 99.33 ........ 15, 16, 24

34 C.F.R. § 99.67 ........ 10

Cal. Civ. Code § 3294 ........ 24, 25

Cal. Educ. Code §§ 49060–49085 ........ 17

Cal. Bus. & Prof. Code §§ 22584, et seq. ........ 1

**Other Authorities**

55 Cal. Jur. 3d Restitution § 2 ........ 23

120 Cong. Rec. 13951–56 (May 9, 1974) ........ 11

120 Cong. Rec. 14232–35 (May 13, 1974) ........ 11

120 Cong. Rec. 14579–605 (May 14, 1974) ........ 11

S. Rep. No. 93-1026 (July 22, 1974) ........ 11

120 Cong. Rec. 39861–66 (December 13, 1974) ........ 11

121 Cong. Rec. 13990–92 (May 13, 1975) ........ 11, 12, 21

Fourteenth Amendment ........ 12

California Constitution ........ 1, 18

Fed. R. Civ. P. 26(e)(1)(A) ........ 7

Fed. R. Civ. P. 30(b)(6) ........ 5, 8

Fed. R. Civ. P. 33(d) ........ 6, 7

Fed. R. Civ. P. 56(a) ........ 2

# TABLE OF EXHIBITS

**Exhibits attached to this filing**


| Exhibit | Description | Page |
|---|---|---|
| A | Additional Excerpts from Rule 30(b)(6) Deposition of Darron Flagg, at *e.g.*, 39–106; 233; 330–31; 418–422 | 8, 21 |
| B | A New Frontier for Student Success: PowerSchool's New Solution's [*sic*] Strategy [PWRSCHL_00098945 at 15] | 21 |


**Exhibits already of record**[1]


| Dkt. | Exhibit | Description | Page |
|---|---|---|---|
| 143-2 | | Declaration of David Concepción | 3 |
| 164-1 | Ex. B | FERPA Legislative History, 120 Cong. Rec. 39861–66 (December 13, 1974) | 11 |
| 164-1 | Ex. C | Remarks of Sen. Buckley before the National Congress of Parents and Teachers (PTA), 121 Cong. Rec. 13990–92 (May 13, 1975) | 11, 12, 21 |
| 197 | Ex. A | Expert Report of Christopher Schulte | 21, 23 |
| 197 | Ex. B | Expert Report of Dr. Cathy O'Neil | 20, 21, 23 |
| 197 | Ex. C | Expert Report of Dr. Suzanne Barber | 20 |
| 197 | Ex. D | Declaration of David Concepción | 2 |
| 197-1 | Ex. 2 | DPIA Report – PowerSchool SIS [PWRSCHL_00644395] | 3, 6, 23 |
| 197-1 | Ex. 3 | DPIA Report – Connected Intelligence [PWRSCHL_00644386] | 6, 23 |
| 197-1 | Ex. 5 | DPIA Report – Naviance [PWRSCHL_00644472] | 6, 23 |
| 197-1 | Ex. 6 | DPIA Report – Schoology Learning [PWRSCHL_00644375] | 6, 23 |
| 197-1 | Ex. 7 | DPIA Report – MTSS [PWRSCHL_00646371] | 6, 23 |


[1] To avoid burdening the Court with hundreds of duplicate pages of exhibits, this Opposition cites to recently filed exhibits already in the record for support rather than attaching additional copies. *See Turney v. Collins*, 119 P.2d 954, 958 (Cal. Ct. App. 1941) ("In the federal courts, from their very inception, it has been sufficient to file an exhibit with the clerk, and by reference to incorporate the exhibit in any pleading filed in the case."). If desired, Plaintiffs will provide copies of all cited exhibits for the Court's convenience.

| Dkt. | Exhibit | Description | Page |
|---|---|---|---|
| 197-1 | Ex. 8 | PowerSchool Holdings, Inc.'s Responses and Objections to Plaintiffs' Non-Uniform Interrogatories………… | 5, 6, 7, 15, 16 |
| 197-1 | Ex. 9 | Excerpts of the December 1, 2025 30(b)(6) Deposition of Darron Flagg………… | 4, 20, 21, 23 |
| 197-1 | Ex. 12 | PowerSchool's 2021 Form 10-K [PWRSCHL_00005197]……………. | 3 |
| 197-1 | Ex. 13 | PowerSchool Holdings, Inc.'s Supplemental Responses and Objections to Plaintiffs' Non-Uniform Interrogatories 1, 4, and 5……. | 15 |
| 197-1 | Ex. 14 | Excerpts of the June 19, 2025 Deposition of Nicole Shinton……….. | 4 |
| 197-1 | Ex. 19 | DPIA Report – Analytics and Insight Platform [PWRSCHL_00644311]………… | 4, 6, 23 |
| 197-1 | Ex. 20 | DPIA Report – Behavior Support [PWRSCHL_00644501]…………... | 6, 23 |
| 197-1 | Ex. 21 | DPIA Report – Performance Matters Assessment [PWRSCHL_00644447]………… | 6, 23 |
| 197-1 | Ex. 22 | Annual X-Sell/Upsell by Product report [PWRSCHL_00002785]……. | 23 |
| 197-1 | Ex. 24 | Hosted PS SIS Customer Info chart [PWRSCHL_00300715]……….. | 3 |
| 197-1 | Ex. 25 | Supplemental Contract Incorporating Sourcewell Contract for Procurement of Educational Software and Services from PowerSchool [PWRSCHL_00007269]………… | 3 |
| 197-1 | Ex. 26 | 2022 Booking Raw Data report [PWRSCHL_00231378]……………... | 3, 4, 23 |
| 197-1 | Ex. 27 | ByFinanceProduct report [PWRSCHL_00117279]…………………… | 3 |
| 197-1 | Ex. 28 | Booking report [PWRSCHL_00702684]……………………………… | 3, 4 |
| 197-1 | Ex. 29 | Clean – from mgmt report [PWRSCHL_00343564]…………………... | 3 |
| 197-1 | Ex. 30 | SIS Customer Base report [PWRSCHL_00374163]…………………... | 3, 4 |
| 197-1 | Ex. 31 | Request for Proposal Student Information Systems [PWRSCHL_00141839]………… | 3 |
| 197-1 | Ex. 32 | Student Data Privacy Agreement for Seattle School District No. 1 and PowerSchool [PWRSCHL_00007183]………………………………... | 4 |
| 197-1 | Ex. 33 | Excerpts of the August 19, 2025 Deposition of David Concepción…... | 4 |
| 197-1 | Ex. 34 | Excerpts of the November 24, 2025 Deposition of M.M.C…………... | 4 |

| Dkt. | Exhibit | Description | Page |
|---|---|---|---|
| 197-1 | Ex. 35 | Excerpts of the November 24, 2025 Deposition of L.M.C.…………… | 4 |
| 197-1 | Ex. 36 | Excerpts of the August 26, 2025 Deposition of S.G.………………….. | 4, 5 |
| 197-1 | Ex. 37 | Excerpts of report1579025626462 [PWRSCHL_00170053]…………... | 4 |
| 197-1 | Ex. 38 | September 1, 2021 email [PWRSCHL_00072231]……………………. | 3, 4 |
| 197-1 | Ex. 39 | UPDATE – Master SFDC Report [PWRSCHL_00282149]…………... | 4 |
| 197-1 | Ex. 40 | Excerpts of a data report [PWRSCHL_00001060]……………………. | 4 |
| 197-1 | Ex. 41 | Excerpts of a raw data report [PWRSCHL_00077702]……………... | 4 |
| 197-1 | Ex. 42 | Excerpts of the December 5, 2025 Deposition of Judith Jaeger………. | 4 |
| 197-1 | Ex. 43 | Excerpts of PS SIS Customers with hosting report [PWRSCHL_00627056]……………………………………………… | 4 |
| 197-1 | Ex. 44 | Excerpts of the September 12, 2025 Deposition of Emily Cherkin…… | 5 |
| 197-1 | Ex. 48 | PowerSchool Holdings, Inc.'s Supplemental Responses and Objections to Plaintiffs' Non-Uniform Interrogatories 2, 3, 7, 8……........................ | 6, 7, 16 |
| 197-1 | Ex. 49 | May 6, 2024 email regarding M.M.C.'s attendance report [CONCEPCION_000001]…………………………………………… | 3 |
| 197-1 | Ex. 50 | May 6, 2024 email regarding L.M.C.'s attendance report [CONCEPCION_000014]…………………………………………… | 3 |
| 197-1 | Ex. 51 | August 21, 2023 email from a West Contra Costa Unified School District principal regarding the submission of personal information to the school, including medical information [CONCEPCION_000142]... | 3 |
| 197-1 | Ex. 52 | August 19, 2022 email from West Contra Costa Unified School District personnel requesting that David submit information using PowerSchool [CONCEPCION_000275]…………………………......................... | 3 |
| 197-1 | Ex. 53 | May 28, 2020 email from West Contra Costa Unified School District personnel requesting M.M.C.'s birth certificate so that changes can be made in the school district's system run by PowerSchool [CONCEPCION_000304]…………………………………………… | 3 |
| 197-1 | Ex. 54 | PowerSchool spreadsheet containing product data [PWRSCHL_00008714]……………………………………………… | 3 |
| 197-1 | Ex. 55 | PowerSchool spreadsheet containing product data [PWRSCHL_00702684]……………………………………………… | 3 |

