Robyn E. Bladow
Kirkland & Ellis LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
Kirkland & Ellis LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for the Defendant PowerSchool Holdings, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

EMILY CHERKIN, et al,

Plaintiffs,

v.

POWERSCHOOL HOLDINGS, INC.,

Defendant.

CASE NO. 3:24-CV-02706-JD

**DEFENDANT POWERSCHOOL HOLDINGS, INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Complaint Filed Date: May 6, 2024

Judge: The Hon. James Donato
Hearing Date: January 14, 2027
Time: 11:00 a.m.
Courtroom: Courtroom 11, 19th Floor

# TABLE OF CONTENTS

Page


I. INTRODUCTION ....... 1

II. ARGUMENT ....... 2

A. Plaintiffs' consent theory fails as a matter of law. ....... 2

1. Schools determined PowerSchool is a school official, which allows schools to share data with PowerSchool without parental consent. ....... 2

2. Plaintiffs' "private defense" argument is irrelevant. ....... 4

B. Plaintiffs' claims fail as a matter of law because they cannot rely on the DPIAs and school licenses. ....... 5

C. There is no genuine dispute of material fact on Plaintiffs' invasion of privacy claims. ....... 8

1. No reasonable expectation of privacy ....... 9

2. No highly offensive data use. ....... 10

D. There is no genuine dispute of material fact on Plaintiffs' unjust enrichment claim. ....... 12

E. There is no evidence that could support punitive damages. ....... 14

CONCLUSION ....... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Babb. v. Cal. Teachers Ass'n*,
378 F. Supp. 3d 875 (C.D. Cal. 2019) ....4

*Carmen v. S. F. Unified Sch. Dist.*,
237 F.3d 1026 (9th Cir. 2001) ....8

*Costello v. Grundon*,
651 F.3d 614 (7th Cir. 2011) ....4

*Folgelstrom v. Lamps Plus, Inc.*,
195 Cal. App. 4th 986 (Cal. Ct. App. 2011), *as modified* (June 7, 2011)....5, 8, 12

*Fresno Unified Sch. Dist. v. K.U. ex rel. A.D.U.*,
980 F. Supp. 2d 1160 (E.D. Cal. 2013)....4

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002)....4

*Heldt v. Guardian Life Ins. Co. of Am.*,
2019 WL 651503 (S.D. Cal. Feb. 15, 2019)....9

*Hernandez v. Hillsides, Inc.*,
211 P.3d 1063 (Cal. 2009)....9, 10

*Hill v. Nat'l Collegiate Athletic Ass'n*,
865 P.2d 633 (Cal. 1994)....9

*Lowry v. City of San Diego*,
858 F.3d 1248 (9th Cir. 2017) ....2, 12

*Pirozzi v. Apple Inc.*,
913 F. Supp. 2d 840 (N.D. Cal. 2012)....13

*Sisti v. Bosley Inc.*,
831 F. Supp. 3d 979 (C.D. Cal. 2026) ....5

*Soremekun v. Thrifty Payless, Inc.*,
509 F.3d 978 (9th Cir. 2007) ....2

*St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*,
218 F.3d 232 (3d Cir. 2000)....4

*Vizcarra v. Michaels Stores, Inc.*,
710 F. Supp. 3d 718 (N.D. Cal. 2024) ....12

*Wall v. Wescom Cent. Credit Union*,
2024 WL 1158361 (C.D. Cal. Mar. 18, 2024) ..... 12

*Zarif v. Hwareh.com, Inc.*,
789 F. Supp. 3d 880 (S.D. Cal. 2025) ..... 12

**Statutes**

Cal. Educ. Code § 49076(a)(2)(G)(i) ..... 3

**Rules**

Fed. R. Civ. P. 26(e)(1)(A) ..... 8

**Other Authorities**

34 C.F.R. § 99.31 ..... 2, 3

120 Cong. Rec. 39,865 ..... 3

# I. INTRODUCTION

Plaintiffs' Opposition demonstrates this case is built around invented legal obligations and hypothetical scenarios—not actual legal duties or evidence.

Plaintiffs first claim that PowerSchool must circumvent schools—the ones making all choices related to what student data to collect and how to use it—and itself obtain consent for every single school's specific use of any PowerSchool product. As part of this argument, Plaintiffs attempt to impose on PowerSchool common law consent requirements that FERPA and state law carve out as specifically defined exceptions to requirements to secure consent. Next, Plaintiffs claim that PowerSchool must test its analytics products for "bias, fairness, or accuracy," even though that would be essentially impossible to do given schools are the ones choosing the data to put into these products, configuring the analytics of interest, and then deciding what to do about the results. The key *legal* question here that should be resolved at summary judgment is whether the law imposes an obligation on PowerSchool (1) to obtain consent from students (who are largely not even users of the products at issue) to process data, or (2) to test its analytics products. It does not.

