Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia H. Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EMILY CHERKIN, et al<br><br>Plaintiffs,<br><br>v.<br><br>POWERSCHOOL HOLDINGS, INC.,<br><br>Defendant. | CASE NO. 3:24-cv-02706-JD<br><br>**DEFENDANT POWERSCHOOL HOLDINGS, INC.'S REPLY IN SUPPORT OF MOTION TO EXCLUDE THE OPINIONS OF CATHERINE O'NEIL**<br><br>Judge: Hon. James Donato<br>Hearing Date: January 14, 2027<br>Time: 11:00 a.m.<br>Courtroom: 11, 19th Floor |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. ARGUMENT .......... 1

A. O'Neil's opinion that PowerSchool products require student data does not apply any expertise. .......... 1

B. O'Neil's algorithm opinion has no methodology. .......... 3

C. O'Neil's algorithm opinion does not fit the case and is an improper legal conclusion. .......... 5

III. CONCLUSION .......... 7

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960 (9th Cir. 2013) ....................3

*Bardin v. Nissan Motor Co.*, 2023 WL 6392743 (W.D. Ky. Sept. 29, 2023) ....................4

*Camenisch v. Umpqua Bank*, 763 F. Supp. 3d 871 (N.D. Cal. 2025) ....................7

*In re Coll. Athlete NIL Litig.*, 2023 WL 8372788 (N.D. Cal. Nov. 3, 2023) ....................4

*Corcoran v. CVS Health*, 2017 WL 1065135 (N.D. Cal. Mar. 21, 2017) ....................4

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995) ....................4

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ....................6

*Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025) ....................3

*In re Facebook*, 956 F.3d 589 (9th Cir. 2020) ....................6

*JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 605 F. Supp. 3d 1295 (N.D. Cal. 2022) ....................3

*MediaTek Inc. v. Freescale Semiconductor, Inc.*, 2014 WL 971765 (N.D. Cal. Mar. 5, 2014) ....................4

*Mighty Enters., Inc. v. She Hong Indus. Co.*, 745 F. App'x 706 (9th Cir. 2018) ....................3

*Montgomery v. Mitsubishi Motors Corp.*, 448 F. Supp. 2d 619 (E.D. Pa. 2006) ....................4

*OWLink Tech., Inc. v. Cypress Tech. Co.*, 2023 WL 4291486 (C.D. Cal. Feb. 16, 2023) ....................4

*Perez v. Rash Curtis & Assocs.*, 2019 WL 1491694 (N.D. Cal. Apr. 4, 2019) ....................4

*State Farm Gen. Ins. Co. v. Maytag Corp.*,
2005 WL 8177756 (N.D. Cal. Nov. 30, 2005) ............................................................5

*United States v. Seschillie*,
310 F.3d 1208 (9th Cir. 2002) ..................................................................................2

*Watts v. Allstate Indem. Co.*,
2013 WL 210059 (E.D. Cal. Jan. 17, 2013) .........................................................4, 5

*White v. Ford Motor Co.*,
312 F.3d 998 (9th Cir. 2002) ....................................................................................3

**Rules**

Fed. R. Civ. P. 30(b)(6)..............................................................................................7

Fed. R. Evid. 702 ...........................................................................................1, 3, 5, 6

## I. INTRODUCTION

Plaintiffs retained Catherine O'Neil as an "algorithmic auditor," but she audited nothing. She never examined a single PowerSchool algorithm, never spoke to a single school about its algorithm use, and, most critically, ***does not know of any way in which any class member was harmed*** by any algorithm (or otherwise). Plaintiffs' opposition does not dispute any of this. Instead, it asks the Court to treat the absence of connection to factual issues a jury should resolve as a mere "assumption" to be tested on cross-examination, and to treat a recitation of PowerSchool's own website as expert "verification." Rule 702 permits neither.

O'Neil's first opinion—that education-technology products built to process student data need student data to function—is common sense dressed up as expertise.