| Dkt. | Exhibit | Description | Page |
|---|---|---|---|
| 197-1 | Ex. 56 | Excerpts from a PowerSchool spreadsheet containing S.G.'s data [PWRSCHL_00702665]…………………………………………… | 5 |
| 197-1 | Ex. 57 | Excerpts from a PowerSchool spreadsheet containing S.G.'s data [PWRSCHL_00702668]…………………………………………… | 5 |
| 197-1 | Ex. 58 | Excerpts from a PowerSchool spreadsheet containing S.G.'s data [PWRSCHL_00702682]…………………………………………… | 5 |
| 197-1 | Ex. 59 | Excerpts from a PowerSchool spreadsheet containing S.G.'s data [PWRSCHL_00702683]…………………………………………… | 5 |
| 197-1 | Ex. 60 | Excerpts from a PowerSchool database containing S.G.'s data [PWRSCHL_00702671]…………………………………………… | 5 |
| 197-1 | Ex. 61 | Spreadsheet of states that follow section 652B of the Restatement…… | 18 |
| 197-1 | Ex. 65 | Quote for a PowerSchool product [PWRSCHL_00007368]…………... | 4 |
| 220-1 | Ex. 1 | Notice of Data Breach……………………………………………... | 3, 8, 21 |

# I. INTRODUCTION

The Court should deny PowerSchool's motion for summary judgment in its entirety.[2] PowerSchool is wrong that FERPA and its California analogue foreclose Plaintiffs' claims: those laws regulate schools and do not provide companies a defense against liability for privacy invasions. Even if PowerSchool could somehow avail itself of these laws, factual disputes about whether PowerSchool meets the elements that purportedly shield its conduct preclude summary judgment.

Plaintiffs' claims of common law intrusion upon seclusion and invasion of privacy under the California Constitution should be allowed to proceed to trial. Whether students have a reasonable expectation of privacy in their personal information while at school and whether PowerSchool's conduct is highly offensive turn heavily on the facts. A court may not grant summary judgment on these classic jury questions.

Plaintiffs' quasi-contract claim for unjust enrichment and demand for punitive damages should also survive. PowerSchool unjustly benefits from using, without parental consent, the student information its products collect, has developed new prediction products that rely on that information and process it in harmful ways, and has used those prediction products to upsell its school district customers, reaping hundreds of millions of dollars in revenue. California recognizes disgorgement of unjustly earned profits even where an individual has not suffered a corresponding loss. It is up to a jury to decide whether

---

[2] Plaintiffs respond only to those arguments properly raised in the Argument section of PowerSchool's motion.

In its Statement of Facts, PowerSchool gestures toward an affirmative defense under California's Student Online Personal Information Protection Act ("SOPIPA"), Cal. Bus. & Prof. Code §§ 22584, et seq., that it did not plead in its Answer nor articulate in response to Plaintiffs' contention interrogatory. *See* Motion, Dkt. 201 at 12–13. Plaintiffs assume that PowerSchool is not arguing that SOPIPA authorizes its conduct because that argument is not raised in the Argument section; because Plaintiffs alleged that PowerSchool's conduct violated SOPIPA, *see* Dkt. 1, ¶ 493, which PowerSchool did not respond to, *see* Dkt. 66, ¶ 493; because none of PowerSchool's 27 affirmative defenses references that statute; because PowerSchool had ample opportunity thereafter to raise and plead this defense, but it failed to do so; and because if it meant to invoke SOPIPA in its motion for summary judgment, it would mark the third time PowerSchool has attempted to belatedly raise a new affirmative defense. *See* PowerSchool's Motion to Amend/Correct Answer, Dkt. 111 (raising 28th defense of countervailing interests), Order, Dkt. 121 (denying motion); PowerSchool's Opposition to Plaintiffs' Motion for Summary Judgment, Dkt. 170 at 28–30 (raising policy arguments, governmental authorization); Plaintiffs' Reply in support, Dkt. 175 at 6–10 (identifying these new arguments).

PowerSchool received a benefit through its fraudulent or coercive conduct, and whether that conduct merits punitive damages.

## II. LEGAL STANDARDS

Parties "may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. *Id.* To determine whether a genuine dispute as to any material fact exists, the Court views the evidence in the light most favorable to the nonmoving party, and "all justifiable inferences are to be drawn" in that party's favor. *Id.* at 255. The moving party may initially establish the absence of a genuine issue of material fact by "pointing out to the district court [ ] that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). It is then the nonmoving party's burden to "go beyond the pleadings" and identify specific facts that show a genuine issue for trial. *Id.* at 323–24.

## III. ARGUMENT

Genuine issues of material fact preclude summary judgment on any of Plaintiffs' claims. As a matter of law, FERPA and its California counterpart are inapplicable and do not authorize or otherwise provide a defense to PowerSchool's conduct.

### A. The data PowerSchool's products collect and how it is used is in genuine dispute.

PowerSchool is wrong that "there is little to no student data in the record" about the Plaintiffs and that the "record contains no data at all about absent class members." *See* Motion, Dkt. 201 at 10–11.

There is ample evidence in the record about Plaintiff minor children S.G., L.M.C., and M.M.C.[3]

Plaintiffs L.M.C., age 13, and M.M.C., age 11, attend school in the West Contra Costa Unified School District ("WCC"). *See* Dkt. 197, Ex. D, Concepción Decl. at ¶ 8. Defendant admits that their data

[3] To minimize duplication, Plaintiffs cite exhibits already of record where possible. *See* n. 1, *supra*.

was stored in PowerSchool's products and taken as part of the 2024 PowerSchool data breach. Dkt. 220-1, Ex. 1. There is also ample evidence that L.M.C.'s and M.M.C.'s data was collected through their school ("WCC") using PowerSchool's products. *See, e.g.*, Dkt. 197-1, Ex. 28 (contracts for SIS at WCC from July 1, 2020, to June 2025); Dkt. 197-1, Ex. 49 (email from WCC containing M.M.C.'s data and stating that current information was available through PowerSchool); Dkt. 197-1, Ex. 50 (email containing L.M.C.'s data and stating that current information was available through PowerSchool); Dkt. 197-1, Ex. 51 (email from WCC's principal stating that all families are required to complete annual forms on PowerSchool, including submission of medical information); Dkt. 197-1, Ex. 52 (email from WCC asking David to input information into PowerSchool); Dkt. 197-1, Ex. 53 (email from WCC requesting that David send M.M.C.'s birth certificate to the district so that it could make a change in its system run by PowerSchool); Dkt. 143-2, Decl. of David Concepción in Support of Opposition to Defendant's Motion for Sanctions at ¶ 10 ("I regularly interact with PowerSchool's product by inputting sensitive data about my family into the product").