Even setting aside these threshold legal questions, Plaintiffs lack the evidence to prove their claims as they formulate them. Proving invasion of privacy requires an assessment of the offensiveness of the invasion, which in turn requires consideration of whether the data at issue is sensitive. Plaintiffs cannot identify data that was misused. Although they vaguely refer to Plaintiffs' "sensitive" data, the scant pieces of evidence they cite mostly consist of basic demographic information or reveal no sensitive information at all. Regardless, Plaintiffs never demonstrate the little data in the record was ever used in the ways they challenge through their legal theories. Indeed, they do not mention their data *at all* when discussing the elements of any of their claims. *See* Opp. 18-24. Their Opposition instead repeatedly hammers PowerSchool's Data Privacy Impact Assessments, which are product documents that merely discuss possible data configurations. PowerSchool's corporate representative testified that actual configuration of the products will vary, and Plaintiffs' own experts concede as much. *See* Dkt. 231-2, Flagg Tr. 72:20-73:4; Dkt. 154, O'Neil Tr. 71:24-72:3; Dkt. 209-15, Schulte Tr. 203:2-17.

More generally, Plaintiffs cannot prove their invasion of privacy or unjust enrichment claims because the undisputed evidence shows that the ordinary data processing here, including any data sharing,

is done solely at a school's direction and for educational purposes. There is nothing "highly offensive" that could amount to an invasion of privacy or any fraud or deceit that could amount to unjust enrichment. Plaintiffs' experts' opinions about potential speculative risks in the future cannot speak to whether the processing that occurred was "highly offensive." Thus, Plaintiffs cannot point to evidence that even creates a fact issue on any of their claims.

Plaintiffs must now set forth "specific facts showing that there is a genuine issue for trial." *Lowry v. City of San Diego*, 858 F.3d 1248, 1255 (9th Cir. 2017). "Conclusory, speculative" assertions cannot "defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Because conclusory, speculative assertions are all Plaintiffs have, PowerSchool is entitled to summary judgment on all claims.

## II. ARGUMENT

### A. Plaintiffs' consent theory fails as a matter of law.

Plaintiffs' core complaint is that PowerSchool fails to obtain consent from every parent/student before a school uses any of its products. But whether PowerSchool even has this obligation in the first place is a question of law that is readily resolved at summary judgment. A plain—and logical—reading of the federal and state statutes governing schools' use of EdTech makes clear that Plaintiffs' consent theory has no legs because those statutes expressly state that consent is not required for "school officials," and the undisputed record is that schools, per their authority under those statutes, have found PowerSchool is a school official. And as a matter of law, PowerSchool's role in an established, statutorily permitted framework defeats Plaintiffs' claims, regardless of whether those statutes provide a private right of action.

#### *1. Schools determined PowerSchool is a school official, which allows schools to share data with PowerSchool without parental consent.*

As everyone agrees, FERPA expressly allows schools to share student data with vendors ***"without [parental] consent"*** if the vendor is a "school official" who performs a "service or function" that the school would have performed and does so "under the [school's] direct control." 34 C.F.R. § 99.31 (emphasis added). In Plaintiffs' own words, this provision "means that a ***school may share records with certain contractors without first obtaining parental consent***." Opp. 13, Dkt. 225 (emphasis added). Plaintiffs also concede (at 17) that California law similarly allows school districts, ***"without written***

***parental consent*** or under judicial order," to "release information from pupil records to . . . [a] contractor or consultant with a legitimate educational interest who has a formal written agreement or contract with the school district regarding the provision of outsourced institutional services or functions by the contractor or consultant." Cal. Educ. Code § 49076(a)(2)(G)(i) (emphasis added). Thus, it is undisputed that under this governing legal regime, a school needs no parental consent to disclose data to those it has deemed a "school official" or a contractor with "a legitimate educational interest."

Plaintiffs claim that there is a fact dispute as to whether PowerSchool is a "school official" under FERPA or has a "legitimate educational interest" in processing student data under California law. But Plaintiffs concede (at 13-14) that FERPA specifies ***schools alone*** have the authority to determine whether a vendor is acting as a "school official" with a "legitimate educational interest." 120 Cong. Rec. 39,865; 34 C.F.R. § 99.31(a)(1)(i)(A) (noting that the school-official exception applies when the school "has determined" that the official has a legitimate educational interest). The same is true under California law. *See* Opp. 16-17.