Her second opinion—that PowerSchool's algorithms carry some unquantified and unfounded risk of bias or inaccuracy and that PowerSchool "could and should" test them—rests on no methodology, ignores her own admission that any harm depends on how schools use the tools, and culminates in an impermissible legal conclusion about PowerSchool's duties. In O'Neil's own words, her opinion is just an "extremely general statement[] about algorithmic harm" that she "would say [] about any early warning system." Mot. Ex. A 125:21-22, 133:17-18, Dkt. 206-2 ("O'Neil Tr."). That is not expert testimony about the specific issues in this case, and the Court should therefore exclude her opinions entirely.

## II. ARGUMENT

### A. O'Neil's opinion that PowerSchool products require student data does not apply any expertise.

O'Neil first opines that the PowerSchool products at issue "would not function effectively without access to student data." Mot. Ex. B 3-4, Dkt. 206-3 ("O'Neil Rep."). That opinion draws on no algorithmic-auditing expertise; indeed, it requires none. It is also wholly untethered from the subject of her retention: the risks posed by algorithms that "predict, among other things, a student's chances of graduating." *Id.* 1; Opp. 4, Dkt. 229-3.

The explanation of this opinion in O'Neil's report confirms the point. More than 20 pages of her 30-page report simply describe PowerSchool products through screenshots of PowerSchool's

public website. O'Neil Rep. 2-25. Nowhere in those pages does she explain how PowerSchool uses "algorithms," much less identify any specific algorithm a school uses in connection with a PowerSchool product. Instead, she catalogs certain products' potential functionalities, and then declares that those products require student data. *See* Opp. 4. She repeats this statement verbatim for all of the products Plaintiffs identify in their motion for class certification.

This opinion—that education-technology products built to process and store student data need student data to function—is the equivalent of opining that Microsoft Word needs words to function. That is common sense, not expert testimony. *See United States v. Seschillie*, 310 F.3d 1208, 1212 (9th Cir. 2002) (affirming exclusion of expert opinion that was "a matter of 'common sense,'" "which anyone could figure out for herself"). It is also irrelevant to the issues in this case.

Plaintiffs' response is that O'Neil's "full" opinion is actually that each product "would not function without the student data set forth in the DPIA, and would have reduced functionality without the additional student data set forth on the product documentation page," which in turn "lays the foundation for" her opinion that "specific data is necessary for each product to function." Opp. 4, 6 (quoting O'Neil Rep. 7). This is circular. The premise and the conclusion are the same and the purported "necessity" of data for PowerSchool's products to function does nothing to advance Plaintiffs' claims of invasion of privacy or unjust enrichment.

Nor, contrary to Plaintiffs' portrayal, Opp. 6, does O'Neil perform any product-specific analysis. Rather, she recites the same sentence for all products at issue and never examines which data elements, if any, a given product actually uses. Restating the content of the DPIAs and PowerSchool's public website supplies no expertise. The jury can read those documents for itself.

Finally, O'Neil admitted at her deposition why this opinion feels out of place in her report. She testified that Christopher Schulte, Plaintiffs' damages expert, "gave [her] that opinion." O'Neil Tr. 135:12-16; 136:7-12. Plaintiffs try to salvage this admission by arguing that "[i]t is one thing for a layperson to suspect something is true, but quite another for an expert to verify it." Opp. 8. But O'Neil verified nothing. Her so-called "verification" consists of cutting and pasting screenshots of public websites and quoting from documents she admitted she did not fully understand. *See* O'Neil Tr. 45:2-25. That is not expert analysis.

Because O'Neil's opinion that certain PowerSchool products require student data rests on no expertise, it will not "help the trier of fact," Fed. R. Evid. 702(a), and it "ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion." *White v. Ford Motor Co.*, 312 F.3d 998, 1009 (9th Cir. 2002).