The school district uses PowerSchool SIS, a Student Data Warehouse Product, as well as Naviance, to collect, process, and store their data. *See* Dkt. 197-1, Exs. 24–30. PowerSchool SIS is the workhorse for PowerSchool, containing massive amounts of data about students and their families. *See* Dkt. 197-1, Ex. 31, PWRSCHL_00141839 at 15 ([redacted]); Dkt. 197-1, Ex. 12, PWRSCHL_00005197 at 11 (confirming that PowerSchool SIS is "used by nearly every school constituent on a day-to-day basis"); Dkt. 197-1, Ex. 2 (PowerSchool SIS DPIA). The district also used Unified Insights, a Student Profiling and Prediction Product that was once known as Hoonuit and is now known as Analytics and Insights from at least 2021 through at least 2023, when L.M.C. and M.M.C. were attending school there. *See* Dkt. 197-1, Ex. 25, PWRSCHL_00007269 at p. 75 (contract between PowerSchool and WCC showing Unified Insights and Hoonuit); Dkt. 197-1, Ex. 26 (showing that PowerSchool trained WCC on the Unified Insights product); Dkt. 197-1, Ex. 38 (showing that WCC used Hoonuit); Dkt. 197-1, Ex. 54 (listing PowerSchool products used by WCC); Dkt. 197-1, Ex. 55 (showing that WCC used Hoonuit). Unified Insights is the bedrock for PowerSchool's Student Profiling and Prediction Products, and is a "comprehensive K-12 student data analytics platform that brings together an organization's disparate data from multiple sources to create a dashboard and analytics related to the

aggregated data." *See* Dkt. 197-1, Ex. 19 at 4; Dkt. 197-1, Ex. 9, Flagg 30(b)(6) Tr. 179:9–183:3. This includes "student analytics" that identify "at risk students and support personalized learning plans." *See* Dkt. 197-1, Ex. 19 at 5. Unified Insights was also used throughout the district, as evidenced by WCC paying PowerSchool to use the product on a per-child basis for the entire population. Dkt. 197-1, Ex. 65 [redacted]). This product is untested for reliability, bias, or accuracy. *See* Dkt. 197-1, Ex. 9, Flagg 30(b)(6) Tr. 222:3–230:3.

Plaintiff David Concepción, L.M.C.'s and M.M.C.'s father, testified that PowerSchool is misusing his children's information without his or his children's authorization. *See* Dkt. 197-1, Ex. 33, Concepción Tr. 126:13–134:22. He explained that PowerSchool misuses student data when it, without permission, "[takes] information and [does] not [hold] it . . . solely for the use of [WCC] . . . ." *See id.* 129:9–18. His children also testified that their personal data is private and invaluable. *See* Dkt. 197-1, Ex. 34, M.M.C. Tr. 38:24–39:5 ("My privacy is too important . . . ."); Ex. 35, L.M.C. Tr. 40:8-10 ("I mean, I wouldn't sell it because it's like my personal stuff."). M.M.C. explained that privacy means "keeping it secret" and "not . . . sharing it with other people." *See* Dkt. 197-1, Ex. 34, M.M.C. Tr. 37:9–13.

Similarly, Plaintiff S.G., a minor, attends school in the Seattle Public School District ("SPS"). *See* Dkt. 197-1, Ex. 36, S.G. Tr. 9:19–20; 10:23–25; 11:1–25; 12:1–23. The school district uses the following PowerSchool products: PowerSchool SIS, Schoology, Naviance, and MTSS. *See* Dkt. 197-1, Exs. 26, 28, 30, 32 [redacted]), Dkt. 197-1, Exs. 37–41. The district also uses Analytics and Insights and Performance Matters, each a Student Profiling and Prediction Product. *See id.* SPS currently hosts some of its data on-premises, meaning that it has its own servers or hardware that it elects to maintain to house its own data, but also hosted SIS data on PowerSchool's cloud servers during the class period. *See* Dkt. 197-1, Ex. 14, Shinton Tr. 45:10–21; Dkt. 197-1, Ex. 42, Jaeger Tr. at 50:24–51:9 (SPS's witness testified that PowerSchool stores SPS student data in the cloud in its "analytics and insights module, which holds student intervention data, and then also Naviance."); Dkt. 197-1, Ex. 43 (showing that SPS was a PowerSchool SIS "customer with hosting"). SPS, however, has always hosted its data for Unified Insights and Naviance on PowerSchool's cloud servers. *See* Dkt. 197-1, Ex. 42, Judith Jaeger Tr. 50:24-51:9; Ex. 43 (confirming that PowerSchool hosts SPS data).

There is substantial evidence that S.G.'s data was collected using PowerSchool's products. *See* Dkt. 197-1, Ex. 56 (PowerSchool spreadsheet containing S.G.'s data); Dkt. 197-1, Ex. 57 (PowerSchool spreadsheet containing S.G.'s assessment data); Dkt. 197-1, Ex. 58 (PowerSchool spreadsheet containing S.G.'s sensitive personal data); Dkt. 197-1, Ex. 59 (PowerSchool spreadsheet containing S.G.'s sensitive personal data); Dkt. 197-1, Ex. 60 (showing a log and timestamps for S.G.'s online activity). Plaintiff Emily Cherkin, S.G.'s mother, also testified that PowerSchool is violating her daughter's privacy rights because it "collects and sells and profits from data about children without informed consent." *See* Dkt. 197-1, Ex. 44, Emily Cherkin Tr. 281:17–19. She believes that PowerSchool should "[s]top collecting children's data without parental consent and compensate for any harm they've caused." *Id.* 284:13-15. Ms. Cherkin further testified regarding school information systems, noting they must be deployed "effectively, safely, and legally." *Id.* 175:22–23. Safety is the "bare minimum protecting privacy of student information [s]o . . . it stays within the school itself." *Id.* 175:23–25. Cherkin's privacy concerns extended beyond the threat of "bad actors," pointing specifically to the commercial practices of PowerSchool. *Id.* 175:6–11. She cautioned that PowerSchool is allowed to "take the data, sell it, and profit from it," turning sensitive student records into a commodity. *Id.* 175:9–11. Ultimately, Ms. Cherkin clarified that her concerns focus on student privacy and PowerSchool's misuse of private data: "my problem, again, is about consent, collection, and sale of data." *Id.* 175:20–21.

S.G. testified she did not give PowerSchool "permission to collect and use her data to make money," expressing concerns that her personal information is being sold to third parties or used to develop predictive AI products. *See* Dkt. 197-1, Ex. 36, S.G. Tr. 155:24–156:1; 154:4–155:7. She maintains her privacy is respected if the information she shared with her teachers and school remains strictly between them. *Id.* 80:11–22.

There is also ample evidence of information PowerSchool's products collect about unnamed class members. PowerSchool's sworn interrogatory responses and Rule 30(b)(6) deposition testimony from its corporate representative are evidence of the baseline data elements collected automatically by each of its products, and are thus common to the putative class representatives and members of the class.

On September 13, 2024, Plaintiffs served their First Set of Interrogatories Nos. 1–7. *See* Dkt. 197-1, Ex. 8. Plaintiffs' Interrogatory No. 1 requested that PowerSchool "[i]dentify each of your 'Products &

Solutions,' as those terms are used or have been used on your website www.powerschool.com, that collects data, uses data, or discloses data to schools or any third party." *See* Dkt. 197-1, Ex. 8 at 5 (sentence case changed for readability throughout). Plaintiffs' Interrogatory No. 3 requested that PowerSchool, "[f]or each product or solution identified in response to Interrogatory Request No. 1[,] identify each category of data collected by each product or service, and for each such category of data identify: a) your educational interest in that category of data, b) each third party to whom that category of data is disclosed, shared, sold, or otherwise used by, and c) why you collect that category of data." *See* Dkt. 197-1, Ex. 8 at 7–9.

In its initial November 13, 2024, response to Interrogatory No. 1, PowerSchool identified 26 products. *See* Dkt. 197-1, Ex. 8 at 5–6. PowerSchool did not substantively respond to Interrogatory No. 3, objecting to it as overly burdensome and disproportionate to the needs of the case. *See* Dkt. 197-1, Ex. 8 at 7–9. PowerSchool's responses were verified "under penalty of perjury" by Darron Flagg, its Chief Compliance Officer, Chief Privacy Officer, and Assistant Corporate Secretary. *See* Dkt. 197-1, Ex. 8 at 29.

On March 31, 2025, PowerSchool supplemented its response to Interrogatory No. 3. *See* Dkt. 197-1, Ex. 48. While again objecting to the request as overly burdensome, this time PowerSchool did substantively respond, stating that "PowerSchool will produce, pursuant to Fed. R. Civ. P. 33(d), the Data Privacy Impact Assessments ('DPIAs') for each product identified in Interrogatory No. 1, which identify the categories and uses of data relating to each such product." *See* Dkt. 197-1, Ex. 48 at 6–7.