The undisputed evidence is that schools have in fact designated PowerSchool a "school official" with legitimate educational interests. *See, e.g.*, Dkt. 197-1 Ex. 32 (contract between PowerSchool and Seattle stating that PowerSchool "is a School Official with legitimate educational interest in accessing education records and performing Services."); Dkt. 171-20, PWRSCHL_00162967 at 65 (contract between PowerSchool and West Contra Costa stating that PowerSchool "will be considered a 'School Official' (as that term is used in FERPA…)); Dkt. 139-5 Ex. 11 (contract explaining that PowerSchool "will be designated as a "school official" with "legitimate educational interest."); Ex. 45, PWRSCHL_00166721 at 2 (same); Ex. 46, PWRSCHL_00163070 at 1 (same); Ex. 47, PWRSCHL_00163821 at 21 (same); Ex. 48, PWRSCHL_00163965 at 46 (same). The undisputed record, clearly laid out in the contracts between schools and PowerSchool, confirms that schools made the required determination that PowerSchool is a school official, and thus no parental consent is required before the schools share data with PowerSchool.[1] To the extent Plaintiffs contest the schools'

---

[1] Plaintiffs' attempt to create a fact dispute here proves the point. Plaintiffs argue that PowerSchool cannot be a "school official" under FERPA because "PowerSchool admitted [in an interrogatory] that it rediscloses student information" to "213 third party vendors." Opp. 15. But that interrogatory

determination (which FERPA provides no private right of action to do), it is irrelevant to questions of *PowerSchool*'s liability.

*2. Plaintiffs' "private defense" argument is irrelevant.*

Plaintiffs next argue that PowerSchool cannot rely on the "school official" exemption because FERPA and the relevant California laws do not create a private right of defense. Opp. 8-14. But PowerSchool's argument is not that FERPA and state law create "a defense for private entities" in the same way that statutes can provide a private right of action. *See id.* 8. PowerSchool's argument is narrower: Plaintiffs cannot use general common-law claims to impose obligations that specific statutory laws expressly disclaim. *See Babb. v. Cal. Teachers Ass'n*, 378 F. Supp. 3d 875, 877-78 (C.D. Cal. 2019).

Plaintiffs' authorities regarding "private defenses" do not address PowerSchool's position, nor do they support the notion of a private defense in the way Plaintiffs define that phrase. For instance, *Gonzaga University v. Doe* held that FERPA creates no individual rights enforceable through a private suit. Opp. 9 (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286–90 (2002)). But PowerSchool is not suing under FERPA nor otherwise trying to enforce any "rights" under the statute. Whether a statute provides a private right of action that a plaintiff can invoke to file suit is a completely different question from whether a statute forecloses a plaintiff's legal theory. *See Fresno Unified Sch. Dist. v. K.U. ex rel. A.D.U.*, 980 F. Supp. 2d 1160, 1182 (E.D. Cal. 2013). "No private right of action under a statute is necessary to assert . . . that statute" as a defense. *Costello v. Grundon*, 651 F.3d 614, 622-24 (7th Cir. 2011); *St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*, 218 F.3d 232, 241 (3d Cir. 2000) (same, for preemption defense). In other words, a defense of compliance with a statute is not a "private right" of action at all. It is merely the commonsense notion that statutory mandates overcome more generalized common law claims. With respect to the California statutes, California confirms that "there can be no common law liability for conduct authorized by state statute." *Babb*, 378 F. Supp. 3d at 877-78 (quotation omitted). Plaintiffs bring California common law claims, and yet *California statutes* specifically conflict with their claim.

---

response states that schools alone control data sharing, including selecting the recipients of shared data. Dkt. 197-1 Ex. 13 at 16; *see also id.* at 17.

* * *

Plaintiffs' consent arguments conflict with the plain text of FERPA, with California's corollary statutes, and with the undisputed evidence in the record. There is no duty for PowerSchool to obtain parental consent because these statutes allow schools to share data with PowerSchool without consent so long as the school has determined that PowerSchool is a "school official" with a "legitimate educational interest." The undisputed evidence is that schools have made this determination. Accordingly, Plaintiffs' consent theory, which undergirds all of their claims, cannot survive summary judgment.