**B. O'Neil's algorithm opinion has no methodology.**

The threshold problem with O'Neil's opinion is that it provides nothing for the jury to weigh. Plaintiffs' defense of their algorithm expert's only algorithm opinion—that PowerSchool offers untested, ready-made algorithms concerning on-time graduation that could possibly result in racial bias or inaccuracy—rests on a mischaracterization of PowerSchool's argument. *See* Opp. 4, 10-12. Plaintiffs reimagine PowerSchool's challenge as an attack on O'Neil's assumptions, which they say is appropriately addressed through cross-examination. *Id.* 9-11. But PowerSchool does not contend that O'Neil applied a flawed methodology or built one on faulty assumptions. Rather, PowerSchool points out that O'Neil applied ***no methodology at all***. Put differently, her opinion is not a method resting on a baseless assumption; it is itself a speculative and baseless assumption.

Moreover, Plaintiffs' impeachment argument is precisely what the 2023 amendment to Rule 702 was adopted to foreclose: a party recasting the "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology" as "questions of weight and not admissibility." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025) (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment). The problem with this reframing is that a jury can decide credibility "only if the proposed testimony meets the thresholds of relevance and reliability." *Engilis*, 151 F.4th at 1050 (citation modified). "The district court cannot abdicate its role as gatekeeper, nor delegate that role to the jury." *Id.* (citation modified).

Plaintiffs' authorities do not hold otherwise. Each involved a challenge to *how* an expert applied a methodology, not to the absence of any methodology altogether. *See* Opp. 9-11 (citing *JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 605 F. Supp. 3d 1295, 1309 (N.D. Cal. 2022) (challenge to the way a damages expert quantified costs); *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (challenge to damages expert's lost profits calculation); *Mighty Enters., Inc. v. She Hong Indus. Co.*, 745 F. App'x 706, 709 (9th Cir. 2018) (challenge to damages expert's

lost profits calculation); *In re Coll. Athlete NIL Litig.*, 2023 WL 8372788, at *2 (N.D. Cal. Nov. 3, 2023) (challenge to the "estimated value of student-athletes'" games "as compared to the revenues Defendants make from broadcast contracts for those sports"); *OWLink Tech., Inc. v. Cypress Tech. Co.*, 2023 WL 4291486, at *2 (C.D. Cal. Feb. 16, 2023) (challenge to damages calculation); *Perez v. Rash Curtis & Assocs.*, 2019 WL 1491694, at *2 (N.D. Cal. Apr. 4, 2019) (challenge to expert's reliance on data in defendant's database "to determine which and how many phone numbers allegedly called by defendant were obtained using skip-tracing"); *MediaTek Inc. v. Freescale Semiconductor, Inc.*, 2014 WL 971765, at *2 (N.D. Cal. Mar. 5, 2014) (challenge to damages expert).

These cases ask whether an expert's inputs or calculations were sound; none permits an expert to skip the analysis completely. Where, as here, the expert applies no methodology at all, there is nothing to impeach. *See Corcoran v. CVS Health*, 2017 WL 1065135, at *12 (N.D. Cal. Mar. 21, 2017) (excluding opinions where expert "has not articulated any particular methodology upon which his opinion is based"); *Watts v. Allstate Indem. Co.*, 2013 WL 210059, at *10,12 (E.D. Cal. Jan. 17, 2013) (excluding class-certification expert who offered "no presentation of her methodology at all," leaving the court "only the expert['s] qualifications, [her] conclusions and [her] assurances of reliability" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995))).

Plaintiffs' argument that "[t]he proper place to contest an expert's purported failure to test is trial," Opp. 12, fails for the same reason. Plaintiffs' own testing cases prove the point: In each, the expert applied a recognized methodology to the product or event at issue. Only one involved no testing at all, and there the automotive expert in a fatal-crash design-defect case analyzed "the scene of the accident," "the vehicle involved in the accident," as well as a voluminous set of case documents and industry materials. *See Montgomery v. Mitsubishi Motors Corp.*, 448 F. Supp. 2d 619, 624-25 (E.D. Pa. 2006). On that record, the court concluded that his opinion was not "purely speculative or conjectural." *Id.* at 629. In the other two cases, the experts did perform testing. In *Bardin v. Nissan Motor Co.*, although a fire had destroyed much of the evidence, the experts relied on "numerous" case materials, applied "the primary accepted methodology for fire investigators," and conducted a "'demonstrative test.'" 2023 WL 6392743, at *5-6 (W.D. Ky. Sept. 29, 2023) (internal citation