PowerSchool produced DPIA Reports for its products including PowerSchool SIS, Dkt. 197-1, Ex. 2; Connected Intelligence, Dkt. 197-1, Ex. 3; Naviance, Dkt. 197-1, Ex. 5; Schoology, Dkt. 197-1, Ex. 6; MTSS, Dkt. 197-1, Ex. 7; Analytics and Insights, Dkt. 197-1, Ex. 19; Behavior Support, Dkt. 197-1, Ex. 20; and Performance Matters Assessment, Dkt. 197-1, Ex. 21.

PowerSchool further responded that it "incorporates by reference its Response to Interrogatory No. 6 as to its educational interest in such data." *See* Dkt. 197-1, Ex. 48 at 7. Its response to Interrogatory No. 6 did not, however, set forth its educational interests in the data. *See* Dkt. 197-1, Ex. 8 at 18–25. As before, this response was again verified "under penalty of perjury" by Mr. Flagg. *See* Dkt. 197-1, Ex. 48 at 12.

Under Rule 33(d), "[i]f the answer to an interrogatory may be determined by examining . . . a party's business records . . . the responding party may answer by: (1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and (2) giving the interrogating party a reasonable opportunity to examine and audit the records[.]"

The question was clear: Plaintiffs asked PowerSchool to identify each category of data collected by each of PowerSchool's products. PowerSchool's sworn response was unequivocal: the DPIAs "identify the categories and uses of data relating to each such product" that PowerSchool identified in its response to Interrogatory No. 1.

The company did not hedge its response. PowerSchool did not state and Mr. Flagg did not swear, as PowerSchool now argues, that the "DPIAs describe only the categories of data that *may be* collected depending on a school's configuration of a product," or that the "DPIAs are merely privacy assessments that state what categories of data a school *could potentially* input into a PowerSchool product." *See* Motion, Dkt. 201 at 11–12 (emphases in original).

If PowerSchool later realized that its March 31, 2025, response to Interrogatory No. 3 was unclear or incomplete, PowerSchool was obligated to supplement it. "A party . . . who has responded to an interrogatory . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]" Fed. R. Civ. P. 26(e)(1)(A).

The difference between what a product may do, if configured to do so, and what it does as a standard matter, is material. If, as PowerSchool swore, the DPIAs identify the categories and uses of data relating to each product, then that is evidence that those products collect those standard data elements for all class members whose schools use them. It is not necessary to have a spreadsheet or database with millions of entries to confirm that fact, especially when PowerSchool repeatedly objected that it was unduly burdensome to describe how its products operate in more detail and declined to produce the underlying records themselves. *See* Dkt. 197-1, Ex. 8 at 11–12; Ex. 48 at 6–7. Thus, if Plaintiffs' respective school districts or those of unnamed class members use a product, PowerSchool's own sworn statements are

evidence that the DPIA corresponding to that product identifies the standard categories of data that product automatically collects and how that data is used. Plaintiffs relied on these sworn statements in deciding not to initiate a discovery dispute that would have sought the underlying records and a more fulsome explanation of PowerSchool's practices, and later, to formulate their theory of the case. *See generally* Dkt. 197, Dkt. 220.

As PowerSchool's designated representative under Rule 30(b)(6), Mr. Flagg testified extensively about PowerSchool's DPIAs. *See* Ex. A, Rule 30(b)(6) Deposition of Darron Flagg, at *e.g.*, 39–106. Mr. Flagg repeatedly referred to the DPIAs for various products to answer questions about what data elements those products collect. *See id.* Accordingly, the records pertaining to L.M.C., M.M.C., and S.G., their and their parents' testimony, PowerSchool's sworn interrogatory responses, and Mr. Flagg's testimony as PowerSchool's corporate representative raise a genuine dispute of material fact as to the data elements collected by PowerSchool's products that precludes summary judgment. *Anderson*, 477 U.S. at 248.

**B. FERPA does not authorize PowerSchool's conduct nor create a private defense to Plaintiffs' claims.**

PowerSchool is wrong that the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 C.F.R. Part 99, authorizes its conduct as a regulatory "school official" or creates a defense to Plaintiffs' claims. *See* Motion, Dkt. 201 at 12–15. Before PowerSchool may invoke FERPA as a defense to Plaintiffs' claims, it must first demonstrate that FERPA may be interpreted as creating a defense for private entities to claims brought by private litigants. Basic canons of statutory construction establish that it may not.

**a. FERPA was enacted to protect student privacy by requiring parental consent to disclosure of student information.**

As this Court has observed, FERPA is a statute enacted by Congress in 1974 to codify students' expectation of privacy in their personal information in the education setting. Order re Dismissal, Dkt. 65 at 4. FERPA protects student privacy by requiring a school to obtain written parental consent before disclosing student information:

> Congress enacted FERPA "to assure parents of students . . . access to their educational records and to protect such individuals' rights to privacy *by limiting the transferability of their records without their consent*." Under its terms, educational institutions, with a few exceptions not material here, must obtain written parental consent prior to releasing students' records or information derived therefrom.

*Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67–68 (1st Cir. 2002) (quoting 120 Cong. Rec. 39862 (1974) (joint statement of sponsoring senators explaining major amendments to FERPA)) (emphasis added); Order re Dismissal, Dkt. 65 at 4. Parental consent must be written, signed, and dated by the parent and "specify[] records to be released, the reasons for such release, and to whom, and with a copy of the records to be released to the student's parents and the student if desired by the parents." 20 U.S.C. § 1232g(b)(2)(A); 34 C.F.R. § 99.30(a)–(d).

Confoundingly, however, PowerSchool contends that FERPA creates a defense for private companies that *fail* to obtain parental consent before creating, collecting, using, and sharing student information and permits them to rely on school consent alone. *See* Motion, Dkt. 201 at 12–13. In support, PowerSchool cites one specific provision setting forth the conditions under which a school[4] need not obtain prior consent before it discloses personally identifiable information from an education record of a student without the consent required by § 99.30, known as the "school official" exception. *See* 34 C.F.R. § 99.31(a)(1) ("An educational agency or institution may disclose . . ."). But PowerSchool's invocation of this exception as a private defense contravenes the very purpose of FERPA.

**b. The text of FERPA establishes that FERPA does not create a private defense.**

The Supreme Court has held that FERPA does not create private rights that may be privately enforced. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286–90 (2002). The Court explained that "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit[.]" *Id.* at 286. Accordingly, the Court observed that "FERPA's nondisclosure provisions contain no rights-creating language, they have an aggregate, not individual, focus, and they serve primarily to direct the Secretary of Education's distribution of public funds to educational institutions." *Id.* at 290; *see also Fresno Unified Sch. Dist. v. K.U. ex rel. A.D.U.*, 980 F. Supp. 2d 1160, 1182 (E.D. Cal. 2013) (FERPA may not be enforced through private litigation). Its analysis is firmly rooted in the text of FERPA.

[4] "School" as used herein refers broadly to "an educational agency or institution" as used in FERPA. *See* 20 U.S.C. § 1232g(a)(3) ("For the purposes of this section, the term 'educational agency or institution' means any public or private agency or institution which is the recipient of funds under any applicable program.").

***First***, and most obviously, FERPA expressly regulates only schools, not private companies. 20 U.S.C. § 1232g, *passim*. It was enacted to "deter schools from adopting policies of releasing student records." *Ragusa v. Malverne Union Free Sch. Dist.*, 549 F. Supp. 2d 288, 291 (E.D.N.Y. 2008). Thus, "FERPA's nondisclosure provisions [ ] speak only in terms of institutional policy and practice, not individual instances of disclosure." *Gonzaga*, 536 U.S. at 288 (citing §§ 1232g(b)(1)-(2)).

***Second***, FERPA creates an exclusive administrative enforcement scheme through the Department of Education. 20 U.S.C. § 1232g(f) ("The Secretary [of Education, *see id.* § 1221(c)(4),] shall take appropriate actions to enforce this section and to deal with violations of this section . . . ."); *id.* § 1232g(g) ("The Secretary shall establish or designate an office and review board within the Department [of Education, *see id.* § 1221(c)(3)] for the purpose of investigating, processing, reviewing, and adjudicating violations of this section and complaints which may be filed concerning alleged violations of this section.").

***Third***, FERPA provides only one enforcement mechanism: the withholding of federal funding from schools with nonconforming disclosure policies. *See, e.g.*, 20 U.S.C. § 1232g(a)(1)(A) ("No funds shall be made available . . . to any educational agency or institution which has a policy of denying . . . the parents of students who are or have been in attendance at a school . . . the right to inspect and review the education records of their children."); § 1232g(b)(1) ("No funds shall be made available . . . to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein . . . ) of students without the written consent of their parents[.]"); 34 C.F.R. § 99.67 (explaining that the Secretary enforces decisions by withholding funds).