**B. Plaintiffs' claims fail as a matter of law because they cannot rely on the DPIAs and school licenses.**

PowerSchool is entitled to summary judgment on Plaintiffs' claims for another reason: There is no evidence of the specific sensitive data at issue, nor is there evidence of how that specific data was allegedly misused. Plaintiffs' claims, both for invasion of privacy and unjust enrichment, require two baseline showings: (1) PowerSchool took students' sensitive data without consent, and then (2) used that sensitive data "for an offensive or improper purpose." *Folgelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 993 (Cal. Ct. App. 2011), *as modified* (June 7, 2011); *Sisti v. Bosley Inc.*, 831 F. Supp. 3d 979, 987 (C.D. Cal. 2026) (where "it is not clear what 'sensitive information' Plaintiff claims was disclosed," there can be no intrusion upon seclusion or unjust enrichment claim). Plaintiffs' claims fail at the start because they cannot meet these requirements.

First, Plaintiffs' protest that there is "ample evidence in the record" about their data is unsupported. Plaintiffs ask the Court to go fish through a handful of cited exhibits, most of which reflect no specific student data, much less sensitive data. For example, Plaintiffs point to an email from a teacher asking Mr. Concepción to put in *his* email address into a PowerSchool product. Ex. 197-1, Ex. 52. To state the obvious, this does not involve student data. Plaintiffs also cite a generic email from the Concepción's' school district notifying the entire district about the cyberattack PowerSchool suffered in 2024. Opp. 2-3. But the email simply states that some unspecified information "*may* have been compromised." Dkt. 220-1, Ex. 1 (emphasis added). The document is not evidence that any student's specific data—and certainly not the Concepcións' data—was actually compromised. Another document Plaintiffs point to discusses the Concepción children's name change, and a school staff member asks for the children's birth certificate

to confirm the change. Ex. 197-1, Ex. 53. Nowhere does the document state what was inputted into a PowerSchool product other than the students' names. *Id.* Another document lists what products the Concepcións' school district uses and says nothing about specific data. Dkt. 197-1, Ex. 28. And so on. The only documents in the record that reflect actual data in a PowerSchool product are two that list attendance records. Dkt. 197-1, Exs. 49, 50. But Plaintiffs do not claim this data is sensitive or otherwise connect this data to any alleged misuse. In sum, there are no concrete examples of sensitive student data about the Concepcións that was input into a PowerSchool product and then used in an invasive or unjust way.

As for S.G., there is also very little data in the record. Again, most of the cited documents are basic demographic information or are comprised of indecipherable code that does not contain any comprehensible information at all, let alone "sensitive" information. *See* Pltf's Table of Exhibits, Dkt. 197-1, Exs. 56-60. For the little data that is in the record, Plaintiffs fail to explain *which* specific data they claim is sensitive and, perhaps more importantly, *how* that specific data was used for an improper purpose. Were these exact data points shared with anyone? If so, who? Was this data put into any analytics products? If so, which products and for what purpose? Plaintiffs do not say because there is no evidence in the record to answer those questions for any Plaintiff.

Plaintiffs attempt to fill this evidentiary void by extrapolating from two sources: DPIAs and school contracts. Those documents cannot bear the weight Plaintiffs place on them.

Regarding the DPIAs, Plaintiffs mischaracterize them in direct contradiction to the mountain of evidence proving what these documents actually are. The DPIAs demonstrate *possible* data elements that *may* be collected into various PowerSchool products. They do *not* establish what data elements are actually collected by any given school or for any given student; that decision is left entirely to the individual schools. To substantiate this, the Court need look no further than the documents themselves. For example, the very DPIAs Plaintiffs cite in the opposition brief (at 3) expressly state that school "[d]istricts have vastly different data collection requirements that are required by an education authority[.]" 197-1 Ex. 2 at 12. They also say, "SIS offers flexibility on the data the customer collects about individuals," and "utilizing Limited Data Validation framework[,] a customer can decide what fields are required or not for both core and extended data." *Id.* at 12-13. The other product DPIAs state the same. *See* Connected

Intelligence DPIA (Dkt. 139-18, PWRSCHL_00644386) ("Connected Intelligence replicates PowerSchool and Non-PowerSchool data sources and has no stand-alone data requirements."); Schoology DPIA (Dkt. 139-20, PWRSCHL_00644375) ("The product offers customers the flexibility to customize the specific data elements they need to collect based on their requirements"); Analytics & Insights Platform (Dkt. 117-1, PWRSCHL_00644311) ("Data sources originate from School/District staff entering or importing data from other integrated systems as authorized by the School/District.").