omitted). And in *State Farm Gen. Ins. Co. v. Maytag Corp.*, the experts examined the fire scene and conducted "destructive testing." 2005 WL 8177756, at *2 (N.D. Cal. Nov. 30, 2005).

O'Neil did none of this. She never tested, audited, or otherwise assessed any predictive algorithm in any PowerSchool product. In fact, she has never even seen a PowerSchool product or predictive algorithm in such a product. Nor does she know of any specific use of a predictive algorithm in a PowerSchool product. O'Neil Tr. 62:7-14. Every "real-life" example of harm in her report has nothing to do with PowerSchool or its products. *Id.* at 91:3-18, 103:1-6. Generalized musings about algorithms are not a methodology—and without a methodology, there is nothing for the jury to weigh. *See Watts*, 2013 WL 210059, at *11 (excluding expert who relied on "generic information" and her experience but "d[id] not even describe her methodology").

### C. O'Neil's algorithm opinion does not fit the case and is an improper legal conclusion.

Perhaps most importantly, O'Neil's opinion is not based in the facts of the case. Plaintiffs try to excuse the absence of any case-specific foundation by faulting PowerSchool for not producing the data O'Neil says she would need to test an algorithm. Opp. 9, 12. That argument inverts the burden. As the proponents of O'Neil's testimony, Plaintiffs must establish its admissibility. Fed. R. Evid. 702. If they needed more data, it was their responsibility to obtain it—from public sources or in discovery.

More fundamentally, the information O'Neil says she would need for an algorithmic audit would come from schools, not PowerSchool. As she acknowledged, "all of the answers to these harm questions are going to depend on the usage. So I can't really talk about harms without stipulating a way it's being used because it's not harmful abstractly." O'Neil Tr. 89:7-12. And O'Neil cannot know how predictive algorithms are used without knowing how schools—their teachers and administrators—use them. *See id.* at 90:5-91:18, 94:10-95:13; Ex. C, O'Neil Tr. 98:8-12; *see also* O'Neil Tr. at 94:18-95:8 (testing requires knowing "[h]ow the school is using" the algorithm). Plaintiffs could have sought this information from schools through third-party subpoenas or public-records requests. They chose not to. *See Watts,* 2013 WL 210059, at *11-12 (excluding insufficiently supported expert opinion despite difficulty of obtaining testing data).

Nor is O'Neil's opinion tied to PowerSchool's products or to these Plaintiffs. She does not know who the Plaintiffs are, where they attend school, what PowerSchool products their schools use, or whether their schools used any predictive algorithm concerning them. O'Neil Tr. 64:1-7, 64:24-65:15. She asked Plaintiffs' counsel for "actual use cases" of predictive algorithms in any PowerSchool product, and they had none to provide. *Id.* at 62:7-14. Stripped of any connection to PowerSchool's products or to Plaintiffs, O'Neil's opinion reduces to speculation that some unquantified risk may befall someone, somewhere. Rule 702 does not admit that kind of unsubstantiated guesswork. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590 (1993) ("[T]he word 'knowledge' [in Rule 702] connotes more than subjective belief or unsupported speculation.") (internal citation omitted).