Just as the Supreme Court determined that the absence of language permitting private enforcement evinced congressional intent to not permit private enforcement, the absence of language creating a private defense evinces congressional intent to *not* create a private defense. *See Gonzaga*, 536 U.S. at 290; *see also Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 59 (2023) ("Even the most formidable policy arguments cannot overcome a clear textual directive.") (citation modified).

**c. FERPA's legislative history precludes invocation of FERPA as a private defense.**

In addition to lacking support in FERPA's text, PowerSchool's attempt to invoke FERPA as a private consent defense is further refuted by FERPA's legislative history.

FERPA[5] was enacted to curb surveillance of students by the government, as well as by private organizations. As its sponsor Senator Buckley explained, "[t]he immediate reason for the legislation was, of course, the growing evidence of the abuse of student records across the nation." *See* Dkt. 164-1, Ex. C, 121 Cong. Rec. 13990. After "irate parents and students" sent thousands of letters detailing the abuses to the Russell Sage Foundation, the Foundation undertook a survey of recordkeeping practices of representative U.S. school districts. It "convened a conference of prominent educators, lawyers, and social scientists to consider the ethical and legal aspects of school record-keeping, and to develop guidelines for the collection, maintenance, and dissemination of these records." *Id.* The resulting report identified a number of abuses by schools and private entities of student information, especially concerning the exclusion of parents from decisions concerning disclosure of their children's information. *Id.* The report's recommendations formed the basis of FERPA. *Id.*

In introducing FERPA, Senator Buckley noted that there was "clear evidence of frequent, even systematic violations of the privacy of students and parents by the schools through the unauthorized collection" and release of student information "to various individuals and organizations." *Id.* Among the "serious abuses" he identified was "the insertion of potentially prejudicial anecdotal comments and factual inaccuracies into children's school records," including material concerning a student's likelihood of future academic success, predictions of student delinquency, and observations as to whether a student was a "bad citizen." *Id.* at 13990–91. Without the right to inspect or correct these records, Senator Buckley observed

---

[5] The entire 1974 Act itself, known as the Buckley/Pell Amendment after sponsors Senator James L. Buckley and Senator Claiborne Pell, was offered as an amendment on the Senate floor to the bill extending the Elementary and Secondary Education Act of 1965. It was not the subject of hearings or committee reports. The legislative history is limited to the Senate floor debates, which primarily concern a provision of the amendment that was not enacted, *see* 120 Cong. Rec. 13951–56 (May 9, 1974); 120 Cong. Rec. 14232–35 (May 13, 1974); 120 Cong. Rec. 14579–605 (May 14, 1974); and the conference report, which briefly describes provisions added to the Senate amendment either from the House bill or directly by the conferees, *see* S. Rep. No. 93-1026, at 186–187 (July 22, 1974) (Conf. Rep.).

Responding to inquiries from the educational community, Senator Buckley and Senator Pell issued a joint statement explaining their amendment in order to provide an adequate record upon which "to develop the necessary regulations." *See* Dkt. 164-1, Ex. B, 120 Cong. Rec. 39861–66 (December 13, 1974). Six months later, in response to inquiries from the public and congressional offices, Senator Buckley received unanimous consent to place in the Congressional Record the text of his March 12, 1975, remarks before the National Congress of Parents and Teachers (PTA) discussing his reasons and beliefs for introducing the Act. *See* Dkt. 164-1, Ex. C, 121 Cong. Rec. 13990–92 (May 13, 1975).

that "devastatingly negative effects on the academic future and job prospects of an innocent, unaware student" can result. *Id.* at 13990. He also made prescient observations about the severe privacy threats posed by the growing use of "computer data banks on students":

> In addition, *the growth of the use of computer data banks on students* and individuals in general *has threatened to tear away most of the few remaining veils guarding personal privacy*, and to place enormous, dangerous power in the hands of the government, as well as private organizations.

*Id.* at 13991 (emphasis added).

Accordingly, FERPA was enacted to safeguard children's privacy in their own education records, including to prevent the abuse and improper disclosure of the records and their contents, and to safeguard parents' rights over those records. Indeed, "[t]he constitutional right of parents to direct their child's education is [] protected through Congressional policy, as exemplified by [FERPA]." *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1211 (S.D. Cal. 2023); *see* Dkt. 164-1, Ex. C, 120 Cong. Rec. 13991 ("I introduced the Family Educational Rights and Privacy Act not only to correct certain abuses in the schools but also to reassert and re-establish the basic rights, responsibilities and involvement of parents in their children's upbringing and education."); *see Troxel v. Granville*, 530 U.S. 57, 65 (2000) (extensively discussing the right to which Senator Buckley referred, namely, parents' Fourteenth Amendment liberty interest "to direct the upbringing and education of children under their control"). And FERPA's primary mechanism for safeguarding student privacy is a broad prohibition against schools disclosing student information to third parties without prior, written parental consent. 20 U.S.C. § 1232g(b)(1).

**d. Construing FERPA as creating a private defense would frustrate its purpose.**

Interpreting FERPA as creating a defense for private companies while simultaneously creating no private right of action for individual students would wholly subvert the stated congressional intent of FERPA in at least three important ways.

***First***, that interpretation would undermine Congress's establishment of an exclusive administrative enforcement scheme through the Department of Education rather than the courts. Such an asymmetrical interpretation would defeat the statutory objective of centralizing enforcement under the Secretary of Education and would impermissibly authorize courts to make adjudicative determinations under FERPA.

***Second***, FERPA creates only duties for educational institutions receiving federal funds. *See* 20 U.S.C. § 1232g(a). It does not create rights or defenses for private companies. *See Gonzaga*, 536 U.S. at 290. Allowing a private company to invoke FERPA defensively would improperly extend the statute's scope beyond what Congress intended to regulate through its spending power. Indeed, the Supreme Court has explained that spending-power legislation of this type creates contractual rights between the federal government and the state rather than individually enforceable rights. *See Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 376 (2025) (observing that "spending-power legislation is in the nature of a contract" (citation modified)).

***Third***, and perhaps most important, construing FERPA as creating a private defense would produce the absurd result of creating rights for private companies but not for students and their parents—those whom the statute was enacted to protect—leaving them *less* protected than if FERPA had never become law. Indeed, the legislative history shows that FERPA was enacted to end the exact type of broad, nonconsensual disclosure practices Plaintiffs allege here. To divine a private defense from FERPA would insulate companies from liability against claims brought under other laws without providing a mechanism for holding those companies accountable. A statutory construction so fundamentally at odds with the statute's remedial framework and express purpose is impermissible. *Pressley v. Cap. Credit & Collection Serv., Inc.*, 760 F.2d 922, 924 (9th Cir. 1985) ("In interpreting statutes the court's objective is to ascertain the congressional intent and give effect to the legislative will." (citation modified)).

**e. FERPA does not preempt more protective state law.**

Finally, because FERPA is a spending-clause statute that conditions schools' federal funding on compliance, it cannot be construed as creating a comprehensive regulatory scheme governing student privacy, let alone one that would preempt state-law claims against private entities not subject to FERPA. *Cf. Rim of the World Unified Sch. Dist. v. Superior Ct.*, 129 Cal. Rptr. 2d 11, 14-15 (Cal. Ct. App. 2002) (holding FERPA sets minimum protections against disclosure that preempt less protective state law governing disclosure of student records). The "school official" designation under FERPA merely means that a *school* may share records with certain contractors without first obtaining parental consent and without violating FERPA's funding conditions; it does not insulate the contractor from liability or absolve it of its duties under other laws. *See Law v. Gen. Motors Corp.*, 114 F.3d 908, 910 (9th Cir. 1997) ("[W]e entertain a strong

presumption that federal statutes do not preempt state laws; particularly those laws directed at subjects—like health and safety—traditionally governed by the states." (citation modified)); *White v. Davis*, 533 P.2d 222, 233 (Cal. 1975) (explaining that the right of privacy was added to the California Constitution in opposition to "increased surveillance and data collection activity in contemporary society").