Although Plaintiffs cite PowerSchool's 30(b)(6) deposition in their attempt to misconstrue the DPIAs, the actual testimony further supports that the DPIAs are only a generic listing of potential data elements: Schools elect what data to collect, and "[w]hat's mandatory for one school is totally different for another school." *See* Dkt. 231-2, Flagg Tr. 42:12-47:10, 61:22-63:7, 75:10-18, 85:18-86:6. Indeed, PowerSchool further testified that it has no visibility into each school's actual data configurations. *Id.* 72:20-73:4. Plaintiffs cannot carry their evidentiary burden by simply *assuming* the opposite without any support.

The evidence does not stop there. Plaintiffs' own experts disavowed that there are "mandatory" data fields collected across the board. *See* Dkt. 209-15, Schulte Tr. 203:2-17 ("It's not my understanding that [the data elements listed in the report are] mandatory."); Ex. 49, Barber Tr. 103:12-113:1, 122:6-123:1 (stating that she doesn't "know if it's actually true" that SIS collects a standard set of data elements and she did not evaluate actual data collection); Dkt. 154, O'Neil Tr. 71:23-72:3 (stating she would "very much assume" that the data elements stored for any given product will vary based on the school). In short, no fact in the record—not even Plaintiffs' own sources or experts—supports Plaintiffs' argument.

Plaintiffs' attempt to twist PowerSchool's interrogatory response to say otherwise also fails. Opp. 5-7. The cited interrogatory response merely states what PowerSchool has stated all along: Schools—not PowerSchool—decide what data to collect and record in PowerSchool products, and the DPIAs merely identify categories of data "relating to each such product." Dkt. 197-1 Ex. 48 at 7. The response says nothing about automatic or mandatory collection, and if Plaintiffs were confused about the response, *see* Opp. 7, the ample evidence described above, including the documents themselves, eliminates any basis to

interpret the record differently.[2]

Regarding the school contracts and licenses, these too say nothing of the specific data that schools collect and process for every student. Plaintiffs cite the contracts their school districts signed with PowerSchool (Opp. 3-4), as well as generally state what products these school districts license, to argue that there is "ample evidence" of what data was collected. But none of the cited documents states that any specific data field was collected for every student. Tellingly, Plaintiffs do not list any such categories of data in their opposition brief.

At bottom, Plaintiffs ask the Court to make an unsupported leap: Many schools use PowerSchool products to process their data, and thus (1) there must be sensitive student data in PowerSchool products regarding Plaintiffs and all class members, and (2) PowerSchool must be using some of that sensitive data for improper purposes, harming Plaintiffs and all class members. There is no evidence to prove even the first step—what exact data is at issue—and certainly none to prove the second. Thus, Plaintiffs have failed to show a genuine dispute of material fact for their claims. *Carmen v. S. F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The gist of a summary judgment motion is to require the adverse party to show that it has a claim or defense, and has evidence sufficient to allow a jury to find in its favor on that claim or defense."). "The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Id.* Even if the Court engaged in that endeavor here, it would find no fact dispute.

**C. There is no genuine dispute of material fact on Plaintiffs' invasion of privacy claims.**

Aside from the problems described above, Plaintiffs cannot prove the elements of their invasion of privacy claims. Plaintiffs make the bold and unsupported assertion that: "A court may not grant summary judgment on" invasion of privacy claims. Opp. 1. Not so. "If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law." *Folgelstrom*, 195 Cal. App. 4th at 990; *see also*

[2] While Plaintiffs argue that PowerSchool should have stated this in its interrogatory answer, Rule 26(e) clarifies that no supplementation is required where contrary information was "otherwise made known" in discovery. *See* Fed. R. Civ. P. 26(e)(1)(A). Both the DPIAs and PowerSchool's 30(b)(6) testimony did exactly that.

*Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1073 (Cal. 2009); *Heldt v. Guardian Life Ins. Co. of Am.*, 2019 WL 651503, at *4 (S.D. Cal. Feb. 15, 2019).

Here, summary judgment is appropriate because the undisputed material facts demonstrate that plaintiffs cannot prove either element of their claim: (1) reasonable expectation of privacy; or (2) data use that is highly offensive.