Second, O'Neil's opinion is not just untethered from the facts; it also does not fit the claims of the case. Plaintiffs contend her opinion "relates to the issues of whether PowerSchool's conduct was highly offensive for the purposes of proving Plaintiffs' privacy claims, and whether PowerSchool's conduct was unfair or unjust for the purposes of proving Plaintiffs' quasi-contract claim." Opp. 2. It does neither and would thus confuse the jury. As Plaintiffs concede, "[w]hether an alleged invasion is 'highly offensive' . . . requires 'holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive.'" Opp. 3 (quoting *In re Facebook*, 956 F.3d 589, 606 (9th Cir. 2020)). O'Neil's opinion does not relate to "the degree and setting of the [alleged] intrusion," PowerSchool's "motives and objectives," or "countervailing interests." *Id.* The one factor it touches—the likelihood of serious harm—is addressed only through speculation. O'Neil admitted that she "can't actually assess [the risk]" beyond estimating that it is "larger than zero." O'Neil Tr. 130:20-24. She is also "not claiming there has been harm or there will be harm." *Id.* at 87:5-6. And she could not say "[w]hat harms . . . would result from an algorithm being inaccurate," because the answer would "depend on usage" and "it's not harmful abstractly." *Id.* at 89:4-12, 132:18-22. When asked to confirm that she failed to conduct any "specific analysis of the likelihood of" any of the risks she identifies in her report materializing, O'Neil responded: "That's fair." *Id.* at 130:7-24.

Finally, O'Neil's opinion "that PowerSchool *could* . . . conduct bias and accuracy testing" rests on pure speculation, and her opinion "that PowerSchool . . . *should* conduct bias and accuracy testing" presents an inadmissible legal conclusion. Opp. 11. As to feasibility (the "could"), Plaintiffs claim that O'Neil's seven-step process is simply a "non-exhaustive" menu of tests. *Id.* But this relabeling changes nothing. Every option O'Neil offers still depends on school-level data, including "10,000 or more data points" and written descriptions of individual students' behavior. O'Neil Tr. 130:25-132:4; O'Neil Rep. 29-30. O'Neil's only support for the claim that such testing would be "relatively easy and inexpensive" is her own say-so. *Id.*30. Plaintiffs' reliance on Darron Flagg's Rule 30(b)(6) testimony that PowerSchool "could" validate its risk models, Opp. 12, does not help them either. That testimony needs no expert gloss; the jury can hear it directly. And it says nothing about O'Neil's claim that testing would be "easy" or "inexpensive." *Id*.

As to obligation, O'Neil's opinion that PowerSchool "should" test its algorithms is an improper legal conclusion. Plaintiffs ask the Court to look past the word "should" and treat the opinion as merely "aim[ing] to show these tests are *feasible*," which in turn "informs the highly-offensive element of the privacy claims." Opp. 13. But feasibility is relevant only if PowerSchool was obligated to test in the first place—the very legal duty Plaintiffs enlist O'Neil to establish. An expert may testify about industry practice or standards; she may not opine on a party's legal obligations. *See Camenisch v. Umpqua Bank*, 763 F. Supp. 3d 871, 883-84 (N.D. Cal. 2025) (permitting expert to testify about industry standards but not about whether [defendant] "had a duty under California law to monitor its accounts"). Here, O'Neil identifies no industry standard. Instead, she jumps straight to PowerSchool's supposed duty. Plaintiffs' offer to strike the word "should," Opp. 13, confirms the problem rather than curing it. Without that word, the testing opinion is irrelevant and has no bearing on any element of Plaintiffs' claims.

## III. CONCLUSION

For these reasons, the Court should grant PowerSchool's Motion in full and exclude all opinions offered by O'Neil.

DATED: November 17, 2026

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Olivia Adendorff*

Olivia Adendorff, P.C.

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400

Martin L. Roth, P.C. (*pro hac vice*)
Alyssa C. Kalisky, P.C. (*pro hac vice*)
Amelia Bailey (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
martin.roth@kirkland.com
alyssa.kalisky@kirkland.com
amelia.bailey@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
Cristina Martinez Squiers (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 972-1770
olivia.adendorff@kirkland.com
cristina.squiers@kirkland.com
eugene.temchenko@kirkland.com

*Attorneys for Defendant PowerSchool Holdings, Inc.*