In sum, no authority suggests that FERPA is the only, or even the primary, source of protection for student privacy. And no authority would permit PowerSchool's liability under state law to rise or fall with a school's compliance with its federal-funding obligations under FERPA or, worse, immunize PowerSchool from liability irrespective of schools' compliance. As this Court observed, FERPA simply demonstrates that students do have a statutorily recognized expectation of privacy in the information that Plaintiffs allege PowerSchool takes, uses, and shares. *See* Order re Dismissal, Dkt. 65 at 4.

Because FERPA may not, as a matter of law, be interpreted as creating a private consent defense, PowerSchool cannot rely on it and its motion for summary judgment fails as to this argument.

**C. Even if FERPA applies, whether PowerSchool is a "school official" is in genuine dispute.**

Even if FERPA somehow applies to authorize PowerSchool's conduct or to provide a defense to Plaintiffs' claims, there is a genuine factual dispute as to whether PowerSchool meets the regulatory "school official" exception under § 99.31(a)(1)(i)(B). PowerSchool is wrong that a vendor need only provide a "service or function" that the school would have performed and "does so under the [school's] direct control." Motion, Dkt. 201 at 13–14. To the contrary, the "school official" exception imposes several additional requirements:

> (a) An educational agency or institution may disclose personally identifiable information from an education record of a student without the consent required by § 99.30 if the disclosure meets one or more of the following conditions:
>
> (1)
>
> (i)
>
> (A) The disclosure is to other school officials, including teachers, within the agency or institution whom the agency or institution has determined to have legitimate educational interests.
>
> (B) A contractor, consultant, volunteer, or other party to whom an agency or institution has outsourced institutional services or functions may be considered a school official under this paragraph provided that the outside party—

> (1) Performs an institutional service or function for which the agency or institution would otherwise use employees;
>
> (2) Is under the direct control of the agency or institution with respect to the use and maintenance of education records; and
>
> (3) Is subject to the requirements of § 99.33(a) governing the use and redisclosure of personally identifiable information from education records.
>
> (ii) An educational agency or institution must use reasonable methods to ensure that school officials obtain access to only those education records in which they have legitimate educational interests. An educational agency or institution that does not use physical or technological access controls must ensure that its administrative policy for controlling access to education records is effective and that it remains in compliance with the legitimate educational interest requirement in paragraph (a)(1)(i)(A) of this section.

*See* 34 C.F.R. § 99.31. The use and redisclosure requirements referenced in § 99.31(a)(1)(i)(B)(3) prevent redisclosure by a receiving party and require notice to the receiving party that redisclosure requires the prior consent of a parent or eligible student, as follows:

> (a)
>
> (1) An educational agency or institution may disclose personally identifiable information from an education record only on the condition that the party to whom the information is disclosed will not disclose the information to any other party without the prior consent of the parent or eligible student.
>
> (2) The officers, employees, and agents of a party that receives information under paragraph (a)(1) of this section may use the information, but only for the purposes for which the disclosure was made.
>
> * * *
>
> (d) An educational agency or institution must inform a party to whom disclosure is made of the requirements of paragraph (a) of this section except for disclosures made under §§ 99.31(a)(8), (9), (11), (12), (14), (15), and (16), and to information that postsecondary institutions are required to disclose under the Clery Act to the accuser and accused regarding the outcome of any campus disciplinary proceeding brought alleging a sexual offense.

*See* 34 C.F.R. § 99.33. Genuine disputes of material fact abound.

First, in its initial November 13, 2024, response to Plaintiffs' Interrogatory No. 5, which sought in pertinent part the identity of third parties with which PowerSchool shares, discloses, and otherwise allows to use data, PowerSchool admitted that it rediscloses student information to at least 151 third parties. *See* Dkt. 197-1, Ex. 8 at 5–6, 11–16. On June 30, 2025, PowerSchool supplemented its response, identifying 213 third-party vendors to whom it discloses student data. *See* Dkt. 197-1, Ex. 13 at 15–26. These responses

confirm that PowerSchool is not a regulatory "school official" under FERPA because it rediscloses student information to hundreds of third parties without the prior consent of a parent or eligible student. *See* 34 C.F.R. §§ 99.31(a)(1)(i)(B)(3), 99.33(a)(1). At the very least, PowerSchool's admissions of redisclosure raise a genuine factual dispute that would make summary judgment inappropriate.

Second, PowerSchool's responses to Plaintiffs' Interrogatory No. 3 confirm that it has no "legitimate educational interest" in the data its products collect. Plaintiffs requested that PowerSchool describe its educational interest in each category of data that each of its products collected. *See* Dkt. 197-1, Ex. 48 at 6–7. PowerSchool initially objected and declined to respond. *See id.* In its March 31, 2025, supplemental response, PowerSchool responded that it "incorporates by reference its Response to Interrogatory No. 6 as to its educational interest in such data." *See* Dkt. 197-1, Ex. 48 at 7. That response, however, did not articulate PowerSchool's educational interest in any category of data that it collects, suggesting that it has none. *See* Dkt. 197-1, Ex. 8 at 18–25. To the extent this response does not confirm that PowerSchool has no "legitimate educational interest" in the information it collects about students, it at least raises a genuine dispute.

Third, there is no evidence of "the purposes for which the disclosure was made" by schools, and thus no way to confirm that PowerSchool is using the information disclosed to it for only those purposes and no others. *See* 34 C.F.R. § 99.33(a)(2). Again, if this does not confirm that PowerSchool is using information other than for the purpose the disclosure was made, it at least raises a genuine dispute.

Fourth, there is no evidence that PowerSchool's school customers inform it of the requirements of § 99.33(a), as required by paragraph (d) of that section. *See* 34 C.F.R. § 99.33(d). This either confirms that PowerSchool is not informed of the requirements or raises a genuine fact dispute that it is.

For at least these four reasons, there is a genuine dispute as to whether PowerSchool qualifies as a regulatory "school official" under FERPA.

**D. The California Education Code does not supply a defense to PowerSchool's conduct.**

For similar reasons that FERPA does not provide a defense to PowerSchool's conduct, and even if it did, material fact disputes preclude summary judgment, California's Education Code likewise provides no defense to PowerSchool's conduct.

The California Education Code governs the administration of education in the state. *See, generally*, Cal. Educ. Code. The portion of the Education Code that governs pupil records is found in Title 2 Elementary and Secondary Education, Division 4 Instruction and Services, Part 27 Pupils, Chapter 6.5 Pupil Records. *See* Cal. Educ. Code §§ 49060–49085. The California Legislature explicitly stated its intent for this chapter to "resolve potential conflicts between California law and the provisions of Public Law 93-380 regarding parental access to, and the confidentiality of, pupil records in order to ensure the continuance of federal education funds to public educational institutions within the state, and to revise generally and update the law relating to those records." Cal. Educ. Code § 49060(a). The chapter expressly incorporates FERPA: "[a] school district shall not permit access to pupil records to a person without written parental consent or under judicial order except as set forth in this section and as permitted by Part 99 (commencing with Section 99.1) of Title 34 of the Code of Federal Regulations," *i.e.*, FERPA. Cal. Educ. Code § 49076(a).

Further, the Legislature expressly identified the institutions to which the Pupil Records chapter does and does not apply: in addition to elementary and secondary schools, the chapter applies "to public agencies that provide educationally related services to pupils with disabilities . . . and to public agencies that educate pupils with disabilities in state hospitals or developmental centers and in youth and adult facilities," but not to "public community colleges, other public or private institutions of higher education, other governmental or private agencies that receive federal education funds unless described herein, or, except for Sections 49068 and 40969.7 and paragraph (5) of subdivision (b) of Section 49076, private schools." Cal. Educ. Code § 49060(b), (c). The Legislature could have stated its intention that the chapter applied to private companies, but it did not do so—accordingly, the chapter does not apply to them.

The portions of the chapter that PowerSchool relies upon are written in terms of what school district and local educational agencies may do: section 49076 provides that a "school district shall not permit access to pupil records to a person without written parental consent . . ." and section 49073.1 provides that a "local educational agency may, pursuant to a policy adopted by its governing board or, in the case of a charter school, its governing body, enter into a contract with a third party . . .".

In short, the California Legislature intended the Pupil Records chapter to be consistent with FERPA and to apply to elementary and secondary schools and certain other institutions that educate children. As a

matter of law, this chapter of the California Education Code does not provide a defense to Plaintiffs' claims for the same reasons FERPA does not.