*1. No reasonable expectation of privacy*

As PowerSchool stated in its opening brief, the relevant framework for this element comes from *Hernandez*, where the California Supreme Court stated that the factors for a reasonable expectation of privacy are the identity of the intruder, the extent of access to information, and the means by which the intrusion occurred. Mot. 17, Dkt. 201. All three factors foreclose Plaintiffs' privacy claims because PowerSchool is a school-authorized vendor (not an unwanted intruder) that only accessed information at a school's behest (the means of access) and did so only for educational purposes (the extent of access). *Id.*

Plaintiffs completely ignore these factors and instead assert that FERPA "enshrine[s] an expectation of privacy." Opp. 19. Further, they rely on wholly inapposite pixel cases related to website operators' non-obvious sharing with a third-party company for advertising purposes (*see id.*), to argue that the expectations adults have in the website browsing and advertising context should apply to students whose administrators use school-sanctioned records software.[3] Both arguments fall flat.

First, as already explained above, FERPA permits schools to designate vendors like PowerSchool "school officials" with "legitimate educational interests" so that schools can, without individual consent, store and analyze their records. Mot. 5-6. Many states, including California, invoke FERPA and go even further. *Id.* So to the extent that FERPA "enshrine[s]" any expectation with respect to privacy, Opp. 19, that expectation must be that schools will use vendors like PowerSchool for ordinary data processing—the only data processing at issue here.

Second, Plaintiffs' comparison to pixel cases is unhelpful. The binding caselaw makes clear that the context of the supposed intrusion matters. *See Hernandez*, 211 P.3d at 1074-75; *Hill v. Nat'l Collegiate*

[3] As PowerSchool noted in its opening brief, seven of the nine products at issue here are used only by school staff; only two products are student-facing platforms. *See* Mot. 3. This fact makes Plaintiffs' comparison to adults' web browsing even more far-fetched.

*Athletic Ass'n*, 865 P.2d 633, 655 (Cal. 1994). The students here are not like consumers using websites when those websites fail to secure consent from the user before collecting and sharing the user's data with third parties to facilitate targeted advertising. First, PowerSchool has no direct interaction with students; in fact, most of the products at issue are not used by students at all. Nor does PowerSchool do any secret sharing to increase its revenue; the schools are directing all sharing for an educational purpose. The undisputed evidence is that the students' school districts contracted with PowerSchool according to a well-established federal and state statutory framework so that the schools could manage and process data for their own educational purposes, which includes any data sharing. Mot. 2-7.

Simply put, this consumer marketplace analogy takes the facts here out of context, but the necessary legal inquiry depends *entirely* on context. That context, including the federal and state laws described above, permits schools to contract with PowerSchool for ordinary educational data processing. Any expectation of privacy that says schools cannot do this is, as a matter of law, unreasonable.

*2. No highly offensive data use*

Plaintiffs respond (Opp. 19, 21) that just because the use of EdTech in this case is very common does not preclude a jury from finding that PowerSchool acted in a "highly offensive" manner. But highly offensive conduct is defined as an "egregious breach of social norms." *Hernandez*, 211 P.3d at 1073. To claim that something ordinary (a norm) can simultaneously be an *egregious* breach of norms defies logic.

Otherwise, Plaintiffs' opposition brief tries to distract from the undisputed evidence that the only data processing here is done at schools' request and for normal educational purposes (*i.e.*, not anything offensive, much less highly offensive) by relying on their experts' entirely speculative harm theories. But Plaintiffs' experts' speculation cannot create a genuine issue of material fact.

For example, Plaintiffs claim that a school may someday—based on the results of some unspecified predictive algorithm—"divert resources away from students with a high risk of not graduating." Opp. 20. Based on these potential risks, and the fact that "algorithms *may* be inaccurate and prone to racial bias" inherent in school data, Plaintiffs argue that PowerSchool should "test its predictive algorithms for accuracy or fairness." *Id.* (emphasis added). Plaintiffs then say that the lack of this testing "lead[s] to the increased risk that the course of a student's entire life *may* be altered on the basis of a bogus prediction." *Id.* (emphasis added). Or maybe, according to Plaintiffs, some unspecified student could

experience "serious financial, health, and social consequences" if their unspecified data is exposed in the future to an unspecified third party. *Id.* There is no evidence in the record that any of this has ever happened.

Nor is there evidence for the predicates that could make these scenarios likely or even possible. There is no evidence about any predictive algorithms concerning graduation risk, and Plaintiffs' algorithm expert admitted she never saw such an algorithm. Dkt. 154, O'Neil Tr. 60:11-13, 65:8-15. There is also no evidence that any of the Plaintiffs' (or anyone else's) data was put into any predictive algorithm. Moreover, Plaintiffs' expert's testing theory—that algorithms should be tested for inaccuracy or bias to avoid these speculative risks—is based on supposed problems with schools' data (e.g., test scores can be racially biased) and the way schools use their data. *See* Dkt. 206 at 11-12. Thus, aside from being based on pure conjecture, Plaintiffs do not explain why or how PowerSchool would even conduct this type of testing.