Further, similar to its arguments about FERPA, there are genuine fact disputes that would preclude application of section 49076(a)(2)(G)(i) as a defense to PowerSchool's conduct. For example, PowerSchool did not articulate its "legitimate educational interest" in the categories of student data it collects in response to Plaintiffs' interrogatory seeking that information, so there is at least a material fact dispute about its interest in the student information it collects. *See* Section III.C, *supra*.

**E. "Reasonableness" and "offensiveness" are questions of fact for the jury.**

Because the common law and California constitutional sources of privacy protection are closely related, courts often analyze common law tort claims of intrusion upon seclusion and claims of invasion of privacy in violation of the California Constitution together. *See In re Otter AI Priv. Litig.*, No. 25-CV-06911-EKL, 2026 WL 2351237, at *8 (N.D. Cal. Aug. 13, 2026); *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1072–74 (Cal. 2009).[6] To state a claim for intrusion upon seclusion, a plaintiff must allege that (1) a defendant "intentionally intrude[d] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy," and (2) the intrusion "occur[red] in a manner highly offensive to a reasonable person." *Hernandez*, 211 P.3d at 1072.

The first element of a claim for intrusion upon seclusion requires the plaintiff to allege an "objectively reasonable expectation of seclusion or solitude in the place, conversation or data source." *Shulman v. Group W. Prods., Inc.*, 955 P.2d 469, 490 (Cal. 1998). As to the second element, whether an intrusion is "highly offensive to a reasonable person" requires a holistic consideration of "the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and

[6] There are no material differences between California's intrusion upon seclusion law and the law of the other 34 states for which Plaintiffs seek certification. All 35 states follow the standard set forth in section 652B of the Restatement, which provides that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Each of the 35 states in the Multistate Classes has adopted this same formulation. *See* Dkt. 197-1, Ex. 61 (spreadsheet of states that follow section 652B of the Restatement); *Howard v. Aspen Way Enters., Inc.*, 406 P.3d 1271, 1275 (Wyo. 2017) (listing states that follow section 652B). The analysis of students' reasonable expectation of privacy and the offensiveness of PowerSchool's conduct is the same, and the fact disputes Plaintiffs identify under California law are the same under the laws of the other 34 states for which certification is sought.

whether countervailing interests[7] or social norms render the intrusion inoffensive." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606 (9th Cir. 2020). "While analysis of a reasonable expectation of privacy primarily focuses on the nature of the intrusion, the highly offensive analysis focuses on the degree to which the intrusion is unacceptable as a matter of public policy." *Id.*

Students have a reasonable expectation of privacy at school. For over 50 years, FERPA has enshrined this expectation of privacy into federal law, vis-à-vis both a student's school district and third parties that may interact with that district. *See* Section III.B, *supra* (discussing legislative history and purpose of FERPA). Students' expectation of privacy has a constitutional dimension; lawmakers and the public have long recognized the damage that can be done when access to student records is abused. *See id.*

Even adult consumers who voluntarily use web browsers, social media platforms, and health tracking apps that collect, use, and share their data maintain a reasonable expectation of privacy as against the companies that make those products. *See, e.g., In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 596 (interception of browsing history when logged out of social media application); *Rodriguez v. Google LLC*, 823 F. Supp. 3d 986, 992–93, 1001–04 (N.D. Cal. 2026) (collection of anonymized browsing data by web browser); *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 569 (N.D. Cal. 2025) (Donato, J.) (transmission of information about menstruation, ovulation, and pregnancy goals to third parties); *Brown v. Google, LLC*, No. 20-CV-3664-YGR, 2022 WL 17961497, at *1 (N.D. Cal. Dec. 12, 2022) (interception of browsing data by web browser). Children at school enjoy a reasonable expectation of privacy that is at least commensurate with what adults expect in the marketplace. *See* Section III.B, *supra.*

The recent advent of a new business model that runs on information extracted from individuals through their interactions with computers, the encroachment of that business model into schools, and a sustained campaign by private equity firms to capture the public education sector for private profit, have not destroyed this expectation or rendered it unreasonable. *See* Motion, Dkt. 201 at 21–25 (describing ubiquity of edtech platforms). Or, at the very least, a jury is best positioned to decide whether they have.

Likewise, the record contains ample evidence from which a jury may conclude that PowerSchool's practices are offensive. Plaintiffs' experts, Dr. Barber and Dr. O'Neil, set forth in detail how students may

[7] PowerSchool waived any countervailing interests defense, *see* n. 1, *supra.*

be seriously harmed by PowerSchool's practices. *See* Expert Report of Dr. Suzanne Barber ("Barber Report"), Dkt. 197, Ex. C at 28–37; Expert Report of Dr. Cathy O'Neil ("O'Neil Report"), Dkt. 197, Ex. B at 26–29.

Dr. Barber described at length how the personally identifiable information held and used by PowerSchool's products is sensitive and constantly under attack. *See* Barber Report, Dkt. 197, Ex. C at 10–29. If this information is exposed, the harms can be diverse, longstanding, and produce a "domino effect" of other harms, whereby just a few discrete pieces of information can lead to the exposure of still more sensitive information, with serious financial, health, and social consequences. *See id.* at 30–36.

Dr. O'Neil reviewed PowerSchool's products and the information they collect, and described how they could be used to make life-altering decisions in ways that are unfair and harmful. *See* O'Neil Report, Dkt. 197, Ex. B at 2–24 (describing products), 25–30 (identifying risks). According to Dr. O'Neil, PowerSchool's products use algorithms that make high-stakes predictions, such as whether a student is likely to graduate high school. *See id.* at 26. These algorithms could be accurate yet harmful, and encourage schools to divert resources away from students with a high risk of not graduating in favor of those with a moderate or low risk of not graduating. *See id.* at 27. And these algorithms may be inaccurate and prone to racial bias, relying on behavior factors related to school discipline and test performance that are known to be biased against students of color. *See id.* at 27–28. PowerSchool admits that it does not test its predictive algorithms for accuracy or fairness, leading to the increased risk that the course of a student's entire life may be altered on the basis of a bogus prediction. *Id.* at 28; *see* Dkt. 197-1, Ex. 9, Flagg 30(b)(6) Tr. 222:3–230:3.

While PowerSchool may deride these opinions as describing far-fetched contingencies—"[e]xpert opinions about how data could *possibly* be exploited by bad actors or how analytics models *could* affect students if schools *perhaps* choose to act on those models"—Dr. Barber and Dr. O'Neil are simply describing increased risks based on PowerSchool's actual conduct. *See* Motion, Dkt. 201 at 19 (emphases in original). When PowerSchool's products are used by and on millions of students, occurrences that affect a small percentage of them may result in tens or hundreds of thousands of young people suffering actual, life-altering harm. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 606 ("likelihood of serious harm" is a consideration in whether the defendant's conduct is offensive).

Further, after Plaintiffs warned in their complaint that PowerSchool's trove of student data rendered it vulnerable to hacking, *see* Dkt. 1 at ¶¶ 191–97, the company's servers were indeed breached in December 2024, exposing the records of tens of millions of students. *See, e.g.,* Dkt. 220-1, Ex. 1; Ex. A, Flagg 30(b)(6) at 418:8–422:2. For these students, the harm was not just likely, but certain. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 606.

As to setting and degree of the intrusion, a reasonable jury can find that the setting of the intrusion—at school, which children have both a right and a legal duty to attend—renders PowerSchool's conduct offensive. The degree of PowerSchool's intrusion is pervasive. Though even the baseline data elements identified in its DPIAs can cause harm, PowerSchool's products are often configured to collect significantly more information about students. *See* O'Neil Report, Dkt. 197, Ex. B at 2–24. And while PowerSchool disclaims that "[t]here are no 'cradle-to-grave profiles' being created about students," *see* Motion, Dkt. 201 at 16, PowerSchool's products do create "Cradle-to-Career" profiles about them, *see* Ex. B, PWRSCHL_00098945 at 15. A jury may find nonconsensual data collection about children that begins when they are born to be offensive, irrespective of whether the collection ends with their entry into the workforce or their death.

As to its motives, PowerSchool is not a school or a charity; it is a private equity-owned company that books hundreds of millions of dollars in annual revenue through its contracts with public school districts. *See* Dkt. 197, Ex. A, Expert Report of Christopher J. Schulte ("Schulte Report") at 30. PowerSchool's own documents describe its prediction products as a "powerful cross-sell opportunity," and its corporate designee testified that validating its risk models would provide "no value to PowerSchool." *See* Section III.F, *infra*; Dkt. 197-1, Ex. 9, Flagg 30(b)(6) Tr. 222:3–230:3. Given that many teachers must buy their own classroom supplies, and that many public schools lack the basics like climate control, clean water, and toilet paper, a jury may find that profit motive, pursued with children's data collected in a compulsory setting, offensive.