Regarding data exposure, Plaintiffs refer to the cyberattack PowerSchool suffered in 2024 even though they emphatically insist elsewhere that, "This is not a data-breach case." Dkt. 228, Opp. to O'Neil Daubert 2. Nonetheless, a third-party criminal's intrusion into PowerSchool's system has little relevance to whether PowerSchool's data processing is "offensive." And there is no evidence in the record regarding the cyberattack aside from one document that the Concepción family received from West Contra Costa notifying families about the situation at a high level. See Dkt. 220-1 Ex. 1. That document, far from stating that the Concepcións' data was "taken as part of the 2024" cyberattack or that some students experienced "certain" harm from the breach, Opp. 3, 21, simply says that unspecified information "may have been compromised." *Id.* Thus, here too, Plaintiffs rely on pure conjecture to create a "highly offensive" situation that does not actually exist.

Finally, perhaps because there is only speculation in the record, Plaintiffs toss out a few brand-new arguments about why the ordinary data processing here could be offensive. The first is that the Court can just assume that someday "a small percentage" of students "may" experience actual harm because so many schools use PowerSchool products. Opp. 20. Plaintiffs then argue that a lack of clean water and access to "climate control" in some unspecified public schools demonstrates that the money schools spend on PowerSchool software harms students by diverting needed resources. Opp. 21. These arguments are

sheer speculation.[4] Speculation, which is all Plaintiffs have, is impermissible at this stage of litigation, where they must put forth "specific facts" that, at a minimum, create "a genuine issue for trial." *Lowry v. City of San Diego*, 858 F.3d 1248, 1255 (9th Cir. 2017). Where, as here, "plaintiff[s] seek[] to add gravity to [their] privacy claims by suggesting that [PowerSchool's] conduct increased the risk that [plaintiffs] would be victimized" in the future, the Court should disregard that argument. *Folgelstrom*, 195 Cal. App. 4th at 993.

All in all, Plaintiffs cannot, as a matter of law, prove there was a highly offensive intrusion here. "However questionable the means employed to obtain plaintiff's [information,]" there must be evidence that the defendant actually "used" that information "for an offensive or improper purpose." *Id.* There is no dispute on this point: The only purpose of PowerSchool's data processing is for schools to meet their educational objectives. Plaintiffs' exclusive reliance on far-fetched hypothetical scenarios does not change that reality. For this reason alone, PowerSchool is entitled to summary judgment on Plaintiffs' invasion of privacy claims.

**D. There is no genuine dispute of material fact on Plaintiffs' unjust enrichment claim.**

For their unjust enrichment claim, Plaintiffs must prove they conferred a benefit on PowerSchool, which PowerSchool obtained through fraud or coercion. *Vizcarra v. Michaels Stores, Inc.*, 710 F. Supp. 3d 718, 732 (N.D. Cal. 2024); *Wall v. Wescom Cent. Credit Union*, 2024 WL 1158361, at *6 (C.D. Cal. Mar. 18, 2024). There is no dispute of material fact on either element.

Regarding the first element, Plaintiffs say (at 23) they are seeking PowerSchool's profits from certain products *not* because they paid for those products, but rather because the benefit Plaintiffs claim they conferred was their personal information. The problem is that Plaintiffs' unjust enrichment claim is limited to four products, and there is no evidence in the record that any data, from Plaintiffs or putative class members, went into these products. Courts have dismissed unjust enrichment claims at the motion-to-dismiss stage for failing to allege these facts. *See Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880, 900

---

[4] Plaintiffs also argue (Opp. 21) that PowerSchool products create "Cradle-to-Career" profiles about students. [redacted] Opp. Ex. B at 9. There is no reason to believe diminishing equity gaps has harmed anyone, if it is even occurring. Moreover, helping low-income families get earlier and more comprehensive resources is far from highly offensive.

(S.D. Cal. 2025) (dismissing unjust enrichment claim because "Plaintiff does not allege [defendant] sold her data or other facts supporting the assertion that Defendant was unjustly enriched by…collect[ing] her data."); *Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840, 847 (N.D. Cal. 2012) (dismissing claim because plaintiff "fails to allege that [defendant] ever received any of the personal information (or some other benefit from plaintiff's personal information) that was purportedly collected by a third-party."). Here, at the summary judgment stage, the burden is higher. Yet Plaintiffs cannot point to any evidence of what data (the purported benefit conferred) was put into any analytic product.