Finally, couching its practices as "routine" "processing" does not conclusively resolve the offensiveness question in PowerSchool's favor. *See* Motion, Dkt. 201 at 16. Simply because practices are ubiquitous does not render them inoffensive. *See* Dkt. 164-1, Ex. C, 121 Cong. Rec. 13990 (FERPA intended to combat "frequent, even systematic violations of the privacy of students and parents by the

schools through the unauthorized collection" and release of student information "to various individuals and organizations."). At the very least, whether the spread of the surveillance business model has so eroded social norms since Senator Buckley's day that PowerSchool's conduct is now considered inoffensive is something a jury should decide.

Because there are genuine factual disputes about whether students have a reasonable expectation of privacy at school and whether PowerSchool's intrusion is offensive, summary judgment is not appropriate.

**F. PowerSchool is not entitled to summary judgment as to unjust enrichment.**

PowerSchool is wrong that "where a defendant's profits come from third-party transactions rather than the plaintiff, the plaintiff has not conferred a benefit to support an unjust enrichment claim." *See* Motion, Dkt. 201 at 20. California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss. *See, e.g., In re Facebook Internet Tracking*, 956 F.3d at 599–600 (California recognizes disgorgement of unjustly earned profits "even where an individual has not suffered a corresponding loss"); *Cnty. of San Bernardino v. Walsh*, 69 Cal. Rptr. 3d 848, 855–56 (Cal. Ct. App. 2007), *as modified on denial of reh'g* (Jan. 25, 2008), *as modified* (Jan. 28, 2008) (noting that where "a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust . . . [t]he defendant may be under a duty to give to the plaintiff the amount by which [the defendant] has been enriched" (quoting Rest., Restitution, § 1, com. e)); *see also Ghirardo v. Antonioli*, 924 P.2d 996, 1003 (Cal. 1996) ("Under the law of restitution, an individual may be required to make restitution if he is unjustly enriched at the expense of another.").

California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 599–600; *CTC Real Est. Services v. Lepe*, 44 Cal. Rptr. 3d 823, 826 (Cal. Ct. App. 2006) (holding that a woman whose identity was stolen and used to obtain later-foreclosed-upon property was entitled to surplus funds from the sale at auction because she was "entitled to the product of the identity theft"); *Ward v. Taggart*, 336 P.2d 534, 538–39 (Cal. 1959) (holding that plaintiffs could recover profits unjustly realized by a real estate agent who misrepresented the purchase price of real estate, even though the

plaintiffs did not pay more than the land was worth when they purchased it); *cf. Walsh*, 69 Cal. Rptr. 3d at 855–57 (holding that the trial court did not err where it solely relied on profit to the defendants rather than loss to the plaintiffs to calculate damages).

Plaintiffs may retain a stake in a defendant's profits garnered from their personal information when circumstances are such that, as between the two parties, it is unjust for the defendant to retain it. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 600; *McBride v. Boughton*, 20 Cal. Rptr. 3d 115, 122–23 (Cal. Ct. App. 2004); *First Nationwide Sav. v. Perry*, 15 Cal. Rptr. 2d 173, 176–77 (Cal. Ct. App. 1992). Under California law, this stake in unjustly earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 600.

There are material factual disputes as to whether Plaintiffs and the putative class conferred a benefit on PowerSchool through fraud or coercion which preclude granting summary judgment of no unjust enrichment. *See* 55 Cal. Jur. 3d Restitution § 2 (benefit must be conferred "through mistake, fraud, coercion, or request."). Plaintiffs and the class did confer a benefit on PowerSchool, in the form of their personal information that PowerSchool purports to be able to collect, use, and share without their or their parents' consent. PowerSchool's products do not function without the student data set forth in the corresponding DPIA Reports. *See* O'Neil Report, Dkt. 197, Ex. B at 2–25; Dkt. 197-1, Exs. 2, 3, 5, 6, 7, 19, 20, and 21 (DPIA Reports).

Once in possession of students' data, PowerSchool developed new prediction products that rely on and process student data in ways that students and their parents never consented to and sold those prediction products to its school district customers. These prediction products represented a "powerful cross-sell opportunity" for PowerSchool. *See, e.g.*, Dkt. 197-1, Ex. 22, Annual X-Sell/Upsell by Product Report; Dkt. 197-1, Ex. 26, Booking Raw Data report; Dkt. 197, Ex. A, Schulte Report at 23–28 (citing PowerSchool documents regarding upsell); Dkt 197-1, Ex. 9, Flagg 30(b)(6) at 329:17–331:4. In some cases, the prediction products amounted to more than one third of PowerSchool's revenues from individual school districts. *See* Dkt. 197, Ex. A, Schulte Report at 25 (citing school district approval of PowerSchool contract).

Without that student data, PowerSchool would have nothing to sell, and it would be unable to develop new products for cross-selling and upselling without using that data in ways that were not originally intended. The benefit to PowerSchool was clearly conferred by Plaintiffs and the class.

There is ample evidence from which a jury could conclude that PowerSchool acted fraudulently and coercively. For example, PowerSchool holds itself out as a regulatory school official under FERPA and represents that its conduct complies with the statute, despite FERPA regulating schools and not companies, and despite admitting that PowerSchool rediscloses student information to hundreds of third parties without parent consent in violation of 34 C.F.R. § 99.33, disqualifying it from being a "school official." *See* Sections III.B–C, *supra*. A reasonable jury also could conclude that PowerSchool acted fraudulently when it cloaked itself in legal authority that it does not possess. Likewise, a jury could find that PowerSchool acted fraudulently when it sold schools prediction products, fueled entirely by student data, that it does not test or otherwise validate for bias, fairness, or accuracy.

Separately, a jury could conclude that PowerSchool's collection, sharing, and use of student information in the manner described herein—sharing with 213 third-party partners or to fuel untested prediction products—without parent or student consent in the context of a student's mandatory public education is coercive.

For these reasons, genuine disputes of material fact preclude summary judgment on Plaintiffs' quasi-contract claim.

**G. Plaintiffs are entitled to punitive damages.**

The same facts that support Plaintiffs' claim for unjust enrichment also tend to show that PowerSchool acted with malice or fraud. *See* Cal. Civ. Code § 3294.

"'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." *See* Cal. Civ. Code § 3294(c)(1). A jury may conclude that it was "despicable" for PowerSchool to misrepresent its status as a regulatory school official under FERPA to sidestep parental consent in "willful and conscious disregard" of students' privacy rights, and then to expose that student data to hackers and use it to build a multibillion-dollar company selling products—some of them unvetted and untested—to public school districts for hundreds of millions of dollars a year.

"'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." *See* Cal. Civ. Code § 3294(c)(3). Likewise, a jury may conclude that it was fraudulent for PowerSchool to intentionally misrepresent its status as a school official under FERPA or conceal that it was not one in order to deprive students of their privacy rights.

Genuine disputes of material fact preclude summary judgment on Plaintiffs' entitlement to punitive damages.

## IV. CONCLUSION

As the Court previously observed, this case presents numerous "legitimate," "quintessential dispute[s] of fact" that preclude summary judgment. *See* August 13, 2026 Hearing Tr., Dkt. 189, at 14:12–15:21. PowerSchool has not carried its burden to show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law on the issues it identified in its briefing.

Plaintiffs respectfully request that the Court deny PowerSchool's motion in its entirety.

Dated: November 3, 2026

Respectfully submitted,

By <u>*/s/ Leonard W. Aragon*</u>
Leonard W. Aragon (*pro hac vice*)
E. Tory Beardsley (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
leonard@hbsslaw.com
toryb@hbsslaw.com

W. Andrew Liddell (*pro hac vice*)
Julie Liddell (*pro hac vice*)
EDTECH LAW CENTER PLLC
904 Rio Grande St. Suite 100
Austin, Texas 78701
Telephone: (512) 200-8028
andrew.liddell@edtech.law
julie.liddell@edtech.law

Whitney Siehl (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
Telephone: (708) 628-4949
whitneys@hbsslaw.com

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

*Attorneys for Plaintiffs and the Putative Class Members*