Nor is there any fact in dispute regarding the second element—whether PowerSchool processed data through fraud or coercion. Here, as with their invasion of privacy claim, Plaintiffs proffer brand-new arguments untethered to the evidence. Plaintiffs first claim (at 23) that PowerSchool develops new prediction products "once in possession of students' data." Plaintiffs cite no evidence for this point (which is unsurprising, because none exists). What the actual and undisputed evidence shows is that PowerSchool does not use student data to develop products. *See* Mot. 13 n.72 (citing Ex. 19, Ahmad Dep. 310:12–311:20; Ex. 7, Cirillo Dep. 318:8–22, Ex. 17, Maharana Dep. 291:14–292:13).

Plaintiffs next claim (at 24) that a jury could conclude that there is fraud here because PowerSchool facilitates data sharing and "does not test" certain products for "bias, fairness, or accuracy." The data sharing point is irrelevant because Plaintiffs' unjust enrichment claim is about four products that supposedly provide data analytics; they do not share data with anyone, and the claim has nothing to do with data sharing. *See* Ex. 50, Sharp Tr. at 30:21-31:6; 35:2-6; 123:5-10 ([redacted]).

Plaintiffs' argument about certain products not being tested fares no better. PowerSchool never advertised its products as being tested for racial bias and inaccuracy, so it is unclear why selling these products to schools—not students—would be a fraudulent act entitling students to these products' profits. Opp. 24. Plus, three of the four products have no predictive function and thus there is nothing to test. Mot. 21. Regardless, as explained above, testing could be done only by the schools who choose the metrics and data for any predictive analytic. *Id.*

Finally, in a last-ditch effort to manufacture fraud, Plaintiffs argue (at 24) for the first time that

"PowerSchool holds itself out as a regulatory school official under FERPA" even though "FERPA regulat[es] schools." Who exactly does PowerSchool "hold[] itself out" to and how was that unknown person or entity deceived? Plaintiffs do not say. Nonetheless, as Plaintiffs concede and as discussed above, it is the schools' decision to designate vendors as "school officials." And the undisputed evidence in the record is that schools do designate PowerSchool this way in their contracts. *See* Mot. 6 n. 31 (citing PowerSchool DPA (PWRSCHL_00161580) at §§ 6.2, 6.5, Dkt. No. 139-5; Seattle Pub. Schs. & PowerSchool Group LLC, Data Privacy Agreement (PWRSCHL_00162868) at 1, Dkt. No. 139-6).

There is not even a hint of fraud here and certainly no genuine dispute of material fact on the point. PowerSchool is thus entitled to summary judgment on Plaintiffs' unjust enrichment claim.

**E. There is no evidence that could support punitive damages.**

Plaintiffs' only response to the fact that there is no evidence to support a request for punitive damages is to recycle their unjust enrichment arguments. Plaintiffs say (at 24-25) that it was "despicable" or an intentional misrepresentation "for PowerSchool to misrepresent its status as a regulatory school official under FERPA," "expose [] student data to hackers," and charge for its products. These arguments all fail for the reasons explained above. It makes no sense to say that PowerSchool deceived anyone through the schools' choice to designate the company a "school official." There is also no evidence in the record that PowerSchool took any negligent action to "expose" the data to hackers.

Finally, the fact that PowerSchool is a for-profit company is irrelevant. Plaintiffs do not accuse PowerSchool of charging more than it should have or otherwise mishandling customer payments. Regardless, it is the schools that pay for these products because, as the Seattle Public School district testified, they find PowerSchool's software indispensable to their ability to function and meet their reporting requirements. *See* Mot. 16, n.81 (citing Ex. 18, Jaeger Dep. 12/18/2025 at 70:8–71:13; Ex. 2, Jaeger Dep. 12/5/2025 at 27:3–6, 29:21–30:8). Plaintiffs' continual refrain that PowerSchool charges for its software and therefore must be doing something wrong is not a material fact in dispute that can survive summary judgment. Like the other arguments discussed above, it is just an atmospheric point intended to manufacture gravity for otherwise meritless claims.

## CONCLUSION

Plaintiffs' consent theory fails as a matter of law, and there is no evidence that PowerSchool did

anything highly offensive or unjust. Rather, the undisputed evidence shows that PowerSchool contracts with schools to provide educational services, and PowerSchool does nothing beyond what those contracts request and require. The Court should therefore grant PowerSchool's motion for summary judgment on all of Plaintiffs' claims.

DATED: November 17, 2026

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Olivia Adendorff*
Olivia Adendorff, P.C.

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*